case No. A05-086 Civil

Bobbi Wade

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF ALASKA

3

4    BOBBI WADE,

5              Plaintiff,

6         vs.

7    ILISAGVIK COLLEGE, NORTH SLOPE

     BOROUGH, JOHN TUTHILL, Individually,

8    and PAMELA TAYLOR, Individually,

9              Defendants.

     _____/

10   Case No. A05-086 CV (TMB)

11

12              *   *   *   *   *   *   *   *   *   *

13

                   DEPOSITION OF BOBBI WADE

14                      Volume 1

                 Pages 1 - 283 (inclusive)

15

                      May 1, 2006

16                     9:19 a.m.

17

          Taken by the Defendants, Ilisagvik College,

18            John Tuthill and Pamela Taylor

                        at

19   Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc.

              1007 West 3rd Avenue, Suite 400

20                Anchorage, Alaska 99501

21

22

23

     Reported by:

24   Caren S. Carlson, RPR

25

COPY

EXHIBIT

Page ___ of ___

case No. A05-086 Civil

Bobbi Wade



Page 2

1    A P P E A R A N C E S:
2
     For Plaintiff:
3
     MS. LINDA J. JOHNSON
4    Clapp, Peterson, Van Flein, Tiemessen,
        Thorsness, LLC
5    711 H Street, Suite 620
     Anchorage, Alaska 99501-3454
6    (907) 272-9272
7    For Defendants Ilisagvik College, John Tuthill
     and Pamela Taylor:
8
     MS. CYNTHIA L. DUCEY
9    MR. JONATHAN CLEMENT
     Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc.
10   1007 West 3rd Avenue, Suite 400
     Anchorage, Alaska 99501-1990
11   (907) 279-3581
12   For Defendant North Slope Borough:
13   MR. PETER C. GAMACHE
     Attorney at Law
14   405 West 36th Avenue, Suite 201
     Anchorage, Alaska 99503
15   (907) 563-6969
16   Also Present:
17   Eric R. Cossman, Alaska Legal Video
18   Taken by:
19   Caren S. Carlson, RPR
20
21      BE IT KNOWN that the aforementioned deposition
22   was taken at the time and place duly noted on the title
23   page, before Caren S. Carlson, Registered Professional
24   Reporter and Notary Public within and for the State of
25   Alaska.

Page 3

1      THE VIDEOGRAPHER:  We're on the record at
2  9:19. This is the video deposition of Bobbi Wade taken
3  by the Defendants Ilisagvik College, John Tuthill and
4  Pamela Taylor in the matter of Wade versus Ilisagvik
5  College, et al., Case Number A05-086 CV (TMB) in the
6  United States District Court for the District of Alaska.
7      This deposition is being held in the offices of
8  Delaney Wiles, Inc., located at 1007 West 3rd Avenue,
9  Suite 400, Anchorage, Alaska, on May 1st, 2006.
10     My name is Eric Cossman from Alaska Legal Video,
11  mailing address 645 G Street, Number 892, Anchorage,
12  Alaska, 99501. The court reporter is Caren Carlson from
13  the firm of Midnight Sun Court Reporters.
14     Will counsel and all present please identify
15  themselves for the record?
16     MS. JOHNSON:  Linda Johnson from Clapp Peterson
17  for Bobbi Wade, the Plaintiff.
18     MS. DUCEY:  Cynthia Ducey for Ilisagvik, Liz
19  [sic] Taylor and Dr. Tuthill.
20     MR. CLEMENT:  Jonathan Clement for Defendants
21  with Delaney Wiles.
22     MR. GAMACHE:  And Peter Gamache for Defendant
23  North Slope Borough.
24     THE VIDEOGRAPHER:  Will the reporter please
25  swear in the witness.

Page 4

1     (Whereupon, the witness was sworn in
2      and testified under oath as follows:)
3     MS. DUCEY:  And I think we've decided just for
4  purposes of stipulation that we're going to have a master
5  set of exhibits that those will travel with us to the
6  depositions.  If there's no objection, I already have an
7  empty box and I'll take that responsibility on if you
8  will permit me to ta- -- to withdraw the exhibits and
9  take them with me.  I'll make sure they get to Barrow and
10  I might hand them off to you in Barrow, Linda.
11     MS. JOHNSON:  Sure.
12     MS. DUCEY:  So -- okay.
13     MS. GAMACHE:  Very good.
14          * * * * * * * * * *
15          EXAMINATION
16  BY MS. DUCEY:
17     Q. All right. Ms. Wade, what's your current
18  address?
19     A.
20
21     Q. And what is the physical address?
22     A.                                      Unalaska,
23     T
24     Q. And how long have you resided there?
25     A. Since March of 2005, but I've owned the property

Page 5

1  since June of 2001.
2     Q. And did you build a house on the property?
3     A. No.  There was an existing building there, but I
4  have pulled a travel trailer onto it.
5     Q. Okay.  And with whom do you currently reside?
6     A. Here in Anchorage?
7     Q. In Unalaska.
8     A. In Unalaska, by myself.
9     Q. And do you maintain a residence anywhere else
10  besides the residence at Wapiti Street?
11     A. No.  I have places I stayed, but not as my
12  residence.
13     Q. Okay.  I'm sure that Ms. Johnson explained that
14  if you don't understand a question I ask, please let me
15  know and I'll try and rephrase it.  The rules say that if
16  there's a question that's been posed but not answered,
17  unless it would involve a privilege that you wanted to
18  discuss with Ms. Johnson you should answer the question.
19  And if you would like a break for any reason, just let me
20  know and we'll take one and -- and I'll try and take
21  frequent breaks today --
22     A. Sure
23     Q. -- okay?
24     A. I understand.
25     Q. Are you taking any medication that would affect

2 (Pages 2 to 5)

EXHIBIT
Page 2 of 5

case No. A05-086 Civil                                                    Bobbi Wade

Page 6

1  your ability to answer questions?
2     A. No.
3     Q. And did you review any documents to prepare for
4  the deposition?
5     A. Only the documents that I have had for the last
6  two years.
7     Q. And what are those?
8     A. The grievance.
9     Q. And anything else that you reviewed?
10    A. I reviewed the questions from John Tuthill's
11 response to my grievance.
12    Q. Uh-huh. Okay. Anything else that you reviewed?
13    A. I reviewed Cynthia Ducey's deposition.
14    Q. You mean Cheryl McKay?
15    A. Cheryl McKay, I'm sorry.
16    Q. It's all right.
17    A. You're Cynthia Ducey. Yes.
18    Q. If you haven't met us, you know, we're
19 probably --
20    A. Yes.
21    Q. All right. And besides talking with Ms. Johnson
22 and anyone with her staff, did you speak to anybody else
23 to prepare for the deposition?
24    A. No.
25    Q. Are you currently employed?

Page 7

1     A. Partially.
2     Q. And where are you employed?
3     A. With Unalaska Independent School District as a
4  substitute teacher.
5     Q. And how long have you been working as a
6  substitute?
7     A. Since January of 2006.
8     Q. And what is the rate of pay for substitute
9  teachers?
10    A. $65 per day.
11    Q. Do you have any other sources of income?
12    A. I have Social Security and I have a small
13 retirement from the state of Florida and I have a small
14 annuity that I receive once a year from TIAFF and CREFF,
15 TIAFF and from the state of Tennessee.
16    Q. Do you recall how much your Social Security is
17 per month?
18    A. My check net when I receive it is $867, but
19 that's after Medicare insurance has been taken out, which
20 is approximately 100 and probably 20 something dollars.
21    Q. Okay. And how about your retirement from
22 Florida, how much is that?
23    A. It's $303.92 per month.
24    Q. And the annuity from Tennessee?
25    A. It's approximately $265 that I receive every

Page 8

1  October --
2     Q. Okay.
3     A. -- once, that's annually. That's not monthly.
4     Q. Okay. And to whom do you report at the Unalaska
5  School District?
6     A. To Ruth Underwood.
7     Q. And what is her job title?
8     A. I really don't know what her job title --
9     Q. Okay.
10    A. The only thing is she gave me the application to
11 fill out and -- and approved me and everything.
12    Q. Okay. Is she related to you by birth or
13 marriage?
14    A. No. She was a total stranger.
15    Q. And how often have you been working as a
16 substitute teacher since January?
17    A. That's all. Oh, you mean how many days?
18    Q. Yeah, approximately.
19    A. I've worked approximately five or six days.
20 It's very sparse.
21    Q. And is there a grade level that you've been
22 substituting?
23    A. In high school.
24    Q. A particular subject?
25    A. No. When you're a substitute, you go for

Page 9

1  anything, any class where you're needed.
2     Q. Okay. Before -- I want to take you back.
3  Before you lived in Unalaska, where did you live?
4     A. I lived in Nashville, Tennessee.
5     Q. And when did you live in Nashville?
6     A. In that particular house?
7     Q. Yes.
8     A. Let's see, we rented that house April the 1st of
9  2004 and it was my granddaughter and myself.
10    Q. Uh-huh. What is your granddaughter's name?
11    A. Her name is Amy L. Conyer.
12    Q. So you lived -- you began residing there April
13 1st and you lived there until when?
14    A. Until March of 2005 and that's when I moved to
15 Unalaska.
16    Q. Okay. Do you remember what the address was at
17 that Nashville residence?
18    A. Not right off I don't because I rented a post
19 office box and I didn't use the address.
20    Q. Okay. What street was it on?
21    A. I don't recall right off.
22    Q. Were you working at that time when you lived in
23 --
24    A. No.
25    Q. -- Nashville?

EXHIBIT  3 (Pages 6 to 9)

Page 3 of

case No. A05-086 Civil

Bobbi Wade

Page 10

1    A. I prepared to work at that time.
2    Q. Uh-huh. How did you prepare to work?
3    A. I went to classes and took classes to get a
4 Tennessee insurance license.
5    Q. Did you obtain a Tennessee license?
6    A. Yes, I did.
7    Q. When did you obtain a license?
8    A. In February of 2005.
9    Q. And what was the course of study? How long for
10 the insurance?
11    A. It was a week long and it was to go over the
12 rules of the insurance, state insurance rules and
13 regulations.
14    Q. Okay. And then you took the test?
15    A. And then I took the test to get a license.
16    Q. Did you pass it?
17    A. Yes, I did.
18    Q. The first time?
19    A. The first time.
20    Q. And were you employed in Tennessee to sell
21 insurance?
22    A. Yes, I was.
23    Q. Where were you employed?
24    A. With Mutual of Omaha Insurance Company.
25    Q. For what period of time?

Page 11

1    A. Until I left and moved to Texas the 1st of
2 March. I only worked there just for a short period of
3 time --
4    Q. Uh-huh.
5    A. -- just for a few weeks.
6    Q. Were you an employee?
7    A. No.
8    Q. What was your status?
9    A. I was a licensed sales representative. We were
10 not considered employees.
11    Q. Okay. And why did you stop working for Mutual
12 of Omaha?
13    A. Because I did not have the funds to continue to
14 live in the city of Nashville so I moved to my place in
15 Texas where it would be less expensive.
16    Q. And did you obtain a license to sell insurance
17 in Texas?
18    A. No, I didn't.
19    Q. Why not?
20    A. Because I live in a very rural area and I'm
21 unfamiliar with the area and it takes an urban setting to
22 be successful in selling insurance.
23    Q. For the time period that you worked for Mutual
24 of Omaha, did you sell any products?
25    A. I sold one, one policy.

Page 12

1    Q. What sort of a policy?
2    A. It was a life policy.
3    Q. A term life?
4    A. No, it wasn't.
5    Q. Whole life?
6    A. It was whole life.
7    Q. And are you getting a commission on that?
8    A. No.
9    Q. Do you know why?
10    A. No, I don't.
11    Q. Who did you --
12    A. I received one small check from -- and that's
13 all I received. It was like maybe $45 or something like
14 that.
15    Q. Okay. What else did you do while you were in
16 Nashville besides take the week-long course and take the
17 test and then work for a few weeks?
18    A. I mostly stayed at home and I went to see a
19 doctor about my foot problem, consulted a doctor that I
20 hadn't seen before.
21    Q. Who was that?
22    A. Dr. Head.
23    Q. Sorry?
24    A. Dr. Head.
25    Q. H-E --

Page 13

1    A. H-E-A-D, yes.
2    Q. Is he a podiatrist?
3    A. Yes.
4    Q. And he's in Nashville?
5    A. Yes.
6    Q. What sort of problem were you having with your
7 foot?
8    A. I've been diagnosed as having a metatarsal
9 neuroma in the bottom of my foot. It's a tumor on the
10 nerve.
11    Q. Did you have any surgery?
12    A. Not yet.
13    Q. So for how many months were you staying at home
14 and not working when you lived in Nashville?
15    A. From the -- I would say from the 1st of October
16 until the 1st of January.
17    Q. So you rented and resided in the house in
18 Nashville from January 1st, '04 through March '05?
19    A. Yes. No, through -- through February of '05.
20 Not March. Just January and February.
21    Q. Okay. And where did you live before Nashville?
22    A. I lived in Barrow, Alaska.
23    Q. How long did you live in Barrow?
24    A. I lived in Barrow from approximately August the
25 15th of 2000 until approximately September the 30th of

4 (Pages 10 to 13)

Page 14

1  2004.
2      Q. Okay. And what was the physical residence at
3  Barrow? Where did you live?
4      A. I lived in the senior center and I believe it
5  was 5254 North Star.
6      Q. I'm not familiar with the senior center. Do you
7  rent a room or an apartment?
8      A. I rented an apartment.
9      Q. Okay. And you were working in Barrow?
10     A. Yes.
11     Q. And where were you working?
12     A. I was working at Ilisagvik College.
13     Q. Okay. I'll come back to that in a minute.
14     A. Okay.
15     Q. Before you lived in Barrow, where did you live?
16     A. I lived in Anchorage.
17     Q. And for what period of time did you live in
18  Anchorage?
19     A. I've lived in Anchorage off and on since 1981,
20  since January of 1981.
21     Q. Okay. And when you say "off and on," where else
22  have you lived during that time period? I know you said
23  Barrow.
24     A. Uh-huh. I went home and lived with my mom for a
25  short period of time in Alabama, Ozark, Alabama, and

