case No. A05-086 Civil                                                      Bobbi Wade

Page 218

1  wouldn't it?
2     A. I did that and he denied that request, also.
3     Q. He denied what request?
4     A. The request I made to take a few days right at
5  the end of the semester in December.
6     Q. That's not what I asked, ma'am. I asked you
7  about one or two days the first week of January.
8     A. No, I didn't ask for the first week in January.
9     Q. Okay. So you didn't ask Dr. Gold if he had time
10 to see you during Christmas or the week after or the
11 first week of the new year?
12    A. I would not be there the first week of the new
13 year. I would be on my way back.
14    Q. Could you answer my question yes or no?
15    A. Rephrase your question.
16    Q. Did you ask Dr. Gold to schedule you so you
17 could come the first business day after the new year?
18    A. No.
19       MS. JOHNSON: Objection, asked and answered.
20    Q. Did you ask Dr. Smith or Dr. Concepcion?
21    A. No.
22    Q. Did you ask Dr. Church?
23    A. No.
24    Q. Okay. So you said you called Dr. Gold and he
25 said he could only see you December 2nd. Then what did

Page 219

1  you do next?
2     A. I turned in another leave request for December,
3  which was denied. I don't have copies of all these
4  requests to accommodate my seeing Dr. Gold. And --
5     Q. And who did you turn the leave request in to?
6     A. I gave them all -- every request I had, I handed
7  them to Dr. Tuthill.
8     Q. And when did you give it to Dr. Tuthill?
9     A. I don't recall.
10    Q. And what did he say when you gave it to him?
11    A. I don't recall.
12    Q. Did he keep the leave request?
13    A. Yes.
14    Q. And what dates were you seeking leave for?
15    A. I don't remember, but it -- because I don't have
16 a copy of the request and it was to accommodate the date
17 on December the 2nd that I could get an appointment with
18 Dr. Gold.
19    Q. And how many days did you seek leave for in that
20 request?
21    A. I don't recall that either.
22    Q. Okay. And at the time you turned in that leave
23 request, it was to only see Dr. Gold for an evaluation of
24 your foot; right?
25    A. I don't recall that either.

Page 220

1     Q. Well, what was it for?
2     A. I know it was to see Dr. Gold. I don't recall
3  if I made appointments or I tried to make appointments,
4  change the appointments with the other doctors or not.
5  It was -- it was urgent to me to get someone to check the
6  spot on my shoulder and that was one of my main concerns.
7     Q. And had anybody checked it locally?
8     A. The doctors in the Barrow clinic had checked it.
9     Q. Uh-huh. And what did they say?
10    A. They told me that they didn't think it was
11 malignant and the -- and the doctor told me that she
12 could take it off there in the Barrow clinic, which I
13 didn't want to do, but I was so worried about it I
14 decided to let her do it anyway.
15    Q. Uh-huh. So she took it off?
16    A. So she took it off --
17    Q. Uh-huh.
18    A. -- yeah.
19    Q. And when did that occur?
20    A. I think it was after my request for leave had
21 been denied. I'm sure it was after my -- because I would
22 never have gone over to the Barrow clinic to have
23 something cut off had it not been just I felt like really
24 necessary. I was that worried about the spot on my
25 shoulder but it -- because it was very angry and

Page 221

1  bothering me.
2     Q. Uh-huh. Why didn't you call a dermatologist in
3  Anchorage?
4     A. I didn't know any dermatologists in Anchorage
5  and I rely on my doctors in Tennessee.
6     Q. Uh-huh. But you might have gotten up and back
7  in a day; right?
8     A. It would still have required leave.
9     Q. Not ten days, though, would it?
10    A. Well, I might not have had to have ten days on
11 the -- December the 2nd. I don't know.
12    Q. Uh-huh. But clearly it would have taken less
13 time to go down to Anchorage?
14    A. It might have taken less time, it might not. I
15 don't know that.
16    Q. Uh-huh. Did you ask for a referral from the
17 Barrow doctor?
18    A. No.
19    Q. Why not?
20    A. Because she didn't think the spot was malignant.
21    Q. But that didn't prevent you from asking for a
22 referral, did it?
23    A. I didn't want to ask her for a referral. I
24 wanted to go to the doctor whom I trusted --
25    Q. Uh-huh.

56 (Pages 218 to 221)

Page 222

1   A. -- Dr. Gold.
2   Q. Is it your testimony there is no doctor in
3   Anchorage that is trustworthy?
4   A. No, it's not, it's that I don't know any doctors
5   in Anchorage.
6   Q. Uh-huh. Well, you didn't know the dermatologist
7   in Nashville either; right?
8   A. My son did. He had been to him.
9   Q. Uh-huh.
10  A. And my daughter-in-law. He was the family
11  dermatologist.
12  Q. Uh-huh. Could have cost less money for a plane
13  flight to Anchorage, too; right?
14  A. Not as much as it would have cost me to have
15  stayed in a motel in Anchorage.
16  Q. And how much would that have been?
17  A. I don't know. I don't know how long I would
18  have stayed.
19  Q. Just down for an appointment and back?
20  A. I don't know if they had -- I would have to stay
21  long enough for it to be tested, that's what I wanted. I
22  want it to be tested.
23  Q. Uh-huh. How much did a plane fare cost back to
24  Nashville?
25  A. It's according to the time of the year. I can't

Page 223

1   say that because I don't know. It's according to the
2   date that you're trying to get the plane ticket.
3   Q. Well, if you go in October or November or
4   December on less than 30-days' notice, how much does it
5   cost?
6   A. I have no idea. I can't give you figures on how
7   much a plane ticket costs. It varies.
8   Q. Uh-huh. Well, tell me how it varies. What's
9   the most expensive flight you've had from Barrow to
10  Nashville?
11  A. Approximately $1200.
12  Q. When did you have to pay that much?
13  A. Not from Barrow, from Anchorage.
14  Q. Uh-huh. When did you have to pay that much?
15  A. I don't remember.
16  Q. And what's the least expensive?
17  A. When I used frequent flyer miles.
18  Q. Uh-huh.
19  A. Where I might have had to buy a few additional
20  miles, maybe up to $300 worth.
21  Q. Did you have frequent flyer miles in fall of
22  '03?
23  A. Yes. That was the reason it was so hard to get
24  a reservation --
25  Q. Uh-huh. Did you --

Page 224

1   A. -- because I had -- I needed to use my frequent
2   flyer miles.
3   Q. Uh-huh. So once the doctor made an appointment,
4   then you had to try and get a reservation using frequent
5   flyer miles?
6   A. Yes.
7   Q. And you wouldn't have been able to go, is it
8   your testimony, unless you were able to use frequent
9   flyer miles?
10  A. No. I -- I don't recall what you're asking me.
11  I don't recall all the little details of how I arranged a
12  plane ticket.
13  Q. Well, did you have money to fly to Nashville?
14  A. I don't recall how much money I had.
15  Q. Did you have money for a plane fare to
16  Nashville?
17  A. Yes.
18  Q. Okay. How did you pay for a plane fare to
19  Nashville?
20  A. I don't recall. I don't remember whether I used
21  frequent flyer miles or I purchased the ticket.
22  Q. And who's your frequent flyer account through?
23  A. I have two. One with Alaska Airlines and one
24  with Delta.
25  Q. Okay. And if you were to purchase a ticket,

Page 225

1   would you be charging it?
2   A. Charging it, how?
3   Q. On a credit card.
4   A. I would be using a credit card, yes.
5   Q. Uh-huh. And what sort of credit card?
6   A. I have a debit Visa card. It would come
7   directly out of my account, so that means I would have to
8   have the money right then.
9   Q. Okay. And issued through what bank?
10  A. Sun Trust Bank in Nashville, Tennessee and at
11  that time Wells Fargo Bank in Barrow.
12  Q. All right. So you learned that Dr. Gold could
13  only see you on the 2nd. You resubmitted a leave
14  request, you don't know for what date, you don't know the
15  number of days, you don't know when you submitted it.
16  And what happened next?
17  A. Right after this leave request was turned down,
18  I was asked by Dean Tuthill to teach another class and
19  that was when -- it might have been in that same
20  conversation that -- the time that I talked to him that
21  he asked me why I couldn't wait until Christmas leave to
22  see the doctors.
23  Q. Uh-huh.
24  A. So the students were my main concern in the
25  classes and the students who had registered for that

case No. A05-086 Civil                                                                    Bobbi Wade

