Case No. A05-086 CV (TMB)                                    Bobbi Wade

Page 284

1              IN THE UNITED STATES DISTRICT COURT
2                   FOR THE DISTRICT OF ALASKA
3
4    BOBBI WADE,
5              Plaintiff,
6         vs.
7    ILISAGVIK COLLEGE, NORTH SLOPE
     BOROUGH, JOHN TUTHILL, Individually,
8    and PAMELA TAYLOR, Individually,
9              Defendants.
     _____/
10   Case No. A05-086 CV (TMB)
11
12            *   *   *   *   *   *   *   *   *   *
13
              VIDEOTAPED DEPOSITION OF BOBBI WADE
14                        Volume 2
                 Pages 284 - 432 (inclusive)
15
                         May 5, 2006
16                        2:04 p.m.
17
18        Taken by the Defendants, Ilisagvik College,
                 John Tuthill and Pamela Taylor
19                           at
     Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc.
20          1007 West 3rd Avenue, Suite 400
                 Anchorage, Alaska 99501
21
22
23
24   Reported by:
     Caren S. Carlson, RPR
25

RECEIVED
JUN 9 2006
DELANEY WILES, INC.

COPY

EXHIBIT K
Page 1 of 31

Case No. A05-086 CV (TMB)                                                              Bobbi Wade

Page 285

APPEARANCES:

For Plaintiff:

MS. LINDA J. JOHNSON
Clapp, Peterson, Van Flein, Tiemessen,
    Thorsness, LLC
711 H Street, Suite 620
Anchorage, Alaska 99501-3454
(907) 272-9272
For Defendants Ilisagvik College, John Tuthill
and Pamela Taylor:

MS. CYNTHIA L. DUCEY
MR. JONATHAN CLEMENT
Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc.
1007 West 3rd Avenue, Suite 400
Anchorage, Alaska 99501-1990
(907) 279-3581
For Defendant North Slope Borough:
MR. PETER C. GAMACHE
Attorney at Law
405 West 36th Avenue, Suite 201
Anchorage, Alaska 99503
(907) 563-6969
Also Present:
Eric R. Cossman, Alaska Legal Video
Taken by:
Caren S. Carlson, RPR

BE IT KNOWN that the aforementioned deposition
was taken at the time and place duly noted on the title
page, before Caren S. Carlson, Registered Professional
Reporter and Notary Public within and for the State of
Alaska.

Page 286

1    THE VIDEOGRAPHER: We are on the record at 2:04.
2  This is the video deposition of Bobbi Wade. Volume 2 of
3  the video deposition of Bobbi Wade taken by Defendants
4  Ilisagvik College, John Tuthill and Pamela Taylor in the
5  matter of Wade versus Ilisagvik College, et al., Case
6  Number A05-086 CV (TMB) in the United States District
7  Court for the District of Alaska. This deposition is
8  being held in the offices of Delaney Wiles, Inc., located
9  at 1007 West 3rd Avenue, Suite 400, Anchorage, Alaska, on
10  May 5th, 2006.
11    My name is Eric Cossman from Alaska Legal Video,
12  mailing address 645 G Street, Number 892, Anchorage,
13  Alaska, 99501. The court reporter is Caren Carlson from
14  the firm Midnight Sun Court Reporters.
15    Will counsel and all present please identify
16  themselves for the record?
17    MS. JOHNSON: Linda Johnson from Clapp, Peterson
18  for Bobbi Wade, the Plaintiff.
19    MR. GAMACHE: Peter Gamache for Defendant North
20  Slope Borough.
21    MS. DUCEY: And Cynthia Ducey for Ilisagvik,
22  Pamela Taylor and Dr. John Tuthill.
23    MR. CLEMENT: Jonathan Clement for Ilisagvik
24  College, Pamela Taylor and John Tuthill.
25    THE VIDEOGRAPHER: Thank you.

Page 287

1    (Bobbi Wade, having been previously
2    sworn in, testified as follows:)
3    EXAMINATION CONTINUED
4  BY MS. DUCEY:
5    Q. Ms. Wade, thank you for coming back this
6  afternoon. And you sat through all of Ms. Taylor's
7  deposition yesterday; did you not?
8    A. Yes.
9    Q. And I observed you taking notes as I was
10  throughout the afternoon. Was there anything that she
11  said that you disagreed with --
12    A. Yes --
13    Q. What did you --
14    A. -- there was.
15    Q. What did you disagree with?
16    A. Well, I would have to have my notes to review
17  them.
18    Q. Uh-huh.
19    A. To know what I disagreed with.
20    Q. Was there anything that coming away from it you
21  felt that you strongly disagreed with?
22    A. There was -- might have been some items, but
23  again I would have to review the notes --
24    Q. Okay.
25    A. -- to remember what they were.

Page 288

1    Q. And where are they, the notes?
2    A. They're at my attorney's office.
3    Q. Uh-huh. Okay.
4    A. I did not know that I would need them or I
5  would --
6    Q. Okay.
7    A. -- have brought them.
8    Q. So there is not a single thing, as you sit here
9  today, that struck you as incorrect or inaccurate?
10    A. Well, to begin with, when Pam said that I filled
11  out an application for personal leave and she referred to
12  it as personal leave, as though I was filling out an
13  application for personal leave, everyone knew involved,
14  that is, Dr. Tuthill, Pam Taylor and the payroll clerk
15  who signed it to verify that I had the hours, everyone
16  knew from the very beginning that it was to go back for
17  sick leave and sick leave comes under personal leave.
18    Q. Uh-huh. Okay. Anything else that struck you as
19  inaccurate?
20    A. I can't remember right off unless I could review
21  my notes. About the time in March when she indicated
22  that she told me in her office that she was going out on
23  leave, that was when my appeal was -- the date for my
24  appeal was coming up and I distinctly remember that she
25  came to my office across the campus. It was in my office

2 (Pages 285 to 288)



Case No. A05-086 CV (TMB)

Bobbi Wade

Page 289

1  where she asked me to put everything on hold until she
2  returned.
3      Q. Uh-huh.
4      A. Those were her exact words.
5      Q. Okay. Did she explain what that was when she
6  said "Put everything on hold"?
7      A. Yes. That meant to just wait on this, on the
8  appeal. "I have to go take leave and I will be gone and
9  just put everything on hold until I get back, until I
10  return."
11      Q. Okay. Anything else that you recall she said
12  yesterday that you disagree with?
13      A. I don't recall anything else right offhand.
14      Q. Okay. As we go through today, if there's
15  anything that comes to mind, would you please let me
16  know?
17      A. Yes, I will.
18      Q. I want to refer to -- for a minute to Exhibit
19  24, which we previously identified, and reference the
20  bottom e-mail from John Tuthill.
21      A. Okay.
22      Q. Is there anything that prevented you from asking
23  your doctors if they felt you required immediate
24  treatment after October 3rd, 2003?
25      A. No, there's nothing that would have prevented

Page 290

1  it.
2      Q. Okay. Did you ask any of your doctors if they
3  felt that you needed immediate treatment?
4      A. No, because I was very busy with my work
5  schedule and I was trying to do what my doctor had asked
6  me to do and at the same time fulfill my duties on my
7  job.
8      Q. Okay.
9      A. And it -- and it was very strenuous at the time.
10      Q. Okay. I'm going to try and keep those in order
11  since we --
12      A. Okay.
13      Q. -- got so many already.
14      A. All right.
15      Q. All right. Let me just show you 25 again for a
16  minute and this is the e-mail you identified as receiving
17  from Dr. Tuthill on October 9th; right?
18      A. Yes.
19      Q. And he said, "If you're planning to take leave
20  later this month, I need written notification from a
21  licensed physician, preferably by fax and as soon as
22  possible, to the effect that your medical treatment cannot
23  wait until the December break when you could have the
24  treatment without conflict in your regular teaching
25  duties."

Page 291

1      Did you ask any of your doctors for written
2  notification that your medical treatment couldn't wait
3  until the December break --
4      MS. JOHNSON: Objection.
5      Q. -- when you could have treatment without
6  conflict of your duties?
7      MS. JOHNSON: Objection, form.
8      A. No, I didn't.
9      Q. Okay. And was there anything that prevented you
10  from doing that?
11      A. Not --
12      MS. JOHNSON: Same objection.
13      A. Nothing, except I was just extremely busy --
14      Q. Okay. All right.
15      A. -- on my job and time didn't permit that I
16  concentrate too much on my -- on health problems at
17  that time.
18      Q. Is there anything that prevented you from
19  printing off that e-mail and showing it to your medical
20  providers in Barrow or faxing it to Dr. Church?
21      A. No. I was very puzzled when I received this
22  e-mail, as I recall.
23      Q. Uh-huh. Why were you puzzled?
24      A. Because after all of our discussions and the
25  fact that Dr. Tuthill asked me to wait until December, I

Page 292

1  couldn't figure out why he would be sending this e-mail
2  to me.
3      Q. Well, wasn't it just a repeat of what he asked
4  you on October 3rd?
5      A. No --
6      Q. Which is --
7      A. -- I don't think.
8      Q. -- on October 3rd he said, I read -- on October
9  3rd, he said, "You'll consult with your physicians here
10  and in Tennessee to determine if they feel you
11  need immediate -- require immediate medical treatment and
12  depending on what they say, you can prepare medical leave
13  requests so you can receive any required treatment during
14  the semester." Right?
15      A. That's right, but I had already agreed at this
16  time when he wrote this note, I had already agreed with
17  him that I would wait until December.
18      Q. Well, then --
19      A. And I -- and it was puzzling to me as to why he
20  would have written a note like this to me.
21      Q. Okay. If you had already agreed that you were
22  going to wait, then, why did you send him the e-mail on
23  October 9th saying that "my medical problem needs
24  attention as soon as possible but it's not a matter of
25  life and death, so leaving everything until the holidays

3 (Pages 289 to 292)

Case No. A05-086 CV (TMB)                                                                    Bobbi Wade

Page 293

1  looks like the most feasible thing right now"?
2      A. And that was on October the 9th?
3      Q. Yes.
4      A. Was that in response to that e-mail or in
5  response to this e-mail?
6      Q. Let me -- I'm sorry, I -- I thought you had it
7  in front of you.
8      A. No. Okay. This was in response to this.
9      Q. Right. So the question is if you had told him
10  after October 3rd that you were going to wait until the
11  holidays and he already knew that by October 9th,
12  then why would you have sent him the response on the 9th
13  saying that you were going to wait until the holidays?
14     A. I'm sorry, could you repeat that question?
15     Q. If he -- if he already knew before he sent the
16  e-mail dated October 9th, that's marked Exhibit 26, if he
17  already knew that you had agreed to delay your leave,
18  then what -- why would you find it necessary to send the
19  response to him that's on the top of Exhibit 26?
20     A. It was -- it was just a reminder of what we had
21  discussed in his office.
22     Q. Uh-huh. You didn't say that you were reminding
23  him, though; didn't you?
24     A. No, I didn't say that, but we had already talked
25  about it. As Pam said yesterday, a lot of things there

Page 294

1  were very informal.
2      Q. Uh-huh. Did you tell the doctor in Barrow on
3  October 24th that your sick leave had been denied?
4      A. Unless I saw a document, I -- I don't know if I
5  could --
6      Q. Uh-huh.
7      A. -- answer that correctly.
8      Q. Did you lead any doctor in Barrow to believe
9  that you had told them that -- sorry. Did you lead a
10  doctor -- any doctor in Barrow to believe that your sick
11  leave had been denied?
12     A. I don't believe I did. That my sick leave had
13  been denied?
14     Q. Yes.
15     A. I told the doctor in Barrow, as I recall, when I
16  went to see the doctor because I -- I went to the doctor
17  for that purpose because Pam said she needed more
18  verification.
19     Q. Uh-huh.
20     A. And I told the doctor that the doctors in
21  Tennessee had requested that I come back for more tests
22  and consequently I needed her to verify that, not that my
23  request had been denied or anything. I told her I needed
24  the -- a verification from her as my doctor to support
25  the doctor in Tennessee that I did need those tests.

Page 295

1      Q. Okay. This is Document 25186. I didn't make a
2  copy, but it's a copy of the 10/24 visit with Dr. Snyder.
3          MS. DUCEY: Please feel free to look at it,
4  Ms. Johnson.
5      Q. Is that your name on the bottom, "Bobbi Wade"?
6  Do you see where it's typed?
7      A. Yes.
8      Q. And that's your date of birth?
9      A. Yes, it -- it seems to be.
10     Q. Do you see at the top where it says "10/24/03,"
11  very top left?
12     A. Yes.
13     Q. Okay. Then you see in the middle there is all
14  that handwriting.
15     A. Yes.
16     Q. It's nice to see a doctor with good handwriting.
17     A. Uh-huh.
18     Q. Look at the top line and what does it say?
19         MS. JOHNSON: Is this a document that you
20  produced to me?
21         MS. DUCEY: Well, of course. I think you
22  produced it to us, actually, but I'm not sure.
23         MS. JOHNSON: Because it's your number on the
24  bottom and it's a 2500 number --
25         MS. DUCEY: Uh-huh.

Page 296

1          MS. JOHNSON: -- or 25,000 number.
2      A. Okay. It says, "Sick leave denied. Needs med
3  references. Has several complaints." Okay. Then I
4  did --
5      Q. (By Ms. Ducey) Very good.
6      A. -- I did refer to her that my sick leave had
7  been denied.
8      Q. Uh-huh. That was inaccurate; wasn't it?
9      A. I don't know.
10     Q. Well, as of 10/24, your request for sick leave
11  had not been acted on because you agreed to delay it;
12  correct?
13     A. It had been denied by Dr. Tuthill verbally.
14     Q. Uh-huh.
15     A. When I walked in his office and asked him, he
16  turned around and yelled at me.
17     Q. Uh-huh.
18     A. I mean, very vehemently, "No, you cannot. I
19  will not sign your request for sick leave."
20     Q. Uh-huh. Well, that was your request that was in
21  December; right?
22     A. No.
23     Q. Uh-huh. Well, was the October 9th e-mail that
24  said, "If you're planning to take medical leave, I need
25  written notification from a licensed physician" --

4 (Pages 293 to 296)

Case No. A05-086 CV (TMB)                                    Bobbi Wade

Page 297

1    A. Again that --
2    Q. -- was -- was this withdrawn?
3    A. I don't know.
4    Q. He never -- he never said that, "Look, if you
5  get me the written notification, you can have your
6  leave"? He never said, "Hey, that's off, too, so don't
7  bother doing that"; did he?
8    A. I don't remember if he did. I know he verbally
9  told me a lot of things that are not -- that is not in
10  these e-mails and --
11    Q. Okay.
12    A. -- there was a lot of verbal discussion and so
13  forth.
14    Q. But you don't remember --
15    A. And, again, I was -- I was puzzled as to why he
16  would send me that e-mail, so I responded to him in the
17  best way that I knew how.
18    MS. DUCEY: When Linda gives you back the paper,
19    Q. Okay. But you don't remember him ever telling
20  you that "By the way, if you get that written
21  notification, it's tough luck, because I'm not going to
22  honor it"?
23    A. No.
24    Q. So that agreement was still good; right?
25    A. Which one are you referring to?

