1    A.    So I -- I can't identify this -- this document
2    right here at all.
3    Q.    Okay.  You sought leave by e-mail to Pam at that
4    same time.  Is it reasonable to infer that if Pam Taylor
5    got a note from Dr. Aragunda requesting that you be
6    referred to doctors outside, it was because you asked Dr.
7    Aragunda to do that?
8    A.    I don't recall asking Dr. Aragunda.
9    Q.    Uh-huh.  You think Dr. Aragunda just violated
10   your attorney/client [sic] privilege and sent the letter?
11   A.    No, I don't.
12   Q.    So how do you think this came in Pam Taylor's
13   hands?
14   A.    I have no idea.
15   Q.    Well, what is the reasonable inference to make?
16         MS. JOHNSON:  Objection, form of the question.
17   A.    I -- I don't choose to make an inference.
18   Q.    I'm asking you, isn't it reasonable to infer?
19   A.    I don't know.
20   Q.    Okay.  You saw her on November 1st at Samuel
21   Simmonds Hospital.  Says, "Patient follow up with chronic
22   medical issues.  States for three or four months she's
23   been getting light-headed when changing positions,
24   walking fast or bending at work.  Also, thinks she's
25   getting very forgetful.  Sometimes she calls somebody and

1   then forgets why or who she called.  'I'm under a lot of
2   stress.'  Her son is ill after having 60 percent of his
3   liver removed secondary to cancer.  He's in intensive
4   care in the Lower 48.  'I just feel guilty that I'm up
5   here.'  Thinking about returning this year.  Assessment,
6   blood pressure up."  Does that refresh your recollection
7   about seeing Dr. Aragunda?
8       A.  I don't recall ever writing or saying those
9   words.
10      Q.  Uh-huh.
11          MS. JOHNSON:  Do you have something for her to
12  look at?
13          MS. DUCEY:  I don't need to show her anything.
14      Q.  (By Ms. Ducey)  Do you deny seeing Dr. Aragunda
15  on November --
16      A.  No, I don't deny seeing Dr. Aragunda, but if I
17  was light-headed it was due to an ear infection --
18      Q.  Uh-huh.
19      A.  -- which I had.
20      Q.  So it's possible you told her that, you just
21  don't recall?
22      A.  I don't recall it.
23          MS. JOHNSON:  Objection, foundation.  Since you
24  haven't shown her anything, she doesn't have anything to
25  verify whether she's said that or not.

```
 1            MS. DUCEY:  I don't have to show her anything.
 2            THE VIDEOGRAPHER:  Microphone.
 3            MS. DUCEY:  How did I do that?  Okay.  Thank
 4   you.
 5        Q.  (By Ms. Ducey)  So what did you do after Dr.
 6   Church told you this?
 7        A.  Told me what?
 8        Q.  That you had to come back for testing.
 9        A.  I told her that I would see if I could work it
10   out and if -- if I possibly could come back, I would; but
11   if I couldn't, it would have to wait until a later date.
12        Q.  And what did she say?
13        A.  And she says, "Well, you really need to have
14   these tests made."
15        Q.  Did she say when?
16        A.  No.  As soon as possible.
17        Q.  Uh-huh.  And did she know that you were an
18   assistant professor?
19        A.  Yes, she did.
20        Q.  Did she know that you had teaching
21   responsibilities?
22        A.  Yes, she did.
23        Q.  And did you discuss your teaching
24   responsibilities --
25        A.  No.
```

```
 1   that note were you first informed telephonically that the
 2   patch that was removed had a carcinoma?
 3       A.  I --
 4       Q.  When in relation to receiving the note from Dr.
 5   Snyder saying you needed medical attention in the
 6   somewhat urgent time frame did you receive the telephone
 7   call?
 8       A.  I received the telephone call -- if -- if you
 9   could show me the note.
10       Q.  I'm just asking you not the date that you
11   received the note, I'm asking when in relation to
12   receiving that note did you get the phone call?
13           MS. JOHNSON:  Could you ask her -- could you let
14   her look at Exhibit 32?
15           MS. DUCEY:  No, I don't need to.
16       Q.  When in relation to receiving the phone call --
17   strike that.  When in relation to receiving the note did
18   you get the phone call?  Was it the same day?
19       A.  I got the phone call prior to getting the note.
20       Q.  Okay.  So was it the day before?
21       A.  I -- I don't recall --
22       Q.  Uh-huh.
23       A.  -- unless I see some documents with some dates.
24       Q.  Okay.  Well -- well, the date of the --
25       A.  I was obviously upset the day I got the phone
```