Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ALASKA

3

4    BOBBI WADE,

5           Plaintiff,                    COPY

6         vs.

7    ILISAGVIK COLLEGE, NORTH SLOPE
     BOROUGH, JOHN TUTHILL, Individually,
8    and PAMELA TAYLOR, Individually,

9           Defendants.
     _____/

10   Case No. A05-086 CV (TMB)

11

12             *  *  *  *  *  *  *  *  *  *

13

                 DEPOSITION OF BOBBI WADE
14                      Volume 1
                 Pages 1 - 283 (inclusive)

15

                       May 1, 2006
16                     9:19 a.m.

17

         Taken by the Defendants, Ilisagvik College,
18            John Tuthill and Pamela Taylor
                          at
19   Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc.
           1007 West 3rd Avenue, Suite 400
20              Anchorage, Alaska 99501

21

22

23

     Reported by:
24   Caren S. Carlson, RPR

25

case No. A05-086 Civil                                          Bobbi Wade

Page 18

1    Q. So when you -- I'm jumping a little bit here
2  just to sort of cut to the chase. For the duration of
3  your marriage, did you live in Graceville, Florida?
4    A. Oh, let's see, we moved to Graceville, Florida,
5  I believe, in 1954 or '56 --
6    Q. Okay.
7    A. -- it was somewhere along there. For the most
8  of the years I lived in Graceville, Florida --
9    Q. Okay.
10   A. -- Jackson County, Florida.
11   Q. Uh-huh. And you said he was your supervisor.
12  What did he do?
13   A. He was on the superintendent's staff of the
14  Jackson County school board.
15   Q. And when you say that you had family here,
16  who -- who was living here that was your family?
17   A. My brother.
18   Q. And what is his name?
19   A. Robert L. Whatley, Jr., deceased.
20   Q. Any other family that you had living here?
21   A. Nieces and nephews from Robert Whatley's family.
22   Q. Is Mr. Underwood still living?
23   A. Yes.
24   Q. Does he reside in Graceville?
25   A. Yes.

Page 19

1    Q. When you lived in Anchorage, what sort of work
2  did you do?
3    A. For several years I -- I substituted for the
4  Anchorage School District.
5    Q. And then what?
6    A. I worked for one year at Prudhoe Bay for the
7  Alaska Welding Center and Quality Control.
8    Q. Uh-huh. What else did you do in Anchorage?
9    A. I went to work for an insurance company here
10  when I couldn't get a regular teacher's job.
11   Q. When were you trying to get a regular teacher's
12  job?
13   A. When I arrived in 1981, that's the first thing I
14  did was go down to the Anchorage School District and fill
15  out an application.
16   Q. Uh-huh.
17   A. At that time they were retiring the older
18  teachers and not hiring older teachers.
19   Q. And what insurance company did you work for?
20   A. Mutual of Omaha.
21   Q. Were you already licensed --
22   A. No.
23   Q. -- to sell insurance?
24   A. I had to become licensed and that was my first
25  insurance license was in the state of Alaska. I decided

Page 20

1  I would go into some other --
2    Q. Okay. And do you remember when you became
3  licensed?
4    A. In 1983.
5    Q. And how long did you work for Mutual of Omaha?
6    A. Until December of 1984.
7    Q. And why did you leave Mutual of Omaha?
8    A. Because I was involved in an automobile accident
9  and I was injured badly and I went home for Christmas to
10  visit my mother and my dad -- no, my dad was not living
11  at that time -- to visit my mother.
12   Q. Okay. And then did you come back after
13  Christmas?
14   A. No. I met a man and got married while I was
15  there, a family friend.
16   Q. The motor vehicle accident, was there anyone
17  cited in that accident, if you recall?
18   A. As far as who was responsible?
19   Q. Yes.
20   A. I was.
21   Q. Do you recall what you were cited for?
22   A. Failing to yield the right-of-way.
23   Q. Was the other person injured?
24   A. No. I -- I don't know.
25   Q. Do you recall what the nature of your injuries

Page 21

1  were?
2    A. A concussion to the head and a twisted --
3  severely twisted ankle, left ankle.
4    Q. Did you lose consciousness?
5    A. Yes.
6    Q. Do you know for how long?
7    A. I regained consciousness in the Providence
8  Hospital.
9    Q. And were you hospitalized overnight?
10   A. Yes.
11   Q. Do you know how many nights?
12   A. I believe it was just for one, just for
13  observation.
14   Q. Uh-huh.
15   A. I don't recall.
16   Q. Do you remember if you had a skull fracture?
17   A. No. I -- I had a skull injury.
18   Q. Uh-huh. Right. Did you have any facial
19  fractures?
20   A. It was in my face and my forehead.
21   Q. Do you remember if you were told whether you had
22  a fracture?
23   A. I don't recall what I was told.
24   Q. Okay. Was there any claim made against you or
25  your insurance company as a result of the motor vehicle

Midnight Sun Court Reporters *** (907) 258-7100

case No. A05-086 Civil

Bobbi Wade

Page 22

1  accident?
2     A. Not that I know of. I don't recall any.
3     Q. And what name were you using at the time you
4  were in this accident?
5     A. I was Underwood. Bobbi J. Underwood.
6     Q. And do you recall if the police or the state
7  troopers responded?
8     A. Yes, they did.
9     Q. Was it the police or the troopers?
10    A. I don't know. It was outside the city limits so
11 it was probably the troopers. I don't know.
12    Q. Did you sell any insurance when you worked in
13 Anchorage?
14    A. Yes. I was very productive.
15    Q. Can you give me an idea of your productivity?
16    A. I was always above the company quota to get the
17 bonuses that I could have earned in getting the quotas
18 and obtaining the quotas. That's all I remember.
19    Q. And how were you compensated as a salesperson?
20    A. Through paychecks.
21    Q. To be more precise, were you paid a salary?
22    A. No. There were certain bonuses from each sales
23 that I made.
24    Q. What sort of products were you selling?
25    A. Health insurance and life insurance.

Page 23

1     Q. And to whom were you reporting?
2     A. To the office manager and I can't recall his
3  name. His first name was Jack is the only -- I can't
4  remember his last name.
5     Q. Okay. When did you come back to Anchorage after
6  you went home to visit your parents for Christmas?
7     A. I came back in 1990.
8     Q. So you were gone for six years?
9     A. Yes.
10    Q. And where were you living during that period of
11 time?
12    A. I was living in various places with a man that I
13 had married.
14    Q. Uh-huh. And what was his name?
15    A. His name was Gary D. Webb, W-E-B-B.
16    Q. So where did you live?
17    A. I lived in Kansas City, Missouri, which is --
18 was the town that he was from and I worked there as a
19 substitute school teacher and then he -- his job took
20 him -- he was in construction. His job took him to
21 California so I lived in Palm Springs, California, for
22 several months. And then he was -- his job took him to
23 New Haven, Connecticut. I went with him to New Haven and
24 I lived there a few months and....
25    Q. And then where did you go?

Page 24

1     A. I left him and went back to Nashville,
2  Tennessee, where my son lives, Steve Underwood.
3     Q. Did you reside with your son?
4     A. Yes, for a short period of time.
5     Q. So what year was it when you came back to
6  Nashville?
7     A. It was like 1987. Right at the end of the year,
8  1990 --
9     Q. Did you obtain a divorce from Mr. Webb?
10    A. Yes, I did.
11    Q. What state did you obtain a divorce in?
12    A. In Alabama, because I left Tennessee and went to
13 live -- down to Alabama to live with my mother.
14    Q. Is that in Ozark?
15    A. Yes.
16    Q. Did you have an attorney represent you?
17    A. For the divorce, yes, I did, but I don't recall
18 the attorney's name.
19    Q. Okay. Did you have any children born of that
20 marriage?
21    A. No.
22    Q. Do you know where Mr. Webb currently resides?
23    A. I have no idea, no.
24    Q. Does he work for a big national construction
25 company?

Page 25

1     A. He did, but I don't recall the name of the
2  company.
3     Q. Do you know what his position was in the
4  construction field?
5     A. He was a finishing carpenter and he usually had
6  the manager's job of finishing, doing the finish work on
7  the inside of a building. He predominantly finished a --
8  remodeled -- he was supervisor of remodeling the
9  Marshalls stores.
10    Q. Did you work when you lived in either Palm
11 Springs or New Haven?
12    A. I didn't work in Palm Springs but I applied for
13 jobs.
14    Q. Where did you apply?
15    A. I applied with the school district that was in
16 driving distance of Palm Springs and I don't recall the
17 name of the school district.
18    Q. And how about in New Haven?
19    A. I was only there for a short time, but I
20 inquired at the -- with the school district about the
21 opportunities of working there. Everywhere I went, I
22 inquired and applied for teaching jobs.
23    Q. Okay. So 1990 you're back in Anchorage and what
24 did you do when you came back?
25    A. I applied for jobs.

7 (Pages 22 to 25)

case No. A05-086 Civil                                                    Bobbi Wade

Page 26

1    Q.  And where did you apply?
2    A.  I applied at the Anchorage School District.
3    Q.  What positions did you apply for?
4    A.  Teaching English jobs and had -- I had several
5    interviews but I was not hired.
6    Q.  So what else did you do after you came back in
7    1990?
8    A.  I applied for a job that I saw was listed in the
9    newspaper in Barrow.
10   Q.  And what was the job?
11   A.  It was a manager of a hotel.
12   Q.  And did you obtain that position?
13   A.  Yes, I did.
14   Q.  And which hotel was it?
15   A.  It was the Arctic Hotel.
16   Q.  And for what period of time did you work there?
17   A.  I worked there for approximately a year.
18   Q.  What was your rate of pay?
19   A.  It was $10 per hour.  Also, I obtained -- I did
20   part-time work at another facility there.  I held down
21   two jobs while I was there.
22   Q.  Uh-huh.  Do you remember what the other facility
23   was?
24   A.  Yes, I do.
25   Q.  What was the name of that?

Page 27

1    A.  Ilisagvik College.
2    Q.  Okay.  What were you doing at Ilisagvik?
3    A.  Adjunct instructor of business courses.
4    Q.  And why did you leave the job at Arctic Hotel?
5    A.  The rate of pay was not sufficient and I
6    obtained another job with the North Slope Borough.
7    Q.  When you were the manager of the Arctic Hotel,
8    who was your supervisor?
9    A.  Noit Kontedong.
10   Q.  Could you repeat that?
11   A.  Noit, N-O-I-T.  That's not his official name but
12   that's the name he was called.
13   Q.  Right.
14   A.  And his last name was Kontedong.  He was from
15   Taiwan.
16   Q.  Okay.  So at the North Slope Borough, what did
17   you do?
18   A.  I went to work for the SATC, the Substance Abuse
19   Treatment Center.
20   Q.  And what did you do for them?
21   A.  I was a -- I was -- I went into training to be a
22   SATC counselor.
23   Q.  Uh-huh.  Did you complete that training?
24   A.  No, I didn't.
25   Q.  Why not?

Page 28

1    A.  Because it was not in my field of interest, I
2    discovered, after I went to work with them and I just did
3    not have the interest to go into the field of study that
4    would have been required of me to do.
5    Q.  Okay.  How long did you work at the Substance
6    Abuse Center?
7    A.  Probably about six weeks.
8    Q.  Okay.  And what else did you do while you were
9    in Barrow?
10   A.  That was all.
11   Q.  Okay.  Then where did you go from there?
12   A.  I left Barrow and came back to Anchorage.
13   Rented an apartment.
14   Q.  What year was that?
15   A.  It was 19- -- the latter part of 1993.  I'm
16   sorry, I -- I think it was 1994.
17   Q.  Okay.  And did you look for work?
18   A.  Yes, I did.
19   Q.  Where did you look for work?
20   A.  Anchorage School District.
21   Q.  What sort of jobs did you apply for?
22   A.  Teaching jobs.
23   Q.  Any particular kind of teaching jobs?
24   A.  English and Art.  I applied for -- I have a
25   degree in English and Art.

Page 29

1    Q.  Okay.  And did you obtain employment with the
2    school district?
3    A.  No, I didn't.
4    Q.  So what did you do then?
5    A.  I enrolled at the University of Alaska to obtain
6    a -- to gain certification in supervision and
7    administration.
8    Q.  And did you obtain the certificate?
9    A.  Yes, I did.
10   Q.  What sort of certificate did you obtain?
11   A.  A principal certificate in the state of Alaska,
12   grades K through 12.
13   Q.  And when did you obtain that?
14   A.  I believe it was in 1995.
15   Q.  Okay.  And --
16   A.  Could have been '96.
17   Q.  Uh-huh.
18   A.  I don't recall the exact.
19   Q.  And did you become employed as a principal?
20   A.  No, I didn't.  I applied.  I had interviews, but
21   no employment.  They had a policy that you had to be a
22   teacher in order to move into a principal's position.
23   Q.  Did you know that before you started the
24   certificate?
25   A.  No.

8 (Pages 26 to 29)

EXHIBIT
Page 4 of 88

Midnight Sun Court Reporters *** (907) 258-7100

case No. A05-086 Civil

Bobbi Wade

Page 30

1    Q. How long did it take to obtain the certificate?
2    A. It took from 1994 to -- let's see, I believe I
3 began in the fall of 1994 and it was in the -- at the end
4 of the summer session in 1995, I believe, are the correct
5 dates. I'm not positive about the dates. It could have
6 been '96. I would have to look at records --
7    Q. Uh-huh.
8    A. -- to refresh my memory.
9    Q. Were you working during the period you were
10 obtaining --
11    A. No, I was going to school on student loans, the
12 Alaska student loan.
13    Q. And how much did you take out in student loans?
14    A. I would have to review the records to give you
15 that answer. I don't remember.
16    Q. Uh-huh. Can you tell me approximately?
17    A. I would say approximately $9,000.
18    Q. Okay. So then what did you do after that?
19    A. I went back to work. I renewed my insurance
20 license and went back to work for Mutual of Omaha. Also,
21 I was a substitute teacher. I was substituting about
22 that time, too.
23    Q. Uh-huh. And how long did you work for Mutual of
24 Omaha the second time?
25    A. I don't recall, but it wasn't very long.

