case No. A05-086 Civil                                                        Bobbi Wade

Page 142

1    A. -- what I was given. I -- I don't recall what I
2 was given.
3    Q. So you may have gone back to Barrow untreated
4 for a urinary tract infection?
5    A. No, I didn't go back to Barrow untreated for a
6 urinary fact -- tract infection. If I had an infection,
7 she gave me medication.
8    Q. Okay. So that --
9    A. But I don't recall if she did or not.
10    Q. All right. So the urinary tract infection
11 presumably wasn't an issue anymore because she treated
12 you for it?
13    A. Yes, there -- there are other issues --
14    Q. Okay. What was it?
15    A. -- that causes the infection.
16    Q. What other issues were there?
17    A. I have a tilted bladder.
18    Q. Uh-huh. Okay.
19    A. And I have been told that it will -- needs --
20 needs to be tacked up and I asked her about it.
21    Q. Okay. And was that an emergency?
22    A. No, it wasn't an emergency.
23    Q. Okay. That would have been elective surgery if
24 it occurred; right?
25    A. Yes.

Page 143

1    Q. Okay. Could have been scheduled at the
2 convenience of the college; right?
3    A. "At the convenience of the college," what do you
4 mean by that?
5    Q. It could have been scheduled at a time that was
6 convenient for the delivery of services to the students;
7 correct?
8    A. It could have, yes.
9    Q. Okay. Okay. Was there anything else that you
10 saw Dr. Church for?
11    A. At that time I was having real severe stomach
12 problems with nauseation [sic], upset stomach, diarrhea
13 and food made me sick.
14    Q. Okay.
15    A. Every time I ate, I became sick.
16    Q. And you reported that to Dr. Church in August
17 '03?
18    A. I talked with her about it.
19    Q. Okay.
20    A. And she suggested that I have the tests made --
21    Q. Uh-huh.
22    A. -- for my stomach.
23    Q. What tests did you need to have done?
24    A. Gallbladder test. It's the test that's
25 called -- I don't recall if it's called an MRI, but it's

Page 144

1 a test that tests you for several different things.
2    Q. Uh-huh. Okay. So she assessed you for nausea,
3 upset stomach and diarrhea and vomiting in August '03;
4 correct?
5    A. She didn't assess me. I don't know what you
6 mean by "assess."
7    Q. You -- you reported symptoms to her; correct?
8    A. Yes.
9    Q. Okay. And those symptoms included nausea, upset
10 stomach --
11    A. Yes.
12    Q. -- diarrhea and vomiting?
13    A. And she would not give me any medication until I
14 had tests made.
15    Q. Okay. And for how long have you been having
16 those symptoms prior to seeing her?
17    A. Not long.
18    Q. Uh-huh. How long?
19    A. I don't know. I don't remember.
20    Q. During the course of the summer?
21    A. No, not the whole course of the summer --
22    Q. But part of the summer?
23    A. -- but just prior to going to her.
24    Q. Okay. And how soon before you saw her did you
25 call to schedule an appointment?

Page 145

1    A. To see her?
2    Q. Uh-huh.
3    A. Probably just a few days. I don't recall when I
4 called to see her.
5    Q. Okay. When you were there during the summer
6 and -- and doing the things that you would normally do
7 during the summer, did you give any thought or concern to
8 the scheduling needs of the college in terms of classes
9 in relation to your medical needs?
10    A. Yes, I did.
11    Q. And what consideration did you give to the
12 college? That summer is what I want to know.
13    A. That summer?
14    Q. Yes.
15    A. Prior to seeing Dr. Church?
16    Q. Yes.
17    A. Or after seeing her or during seeing her?
18    Q. Prior to seeing her. You're on the Alcan,
19 you're headed down the road to Murfreesboro and you know
20 you're going to be there for the summer, did you give any
21 consideration during the course of the summer to the
22 college's scheduling needs in relation to your medical
23 needs?
24    A. Not at that time, no.
25    Q. Okay.

EXHIBIT 37 (Pages 142 to 145)
Page ___ of ___

case No. A05-086 Civil                                                      Bobbi Wade

Page 146

1      A. And I don't think it was May. I think it was
2  June. I was not in Murfreesboro until July the 2- -- the
3  1st.
4      Q. Uh-huh. Where were you before that?
5      A. I was teaching summer school at Ilisagvik.
6      Q. Uh-huh.
7      A. It was in June that I left. It wasn't in May.
8      Q. Okay. Did you see anybody in Barrow for these
9  problems prior to --
10     A. I don't recall --
11     Q. -- leaving?
12     A. -- the dates I seen people in Barrow.
13     Q. I'm not asking you for specific dates, ma'am.
14  I'm asking you based on your best recollection if prior
15  to leaving for the summer, you recall being seen in
16  Barrow and reporting any of these symptoms?
17     A. No, I don't. I don't recall that is -- is not.
18  No, I don't. I didn't.
19     Q. Okay. When you got back to -- well, let me ask
20  you this first. When did you first learn that the prior
21  dean of instruction contract had not been renewed?
22     A. Which one are you talking about?
23     Q. Did you say that Frank Willingham was dean from
24  2002 to 2003 school year?
25     A. No.

Page 147

1      Q. Okay. Was it Stan Scott?
2      A. Bruce Myers was the dean --
3      Q. Bruce Myers, okay.
4      A. -- 2002 to 2003.
5      Q. All right. Let's -- let's talk about Bruce
6  Myers. Did Bruce Myers ever refer to you as the lead?
7      A. I don't recall.
8      Q. Did he ever give you duties that he said were
9  duties only for the lead of the business department?
10     A. No, not that I recall, but he did let me assume
11  the job that I had been doing. He took no duties away
12  from me.
13     Q. Okay. And his contract wasn't renewed, was it?
14     A. I don't know. I don't know what happened to
15  Bruce Myers.
16     Q. He didn't come back, did he?
17     A. He didn't come back.
18     Q. Okay. And what was the speculation?
19     A. I have no idea.
20     Q. Okay. So when did you learn that there was a
21  new dean of instruction?
22     A. I learned whenever he was hired.
23     Q. And when was that?
24     A. He was hired for the 1st of July. He was hired
25  in June.

Page 148

1      Q. Okay. And did you meet him before you left for
2  the summer?
3      A. No. He came in just a few days -- the last few
4  days of June and I had already left.
5      Q. Okay. Did you meet with Dr. O'Rourke before you
6  left?
7      A. I don't recall if I did or not.
8      Q. Do you remember --
9      A. I was constantly meeting with Dr. O'Rourke.
10     Q. Uh-huh. For what reasons?
11     A. Scheduling, curriculum.
12     Q. Do you remember if you reviewed your class
13  schedule with him prior to leaving?
14     A. No, I don't remember doing that.
15     Q. Okay. Do you remember if Dr. MacLean asked you
16  to do so?
17     A. No, she did not ask me to do so.
18     Q. Okay. So when was the first time you recall
19  meeting Dr. Tuthill?
20     A. It was at -- at registration when the
21  students -- a few days after I returned.
22     Q. And tell me what you recall about that meeting.
23     A. I didn't officially meet him. I met him in the
24  hall --
25     Q. Okay.

Page 149

1      A. -- during registration because it was chaos with
2  all the students there trying to register. I had
3  advisees. I had more students than I could handle.
4      Q. Uh-huh. Did you tell him that?
5      A. Yes. I asked him if Jaime Elberg could help me
6  register the students and he said she could.
7      Q. Did you tell him you also had too big of a class
8  load?
9      A. No, I didn't.
10     Q. In your opinion, did you have too big of a class
11  load?
12     A. No, because I never refused a student who wanted
13  to take my class.
14     Q. How many classes did you have?
15     A. At that time, I had six.
16     Q. Uh-huh. So you met him in the hall and you
17  advised him that you had too many advisees and needed
18  help?
19     A. No. There were too many students there at one
20  time wanting to see me and they were having to wait --
21     Q. Uh-huh.
22     A. -- because I couldn't get to them in time.
23     Q. And what did he say?
24     A. And I asked him if Jaime could help me --
25     Q. Uh-huh.

38 (Pages 146 to 149)

EXHIBIT C
Page 31 of 82

case No. A05-086 Civil                                                    Bobbi Wade

Page 150

1    A. -- register the students and he said, "Yes."
2    Q. Okay. Did you have any other discussion with
3  him?
4    A. I don't recall any other discussion.
5    Q. All right. Was there a faculty meeting where
6  you saw him again soon after that?
7    A. I don't recall. I would have to look at the --
8  review the --
9    Q. Okay.
10    A. -- documents.
11    Q. Do you remember at any time, Ms. Wade, telling
12  him that you had too many classes?
13    A. No. I never told him I had too many classes.
14    Q. Do you remember telling him that you did not
15  like your schedule?
16    A. No. I did not tell him I didn't like my
17  schedule. I said the -- the way someone had changed the
18  schedule, it wasn't the schedule I made prior to my
19  leaving for summer. And I told him that it made it very
20  difficult to begin six classes at one time.
21    Q. What did he say?
22    A. I don't recall his comment to that.
23    Q. Okay. So you told him someone had changed your
24  schedule and that --
25    A. It had been changed while I was gone during the

Page 151

1  summer.
2    Q. Do you know who changed it?
3    A. No, I don't. I tried to find out and no one
4  seemed to know.
5    Q. Okay. What did he tell you he would do?
6    A. He didn't -- I don't recall him telling me
7  anything he would do because I never did -- I don't
8  recall discussing my class schedule with -- with the
9  dean.
10    Q. Okay. Was he your direct supervisor?
11    A. At that time he was, yes.
12    Q. And did he stay your direct supervisor?
13    A. Did he say what?
14    Q. Did he stay your direct supervisor?
15    A. Yes, he did.
16    Q. Do you remember there any meeting where he told
17  you what he expected of the faculty prior to the year
18  beginning?
19    A. I don't recall a meeting. There might have been
20  a faculty meeting where he introduced himself because he
21  was new, but I don't recall the time nor the date.
22    (Exhibit No. 19 marked.)
23    Q. Okay. Could you look at --
24    MS. DUCEY: Was that 18, Jonathan?
25    MR. CLEMENT: 19.

Page 152

1    MS. DUCEY: 19.
2    MS. JOHNSON: Do you have one for us?
3    MS. DUCEY: Oh, I have them.
4    Q. (By Ms. Ducey) Can you identify 19?
5    A. This particular document, no, but I can identify
6  the classes, yes.
7    Q. Okay. Does that correctly set out the classes
8  that you had in --
9    A. I don't know. I would have to give it some
10  careful notice in reading here to know --
11    Q. Let's go off record.
12    A. -- it's not -- not correct.
13    THE VIDEOGRAPHER: Going off record. The time
14  is 2:08.
15    (Pause in proceedings.)
16    THE VIDEOGRAPHER: Okay. Back on the record.
17  The time is 2:10.
18    Q. (By Ms. Ducey) All right. Have you had a
19  chance to look at 19?
20    A. Okay.
21    Q. And is 19 complete and accurate with respect to
22  the classes you were scheduled to teach in August '03?
23    A. It appears to be. I see, one, two, three -- I
24  had four classes that were scheduled online.
25    Q. Okay. And you had two classes that you taught

Page 153

1  in the classroom?
2    A. In the classroom.
3    Q. Okay. And that was Business Math and Business
4  English; correct?
5    A. Yes.
6    Q. Okay. And those were module classes; correct?
7    A. Yes.
8    Q. And those modules were set to occur in four-week
9  intervals; right?
10    A. At that time. And it was four to six. I don't
11  recall.
12    Q. Okay. And what --
13    A. I would have to look at a calendar
14    Q. So you take Business Math A first?
15    A. Uh-huh, first.
16    Q. Okay. And you had to pass Business Math A;
17  right?
18    A. Yes.
19    Q. And then you would take Business Math B; right?
20    A. Yes.
21    Q. And then if you passed Business Math B, you
22  could enroll in Business Math C; right?
23    A. Right.
24    Q. And the same procedure applied to Business
25  English; right?

case No. A05-086 Civil                                                              Bobbi Wade

---

Page 154

1    A. Yes.
2    Q. Okay. And one was not supposed to be able to
3  enroll in the se- -- the next module unless the student
4  had passed the prior module; right?
5    A. Right, but they might have already been
6  registered for all three modules at the beginning.
7    Q. Uh-huh. They --
8    A. But if they didn't pass, they couldn't go on to
9  the next module.
10   Q. Okay. And Business Math A was scheduled to
11 begin August 27th and run to October 1st; right?
12   A. Yes.
13   Q. Business Math B was from October 6th to November
14 12th; right?
15   A. Yes.
16   Q. And then Business Math C -- I don't see that
17 one -- that was going to run after the November 12th
18 module ended?
19   A. Yes.
20   Q. Okay. So that would be running mostly in
21 December?
22   A. Yes.
23   Q. Okay. And Business English started August 2nd,
24 it says. Do you see that? Is that right?
25   A. Yes.

---

Page 155

1    Q. Okay. Were you teaching Business English A?
2    A. Yes.
3    Q. Were you teaching it in the classroom?
4    A. Yes.
5    Q. Okay. So how was it that you were there on
6  August 2nd if you were in Dr. Church's office on August
7  6th?
8    A. August, that's an error. I was not there on
9  August 2nd. I'm sorry.
10   Q. Maybe the 7 just got dropped off accidentally
11 because none of the fall semesters started before --
12   A. That date -- that date is not correct.
13   Q. Right. None of the fall semesters started
14 before the 27th, did it?
15   A. No.
16   Q. Okay. So the August 27th through September 30th
17 would be about a four-week module, wouldn't it?
18   A. Yes, but it might have run longer than four
19 weeks. I don't recall. I would have to study the
20 schedules and review -- and refresh my memory on the
21 schedules.
22   Q. Uh-huh. Well, why would a fall semester class
23 start 25 days before fall classes began?
24   A. I don't know who made this. I didn't do this.
25   Q. Okay. But can you think of a reason why a fall

---

Page 156

1  semester class --
2    A. Are you referring to the August 2nd?
3    Q. Yes. That's what we're talking about. Nothing
4  else.
5    A. Obviously it's a -- it's an error. School was
6  not even in session on August the 2nd.
7    Q. That's all I wanted to establish. That it
8  probably started August 27th, the first day of class;
9  right?
10   A. Yes.
11   Q. Okay.
12   A. Probably just left the 7 off.
13   Q. And Business English B started October 6th
14 through November 4th; right?
15   A. Yes. I couldn't verify that unless I went back
16 and checked my old schedules.
17   Q. Okay.
18   A. Because this is not the regular schedule here.
19   Q. Do you have documents in your possession that --
20   A. I don't, not at this time.
21   Q. -- showed the regular schedule? Okay. Did you
22 at one time?
23   A. Yes.
24   Q. Okay. And what happened to those documents?
25   A. I turned them all over to my attorney.

