Case No. A05-086 CV (TMB)                                                    Bobbi Wade

Page 329

1    Q. Okay.
2    A. When we finish this question, I need to take a
3  break.
4         MS. JOHNSON: Why don't we take it now while
5  she's looking for something.
6         MS. DUCEY: That's fine.
7         THE WITNESS: You have no objections?
8         MS. DUCEY: No.
9         THE WITNESS: Okay.
10        THE VIDEOGRAPHER: Going off record then. The
11  time is 2:56.
12            (Recess taken.)
13        THE VIDEOGRAPHER: Okay. We're back on the
14  record. The time is 3:05.
15    Q. (By Ms. Ducey) So I want to show you 22 and 23,
16  which we marked before, and I believe you previously
17  identified those as forms that you completed?
18    A. Yes.
19    Q. And they show the original meeting times for --
20  correct me if I'm wrong -- the B Module of both Business
21  English and Business Math; correct?
22    A. Yes.
23    Q. Okay. And those met from 10/6 to 11/4 for 109-B
24  and from 10/6 to 11/12 for 105-B; correct?
25    A. Yes.

Page 330

1            (Exhibit No. 62 marked.)
2    Q. Okay. This is 62.
3         MS. DUCEY: Go ahead and pass those copies out,
4  Jonathan.
5    Q. And can you identify what that is?
6    A. It looks like a copy of the syllabi.
7    Q. Okay. And did you prepare this?
8    A. It looks like what I -- it appears to be what I
9  prepared, yes.
10    Q. Okay. And that's for Business 109, right,
11  Business English?
12    A. Yes.
13    Q. Okay. And it shows Module B as the same as
14  you've indicated it on Exhibit 22; right?
15    A. Yes.
16    Q. All right. And then it shows Module C, 11/6 to
17  12/16; right?
18    A. Yes. Uh-huh.
19    Q. Okay. And so while you were gone, there would
20  be at least two weeks of classes for Business 109 that
21  you would not have been present for; correct?
22    A. Correct.
23    Q. Okay. And if we can trust your schedule on
24  Exhibit 22 for 105-B, the class ended on 11/12 and would
25  have picked up with Bus- -- with Module C just a few days

Page 331

1  after the ending of B; correct?
2    A. Yes.
3    Q. Okay. And so if that's around the 15th of the
4  month, then again you would have missed two weeks of
5  classes; right?
6    A. Yes, which included Thanksgiving.
7    Q. Uh-huh. Classes meet that week?
8    A. They did -- they were scheduled to meet on
9  Monday and Tuesday, but not on Wednesday.
10    Q. Uh-huh. Was there anything in your added duty
11  contract that gave you the right to change a class
12  meeting time?
13    A. Not without filling out the -- the proper forms.
14    Q. Okay. Not without approval of the dean; right?
15    A. Right.
16    Q. Okay. Anything in your regular teaching
17  contract that permitted you to change the course meeting
18  time?
19    A. No.
20    Q. Okay. Or the dates?
21    A. No.
22        MS. DUCEY: Can I have the next one, Jonathan?
23            (Exhibit No. 63 marked.)
24    Q. This is 63, Ms. Wade. Can you identify this as
25  the complaint that was filed on your behalf?

Page 332

1    A. It appears to be.
2    Q. Okay. Did you have an opportunity to review it
3  before it was filed?
4    A. This --
5    Q. Yes.
6    A. -- particular document? My complaint?
7    Q. Yes.
8    A. Yes.
9    Q. Okay. And at the time it was filed, did you
10  believe it was complete and accurate?
11    A. I did.
12    Q. Has anything subsequently come to your attention
13  that you believe is not complete or accurate about the
14  complaint?
15    A. No, huh-uh.
16    Q. Could you turn to Page 10?
17    A. Where are the -- oh, I see.
18    Q. On the bottom left.
19    A. Yeah, I see. Okay.
20    Q. Okay. Do you see Paragraph 41?
21    A. Yes.
22    Q. Okay. And it says, "Defendants violated
23  Ms. Wade's family rights by, A, refusing to grant the
24  requested protected leave." Do you see that?
25    A. Yes.

Case No. A05-086 CV (TMB)                                          Bobbi Wade

Page 333

1  Q. What are the facts on which that's based?
2     MS. JOHNSON: Objection, calls for legal
3  conclusion. If you can answer.
4     A. I did not write this, so I -- I do not know
5  exactly what it means.
6     Q. It says that your protected -- your requested
7  leave was refused; right?
8     A. Yes.
9     Q. Okay. What are the facts that that's based on?
10    A. The -- whatever was in my contract, the leave.
11    Q. Okay. When was your leave -- requested leave
12  refused? On what dates?
13    A. It was refused on just prior to October the 2nd.
14    Q. Uh-huh. Any other times?
15    A. I don't recall any other times.
16    Q. Okay.
17    A. Except when I requested leave in December after
18  Dr. Tuthill suggested that I wait until December, then I
19  soon filled out a leave request form for December and he
20  refused to grant that leave.
21    Q. Do you know where that leave request form is?
22    A. No, I don't.
23    Q. What did you do with that leave request form?
24    A. It should be in my folders, in my documents.
25    Q. Uh-huh.

Page 334

1     A. It should have been in my personnel folder.
2     Q. Uh-huh. Why do you say that?
3     A. I don't know where they kept -- they're kept in
4  the Human Resource office, but I -- I just assume that
5  copies of everything were kept somewhere.
6     Q. Okay. A more basic question is I asked you when
7  we were here on Monday if you filled out a leave request
8  for that December leave and you said you did not recall
9  doing that, you did not know. Is it your testimony now
10  that you did fill out such a request?
11    A. I have reviewed the documents since that time.
12    Q. Uh-huh.
13    A. And I do remember filling out a leave request
14  for December.
15    Q. Uh-huh.
16    A. And I think they -- my documents might contain
17  some e-mails that refers to that.
18    Q. Okay. What document did you review that
19  refreshed your recollection about a leave request in
20  December?
21    A. The grievance, the grievance procedure --
22    Q. Uh-huh.
23    A. -- that I filed.
24    Q. Okay. And do you now recall what dates you
25  asked for the leave request for?

Page 335

1     A. Not without looking at it, no, but I -- I
2  remember that it was in December and Dr. Tuthill wrote me
3  a -- an e-mail telling me that he was refusing that
4  leave for -- that leave request.
5     Q. Okay. And do you remember what date you signed
6  that leave request?
7     A. No, I don't.
8     Q. Do you remember what date you submitted it?
9     A. No, I don't.
10    Q. Do you remember to whom you submitted it?
11    A. To Dr. Tuthill.
12    Q. Okay. Do you know when you submitted it to him?
13    A. No, I don't. Shortly after we agreed that I
14  would wait until December and I had begun to teach the --
15  the extra class.
16    Q. Okay. All right. And anything else factually
17  that supports 41 A?
18    A. 41 A?
19    Q. Uh-huh.
20    A. I can't recall anything at this time.
21    Q. Okay. And under 41 B it says, "The defendants
22  violated Ms. Wade's family rights by failing to tell
23  Ms. Wade her family rights." What are the facts on which
24  that's based?
25    A. Because --

Page 336

1     MS. JOHNSON: Objection to the extent it calls
2  for a legal conclusion.
3     A. Okay. Because I was not told about any FMLA
4  rights at that time.
5     Q. Okay. At what time?
6     A. When I was requesting leave in October,
7  November, December, whenever it was that I was requesting
8  when I was desperately trying to get home to see about my
9  shoulder.
10    Q. Okay. And with respect to C, it says, "Failing
11  to reinstate Ms. Wade when she returned from FMLA
12  protected leave." What are the facts upon which that's
13  based?
14    MS. JOHNSON: Same objection.
15    A. My classes were not given back to me.
16    Q. Uh-huh. What classes?
17    A. Business Math, Module C and Business English,
18  Module C.
19    Q. Okay. Anything else?
20    A. I don't recall anything else.
21    Q. Okay. And under D it says, "Interfering with
22  her right to take FMLA leave." What are the facts upon
23  which that's based?
24    MS. JOHNSON: Same objection.
25    A. These phrases were not written by me and I don't

14 (Pages 333 to 336)

Page 353

1  homework --
2      A. It's hard.
3      Q. Hard to get students to develop study habits;
4  isn't it?
5      A. Yes --
6      Q. And one of the main --
7      A. -- very difficult.
8      Q. One of the main -- I don't know if it's the main
9  thing -- but a primary objective of teaching is to teach
10  students good study skills; isn't it?
11      A. Yes.
12      Q. And organizational habits?
13      A. Yes.
14      Q. And in order to do this, one must set an
15  example; right?
16      A. Yes.
17      Q. For instance, in my daughter's 6th grade
18  class --
19      A. Uh-huh.
20      Q. -- she has to complete an assignment planner
21  every day --
22      A. Uh-huh.
23      Q. -- sign it and have her parents sign it; right?
24      A. Yes.
25      Q. Okay. So one method of instilling those good

Page 354

1  organizational habits and study skills is to require a
2  consistent and regular effort; wouldn't you agree?
3      A. Yes.
4      Q. And with students for whom they're already at
5  risk, would you agree that one could instill better study
6  and organizational skills through weekly assignments with
7  weekly due dates rather than just one assignment and due
8  date for homework for the entire class?
9      A. As I recall, that is what Dr. Tuthill suggested,
10  that I give the due dates each week instead of every two
11  weeks.
12      Q. Okay. But prior to that, do you recall if in
13  Business 154 for the entire semester, there were only
14  three due dates?
15      A. Three?
16      Q. Yes.
17      A. If there were, they were changed to more regular
18  due dates because I -- as I recall, I had frequent due
19  dates and that -- in the fall of 2003.
20      Q. Uh-huh.
21      A. And then I made them more frequent at his
22  request.
23      Q. Okay. In the fall 2003, did you have a policy
24  on late assignments or late homework turned in?
25      A. Probably did.

Page 355

1      Q. Okay.
2      A. Because if I -- instructors need a policy on
3  late homework.
4      Q. What was your policy in the fall of '03?
5      A. I don't recall what it was, but prior -- just
6  prior to each due date I would send each student -- I
7  would send an e-mail to the students reminding them of
8  the due date.
9      Q. Uh-huh. And did you tell them what the
10  consequences were for failure to turn in a timely
11  assignment?
12      A. Well, if there was a student behind, I would
13  give -- send them an e-mail and ask them to make an
14  appointment to come see me --
15      Q. Uh-huh.
16      A. -- so we could sit down and talk about what they
17  needed to do --
18      Q. Okay.
19      A. -- to get their work in.
20      Q. And was your policy that you accepted late
21  homework unconditionally?
22      A. No, I didn't accept -- accept it
23  unconditionally.
24      Q. How did you determine, if at all, whether you
25  would accept late homework?

Page 356

1      A. It was according to the circumstances with each
2  student.
3      Q. Uh-huh.
4      A. All -- each student is an individual. You can't
5  judge one by the other.
6      Q. How --
7      A. And you have to remember that my students, the
8  median age was 35.
9      Q. Uh-huh. How was the student to know in advance
10  whether their homework would be accepted late then?
11      A. They perhaps wouldn't know unless they came over
12  and sat down and talked with me in my office --
13      Q. Okay.
14      A. -- which I was in my office all day, every day.
15      Q. Okay. As a teacher, do you believe that it's
16  important for students to be treated equally?
17      A. Yes, I do.
18      Q. And do you believe that it's important not to
19  show favoritism?
20      A. Yes, I do.
21      Q. Or the appearance of favoritism?
22      A. Yes, I do.
23      Q. In your studies, have there ever been times when
24  professors or teachers that you had had a posted policy
25  or a published policy on late homework or late

EXHIBIT
Page 62 of 8

Page 369

1    A. -- without my assistance.
2    Q. Okay. And he said, "Second, you've apparently
3 ended all three of these courses too early. They're all
4 scheduled to run until April 26th and the last -- the
5 last day of classes in the spring semester. Your
6 syllabus for Business 112 and 260 indicates students must
7 complete their assignments on April 16th, ten days before
8 the close of the semester. Unless you have authorization
9 from the dean, you need to follow the academic schedule,
10 including the Blackboard courses." In your opinion, was
11 that an unreasonable request that you run the classes?
12    A. Yes, it was.
13    Q. Why was it unreasonable?
14    A. All college professors, they always end their
15 work ahead of the time that the semester ends --
16    Q. Uh-huh.
17    A. -- in order to get all papers graded and to aid
18 students in doing catch-up work and things like that.
19 There's a lot to be done. And then the registrar
20 requests that graduating students' grades be in earlier
21 to that date, prior to that date. And you cannot, in all
22 fairness -- I cannot tell one student, "Your semester is
23 going to end on this date," but another -- to other
24 students tell them, "Your semester is going to end on
25 this date."

Page 370

1    Q. Uh-huh.
2    A. They all have to have the same date. And in
3 order to get grades sent and to get the papers graded by
4 graduation and get them to the registrar so they can fix
5 out all the necessary paperwork for graduation, the date
6 was prior to that date.
7    Q. Okay.
8    A. But I don't recall exactly what it was.
9    Q. All right. In your opinion, did Dr. Tuthill
10 have anything with the interest of the students in mind
11 when he asked you to make that change?
12    A. I had -- I had no idea what Dr. Tuthill had in
13 his mind at that time.
14    Q. Okay. Then the third thing he said is that you
15 were under-utilizing several Blackboard features that
16 could make the courses more user-friendly. It says,
17 "In your syllabus you emphasize that you will not use the
18 Blackboard chat room or discussion board. Please
19 reconsider. It would help to have regular Blackboard
20 discussions in each of your classes and possibly to
21 arrange for some activities in which your students can
22 use the Blackboard to work together. The students need
23 to feel they're part of a group, that they're not alone.
24 And having the chance to interact with you as a group
25 could keep them going." In your opinion, was that

Page 371

1 request unreasonable?
2    A. No, it was not unreasonable, but I began to feel
3 at this time he was taking away all of my academic
4 freedom to teach my classes as I saw fit.
5    Q. Uh-huh. Well, as the new dean -- as the dean of
6 instruction, he was entitled to scrutinize?
7    A. I suppose -- I suppose he was entitled, yes.
8    Q. Okay. And what action, if any, did you take in
9 response to that suggestion?
10    A. We had verbal discussions about the chat room
11 and I explained to him why I didn't use the chat room
12 because it was almost impossible because the students out
13 in the villages did not have access to computers as they
14 chose and the chat room is more usable when you get
15 everyone online at the same time. Now a lot of
16 instructors and a lot of universities use the chat room.
17 In fact, I'm taking an online course myself, and I will
18 have to tune in into the chat room at a certain time, at
19 a certain time of the week in order to chat with all
20 students, inter- -- intermingle with the other students,
21 which is okay if you live in an area of a country that
22 that is possible. But in Barrow and the facilities that
23 we had out in the villages, it was not possible.
24    Q. Uh-huh. Where wasn't it possible to communicate
25 in a chat room at a certain time?