Page 15

1  so -- yes.
2      Q. Okay. Is that the only break that you had in
3  your residence in Alaska?
4      A. No. Let's see. Let me recall. I don't recall
5  what the next break was. I would have to give that some
6  thought.
7      Q. When you lived in Nashville with your
8  granddaughter in '04 and '05, did you establish residency
9  there?
10     A. Yes, I did.
11     Q. When did you establish residency?
12     A. In September, when I returned to Nashville.
13     Q. Uh-huh. When you rented the apartment with your
14  granddaughter, from what states, if any, did you have a
15  driver's license?
16     A. Alaska and Tennessee because at one time when I
17  was in Tennessee my Alaska license expired and I had to
18  get them renewed to fly back to get identification.
19     Q. All right.
20     THE REPORTER: I'm sorry, fly back to get?
21     THE WITNESS: What?
22     THE REPORTER: Fly back to get?
23     THE WITNESS: I had to get a Tennessee license
24  in order to fly back to Alaska to my job because the
25  air -- you have to have an active ID to board a plane and

Page 16

1  I didn't have any choice. It wasn't that I wanted to
2  give up my Alaska license but I didn't have a choice.
3      Q. (By Ms. Ducey) In 2004, where were you
4  registered to vote?
5      A. In Barrow, Alaska.
6      Q. And in 2004, did you obtain a Permanent Fund
7  Dividend?
8      A. No.
9      Q. In 2005, did you obtain a Permanent Fund?
10     A. Let's see. I'm sorry, let me back up. I think
11  I did get one in 2004, but not in 2005.
12     Q. What brought you to Anchorage in 1981?
13     A. A divorce from my husband whom I've been married
14  to for a long, long time, many years and he was my
15  supervisor, so I left the area to go to a new area. I
16  had a lot of family who lived here so I moved to
17  Anchorage.
18     Q. And what was your husband's name?
19     A. Homer T. Underwood.
20     Q. Where -- did you obtain a divorce from him?
21     A. Yes, I did.
22     Q. What state did you obtain a divorce?
23     A. Alaska.
24     Q. In Anchorage?
25     A. Yes.

Page 17

1      Q. Did you have an attorney represent you?
2      A. Yes, I did.
3      Q. Do you remember who that was?
4      A. John Hellenthal, I think his name was --
5      Q. Uh-huh.
6      A. -- I'm not sure. It was Heckenthal or
7  Hellenthal or something like that.
8      Q. Uh-huh. Did you reside with Mr. Underwood here
9  in Anchorage?
10     A. No.
11     Q. Where did Mr. Underwood reside at the time of
12  your divorce?
13     A. In Graceville, Florida.
14     Q. And what was the year of your marriage?
15     A. 1951. December 23rd, 1951.
16     Q. You got married the day before my mother did.
17  Do you have children born of the marriage?
18     A. Yes, I do.
19     Q. And can you tell me their names and ages?
20     A. Homer T. Underwood, Jr., which is called Toby
21  from the "T." He's 52. He was born November the 9th of
22  1953.
23     Q. Okay. Any other children?
24     A. Steve Underwood. Steven Lee Underwood. He was
25  born December the 25th of 1958.

case No. A05-086 Civil

Bobbi Wade

---

Page 18

1    Q. So when you -- I'm jumping a little bit here
2  just to sort of cut to the chase. For the duration of
3  your marriage, did you live in Graceville, Florida?
4    A. Oh, let's see, we moved to Graceville, Florida,
5  I believe, in 1954 or '56 --
6    Q. Okay.
7    A. -- it was somewhere along there. For the most
8  of the years I lived in Graceville, Florida --
9    Q. Okay.
10   A. -- Jackson County, Florida.
11   Q. Uh-huh. And you said he was your supervisor.
12 What did he do?
13   A. He was on the superintendent's staff of the
14 Jackson County school board.
15   Q. And when you say that you had family here,
16 who -- who was living here that was your family?
17   A. My brother.
18   Q. And what is his name?
19   A. Robert L. Whatley, Jr., deceased.
20   Q. Any other family that you had living here?
21   A. Nieces and nephews from Robert Whatley's family.
22   Q. Is Mr. Underwood still living?
23   A. Yes.
24   Q. Does he reside in Graceville?
25   A. Yes.

---

Page 19

1    Q. When you lived in Anchorage, what sort of work
2  did you do?
3    A. For several years I -- I substituted for the
4  Anchorage School District.
5    Q. And then what?
6    A. I worked for one year at Prudhoe Bay for the
7  Alaska Welding Center and Quality Control.
8    Q. Uh-huh. What else did you do in Anchorage?
9    A. I went to work for an insurance company here
10 when I couldn't get a regular teacher's job.
11   Q. When were you trying to get a regular teacher's
12 job?
13   A. When I arrived in 1981, that's the first thing I
14 did was go down to the Anchorage School District and fill
15 out an application.
16   Q. Uh-huh.
17   A. At that time they were retiring the older
18 teachers and not hiring older teachers.
19   Q. And what insurance company did you work for?
20   A. Mutual of Omaha.
21   Q. Were you already licensed --
22   A. No.
23   Q. -- to sell insurance?
24   A. I had to become licensed and that was my first
25 insurance license was in the state of Alaska. I decided

---

Page 20

1  I would go into some other --
2    Q. Okay. And do you remember when you became
3  licensed?
4    A. In 1983.
5    Q. And how long did you work for Mutual of Omaha?
6    A. Until December of 1984.
7    Q. And why did you leave Mutual of Omaha?
8    A. Because I was involved in an automobile accident
9  and I was injured badly and I went home for Christmas to
10 visit my mother and my dad -- no, my dad was not living
11 at that time -- to visit my mother.
12   Q. Okay. And then did you come back after
13 Christmas?
14   A. No. I met a man and got married while I was
15 there, a family friend.
16   Q. The motor vehicle accident, was there anyone
17 cited in that accident, if you recall?
18   A. As far as who was responsible?
19   Q. Yes.
20   A. I was.
21   Q. Do you recall what you were cited for?
22   A. Failing to yield the right-of-way.
23   Q. Was the other person injured?
24   A. No. I -- I don't know.
25   Q. Do you recall what the nature of your injuries

---

Page 21

1  were?
2    A. A concussion to the head and a twisted --
3  severely twisted ankle, left ankle.
4    Q. Did you lose consciousness?
5    A. Yes.
6    Q. Do you know for how long?
7    A. I regained consciousness in the Providence
8  Hospital.
9    Q. And were you hospitalized overnight?
10   A. Yes.
11   Q. Do you know how many nights?
12   A. I believe it was just for one, just for
13 observation.
14   Q. Uh-huh.
15   A. I don't recall.
16   Q. Do you remember if you had a skull fracture?
17   A. No. I -- I had a skull injury.
18   Q. Uh-huh. Right. Did you have any facial
19 fractures?
20   A. It was in my face and my forehead.
21   Q. Do you remember if you were told whether you had
22 a fracture?
23   A. I don't recall what I was told.
24   Q. Okay. Was there any claim made against you or
25 your insurance company as a result of the motor vehicle

---

6 (Pages 18 to 21)

EXHIBIT 5
Page 6 of 65

case No. A05-086 Civil

Bobbi Wade

Page 22

1  accident?
2      A. Not that I know of. I don't recall any.
3      Q. And what name were you using at the time you
4  were in this accident?
5      A. I was Underwood. Bobbi J. Underwood.
6      Q. And do you recall if the police or the state
7  troopers responded?
8      A. Yes, they did.
9      Q. Was it the police or the troopers?
10     A. I don't know. It was outside the city limits so
11  it was probably the troopers. I don't know.
12     Q. Did you sell any insurance when you worked in
13  Anchorage?
14     A. Yes. I was very productive.
15     Q. Can you give me an idea of your productivity?
16     A. I was always above the company quota to get the
17  bonuses that I could have earned in getting the quotas
18  and obtaining the quotas. That's all I remember.
19     Q. And how were you compensated as a salesperson?
20     A. Through paychecks.
21     Q. To be more precise, were you paid a salary?
22     A. No. There were certain bonuses from each sale
23  that I made.
24     Q. What sort of products were you selling?
25     A. Health insurance and life insurance.

Page 23

1      Q. And to whom were you reporting?
2      A. To the office manager and I can't recall his
3  name. His first name was Jack is the only -- I can't
4  remember his last name.
5      Q. Okay. When did you come back to Anchorage after
6  you went home to visit your parents for Christmas?
7      A. I came back in 1990.
8      Q. So you were gone for six years?
9      A. Yes.
10     Q. And where were you living during that period of
11  time?
12     A. I was living in various places with a man that I
13  had married.
14     Q. Uh-huh. And what was his name?
15     A. His name was Gary D. Webb, W-E-B-B.
16     Q. So where did you live?
17     A. I lived in Kansas City, Missouri, which is --
18  was the town he was from and I worked there as a
19  substitute school teacher and then he -- his job took
20  him -- he was in construction. His job took him to
21  California so I lived in Palm Springs, California, for
22  several months. And then he was -- his job took him to
23  New Haven, Connecticut. I went with him to New Haven and
24  I lived there a few months and....
25     Q. And then where did you go?

Page 24

1      A. I left him and went back to Nashville,
2  Tennessee, where my son lives, Steve Underwood.
3      Q. Did you reside with your son?
4      A. Yes, for a short period of time.
5      Q. So what year was it when you came back to
6  Nashville?
7      A. It was like 1987. Right at the end of the year,
8  1990 --
9      Q. Did you obtain a divorce from Mr. Webb?
10     A. Yes, I did.
11     Q. What state did you obtain a divorce in?
12     A. In Alabama, because I left Tennessee and went to
13  live -- down to Alabama to live with my mother.
14     Q. Is that in Ozark?
15     A. Yes.
16     Q. Did you have an attorney represent you?
17     A. For the divorce, yes, I did, but I don't recall
18  the attorney's name.
19     Q. Okay. Did you have any children born of that
20  marriage?
21     A. No.
22     Q. Do you know where Mr. Webb currently resides?
23     A. I have no idea, no.
24     Q. Does he work for a big national construction
25  company?

Page 25

1      A. He did, but I don't recall the name of the
2  company.
3      Q. Do you know what his position was in the
4  construction field?
5      A. He was a finishing carpenter and he usually had
6  the manager's job of finishing, doing the finish work on
7  the inside of a building. He predominantly finished a --
8  remodeled -- he was supervisor of remodeling the
9  Marshalls stores.
10     Q. Did you work when you lived in either Palm
11  Springs or New Haven?
12     A. I didn't work in Palm Springs but I applied for
13  jobs.
14     Q. Where did you apply?
15     A. I applied with the school district that was in
16  driving distance of Palm Springs and I don't recall the
17  name of the school district.
18     Q. And how about in New Haven?
19     A. I was only there for a short time, but I
20  inquired at the -- with the school district about the
21  opportunities of working there. Everywhere I went, I
22  inquired and applied for teaching jobs.
23     Q. Okay. So 1990 you're back in Anchorage and what
24  did you do when you came back?
25     A. I applied for jobs.

case No. A05-086 Civil

Bobbi Wade

Page 26

1    Q. And where did you apply?
2    A. I applied at the Anchorage School District.
3    Q. What positions did you apply for?
4    A. Teaching English jobs and had -- I had several
5  interviews but I was not hired.
6    Q. So what else did you do after you came back in
7  1990?
8    A. I applied for a job that I saw was listed in the
9  newspaper in Barrow.
10    Q. And what was the job?
11    A. It was a manager of a hotel.
12    Q. And did you obtain that position?
13    A. Yes, I did.
14    Q. And which hotel was it?
15    A. It was the Arctic Hotel.
16    Q. And for what period of time did you work there?
17    A. I worked there for approximately a year.
18    Q. What was your rate of pay?
19    A. It was $10 per hour. Also, I obtained -- I did
20  part-time work at another facility there. I held down
21  two jobs while I was there.
22    Q. Uh-huh. Do you remember what the other facility
23  was?
24    A. Yes, I do.
25    Q. What was the name of that?

Page 27

1    A. Ilisagvik College.
2    Q. Okay. What were you doing at Ilisagvik?
3    A. Adjunct instructor of business courses.
4    Q. And why did you leave the job at Arctic Hotel?
5    A. The rate of pay was not sufficient and I
6  obtained another job with the North Slope Borough.
7    Q. When you were the manager of the Arctic Hotel,
8  who was your supervisor?
9    A. Noit Kontedong.
10    Q. Could you repeat that?
11    A. Noit, N-O-I-T. That's not his official name but
12  that's the name he was called.
13    Q. Right.
14    A. And his last name was Kontedong. He was from
15  Taiwan.
16    Q. Okay. So at the North Slope Borough, what did
17  you do?
18    A. I went to work for the SATC, the Substance Abuse
19  Treatment Center.
20    Q. And what did you do for them?
21    A. I was a -- I was -- I went into training to be a
22  SATC counselor.
23    Q. Uh-huh. Did you complete that training?
24    A. No, I didn't.
25    Q. Why not?

Page 28

1    A. Because it was not in my field of interest, I
2  discovered, after I went to work with them and I just did
3  not have the interest to go into the field of study that
4  would have been required of me to do.
5    Q. Okay. How long did you work at the Substance
6  Abuse Center?
7    A. Probably about six weeks.
8    Q. Okay. And what else do you do while you were
9  in Barrow?
10    A. That was all.
11    Q. Okay. Then where did you go from there?
12    A. I left Barrow and came back to Anchorage.
13  Rented an apartment.
14    Q. What year was that?
15    A. It was 19- -- the latter part of 1993. I'm
16  sorry, I -- I think it was 1994.
17    Q. Okay. And did you look for work?
18    A. Yes, I did.
19    Q. Where did you look for work?
20    A. Anchorage School District.
21    Q. What sort of jobs did you apply for?
22    A. Teaching jobs.
23    Q. Any particular kind of teaching jobs?
24    A. English and Art. I applied for -- I have a
25  degree in English and Art.