Page 226

1   classes -- that class, they were my advisees and there
2   was no one else to teach that class and it was either
3   they had to drop it -- and I don't recall if any of them
4   needed that class to finish a certification or whatever,
5   but it was imperative, it seemed by Dr. Tuthill, that
6   that class be taught and he just really impressed upon me
7   that I -- I needed to teach that class. So I agreed to
8   teach it, but -- and my load was already very, very
9   heavy --
10     Q. Uh-huh.
11     A. -- my teaching schedule.
12     Q. So you felt under pressure to accept that
13  teaching responsibility?
14     A. I did. I did, because he pressured me to -- to
15  accept that responsibility.
16     Q. Okay. And what class was it?
17     A. It was an Office Technology class. It was
18  Filing and -- Filing and Records Management, I believe,
19  I -- but I'm not sure about that.
20     Q. Okay. And when you talked to him, did you have
21  any communication by e-mail about that?
22     A. There was some, yes.
23     Q. Uh-huh. And did he mention the leave again?
24     A. I -- I don't recall. I would have to refresh my
25  memory by rereading the e-mail.

Page 227

1     Q. Okay. All right. So what happened next?
2     A. I took the class and I taught it.
3     Q. Uh-huh.
4     A. And in the meantime, I went to see the doctor in
5   Barrow about the spot on my shoulder --
6     Q. Uh-huh.
7     A. -- because it was continuing to really be
8   aggravating and, of course, I was really concerned about
9   what it might be. So she suggested that she cut it off
10  so I let her cut it off.
11    Q. Uh-huh. Then what happened?
12    A. She sent it to a lab in Anchorage to be tested.
13    Q. Uh-huh. Then what happened?
14    A. She called me at work one day and told me the
15  spot was malignant.
16    Q. Uh-huh. And what else did she say?
17    A. She said, "You need to immediately have a moles
18  procedure."
19    Q. What was that?
20    A. It's to have the -- more skin cut out around the
21  spot and to have it tested to see if all the cancer cells
22  are gone, if she cut out all the cancer cells.
23    Q. Uh-huh.
24    A. And I'm not a doctor, I can't verify that and I
25  don't know, you know, exactly what a moles procedure is,

Page 228

1   but I was basically given that idea of what a moles
2   procedure was.
3     Q. Okay.
4     A. She also informed me that there was no one in
5   Barrow that could do that. She says there's no one in
6   Anchorage that can do that. In fact, there is no one in
7   the whole state of Alaska that can -- that's certified to
8   do that.
9     Q. Uh-huh. And who was this that told you this?
10    A. Dr. Snyder at the Barrow Medical Clinic. She's
11  the doctor who cut it off.
12    Q. Okay. And when did she tell you this?
13    A. I don't recall the date she cut it off, but it
14  was -- she had to have time to send it to the lab to be
15  tested. It was four or five days later --
16    Q. Okay.
17    A. -- and I don't recall what the dates were.
18    Q. Okay. So when you learned about this then, what
19  did you do?
20    A. I made out another request --
21    Q. Uh-huh.
22    A. -- for leave.
23    Q. For what days?
24    A. I don't recall. I don't have it in front of me.
25  I would have to look at it to know the exact dates.

Page 229

1     Q. Okay. When you made out a leave request, did
2   you have the moles procedure scheduled?
3     A. Did I have it scheduled?
4     Q. Yes.
5     A. No.
6     Q. Well, how did you know when you would go then?
7     A. Because I had to make an appointment with Dr.
8   Church and she would schedule an appointment with the
9   doctor that could do the moles procedure.
10    Q. Why didn't you just call the dermatologist or
11  the surgeon directly?
12    A. I didn't know the doctors that could do -- that
13  was certified to do a moles procedure.
14    Q. Uh-huh.
15    A. I -- I'm not a medical person.
16    Q. Uh-huh. Did you call Dr. Church and leave a
17  message?
18    A. No.
19    Q. Why not?
20    A. I called Dr. Church and -- and set up an
21  appointment with her, to see her.
22    Q. Uh-huh.
23    A. And she gave me the appointment and then I
24  arranged my schedule to coincide with her appointment.
25  When I got to Nashville and saw Dr. Church, then she

58 (Pages 226 to 229)

Page 230

1  scheduled an appointment with Dr. DeLozier, who was a
2  certified medical doctor that could do the moles
3  procedure.
4      Q. Okay. When was your appointment with Dr.
5  Church?
6      A. I don't recall. I would have to look.
7      Q. What month was it in?
8      A. It was in November.
9      Q. Uh-huh.
10     A. It was to coincide with my leave request and I
11 don't have that leave request in front of me.
12     Q. And when did you make the appointment with Dr.
13 Church?
14     A. I don't know. After Dr. Snyder called me and
15 told me I needed the moles procedure and no one in the
16 state of Alaska was certified to do that.
17     Q. Okay. Did you do it the same day?
18     A. I don't know.
19     Q. Days later?
20     A. I don't know.
21     Q. No idea?
22     A. I don't recall. I don't recall. It was within
23 that time span.
24     Q. Well, what time span are we talking about?
25     A. That I made out the request for leave.

Page 231

1      Q. Well, what time span is that?
2          MS. JOHNSON: Objection, asked and answered.
3      A. It was the first part of November.
4      Q. Okay. You went in --
5      A. All the dates coincided --
6      Q. Uh-huh.
7      A. -- to the events that were happening --
8      Q. Uh-huh.
9      A. -- but I don't know what those dates were.
10     Q. Okay. And what did you do with the leave
11 request?
12     A. I took it to Pam.
13     Q. Okay. And?
14     A. I told -- and I took the note from Dr. Snyder.
15 I first took the leave request to Dr. Tuthill and the
16 note from Dr. Snyder.
17     Q. Uh-huh.
18     A. And he says, "Well, it seems to me that urgent"
19 -- that's what she said, it was urgent that I see another
20 doctor --
21     Q. Uh-huh.
22     A. -- "It certainly seems to me that urgent means
23 you need to leave."
24     Q. Uh-huh. What else did he say?
25     A. I don't recall, but I know he said that.

Page 232

1      Q. Okay. So what did you do?
2      A. He signed it and I took it to Pam and got all
3  the appropriate people to sign it. And I don't have the
4  leave request in front of me, so I would need it to
5  remember the dates and times and so forth.
6      Q. Okay. So as soon as you presented a doctor's
7  note that was recent, not 45 days old, that said,
8  "urgent," you got the leave approved; is that right?
9          MS. JOHNSON: Objection to the form of the
10 question.
11     Q. Is that right?
12     A. At that time, yes.
13     Q. Okay. There was no delay?
14     A. No. But I also told Dr. Tuthill what the
15 problem was. It wasn't just the note. It was my verbal
16 conversation with him that I told him that the spot on my
17 shoulder was malignant.
18     Q. Uh-huh. Did you tell him that when you
19 submitted the leave request?
20     A. Here? I don't know if it was at the same time
21 or not, but I told him that. I also told Pam. I also
22 showed her the spot on my shoulder.
23     Q. Uh-huh.
24     A. She saw it.
25     Q. When did she see it?

Page 233

1      A. I don't recall when she saw it.
2      Q. Where was she when she saw it?
3      A. In her office.
4      Q. Was anybody else there?
5      A. No. I wouldn't have pulled my blouse apart if
6  anybody else had been there.
7      Q. So did you show Dr. Tuthill the spot on your
8  shoulder --
9      A. Absolutely not.
10     Q. -- at the same time you gave him -- or did you
11 tell him about the spot on your shoulder the same time
12 you gave him the note from Dr. Snyder?
13     A. I told him, yes.
14     Q. Okay.
15     A. I told him that the spot I had been complaining
16 about, that I was concerned about, came back malignant.
17     Q. Okay. Was there any further delay in getting
18 you the time off that you needed to go to Tennessee?
19     A. No.
20     Q. And how soon did you leave?
21     A. As soon as I could make arrangements to leave
22 because I wasn't anticipating leaving in November and it
23 takes time to get plane tickets and make preparations and
24 to reschedule my two classes.
25     Q. And how long were you gone?