Page 298

1    Q. The agreement that he had with you that, "If you
2  get written notification by a doctor that your medical
3  treatment can't wait, I'll process your request for
4  medical leave as soon as I get that."
5    A. Ms. Ducey, I had already taken on another class
6  by that time to teach and I had reached the point where
7  I -- at that time I could not take leave at that time.
8    Q. Okay. But he never told you that his agreement
9  to give you leave as soon as you presented written
10  notification was no longer valid; right?
11    A. No, he never told me that.
12    Q. Okay. So as of 10/24, when you told the doctor
13  that sick leave was denied, that wasn't accurate; was it?
14    A. I was referring to that first sick leave when he
15  verbally told me he would not sign it.
16    Q. Right. But on 10/24 that was already -- you --
17  you were past that, you --
18    A. I did not know what he meant there and I did not
19  know his reasoning for sending me that e-mail.
20    Q. Well, did you ask him?
21    A. No, I didn't.
22    Q. Okay. He never told you that he didn't mean
23  what he said in the e-mail; right?
24    A. And also I was talking to Pam at that time.
25    MS. DUCEY: Excuse me. That's not an exhibit,

Page 299

1  Jonathan. Just put it back in the file.
2    A. And she was telling me what I should do and
3  shouldn't do about getting proof that I needed to take
4  medical leave.
5    Q. Okay. And he told you -- she told you
6  repeatedly that the dean is the one that approves it;
7  right?
8    A. She didn't tell me that at -- at the time
9  verbally.
10    Q. Uh-huh. But you knew that; right? You knew you
11  had to get the dean's approval; correct?
12    A. His signature, yes.
13    Q. Yes. On 10/24 when you told the doctor sick
14  leave was denied, there had been no request for sick
15  leave denied -- that was denied that negated the October
16  9th e-mail; correct?
17    A. I don't know, because I had been denied on
18  October the 24th. I was denied when I went -- handed
19  him -- when I talked to him the first time and I went
20  back in his office around the 1st or 2nd or 3rd of
21  October.
22    Q. Right.
23    A. And he very strongly told me, "I will not sign
24  your sick leave." That was what I was referring to.
25    Q. And then time went on and October 9th came after

Page 300

1  October 2nd; right?
2    A. Yes.
3    Q. And on October 9th he sent you this e-mail --
4    A. Yes --
5    Q. -- that said --
6    A. -- and I --
7    Q. -- that said all you have to do is get written
8  notification, okay; right?
9    A. Right.
10    Q. And then you withdrew your request for leave;
11  right? Said --
12    A. I did not withdraw anything. I took on another
13  class to teach and I couldn't leave at that time.
14    Q. Okay.
15    MS. JOHNSON: I -- I object to this line of
16  questioning. We did all this last Monday and --
17    MS. DUCEY: No, we didn't do this.
18    MS. JOHNSON: -- unless you have a new line of
19  questioning, this really is just going over old ground.
20    MS. DUCEY: No, we didn't do this.
21    Q. (By Ms. Ducey) And then you said, "Leaving
22  everything until the holidays looks like the most
23  feasible thing as of October 9th"; right?
24    A. Yes.
25    MS. JOHNSON: Objection, asked and answered.

5 (Pages 297 to 300)

Case No. A05-086 CV (TMB)

Bobbi Wade

---

Page 305

1    A. And it was an unusual situation.
2    Q. Did they say it was extremely burdensome to do
3  that?
4    A. No. They just said it was unusual --
5    Q. Okay. Unusual --
6    A. -- and they complied with my wishes.
7    Q. Unusual for Tennessee?
8    A. Well, I don't know what they were referring to.
9  I don't know if it was for Tennessee or for the whole
10 world, as far as that goes.
11   Q. Okay. Did you -- what date did you receive
12 notification of the pathology test results?
13   A. From which doctor?
14   Q. Well, who did you receive it from first?
15   A. The doctor from Barrow.
16   Q. Okay. And when did she tell you?
17   A. I would have to look at the documents to recall
18 the dates exactly.
19   Q. All right. Well, you saw the doctor in Barrow
20 on 10/24 and that's when she shaved the mole; right?
21   A. It wasn't a mole.
22   Q. Well, you had --
23   A. It was skin cancer.
24   Q. Well, it -- it was a mole that had --
25   A. No, it was never a mole.

---

Page 306

1    Q. Okay.
2    A. It was a spot on my shoulder that was angry and
3  red and irritating.
4    Q. All right.
5    A. That I was very worried and concerned about.
6    Q. Okay. So you had a spot on your shoulder?
7    A. Yes.
8    Q. And you saw the doctor on 10/24 for that and she
9  shaved it; right?
10   A. She didn't do it that day. I had to return for
11 her to do that.
12   Q. Okay. When did you return?
13   A. A few days later. I would have to look at the
14 documents to get the exact date.
15   Q. Okay. So a few days after the 24th, so let's
16 assume that that was the 26th, you had it shaved and then
17 when did she notify you of the results?
18   A. A few days after that. Again, I would have to
19 look at the documents to know the exact date. The tests
20 was sent to Anchorage for testing --
21   Q. Uh-huh.
22   A. -- and it had to come to Anchorage and then go
23 back to her.
24   Q. Uh-huh. So a couple days after the 27th?
25   A. Yes. Yes, two or three or four, something like

---

Page 307

1  that.
2    Q. Okay. So by the end of the month?
3    A. Yes --
4    Q. Okay.
5    A. -- I would say or it might have been the 1st of
6  November. I -- I would have to look to --
7    Q. All right. And she --
8    A. -- refresh my --
9    Q. -- telephoned you and told you that?
10   A. Yes, she called me at work.
11   Q. And then how soon after that telephone call did
12 you get the note from her?
13   A. Which note are you referring to?
14   Q. The note that we previously identified from Dr.
15 Snyder that said that you needed --
16   A. I don't know. I would have to see --
17   Q. -- treatment in an urgent time frame.
18   A. You would have to show me the document for me to
19 recall the date.
20   Q. Was it days later?
21   A. No, it -- it was as soon as possible.
22   Q. Okay. Did you go the same day to get the note?
23   A. I don't -- I don't recall. I would have to see
24 the document to know the date.
25   Q. Okay. Well, when in relationship to receipt of

---

Page 308

1  that note were you first informed telephonically that the
2  patch that was removed had a carcinoma?
3    A. I --
4    Q. When in relation to receiving the note from Dr.
5  Snyder saying you needed medical attention in the
6  somewhat urgent time frame did you receive the telephone
7  call?
8    A. I received the telephone call -- if -- if you
9  could show me the note.
10   Q. I'm just asking you not the date that you
11 received the note, I'm asking when in relation to
12 receiving that note did you get the phone call?
13     MS. JOHNSON: Could you ask her -- could you let
14 her look at Exhibit 32?
15     MS. DUCEY: No, I don't need to.
16   Q. When in relation to receiving the phone call --
17 strike that. When in relation to receiving the note did
18 you get the phone call? Was it the same day?
19   A. I got the phone call prior to getting the note.
20   Q. Okay. So was it the day before?
21   A. I -- I don't recall --
22   Q. Uh-huh.
23   A. -- unless I see some documents with some dates.
24   Q. Okay. Well -- well, the date of the --
25   A. I was obviously upset the day I got the phone

---

7 (Pages 305 to 308)

EXHIBIT _____
Page 6 of 31

Case No. A05-086 CV (TMB)                                          Bobbi Wade

Page 309

1  call.
2     Q. The date of the telephone call isn't recorded
3  anywhere; is it?
4     A. No.
5     Q. Okay. So that's what I want to know. When in
6  relation to receiving the note from Dr. Snyder did you
7  get the phone call?
8        MS. JOHNSON: Objection, asked and answered.
9     A. Just prior to getting the note from her.
10    Q. Was it the day before?
11       MS. JOHNSON: Asked and answered.
12    A. It could have been. I don't recall unless I see
13 a document with dates on it.
14    Q. It doesn't have -- there is no document with
15 dates.
16    A. Okay.
17    Q. So it's your testimony that you can't give me
18 any idea?
19       MS. JOHNSON: Objection to form.
20    A. How far apart it was?
21    Q. Right. That's all I want to know.
22    A. It -- it could have been the same day. It could
23 have been the next day, but I knew that I would have to
24 have a note from her to give to Dr. Tuthill in order to
25 be able to get sick leave to go have the moles procedure.

Page 310

1  She informed me over the phone that I would need a moles
2  procedure.
3     Q. Uh-huh.
4     A. And I might have told her over the phone that I
5  would need a note from her.
6     Q. And what did you tell her you needed in the
7  note?
8     A. To certify that I needed the moles procedure,
9  that it couldn't be done in the state of Alaska because
10 there was not a certified doctor that can make such a
11 test --
12    Q. Uh-huh. And what else did you tell her in --
13    A. -- in the state of Alaska. That's all I recall
14 telling her.
15    Q. Okay. You eventually saw who to get the moles
16 procedure?
17    A. When I arrived in Tennessee, I saw Dr. Church
18 and then I couldn't get an appointment to see the doctor
19 I had originally wanted to see, Dr. Gold.
20    Q. Uh-huh.
21    A. And she and -- Dr. Church informed me that he
22 was not a certified doctor that could do the moles
23 procedure.
24    Q. Right. The question was, who did the moles
25 procedure?

Page 311

1     A. Dr. DeLozier.
2     Q. Okay. And when did he do it?
3     A. In a few days. She had to make an appointment
4  with him and it was in several -- it was in two or three
5  days. It wasn't immediately like that day or the next
6  day. Again, I would have to look at the document to know
7  the exact date.
8     Q. Was the procedure done in his office?
9     A. Yeah, I think so. I don't recall.
10    Q. Okay. And did you have the procedure done the
11 same day of your first visit?
12    A. I had the procedure done the same day of my
13 first visit to him --
14    Q. Uh-huh.
15    A. -- yes.
16    Q. Okay. And was it done with a local anesthetic?
17    A. Yes.
18    Q. All right. And did they shave off pieces, look
19 at them under the microscope after they had shaved pieces
20 until they were satisfied that it was completely gone?
21    A. I don't know what they did.
22    Q. Okay. And how long were you in the office that
23 day?
24    A. I was in there for, I would say, from two to
25 three hours.

Page 312

1     Q. Okay. And how long did the actual procedure
2  take?
3     A. I would say probably 30 minutes.
4     Q. Okay. Did you have a stitch?
5     A. Yes.
6     Q. Just one?
7     A. No, I -- I had several stitches.
8     Q. Okay.
9     A. I don't recall how many.
10    Q. What did Dr. DeLozier tell you should do in
11 terms of caring for it after it was shaved?
12    A. He put a patch on it and I don't recall him
13 telling me anything as far as care.
14    Q. Okay. Did he tell you that any of your
15 activities were not to be done?
16    A. I don't remember what he told me without
17 referring to my chart to see what he --
18    Q. Okay.
19    A. -- was written down there.
20    Q. Did he tell you couldn't work?
21    A. No, he didn't tell me I couldn't work.
22    Q. Okay. Did he tell you that you needed any
23 follow-up?
24    A. I don't recall that he did.
25    Q. Uh-huh. And did you have follow-up with him?

Midnight Sun Court Reporters
(907) 258-7100

Case No. A05-086 CV (TMB)                                                    Bobbi Wade

Page 313

1    A. I went back for him to -- yes, for him to take a
2  look at it.
3    Q. Uh-huh.
4    A. And to verify that everything was fine --
5    Q. Uh-huh.
6    A. -- and so forth.
7    Q. And when was that?
8    A. I don't recall unless I could see -- it was just
9  within a few days, but I don't know the exact date unless
10  I could see documents.
11    Q. Uh-huh. Did he tell you you have the option of
12  having the stitches removed back in Barrow?
13    A. No.
14    Q. Okay. Did you consider that?
15    A. No.
16    Q. All right. And then while you were in
17  Tennessee, you had an appointment with Dr. Church on the
18  12th. You had an appointment with Dr. DeLozier where he
19  reshaved the patch and stitched it?
20    A. Yes.
21    Q. And then you came back to see Dr. DeLozier;
22  right?
23    A. Before I left I did, yes.
24    Q. Okay. And did you have any other medical
25  appointments?

Page 314

1    A. Yes.
2      MS. JOHNSON: Objection, asked and answered.
3    A. Yes, I did.
4    Q. Okay. What other medical appointments did you
5  have?
6    A. I had an appointment to have tests made
7  concerning my stomach --
8    Q. Uh-huh.
9    A. -- at the St. Thomas Hospital and that was
10  several days after I had the appointment with Dr.
11  DeLozier because appointments with those doctors are very
12  difficult to get especially on a short notice.
13    Q. When -- when you got to Tennessee on your first
14  visit with Dr. Church on the 12th, did she tell you that
15  you were not permitted to work?
16    A. I don't recall if she told -- what she told me
17  exactly.
18    Q. Okay. The doctor's note don't -- the doctor's
19  chart doesn't contain any documentation that you were
20  prevented from working. Do you recall if she told you
21  that?
22    A. Well, no, I don't recall if she told me that.
23    Q. Okay. And when you saw her again before you
24  left, did she tell you that you were not permitted to
25  work?

Page 315

1    A. Not permitted to work after I left?
2    Q. Did she tell you that at any time you were not
3  permitted to work?
4    A. I don't recall that she did.
5    Q. Okay. Did doctor -- did you say you saw a
6  stomach specialist?
7    A. Yes, I did.
8    Q. And what was his name?
9    A. Eskind.
10    Q. Okay. And did Dr. Eskind tell you at any time
11  that you were not able to work?
12    A. I don't recall what Dr. Eskind told me at that
13  time unless I could see the documents.
14    Q. Uh-huh. Did you feel you were unable to work at
15  any time in between those appointments?
16    A. In between the appointments?
17    Q. Yes.
18    A. No, I did not feel that way because I did work.
19    Q. Uh-huh. What did you do?
20    A. I kept up with my classes online on the
21  computer.
22    Q. Uh-huh. Did anyone ask you to do that?
23    A. I don't recall. When I went in to work out the
24  leave with Dr. Tuthill, we talked about my classes and I
25  don't recall if he asked me or if I volunteered. At that

Page 316

1  time I didn't want my leave denied again and I was very
2  afraid that it would be and I might have offered to keep
3  up with my classes online.
4    Q. Uh-huh.
5    A. Because I -- at that time I would have left had
6  they denied my leave anyway because I was that worried
7  about the spot on my shoulder and I was afraid I would
8  lose my job over it, so I was willing to accommodate him
9  in any way that I could to take care of my classes while
10  I was on sick leave and I didn't mind doing it.
11    Q. And did it prevent your treatment at all?
12    A. No, it didn't.
13    Q. Did it interfere with your treatment?
14    A. No, it didn't.
15    Q. You would have done that anyway, right, even
16  if --
17    A. I would have --
18    Q. -- he hadn't asked?
19    A. Had he denied my sick leave at that time, I was
20  very concerned about the spot on my shoulder and the fact
21  that the doctor in Barrow did not get all the cancer
22  cells and that's what a moles procedure is, is to verify
23  that all the cancer cells are gone and a doctor has to be
24  certified to do that test.
25    Q. Actually, that's not what I asked you. You

9 (Pages 313 to 316)

EXHIBIT
Page 8 of 31

Case No. A05-086 CV (TMB)                                                      Bobbi Wade