Page 31

1    Q. And what happened that led you not to work for
2 them?
3    A. There was a new office manager that was very
4 overbearing and I had -- I had problems getting the money
5 that I was earning.
6    Q. Who was the office manager?
7    A. I don't remember her name.
8    Q. Did you sell any products the second time you
9 worked for --
10    A. Yes, I did.
11    Q. -- the company? Do you know how much you sold?
12    A. No.
13    Q. Do you know what your persistency rate was for
14 the products you sold?
15    A. I sold the quota to get the bonuses that was
16 required, you know, to sell to receive all the pay and
17 the bonuses that came along with the production.
18    Q. Do you know what I mean by "persistency"?
19    A. Was it persistent throughout the term --
20    Q. Yes.
21    A. -- yes, it was persistent.
22    Q. What kind of products were you selling?
23    A. Health and life insurance.
24    Q. Were you selling whole life?
25    A. Yes. Term life and whole life and -- and health

Page 32

1 insurance.
2    Q. For those products you sold, though, if they
3 were persistent over time, why aren't you getting any
4 return from them?
5    A. I did for a while, but they finally stopped
6 coming.
7    Q. And when was the last time you got any income
8 from selling those products?
9    A. I don't recall. It's been several years ago.
10    Q. So what did you do after you left Mutual of
11 Omaha?
12    A. I moved to -- I left because I spent some time
13 in getting materials together and beginning a business of
14 my own --
15    Q. Uh-huh.
16    A. -- and that was incorporation with the
17 University of Alaska.
18    Q. Uh-huh. What was that business?
19    A. It was -- the title of it was Anchorage Academy
20 One.
21    Q. Uh-huh. What was the nature of that business?
22    A. It was educational business. I applied for a
23 SBA loan to support and to begin the business.
24    Q. Did you obtain a loan?
25    A. Eventually, yes, I did, but not in time to

Page 33

1 actually begin the school in the fall of that year.
2    Q. How much of a loan did you obtain?
3    A. $60,000.
4    Q. When did you obtain that loan?
5    A. After I had gone to Tennessee to take a job.
6    Q. What year was that?
7    A. I believe that was in 1997.
8    Q. So what happened with the money from the small
9 business loan?
10    A. It went back. I never used it. I never
11 obtained it.
12    Q. And how long were you involved in Anchorage
13 Academy One?
14    A. Until the summer of 2000.
15    Q. So from 1997 until the summer of 2000?
16    A. I was involved with Anchorage Academy One and
17 had held a -- an Alaska license.
18    Q. What sort of a license?
19    A. Business license.
20    Q. You said that you moved. Where did you move
21 during this period of time?
22    A. I moved to Murfreesboro, Tennessee.
23    Q. And why did you move there?
24    A. Because the loan did not come through in time
25 for me to begin the private school that I had -- was

case No. A05-086 Civil                                                                                 Bobbi Wade

Page 34

1  going to begin in Anchorage in time for me to begin in
2  September, so I applied for jobs everywhere.
3      Q. When you say "everywhere," where do you mean?
4      A. All over the United States. When you -- when
5  you are teaching in colleges and universities, there's an
6  educational chronicle that comes out that lists all the
7  jobs.
8      Q. What kinds of jobs were you applying for?
9      A. Higher education jobs --
10     Q. What sort --
11     A. -- in colleges and universities.
12     Q. Uh-huh. What sort of higher education jobs?
13     A. English, freshman English or Art.
14     Q. And did you obtain any positions at any colleges
15  or universities?
16     A. Yes, I did.
17     Q. Where did you obtain --
18     A. At Middle Tennessee State University in
19  Murfreesboro, Tennessee.
20     Q. And what position did you obtain?
21     A. An adjunct English instructor.
22     Q. And what was your rate of pay?
23     A. I don't recall exactly, but it was something
24  like $1300 per course for a three-hour course because it
25  was like around $4 per unit.

Page 35

1      Q. Uh-huh.
2      A. And I was teaching nine units, teaching three
3  courses and -- three three-hour courses which were
4  nine --
5      Q. Okay.
6      A. -- so you can do the math there.
7      Q. Okay. And what years did you teach at Middle
8  Tennessee University?
9      A. 1997 and 1998 and also in 1997 I enrolled in a
10  doctoral program and was taking courses myself. I was an
11  employee and -- I was an adjunct instructor and a student
12  at Middle Tennessee State University.
13     Q. Okay. Why did you leave Middle Tennessee
14  University?
15     A. I --
16     Q. Why did you leave the teaching, first of all?
17  Sorry to interrupt.
18     A. I got married again --
19     Q. Uh-huh.
20     A. -- in December of 1997.
21     Q. And who did you marry?
22     A. I married Billy Frank Wade, W-A-D-E.
23     Q. And why did you leave the Ph.D. program?
24     A. Because I married Bill in December while I was
25  there. He left to come back to Anchorage and then when

Page 36

1  my teaching was over there, I left to come back -- move
2  back to Alaska to be with him.
3      Q. Did you ever re-enroll in that Ph.D. program?
4      A. No.
5      Q. What did Mr. Wade do for a living?
6      A. He was a civil service employee at Elmendorf Air
7  Force Base.
8      Q. And as a civil service employee, what sort of
9  work did he do?
10     A. He was a high-voltage electrician.
11     Q. So he was --
12     A. I think the correct name for it is lineman.
13     Q. He was an outside --
14     A. Yes.
15     Q. -- wireman?
16     A. Yes.
17     Q. Uh-huh. And did you obtain a divorce from
18  Mr. Wade?
19     A. Yes, I did.
20     Q. What year did you obtain a divorce?
21     A. 2000, December 4th of 2000.
22     Q. And where did you obtain the divorce?
23     A. In Anchorage.
24     Q. Did you have an attorney represent you?
25     A. Yes, I did.

Page 37

1      Q. Do you recall who that was?
2      A. David Wintzell.
3      Q. Do you know if Mr. Wade still resides in
4  Anchorage?
5      A. No, I don't know that. I have no idea where he
6  might reside.
7      Q. So when you came back to Anchorage in -- it was
8  1998; correct?
9      A. Yes.
10     Q. Where did you reside with him?
11     A. In the Swantiz Apartments on Eureka Street just
12  off of Fireweed.
13     Q. And did you look for work when you came back?
14     A. Yes, I did.
15     Q. Where did you look for work?
16     A. I applied to the University of Alaska and also
17  to the Anchorage School -- yes, the Anchorage School
18  District.
19     Q. And what jobs did you apply for there?
20     A. Anchorage School District?
21     Q. Uh-huh.
22     A. It was principal -- at that time I had my
23  principal's degree -- English or Art. Those three
24  categories I always apply.
25     Q. Uh-huh. What did you apply for at UAA?

10 (Pages 34 to 37)

case No. A05-086 Civil                                                                     Bobbi Wade

Page 38

1    A. Adjunct, English adjunct.
2    Q. Did you obtain a position with either one?
3    A. Yes, I did.
4    Q. And with whom did you obtain a position?
5    A. UAA.
6    Q. And what was the position?
7    A. It was adjunct English instructor and
8    developmental studies instructor.
9    Q. And what was your rate of pay?
10   A. The best I recall, it was something like $750
11   per unit.
12   Q. $750?
13   A. Yes.
14   Q. And how many units did you teach?
15   A. The fall semester of 1998, I taught -- I think
16   it was four, four courses I taught.
17   Q. Okay. Did you teach beyond the fall semester?
18   A. I taught the limit of the college --
19   Q. Uh-huh.
20   A. -- whatever it was.
21   Q. Okay.
22   A. Yes, I also taught the spring semester.
23   Q. And how many units did you teach?
24   A. Four.
25   Q. Why did you leave that position?

Page 39

1    A. Well, I taught -- I went on to teach in the fall
2    of 1998. It was December of 1998 before I left that
3    position.
4    Q. Okay. Why did you leave?
5    A. Because Bill Wade, my husband, wanted me to go
6    back to Tennessee so I went back to Tennessee.
7    Q. And where did you move in Tennessee?
8    A. I moved back to Murfreesboro, to the same
9    apartment I had previously lived -- same apartment
10   building that I had previously lived.
11   Q. Uh-huh. Were you living with him at the time?
12   A. No. Once I got there, I never lived with him
13   anymore.
14   Q. Did you look for work there?
15   A. Yes, I did.
16   Q. Where did you look for work?
17   A. I applied for work at Middle Tennessee State
18   University and I applied at several colleges, but one
19   include -- included the Nashville Technical College in
20   Nashville.
21   Q. What positions did you apply for?
22   A. Adjunct English.
23   Q. Did you obtain any position?
24   A. Yes, I did.
25   Q. What position did you obtain?

Page 40

1    A. Adjunct English in Nashville State Technical
2    College.
3    Q. What was your rate of pay?
4    A. It was about the same as it was at MTSU, about
5    around $4 per unit. I'm not as positive of the exact
6    figure.
7    Q. And how many units did you teach?
8    A. I taught four there.
9    Q. And how long did you teach there?
10   A. Until the -- May of 2000.
11   Q. And then what happened?
12   A. I discovered that I needed to divorce Bill Wade,
13   so I came back to Anchorage.
14   Q. Did you look for work here?
15   A. Yes, I did.
16   Q. Where did you look?
17   A. I applied back to the University of Alaska. I
18   applied to several places around the Anchorage School
19   District. I saw an ad in the paper for instructors at
20   Ilisagvik College and I applied there. And I had also
21   applied for adjunct work with Colorado State University
22   in the state of Colorado and I had already obtained work
23   there.
24   Q. Uh-huh.
25   A. They had already assured me that I would have

Page 41

1    work there.
2    Q. Okay. What work did they offer you?
3    A. Adjunct instructor in English and they had
4    offered me four courses at $3,000 per course, so that
5    rate of pay was comparable to the state of Alaska.
6    Q. Uh-huh. And why didn't you take that position?
7    A. Because I was given the job at Ilisagvik.
8    Q. And what made you choose that job over the job
9    at Colorado State?
10   A. Because it was a full-time job with benefits.
11   Colorado State was a part-time job.
12   Q. Okay. And what position were you offered at
13   Ilisagvik?
14   A. Business management and assistant professor of
15   office -- business -- of the BMIT program --
16   Q. Uh-huh.
17   A. -- business management and office management.
18   Q. Okay. And who hired you?
19   A. Pam Taylor.
20   Q. Was she the person that made the decision?
21   A. She and the instructor who was leaving, Elisa
22   Asplin. I interviewed with both of those people over the
23   phone.
24   Q. Uh-huh. And what were your qualifications to
25   teach business?

11 (Pages 38 to 41)

case No. A05-086 Civil                                                    Bobbi Wade

Page 42

1    A. I had begun several businesses of my own and I
2  had training -- experience, not training -- in accounting
3  and bookkeeping and Business English and in the business
4  field and I also had a principal's certificate that was
5  in supervision and administration, which involved a lot
6  of business courses that was comparable to a business
7  degree.
8    Q. Where did you take those business courses?
9    A. I didn't take business courses.
10   Q. You said --
11   A. I never said I took business courses.
12   Q. You had a principal certificate that involved
13 business courses. Did I misunderstand you?
14   A. Courses that was taught. They were -- I took
15 those courses when I took my -- got my certification to
16 be a principal. I took school law and things like that.
17 I took law courses. I took financial courses. I took
18 courses that involved statistics, things like that. It
19 also involved management.
20   Q. And besides the businesses that you mentioned to
21 me, were there any other businesses that you had begun?
22   A. They were in previous years a long time ago.
23   Q. Uh-huh. What other businesses were they?
24   A. The first business I began was a private school
25 in the state of Florida.

Page 43

1    Q. Uh-huh. When was that?
2    A. It was in 1966.
3    Q. And what kind of school was it?
4    A. It was a Kindergarten preschool.
5    Q. Was it licensed as a Kindergarten?
6    A. I did not have to obtain a license, no.
7    Q. And how long did you have that business?
8    A. Four years.
9    Q. Why did you stop that business?
10   A. I stopped it because my husband got a job as a
11 principal in Panama City, Florida, and we moved.
12   Q. What was the name of that business?
13   A. Jack and Jill Kindergarten.
14   Q. Any other businesses that you've begun that
15 you've not mentioned?
16   A. In the late 1970s, I began an art and antique
17 business.
18   Q. Where was that?
19   A. It was in Graceville, Florida.
20   Q. What was the name of it?
21   A. Vintage House Art and Antiques.
22   Q. And how long did you operate that business?
23   A. Approximately two years.
24   Q. And why did you stop operating that business?
25   A. It began to grow and it became too demanding and

Page 44

1  I was working full-time at the high school as a public
2  school teacher and my husband asked me to stop the
3  business, so I did.
4    Q. Did you sell it?
5    A. No. I just sold out and closed it.
6    Q. Okay. Any other businesses that you've been
7  involved in?
8    A. The next business that I recall was the
9  Anchorage Academy One --
10   Q. Okay.
11   A. -- in Grace- -- in Anchorage.
12   Q. With Anchorage Academy One, did you ever obtain
13 any contracts?
14   A. No. We wrote many proposals for contracts,
15 government contracts, but we never obtained one.
16   Q. So you never received any income from Anchorage
17 Academy One?
18   A. No.
19   Q. And you said you had experience in bookkeeping.
20 What experience in bookkeeping did you have?
21   A. In -- from 1960 to 1966 when I began the
22 Kindergarten business, I worked for the U.S. Department
23 of Agriculture as the bookkeeper and accounting person --
24 clerk.
25   Q. You were a clerk?