---

Page 157

1    Q. Okay. Did you destroy or discard any documents
2  related to your employment since you left?
3    A. No.
4    Q. Did you destroy or discard any documents you had
5  stored electronically either on a hard drive or on
6  software?
7    A. No. Those were destroyed on my computer when I
8  left the college.
9    Q. When you came back in the latter part of August,
10 did you immediately advise your dean that you needed to
11 leave for medical treatment?
12   A. No.
13   Q. Why not?
14   A. Because I had work I had to do.
15   Q. So you --
16   A. My medical treatment was not on my mind at that
17 time.
18   Q. Okay. So you were the only person that knew
19 that you were going to be leaving for medical treatment?
20   A. I didn't know that I was going to be leaving. I
21 knew that I would request and I would ask and try to
22 follow my doctor's request and that's what I tried to do.
23   Q. Uh-huh. Okay. Could you answer my question?
24 You were the only person among the people at Ilisagvik
25 College that knew that you might need to leave before the

---

40 (Pages 154 to 157)

case No. A05-086 Civil

Bobbi Wade

---

Page 158

1  semester was up; right?
2      A. Yes. Not before the semester was up, before I
3  requested the leave.
4      Q. That you would have to leave before the semester
5  was completed, is what I meant to say.
6      A. Rephrase your question.
7      Q. I'll withdraw it.
8          (Exhibit No. 20 marked.)
9      MS. DUCEY: 20?
10     MR. CLEMENT: Yes.
11     Q. And Number 20 is a note from Dr. Church;
12  correct?
13     A. Yes.
14     Q. Regarding you; right?
15     A. Uh-huh.
16     Q. Dated August 7th, '03; right?
17     A. Yes.
18     Q. So you were in her office on the 7th; correct?
19     A. Yes.
20     Q. And it says, "Bobbi Wade is a patient followed
21  in our clinic. I'm aware it's necessary for her to
22  travel to Alaska for her job, but I requested she return
23  as soon as possible for further medical workup with
24  possible surgical treatment." Signed "Dr. Church."
25  Right?

Page 159

1      A. Uh-huh.
2      Q. This is a letter that you had in your hand when
3  you came back to Barrow; right?
4      A. Yes.
5      Q. Did you show this to the dean of instruction
6  immediately?
7      A. No.
8      Q. Did you show the director of human resources
9  immediately this letter?
10     A. No.
11     Q. Why not?
12     A. Because this -- this was not on my mind.
13  Getting my classes started was on my mind.
14     Q. Okay. And what was the "further medical workup"
15  that Dr. Church refers to there?
16     A. I would have to refer to my medical records to
17  know exactly, but one thing -- the possible medical
18  workup and possible surgical treatment was I had several
19  different items then that I was contending with, medical
20  items, foot, spot on shoulder, stomach problems --
21     Q. Uh-huh.
22     A. -- and urinary tract problems.
23     Q. And all of those Dr. Church had seen you for and
24  evaluated you for --
25     A. Yes.

Page 160

1      Q. -- at least to some extent?
2      A. Yes. And she told me that -- there was quite a
3  discussion with Dr. Church and I told her, you know, that
4  I would have to take off to have those tests made.
5      Q. Okay. So when you came back to Barrow, even
6  though you knew at some point you wanted to have those
7  testing, there was no urgency to have it done?
8      A. I didn't know of any urgency at the time.
9      Q. Okay. In fact, you understood that you could go
10  back and start teaching your classes without any
11  problems; right?
12     A. Yes. My classes came first and I also knew if
13  they didn't grant me the request to go back, that I
14  wouldn't.
15     Q. And when you returned to Alaska you had made no
16  express plans to see Dr. Church; is that right?
17     A. On a return trip?
18     Q. Yes.
19     A. No.
20     Q. And as far as you knew, you hadn't done anything
21  to make a follow-up appointment with her; correct?
22     A. Not at that time.
23     Q. Okay. Did you tell her it was possible you
24  might not be back until December?
25     A. I told her that it -- that it might be -- not be

Page 161

1  possible that I could come back until December.
2      Q. Uh-huh. And what did she say?
3      A. She advised me that these tests needed to be
4  made as soon as possible and if it was at all possible,
5  to come back.
6      Q. Did she tell you that there were any adverse
7  consequences if you didn't come back before December?
8      A. No, because she didn't know about the spot on my
9  shoulder, if there would be any adverse consequences or
10  not, nor neither did I.
11     Q. Okay. Did she tell you that?
12     A. No, she didn't tell me that.
13     Q. Then why did you say it? How do you know that
14  she thought that?
15     A. If she had known, she would have written an
16  urgent note that I come back. She -- there was no way
17  for her to know. It had to be tested for her to know.
18     Q. Okay. But she examined the mole?
19     A. It wasn't a mole.
20     Q. She examined the spot on your left shoulder;
21  correct?
22     A. Yes, she looked at it.
23     Q. And you told her --
24     A. And she did not know what it was.
25     Q. Okay. And did she give you a referral at that

---

41 (Pages 158 to 161)

EXHIBIT
Page 5 no 88

case No. A05-086 Civil                                            Bobbi Wade

**Page 162**

1  time to see a dermatologist?
2      A. No, because I told her I wanted to make the
3  appointment with a dermatologist that my family members
4  had seen that I trusted. I preferred to see Dr. Gold and
5  I didn't want her to make an appointment with some other
6  doctor.
7      Q. Okay. So when was the first time you gave
8  anyone any -- at the college any reason to believe that
9  you needed to go back for medical treatment?
10     A. It was towards the end of September when I got
11 my classes, everything all scheduled and running, and the
12 courses designed on the Blackboard, which was very
13 time-consuming, that I worked day and night and weekends
14 on to get done. And when I got everything in order, that
15 my classes were situated in good order and I rescheduled
16 the B section of the English and Math as not to interrupt
17 my students, then I went to him and I talked to him about
18 my condition and that my doctor had requested that we
19 come back -- that I come back and have tests made.
20     Q. Uh-huh.
21     A. And he seemed agreeable at that time. He said
22 he didn't see any reason why I couldn't have it -- do
23 that.
24     Q. Okay. When was it that you told him?
25     A. It was toward the end of September. I don't

**Page 163**

1  remember the exact date.
2      Q. And why do you remember it was September?
3      A. Because I had gotten notice from Dr. Church's
4  office that she had scheduled appointments for me on
5  around the first part of October.
6      Q. Uh-huh. When in October?
7      A. I don't recall. I think one was the 2nd and the
8  other was the 3rd. So I called the doctor's offices, Dr.
9  Smith and Dr. Concepcion, and I called their offices and
10 told them that I couldn't possibly make it that early
11 because of my job duties and to reschedule them later
12 into the month.
13     Q. When did you have this conversation with their
14 office?
15     A. It was just prior to the -- the date of those
16 appointments that she had set. I don't remember the
17 exact date.
18     Q. How many days prior?
19     A. I have no idea how many days. I saw it -- the
20 dean the latter part of September and those dates were
21 due on the 2nd and 3rd and so it was all with -- within
22 just a few days there.
23     Q. Well, the doctor's office knew that you were in
24 Barrow, didn't they?
25     A. Yes, they did.

**Page 164**

1      Q. So they wouldn't have scheduled an appointment
2  for the next day, would they?
3      A. No. I didn't say they scheduled it for the next
4  day. I don't know when she scheduled the appointments.
5      Q. Well, didn't they give you some lead time?
6      A. I don't recall if they did or not.
7      Q. And didn't they call and ask you if that date
8  would be convenient to schedule a test since they knew
9  you were in Barrow?
10     A. I don't recall if they did or not. I don't -- I
11 don't recall. I was very busy in my work at that time.
12     Q. Uh-huh.
13     A. I had an awfully heavy load work schedule.
14     Q. And what tests were scheduled for October 1st
15 and 3rd?
16     A. There were no tests scheduled.
17     Q. Well, what was scheduled for the 1st and 3rd?
18     A. To see the specialists.
19     Q. What specialists?
20     A. Dr. Smith and Dr. Concepcion. I've already
21 answered that question.
22     Q. Well, you haven't told me what kind of
23 specialists they are.
24     A. I previously did, yes. Dr. Concepcion is a
25 urinary tract, bladder, so forth.

**Page 165**

1      Q. Uh-huh. And how about Dr. Concepcion?
2      A. That's who she was.
3      Q. Okay. How about Dr. Smith?
4      A. He's an orthopedic doctor.
5      Q. And why were you seeing an orthopedist?
6      A. Because of the -- my foot problem.
7      Q. Okay. And what was the purpose of seeing a
8  urologist?
9      A. Because of my urinary tract problem.
10     Q. Okay. So when you called the offices back and
11 said that you couldn't make those appointments, did you
12 tell the staff that --
13     A. I didn't call Dr. Church's office. I called Dr.
14 Smith and Dr. Concepcion's office and changed the
15 appointments after I made out my leave request.
16     Q. Okay. And for what date did you make the
17 appointments changed to?
18     A. They were later in October. I don't remember
19 the appointments' dates. I would have to review to
20 refresh my memory.
21     Q. And what would you review? What would you
22 review?
23     A. I would go back and -- and review appointments.
24     Q. Uh-huh. Where?
25     A. Maybe I jotted it down somewhere.

42 (Pages 162 to 165)

Midnight Sun Court Reporters *** (907) 258-7100

case No. A05-086 Civil                                                    Bobbi Wade

Page 178

1    A. I don't recall that I did.
2    Q. Okay. So you did not show him --
3    A. But I discussed it with him, yes.
4    Q. So you did not show him --
5    A. No.
6    Q. -- any documents?
7    A. No.
8    Q. And what did you tell him about Exhibit 20? You
9    said you discussed it with him.
10   A. I discussed my reasons for needing to go back to
11   Tennessee to see a doctor and to have some tests made.
12   Q. Okay. And what did you tell him your reasons
13   were?
14   A. I don't recall. They were concerning my medical
15   issues.
16   Q. And what did you tell him about your medical
17   issues?
18   A. I don't recall exactly.
19   Q. Okay. Did you tell him anything else about
20   your --
21   A. It's highly embarrassing to talk with a man
22   about your medical issues when they concern certain
23   aspects.
24   Q. Uh-huh. Did you tell him anything else about
25   your medical needs?

Page 179

1    A. No, but we discussed it and he seemed agreeable
2    that it was -- it seemed to be a working -- a working
3    idea.
4    Q. Okay. So Angie verified that you had time off?
5    A. When I went back to my office, I filled out the
6    leave request. The first person I took it to was Angie
7    and I don't recall Angie's last name. She was the
8    payroll clerk and that was the procedure. She kept the
9    record of the leave and everything.
10   Q. Uh-huh.
11   A. And she had to sign a request leave documenting
12   that -- that we had the available leave that we were
13   asking for. She signed it.
14   Q. Okay.
15   A. And then I took it in to Pam to sign it.
16   Q. Was she there when you took it in?
17   A. Yes, she was.
18   Q. Okay. And what did you say to her?
19   A. I told her that I needed to take personal leave
20   for sick -- for medical reasons. And I checked it on
21   sick leave and she took it and looked at it. And she
22   looked up at me and says, "You don't have the time, the
23   days." And I said, "Why not?" And she says, "You have
24   to earn this time. You earn the first six days in the
25   fall semester and you earn the second six days in the

Page 180

1    spring semester and this is the beginning of the fall
2    semester so you haven't earned any sick leave days."
3    Q. Uh-huh. What did you say?
4    A. I don't recall what I said, but I was
5    flabbergasted.
6    Q. Uh-huh. So what did you do then? How did you
7    leave that?
8    A. I left it with her. I asked her -- I left the
9    leave request with her.
10   Q. Did you tell her what the nature of your medical
11   leave was?
12   A. I don't recall if I did or not. Not right at
13   that particular time.
14   Q. Did you tell her it was for a serious health
15   condition?
16   MS. JOHNSON: Objection to form of the question.
17   A. I don't recall what I told her.
18   Q. Okay. Did you tell her that you were unable to
19   work?
20   A. No, I didn't tell her that.
21   Q. Okay. So what did she do with your leave
22   request?
23   A. I don't recall exactly what she did with it, if
24   she handed it back to me or if she kept it, but I
25   e-mailed her several days later inquiring about it.

Page 181

1    Q. Uh-huh.
2    A. And she instructed me to see Dr. Tuthill.
3    Q. How many days later was it?
4    A. I don't recall. Just a few days later.
5    Q. And had your appointment time come and gone in
6    the meantime?
7    A. Not the appointment time that I had changed
8    those two appointments to and the appointment with Dr.
9    Gold. I had changed those appointments to occur during
10   that ten-day time frame that I had requested leave.
11   Q. Okay. So what happened next?
12   A. After I got the e-mail from Pam, I went over to
13   see Dr. Tuthill because the time was drawing near and I
14   needed a -- a definite answer. He had been agreeable
15   with me when I talked to him before. Pam had refused to
16   sign my request for leave because she was telling me I
17   didn't have the time, the days, and so I went over to see
18   Dr. Tuthill and I walked in his office and asked him if
19   he was going to approve my leave.
20   Q. And what did he say?
21   A. He turned around and very vehemently told me,
22   no, that my duties were at the college and he could
23   not -- he would not sign my leave request.
24   Q. Uh-huh. Did he say why?
25   A. He said my duties were at the college and that

46 (Pages 178 to 181)

case No. A05-086 Civil

Bobbi Wade

Page 182

1  was all he said. So I turned around and walked out.
2     Q. Okay. And did he say anything else to you?
3     A. I don't recall that he did.
4     Q. Okay. Did --
5     A. At his tone of voice, I didn't want him to say
6  anything else to me.
7     Q. Okay. Did you have any other conversations with
8  him about your leave at that -- during that time?
9     A. Not that particular leave, no.
10    Q. Okay. So what happened next?
11    A. Sometime, I don't recall exactly when, he asked
12 me if I couldn't take the leave at Christmastime and I
13 told him it was possible that I could.
14    Q. And how did you learn about that? Did you have
15 a personal conversation with him?
16    A. Yes, it was personal conversation.
17    Q. Uh-huh. And what did he say?
18    A. What was the question?
19    Q. You said sometime he asked if you could take the
20 leave at Christmas and you said you could.
21    A. I said it was a possibility that I could.
22    Q. Okay. So this was in a meeting that you had
23 with him?
24    A. It wasn't a meeting. I just walked --
25    Q. An official meeting, right.