Page 372

1    A. Because --
2    Q. Actually the question was where. Where was it
3 not possible?
4    A. Where was it not possible?
5    Q. Uh-huh.
6    A. The students who were out in the villages, their
7 facilities were so limited and they had only access at
8 certain times of the day. They did not have constant
9 access to a computer. In fact, the students in the
10 villages were very limited in their access to a computer.
11    Q. Was it not possible to schedule a Blackboard
12 discussion for the students in the villages and the
13 students in Barrow at a time when the students in the
14 villages had access to the computer?
15    A. There in -- I never knew of any computer being
16 in the village -- more than one computer that was access
17 and only one student could have used it at -- at the
18 time.
19    Q. Uh-huh. Well, they could all have sat before
20 the -- the screen; right?
21    A. Well, the problem would have been getting them
22 all there and the fact that the facilitator's office was
23 open at the time when I could have gotten them all
24 together.
25    Q. Uh-huh.

23 (Pages 369 to 372)

EXHIBIT
Page 63 of 88

Case No. A05-086 CV (TMB)                                    Bobbi Wade

Page 373

1    A. And my students were so widespread and had such
2  limited facilities that it was impossible to get them all
3  together.
4    Q. Okay. Did you make --
5    A. And that's the reason I didn't use the chat
6  room.
7    Q. Did you make any attempt to incorporate the
8  suggestion by seeing if there was any time that you could
9  schedule an online chat session?
10    A. I would have, had I stayed there.
11    Q. Uh-huh.
12    A. But you have to remember, the Blackboard and the
13  online facilities was still in the pioneer stage.
14    Q. Sure. Did you make any attempt in the spring
15  semester 2004 to incorporate those suggestions?
16    A. No, I don't recall that I did because I had the
17  same problem in the spring that we had, you know, prior
18  to that time --
19    Q. Okay.
20    A. -- but hopefully we were expecting things to get
21  better. The distance education had many, many, many
22  problems.
23    Q. Uh-huh. And in your opinion, was Dr. Tuthill's
24  suggestion that you try and schedule a chat room done
25  other than to further the interest of the students?

Page 374

1    A. I never had an opinion about it. I just
2  discussed it with him and I explained to him what my
3  reasons were for not using the chat room and I also
4  explained to some of the students my reason because there
5  might have been some students on campus there in the dorm
6  that might have had acc- -- more access to computers. I
7  know I had computers in my classroom and I urged -- I
8  constantly urged the students to come over and use the
9  computers in my classroom at any time and they would
10  never come.
11    Q. Okay. Back to the talk talking about the
12  success rate. Do you believe that the success rate you
13  had for the Blackboard courses was -- let me restate
14  that.
15    Dr. Tuthill, I think that you know, I'll show you
16  the document later, but during the grievance proceeding
17  he took the position that the success rate for your
18  classes was lower than for some of the other classes. Do
19  you recall reviewing that?
20    A. The success rate?
21    Q. Yes.
22    A. Reviewing, what, my success rate?
23    Q. He took the position in the context of the
24  grievance proceedings that your success rate for the
25  Blackboard courses was lower than other instructors'.

Page 375

1    A. Yes, he said it was lower.
2    Q. Okay. And do you agree with that?
3    A. No, I don't agree with that.
4    Q. Why not?
5    A. Because the success rate of other classes were
6  lower than mine, some -- some of the other classes.
7    Q. Uh-huh. Do you know which ones?
8    A. One in particular, that I recall, was J. St.
9  Vincent, the English teacher.
10    Q. Uh-huh. And which class did she teach that you
11  believe had a lower --
12    A. It was a --
13    Q. -- success rate?
14    A. It was an English class. I don't recall which
15  English class, but I remember that she had up -- maybe up
16  to eight students in the class and they had all withdrawn
17  or either failed.
18    Q. Do you remember when that class was taught?
19    A. It was the fall semester.
20    Q. Okay.
21    A. Uh-huh.
22    Q. Anybody else?
23    A. There was an adjunct professor that taught a
24  health course and I noticed that all of her students
25  failed or either withdrew. And I couldn't understand

Page 376

1  where Dr. Tuthill was getting these statistics on --
2    Q. Uh-huh.
3    A. -- my classes in regards to other classes.
4    Q. Okay.
5    A. And then my classes had many more students so
6  consequently many more students and in particular
7  Business 154 was kind of an unusual situation that I had
8  come about those students to begin with.
9    Q. Why --
10    A. Those students should never have been enrolled
11  in my class.
12    Q. Why is that?
13    A. Because I didn't register those students and --
14  and they were not business management students. The
15  student that complained so much was not -- I don't
16  believe that she was a business management student.
17    Q. Uh-huh. Why would that prevent them from taking
18  your class?
19    A. It wouldn't, but had I been the one to have
20  registered those students, I would never have advised
21  them to take that class.
22    Q. Why?
23    A. And I would have certainly cut off the load
24  limit of the class long before it reached 22 or 23 or 24,
25  whatever -- how many it was, when I had specifically

24 (Pages 373 to 376)

Case No. A05-086 CV (TMB)

Bobbi Wade

Page 381

1    A. I don't know what someone else would think.
2    Q. Okay. Did Sonya at this point ask you for
3 guidelines for late homework?
4    A. I don't remember that she did. She might have.
5    Q. Okay. Did you ask Sonya to give you a list of
6 students -- let me say that -- this again. With respect
7 to Business 154, did you ask Sonya to inform a list of
8 students that you gave to Sonya that you would be
9 withdrawing them if they didn't turn in their homework?
10    A. I could have because the students were going to
11 see her, they weren't coming to see me as -- as they
12 should have been.
13    Q. Okay. And did you ask her if Sonya would
14 contact them to give them that information?
15    A. I don't know. I don't recall telling her that.
16 I could have.
17    Q. Okay. Do you remember telling Sonya that you
18 had an announcement posted on the Blackboard of Business
19 154 about what -- that you would withdraw them if they
20 didn't turn in their homework?
21    A. I -- I don't recall telling her that.
22    Q. Do you recall if you told her that the students
23 don't bother to log in to look at it?
24    A. I don't recall telling her that, but I could
25 have.

Page 382

1    Q. Okay.
2    A. All they had to do was -- they were taking a
3 Blackboard course so they should have consulted the
4 Blackboard. We communicated through the Blackboard, not
5 through Sonya.
6    Q. Right. One -- one method was the Blackboard
7 announcement; right?
8    A. Well, that was the primary method.
9    Q. Do you recall if at any time in Business 154 you
10 posted an announcement on the Blackboard informing the
11 students -- informing which students had not turned their
12 homework in and that they would be withdrawn if they
13 didn't turn their homework in?
14    A. I would never post anything that would be
15 embarrassing to -- for a student on the Blackboard,
16 single out students on the Blackboard.
17    Q. Did you do it more generically, advise them that
18 if they did not turn in their homework --
19    A. If I did it at all, it was generic, yes.
20    Q. Do you recall if you did?
21    A. No, I don't.
22    Q. Do you recall if you represented to Sonya that
23 you did?
24    A. No, I don't. At that time, spring registration
25 had begun and it was a super busy time and with students

Page 383

1 trying to finish up the semester and students registering
2 for the --
3    Q. Uh-huh.
4    A. -- spring semester.
5    Q. Do you recall if there were any students in your
6 class that e-mailed you with questions about the course
7 that you failed to respond to?
8    A. I do not recall any students e-mailing me that I
9 never responded to their e-mails. I do know that a lot
10 of students e-mailed me from computers that I could get
11 their e-mails but I couldn't send the e-mails back
12 because they did not use their correct e-mail address.
13    Q. Uh-huh.
14    A. And it was a real problem and I consulted with
15 Rob Carrillo about that problem constantly. We
16 constantly had problems with students because they were
17 constantly told they had to use the correct e-mail number
18 and consequently a lot of them didn't and it caused big
19 problems when they didn't use the correct e-mail number.
20 I could send a blanket e-mail to all students from the
21 Blackboard classes and some of the students would get it
22 and some wouldn't. And I would then give Rob a list of
23 those students and he would check out the problem to find
24 out what the problem was because the students couldn't
25 get the e-mails. You have to keep in mind that it was

Page 384

1 still pioneer with Blackboard.
2    Q. Okay. If a student sent you an e-mail, though,
3 and you simply replied, why is it they wouldn't get the
4 e-mail?
5    A. If they had not used the -- there was something
6 about the system. If they didn't use the correct e-mail
7 number, my reply would not go back to them. It would not
8 go back to them on the e-mail they had used to send it to
9 me.
10    Q. Uh-huh. I'm not sure if I understand what you
11 mean by "e-mail number."
12    A. The e-mail address, not -- not number. I refer
13 to it as number, like a phone number, but it's actually
14 address.
15    Q. Well --
16    A. And that was a big problem, students not using
17 the correct e-mail address to send an e-mail to me.
18    Q. Uh-huh. But if you actually received an e-mail
19 from a student and you pushed reply to sender and sent a
20 substantive response, is it your testimony that those
21 e-mails weren't getting through?
22    A. Some of them wouldn't. It would come back to me
23 unsent.
24    Q. And do you know why --
25    A. No, I --

26 (Pages 381 to 384)

Case No. A05-086 CV (TMB)                                              Bobbi Wade

Page 393

1   A. -- in any way in the classroom. I don't recall
2   what I might have said or what I might have done, but I
3   would never embarrass a student as to their capabilities.
4   Q. Did you ever say in response to an incorrect
5   answer, "No, no, no, that's not right"?
6   A. No. Not as far as a student's answer.
7   Q. Uh-huh. In your opinion, would that be an
8   inappropriate response --
9   A. Yes, it would.
10  Q. -- to this?
11  A. I might have said, "No, no, no, that's not
12  right, I'm not -- you know, I'm not going to fly to
13  Mars," you know, as a humorous thing, but not in the
14  answer to a serious question, no. My classes were kept
15  rather -- rather humorous at all times.
16  Q. Right. Then with respect to Business English
17  109 in the fall of '03, was -- did there come a time when
18  you threw the test away that students had taken and
19  didn't grade them?
20  A. There might have been a time. It seems like the
21  time that I threw -- that I did not count the test, the
22  only time that I would not have counted a test is because
23  they all failed it and I just disregarded it altogether
24  and started over and tried to reemphasize.
25  Q. Do you remember if you told the class that

Page 394

1   someone had stolen your answer keys so that's why you
2   threw the test away?
3   A. No. My books went missing at times, but I don't
4   ever remember telling a student that my answer key was
5   stolen.
6   Q. All right. And so I take it, then, that you
7   wouldn't remember in the same discussion telling the
8   class that they could try and challenge the test with a
9   CLEP test, but they should trust you that they would not
10  want to and just come to class?
11  A. I told them that it was very -- it was very
12  hard, the test was very hard, and anyone who could pass
13  it, but it wasn't the CLEP test. There was a formal
14  procedure to go through --
15  Q. Uh-huh.
16  A. -- for a CLEP test.
17  Q. Uh-huh. What does "CLEP" stand for?
18  A. I don't recall right now, but it -- it means
19  that a student can test out of a course.
20  Q. So they can take the test in lieu of the course?
21  A. Yes, but this was not handled under the same
22  procedure as -- this was not the same thing as the CLEP
23  test because these were basic courses. And Courtney
24  Bartholomew, who was in the same department, he did the
25  same thing with the basic computer course. Students who

Page 395

1   were very skilled in computers when they first went to
2   his class because they were required to take the course,
3   he would give them a test and if they passed it, then
4   they didn't have to take the course. It was basically
5   the same way in Business English and Business Math.
6   Q. Okay.
7   A. Because I had some very low students and some
8   very smart students and the smart students would sit
9   there and listen to me day after day tutor and -- to try
10  to teach those low students would have been very boring
11  because I was trying to teach them materials that the
12  smart students already knew. So I followed Courtney's
13  procedure and just for Business English and Business
14  Math, nothing else, I gave them a basic English skills
15  test to cover all the material in the course, including
16  A, B and C, and if they passed those tests, I gave them a
17  comprehensive test for A, a comprehensive test for B and
18  a comprehensive test for C. And if they passed all those
19  tests, above a C, with a score above a C, then they were
20  not required to come to class and take the course.
21  Q. Uh-huh.
22  A. And I gave them the score they made on their
23  test paper as a grade at the end of the semester or the
24  course.
25  Q. Okay. Did you ever cancel class in Business

Page 396

1   English 109 in the fall of '03?
2   A. Cancel for what purpose? We had many purposes
3   that got -- classes were cancelled?
4   Q. Did you ever cancel the class?
5   A. I don't recall, but it's possible that I did.
6   Q. Okay. And did you ever cancel the next
7   meeting's class at the end of the current meeting's
8   class? In other words, not announce a class cancellation
9   until --
10  A. No, I would never cancel a class without an
11  announced cancellation.
12  Q. Okay.
13  A. And if I cancelled a class it was due to the
14  road being impassable or the snow being piled on the road
15  or the inclement weather and sometime when it was almost
16  impossible for students to get to class.
17  Q. Okay. In Business 109, in the fall semester of
18  2003, did you announce that instead of meeting two days a
19  week we would only be meeting one day a week?
20  A. I never made any announcements that -- unless it
21  was a regular scheduled procedure.
22  Q. Okay.
23  A. I don't know exactly what you're talking about
24  here.
25  Q. Well, when you turned in the course schedule