Page 29

1    Q. Okay. And did you obtain employment with the
2  school district?
3    A. No, I didn't.
4    Q. So what did you do then?
5    A. I enrolled at the University of Alaska to obtain
6  a -- to gain certification in supervision and
7  administration.
8    Q. And did you obtain the certificate?
9    A. Yes, I did.
10    Q. What sort of certificate did you obtain?
11    A. A principal certificate in the state of Alaska,
12  grades K through 12.
13    Q. And when did you obtain that?
14    A. I believe it was in 1995.
15    Q. Okay. And --
16    A. Could have been '96.
17    Q. Uh-huh.
18    A. I don't recall the exact.
19    Q. And did you become employed as a principal?
20    A. No, I didn't. I applied. I had interviews, but
21  no employment. They had a policy that you had to be a
22  teacher in order to move into a principal's position.
23    Q. Did you know that before you started the
24  certificate?
25    A. No.

EXHIBIT
Page ___ of ___

case No. A05-086 Civil

Bobbi Wade

Page 30

1    Q. How long did it take to obtain the certificate?
2    A. It took from 1994 to -- let's see, I believe I
3  began in the fall of 1994 and it was in the -- at the end
4  of the summer session in 1995, I believe, are the correct
5  dates. I'm not positive about the dates. It could have
6  been '96. I would have to look at records --
7    Q. Uh-huh.
8    A. -- to refresh my memory.
9    Q. Were you working during the period you were
10  obtaining --
11    A. No, I was going to school on student loans, the
12  Alaska student loan.
13    Q. And how much did you take out in student loans?
14    A. I would have to review the records to give you
15  that answer. I don't remember.
16    Q. Uh-huh. Can you tell me approximately?
17    A. I would say approximately $9,000.
18    Q. Okay. So then what did you do after that?
19    A. I went back to work. I renewed my insurance
20  license and went back to work for Mutual of Omaha. Also,
21  I was a substitute teacher. I was substituting about
22  that time, too.
23    Q. Uh-huh. And how long did you work for Mutual of
24  Omaha the second time?
25    A. I don't recall, but it wasn't very long.

Page 31

1    Q. And what happened that led you not to work for
2  them?
3    A. There was a new office manager that was very
4  overbearing and I had -- I had problems getting the money
5  that I was earning.
6    Q. Who was the office manager?
7    A. I don't remember her name.
8    Q. Did you sell any products the second time you
9  worked for --
10    A. Yes, I did.
11    Q. -- the company? Do you know how much you sold?
12    A. No.
13    Q. Do you know what your persistency rate was for
14  the products you sold?
15    A. I sold the quota to get the bonuses that was
16  required, you know, to sell to receive all the pay and
17  the bonuses that came along with the production.
18    Q. Do you know what I mean by "persistency"?
19    A. Was it persistent throughout the term --
20    Q. Yes.
21    A. -- yes, it was persistent.
22    Q. What kind of products were you selling?
23    A. Health and life insurance.
24    Q. Were you selling whole life?
25    A. Yes. Term life and whole life and -- and health

Page 32

1  insurance.
2    Q. For those products you sold, though, if they
3  were persistent over time, why aren't you getting any
4  return from them?
5    A. I did for a while, but they finally stopped
6  coming.
7    Q. And when was the last time you got any income
8  from selling those products?
9    A. I don't recall. It's been several years ago.
10    Q. So what did you do after you left Mutual of
11  Omaha?
12    A. I moved to -- I left because I spent some time
13  in getting materials together and beginning a business of
14  my own --
15    Q. Uh-huh.
16    A. -- and that was incorporation with the
17  University of Alaska.
18    Q. Uh-huh. What was that business?
19    A. It was -- the title of it was Anchorage Academy
20  One.
21    Q. Uh-huh. What was the nature of that business?
22    A. It was educational business. I applied for a
23  SBA loan to support and to begin the business.
24    Q. Did you obtain a loan?
25    A. Eventually, yes, I did, but not in time to

Page 33

1  actually begin the school in the fall of that year.
2    Q. How much of a loan did you obtain?
3    A. $60,000.
4    Q. When did you obtain that loan?
5    A. After I had gone to Tennessee to take a job.
6    Q. What year was that?
7    A. I believe that was in 1997.
8    Q. So what happened with the money from the small
9  business loan?
10    A. It went back. I never used it. I never
11  obtained it.
12    Q. And how long were you involved in Anchorage
13  Academy One?
14    A. Until the summer of 2000.
15    Q. So from 1997 until the summer of 2000?
16    A. I was involved with Anchorage Academy One and
17  had held a -- an Alaska license.
18    Q. What sort of a license?
19    A. Business license.
20    Q. You said that you moved. Where did you move
21  during this period of time?
22    A. I moved to Murfreesboro, Tennessee.
23    Q. And why did you move there?
24    A. Because the loan did not come through in time
25  for me to begin the private school that I had -- was

9 (Pages 30 to 33)

EXHIBIT
Page 9 of 63

case No. A05-086 Civil                                                                      Bobbi Wade

Page 34

1  going to begin in Anchorage in time for me to begin in
2  September, so I applied for jobs everywhere.
3      Q. When you say "everywhere," where do you mean?
4      A. All over the United States. When you -- when
5  you are teaching in colleges and universities, there's an
6  educational chronicle that comes out that lists all the
7  jobs.
8      Q. What kinds of jobs were you applying for?
9      A. Higher education jobs --
10     Q. What sort --
11     A. -- in colleges and universities.
12     Q. Uh-huh. What sort of higher education jobs?
13     A. English, freshman English or Art.
14     Q. And did you obtain any positions at any colleges
15  or universities?
16     A. Yes, I did.
17     Q. Where did you obtain --
18     A. At Middle Tennessee State University in
19  Murfreesboro, Tennessee.
20     Q. And what position did you obtain?
21     A. An adjunct English instructor.
22     Q. And what was your rate of pay?
23     A. I don't recall exactly, but it was something
24  like $1300 per course for a three-hour course because it
25  was like around $4 per unit.

Page 35

1      Q. Uh-huh.
2      A. And I was teaching nine units, teaching three
3  courses and -- three three-hour courses which were
4  nine --
5      Q. Okay.
6      A. -- so you can do the math there.
7      Q. Okay. And what years did you teach at Middle
8  Tennessee University?
9      A. 1997 and 1998 and also in 1997 I enrolled in a
10  doctoral program and was taking courses myself. I was an
11  employee and -- I was an adjunct instructor and a student
12  at Middle Tennessee State University.
13     Q. Okay. Why did you leave Middle Tennessee
14  University?
15     A. I --
16     Q. Why did you leave the teaching, first of all?
17  Sorry to interrupt.
18     A. I got married again --
19     Q. Uh-huh.
20     A. -- in December of 1997.
21     Q. And who did you marry?
22     A. I married Billy Frank Wade, W-A-D-E.
23     Q. And why did you leave the Ph.D. program?
24     A. Because I married Bill in December while I was
25  there. He left to come back to Anchorage and then when

Page 36

1  my teaching was over there, I left to come back -- move
2  back to Alaska to be with him.
3      Q. Did you ever re-enroll in that Ph.D. program?
4      A. No.
5      Q. What did Mr. Wade do for a living?
6      A. He was a civil service employee at Elmendorf Air
7  Force Base.
8      Q. And as a civil service employee, what sort of
9  work did he do?
10     A. He was a high-voltage electrician.
11     Q. So he was --
12     A. I think the correct name for it is lineman.
13     Q. He was an outside --
14     A. Yes.
15     Q. -- wireman?
16     A. Yes.
17     Q. Uh-huh. And did you obtain a divorce from
18  Mr. Wade?
19     A. Yes, I did.
20     Q. What year did you obtain a divorce?
21     A. 2000, December 4th of 2000.
22     Q. And where did you obtain the divorce?
23     A. In Anchorage.
24     Q. Did you have an attorney represent you?
25     A. Yes, I did.

Page 37

1      Q. Do you recall who that was?
2      A. David Wintzell.
3      Q. Do you know if Mr. Wade still resides in
4  Anchorage?
5      A. No, I don't know that. I have no idea where he
6  might reside.
7      Q. So when you came back to Anchorage in -- it was
8  1998; correct?
9      A. Yes.
10     Q. Where did you reside with him?
11     A. In the Swantiz Apartments on Eureka Street just
12  off of Fireweed.
13     Q. And did you look for work when you came back?
14     A. Yes, I did.
15     Q. Where did you look for work?
16     A. I applied to the University of Alaska and also
17  to the Anchorage School -- yes, the Anchorage School
18  District.
19     Q. And what jobs did you apply for there?
20     A. Anchorage School District?
21     Q. Uh-huh.
22     A. It was principal -- at that time I had my
23  principal's degree -- English or Art. Those three
24  categories I always apply.
25     Q. Uh-huh. What did you apply for at UAA?

10 (Pages 34 to 37)

EXHIBIT
Page 10 of 15

case No. A05-086 Civil

Bobbi Wade

Page 38

1    A. Adjunct, English adjunct.
2    Q. Did you obtain a position with either one?
3    A. Yes, I did.
4    Q. And with whom did you obtain a position?
5    A. UAA.
6    Q. And what was the position?
7    A. It was adjunct English instructor and
8  developmental studies instructor.
9    Q. And what was your rate of pay?
10   A. The best I recall, it was something like $750
11 per unit.
12   Q. $750?
13   A. Yes.
14   Q. And how many units did you teach?
15   A. The fall semester of 1998, I taught -- I think
16 it was four, four courses I taught.
17   Q. Okay. Did you teach beyond the fall semester?
18   A. I taught the limit of the college --
19   Q. Uh-huh.
20   A. -- whatever it was.
21   Q. Okay.
22   A. Yes, I also taught the spring semester.
23   Q. And how many units did you teach?
24   A. Four.
25   Q. Why did you leave that position?

Page 39

1    A. Well, I taught -- I went on to teach in the fall
2  of 1998. It was December of 1998 before I left that
3  position.
4    Q. Okay. Why did you leave?
5    A. Because Bill Wade, my husband, wanted me to go
6  back to Tennessee so I went back to Tennessee.
7    Q. And where did you move in Tennessee?
8    A. I moved back to Murfreesboro, to the same
9  apartment I had previously lived -- same apartment
10 building that I had previously lived.
11   Q. Uh-huh. Were you living with him at the time?
12   A. No. Once I got there, I never lived with him
13 anymore.
14   Q. Did you look for work there?
15   A. Yes, I did.
16   Q. Where did you look for work?
17   A. I applied for work at Middle Tennessee State
18 University and I applied at several colleges, but one
19 include -- included the Nashville Technical College in
20 Nashville.
21   Q. What positions did you apply for?
22   A. Adjunct English.
23   Q. Did you obtain any position?
24   A. Yes, I did.
25   Q. What position did you obtain?

Page 40

1    A. Adjunct English in Nashville State Technical
2  College.
3    Q. What was your rate of pay?
4    A. It was about the same as it was at MTSU, about
5  around $4 per unit. I'm not as positive of the exact
6  figure.
7    Q. And how many units did you teach?
8    A. I taught four there.
9    Q. And how long did you teach there?
10   A. Until the -- May of 2000.
11   Q. And then what happened?
12   A. I discovered that I needed to divorce Bill Wade,
13 so I came back to Anchorage.
14   Q. Did you look for work here?
15   A. Yes, I did.
16   Q. Where did you look?
17   A. I applied back to the University of Alaska. I
18 applied to several places around the Anchorage School
19 District. I saw an ad in the paper for instructors at
20 Ilisagvik College and I applied there. And I had also
21 applied for adjunct work with Colorado State University
22 in the state of Colorado and I had already obtained work
23 there.
24   Q. Uh-huh.
25   A. They had already assured me that I would have

Page 41

1  work there.
2    Q. Okay. What work did they offer you?
3    A. Adjunct instructor in English and they had
4  offered me four courses at $3,000 per course, so that
5  rate of pay was comparable to the state of Alaska.
6    Q. Uh-huh. And why didn't you take that position?
7    A. Because I was given the job at Ilisagvik.
8    Q. And what made you choose that job over the job
9  at Colorado State?
10   A. Because it was a full-time job with benefits.
11 Colorado State was a part-time job.
12   Q. Okay. And what position were you offered at
13 Ilisagvik?
14   A. Business management and assistant professor of
15 office -- business -- of the BMIT program --
16   Q. Uh-huh.
17   A. -- business management and office management.
18   Q. Okay. And who hired you?
19   A. Pam Taylor.
20   Q. Was she the person that made the decision?
21   A. She and the instructor who was leaving, Elisa
22 Asplin. I interviewed with both of those people over the
23 phone.
24   Q. Uh-huh. And what were your qualifications to
25 teach business?

11 (Pages 38 to 41)

case No. A05-086 Civil

Bobbi Wade

Page 42

1    A. I had begun several businesses of my own and I
2  had training -- experience, not training -- in accounting
3  and bookkeeping and Business English and in the business
4  field and I also had a principal's certificate that was
5  in supervision and administration, which involved a lot
6  of business courses that was comparable to a business
7  degree.
8    Q. Where did you take those business courses?
9    A. I didn't take business courses.
10    Q. You said --
11    A. I never said I took business courses.
12    Q. You had a principal certificate that involved
13  business courses. Did I misunderstand you?
14    A. Courses that was taught. They were -- I took
15  those courses when I took my -- got my certification to
16  be a principal. I took school law and things like that.
17  I took law courses. I took financial courses. I took
18  courses that involved statistics, things like that. It
19  also involved management.
20    Q. And besides the businesses that you mentioned to
21  me, were there any other businesses that you had begun?
22    A. They were in previous years a long time ago.
23    Q. Uh-huh. What other businesses were they?
24    A. The first business I began was a private school
25  in the state of Florida.