59 (Pages 230 to 233)

Midnight Sun Court Reporters *** (907) 258-7100

Page 234

1  A. I don't see the dates so I can't tell you
2  exactly. I returned on December the 1st, but I don't
3  recall the date I left.
4        (Exhibit No. 24 marked.)
5  Q. This is 24. Can you take a look at that and
6  tell me if you can identify what that is.
7  A. This was way back the first of October.
8  Q. Could you look at the bottom e-mail and is that
9  an e-mail that you received from John Tuthill on October
10 3rd?
11 A. Yes, it is. It seems to be.
12 Q. Okay. And you recall receiving this?
13 A. Yes.
14 Q. Okay. And it says, "Here's my understanding of
15 where we stand after all our conversations this week";
16 correct?
17 A. Yes.
18 Q. "My understanding is you'll begin teaching
19 Business English B and Business Math B next week as
20 originally scheduled and that you will notify the
21 students in advance so they'll know to come." Did you do
22 that?
23 A. Yes.
24 Q. Okay. So this was after you got the course
25 approval change signed by Courtney Bartholomew; right?

Page 235

1  A. Yes.
2  Q. Okay. "And my understanding further is that you
3  will consult with your physicians here and in Tennessee
4  to determine if they feel you require immediate medical
5  treatment and depending on what they say, you may prepare
6  a medical leave request so that you can receive any
7  required treatment during the semester." Right?
8  A. I remember getting this.
9  Q. Okay. That's what it says; right?
10 A. Yes.
11 Q. And you got it October 3rd; right?
12 A. That's what the date says.
13 Q. Okay. And it says, "If my understanding is
14 incorrect, please tell me your understanding as soon as
15 you can." Right?
16 A. Yes.
17 Q. Okay. And when did this occur in the scheme of
18 things that you've just related?
19 A. When did this letter occur?
20 Q. Yeah. When did you receive this e-mail?
21 A. Well, apparently I sent a -- according to the
22 date, I received it on October the 3rd.
23 Q. Uh-huh. And when is that in relation to all of
24 the discussions you've had with Dr. Tuthill and Courtney
25 Bartholomew and Pam Taylor and Angie?

Page 236

1  A. This was after all those discussions.
2  Q. After all what discussions?
3  A. All the discussions we've been talking about
4  concerning my leave.
5  Q. Okay. So this is the last thing that happened?
6  A. I don't recall if this is the last thing that
7  happened or not.
8  Q. Uh-huh. You said it was after all --
9  A. And I was puzzled as to why he would write me a
10 note of this matter.
11 Q. Why are you puzzled?
12 A. I was puzzled at the time as to why he would
13 write a note such as this one to me.
14 Q. Well, what would be wrong with it?
15 A. Because he said, "It's my understanding that you
16 will begin teaching Business English B and Business
17 English B and Math -- Business Math B." It was his
18 understanding after he told me that I would have to do
19 it, that I -- he would not approve this leave. I had no
20 choice.
21 Q. Uh-huh.
22 A. It wasn't an understanding. It was a request --
23 Q. Uh-huh.
24 A. -- that I returned to my classes --
25 Q. Uh-huh.

Page 237

1  A. -- and the word "understanding" is misleading.
2  Q. Uh-huh.
3  A. It was a demand that I return to my classes.
4  Q. Did he use that word, "I demand that you return
5  to your classes"?
6  A. He might not have used "demand," but he strongly
7  told me that you will -- that he would not grant me this
8  request to leave.
9  Q. Uh-huh.
10 A. And that, therefore, the class change -- he
11 would not grant me the request for class change.
12 Q. Well, he must have had an immediate change of
13 plan; right?
14 A. Well, he must have had something to say, "It is
15 my understanding." That's what I couldn't -- I couldn't
16 understand is why he would use the terminology
17 "understand."
18 Q. Well, he must have had a pretty dramatic
19 turnaround from what you claim he said in the
20 conversation because he said, "I understand you're going
21 to consult with your physicians to see if" --
22 A. Well, he was very --
23 Q. Could I finish? Because he says in the e-mail,
24 "I understand that you're going to consult with your
25 physicians and determine if they feel you require

Page 238

1  immediate treatment and depending on what they say, you
2  can prepare a medical leave request so you can receive
3  any required treatment during the semester." Right?
4      A. That's what he's saying, yes.
5      Q. Okay. So you're sure he told you,
6  unconditionally, no?
7      A. I'm sure it was uncondit- -- it was. Yes, it
8  was unconditionally no.
9      Q. No room for any --
10     A. No room for any --
11     Q. -- misunderstanding on that?
12     A. "You will go back to your classes."
13     Q. Okay. But he did tell you --
14     A. He was trying to be nice here. He wasn't nice
15 when he told me that I could -- that he would -- he
16 denied my leave request.
17     Q. Okay. But he told you then immediately after,
18 maybe after he talked with Pam, that "talk with your
19 doctors and find out what needs to be done and if you
20 need to, prepare a leave request"; right?
21     A. And I did go and see the doctor.
22     Q. Okay.
23     A. And Dr. Snyder wrote a request to the same
24 effect that Dr. Church did that I needed to leave and he
25 denied that request, also.

Page 239

1      Q. All right. Then you sent him back an e-mail;
2  right?
3      A. Yes.
4      Q. And that's dated October 6th; right?
5      A. Yes.
6      Q. Did you e-mail him back before then?
7      A. I don't recall that I did --
8      Q. Okay. And what did you say?
9      A. I said, yes, Business English 109 and Business
10 Math 109 will begin this week. I would not be charged
11 with subordination [sic] to my supervisor.
12     Q. Could you -- I asked you to read what the e-mail
13 says that you wrote to him.
14     A. "I have appointments in Tennessee with my
15 doctors and I also have a letter from my doctor in
16 Tennessee stating that I will need to return as soon as
17 possible for medical treatment. Under these
18 circumstances, I don't feel that it's necessary to
19 consult with doctors here."
20     Q. Uh-huh.
21     A. "There are no doctors here that can be seen
22 without long-standing appointments and this is an
23 immediate situation."
24     Q. What was immediate?
25     A. The fact that I get this spot on my shoulder

Page 240

1  seen about because it was very angry and it was very
2  bothering me at the time.
3      Q. Uh-huh. Did you tell him that?
4      A. I don't recall if I did or not.
5      Q. Okay.
6      A. But I let him know that I needed to go home to
7  see the doctor.
8      Q. Okay. Well, how would he know unless you told
9  him?
10     A. I tried to do everything in a professional
11 manner.
12     Q. Okay.
13     A. I didn't go in and yell and scream and demand
14 like some people do.
15     Q. Well, you --
16     A. I handed him the proper documents.
17     Q. Okay. Well, you said you have a note that says
18 you need to return as soon as possible.
19     A. Uh-huh.
20     Q. In the same paragraph you describe that as
21 immediate; right? "This is an immediate situation."
22 That's what it says.
23     A. That means now. I need to go now.
24     Q. Okay. So as soon as possible means immediate,
25 doesn't it?

Page 241

1      A. Yes.
2      Q. Okay. But this letter is dated more than 30
3  days before; isn't it?
4      A. More than 30 days?
5      Q. The letter from Dr. Church?
6         MS. JOHNSON: Objection, form of the question.
7      A. I don't know when the letter is dated --
8      Q. Well, look at it --
9      A. -- I don't have it in front of me.
10     Q. -- it's Number 20. August 7, '03 --
11     A. But I had -- by this time I had another letter
12 from the doctor in Barrow.
13     Q. By October 3rd at 3:57 p.m.?
14     A. I don't know if it was by October the 3rd or
15 not, but I -- soon after that I went to the doctor in
16 Barrow and she verified --
17     Q. Okay.
18     A. -- that I needed medical attention.
19     Q. Okay. But on October 3rd at 3:57, the only
20 notification he had was a note from Dr. Church that was
21 more than 30 days stale; right?
22     A. Except for our conversation and the fact that I
23 had sat down and told him that I -- it was really
24 necessary that I go back to -- to continue with the tests
25 and so forth with Dr. Church.