Page 325

1    A. Yes.
2    Q. Did she write "denied" on it?
3    A. She would not sign it.
4    Q. Uh-huh.
5    A. Their way of denying a leave request is the fact
6  that they wouldn't sign it.
7    Q. Did you have the dean's signature at that point?
8    A. I don't recall if I did.
9    Q. Well, if you didn't have the dean's signature,
10 then you would need that first; right?
11   A. I don't know. I don't recall whether or not the
12 dean had signed it. He might have. I would have to see
13 the document to --
14   Q. I'm asking about the procedure. The procedure
15 was if you wanted to take personal leave during the
16 semester, you needed the dean's signature first; correct?
17   A. I would have to see the document to know the
18 sequence of signatures.
19   Q. I'm asking based on your recollection.
20   A. I don't -- I don't recall if I had his signature
21 at that time.
22   Q. That's not what I asked you. I asked you in
23 terms of procedure, you were required to have the dean's
24 approval before you went to human resources.
25   A. I don't remember at that time because the

Page 326

1  request leave, sometimes they changed from one year to
2  the next.
3    Q. Uh-huh.
4    A. And if you could show me the document, then it
5  would refresh my memory.
6    Q. Uh-huh. Do you recall being treated for the
7  same spot on your shoulder in June 2002 in Barrow?
8    A. June 2002?
9    Q. Uh-huh.
10   A. No, I don't.
11   Q. Do you recall that spot being troublesome
12 before?
13   A. Oh, yes. There were times when it became red
14 and itchy.
15   Q. Uh-huh. And in the past you would ask -- ask
16 for a dermatology referral; hadn't you?
17   A. I don't recall. I think a dermatologist may be
18 in Barrow, that -- the doctors go and come up there, so
19 sometimes they have a specialist come in and sometimes
20 they don't. I -- I can't remember whether a
21 dermatologist was coming into Barrow.
22   Q. On 6/26/02 you were seen at Samuel Simmonds. It
23 said, "Called to come in. Would like thyroid checked.
24 Did not take meds this a.m. Reevaluation of HTN and
25 insomnia. Ambi- --- Ambien working well. Did not take

Page 327

1  any of her meds today because she thought they would need
2  TSH check, but it was done on 4/2. She declines a
3  gynecological exam scheduled today. She needs to go to
4  work and organize things, leaving in a few days to Lower
5  48. Her 44-year-old son just diagnosed with colon
6  cancer. Also wants a dermatology referral due to a
7  lesion that is itchy and burning." Does that refresh
8  your recollection about whether you were seen in 2002 for
9  the same lesion?
10   A. No, I don't remember that far back.
11   Q. Okay. Do you deny what the record says?
12   A. No, I don't deny it.
13   Q. Okay. Did you get treatment for the lesion at
14 any time in the summer of 2002?
15   A. I was never -- no doctor ever gave me any
16 treatment for the lesion.
17   Q. Okay.
18   A. For the spot on my shoulder.
19   Q. Did you make any attempts to see a dermatologist
20 between June 2002 and when the semester started in '03?
21       MS. JOHNSON: Objection, asked and answered.
22   A. I don't recall if I did or not.
23   Q. Once you took your leave from -- it was from
24 11/12 to 12/1, correct, November 12th to December 1st;
25 right?

Page 328

1    A. Yes.
2    Q. Okay. Then you were absent for some of the
3  classes for Module B of Business English; correct?
4    A. Module B?
5    Q. Uh-huh.
6    A. No, I completed Module B, as I recall, before I
7  left.
8    Q. Okay. And Module C began and classes were
9  underway while you were gone; correct?
10   A. They were supposed to have begun.
11   Q. And the same was true for Business Math;
12 correct?
13   A. Yes.
14   Q. That Module C had begun and the classes were
15 underway; correct?
16   A. It -- they were supposed to have been.
17   Q. Okay. And those modules met how many times a
18 week for Business Math?
19   A. Twice.
20   Q. And how many times a week for Business English?
21   A. Twice.
22   Q. Okay. And you missed more than two weeks of
23 those classes; correct?
24   A. I don't recall unless I see the dates and the
25 chart exactly what day those classes began.

12 (Pages 325 to 328)

EXHIBIT K
Page 9 of 31

Page 337

1  know exactly what that means, "Interfering with her right
2  to take MFLA [sic] leave." I would say that it's because
3  he would not let me leave at the time that I wanted to
4  leave and to get the medical attention that I needed to
5  get at that time.
6      Q. Okay. And with respect to just 41 A through D,
7  what are the damages that you contend were caused by
8  those actions?
9      A. I would have to give that some thought.
10     Q. Okay. So I understand --
11     A. I think it would -- the damages would be that --
12  part of the damages would be that I received a notice
13  that my contract would not be renewed.
14     Q. Uh-huh.
15     A. Because of the -- that complaint.
16     Q. Okay. Well, I'm going to get to that in a
17  minute.
18     A. Okay. So --
19     Q. I'm going to limit myself to A through D --
20     A. Okay.
21     Q. -- and I want to know what damages you contend
22  were causally related to those allegations?
23     MS. JOHNSON: And we're talking about the first
24  D, right, not the second D? Pardon me for --
25     A. Are we talking about 41 D?

Page 338

1      MS. JOHNSON: The first 41 D.
2      Q. 41 D, A through DD --
3      A. Oh, there's two Ds, I see. Okay. No wonder --
4      Q. Proofreading isn't an exact science.
5      A. The first D?
6      Q. Yes.
7      A. Interfering with her right to take MFLA, M --
8  FMLA leave.
9      Q. So A through the first D, what are the damages
10  that you contend were caused by those allegations only?
11     MS. JOHNSON: Objection to legal conclusion.
12     A. I would have to give that some thought to know
13  what the damages were.
14     Q. All right. Well, this is my time to discover
15  the facts.
16     A. Okay.
17     Q. That's why we brought you here. I served you
18  interrogatories asking you that information --
19     A. Uh-huh.
20     Q. -- and now I'm entitled to inquire, so let me
21  just go through a couple of things. You received leave
22  without pay the entire time you were off in November and
23  through December 1st; correct?
24     A. No, I didn't.
25     Q. I'm sorry, I re--- I misstated that. You got

Page 339

1  paid for all of your time; right?
2      A. Yes, I did.
3      Q. Uh-huh. And you told me before that you had no
4  out-of-pocket expenses that were caused by asking for you
5  to get written notification of the urgent need for your
6  leave after October 2nd, so no out-of-pocket expenses
7  caused by the delay in your leave from October 2nd until
8  November 12th; correct?
9      A. Not any except doctor bills at the Barrow
10  clinic.
11     Q. Okay. And were those all fully reimbursed?
12     A. No.
13     Q. What wasn't reimbursed?
14     A. I still owe a bill there.
15     Q. Uh-huh. How much is that?
16     A. I have no idea, but it's -- the last I knew it
17  was around $1200.
18     Q. Do you know what that was for?
19     A. No, ma'am, not exactly.
20     Q. Okay. What did your insurance cover, your
21  health insurance at that time?
22     A. I don't know.
23     Q. Did it cover 80 percent?
24     A. I don't know.
25     Q.

Page 340

1      A. I didn't keep up with the health insurance. I
2  didn't have time. I was too busy on my job.
3      Q. Did the Barrow clinic submit your health
4  insurance for you?
5      A. Yes, they did.
6      Q. All right. And did you receive some notice from
7  them that you had a bill that was outstanding?
8      A. Yes, I did.
9      Q. Okay. But you don't know what that's for?
10     A. No, I don't. And I don't think they correctly
11  submitted my health claims because with the Medicare
12  supplement A and B and with the P5 insurance, all of my
13  bills should have been paid. So I went back to the
14  Barrow clinic to ask them to resubmit --
15     Q. Uh-huh.
16     A. -- and so I did take a little time to try to get
17  the bills straightened out.
18     Q. Okay.
19     A. But it never was.
20     MS. DUCEY: Just, Ms. Johnson, point of
21  clarification, I have not seen any evidence that there
22  were bills not paid for that time period. Is there
23  something that I have missed that you've provided to us?
24     MS. JOHNSON: I don't think so. I'm not sure
25  that I've seen those either.

15 (Pages 337 to 340)

EXHIBIT ___
Page 10 of 31

Case No. A05-086 CV (TMB)                                        Bobbi Wade

Page 341

1      MS. DUCEY:  Okay.
2      MS. JOHNSON:  So we will look for those.
3      MS. DUCEY:  All right.  So just -- just so that
4  we're clear, since I don't have that bill and I think I'm
5  entitled to see it, the deposition is going to be
6  continued at least for that purpose, that's my position.
7  And you don't have to respond to that, but I just want
8  that to be clear.
9      Q.  (By Ms. Ducey)  Is there anything else in terms
10 of damages that you claim were caused by 41 A through the
11 first D?
12     A.  You're referring to damages, you're referring to
13 dollars; correct?
14     Q.  Uh-huh.  Yes.
15     A.  I can't recall any.  There might have been, but
16 other than the medical bills at the Barrow Medical
17 Clinic, I don't recall any.
18     Q.  Now, you took the leave, but it, as I understand
19 the documents, was never specifically designated as
20 family leave and so my question is -- and I think the
21 documents that we've seen thus far show that.
22     A.  Uh-huh.
23     Q.  So my question is what damages, if any, were
24 caused to you by the failure to designate your leave
25 ultimately as FMLA?

Page 342

1      MS. JOHNSON:  Objection, calls for legal
2  conclusion.
3      A.  As far as costs related?
4      Q.  Yes.
5      A.  I would have to give that some thought and some
6  study to -- to know what my damages were as far as costs.
7      Q.  You can't think of any right now; right?
8      A.  No, I can't think of any right now.
9      Q.  I'll probably come back to that complaint, but
10 for the moment you can put that aside.  Thank you.
11     A.  This whole document?
12     Q.  Yes.  If you like -- in fact, we'll try and keep
13 things in order.  It's not a perfect science.  All right.
14 Did you know who Sonya Abu was?
15     A.  Yes.
16     Q.  And what -- what was Sonya Abu's job title, if
17 you recall?
18     A.  To begin with in the fall semester, I didn't
19 know her job title.
20     Q.  Uh-huh.
21     A.  Because I asked her.
22     Q.  What did she say?
23     A.  She says, "I really don't know.  I haven't found
24 out."
25     Q.  Uh-huh.  She didn't know what her title was --

Page 343

1      A.  No.
2      Q.  -- or her duties?
3      A.  Her duties nor her title.
4      Q.  And how did you come to find out what her title
5  was, if at all?
6      A.  I really didn't know her title -- title until I
7  saw the documents --
8      Q.  Uh-huh.
9      A.  -- with her title on it.
10     Q.  Okay.  Did you find out what sort of duties she
11 had?
12     A.  No.  I knew she worked over in the
13 administration building and she had something to do with
14 the student affairs.
15     Q.  Okay.  How much contact did you have with her?
16     A.  In several instances, she would send me an
17 e-mail about a student and I would respond to her e-mail
18     Q.  Uh-huh.  Do you remember in particular who she
19 sent you e-mails about?
20     A.  No.  She sent me e-mails about several students.
21     Q.  Do you remember what the circumstances were?
22     A.  Just little questions concerning their schedules
23 and so forth, and then she wanted to keep better track of
24 the students and their progress and their work and their
25 grades, so I asked her to come over to my building and

Page 344

1  let me go through the online courses with her, the
2  Blackboard, and I made an attempt to show her how to use
3  the Blackboard so that she could -- when she had
4  questions about a student's progress that she could
5  monitor them herself if she chose to.
6      Q.  Okay.  And did she come over to your office?
7      A.  Yes, she did.
8      Q.  Do you remember when?
9      A.  It was later in the fall of 2003.  I don't
10 remember what date.  It could have even been in the
11 spring of 2004.
12     Q.  Okay.  We talked the other day about the fact
13 that you had advisees; correct?
14     A.  Yes.
15     Q.  Okay.  In the fall of '03, do you recall how
16 many advisees you had?
17     A.  I had approximately 60-something.  I don't
18 remember the exact number.
19     Q.  Okay.  And was that a normal load?
20     A.  No.
21     Q.  Okay.  What was normal, if there was one?
22     A.  Normal would have been 15 or 20.
23     Q.  Okay.  And do you know why you had that many?
24     A.  Because I had an influx of students involved in
25 2003.

16 (Pages 341 to 344)



Case No. A05-086 CV (TMB)                                               Bobbi Wade

1  Q. Okay. Did you advise anyone that you thought
2  you had too many advisees?
3  A. Yes -- no, not that I had -- yes, Dr. Tuthill.
4  Q. Okay.
5  A. But I don't recall when. I think it was in
6  December that I told him that I couldn't handle all of
7  the spring registration and I needed help.
8  Q. When you advised a student, did you go over
9  their core schedule with them for the upcoming semester?
10  A. Yes, I did.
11  Q. Did you help them complete the form?
12  A. Yes, I did.
13  Q. And was one of the purposes to try and make sure
14  that they took the proper classes in order to move
15  towards whatever certification or degree they were
16  looking for?
17  A. Yes, it was, uh-huh. And it took a long time
18  with each student.
19  Q. Sure. And once they were -- the form was
20  completed, then would they submit that to the registrar?
21  A. Yes.
22  Q. Who was the registrar at that time?
23  A. Diana Perkett.
24  Q. And when you assisted the advisees in completing
25  their forms, did it ever come to your attention that they

1  were incorrectly completed?
2  A. The forms?
3  Q. Yes.
4  A. I didn't complete all the forms for the fall
5  semester. A -- a big portion of them were done by the
6  time I arrived back on campus --
7  Q. Uh-huh.
8  A. -- because Dr. Tuthill had come in and he had --
9  registration had opened to the students in July when I
10  was away on summer break.
11  Q. Uh-huh. Okay. The question, though, was did it
12  ever come to your attention that forms you had assisted
13  students in completing were not done correctly?
14  A. That I had assisted?
15  Q. Yes.
16  A. No.
17  Q. Okay. Did it ever come to your attention that
18  any of the forms that were submitted after consultation
19  with anybody had been done incorrectly?
20  A. They were not advised to take the proper
21  classes, yes.
22  Q. Uh-huh. And how did that come to your
23  attention?
24  A. When students began to have problems and come to
25  me about the conflicts in their schedules.