Page 45

1    A. Yes. And I was federally audited annually by
2  federal auditors. There was never any discrepancies
3  found.
4    Q. Where did you work for the Department of
5  Agriculture?
6    A. In Jackson County, Florida.
7    Q. Any other bookkeeping experience?
8    A. Shortly after I had my auto accident here in
9  Anchorage, I did the payroll and recordkeeping for Aoki
10 Construction on a temporary part-time basis.
11   Q. Would you say again what the construction --
12   A. Aoki, A-O-K-I.
13   Q. Uh-huh. How long did you work for them?
14   A. Just a few months.
15   Q. Any other business experience -- I'm sorry,
16 bookkeeping experience is what I was asking you about?
17   A. I was required to do -- I had to do -- I did
18 bookkeeping for my own businesses. I kept up with
19 expenses and financial reports for the Anchorage Academy
20 One because I had to do financial reports in order to get
21 an SBA loan.
22   Q. Did you have an in-person interview with
23 Ms. Taylor and Ms. Asplin?
24   A. You mean to enter into the conversation?
25   Q. Well, let me back up. Did you submit an

EXHIBIT
Page ___ of ___

case No. A05-086 Civil                                                        Bobbi Wade

Page 46

1   application?
2       A. To whom?
3       Q. Ilisagvik.
4       A. Of course.
5       Q. Okay. And were you called for an interview?
6       A. Yes.
7       Q. And did you have an in-person interview?
8       A. What do you mean by "in-person"?
9       Q. Face-to-face.
10      A. No. It was over the phone. I was in Anchorage
11  at the time.
12      Q. Okay. And what did they tell you about the job?
13      A. I actually applied for the office technology job
14  because there was two jobs and I had previously taught
15  office -- the office technology courses for the college.
16  I felt more comfortable applying for that job. I named
17  both jobs in my letter of application and -- because it
18  said that in that job description that was in the
19  newspaper that you would have a degree in that field or a
20  related field.
21      Q. Okay.
22      A. And I did not know which related fields they
23  referred to, but I felt like my degree, my certification
24  in supervision and administration and educational
25  leadership, I did not know if I qualified for those jobs.

Page 47

1       Q. And did you discuss that in the interview?
2       A. Yes.
3       Q. Tell me what you recall about that.
4       A. I remember asking Pam Taylor if I would have the
5   office technology job because I had taught those courses
6   previously at Ilisagvik. She says, "Oh, no, we're going
7   to give you the business management job."
8       Q. Uh-huh. And did she say why?
9       A. She said I was better qualified.
10      Q. And what, if anything, did Ms. Asplin say in the
11  interview?
12      A. I don't recall what she said to me. She just
13  asked me a few questions and I don't recall what they
14  were.
15      Q. Okay. Did you speak to the dean of instruction
16  before you were hired?
17      A. No.
18      Q. Did you speak to the president of the college
19  before you were hired?
20      A. No.
21      Q. Did you have any other discussions about your
22  qualifications prior to being hired?
23      A. There at one time when over the phone -- during
24  the interview for Ilisagvik College over the phone,
25  Brooke Selmer was present and he was at that time when

Page 48

1   Elisa Asplin left kind of the director of the BMIT
2   Department.
3       Q. Do you remember if he said anything?
4       A. No, I don't. He did, but I don't remember what.
5   Pam did most of the talking and she asked me most of the
6   questions.
7       Q. Uh-huh. What did she ask you?
8       A. I don't recall everything she asked me.
9       Q. Did she ask you what your experience was --
10      A. Yes, she did.
11      Q. -- in business? Do you remember what you told
12  her?
13      A. Approximately the same thing I've told you. I
14  related my actual experiences. I didn't build up on
15  anything.
16      Q. Okay. So then you went up to Barrow?
17      A. Yes. At that time my funds were beginning to
18  run out and I asked Pam if they could provide me with a
19  ticket to Barrow and she told me that they could, so --
20  and I was also told once I arrived up there that I would
21  have a -- there was monies for moving, but at the time I
22  needed the monies they weren't available. I had to pay
23  my own shipping charges at the time --
24      Q. Uh-huh.
25      A. -- and then I was reimbursed.

Page 49

1       Q. Okay. So what sort of a term were you hired
2   for?
3       A. I was hired for one -- I was given a one-year
4   contract.
5       Q. Okay.
6       A. And there was never any provisions, conditional
7   provisions.
8       Q. Okay. I want to back up just for a minute and
9   cover a couple of bases I didn't cover before. Can you
10  tell me where you were born?
11      A. I was born in Dale County, Alabama.
12      Q. Were you raised in Alabama?
13      A. Yes.
14      Q. Where?
15      A. Dale County.
16      Q. Where did you attend high school?
17      A. At Dale County High School.
18      Q. Did you obtain a high school degree?
19      A. Yes, I did.
20      Q. Did you marry your first husband there?
21      A. Yes.
22      Q. And what year did you move to -- from Alabama
23  with your husband?
24      A. From Dale County we moved to Geneva County and
25  and that was the fall of 1952.

case No. A05-086 Civil                                                    Bobbi Wade

1    Q. Okay. And from there you went to Florida?
2    A. Yes. We were in Geneva one year, I think. It
3  might have been two.
4    Q. Have you had any other marriages that you've not
5  mentioned to me?
6    A. No.
7    Q. What was your birth name?
8    A. Bobbi Jean Whatley. W-H -- with an "H,"
9  W-H-A-T-L-E-Y.
10   Q. Okay. And I think I understand some of the
11 other names that you've gone by. I want to make sure
12 that I know them all.
13   A. Okay.
14   Q. I understood you married Mr. Underwood and for a
15 time you used Underwood as a last name --
16   A. Yes.
17   Q. -- for a long time?
18   A. For a long time.
19   Q. And then what other names have you used?
20   A. Webb.
21   Q. I'm sorry?
22   A. I married Gary Webb. I used the name of Webb.
23   Q. Uh-huh. And what other names?
24   A. And then I married Bill Wade and I've been using
25 the name of Wade since that time.

1    Q. Okay. I ask all plaintiffs if they've ever been
2  arrested. Have you ever been arrested?
3    A. No.
4      MS. DUCEY: Would it be a convenient time for a
5  break?
6      MS. JOHNSON: That's a good idea.
7      MS. DUCEY: So the bathroom, if you just go
8  around there and through the door.
9      THE VIDEOGRAPHER: Let me just announce off
10 record. We're going off record. The time is 10:27.
11       (Recess taken.)
12      THE VIDEOGRAPHER: We're back on the record.
13 The time is 10:39.
14   Q. (By Ms. Ducey) Ms. Wade, when you were offered
15 a position by Ilisagvik in 2000, was there a dean of
16 instruction?
17   A. Yes.
18   Q. Who was the dean?
19   A. Frank Willingham.
20   Q. Okay. And do you know what happened to him?
21   A. He went back to his hometown in Houston, Texas.
22   Q. Uh-huh. How soon after you left?
23   A. I don't recall the exact year that Frank left,
24 but I think it was -- let's see, the end of 2002.
25   Q. Did you ever have a discussion with him about

1  your qualifications to be a business professor?
2    A. Only when I applied for another position that
3  had come up.
4    Q. Uh-huh. Tell me about that.
5    A. I don't recall the position, but I discussed my
6  qualifications with Frank.
7    Q. Uh-huh. Tell me what you recall about that
8  discussion.
9    A. Nothing, because it wasn't important enough
10 to -- I was satisfied in my job.
11   Q. Okay.
12      MS. DUCEY: Whenever you have those, I'll take
13 them. Just give them all to me. Thank you.
14        (Exhibit No. 1 marked.)
15   Q. So we've marked this Number 1, Ms. Wade, and you
16 can go ahead and give Peter and Linda theirs. You
17 probably need those glasses out for a bit.
18   A. If I can ever find them. Okay.
19   Q. And after you've had a chance to look at that,
20 can you tell me if you identify this as transcripts of
21 your academic record from Troy State, from UAA and from
22 Middle Tennessee State University?
23   A. Yes, I do.
24   Q. Great. And can we look at the top, which should
25 be the Middle Tennessee State University; right?

1    A. Uh-huh.
2    Q. All right. And is that transcript, as you
3  recall, accurate?
4    A. Yes.
5    Q. Okay. And it shows that you enrolled in a
6  Doctor of Arts with a major in English; correct?
7    A. With a minor in educational leadership.
8    Q. Uh-huh.
9    A. It doesn't show that.
10   Q. Uh-huh. And that you withdrew from that program
11 in February of 1998; is that correct?
12   A. Yes.
13   Q. And you never went back to that doctoral
14 program?
15   A. No.
16   Q. Did you ever enroll in any other doctoral
17 program after you withdrew from that?
18   A. I did not enroll in a doctoral program, but I
19 took a course at UAA and -- and the transcript of the
20 course was to be transferred to Middle Tennessee State
21 University.
22   Q. When did you take that course?
23   A. I took it in -- let's see. I enrolled in it --
24 I can't recall.
25   Q. Okay. Why don't you look at the next page and

14 (Pages 50 to 53)

case No. A05-086 Civil                                                    Bobbi Wade

Page 54

1  do you recognize that as your transcript from UAA?
2    A. Yes.
3    Q. Okay. Does it show anywhere that you were
4  enrolled in a doctoral program?
5    A. No.
6    Q. Okay. Do you recognize the class that you were
7  referring to that you wanted transferred to Middle
8  Tennessee State?
9    A. From Middle Tennessee State, no. No, it's not
10  on here.
11    Q. Okay. Did you finish that class?
12    A. No.
13    Q. Okay. Could you look at the third page which
14  should be a Troy State University record?
15    A. Yes.
16    Q. And does that page appear to be an accurate copy
17  of your transcript?
18    A. Yes.
19    Q. All right. And then the last page -- let's see,
20  I've got to look to see if that's your master's program
21  or your undergrad. In any event, this is also -- do you
22  identify this as a copy of your transcript from Troy
23  State -- it is the graduate record, I see that?
24    A. Yes, it's the graduate.
25    Q. And does it appear to be accurate?

Page 55

1    A. Yes.
2    Q. Okay. Now just so that I -- I have firm in my
3  mind, you obtained a bachelor's degree from Troy State
4  University; correct?
5    A. Yes.
6    Q. And what year did you obtain that?
7    A. 1973.
8    Q. Okay. And that was in what subject?
9    A. Educational leadership and English with an
10  English minor.
11    Q. Okay. Could you go back and look at the second
12  to the last page, which should be your Troy State
13  University record; correct?
14    A. Yes.
15    Q. Okay. And I'm looking, date admitted as June
16  14, '74; right? Do you see right on --
17    A. Oh, this is my graduate record. Yes, uh-huh.
18    Q. And that says, "undergraduate degree." I can't
19  tell if that's a B.S. in Education or a B.A., but --
20    A. It's a B.S.
21    Q. And you got that from Troy State in Troy,
22  Alabama; right?
23    A. Yes.
24    Q. And then it says the diploma was dated August 8,
25  '75; is that correct?

Page 56

1    A. Yes.
2    Q. And the major was in secondary education;
3  correct?
4    A. Yes.
5    Q. And your minor was in English; right?
6    A. Yes.
7    Q. Okay. Is that correct?
8    A. That's correct --
9    Q. All right.
10    A. -- yes.
11    Q. And then you got a master's degree in -- was it
12  in education?
13    A. It was Art Education.
14    Q. Okay.
15    A. That was a program in an educational specialist
16  degree --
17    Q. Okay.
18    A. -- but I never completed it, but I had enough
19  courses to give me the master's.
20    Q. Okay. Did you obtain any master's degree?
21    A. When?
22    Q. At any time.
23    A. Yes.
24    Q. And where did you obtain your master's degree?
25    A. At Troy State University.

Page 57

1    Q. Okay. And in what subject?
2    A. Secondary education with a minor in English.
3    Q. So that was -- was that the degree you obtained
4  in '75?
5    A. Yes.
6    Q. The master's degree in secondary education?
7    A. Yes.
8    Q. Okay. Can you look through Exhibit 1 and tell
9  me if this comprises, as you understand it, your entire
10  course of post-high school classes that you completed?
11    A. I have one other transcript from Auburn
12  University that is not included, but it's in library
13  science.
14    Q. Okay. And where is Auburn?
15    A. It's in Alabama.
16    Q. And when did you obtain that degree?
17    A. I didn't obtain a degree. I took courses
18  leading toward a certification.
19    Q. Okay. And when did you take these courses?
20    A. In 1980 and '81. I'm sorry, in 1979 and '80.
21    Q. And how many courses did you take?
22    A. As I recall, it was 16 hours that I completed.
23    Q. In library science?
24    A. Yes.
25    Q. Were all of the classes that you took in library

EXHIBIT
Page __11__ of __

case No. A05-086 Civil                                                          Bobbi Wade

Page 58

1  science?
2      A. Yes.
3      Q. Okay. Anything else besides the Auburn
4  transcript that's not included in Exhibit 1?
5      A. I don't recall anything else.
6      Q. Okay. I'm looking through Exhibit 1 and I don't
7  see any business classes. Am I mistaken?
8      A. No.
9      Q. Okay. You can set that aside. Thank you. You
10 can probably make a pile over there, Ms. Wade, and we may
11 come back to that one.
12     MS. DUCEY: Let me have the next one. Jonathan,
13 why don't I give them to you so that -- I don't trust
14 myself with these.
15     (Exhibit No. 2 marked.)
16     Q. All right. Number 2, Ms. Wade, can you take a
17 look at that and tell me if you can identify what that
18 is?
19     A. It appears to be my letter of application to
20 Ilisagvik College.
21     Q. All right. And it's dated June 29, 2000?
22     A. Yes.
23     Q. And is this the application that you actually
24 submitted to the college -- or a copy?
25     A. I submitted the formal application.

Page 59

1      Q. Okay. Could you look at the next page? And can
2  you identify that as the application that you completed?
3      A. On the formal application, yes.
4      Q. Okay. So did you submit this letter with the
5  application together?
6      A. Yes, I did.
7      Q. And you completed the application, it looks
8  like, in your own handwriting?
9      A. Yes.
10     Q. And signed it at the bottom?
11     A. Yes.
12     Q. Did you submit any other documents when you
13 applied for the position?
14     A. I submitted a resume.
15     Q. Okay. Anything besides the resume?
16     A. I don't recall anything else. It could have
17 been letters of recommendation --
18     Q. Okay.
19     A. -- from previous jobs.
20     (Exhibit No. 3 marked.)
21     Q. And this is Number 3. Ms. Wade, can you
22 identify what that is?
23     A. This is my resume.
24     Q. Is this the resume that you submitted along with
25 your application and the cover letter?