Page 183

1     A. It was just walking in his office and talking
2  with him.
3     Q. Okay. And when did that happen?
4     A. I don't know the exact date, but it was right
5  around the date of October the 2nd and 3rd.
6     Q. Uh-huh. Okay. Now did this second conversation
7  where he asked if you could take the leave at Christmas
8  occur after you had e-mailed Pam and she said you should
9  go ask John Tuthill ?
10    A. I don't recall at that -- I wanted a definite
11 answer from that leave request that I had submitted on
12 October the 2nd in writing and Pam wouldn't give me one.
13    Q. Okay. At the time that you had the conversation
14 with him about waiting until Christmas, did you have a
15 written response to your leave request?
16    A. No, I never got a written response to that leave
17 request.
18    Q. Okay. So what happened next?
19    A. The administrative assistant called me and asked
20 me if I could take on another class to teach.
21    Q. What was the class?
22    A. It was OT-104, Filing and Records Management or
23 either OT-107. I don't remember. It was an office
24 technology class.
25    Q. Okay. Up to this point, Ms. Wade, had you

Page 184

1  presented written certification of your need to take
2  medical leave --
3     A. Yes.
4     Q. -- to the college?
5     A. Yes.
6     Q. And what medical certification had you
7  presented?
8     A. I presented the letter here from Dr. Church and
9  I also went and -- to see the doctor in Barrow.
10    Q. And when did you present the letter from Dr.
11 Church?
12    A. I presented the letter from Dr. Church at the
13 time I presented my request for leave on October the 2nd.
14    Q. To who?
15    A. To Pam Taylor.
16    Q. Okay. You physically gave it to her?
17    A. It was with the request, yes.
18    Q. And she kept it?
19    A. I don't know if she -- no, she didn't keep it.
20 No one kept it. I have the original. I also at one time
21 showed it to Dr. Tuthill and he turned around and handed
22 it back to me.
23    Q. Uh-huh. When did you show it to Dr. Tuthill?
24    A. I think I showed it to him when I went over to
25 talk with him. I'm not sure about that because I felt

Page 185

1  like I would need verification that my request was
2  legitimate --
3     Q. Uh-huh.
4     A. -- and I wasn't just trying to get off, you
5  know, for no reason.
6     Q. Okay. When you presented the leave request, the
7  first one, when was it that you were trying to take
8  leave?
9     A. I don't recall the dates. I would have to look
10 to see, but it was in October.
11    Q. All right. And you wanted to take the leave in
12 October for the convenience of the doctors; right?
13    A. Yes.
14    Q. Okay. It wasn't something that was urgent;
15 correct?
16    A. It wasn't something I didn't know it wasn't -- I
17 didn't think it was urgent at the time. The shoulder,
18 the spot on my shoulder, I didn't know at that time it
19 was urgent, but I was very worried and concerned about
20 it --
21    Q. Uh-huh.
22    A. -- because it had become very angry and red and
23 itchy and scratchy and whatever.
24    Q. Okay. If it was angry and red, why didn't you
25 see the doctor in Barrow?

case No. A05-086 Civil                                        Bobbi Wade

---

Page 186

1    A. I did after they refused my request for leave.
2    Q. Okay. Was their refusal an unconditional
3  refusal for leave, under no circumstances would we let
4  you go before Christmas?
5    A. They didn't say whether it was unconditional or
6  not. She just refused my request for leave.
7    Q. Okay. But they didn't tell you that
8  conditionally if you present something to us, we'll let
9  you go?
10   A. When I presented it to Pam, she also told me
11 that it -- that this letter from Dr. Church wasn't
12 sufficient, that I would need more verification that I
13 really needed to leave to see the doctor.
14   Q. Uh-huh.
15   A. So that's when I went to the Barrow clinic.
16   Q. Okay. And when Pam told you that, was that the
17 first time you had learned that?
18   A. That I needed more?
19   Q. Yes.
20   A. Yes.
21   Q. Okay. And that was a surprise to you?
22   A. Yes.
23   Q. Okay. And did she say why you needed more?
24   A. She said, "This is not good enough for me."
25   Q. Did she say why?

---

Page 187

1    A. No, she didn't say why.
2    Q. Did she say what you needed?
3    A. No.
4    Q. And did you receive any notice from the college
5  about what you needed --
6    A. No.
7    Q. -- in order to make the note valid?
8    A. No.
9    Q. Now, at the time that you turned that note in,
10 it said, "I requested she return as soon as possible";
11 right?
12   A. Uh-huh.
13   Q. Sounds pretty urgent, doesn't it?
14   A. Well, at that time it was urgent to her because
15 my -- my stomach problems and my urinary tract problems
16 and my foot problems were -- they were hurting me real --
17 really bad. I was really nauseated and my stomach was
18 upset all the time.
19   Q. Okay. But a stranger reading this seeing, "I've
20 requested she return as soon as possible," I would assume
21 that meant immediately, wouldn't you?
22   A. As soon as possible, it wasn't possible for me
23 to return prior to that time.
24   Q. That's not what I'm asking, ma'am. A stranger
25 reading this note, knowing nothing and seeing "as soon as

---

Page 188

1  possible," that would mean immediately; right?
2      MS. JOHNSON: Objection, foundation.
3    A. I would have absolutely no idea what a stranger
4  would be thinking. Okay.
5    Q. You're the professor of English; right?
6    A. Yes.
7    Q. Okay. What does "as soon as possible" mean to
8  you?
9    A. As soon as possible.
10   Q. Right away; right?
11   A. No, not necessarily right away. As soon as it
12 was possible with me.
13   Q. Does it say that?
14   A. No. As soon as possible, but it wasn't possible
15 prior to that.
16   Q. It doesn't say, "I've requested she return as
17 soon as it's possible for her to do so consistent with
18 her schedule," does it?
19   A. Well, her wording is --
20     MS. JOHNSON: Objection, argumentative.
21   A. -- not good here. She's a doctor, not an
22 English instructor.
23   Q. Okay. But it does say "as soon as possible";
24 right?
25   A. Yes, it does.

---

Page 189

1    Q. And it's not qualified by "as soon as her
2  schedule permits it"; right?
3    A. No.
4    Q. So how else would one read this other than right
5  away?
6    A. I have no idea how someone else would read that.
7    Q. Okay. And you didn't present this until
8  October; right?
9    A. I presented it in late September to Dr. Tuthill.
10 I showed it to him --
11   Q. So perhaps --
12   A. -- when I went over to talk with him. --
13   Q. Perhaps --
14   A. -- I already established that fact.
15   Q. September 30th, perhaps?
16   A. No, it was before. It was like the last week in
17 September.
18   Q. Uh-huh. When?
19     MS. JOHNSON: Objection.
20   A. I don't know. I don't recall the date I went
21 over and talked with him verbally, but I do know it was
22 toward the end of September.
23   Q. Okay. So it could have been the 30th?
24   A. No, it wasn't that late.
25   Q. Okay. Well, a little while ago you told me that

---

48 (Pages 186 to 189)

EXHIBIT
Page 39 of 88

case No. A05-086 Civil

Bobbi Wade

Page 190

1  you presented this -- you went in to talk with Dr.
2  Tuthill just a couple of days before you presented your
3  leave request.
4      A. I didn't say a couple of days.
5      Q. Well, how many days was it?
6      A. I don't know. I don't recall the date I went
7  over to talk with him.
8      Q. Could it have been the same day --
9      A. I don't know.
10     Q. -- that you put your leave request in?
11     A. I just told you I don't know.
12     Q. Okay. Did many days pass between the time you
13 talked to Tuthill --
14         MS. JOHNSON: Objection.
15     A. No.
16     Q. -- and the time you presented the leave request?
17     A. No, I cannot pinpoint the date.
18     Q. Okay.
19         MS. JOHNSON: Are you okay?
20         THE WITNESS: No, I'm okay.
21         (Exhibit No. 21 marked.)
22     Q. (By Ms. Ducey) This is 21. Can you identify
23 what 21 is?
24     A. Yes.
25     Q. What is 21?

Page 191

1      A. It's the request for leave that I submitted on
2  October the 2nd.
3      Q. Okay. And this was the first leave request you
4  submitted in the fall of '03; correct?
5      A. I'm not sure of that. I might have had a leave
6  request filled out at the time I talked with Dr. Tuthill,
7  but I have no record of that, so I can't recall exactly
8  if I gave him a request for leave at that time or not.
9      Q. All right. Well, you don't know if this is the
10 very leave request that you claim that you had filled out
11 at the day you met with Dr. Tuthill, do you?
12         MS. JOHNSON: Objection to the form of the
13 question.
14     A. I didn't -- I didn't say I had this filled out
15 the day I met with him.
16     Q. Ma'am, you told me that you gave him the leave
17 request along with the note from Dr. Church and that he
18 handed them back to you.
19     A. Well, that's possible. I don't recall exactly.
20     Q. Well, what happened? Did you or didn't you?
21     A. It wasn't yesterday that it happened. I don't
22 know --
23     Q. Okay. Do you have --
24     A. -- if I gave it to him that day or if I gave it
25 to him the same day I took it to Pam on October the 2nd.

Page 192

1      Q. All right. You also told me that you left Dr.
2  Tuthill's office and went to verify with Angie that you
3  had the hours available.
4      A. I didn't say I left Dr. Tuthill's office. I
5  said I filled out the request for leave and took it to
6  Angie's office.
7      Q. Uh-huh. Okay. And she signed it, didn't she?
8      A. Because my office is clear across the campus
9  from their offices and I do not have paperwork and stuff
10 to do things like this --
11     Q. Right, but if you --
12     A. -- on the same day.
13     Q. But if you were in Dr. Tuthill's office with the
14 leave request form and left his office believing that you
15 should proceed with the process, why wouldn't you just
16 walk down to Angie and have her approve your leave?
17     A. I might have done that. I don't remember
18 exactly my steps. I can't retrace my steps.
19     Q. Uh-huh. Okay. But she --
20     A. I just remember the important things. I can't
21 remember every little minute detail.
22     Q. Okay. But she did verify that you had, it looks
23 like, 90 hours of leave available?
24     A. Yes.
25     Q. Okay. On October 2nd, '03?

Page 193

1      A. Yes.
2      Q. So no reason to even have to use personal leave;
3  right? You've got 90 hours of leave built up; right?
4      A. Well, that's what it says here.
5      Q. Uh-huh. More than a week; right?
6      A. Yes.
7      Q. Okay. So why would Pam tell you you didn't if
8  it was verified and you handed it to her?
9      A. She said it wasn't available to me, I hadn't
10 earned it.
11     Q. Uh-huh. Well, there is 90 hours right there.
12     A. But she said I hadn't earned those hours.
13     Q. Okay. Do you have evidence that you submitted a
14 leave request or even filled one out prior to October
15 2nd?
16     A. No, I don't.
17     Q. Okay.
18     A. I know that I talked with Dr. Tuthill, but I
19 don't -- I'm not sure that there was a request for leave
20 prior to this one.
21     Q. Okay. And it's dated October 2nd; correct?
22     A. Yes.
23     Q. And you're seeking to leave 18 days later;
24 right?
25     A. Yes.

case No. A05-086 Civil                                              Bobbi Wade

Page 194

1  Q. Okay. So you didn't give 30-days' notice to
2  this leave; correct?
3  A. As I recall, I had never seen that 30-day notice
4  in the -- on anything and I had never been apprised of
5  that.
6  Q. What was that?
7  A. When I saw that in that book right here, that
8  was my first recollection of ever having seen those
9  words, "30 days prior."
10  Q. Uh-huh.
11  A. That had not been previously in our handbooks.
12  Q. Uh-huh.
13  A. No one had ever mentioned it.
14  Q. Well, you did get the updates of the handbook;
15  right?
16  A. Yes, I did.
17  Q. And I think we identified the copy of the
18  handbook or the policies --
19  A. Yes, absolutely.
20  Q. -- that you said you recall receiving in '01.
21  So you had it, whether you read it or not?
22  A. But the handbook had been revised and updated
23  and re- -- redone since that time.
24  Q. I think we established that on --
25  A. Yes.

Page 195

1  Q. -- September 21st, '01 --
2  A. It was also redone in the --
3  Q. Could I finish my question?
4  A. Yeah.
5  Q. September 21st, '01, you got a copy of the
6  updated Family Medical Leave Policy and you identified it
7  earlier today.
8  A. Okay. I got that.
9  Q. So you had it before you --
10  A. I got one, but I -- I can't verify that it's
11  exactly that -- those same words --
12  Q. Okay.
13  A. -- no, there's no way.
14  Q. You had it but apparently you didn't bother to
15  read it; right?
16  MS. JOHNSON: Objection to the form of the
17  question.
18  A. I read the handbook, yes.
19  Q. Uh-huh. Okay.
20  A. I reviewed the handbook.
21  Q. All right. You read it word by word?
22  A. But I couldn't verify that those same words were
23  in the handbook at the time I read it.
24  Q. You read it word by word?
25  A. Yes -- no, not necessarily. Parts of it I did.

Page 196

1  Q. Okay. So you may not have read the Family
2  Medical Leave Policy, but you got it?
3  A. I got it, but I can't guarantee those words were
4  in it at the time I got it because it has been redone
5  since that time.
6  Q. All right. So you didn't give 30-days' notice
7  and you marked it as personal leave; right?
8  A. That was never mentioned to me. I never knew
9  that I had to give 30-days' notice and I do not believe
10  it was in the handbook at the time the handbook was
11  presented to me when I started to work.
12  Q. Well, if you say that you don't believe it, tell
13  me what the Family Medical Leave Policy said.
14  A. I have no idea of what it said because I don't
15  have a copy of it.
16  Q. Right. And because you may not have read it;
17  right?
18  A. No, I did read it.
19  Q. I asked you this morning if you read the Family
20  Medical Leave Policy and you said you couldn't recall.
21  A. I can't recall if I did. I've read the handbook
22  and I've reviewed the handbook. I've looked at items of
23  the handbook.
24  Q. Uh-huh. But, ma'am, I asked you this morning if
25  you had read the Family Medical Leave Policy in Exhibit

Page 197

1  7, the handbook, and you said you didn't recall.
2  A. Well, I don't recall reading it.
3  Q. Okay. So how do you know whether it was in
4  there or not?
5  A. Well, it's possible I don't know.
6  Q. Okay. All right. And you marked the leave
7  "personal"; right?
8  A. Yes.
9  Q. Okay. But there was a provision for family
10  medical leave; right?
11  A. There was.
12  Q. Uh-huh. There was a provision for extended
13  medical leave; right?
14  A. There was.
15  Q. Okay. And under -- in that same box where it
16  says "type of leave requested," you elected to mark
17  "personal leave"; right?
18  A. Yes, but personal leave as you noticed down
19  below includes sick leave. I was asking for sick leave,
20  not medical leave.
21  Q. Okay. And it also says family medical leave,
22  doesn't it?
23  A. Yes.
24  Q. And it says it requires a copy of a doctor's
25  verification; right?