29 (Pages 393 to 396)

EXHIBIT

Page 66 of 68

Case No. A05-086 CV (TMB)                                                Bobbi Wade

---

Page 417

1  Q. Uh-huh. In your opinion, was you teaching your
2  granddaughter independent studies or even regular course
3  work subject to an appearance of favoritism?
4  A. No, I don't think it was, not under the
5  circumstances.
6  Q. And in your opinion, would reasonable educators
7  agree that it was perfectly all right under the
8  circumstances for you to teach your daughter numerous --
9  your granddaughter numerous courses including independent
10  studies?
11  MS. JOHNSON: Foundation.
12  A. Would you please --
13  Q. Do you believe --
14  A. -- condense your question so that it's
15  understandable?
16  Q. Do you believe reasonable educators would agree
17  with you that it's perfectly all right for --
18  A. Under different circumstances other than
19  Ilisagvik and in Barrow, yes.
20  Q. How long did Amy live with you?
21  A. She lived with me a semester and then she -- we
22  got word that her father had a cancer very -- in very
23  severe -- severe stages.
24  Q. Okay. So she took one semester of coursework?
25  A. Yes, while she was there. She took some courses

Page 418

1  or either tried to take some after she left, but I don't
2  think she ever did.
3  Q. What semester was it?
4  A. I don't recall. I would have to look at the
5  records just like I look at any other student's records.
6  Q. Uh-huh. Well, he says that as of January --
7  January 2004 that she's been living in Tennessee. You
8  would agree that she was living in Tennessee; correct?
9  A. In 2004, yeah. Right.
10  Q. And your son got cancer in 2002; didn't he?
11  A. Yes. In the summer of 2002 is when she left to
12  go back to Tennessee.
13  Q. Okay. So would that make it reasonable to
14  assume that she was there with you in the spring semester
15  of 2002 if she left --
16  A. No, she was in Tennessee.
17  Q. Okay.
18  A. But she was a registered student at Ilisagvik
19  College. She was registered in -- she was accepted into
20  the business management program at Ilisagvik College.
21  Q. Okay. So she lived with you one semester only
22  in Barrow; correct?
23  A. Yes.
24  Q. And then she moved back to Tennessee; correct?
25  A. Yes.

Page 419

1  Q. And never came back to Barrow; right?
2  A. No.
3  Q. Okay. And during the period of time that she
4  was living in Tennessee, she was also a student enrolled
5  at Middle Tennessee State University; correct?
6  A. At -- I don't recall when she was enrolled at
7  Middle Tennessee State University.
8  Q. But you said she was enrolled; correct?
9  A. Yes.
10  Q. And at that time she would have had the option
11  to take those business classes at Middle Tennessee State
12  University; correct?
13  A. She might have. I don't know the circumstances
14  of her opportunities.
15  Q. So -- so the only time that you claim there were
16  these negligent circumstances was the one semester that
17  she lived with you in Barrow when you claimed that she
18  had no other opportunity; correct?
19  A. Right.
20  Q. Okay. So on the other semesters, then, when
21  she's living in Tennessee, there would be an appearance
22  of favoritism in you giving her classes, particularly
23  independent study; weren't there?
24  A. Not if when she wanted to come back to Barrow to
25  graduate, which she did. She wanted to continue her

Page 420

1  studies at Ilisagvik. She only lacked one or two classes
2  being able to graduate and she wanted to graduate from
3  Ilisagvik and she was planning to come back for
4  graduation in the Spring of 2004.
5  Q. Well, I'm sure that any student who could take
6  class from Grandma and have it be an independent study
7  that Grandma created would be happy to do that, but that
8  doesn't negate the appearance of favoritism; does it?
9  MS. JOHNSON: Objection, argumentative.
10  A. I don't know.
11  Q. And is it --
12  A. I can't speak for someone else.
13  Q. Is it up to -- well, you did say that you --
14  A. I would not have favored my granddaughter. I
15  would have done it for any student under the same
16  circumstances.
17  Q. That's not the point, Ms. Wade. The point is,
18  the appearance of favoritism and as a highly educated
19  educator with an administrator's certificate, you don't
20  agree that there's an appearance of favoritism in
21  teaching your granddaughter so many classes?
22  A. There's not an any appearance to me, no. I
23  can't speak for someone else.
24  Q. And it never occurred to you that there would
25  clearly be an appearance of favoritism to any other

35 (Pages 417 to 420)

Bobbi Wade

Page 421

1  reasonable educator that would view this situation?
2      A. No, because everyone at Ilisagvik accepted it.
3  They -- Amy was in other classes. They accepted Amy.
4  There was no one else to teach business management
5  classes. She took other classes from other instructors.
6  When she needed a class that I was teaching, she took it.
7  And I never showed her -- I made a point not to show her
8  any favoritism and what I offered to do for Amy, I would
9  have done it for any student.
10     Q. Did that make it right? Did that negate the
11 appearance of favoritism?
12     A. I don't know in anyone else's opinion whether it
13 was right or not, but it was right in my opinion.
14     Q. Okay. You were also claiming her as a dependent
15 for purposes of tuition waiver; is that right?
16     A. I wasn't claiming her a dependent except for the
17 fact that she lived with me and I was supporting her. I
18 also supported her while she lived in Tennessee. I
19 have -- I supported her for five years.
20     Q. Okay. For what period of time?
21     A. I supported her -- I -- I don't recall.
22     Q. You have no idea when you were -- claimed her as
23 a dependent?
24     A. I never claimed her as a dependent. It was just
25 the fact -- and I inquired at the registrar's office if

Page 422

1  Amy could get -- because of the clause in the rules where
2  it said children of the faculty. And I went over and
3  inquired as to whether or not Amy would have to pay
4  tuition or whether or not she would have to get her
5  tuition waived and I was told that her tuition would be
6  waived, but --
7      Q. And who did -- who did you inquire of?
8      A. I don't remember, but it was over at the
9  business office and the registrar's office.
10     Q. Uh-huh.
11     A. And I got everything cleared through the
12 administration before she registered for a class and --
13 or before she -- when she enrolled.
14     Q. Did you advise the registrar at any time that
15 she was no longer living with you?
16     A. Barrow is very small. Everybody knows
17 everything and Diana Perkett is a really good friend of
18 mine and she knew that Amy had left and she knew why.
19     Q. Uh-huh. Did you advise her in her official
20 capacity as registrar that Amy was no longer living with
21 you and asked if the tuition waiver still applied?
22     A. No, I didn't. But she could have been turned
23 down had it not been.
24     Q. What support did you provide for her when she
25 was not living with you?

Page 423

1      A. I provided a place for her to live and sent her
2  money to live on.
3      Q. How much money did you send?
4      A. I don't know. I don't recall. I never counted
5  it.
6      Q. Did you claim her as a dependent on your tax
7  returns?
8      A. No, I didn't. She filed her own tax return.
9      Q. In your opinion, was Dean Tuthill's inquiry
10 about you teaching your granddaughter 23 units, including
11 independent studies, unreasonable?
12     A. He didn't inquire about it. The only time --
13 the first time I discovered he had any objection to it
14 was when I got this letter, when I received this letter.
15     Q. When he objected to approving individual study?
16     A. Yes.
17     Q. Okay. And in your opinion, was that inquiry
18 unreasonable?
19     A. No, it was not unreasonable, but it would have
20 been more reasonable if he would have called me and said,
21 "Make an appointment, let's -- come over and let's
22 discuss this." But he never consulted me on anything.
23 The only time I knew that there was a problem is when I
24 was reprimanded about it and he never heard my side of
25 the problem.

Page 424

1      Q. And you didn't bother to give him a response?
2      A. Not at this point I didn't because my grievance
3  had already been filed against him.
4      Q. He told you that he -- he had no problem with
5  Ms. Underwood continuing her education at Ilisagvik even
6  in Tennessee, but she should do it via regularly
7  scheduled distance ed classes; correct?
8      A. I don't recall if he said that.
9      Q. It says that right in Exhibit 6- --
10     A. If it says that, then it says that.
11     Q. -4.
12     MS. JOHNSON: I'm sorry, it's 5:15 and I am
13 going to have to leave at 5:30 to pick up my kids --
14     MS. DUCEY: Yeah, yeah, I'm going to --
15     MS. JOHNSON: -- so I just wanted to let you
16 know.
17     MS. DUCEY: Yeah, I'm going to finish this --
18     MS. JOHNSON: Okay.
19     MS. DUCEY: -- line.
20     A. He had a problem with this and no one had ever
21 indicated before that there was a problem with Amy
22 attending Ilisagvik College and getting her tuition
23 waivered because I was on the faculty --
24     Q. (By Ms. Ducey) Uh-huh.
25     A. -- or the fact that I was the only business

36 (Pages 421 to 424)

Page 433

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ALASKA

3

4    BOBBI J. WADE,

5           Plaintiff,

6       vs.

7    ILISAGVIK COLLEGE, NORTH SLOPE
     BOROUGH, JOHN TUTHILL, individually,

8    and PAMELA TAYLOR, individually,

9

           Defendants.

10   _____

11   Case No. A05-086 CV (TMB)

12                                 COPY

13

14

15

16        VIDEOTAPED DEPOSITION OF BOBBI J. WADE

17              Taken December 6, 2006
                Commencing at 9:21 a.m.

18

           Volume III - Pages 433 - 689, inclusive

19

20

21           Taken by the Defendants
                     at
22            Delaney Wiles, Inc.
          1007 West 3rd Avenue, Suite 400
23            Anchorage, AK 99501

24

25   Reported by:  Valerie Martinez

A05-086 CV (TMB)                                                    Bobbi J. Wade

Page 462

1  because they had previously taught them.
2  Q   When you say that "they were scheduled to teach
3  those classes," tell me what documentary evidence
4  supports that claim.
5  A   The schedules we made out and turned in to the
6  dean's office.
7  Q   Now, Dr. O'Rourke was the acting dean during this
8  process of arranging for the schedules; correct?
9  A   Yes.
10  Q   And you understood that they were looking for a
11  permanent replacement; right?
12  A   Yes.
13  Q   And that hopefully they were going to have a
14  permanent dean on board by the time classes started in
15  August; correct?
16  A   Yes. Because I was on the hiring committee.
17  Q   Did you understand that when the new dean came,
18  there might be changes to the schedule?
19  A   No.
20  Q   But you knew that that was within his authority to
21  do; correct?
22  A   I had not thought about it.
23  Q   Any reason to believe now that he didn't have the
24  authority to change the schedule?
25  A   No.

Page 463

1  Q   And offering those contracts to adjuncts would, of
2  course, be dependent on budgetary constraints; right?
3  A   Yes.
4       MS. JOHNSON: Objection. Calls for a legal
5  conclusion.
6  BY MS. DUCEY:
7  Q   Did you also know that in the course of your
8  employment with Ilisagvik that class schedules were
9  sometimes adjusted to meet student needs, particularly
10  graduation needs and certification completion?
11  A   Yes, ma'am, they always were.
12  Q   Okay. So you said that you were on the hiring
13  committee for the dean. Can you tell me what
14  involvement you had in that?
15  A   We had meetings to review applications.
16  Q   And when did those occur?
17  A   Those occurred, I would say, in June -- May and
18  June.
19  Q   What other involvement did you have?
20  A   We had a teleconference interview with the
21  prospective deans. We all asked questions.
22  Q   Do you remember how many interviews you
23  participated in?
24  A   For Dr. Tuthill?
25  Q   For any applicant.

Page 464

1  A   For any applicant that was -- for that particular
2  job?
3  Q   Uh-huh.
4  A   That was the -- there was one other and it was for
5  another person, and I don't recall his name because he
6  was not hired.
7  Q   Did the hiring committee make any recommendations?
8  A   Yes, ma'am. But we had a chair of the hiring
9  committee.
10  Q   Who was the chair?
11  A   Beverly Grinage.
12  Q   Did you participate in a phone interview with Dr.
13  Tuthill?
14  A   Yes, I did.
15  Q   More than one?
16  A   No, just one. That's the only phone interview we
17  had.
18  Q   Did you meet with Dr. Tuthill before an offer was
19  made to him?
20  A   No, ma'am.
21  Q   Is that because you were already gone for the
22  summer?
23  A   Yes, ma'am.
24  Q   Do you know if anyone else on the committee met
25  with him?

Page 465

1  A   Yes, ma'am.
2  Q   Who else met with him?
3  A   The only person I know that met with him was Jay
4  St. Vincent.
5  Q   How do you know that?
6       MS. JOHNSON: Objection. Speculation.
7       MS. DUCEY: You can answer if you know.
8       THE WITNESS: She told me.
9  BY MS. DUCEY:
10  Q   What did she tell you about that meeting?
11  A   She talked about it in a faculty meeting, her
12  meeting with Dr. Tuthill.
13  Q   Do you remember what she said?
14  A   No, I don't.
15  Q   Did Beverly Grinage make a recommendation that Dr.
16  Tuthill be hired, if you know?
17  A   I don't know. I don't know who made the
18  recommendation.
19  Q   Did Jay St. Vincent recommend that Dr. Tuthill be
20  hired?
21  A   I don't know.
22       MS. JOHNSON: Foundation.
23  BY MS. DUCEY:
24  Q   Did you make a recommendation that he not be hired?
25  A   No, I did not.