Page 43

1    Q. Uh-huh. When was that?
2    A. It was in 1966.
3    Q. And what kind of school was it?
4    A. It was a Kindergarten preschool.
5    Q. Was it licensed as a Kindergarten?
6    A. I did not have to obtain a license, no.
7    Q. And how long did you have that business?
8    A. Four years.
9    Q. Why did you stop that business?
10    A. I stopped it because my husband got a job as a
11  principal in Panama City, Florida, and we moved.
12    Q. What was the name of that business?
13    A. Jack and Jill Kindergarten.
14    Q. Any other businesses that you've begun that
15  you've not mentioned?
16    A. In the late 1970s, I began an art and antique
17  business.
18    Q. Where was that?
19    A. It was in Graceville, Florida.
20    Q. What was the name of it?
21    A. Vintage House Art and Antiques.
22    Q. And how long did you operate that business?
23    A. Approximately two years.
24    Q. And why did you stop operating that business?
25    A. It began to grow and it became too demanding and

Page 44

1  I was working full-time at the high school as a public
2  school teacher and my husband asked me to stop the
3  business, so I did.
4    Q. Did you sell it?
5    A. No. I just sold out and closed it.
6    Q. Okay. Any other businesses that you've been
7  involved in?
8    A. The next business that I recall was the
9  Anchorage Academy One --
10    Q. Okay.
11    A. -- in Grace- -- in Anchorage.
12    Q. With Anchorage Academy One, did you ever obtain
13  any contracts?
14    A. No. We wrote many proposals for contracts,
15  government contracts, but we never obtained one.
16    Q. So you never received any income from Anchorage
17  Academy One?
18    A. No.
19    Q. And you said you had experience in bookkeeping.
20  What experience in bookkeeping did you have?
21    A. In -- from 1960 to 1966 when I began the
22  Kindergarten business, I worked for the U.S. Department
23  of Agriculture as the bookkeeper and accounting person --
24  clerk.
25    Q. You were a clerk?

Page 45

1    A. Yes. And I was federally audited annually by
2  federal auditors. There was never any discrepancies
3  found.
4    Q. Where did you work for the Department of
5  Agriculture?
6    A. In Jackson County, Florida.
7    Q. Any other bookkeeping experience?
8    A. Shortly after I had my auto accident here in
9  Anchorage, I did the payroll and recordkeeping for Aoki
10  Construction on a temporary part-time basis.
11    Q. Would you say again what the construction --
12    A. Aoki, A-O-K-I.
13    Q. Uh-huh. How long did you work for them?
14    A. Just a few months.
15    Q. Any other business experience -- I'm sorry,
16  bookkeeping experience is what I was asking you about?
17    A. I was required to do -- I had to do -- I did
18  bookkeeping for my own businesses. I kept up with
19  expenses and financial reports for the Anchorage Academy
20  One because I had to do financial reports in order to get
21  an SBA loan.
22    Q. Did you have an in-person interview with
23  Ms. Taylor and Ms. Asplin?
24    A. You mean to enter into the conversation?
25    Q. Well, let me back up. Did you submit an

12 (Pages 42 to 45)

case No. A05-086 Civil

Bobbi Wade

Page 46

1  application?
2      A. To whom?
3      Q. Ilisagvik.
4      A. Of course.
5      Q. Okay. And were you called for an interview?
6      A. Yes.
7      Q. And did you have an in-person interview?
8      A. What do you mean by "in-person"?
9      Q. Face-to-face.
10     A. No. It was over the phone. I was in Anchorage
11  at the time.
12     Q. Okay. And what did they tell you about the job?
13     A. I actually applied for the office technology job
14  because there was two jobs and I had previously taught
15  office -- the office technology courses for the college.
16  I felt more comfortable applying for that job. I named
17  both jobs in my letter of application and -- because it
18  said that in that job description that was in the
19  newspaper that you would have a degree in that field or a
20  related field.
21     Q. Okay.
22     A. And I did not know which related fields they
23  referred to, but I felt like my degree, my certification
24  in supervision and administration and educational
25  leadership, I did not know if I qualified for those jobs.

Page 47

1      Q. And did you discuss that in the interview?
2      A. Yes.
3      Q. Tell me what you recall about that.
4      A. I remember asking Pam Taylor if I would have the
5  office technology job because I had taught those courses
6  previously at Ilisagvik. She says, "Oh, no, we're going
7  to give you the business management job."
8      Q. Uh-huh. And did she say why?
9      A. She said I was better qualified.
10     Q. And what, if anything, did Ms. Asplin say in the
11  interview?
12     A. I don't recall what she said to me. She just
13  asked me a few questions and I don't recall what they
14  were.
15     Q. Okay. Did you speak to the dean of instruction
16  before you were hired?
17     A. No.
18     Q. Did you speak to the president of the college
19  before you were hired?
20     A. No.
21     Q. Did you have any other discussions about your
22  qualifications prior to being hired?
23     A. There at one time when over the phone -- during
24  the interview for Ilisagvik College over the phone,
25  Brooke Selmer was present and he was at that time when

Page 48

1  Elisa Asplin left kind of the director of the BMIT
2  Department.
3      Q. Do you remember if he said anything?
4      A. No, I don't. He did, but I don't remember what.
5  Pam did most of the talking and she asked me most of the
6  questions.
7      Q. Uh-huh. What did she ask you?
8      A. I don't recall everything she asked me.
9      Q. Did she ask you what your experience was --
10     A. Yes, she did.
11     Q. -- in business? Do you remember what you told
12  her?
13     A. Approximately the same thing I've told you. I
14  related my actual experiences. I didn't build up on
15  anything.
16     Q. Okay. So then you went up to Barrow?
17     A. Yes. At that time my funds were beginning to
18  run out and I asked Pam if they could provide me with a
19  ticket to Barrow and she told me that they could, so --
20  and I was also told once I arrived up there that I would
21  have a -- there was monies for moving, but at the time I
22  needed the monies they weren't available. I had to pay
23  my own shipping charges at the time --
24     Q. Uh-huh.
25     A. -- and then I was reimbursed.

Page 49

1      Q. Okay. So what sort of a term were you hired
2  for?
3      A. I was hired for one -- I was given a one-year
4  contract.
5      Q. Okay.
6      A. And there was never any provisions, conditional
7  provisions.
8      Q. Okay. I want to back up just for a minute and
9  cover a couple of bases I didn't cover before. Can you
10  tell me where you were born?
11     A. I was born in Dale County, Alabama.
12     Q. Were you raised in Alabama?
13     A. Yes.
14     Q. Where?
15     A. Dale County.
16     Q. Where did you attend high school?
17     A. At Dale County High School.
18     Q. Did you obtain a high school degree?
19     A. Yes, I did.
20     Q. Did you marry your first husband there?
21     A. Yes.
22     Q. And what year did you move to -- from Alabama
23  with your husband?
24     A. From Dale County we moved to Geneva County and
25  and that was the fall of 1952.

case No. A05-086 Civil                                                    Bobbi Wade

---

Page 50

1    Q. Okay. And from there you went to Florida?
2    A. Yes. We were in Geneva one year, I think. It
3  might have been two.
4    Q. Have you had any other marriages that you've not
5  mentioned to me?
6    A. No.
7    Q. What was your birth name?
8    A. Bobbi Jean Whatley. W-H -- with an "H,"
9  W-H-A-T-L-E-Y.
10    Q. Okay. And I think I understand some of the
11  other names that you've gone by. I want to make sure
12  that I know them all.
13    A. Okay.
14    Q. I understood you married Mr. Underwood and for a
15  time you used Underwood as a last name --
16    A. Yes.
17    Q. -- for a long time?
18    A. For a long time.
19    Q. And then what other names have you used?
20    A. Webb.
21    Q. I'm sorry?
22    A. I married Gary Webb. I used the name of Webb.
23    Q. Uh-huh. And what other names?
24    A. And then I married Bill Wade and I've been using
25  the name of Wade since that time.

Page 51

1    Q. Okay. I ask all plaintiffs if they've ever been
2  arrested. Have you ever been arrested?
3    A. No.
4    MS. DUCEY: Would it be a convenient time for a
5  break?
6    MS. JOHNSON: That's a good idea.
7    MS. DUCEY: So the bathroom, if you just go
8  around there and through the door.
9    THE VIDEOGRAPHER: Let me just announce off
10  record. We're going off record. The time is 10:27.
11    (Recess taken.)
12    THE VIDEOGRAPHER: We're back on the record.
13  The time is 10:39.
14    Q. (By Ms. Ducey) Ms. Wade, when you were offered
15  a position by Ilisagvik in 2000, was there a dean of
16  instruction?
17    A. Yes.
18    Q. Who was the dean?
19    A. Frank Willingham.
20    Q. Okay. And do you know what happened to him?
21    A. He went back to his hometown in Houston, Texas.
22    Q. Uh-huh. How soon after you left?
23    A. I don't recall the exact year that Frank left,
24  but I think it was -- let's see, the end of 2002.
25    Q. Did you ever have a discussion with him about

Page 52

1  your qualifications to be a business professor?
2    A. Only when I applied for another position that
3  had come up.
4    Q. Uh-huh. Tell me about that.
5    A. I don't recall the position, but I discussed my
6  qualifications with Frank.
7    Q. Uh-huh. Tell me what you recall about that
8  discussion.
9    A. Nothing, because it wasn't important enough
10  to -- I was satisfied in my job.
11    Q. Okay.
12    MS. DUCEY: Whenever you have those, I'll take
13  them. Just give them all to me. Thank you.
14    (Exhibit No. 1 marked.)
15    Q. So we've marked this Number 1, Ms. Wade, and you
16  can go ahead and give Peter and Linda theirs. You
17  probably need those glasses out for a bit.
18    A. If I can ever find them. Okay.
19    Q. And after you've had a chance to look at that,
20  can you tell me if you identify this as transcripts of
21  your academic record from Troy State, from UAA and from
22  Middle Tennessee State University?
23    A. Yes, I do.
24    Q. Great. And can we look at the top, which should
25  be the Middle Tennessee State University; right?

Page 53

1    A. Uh-huh.
2    Q. All right. And is that transcript, as you
3  recall, accurate?
4    A. Yes.
5    Q. Okay. And it shows that you enrolled in a
6  Doctor of Arts with a major in English; correct?
7    A. With a minor in educational leadership.
8    Q. Uh-huh.
9    A. It doesn't show that.
10    Q. Uh-huh. And that you withdrew from that program
11  in February of 1998; is that correct?
12    A. Yes.
13    Q. And you never went back to that doctoral
14  program?
15    A. No.
16    Q. Did you ever enroll in any other doctoral
17  program after you withdrew from that?
18    A. I did not enroll in a doctoral program, but I
19  took a course at UAA and -- and the transcript of the
20  course was to be transferred to Middle Tennessee State
21  University.
22    Q. When did you take that course?
23    A. I took it in -- let's see. I enrolled in it --
24  I can't recall.
25    Q. Okay. Why don't you look at the next page and

---

14 (Pages 50 to 53)

EXHIBIT
Page 14 of 16

Page 54

1  do you recognize that as your transcript from UAA?
2      A. Yes.
3      Q. Okay. Does it show anywhere that you were
4  enrolled in a doctoral program?
5      A. No.
6      Q. Okay. Do you recognize the class that you were
7  referring to that you wanted transferred to Middle
8  Tennessee State?
9      A. From Middle Tennessee State, no. No, it's not
10 on here.
11     Q. Okay. Did you finish that class?
12     A. No.
13     Q. Okay. Could you look at the third page which
14 should be a Troy State University record?
15     A. Yes.
16     Q. And does that page appear to be an accurate copy
17 of your transcript?
18     A. Yes.
19     Q. All right. And then the last page -- let's see,
20 I've got to look to see if that's your master's program
21 or your undergrad. In any event, this is also -- do you
22 identify this as a copy of your transcript from Troy
23 State -- it is the graduate record, I see that?
24     A. Yes, it's the graduate.
25     Q. And does it appear to be accurate?

Page 55

1      A. Yes.
2      Q. Okay. Now just so that I -- I have firm in my
3  mind, you obtained a bachelor's degree from Troy State
4  University; correct?
5      A. Yes.
6      Q. And what year did you obtain that?
7      A. 1973.
8      Q. Okay. And that was in what subject?
9      A. Educational leadership and English with an
10 English minor.
11     Q. Okay. Could you go back and look at the second
12 to the last page, which should be your Troy State
13 University record; correct?
14     A. Yes.
15     Q. Okay. And I'm looking, date admitted as June
16 14, '74; right? Do you see right on --
17     A. Oh, this is my graduate record. Yes, uh-huh.
18     Q. And that says, "undergraduate degree." I can't
19 tell if that's a B.S. in Education or a B.A, but --
20     A. It's a B.S.
21     Q. And you got that from Troy State in Troy,
22 Alabama; right?
23     A. Yes.
24     Q. And then it says the diploma was dated August 8,
25 '75; is that correct?

Page 56

1      A. Yes.
2      Q. And the major was in secondary education;
3  correct?
4      A. Yes.
5      Q. And your minor was in English; right?
6      A. Yes.
7      Q. Okay. Is that correct?
8      A. That's correct --
9      Q. All right.
10     A. -- yes.
11     Q. And then you got a master's degree in -- was it
12 in education?
13     A. It was Art Education.
14     Q. Okay.
15     A. That was a program in an educational specialist
16 degree --
17     Q. Okay.
18     A. -- but I never completed it, but I had enough
19 courses to give me the master's.
20     Q. Okay. Did you obtain any master's degree?
21     A. When?
22     Q. At any time.
23     A. Yes.
24     Q. And where did you obtain your master's degree?
25     A. At Troy State University.