Page 242

1  Q. Well, what did you tell him so that he would
2  know --
3  A. I don't recall exactly what I told him, but I do
4  know that Dr. Tuthill knew that I needed to see the -- go
5  back for medical treatment.
6  Q. Well, you -- you went back and forth between "I
7  can wait until Christmas" to "I'm going to go now";
8  right?
9  A. That was because he asked me to wait until
10 Christmas.
11 Q. Right. And --
12 A. And I was trying to accommodate him. I was
13 trying to adhere to his wishes because he was my
14 supervisor and he was also new on the job and I was also
15 real concerned about my classes and my students --
16 Q. Okay.
17 A. -- as what was going to happen to them.
18 Q. On October 3rd, 2003, at 3:57, did he have any
19 medical certification from a doctor that was other than
20 more than 30 days old?
21 A. I don't know. I don't recall when I gave him
22 the note from the Barrow doctor.
23 Q. Okay. And on October 6 when you wrote him back
24 and said you had a doctor from -- a letter from your
25 doctor in Tennessee, you didn't mention any letter from a

Page 243

1  doctor in Barrow; right?
2  A. Okay. So I --
3  Q. So you didn't have that letter; right?
4  A. Probably didn't at that time.
5  Q. Okay. So you told him that you weren't going to
6  get anything else; right?
7     MS. JOHNSON: Objection, form of the question.
8  A. No, I didn't tell him that.
9  Q. "I don't feel it's necessary to consult with
10 doctors here."
11 A. Because you couldn't see a doctor in Barrow. It
12 was very difficult to see a doctor in Barrow.
13 Q. Uh-huh. What was difficult about it?
14 A. Because there were no doctors in Barrow.
15 Q. Well, there is two --
16 A. The people that you saw when you went to the
17 medical clinic and you registered to see a doctor, when
18 you got in there, in the room and sat down for -- and
19 waited for hours to see that doctor, when you got in the
20 room, it was a physician's assistant, a P.A. It wasn't a
21 medical doctor that you saw.
22 Q. You saw plenty of doctors there; right? You saw
23 Dr. Snyder?
24 A. Yes, but -- but I had appointments.
25 Q. And it wasn't hard to get an appointment?

Page 244

1  A. And it -- well, you could get an appointment but
2  it was way in -- it was days and days and days.
3  Q. How many days? How many days?
4  A. I don't know.
5  Q. More than a week?
6  A. I don't know.
7  Q. You didn't have any problem getting in to see
8  Dr. Snyder, did you?
9  A. I don't recall. I don't know how much of a
10 problem I had getting in.
11 Q. Well, you didn't wait more than 30 days, did
12 you?
13 A. I don't know what the date of the doctor from
14 the Barrow clinic is. I don't have that note in front of
15 me.
16 Q. How would he know on October 3rd, 2003, that you
17 did have an urgent medical problem unless you --
18 A. Because I --
19 Q. Excuse me. May I finish? -- unless you
20 presented him with a note that was of recent duration
21 that said you needed immediate attention?
22    MS. JOHNSON: Let's not raise our voices. Okay.
23 Q. How would he know?
24 A. Because I told him --
25 Q. Did you tell --

Page 245

1  A. -- verbally.
2  Q. Did you tell him, "I had a malignancy on my
3  shoulder" --
4  A. No, I didn't know --
5  Q. -- "and I must leave"?
6  A. -- at that time I had a malignancy.
7  Q. He knew that you had medical appointments;
8  right?
9  A. He knew I had a request from my doctor to go
10 back for further tests. And I began to tell him what my
11 problems were and he said to me, "I don't want to know
12 your problems." He said, "I don't want to know."
13 Q. He said to get the written certification and
14 give it to Pam; right?
15 A. Not at that time, he didn't, no.
16 Q. Uh-huh. He said he --
17 A. He never told me to get --
18 Q. -- didn't want to know it all?
19 A. -- a written certification except for right
20 here --
21 Q. Uh-huh.
22 A. -- after he denied this request.
23 Q. But he didn't deny it, he said, "Get something
24 from a doctor that said it can't wait"; right?
25 A. Well, he --

Page 246

1    MS. JOHNSON: Objection, argumentative.
2    A. -- he already had something from a doctor.
3    Q. That was more than 30 days old; right?
4    MS. JOHNSON: Objection, asked and answered.
5    A. Is there any rule that says it had to be less
6  than 30 days old?
7    Q. Well, Ms. Wade, I don't know about you, but
8  immediate means right away, without further delay,
9  without any time intervening, that this is a crisis. And
10 if I'm presented with a note that's 30 days later that
11 says "as soon as possible," it's hard for me to give it
12 much credit.
13   MS. JOHNSON: Objection to form, argumentative.
14   Q. And did that never occur to you?
15   MS. JOHNSON: Same objection.
16   Q. That if you held on to this note that says "as
17 soon as possible" and presented it only when you thought
18 it was worth your while to, that it would be hard to give
19 it credit, hard to understand how it can be as soon as
20 possible if it's presented -- actually, it's almost 6 --
21   A. I did what I thought was best.
22   Q. It's almost -- it was almost 60 days later,
23 wasn't it?
24   A. Not before Dr. Tuthill saw it. He saw it in
25 September.

Page 247

1    Q. Okay. Well, 30 days later. Late September.
2  August 7th, to what you said was at least the last day --
3  the last week of September. Late September is what you
4  said repeatedly; right?
5    A. Late September, yes.
6    Q. Okay. And let's see, 31 days in August; right?
7    A. Uh-huh.
8    Q. So that's 24 days that passed. And then if we
9  assume that we had at least until the 20th, right, you
10 did say late September?
11   A. Yes.
12   Q. And we're talking 47 days?
13   A. Yes.
14   Q. Does that sound like an emergency, waiting 47
15 days?
16   A. I don't think anyone ever called it an
17 emergency.
18   Q. Does it sound like it's urgent?
19   A. Yes. It -- it sounds like it's necessary.
20   Q. Okay. Well, it's necessary to be done as soon
21 as possible if it's presented 47 days later or more?
22   MS. JOHNSON: Objection, argumentative.
23   A. I did what I thought was best concerning my
24 classes. I had to think of my job and my classes. And
25 to accommodate my job and my classes and the doctor's

Page 248

1  request, I did the best that I knew how. I was very
2  concerned about my classes and my students.
3    MS. DUCEY: Did I give you three, Jonathan?
4    MR. CLEMENT: No, just one.
5    (Exhibit No. 25 marked.)
6    MS. DUCEY: So 25?
7    MR. CLEMENT: Yes.
8    Q. (By Ms. Ducey) Can you identify what that is?
9    A. Yes, and I was very confused as to why he wrote
10 this note to me.
11   Q. Uh-huh. Why were you confused?
12   A. Because he had already asked me to take -- to
13 teach another class --
14   Q. Uh-huh.
15   A. -- and I had taken that class.
16   Q. Uh-huh. Well, you hadn't taken it as of October
17 9th, had you?
18   A. I -- I don't know. I don't remember the date,
19 but the class was mentioned previous to the class
20 beginning.
21   Q. Uh-huh. So did you send him any e-mails between
22 October 6th, which is Exhibit 24, and October 9th?
23   A. I don't recall. I might have.
24   Q. Okay. Did he send you any e-mails?
25   A. I don't recall.

Page 249

1    Q. All right. And what does he say on October 9th?
2    A. "If you are planning to take medical leave later
3  this month, I need a written notification from a licensed
4  physician, preferably by fax and as soon as possible, to
5  the effect that your medical treatment cannot wait until
6  the December break when you could have the treatment
7  without conflict with your regular teaching duties. As
8  soon as I have received such notification, I can begin to
9  process the request for a medical leave."
10   Q. And what did you do in response to receiving
11 this?
12   A. I don't recall. I really don't recall getting
13 this -- this letter and if I did, it would have been very
14 confusing as to why he would have sent this letter to
15 me --
16   Q. Uh-huh.
17   A. -- when he had denied my request and I already
18 had a doctor's note.
19   (Exhibit Nos. 26 & 27 marked.)
20   Q. Can you identify what 26 is?
21   A. Yes.
22   Q. And what is 26?
23   A. It seems I responded to his note.
24   Q. Okay. On the same day; right?
25   A. Yes.