1  Q. Uh-huh. Do you remember when, if at all, you
2  learned of this?
3  A. It would have been shortly after the beginning
4  of the fall semester.
5  Q. Do you remember what students came to you?
6  A. No, I don't. I had so many I -- I can't
7  remember who came to me.
8  Q. Uh-huh. Do you remember any particulars about
9  what classes had -- were incorrect or were a problem?
10  A. No, I -- I don't remember any particular
11  student.
12  Q. What action did you take when you learned --
13  heard from these students?
14  A. I tried to correct it. I did whatever was
15  necessary to correct the situation.
16  Q. Okay. Did Diana Perkett ever tell you that
17  there were problems with the registration in any of the
18  students?
19  A. No, she never told me that.
20  Q. Did you ever receive any schedules back from her
21  asking that there be corrections made?
22  A. No, because Diana didn't schedule students. She
23  would not have done that.
24  Q. Right. And I'm not suggesting that she did, but
25  she would accept the -- she -- she was the registrar,

1  meaning that she would register the students for the
2  classes they selected; correct?
3  A. Yes, she would input it into the system.
4  Q. So my question was really more directed to that
5  issue, not -- not any suggestion that she filled out
6  schedules. Did you ever learn from her that class
7  schedules that were submitted by students were -- were
8  done wrong, needed to be done again?
9  A. None that I can recall.
10  Q. Okay.
11  A. I don't -- there could have been, but I don't
12  recall any.
13  Q. How -- how did you contact student advisees when
14  you were at the college?
15  A. I contacted them by e-mail and by telephone and
16  by address.
17  Q. And did you have any system for how you would
18  contact them?
19  A. No. It was according to the information I had
20  about the student. We had a -- what was called an IQ Web
21  that the input -- the student information was put into
22  the IQ Web and I could go into the IQ Web and get the
23  personal data on a student that I needed to contact that
24  student. And they were -- they had phone numbers, they
25  had addresses, and oftentimes those phone numbers were

17 (Pages 345 to 348)

EXHIBIT
Page 12 of 31

Case No. A05-086 CV (TMB)                                    Bobbi Wade

Page 349

1    not a phone number that they could be reached. They had
2    e-mail addresses and they were contact -- contacted in
3    different ways.
4        Q. Okay. I showed you Exhibit 18 the other day.
5    Take a look at that again. And Exhibit 18 says,
6    "Academic Calendar 2003-'04"; right?
7        A. Yes.
8        Q. And under the "fall '03," it has a list of
9    dates; correct?
10       A. Yes.
11       Q. And the last date under "fall 2003" is Friday,
12   December 19th; right?
13       A. Yes.
14       Q. And what is that date listed as?
15       A. Grades due to registrar.
16       Q. Okay. Any reason to dispute the date here?
17       A. No.
18       Q. Do you recall that that was, in fact, the
19   date -- last date to submit grades to the registrar?
20       A. Yes.
21       Q. Okay. You can put that aside. Thank you. In
22   fact, I'll even put it back. I'm trying to keep these in
23   order. Whoops, it goes there. Okay.
24           Did you teach a class in the fall '03 called
25   Introduction -- "Introduction to Organizational

Page 350

1    Management, Business 154"?
2        A. Yes, I did.
3        Q. Okay. And did you prepare the syllabus?
4        A. Yes, I did.
5        Q. Did the syllabus include the class duration?
6        A. I believe it did.
7        Q. And the meeting times?
8        A. Yes.
9        Q. Okay.
10       A. That was an online course.
11       Q. Uh-huh. Sure. Yeah. And tell me if I'm wrong,
12   but do you recall if the syllabus listed the class
13   duration as from August 27th to December 17th?
14       A. Yes, uh-huh.
15       Q. Okay. And does the registrar post a class
16   schedule? They also make up a schedule of classes?
17       A. And put it on the IQ Web, yes.
18       Q. Okay. And then somebody can come in also and
19   physically look at when the class duration is?
20       A. Yes, uh-huh.
21       Q. Okay. And do you remember with respect to
22   Business 154 whether the class schedule conflicted with
23   the syllabus in terms of the dates of meeting?
24       A. No, I don't.
25       Q. Okay. Did you advise the students either

Page 351

1    verbally or in the syllabus that grades would be turned
2    in to Business 154 on December 10?
3        A. I don't recall if I told them grades would be
4    turned in, but I -- sometimes classes end several days
5    before the end of the semester in order for instructors
6    to get papers graded and get grades averaged and to get
7    grades in by the time by -- like by December the 17th.
8        Q. Assuming that the class schedule posted by the
9    registrar said that the class met until the 12th, that
10   would give you five days --
11       A. Yes, uh-huh.
12       Q. -- to get grades in? And assuming the class
13   schedule was posted by the registrar as ending on the
14   12th of December, did you -- do you recall if you got a
15   changed schedule approved by the dean to change the
16   course schedule to end on --
17       A. It wasn't changed --
18       Q. -- the 10th?
19       A. -- that's just when I requested that all work be
20   in.
21       Q. Okay. Do you remember if you told the students
22   that there was no particular date due for homework in
23   that class?
24       A. There was a particular day because it had
25   date -- due dates.

Page 352

1        Q. What had due dates?
2        A. All class assignments had due dates.
3        Q. Where was that posted?
4        A. It was posted in the -- on the Blackboard.
5        Q. Do you remember in Business 154 when you had
6    assignments due?
7        A. I had them posted and Dr. Tuthill sent an
8    e-mail, or either he called me, I don't remember when,
9    and he told me that he thought that I should make the
10   assignments due -- give them a -- give more due dates.
11   So I went back and changed all of my due dates --
12       Q. Uh-huh.
13       A. -- and I made them just as he asked me to do.
14       Q. Okay. When did you do that?
15       A. During the course, whenever he asked me to. I
16   don't remember when.
17       Q. Okay. Do you remember if you did that in the
18   fall '03?
19       A. Yes, I did that in the fall of '03.
20       Q. We talked about the fact on Monday that the
21   students who come to Ilisagvik, some of them are at risk
22   for a number of factors that we identified on Monday;
23   right?
24       A. Yes.
25       Q. Okay. And when I try to get my kids to do

18 (Pages 349 to 352)

EXHIBIT
Page 3 of 31

Page 353

1  homework --
2      A. It's hard.
3      Q. Hard to get students to develop study habits;
4  isn't it?
5      A. Yes --
6      Q. And one of the main --
7      A. -- very difficult.
8      Q. One of the main -- I don't know if it's the main
9  thing -- but a primary objective of teaching is to teach
10  students good study skills; isn't it?
11      A. Yes.
12      Q. And organizational habits?
13      A. Yes.
14      Q. And in order to do this, one must set an
15  example; right?
16      A. Yes.
17      Q. For instance, in my daughter's 6th grade
18  class --
19      A. Uh-huh.
20      Q. -- she has to complete an assignment planner
21  every day --
22      A. Uh-huh.
23      Q. -- sign it and have her parents sign it; right?
24      A. Yes.
25      Q. Okay. So one method of instilling those good

Page 354

1  organizational habits and study skills is to require a
2  consistent and regular effort; wouldn't you agree?
3      A. Yes.
4      Q. And with students for whom they're already at
5  risk, would you agree that one could instill better study
6  and organizational skills through weekly assignments with
7  weekly due dates rather than just one assignment and due
8  date for homework for the entire class?
9      A. As I recall, that is what Dr. Tuthill suggested,
10  that I give the due dates each week instead of every two
11  weeks.
12      Q. Okay. But prior to that, do you recall if in
13  Business 154 for the entire semester, there were only
14  three due dates?
15      A. Three?
16      Q. Yes.
17      A. If there were, they were changed to more regular
18  due dates because I -- as I recall, I had frequent due
19  dates and that -- in the fall of 2003.
20      Q. Uh-huh.
21      A. And then I made them more frequent at his
22  request.
23      Q. Okay. In the fall 2003, did you have a policy
24  on late assignments or late homework turned in?
25      A. Probably did.

Page 355

1      Q. Okay.
2      A. Because if I -- instructors need a policy on
3  late homework.
4      Q. What was your policy in the fall of '03?
5      A. I don't recall what it was, but prior -- just
6  prior to each due date I would send each student -- I
7  would send an e-mail to the students reminding them of
8  the due date.
9      Q. Uh-huh. And did you tell them what the
10  consequences were for failure to turn in a timely
11  assignment?
12      A. Well, if there was a student behind, I would
13  give -- send them an e-mail and ask them to make an
14  appointment to come see me --
15      Q. Uh-huh.
16      A. -- so we could sit down and talk about what they
17  needed to do --
18      Q. Okay.
19      A. -- to get their work in.
20      Q. And was your policy that you accepted late
21  homework unconditionally?
22      A. No, I didn't accept -- accept it
23  unconditionally.
24      Q. How did you determine, if at all, whether you
25  would accept late homework?

Page 356

1      A. It was according to the circumstances with each
2  student.
3      Q. Uh-huh.
4      A. All -- each student is an individual. You can't
5  judge one by the other.
6      Q. How --
7      A. And you have to remember that my students, the
8  median age was 35.
9      Q. Uh-huh. How was the student to know in advance
10  whether their homework would be accepted late then?
11      A. They perhaps wouldn't know unless they came over
12  and sat down and talked with me in my office --
13      Q. Okay.
14      A. -- which I was in my office all day, every day.
15      Q. Okay. As a teacher, do you believe that it's
16  important for students to be treated equally?
17      A. Yes, I do.
18      Q. And do you believe that it's important not to
19  show favoritism?
20      A. Yes, I do.
21      Q. Or the appearance of favoritism?
22      A. Yes, I do.
23      Q. In your studies, have there ever been times when
24  professors or teachers that you had had a posted policy
25  or a published policy on late homework or late

EXHIBIT
Page 14 of 31

Case No. A05-086 CV (TMB)                                                    Bobbi Wade

Page 357

1  assignments?
2      A. I don't recall any.
3      Q. Okay. And my daughter's 6th grade teacher has a
4  policy that she makes sure everyone knows, including the
5  parents, which is that late homework is an F, but they
6  have a certain amount of time to complete that and
7  they'll get half credit for it depending on what the
8  assignments are. Did you ever post -- have such a
9  policy?
10     A. No, I didn't.
11     Q. Is there a reason why you did not have such a
12  policy that would give forgiveness but have a consequence
13  and that everyone knew?
14     A. No, I -- I don't recall any.
15     Q. Okay. Did Sonya Abu ask you at any time what
16  the consequences were for late homework?
17     A. I don't recall that she did. She might have.
18     Q. Do you recall if anyone from the college asked
19  you -- let's say not a student -- but anyone asked you
20  what the consequences were for late homework?
21     A. I don't recall anyone who was not a student
22  asking me at all what the consequences would be.
23     Q. Okay. Did any student ask you what the
24  consequences would be?
25     A. I don't recall. They could have. I tried and

Page 358

1  made an effort to help each student as much as I could
2  but I had 80-something students in classes.
3      Q. Yeah.
4      A. And about two-thirds of those students were my
5  advisees and my time was very limited and I made every
6  effort to help each student at the time they needed my
7  help and the students who would come to my office to keep
8  appointments for consultation on their work.
9      Q. Okay. Okay. Could you excuse me just a minute?
10         (Discussion off the record.)
11     Q. While Jonathan gets me a file, I'm going to
12  shift just for a minute to another subject.
13     When you came back from your leave in December '01,
14  aside from the issue of -- (microphone adjusted) I guess
15  that's your job; right?
16     When you came back from leave in December '01, aside
17  from the issue of Business Module C and teaching that,
18  was the issue of your leave and taking it, were there --
19  was there anything else that was still outstanding
20  regarding that? In other words, I want to know if you
21  went on your leave, you came back, you had a complaint
22  about Business Module C, but other than that, all of the
23  other issues about your leave had settled?
24     A. Yes.
25     Q. Okay. Then did you leave for the holidays,

Page 359

1  Christmas again?
2      A. Yes, I did.
3      Q. Okay. And came back in January; right?
4      A. Yes.
5      Q. Okay. And then do you recall receiving an
6  e-mail from John Tuthill about some concerns that he had?
7      A. Yes, I do, in December.
8      Q. And what were the concerns about?
9      A. I had several students who had not turned in any
10  work during the semester.
11     Q. Uh-huh.
12     A. And then when they received notice that they
13  were being withdrawn from the class, then they began to
14  panic and they began to complain.
15     Q. Okay. And how did that come to Dean Tuthill's
16  attention, if at all?
17     A. I didn't know at the time, but I know now, it
18  went to him from Sonya Abu.
19     Q. Okay. All right. And then -- but without
20  knowing that, though, John Tuthill contacted you
21  regarding it?
22     A. Regard -- regarding one student, yes.
23     Q. Do you remember who that student was?
24     A. I don't recall her name, but I remember that she
25  was the president of the student council.

Page 360

1      Q. Okay. And --
2      A. I would have to refresh my memory on names.
3      Q. Okay.
4      A. Because I'm bad at remembering names.
5      Q. How did he contact you?
6      A. I don't recall. I think it was through an
7  e-mail.
8      Q. Okay. And did you have any follow-up with him
9  on that?
10     A. I corresponded. I don't remember if it was by
11  phone or by e-mail with Sonya Abu.
12     Q. Uh-huh.
13     A. And I asked Sonya to consult with a student,
14  since the student was going to her instead of coming to
15  me like they should have --
16     Q. Uh-huh.
17     A. -- and ask the student to come over to my office
18  to see me and I would sit down and we would work out
19  something to resolve her problem and I would give her
20  extra time --
21     Q. Okay.
22     A. -- to do her work. And that was in December
23  she had since September and she had not turned in
24  any work at all.
25     Q. Uh-huh.

20 (Pages 357 to 360)

EXHIBIT K
Page 15 of 31

Case No. A05-086 CV (TMB)                                                    Bobbi Wade

Page 361

1    A. And she received notices and she received
2  everything that other students received and she never
3  responded to my e-mails to -- I had notices that I sent
4  out to all students to make an appointment with me and
5  come sit down and discuss their grades and their work and
6  she totally ignored everything all semester until
7  December when it was too late and then she was
8  frantically trying to get her work in.
9    Q. Okay. And how did she receive those notices
10 from you about homework?
11   A. I sent e-mails and I made phone calls. Now
12 remember, this was an online course.
13   Q. Uh-huh.
14   A. And they were supposed to read the notices. And
15 I also made postings on the online course --
16   Q. Uh-huh.
17   A. -- for the students to read.
18   Q. When did you make postings?
19   A. Periodically when something would change or I
20 needed the students to know something.
21   Q. Uh-huh.
22   A. And there was also a -- on the Blackboard, I had
23 a score that I could go in as the instructor that told me
24 how many times a student had gone online and clicked into
25 the course.

Page 362

1    Q. Uh-huh.
2    A. And early in December that student had clicked
3  into the course possibly twice.
4    Q. Okay.
5    A. And I say twice. As I recall, I think it was
6  one time, but I will give her the benefit of saying it
7  was twice.
8    Q. Sure. Okay. And I know you mentioned this but
9  I can't recall what course it was. Could you tell me
10 again?
11   A. Organizational Management Business 154.
12   Q. 154. Thank you.
13   A. Uh-huh.
14   Q. Okay. And was there anything else that John
15 Tuthill communicated with you on, besides the one
16 student?
17   A. That was the only student he communicated with
18 me on.
19   Q. Okay. What did you do in response to receiving
20 that e-mail from John Tuthill?
21   A. I don't recall exactly what I did, but I -- and
22 I don't recall if I talked to Sonya after his e-mail.
23   Q. Uh-huh.
24   A. But I believe it was after, but I -- I couldn't
25 swear to that or -- or contend that it's correct because

Page 363

1  it's -- it's hard to remember every little technical
2  detail.
3    Q. So tell me about your discussion with him when
4  you did.
5    A. With John?
6    Q. Uh-huh.
7    A. I don't recall having a discussion --
8    Q. Oh, okay.
9    A. -- with John. My discussion was with Sonya.
10   Q. Okay. And did you attempt further to meet with
11 this student?
12   A. Yes, I did. I tried to get -- I urged Sonya to
13 get her to make an appointment because at that time Sonya
14 would not tell me who the student was.
15   Q. Okay. Did she tell you why?
16   A. No, but the student was my advisee and I
17 couldn't help the student if I didn't know who they were.
18   Q. Uh-huh. Did she tell you the student wanted to
19 be confidential -- wanted to remain confidential?
20   A. Well, that was a bit unusual for one of my
21 advisees to want to remain anonymous.
22   Q. Uh-huh.
23   A. And different students had different
24 circumstances and you have to deal with students one on
25 one as an individual.