Page 60

1      A. It appears to be.
2      Q. And you submitted this in approximately June of
3  2000?
4      A. Yes.
5      Q. At the time you submitted it, do you recall if
6  there was anything inaccurate about it?
7      A. No, I don't recall.
8      Q. Okay. You can put that aside.
9      Ms. Wade, you do not have a degree in business or
10 business management; is that right?
11     A. That's right.
12     Q. Or information technology?
13     A. No.
14     Q. Or in finance?
15     A. No.
16     Q. And you don't have a degree in economics;
17 correct?
18     A. No.
19     Q. Or in mathematics or statistics?
20     A. No.
21     Q. Aside from Business English, you've never taught
22 a class in one of these subjects either, before
23 Ilisagvik; correct?
24     A. Not before Ilisagvik, no. Only included
25 Business English and to my English classes in public

Page 61

1  school teaching.
2      Q. Uh-huh. And you were never involved in any
3  private corporate management; correct?
4      A. I don't recall any.
5      Q. You've never been in any sort of a management
6  training program other than the -- the principal
7  certificate?
8      A. I don't recall.
9      Q. Were you involved in a management training
10 program for Mutual of Omaha?
11     A. Not for management, no.
12     Q. Is there any other private corporation that you
13 worked for where you might have been in any sort of a
14 management training program?
15     A. I don't recall. I could have been at -- with
16 the U.S. Department of Agriculture.
17     Q. Uh-huh. In a management training program that
18 would have put you into management?
19     A. No, not a program. It would have been
20 on-the-job training.
21     Q. Okay. What sort of training?
22     A. Management training.
23     Q. Uh-huh. And when was that?
24     A. It was from 1960 to 1966.
25     Q. To '66?

16 (Pages 58 to 61)

EXHIBIT
Page 12 of 58

case No. A05-086 Civil                                                    Bobbi Wade

---

Page 66

1    Q. Have you ever participated in any sort of an
2  alcohol or a substance abuse treatment program?
3    A. No.
4      MS. JOHNSON: Objection to more than ten years.
5    Q. Did you at one time live in North Dakota?
6    A. No.
7    Q. Or South Dakota?
8    A. No.
9    Q. Or Kentucky?
10    A. No.
11    Q. So when you went up and were offered the job by
12  Ilisagvik, what were you told in terms of the rate of pay
13  and the other terms of your employment?
14    A. I was not told anything at the -- to begin with,
15  and then just prior to my -- after signing an agreement,
16  I was told that my rate of pay would be seventy-five
17  thousand and four-hundred and something and I don't
18  remember --
19    Q. Okay.
20    A. -- the last two digits.
21    Q. And who told you that?
22    A. Pam Taylor.
23    Q. And did she tell you anything else about the
24  rate of pay or the benefits at that time?
25    A. She explained benefits to me, the insurance.

---

Page 67

1    Q. What did she tell you about the insurance?
2    A. But that was in a meeting. It wasn't done to me
3  personally.
4    Q. Okay. Was that your first day of work?
5    A. Yes.
6      MS. DUCEY: Will you mark those for me, please?
7        (Exhibit No. 4 marked.)
8    Q. And your first day of work, did you spend most
9  of the day with Ms. Taylor?
10    A. Yes.
11    Q. And tell me what happened that first day, then.
12    A. We were -- that was all -- with all new
13  employees and she went over the health regulations --
14    Q. Uh-huh.
15    A. -- as I recall.
16    Q. Anything else?
17    A. And we were told we would need to take a drug
18  test --
19    Q. Uh-huh.
20    A. -- which we did. She went over the insurance
21  and how the P5 Insurance program worked and that was
22  basically it. I don't recall anything else.
23    Q. Okay. Did you sign a contract?
24    A. Yes, I did.
25    Q. And let me show you what's been marked Number 4

---

Page 68

1  and ask if you can identify that?
2    A. It appears to be the contract that I signed.
3    Q. All right. Does that appear to be a complete
4  and accurate photocopy of the contract?
5    A. It does.
6    Q. Okay.
7      MS. DUCEY: You can mark that, Jonathan.
8        (Exhibit No. 5 marked.)
9    Q. This is Number 5, Ms. Wade. Can you identify
10  what that is?
11    A. Okay.
12    Q. Can you identify what that is?
13    A. It appears to be a checklist that was checked by
14  me.
15    Q. Okay. And that's your signature on the bottom?
16    A. Yes, it's my signature.
17    Q. Okay. It says that you signed it on August
18  22nd, 2000. Is that consistent with your recollection?
19    A. Yes.
20    Q. Do you remember how soon or -- strike that
21  again. Do you recall in relation to August 22nd when the
22  first day of classes was?
23    A. It was towards the end of August, approximately
24  August 27, 28 or 29 or something like that. I don't
25  recall the exact date.

---

Page 69

1    Q. Okay. And that indicates that you certify that
2  you've received various pieces of information which
3  include the Employee Handbook; correct?
4    A. Yes, but I can't certify that I did all the
5  checking on these, on this form.
6    Q. Right. Uh-huh. But you did sign it; correct?
7    A. I did sign it.
8    Q. Okay.
9        (Exhibit No. 6 marked.)
10    Q. And this is Number 6, Ms. Wade. Can you take a
11  look at that and tell me if you can identify what that
12  is?
13      MR. GAMACHE: We're short one.
14      MS. DUCEY: We need one more? Okay. I'm not
15  sure how many I have.
16    A. Yes, this is acknowledging the receipt of the
17  Ilisagvik Employee Handbook.
18    Q. Okay. And it says, "I understand I'm
19  responsible for reading and complying with the contents";
20  correct?
21    A. Yes, it does.
22    Q. And do you remember if you read the handbook?
23    A. I read parts of it, yes.
24      MS. DUCEY: All right. We'll kill a few trees.
25  Give those to -- hand one to Linda, too.

---

18 (Pages 66 to 69)

case No. A05-086 Civil                                                    Bobbi Wade

Page 70

1        MR. CLEMENT:  Okay.
2              (Exhibit No. 7 marked.)
3        Q.  Can you take a look at that, Ms. Wade, and tell
4    me if you can identify what that is?
5        A.  It's the Ilisagvik Employee Handbook.
6        Q.  And do you recall receiving a copy of this at
7    some point during your employment?
8        A.  At some point during -- yes, during the
9    employment.
10       Q.  Okay.  And I wonder if you could look just in
11   the very front cover and on the bottom right, in
12   litigation we number things.  See where it says, "Wade
13   versus Ilisagvik," and there's a number above it?
14       A.  Yes.
15       Q.  Now if I did -- if I did my job these are
16   consecutively numbered, so I'm going to ask you to turn
17   probably about ten pages forward to 20544.  And are you
18   on the page that says, "General Policies Equal Employment
19   Opportunities"?
20       A.  Yes.
21       Q.  Okay.  And the college had this anti-harassment
22   policy; is that correct?
23       A.  That's correct.
24       Q.  Okay.  And it prohibited discrimination based on
25   age; correct?

Page 71

1        A.  Yes.
2        Q.  Okay.  And on the next page, at the bottom,
3    there's a reporting procedure; correct?
4        A.  Yes.
5        Q.  And it says that the Human Resource Director is
6    the person responsible for receiving oral and written
7    reports of harassment or claimed violations of similar
8    -- human or civil rights.  Correct?
9        A.  Yes.
10       Q.  Says, "Any person that believes he or she has
11   been the victim of harassment by an employee or a student
12   of the college or a third person with knowledge or belief
13   of conduct that may constitute harassment should report
14   the alleged acts immediately to the Human Resource
15   Director or other supervisor with whom the employee feels
16   comfortable."  Correct?
17       A.  Yes.
18       Q.  Okay.  And if you could go -- oh, it's probably
19   about 20 pages forward to -- actually, it's farther than
20   that -- to 20569.
21       A.  Okay.
22       Q.  And is that the page that says, "leave without
23   pay," about a quarter of the way down?
24       A.  Yes, it is.
25       Q.  Okay.  And then under that there is a little box

Page 72

1    that says, "Family Leave and Medical Leave"; correct?
2        A.  Yes.
3        Q.  And it says that depending on whether you
4    qualify, that you can qualify for up to 12 -- 17 hours --
5    17 1/2 hours a week for twelve consecutive months for
6    your own serious medical illness that prevents you from
7    working; correct?
8        A.  Yes.
9        Q.  Okay.  And then on the next page it has
10   "requirements" in the middle; right?
11       A.  Yes.
12       Q.  And one of the requirements -- the first
13   requirement, actually, says, "If the need for leave is
14   foreseeable, the employee must provide Ilisagvik College
15   with a written request for the leave at least 30 days in
16   advance of the requested leave date."  Correct?
17       A.  I don't see where it says that.
18       Q.  You see right in the middle where it says,
19   "Requirements"?
20       A.  Yes, I see that.
21       Q.  Okay.  Why don't you read the first sentence
22   into the record?
23       A.  "If the need for leave is foreseeable, the
24   employee must provide Ilisagvik College with a written
25   request for the leave at least 30 days in advance of the

Page 73

1    requested leave date."
2        Q.  Okay.  And it says, "If it's not foreseeable,
3    the employee is expected to request leave as soon as
4    reasonably possible."  Correct?
5        A.  Yes, it does.
6        Q.  It goes on to say that the written request must
7    include the reason for the leave, its duration and
8    starting and return dates."  Correct?
9        A.  Yes.
10       Q.  And it says, "In addition, if the leave is for
11   your own serious health condition or that of a family
12   member, you will be required to furnish medical
13   certification of the serious health condition."  Correct?
14       A.  Yes.
15       Q.  Okay.  Then could you read into the record the
16   very last sentence of the requirement section?  It starts
17   with, "In the event of failure."
18       A.  Of that same paragraph?
19       Q.  Uh-huh.  It's the last sentence but it's --
20       A.  So it must be --
21       Q.  -- four or five lines, yeah.
22       A.  I still don't see the beginning of it.
23       Q.  All right.  I'll read it to you.  It's the sixth
24   line up from the bottom.  It says, "In the event" --
25       A.  Oh, yes.  Okay.

EXHIBIT
Page 14 of 55

19 (Pages 70 to 73)

case No. A05-086 Civil                                                      Bobbi Wade

---

Page 74

1    Q. Go ahead.
2    A. "In the event of failure or refusal to supply
3  required physician's certification or if the
4  certification does not clearly show sufficient disability
5  to preclude the employee from the performance of duties,
6  the supervisor and human resources director may cancel
7  the family leave or medical leave and require the
8  employee to report for duty on a specified date."
9    Q. Okay. Do you remember if you read the
10 anti-harassment policy at any time during your employment
11 with Ilisagvik?
12   A. Yes, I had seen it.
13   Q. Okay. And do you recall if you read the Family
14 Medical Leave Act provisions of the policy?
15   A. I don't believe that this -- I don't remember
16 reading this.
17   Q. Uh-huh. Do you deny ever getting a copy of the
18 Employee Handbook?
19   A. No, I don't deny that.
20   Q. Okay. You got multiple copies, didn't you?
21   A. No.
22   Q. Didn't you get updates as the years went on?
23   A. Just a few leaves, to take those leaves out,
24 uh-huh.
25   Q. So you had one booklet, but sometimes --

Page 75

1    A. Yes.
2    Q. -- you were given a new page?
3    A. Yes, it had to be reconstituted.
4    Q. Okay. And do you remember when you got an
5  update if you were told if any of the updates had a
6  family medical leave policy?
7    A. No, I was not told. I was just handed the
8  updates.
9    Q. Do you have reason to believe that you weren't
10 given a handbook that had the Family Medical Leave Act in
11 it?
12   A. I received the Employee Handbook, the old
13 version, at the beginning of my employee --
14   Q. Uh-huh.
15   A. -- employment. And it was updated annually with
16 extra leaves for the old leaves to be taken out and the
17 new leaves put in.
18   Q. Okay. My question was different, though. Let's
19 say in the original handbook that you got, do you deny
20 that there was a provision on family medical leave in it?
21   A. No, I don't deny that.
22   Q. Okay. So it was probably there, you just didn't
23 read it?
24   A. It was probably there. I don't recall.
25   Q. During the first day when you were with Pam most

Page 76

1  of the day, did you go through some of the policies in
2  the handbook?
3    A. Yes, we did.
4    Q. Do you remember what policies you went through?
5    A. No, I don't.
6         (Exhibit No. 8 marked.)
7    Q. And this is Number 8. Can you identify what
8  Number 8 is?
9    A. Okay. This is where I received the leaves to
10 reconstitute the handbook.
11   Q. Okay. And on --
12   A. In September of 2001.
13   Q. Okay. And that's your signature on Exhibit 8;
14 correct?
15   A. Yes, it is.
16   Q. All right. And do you remember what policies
17 you were given to replace in the handbook?
18   A. No.
19   Q. Do you remember if you did that --
20   A. No.
21   Q. -- if you replaced them?
22   A. I don't recall.
23   Q. Do you still have your copy of the handbook?
24   A. No, I left it at Ilisagvik.
25   Q. Okay. Where did you leave it?

Page 77

1    A. In my old office.
2    Q. Okay.
3         (Exhibit No. 9 marked.)
4    Q. This is Number 9. Can you take a look at that
5  and tell me if you can identify what it is?
6    A. This is where the handbook was updated.
7    Q. Okay. And that was on January 10th, '02?
8    A. Yes.
9    Q. Okay.
10   A. That's what it indicates.
11   Q. Uh-huh. And do you remember what was being
12 changed in the handbook in February '02?
13   A. No.
14   Q. Do you remember if it was the policy on family
15 medical leave?
16   A. No.
17   Q. So on -- I just want to make sure I understand.
18 On August 27th [sic], you received a copy for yourself of
19 the Employee Handbook; correct?
20   MS. JOHNSON: Objection to the year. Didn't say
21 the year.
22   Q. You can answer.
23   A. Can you rephrase the question, please?
24   Q. Uh-huh. On August 22nd, when you began your
25 employment, you received a copy of the Employee Handbook.