50 (Pages 194 to 197)

EXHIBIT
Page 40 of 88

case No. A05-086 Civil

Bobbi Wade

**Page 202**

1  Dean Tuthill and to Pam Taylor. I -- Courtney and I were
2  in the same building.
3      Q. Ms. Wade --
4      A. When I filled this down -- out, I went down and
5  got Courtney to sign it and then I took it over to the
6  administration building. So I didn't give this to them
7  on the 2nd --
8      Q. Okay.
9      A. -- it was on the 3rd.
10     Q. All right. So first you got Courtney
11 Bartholomew to sign off on this form; correct?
12     A. Yeah, but he thought I asked his opinion on
13 it --
14     Q. Okay.
15     A. -- and the fact that he thought it was a good,
16 workable schedule.
17     Q. Okay. Then you took it to Dr. Tuthill with the
18 letter you say -- the letter from Dr. Church?
19     A. Yes.
20     Q. And you advised Dr. Tuthill after you had
21 already obtained Courtney Bartholomew's signature that
22 you needed leave and you would like to have this course
23 change approved; correct?
24     A. I don't understand your question.
25     Q. After you obtained Courtney Bartholomew's

**Page 203**

1  signature, that's when you went to Dr. Tuthill for the
2  first time, gave him this change form marked 22, gave him
3  Number 21, which is the letter from Dr. Church, said,
4  "Look, I've got appointments scheduled and I would like
5  you to approve this leave." Correct?
6      A. I'm not sure.
7      Q. Uh-huh.
8      A. Because you're asking me a lot of questions
9  there and then you want me to verify that all of them --
10     Q. What I want to know --
11     A. -- are correct and I can't do that --
12     Q. -- is which came first, the signature by
13 Courtney Bartholomew or your first notification to Dr.
14 Tuthill that you --
15     A. What I --
16     Q. May I finish? Or your first notification to
17 Tuthill where you said that you went into his office, you
18 gave him the change course form, you told him you had
19 medical appointments, and you claim you showed him the
20 letter from Dr. Church?
21     MS. JOHNSON: Objection to form of the question
22     Q. Which came first, the signature by Bartholomew
23 or the first meeting with Tuthill?
24     A. The first meeting with Tuthill was in September,
25 late September. It was a verbal meeting.

**Page 204**

1      Q. Uh-huh.
2      A. There was no paper presentations, but I had this
3  in my hand --
4      Q. Uh-huh.
5      A. -- when I talked with him.
6      Q. Okay. So now you're sure --
7      A. And I showed it to him --
8      Q. Okay.
9      A. -- but he wouldn't take it and look at it.
10     Q. All right. So you're certain that the first
11 notice to Dr. Tuthill, there was no presentation of any
12 paperwork?
13     A. No, except this.
14     Q. Well, was there or wasn't there?
15     A. I didn't give it to him because he wouldn't take
16 it.
17     Q. But you told me that at the time you handed him
18 Exhibit 21, you had the change course form --
19     A. And I have also told you --
20     Q. May I finish? You had the letter from Dr.
21 Church, you presented them both to him. He looked at
22 them and he gave them back to you. When did that meeting
23 occur?
24     A. I don't know.
25     MS. DUCEY: Okay. Would this be an appropriate

**Page 205**

1  time for a break?
2      THE VIDEOGRAPHER: Going off record. The time
3  is 3:10.
4      (Recess taken.)
5      THE VIDEOGRAPHER: Okay. We're back on the
6  record. The time is 3:27.
7      MS. DUCEY: I just want to clear up.
8  Mr. Gamache brought to my attention that 22 is actually
9  the course change form for Business Math and if there was
10 any misstatement, I just want to make sure that exhibit
11 is identified clearly.
12     MS. JOHNSON: 22 is, because I have 22 as
13 English?
14     MR. GAMACHE: Yeah, it's --
15     MS. DUCEY: Well, we may have misstated it, so
16 could you -- could you just write over that --
17     MS. JOHNSON: Yeah.
18     MS. DUCEY: -- and put 22? Sorry about that.
19 Okay.
20     MS. JOHNSON: Which one is this?
21     MS. DUCEY: So this one is 23 and it should be
22 Business Math -- no, it should be Business English;
23 right?
24     MS. JOHNSON: Yes.
25     THE WITNESS: This one is Business Math.

Page 206

1    MR. GAMACHE: That's where we got mixed up.
2    MS. DUCEY: It's totally my fault. I'm trying
3  to confuse Jonathan.
4    MR. CLEMENT: This is 22.
5    MS. DUCEY: Now that should be Business English;
6  okay? So we're going to just cross that out.
7    MS. JOHNSON: 22 is English and --
8    MS. DUCEY: Make that --
9    MS. JOHNSON: -- 23 is Math?
10    MS. DUCEY: Yeah.
11    MS. JOHNSON: So --
12    MS. DUCEY: No, no, no. 22 is Math and 23 is
13  English.
14    MS. JOHNSON: Yeah, I just said them backwards.
15    MS. DUCEY: Okay. So I'll give that back to
16  you.
17      (Exhibit No. 23 marked.)
18    Q. (By Ms. Ducey) 23, can you identify that?
19    MR. GAMACHE: And I'm missing 22 if you can make
20  me a copy. All I have is 23 here.
21    MS. JOHNSON: Did you say English?
22    MR. GAMACHE: I'm sorry --
23    MS. DUCEY: Can I give you my marked-up 22?
24    MS. JOHNSON: We've got it now. This is
25  perfect.

Page 207

1    MR. GAMACHE: This is 22?
2    MR. CLEMENT: Yes.
3    Q. (By Ms. Ducey) Okay. Is that the course change
4  form that you filled out for the Business English, Ms.
5  Wade?
6    A. It appears to be.
7    Q. All right. And it has Courtney Bartholomew's
8  signature; correct?
9    A. Yes.
10    Q. And that's on October 3rd; right?
11    A. Yes.
12    Q. All right. What was the reason on both of these
13  forms that you listed for changing the course?
14    A. Okay. The reason is to accommodate the
15  convenience of students who need both modules B and C.
16    Q. That's the reason you listed on Business Math;
17  right?
18    A. Okay. And on -- on the other one, I just said
19  to accommodate student needs --
20    Q. Okay.
21    A. -- and it was the same for both Business B and
22  C --
23    Q. All right. With respect to Exhibit 23, Business
24  English module B, how did changing the course dates and
25  times accommodate student needs?

Page 208

1    A. Because it would give them the opportunity
2  for -- to continue the classes and to get both courses in
3  B and C.
4    Q. Uh-huh. But it would -- but it would more
5  accommodate your medical appointments, wouldn't it?
6    A. Yes, uh-huh.
7    Q. Okay. Did you put that there?
8    A. Well, I didn't put down all the intention
9  there --
10    Q. Uh-huh.
11    A. -- because it would have been to accommodate the
12  students' needs who need -- needs of students who need
13  both Modules B and C in my absence or something like
14  that. I should have added "in my absence."
15    Q. Well, no one could take B and C simultaneously;
16  right?
17    A. At the same time?
18    Q. Uh-huh.
19    A. No.
20    Q. But that's what your proposed course change did;
21  right?
22    A. Okay. This one -- this one is at the same time
23  they were taking B, they would take -- I had the class
24  listed, class meeting to begin to -- at 12:00 to 1:30 and
25  that would be Module B. So that would begin one class at

Page 209

1  12:30 to one -- 1:30 and then Module C would be taught
2  from 1:30 to 3:00.
3    Q. And so Modules B and C would be running on the
4  same dates; correct?
5    A. Yes.
6    Q. Simultaneously?
7    A. Let me look at the dates. Let me have just a
8  minute here to refresh my memory of exactly what I did
9  here. Change to 11/6 to 12/16. Change meeting date from
10  10/06 to 11/4 to 11/6. That would have been shortly
11  after I returned October the 31st and then I could pick
12  up both classes. That would be stacked piggyback or
13  whatever you might want to call it and teach both
14  classes. Teach one at 12:30 -- from 12:00 to 1:30 and
15  then the other one from -- that would just be B. And
16  then the other one would be taught from 1:30 to 3:30 at
17  the regular time. But, yes, they would have been stacked
18  at that time.
19    Q. Okay. So B and C would be running on the same
20  dates just at different times of day?
21    A. Yes, uh-huh.
22    Q. And the requirement, I think we established, was
23  that a student had to successfully complete the first
24  module before they could even enroll in the second
25  module; right?

case No. A05-086 Civil                                    Bobbi Wade

Page 210

1    A. Yes.
2    Q. Okay. And you also changed the meeting time;
3 right?
4    A. The meeting time?
5    Q. Uh-huh.
6    A. Yes.
7    Q. You changed it from being 1:30 to 3:00 and in
8 the new scenario --
9    A. Okay.
10    Q. -- it was from 12:00 to 1:30; right?
11    A. Let me take a look at the Business Math.
12    Q. I'm just looking at Business English first. Why
13 don't we just do one at a time?
14    A. But they coincided. Okay. So I see what I did
15 was the same for both classes. And I had talked with my
16 students and -- and asked everyone if this schedule would
17 conflict with any other courses that they were taking.
18 And all of them, we checked to see that they wouldn't --
19 it wouldn't conflict -- there wouldn't be a conflict.
20    Q. Okay. Well, how would running B and C
21 simultaneously accommodate student needs?
22    A. It would give them a chance to complete their
23 classes to get credit for both classes before the end of
24 the semester.
25    Q. But it violated the policy which was that one

Page 211

1 module could not -- the second module couldn't be taken
2 until the first was successfully completed; right?
3    A. There was no written policy. Some teachers
4 prior to me had taught all three modules and let the
5 students progress at their own pace.
6    Q. Uh-huh.
7    A. There was no written instructions as to how
8 these three modules should be taught.
9    Q. But at the time you were teaching it, clearly
10 the practice was to require A to be successfully
11 completed before one could enroll in B, and B must be
12 successfully completed before one could enroll in C;
13 right?
14    A. Yes, but it was my policy.
15    Q. Okay. Well, it was a policy that --
16    A. It wasn't the policy of the school.
17    Q. It was a policy that was well-known to the
18 school and was adopted by the school, wasn't it?
19    A. I don't think it was well-known and it wasn't
20 adopted, no.
21    Q. Well, Dr. Tuthill knew about it.
22    A. Well, he knew about it, about the Modules A, B
23 and C, but he didn't know them -- about them until a
24 later date.
25    Q. And the information that was in Business English

Page 212

1 B was to build on the information that you learned in
2 Business English A; correct?
3    A. Possibly, at times, yes.
4    Q. So the material was more complex; correct?
5    A. It was possible.
6    Q. And one had to have that foundation before one
7 could successfully complete Module B; right?
8    A. The three modules were taught in sequence, yes.
9    Q. Okay. And, likewise, for Business Math, you put
10 as the reason to accommodate the convenience of the
11 students who need both Modules B and C, how would it
12 acnomodate [sic] -- accommodate the convenience of the
13 students to run B and C simultaneously?
14    A. Well, there were some students who did not need
15 B and C. There were some students who did not need C,
16 they only needed A and B, and there were students at
17 different levels and -- and there were students who did
18 not need certain modules.
19    Q. Uh-huh. But for the students that needed that
20 sequence, A, B, and C --
21    A. That would give them the chance to finish both
22 modules.
23    Q. But it wouldn't give them the opportunity to
24 learn the simpler information before they had to absorb
25 the more complex information, would it?

Page 213

1    A. Well, as their instructor, I had set the
2 classes, that Module B comes just prior to Module C in
3 the course of the day here.
4    Q. The registrar had been informed that students
5 were not to be permitted to enroll in the succeeding
6 modules --
7    A. Who informed them?
8    Q. -- until they -- until they successfully passed
9 the first module; isn't that true?
10    MS. JOHNSON: Objection, foundation.
11    A. I don't know.
12    Q. Okay. But the real reason that you put on
13 Business Math, Exhibit 22, was to accommodate the
14 convenience of the students, was that so you could make
15 your medical appointments; right?
16    A. Not necessarily.
17    Q. But that was the primary reason, wasn't it?
18    A. I don't know if it was the primary reason or
19 not. I really --
20    Q. Why else would --
21    A. I was really --
22    Q. Why else would --
23    A. I was really --
24    MS. JOHNSON: Let her answer, please.
25    A. I was really worried about my students and their

54 (Pages 210 to 213)

EXHIBIT
Page ___ of ___

case No. A05-086 Civil                                                          Bobbi Wade

Page 226

1  classes -- that class, they were my advisees and there
2  was no one else to teach that class and it was either
3  they had to drop it -- and I don't recall if any of them
4  needed that class to finish a certification or whatever,
5  but it was imperative, it seemed by Dr. Tuthill, that
6  that class be taught and he just really impressed upon me
7  that I -- I needed to teach that class. So I agreed to
8  teach it, but -- and my load was already very, very
9  heavy --
10    Q. Uh-huh.
11    A. -- my teaching schedule.
12    Q. So you felt under pressure to accept that
13  teaching responsibility?
14    A. I did. I did, because he pressured me to -- to
15  accept that responsibility.
16    Q. Okay. And what class was it?
17    A. It was an Office Technology class. It was
18  Filing and -- Filing and Records Management, I believe,
19  I -- but I'm not sure about that.
20    Q. Okay. And when you talked to him, did you have
21  any communication by e-mail about that?
22    A. There was some, yes.
23    Q. Uh-huh. And did he mention the leave again?
24    A. I -- I don't recall. I would have to refresh my
25  memory by rereading the e-mail.

Page 227

1    Q. Okay. All right. So what happened next?
2    A. I took the class and I taught it.
3    Q. Uh-huh.
4    A. And in the meantime, I went to see the doctor in
5  Barrow about the spot on my shoulder --
6    Q. Uh-huh.
7    A. -- because it was continuing to really be
8  aggravating and, of course, I was really concerned about
9  what it might be. So she suggested that she cut it off
10  so I let her cut it off.
11    Q. Uh-huh. Then what happened?
12    A. She sent it to a lab in Anchorage to be tested.
13    Q. Uh-huh. Then what happened?
14    A. She called me at work one day and told me the
15  spot was malignant.
16    Q. Uh-huh. And what else did she say?
17    A. She said, "You need to immediately have a moles
18  procedure."
19    Q. What was that?
20    A. It's to have the -- more skin cut out around the
21  spot and to have it tested to see if all the cancer cells
22  are gone, if she cut out all the cancer cells.
23    Q. Uh-huh.
24    A. And I'm not a doctor, I can't verify that and I
25  don't know, you know, exactly what a moles procedure is.