EXHIBIT    9 (Pages 462 to 465)

A05-086 CV (TMB)                                    Bobbi J. Wade

Page 466

1  Q   Did you have a recommendation -- sorry -- let me
2  restate that.  Did you have a choice, as between these
3  two applicants, who should be hired?
4  A   I believe I did in a meeting before I left.  We
5  decided that Dr. Tuthill would be hired dependent upon
6  his visit to the campus, and there would be two or three
7  people there to meet with him, but the others would be
8  gone by that time.  And one of those people was Jay.
9  Q   Did you agree with that recommendation?
10 A   Yes.
11 Q   Why did you agree with it?
12 A   We didn't have a lot of choice at that time and we
13 were being urged to hire someone.
14 Q   Did you have any reservations about Dr. Tuthill?
15 A   No, ma'am.  I didn't know him.
16 Q   Did he appear to meet the qualifications?
17 A   Not as well as some of the others.
18 Q   Who else met the qualifications better?
19 A   There was another person, but Edna recommended that
20 he not be considered.
21 Q   Do you know why?
22 A   Because he was the uncle of one of the faculty.
23 Q   Do you remember what that person's name was?
24 A   No, I don't.
25 Q   Did she say why she was concerned about that?

Page 467

1  A   Because he was a relative.
2  Q   And she would -- let me restate that.  Who was the
3  faculty member, if you recall?
4  A   John Howlett.
5  Q   And what was he teaching?
6  A   He's in the vocational department.  He teaches
7  plumbing and carpentry.
8  Q   And what was it about his uncle that you thought
9  resulted in better qualifications by him?
10 A   I don't recall because it's been a long time since
11 I saw his resume, and I don't recall what his
12 qualifications were.
13 Q   I got a little bit off track.  I want to go back to
14 Dr. O'Rourke for a minute.  So, you told me that you had
15 meetings with him, you thought, in the spring, every
16 spring, to go over the course schedule; right?
17 A   Usually he aided in scheduling.
18 Q   Yes.
19 A   Yes.
20 Q   Did you ever have any problems dealing with him?
21 A   No, I didn't.
22 Q   Did you ever disagree with him with respect to
23 class or course schedulings when you met with him?
24 A   I don't recall any disagreements.  There might have
25 been some time -- some class times that I disagreed

Page 468

1  with, but anything that I suggested, Dr. O'Rourke always
2  went along with my suggestion if he thought it was
3  feasible.  And if he didn't, he told me why and we made
4  changes.  We worked very well together.
5  Q   Do you think he was fair?
6  A   Yes, he was.
7  Q   Did you believe that he was qualified to be doing
8  the things he was doing at the college?
9  A   I had no idea what Dr. O'Rourke's qualifications
10 were.
11 Q   You didn't know that he had been chancellor at UAF
12 for a number of years?
13 A   No, I didn't.
14 Q   Any reason to believe, in your dealings with him,
15 that he was not qualified?
16 A   No.
17 Q   What other situations did you meet with Dr.
18 O'Rourke on?
19 A   Those are the only ones that I recall.
20 Q   For a minute, could you go back to 95?  You can
21 take as much time as you need, Ms. Wade.  Can you tell
22 me anywhere on this job description where it says that
23 you supervise other faculty?
24 A   No, it -- I know it doesn't say that, without
25 reading it.

Page 469

1  Q   Anyplace where it says you supervise adjuncts?
2  A   No.
3  Q   Is there anyplace in the job description that says
4  you control the curriculum for other faculty besides
5  yourself?
6  A   No.
7  Q   If you could just pick up the contract again, which
8  is Number 12, is there anywhere in the contract that
9  says you supervise other faculty members?
10 A   No, ma'am.
11 Q   Or adjuncts?
12 A   No, ma'am.
13 Q   Is there anywhere in the contract that says you
14 control the curriculum of other faculties?
15 A   Go over curriculum?
16 Q   That you control the curriculum for other faculty
17 members?
18 A   No, ma'am.
19     MS. JOHNSON:  Should we take a quick break
20 while we're waiting?
21     MS. DUCEY:  Sure that's fine.
22     THE VIDEOGRAPHER:  Off record.  10:13 a.m.
23 Tape number one.
24     (Off the record.)
25     THE VIDEOGRAPHER:  On record.  10:24 a.m.

A05-086 CV (TMB)                                                                 Bobbi J. Wade

Page 630

1  besides Pam on that one occasion?
2  A   No.  There was another person, but she was not
3  regular faculty.
4  Q   Who was that?
5  A   It was Aimee Valenti.
6  Q   When did she yell at you?
7  A   When she came into my office.
8  Q   And you yelled back; right?
9  A   No, I did not.  I do not yell at people on the job.
10 Q   So you deny that you raised your voice?
11 A   I certainly do.
12 Q   Or became upset?
13 A   I was upset but she didn't know it.
14 Q   Did you have a heated discussion with her?
15 A   No, it was not a discussion.  She just came in and
16 yelled at me, turned around and left.  And I said
17 nothing to her.
18 Q   And what did she yell?
19 A   That I was not her boss, that John was her boss,
20 that she wouldn't do anything I said, she would only do
21 what John said.
22 Q   How did Aimee Valenti fit into John's specific
23 plans so that he wanted to favor her over you?
24        MS. JOHNSON:  Objection.  Form.
25        THE WITNESS:  I don't know.

Page 631

1  BY MS. DUCEY:
2  Q   Any other ways that you believe you were denied
3  access to a meaningful appeal?
4  A   No.  I can't think of any.
5  Q   Okay.  What appeal process are we talking about,
6  specifically, here in number 45?
7  A   Number 45 was the appeal that took place on -- it
8  finally took place on June the 24th of 2004.
9  Q   Now, was this with Dr. O'Rourke and Cheryl McKay.
10 A   Yes.
11 Q   And Ted Stepovich as your lawyer?
12 A   Yes.
13 Q   So that was Step 3 of the grievance process;
14 correct?
15 A   Yes.
16 Q   It wasn't technically an administrative appeal, was
17 it?
18        MS. JOHNSON:  Objection.  Foundation.
19        THE WITNESS:  I don't know what you mean.
20        MS. JOHNSON:  Calls for a legal conclusion.
21        THE WITNESS:  Yeah, I don't know what you mean
22 by an administrative appeal.
23 BY MS. DUCEY:
24 Q   You understood that this was the final step in the
25 internal grievance process; correct?

Page 632

1  A   Yes.
2  Q   All right.  It says, "Defendants deprived Ms. Wade
3  of her rights to discovery..."  What do you mean by
4  that?
5  A   It was the book of information that they brought
6  into the room that I had never seen before.  They had
7  compiled -- just like you have your book there -- they
8  had put together a compilation of the documents that I
9  have never seen before.
10 Q   Anything else with respect to the right of
11 discovery?
12 A   No.  And they went through all the documents as to
13 why in John's defense and then they gave me 20 minutes
14 to respond to it and I refused.  I told him there was no
15 way I could respond in 20 minutes.
16 Q   That's what you said?
17 A   Yes, uh-huh.
18 Q   But you had a lawyer there; right?
19 A   He wasn't there.  He was on the speakerphone.
20 Q   He was participating; right?
21 A   Yes.
22 Q   And had you presented him with the information you
23 thought was appropriate for the hearing?
24        MS. JOHNSON:  We are not waiving
25 attorney-client privilege with respect to testifying.

Page 633

1  BY MS. DUCEY:
2  Q   I'll restate it.  Did you have an opportunity to
3  meet or discuss with him the subject of the grievance?
4  Don't tell me what he said.  Just tell me if you had the
5  opportunity to.
6  A   I had the opportunity --
7        MS. JOHNSON:  Wait.  I object to whether they
8  discussed it, whether they met is a fair question.
9  BY MS. DUCEY:
10 Q   Did you have the opportunity to meet with him
11 before the hearing?
12 A   No.
13 Q   Why not?
14 A   Because he was in Anchorage and I was in Barrow.
15 Q   Did you have the opportunity to mail or e-mail or
16 otherwise communicate things to him that you thought he
17 should know?
18 A   No.  He had, just prior to the meeting --
19        MS. JOHNSON:  Don't tell anything that he said
20 to you.  You can tell actions but don't say
21 conversations to him.
22        THE WITNESS:  I had sent him a copy of my
23 grievance.
24 BY MS. DUCEY:
25 Q   Okay.  Let's see, back to Number 7 for a minute.

A05-086 CV (TMB)                                                    Bobbi J. Wade

Page 674

1  A  No.
2  Q  Then what happened?
3  A  John began to explain to me that he could
4  terminate -- he could not renew my contract and he
5  didn't have to have any reason.
6  Q  Then what happened?
7  A  I told him -- I said, well, you do whatever you
8  feel like you need to do and I will do whatever I feel
9  like I need to do. And Pam says --
10 Q  What did you mean by that?
11 A  -- and Pam says, read the letter. And I told her,
12 no, Pam, I will not read the letter now. There is no
13 need to read it. I know what it says.
14 Q  What did you mean that you do whatever you have to
15 do and I'll do whatever I have to do?
16 A  Well, I knew they were violating a federal law.
17 Q  What federal law did you know they were violating?
18 A  I knew I was in the protected class.
19 Q  Based on age?
20 A  Yes.
21 Q  So you thought they were violating the age
22 discrimination law?
23 A  Yes, I did.
24 Q  Is there anything else you thought they were
25 violating?

Page 675

1  A  Not at that particular time.
2  Q  And how were they violating the federal law on age?
3  A  Because I was in a protected class, and I was
4  nearing vesting in retirement.
5  Q  So, I will do whatever I have to do means that you
6  were going to sue?
7  A  I would seek further counsel concerning that.
8  Q  And possibly sue?
9  A  Yes.
10 Q  So it was a threat?
11 A  No, it wasn't a threat.
12 Q  Or it was a promise?
13 A  It was a promise, yeah. I don't threaten people.
14 Q  And was anything else said at that meeting?
15 A  No.
16 Q  Why didn't you file your EEOC complaint then?
17 A  I didn't think it was -- that it was part of the
18 procedure that I would need to file it.
19 Q  Can you look at page 14? And the Seventh Cause of
20 Action says Violation of the Alaska Whistleblower Act.
21 Do you see that?
22 A  Yes, uh-huh.
23 Q  Sixty-four says, "Ms. Wade was terminated for
24 reporting a discriminatory employment practice to
25 Defendants Tuthill and Taylor." Do you see that?

Page 676

1  A  Yes.
2  Q  What did you report?
3  A  The grievance that I reported on December the 11th.
4  Q  Anything else that you claim was the report?
5  A  No, that was it.
6  Q  And to whom did you report it?
7  A  I sent a copy to Tuthill. I sent a copy to Taylor
8  and I sent a copy to Edna and I sent a copy to the chair
9  of the department, Courtneay Bartholomew.
10 Q  And what discriminatory employment practice did you
11 report at that time?
12 A  It's in the grievance that I filed on December the
13 11th. It's in the complaint. I call it a complaint
14 because Pam says it wasn't a grievance.
15 Q  Do you remember what discriminatory practice you
16 reported?
17 A  No, but it's all those things that I just named to
18 you a little while ago.
19 Q  Okay. This is 38. Is that the document that
20 you're referring to?
21 A  Yes.
22 Q  So this is the report that you claim forms the
23 basis --
24 A  Yes.
25 Q  -- of the Seventh Cause of Action --

Page 677

1  A  Yes.
2  Q  -- the report?
3  A  Uh-huh.
4  Q  Okay. Is there anything in this document that
5  deals with matters other than are personal to your own
6  employment situation?
7  A  That deals with matters other than my own?
8  Q  Yes.
9  A  I don't think so.
10 Q  So all of this grievance deals with your own
11 personal employment situation; is that right?
12 A  Yes, uh-huh.
13 Q  There is nothing that deals with any other
14 employees; correct?
15 A  Not that I recall.
16 Q  Is there any statement in there or request that
17 some system-wide policy of Ilisagvik be changed?
18 A  In here?
19 Q  Yes.
20 A  I requested --
21 Q  Yes.
22 A  -- a policy to be changed?
23 Q  Some system-wide policy to be changed.
24 A  I don't recall any.
25 Q  Is there anything in Exhibit 38 that requests that

A05-086 CV (TMB)                                              Bobbi J. Wade

Page 678

1  system-wide practice be changed?
2  A  I don't recall any.
3  Q  This was a grievance that covered your own
4  employment dispute with your supervisor, John Tuthill;
5  right?
6  A  Yes.
7  Q  Was it a matter of personal concern to you?
8  A  I would say that it was, yes.
9  Q  And was your personal issue a matter of concern to
10  anybody else in the public?
11  A  I don't --
12      MS. JOHNSON:  Just a second.  I think that
13  calls for a legal conclusion.  You can answer.
14      THE WITNESS:  I don't think so.
15  BY MS. DUCEY:
16  Q  What adverse action was taken against you as a
17  result of filing this grievance?
18  A  I was terminated from -- my contract was not
19  renewed.
20  Q  And who do you believe discriminated against you
21  for filing this grievance?
22  A  John Tuthill.
23  Q  And what are the facts that would support that
24  claim?  That he discriminated against you because you
25  reported -- as it alleged in paragraph 65 -- a matter of

Page 679

1  public concern?
2  A  I suppose this is the public concern.  Which one
3  are you on?  Page 14?
4  Q  I am looking at paragraph 65 right now.
5  A  65?
6  Q  Uh-huh.  So what I'm wondering is, wouldn't the
7  evidence that would support a conclusion that the reason
8  your contract was not renewed was because you reported a
9  matter of public concern?  We are talking about Tuthill
10  right now.
11      MS. JOHNSON:  Objection to a legal -- calls
12  for a legal conclusion.
13  BY MS. DUCEY:
14  Q  It's a question about his motive.  What is the
15  evidence that would establish Dr. Tuthill's motive in
16  not renewing your contract was because you reported on
17  an issue of public concern?
18  A  It would have been the grievance.
19  Q  You don't understand my question.  What is the
20  evidence that he had an improper motive, that his motive
21  was to terminate you for making a report on a matter of
22  public concern?
23      MS. JOHNSON:  Legal -- calls for a legal
24  conclusion.
25      THE WITNESS:  I don't know of the evidence,

Page 680

1  any evidence.
2  BY MS. DUCEY:
3  Q  Are you aware of any?
4  A  I'm not aware of any evidence that would be public
5  concern.  I really don't understand your question.
6  Q  As you sit here today, do you believe that one of
7  the reasons that you were terminated was because you
8  reported on a matter of public concern set out in that
9  December 11th grievance?
10  A  Yes.
11      MS. JOHNSON:  Calls for a legal conclusion.
12      THE WITNESS:  Yes.
13  BY MS. DUCEY:
14  Q  What is the evidence that would support that
15  conclusion?
16  A  This document (indicating).
17  Q  We're talking in circles.  Because in order to
18  prove this claim, you have to prove motive.  You have to
19  prove that the reason he did it was because you made a
20  public report.
21  A  Yes.
22  Q  I understand that you filed a grievance.
23  A  Yes.
24      MS. JOHNSON:  I object to your form of the
25  question.