Page 57

1      Q. Okay. And in what subject?
2      A. Secondary education with a minor in English.
3      Q. So that was -- was that the degree you obtained
4  in '75?
5      A. Yes.
6      Q. The master's degree in secondary education?
7      A. Yes.
8      Q. Okay. Can you look through Exhibit 1 and tell
9  me if this comprises, as you understand it, your entire
10 course of post-high school classes that you completed?
11     A. I have one other transcript from Auburn
12 University that is not included, but it's in library
13 science.
14     Q. Okay. And where is Auburn?
15     A. It's in Alabama.
16     Q. And when did you obtain that degree?
17     A. I didn't obtain a degree. I took courses
18 leading toward a certification.
19     Q. Okay. And when did you take these courses?
20     A. In 1980 and '81. I'm sorry, in 1979 and '80.
21     Q. And how many courses did you take?
22     A. As I recall, it was 16 hours that I completed.
23     Q. In library science?
24     A. Yes.
25     Q. Were all of the classes that you took in library

Page 58

1  science?
2     A. Yes.
3     Q. Okay. Anything else besides the Auburn
4  transcript that's not included in Exhibit 1?
5     A. I don't recall anything else.
6     Q. Okay. I'm looking through Exhibit 1 and I don't
7  see any business classes. Am I mistaken?
8     A. No.
9     Q. Okay. You can set that aside. Thank you. You
10  can probably make a pile over there, Ms. Wade, and we may
11  come back to that one.
12     MS. DUCEY: Let me have the next one. Jonathan,
13  why don't I give them to you so that -- I don't trust
14  myself with these.
15     (Exhibit No. 2 marked.)
16     Q. All right. Number 2, Ms. Wade, can you take a
17  look at that and tell me if you can identify what that
18  is?
19     A. It appears to be my letter of application to
20  Ilisagvik College.
21     Q. All right. And it's dated June 29, 2000?
22     A. Yes.
23     Q. And is this the application that you actually
24  submitted to the college -- or a copy?
25     A. I submitted the formal application.

Page 59

1     Q. Okay. Could you look at the next page? And can
2  you identify that as the application that you completed?
3     A. On the formal application, yes.
4     Q. Okay. So did you submit this letter with the
5  application together?
6     A. Yes, I did.
7     Q. And you completed the application, it looks
8  like, in your own handwriting?
9     A. Yes.
10     Q. And signed it at the bottom?
11     A. Yes.
12     Q. Did you submit any other documents when you
13  applied for the position?
14     A. I submitted a resume.
15     Q. Okay. Anything besides the resume?
16     A. I don't recall anything else. It could have
17  been letters of recommendation --
18     Q. Okay.
19     A. -- from previous jobs.
20     (Exhibit No. 3 marked.)
21     Q. And this is Number 3. Ms. Wade, can you
22  identify what that is?
23     A. This is my resume.
24     Q. Is this the resume that you submitted along with
25  your application and the cover letter?

Page 60

1     A. It appears to be.
2     Q. And you submitted this in approximately June of
3  2000?
4     A. Yes.
5     Q. At the time you submitted it, do you recall if
6  there was anything inaccurate about it?
7     A. No, I don't recall.
8     Q. Okay. You can put that aside.
9     Ms. Wade, you do not have a degree in business or
10  business management; is that right?
11     A. That's right.
12     Q. Or information technology?
13     A. No.
14     Q. Or in finance?
15     A. No.
16     Q. And you don't have a degree in economics;
17  correct?
18     A. No.
19     Q. Or in mathematics or statistics?
20     A. No.
21     Q. Aside from Business English, you've never taught
22  a class in one of these subjects either, before
23  Ilisagvik; correct?
24     A. Not before Ilisagvik, no. Only included
25  Business English and to my English classes in public

Page 61

1  school teaching.
2     Q. Uh-huh. And you were never involved in any
3  private corporate management; correct?
4     A. I don't recall any.
5     Q. You've never been in any sort of a management
6  training program other than the -- the principal
7  certificate?
8     A. I don't recall.
9     Q. Were you involved in a management training
10  program for Mutual of Omaha?
11     A. Not for management, no.
12     Q. Is there any other private corporation that you
13  worked for where you might have been in any sort of a
14  management training program?
15     A. I don't recall. I could have been at -- with
16  the U.S. Department of Agriculture.
17     Q. Uh-huh. In a management training program that
18  would have put you into management?
19     A. No, not a program. It would have been
20  on-the-job training.
21     Q. Okay. What sort of training?
22     A. Management training.
23     Q. Uh-huh. And when was that?
24     A. It was from 1960 to 1966.
25     Q. To '66?



case No. A05-086 Civil                                    Bobbi Wade

Page 62

1    A. Uh-huh.
2    Q. Are you saying that you were in a management
3 training program --
4    A. No.
5    Q. -- for that --
6    A. No.
7    Q. -- period of time?
8    A. No.
9    Q. Could you please explain what you mean by that,
10 then?
11    A. I might have been. I don't recall is what I
12 said.
13    Q. Okay. Before I go back to Ilisagvik, I want to
14 go over a couple of things. Since you have moved to
15 Unalaska, Texas, have you seen any medical providers?
16    A. Yes, I have.
17    Q. And who have you seen?
18    A. Dr. Ray Perez.
19    Q. What have you seen him for?
20    A. High blood pressure.
21    Q. Anything else?
22    A. Sinus infections --
23    Q. Uh-huh.
24    A. -- urinary tract test.
25    Q. Okay. Have you seen anyone else in Texas?

Page 63

1    A. No.
2    Q. Since you've lived in Texas, have you sought
3 medical treatment outside of the state?
4    A. When I go back to Tennessee to my regular family
5 doctor.
6    Q. Okay. And who do you see there?
7    A. I see Dr. Emfinger.
8    Q. And why do you see him?
9    A. If I have a need, for sinus infection or urinary
10 tract infection or things like that.
11    Q. Uh-huh. Who else have you seen in the Nashville
12 area, in terms of medical providers?
13    MS. JOHNSON: Objection. There is no date
14 restriction.
15    Q. You can answer.
16    A. Other than those two I've just mentioned, I've
17 seen Dr. DeLozier.
18    Q. Uh-huh. And who else?
19    A. I've seen Dr. Eskind.
20    Q. How do you spell his name?
21    A. E-S-K-I-N-D, I believe. I'm not sure of that.
22    Q. Okay. Who else have you seen?
23    A. Dr. Lea, L-E-A. Dr. Cohn.
24    Q. C-O-M-B?
25    A. C-O-H-N, Cohn.

Page 64

1    Q. Cohn, okay.
2    A. And Dr. Head.
3    Q. Head?
4    A. Head.
5    Q. H --
6    A. H-E-A-D.
7    Q. Who else have you seen?
8    A. I've seen Dr. Lobb, L-O-B-B.
9    Q. L-O-B-D?
10    A. L-O-B-B.
11    Q. B-B, uh-huh.
12    A. Yes.
13    Q. And who else?
14    A. I don't recall any others right off. There
15 could have been someone else, but I don't recall.
16    Q. Why did you see Dr. Cohn?
17    A. For my foot.
18    Q. Why did you see Dr. Head?
19    A. For my foot.
20    Q. And why did you see Dr. Lobb?
21    A. He's my dentist.
22    Q. And when you were in Anchorage, what medical
23 providers have you seen?
24    MS. JOHNSON: Objection to questions beyond the
25 ten-year scope that we've already talked about.

Page 65

1    A. I don't recall.
2    Q. Did you have a family doctor when you lived in
3 Anchorage?
4    A. No. I usually went back to Tennessee.
5    Q. So you've never been seen by any health care
6 provider in Anchorage?
7    MS. JOHNSON: Objection to her answering
8 anything beyond ten years.
9    Q. You can answer.
10    A. I don't recall.
11    Q. When you lived in Missouri, did you ever see
12 a -- a medical provider?
13    A. No.
14    Q. And when you were in Palm Springs or
15 Connecticut, did you ever see a medical provider?
16    A. No.
17    Q. Have you ever consulted with a psychiatrist for
18 any reason?
19    A. No.
20    MS. JOHNSON: Objection.
21    Q. Or a psychologist?
22    MS. JOHNSON: Go ahead.
23    A. Not that I recall.
24    Q. Or a licensed social worker?
25    A. No.

case No. A05-086 Civil

Bobbi Wade

---

Page 66

1    Q. Have you ever participated in any sort of an
2  alcohol or a substance abuse treatment program?
3    A. No.
4      MS. JOHNSON: Objection to more than ten years.
5    Q. Did you at one time live in North Dakota?
6    A. No.
7    Q. Or South Dakota?
8    A. No.
9    Q. Or Kentucky?
10    A. No.
11    Q. So when you went up and were offered the job by
12  Ilisagvik, what were you told in terms of the rate of pay
13  and the other terms of your employment?
14    A. I was not told anything at the -- to begin with,
15  and then just prior to my -- after signing an agreement,
16  I was told that my rate of pay would be seventy-five
17  thousand and four-hundred and something and I don't
18  remember --
19    Q. Okay.
20    A. -- the last two digits.
21    Q. And who told you that?
22    A. Pam Taylor.
23    Q. And did she tell you anything else about the
24  rate of pay or the benefits at that time?
25    A. She explained benefits to me, the insurance.

---

Page 67

1    Q. What did she tell you about the insurance?
2    A. But that was in a meeting. It wasn't done to me
3  personally.
4    Q. Okay. Was that your first day of work?
5    A. Yes.
6      MS. DUCEY: Will you mark those for me, please?
7        (Exhibit No. 4 marked.)
8    Q. And your first day of work, did you spend most
9  of the day with Ms. Taylor?
10    A. Yes.
11    Q. And tell me what happened that first day, then.
12    A. We were -- that was all -- with all new
13  employees and she went over the health regulations --
14    Q. Uh-huh.
15    A. -- as I recall.
16    Q. Anything else?
17    A. And we were told we would need to take a drug
18  test --
19    Q. Uh-huh.
20    A. -- which we did. She went over the insurance
21  and how the P5 Insurance program worked and that was
22  basically it. I don't recall anything else.
23    Q. Okay. Did you sign a contract?
24    A. Yes, I did.
25    Q. And let me show you what's been marked Number 4

---

Page 68

1  and ask if you can identify that?
2    A. It appears to be the contract that I signed.
3    Q. All right. Does that appear to be a complete
4  and accurate photocopy of the contract?
5    A. It does.
6    Q. Okay.
7      MS. DUCEY: You can mark that, Jonathan.
8        (Exhibit No. 5 marked.)
9    Q. This is Number 5, Ms. Wade. Can you identify
10  what that is?
11    A. Okay.
12    Q. Can you identify what that is?
13    A. It appears to be a checklist that was checked by
14  me.
15    Q. Okay. And that's your signature on the bottom?
16    A. Yes, it's my signature.
17    Q. Okay. It says that you signed it on August
18  22nd, 2000. Is that consistent with your recollection?
19    A. Yes.
20    Q. Do you remember how soon or -- strike that
21  again. Do you recall in relation to August 22nd when the
22  first day of classes was?
23    A. It was towards the end of August, approximately
24  August 27, 28 or 29 or something like that. I don't
25  recall the exact date.

---

Page 69

1    Q. Okay. And that indicates that you certify that
2  you've received various pieces of information which
3  include the Employee Handbook; correct?
4    A. Yes, but I can't certify that I did all the
5  checking on these, on this form.
6    Q. Right. Uh-huh. But you did sign it; correct?
7    A. I did sign it.
8    Q. Okay.
9        (Exhibit No. 6 marked.)
10    Q. And this is Number 6, Ms. Wade. Can you take a
11  look at that and tell me if you can identify what that
12  is?
13      MR. GAMACHE: We're short one.
14      MS. DUCEY: We need one more? Okay. I'm not
15  sure how many I have.
16    A. Yes, this is acknowledging the receipt of the
17  Ilisagvik Employee Handbook.
18    Q. Okay. And it says, "I understand I'm
19  responsible for reading and complying with the contents";
20  correct?
21    A. Yes, it does.
22    Q. And do you remember if you read the handbook?
23    A. I read parts of it, yes.
24      MS. DUCEY: All right. We'll kill a few trees.
25  Give those to -- hand one to Linda, too.