Page 250

1   Q. Less than an hour later?
2   A. He wrote the letter at 12:39 and I responded at
3   1:02.
4   Q. Okay. And what did you say?
5   A. "I turned in that request in to Pam the day
6   before yesterday. She attached a statement from my
7   doctor's" --
8   Q. No, it says, "I attached a statement."
9   A. "I attached a statement from my doctor in
10  Tennessee and then I went to the doctor here in Barrow on
11  Monday evening and she reinforced the opinion by written
12  note which I feel is sufficient for obtaining leave."
13  Q. Uh-huh. Can I stop you right there?
14  A. Sure.
15  Q. It says that you attached a statement from my
16  doctor in Tennessee to the leave request that you turned
17  in to Pam the day before yesterday. So the day before
18  yesterday would have been October 7th; right?
19  A. Yes.
20  Q. Okay. And the statement from your doctor in
21  Tennessee, the only one that you had was the statement
22  from Dr. Church; right?
23  A. Right.
24  Q. Okay. So does that refresh your recollection
25  about the first time you presented that note to Pam?

Page 251

1   A. That wasn't the first time.
2   Q. Uh-huh.
3   A. That was after I presented that note from Dr.
4   Church several times.
5   Q. Uh-huh. When -- when did you present it? You
6   said "several times."
7   A. I don't know, but I know it was with this first
8   request for leave on October the 7th -- the 2nd.
9   Q. Was it physically attached?
10  A. I don't recall.
11  Q. Did she keep it?
12  A. I don't recall if she kept it or not.
13  Q. Well, why would you attach it again if it wasn't
14  kept by Ms. Taylor?
15  A. I'm a very efficient person. I always make sure
16  everything is attached to anything, any documents that
17  need to be attached. I didn't want to just present the
18  one from Barrow. I wanted to present both of them again.
19  Q. Uh-huh.
20  A. When I got the one from Barrow, I attached it to
21  the one from Tennessee and I felt that was sufficient for
22  obtaining leave.
23  Q. Okay. And so go on. Pick up with "but since I
24  can't."
25  A. "But since I can't change the schedule on

Page 252

1   Modules B and -- for Business Math and Business English,
2   that's because John wouldn't let me change them, I really
3   don't want to leave my students at this point. They are
4   good classes and I don't want to upset them in any way.
5   My medical problems needs attention as soon as possible,
6   but it is not a matter of life or death. So leaving
7   everything until the holidays looks like the most
8   feasible thing right now. Thanks."
9   Q. Okay.
10  A. And that is exactly true. It did look like the
11  most feasible thing because I had no idea that the spot
12  that I was worrying about on my shoulder was malignant.
13  Q. Okay. So at that point you indicated that you
14  did not intend to try and take medical leave before the
15  end of the semester?
16  A. At that point, but I did turn in a request to --
17  to take medical leave in December at the end of the
18  semester, yes.
19  Q. Okay. And I'm talking about right then --
20  A. Yeah.
21  Q. -- as of October 9th, 2003, at 1:02, you have
22  indicated that your medical problems can wait until the
23  Christmas holidays?
24  A. Yes. Uh-huh.
25  Q. There wasn't anything urgent about them; right?

Page 253

1   A. No.
2   Q. Based on what you knew at the time?
3   A. There was something urgent, but I was totally
4   unaware.
5   Q. Nobody knew at that point?
6   A. Nobody knew.
7   Q. Okay. All right.
8   A. But I suspected.
9   Q. Okay. So you agreed to withdraw your request
10  for leave so that you could finish your course delivery;
11  right?
12  A. Right. I was trying to accommodate Dr. Tuthill.
13  Q. And you were not unable to work at that time;
14  correct?
15  A. No, I was never unable to work.
16  Q. Not incapacitated?
17  A. No.
18  Q. And everything else that Dr. Church had asked
19  you to come back for could wait until the holidays;
20  correct?
21  A. Yes. May I clarify something here?
22  Q. Sure.
23  A. I was putting my health on hold to accommodate
24  Dr. Tuthill's request.
25  Q. Which was that classes not be interrupted if

Page 254

1  there wasn't a medically --
2      A. Right, uh-huh.
3      Q. -- required reason to do so?
4      A. Yes.
5      Q. And at that time you didn't believe there was a
6  medically-based reason?
7      A. I didn't know. It wasn't --
8      Q. Could you answer my question? As of October
9  9th, you had no reason to believe there was a
10 medically-based reason why your treatment could not wait
11 until Christmas --
12     MS. JOHNSON: Objection, asked and answered.
13     Q. -- correct?
14     A. Would you rephrase that question?
15     Q. As of October 9th, 2006 [sic], you had no reason
16 to believe that the tests and evaluations you needed
17 could not wait until Christmas?
18     A. That's not true. I did have reason to believe,
19 but I kept them to myself.
20     Q. Okay. Why --
21     A. Because of the condition of my shoulder.
22     Q. Uh-huh.
23     A. No one knew the condition of my shoulder except
24 me.
25     Q. Okay. So as of October 9th, nobody knew the

Page 255

1  condition of your shoulder?
2      A. No one else other than myself.
3      Q. Okay. And even though Dr. Tuthill asked you for
4  written certification that your treatment couldn't wait
5  until Christmas, you said nothing about the shoulder;
6  right?
7      A. I tried to tell him what my problem was and he
8  said he didn't want to hear it.
9      Q. Okay. And when?
10     A. I don't recall the date.
11     Q. So do you know for a fact whether it was prior
12 to October 9th?
13     A. It was -- I don't know if it was prior to
14 October the 9th, but it was prior to the time when I got
15 the malignancy test back.
16     Q. Uh-huh. But we don't know when that is, do we?
17     A. No, I don't recall. I was in his office and I
18 began to talk about my ailments and he said, "I don't
19 want to hear about your ailments."
20     MS. DUCEY: All right. Would you mark that next
21 one, Jonathan?
22     MR. CLEMENT: 28.
23     MS. DUCEY: Which one did we --
24     MS. JOHNSON: 27 you just talked about.
25     MR. CLEMENT: 27 was the last one.

Page 256

1      Q. (By Ms. Ducey) May I see 27 just for a minute?
2  All right. Thank you.
3      So can you identify 27?
4      A. Yes. Oh, just a minute. Yes, I can identify
5  this.
6      Q. Okay. So on October 14th you sent an e-mail to
7  Pam Taylor; correct?
8      A. Yes.
9      Q. And you referenced the October 2nd leave
10 request; right?
11     A. Yes.
12     Q. You said, "I submitted a request form to you for
13 medical leave." That's not accurate, is it?
14     A. It was a request for sick leave. I might have
15 referred to it as medical leave.
16     Q. Uh-huh. Well, you didn't. Why don't you look
17 back at it? Let's look back at --
18     A. It was with --
19     MS. DUCEY: What number is that, Jon?
20     A. -- with personal leave with sick leave included
21 in personal leave.
22     MS. DUCEY: The October 2nd request.
23     MR. CLEMENT: It would be 21.
24     MS. DUCEY: Thank you.
25     Please look back at -- that's not 21. That's

Page 257

1  the Church letter.
2      MS. JOHNSON: Exhibit 21 is the request for
3  leave.
4      MS. DUCEY: Oh, okay.
5      Q. (By Ms. Ducey) Look back at 21 for a minute.
6  And on the face of this document is there anywhere where
7  you made a request for medical leave?
8      A. I made a request for personal, which included
9  sick leave and to me sick and medical is the same thing.
10     Q. Is there anywhere on the face of this document
11 where you marked anything that would give someone reason
12 to believe that medical leave was sought?
13     A. Not on here, not medical leave, but to me
14 medical and sick was the same thing.
15     Q. Okay. Is there anywhere that it says "sick
16 leave" that's marked?
17     A. No.
18     Q. It's marked "personal leave," isn't it?
19     A. But sick leave is included in that and I told
20 him --
21     MS. DUCEY: The record should reflect that
22 Ms. Johnson is coaching the witness. Please put the
23 exhibit away from her.
24     MS. JOHNSON: I'm sorry. I was just holding it
25 out so she could look at it.