Page 364

1    Q. Okay.
2    A. And you have to help them with their individual
3  problems --
4    Q. Okay.
5    A. -- and that's what I did.
6    Q. Yes. I'm going to come back to that in a
7  minute --
8    A. Okay.
9    Q. -- because I sent Jonathan out to get those
10 e-mails --
11   A. Okay.
12   Q. -- and if we don't have them, we're not going to
13 make much progress.
14   A. Okay.
15   Q. After that, did you have any further
16 communication from John Tuthill about concerns that he
17 had?
18   A. I don't recall any. I would have to have them
19 before me --
20   Q. Uh-huh.
21   A. -- before I could remember.
22       (Exhibit No. 64 marked.)
23   Q. I'm going to show you 64.
24   MS. DUCEY: And, Linda, if you don't mind giving
25 one to Peter.

21 (Pages 361 to 364)

EXHIBIT
Page ___ of ___

Page 365

1    MR. GAMACHE: What number is it?
2    MS. DUCEY: 64, if I'm counting right.
3    Q. (By Ms. Ducey) Can you identify what 64 is?
4    A. Yes, I can.
5    Q. And what is 64?
6    A. It's an e-mail from John Tuthill.
7    Q. Okay. Does that refresh your recollection about
8 whether he communicated other concerns to you?
9    A. I don't recall a lot of other concerns other
10 than that one student.
11    Q. Well, actually my question first was does that
12 refresh your recollection -- never mind. Let me restate
13 the question. Did you receive this e-mail?
14    A. Yes, I did.
15    Q. Okay. And it was on or about January 15th, '04?
16    A. Yes.
17    Q. Okay. And he expressed as a concern in the
18 first paragraph about the success rate for the students
19 registered in Blackboard classes; right?
20    A. Yes.
21    Q. It says, "The success rate for students in your
22 three Blackboard classes was 23 percent at the end of the
23 fall semester." Right?
24    A. That's what it says.
25    Q. Did you agree with that number?

Page 366

1    A. No, because I don't know. I didn't know what
2 the percent was. That's not my job to keep up with
3 percentages.
4    Q. Okay. Do you remember how many students were
5 enrolled in the three Blackboard classes?
6    A. The three?
7    Q. Uh-huh.
8    A. No, not the three, but in Business 1 --
9 154 there were over 20 and it had been my request that no
10 more than 10 be enrolled in a Blackboard class.
11    Q. Okay. And it also goes on to say, "26 of the
12 total number of students registered for Blackboard
13 courses received credit for their course at the end of
14 the semester." Correct?
15    A. That's what it says.
16    Q. Okay. And do you know if that was the total
17 success rate for Blackboard classes?
18    A. No, I don't.
19    Q. Okay. Then do you see the third paragraph where
20 it says, "In reviewing the three Blackboard courses you
21 delivered, which was Business 100, 154 and 233," and he
22 said, "the two that appear to be up and running this
23 semester that was 112 and 260," he says, "I find three
24 areas in which changes could be made that would benefit
25 the students." Right?

Page 367

1    A. That's what it says, yes.
2    Q. So he talked first about, in the next paragraph,
3 "First, in all of these courses, you've lumped together
4 many assignments due on the same date." Right?
5    A. That's what he says, yeah.
6    Q. Okay. And then toward the end he says -- this
7 is about two, four, seven lines from the top of that
8 paragraph.
9    A. Uh-huh.
10    Q. Seven lines from the bottom, rather. "Please
11 revise your courses so you have a separate due date for
12 each chapter assignment." Do you see that?
13    A. Yes.
14    Q. And then he goes on to say, "Please get the
15 students to begin submitting work to you before the end
16 of this month." Right?
17    A. Uh-huh.
18    Q. And if you find -- "If at that point you find
19 some students are not participating or turning in
20 substandard work, please notify Rob and Sonya of the
21 names of the students and their problems so they can get
22 on it and see what they can do to help." Do you see
23 that?
24    A. Yes.
25    Q. Were any of those suggestions, in your opinion,

Page 368

1 unreasonable?
2    A. No.
3    Q. Okay. And what action, if any, did you take in
4 response to receiving this suggestion?
5    A. I was constantly -- I worked constantly with
6 Rob.
7    Q. Okay.
8    A. And he was aware at all times. We worked
9 together with the Blackboard students.
10    Q. All right. And did you change the assignment
11 dates, for instance, for Business 112, so that they were
12 not all due on two different dates?
13    A. Yes, I did.
14    Q. Okay. Did you revise the courses so that you
15 had a separate due date for each chapter assignment?
16    A. As I recall, I did.
17    Q. Okay. And did you notify Sonya of the names of
18 prov- -- of students who were not participating or
19 turning in substandard work?
20    A. I corresponded with Sonya and with Rob and --
21 and this might have been about the time that I asked Rob
22 to sit in with me and try to explain the Blackboard
23 system to Sonya and I gave her my code numbers so she
24 could get into the Blackboard and review my grades --
25    Q. All right.

22 (Pages 365 to 368)


EXHIBIT K
Page 17 of 31

Page 369

1    A. -- without my assistance.

2    Q. Okay. And he said, "Second, you've apparently
3  ended all three of these courses too early. They're all
4  scheduled to run until April 26th and the last -- the
5  last day of classes in the spring semester. Your
6  syllabus for Business 112 and 260 indicates students must
7  complete their assignments on April 16th, ten days before
8  the close of the semester. Unless you have authorization
9  from the dean, you need to follow the academic schedule,
10 including the Blackboard courses." In your opinion, was
11 that an unreasonable request that you run the classes?

12    A. Yes, it was.

13    Q. Why was it unreasonable?

14    A. All college professors, they always end their
15 work ahead of the time that the semester ends --

16    Q. Uh-huh.

17    A. -- in order to get all papers graded and to aid
18 students in doing catch-up work and things like that.
19 There's a lot to be done. And then the registrar
20 requests that graduating students' grades be in earlier
21 to that date, prior to that date. And you cannot, in all
22 fairness -- I cannot tell one student, "Your semester is
23 going to end on this date," but another -- to other
24 students tell them, "Your semester is going to end on
25 this date."

Page 370

1    Q. Uh-huh.

2    A. They all have to have the same date. And in
3  order to get grades sent and to get the papers graded by
4  graduation and get them to the registrar so they can fix
5  out all the necessary paperwork for graduation, the date
6  was prior to that date.

7    Q. Okay.

8    A. But I don't recall exactly what it was.

9    Q. All right. In your opinion, did Dr. Tuthill
10 have anything with the interest of the students in mind
11 when he asked you to make that change?

12    A. I had -- I had no idea what Dr. Tuthill had in
13 his mind at that time.

14    Q. Okay. Then the third thing he said is that you
15 were under-utilizing several Blackboard features that
16 could make the courses more user-friendly. And it says,
17 "In your syllabus you emphasize that you will not use the
18 Blackboard chat room or discussion board. Please
19 reconsider. It would help to have regular Blackboard
20 discussions in each of your classes and possibly to
21 arrange for some activities in which your students can
22 use the Blackboard to work together. The students need
23 to feel they're part of a group, that they're not alone.
24 And having the chance to interact with you as a group
25 could keep them going." In your opinion, was that

Page 371

1  request unreasonable?

2    A. No, it was not unreasonable, but I began to feel
3  at this time he was taking away all of my academic
4  freedom to teach my classes as I saw fit.

5    Q. Uh-huh. Well, as the new dean -- as the dean of
6  instruction, he was entitled to scrutinize?

7    A. I suppose -- I suppose he was entitled, yes.

8    Q. Okay. And what action, if any, did you take in
9  response to that suggestion?

10    A. We had verbal discussions about the chat room
11 and I explained to him why I didn't use the chat room
12 because it was almost impossible because the students out
13 in the villages did not have access to computers as they
14 chose and the chat room is more usable when you get
15 everyone online at the same time. Now a lot of
16 instructors and a lot of universities use the chat room.
17 In fact, I'm taking an online course myself, and I will
18 have to tune in into the chat room at a certain time, at
19 a certain time of the week in order to chat with all
20 students, inter-- -- intermingle with the other students,
21 which is okay if you live in an area of a country that
22 that is possible. But in Barrow and the facilities that
23 we had out in the villages, it was not possible.

24    Q. Uh-huh. Where wasn't it possible to communicate
25 in a chat room at a certain time?

Page 372

1    A. Because --

2    Q. Actually the question was where. Where was it
3  not possible?

4    A. Where was it not possible?

5    Q. Uh-huh.

6    A. The students who were out in the villages, their
7  facilities were so limited and they had only access to
8  certain times of the day. They did not have constant
9  access to a computer. In fact, the students in the
10 villages were very limited in their access to a computer.

11    Q. Was it not possible to schedule a Blackboard
12 discussion for the students in the villages and the
13 students in Barrow at a time when the students in the
14 villages had access to the computer?

15    A. There in -- I never knew of any computer being
16 in the village -- more than one computer that was access
17 and only one student could have used it at -- at the
18 time.

19    Q. Uh-huh. Well, they could all have sat before
20 the -- the screen; right?

21    A. Well, the problem would have been getting them
22 all there and the fact that the facilitator's office was
23 open at the time when I could have gotten them all
24 together.

25    Q. Uh-huh.

23 (Pages 369 to 372)

Case No. A05-086 CV (TMB)                                                    Bobbi Wade

Page 373

1    A. And my students were so widespread and had such
2  limited facilities that it was impossible to get them all
3  together.
4    Q. Okay. Did you make --
5    A. And that's the reason I didn't use the chat
6  room.
7    Q. Did you make any attempt to incorporate the
8  suggestion by seeing if there was any time that you could
9  schedule an online chat session?
10    A. I would have, had I stayed there.
11    Q. Uh-huh.
12    A. But you have to remember, the Blackboard and the
13  online facilities was still in the pioneer stage.
14    Q. Sure. Did you make any attempt in the spring
15  semester 2004 to incorporate those suggestions?
16    A. No, I don't recall that I did because I had the
17  same problem in the spring that we had, you know, prior
18  to that time --
19    Q. Okay.
20    A. -- but hopefully we were expecting things to get
21  better. The distance education had many, many, many
22  problems.
23    Q. Uh-huh. And in your opinion, was Dr. Tuthill's
24  suggestion that you try and schedule a chat room done
25  other than to further the interest of the students?

Page 374

1    A. I never had an opinion about it. I just
2  discussed it with him and I explained to him what my
3  reasons were for not using the chat room and I also
4  explained to some of the students my reason because there
5  might have been some students on campus there in the dorm
6  that might have had acc- -- more access to computers. I
7  know I had computers in my classroom and I urged -- I
8  constantly urged the students to come over and use the
9  computers in my classroom at any time and they would
10  never come.
11    Q. Okay. Back to the talk talking about the
12  success rate. Do you believe that the success rate you
13  had for the Blackboard courses was -- let me restate
14  that.
15    Dr. Tuthill, I think that you know, I'll show you
16  the document later, but during the grievance proceeding
17  he took the position that the success rate for your
18  classes was lower than for some of the other classes. Do
19  you recall reviewing that?
20    A. The success rate?
21    Q. Yes.
22    A. Reviewing, what, my success rate?
23    Q. He took the position in the context of the
24  grievance proceedings that your success rate for the
25  Blackboard courses was lower than other instructors'.

Page 375

1    A. Yes, he said it was lower.
2    Q. Okay. And do you agree with that?
3    A. No, I don't agree with that.
4    Q. Why not?
5    A. Because the success rate of other classes were
6  lower than mine, some -- some of the other classes.
7    Q. Uh-huh. Do you know which ones?
8    A. One in particular, that I recall, was J. St.
9  Vincent, the English teacher.
10    Q. Uh-huh. And which class did she teach that you
11  believe had a lower --
12    A. It was a --
13    Q. -- success rate?
14    A. It was an English class. I don't recall which
15  English class, but I remember that she had up -- maybe up
16  to eight students in the class and they had all withdrawn
17  or either failed.
18    Q. Do you remember when that class was taught?
19    A. It was the fall semester.
20    Q. Okay.
21    A. Uh-huh.
22    Q. Anybody else?
23    A. There was an adjunct professor that taught a
24  health course and I noticed that all of her students
25  failed or either withdrew. And I couldn't understand

Page 376

1  where Dr. Tuthill was getting these statistics on --
2    Q. Uh-huh.
3    A. -- my classes in regards to other classes.
4    Q. Okay.
5    A. And then my classes had many more students so
6  consequently many more students and in particular
7  Business 154 was kind of an unusual situation that I had
8  come about those students to begin with.
9    Q. Why --
10    A. Those students should never have been enrolled
11  in my class.
12    Q. Why is that?
13    A. Because I didn't register those students and --
14  and they were not business management students. The
15  student that complained so much was not -- I don't
16  believe that she was a business management student.
17    Q. Uh-huh. Why would that prevent them from taking
18  your class?
19    A. It wouldn't, but had I been the one to have
20  registered those students, I would never have advised
21  them to take that class.
22    Q. Why?
23    A. And I would have certainly cut off the load
24  limit of the class long before it reached 22 or 23 or 24,
25  whatever -- how many it was, when I had specifically

24 (Pages 373 to 376)

EXHIBIT
Page 19 of 31

Case No. A05-086 CV (TMB)

Bobbi Wade

---

Page 377

1    requested no more than ten be put in a -- on -- into a
2    Blackboard class.
3        Q. Why would you -- you said, "I never would have
4    advised them to take the class." Why not?
5        A. Because they were not business management
6    students.
7        Q. Uh-huh. Is there any other reason?
8        A. No. I would have advised -- they were not my
9    advisees, some of them weren't.
10       Q. Okay. Are there any other classes in which you
11   believe that the success rate was lower than yours?
12       A. Those are all that I can remember right off.
13       Q. Okay.
14       A. There was a -- the problem was three or four or
15   five was a norm for the number of students in a class.
16       Q. Uh-huh.
17       A. And to begin with, the other classes didn't have
18   as many other classes throughout the school, very seldom
19   had as many students in their classes as I had in my
20   classes.
21       Q. Why did the number of students affect the
22   success rate, if at all?
23       A. Because there were more to drop out and more to
24   not -- not come to class.
25       Q. Who is that?

---

Page 378

1        A. Oh, I'm sorry, I forgot to turn off my cell
2    phone. I will now turn it off. I'm sorry.
3        Q. It's okay. It happens in the strangest places.
4    Okay.
5        A. If you're going to be a few minutes --
6        Q. Yeah, why don't you --
7        A. -- I really need to take a break.
8        Q. Sure.
9            THE VIDEOGRAPHER: Going off record. The time
10   is 4:08.
11           (Recess taken.)
12           THE VIDEOGRAPHER: We're back on the record.
13   The time is 4:17.
14       Q. (By Ms. Ducey) I want -- now that I have
15   something to refresh my recollection, I want to go back
16   to the student in Business 154 that you mentioned before
17   that had only clicked in twice and that had not turned in
18   any homework.
19       A. Yeah.
20       Q. When Sonya e-mailed you and asked what the
21   consequences were for late home -- homework, did you ask
22   who the student was?
23       A. I might have. I don't recall.
24       Q. Okay. And did you recall her telling you the
25   student wanted to remain confidential?