20 (Pages 74 to 77)

case No. A05-086 Civil                                          Bobbi Wade

Page 78

1    A. August the 27th [sic] of what year?
2    Q. Well, I think we established that you signed
3  your orientation paperwork -- if you want to look back
4  there -- well, let's -- let's flip it over.
5    A. I don't need to look back.
6    Q. Okay. So --
7    A. But you asked a question, then you've given a
8  date but not the year. Could you please give me the
9  whole date?
10    Q. Well, if your lawyer has an objection, she can
11  make an objection. If you don't understand the question,
12  you can ask me to repeat it, but I thought that we
13  established that your first day of employment was August
14  22nd, so we were on the same page on that; right?
15    A. Okay.
16    MS. JOHNSON: Objection to characterization of
17  the first date of employment.
18    Q. Okay. So August 22nd you received -- you
19  actually received a copy of the Employee Handbook; right?
20    A. I don't recall.
21    Q. Okay. Well, let's flip the exhibits over. And
22  I'm not sure what number -- what number is the
23  orientation?
24    MR. GAMACHE: 6.
25    Q. Yeah, could you look at 6 again, please? All

Page 79

1  right. I think that's the one. Isn't that the new --
2  could you hand me my copy of 6?
3    A. 6, here it is.
4    Q. All right. Actually, it's -- it's 5 that I'd
5  like you to look at. The checklist. All right. And on
6  August 22nd, which you previously said was the first day
7  that you came to work, you actually received a copy of
8  the Employee Handbook; correct?
9    A. That is checked on this form, yes.
10    Q. Do you have any reason to dispute what the
11  checklist says that you signed?
12    A. No.
13    Q. Okay. And it was a complete copy of the
14  handbook that you received at the time; correct?
15    A. I don't recall if I received the book at the
16  time.
17    Q. Okay. Do you have any reason to dispute what
18  this orientation checklist says?
19    A. Yes, I do.
20    Q. Okay. And what are the facts upon which you
21  would dispute whether you received the Employee Handbook?
22    A. I do not believe all those checkmarks are mine.
23    Q. Okay. That wasn't my question, ma'am, and I
24  wouldn't expect them to be yours.
25    A. Uh-huh.

Page 80

1    Q. I would expect that -- was it Peggy Brown that
2  sat with you, Peggy Brown, the Human Resource
3  Representative?
4    A. I don't remember Peggy Brown.
5    Q. Okay. Do you remember Pam Taylor?
6    A. Yes.
7    Q. All right. I would expect that whoever did your
8  orientation would sit with you and check those boxes as
9  they gave you things. So here's my question. Do you
10  have reason to dispute the accuracy of what Number 5
11  says, which is that on August 22nd you received a copy of
12  the Employee Handbook?
13    A. Not at this time.
14    Q. Okay. And I think we established that
15  Ms. Taylor went over some of the policies in the handbook
16  at that time; right?
17    A. She might have. I don't recall.
18    Q. Okay. All right. And the copy of the policy --
19  the copy of the handbook that you obtained was the copy
20  that you kept throughout your tenure at Ilisagvik;
21  correct?
22    A. Yes.
23    Q. Okay. Where in the college building was
24  Ms. Taylor's office located?
25    A. It was in the administration building.

Page 81

1    Q. Okay. Did she have her own office?
2    A. Yes.
3    Q. And from time to time did you visit her there?
4    A. Yes, I did.
5    Q. And do you recall seeing bulletin boards where
6  there were postings?
7    A. There were bulletin boards outside of all the
8  offices in the administration building.
9    Q. Uh-huh. Did you ever look at any of the
10  postings that were outside the bulletin board in
11  Ms. Taylor's office?
12    A. Occasionally.
13    Q. And what sort of postings did you see on the
14  bulletin board?
15    A. The job openings that were available.
16    Q. Is that because you were looking for other
17  positions at the college?
18    A. Not particularly, just while waiting to see Pam
19  for some reason.
20    Q. Uh-huh. And do you remember seeing a posting
21  that talked about the harassment policy and federal and
22  state law on harassment?
23    A. No, I do not.
24    Q. Uh-huh. Do you have any reason to dispute that
25  there was such a posting?

21 (Pages 78 to 81)

case No. A05-086 Civil                                           Bobbi Wade

Page 82

1    A. No.
2    Q. Do you remember seeing a posting on what the
3  minimum wage was in the state of Alaska?
4    A. No.
5    Q. Do you have any reason to dispute there was such
6  a posting?
7    A. No.
8    Q. Do you remember seeing a posting on workmen's
9  compensation insurance for employees?
10   A. No.
11   Q. Do you have reason to dispute there was such a
12 posting?
13   A. No.
14   Q. Do you remember seeing a posting on the Family
15 Medical Leave Act?
16   A. No.
17   Q. Do you have reason to dispute there was such a
18 posting?
19   A. No.
20   Q. The first year that you came, what classes were
21 you scheduled to teach?
22   A. Business management classes.
23   Q. Do you remember how many units you had?
24   A. No, not right off without looking back at the
25 records.

Page 83

1    Q. How many of the classes you were scheduled to
2  teach were distance delivery classes?
3    A. I don't recall.
4    Q. Do you remember the first year if you taught any
5  classes in the classroom to students in a face-to-face
6  manner?
7    A. Yes, I did.
8    Q. Do you remember how many?
9    A. No, I don't.
10   Q. And who would determine the class meeting times
11 and days?
12   A. The director.
13   Q. The director of the program?
14   A. Of the business, BMIT Department.
15   Q. And who was that in 2000?
16   A. Dr. Stanley Scott.
17   Q. As part of your contract, were you required to
18 keep office hours?
19   A. Yes.
20   Q. And how many -- what is the number of office
21 hours you were required to keep?
22   A. I don't recall, but I believe it was something
23 like three, but I might be wrong on that.
24   Q. Three hours --
25   A. Three hours per week.

Page 84

1    Q. Uh-huh. And so were you given an office for
2  that purpose?
3    A. Yes, I was.
4    Q. What was the purpose of having office hours, as
5  you understand it?
6    A. To counsel with students who were my advisees.
7    Q. And how was it determined who your advisees
8  were?
9    A. I was given those by the registrar.
10   Q. And as a person with all of your educational
11 background and experience, how important was it to have
12 office hours for students?
13   A. It was very important.
14   Q. Why was it very important?
15   A. Because there were times that students needed to
16 consult with me outside of class.
17   Q. Any other reasons why you considered office
18 hours very important?
19   A. It was also for registering students, helping
20 them, and getting them registered to take the courses
21 and -- the proper courses in the programs they were in.
22   Q. Did you also from time -- did you keep office
23 hours in addition for the students who were in your class
24 but were not your advisees if they had a question?
25   A. I kept office hours in exc- -- in excess of the

Page 85

1  recommended amount of time.
2    Q. Uh-huh.
3    A. I was in my office constantly throughout the day
4  when I wasn't in class.
5    Q. Is that so you would be available to the
6  students?
7    A. Yes.
8    Q. Who, as you understand it, comprised the student
9  population at Ilisagvik?
10   A. Do you mean the race or the -- what do you mean
11 by the "student population"? Who? Who is "who"?
12   Q. Well, when you -- when you came, who did you
13 understand these students to be?
14   A. Barrow students.
15   Q. Okay. And did you understand that they had any
16 particular needs or interests?
17   A. No.
18   Q. What did you understand about their culture or
19 language?
20   A. I understood that they spoke another language.
21   Q. And what did you understand from among the
22 student population their past educational history had
23 been?
24   A. I didn't have access to that material. I don't
25 know.

22 (Pages 82 to 85)

case No. A05-086 Civil

Bobbi Wade

Page 86

1   Q. Okay. Did you come to learn that some of these
2   students were students who had not obtained a high school
3   diploma?
4   A. No.
5   Q. Okay. Did you come to learn that any of these
6   students were somewhat at risk for finishing a program?
7   A. Over time, I did, yes.
8   Q. And as you understand it, what were the reasons
9   that they were at risk?
10   A. The lack of educational background.
11   Q. Anything else?
12   A. Family obligations. Most of my students were
13   from a middle age and they had families and children.
14   Q. Did you learn -- did you come to learn that some
15   of these students lacked the proper sorts of life skills
16   to help them manage a case -- a class load and succeed?
17   A. Yes, I did.
18   Q. And what sort of degree or certificate programs
19   were offered by the college?
20   A. I can't speak for the whole college.
21   Q. Let's talk about in your area, in the business
22   area. What sort of degree or certificate programs were
23   offered?
24   A. To begin with, the business management degree.
25   Q. And was that a four-year degree?

Page 87

1   A. No, it was a two-year degree.
2   Q. So it was an AA degree?
3   A. AAS degree.
4   Q. AAS, uh-huh. And what sort of other programs
5   were offered?
6   A. Later the programs were revised to offer
7   certificates along the way and working toward the degree.
8   Q. What sort of certificates were offered?
9   A. Office technology certificate, accounting
10   certificate and business management certificate.
11   Q. As you understand it, why were these lower
12   levels of certificates offered subsequently?
13   A. Because there were a high percentage of students
14   who never obtained the degree and this gave them an
15   incentive to study because they could have obtained a
16   certificate.
17   Q. How important was it, then, in the scheme of
18   this student population to be available to the students
19   to give them counseling and advice?
20   A. It was very important. That's the reason I
21   stayed in my office most of the day.
22   Q. And how important was it to initiate contact
23   with your advisees to make certain that they knew what
24   they were supposed to be doing?
25   A. It was somewhat important to initiate the

Page 88

1   contact with them.
2   Q. Did you do that?
3   A. Yes, if the need arose, I contacted the student.
4   Q. And how might the need arise?
5   A. If they lacked -- if they needed a certain
6   course or if they needed to finish a course or if they
7   needed to enroll in a certain course, I have -- I had
8   consultation with all my students prior -- all my
9   advisees, not my students -- prior to registration.
10   Q. And how would you contact them?
11   A. By letter or e-mail, but it was mostly by the
12   school dates of registration and counseling and so forth.
13   When registration opened, then the students would begin
14   to come to me.
15   Q. Uh-huh. You mentioned that a lot of the
16   students were middle age and had families; right?
17   A. Yes.
18   Q. And did many of them also have job
19   responsibilities?
20   A. Yes.
21   Q. And so they were trying to juggle job, family,
22   and these school classes?
23   A. And school, yes.
24   Q. Was that difficult?
25   A. It was difficult for them or for me?

Page 89

1   Q. For the students.
2   A. It was difficult for the students, yes.
3   Q. So in order to be able to come to class, then,
4   they needed a -- a schedule that was reliable to follow?
5   A. Yes.
6   Q. Otherwise they might be working at the time that
7   class was scheduled; right?
8   A. That's right. I always tried to make sure that
9   their sched- -- classes were scheduled and classes were
10   set up to meet their needs.
11   Q. Was Edna MacLean the president of the college
12   the first year that you were there?
13   A. She was.
14   Q. And did you have any contact with her?
15   A. I met her in several meetings, yes.
16   Q. With respect to Mr. Scott, how did he run the
17   department?
18   A. He called regular meetings to discuss any issues
19   that any instructor needed to discuss.
20   Q. Uh-huh. And do you know how he determined who
21   should teach what class?
22   A. No, I couldn't answer that, what he determined.
23   MS. JOHNSON: Can we wait for a minute?
24   MS. DUCEY: Sure. Is there a problem?
25   MS. JOHNSON: Can we go off record for a second?

23 (Pages 86 to 89)

case No. A05-086 Civil                                          Bobbi Wade

Page 90

1      MS. DUCEY: Yeah.
2      THE VIDEOGRAPHER: Okay. Going off record. The
3  time is 11:35.
4      (Discussion off the record.)
5      THE VIDEOGRAPHER: Back on the record. The time
6  is 11:36.
7      Q. (By Ms. Ducey) Okay. Then, Ms. Wade, when your
8  contract for the first year finished, were you offered
9  another contract?
10     A. Yes, I was.
11     Q. And do you remember who offered you that
12 contract?
13     A. I don't recall the person actually handing me
14 the contract.
15     Q. Uh-huh.
16     A. We were normally sent an e-mail, "Your contracts
17 are ready. Please come over to Edna's office and sign
18 them."
19     Q. Okay. Do you remember if you had discussions
20 with anyone prior to being given --
21     A. No.
22     Q. -- a new contract?
23     A. I don't recall any discussions, no.
24     MS. DUCEY: All right. What number are we on?
25     MR. CLEMENT: 10.

Page 91

1      (Exhibit No. 10 marked.)
2      Q. Can you take a look at 10 and tell me if you can
3  identify what that is? Is this a letter that you
4  received from President MacLean?
5      A. Yes, it is.
6      Q. And it's dated February 8, 2002; right?
7      A. Yes.
8      Q. And this is before you were offered a renewal of
9  your contract; correct?
10     A. Yes.
11     Q. And this letter talks about diminished funding
12 and the real possibility that there's going to be some
13 significant cuts in the budget." Right?
14     A. Yes.
15     Q. And at the bottom it says, "At this time I
16 cannot tell you which faculty positions will be funded in
17 the upcoming year." Correct?
18     A. Yes.
19     Q. Uh-huh. And it says at the very bottom of the
20 page, "According to the terms of your employment contract
21 and Board of Trustees' policies, your position is not
22 tenured and you have no expectation of employment
23 following expiration of your current contract." Correct?
24     A. Yes.
25     Q. Okay. You can put that aside.