Page 228

1  but I was basically given that idea of what a moles
2  procedure was.
3    Q. Okay.
4    A. She also informed me that there was no one in
5  Barrow that could do that. She says there's no one in
6  Anchorage that can do that. In fact, there is no one in
7  the whole state of Alaska that can -- that's certified to
8  do that.
9    Q. Uh-huh. And who was this that told you this?
10    A. Dr. Snyder at the Barrow Medical Clinic. She's
11  the doctor who cut it off.
12    Q. Okay. And when did she tell you this?
13    A. I don't recall the date she cut it off, but it
14  was -- she had to have time to send it to the lab to be
15  tested. It was four or five days later --
16    Q. Okay.
17    A. -- and I don't recall what the dates were.
18    Q. Okay. So when you learned about this then, what
19  did you do?
20    A. I made out another request --
21    Q. Uh-huh.
22    A. -- for leave.
23    Q. For what days?
24    A. I don't recall. I don't have it in front of me.
25  I would have to look at it to know the exact dates.

Page 229

1    Q. Okay. When you made out a leave request, did
2  you have the moles procedure scheduled?
3    A. Did I have it scheduled?
4    Q. Yes.
5    A. No.
6    Q. Well, how did you know when you would go then?
7    A. Because I had to make an appointment with Dr.
8  Church and she would schedule an appointment with the
9  doctor that could do the moles procedure.
10    Q. Why didn't you just call the dermatologist or
11  the surgeon directly?
12    A. I didn't know the doctors that could do -- that
13  was certified to do a moles procedure.
14    Q. Uh-huh.
15    A. I -- I'm not a medical person.
16    Q. Uh-huh. Did you call Dr. Church and leave a
17  message?
18    A. No.
19    Q. Why not?
20    A. I called Dr. Church and -- and set up an
21  appointment with her, to see her.
22    Q. Uh-huh.
23    A. And she gave me the appointment and then I
24  arranged my schedule to coincide with her appointment.
25  When I got to Nashville and saw Dr. Church, then she

58 (Pages 226 to 229)

case No. A05-086 Civil                                                      Bobbi Wade

Page 230

1    scheduled an appointment with Dr. DeLozier, who was a
2    certified medical doctor that could do the moles
3    procedure.
4        Q. Okay. When was your appointment with Dr.
5    Church?
6        A. I don't recall. I would have to look.
7        Q. What month was it in?
8        A. It was in November.
9        Q. Uh-huh.
10       A. It was to coincide with my leave request and I
11   don't have that leave request in front of me.
12       Q. And when did you make the appointment with Dr.
13   Church?
14       A. I don't know. After Dr. Snyder called me and
15   told me I needed the moles procedure and no one in the
16   state of Alaska was certified to do that.
17       Q. Okay. Did you do it the same day?
18       A. I don't know.
19       Q. Days later?
20       A. I don't know.
21       Q. No idea?
22       A. I don't recall. I don't recall. It was within
23   that time span.
24       Q. Well, what time span are we talking about?
25       A. That I made out the request for leave.

Page 231

1        Q. Well, what time span is that?
2        MS. JOHNSON: Objection, asked and answered.
3        A. It was the first part of November.
4        Q. Okay. You went in --
5        A. All the dates coincided --
6        Q. Uh-huh.
7        A. -- to the events that were happening --
8        Q. Uh-huh.
9        A. -- but I don't know what those dates were.
10       Q. Okay. And what did you do with the leave
11   request?
12       A. I took it to Pam.
13       Q. Okay. And?
14       A. I told -- and I took the note from Dr. Snyder.
15   I first took the leave request to Dr. Tuthill and the
16   note from Dr. Snyder.
17       Q. Uh-huh.
18       A. And he says, "Well, it seems to me that urgent"
19   -- that's what she said, it was urgent that I see another
20   doctor --
21       Q. Uh-huh.
22       A. -- "It certainly seems to me that urgent means
23   you need to leave."
24       Q. Uh-huh. What else did he say?
25       A. I don't recall, but I know he said that.

Page 232

1        Q. Okay. So what did you do?
2        A. He signed it and I took it to Pam and got all
3    the appropriate people to sign it. And I don't have the
4    leave request in front of me, so I would need it to
5    remember the dates and times and so forth.
6        Q. Okay. So as soon as you presented a doctor's
7    note that was recent, not 45 days old, that said,
8    "urgent," you got the leave approved; is that right?
9        MS. JOHNSON: Objection to the form of the
10   question.
11       Q. Is that right?
12       A. At that time, yes.
13       Q. Okay. There was no delay?
14       A. No. But I also told Dr. Tuthill what the
15   problem was. It wasn't just the note. It was my verbal
16   conversation with him that I told him that the spot on my
17   shoulder was malignant.
18       Q. Uh-huh. Did you tell him that when you
19   submitted the leave request?
20       A. Here? I don't know if it was at the same time
21   or not, but I told him that. I also told Pam. I also
22   showed her the spot on my shoulder.
23       Q. Uh-huh.
24       A. She saw it.
25       Q. When did she see it?

Page 233

1        A. I don't recall when she saw it.
2        Q. Where was she when she saw it?
3        A. In her office.
4        Q. Was anybody else there?
5        A. No. I wouldn't have pulled my blouse apart if
6    anybody else had been there.
7        Q. So did you show Dr. Tuthill the spot on your
8    shoulder --
9        A. Absolutely not.
10       Q. -- at the same time you gave him -- or did you
11   tell him about the spot on your shoulder the same time
12   you gave him the note from Dr. Snyder?
13       A. I told him, yes.
14       Q. Okay.
15       A. I told him that the spot I had been complaining
16   about, that I was concerned about, came back malignant.
17       Q. Okay. Was there any further delay in getting
18   you the time off that you needed to go to Tennessee?
19       A. No.
20       Q. And how soon did you leave?
21       A. As soon as I could make arrangements to leave
22   because I wasn't anticipating leaving in November and it
23   takes time to get plane tickets and make preparations and
24   to reschedule my two classes.
25       Q. And how long were you gone?

EXHIBIT
Page 15 of 28

case No. A05-086 Civil                                              Bobbi Wade

Page 234

1     A. I don't see the dates so I can't tell you
2  exactly. I returned on December the 1st, but I don't
3  recall the date I left.
4         (Exhibit No. 24 marked.)
5     Q. This is 24. Can you take a look at that and
6  tell me if you can identify what that is.
7     A. This was way back the first of October.
8     Q. Could you look at the bottom e-mail and is that
9  an e-mail that you received from John Tuthill on October
10 3rd?
11    A. Yes, it is. It seems to be.
12    Q. Okay. And you recall receiving this?
13    A. Yes.
14    Q. Okay. And it says, "Here's my understanding of
15 where we stand after all our conversations this week";
16 correct?
17    A. Yes.
18    Q. "My understanding is you'll begin teaching
19 Business English B and Business Math B next week as
20 originally scheduled and that you will notify the
21 students in advance so they'll know to come." Did you do
22 that?
23    A. Yes.
24    Q. Okay. So this was after you got the course
25 approval change signed by Courtney Bartholomew; right?

Page 235

1     A. Yes.
2     Q. Okay. "And my understanding further is that you
3  will consult with your physicians here and in Tennessee
4  to determine if they feel you require immediate medical
5  treatment and depending on what they say, you may prepare
6  a medical leave request so that you can receive any
7  required treatment during the semester." Right?
8     A. I remember getting this.
9     Q. Okay. That's what it says; right?
10    A. Yes.
11    Q. And you got it October 3rd; right?
12    A. That's what the date says.
13    Q. Okay. And it says, "If my understanding is
14 incorrect, please tell me your understanding as soon as
15 you can." Right?
16    A. Yes.
17    Q. Okay. And when did this occur in the scheme of
18 things that you've just related?
19    A. When did this letter occur?
20    Q. Yeah. When did you receive this e-mail?
21    A. Well, apparently I sent a -- according to the
22 date, I received it on October the 3rd.
23    Q. Uh-huh. And when is that in relation to all of
24 the discussions you've had with Dr. Tuthill and Courtney
25 Bartholomew and Pam Taylor and Angie?

Page 236

1     A. This was after all those discussions.
2     Q. After all what discussions?
3     A. All the discussions we've been talking about
4  concerning my leave.
5     Q. Okay. So this is the last thing that happened?
6     A. I don't recall if this is the last thing that
7  happened or not.
8     Q. Uh-huh. You said it was after all --
9     A. And I was puzzled as to why he would write me a
10 note of this matter.
11    Q. Why are you puzzled?
12    A. I was puzzled at the time as to why he would
13 write a note such as this one to me.
14    Q. Well, what would be wrong with it?
15    A. Because he said, "It's my understanding that you
16 will begin teaching Business English B and Business
17 English B and Math -- Business Math B." It was his
18 understanding after he told me that I would have to do
19 it, that I -- he would not approve this leave. I had no
20 choice.
21    Q. Uh-huh.
22    A. It wasn't an understanding. It was a request --
23    Q. Uh-huh.
24    A. -- that I returned to my classes --
25    Q. Uh-huh.

Page 237

1     A. -- and the word "understanding" is misleading.
2     Q. Uh-huh.
3     A. It was a demand that I return to my classes.
4     Q. Did he use that word, "I demand that you return
5  to your classes"?
6     A. He might not have used "demand," but he strongly
7  told me that you will -- that he would not grant me this
8  request to leave.
9     Q. Uh-huh.
10    A. And that, therefore, the class change -- he
11 would not grant me the request for class change.
12    Q. Well, then he must have had an immediate change of
13 plan; right?
14    A. Well, he must have had something to say, "It is
15 my understanding." That's what I couldn't -- I couldn't
16 understand is why he would use the terminology
17 "understand."
18    Q. Well, he must have had a pretty dramatic
19 turnaround from what you claim he said in the
20 conversation because he said, "I understand you're going
21 to consult with your physicians to see if" --
22    A. Well, he was very --
23    Q. Could I finish? Because he says in the e-mail,
24 "I understand that you're going to consult with your
25 physicians and determine if they feel you require

60 (Pages 234 to 237)

EXHIBIT
Page 46 of 88

case No. A05-086 Civil                                                    Bobbi Wade

Page 246

1    MS. JOHNSON: Objection, argumentative.
2    A. -- he already had something from a doctor.
3    Q. That was more than 30 days old; right?
4    MS. JOHNSON: Objection, asked and answered.
5    A. Is there any rule that says it had to be less
6    than 30 days old?
7    Q. Well, Ms. Wade, I don't know about you, but
8    immediate means right away, without further delay,
9    without any time intervening, that this is a crisis. And
10   if I'm presented with a note that's 30 days later that
11   says "as soon as possible," it's hard for me to give it
12   much credit.
13   MS. JOHNSON: Objection to form, argumentative
14   Q. And did that never occur to you?
15   MS. JOHNSON: Same objection.
16   Q. That if you held on to this note that says "as
17   soon as possible" and presented it only when you thought
18   it was worth your while to, that it would be hard to give
19   it credit, hard to understand how it can be as soon as
20   possible if it's presented -- actually, it's almost 6 --
21   A. I did what I thought was best.
22   Q. It's almost -- it was almost 60 days later,
23   wasn't it?
24   A. Not before Dr. Tuthill saw it. He saw it in
25   September.

Page 247

1    Q. Okay. Well, 30 days later. Late September.
2    August 7th, to what you said was at least the last day --
3    the last week of September. Late September is what you
4    said repeatedly; right?
5    A. Late September, yes.
6    Q. Okay. And let's see, 31 days in August; right?
7    A. Uh-huh.
8    Q. So that's 24 days that passed. And then if we
9    assume that we had at least until the 20th, right, you
10   did say late September?
11   A. Yes.
12   Q. And we're talking 47 days?
13   A. Yes.
14   Q. Does that sound like an emergency, waiting 47
15   days?
16   A. I don't think anyone ever called it an
17   emergency.
18   Q. Does it sound like it's urgent?
19   A. Yes. It -- it sounds like it's necessary.
20   Q. Okay. Well, it's necessary to be done as soon
21   as possible if it's presented 47 days later or more?
22   MS. JOHNSON: Objection, argumentative.
23   A. I did what I thought was best concerning my
24   classes. I had to think of my job and my classes. And
25   to accommodate my job and my classes and the doctor's

Page 248

1    request, I did the best that I knew how. I was very
2    concerned about my classes and my students.
3    MS. DUCEY: Did I give you three, Jonathan?
4    MR. CLEMENT: No, just one.
5    (Exhibit No. 25 marked.)
6    MS. DUCEY: So 25?
7    MR. CLEMENT: Yes.
8    Q. (By Ms. Ducey) Can you identify what that is?
9    A. Yes, and I was very confused as to why he wrote
10   this note to me.
11   Q. Uh-huh. Why were you confused?
12   A. Because he had already asked me to take -- to
13   teach another class --
14   Q. Uh-huh.
15   A. -- and I had taken that class.
16   Q. Uh-huh. Well, you hadn't taken it as of October
17   9th, had you?
18   A. I -- I don't know. I don't remember the date,
19   but the class was mentioned previous to the class
20   beginning.
21   Q. Uh-huh. So did you send him any e-mails between
22   October 6th, which is Exhibit 24, and October 9th?
23   A. I don't recall. I might have.
24   Q. Okay. Did he send you any e-mails?
25   A. I don't recall.

Page 249

1    Q. All right. And what does he say on October 9th?
2    A. "If you are planning to take medical leave later
3    this month, I need a written notification from a licensed
4    physician, preferably by fax and as soon as possible, to
5    the effect that your medical treatment cannot wait until
6    the December break when you could have the treatment
7    without conflict with your regular teaching duties. As
8    soon as I have received such notification, I can begin to
9    process the request for a medical leave."
10   Q. And what did you do in response to receiving
11   this?
12   A. I don't recall. I really don't recall getting
13   this -- this letter and if I did, it would have been very
14   confusing as to why he would have sent this letter to
15   me --
16   Q. Uh-huh.
17   A. -- when he had denied my request and I already
18   had a doctor's note.
19   (Exhibit Nos. 26 & 27 marked.)
20   Q. Can you identify what 26 is?
21   A. Yes.
22   Q. And what is 26?
23   A. It seems I responded to his note.
24   Q. Okay. On the same day; right?
25   A. Yes.

EXHIBIT
Page ___ of ___

case No. A05-086 Civil                                              Bobbi Wade

Page 250

1    Q. Less than an hour later?
2    A. He wrote the letter at 12:39 and I responded at
3  1:02.
4    Q. Okay. And what did you say?
5    A. "I turned in that request in to Pam the day
6  before yesterday. She attached a statement from my
7  doctor's" --
8    Q. No, it says, "I attached a statement."
9    A. "I attached a statement from my doctor in
10  Tennessee and then I went to the doctor here in Barrow on
11  Monday evening and she reinforced the opinion by written
12  note which I feel is sufficient for obtaining leave."
13    Q. Uh-huh. Can I stop you right there?
14    A. Sure.
15    Q. It says that you attached a statement from my
16  doctor in Tennessee to the leave request that you turned
17  in to Pam the day before yesterday. So the day before
18  yesterday would have been October 7th; right?
19    A. Yes.
20    Q. Okay. And the statement from your doctor in
21  Tennessee, the only one that you had was the statement
22  from Dr. Church; right?
23    A. Right.
24    Q. Okay. So does that refresh your recollection
25  about the first time you presented that note to Pam?