Page 681

1  BY MS. DUCEY:
2  Q  But in order to prove this claim, you have to prove
3  that his motive was he was out to get you just because
4  you filed a grievance.  So what I want to know is,
5  what's the evidence that would support a conclusion that
6  his motive was to discriminate against you for filing
7  this grievance?
8  A  I don't have any evidence to support that his
9  motive was to get rid of me because of filing this
10  grievance.
11  Q  Would resolution of that grievance in your favor
12  have assisted any public concern?
13      MS. JOHNSON:  Objection.  Calls for a legal
14  conclusion.
15      THE WITNESS:  I don't know.
16  BY MS. DUCEY:
17  Q  It only would have assisted you in your own
18  personal issue; right?
19      MS. JOHNSON:  Objection.  Legal conclusion.
20      THE WITNESS:  I can't say.
21  BY MS. DUCEY:
22  Q  Well, is there anything in there that asks for
23  system-wide relief, relief for all employees?
24  A  No.
25  Q  It's only asking for relief --

63 (Pages 678 to 681)

A05-086 CV (TMB)                                                          Bobbi J. Wade

Page 682

1   A   Yes.
2   A   -- on your behalf; right?
3   A   On my behalf, yes.
4   Q   All right.  Now, did you say that you thought that
5   Ms. Taylor also discriminated against you for reporting
6   a matter of public concern?
7   A   Is that in this document here?
8   Q   No, I want to know if that's your position.
9   A   That she discriminated against me?
10  Q   Yes.
11  A   For?
12  Q   For reporting a matter of public concern.
13  A   Yes, I think she did.
14  Q   And what is the evidence that supports a conclusion
15  that her motive was --
16  A   I have no evidence of her motives.
17  Q   Do you have any evidence that anyone besides Dr.
18  Tuthill was aware of this improper motive?
19  A   No.
20  Q   So Edna MacLean wouldn't have known?
21  A   I don't know what Edna knew.  I could never talk
22  with her.
23  Q   Board of Trustees didn't know?
24      MS. JOHNSON:  Foundation.
25      THE WITNESS:  I don't know what the Board of

Page 683

1   Trustees knew.
2   BY MS. DUCEY:
3   Q   And same question with respect to Ms. Taylor.  What
4   is the evidence that anyone above Ms. Taylor's level
5   knew of her improper motive?
6   A   I know of no evidence of her motives.
7   Q   Do you believe that Dr. Tuthill and Ms. Taylor
8   discussed terminating you because you filed a grievance?
9       MS. JOHNSON:  Foundation.
10      THE WITNESS:  I have no idea what they
11  discussed.
12  BY MS. DUCEY:
13  Q   Do you have any evidence that would support that
14  conclusion?
15  A   No.
16  Q   Do you believe they had that as a joint purpose?
17  A   I don't know.  I believe Pam had her reasons and he
18  had his reasons.
19  Q   What do you believe were Pam's reasons?
20  A   I believe that Pam's reason was because of the
21  health programs and the rising cost and my age.  And
22  part of her reason is she wanted to support John Tuthill
23  in whatever he was doing.
24  Q   What do you believe Dr. Tuthill's reasons were?
25  A   I believe his reasons were vindictive.

Page 684

1   Q   And why was he vindictive, in your opinion?
2   A   Because he wanted to get even with me.  He didn't
3   want me there.
4   Q   Why did he want to get even with you?
5   A   Because I had complained against him.
6   Q   And what complaint are you talking about when you
7   say he --
8   A   This (indicating).
9   Q   Only that?
10  A   Only this, yes.
11  Q   Now, could you look at page 10 of Exhibit 63?
12  A   What is Exhibit 63?
13  Q   The Complaint.  It's right there in front you and
14  it's not on the first page.  Just put that down and put
15  the thing in your hand down and the Complaint is right
16  next to you.
17  A   Here.
18  Q   Page 10, please.
19  A   My hands are so dry.  Okay.
20  Q   Paragraph 41, E, is what I want to direct your
21  attention to.
22  A   Okay.
23  Q   And it says, Defendants violated Ms. Wade's FMLA
24  rights by -- number E says -- retaliating against
25  Ms. Wade.

Page 685

1   A   Okay.
2   Q   What is the factual basis for that claim of
3   retaliation?
4   A   The fact that it got to the point where he had no
5   choice but to grant me the leave that I requested, and
6   he didn't like it.
7   Q   What's the evidence that he didn't like it?
8   A   I don't have any evidence that he didn't like it.
9   Q   What is the evidence that would support a claim
10  that he had no choice?
11  A   The fact that Pam Taylor is the one that advises on
12  whether or not a person is given leave.  When it
13  concerns FMLA everybody depended on her.  And I believe
14  that Dr. Tuthill might have listened to Pam Taylor and
15  she probably told him that he had to sign my leave
16  request.
17  Q   That he had to?
18  A   Yes.
19  Q   And what is the factual basis for that statement
20  that he had to as opposed to her giving recommendations
21  and advice?
22  A   Because it would -- stay within the law, that it
23  would be necessary for him to sign my leave request.
24  Q   Who retaliated against you with respect to
25  paragraph 41, E?  I want to know about FMLA retaliation.

EXHIBIT ___
Page 25 of 28

Case No. A05-086-CV (TMB)                                    Bobbi J. Wade

Page 690

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ALASKA

3

4    BOBBI J. WADE,

5          Plaintiff,

6       vs.

7    ILISAGVIK COLLEGE, NORTH SLOPE
     BOROUGH, JOHN TUTHILL, individually,

8    and PAMELA TAYLOR, individually,

9

          Defendants.

10   _____

11   Case No. A05-086 CV (TMB)

12                              COPY

13

14

15

16      VIDEOTAPED DEPOSITION OF BOBBI J. WADE

17             Taken December 7, 2006
             Commencing at 8:23 a.m.

18

         Volume IV - Pages 690 - 1015, inclusive

19

20

21           Taken by the Defendants
                      at

22           Delaney Wiles, Inc.
        1007 West 3rd Avenue, Suite 400

23           Anchorage, AK 99501

24

25   Reported by:  Valerie Martinez

Case No. A05-086-CV (TMB)                                          Bobbi J. Wade

Page 751

1   Q   Do you remember receiving this from Pam Taylor?
2   A   Not right off I don't, no.
3   Q   Do you deny receiving it in December?
4   A   No, I don't because I recall asking her for the
5   Grievance Procedure but I think it was after December.
6   It was prior to my grievance on February the 29th when I
7   began the grievance process again.
8           MS. DUCEY:  There's a slight out of order in
9   these.  Thank you.
10  BY MS. DUCEY:
11  Q   All right.  This is not the official exhibit copy
12  because I don't -- it's out of order here in the packet,
13  but it was previously marked as Exhibit 43.  Can you
14  take a look at that?
15  A   Okay.  This is when I attempted to and I presented
16  this document at the December 19th meeting.
17  Q   Okay.
18  A   I attempted to fulfill the requirements of the
19  grievance that I submitted on December the 11th.
20  Q   Okay.  And who did you give it to?
21  A   I gave this to Pam.
22  Q   So by December 19th you were aware of why Pam
23  thought that grievance was -- did not comply with
24  the rules?
25  A   Yes.  She told me that I had not followed up on

Page 752

1   the -- on all the items that should be in the grievance.
2   Q   And what did Pam say when you attempted to give it
3   to her?
4   A   She just kindly tossed it back to me and didn't
5   even look at it.
6   Q   Was it while the presentation was going on?
7   A   No.
8   Q   When was it?
9   A   It was after the presentation.  I believe Dr.
10  Tuthill, to the best of my recollection, that he had
11  already left the room.
12  Q   Did she say anything about it?
13  A   No.
14  Q   Did you ask her?
15  A   No.
16  Q   Did she read it?
17  A   She didn't at that time.
18  Q   She did not?
19  A   She did not.
20  Q   Why didn't you ask her about it then?  If she
21  didn't read it and she made no comment about it and the
22  presentation was over, why didn't you ask her why she
23  was giving it back?
24  A   I don't know why I didn't ask her.  That's my
25  nature.  I am not a pushy person.

Page 753

1   Q   Do you know how it came to be in her file, then, if
2   you didn't -- if she didn't --
3   A   No.
4   Q   -- retain the copy?
5           MS. JOHNSON:  Objection.  Foundation.
6           THE WITNESS:  No.  I have no idea how it came
7   to be in her files.
8   BY MS. DUCEY:
9   Q   This document was previously marked as 44.  Can you
10  identify what that is?
11  A   This is the follow-up of the meeting from Diana
12  Kennedy.
13  Q   Did you receive a copy of this document on or about
14  December 19th, '03?
15  A   I believe I got a copy of this maybe -- I don't
16  recall what day I got my copy because I left on the
17  20th.  December the 19th was the last day before the
18  Christmas break and everyone had already left.
19  Q   You were present on the 19th, though?
20  A   Yes, I was present but some people had left a week
21  earlier.
22  Q   Do you have an actual recollection of not receiving
23  this until after you came back from the holiday?
24  A   I don't recall when I received this.  But it was
25  not long after.

Page 754

1   Q   During the holidays, did you look at your e-mail
2   from time to time?
3   A   I don't recall if I looked at my e-mail or not from
4   Ilisagvik College because I would have to get into the
5   Ilisagvik College web site and there's normally not any
6   activity on campus during the Christmas break.
7   Q   So when you came back, did you look at your
8   e-mails?
9   A   Yes, I did.  And that's probably when I received
10  this notice.
11  Q   Did you agree with the content of Exhibit 44?
12  A   I recall that I didn't entirely agree with it.
13  Q   What didn't you agree with?
14  A   Well, let me take a look at it.  Just glancing over
15  it, I don't see anything.  I think it was -- the only
16  thing that I disagreed with was the fact that Diana
17  thought she remembered telling me that -- asking me if
18  it was okay with me to cancel the Economics class and
19  she definitely did not.  I didn't know anything about
20  that until after it was cancelled.
21  Q   You're certain of that?
22  A   I am certain of that.
23  Q   All right.  This was previously marked as 45.  Can
24  you take a look at that and tell me if you can identify
25  what that is?

Case No. A05-086-CV (TMB)                                         Bobbi J. Wade

Page 779

1  Q    Then at what point do you advise the registrar --
2  let's suppose the student comes in and sits down and
3  takes Module C and attempts to take the test and there's
4  a grade, and they insist that they want the grade for
5  the class and Module C. Does the registrar need to be
6  informed?
7  A    I don't exactly understand what you're talking
8  about. It's kind of confusing.
9  Q    So there's no circumstances where the registrar
10 needs to know what the grades are for Module A and B --
11 A    No, ma'am.
12 Q    -- prior to Module C?
13 A    No, ma'am.
14 Q    But that was your practice to submit those grades
15 to the registrar?
16 A    Yes, ma'am.
17       MS. JOHNSON: Objection to form.
18       THE WITNESS: And before another student
19 registered, they had to come over and get my signature
20 on the registration form, and, therefore, I would know
21 whether they could register.
22 BY MS. DUCEY:
23 Q    And did you learn, after you came back in the fall
24 2003 or in early 2004, that there were problems with the
25 grades?

Page 780

1  A    I learned in fall of 2003 but I did not know until
2  I returned in January that there had been problems with
3  the grades and Module C.
4  Q    And when did you learn in January that there were
5  problems with the grades?
6  A    I don't recall when I learned.
7  Q    And from who did you learn?
8  A    I don't recall who.
9  Q    And what did you learn?
10 A    That some of the grades had been changed.
11 Q    And what grades did you learn had been changed?
12 A    Some of the grades had been changed from F's to
13 I's. And I learned in -- and I don't recall how I
14 learned, but I slowly learned that there had been a
15 problem with the Module C grades but no one consulted me
16 about it.
17 Q    So some of the grades had been changed from an F to
18 I. Did you learn that there were any other problems?
19 A    No.
20 Q    And with respect to your granddaughter, did you
21 learn that there was a problem?
22 A    Her grade was also changed.
23 Q    From?
24 A    From -- I believe she had maybe a DF and it was
25 changed to an I.