---

18 (Pages 66 to 69)

case No. A05-086 Civil

Bobbi Wade

---

Page 74

1    Q. Go ahead.
2    A. "In the event of failure or refusal to supply
3 required physician's certification or if the
4 certification does not clearly show sufficient disability
5 to preclude the employee from the performance of duties,
6 the supervisor and human resources director may cancel
7 the family leave or medical leave and require the
8 employee to report for duty on a specified date."
9    Q. Okay. Do you remember if you read the
10 anti-harassment policy at any time during your employment
11 with Ilisagvik?
12    A. Yes, I had seen it.
13    Q. Okay. And do you recall if you read the Family
14 Medical Leave Act provisions of the policy?
15    A. I don't believe that this -- I don't remember
16 reading this.
17    Q. Uh-huh. Do you deny ever getting a copy of the
18 Employee Handbook?
19    A. No, I don't deny that.
20    Q. Okay. You got multiple copies, didn't you?
21    A. No.
22    Q. Didn't you get updates as the years went on?
23    A. Just a few leaves, to take those leaves out,
24 uh-huh.
25    Q. So you had one booklet, but sometimes --

Page 75

1    A. Yes.
2    Q. -- you were given a new page?
3    A. Yes, it had to be reconstituted.
4    Q. Okay. And do you remember when you got an
5 update if you were told if any of the updates had a
6 family medical leave policy?
7    A. No, I was not told. I was just handed the
8 updates.
9    Q. Do you have reason to believe that you weren't
10 given a handbook that had the Family Medical Leave Act in
11 it?
12    A. I received the Employee Handbook, the old
13 version, at the beginning of my employee --
14    Q. Uh-huh.
15    A. -- employment. And it was updated annually with
16 extra leaves for the old leaves to be taken out and the
17 new leaves put in.
18    Q. Okay. My question was different, though. Let's
19 say in the original handbook that you got, do you deny
20 that there was a provision on family medical leave in it?
21    A. No, I don't deny that.
22    Q. Okay. So it was probably there, you just didn't
23 read it?
24    A. It was probably there. I don't recall.
25    Q. During the first day when you were with Pam most

Page 76

1 of the day, did you go through some of the policies in
2 the handbook?
3    A. Yes, we did.
4    Q. Do you remember what policies you went through?
5    A. No, I don't.
6        (Exhibit No. 8 marked.)
7    Q. And this is Number 8. Can you identify what
8 Number 8 is?
9    A. Okay. This is where I received the leaves to
10 reconstitute the handbook.
11    Q. Okay. And on --
12    A. In September of 2001.
13    Q. Okay. And that's your signature on Exhibit 8;
14 correct?
15    A. Yes, it is.
16    Q. All right. And do you remember what policies
17 you were given to replace in the handbook?
18    A. No.
19    Q. Do you remember if you did that --
20    A. No.
21    Q. -- if you replaced them?
22    A. I don't recall.
23    Q. Do you still have your copy of the handbook?
24    A. No, I left it at Ilisagvik.
25    Q. Okay. Where did you leave it?

Page 77

1    A. In my old office.
2    Q. Okay.
3        (Exhibit No. 9 marked.)
4    Q. This is Number 9. Can you take a look at that
5 and tell me if you can identify what it is?
6    A. This is where the handbook was updated.
7    Q. Okay. And that was on January 10th, '02?
8    A. Yes.
9    Q. Okay.
10    A. That's what it indicates.
11    Q. Uh-huh. And do you remember what was being
12 changed in the handbook in February '02?
13    A. No.
14    Q. Do you remember if it was the policy on family
15 medical leave?
16    A. No.
17    Q. So on -- I just want to make sure I understand.
18 On August 27th [sic], you received a copy for yourself of
19 the Employee Handbook; correct?
20    MS. JOHNSON: Objection to the year. Didn't say
21 the year.
22    Q. You can answer.
23    A. Can you rephrase the question, please?
24    Q. Uh-huh. On August 22nd, when you began your
25 employment, you received a copy of the Employee Handbook.

---

20 (Pages 74 to 77)

EXHIBIT
Page 19 of 25

Page 82

1  A. No.
2  Q. Do you remember seeing a posting on what the
3  minimum wage was in the state of Alaska?
4  A. No.
5  Q. Do you have any reason to dispute there was such
6  a posting?
7  A. No.
8  Q. Do you remember seeing a posting on workmen's
9  compensation insurance for employees?
10  A. No.
11  Q. Do you have reason to dispute there was such a
12  posting?
13  A. No.
14  Q. Do you remember seeing a posting on the Family
15  Medical Leave Act?
16  A. No.
17  Q. Do you have reason to dispute there was such a
18  posting?
19  A. No.
20  Q. The first year that you came, what classes were
21  you scheduled to teach?
22  A. Business management classes.
23  Q. Do you remember how many units you had?
24  A. No, not right off without looking back at the
25  records.

Page 83

1  Q. How many of the classes you were scheduled to
2  teach were distance delivery classes?
3  A. I don't recall.
4  Q. Do you remember the first year if you taught any
5  classes in the classroom to students in a face-to-face
6  manner?
7  A. Yes, I did.
8  Q. Do you remember how many?
9  A. No, I don't.
10  Q. And who would determine the class meeting times
11  and days?
12  A. The director.
13  Q. The director of the program?
14  A. Of the business, BMIT Department.
15  Q. And who was that in 2000?
16  A. Dr. Stanley Scott.
17  Q. As part of your contract, were you required to
18  keep office hours?
19  A. Yes.
20  Q. And how many -- what is the number of office
21  hours you were required to keep?
22  A. I don't recall, but I believe it was something
23  like three, but I might be wrong on that.
24  Q. Three hours --
25  A. Three hours per week.

Page 84

1  Q. Uh-huh. And so were you given an office for
2  that purpose?
3  A. Yes, I was.
4  Q. What was the purpose of having office hours, as
5  you understand it?
6  A. To counsel with students who were my advisees.
7  Q. And how was it determined who your advisees
8  were?
9  A. I was given those by the registrar.
10  Q. And as a person with all of your educational
11  background and experience, how important was it to have
12  office hours for students?
13  A. It was very important.
14  Q. Why was it very important?
15  A. Because there were times that students needed to
16  consult with me outside of class.
17  Q. Any other reasons why you considered office
18  hours very important?
19  A. It was also for registering students, helping
20  them, and getting them registered to take the courses
21  and -- the proper courses in the programs they were in.
22  Q. Did you also from time -- did you keep office
23  hours in addition for the students who were in your class
24  but were not your advisees if they had a question?
25  A. I kept office hours in exc- -- in excess of the

Page 85

1  recommended amount of time.
2  Q. Uh-huh.
3  A. I was in my office constantly throughout the day
4  when I wasn't in class.
5  Q. Is that so you would be available to the
6  students?
7  A. Yes.
8  Q. Who, as you understand it, comprised the student
9  population at Ilisagvik?
10  A. Do you mean the race or the -- what do you mean
11  by the "student population"? Who? Who is "who"?
12  Q. Well, when you -- when you came, who did you
13  understand these students to be?
14  A. Barrow students.
15  Q. Okay. And did you understand that they had any
16  particular needs or interests?
17  A. No.
18  Q. What did you understand about their culture or
19  language?
20  A. I understood that they spoke another language.
21  Q. And what did you understand from among the
22  student population their past educational history had
23  been?
24  A. I didn't have access to that material. I don't
25  know.

22 (Pages 82 to 85)

EXHIBIT
Page 20 of 6

Page 94

```
1      A. Yes.
2      Q. Was there ever a written modification that was
3  signed by the parties to your contract in '02?
4      A. I don't recall.
5      Q. Okay. And if you look at the first page of the
6  contract -- I'm sorry, the second page. That's the
7  actual contract, isn't it? It starts, "Ilisagvik
8  College, professional employment contract, academic
9  instructor, 2002-'03"; right?
10     A. Yes.
11     Q. All right. There was on the second page a
12 provision for paid time off under Number 4, wasn't there?
13     A. Yes.
14     Q. Okay. And it says, "The employee is entitled to
15 a total of twelve paid days leave without salary
16 deduction during the term of this contract which may be
17 used for paid personal injury or illness, sick leave. Up
18 to six of the twelve days may be used for paid personal
19 time off in lieu of sick leave. Use of paid time off
20 requires reasonable advance notice and is subject to the
21 policies and procedures contained in the Employee
22 Handbook as may be amended from time to time." Right?
23     A. Yes.
24     Q. Okay. In 2002, do you remember what classes you
25 taught?
```

Page 95

```
1      A. No, ma'am, I don't without looking at the
2  record.
3      Q. And did you teach any classes in the classroom
4  face-to-face?
5      A. Yes, I did.
6      Q. Do you remember what those were?
7      A. No, not without looking at the past schedule.
8      Q. Okay. And when you taught those classes, were
9  you there?
10     A. Yes.
11     Q. Okay. Did you have any absences in 2002?
12     A. I don't recall any.
13     Q. Okay. At the expiration of your term in 2002,
14 were you offered a new contract?
15     A. Yes.
16     Q. Do you remember who offered that to you?
17     A. No, not particularly the person, per se.
18     Q. Okay. Did you always read your contracts when
19 you got them?
20     A. Yes.
21     Q. Did you feel you understood them?
22     A. Yes.
23     Q. How about the handbook, the provision that you
24 did take the time to read, did you feel that you
25 understood them?
```

Page 96

```
1      A. Yes.
2          (Exhibit No. 12 marked.)
3      MS. DUCEY: This is Number 12; is that right?
4      MR. CLEMENT: Yes.
5      Q. Can you take a look at that and tell me if you
6  can identify what that is?
7      A. It appears to be a copy of my contract for the
8  upcoming year.
9      Q. Does it appear to be a complete and accurate
10 photocopy?
11     A. It appears to be, but I don't know about the
12 information at the end.
13     Q. Let's look at the information at the end. And
14 what are you referring to at the end?
15     A. The last two pages.
16     Q. Which is the faculty position description?
17     A. Yes. I don't recall that being attached to my
18 contract at the time I signed it.
19     Q. Okay. Do you recall if that was the position
20 description that applied to your employment?
21     A. No, because I don't recall seeing this.
22     Q. Okay. You never saw a faculty position
23 description?
24     A. I don't recall. I don't -- I don't know
25 exactly --
```

Page 97

```
1      Q. Okay.
2      A. -- what you're referring to.
3      Q. All right. But the first two pages, which says,
4  "Faculty Appointment Letter" for 2003-2004, dated May
5  1st, '03, appears to be complete and accurate?
6      A. It appears to be complete, but I could not agree
7  to the accuracy because I haven't read it and I don't
8  know.
9      Q. Okay. But it -- why don't we go off record and
10 you can take a minute to read that.
11     MS. JOHNSON: Why don't we take a break?
12     THE VIDEOGRAPHER: Okay. Going off record. The
13 time is 11:46.
14         (Recess taken.)
15     THE VIDEOGRAPHER: Okay. We're back on the
16 record. The time is 11:56.
17     Q. (By Ms. Ducey) All right. Ms. Wade, did you
18 have an opportunity to read through Exhibit 12 while we
19 were off record?
20     A. I scanned it. I did not read every word.
21     Q. Okay. And is Exhibit 12 a complete and accurate
22 copy of your contract?
23     A. Except for the last two pages.
24     Q. Okay. Could you look at the second to the last
25 page?
```

25 (Pages 94 to 97)

case No. A05-086 Civil                                                    Bobbi Wade

1    A. Would that be Page 5?
2    Q. I'm going back to the faculty position
3  description, which --
4    A. Oh.
5    Q. -- is the last two pages of the exhibit.
6    A. This?
7    Q. Yeah.
8    A. Yes.
9    Q. And is that your signature on the top right?
10    A. That is my signature.
11    Q. Okay. So at some point you did get the faculty
12  position description; right?
13    A. I don't recall ever getting this.
14    Q. How would your signature be on there if you
15  didn't get that?
16    A. It could have been put on there by someone else,
17  copied on there.
18    Q. Do you believe it was?
19    A. I don't know.
20    Q. But if the original shows that that's your
21  signature on there then --
22    A. It is my signature.
23    Q. Yes.
24    A. It's a copy of my signature.
25    Q. Right. And if the original shows that your

1  signature is on the faculty position description, then
2  you obviously received a copy of it?
3    A. I received it at some time --
4    Q. Right.
5    A. -- but not in this contract.
6    Q. Okay. All right. On the second page of Exhibit
7  12, which is the employment offer, you signed it
8  accepting the terms and conditions; correct?
9    A. Yes, after speaking with Dr. MacLean.
10    Q. Okay. And at the top of the page it says, "The
11  terms and conditions of your employment are in accordance
12  with this letter of appointment including Attachment A,
13  the Ilisagvik College Employee Handbook, and the policy
14  and regulations of the Board of Trustees as they exist
15  today and as they may be duly amended from time to time."
16  Correct?
17    A. Yes.
18    Q. And it again says, "This letter of employment
19  with its references encompassed herein, constitutes the
20  full and complete contract agreement between yourself and
21  Ilisagvik. Any other oral agreement between the parties
22  shall be null and void. This contract shall be modified
23  only in writing." Correct?
24    A. Yes.
25    Q. Was there any written modification that was --

1  modified this contract?
2    A. I never received any.
3    Q. Okay. Then can you look at Attachment A? Okay.
4  And if you could look with me at the second page of
5  Attachment A. All right. In about three-quarters of the
6  way down, do you see where it says, "personal and sick
7  leave"?
8    A. Yes.
9    Q. Okay. The personal and sick leave term of this
10  contract changed from the year before, didn't it?
11    A. I don't know. I couldn't vouch for that.
12    Q. Uh-huh. Could you read that into the record?
13    A. "Twelve days of personal leave per contract year
14  are allowed when it's -- when taken it does not unduly
15  interfere with the delivery of the college's program or
16  instruction. Leave must be approved in advance by the
17  faculty members, department head, and dean of instruction
18  except in the event of the emergency situation. Personal
19  leave has no cash value and may not be accrued from year
20  to year."
21    Q. Okay. Why don't you put that side by side with
22  the contract from the year before, which should be --
23  hopefully that's Exhibit 11? Do you got that there?
24    A. Here's Exhibit 11.
25    Q. All right. And if you let me see it just for a

1  minute, I can find the page for you.
2    A. Okay.
3    Q. Thank you. I'm referring back to 4A. Under 4A
4  in your 2002 contract, it permitted twelve paid days off,
5  correct, that you could use for personal injury or
6  sickness; right?
7    A. On which page?
8    Q. It's the page I just pointed you to, ma'am.
9  Right there. Do you see 4A, under "benefits"?
10    A. Oh, yes.
11    Q. Yeah. So in your 2002 contract, you could have
12  a total of twelve paid days leave. You could use up to
13  six for person- -- personal paid time off in lieu of sick
14  leave and the use of the paid time off required
15  reasonable advance notice. Correct?
16    A. Yes.
17    Q. And under your new contract, you were permitted
18  twelve days of leave when taking it didn't unduly
19  interfere with the delivery of the college -- college's
20  program of instruction; right?
21    A. Right.
22    Q. And you had to have that leave approved in
23  advance --
24    A. Yes.
25    Q. -- right?