Page 258

1  MS. DUCEY: Well, if you want to cross-examine
2  her --
3  MS. JOHNSON: It's not -- it was not a coach.
4  MS. DUCEY: All right.
5  MS. JOHNSON: Do you want to look at your own?
6  THE WITNESS: Yes, I do.
7  MS. JOHNSON: That's fine. Look at Number 21.
8  She objected to --
9  A. I know what's on there and I know that sick
10 leave is listed under personal leave.
11 Q. (By Ms. Ducey) Uh-huh. All right. And you
12 said that you "had no response advising of the status of
13 the request. Could you please update me." Right?
14 A. Yes.
15 Q. Okay. And she wrote you back the same day;
16 right?
17 A. Yes.
18 Q. And she said, "It's my understanding from John,
19 you and he had directly communicated last week regarding
20 your leave request and you decided to wait until the
21 semester's classes were completed before going off slope.
22 As the supervisor's signature is always necessary before
23 leave request can be forwarded to H.R., please continue
24 to contact John -- to first contact John directly should
25 your situation change." Correct?

Page 259

1  A. Yes.
2  Q. Okay. And you had withdrawn the request for
3  leave; right?
4  A. I had not withdrawn it, no.
5  Q. Maybe I misunderstood. Exhibit 24 -- I'm sorry,
6  Exhibit 26. "My medical problem needs attention as soon
7  as possible, but it's not a matter of life and death so
8  leaving everything until the holiday looks like the most
9  feasible thing right now." --
10 A. Okay.
11 Q. -- Right?
12 A. That was agreeing to wait, but it was not
13 withdrawing my request. That's --
14 Q. Well --
15 A. -- that's two different things.
16 Q. -- could you look at 26 again? And what is the
17 subject of this e-mail?
18 A. From whom, John or --
19 Q. From John Tuthill.
20 A. From me to John Tuthill. "I turned that request
21 in to Pam. I don't" --
22 Q. What is the subject line of the e-mail --
23 A. I really don't --
24 Q. -- is what my question was?
25 A. The subject of the e-mail is my taking leave.

Page 260

1  Q. What -- what does it say, ma'am?
2  A. It says, "John, I turned that request in."
3  Q. Could you please identify the subject of the
4  e-mail?
5  MS. JOHNSON: I --
6  Q. The subject line says "Re"?
7  A. "Medical leave request."
8  Q. And in that e-mail you said, "leaving everything
9  until the holidays looks like the most feasible thing
10 right now," referenced your medical leave request;
11 correct?
12 A. Yes. Which to me was the same thing as sick
13 leave.
14 Q. So you withdraw it as of --
15 A. That's not a withdrawal.
16 Q. Well, what is it, ma'am?
17 A. I never said I was withdrawing my request.
18 Q. Well, maybe it's --
19 A. I was just going along with his idea and
20 agreeing that it -- it would be better for me to wait
21 until the Christmas holidays because he would not let me
22 change my class schedule.
23 Q. So you agreed to delay it?
24 A. I agreed to delay it, yes.
25 Q. All right. So, then, the medical leave request

Page 261

1  that was dated October 2nd, and asked for leave beginning
2  October 6th, didn't need to be acted on, did it? It was
3  moot.
4  A. But I wanted a -- an official -- a written
5  notice that my request was turned down.
6  Q. Why?
7  A. Because I've always wanted a written response to
8  my requests.
9  Q. But it was moot, wasn't it?
10 A. It apparently -- apparently so. I just wanted
11 to know what Pam -- the decision Pam had made.
12 Q. Okay. Did you explain that even though you had
13 withdrawn your request --
14 A. John and I talked about my waiting until
15 December to see the doctor.
16 Q. Okay. You can see why Pam might be confused
17 though; right?
18 A. Yes, I can see.
19 Q. She's been told that you've agreed to wait until
20 Christmas and the request is moot and now you're asking
21 for action on it; right?
22 A. I wanted to know what her status was.
23 Q. So to clear up the confusion, she said, "Why
24 don't you ask your supervisor if there's been some
25 misunderstanding first before I wade into this?"

Page 262

1   A. Yes.
2   Q. Is that unreasonable?
3   A. No.
4       MS. JOHNSON: What time is it?
5       THE WITNESS: It's twenty to 5:00.
6       MS. JOHNSON: How long are you going to go
7   today, do you know?
8       MS. DUCEY: As long as you want to go. I mean,
9   I think we can make a little more progress today.
10      MS. JOHNSON: Okay. Just want to make sure
11  you're going to continue. I may have to take a break to
12  make a phone call.
13      MS. DUCEY: Why don't we do that right now?
14      THE VIDEOGRAPHER: Going off record. The time
15  is 4:35.
16      (Recess taken.)
17      THE VIDEOGRAPHER: We're back on the record.
18  The time is 4:48.
19      (Exhibit No. 28 marked.)
20  Q. (By Ms. Ducey) Okay. There is 28.
21  A. What did I do with my glasses? Oh, 28. Okay.
22  Q. Okay. So this was an e-mail that Dr. Tuthill
23  sent you on October 9th; correct?
24  A. Yes.
25  Q. Okay. And this was after you received the first

Page 263

1   e-mail from him that we marked as Exhibit 25; right?
2   A. If it states that, yes.
3   Q. Okay. And he -- you remember getting this
4   e-mail?
5   A. Yes.
6   Q. And he said that "I'm not asking you or
7   assigning you to teach OT-104, Filing and Record
8   Management, though so far we've not been able to identify
9   another qualified instructor." Correct?
10  A. Yes.
11  Q. Okay. Is that the class you were talking about
12  that he --
13  A. Yes.
14  Q. And did he pressure you before or after receipt
15  of this e-mail?
16  A. Actually, Dr. Tuthill was not the one who
17  pressured me. It was his administrative assistant, Diana
18  Kennedy.
19  Q. Okay.
20  A. And at his request. She usually did what he
21  asked her to do.
22  Q. Uh-huh.
23  A. And she told me that "You just have to teach it,
24  there's no one else to teach it."
25  Q. Uh-huh. But he said that --

Page 264

1   A. But Dr. Tuthill did not use those words.
2   Q. Okay. All right. And then he got on -- went on
3   to discuss the interpretation of the compensation for
4   added duty contracts; right?
5   A. Yes, he did.
6   Q. And he said, "But regard -- as for OT-104, if
7   you want to take it on, you're more than welcome. That
8   would help and assuming either of the latter two
9   interpretations of our current official policies wins
10  out, you would receive compensation for two additional
11  teaching credits for $3,000." Right?
12  A. Uh-huh.
13  Q. He goes on to say, "But I don't see how we can
14  do that if you're expecting to go on medical leave later
15  this month. If that is likely to happen, then I need to
16  find a substitute instructor for your Business English or
17  Business Math classes and an alternative instructor for
18  OT-104. I hope this answers your questions." Right?
19  A. Oh, I don't follow you, where you're reading.
20  Q. I'm at the very bottom.
21  A. Oh, okay.
22  Q. Last three paragraphs.
23  A. "As for OT-104."
24  Q. Uh-huh.
25  A. I don't know why he made that statement. I

Page 265

1   don't know why he keep refer -- keeps referring to "if
2   you are expecting to go on medical leave." I wasn't
3   expecting because I not -- I could not rearrange my
4   classes because he wouldn't permit me to.
5   Q. Right. But you didn't withdraw your request
6   according to Exhibit 26. Well, you told him everything
7   looked -- looks okay, so leaving everything until the
8   holidays looks like the most feasible thing as of October
9   9th. Well --
10  A. Because I couldn't rearrange my classes.
11  Q. Did you have a discussion with him after you
12  sent him the e-mail where you said that you were going to
13  wait until Christmas?
14  A. I don't recall.
15  Q. Okay.
16      (Exhibit No. 29 marked.)
17  Q. All right. Now this is 29. Can you identify
18  that?
19  A. Yes.
20  Q. Okay. And that's an e-mail dated October 20th;
21  right?
22  A. Uh-huh.
23  Q. And it says, "I can't approve your leave request
24  for leave the morning of December 11th through the 19th."
25  Right?