---

Page 379

1        A. I might have. I -- I don't recall, but I do
2    remember that she wouldn't give me the name of the
3    student.
4        Q. Uh-huh.
5        A. And I -- I remember telling her that the new --
6    student needed to make an appointment with me and to come
7    over to my office and let's sit down and review the work
8    and work out a solution to the problems. And if the
9    student was genuinely interested in doing the work and
10   getting the work in by the end of the semester, that I
11   would work with that student.
12       Q. Okay.
13       A. But I would need to know -- I need to know who
14   I'm working with. I can't help a student unless I know
15   what their problems are and how to deal with them and,
16   besides, the student was my advisee. It should have been
17   me the student was coming to instead of going to Sonya to
18   begin with.
19       Q. Okay. Was -- was it your practice, then, at
20   least with respect to Business 154, that it was within
21   your discretion whether to accept late work?
22       A. I don't recall, no, having that.
23       Q. If that wasn't the practice, then, how did a
24   student know what the policy was on late homework?
25       A. I don't recall having a policy on late homework.

---

Page 380

1        Q. Okay. And so sort of back to my question, then.
2    Then it was within your discretion to decide whether to
3    accept late homework?
4        A. Any student that made an effort to do their
5    work, I accepted it at any time.
6        Q. Okay. And that was a matter left to your
7    discretion?
8        A. Yes, uh-huh, but I was always fair to them.
9        Q. Okay.
10       A. And gave them the benefit of the doubt.
11       Q. In your opinion, does that sort of a practice,
12   without an established policy, result in unfairness to
13   students?
14       A. No, I -- I would never be unfair to a student.
15       Q. In your opinion, does it result in a perception
16   of unfairness?
17       A. No.
18       Q. Why not?
19       A. Not the way I treat students. I have never
20   treated a student unfair in any situation.
21       Q. Not actually -- I'm not asking you about actual
22   unfairness. I'm asking you about a perception of
23   unfairness.
24       A. It could be perceived.
25           MS. JOHNSON: Objection.

---

25 (Pages 377 to 380)

EXHIBIT
Page 20 of 31

Page 381

1    A. I don't know what someone else would think.
2    Q. Okay. Did Sonya at this point ask you for
3 guidelines for late homework?
4    A. I don't remember that she did. She might have.
5    Q. Okay. Did you ask Sonya to give you a list of
6 students -- let me say that -- this again. With respect
7 to Business 154, did you ask Sonya to inform a list of
8 students that you gave to Sonya that you would be
9 withdrawing them if they didn't turn in their homework?
10    A. I could have because the students were going to
11 see her, they weren't coming to see me as -- as they
12 should have been.
13    Q. Okay. And did you ask her if Sonya would
14 contact them to give them that information?
15    A. I don't know. I don't recall telling her that.
16 I could have.
17    Q. Okay. Do you remember telling Sonya that you
18 had an announcement posted on the Blackboard of Business
19 154 about what -- that you would withdraw them if they
20 didn't turn in their homework?
21    A. I -- I don't recall telling her that.
22    Q. Do you recall if you told her that the students
23 don't bother to log in to look at it?
24    A. I don't recall telling her that, but I could
25 have.

Page 382

1    Q. Okay.
2    A. All they had to do was -- they were taking a
3 Blackboard course so they should have consulted the
4 Blackboard. We communicated through the Blackboard, not
5 through Sonya.
6    Q. Right. One -- one method was the Blackboard
7 announcement; right?
8    A. Well, that was the primary method.
9    Q. Do you recall if at any time in Business 154 you
10 posted an announcement on the Blackboard informing the
11 students -- informing which students had not turned their
12 homework in and that they would be withdrawn if they
13 didn't turn their homework in?
14    A. I would never post anything that would be
15 embarrassing to -- for a student on the Blackboard,
16 single out students on the Blackboard.
17    Q. Did you do it more generically, advise them that
18 if they did not turn in their homework --
19    A. If I did it at all, it was generic, yes.
20    Q. Do you recall if you did?
21    A. No, I don't.
22    Q. Do you recall if you represented to Sonya that
23 you did?
24    A. No, I don't. At that time, spring registration
25 had begun and it was a super busy time and with students

Page 383

1 trying to finish up the semester and students registering
2 for the --
3    Q. Uh-huh.
4    A. -- spring semester.
5    Q. Do you recall if there were any students in your
6 class that e-mailed you with questions about the course
7 that you failed to respond to?
8    A. I do not recall any students e-mailing me that I
9 never responded to their e-mails. I do know that a lot
10 of students e-mailed me from computers that I could get
11 their e-mails but I couldn't send me the e-mails back
12 because they did not use their correct e-mail address.
13    Q. Uh-huh.
14    A. And it was a real problem and I consulted with
15 Rob Carrillo about that problem constantly. We
16 constantly had problems with students because they were
17 constantly told they had to use the correct e-mail number
18 and consequently a lot of them didn't and it caused big
19 problems when they didn't use the correct e-mail number.
20 I could send a blanket e-mail to all students from the
21 Blackboard classes and some of the students would get it
22 and some wouldn't. And I would then give Rob a list of
23 those students and he would check out the problem to find
24 out what the problem was because the students couldn't
25 get the e-mails. You have to keep in mind that it was

Page 384

1 still pioneer with Blackboard.
2    Q. Okay. If a student sent you an e-mail, though,
3 and you simply replied, why is it they wouldn't get the
4 e-mail?
5    A. If they had not used the -- there was something
6 about the system. If they didn't use the correct e-mail
7 number, my reply would not go back to them. It would not
8 go back to them on the e-mail they had used to send it to
9 me.
10    Q. Uh-huh. I'm not sure if I understand what you
11 mean by "e-mail number."
12    A. The e-mail address, not -- not number. I refer
13 to it as number, like a phone number, but it's actually
14 address.
15    Q. Well --
16    A. And that was a big problem, students not using
17 the correct e-mail address to send an e-mail to me.
18    Q. Uh-huh. But if you actually received an e-mail
19 from a student and you pushed reply to sender and sent a
20 substantive response, is it your testimony that those
21 e-mails weren't getting through?
22    A. Some of them wouldn't. It would come back to me
23 unsent.
24    Q. And do you know why --
25    A. No, I --

26 (Pages 381 to 384)



Case No. A05-086 CV (TMB)

Bobbi Wade

Page 385

1    Q. -- if you simply --
2    A. I gave that problem to Rob Carrillo.
3    Q. And did he tell you why?
4    A. No, he never did.
5    Q. Okay. Did you make other efforts to contact
6  these students --
7    A. Yes, I did.
8    Q. -- that were undeliverable?
9    A. Yes, I did.
10    Q. What other efforts did you make?
11    A. We tried to get their -- their correct e-mail
12  numbers because some students that was the only contact
13  we had with them --
14    Q. Uh-huh.
15    A. -- was through the e-mail. And also there was
16  an administrative assistant in the department over there
17  and any student we couldn't reach because of the failure
18  of an e-mail number or the fact they didn't have a
19  telephone, we would give a list of those students to the
20  administrative assistant to find a way to contact those
21  students.
22    Q. Okay. And did you have any success?
23    A. Some we did and some we didn't.
24    Q. And do you remember if it was a big number of
25  students?

Page 386

1    A. No, it was never a big number of students.
2    Q. Okay.
3    A. The majority of the conscientious students was
4  always reachable.
5    Q. How would students turn their homework
6  assignments in on 154? Was it online?
7    A. They had a means of turning it in on the
8  Blackboard. There was a -- it was sort of like the chat
9  room.
10    Q. Uh-huh.
11    A. It was a -- room to turn in homework. Once
12  they turned the homework in, they couldn't retrieve it,
13  it was mine then. And also most of the time, I had them
14  to send it to an e-mail, just attach it to an e-mail.
15    Q. Okay.
16    A. That way the first thing in the morning, I could
17  go in and retrieve all the student homework off the
18  e-mails.
19    Q. Do you recall learning that students claimed
20  that they had turned their homework in online but you had
21  not responded to it?
22    A. No. I retrieved all the homework that was
23  turned in online.
24    Q. You -- when you were teaching Business Math 105
25  in the fall '03, do you remember canceling the class

Page 387

1  because you thought someone had stolen your book?
2    A. I didn't cancel the class. I cancelled the
3  work.
4    Q. Uh-huh. What does that mean?
5    A. I didn't give them a test or something that I
6  had planned to give because my textbook -- my teacher
7  handbook with all the answers was missing --
8    Q. Uh-huh.
9    A. -- and I couldn't find it. Which was often,
10  that happened often.
11    Q. Uh-huh.
12    A. There were too many keys to my office and I
13  complained about that several times also about having a
14  more secure office.
15    Q. Who did you complain to about the keys?
16    A. The person who handled the keys was Randy Hins-
17  -- Heeston. Heeston, I believe his name was at that
18  time, but I don't remember when I complained about not
19  having keys. Sometimes it was to other people in the
20  department, but oftentimes I knew that other people had
21  been into my office.
22    Q. And how did you know that?
23    A. Because of things that were missing that I knew
24  that was on my desk.
25    Q. Such as?

Page 388

1    A. Books, books and especially teacher editions
2  with answer keys.
3    Q. Uh-huh. Well, that's a pretty serious
4  allegation of student theft; wouldn't you agree? Student
5  theft of --
6    A. I didn't accuse anyone. I just told them my
7  book was missing --
8    Q. Okay.
9    A. -- and consequently I would not give the test.
10    Q. Okay. Did you tell them that you thought
11  someone had stolen the book?
12    A. I said someone -- I believe someone has taken
13  the book from my office.
14    Q. Uh-huh.
15    A. Might have borrowed the book. Another
16  instructor might have borrowed it, I don't know. But if
17  they did, they had a key to my office because they went
18  there when I wasn't there because I was not asked about
19  the book.
20    Q. Uh-huh. Did you inquire of other teachers if
21  they borrowed your book before you --
22    A. At times I did, yes.
23    Q. Uh-huh. On the particular day that you
24  cancelled, you said the test, had you inquired prior to
25  class whether any teachers could have borrowed your book?

27 (Pages 385 to 388)

EXHIBIT
Page 22 of 31

Case No. A05-086 CV (TMB)                                                    Bobbi Wade

Page 389

1      A. I don't recall if I did or not. But just before
2   class, just before I was to give the test, I discovered
3   that my teacher edition of the book was gone.
4      Q. Do you remember what date that was?
5      A. No, I don't. I have no idea.
6      Q. And on that day, did you refuse to answer
7   questions that the students had about the class or
8   coursework?
9      A. No, I never refused to answer questions the
10  students asked.
11     Q. Did you tell the students in Business Math that
12  they should ask the tutors if they had questions?
13     A. No, I didn't.
14     Q. Okay.
15     A. I advised them that once they left my class, if
16  they needed outside help, we had a tutoring center over
17  there. And if they needed additional help other than the
18  class, they could go to the tutoring center, that's what
19  the tutoring center was for.
20     Q. Uh-huh. The students in Business Math, some of
21  them had -- were pretty spotty in basic knowledge;
22  correct?
23     A. Yes, they ranged from high to low. It was a
24  very difficult class to teach.
25     Q. So some students, you know, may, for instance,

Page 390

1   know all of their multiplication and division tables --
2      A. Yes.
3      Q. -- but might be spotty in other areas of
4   elementary math; wouldn't you agree?
5      A. Uh-huh.
6      Q. Okay. And for those students that were taking
7   Business Math, did you attempt to assist them?
8      A. Of course, I did. I gave them all the help that
9   I had time to give them in class and then I recommended
10  if they needed further help to go to the tutoring center.
11     Q. Okay.
12     A. We had tutors hired over there for that purpose.
13     Q. So with respect to the Business Math 105
14  students, it was expected that these students' knowledge
15  would have some gaps in it; right?
16     A. Yes, absolutely.
17     Q. And -- and you would hear them ask a question
18  and you would think, "Why don't they know the answer to
19  that question? This is elementary math." I mean, you
20  might think that to yourself; right?
21     A. Yes.
22     Q. Okay. Do you recall there ever being questions
23  in Business Math 105 about how to find the lowest common
24  denominator?
25     A. No, I don't. And I don't believe that section

Page 391

1   was covered because the Business Math book was very
2   extensive and we didn't have time. I had certain things
3   I needed to cover in Module B. I had certain things in
4   module -- in Module A and Module B and Module C.
5      Q. Uh-huh.
6      A. And that -- there was certain sections that we
7   didn't cover.
8      Q. Okay. Do you recall a student asking you on the
9   side if they would assist -- if you would assist them in
10  finding the lowest common denominator?
11     A. No, I didn't. I don't.
12     Q. Did you ever refuse to help a student find the
13  lowest common denominator?
14     A. No. No.
15     Q. Very easy to re-explain; wouldn't you agree?
16     A. Yes. Yes.
17     Q. Wouldn't be burdensome to describe that to a
18  student; would it?
19     A. No. In fact, I explained to the whole class as
20  a whole many, many times how to find the lowest common
21  denominator. I -- I don't know.
22     Q. But it wouldn't be unusual with an at-risk group
23  like this that even though it's been explained, that they
24  might not get it even if you tell them again; right?
25     A. That's correct. I gave the students all the

Page 392

1   time I had to give them in helping to tutor them myself
2   in the skills that they didn't understand. And sometimes
3   I didn't have time to work with each one of them
4   individually. I couldn't do that. My classes were large
5   in Business Math and Business English.
6      Q. Uh-huh.
7      A. And it was a high range from very, very low to
8   high.
9      Q. Uh-huh. Do you remember --
10     A. It was hard to teach.
11     Q. -- how many students were in Business Math 105
12  in the fall '03?
13     A. The best I remember, there were over 20, but I
14  don't remember the exact number.
15     Q. Okay. When you had these face-to-face classes
16  such as Math 105 and students responded to a question
17  with an incorrect answer, how would you handle that?
18     A. I would explain it if the time permitted.
19     Q. Would you tell them they were wrong?
20     A. If they had an incorrect answer?
21     Q. Uh-huh.
22     A. I never -- I made a point to try to never just
23  do -- say or do anything to a student that might be an
24  embarrassment to them --
25     Q. Uh-huh.