Page 92

1      Do you remember if you talked with anyone about what
2  you should expect after receiving that letter from Dr.
3  MacLean?
4      A. It was discussed in meetings --
5      Q. Uh-huh.
6      A. -- yes.
7      Q. What meetings was it discussed in?
8      A. Faculty meetings and meetings in general.
9  Sometimes Edna called meetings that was for the whole
10 staff and faculty.
11     Q. Uh-huh. And what did she tell you at those
12 meetings?
13     A. She told us they would -- they pertained to
14 programs, not people, not faculty in particular -- not
15 faculty positions but the programs in which they were
16 teaching.
17     Q. Okay.
18     (Exhibit No. 11 marked.)
19     MS. DUCEY: You can give that to Ms. Wade.
20     Q. Can you take a look at Number 11 -- is it,
21 Jonathan?
22     MR. CLEMENT: Number 11, yes.
23     Q. And tell me if you can identify what that is?
24     A. It looks like the contract for 2002 to 2003.
25 It appears to be.

Page 93

1      Q. Okay. And does it appear to be a complete copy
2  of your contract?
3      A. It appears to be.
4      Q. Okay. And on the fifth page in, you signed it
5  along with Dr. MacLean; correct?
6      A. Fourth page I have.
7      Q. Uh-huh.
8      A. Yes.
9      Q. You signed it on April 22nd, '02; correct?
10     A. Yes.
11     Q. And in business contracts, commercial contracts,
12 do you know what it means when there's an integration
13 clause in the contract?
14     MS. JOHNSON: Objection, calls for speculation.
15     A. No.
16     Q. Can you look right above -- right on the same
17 page where your signature is at 15?
18     A. Yes.
19     Q. And it says, "modification"; right?
20     A. Yes.
21     Q. It says, "This contract Attachment A and any
22 addendum thereto constitutes the complete and full
23 agreement between the parties. Any oral agreement
24 between the parties shall be null and void. This
25 contract shall be modified only in writing." Correct?

24 (Pages 90 to 93)

case No. A05-086 Civil                                                          Bobbi Wade

Page 94

1    A. Yes.
2    Q. Was there ever a written modification that was
3    signed by the parties to your contract in '02?
4    A. I don't recall.
5    Q. Okay. And if you look at the first page of the
6    contract -- I'm sorry, the second page. That's the
7    actual contract, isn't it? It starts, "Ilisagvik
8    College, professional employment contract, academic
9    instructor, 2002-'03"; right?
10   A. Yes.
11   Q. All right. There was on the second page a
12   provision for paid time off under Number 4, wasn't there?
13   A. Yes.
14   Q. Okay. And it says, "The employee is entitled to
15   a total of twelve paid days leave without salary
16   deduction during the term of this contract which may be
17   used for paid personal injury or illness, sick leave. Up
18   to six of the twelve days may be used for paid personal
19   time off in lieu of sick leave. Use of paid time off
20   requires reasonable advance notice and is subject to the
21   policies and procedures contained in the Employee
22   Handbook as may be amended from time to time." Right?
23   A. Yes.
24   Q. Okay. In 2002, do you remember what classes you
25   taught?

Page 95

1    A. No, ma'am, I don't without looking at the
2    record.
3    Q. And did you teach any classes in the classroom
4    face-to-face?
5    A. Yes, I did.
6    Q. Do you remember what those were?
7    A. No, not without looking at the past schedule.
8    Q. Okay. And when you taught those classes, were
9    you there?
10   A. Yes.
11   Q. Okay. Did you have any absences in 2002?
12   A. I don't recall any.
13   Q. Okay. At the expiration of your term in 2002,
14   were you offered a new contract?
15   A. Yes.
16   Q. Do you remember who offered that to you?
17   A. No, not particularly the person, per se.
18   Q. Okay. Did you always read your contracts when
19   you got them?
20   A. Yes.
21   Q. Did you feel you understood them?
22   A. Yes.
23   Q. How about the handbook, the provision that you
24   did take the time to read, did you feel that you
25   understood them?

Page 96

1    A. Yes.
2    (Exhibit No. 12 marked.)
3    MS. DUCEY: This is Number 12; is that right?
4    MR. CLEMENT: Yes.
5    Q. Can you take a look at that and tell me if you
6    can identify what that is?
7    A. It appears to be a copy of my contract for the
8    upcoming year.
9    Q. Does it appear to be a complete and accurate
10   photocopy?
11   A. It appears to be, but I don't know about the
12   information at the end.
13   Q. Let's look at the information at the end. And
14   what are you referring to at the end?
15   A. The last two pages.
16   Q. Which is the faculty position description?
17   A. Yes. I don't recall that being attached to my
18   contract at the time I signed it.
19   Q. Okay. Do you recall if that was the position
20   description that applied to your employment?
21   A. No, because I don't recall seeing this.
22   Q. Okay. You never saw a faculty position
23   description?
24   A. I don't recall. I don't -- I don't know
25   exactly --

Page 97

1    Q. Okay.
2    A. -- what you're referring to.
3    Q. All right. But the first two pages, which says,
4    "Faculty Appointment Letter" for 2003-2004, dated May
5    1st, '03, appears to be complete and accurate?
6    A. It appears to be complete, but I could not agree
7    to the accuracy because I haven't read it and I don't
8    know.
9    Q. Okay. But it -- why don't we go off record and
10   you can take a minute to read that.
11   MS. JOHNSON: Why don't we take a break?
12   THE VIDEOGRAPHER: Okay. Going off record. The
13   time is 11:46.
14   (Recess taken.)
15   THE VIDEOGRAPHER: Okay. We're back on the
16   record. The time is 11:56.
17   Q. (By Ms. Ducey) All right. Ms. Wade, did you
18   have an opportunity to read through Exhibit 12 while we
19   were off record?
20   A. I scanned it. I did not read every word.
21   Q. Okay. And is Exhibit 12 a complete and accurate
22   copy of your contract?
23   A. Except for the last two pages.
24   Q. Okay. Could you look at the second to the last
25   page?

25 (Pages 94 to 97)

EXHIBIT ____ Page 20 of 88

case No. A05-086 Civil                                    Bobbi Wade

---

**Page 98**

1   A. Would that be Page 5?
2   Q. I'm going back to the faculty position
3 description, which --
4   A. Oh.
5   Q. -- is the last two pages of the exhibit.
6   A. This?
7   Q. Yeah.
8   A. Yes.
9   Q. And is that your signature on the top right?
10  A. That is my signature.
11  Q. Okay. So at some point you did get the faculty
12 position description; right?
13  A. I don't recall ever getting this.
14  Q. How would your signature be on there if you
15 didn't get that?
16  A. It could have been put on there by someone else,
17 copied on there.
18  Q. Do you believe it was?
19  A. I don't know.
20  Q. But if the original shows that that's your
21 signature on there then --
22  A. It is my signature.
23  Q. Yes.
24  A. It's a copy of my signature.
25  Q. Right. And if the original shows that your

---

**Page 99**

1 signature is on the faculty position description, then
2 you obviously received a copy of it?
3   A. I received it at some time --
4   Q. Right.
5   A. -- but not in this contract.
6   Q. Okay. All right. On the second page of Exhibit
7 12, which is the employment offer, you signed it
8 accepting the terms and conditions; correct?
9   A. Yes, after speaking with Dr. MacLean.
10  Q. Okay. And at the top of the page it says, "The
11 terms and conditions of your employment are in accordance
12 with this letter of appointment including Attachment A,
13 the Ilisagvik College Employee Handbook, and the policy
14 and regulations of the Board of Trustees as they exist
15 today and as they may be duly amended from time to time."
16 Correct?
17  A. Yes.
18  Q. And it again says, "This letter of employment
19 with its references encompassed herein, constitutes the
20 full and complete contract agreement between yourself and
21 Ilisagvik. Any other oral agreement between the parties
22 shall be null and void. This contract shall be modified
23 only in writing." Correct?
24  A. Yes.
25  Q. Was there any written modification that was --

---

**Page 100**

1 modified this contract?
2   A. I never received any.
3   Q. Okay. Then can you look at Attachment A? Okay.
4 And if you could look with me at the second page of
5 Attachment A. All right. In about three-quarters of the
6 way down, do you see where it says, "personal and sick
7 leave"?
8   A. Yes.
9   Q. Okay. The personal and sick leave term of this
10 contract changed from the year before, didn't it?
11  A. I don't know. I couldn't vouch for that.
12  Q. Uh-huh. Could you read that into the record?
13  A. "Twelve days of personal leave per contract year
14 are allowed when it's -- when taken it does not unduly
15 interfere with the delivery of the college's program or
16 instruction. Leave must be approved in advance by the
17 faculty members, department head, and dean of instruction
18 except in the event of the emergency situation. Personal
19 leave has no cash value and may not be accrued from year
20 to year."
21  Q. Okay. Why don't you put that side by side with
22 the contract from the year before, which should be --
23 hopefully that's Exhibit 11? Do you got that there?
24  A. Here's Exhibit 11.
25  Q. All right. And if you let me see it just for a

---

**Page 101**

1 minute, I can find the page for you.
2   A. Okay.
3   Q. Thank you. I'm referring back to 4A. Under 4A
4 in your 2002 contract, it permitted twelve paid days off,
5 correct, that you could use for personal injury or
6 sickness; right?
7   A. On which page?
8   Q. It's the page I just pointed you to, ma'am.
9 Right there. Do you see 4A, under "benefits"?
10  A. Oh, yes.
11  Q. Yeah. So in your 2002 contract, you could have
12 a total of twelve paid days leave. You could use up to
13 six for person- -- personal paid time off in lieu of sick
14 leave and the use of the paid time off required
15 reasonable advance notice. Correct?
16  A. Yes.
17  Q. And under your new contract, you were permitted
18 twelve days of leave when taking it didn't unduly
19 interfere with the delivery of the college -- college's
20 program of instruction; right?
21  A. Right.
22  Q. And you had to have that leave approved in
23 advance --
24  A. Yes.
25  Q. -- right?

---

26 (Pages 98 to 101)

Page 102

```
1    A. Uh-huh.
2    Q. Okay. Do you remember if you read your 2003
3  contract?
4    A. I don't recall.
5    Q. Okay. Do you recall if you were being aware of
6  that?
7    A. I was aware of the rules, yes
8    Q. Okay. As somebody with a master's degree in
9  education, tell me what you consider to be among the most
10  important things that an instructor or a professor does
11  when they are teaching students, when they're teaching a
12  class.
13    A. The important thing?
14    Q. Uh-huh.
15    A. In teaching?
16    Q. What do you consider priorities?
17    A. Is to always be there and be on time for a good
18  teacher.
19    Q. All right. So it's important if you're teaching
20  a class to actually teach the class; right?
21    A. Right.
22    Q. And that means that you should show up at the
23  time appointed and be on time and actually give the
24  class; right?
25    Q. Why is that important?
```

Page 103

```
1    A. It's important as not to disrupt the students.
2    Q. Is it particularly important with students like
3  those at Ilisagvik who are, for various reasons, at risk
4  for not completing programs?
5    A. I can't answer that question.
6    Q. In your experience, did you come to learn that
7  it was important to be there and teach the class for
8  chil- -- students who were at risk?
9    A. Yes, it was important.
10    MS. DUCEY: All right. Would it be a convenient
11  time to take a lunch break?
12    MS. JOHNSON: Sure.
13    MS. DUCEY: And I got my lunch here, so you all
14  tell me how long you need.
15    THE VIDEOGRAPHER: Do you want to go off record?
16    MS. DUCEY: Yes.
17    THE VIDEOGRAPHER: Going off record at the end
18  of Tape 1. Time is 12:04.
19    (Lunch recess.)
20    THE VIDEOGRAPHER: Okay. We're back on the
21  record at the beginning of Tape 2. The time is 1:02.
22    MS. DUCEY: All right. Jonathan, what number
23  are we on?
24    MR. CLEMENT: 13.
25    MS. DUCEY: Okay. Would you make that 13A and
```

Page 104

```
1  that 13B?
2    (Exhibit Nos. 13A-13B marked.)
3    THE WITNESS: Have we finished with the handbook
4  for now?
5    MS. DUCEY: I think for the moment, yes.
6    THE WITNESS: Okay. I'll just put it aside over
7  here.
8    MS. DUCEY: There's 13A and have you got 13B,
9  too? Let's give them to her both at the same time. Can
10  you make that one 13B? Okay. And will you trust me with
11  that pile of exhibits for a minute?
12    MR. CLEMENT: Okay.
13    Q. (By Ms. Ducey) Can you take a look at 13A and
14  13B for a minute, Ms. Wade?
15    A. Okay.
16    MS. DUCEY: Jonathan, could you hand me the pile
17  of exhibits that we've already marked?
18    MR. CLEMENT: Oh, sure.
19    MS. DUCEY: I promise I'll give them back.
20    Q. (By Ms. Ducey) So 13A is the anti-harassment
21  policy; right? That's what it says.
22    A. Uh-huh, yes.
23    Q. Do you remember getting that in September '01?
24    A. No, I don't recall getting it.
25    Q. Okay.
```

Page 105

```
1    A. I might have, but I don't recall.
2    Q. All right. And then 13B is leave without pay in
3  the Family Medical Leave Policy; right?
4    A. Yes.
5    Q. And do you remember receiving that in September
6  '01?
7    A. Not this particular item, per se, no.
8    Q. Okay. Well, you had a good memory because I
9  called and found out that there was a -- revision to
10  the policy, September 7th, '01 --
11    A. Okay.
12    Q. -- which corresponds with Exhibit 8 --
13    A. Uh-huh.
14    Q. -- which shows that you got those updates that
15  you mentioned on September 21st, '01.
16    A. Okay.
17    Q. So I'm just wondering, does that refresh your
18  recollection about whether 13A --
19    A. I don't recall reading these --
20    Q. Okay.
21    A. -- or what was in them.
22    Q. All right. But you might have received an
23  amendment; right?
24    A. Yes.
25    Q. You can put those aside. Thank you.
```

27 (Pages 102 to 105)

case No. A05-086 Civil                                                Bobbi Wade

<table>
<tr><td valign="top">

Page 110

1    A. Dr. Tuthill, no, he didn't.
2    Q. Did you receive any additional remunerations for
3  being lead -- lead faculty?
4    A. No.
5    Q. Now in the fall '03, when did classes begin, if
6  you can recall?
7    A. It was the last -- around the 27th, 28th or 29th
8  of August. I would have to look at the sched-- --
9  schedule to refresh my memory.
10   Q. Okay. You had been out on some personal leave
11 during the '02-'03 school year; correct?
12   A. Yes.
13   Q. And what was the reason for that?
14   A. On personal leave was right at the end of the
15 summer session when I took some leave days to leave early
16 to drive an automobile from Anchorage to Nashville.
17   Q. Uh-huh. That was two weeks of leave in May,
18 wasn't it?
19   A. Yes, but my courses were done and finished.
20   Q. Uh-huh. Okay. And you took other leave in
21 2002-'03, didn't you?
22   A. No, I didn't take leave.
23   Q. You were absent from the school, weren't you?
24   A. Not from the school, no.
25   Q. At no time?