Page 251

1    A. That wasn't the first time.
2    Q. Uh-huh.
3    A. That was after I presented that note from Dr.
4  Church several times.
5    Q. Uh-huh. When -- when did you present it? You
6  said "several times."
7    A. I don't know, but I know it was with this first
8  request for leave on October the 7th -- the 2nd.
9    Q. Was it physically attached?
10    A. I don't recall.
11    Q. Did she keep it?
12    A. I don't recall if she kept it or not.
13    Q. Well, why would you attach it again if it wasn't
14  kept by Ms. Taylor?
15    A. I'm a very efficient person. I always make sure
16  everything is attached to anything, any documents that
17  need to be attached. I didn't want to just present the
18  one from Barrow. I wanted to present both of them again.
19    Q. Uh-huh.
20    A. When I got the one from Barrow, I attached it to
21  the one from Tennessee and I felt that was sufficient for
22  obtaining leave.
23    Q. Okay. And so go on. Pick up with "but since I
24  can't."
25    A. "But since I can't change the schedule on

Page 252

1  Modules B and -- for Business Math and Business English,
2  that's because John wouldn't let me change them, I really
3  don't want to leave my students at this point. They are
4  good classes and I don't want to upset them in any way.
5  My medical problems needs attention as soon as possible,
6  but it is not a matter of life or death. So leaving
7  everything until the holidays looks like the most
8  feasible thing right now. Thanks."
9    Q. Okay.
10    A. And that is exactly true. It did look like the
11  most feasible thing because I had no idea that the spot
12  that I was worrying about on my shoulder was malignant.
13    Q. Okay. So at that point you indicated that you
14  did not intend to try and take medical leave before the
15  end of the semester?
16    A. At that point, but I did turn in a request to --
17  to take medical leave in December at the end of the
18  semester, yes.
19    Q. Okay. And I'm talking about right then --
20    A. Yeah.
21    Q. -- as of October 9th, 2003, at 1:02, you have
22  indicated that your medical problems can wait until the
23  Christmas holidays?
24    A. Yes. Uh-huh.
25    Q. There wasn't anything urgent about them; right?

Page 253

1    A. No.
2    Q. Based on what you knew at the time?
3    A. There was something urgent, but I was totally
4  unaware.
5    Q. Nobody knew at that point?
6    A. Nobody knew.
7    Q. Okay. All right.
8    A. But I suspected.
9    Q. Okay. So you agreed to withdraw your request
10  for leave so that you could finish your course delivery;
11  right?
12    A. Right. I was trying to accommodate Dr. Tuthill.
13    Q. And you were not unable to work at that time;
14  correct?
15    A. No, I was never unable to work.
16    Q. Not incapacitated?
17    A. No.
18    Q. And everything else that Dr. Church had asked
19  you to come back for could wait until the holidays;
20  correct?
21    A. Yes. May I clarify something here?
22    Q. Sure.
23    A. I was putting my health on hold to accommodate
24  Dr. Tuthill's request.
25    Q. Which was that classes not be interrupted if

64 (Pages 250 to 253)

case No. A05-086 Civil                                    Bobbi Wade

Page 254

1  there wasn't a medically --
2      A. Right, uh-huh.
3      Q. -- required reason to do so?
4      A. Yes.
5      Q. And at that time you didn't believe there was a
6  medically-based reason?
7      A. I didn't know. It wasn't --
8      Q. Could you answer my question? As of October
9  9th, you had no reason to believe there was a
10 medically-based reason why your treatment could not wait
11 until Christmas --
12     MS. JOHNSON: Objection, asked and answered.
13     Q. -- correct?
14     A. Would you rephrase that question?
15     Q. As of October 9th, 2006 [sic], you had no reason
16 to believe that the tests and evaluations you needed
17 could not wait until Christmas?
18     A. That's not true. I did have reason to believe,
19 but I kept them to myself.
20     Q. Okay. Why --
21     A. Because of the condition of my shoulder.
22     Q. Uh-huh.
23     A. No one knew the condition of my shoulder except
24 me.
25     Q. Okay. So as of October 9th, nobody knew the

Page 255

1  condition of your shoulder?
2      A. No one else other than myself.
3      Q. Okay. And even though Dr. Tuthill asked you for
4  written certification that your treatment couldn't wait
5  until Christmas, you said nothing about the shoulder;
6  right?
7      A. I tried to tell him what my problem was and he
8  said he didn't want to hear it.
9      Q. Okay. And when?
10     A. I don't recall the date.
11     Q. So do you know for a fact whether it was prior
12 to October 9th?
13     A. It was -- I don't know if it was prior to
14 October the 9th, but it was prior to the time when I got
15 the malignancy test back.
16     Q. Uh-huh. But we don't know when that is, do we?
17     A. No, I don't recall. I was in his office and I
18 began to talk about my ailments and he said, "I don't
19 want to hear about your ailments."
20     MS. DUCEY: All right. Would you mark that next
21 one, Jonathan?
22     MR. CLEMENT: 28.
23     MS. DUCEY: Which one did we --
24     MS. JOHNSON: 27 you just talked about.
25     MR. CLEMENT: 27 was the last one.

Page 256

1      Q. (By Ms. Ducey) May I see 27 just for a minute?
2  All right. Thank you.
3      So can you identify 27?
4      A. Yes. Oh, just a minute. Yes, I can identify
5  this.
6      Q. Okay. So on October 14th you sent an e-mail to
7  Pam Taylor; correct?
8      A. Yes.
9      Q. And you referenced the October 2nd leave
10 request; right?
11     A. Yes.
12     Q. You said, "I submitted a request form to you for
13 medical leave." That's not accurate, is it?
14     A. It was a request for sick leave. I might have
15 referred to it as medical leave.
16     Q. Uh-huh. Well, you didn't. Why don't you look
17 back at it? Let's look back at --
18     A. It was with --
19     MS. DUCEY: What number is that, Jon?
20     A. -- with personal leave with sick leave included
21 in personal leave.
22     MS. DUCEY: The October 2nd request.
23     MR. CLEMENT: It would be 21.
24     MS. DUCEY: Thank you.
25     Please look back at -- that's not 21. That's

Page 257

1  the Church letter.
2      MS. JOHNSON: Exhibit 21 is the request for
3  leave.
4      MS. DUCEY: Oh, okay.
5      Q. (By Ms. Ducey) Look back at 21 for a minute.
6  And on the face of this document is there anywhere where
7  you made a request for medical leave?
8      A. I made a request for personal, which included
9  sick leave and to me sick and medical is the same thing.
10     Q. Is there anywhere on the face of this document
11 where you marked anything that would give someone reason
12 to believe that medical leave was sought?
13     A. Not on here, not medical leave, but to me
14 medical and sick was the same thing.
15     Q. Okay. Is there anywhere that it says "sick
16 leave" that's marked?
17     A. No.
18     Q. It's marked "personal leave," isn't it?
19     A. But sick leave is included in that and I told
20 him --
21     MS. DUCEY: The record should reflect that
22 Ms. Johnson is coaching the witness. Please put the
23 exhibit away from her.
24     MS. JOHNSON: I'm sorry. I was just holding it
25 out so she could look at it.

case No. A05-086 Civil

Bobbi Wade

Page 258

1     MS. DUCEY: Well, if you want to cross-examine
2  her --
3     MS. JOHNSON: It's not -- it was not a coach.
4     MS. DUCEY: All right.
5     MS. JOHNSON: Do you want to look at your own?
6     THE WITNESS: Yes, I do.
7     MS. JOHNSON: That's fine. Look at Number 21.
8  She objected to --
9     A. I know what's on there and I know that sick
10  leave is listed under personal leave.
11     Q. (By Ms. Ducey) Uh-huh. All right. And you
12  said that you "had no response advising of the status of
13  the request. Could you please update me." Right?
14     A. Yes.
15     Q. Okay. And she wrote you back the same day;
16  right?
17     A. Yes.
18     Q. And she said, "It's my understanding from John,
19  you and he had directly communicated last week regarding
20  your leave request and you decided to wait until the
21  semester's classes were completed before going off slope.
22  As the supervisor's signature is always necessary before
23  leave request can be forwarded to H.R., please continue
24  to contact John -- to first contact John directly should
25  your situation change." Correct?

Page 259

1     A. Yes.
2     Q. Okay. And you had withdrawn the request for
3  leave; right?
4     A. I had not withdrawn it, no.
5     Q. Maybe I misunderstood. Exhibit 24 -- I'm sorry,
6  Exhibit 26. "My medical problem needs attention as soon
7  as possible, but it's not a matter of life and death so
8  leaving everything until the holiday looks like the most
9  feasible thing right now." --
10     A. Okay.
11     Q. -- Right?
12     A. That was agreeing to wait, but it was not
13  withdrawing my request. That's --
14     Q. Well --
15     A. -- that's two different things.
16     Q. -- could you look at 26 again? And what is the
17  subject of this e-mail?
18     A. From whom, John or --
19     Q. From John Tuthill.
20     A. From me to John Tuthill. "I turned that request
21  in to Pam. I don't" --
22     Q. What is the subject line of the e-mail --
23     A. I really don't --
24     Q. -- is what my question was?
25     A. The subject of the e-mail is my taking leave.

Page 260

1     Q. What -- what does it say, ma'am?
2     A. It says, "John, I turned that request in."
3     Q. Could you please identify the subject of the
4  e-mail?
5     MS. JOHNSON: I --
6     Q. The subject line says "Re"?
7     A. "Medical leave request."
8     Q. And in that e-mail you said, "leaving everything
9  until the holidays looks like the most feasible thing
10  right now," referenced your medical leave request;
11  correct?
12     A. Yes. Which to me was the same thing as sick
13  leave.
14     Q. So you withdraw it as of --
15     A. That's not a withdrawal.
16     Q. Well, what is it, ma'am?
17     A. I never said I was withdrawing my request.
18     Q. Well, maybe it's --
19     A. I was just going along with his idea and
20  agreeing that it -- it would be better for me to wait
21  until the Christmas holidays because he would not let me
22  change my class schedule.
23     Q. So you agreed to delay it?
24     A. I agreed to delay it, yes.
25     Q. All right. So, then, the medical leave request

Page 261

1  that was dated October 2nd, and asked for leave beginning
2  October 6th, didn't need to be acted on, did it? It was
3  moot.
4     A. But I wanted a -- an official -- a written
5  notice that my request was turned down.
6     Q. Why?
7     A. Because I've always wanted a written response to
8  my requests.
9     Q. But it was moot, wasn't it?
10     A. It apparently -- apparently so. I just wanted
11  to know what Pam -- the decision Pam had made.
12     Q. Okay. Did you explain that even though you had
13  withdrawn your request --
14     A. John and I talked about my waiting until
15  December to see the doctor.
16     Q. Okay. You can see why Pam might be confused
17  though; right?
18     A. Yes, I can see.
19     Q. She's been told that you've agreed to wait until
20  Christmas and the request is moot and now you're asking
21  for action on it; right?
22     A. I wanted to know what her status was.
23     Q. So to clear up the confusion, she said, "Why
24  don't you ask your supervisor if there's been some
25  misunderstanding first before I wade into this?"

case No. A05-086 Civil                                                    Bobbi Wade

Page 262

1    A. Yes.
2    Q. Is that unreasonable?
3    A. No.
4    MS. JOHNSON: What time is it?
5    THE WITNESS: It's twenty to 5:00.
6    MS. JOHNSON: How long are you going to go
7 today, do you know?
8    MS. DUCEY: As long as you want to go. I mean,
9 I think we can make a little more progress today.
10    MS. JOHNSON: Okay. Just want to make sure
11 you're going to continue. I may have to take a break to
12 make a phone call.
13    MS. DUCEY: Why don't we do that right now?
14    THE VIDEOGRAPHER: Going off record. The time
15 is 4:35.
16    (Recess taken.)
17    THE VIDEOGRAPHER: We're back on the record.
18 The time is 4:48.
19    (Exhibit No. 28 marked.)
20    Q. (By Ms. Ducey) Okay. There is 28.
21    A. What did I do with my glasses? Oh, 28. Okay.
22    Q. Okay. So this was an e-mail that Dr. Tuthill
23 sent you on October 9th; correct?
24    A. Yes.
25    Q. Okay. And this was after you received the first

Page 263

1 e-mail from him that we marked as Exhibit 25; right?
2    A. If it states that, yes.
3    Q. Okay. And he -- you remember getting this
4 e-mail?
5    A. Yes.
6    Q. And he said that "I'm not asking you or
7 assigning you to teach OT-104, Filing and Record
8 Management, though so far we've not been able to identify
9 another qualified instructor." Correct?
10    A. Yes.
11    Q. Okay. Is that the class you were talking about
12 that he --
13    A. Yes.
14    Q. And did he pressure you before or after receipt
15 of this e-mail?
16    A. Actually, Dr. Tuthill was not the one who
17 pressured me. It was his administrative assistant, Diana
18 Kennedy.
19    Q. Okay.
20    A. And at his request. She usually did what he
21 asked her to do.
22    Q. Uh-huh.
23    A. And she told me that "You just have to teach it,
24 there's no one else to teach it."
25    Q. Uh-huh. But he said that --

Page 264

1    A. But Dr. Tuthill did not use those words.
2    Q. Okay. All right. And then he got on -- went on
3 to discuss the interpretation of the compensation for
4 added duty contracts; right?
5    A. Yes, he did.
6    Q. And he said, "But regard -- as for OT-104, if
7 you want to take it on, you're more than welcome. That
8 would help and assuming either of the latter two
9 interpretations of our current official policies wins
10 out, you would receive compensation for two additional
11 teaching credits for $3,000." Right?
12    A. Uh-huh.
13    Q. He goes on to say, "But I don't see how we can
14 do that if you're expecting to go on medical leave later
15 this month. If that is likely to happen, then I need to
16 find a substitute instructor for your Business English or
17 Business Math classes and an alternative instructor for
18 OT-104. I hope this answers your questions." Right?
19    A. Oh, I don't follow you, where you're reading.
20    Q. I'm at the very bottom.
21    A. Oh, okay.
22    Q. Last three paragraphs.
23    A. "As for OT-104."
24    Q. Uh-huh.
25    A. I don't know why he made that statement. I

Page 265

1 don't know why he keep refer -- keeps referring to "if
2 you are expecting to go on medical leave." I wasn't
3 expecting because I not -- I could not rearrange my
4 classes because he wouldn't permit me to.
5    Q. Right. But you didn't withdraw your request
6 according to Exhibit 26. Well, you told him everything
7 looked -- looks okay, so leaving everything until the
8 holidays looks like the most feasible thing as of October
9 9th. Well --
10    A. Because I couldn't rearrange my classes.
11    Q. Did you have a discussion with him after you
12 sent him the e-mail where you said that you were going to
13 wait until Christmas?
14    A. I don't recall.
15    Q. Okay.
16    (Exhibit No. 29 marked.)
17    Q. All right. Now this is 29. Can you identify
18 that?
19    A. Yes.
20    Q. Okay. And that's an e-mail dated October 20th;
21 right?
22    A. Uh-huh.
23    Q. And it says, "I can't approve your leave request
24 for leave the morning of December 11th through the 19th."
25 Right?