Page 781

1  Q    And how did you learn that?
2  A    I suppose through checking on the IQweb to see. I
3  constantly checked on the IQweb on grades.
4  Q    What's the IQweb?
5  A    It's where all the grades are posted.
6  Q    And why did you check the IQweb for grades?
7  A    I do that constantly -- I did that constantly.
8  Q    So you have a recollection of looking at the IQweb
9  and seeing that grades had been changed including your
10 granddaughter's?
11 A    Yes, I did.
12 Q    And did you take any action in response to seeing
13 that?
14 A    No, I didn't.
15 Q    None at all?
16 A    No.
17 Q    You didn't ask anybody about that?
18 A    Nope.
19 Q    You didn't send any e-mails and say, hey, Amy
20 Underwood should be getting a grade of DF instead of I?
21 A    No, I didn't. I don't recall doing that.
22 Q    So it was of no importance to you?
23       MS. JOHNSON: Objection. Form of the
24 question.
25       THE WITNESS: I don't recall if it was any

Page 782

1  importance to me or not. It was just as important to me
2  for one student as it was for Amy Underwood.
3  BY MS. DUCEY:
4  Q    And no one inquired of you about Amy Underwood's
5  grade?
6  A    In December or it was in January -- I don't recall
7  when -- I got one or two e-mails from Dr. Tuthill
8  requesting that I send him the grades of the students
9  who had tested out of Business English and Business
10 Math, and I sent him the list of students and their
11 grades. And for Amy Underwood and one or two other
12 students, I put a DF.
13 Q    Why did you give them a DF?
14 A    Because they had been -- I had told them at the
15 beginning of the semester if they didn't get finished,
16 they could be deferred and they could finish on into the
17 spring semester.
18 Q    When did you tell Amy this?
19 A    At the beginning of the semester I told all
20 students that, not just Amy.
21 Q    I am asking in particular when you communicated
22 with Amy and told her that she'd get a DF in Module C.
23 A    I don't recall when I communicated with her.
24 Q    By what means did you communicate that to her?
25 A    It was either through e-mail or either in person

24 (Pages 779 to 782)

Case No. A05-086-CV (TMB)                                    Bobbi J. Wade

Page 783

1   when I was home for my Mohs procedure.
2   Q   And why did you tell her that she would get a DF?
3   A   So that she could continue and finish the course
4   later if she choose to.
5   Q   Why couldn't she finish the course?
6   A   Because it was too late at that time.
7   Q   Wasn't she attending the course?
8   A   She was registered for it.
9   Q   Was she attending?
10  A   No.
11  Q   Why not?
12  A   Because I wasn't teaching the class.
13  Q   Why wouldn't she attend if you weren't teaching it?
14  A   I have no idea why Aimee Valenti did not get in
15  touch with Amy.
16  Q   What do you mean she didn't get in touch with her?
17  A   I get in touch with all students who are distance
18  students.  I send them an e-mail.
19  Q   What sort of an e-mail?
20  A   Regarding the coursework, and then I mail things to
21  them regarding the coursework.
22  Q   Did you tell Amy Underwood not to take Module C or
23  Business English?
24  A   No, I did not.
25  Q   Did you understand when you left for your medical

Page 784

1   leave that she was enrolled in the class and would be
2   taking it?
3   A   When I left for my medical leave, I did not give
4   Amy Underwood a second thought because that was not on
5   my mind.
6   Q   So you expected since she was enrolled and had
7   taken --
8   A   I expected the --
9   Q   Could I finish my question?  You expected since she
10  was enrolled and you hadn't spoken otherwise to her that
11  she would be taking Business English C; correct?
12  A   Yes, I did.
13  Q   How did Amy take Business English B?
14  A   She took a test to test out of it.
15  Q   When did she take the test?
16  A   At the beginning of the semester.
17  Q   And why did you permit her to test out of Business
18  English B?
19  A   I gave her the same opportunity that I gave all the
20  students who were enrolled in English B.
21  Q   What was that opportunity?
22  A   To test out.
23  Q   And how was that communicated?
24  A   By mail.
25  Q   What sort of mail?

Page 785

1   A   Regular post office mail.
2   Q   And what did it say?  What did the thing say that
3   you sent in the mail for all the students?
4   A   Only the students who were distance students.
5   Q   What did it say?
6   A   I sent them the materials that they were to
7   complete and the tests that they were to take and they
8   were to be mailed back to me.
9   Q   And did you have any discussion with Amy about
10  whether she would go ahead and test out of the Business
11  English B after receiving that communication?
12  A   No.  I would have done that as soon as the course
13  began.
14  Q   At any time, did you have any communication with
15  her about taking you up on the offer to test out?
16  A   No, not that I recall.
17  Q   So did she take the test?
18  Q   For Module C?
19  Q   For Business English B?
20  A   B?  Yes, she did.
21  Q   So how did you know she wanted to take the test?
22  A   Because we e-mailed each other back and forth.
23  Q   And what did she e-mail back to you?
24  A   She was registered to take the course so I sent her
25  the requirements just like I sent the students the

Page 786

1   requirements in Point Hope who were taking the course.
2   Q   And did she take the test?
3   A   Yes, she did.
4   Q   Where is that test now?
5   A   They have been destroyed.
6   Q   When?
7   A   I suppose when I cleaned out my office when I left
8   the college.  I would not leave the office in a clutter.
9   I cleaned everything out.
10  Q   Why didn't you take those documents with you?
11  A   Why didn't I?
12  Q   Uh-huh.
13  A   Because I didn't have -- it was very costly to take
14  things with me and I only took what I felt was necessary
15  to take.  I destroyed all unnecessary items.  I destroyed
16  all test papers and all assignments that had been turned
17  in.  All of that was thrown away.
18  Q   So you destroyed that at the time when you had a
19  grievance pending; right?
20  A   Yes.
21  Q   And you were considering taking further action
22  after the grievance if it wasn't resolved in your favor;
23  right?
24  A   Yes.
25  Q   And you had a lawyer; right?

25 (Pages 783 to 786)

Case No. A05-086-CV (TMB)                                      Bobbi J. Wade

| Page 787 | Page 789 |
|---|---|

**Page 787**

1  A  Yes.
2  Q  And you knew you might file a lawsuit at that
3  point; right?
4  A  Yes.
5  Q  And you also knew that your relationship with Amy
6  Underwood and whether that presented some sort of an
7  appearance or impropriety was at issue with respect to
8  the grievances in your non-renewal; right?
9      MS. JOHNSON: Objection. Form and foundation
10     THE WITNESS: I didn't know that her grades
11 would be an issue.
12 BY MS. DUCEY:
13 Q  But you knew that your relationship to her and that
14 the appearance of impropriety was at issue; correct?
15 A  Yes, I knew that.
16     MS. JOHNSON: Same objection.
17 BY MS. DUCEY:
18 Q  So you said that she didn't take Business English C
19 because you weren't teaching it. What difference did
20 that make?
21 A  Because I wasn't there.
22 Q  But what difference did it make whether you were
23 teaching it or not?
24 A  It didn't make any difference.
25 Q  Then why didn't she take it?

**Page 788**

1      MS. JOHNSON: Objection. Foundation.
2      THE WITNESS: I have no idea. I wasn't
3  teaching the class.
4  BY MS. DUCEY:
5  Q  And you never asked her?
6  A  No.
7  Q  I thought you were concerned that she get her
8  degree by the spring.
9  A  I was concerned but I was concerned with every
10 student.
11 Q  But in particular you were concerned about your
12 granddaughter, weren't you?
13 A  Not in particular. I was concerned but not in
14 particular.
15 Q  You were her advisor, weren't you?
16 A  I was her advisor.
17 Q  And as her advisor, it was your duty to ensure that
18 she tried to graduate on time; right?
19 A  Yes.
20 Q  And I think you have previously testified that was
21 a concern of yours; correct?
22 A  Yeah, it's a concern but not a particular concern.
23 Q  So why didn't she take the class when it wasn't
24 taught by you?
25     MS. JOHNSON: Objection. Foundation.

**Page 789**

1      THE WITNESS: I couldn't say why she didn't
2  take the class.
3  BY MS. DUCEY:
4  Q  Do you think it's unusual?
5  A  It doesn't matter what I think. She was on the
6  roll. She was registered to take the course. Why
7  didn't the instructor get in touch with her?
8  Q  Why didn't she show up for class?
9  A  Because she was taking it by teleconference and
10 distance education.
11 Q  So whose responsibility was it to call in? Was it
12 hers?
13 A  It's the instructor's responsibility to get in
14 touch with their distance education students and see
15 that everything is all arranged for them to take the
16 course.
17 Q  Well, whose responsibility is it to show up for
18 class? Is it primarily the student's responsibility to
19 show up at the assigned --
20 A  It's the student's.
21 Q  -- date and time? Could I finish my question,
22 please? Is it primarily the student's responsibility?
23 A  Yes.
24 Q  So if the student registers for a class and they
25 haven't indicated to the registrar they want to drop or

**Page 790**

1  withdraw, you would expect, as the instructor, that they
2  are going to be responsible and show up; right?
3  A  Yes.
4  Q  And any reason to believe that Amy had not a clue
5  about what she needed to do to call in?
6      MS. JOHNSON: Objection. Foundation.
7      THE WITNESS: I do not know what Amy had. I'm
8  not Amy.
9  BY MS. DUCEY:
10 Q  She took Business Math from you, too, didn't she?
11 A  Yes, she did.
12 Q  Modules A and B; correct?
13 A  Yes, she did.
14 Q  While she was in Tennessee; correct?
15 A  No. She took Module A during the summer session.
16 Q  And she took Module B by distance, didn't she?
17 A  Yes.
18 Q  And how did she attend that class?
19 A  She did the work. I mailed it to her the same as I
20 did to the students in Point Hope and to the villages.
21 Q  So she never bothered to call into that class?
22     MS. JOHNSON: Objection.
23     THE WITNESS: She called in a few times, yes.
24 BY MS. DUCEY:
25 Q  But most of the time she didn't?

26 (Pages 787 to 790)

Case No. A05-086-CV (TMB)                                    Bobbi J. Wade

Page 791

1  A   She didn't call in constantly for every class.
2  Q   In fact, she missed many of the classes, didn't
3  she?
4       MS. JOHNSON: Objection. Foundation.
5       THE WITNESS: I don't know. I couldn't tell
6  you the number of classes.
7  BY MS. DUCEY:
8  Q   Well, as the instructor, wouldn't you know whether
9  a student failed to attend consistently?
10 A   I gave her -- I sent her the information and her
11 instructions just as I did other students. Not only Amy
12 but other students.
13 Q   What other students did you treat the same way with
14 respect to Business English B?
15 A   Other students who lived out in the villages.
16 Q   Name them.
17 A   I can't name them because I don't recall who they
18 were.
19 Q   Did you keep a consistent set of instructions and
20 so forth for these distance students?
21 A   Yes, I did, because that was a common practice to
22 teach distance students and there was many ways I got
23 the material out to these students.
24 Q   And did you send them the exact same materials?
25 A   Yes, I did.

Page 792

1  Q   Where are those materials now?
2  A   They've been thrown away.
3  Q   Another thing that you threw away after you had
4  gotten an attorney and had the grievance pending?
5       MS. JOHNSON: Objection. Form.
6  BY MS. DUCEY:
7  Q   Is that true?
8  A   They were all students.
9  Q   Is that true? Another thing --
10 A   That's true.
11 Q   -- that you threw away after you had an attorney,
12 you knew the grievance was pending, and you knew the
13 appearance of impropriety regarding Amy Underwood was an
14 issue; is that true?
15      MS. JOHNSON: Objection. Form and foundation.
16      THE WITNESS: The issue regarding Amy
17 Underwood did not concern her grades.
18 BY MS. DUCEY:
19 Q   Could you answer my question? You threw those
20 documents away after you had an attorney, the grievance
21 was pending, and you knew Amy Underwood's relationship
22 to you was an issue?
23      MS. JOHNSON: Form and foundation.
24      THE WITNESS: Yes, ma'am, I threw those
25 documents away with -- along with 24 other students.

Page 793

1  BY MS. DUCEY:
2  Q   Did the distance delivery students phone in to
3  Business English B?
4  A   Yes, ma'am, they did.
5  Q   And how would they phone in?
6  A   On the teleconference system if it was on
7  teleconference. I don't even recall if it was on
8  teleconference. I would have to look at all the
9  documents to refresh my memory on how the classes were
10 taught. We had many different methods of teaching
11 classes because a lot of our students were distance
12 students.
13 Q   So you had a speakerphone in your classroom?
14 A   If it was considered a teleconference class we did.
15 Q   And the students had a number to call into?
16 A   Yes, ma'am.
17 Q   And how did you arrange it with Amy for Business
18 English -- Business Math B?
19 A   She called in herself.
20 Q   Do you know what number she called in from?
21 A   I gave her the number in the room, whatever it was.
22 I don't recall what it was.
23 Q   So it was her responsibility to call in?
24 A   Yes, ma'am.
25 Q   Did you also give her the number for Business

Page 794

1  English to call into?
2  A   She had the number, the telephone number.
3  Q   And where was she living when she made the phone
4  calls?
5  A   She was living in Murfreesboro.
6  Q   At the Arapaho address?
7  A   Yes.
8  Q   Do you remember what the telephone number was
9  there?
10 A   No, ma'am, I don't.
11 Q   Was that a phone bill that you paid?
12 A   I don't recall who paid the phone bill, whether I
13 paid it or whether she paid it.
14 Q   Do you have any document that would indicate to you
15 now what the phone number was at the Arapaho address?
16 A   No, I don't.
17 Q   You don't have any sort of a personal address book
18 that would indicate that?
19 A   No, ma'am.
20 Q   So we would have to depose the phone provider to
21 find out that phone number?
22 A   Yes, ma'am.
23 Q   Who was the provider, do you remember? Was it GCI
24 or was it --
25 A   I believe it was BellSouth.

27 (Pages 791 to 794)

EXHIBIT
Page 27 of 88

Case No. A05-086-CV (TMB)                                                      Bobbi J. Wade

Page 807

1  to that question.
2  BY MS. DUCEY:
3  Q  How would they know unless you communicated it?
4  A  They would not know.
5  Q  Is there anything that prevented you from
6  communicating it?
7  A  No, there's not, other than the fact that the
8  grades were not due and it was my discretion to turn
9  them in on any date I chose.
10 Q  And you're sure that on November 4th you didn't
11 know you wouldn't be teaching the class?
12 A  I'm not sure because Dr. Tuthill would not tell me.
13 Q  He wouldn't tell you?
14 A  No.
15 Q  Did you ask him?
16 A  I asked him if I could return to my classes and he
17 says, I will take care of it, don't worry about your
18 classes, I will take care of it.
19 Q  And it's your testimony you had no inkling or idea
20 that someone else might be teaching those classes?
21 A  I don't know at what time I found out that someone
22 else would be teaching those classes. I think it was on
23 November the 4th, the day I left.
24 Q  And how did you find that out?
25 A  November the 12th -- I'm sorry.