26 (Pages 98 to 101)

Page 102

1    A. Uh-huh.
2    Q. Okay. Do you remember if you read your 2003
3  contract?
4    A. I don't recall.
5    Q. Okay. Do you recall if you were being aware of
6  that?
7    A. I was aware of the rules, yes
8    Q. Okay. As somebody with a master's degree in
9  education, tell me what you consider to be among the most
10  important things that an instructor or a professor does
11  when they are teaching students, when they're teaching a
12  class.
13    A. The important thing?
14    Q. Uh-huh.
15    A. In teaching?
16    Q. What do you consider priorities?
17    A. Is to always be there and be on time for a good
18  teacher.
19    Q. All right. So it's important if you're teaching
20  a class to actually teach the class; right?
21    A. Right.
22    Q. And that means that you should show up at the
23  time appointed and be on time and actually give the
24  class; right?
25    Q. Why is that important?

Page 103

1    A. It's important as not to disrupt the students.
2    Q. Is it particularly important with students like
3  those at Ilisagvik who are, for various reasons, at risk
4  for not completing programs?
5    A. I can't answer that question.
6    Q. In your experience, did you come to learn that
7  it was important to be there and teach the class for
8  chil- -- students who were at risk?
9    A. Yes, it was important.
10    MS. DUCEY: All right. Would it be a convenient
11  time to take a lunch break?
12    MS. JOHNSON: Sure.
13    MS. DUCEY: And I got my lunch here, so you all
14  tell me how long you need.
15    THE VIDEOGRAPHER: Do you want to go off record?
16    MS. DUCEY: Yes.
17    THE VIDEOGRAPHER: Going off record at the end
18  of Tape 1. Time is 12:04.
19    (Lunch recess.)
20    THE VIDEOGRAPHER: Okay. We're back on the
21  record at the beginning of Tape 2. The time is 1:02.
22    MS. DUCEY: All right. Jonathan, what number
23  are we on?
24    MR. CLEMENT: 13.
25    MS. DUCEY: Okay. Would you make that 13A and

Page 104

1  that 13B?
2    (Exhibit Nos. 13A-13B marked.)
3    THE WITNESS: Have we finished with the handbook
4  for now?
5    MS. DUCEY: I think for the moment, yes.
6    THE WITNESS: Okay. I'll just put it aside over
7  here.
8    MS. DUCEY: There's 13A and have you got 13B,
9  too? Let's give them to her both at the same time. Can
10  you make that one 13B? Okay. And will you trust me with
11  that pile of exhibits for a minute?
12    MR. CLEMENT: Okay.
13    Q. (By Ms. Ducey) Can you take a look at 13A and
14  13B for a minute, Ms. Wade?
15    A. Okay.
16    MS. DUCEY: Jonathan, could you hand me the pile
17  of exhibits that we've already marked?
18    MR. CLEMENT: Oh, sure
19    MS. DUCEY: I promise I'll give them back.
20    Q. (By Ms. Ducey) So 13A is the anti-harassment
21  policy; right? That's what it says.
22    A. Uh-huh, yes.
23    Q. Do you remember getting that in September '01?
24    A. No, I don't recall getting it.
25    Q. Okay.

Page 105

1    A. I might have, but I don't recall.
2    Q. All right. And then 13B is leave without pay in
3  the Family Medical Leave Policy; right?
4    A. Yes.
5    Q. And do you remember receiving that in September
6  '01?
7    A. Not this particular item, per se, no.
8    Q. Okay. Well, you had a good memory because I
9  called and found out that there was a -- a revision to
10  the policy, September 7th, '01 --
11    A. Okay.
12    Q. -- which corresponds with Exhibit 8 --
13    A. Uh-huh.
14    Q. -- which shows that you got those updates that
15  you mentioned on September 21st, '01.
16    A. Okay.
17    Q. So I'm just wondering, does that refresh your
18  recollection about whether 13A --
19    A. I don't recall reading these --
20    Q. Okay.
21    A. -- or what was in them.
22    Q. All right. But you might have received an
23  amendment; right?
24    A. Yes.
25    Q. You can put those aside. Thank you.

27 (Pages 102 to 105)

Page 110

1    A. Dr. Tuthill, no, he didn't.
2    Q. Did you receive any additional remunerations for
3 being lead -- lead faculty?
4    A. No.
5    Q. Now in the fall '03, when did classes begin, if
6 you can recall?
7    A. It was the last -- around the 27th, 28th or 29th
8 of August. I would have to look at the sched- --
9 schedule to refresh my memory.
10   Q. Okay. You had been out on some personal leave
11 during the '02-'03 school year; correct?
12   A. Yes.
13   Q. And what was the reason for that?
14   A. On personal leave was right at the end of the
15 summer session when I took some leave days to leave early
16 to drive an automobile from Anchorage to Nashville.
17   Q. Uh-huh. That was two weeks of leave in May,
18 wasn't it?
19   A. Yes, but my courses were done and finished.
20   Q. Uh-huh. Okay. And you took other leave in
21 2002-'03, didn't you?
22   A. No, I didn't take leave.
23   Q. You were absent from the school, weren't you?
24   A. Not from the school, no.
25   Q. At no time?

Page 111

1    A. There was a time in December when I was not on
2 campus, but I was -- I was on off-site duty.
3    Q. But you asked to take leave, didn't you?
4    A. I did.
5    Q. And it was designated as leave, wasn't it?
6    A. No, it wasn't. It was designated as off-site
7 duty.
8        (Exhibit No. 16 marked.)
9       MS. DUCEY: And, Peter, I don't have a copy for
10 you. Yes, I do. Never mind.
11   Q. Can you identify what Number 16 is? Can you
12 identify 16?
13   A. Yes, ma'am.
14   Q. What is Number 16?
15   A. It's a letter when I requested leave.
16   Q. Uh-huh.
17   A. To see about my son who was critically ill.
18   Q. And that's dated November 7, '02; right?
19   A. Yes.
20   Q. And you wanted to take ten days of personal
21 leave; right?
22   A. If that's what it says, yes.
23   Q. Okay. But you only had six days of personal
24 leave; right?
25   A. I don't know. I couldn't confirm that.

Page 112

1    Q. Did you write this e-mail?
2    A. Yes, I did.
3    Q. Can you read what it says beginning with "Angie
4 understands"?
5    A. "Angie understands that I can only take six days
6 unless I take four days of those days without pay, but I
7 was advised by my doctor last week and she has written
8 letters of verification to go out of Barrow to have tests
9 made. Nothing wrong just precautionary measures." I
10 don't think to mention -- "I didn't think to mention this
11 to Angie."
12   Q. All right. So you had six days of leave and if
13 you took ten, four of those would be without pay; right?
14   A. It seems so, yes.
15   Q. Okay. But then you thought of another reason
16 that you could use, which was that you wanted to have
17 some medical tests done; right?
18      MS. JOHNSON: Object to the form of the
19 question.
20   Q. Is that right?
21   A. What was the -- would you repeat the question?
22   Q. You thought of another reason --
23   A. I thought of another reason?
24   Q. -- that you could leave?
25   A. I don't know what I thought of at that time.

Page 113

1    Q. "I didn't think to mention this aspect to
2 Angie," is what it says; right?
3    A. Yes.
4    Q. And subsequently you thought of another reason
5 that you could go outside and perhaps be paid all of your
6 time; right?
7       MS. JOHNSON: Objection to the form of the
8 question.
9    Q. Is that right?
10   A. I don't know. I -- I can't verify what I
11 thought at the time. I don't know what I thought.
12   Q. Okay. So it says, "I didn't think to mention
13 this aspect to Angie." Obviously you didn't think of
14 that --
15   A. No.
16   Q. -- at the time you requested the leave?
17   A. No.
18   Q. But later on you said that you were advised by
19 your doctor that you needed to go to Barrow to have tests
20 made; right?
21   A. Yes.
22   Q. You weren't sick; right?
23   A. I don't know. I don't remember. I don't
24 remember if I was sick or not at that time.
25   Q. It says, "Just precautionary measures"; right?

Page 114

1    A. To have the tests made. Not to go out on leave.
2    Q. Uh-huh. So you weren't sick, it was just a
3  precaution; right?
4    A. I don't remember.
5    Q. Uh-huh. Do you dispute what's in the e-mail
6  that you wrote?
7    A. No.
8    Q. Any reason --
9    A. I don't remember my thinking in this matter.
10   Q. Uh-huh. Any reason to believe that you were, in
11 fact, ill but didn't mention it?
12   A. If I told Angie that I needed tests made, then I
13 needed the tests made.
14   Q. Uh-huh.
15   A. I would of not have fabricated it.
16   Q. Do you remember what doctor you were seeing?
17   A. Dr. Church.
18   Q. Uh-huh. And do you remember what you were
19 seeing her for?
20   A. No, I don't.
21   Q. So you were trying to think of a way that you
22 could get the four days paid, as well; correct?
23       MS. JOHNSON: Object to the form of the
24 question.
25   A. I don't know.

Page 115

1    Q. You have no recollection about this?
2    A. No.
3    Q. Do you dispute what's in here?
4    A. No, I don't.
5    Q. Okay. So the -- the e-mail says that you were
6  trying to get those four other days with pay; right? Is
7  that what it says?
8    A. I don't know.
9    Q. Why don't you look at it?
10   A. I've already looked at it. I read it.
11   Q. Look at it again. It says, "Can I take ten days
12 off without losing pay?"
13   A. Okay.
14   Q. So that's what you wanted to do; right?
15   A. Yes --
16   Q. You only had six days --
17   A. -- apparently so.
18   Q. -- but you wanted ten days off with pay; right?
19   A. Right.
20   Q. You said, "If I took the whole twelve days I
21 could actually leave at Thanksgiving"; right?
22   A. Yes.
23   Q. So leave at Thanksgiving and not come back until
24 January 2nd; right?
25   A. Yes.

Page 116

1    Q. How many classes would you have missed at that
2  point?
3    A. I don't recall. I would have to study the
4  schedule at the time.
5    Q. But you would have missed a number of classes;
6  correct?
7    A. Yes.
8    Q. And some of those were classes that you were
9  teaching face-to-face; right?
10   A. I don't know. I would have to review the
11 schedule.
12   Q. Do you recall if you missed classes that you
13 taught?
14   A. I didn't -- I didn't miss classes.
15   Q. Did you have classes that you taught --
16   A. Yes, I did.
17   Q. -- face-to-face?
18   A. No, not face-to-face.
19   Q. Did you keep office hours where you were gone
20 from Thanksgiving to January 2nd?
21   A. Not in my office, but on the e-mail.
22   Q. Uh-huh. And how did you keep them on e-mail?
23   A. I kept in touch with my students by e-mail.
24   Q. Uh-huh. Who approved that leave?
25   A. The dean of instruction.

Page 117

1    Q. Uh-huh. And who was at that that?
2    A. Bruce Myers. It wasn't leave he approved.
3    Q. Uh-huh. What did he approve?
4    A. Off-site duty.
5    Q. Did you get anything in writing verifying that?
6    A. Yes, I did.
7    Q. What did you have in writing?
8    A. A letter from Dean Myers stating that I was
9  granted the off-site duty.
10   Q. Now when you went back in -- you went back to
11 Tennessee in the summer of '03; correct?
12   A. Yes.
13   Q. And then the summer of '03, did you see any
14 medical providers?
15   A. Yes, I did.
16   Q. Who did you see?
17   A. I saw Dr. Church.
18   Q. When did you see Dr. Church?
19   A. It was -- I don't recall the exact date. It was
20 either the latter part of July or the early part of
21 August.
22   Q. What was the reason you saw Dr. Church?
23   A. For several reasons. One being a urinary tract
24 problem.
25   Q. Uh-huh. What was the nature of that problem?

case No. A05-086 Civil

Bobbi Wade

Page 118

1   A. It was like a urinary tract infection.
2   Q. Uh-huh. And did she treat it in late July?
3   A. I don't recall what she did about that and what
4   I took.
5   Q. Anything else that she saw you for?
6   A. Yes.
7   Q. What else?
8   A. High blood pressure.
9   Q. You had had that over the summer?
10  A. Yes.
11  Q. And that was a continuing problem for you,
12  wasn't it?
13  A. Yes. But it continued to rise and get higher.
14  Q. And how did she treat that?
15  A. By medication.
16  Q. What medication did you take?
17  A. Lisinopril.
18  Q. When did you begin taking Lisinopril for the
19  first time?
20  A. I don't recall.
21  Q. You took it before you saw Dr. Church, didn't
22  you?
23  A. I don't recall. The doctor in Barrow might have
24  prescribed it.
25  Q. Well, you actually took it for many years,

Page 119

1   didn't you, Ms. Wade?
2   A. Not for many years, no.
3   Q. Did you see any other medical providers in the
4   summer of '03?
5   A. No.
6   Q. Okay. So when you saw Dr. Church in the summer
7   of '03, did she give you any reason that you might have
8   to return to see her?
9   A. Yes, she did.
10  Q. What did she say?
11  A. She wanted to do further tests as to what was
12  causing my high blood pressure and at the time I was
13  having stomach problems. She wanted to do tests there.
14  Q. Uh-huh.
15  A. And I had a -- I had begun to have a problem
16  with my left foot and I needed -- it was really painful
17  and I needed to get that -- find out what was causing
18  that. And I had a spot on my left shoulder that I was
19  becoming real concerned about because it was beginning to
20  itch and burn and really drawing my attention and I was
21  afraid.
22  Q. And so what did she tell you she wanted you to
23  do?
24  A. She wanted me to come back for tests -- she
25  wanted me to have tests then --

Page 120

1   Q. Uh-huh.
2   A. -- and I told her I couldn't.
3   Q. Why not?
4   A. Because I wouldn't have time to have all the
5   medical testing done and get back to work on time and I
6   had to get back to work on time.
7   Q. Uh-huh. What time were you supposed to be back?
8   A. I believe it was August the 15th, but I wasn't
9   pos- -- I'm not positive about that date because each
10  year it was a different date.
11  Q. Uh-huh.
12  A. But it was approximately during that time.
13  Q. Did you try and schedule some of those tests
14  before you had to go back?
15  A. No. There wasn't -- there wasn't time.
16  Q. Why not?
17  A. I don't recall.
18  Q. Who did you try and schedule them with?
19  A. I didn't try to schedule the tests.
20  Q. So you made no effort at all to schedule the
21  tests?
22  A. No. Dr. Church scheduled the tests, not me.
23  Q. Well, did you ask Dr. Church to make an effort
24  to schedule the tests, some of them, before you had to go
25  back?