case No. A05-086 Civil                                                                Bobbi Wade

Page 266

1  "Such a leave would mean you miss the last five days
2  of instruction and that to my mind unduly interferes with
3  the delivery of the college's program of instruction.
4  Please continue to meet with your classes until the end
5  of the semester in accordance with our regular academic
6  schedule." Right?
7      A. Yes.
8      Q. Now in the meantime had you submitted to him any
9  additional medical certification?
10     A. I don't recall that I did.
11     Q. Okay. Does that refresh your recollection about
12 when you had a conversation with him about leaving in
13 December?
14     A. Leaving in December?
15     Q. About taking leave in December. You said
16 that --
17     A. I don't recall discussing taking leave in
18 December with him except the fact that I agreed with him
19 that I could wait until December.
20         (Exhibit No. 30 marked.)
21     Q. Could you look at 30 and can you tell -- can you
22 tell me if you can identify what 30 is?
23     A. 30, it's a request for leave in December that
24 was just prior to getting the test results from my doctor
25 in Barrow.

Page 267

1      Q. Okay. Did you sign the leave request?
2      A. Yes, I did.
3      Q. What is the date of your signature?
4      A. It's November the 3rd.
5      Q. Okay. And Angie approved it; right?
6      A. Angie approved it, yes.
7      Q. On the 2nd day?
8      A. On the -- on the same day.
9      Q. Okay. And the leave was for six days; right?
10     A. 11th [sic] to the 26th, I suppose, yeah.
11     Q. And it was from 11/18 through 11/26; right?
12     A. Yes.
13     Q. And you marked it "personal," but it looks like
14 somebody underlined "sick leave"; right?
15     A. I did, because the first leave request that was
16 denied, I had not underlined sick leave and I wanted them
17 to know that it was for sick leave.
18     Q. And it says, "For treatment, tests and
19 evaluations by family doctor." Right?
20     A. Yes.
21     Q. Okay. And what had happened on 11/3 to make you
22 change your days to 11/8 -- from 11/18 to 11/26?
23     A. I don't recall what had happened. This was the
24 end of the semester and it wasn't possible for me to see
25 Dr. Gold on the 2nd of December and I don't remember why

Page 268

1  it wasn't possible. I don't remember why I couldn't keep
2  that appointment other than I couldn't leave and so I
3  made out a final request to give me enough days in
4  December during the Christmas holidays and the New Year's
5  holidays that doctors' offices would be open that I could
6  possibly make an appointment to see them to have those
7  tests made.
8      Q. Okay. But this isn't a request for leave in
9  December, is it?
10     A. Oh, this is for the request for November, yes.
11     Q. November 18th through the 26th.
12     A. Yeah, I'm sorry.
13     Q. So let me restate the question.
14     A. Yes.
15     Q. Why did you ask for leave from the 18th through
16 the 26th of November on November 3rd?
17     A. That was -- then that was after I received the
18 notice from the Barrow doctor.
19     Q. What notice is that?
20     A. Or received the phone call. I didn't receive
21 the notice, but received the phone call from her.
22     Q. Uh-huh.
23     A. That the spot on my shoulder was malignant.
24     Q. Okay. And did you have -- did you submit
25 anything with this note?

Page 269

1      A. I don't recall, but anytime I submitted a
2  request for leave, I also turned in a schedule for my
3  classes that could be accommodated for me to -- to finish
4  my modules.
5      Q. Do you recall if you did that in this instance?
6      A. I -- I don't know. I can't verify that I did.
7  I would have to go back and check through records to see.
8      Q. Okay. And why did you ask for six days?
9      A. Here? The only reason I asked for six days is
10 so that I could get back in time to resume my classes
11 according to the -- the schedule I had made out. I had
12 asked to resume them on December the 1st.
13     Q. Okay. Did you have appointments scheduled?
14     A. No. I don't know at this point whether I had
15 appointments or not because here the doctor in Barrow had
16 called me and told me I had a malignancy on my
17 shoulder --
18     Q. Uh-huh.
19     A. -- and I needed a moles procedure. And I made
20 out the request for leave according to the calendar that
21 would best suit my needs as far as medical purposes were
22 concerned --
23     Q. Uh-huh.
24     A. -- and to get back in time to resume my classes
25 on December the 1st.

Page 270

1  Q. And you said -- you filled this in and you said
2  it was for treatment, tests and evaluations by family
3  doctor; right?
4  A. Yes.
5  Q. And that's Dr. Church; right?
6  A. Well, I depended on the family doctor to make my
7  appointments with the specialists. That was her
8  procedure.
9  Q. That's who you're referring to; right?
10 A. I'm referring, yes, there to Dr. Church. And I
11 didn't expect Dr. Church to do the moles procedure. I
12 told her in a phone call it was a moles procedure.
13 Q. You told Dr. Church?
14 A. Yes.
15 Q. So you actually talked to her?
16 A. I think I did. I made arrangements --
17 Q. Uh-huh.
18 A. -- when I got home at this time to see a
19 specialist who was certified.
20 Q. When did you speak with Dr. Church
21 telephonically?
22 A. I don't know. I don't remember.
23 Q. Was that while you were still in Barrow?
24 A. Yes.
25 Q. Okay. And what did you tell her?

Page 271

1  A. I told her that I had a malignancy, that the
2  spot on my shoulder was malignant and the doctor in
3  Barrow had advised me that I needed a moles procedure.
4  Q. And what did she say to you?
5  A. She says, "When you get here, I will recommend
6  someone for you to see."
7  Q. Okay. So she didn't tell you she could set
8  something up with you -- for you?
9  A. Yeah, she told me she could recommend a doctor
10 that could do a moles procedure over the phone.
11 Q. Did she recommend somebody --
12 A. Yes, she did.
13 Q. -- over the phone?
14 A. Oh, not over the phone. I found out when I got
15 there who my appointment was with and it was with Dr.
16 DeLozier.
17 Q. Okay. So did you ask her to try and expedite an
18 appointment with DeLozier?
19 A. No.
20 Q. Or set one up?
21 A. I asked her -- I told her I needed to see a
22 doctor who could do a moles procedure and she told me
23 that she would make the arrangements for me and as soon
24 as I got there to come to her office.
25 Q. Okay. So you don't remember what this leave

Page 272

1  request that's dated November 3rd -- if you submitted the
2  written notification from your doctor that Dr. Tuthill
3  had been seeking saying that you couldn't wait until the
4  Christmas holidays to have the medical treatment;
5  correct?
6  A. Would you repeat that question?
7  Q. You don't recall if attached to this leave
8  request dated November 3rd, marked as Exhibit 30, whether
9  you had the written notification from the doctors stating
10 that you couldn't wait until the Christmas holidays to
11 have medical treatment?
12 A. I had the written notification from the doctor
13 in Barrow.
14 Q. On November 3rd?
15 A. It was -- yes, it was presented with this.
16 Q. Okay. Are you certain of that?
17 A. Yes. I gave it to Pam or I gave it to Tuthill
18 or I gave it to whoever needed it, but I had that request
19 from the doctor.
20 Q. No doubt in your mind; right?
21    MS. JOHNSON: If you have a document, would you
22 show it to her, please.
23 Q. Is that right, you're certain?
24 A. No, I'm not certain of anything.
25 Q. Well, did you or did you not include a note from