28 (Pages 389 to 392)

EXHIBIT
Page 23 of 31

Case No. A05-086 CV (TMB)

Bobbi Wade

Page 393

1    A. -- in any way in the classroom. I don't recall
2  what I might have said or what I might have done, but I
3  would never embarrass a student as to their capabilities.
4    Q. Did you ever say in response to an incorrect
5  answer, "No, no, no, that's not right"?
6    A. No. Not as far as a student's answer.
7    Q. Uh-huh. In your opinion, would that be an
8  inappropriate response --
9    A. Yes, it would.
10   Q. -- to this?
11   A. I might have said, "No, no, no, that's not
12  right, I'm not -- you know, I'm not going to fly to
13  Mars," you know, as a humorous thing, but not in the
14  answer to a serious question, no. My classes were kept
15  rather -- rather humorous at all times.
16   Q. Right. Then with respect to Business English
17  109 in the fall of '03, was -- did there come a time when
18  you threw the test away that students had taken and
19  didn't grade them?
20   A. There might have been a time. It seems like the
21  time that I threw -- that I did not count the test, the
22  only time that I would not have counted a test is because
23  they all failed it and I just disregarded it altogether
24  and started over and tried to reemphasize.
25   Q. Do you remember if you told the class that

Page 394

1  someone had stolen your answer keys so that's why you
2  threw the test away?
3    A. No. My books went missing at times, but I don't
4  ever remember telling a student that my answer key was
5  stolen.
6    Q. All right. And so I take it, then, that you
7  wouldn't remember in the same discussion telling the
8  class that they could try and challenge the test with a
9  CLEP test, but they should trust you that they would not
10  want to and just come to class?
11   A. I told them that it was very -- it was very
12  hard, the test was very hard, and anyone who could pass
13  it, but it wasn't the CLEP test. There was a formal
14  procedure to go through --
15   Q. Uh-huh.
16   A. -- for a CLEP test.
17   Q. Uh-huh. What does "CLEP" stand for?
18   A. I don't recall right now, but it -- it means
19  that a student can test out of a course.
20   Q. So they can take the test in lieu of the course?
21   A. Yes, but this was not handled under the same
22  procedure as -- this was not the same thing as the CLEP
23  test because these were basic courses. And Courtney
24  Bartholomew, who was in the same department, he did the
25  same thing with the basic computer course. Students who

Page 395

1  were very skilled in computers when they first went to
2  his class because they were required to take the course,
3  he would give them a test and if they passed it, then
4  they didn't have to take the course. It was basically
5  the same way in Business English and Business Math.
6    Q. Okay.
7    A. Because I had some very low students and some
8  very smart students and the smart students would sit
9  there and listen to me day after day tutor and -- to try
10  to teach those low students would have been very boring
11  because I was trying to teach them materials that the
12  smart students already knew. So I followed Courtney's
13  procedure and just for Business English and Business
14  Math, nothing else, I gave them a basic English skills
15  test to cover all the material in the course, including
16  A, B and C, and if they passed those tests, I gave them a
17  comprehensive test for A, a comprehensive test for B and
18  a comprehensive test for C. And if they passed all those
19  tests, above a C, with a score above a C, then they were
20  not required to come to class and take the course.
21   Q. Uh-huh.
22   A. And I gave them the score they made on their
23  test paper as a grade at the end of the semester or the
24  course.
25   Q. Okay. Did you ever cancel class in Business

Page 396

1  English 109 in the fall of '03?
2    A. Cancel for what purpose? We had many purposes
3  that got -- classes were cancelled?
4    Q. Did you ever cancel the class?
5    A. I don't recall, but it's possible that I did.
6    Q. Okay. And did you ever cancel the next
7  meeting's class at the end of the current meeting's
8  class? In other words, not announce a class cancellation
9  until --
10   A. No, I would never cancel a class without an
11  announced cancellation.
12   Q. Okay.
13   A. And if I cancelled a class it was due to the
14  road being impassable or the snow being piled on the road
15  or the inclement weather and sometime when it was almost
16  impossible for students to get to class.
17   Q. Okay. In Business 109, in the fall semester of
18  2003, did you announce that instead of meeting two days a
19  week we would only be meeting one day a week?
20   A. I never made any announcements that -- unless it
21  was a regular scheduled procedure.
22   Q. Okay.
23   A. I don't know exactly what you're talking about
24  here.
25   Q. Well, when you turned in the course schedule

29 (Pages 393 to 396)

EXHIBIT K
Page 24 of 31

Page 397

1  change that we looked at numerous times where you were
2  going to change the module time --
3      A. Oh, you mean for the fall of 2003?
4      Q. Yes. Did you announce to the class that you
5  were changing the class meeting day from twice a week to
6  once a week?
7      A. I don't recall doing that.
8      Q. Okay. Did you tell them that you were going to
9  do that unless no one was showing up for class?
10     A. No, I don't recall doing that.
11     Q. Okay. Did --
12     A. My classes were always -- they were always
13  there. I always had big classes. I can't imagine why I
14  would say "if no one shows up for class."
15     Q. Okay. Did you tell them if no one showed up for
16  that one class meeting that you would go back to twice a
17  week?
18     A. No, I don't recall that at all.
19     Q. When you went through the Business 109 -- the
20  Business English materials 109, you had a book; is that
21  right?
22     A. Yes.
23     Q. And how did you proceed through the book, the
24  textbook?
25     A. According to the syllabus.

Page 398

1      Q. Okay. So the syllabus -- I'm looking at 62.
2      A. And it was varied. There was so much material
3  in these courses it was very difficult to get the
4  appropriate amount into a module, Module A or B or C.
5  You could hardly get finished with one before it was time
6  to begin the other and it was very difficult to teach
7  everything you wanted to teach.
8      Q. Okay. So take a look at 62 again, just for a
9  minute, the last page. And that's the course schedule;
10  right?
11     A. Yes. Yes.
12     Q. And that's what you prepared; correct?
13     A. It looks as though it's what I prepared.
14     Q. Okay. So the first thing that you went to was
15  Chapter 16; right?
16     A. Yes, uh-huh.
17     Q. And then Chapter 17; correct?
18     A. Yes, and that's --
19     Q. That's under 12?
20     A. Yes.
21     Q. And then Module B started out with Chapter 12 to
22  be followed by Chapter 1; right?
23     A. Yes.
24     Q. Then Chapter 2; correct?
25     A. Yes.

Page 399

1      Q. And Module C started with Chapter 20; correct?
2      A. Yes, the writing process.
3      Q. And then went to a couple of the appendices;
4  right?
5      A. Yes. I always teach the writing in -- in the
6  module -- Module C after they've gone through the basic
7  skills in Module A and Module B.
8      Q. Okay. So it looks like from that you didn't
9  follow the chapters in sequence; correct?
10     A. No, I never followed the chapters in sequence.
11     Q. Why not?
12     A. Because I feel that a student needs the skills
13  in Module A and then in Module B before we get to Module
14  C.
15     Q. Okay. In your opinion were -- could the
16  students become confused by jumping around from chapter
17  to chapter instead of going in sequence from 1 through
18  16?
19     A. No.
20     Q. Why not?
21     A. Because I explained it to them very carefully
22  why we're not -- why we're taking -- like we begin on
23  Chapter 16. I do not want them to begin to write unless
24  they know the rules of capitalization. I do not want
25  them to begin to write unless they know the rules of

Page 400

1  commas. We do not have time to cover everything in the
2  books so I pick out what we can cover and the time we
3  have that I think is the most important that they know
4  and then they need to know the principal parts of verbs,
5  regular and irregular, before they begin the writing
6  process. And it goes on with the same procedure. And
7  then we cover Chapter 10 on the principal parts of the
8  verbs, regular and irregular, and then we go to the
9  subject-verb agreement and then we start the writing
10  principals. And we also cover spelling guidelines at the
11  same time. So capitalization, commas and principal parts
12  of verbs and subject and verb agreement is very important
13  that the student know those rules before they begin the
14  writing process.
15     Q. When --
16     A. And it's very difficult for a student to
17  understand the writing process.
18     Q. Uh-huh. When you reviewed homework for any of
19  the classes, did you turn it back to the students?
20     A. Not right then. They turned in their workbooks
21  at the end of the -- the module.
22     Q. Okay.
23     A. And then it was checked and -- and graded or
24  whatever needed to be done.
25     Q. For the nonmodule classes, did they turn in

EXHIBIT
Page 25 of 31

Case No. A05-086 CV (TMB)                                              Bobbi Wade

---

Page 401

1  homework on a more regular basis?
2      A. Yes.
3      Q. And when did -- did you review the homework?
4      A. Yes, I did.
5      Q. Did you turn it back to the students?
6      A. Yes, I did. They were given their books back
7  because they had to use it for the next module.
8      Q. Okay. And when would you turn it back in
9  relation to the end of the class?
10     A. In the next class beginning -- there was never
11 any break in classes between the modules. I would
12 just -- they knew they were ending Module A and we were
13 going to Module B and it was a sequence that we followed.
14 That was the reason it was so confusing and I worked so
15 hard to try to get my schedule worked out that I could
16 resume Module C because it would have been very confusing
17 to the students.
18     Q. Okay. When you came back from your leave on
19 December 1st, do you remember a student named Crystal
20 Gross that was in Business 154?
21     A. The name sounds familiar.
22     Q. Okay. And do you recall withdrawing her from
23 Business 154 --
24     A. Not in --
25     Q. -- when you came back?

---

Page 402

1      A. Not in particular.
2      Q. Okay. Do you remember if you contacted her when
3  you came back to Barrow to find out if she was going to
4  finish her coursework?
5      A. I don't recall, no.
6      Q. And do you recall if you withdrew her after the
7  deadline in the registrar's office for withdrawing
8  students?
9      A. Well, there was a deadline for officially
10 withdrawing students, but there was a provision that when
11 you turned in a student's grade or toward the end of the
12 semester that you could withdraw them to prevent them
13 from making an A [sic]. A withdrawal is better on a
14 student. It does not go on their permanent record like
15 an A -- like an F does.
16     Q. Uh-huh.
17     A. If a student makes an F, it's there forever, so
18 it's to the benefit of the student to withdraw them
19 rather than to give them an F at the end of the semester.
20 And, again, that's instructors just giving the student
21 every benefit that they can possibly offer them.
22     Q. Did you secure approval from the dean's office
23 to withdraw a student after the deadline had passed?
24     A. I don't recall what the handbook says, but I
25 abided by the handbook, whatever it says.

---

Page 403

1      Q. Okay.
2      A. I never had to have approval from the dean's
3  office to withdraw a student unless when we turned in
4  grades at the end of the semester, if there was a
5  withdrawal, a student who would have ordinarily made an
6  F, if I gave that student a withdrawal, then the dean had
7  to sign the withdrawal.
8      Q. Okay.
9      A. And I believe I turned in the withdrawals toward
10 the end of the semester and I submitted those withdrawals
11 to the dean to sign and I think he refused, the best of
12 my recollection. I might be wrong, but I think he
13 refused to sign them.
14     Q. Uh-huh. Another possibility aside from
15 withdrawing was to take an incomplete; correct?
16     A. Right. And we also had a DF.
17     Q. Uh-huh. Or a deferred grade?
18     A. Yes.
19     Q. And do you remember if you advised Crystal Gross
20 that she could take an incomplete in Business 154 in the
21 fall semester?
22     A. No, I don't recall that if I -- that I advised
23 her particularly, but oftentimes students would have
24 problems getting a textbook. Our -- our method of
25 students obtaining textbooks became a problem. And in

---

Page 404

1  the fall of 2002 or 2003, I don't remember which
2  semester, because they had to order the textbooks online
3  and that was a problem with students. And as a result a
4  lot of students, it was well into the semester before
5  they would ever get a textbook. And I would try to
6  have -- have to take my time to try to help them get a
7  textbook and as a result they could not get their work
8  in. There was many, many reasons why a student failed to
9  complete their work and that was one of the biggest
10 problems were textbooks.
11     Q. Uh-huh.
12     A. And then if they did not get their book on time
13 to complete their work on time, then I would give them a
14 DF. That means they would have more time the following
15 semester to complete that work --
16     Q. Uh-huh.
17     A. -- that particular work, or an incomplete.
18     Q. Did you have authority to give a DF to a student
19 who was not in a course you were teaching?
20     A. I -- I don't recall ever giving a student that
21 authority that wasn't in my class, no.
22     Q. Okay. So --
23     A. I would not have done that.
24     Q. Right. And you did not have authority to do so
25 either; did you?

---

31 (Pages 401 to 404)

EXHIBIT
Page 26 of 31

Case No. A05-086 CV (TMB)                                                Bobbi Wade

Page 405

1    A. To give a student DF?
2    Q. A grade in a class that you were not teaching.
3    A. No, no. The students who had grades already
4  had -- had tested out of Module C, they had done that at
5  the beginning of Module A.
6    Q. Okay. And you didn't have authority to give a
7  student a deferred grade in a class that you weren't
8  teaching; did you?
9    A. Not after the class was given to someone else,
10  but what I did was done previous to -- to that class
11  being given to someone else.
12    Q. What -- what student are you referring to?
13    A. I don't know. I can't recall what student.
14    Q. What class are you referring to?
15    A. Business English and Business Math. Those were
16  the only two classes I had in modules and many, many
17  instructions were given to them at the beginning of
18  Module A because the whole course, A through C, is
19  considered one course. It's just divided up into
20  modules --
21    Q. Okay.
22    A. -- and I told them many things in Module A at
23  the beginning of the course, just like any instructor
24  does at the beginning of a course.
25    Q. But by the time grades were submitted, you were

Page 406

1  no longer the instructor; correct?
2    A. Not in Module A.
3    Q. Uh-huh. By the time grades were submitted for
4  Module C, you weren't the instructor; right?
5    A. No. No.
6    Q. So you didn't have authority to change the grade
7  that was listed; correct?
8    A. No, but I told the instructors that I had tested
9  some of those students out in Module A and I have their
10  grades and when it came time to give those students their
11  grades I -- I would submit those grades to them.
12    Q. Uh-huh. When --
13    A. I wasn't trying to do their job.
14    Q. When a class began, what did you do to ensure
15  that students had books and materials that they needed?
16    A. I don't recall assisting students too much and I
17  gave them the referral numbers and the person who was in
18  charge of helping them to get textbooks. Those people
19  were over in the administration building. There were
20  people designated to aid students in getting books.
21    Q. Uh-huh.
22    A. That was not one of my --
23    Q. So if a student advised you that they didn't
24  have materials or a book, what did you -- what action, if
25  any, did you take?

Page 407

1    A. I would try to help them resolve the problem in
2  getting the book. Many times I called the people who
3  were in charge of getting the books and tried to track
4  down the reason that student had not gotten the book.
5    Q. Okay. When you were taking the certification
6  for a principal at UAA, you had both coursework and you
7  had an internship; correct?
8    A. Yes.
9    Q. And what school was your internship with?
10    A. The name of the school?
11    Q. Yes.
12    A. Northwood Elementary.
13    Q. Northwood, okay.
14    A. And then Henshaw [sic] Middle School.
15    Q. Okay. Hanshaw?
16    A. Hanshaw, yeah.
17    Q. So when you took the internship, I'm sure that
18  you learned that there were certain ethical principles
19  that educators should go by; correct?
20    A. Absolutely.
21    Q. And one of those would be to ensure that
22  students were treated equally; correct?
23    A. As far as my capabilities went, yes.
24    Q. And another thing would be to ensure that there
25  was no favoritism toward a student; correct?