</td><td valign="top">

Page 112

1    Q. Did you write this e-mail?
2    A. Yes, I did.
3    Q. Can you read what it says beginning with "Angie
4  understands"?
5    A. "Angie understands that I can only take six days
6  unless I take four days of those days without pay, but I
7  was advised by my doctor last week and she has written
8  letters of verification to go out of Barrow to have tests
9  made. Nothing wrong just precautionary measures." I
10 don't think to mention -- "I didn't think to mention this
11 to Angie."
12   Q. All right. So you had six days of leave and if
13 you took ten, four of those would be without pay; right?
14   A. It seems so, yes.
15   Q. Okay. But then you thought of another reason
16 that you could use, which was that you wanted to have
17 some medical tests done; right?
18       MS. JOHNSON: Object to the form of the
19 question.
20   Q. Is that right?
21   A. What was the -- would you repeat the question?
22   Q. You thought of another reason --
23   A. I thought of another reason?
24   Q. -- that you could leave?
25   A. I don't know what I thought of at that time.

</td></tr>
<tr><td valign="top">

Page 111

1    A. There was a time in December when I was not on
2  campus, but I was -- I was on off-site duty.
3    Q. But you asked to take leave, didn't you?
4    A. I did.
5    Q. And it was designated as leave, wasn't it?
6    A. No, it wasn't. It was designated as off-site
7  duty.
8        (Exhibit No. 16 marked.)
9        MS. DUCEY: And, Peter, I don't have a copy for
10 you. Yes, I do. Never mind.
11   Q. Can you identify what Number 16 is? Can you
12 identify 16?
13   A. Yes, ma'am.
14   Q. What is Number 16?
15   A. It's a letter when I requested leave.
16   Q. Uh-huh.
17   A. To see about my son who was critically ill.
18   Q. And that's dated November 7, '02; right?
19   A. Yes.
20   Q. And you wanted to take ten days of personal
21 leave; right?
22   A. If that's what it says, yes.
23   Q. Okay. But you only had six days of personal
24 leave; right?
25   A. I don't know. I couldn't confirm that.

</td><td valign="top">

Page 113

1    Q. "I didn't think to mention this aspect to
2  Angie," is what it says; right?
3    A. Yes.
4    Q. And subsequently you thought of another reason
5  that you could go outside and perhaps be paid all of your
6  time; right?
7        MS. JOHNSON: Objection to the form of the
8  question.
9    Q. Is that right?
10   A. I don't know. I -- I can't verify what I
11 thought at the time. I don't know what I thought.
12   Q. Okay. So it says, "I didn't think to mention
13 this aspect to Angie." Obviously you didn't think of
14 that --
15   A. No.
16   Q. -- at the time you requested the leave?
17   A. No.
18   Q. But later on you said that you were advised by
19 your doctor that you needed to go to Barrow to have tests
20 made; right?
21   A. Yes.
22   Q. You weren't sick; right?
23   A. I don't know. I don't remember. I don't
24 remember if I was sick or not at that time.
25   Q. It says, "Just precautionary measures"; right?

</td></tr>
</table>

EXHIBIT     29 (Pages 110 to 113)

case No. A05-086 Civil

Bobbi Wade

---

Page 114

1  A. To have the tests made. Not to go out on leave.
2  Q. Uh-huh. So you weren't sick, it was just a
3  precaution; right?
4  A. I don't remember.
5  Q. Uh-huh. Do you dispute what's in the e-mail
6  that you wrote?
7  A. No.
8  Q. Any reason --
9  A. I don't remember my thinking in this matter.
10  Q. Uh-huh. Any reason to believe that you were, in
11  fact, ill but you didn't mention it?
12  A. If I told Angie that I needed tests made, then I
13  needed the tests made.
14  Q. Uh-huh.
15  A. I would of not have fabricated it.
16  Q. Do you remember what doctor you were seeing?
17  A. Dr. Church.
18  Q. Uh-huh. And do you remember what you were
19  seeing her for?
20  A. No, I don't.
21  Q. So you were trying to think of a way that you
22  could get the four days paid, as well; correct?
23  MS. JOHNSON: Object to the form of the
24  question.
25  A. I don't know.

Page 115

1  Q. You have no recollection about this?
2  A. No.
3  Q. Do you dispute what's in here?
4  A. No, I don't.
5  Q. Okay. So the -- the e-mail says that you were
6  trying to get those four other days with pay; right? Is
7  that what it says?
8  A. I don't know.
9  Q. Why don't you look at it?
10  A. I've already looked at it. I read it.
11  Q. Look at it again. It says, "Can I take ten days
12  off without losing pay?"
13  A. Okay.
14  Q. So that's what you wanted to do; right?
15  A. Yes --
16  Q. You only had six days --
17  A. -- apparently so.
18  Q. -- but you wanted ten days off with pay; right?
19  A. Right.
20  Q. You said, "If I took the whole twelve days I
21  could actually leave at Thanksgiving"; right?
22  A. Yes.
23  Q. So leave at Thanksgiving and not come back until
24  January 2nd; right?
25  A. Yes.

Page 116

1  Q. How many classes would you have missed at that
2  point?
3  A. I don't recall. I would have to study the
4  schedule at the time.
5  Q. But you would have missed a number of classes;
6  correct?
7  A. Yes.
8  Q. And some of those were classes that you were
9  teaching face-to-face; right?
10  A. I don't know. I would have to review the
11  schedule.
12  Q. Do you recall if you missed classes that you
13  taught?
14  A. I didn't -- I didn't miss classes.
15  Q. Did you have classes that you taught --
16  A. Yes, I did.
17  Q. -- face-to-face?
18  A. No, not face-to-face.
19  Q. Did you keep office hours where you were gone
20  from Thanksgiving to January 2nd?
21  A. Not in my office, but on the e-mail.
22  Q. Uh-huh. And how did you keep them on e-mail?
23  A. I kept in touch with my students by e-mail.
24  Q. Uh-huh. Who approved that leave?
25  A. The dean of instruction.

Page 117

1  Q. Uh-huh. And who was at that that?
2  A. Bruce Myers. It wasn't leave he approved.
3  Q. Uh-huh. What did he approve?
4  A. Off-site duty.
5  Q. Did you get anything in writing verifying that?
6  A. Yes, I did.
7  Q. What did you have in writing?
8  A. A letter from Dean Myers stating that I was
9  granted the off-site duty.
10  Q. Now when you went back in -- you went back to
11  Tennessee in the summer of '03; correct?
12  A. Yes.
13  Q. And then the summer of '03, did you see any
14  medical providers?
15  A. Yes, I did.
16  Q. Who did you see?
17  A. I saw Dr. Church.
18  Q. When did you see Dr. Church?
19  A. It was -- I don't recall the exact date. It was
20  either the latter part of July or the early part of
21  August.
22  Q. What was the reason you saw Dr. Church?
23  A. For several reasons. One being a urinary tract
24  problem.
25  Q. Uh-huh. What was the nature of that problem?

---

30 (Pages 114 to 117)

case No. A05-086 Civil                                                            Bobbi Wade

Page 118

1    A. It was like a urinary tract infection.
2    Q. Uh-huh. And did she treat it in late July?
3    A. I don't recall what she did about that and what
4  I took.
5    Q. Anything else that she saw you for?
6    A. Yes.
7    Q. What else?
8    A. High blood pressure.
9    Q. You had had that over the summer?
10   A. Yes.
11   Q. And that was a continuing problem for you,
12 wasn't it?
13   A. Yes. But it continued to rise and get higher.
14   Q. And how did she treat that?
15   A. By medication.
16   Q. What medication did you take?
17   A. Lisinopril.
18   Q. When did you begin taking Lisinopril for the
19 first time?
20   A. I don't recall.
21   Q. You took it before you saw Dr. Church, didn't
22 you?
23   A. I don't recall. The doctor in Barrow might have
24 prescribed it.
25   Q. Well, you actually took it for many years,

Page 119

1  didn't you, Ms. Wade?
2    A. Not for many years, no.
3    Q. Did you see any other medical providers in the
4  summer of '03?
5    A. No.
6    Q. Okay. So when you saw Dr. Church in the summer
7  of '03, did she give you any reason that you might have
8  to return to see her?
9    A. Yes, she did.
10   Q. What did she say?
11   A. She wanted to do further tests as to what was
12 causing my high blood pressure and at the time I was
13 having stomach problems. She wanted to do tests there.
14   Q. Uh-huh.
15   A. And I had a -- I had begun to have a problem
16 with my left foot and I needed -- it was really painful
17 and I needed to get that -- find out what was causing
18 that. And I had a spot on my left shoulder that I was
19 becoming real concerned about because it was beginning to
20 itch and burn and really drawing my attention and I was
21 afraid.
22   Q. And so what did she tell you she wanted you to
23 do?
24   A. She wanted me to come back for tests -- she
25 wanted me to have tests then --

Page 120

1    Q. Uh-huh.
2    A. -- and I told her I couldn't.
3    Q. Why not?
4    A. Because I wouldn't have time to have all the
5  medical testing done and get back to work on time and I
6  had to get back to work on time.
7    Q. Uh-huh. What time were you supposed to be back?
8    A. I believe it was August the 15th, but I wasn't
9  pos- -- I'm not positive about that date because each
10 year it was a different date.
11   Q. Uh-huh.
12   A. But it was approximately during that time.
13   Q. Did you try and schedule some of those tests
14 before you had to go back?
15   A. No. There wasn't -- there wasn't time.
16   Q. Why not?
17   A. I don't recall.
18   Q. Who did you try and schedule them with?
19   A. I didn't try to schedule the tests.
20   Q. So you made no effort at all to schedule the
21 tests?
22   A. No. Dr. Church scheduled the tests, not me.
23   Q. Well, did you ask Dr. Church to make an effort
24 to schedule the tests, some of them, before you had to go
25 back?

Page 121

1    A. No.
2    Q. Why not?
3    A. Because there wasn't time.
4    Q. Why wasn't there time?
5    MS. JOHNSON: Objection as to form.
6    A. I don't recall.
7    Q. There was time to do nothing between the time
8  you saw Dr. Church until the time you got back?
9    MS. JOHNSON: Objection, form of the question.
10   A. I don't -- I don't recall.
11   Q. Not a single time?
12   A. I don't know. I don't recall what my activities
13 were at that time.
14   Q. Uh-huh. But what could be more important than
15 your health?
16   MS. JOHNSON: Objection, form.
17   A. There was nothing.
18   Q. Okay. You weren't working that summer, were
19 you?
20   A. No.
21   Q. Okay. And was there -- were there any other
22 things that had a higher priority than your health in
23 late July, early August?
24   A. No. No.
25   Q. Did you ask Dr. Church to see if she could

31 (Pages 118 to 121)

case No. A05-086 Civil

Bobbi Wade

Page 122

1  schedule anything?
2      A. No. I don't recall whether she tried at that
3  time to get appointments or not. She might have.
4      Q. Are you sure it was Dr. Church?
5      A. Yes, it was Dr. Church.
6      Q. And when did she tell you she needed -- you
7  needed to return?
8      A. She just asked me when I could have the tests
9  made.
10      Q. And what did you tell her?
11      A. She says, "You need to have these tests as soon
12  as possible." And I told her I would try to arrange for
13  a trip back to have the tests made once I got back to
14  work and got my semester underway and all my schedules
15  underway and arrangements worked out for my students.
16      Q. Okay. Now did the foot problem prevent you from
17  performing your job duties?
18      A. No, it did not.
19      Q. How about the stomach problem?
20      A. No, it did not.
21      Q. And did the spot on the shoulder prevent you
22  from performing your job duties?
23      A. No, ma'am. I was never absent from my job
24  unless it was necessary to see a doctor.
25          (Exhibit No. 17 marked.)

Page 123

1      Q. This one is 17.
2          MS. DUCEY: If you could, Linda, could you pass
3  one to Peter.
4      Q. Can you identify what that is?
5      A. I don't recall this.
6      Q. Okay. Do you recall --
7      A. I can't remember.
8      Q. Do you remember a doctor named Soraya Aragunda?
9      A. Yes, she was -- she was on the staff over at the
10  Barrow Medical Clinic.
11      Q. Do you remember asking her to write a letter to
12  Pam Taylor for you?
13      A. No, I don't recall asking her, but anytime a
14  person needed to leave to see a doctor, Pam requested a
15  note from the doctor.
16      Q. Uh-huh. So is it reasonable to infer that you
17  did ask her, otherwise she would not have been able to
18  obtain this information from the doctor?
19      A. I've never seen this document right here
20  before --
21      Q. Uh-huh.
22      A. -- and I could not even verify that that's the
23  doctor's name and I -- it makes me wonder why she didn't
24  sign it instead of printing her name.
25      Q. Uh-huh.