67 (Pages 262 to 265)

case No. A05-086 Civil

Bobbi Wade

Page 266

1    "Such a leave would mean you miss the last five days
2    of instruction and that to my mind unduly interferes with
3    the delivery of the college's program of instruction.
4    Please continue to meet with your classes until the end
5    of the semester in accordance with our regular academic
6    schedule." Right?
7        A. Yes.
8        Q. Now in the meantime had you submitted to him any
9    additional medical certification?
10       A. I don't recall that I did.
11       Q. Okay. Does that refresh your recollection about
12   when you had a conversation with him about leaving in
13   December?
14       A. Leaving in December?
15       Q. About taking leave in December. You said
16   that --
17       A. I don't recall discussing taking leave in
18   December with him except the fact that I agreed with him
19   that I could wait until December.
20           (Exhibit No. 30 marked.)
21       Q. Could you look at 30 and can you tell -- can you
22   tell me if you can identify what 30 is?
23       A. 30, it's a request for leave in December that
24   was just prior to getting the test results from my doctor
25   in Barrow.

Page 267

1        Q. Okay. Did you sign the leave request?
2        A. Yes, I did.
3        Q. What is the date of your signature?
4        A. It's November the 3rd.
5        Q. Okay. And Angie approved it; right?
6        A. Angie approved it, yes.
7        Q. On the 2nd day?
8        A. On the -- on the same day.
9        Q. Okay. And the leave was for six days; right?
10       A. 11th [sic] to the 26th, I suppose, yeah.
11       Q. And it was from 11/18 through 11/26; right?
12       A. Yes.
13       Q. And you marked it "personal," but it looks like
14   somebody underlined "sick leave"; right?
15       A. I did, because the first leave request that was
16   denied, I had not underlined sick leave and I wanted them
17   to know that it was for sick leave.
18       Q. And it says, "For treatment, tests and
19   evaluations by family doctor." Right?
20       A. Yes.
21       Q. Okay. And what had happened on 11/3 to make you
22   change your days to 11/8 -- from 11/18 to 11/26?
23       A. I don't recall what had happened. This was the
24   end of the semester and it wasn't possible for me to see
25   Dr. Gold on the 2nd of December and I don't remember why

Page 268

1    it wasn't possible. I don't remember why I couldn't keep
2    that appointment other than I couldn't leave and so I
3    made out a final request to give me enough days in
4    December during the Christmas holidays and the New Year's
5    holidays that doctors' offices would be open that I could
6    possibly make an appointment to see them to have those
7    tests made.
8        Q. Okay. But this isn't a request for leave in
9    December, is it?
10       A. Oh, this is for the request for November, yes.
11       Q. November 18th through the 26th.
12       A. Yeah, I'm sorry.
13       Q. So let me restate the question.
14       A. Yes.
15       Q. Why did you ask for leave from the 18th through
16   the 26th of November on November 3rd?
17       A. That was -- then that was after I received the
18   notice from the Barrow doctor.
19       Q. What notice is that?
20       A. Or received the phone call. I didn't receive
21   the notice, but received the phone call from her.
22       Q. Uh-huh.
23       A. That the spot on my shoulder was malignant.
24       Q. Okay. And did you have -- did you submit
25   anything with this note?

Page 269

1        A. I don't recall, but anytime I submitted a
2    request for leave, I also turned in a schedule for my
3    classes that could be accommodated for me to -- to finish
4    my modules.
5        Q. Do you recall if you did that in this instance?
6        A. I -- I don't know. I can't verify that I did.
7    I would have to go back and check through records to see.
8        Q. Okay. And why did you ask for six days?
9        A. Here? The only reason I asked for six days is
10   so that I could get back in time to resume my classes
11   according to the -- the schedule I had made out. I had
12   asked to resume them on December the 1st.
13       Q. Okay. Did you have appointments scheduled?
14       A. No. I don't know at this point whether I had
15   appointments or not because here the doctor in Barrow had
16   called me and told me I had a malignancy on my
17   shoulder --
18       Q. Uh-huh.
19       A. -- and I needed a moles procedure. And I made
20   out the request for leave according to the calendar that
21   would best suit my needs as far as medical purposes were
22   concerned --
23       Q. Uh-huh.
24       A. -- and to get back in time to resume my classes
25   on December the 1st.

68 (Pages 266 to 269)

case No. A05-086 Civil                                          Bobbi Wade

Page 274

1  the 26th; correct?
2  A. Yes.
3  Q. And looks like the leave designated is extended
4  medical leave, although "personal" was marked and it's
5  got "PT" by it; right?
6  A. Yes.
7  Q. Do you see the little circle? Do you remember
8  what leave you checked?
9  A. I don't think I checked anything because
10 according to Pam and John, I had been checking the wrong
11 things --
12 Q. Okay.
13 A. -- so Pam says, "Don't check anything. I'll
14 check it."
15 Q. All right. And why did you change the number of
16 days from six to eleven in 24 hours?
17 A. I don't know. I don't remember.
18 Q. Okay. Why did you resubmit a leave request the
19 next day?
20 A. I think it was due to Pam's request that I do
21 so.
22 Q. Do you remember how that request was made to
23 you?
24 A. No, I don't.
25 Q. Do you remember what she asked?

Page 275

1  A. No, I don't.
2  Q. Okay.
3  A. But she was pre- -- very precise in what she
4  wanted and I was trying to adhere to her wishes.
5  Q. Okay. Do you remember if your schedule changed?
6  A. My scheduling what?
7  Q. While you were in Tennessee.
8  A. No, I don't remember.
9  Q. Okay. And it looks like I got the wrong copy
10 with a little yellow sticky on it, but it says, "Leave
11 designated once. Required medical documentation, i.e.,
12 appointment schedules and work release obtained. Leave
13 will be adjusted to reflect appropriate extended medical
14 leave dates." Right?
15 A. Pam wrote that on there. I had no knowledge of
16 when she put that on there. She might have written it
17 after I left. I don't know.
18 Q. Okay. But your leave was approved; right?
19 A. At this time it was, yes.
20 Q. Do you remember if you submitted anything with
21 it?
22 A. No, I don't remember, but I do remember that I
23 gave Pam all the appropriate doctors -- documents
24 concerning my leave and appointments and whatever.
25 Q. What were those documents that you gave her?

Page 276

1  A. I don't remember. They were documents from my
2  doctor in Tennessee.
3  Q. Dr. Church?
4  A. They were documents where Dr. Church had made
5  appointments for me.
6  Q. Okay. So you believe you submitted those with
7  Exhibit 31?
8  A. I think I did, but I'm not sure.
9  Q. Did you submit anything else with Exhibit 31?
10 A. I don't remember.
11     (Exhibit No. 32 marked.)
12 Q. Okay. Can you take a look at Exhibit 31 and
13 tell me if you can identify what that is?
14 A. 31 or 32?
15     MR. CLEMENT: 32.
16     MS. DUCEY: Thanks.
17 Q. (By Ms. Ducey) 32.
18 A. Okay.
19 Q. Can you identify what 32 is?
20 A. Yes.
21 Q. What is Exhibit 32?
22 A. It's a note from my doctor, Dr. Snyder, at the
23 Barrow Medical Clinic.
24 Q. What's the date of that note?
25 A. It's November the 5th.

Page 277

1  Q. Could you have turned that in prior to November
2  3rd or on November 3rd?
3  A. Could I have turned it in?
4  Q. Yes.
5  A. No, because it's got November the 5th on it.
6  Q. All right. So is it reasonable to infer that
7  you did not turn it in with the leave request dated
8  November 3rd, which is Exhibit 30?
9  A. It's possible that I didn't because Dr. Snyder
10 called me and told me about the malignancy and that I had
11 to take the time to go back over to her office to get
12 this note.
13 Q. Okay. But it's dated the 5th; right?
14 A. It's dated the 5th and that's the day I went
15 back over and got it and maybe after I turned this
16 request for leave in, I might have then gotten all --
17 together all the proper documents that Pam needed.
18 Q. Okay. And it's from Dr. Snyder and she says,
19 "I'm writing on behalf of Bobbi Wade, a patient of mine.
20 Ms. Wade needs follow-up for some medical conditions that
21 cannot be addressed here. The follow-ups are to occur in
22 a somewhat urgent time frame. Thank you for your
23 understanding." Right?
24 A. Yes.
25 Q. And that day John Tuthill approved your leave;

70 (Pages 274 to 277)

case No. A05-086 Civil                                                    Bobbi Wade

---

**Page 278**

1  right?
2      A. Yes.
3      Q. And the next day Ms. Taylor signed off on it;
4  right?
5      A. Yes.
6      Q. And this was the medical certification that was
7  being requested that you could not wait until the end of
8  the semester to take your leave; correct?
9      A. How could she have written this when she did not
10 know at that time that I had a malignancy?
11     Q. Precisely the point.
12     A. Because I couldn't supply him with this because
13 we did not know of the malignancy, but I knew of the
14 urgency of my shoulder.
15     Q. Right. So until Dr. Snyder got the report back,
16 there was not a medical reason why you needed to travel
17 to Tennessee before the end of the semester; correct?
18     MS. JOHNSON: Objection, form.
19     A. I don't know if there was a reason or not.
20     Q. Well, I've been asking you extensively for hours
21 this afternoon. Was --
22     MS. JOHNSON: And it's asked and answered.
23     Q. Was there a doctor who told you that you could
24 not wait until December --
25     A. No.

---

**Page 279**

1      Q. -- for medical treatment?
2      A. No, no one told me that I could not wait until
3  December.
4      Q. Okay. All right.
5      A. She doesn't even state I could not wait in this
6  note.
7      Q. Well, it's a note dated November 5th that you
8  presented on the 5th that says "urgent"; right?
9      A. All it says is "urgent."
10     Q. Didn't wait 47 days to present that urgent note;
11 right?
12     MS. JOHNSON: Objection, argumentative.
13     MS. DUCEY: I think that I -- I'm about to
14 change subjects and I'm -- probably a good time to stop
15 for the day.
16     THE VIDEOGRAPHER: Going off record now?
17     MS. DUCEY: Yeah.
18     THE VIDEOGRAPHER: This concludes Volume 1 of
19 the deposition of Bobbi Wade. The time is 5:11.
20         (Proceedings adjourned at 5:11 p.m.)
21
22
23
24
25

---

**Page 280**

1              WITNESS CERTIFICATE
2      I, the undersigned, Bobbi Wade, do hereby certify
3  that I have read the foregoing deposition and that, to
4  the best of my knowledge, said deposition is true and
5  accurate with the exception of the following corrections
6  listed below:
7
8  PAGE/LINE    CORRECTION AND REASON FOR CORRECTION
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
       Date          Bobbi Wade
23
     (Use additional paper to note corrections as needed,
24 signing and dating each page.)
25

---

**Page 281**

1      REPORTER'S CERTIFICATE.
2
3      I, CAREN S. CARLSON, Registered Professional
4  Reporter and Notary Public in and for the State of
5  Alaska, do hereby certify:
6      That the witness in the foregoing proceedings
7  was duly sworn; that the proceedings were then taken
8  before me at the time and place herein set forth; that
9  the testimony and proceedings were reported
10 stenographically by me and later transcribed under my
11 direction by computer transcription; that the foregoing
12 is a true record of the testimony and proceedings taken
13 at that time; that the witness requested signature; and
14 that I am not a party to nor have I any interest in the
15 outcome of the action herein contained.
16     IN WITNESS WHEREOF, I have hereunto subscribed
17 my hand and affixed my seal this 11th day of May, 2006.
18
19
20
21
           CAREN S. CARLSON
22         Registered Professional Reporter
           Notary Public for Alaska
23         My Commission Expires: 05-30-09
24
25

---

Case No. A05-086 CV (TMB)                                                    Bobbi Wade

Page 284

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF ALASKA

 3

 4    BOBBI WADE,

 5              Plaintiff,

 6         vs.