Page 808

1  Q  How did you find that out?
2  A  Because Aimee Valenti came to my room while I was
3  giving a final test and walked in the room and asked for
4  information, and I told her I couldn't talk to her at
5  that time, I would talk to her later, to come back
6  later.
7  Q  What information did she ask for?
8  A  She wanted the teaching materials.
9  Q  And you wouldn't give them to her?
10     MS. JOHNSON: Objection. Form of the
11 question.
12     THE WITNESS: I was right in the middle of
13 giving a final test.
14 BY MS. DUCEY:
15 Q  Did you give her the teaching materials --
16 A  No, because --
17 Q  -- at any time before you left?
18 A  No.
19 Q  Why not?
20 A  I didn't have an opportunity.
21 Q  So is it any wonder she used her own materials?
22     MS. JOHNSON: Objection. Form of the
23 question.
24     THE WITNESS: She could have gotten them out
25 of the department.

Page 809

1  BY MS. DUCEY:
2  Q  Well, if you refused to do it and you --
3  A  I didn't refuse to do it. She never came back.
4  Q  Why would she have to come back if you knew she had
5  a need --
6  A  Because I was in the middle of the class --
7  Q  Could I finish?
8     MS. JOHNSON: Let her finish.
9  BY MS. DUCEY:
10 Q  Why would she have to come back and press you for
11 them if you knew she was going to be teaching the class
12 and needed the materials?
13     MS. JOHNSON: Objection. Form of the
14 question.
15     THE WITNESS: She could have come back when
16 the class was over and the test was finished like I
17 asked her to do, and she did not come back.
18 BY MS. DUCEY:
19 Q  So she didn't come back --
20 A  And I was getting ready to board a plane and I
21 didn't have time to find her because she was not a
22 regular teacher, and I had no method of getting in touch
23 with her.
24 Q  Well, hadn't there --
25 A  I left all my teaching materials in my office for

Page 810

1  anyone to pick up that wanted to pick them up.
2  Q  And did you tell John Tuthill that?
3  A  No, but Courtneay Bartholomew knew that and he had
4  a key to my office.
5  Q  Did you ask Courtney to relay that to John
6  Tuthill?
7  A  No, I didn't.
8  Q  Why not?
9  A  I don't know why not. I don't recall. I was
10 terribly upset at the time and was trying to get ready
11 to get on a plane.
12 Q  Business English C had actually already started
13 before you left, hadn't it?
14 A  It was supposed to have.
15 Q  And it did, didn't it?
16 A  I don't know if it did. I never witnessed that it
17 did. No one told me that it did.
18 Q  Well, it started -- Business Module C -- strike
19 that. Business English Module C began before Business
20 Math Module C; isn't that true?
21 A  It was supposed to have but I can't guarantee that
22 it did because I don't know.
23 Q  Well, you would have known if you thought you were
24 teaching the class, wouldn't you?
25 A  I said I didn't know that she -- she came in on

31 (Pages 807 to 810)

Page 967

1   A   It's a Payroll Advance Request.
2   Q   And what's the date of the request?
3   A   May the 26th of 2004.
4   Q   And you were requesting how much money?
5   A   $1200.
6   Q   And you needed the check when?
7   A   Apparently, as soon as I could get it.
8   Q   It says, "Immediately." Right?
9   A   Yes.
10  Q   And what was the reason you gave for it?
11  A   The high cost of travel for medical leave caused a
12  cash shortage for the month of May.
13  Q   And urgent need to meet expenses?
14  A   Yes.
15  Q   Do you remember what expenses you needed to meet?
16  A   No, ma'am, I don't.
17  Q   So still having money problems into 2004; right?
18      MS. JOHNSON: Objection. Characterization.
19      THE WITNESS: I needed extra money at times.
20  BY MS. DUCEY:
21  Q   Did you have any money saved in the years that you
22  lived in Barrow?
23  A   Nothing except the PERS.
24  Q   So you lived from paycheck to paycheck?
25  A   Yes, I did.

Page 968

1   Q   And sometimes you lived beyond your means and had
2   to ask for an advance?
3       MS. JOHNSON: Objection. Foundation.
4   BY MS. DUCEY:
5   Q   Is that right?
6   A   It was the circumstances that required the check
7   advances.
8   Q   This was previously marked as 85. Can you take a
9   look at that and tell me if you can identify what that
10  is?
11  A   It appears that -- to be an e-mail that I sent to
12  John Tuthill on December the 10th.
13  Q   Regarding independent study?
14  A   Yes.
15  Q   And you said that you had three students who
16  requested to do an independent study in the spring;
17  correct?
18  A   Yes.
19  Q   Who were the three students?
20  A   I don't recall who they were.
21  Q   Wasn't one of them Amy?
22  A   She could have been.
23  Q   Well, she was scheduled to graduate in '04, wasn't
24  she?
25  A   She could have graduated had she gotten the courses

Page 969

1   she needed.
2   Q   But she needed more; right?
3   A   Yes.
4   Q   Do you remember giving independent studies for
5   anybody but Amy?
6   A   Yes.
7   Q   Who else?
8   A   I don't know who they were.
9   Q   I have shown you this before, but I want to go back
10  to it for a minute. It's page -- the second page of
11  Exhibit 64. So can you just take a look at that for a
12  minute? You didn't identify the students in an e-mail
13  dated December 10th, did you?
14  A   No, I didn't.
15  Q   So you didn't tell John Tuthill that one of them
16  was Amy Underwood; right?
17  A   No, I didn't.
18  Q   And he said he thought it would be great; right?
19  A   It appeared that he did.
20  Q   And then the second page of 64 is an e-mail to you
21  from Dr. Tuthill; right?
22  A   Yes.
23  Q   And it's dated January 20th, '04; correct?
24  A   Yes.
25  Q   And he says, "Under ordinary circumstances, I am

Page 970

1   happy to approve requests for independent [sic] studies,
2   but I cannot approve your request for Amy Underwood to
3   take Time Management and Record Keeping for Business as
4   independent studies. The last 23 credits Ms. Underwood
5   has received from Ilisagvik have been with you as the
6   instructor." Was that true, the last 23 credits were
7   with you as the instructor?
8   A   I don't know. I would have to count them up.
9   Q   Were you aware of whether she took any classes but
10  from you for the last 23 credits?
11      MS. JOHNSON: Objection. We went over this
12  yesterday.
13      THE WITNESS: I would have to look at her
14  record to see.
15  BY MS. DUCEY:
16  Q   Did you agree with Dr. Tuthill's opinion?
17  A   Not necessarily.
18  Q   What didn't you agree with about it?
19  A   Because I didn't see anything wrong with Amy taking
20  the courses that I was teaching because I was the only
21  instructor to teach those courses.
22  Q   And this is Exhibit 78. Can you take a look at
23  that and tell me if you have seen that document before?
24  A   Yes, I've seen this.
25  Q   And what is that?

71 (Pages 967 to 970)

Case No. A05-086-CV (TMB)                                                    Bobbi J. Wade

| Page 971 | Page 973 |
|---|---|
| 1 A It appears to be Amy's transcript of grades.<br>2 Q Before this lawsuit was filed, had you seen this<br>3 transcript?<br>4 A I don't believe I had seen this particular<br>5 transcript, no.<br>6 Q Do you have any reason to doubt its authenticity?<br>7 A No.<br>8 Q So why don't you look at that and, if you can, tell<br>9 me which classes on the transcript you taught?<br>10 A The spring of 2002, I taught Introduction to<br>11 Business. Do you want to go beyond that?<br>12 Q Sure.<br>13 A Summer of 2002, I taught Business Math, Principals<br>14 of Marketing, and Proofreading and Editing. I'm not<br>15 sure I taught the Proofreading and Editing but I know I<br>16 taught the Business Math A and Principals of Marketing.<br>17 The fall of 2002, I taught the Principals of<br>18 Economics, Introduction to Organizational Management,<br>19 the Principals of Accounting -- which she didn't<br>20 finish -- and Financial Management.<br>21 Then in the spring, she finished -- completed<br>22 the Principals of Accounting and I taught Business Law.<br>23 Q So in the spring, you taught her both of those<br>24 classes; is that right?<br>25 A In the spring, yes. | 1 Blackboard but I don't think so. I can't recall unless<br>2 I had the documents to review.<br>3 The fall of 2002, the Principals of Economics<br>4 was on Blackboard, Organizational Management was on<br>5 Blackboard, Principals of Accounting was on Blackboard,<br>6 and Financial Management was on Blackboard.<br>7 The spring of 2002, she completed the Principals<br>8 of Accounting, which was still on Blackboard because the<br>9 other two students didn't complete it.<br>10 MS. JOHNSON: You mean spring '03?<br>11 THE WITNESS: The spring of '03. And Business<br>12 Law was on the Blackboard.<br>13 In the fall of 2003, Business Math, she took<br>14 that as a distance education student. And Business<br>15 English and -- A and B were both -- she took them as a<br>16 distance education student. They were not a -- the<br>17 Business Math and the Business English was never on<br>18 Blackboard. And other than that, everything she took<br>19 except the Principals of Marketing in the summer of 2002<br>20 was on the Blackboard.<br>21 BY MS. DUCEY:<br>22 Q And this is Number 79 previously marked. Can you<br>23 identify what that is?<br>24 A It's a petition form where Amy was requesting to<br>25 test out of IT-110 because that's one of the courses |

| Page 972 | Page 974 |
|---|---|
| 1 Q All right. Go on.<br>2 A Then in the fall of 2003, I taught Business Math<br>3 Module B, Business English, and -- Module A and B.<br>4 Q So the last 26 units except for the two<br>5 incompletes; right?<br>6 A If that's what it adds ups to. Those are the<br>7 classes I taught that she took.<br>8 Q And in your opinion, that wasn't inappropriate at<br>9 all?<br>10 A It would have been if I had not been the only<br>11 teacher.<br>12 Q Which ones of those were independent studies?<br>13 A The only one that was an independent study was the<br>14 accounting. And there were two other people who took<br>15 that also at the same time Amy took it. I had three<br>16 independent studies to take accounting all at the same<br>17 time because it was on the Blackboard.<br>18 Q And of those, which were Blackboard classes?<br>19 A In the spring of 2002, Introduction to Business was<br>20 a Blackboard course. I don't recall if that was a<br>21 Blackboard course. It could have been a classroom<br>22 course.<br>23 In the summer of 2002, Business Math and<br>24 Principals of Marketing, I believe were classroom<br>25 classes. Principals of Marketing could have been on the | 1 that she lacked, she needed to take.<br>2 Q And it's got your signature on it; right?<br>3 A Yes, it does. I was her advisor. I had to sign<br>4 everything she requested.<br>5 Q And it had Courtneay's signature; right?<br>6 A Yes.<br>7 Q It doesn't have the dean, though, does it?<br>8 A It doesn't have what?<br>9 Q The dean's signature; right?<br>10 A No.<br>11 Q Do you know why?<br>12 A Because he wouldn't sign it.<br>13 Q And was this all your handwriting except for<br>14 Courtneay's signature and the exhibit sticker?<br>15 A Yes, uh-huh.<br>16 Q So you filled it out for Amy; right?<br>17 A Yes.<br>18 Q And you put the justification in; correct?<br>19 A Yes. I did that for all students who did this<br>20 petition.<br>21 Q And you composed it as well, the justification?<br>22 A Yes.<br>23 Q And you did it in the first person as if you were<br>24 the person that -- as if you were Amy, right?<br>25 A I was following her instructions. We conversed as |

Case No. A05-086-CV (TMB)                                    Bobbi J. Wade

Page 975

1  to what she would put down there on the telephone. I
2  asked her what she wanted to say and why she wanted to
3  test out and she told me and I wrote it down.
4  Q   Did she initiate the process to try and test out of
5  IT-110 or did you?
6  A   I don't recall. I did the same for Amy as I did
7  for all students.
8  Q   And that is Number 80. Can you take a look at that
9  and tell me if you can identify what that is?
10  A   This is a Tuition Scholarship/Waiver Application.
11  Q   Can you read under Tuition Scholarship/Waiver
12  Application, the first sentence?
13  A   "The Ilisagvik College Board of Trustees has
14  established a tuition waiver for all North Slope Borough
15  residents and for all Ilisagvik College employees,
16  employee spouses, and employee dependents. This tuition
17  waiver applies to courses originating from Ilisagvik
18  College and does not cover other expenses such as
19  textbooks, lab fees, registration fees, or [sic] special
20  fees."
21  Q   So by its terms, it applied only to dependents of
22  employees; correct?
23  A   Yes, uh-huh.
24  Q   And you knew that; right?
25  A   I took this over to the proper person who was in

Page 976

1  charge of this and asked her if Amy would qualify to get
2  a tuition waiver and she told me that she would.
3  Q   You knew, though, that the person who -- for whom
4  tuition was going to be waived had to be your dependent;
5  right?
6      MS. JOHNSON: Objection. Foundation, form of
7  the question.
8      THE WITNESS: I don't recall if I had read
9  that first sentence or not. I just knew this was the
10  tuition waiver application. But I did get permission.
11  BY MS. DUCEY:
12  Q   So you signed this waiver application without
13  knowing what the rules were?
14  A   I signed it because I went over and inquired about
15  it and they told me it would be fine.
16  Q   So you would sign that without knowing what the
17  rules were?
18      MS. JOHNSON: Objection. Foundation and form
19  of the question.
20      THE WITNESS: I don't know if I read the rule
21  or not. I can't recall if I did, but I got permission
22  that would override the rule that's at the top of this
23  application.
24  BY MS. DUCEY:
25  Q   Who did you get permission from to waive a Board of

Page 977

1  Trustees policy?
2  A   Whoever was in charge of tuition waivers. I don't
3  recall.
4  Q   And who was that?
5  A   I don't know if it was Terrie, the CFO or if it was
6  the financial aid officer. I don't recall who it was,
7  but I took it to the proper person.
8  Q   So it's your testimony that the policy on dependent
9  status was waived by an employee for you so that you
10  could sign this truthfully?
11      MS. JOHNSON: Objection. Form.
12  BY MS. DUCEY:
13  Q   Is that your testimony?
14  A   Yes, it is.
15  Q   But you don't know who waived it for you?
16  A   I don't recall.
17  Q   And you don't have any documentation that supports
18  the policy being waived just for you?
19  A   No.
20  Q   And what about for your grandson, Steve Underwood?
21  A   He took care of all that himself.
22  Q   Did he get a waiver?
23  A   Yes, he did from the financial aid officer.
24  Q   And you had to sign that waiver, didn't you?
25  A   Yes, I did.