Page 121

1   A. No.
2   Q. Why not?
3   A. Because there wasn't time.
4   Q. Why wasn't there time?
5   MS. JOHNSON: Objection as to form.
6   A. I don't recall.
7   Q. There was time to do nothing between the time
8   you saw Dr. Church until the time you got back?
9   MS. JOHNSON: Objection, form of the question.
10  A. I don't -- I don't recall.
11  Q. Not a single time?
12  A. I don't know. I don't recall what my activities
13  were at that time.
14  Q. Uh-huh. But what could be more important than
15  your health?
16  MS. JOHNSON: Objection, form.
17  A. There was nothing.
18  Q. Okay. You weren't working that summer, were
19  you?
20  A. No.
21  Q. Okay. And was there -- were there any other
22  things that had a higher priority than your health in
23  late July, early August?
24  A. No. No.
25  Q. Did you ask Dr. Church to see if she could

31 (Pages 118 to 121)

case No. A05-086 Civil

Bobbi Wade

---

Page 122

1  schedule anything?
2      A. No. I don't recall whether she tried at that
3  time to get appointments or not. She might have.
4      Q. Are you sure it was Dr. Church?
5      A. Yes, it was Dr. Church.
6      Q. And when did she tell you she needed -- you
7  needed to return?
8      A. She just asked me when I could have the tests
9  made.
10     Q. And what did you tell her?
11     A. She says, "You need to have these tests as soon
12 as possible." And I told her I would try to arrange for
13 a trip back to have the tests made once I got back to
14 work and got my semester underway and all my schedules
15 underway and arrangements worked out for my students.
16     Q. Okay. Now did the foot problem prevent you from
17 performing your job duties?
18     A. No, it did not.
19     Q. How about the stomach problem?
20     A. No, it did not.
21     Q. And did the spot on the shoulder prevent you
22 from performing your job duties?
23     A. No, ma'am. I was never absent from my job
24 unless it was necessary to see a doctor.
25         (Exhibit No. 17 marked.)

---

Page 123

1      Q. This one is 17.
2      MS. DUCEY: If you could, Linda, could you pass
3  one to Peter.
4      Q. Can you identify what that is?
5      A. I don't recall this.
6      Q. Okay. Do you recall --
7      A. I can't remember.
8      Q. Do you remember a doctor named Soraya Aragunda?
9      A. Yes, she was -- she was on the staff over at the
10 Barrow Medical Clinic.
11     Q. Do you remember asking her to write a letter to
12 Pam Taylor for you?
13     A. No, I don't recall asking her, but anytime a
14 person needed to leave to see a doctor, Pam requested a
15 note from the doctor.
16     Q. Uh-huh. So is it reasonable to infer that you
17 did ask her, otherwise she would not have been able to
18 obtain this information from the doctor?
19     A. I've never seen this document right here
20 before --
21     Q. Uh-huh.
22     A. -- and I could not even verify that that's the
23 doctor's name and I -- it makes me wonder why she didn't
24 sign it instead of printing her name.
25     Q. Uh-huh.

---

Page 124

1      A. So I -- I can't identify this -- this document
2  right here at all.
3      Q. Okay. You sought leave by e-mail to Pam at that
4  same time. Is it reasonable to infer that if Pam Taylor
5  got a note from Dr. Aragunda requesting that you be
6  referred to doctors outside, it was because you asked Dr.
7  Aragunda to do that?
8      A. I don't recall asking Dr. Aragunda.
9      Q. Uh-huh. You think Dr. Aragunda just violated
10 your attorney/client [sic] privilege and sent the letter?
11     A. No, I don't.
12     Q. So how do you think this came in Pam Taylor's
13 hands?
14     A. I have no idea.
15     Q. Well, what is the reasonable inference to make?
16     MS. JOHNSON: Objection, form of the question.
17     A. I -- I don't choose to make an inference.
18     Q. I'm asking you, isn't it reasonable to infer?
19     A. I don't know.
20     Q. Okay. You saw her on November 1st at Samuel
21 Simmonds Hospital. Says, "Patient follow up with chronic
22 medical issues. States for three or four months she's
23 been getting light-headed when changing positions,
24 walking fast or bending at work. Also, thinks she's
25 getting very forgetful. Sometimes she calls somebody and

---

Page 125

1  then forgets why or who she called. 'I'm under a lot of
2  stress.' Her son is ill after having 60 percent of his
3  liver removed secondary to cancer. He's in intensive
4  care in the Lower 48. 'I just feel guilty that I'm up
5  here.' Thinking about returning this year. Assessment,
6  blood pressure up." Does that refresh your recollection
7  about seeing Dr. Aragunda?
8      A. I don't recall ever writing or saying those
9  words.
10     Q. Uh-huh.
11     MS. JOHNSON: Do you have something for her to
12 look at?
13     MS. DUCEY: I don't need to show her anything.
14     Q. (By Ms. Ducey) Do you deny seeing Dr. Aragunda
15 on November --
16     A. No, I don't deny seeing Dr. Aragunda, but if I
17 was light-headed it was due to an ear infection --
18     Q. Uh-huh.
19     A. -- which I had.
20     Q. So it's possible you told her that, you just
21 don't recall?
22     A. I don't recall it.
23     MS. JOHNSON: Objection, foundation. Since you
24 haven't shown her anything, she doesn't have anything to
25 verify whether she's said that or not.

---

32 (Pages 122 to 125)

case No. A05-086 Civil

Bobbi Wade

Page 126

1    MS. DUCEY: I don't have to show her anything.
2    THE VIDEOGRAPHER: Microphone.
3    MS. DUCEY: How did I do that? Okay. Thank
4  you.
5    Q. (By Ms. Ducey) So what did you do after Dr.
6  Church told you this?
7    A. Told me what?
8    Q. That you had to come back for testing.
9    A. I told her that I would see if I could work it
10 out and if -- if I possibly could come back, I would; but
11 if I couldn't, it would have to wait until a later date.
12   Q. And what did she say?
13   A. And she says, "Well, you really need to have
14 these tests made."
15   Q. Did she say when?
16   A. No. As soon as possible.
17   Q. Uh-huh. And did she know that you were an
18 assistant professor?
19   A. Yes, she did.
20   Q. Did she know that you had teaching
21 responsibilities?
22   A. Yes, she did.
23   Q. And did you discuss your teaching
24 responsibilities --
25   A. No.

Page 127

1    Q. -- in relation to the tests?
2    A. Not with Dr. Church I didn't.
3    Q. Why not?
4    A. I don't recall why not.
5    Q. Well, wouldn't that have been something
6  important to do so that you could attempt to arrange your
7  classes so that --
8    A. I might have. I just don't recall.
9    Q. Uh-huh. And when you left to come back to
10 Alaska, did you have any appointments scheduled?
11   A. There was a -- Dr. Church had scheduled some
12 appointments early in October, yes.
13   Q. So when you left in August, you had appointments
14 scheduled for October?
15   A. I -- I was not aware of the scheduling of the
16 appointments in October, no, not when I got back. After
17 she sent notice to me or either called me or I called her
18 office, I don't know how I received notice of those
19 appointments.
20   Q. Uh-huh. What appointments were they?
21   A. It was -- one appointment was with Dr. Smith, an
22 orthopedic doctor --
23   Q. Uh-huh.
24   A. -- that saw my foot, and the other one was a
25 Dr. Concepcion concerning my urinary tract problem.

Page 128

1    Q. And what were the appointments for?
2    A. For testing.
3    Q. Okay. And if you didn't make those
4  appointments, were you incapacitated?
5    A. No.
6    Q. And unable to work?
7    A. No. They were not life threatening.
8    Q. So when you left Nashville to come back to
9  Barrow, it's your understanding that Dr. Church had not
10 scheduled appointments for you; correct?
11   A. I don't know when she scheduled the
12 appointments. I don't recall. I can't remember.
13   Q. Uh-huh. And what was it in October that was of
14 an urgent nature that couldn't wait until the end of the
15 semester?
16   A. The spot on my shoulder had become really angry
17 and it was itching and burning and I became real
18 concerned about it and I had called a doctor that had
19 been used by my family in Nashville to make an
20 appointment for him to test -- I wanted the spot on my
21 shoulder tested.
22   Q. Uh-huh.
23   A. The reason Dr. Church didn't do that is because
24 I requested her to let me make my own appointment because
25 I wanted to see a particular doctor.

Page 129

1    Q. Okay. When you were there in August and you
2  knew that that spot was bothering you, did you make any
3  attempt to schedule the appointment with the doctor at
4  that point?
5    A. I don't recall that I did.
6    Q. What was the doctor's name?
7    A. Dr. Gold.
8    Q. G-O-L-D?
9    A. Yes.
10   Q. And what was Dr. Gold -- what type of doctor was
11 he?
12   A. He was a dermatologist.
13   Q. Did you ever make an appointment with Dr. Gold?
14   A. Yes, I did.
15   Q. When did you make an appointment with Dr. Gold?
16   A. I made one in -- for October in the time span
17 that I asked for leave, for sick leave.
18   Q. When?
19   A. I don't remember the date.
20   Q. Was it before or after you submitted a request
21 for leave?
22   A. That I made the appointment?
23   Q. Yes.
24   A. I don't remember the date I made the
25 appointment.

33 (Pages 126 to 129)

EXHIBIT
Page 28 of 29

case No. A05-086 Civil                                                                    Bobbi Wade

Page 130

1    Q. What is Dr. Gold's first name?
2    A. I don't know.
3    Q. Did you ever see Dr. Gold?
4    A. No, I didn't.
5    Q. Why not?
6    A. Because later when I could have seen him, he was
7  not available.
8    Q. And when could you have seen him?
9    A. I could have seen him the 2nd of December.
10   Q. All right.  How soon after you saw Dr. Church
11 did you come back to Anchorage?
12   A. I don't recall how many days it was, but I was
13 here a few days prior to the due date to be back and it
14 was -- if it was August the 15th I was here the week -- I
15 came back the week before.
16   Q. Okay.  Were you required to come before class
17 started?
18   A. No, I gave myself plenty of time because it was
19 a big chore to make a plane trip from Nashville to Barrow
20 and it wasn't a pleasant ordeal.
21   Q. Okay.  So you were required to be back the first
22 day of classes?
23   A. Yes -- no, before that.
24   Q. When before?
25   A. I don't recall the date.  I've already told you

Page 131

1  that.
2    Q. I'm not asking about the date.  I'm asking what
3  event triggers the requirement that faculty be present in
4  Barrow.
5    A. We're given notice the day the faculty is due
6  back.
7    Q. And what happens?  Is it the first day of
8  registration, is it the first day of class, is it a time
9  when a student --
10   A. It's the first day to report back on campus in
11 our offices and to be present.
12   Q. And it has no relation at all to the beginning
13 of the semester?
14   A. No.
15   Q. It's just an arbitrary date?
16   A. Yes.
17   Q. So is it weeks before you -- the first day of
18 class?
19   A. No, August the 15th until August the 27th is not
20 weeks before.
21   Q. Uh-huh.  Was it August 15th that you were
22 required to be back?
23     MS. JOHNSON:  Objection, asked and answered.
24   A. Yes.  I don't know the exact date.  I said I
25 thought it was August the 15th.

Page 132

1    Q. Uh-huh.  How long had the patch on your shoulder
2  been bothering you before you saw Dr. Church?
3    A. For several months.  It was just a tiny little
4  spot.
5    Q. Uh-huh.  And why didn't you take care of it
6  earlier in the summer?
7    A. Because it was not causing any problem and I had
8  had -- Dr. Church looked at it and -- and told me she
9  didn't think there was anything to it.
10   Q. I'm asking before you saw Dr. Church, you said
11 it was bothering you --
12   A. I don't recall.
13   Q. -- for several months.  Why didn't you have an
14 appointment before then to take care of it?
15     MS. JOHNSON:  Objection, form of the question.
16   A. I -- I don't remember why.
17   Q. Was there anything that prevented you from
18 making an appointment during the summer before --
19   A. No --
20   Q. -- you saw Dr. Church?
21   A. -- it didn't become angry until I returned to
22 school in the fall of 2003.
23   Q. Okay.  So when you saw Dr. Church, there was no
24 reason to do anything about it?
25   A. There was anxiety on my part --

Page 133

1    Q. Uh-huh.
2    A. -- to have it tested.  And she would have had to
3  refer me to another doctor and I would have had to make
4  an appointment which takes a lot of time and there wasn't
5  time to do all that.
6    Q. How much time does it take to get an
7  appointment?
8    A. Several days.
9    Q. Uh-huh.  You had several days, didn't you?
10     MS. JOHNSON:  Objection to the form of the
11 question.
12   A. There was not enough time.
13   Q. How many days were there?
14   A. I don't know.
15   Q. Well, if you don't know how many days there
16 were, how do you know if there wasn't enough time?
17     MS. JOHNSON:  Objection, form of the question.
18   A. Because I recall telling her that I didn't have
19 enough time for her to schedule appointments with other
20 doctors.
21   Q. Well, you may not have had time to schedule
22 appointments with every doctor, but I'm asking you with
23 respect to the patch on your shoulder, which you said was
24 causing you anxiety, how many days was there between the
25 time you saw Dr. Church and the time that -- two or three

34 (Pages 130 to 133)