Page 273

1  a Barrow doctor?
2  A. I don't know. I don't remember if I did or not.
3  Q. Okay.
4  A. At this point, I was terribly worried about my
5  shoulder and I would have left anyway without permission.
6     (Exhibit No. 31 marked.)
7  Q. Can you identify 31?
8  A. 31 is another request.
9  Q. Is that your signature on the bottom?
10 A. Yes.
11 Q. And it says for 11/4/03; right?
12 A. Yes.
13 Q. Okay. And Pam Taylor signed it on what day?
14 A. 11/6/03.
15 Q. Okay. And do you recognize John Tuthill's
16 signature above hers?
17 A. Yes, I do.
18 Q. And a little hard to read. I might have a
19 better --
20 A. The date is not legible, but it seems to be the
21 5th.
22 Q. It looks like the 5th, too, doesn't it? All
23 right. And you asked for eleven days off; right?
24 A. Yes.
25 Q. And you asked to have off from November 12th to

Page 274

1  the 26th; correct?
2      A. Yes.
3      Q. And looks like the leave designated is extended
4  medical leave, although "personal" was marked and it's
5  got "PT" by it; right?
6      A. Yes.
7      Q. Do you see the little circle? Do you remember
8  what leave you checked?
9      A. I don't think I checked anything because
10 according to Pam and John, I had been checking the wrong
11 things --
12     Q. Okay.
13     A. -- so Pam says, "Don't check anything. I'll
14 check it."
15     Q. All right. And why did you change the number of
16 days from six to eleven in 24 hours?
17     A. I don't know. I don't remember.
18     Q. Okay. Why did you resubmit a leave request the
19 next day?
20     A. I think it was due to Pam's request that I do
21 so.
22     Q. Do you remember how that request was made to
23 you?
24     A. No, I don't.
25     Q. Do you remember what she asked?

Page 275

1      A. No, I don't.
2      Q. Okay.
3      A. But she was pre- -- very precise in what she
4  wanted and I was trying to adhere to her wishes.
5      Q. Okay. Do you remember if your schedule changed?
6      A. My scheduling what?
7      Q. While you were in Tennessee.
8      A. No, I don't remember.
9      Q. Okay. And it looks like I got the wrong copy
10 with a little yellow sticky on it, but it says, "Leave
11 designated once. Required medical documentation, i.e.,
12 appointment schedules and work release obtained. Leave
13 will be adjusted to reflect appropriate extended medical
14 leave dates." Right?
15     A. Pam wrote that on there. I had no knowledge of
16 when she put that on there. She might have written it
17 after I left. I don't know.
18     Q. Okay. But your leave was approved; right?
19     A. At this time it was, yes.
20     Q. Do you remember if you submitted anything with
21 it?
22     A. No, I don't remember, but I do remember that I
23 gave Pam all the appropriate doctors -- documents
24 concerning my leave and appointments and whatever.
25     Q. What were those documents that you gave her?

Page 276

1      A. I don't remember. They were documents from my
2  doctor in Tennessee.
3      Q. Dr. Church?
4      A. They were documents where Dr. Church had made
5  appointments for me.
6      Q. Okay. So you believe you submitted those with
7  Exhibit 31?
8      A. I think I did, but I'm not sure.
9      Q. Did you submit anything else with Exhibit 31?
10     A. I don't remember.
11         (Exhibit No. 32 marked.)
12     Q. Okay. Can you take a look at Exhibit 31 and
13 tell me if you can identify what that is?
14     A. 31 or 32?
15       MR. CLEMENT: 32.
16       MS. DUCEY: Thanks.
17     Q. (By Ms. Ducey) 32.
18     A. Okay.
19     Q. Can you identify what 32 is?
20     A. Yes.
21     Q. What is Exhibit 32?
22     A. It's a note from my doctor, Dr. Snyder, at the
23 Barrow Medical Clinic.
24     Q. What's the date of that note?
25     A. It's November the 5th.

Page 277

1      Q. Could you have turned that in prior to November
2  3rd or on November 3rd?
3      A. Could I have turned it in?
4      Q. Yes.
5      A. No, because it's got November the 5th on it.
6      Q. All right. So is it reasonable to infer that
7  you did not turn it in with the leave request dated
8  November 3rd, which is Exhibit 30?
9      A. It's possible that I didn't because Dr. Snyder
10 called me and told me about the malignancy and that I had
11 to take the time to go back over to her office to get
12 this note.
13     Q. Okay. But it's dated the 5th; right?
14     A. It's dated the 5th and that's the day I went
15 back over and got it and maybe after I turned this
16 request for leave in, I might have then gotten all --
17 together all the proper documents that Pam needed.
18     Q. Okay. And it's from Dr. Snyder and she says,
19 "I'm writing on behalf of Bobbi Wade, a patient of mine.
20 Ms. Wade needs follow-up for some medical conditions that
21 cannot be addressed here. The follow-ups are to occur in
22 a somewhat urgent time frame. Thank you for your
23 understanding." Right?
24     A. Yes.
25     Q. And that day John Tuthill approved your leave;

Page 278

1  right?
2      A. Yes.
3      Q. And the next day Ms. Taylor signed off on it;
4  right?
5      A. Yes.
6      Q. And this was the medical certification that was
7  being requested that you could not wait until the end of
8  the semester to take your leave; correct?
9      A. How could she have written this when she did not
10 know at that time that I had a malignancy?
11     Q. Precisely the point.
12     A. Because I couldn't supply him with this because
13 we did not know of the malignancy, but I knew of the
14 urgency of my shoulder.
15     Q. Right. So until Dr. Snyder got the report back,
16 there was not a medical reason why you needed to travel
17 to Tennessee before the end of the semester; correct?
18         MS. JOHNSON: Objection, form.
19     A. I don't know if there was a reason or not.
20     Q. Well, I've been asking you extensively for hours
21 this afternoon. Was --
22         MS. JOHNSON: And it's asked and answered.
23     Q. Was there a doctor who told you that you could
24 not wait until December --
25     A. No.

Page 279

1      Q. -- for medical treatment?
2      A. No, no one told me that I could not wait until
3  December.
4      Q. Okay. All right.
5      A. She doesn't even state I could not wait in this
6  note.
7      Q. Well, it's a note dated November 5th that you
8  presented on the 5th that says "urgent"; right?
9      A. All it says is "urgent."
10     Q. Didn't wait 47 days to present that urgent note;
11 right?
12         MS. JOHNSON: Objection, argumentative.
13         MS. DUCEY: I think that I -- I'm about to
14 change subjects and I'm -- probably a good time to stop
15 for the day.
16         THE VIDEOGRAPHER: Going off record now?
17         MS. DUCEY: Yeah.
18         THE VIDEOGRAPHER: This concludes Volume 1 of
19 the deposition of Bobbi Wade. The time is 5:11.
20     (Proceedings adjourned at 5:11 p.m.)
21
22
23
24
25

Page 280

1               WITNESS CERTIFICATE
2      I, the undersigned, Bobbi Wade, do hereby certify
3  that I have read the foregoing deposition and that, to
4  the best of my knowledge, said deposition is true and
5  accurate with the exception of the following corrections
6  listed below:
7
8  PAGE/LINE    CORRECTION AND REASON FOR CORRECTION
9
10
11
12
13
14
15
16  _____
17  _____
18  _____
19  _____
20  _____
21
22  _____      _____
    Date               Bobbi Wade
23
    (Use additional paper to note corrections as needed,
24  signing and dating each page.)
25

Page 281

1          REPORTER'S CERTIFICATE.
2
3      I, CAREN S. CARLSON, Registered Professional
4  Reporter and Notary Public in and for the State of
5  Alaska, do hereby certify:
6      That the witness in the foregoing proceedings
7  was duly sworn; that the proceedings were then taken
8  before me at the time and place herein set forth; that
9  the testimony and proceedings were reported
10 stenographically by me and later transcribed under my
11 direction by computer transcription; that the foregoing
12 is a true record of the testimony and proceedings taken
13 at that time; that the witness requested signature; and
14 that I am not a party to nor have I any interest in the
15 outcome of the action herein contained.
16     IN WITNESS WHEREOF, I have hereunto subscribed
17 my hand and affixed my seal this 11th day of May, 2006.
18
19
20
21
22          CAREN S. CARLSON
            Registered Professional Reporter
            Notary Public for Alaska
23          My Commission Expires: 05-30-09
24
25

7 (Pages 278 to 281)