Page 408

1    A. As -- as far as my capabilities.
2    Q. Particularly if there was favoritism that was
3  motivated by some personal relationship; correct?
4    A. Correct.
5    Q. Okay. And, likewise, the appearance of
6  unfairness would be something educators would want to
7  avoid; wouldn't you agree?
8    A. Absolutely.
9    Q. Okay.
10    A. I never treated a student unfair.
11    Q. Okay. And -- and the appearance of favoritism
12  is something that all educators want to avoid; correct?
13    A. Well, I can't speak for other educators, but
14  it's something that I would avoid, yes.
15    Q. Okay. In all the years that you've taught, has
16  there ever been a situation where a principal, to your
17  knowledge, approved having the child of the teacher in
18  the same class?
19    A. I -- I couldn't say.
20    Q. Okay. That would be inappropriate; wouldn't you
21  agree?
22    A. Not necessarily. It would be according to the
23  circumstances.
24    Q. Okay. But if -- if the circumstances permitted
25  that child to be in another class, that would absolutely

Case No. A05-086 CV (TMB)                                                    Bobbi Wade

Page 413

1  A. Yes.
2  Q. For time management and recordkeeping; right?
3  A. Yes.
4  Q. He said, "The last 23 credits Ms. Underwood has
5  received from Ilisagvik have been with you as the
6  instructor." Do you see that?
7  A. Yes, I see that, but I'm not sure that's right.
8  Q. Uh-huh. Did you --
9  A. Because I would have to go back and check the
10 records.
11 Q. Did you dispute that at the time?
12 A. No, because at that time I couldn't talk to Dr.
13 Tuthill.
14 Q. Uh-huh. Why not?
15 A. He was very -- he was very abrupt and abusive
16 toward me at that time.
17 Q. Did you send him a response to the e-mail?
18 A. No.
19 Q. Why not?
20 A. I -- I didn't want to. I was feeling at that
21 time I was being ostracized.
22 Q. Uh-huh. It says, "For a student to receive so
23 much instruction from her grandmother is troubling
24 enough." Do you agree that it's troubling to receive
25 the last 23 credits of college courses that you took --

Page 414

1  A. I would not say --
2  Q. May I finish. -- from a grandmother is
3  troubling?
4  A. I would not say that she took 23 credits from me
5  because I don't know. I can't verify that.
6  Q. Assuming it's true, would you agree that it's
7  troubling?
8  A. It would be under different circumstances, but
9  not under these because she wanted the degree in business
10 and I was the only person there to teach the classes.
11 Q. Well, you said that she was a student at Middle
12 Tennessee State University; is that right?
13 A. Yes, but she didn't come to Ilisagvik to go to
14 school. She came to live with me because she had no
15 other choice.
16 Q. Uh-huh.
17 A. And while there she went to school --
18 Q. Uh-huh.
19 A. -- and she chose what she wanted to take. I
20 didn't influence her in any way. I did not ask her to go
21 into the business program. I did not influence her to go
22 into the business program. That was her choice. That
23 was her prerogative and she should have been given the
24 opportunity to do --
25 Q. Uh-huh.

Page 415

1  A. -- whatever she chose to do, just like any other
2  student.
3  Q. Well, if she --
4  A. Had I not given her that opportunity or the
5  college given her that opportunity, then she would not
6  have had a fair chance to get a degree in business.
7  Q. Okay. Well, Ms. Wade, as the instructor, as a
8  person who claims to be certified in -- to be a principal
9  and to be in administration, wouldn't you agree that it's
10 not up to the student to decide whether there's actual
11 favoritism or an appearance of favoritism, but it's up to
12 the educator to make that decision?
13 MS. JOHNSON: Objection, form of the question.
14 A. In a college?
15 Q. Yes.
16 A. To a college student, absolutely not.
17 Q. You believe that if your granddaughter comes and
18 says, "I want to take 23 credits, many of which are
19 independent studies, Grandma" --
20 A. They're not --
21 Q. -- "would you be my teacher?"
22 A. They're not many independent studies.
23 Q. Could you answer my question? Would you agree
24 hypothetically, as an experienced educator, somebody who
25 is qualified to be a business professor, who knows

Page 416

1  business ethics, would you agree that it's up to the
2  educator to make that choice rather than the student?
3  MS. JOHNSON: Objection, foundation.
4  A. No. Amy should have been given just as fair a
5  chance as any other student in that school to pursue
6  whatever education she desired.
7  Q. Well, it would have been easy to tell her then
8  to take regular courses instead of independent study from
9  her grandmother; wouldn't it?
10 A. No. That was not my responsibility to tell her
11 what to take simply because I was the instructor in some
12 of the classes.
13 Q. Okay. As an experienced educator with a
14 principal's certificate, would you agree that it is
15 reasonable for a dean to question those circumstances?
16 A. Under different circumstances, I would say yes,
17 but under the circumstances at Barrow and at Ilisagvik
18 College, he should have called me in and talked with me
19 if he had any objection to this, which he didn't. The
20 only notice that I got for him -- from him that he wasn't
21 in favor was this letter.
22 Q. Well, he probably wasn't there for some of those
23 last 23 credits; wouldn't you agree?
24 A. He probably wasn't and I don't agree that it was
25 23 credits.

34 (Pages 413 to 416)

EXHIBIT _K_
Page 28 of 31

Case No. A05-086 CV (TMB)                                                    Bobbi Wade

Page 417

1    Q. Uh-huh. In your opinion, was you teaching your
2    granddaughter independent studies or even regular course
3    work subject to an appearance of favoritism?
4    A. No, I don't think it was, not under the
5    circumstances.
6    Q. And in your opinion, would reasonable educators
7    agree that it was perfectly all right under the
8    circumstances for you to teach your daughter numerous --
9    your granddaughter numerous courses including independent
10   studies?
11       MS. JOHNSON: Foundation.
12   A. Would you please --
13   Q. Do you believe --
14   A. -- condense your question so that it's
15   understandable?
16   Q. Do you believe reasonable educators would agree
17   with you that it's perfectly all right for --
18   A. Under different circumstances other than
19   Ilisagvik and in Barrow, yes.
20   Q. How long did Amy live with you?
21   A. She lived with me a semester and then she -- we
22   got word that her father had a cancer very -- in very
23   severe -- severe stages.
24   Q. Okay. So she took one semester of coursework?
25   A. Yes, while she was there. She took some courses

Page 418

1    or either tried to take some after she left, but I don't
2    think she ever did.
3    Q. What semester was it?
4    A. I don't recall. I would have to look at the
5    records just like I look at any other student's records.
6    Q. Uh-huh. Well, he says that as of January --
7    January 2004 that she's been living in Tennessee. You
8    would agree that she was living in Tennessee; correct?
9    A. In 2004, yeah. Right.
10   Q. And your son got cancer in 2002; didn't he?
11   A. Yes. In the summer of 2002 is when she left to
12   go back to Tennessee.
13   Q. Okay. So would that make it reasonable to
14   assume that she was there with you in the spring semester
15   of 2002 if she left --
16   A. No, she was in Tennessee.
17   Q. Okay.
18   A. But she was a registered student at Ilisagvik
19   College. She was registered in -- she was accepted into
20   the business management program at Ilisagvik College.
21   Q. Okay. So she lived with you one semester only
22   in Barrow; correct?
23   A. Yes.
24   Q. And then she moved back to Tennessee; correct?
25   A. Yes.

Page 419

1    Q. And never came back to Barrow; right?
2    A. No.
3    Q. Okay. And during the period of time that she
4    was living in Tennessee, she was also a student enrolled
5    at Middle Tennessee State University; correct?
6    A. At -- I don't recall when she was enrolled at
7    Middle Tennessee State University.
8    Q. But you said she was enrolled; correct?
9    A. Yes.
10   Q. And at that time she would have had the option
11   to take those business classes at Middle Tennessee State
12   University; correct?
13   A. She might have. I don't know the circumstances
14   of her opportunities.
15   Q. So -- so the only time that you claim there were
16   these negligent circumstances was the one semester that
17   she lived with you in Barrow when you claimed that she
18   had no other opportunity; correct?
19   A. Right.
20   Q. Okay. So on the other semesters, then, when
21   she's living in Tennessee, there would be an appearance
22   of favoritism in you giving her classes, particularly
23   independent study; weren't there?
24   A. Not if she wanted to come back to Barrow to
25   graduate, which she did. She wanted to continue her

Page 420

1    studies at Ilisagvik. She only lacked one or two classes
2    being able to graduate and she wanted to graduate from
3    Ilisagvik and she was planning to come back for
4    graduation in the Spring of 2004.
5    Q. Well, I'm sure that any student who could take
6    class from Grandma and have it be an independent study
7    that Grandma created would be happy to do that, but that
8    doesn't negate the appearance of favoritism; does it?
9        MS. JOHNSON: Objection, argumentative.
10   A. I don't know.
11   Q. And is it --
12   A. I can't speak for someone else.
13   Q. Is it up to -- well, you did say that you --
14   A. I would not have favored my granddaughter. I
15   would have done it for any student under the same
16   circumstances.
17   Q. That's not the point, Ms. Wade. The point is,
18   the appearance of favoritism and as a highly educated
19   educator with an administrator's certificate, you don't
20   agree that there's an appearance of favoritism in
21   teaching your granddaughter so many classes?
22   A. There's not an any appearance to me, no. I
23   can't speak for someone else.
24   Q. And it never occurred to you that there would
25   clearly be an appearance of favoritism to any other

35 (Pages 417 to 420)

Case No. A05-086 CV (TMB)                                                    Bobbi Wade

Page 421

1 reasonable educator that would view this situation?
2     A. No, because everyone at Ilisagvik accepted it.
3 They -- Amy was in other classes. They accepted Amy.
4 There was no one else to teach business management
5 classes. She took other classes from other instructors.
6 When she needed a class that I was teaching, she took it.
7 And I never showed her -- I made a point not to show her
8 any favoritism that what I offered to do for Amy, I would
9 have done it for any student.
10     Q. Did that make it right? Did that negate the
11 appearance of favoritism?
12     A. I don't know in anyone else's opinion whether it
13 was right or not, but it was right in my opinion.
14     Q. Okay. You were also claiming her as a dependent
15 for purposes of tuition waiver; is that right?
16     A. I wasn't claiming her a dependent except for the
17 fact that she lived with me and I was supporting her. I
18 also supported her while she lived in Tennessee. I
19 have -- I supported her for five years.
20     Q. Okay. For what period of time?
21     A. I supported her -- I -- I don't recall.
22     Q. You have no idea when you were -- claimed her as
23 a dependent?
24     A. I never claimed her as a dependent. It was just
25 the fact -- and I inquired at the registrar's office if

Page 422

1 Amy could get -- because of the clause in the rules where
2 it said children of the faculty. And I went over and
3 inquired as to whether or not Amy would have to pay
4 tuition or whether or not she would have to get her
5 tuition waived and I was told that her tuition would be
6 waived, but --
7     Q. And who did -- who did you inquire of?
8     A. I don't remember, but it was over at the
9 business office and the registrar's office.
10     Q. Uh-huh.
11     A. And I got everything cleared through the
12 administration before she registered for a class and --
13 or before she -- when she enrolled.
14     Q. Did you advise the registrar at any time that
15 she was no longer living with you?
16     A. Barrow is very small. Everybody knows
17 everything and Diana Perkett is a really good friend of
18 mine and she knew that Amy had left and she knew why.
19     Q. Uh-huh. Did you advise her in her official
20 capacity as registrar that Amy was no longer living with
21 you and asked if the tuition waiver still applied?
22     A. No, I didn't. But she could have been turned
23 down had it not been.
24     Q. What support did you provide for her when she
25 was not living with you?

Page 423

1     A. I provided a place for her to live and sent her
2 money to live on.
3     Q. How much money did you send?
4     A. I don't know. I don't recall. I never counted
5 it.
6     Q. Did you claim her as a dependent on your tax
7 returns?
8     A. No, I didn't. She filed her own tax return.
9     Q. In your opinion, was Dean Tuthill's inquiry
10 about you teaching your granddaughter 23 units, including
11 independent studies, unreasonable?
12     A. He didn't inquire about it. The only time --
13 the first time I discovered he had any objection to it
14 was when I got this letter, when I received this letter.
15     Q. When he objected to approving individual study?
16     A. Yes.
17     Q. Okay. And in your opinion, was that inquiry
18 unreasonable?
19     A. No, it was not unreasonable, but it would have
20 been more reasonable if he would have called me and said,
21 "Make an appointment, let's -- come over and let's
22 discuss this." But he never consulted me on anything.
23 The only time I knew that there was a problem is when I
24 was reprimanded about it and he never heard my side of
25 the problem.

Page 424

1     Q. And you didn't bother to give him a response?
2     A. Not at this point I didn't because my grievance
3 had already been filed against him.
4     Q. He told you that he -- he had no problem with
5 Ms. Underwood continuing her education at Ilisagvik even
6 in Tennessee, but she should do it via regularly
7 scheduled distance ed classes; correct?
8     A. I don't recall if he said that.
9     Q. It says that right in Exhibit 6- --
10     A. If it says that, then it says that.
11     Q. -4.
12     MS. JOHNSON: I'm sorry, it's 5:15 and I am
13 going to have to leave at 5:30 to pick up my kids --
14     MS. DUCEY: Yeah, yeah, I'm going to --
15     MS. JOHNSON: -- so I just wanted to let you
16 know.
17     MS. DUCEY: Yeah, I'm going to finish this --
18     MS. JOHNSON: Okay.
19     MS. DUCEY: -- line.
20     A. He had a problem with this and no one had ever
21 indicated before that there was a problem with Amy
22 attending Ilisagvik College and getting her tuition
23 waivered because I was on the faculty --
24     Q. (By Ms. Ducey) Uh-huh.
25     A. -- or the fact that I was the only business

36 (Pages 421 to 424)

Case No. A05-086 CV (TMB)                                    Bobbi Wade

---

Page 429

1    Thank you for your time, Ms. Wade.  I appreciate it.
2         THE WITNESS:  You're welcome.
3         MS. JOHNSON:  Off the record.
4         THE VIDEOGRAPHER:  This concludes Volume 2 of
5    the deposition of Bobbi Wade.  The time now is 5:20.
6         (Proceedings adjourned at 5:20 p.m.)
7         (Signature Requested.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 431

REPORTER'S CERTIFICATE

1
2
3    I, CAREN S. CARLSON, Registered Professional
4    Reporter and Notary Public in and for the State of
5    Alaska, do hereby certify:
6    That the witness in the foregoing proceedings
7    was duly sworn; that the proceedings were then taken
8    before me at the time and place herein set forth; that
9    the testimony and proceedings were reported
10   stenographically by me and later transcribed under my
11   direction by computer transcription; that the foregoing
12   is a true record of the testimony and proceedings taken
13   at that time; that the witness requested signature; and
14   that I am not a party to nor have I any interest in the
15   outcome of the action herein contained.
16   IN WITNESS WHEREOF, I have hereunto subscribed
17   my hand and affixed my seal this 8th day of June, 2006.
18
19
20
21
22        CAREN S. CARLSON
          Registered Professional Reporter
          Notary Public for Alaska
23        My Commission Expires: 05-30-09
24
25

---

Page 430

WITNESS CERTIFICATE

1
2    I, the undersigned, Bobbi Wade, do hereby certify
3    that I have read the foregoing deposition and that, to
4    the best of my knowledge, said deposition is true and
5    accurate with the exception of the following corrections
6    listed below:
7
8    PAGE/LINE    CORRECTION AND REASON FOR CORRECTION
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
     _____       _____
     Date                Bobbi Wade
23
     (Use additional paper to note corrections as needed,
24   signing and dating each page.)
25

---

Page 432

INDEX TO DEPOSITION.

1
2    Bobbi Wade                          May 5, 2006
3
4    EXAMINATION
                              PAGE
5
6    BY MS. DUCEY ------------------------------- 287
7
8    * * * * * * * * * *
9    EXHIBITS
10
     NO.          DESCRIPTION              PAGE
11
12   63           Complaint                331
13
14   64           E-mail from John Tuthill
                  dated 1-15-04 & 1-20-04          364
15                (Exhibits retained by counsel.)
16
17
18
19
20
21
22
23
24
25

---

38 (Pages 429 to 432)