Page 124

1      A. So I -- I can't identify this -- this document
2  right here at all.
3      Q. Okay. You sought leave by e-mail to Pam at that
4  same time. Is it reasonable to infer that if Pam Taylor
5  got a note from Dr. Aragunda requesting that you be
6  referred to doctors outside, it was because you asked Dr.
7  Aragunda to do that?
8      A. I don't recall asking Dr. Aragunda.
9      Q. Uh-huh. You think Dr. Aragunda just violated
10  your attorney/client [sic] privilege and sent the letter?
11      A. No, I don't.
12      Q. So how do you think this came in Pam Taylor's
13  hands?
14      A. I have no idea.
15      Q. Well, what is the reasonable inference to make?
16          MS. JOHNSON: Objection, form of the question.
17      A. I -- I don't choose to make an inference.
18      Q. I'm asking you, isn't it reasonable to infer?
19      A. I don't know.
20      Q. Okay. You saw her on November 1st at Samuel
21  Simmonds Hospital. Says, "Patient follow up with chronic
22  medical issues. States for three or four months she's
23  been getting light-headed when changing positions,
24  walking fast or bending at work. Also, thinks she's
25  getting very forgetful. Sometimes she calls somebody and

Page 125

1  then forgets why or who she called. 'I'm under a lot of
2  stress.' Her son is ill after having 60 percent of his
3  liver removed secondary to cancer. He's in intensive
4  care in the Lower 48. 'I just feel guilty that I'm up
5  here.' Thinking about returning this year. Assessment,
6  blood pressure up." Does that refresh your recollection
7  about seeing Dr. Aragunda?
8      A. I don't recall ever writing or saying those
9  words.
10      Q. Uh-huh.
11          MS. JOHNSON: Do you have something for her to
12  look at?
13          MS. DUCEY: I don't need to show her anything.
14      Q. (By Ms. Ducey) Do you deny seeing Dr. Aragunda
15  on November --
16      A. No, I don't deny seeing Dr. Aragunda, but if I
17  was light-headed it was due to an ear infection --
18      Q. Uh-huh.
19      A. -- which I had.
20      Q. So it's possible you told her that, you just
21  don't recall?
22      A. I don't recall it.
23          MS. JOHNSON: Objection, foundation. Since you
24  haven't shown her anything, she doesn't have anything to
25  verify whether she's said that or not.

32 (Pages 122 to 125)

EXHIBIT
Page 26 of 28

case No. A05-086 Civil                                                    Bobbi Wade

Page 126

1      MS. DUCEY: I don't have to show her anything.
2      THE VIDEOGRAPHER: Microphone.
3      MS. DUCEY: How did I do that? Okay. Thank
4   you.
5      Q. (By Ms. Ducey) So what did you do after Dr.
6   Church told you this?
7      A. Told me what?
8      Q. That you had to come back for testing.
9      A. I told her that I would see if I could work it
10  out and if -- if I possibly could come back, I would; but
11  if I couldn't, it would have to wait until a later date.
12     Q. And what did she say?
13     A. And she says, "Well, you really need to have
14  these tests made."
15     Q. Did she say when?
16     A. No. As soon as possible.
17     Q. Uh-huh. And did she know that you were an
18  assistant professor?
19     A. Yes, she did.
20     Q. Did she know that you had teaching
21  responsibilities?
22     A. Yes, she did.
23     Q. And did you discuss your teaching
24  responsibilities --
25     A. No.

Page 127

1      Q. -- in relation to the tests?
2      A. Not with Dr. Church I didn't.
3      Q. Why not?
4      A. I don't recall why not.
5      Q. Well, wouldn't that have been something
6   important to do so that you could attempt to arrange your
7   classes so that --
8      A. I might have. I just don't recall.
9      Q. Uh-huh. And when you left to come back to
10  Alaska, did you have any appointments scheduled?
11     A. There was a -- Dr. Church had scheduled some
12  appointments early in October, yes.
13     Q. So when you left in August, you had appointments
14  scheduled for October?
15     A. I -- I was not aware of the scheduling of the
16  appointments in October, no, not when I got back. After
17  she sent notice to me or either called me or I called her
18  office, I don't know how I received notice of those
19  appointments.
20     Q. Uh-huh. What appointments were they?
21     A. It was -- one appointment was with Dr. Smith, an
22  orthopedic doctor --
23     Q. Uh-huh.
24     A. -- that saw my foot, and the other one was a
25  Dr. Concepcion concerning my urinary tract problem.

Page 128

1      Q. And what were the appointments for?
2      A. For testing.
3      Q. Okay. And if you didn't make those
4   appointments, were you incapacitated?
5      A. No.
6      Q. And unable to work?
7      A. No. They were not life threatening.
8      Q. So when you left Nashville to come back to
9   Barrow, it's your understanding that Dr. Church had not
10  scheduled appointments for you; correct?
11     A. I don't know when she scheduled the
12  appointments. I don't recall. I can't remember.
13     Q. Uh-huh. And what was it in October that was of
14  an urgent nature that couldn't wait until the end of the
15  semester?
16     A. The spot on my shoulder had become really angry
17  and it was itching and burning and I became real
18  concerned about it and I had called a doctor that had
19  been used by my family in Nashville to make an
20  appointment for him to test -- I wanted the spot on my
21  shoulder tested.
22     Q. Uh-huh.
23     A. The reason Dr. Church didn't do that is because
24  I requested her to let me make my own appointment because
25  I wanted to see a particular doctor.

Page 129

1      Q. Okay. When you were there in August and you
2   knew that that spot was bothering you, did you make any
3   attempt to schedule the appointment with the doctor at
4   that point?
5      A. I don't recall that I did.
6      Q. What was the doctor's name?
7      A. Dr. Gold.
8      Q. G-O-L-D?
9      A. Yes.
10     Q. And what was Dr. Gold -- what type of doctor was
11  he?
12     A. He was a dermatologist.
13     Q. Did you ever make an appointment with Dr. Gold?
14     A. Yes, I did.
15     Q. When did you make an appointment with Dr. Gold?
16     A. I made one in -- for October in the time span
17  that I asked for leave, for sick leave.
18     Q. When?
19     A. I don't remember the date.
20     Q. Was it before or after you submitted a request
21  for leave?
22     A. That I made the appointment?
23     Q. Yes.
24     A. I don't remember the date I made the
25  appointment.

EXHIBIT 33 (Pages 126 to 129)
Page 27 of 88

case No. A05-086 Civil                                                                      Bobbi Wade

Page 134

1  days before you said it would take to get an appointment?
2      A. I don't recall the day I saw Dr. Church.
3      Q. Uh-huh. You saw her August 6th.
4      A. August the 6th and I had plane schedules and you
5  can't -- you can't change plane schedules without paying
6  higher fees and more money.
7      Q. What was the plane schedule?
8      A. I don't recall.
9      Q. Would the documentation --
10     A. But I had to return according to my plane
11  schedule --
12     Q. Uh-huh.
13     A. -- and the time was drawing near.
14     Q. Were you leaving on the 6th?
15     A. No, I don't think so.
16     Q. Were you leaving on the 7th?
17     A. I don't recall what day.
18     Q. Did she hand -- did she personally give you a
19  note, Dr. Church?
20     A. Yes, she did.
21     Q. Okay. She handed it to you?
22     A. Yes, she did.
23     Q. Okay. And did you leave that day?
24     A. I don't think so. I don't recall.
25     Q. Okay. Did you leave several days later?

Page 135

1      A. I don't recall what day I left. I don't know --
2      Q. Uh-huh.
3      A. -- what day I left. I would have to refer back
4  to plane tickets and plane stubs, which I don't have --
5      Q. Uh-huh.
6      A. -- any longer.
7      Q. Did you have a rental agreement for the senior
8  center?
9      A. A rental agreement?
10     Q. In Barrow.
11     A. I don't recall the exact time I moved into the
12  senior center.
13     Q. Uh-huh. Could you ask -- could you answer my
14  question? Did you have a rental agreement for Barrow
15  Senior Center?
16     A. When -- at the time I rented, yes.
17     Q. Uh-huh. And did you have one set up for when
18  you returned?
19     A. I don't recall if I did or not.
20     Q. Well, why wouldn't you have that plan in place?
21     A. Because I might not have rented an apartment at
22  that time at the senior center.
23     Q. Did you?
24     A. Did I what?
25     Q. Where did you stay in the fall '03?

Page 136

1      A. When I returned --
2      Q. What else could we be talking about?
3      A. -- for my job?
4          MS. JOHNSON: Objection to the form of the
5  question.
6      A. And would I have returned without a place to
7  live? No, I had an apartment rented out on campus.
8          MS. JOHNSON: Without -- without a question
9  pending, we want to take a break.
10         THE VIDEOGRAPHER: Going off record? Ms. Ducey?
11         MS. DUCEY: Sure.
12         THE VIDEOGRAPHER: Going off record. The time
13  is 1:44.
14             (Recess taken.)
15         THE VIDEOGRAPHER: Back on the record. The time
16  is 1:50.
17     Q. Well --
18     A. Ms. Ducey, I would like to clarify a -- a point,
19  if I may.
20     Q. Sure.
21     A. At all times that I lived in Barrow from August
22  of 2000 until September of 2005, I had a place to live
23  that the rent was paid year-round.
24     Q. Uh-huh.
25     A. I never gave up a place to live in Barrow.

Page 137

1      Q. Okay.
2      A. So....
3      Q. All right. Thank you.
4      A. I -- I didn't know the point you were trying to
5  make there.
6      Q. Ms. Wade, were all of the faculty required back
7  on the same date?
8      A. Yes.
9      Q. And it was generally about ten days before class
10  started, wasn't it?
11     A. Yes.
12     Q. Okay. So if class started August 27th, August
13  17th would have been your date to come back; correct?
14     A. I don't recall. It was approximately around
15  August the 15th, but it could have been a few days
16  before, it could have been a few days after. I would
17  have to look at my contract to verify that or either some
18  documents to verify that.
19     Q. Uh-huh. Okay. All right.
20             (Exhibit No. 18 marked.)
21         MS. DUCEY: 18, right? 18?
22         MR. CLEMENT: Yes.
23         MS. DUCEY: You can show it to the witness.
24         MR. CLEMENT: Okay.
25     Q. (By Ms. Ducey) All right. I'll represent to

EXHIBIT 35 (Pages 134 to 137)
Page 29 of 88

case No. A05-086 Civil                                              Bobbi Wade

---

Page 138

1  you that that's an Ilisagvik academic calendar for
2  '03-'04. Have you something like that before?
3      A. Yes.
4      Q. When's the first day of class in '03?
5      A. First day of classes is August the 27th.
6      Q. All right. So if you had to be there ten days
7  before, that would have been the 17th; right?
8      A. I'm not looking at a calendar. I can't tell you
9  that unless I see a 2003 calendar.
10     Q. Uh-huh. What would a 2003 calendar show you?
11     A. It would show me the date that -- let's see.
12 This is -- the 17th would have been on? This says --
13 you're stipul- -- stipulating that it was exactly ten
14 days prior to this date. I don't know that --
15     Q. Okay.
16     A. -- to be a fact. It might --
17     Q. So --
18     A. -- not have been ten days.
19     Q. All right. So if it was on a weekend, it would
20 be the following Monday?
21     A. Yes.
22     Q. All right. So it might even be later than the
23 17th; right?
24     A. Or it might be earlier.
25     Q. Okay. All right. So between the time that you

---

Page 139

1  saw Dr. Church and -- on the 6th and the time that you
2  were back in Barrow, you did nothing to try and take care
3  of any medical problems; right?
4      A. No.
5      Q. All right. And you left the last two weeks of
6  May and you were traveling with your granddaughter;
7  right?
8      A. No. I wasn't traveling with my granddaughter.
9      Q. You were assisting her with some dogs?
10     A. No.
11     Q. Okay. What was the purpose for your leave in
12 May '03?
13     A. I needed to leave early to drive my automobile
14 from Anchorage to Murfreesboro, Tennessee.
15     Q. And how many days did that take?
16     A. I don't recall. But it's like a twelve-day
17 trip.
18     Q. Okay. So if you left in the middle of May, you
19 were certainly there by the middle -- by the beginning of
20 June; right?
21     A. Yes.
22     Q. Okay. And you were there all of June; right?
23 You were in Murfreesboro --
24     A. I -- I don't recall those dates and I cannot
25 make a statement unless I'm looking at a calendar to

---

Page 140

1  refresh my memory and what took place on those dates.
2      Q. Do you remember if you took any trips once you
3  got to Murfreesville?
4      A. Murfreesboro.
5      Q. Murfreesboro in the summer of '03?
6      A. Until I got to Murfreesboro?
7      Q. No, ma'am. Once you arrived on the Alcan in
8  town about the first of June, did you take any other
9  trips outside of the area during the summer?
10     A. I don't recall.
11     Q. Okay. Was there any pressing business that you
12 can recall in the summer of '03 that would have taken you
13 out of town?
14     A. Not taken me out of town, but there was pressing
15 business in town.
16     Q. Okay. What pressing business was there?
17     A. I was -- I had bought a condominium and I had to
18 move into it and -- and get situated and everything.
19     Q. Okay. And how long did that take?
20     A. I don't know. I don't recall.
21     Q. Okay. Was it such pressing business that you
22 didn't have time to make a doctor's appointment?
23        MS. JOHNSON: Object to the form of the
24 question.
25     A. I don't recall.

---

Page 141

1      Q. Okay. Was it such pressing business that you
2  couldn't realize that you needed to take care of, for
3  instance, the itchy mole on your shoulder that you said
4  had been bothersome two months before you saw Dr. Church?
5        MS. JOHNSON: Objection, form of the question.
6      A. I don't recall. Maybe the spot on my shoulder
7  wasn't bothering me then like it was in the fall of 2003.
8      Q. All right. Was there something that was more
9  pressing that prevented you from picking up the phone and
10 calling and saying, "My foot is bothering me, it's been
11 bothering me, I would like to schedule an appointment"?
12     A. No.
13     Q. Okay. And was there anything about your urinary
14 tract infection that prevented you from picking up the
15 phone and saying, "I have symptoms. I would like to make
16 an appointment"?
17     A. I didn't have symptoms until just prior to the
18 appointment.
19     Q. Uh-huh. But apparently you weren't even treated
20 before you went back to Barrow.
21     A. Yes, I was given medication.
22     Q. Well, I asked you a little while ago and you
23 said, no, you weren't given medication?
24     A. I don't recall --
25     Q. Well, were you or weren't you?

---

36 (Pages 138 to 141)

EXHIBIT
Page 29 of 88