 7    ILISAGVIK COLLEGE, NORTH SLOPE
      BOROUGH, JOHN TUTHILL, Individually,
 8    and PAMELA TAYLOR, Individually,

 9              Defendants.
      _____/

10    Case No. A05-086 CV (TMB)

11

12         *   *   *   *   *   *   *   *   *   *

13

14         VIDEOTAPED DEPOSITION OF BOBBI WADE
                         Volume 2
                 Pages 284 - 432 (inclusive)

15

16                      May 5, 2006
                        2:04 p.m.

17

18    Taken by the Defendants, Ilisagvik College,
             John Tuthill and Pamela Taylor
19                         at
      Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc.
20          1007 West 3rd Avenue, Suite 400
                 Anchorage, Alaska 99501

21

22

23

24    Reported by:
      Caren S. Carlson, RPR

25
```

RECEIVED JUN 9 2006 DELANEY WILES, INC.

COPY

Case No. A05-086 CV (TMB)                                          Bobbi Wade

Page 289

1  where she asked me to put everything on hold until she
2  returned.
3      Q. Uh-huh.
4      A. Those were her exact words.
5      Q. Okay. Did she explain what that was when she
6  said "Put everything on hold"?
7      A. Yes. That meant to just wait on this, on the
8  appeal. "I have to go take leave and I will be gone and
9  just put everything on hold until I get back, until I
10 return."
11     Q. Okay. Anything else that you recall she said
12 yesterday that you disagree with?
13     A. I don't recall anything else right offhand.
14     Q. Okay. As we go through today, if there's
15 anything that comes to mind, would you please let me
16 know?
17     A. Yes, I will.
18     Q. I want to refer to -- for a minute to Exhibit
19 24, which we previously identified, and reference the
20 bottom e-mail from John Tuthill.
21     A. Okay.
22     Q. Is there anything that prevented you from asking
23 your doctors if they felt you required immediate
24 treatment after October 3rd, 2003?
25     A. No, there's nothing that would have prevented

Page 290

1  it.
2      Q. Okay. Did you ask any of your doctors if they
3  felt that you needed immediate treatment?
4      A. No, because I was very busy with my work
5  schedule and I was trying to do what my doctor had asked
6  me to do and at the same time fulfill my duties on my
7  job.
8      Q. Okay.
9      A. And it -- and it was very strenuous at the time.
10     Q. Okay. I'm going to try and keep those in order
11 since we --
12     A. Okay.
13     Q. -- got so many already.
14     A. All right.
15     Q. All right. Let me just show you 25 again for a
16 minute and this is the e-mail you identified as receiving
17 from Dr. Tuthill on October 9th; right?
18     A. Yes.
19     Q. And he said, "If you're planning to take leave
20 later this month, I need written notification from a
21 licensed physician, preferably by fax and as soon as
22 possible, to the effect your medical treatment cannot
23 wait until the December break when you could have the
24 treatment without conflict in your regular teaching
25 duties."

Page 291

1      Did you ask any of your doctors for written
2  notification that your medical treatment couldn't wait
3  until the December break --
4      MS. JOHNSON: Objection.
5      Q. -- when you could have treatment without
6  conflict of your duties?
7      MS. JOHNSON: Objection, form.
8      A. No, I didn't.
9      Q. Okay. And was there anything that prevented you
10 from doing that?
11     A. Not --
12     MS. JOHNSON: Same objection.
13     A. Nothing, except I was just extremely busy --
14     Q. Okay. All right.
15     A. -- on my job and time didn't permit that I
16 concentrate too much on my -- on health problems at
17 that time.
18     Q. Is there anything that prevented you from
19 printing off that e-mail and showing it to your medical
20 providers in Barrow or faxing it to Dr. Church?
21     A. No. I was very puzzled when I received this
22 e-mail, as I recall.
23     Q. Uh-huh. Why were you puzzled?
24     A. Because after all of our discussions and the
25 fact that Dr. Tuthill asked me to wait until December, I

Page 292

1  couldn't figure out why he would be sending this e-mail
2  to me.
3      Q. Well, wasn't it just a repeat of what he asked
4  you on October 3rd?
5      A. No --
6      Q. Which is --
7      A. -- I don't think.
8      Q. -- on October 3rd he said, I read -- on October
9  3rd, he said, "You'll consult with your physicians here
10 and in Tennessee to determine if they feel you
11 need immediate -- require immediate medical treatment and
12 depending on what they say, you can prepare medical leave
13 requests so you can receive any required treatment during
14 the semester." Right?
15     A. That's right, but I had already agreed at this
16 time when he wrote this note, I had already agreed with
17 him that I would wait until December.
18     Q. Well, then --
19     A. And I -- and it was puzzling to me as to why he
20 would have written a note like this to me.
21     Q. Okay. If you had already agreed that you were
22 going to wait, then, why did you send him the e-mail on
23 October 9th saying that "my medical problem needs
24 attention as soon as possible but it's not a matter of
25 life and death, so leaving everything until the holidays

3 (Pages 289 to 292)

Case No. A05-086 CV (TMB)                                        Bobbi Wade

Page 313

1    A. I went back for him to -- yes, for him to take a
2  look at it.
3    Q. Uh-huh.
4    A. And to verify that everything was fine --
5    Q. Uh-huh.
6    A. -- and so forth.
7    Q. And when was that?
8    A. I don't recall unless I could see -- it was just
9  within a few days, but I don't know the exact date unless
10 I could see documents.
11   Q. Uh-huh. Did he tell you you have the option of
12 having the stitches removed back in Barrow?
13   A. No.
14   Q. Okay. Did you consider that?
15   A. No.
16   Q. All right. And then while you were in
17 Tennessee, you had an appointment with Dr. Church on the
18 12th. You had an appointment with Dr. DeLozier where he
19 reshaved the patch and stitched it?
20   A. Yes.
21   Q. And then you came back to see Dr. DeLozier;
22 right?
23   A. Before I left I did, yes.
24   Q. Okay. And did you have any other medical
25 appointments?

Page 314

1    A. Yes.
2      MS. JOHNSON: Objection, asked and answered.
3    A. Yes, I did.
4    Q. Okay. What other medical appointments did you
5  have?
6    A. I had an appointment to have tests made
7  concerning my stomach --
8    Q. Uh-huh.
9    A. -- at the St. Thomas Hospital and that was
10 several days after I had the appointment with Dr.
11 DeLozier because appointments with those doctors are very
12 difficult to get especially on a short notice.
13   Q. When -- when you got to Tennessee on your first
14 visit with Dr. Church on the 12th, did she tell you that
15 you were not permitted to work?
16   A. I don't recall if she told -- what she told me
17 exactly.
18   Q. Okay. The doctor's note don't -- the doctor's
19 chart doesn't contain any documentation that you were
20 prevented from working. Do you recall if she told you
21 that?
22   A. Well, no, I don't recall if she told me that.
23   Q. Okay. And when you saw her again before you
24 left, did she tell you that you were not permitted to
25 work?

Page 315

1    A. Not permitted to work after I left?
2    Q. Did she tell you that at any time you were not
3  permitted to work?
4    A. I don't recall that she did.
5    Q. Okay. Did doctor -- did you say you saw a
6  stomach specialist?
7    A. Yes, I did.
8    Q. And what was his name?
9    A. Eskind.
10   Q. Okay. And did Dr. Eskind tell you at any time
11 that you were not able to work?
12   A. I don't recall what Dr. Eskind told me at that
13 time unless I could see the documents.
14   Q. Uh-huh. Did you feel you were unable to work at
15 any time in between those appointments?
16   A. In between the appointments?
17   Q. Yes.
18   A. No, I did not feel that way because I did work.
19   Q. Uh-huh. What did you do?
20   A. I kept up with my classes online on the
21 computer.
22   Q. Uh-huh. Did anyone ask you to do that?
23   A. I don't recall. When I went in to work out the
24 leave with Dr. Tuthill, we talked about my classes and I
25 don't recall if he asked me or if I volunteered. At that

Page 316

1  time I didn't want my leave denied again and I was very
2  afraid that it would be and I might have offered to keep
3  up with my classes online.
4    Q. Uh-huh.
5    A. Because I -- at that time I would have left had
6  they denied my leave anyway because I was that worried
7  about the spot on my shoulder and I was afraid I would
8  lose my job over it, so I was willing to accommodate him
9  in any way that I could to take care of my classes while
10 I was on sick leave and I couldn't mind doing it.
11   Q. And did it prevent your treatment at all?
12   A. No, it didn't.
13   Q. Did it interfere with your treatment?
14   A. No, it didn't.
15   Q. You would have done that anyway, right, even
16 if --
17   A. I would have --
18   Q. -- he hadn't asked?
19   A. Had he denied my sick leave at that time, I was
20 very concerned about the spot on my shoulder and the fact
21 that the doctor in Barrow did not get all the cancer
22 cells and that's what a moles procedure is, is to verify
23 that all the cancer cells are gone and a doctor has to be
24 certified to do that test.
25   Q. Actually, that's not what I asked you. You

9 (Pages 313 to 316)

EXHIBIT
Page 51 of 58

Page 317

1  would have in any event, as a conscientious instructor,
2  done some work while you were gone if you had the
3  opportunity to and it didn't otherwise interfere with
4  your medical treatment; correct?
5      A. Right.
6      Q. Uh-huh. So he didn't have to ask you; right?
7      A. No, he didn't -- he didn't have to ask.
8      Q. And you didn't even have to volunteer, you were
9  going to do that anyway; right?
10     A. I -- I would have done that anyway, yes.
11     Q. What did you do in terms of work while you were
12  gone?
13     A. I responded to students. I kept up with my
14  online correspondence with them, just as I did in Barrow.
15  It was -- online courses are taught --
16     Q. Sure.
17     A. -- on the computer.
18     Q. Uh-huh.
19     A. So they can be taught from anywhere that a
20  person can get to a computer.
21     Q. Okay.
22     A. And my son had a computer and my granddaughter
23  had a computer in Tennessee so I kept up with my online
24  courses while I was in Tennessee.
25     Q. Okay. Who did you stay with?

Page 318

1      A. I stayed at my own house.
2      Q. Uh-huh.
3      A. And it was in the town where my son lives.
4      Q. Was anyone staying with you?
5      A. My granddaughter lived with me at that time.
6      Q. Uh-huh. That's Amy?
7      A. Amy, yes.
8      Q. How old was she at the time?
9      A. She was in her 20s. I would have to figure it
10  out. She was a college student.
11     Q. Uh-huh. Where was she a college student?
12     A. She was a college student at Middle Tennessee
13  State University in Murfreesboro, that's where my
14  condominium was located, and she was also a student in --
15  at Ilisagvik College in Barrow, Alaska.
16     A. Uh-huh.
17     Q. What was she studying at Middle Tennessee?
18     A. She was going to go into prelaw and she was
19  taking courses to prepare her for the study of law.
20     Q. Uh-huh. Was she working?
21     A. Yes, she was working. Most of the college
22  students did.
23     Q. Where was she working at the time?
24     A. I don't recall where she was working at the
25  time, but during the time she was in college in

Page 319

1  Murfreesboro, she worked as a waitress at the local
2  restaurants and as all of her friends did.
3      Q. Did you do any other work while you were gone?
4      A. No, I didn't. That's all I did.
5      Q. Okay. What else did you do while you were in
6  Tennessee?
7      A. I did not do anything else.
8      Q. Okay. You had been sued in Tennessee; correct?
9      A. Not at that time, no.
10     Q. Uh-huh. Not as of November '03?
11     A. No.
12     Q. Okay. What were you sued about?
13     A. My granddaughter had -- I had rented an
14  apartment for her to go to college and it was in my name
15  and she and her little friends trashed it so the
16  apartment owner charged me with the charges.
17     Q. Okay. And --
18     A. Because it was in my name.
19     Q. Uh-huh. Did you have a lawyer represent you?
20     A. Yes, I did, but it was over the phone. I -- I
21  never met with the lawyer personally.
22     Q. Uh-huh.
23     MS. JOHNSON: Objection to the request for
24  attorney/client privilege.
25     MS. DUCEY: I'm not going to ask her anything

Page 320

1  about that.
2      Q. Don't tell me anything about what your lawyer
3  told you.
4      A. Okay.
5      Q. When did you obtain the lawyer?
6      MS. JOHNSON: Objection to request for
7  attorney/client privileges. She doesn't have to --
8      A. I don't remember, no.
9      Q. Okay. And did the lawyer enter an appearance
10  for you?
11     A. At the hearing?
12     Q. Uh-huh.
13     A. Yes, he did.
14     Q. Did you appear at the hearing?
15     A. No, I was on the job in Barrow.
16     Q. Okay.
17     A. There was no way I could be there.
18     Q. Uh-huh. And your recollection is that that was
19  after your leave in November '03?
20     A. Yes, uh-huh.
21     Q. Okay. And was it a worry to you prior to
22  getting an attorney to enter an appearance for you?
23     A. No, not -- not a big worry.
24     Q. Okay. And you had no other business that you
25  conducted while you were in Tennessee while you were gone



Case No. A05-086 CV (TMB)                                                              Bobbi Wade

Page 321

1   on leave?
2       A. No.
3       Q. Okay.
4       A. No, my sole purpose was for medical purposes.
5       Q. Where did you spend Thanksgiving?
6       A. At my home. I might have gone and eaten
7   Thanksgiving dinner with the family.
8       Q. And when did you come back to the state?
9       A. I would have to look at a calendar to know the
10  dates, but I -- my first day of work, to be back at work
11  was December the 1st and I was there.
12      Q. Okay. All of the time that you took off was
13  paid leave; correct?
14      A. Yes.
15      Q. Okay.
16      A. Yes, it was.
17      Q. So you took nothing unpaid; right?
18      A. No.
19      Q. Okay. And I asked you this before, but you
20  don't recall whether you used frequent flyer miles or if
21  you bought a ticket or how much the ticket was?
22      A. No, I -- I don't recall that because oftentimes
23  I have frequent flyer miles, but I -- I can't recall at
24  that time if I had any or not, but I -- I don't recall if
25  I purchased my ticket or --

Page 322

1       Q. Okay.
2       A. -- used miles.
3       Q. All right. Did you have any other expenses that
4   you would not have had -- listen to my question
5   carefully. Initially your leave request was for October
6   2nd and you asked that you be permitted to take leave --
7   we better find it because I don't remember -- the initial
8   leave request is Exhibit 21, says you wanted ten days
9   from October 20th to the 31st. That was the first
10  request; right?
11      A. Yes, uh-huh.
12      Q. All right. Did -- did you have any
13  out-of-pocket expenses that you would not have had had
14  you taken this leave on October 20th?
15      A. I don't recall any.
16      Q. Okay. After you submitted the October 2nd leave
17  request and you spoke with Pam Taylor about it, did -- at
18  any time did she tell you that she wanted you to take
19  care of your medical condition?
20      A. That she wanted me?
21      Q. Yes.
22      A. I don't recall her telling me that.
23      Q. Did she seem unconcerned?
24      A. Yes, she did.
25      Q. Uh-huh. And uncaring?

Page 323

1       A. Yes.
2       Q. And how did you get that impression?
3       A. It seemed that every solution that I came up
4   with that was a logical solution that I take leave and go
5   see about the spot on my shoulder and about my stomach
6   problems and my foot problem and the problems I was
7   having at that time with my health, she would tell me
8   reasons, "Well, that's not sufficient, you have to do
9   more."
10      Q. Uh-huh.
11      A. No matter what I supplied Pam with, she wanted
12  more.
13      Q. Okay. Did she --
14      A. And Pam had blocked my leave. She had done the
15  same thing to me before.
16      Q. Uh-huh.
17      A. This wasn't the first time.
18      Q. When had she done it before?
19      A. She did it in December of 2002 when my son was
20  critically ill.
21      Q. Uh-huh. And what did she do in 2002?
22      A. She told me the same thing at the time. I
23  didn't have the leave. I couldn't go because I didn't
24  have the time --
25      Q. Uh-huh.

Page 324

1       A. -- the sick leave. And she did not tell me
2   about the Family Medical Leave Act or anything --
3       Q. Uh-huh.
4       A. -- just that I -- "You cannot take leave because
5   you don't have -- have the leave to take."
6       Q. She told you you didn't have accrued leave;
7   right?
8       A. Yes.
9       Q. Did she tell you that you couldn't take unpaid
10  leave?
11      A. No, she didn't. She just told me I couldn't
12  leave. I didn't have the time.
13      Q. Did you ask to take unpaid leave in December
14  '02?
15      A. No, I didn't.
16      Q. Why not?
17      A. Because I didn't need to. The dean told me that
18  he would give me off-site duty.
19      Q. Okay. And also because you couldn't afford to
20  take unpaid leave?
21      A. That's possible, yes.
22      Q. So it's your testimony, then, in December '02,
23  did you present a leave request to Pam?
24      A. Yes, I did.
25      Q. And did she deny it?

                                                    11 (Pages 321 to 324)