Page 978

1  Q   And he wasn't your dependent, was he?
2  A   No more than Amy was.
3  Q   But he was even less so than Amy; right?
4      MS. JOHNSON: Objection. Form of the
5  question.
6      THE WITNESS: I don't think he was less so.
7  BY MS. DUCEY:
8  Q   But you testified just a minute ago that he wasn't
9  your dependent, didn't you -- never mind. I withdraw
10  that. Let's go to Kelly Underwood. Did Kelly get a
11  tuition waiver?
12  A   I think she did.
13  Q   And you signed a form so that she could get her
14  tuition waived?
15  A   Yes, I did.
16  Q   And she wasn't your dependent, was she?
17  A   Not at that time, no. She was my granddaughter.
18  Q   All right.
19  A   And they agreed that it was all right for my
20  grandchildren to take courses and get their tuition
21  waived.
22  Q   Who agreed?
23  A   The people over in the administrative building that
24  took care of tuition, which was the financial aid
25  officer.

Case No. A05-086-CV (TMB)                                    Bobbi J. Wade

Page 991

1  want to give her originals.
2        MR. GAMACHE: I've got copies, I'll just give
3  them. I've got copies -- extra, if you need them.
4        MS. JOHNSON: What did you say 90 -- here's 93
5  right here.
6        MR. GAMACHE: These four.
7        THE WITNESS: Okay.
8        MR. GAMACHE: I put them in numerical order so
9  you can find them, but I'm going to take them --
10       THE WITNESS: So which one do you want?
11       MR. GAMACHE: I am going to start with 92.
12       THE WITNESS: These don't have exhibit --
13       MR. GAMACHE: I know. I haven't written them
14  on there.
15       THE WITNESS: Oh, I see, 63, 92, okay.
16       MR. GAMACHE: Do you want one?
17       MS. DUCEY: I do not. Thanks.
18       MR. GAMACHE: Okay.
19  BY MR. GAMACHE:
20  Q   We took a trip to Barrow together for one
21  deposition quite a while ago, so we know each other from
22  that trip; is that correct?
23  A   That's correct.
24  Q   And you know that I'm here representing the North
25  Slope Borough?

Page 992

1  A   Yes, I do.
2  Q   And they are a separate defendant in this case,
3  separate from Ilisagvik College; right?
4  A   Yes.
5  Q   So the questions I am going to pose tonight relate
6  only to the North Slope Borough, and that's why I wanted
7  to start with this Exhibit 92. And it's not one that
8  you've seen because we have introduced it through Dr.
9  Edna MacLean, a deposition that you didn't attend. So
10  that's why I wanted to start with this one.
11       And what it is, is it's chapter 8.02 of the
12  North Slope Borough charter, and it relates to college
13  and adult education.
14  A   Okay.
15  Q   And what this is, this is an ordinance from the
16  Borough that, essentially, created Ilisagvik College.
17  A   Okay.
18  Q   And let me just focus your attention to two
19  sections. On the first page, the 8.02.020 and then the
20  8.02.030.
21  A   Okay.
22  Q   And the 8.02.020 says that, "There is established a
23  public, non-profit corporation to be called Ilisagvik
24  College, for the purpose of providing post secondary
25  education programs within the North Slope Borough."

Page 993

1  And, "The corporation shall be authorized to grant
2  associate degrees, vocational certificates and
3  certificates of completion."
4  A   Okay.
5  Q   Now, you were at the Ilisagvik College almost four
6  years -- is that right -- or more than four?
7  A   Four years.
8  Q   Four years. So based on your experience there,
9  what you saw with regard to how the college operated,
10  the courses it offered, and the students it taught, is
11  this section here, 8.02.020 consistent with your
12  experience as to what was happening at the college?
13       MS. JOHNSON: Objection to the extent it calls
14  for a legal conclusion.
15       MR. GAMACHE: Right.
16  BY MR. GAMACHE:
17  Q   Is that what Ilisagvik College did is it provided
18  those AA degrees?
19  A   In my opinion, yes.
20  Q   Okay. And then the next section talks about the
21  powers and duties of the college. It says, the college,
22  through its Board of Directors, shall: one, operate the
23  college; two, hire and employ all personnel necessary
24  for the management and provision of the programs; and
25  three, establish and maintain the academic policies of

Page 994

1  the programs, and it goes on but it's those three that I
2  wanted to focus on.
3  A   Okay.
4  Q   When you were hired to teach your courses, were you
5  hired by Ilisagvik College or were you hired by the
6  North Slope Borough?
7        MS. JOHNSON: Objection. Foundation.
8        THE WITNESS: I was hired by Ilisagvik
9  College.
10  BY MR. GAMACHE:
11  Q   Did you get checks or did you get automatic
12  deposits into your account?
13  A   I got automatic deposits.
14  Q   I was going to ask if you got checks, what it said
15  on them.
16  A   It said Ilisagvik College because I got the stubs.
17  Q   Okay. Thank you. And the second paragraph under
18  the Powers and Duties --
19  A   Okay.
20  Q   -- it says, as a non-profit corporation organized
21  under the statutory requirements of the State of Alaska,
22  Ilisagvik College shall be an independent legal entity
23  and may in that name: number one, sue and be sued, and
24  it goes on with other things.
25       If the college was and is an independent legal

Page 995

1  entity and if the college, based on the paragraph above,
2  has the authority to hire an employee personnel, would
3  it be fair to say that any errors in the hiring of
4  personnel or any errors in the non-retention of
5  personnel would be the responsibility of Ilisagvik
6  College?
7          MS. JOHNSON: Hold on. Objection. It calls
8  for a legal conclusion and it's also compound.
9  BY MR. GAMACHE:
10  Q  Do you understand my question, Bobbi?
11  A  Not entirely.
12  Q  Let me ask it this way -- let's go to the next
13  Exhibit Number 93. I'll give you a little more
14  background. Now, as I understand this lawsuit, there
15  were three things that -- three issues were raised.
16  Tell me if I'm right. One is your application for
17  medical leave and the way that was handled?
18  A  Yes.
19  Q  Second thing was the grievance that you made and
20  the way it was handled?
21  A  Yes.
22  Q  And the third thing was your non-retention?
23  A  Yes.
24  Q  Those were the big three issues.
25  A  Yes.

Page 996

1  Q  Now, with regard to these three issues, did they
2  all happen in the period, essentially, from late 2003 to
3  the middle of 2004?
4  A  Yes.
5  Q  Would that be fair to say? All that happened
6  during that period?
7  A  Yes.
8  Q  And I call your attention to this Exhibit 93, and
9  what it is, is it's a Professional Services Agreement
10  between the North Slope Borough and Ilisagvik College.
11  And you can just accept from me that this was the basis
12  that the college received money from the North Slope
13  Borough, was this Professional Services Agreement, and
14  they did one every year.
15          Now, take a look at the top of this 93. Do you
16  see where it says that this Professional Services
17  Agreement is for the period July 1, 2003 through
18  June 30th, 2004?
19  A  Yes.
20  Q  Now, if this agreement covered that period, would
21  it not cover the three issues that we are here about
22  tonight, your --
23  A  It seems as though it would.
24  Q  Okay. Under number three on General Provisions --
25  it's 3, a, on that first page -- it says, the grantee,

Page 997

1  meaning the college, "The Grantee is an independent
2  contractor. It is neither an employee, partner, nor
3  joint venture with the Borough." Do you see that?
4  A  Yes, sir.
5  Q  And then under 3, c, at the bottom there, it talks
6  about discrimination. The grantee, meaning the college,
7  may not discriminate against any employee or applicant
8  for employment because of race, age, religion, color,
9  national origin. I guess I said age in the wrong place,
10  but age is in there. So is physical handicap, sex,
11  marital something -- oh, that's the next page -- marital
12  status, change in marital status, pregnancy, or
13  parenthood.
14          So, would it be fair to say that as part of the
15  agreement between the college and the Borough that one
16  of the standards the Borough required was that the
17  college not discriminate?
18          MS. JOHNSON: Objection. Foundation and it
19  calls for a legal conclusion. You can answer if you
20  can.
21          THE WITNESS: Well, it appears that way.
22          THE VIDEOGRAPHER: The tape has two minutes.
23          MR. GAMACHE: Two minutes? That's all I need.
24  BY MR. GAMACHE:
25  Q  And then on the next page at the top, we're under

Page 998

1  3, d, now. It says, Compliance With Laws. The
2  Grantee -- again, the college -- agrees to comply with
3  all applicable state, federal, and local laws and
4  regulations; do you see that?
5  A  Yes, sir.
6  Q  Now, with regard to -- if we were going to ask
7  somebody what these two provisions mean, would Edna
8  MacLean be a good person to ask?
9          MS. JOHNSON: Objection. Foundation.
10          THE WITNESS: I don't know.
11  BY MR. GAMACHE:
12  Q  Can you think of anyone better to ask?
13          MS. JOHNSON: Objection. Foundation.
14          THE WITNESS: No.
15          MR. GAMACHE: All right. We better change.
16          THE VIDEOGRAPHER: Okay.
17          MR. GAMACHE: Thanks.
18          THE VIDEOGRAPHER: Off record. 8:03 p.m. End
19  of tape number 15.
20          (Off the record.)
21          THE VIDEOGRAPHER: On record. 8:04 p.m.
22  Start of tape number 16.
23  BY MR. GAMACHE:
24  Q  Now we're looking at Exhibit 63, which is a copy of
25  the Complaint in this case. Let me just call your

Case No. A05-086-CV (TMB)                                    Bobbi J. Wade

Page 1011

1   A   It takes a will of steel to live in Barrow.
2   Q   And I'm just trying to determine what you were
3   thinking at the time. I think I understand more clearly
4   now, but it never occurred to you to seek out a middle
5   ground as a way of getting vested in PERS?
6   A   No, it didn't. I contemplated applying for another
7   job with the North Slope Borough and I think I did,
8   actually, apply for another job with the North Slope
9   Borough while -- before I left.
10  Q   At the Job Center there, I think?
11  A   Yes, uh-huh.
12  Q   Because getting good people is not easy in Barrow;
13  is it?
14  A   And I didn't get any response to it in time.
15  Q   I see.
16  A   I had stayed as long as I could stay without a
17  salary.
18      MR. GAMACHE: Thank you very much.
19      MS. DUCEY: I have a couple follow-up
20  questions.
21      FURTHER EXAMINATION
22  BY MS. DUCEY:
23  Q   Did anybody tell you, Ms. Wade, that if you
24  accepted this job you would be required to withdraw your
25  grievance?

Page 1012

1   A   No.
2   Q   Does it say that on the face of this document?
3   A   No, it doesn't.
4   Q   Did anyone tell you that you would have to waive
5   your rights to file a lawsuit if you took this job?
6   A   No, that was just my own idea.
7   Q   Did you ask anybody?
8   A   No.
9   Q   You didn't ask Dr. Tuthill?
10  A   No.
11  Q   Or Pam Taylor?
12  A   No.
13  Q   Or Edna MacLean?
14  A   No.
15  Q   This job wouldn't have had you reporting to John
16  Tuthill, would it?
17  A   I don't know. I can't answer that. He was -- yes,
18  he was over the ABE program just like he was everything
19  else.
20  Q   But you would no longer be a direct report to him;
21  would you?
22  A   Directly report to him?
23  Q   A direct report to him.
24  A   No.
25  Q   In fact, it says this is a regular full-time

Page 1013

1   non-faculty exempt position that reports to the director
2   of work force development; correct?
3   A   Correct.
4   Q   Who was the director of work force development?
5   A   I don't know.
6   Q   And so presumably, that director would be
7   evaluating you; right?
8   A   Yes.
9   Q   And determining, at least a recommendation, about
10  whether to retain you past the probationary period?
11  A   That's right. And the director -- I don't recall
12  her name that had been appointed to do that job, but she
13  was not title director, but she was appointed to do that
14  job by Tuthill. She did not have her degree in
15  education.
16      MS. DUCEY: I don't have anything else.
17      MS. JOHNSON: Are we done?
18      MR. GAMACHE: It's your turn.
19      MS. JOHNSON: I'm not going to ask her any
20  questions.
21      MR. GAMACHE: Okay. Then we are done.
22      THE VIDEOGRAPHER: Off record. 8:25 p.m.
23  This is the end of the deposition.
24      (Proceedings adjourned at 8:25 p.m.)
25      (Signature requested.)

Page 1014

1           REPORTER'S CERTIFICATE
2       I, Valerie Martinez, Notary Public in and for
3   the State of Alaska do hereby certify:
4       That the witness in the foregoing proceedings
5   was previously duly sworn; that the proceedings were
6   then taken before me at the time and place herein set
7   forth; that the testimony and proceedings were reported
8   stenographically by me and later transcribed under my
9   direction by computer transcription; that the foregoing
10  is a true record of the testimony and proceedings taken
11  at that time; that I am not a party to nor have I any
12  interest in the outcome of the action herein contained;
13  and that signature has been requested.
14      IN WITNESS WHEREOF, I have hereunto subscribed
15  my hand and affixed my seal this _____ day of _____,
16  2006.
17
18
19      _____
        Valerie Martinez
20      Notary Public for Alaska
21
        My Commission Expires: June 22, 2010
22
23
24
25

82 (Pages 1011 to 1014)

Midnight Sun Court Reporters (907) 258-7100