IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

– — – — – — – — – — – — – — – — – — – — – —

BOBBI WADE,                                    )
                                               )
                    Plaintiff,                 )
                                               )
     vs.                                       )  No.  305-cv-086-TMB
                                               )
ILISAGVIK COLLEGE; NORTH SLOPE                 )
BOROUGH; JOHN TUTHILL,                         )
individually; and PAMELA TAYLOR,               )
individually,                                  )
                                               )
                    Defendants.                )
                                               )

– — – — – — – — – — – — – — – — – — – — – —


     Videotaped Deposition Upon Oral Examination

                         of

              JOHN TUTHILL, Ph.D.


– — – — – — – — – — – — – — – — – — – — – —



                    8:04 a.m.

                  May 10, 2006

          1601 Fifth Avenue, Suite 860

            Seattle, Washington


Sharon K. Langford, CCR     1601 Fifth Avenue, Suite 860
Court Reporter              Seattle, WA 98101



EXHIBIT ___D___
Page ___1___ of ___40___

Wade vs. Ilisagvik                          5-10-2006                          John Tuthill, Ph.D.

6

1     A.  Yes.
2     Q.  And what was the outcome of the trial?  Was
3  there a trial?
4     A.  No, it was settled out of court.
5     Q.  And have you ever been sued other than that
6  time?
7     A.  No.
8     Q.  So you understand in a deposition that you're
9  to tell the truth; is that right?
10    A.  I understand that.
11    Q.  Okay.  And you have the right to take a
12  break.  This is not a marathon, so if you need a break,
13  you know, just say so and we'll go off record and we
14  can, you know, take a few minutes.
15    A.  Okay.
16    Q.  There needs to be no question pending when you
17  take a break, so if I've asked you a question you need
18  to answer and then we can take a break.
19    A.  All right.
20    Q.  I need you to answer out loud, so no head
21  shakes or uh-huhs or huh-uhs.  Try to say yes, no, or
22  okay.  Some other sort of word.
23    A.  Okay.
24    Q.  All right.  You have worked outside of the
25  United States; is that correct?

7

1     A.  That is correct.
2     Q.  And you are currently working outside the
3  United States?
4     A.  That is correct.
5     Q.  And you're in the Marshall Islands; is that
6  correct?
7     A.  Yes.
8     Q.  Is that a territory of some other country or
9  is that, is it its own country?
10    A.  It is an independent country.  It has a treaty
11  of free association with the United States, but it is an
12  independent country.  It has its own president.  It has
13  its own United Nations representative.
14    Q.  And you have also worked -- let's see.  You
15  have worked in the Marshall Islands in the past; is that
16  correct?
17    A.  That is correct.
18    Q.  And I understand from your answers to
19  interrogatories that you worked in the Marshall Islands
20  from the year 2000 until 2002?
21    A.  That is correct.
22    Q.  And when did you go back to the Marshall
23  Islands to work?  2005?
24    A.  I physically moved back the beginning of
25  November of 2005.  Though my contract, I actually

8

1  started working for the College of the Marshall Islands
2  in October.
3     Q.  And the College of the Marshall Islands is
4  where you worked in early 2000 as well?
5     A.  That is correct.
6     Q.  And at the time that you left the Marshall
7  Islands in 2000, what was your title?
8     A.  I left the College of the Marshall Islands in
9  2002.
10    Q.  Thank you.
11    A.  My title at the time I left was interim
12  president.
13    Q.  Interim president, okay.  And you have gone
14  back as vice president?
15    A.  That is correct.
16    Q.  And what are your duties now?
17    A.  I am the second ranking administrative officer
18  at the college.  I have general supervisory authority
19  over all instructional and student service programs.
20    Q.  And had you held this particular position in
21  the past?
22    A.  Not exactly.  I had been vice president and
23  dean of instruction.  What's been added to my duties now
24  is the student service aspect of it.
25    Q.  And in between your service at the Marshall

9

1  Islands you were in the Ukraine?
2     A.  I was in the Ukraine for one year.
3     Q.  And you were a Fulbright scholar; is that
4  correct?
5     A.  That is correct.
6     Q.  And what were you studying?
7     A.  I was not studying.  I was lecturing.
8  Fulbright has two different directions for Americans
9  overseas.  One is a research Fulbright; the other is an
10  instructional Fulbright.  I was a Fulbright lecturer.  I
11  taught advanced English for special purposes and I
12  taught beginning history classes, and counseled and
13  advised students and worked with students on identifying
14  opportunities for them to study outside of Ukraine.
15    Q.  How did you hear about that particular job?
16    A.  I heard about -- well, you know, everyone's
17  always known about Fulbright opportunities.  I began to
18  explore it seriously as a result of e-mail conversations
19  with an individual who had had a Fulbright in the former
20  Soviet Union and who was applying for a faculty position
21  at the College of the Marshall Islands.
22        He and I struck up an e-mail conversation and
23  talked about Fulbrights.  He told me that he thought
24  that I would have a very good chance of getting one.  I
25  never thought of that before, so I applied and he was

3 (Pages 6 to 9)

EXHIBIT ___D___
Page 2 of 40

Wade vs. Ilisagvik                                    5-10-2006                                    John Tuthill, Ph.D.

10

1    right. I got it.
2        Q.   And prior to your original Marshall Island job
3    you were an associate professor at the University of
4    Guam; is that correct?
5        A.   That is correct.
6        Q.   And what did you teach at the University of
7    Guam?
8        A.   History.
9        Q.   And you were there from 1992 through 1999?
10       A.   That is correct.
11       Q.   And prior to that you had several teaching
12   positions, two in California and one in Georgia. Were
13   you also a history professor in all three of those?
14       A.   I think there was only one in California. I
15   taught for a year at the University of California at
16   Davis.
17       Q.   Okay. I have an interruption. I have UC
18   Davis '88 to '89?
19       A.   And then Georgia Southern from '89 to '92.
20   Yes, I was teaching history at both institutions.
21       Q.   Oh, this says summer adjunct position.
22       A.   Yes, that's correct. The UC Davis hired me to
23   come back the following summer to teach humanities
24   courses. So at UC Davis I was teaching history and
25   humanities. At Georgia Southern I taught history.

11

1            VIDEOGRAPHER: If I can get you to lean
2    back just a little bit, I'm getting a lot of sun on your
3    face. Thank you. And I'll try to fix that in the
4    meantime.
5        Q.   (By Ms. Johnson) So what did you do, how did
6    you hear about the Ilisagvik College position?
7        A.   From an advertisement in the Chronicle of
8    Higher Education.
9        Q.   And you applied via mail or via e-mail?
10       A.   I was in Ukraine at the time so I suspect I
11   applied by e-mail, though I don't specifically recall.
12       Q.   And did you receive an interview?
13       A.   Yes. I had a telephone interview, which I did
14   in Ukraine. They telephoned me from Barrow. And then
15   they flew me to Barrow in late June.
16       Q.   Who did you have the telephone interview with?
17       A.   It was the search committee. Edna MacLean was
18   there. Beverly Greenwich was there. I believe Jay
19   St. Vincent was there. I don't recall who else was
20   there.
21       Q.   And when you flew in to interview who did you
22   interview with?
23       A.   Well, I know that I met Jay. I know that I
24   met the biology instructor, Lana Mcneil. I know that I
25   met with Beverly Greenwich. I know that I met with Edna

12

1    MacLean. I suspect that I had brief meetings with other
2    folks. I met with Diana Kennedy.
3            I would say those were the principals, but I'm
4    sure there were others involved, too.
5        Q.   Did you meet with any board of trustee
6    members?
7        A.   Not that I recall.
8        Q.   How about anybody at the North Slope Borough?
9        A.   Not that I recall.
10       Q.   And when were you informed that you had been
11   chosen for the position?
12       A.   On the last day of the interview.
13       Q.   So you knew in June; is that correct?
14       A.   I knew at the very end of June.
15       Q.   And when did your position start?
16       A.   The next week.
17       Q.   Did you have to fly back to the Ukraine?
18       A.   No. The family and I had left Ukraine and the
19   family was in a hotel near the Cincinnati airport. So I
20   flew back to the Cincinnati airport. I believe that we
21   all flew together to Barrow on July 5th, though I'm not
22   100 percent sure of the date.
23       Q.   So approximately first week of July --
24       A.   Yeah.
25       Q.   -- you moved to Barrow?

13

1        A.   Yeah.
2        Q.   And what did you do to prepare yourself for
3    your job in Barrow?
4        A.   Nothing.
5        Q.   Nothing?
6        A.   (Witness shakes head.)
7        Q.   You didn't need --
8        A.   You mean before I arrived?
9        Q.   Right.
10       A.   Nothing.
11       Q.   What was your understanding of what your job
12   was going to be?
13       A.   My understanding was that my job was to be the
14   chief instructional officer at the College; that I was
15   to supervise all instructional programs; that I was to
16   supervise and evaluate the faculty; that I was to
17   develop new programs according to the plans of the board
18   of trustees and the College president; that I was to
19   represent the College in meetings outside the
20   institution, with the Borough or with other agencies and
21   institutions in Alaska and elsewhere.
22       Q.   Once you got to Barrow did you have permanent
23   living quarters?
24       A.   No.
25       Q.   So you had to search for something, someplace

4 (Pages 10 to 13)

EXHIBIT D
Page 3 of 40

Wade vs. Ilisagvik                         5-10-2006                         John Tuthill, Ph.D.

14

1  to live?
2      A.  No.  When I initially moved the College placed
3  me in a half of a Quonset hut adjacent to the College.
4  I lived there on a temporary basis, oh, I guess about a
5  month, at which point we moved into a full Quonset hut
6  across the parking lot from the College, where we
7  resided until probably the following January.
8      Q.  **Once you got to Barrow did you have an office**
9  **assigned to you?**
10     A.  Yes, I did.
11     Q.  **Where was your office?**
12     A.  The office was the first door on the left when
13 you entered the main entrance of the main College
14 building, immediately opposite the hallway from the
15 College president's office.  Next door to the dean of
16 student services office.
17     Q.  **Where was the HR office from your office?**
18     A.  Down the hall and around the corner to the
19 right.
20     Q.  **And the first day that you went and sat down**
21 **in your office, did you go through and did you review**
22 **who the people that you were going to be supervising**
23 **were?**
24     A.  I did.
25     Q.  **And what did you do to review?**

16

1  **begin your position at Barrow?**
2      A.  The first day I remember being very quiet.
3  Nobody knew who I was.  Everyone left me alone.  I went
4  through the files and tried to figure out who was what.
5  The next day I began getting assignments and tasks
6  placed upon me, and I began dealing with them.  So I had
7  one day of quiet to get up to speed, and then I hit the
8  ground running.
9          The next week the board of trustees had a
10 meeting.  The result of that meeting was a whole list of
11 planned tasks that were assigned to my office, and I got
12 going on them.
13     Q.  **Did you review the employee handbook?**
14     A.  I did.
15     Q.  **When did you do that?**
16     A.  The first day.
17     Q.  **And did you read it all the way through?**
18     A.  I wouldn't say that I read it in excruciating
19 detail, but I went all the way through it to get an idea
20 of what was there.
21     Q.  **Was there a faculty handbook at the time?**
22     A.  I don't believe there was.  I think there was
23 something that was called the faculty handbook that was
24 out of date and incomplete.
25     Q.  **Did you review it?**

15

1      A.  I pulled their files from my office, the files
2  that were kept in the office that I occupied, and
3  reviewed all of the documents, which usually included
4  student evaluations, sometimes copies of correspondence
5  between the faculty members and the assistant to the
6  dean or the dean, sometimes but not always resumes and
7  application forms.
8      Q.  **Do you specifically recall doing that for**
9  **Bobbi Wade?**
10     A.  I do.
11     Q.  **Did you review -- did she have any student**
12 **evaluations in her file?**
13     A.  She did.
14     Q.  **What about correspondence?**
15     A.  I don't recall correspondence.
16     Q.  **How about a resume?**
17     A.  I don't recall the resume.
18     Q.  **An application?**
19     A.  I don't recall that application.  I do
20 remember the student evaluations.
21     Q.  **Just the student evaluations?  Did you go down**
22 **to the human resources office and look at any of the**
23 **other information?**
24     A.  Not that I recall.
25     Q.  **In general terms, what else did you do to**

17

1      A.  I looked at it and reached the conclusion that
2  it was incomplete and out of date.
3      Q.  **Did you read all the way through it?**
4      A.  No.
5      Q.  **What about individual professor contracts?**
6  **Did you review those?**
7      A.  No.
8      Q.  **What sort of training have you had in American**
9  **employment practices?**
10     A.  No formal training.
11     Q.  **No formal training.  Have you had any informal**
12 **training?**
13     A.  I've had on-the-job training.  I've had
14 experiences as an administrator.
15     Q.  **What sort of experience as an administrator**
16 **are you referring to?**
17     A.  Well, there have been medical leave issues.
18 There have been contract dispute issues that I've had to
19 deal with.  There have been instances of contract
20 non-renewals.  There have been instances of grievances
21 that I have been a party to or somehow connected with.
22     Q.  **And other than Bobbi Wade's instances, how**
23 **many of these would you say applied while you were at**
24 **Barrow?**
25     A.  Oh, how many of these issues?

5 (Pages 14 to 17)

MOBURG & ASSOCIATES                1601 Fifth Avenue, Suite 860                Seattle, WA 98101
Court Reporters                          206-622-3110        EXHIBIT                       Fax 206-343-2272

Page  4  of  40

Wade vs. Ilisagvik                          5-10-2006                          John Tuthill, Ph.D.

22

1  they are able to go back to work.
2      Q.  Anything else?
3      A.  That's what I recall.
4      Q.  And where did you gain that particular
5  knowledge?
6      A.  From conversations with the HR director in the
7  College of the Marshall Islands, conversations with the
8  HR director at Ilisagvik College.
9      Q.  And the HR director at Ilisagvik is Pam
10 Taylor?
11     A.  That is correct.
12     Q.  And she was the HR director the entire time
13 you worked at Ilisagvik?
14     A.  That is correct.
15     Q.  And do you recall specifically applying the
16 Family Medical Leave Act while you were at Ilisagvik
17 College?
18     A.  No.
19     Q.  Did you ever believe that it might apply to
20 any instance at Ilisagvik College?
21     A.  What I was aware of in two instances in the
22 fall of 2003 was that we had faculty members who were
23 telling us that they had medical issues which needed to
24 be taken care of. In conversations with the HR director
25 at Ilisagvik and with the College attorney, I was

24

1  documentation that there was a medical issue that needed
2  timely treatment and that the treatment had to be
3  provided off-Slope.
4          Again, specifically in my mind whether this
5  was FMLA Or extended medical leave or what wasn't the
6  issue. The issue was to provide the employee with the
7  information the employee needed to know in order to have
8  the College process the leave application.
9      Q.  In the fall of '03, starting with Bobbi Wade,
10 was your advice to her written or oral?
11     A.  Both.
12     Q.  And did you specifically direct the human
13 resources department to give Ms. Wade anything in
14 writing?
15     A.  I did not.
16     Q.  Why?
17     A.  That wasn't my job. Miss Wade presented her
18 leave request. I discussed the leave request with the
19 College HR director. I discussed the leave request with
20 the College attorney. I got the information I believed
21 I needed as to what to tell Miss Wade about what the
22 College needed in terms of medical documentation to
23 support the leave request for a medical leave. I gave
24 her that information orally; I gave her that information
25 in writing.

23

1  advised that the College could give those medical leaves
2  after the College had been provided, by documented
3  medical evidence, that there was a medical condition
4  which needed treatment promptly and which could not be
5  provided locally. That is the advice that I gave to the
6  two employees.
7          Was that specifically FMLA, in my mind, as
8  opposed to other legislation or other leave policies?
9  No. As the Dean of Instruction that wasn't my issue.
10 My issue was to make sure that the employees knew the
11 evidence that we needed in order to process the leave
12 request.
13     Q.  And how did -- the two instances were who?
14     A.  One was Miss Wade. The other was Jay
15 St. Vincent.
16     Q.  And other than the fall of '03, were there any
17 other instances at the College where you thought that
18 medical leave or family medical leave might apply?
19     A.  I will say the same thing I said before. From
20 my perspective as Dean of Instruction, the exact federal
21 category or type of leave was not my issue.
22         A medical leave issue arose with Miss Wade
23 again in the spring semester of 2004 and she was
24 provided with the same advice, that the College would
25 grant her the medical leave when we had appropriate

25

1      Q.  If a specific document needed to go out
2  pursuant to the family medical leave, whose job would it
3  have been to do that?
4      A.  Probably the HR director, but I can't speak to
5  that.
6      Q.  Is that the person that you would have
7  expected would know to hand out a specific form or piece
8  of paper on the Family Medical Leave Act?
9      A.  I can't speak to the job requirements of the
10 HR director. I can say that that certainly was not
11 something within my purview. I did not have that
12 information.
13     Q.  You did have a conversation with the College
14 attorney, and would that person's name be Cheryl McKay?
15     A.  That is correct.
16     Q.  And do you recall what Cheryl McKay, what
17 advice Cheryl McKay gave you?
18     A.  I do not recall -- there were several
19 conversations over the next month on the issue. I do
20 not recall specifics in each conversation. The general
21 impression that I got from each of the conversations was
22 the same: that the College should and would issue a
23 medical leave to Miss Wade as soon as we had appropriate
24 documentation that there was a medical need for
25 treatment in a timely manner that could only be provided

7 (Pages 22 to 25)

Wade vs. Ilisagvik                                    5-10-2006                                    John Tuthill, Ph.D.

---

**26**

1    off-Slope.
2        Q.   And what about when she came back from any
3    medical leave?  Did Cheryl McKay give you any advice as
4    to what to do then?
5        A.   I recall Pam Taylor insisting that when the
6    employee, any employee who's gone on a medical leave
7    returned to work, they needed to have a medical
8    clearance.  They needed to have a discharge from the
9    doctor saying that they were now able to return to work,
10   with the added qualification of any restrictions on duty
11   that might need to be placed and for how long those
12   restrictions should be there.
13       Q.   What about the job?  Was there any specific
14   advice as to giving -- how you gave the job back, when
15   you gave the job back?
16       A.   No.  My understanding was as soon as the
17   employee returned with the medical discharge, they would
18   resume their normal job functions.
19       Q.   The very same day that they returned?  If they
20   had a full release back?
21       A.   If they had a full release back, then as soon
22   as they were ready to come back to work, yes.
23       Q.   I want you to look at what's already been
24   marked as 13B.  This has been previously marked in
25   another deposition.  Do you need a minute to look

---

**27**

1    through that?
2        A.   Is that what you'd like?
3        Q.   No, I'm asking you if you want a minute to
4    read through it?
5        A.   Sure.
6            Okay.
7        Q.   Do you recall having read this before today?
8        A.   Yes.
9        Q.   And do you recall this as being part of the
10   Ilisagvik College employee handbook?
11       A.   I do.
12       Q.   And down at the bottom it says it was approved
13   in '01, so was this part of the handbook that you looked
14   at when you first got to the College?
15       A.   I believe it is.
16       Q.   Did you read this contemporaneous with Bobbi
17   Wade's request for medical leave?
18       A.   I believe I did.
19       Q.   And did you think that you understood this
20   policy at the time that you read it?
21       A.   I don't think that I would claim to be an
22   expert in it.
23       Q.   No, but did you understand the terms that were
24   spelled out here?
25       A.   In general.

---

**28**

1        Q.   And did you consult this particular provision
2    as you were -- as you were making the decision whether
3    to let Bobbi Wade have medical leave?
4        A.   In general terms, yes, but I would say I
5    consulted more with the HR director and with the College
6    attorney, because they were the experts in this field.
7    I was not.
8        Q.   What advice did the HR director give you?
9        A.   The HR director advised me to inform Miss Wade
10   that she was eligible for the medical leave once she had
11   supplied appropriate documentation of a medical issue,
12   the timely manner in which it needed to be treated.
13       Q.   In your mind, what was appropriate
14   documentation?
15       A.   In my mind, appropriate documentation would be
16   something from a licensed physician that indicated, A,
17   that there was a serious medical issue; B, that it was a
18   medical issue that needed treatment in a timely manner;
19   and C, that it was an issue that could not be treated
20   locally, so that the employee would have to leave the
21   Slope.
22       Q.   In order to determine whether it was a serious
23   medical issue, what did you expect the medical provider
24   to say?
25       A.   I expected the medical provider to say that

---

**29**

1    there was a serious medical issue.
2        Q.   In those words?
3        A.   That I think would have satisfied me.  Whether
4    that would have satisfied the HR director who was more
5    familiar with the precise details of this or not, I
6    don't know.
7            I was not personally interested in the precise
8    nature of the medical issues.  Personally, I didn't
9    think that was my business.  My business,
10   professionally, was to make sure that a serious medical
11   need was documented.
12       Q.   Okay.  When did Bobbi Wade first come to you
13   and tell you that she needed medical leave?
14       A.   The first leave request that I received was
15   dated October the 2nd.  I cannot say for certain that
16   that was the first time that we discussed the issue.  We
17   may have discussed that a leave request was coming
18   earlier.  I do not recall.
19       Q.   And you have a fairly specific memory of it
20   being October 2nd.  Have you reviewed that document
21   recently?
22       A.   I have reviewed the document recently.  I have
23   a very specific memory that the document is dated
24   October the 2nd.  I do not recall specifically that
25   there were conversations on October the 2nd.

---

8 (Pages 26 to 29)

30

1  Q.  Why do you remember the specific date of
2  October 2nd?  You have an independent memory of that,
3  correct?
4  A.  No.  I looked at it recently.
5  Q.  Oh, okay.  And Exhibit 14 has also been
6  previously marked.  Can you tell me if you recall seeing
7  this particular posting?
8  A.  Do I recall seeing this specific posting?
9  Q.  Yes.
10  A.  No.
11  Q.  Do you remember a bulletin board outside the
12  human resources office?
13  A.  In general terms, yes.
14  Q.  Did you read the -- were there postings like
15  this outside the HR office?
16  A.  I'm sure there were postings.  Whether they
17  were like this I couldn't say.
18  Q.  You didn't stop to read the postings?
19  A.  Not generally.
20      MS. JOHNSON:  I'd like to mark a new
21  exhibit.  It will be marked Exhibit No. 65.
22      (Exhibit No. 65 was marked
23        for identification.)
24  Q.  While you were at Ilisagvik College -- well,
25  when did you leave Ilisagvik College?

31

1  A.  At the end of February of 2005.
2  Q.  Okay.  So while you were at Ilisagvik College
3  do you recall that faculty received a merit increase?
4  A.  I don't specifically recall it, though I'm not
5  surprised.
6  Q.  And do you recall how much the merit increase
7  was?
8  A.  No.  I have no idea.
9  Q.  Turn to Exhibit 47.  Let me give you a copy.
10  It's been previously marked.
11      Do you recall this document?
12  A.  Yes.
13  Q.  And your signature is at the bottom beside the
14  words "Department Director"; is that correct?
15  A.  That is correct.
16  Q.  And you dated it 1/28/04; is that right?
17  A.  That is correct.
18  Q.  And this document says that it's a Personnel
19  Action Form for Bobbi Wade; is that right?
20  A.  That is correct.
21  Q.  And the Personnel Action Form appears to be
22  non-renewal.
23  A.  That is correct.
24  Q.  Can you tell me what that means?
25  A.  It means that with all of the signatures, the

32

1  College had decided not to offer Miss Wade a new
2  contract with the expiration of her current contract at
3  the end of June of 2004.
4  Q.  And when you say the College decided, who had
5  the ultimate authority to make this decision?
6  A.  The ultimate authority rested with the
7  president, Edna MacLean.
8  Q.  At what point did you become aware -- well,
9  who had the -- Edna MacLean, although she had the
10  ultimate authority, did she do day-to-day operations
11  with the faculty?
12  A.  No.
13  Q.  That was your job, right?
14  A.  That was my job.
15  Q.  Okay.  And was it your original duty to go
16  through the contracts and decide which contracts would
17  be renewed and which ones would not?
18  A.  Yes.
19  Q.  And what did you do -- at what point did you
20  make those types of decisions for the next year?
21  A.  In this specific instance I made the decision
22  the day before.
23  Q.  And what did you do to prepare yourself for
24  the decision one way or another?
25  A.  Gathered as much evidence as I could from many

33

1  different sources, reviewed the evidence, analyzed the
2  evidence, agonized over what the right thing to do was,
3  discussed issues with colleagues, and reached a
4  conclusion.
5  Q.  When did you first start contemplating whether
6  or not you would renew Bobbi Wade's contract?
7  A.  I would say sometime in January.
8  Q.  And you said that you started looking at
9  evidence.  What evidence did you start looking at?
10  A.  The evidence included the student evaluations
11  that she had on file, the comments, observations, and
12  complaints about her teaching that I had received orally
13  from a number of students and received in writing from
14  some students and from Sonya Abu, the student retention
15  officer, reviewing the grades in Miss Wade's courses,
16  reviewing issues for when those grades were submitted,
17  reviewing the file of correspondence that I had to and
18  from Miss Wade, reviewing her application form, her
19  resume, her academic background.
20  Q.  When you say the correspondence file, what
21  correspondence file are you referring to?
22  A.  We had any number of e-mails that we had
23  exchanged over the course of my employment at
24  Ilisagvik.  I had e-mails from her about various
25  issues.  She had e-mails from me.

9 (Pages 30 to 33)

Wade vs. Ilisagvik                          5-10-2006                          John Tuthill, Ph.D.

34

1      Q.  Do you recall what those were about?
2      A.  Mostly they were about teaching or about
3  scheduling or about issues that came up in the
4  workplace.  Sometimes about the leave requests.
5      Q.  And did you keep a copy of those e-mails?
6      A.  I did.
7      Q.  Did you specifically run them off of the
8  computer?
9      A.  I don't think I did at this point.  I had them
10  all saved in my college e-mail file.  I believe I
11  printed copies of these when we went into the grievance
12  phase in the spring of 2004, but I don't believe I had
13  printed copies of them in January.
14      Q.  So when you say correspondence, you weren't
15  looking at a correspondence file like we talked about
16  before?
17      A.  No.  I'm going through my e-mails.
18      Q.  And while you were looking through the
19  application and resume, did you have to go down to the
20  human resources office in order to do that?
21      A.  Yes.
22      Q.  And the grade submission, tell me about the
23  grade submission and why that was evidence that you
24  looked at?
25      A.  Over the Christmas vacation of 2003 I looked

35

1  at the grade submissions of all of the faculty, looked
2  at the grades that they had given, looked with specific
3  interest at the number of students who had withdrawn
4  from the courses.  That was an issue of interest and
5  concern.  There were also issues in Miss Wade's case
6  where we received grades for two of her courses a month
7  late, which led to strongly adverse effects for the
8  continuity of the course.
9      Q.  You say they were strongly adverse?
10      A.  It's not the grades were strongly adverse.
11  This was a modularized course, two modularized courses
12  that had an A component for four weeks, a B component
13  for four weeks, a C component for four weeks.  Because
14  Miss Wade was late in submission of the B component
15  grades by a month, it meant that the students had
16  already been promoted into C even when it turned out
17  they had not mastered the material in B, so they
18  shouldn't have been registered in the C module at all.
19  It was a mess that I had to spend considerable time
20  straightening out.
21      Q.  And why was this a problem for the College?
22      A.  Why was it a problem for the College?
23      Q.  Uh-huh.
24      A.  Because we were giving inappropriate grades in
25  the C modules to students who were in the course because

36

1  we had not followed our own procedures.  The procedure
2  was if a student had failed to complete Module B, the
3  student should be administratively withdrawn at the
4  outset of Module C, not allowed to register.  Instead,
5  because we didn't have the grades in a timely manner,
6  the students had been allowed to register for Module C,
7  and in many instances they were given a grade of F when
8  the appropriate grade for them would have been a W.
9      Q.  W being?
10      A.  Withdrawn.
11      Q.  Withdrawn.  Bobbi Wade taught the first two
12  modules of that, of those two classes; is that correct?
13      A.  That is correct.
14      Q.  She taught A and B in Business 105 and she
15  taught A and B in Business 109?
16      A.  That is correct.
17      Q.  And the C modules were given, in 105 was given
18  to a different instructor; is that correct?
19      A.  That is correct.
20      Q.  And 109 was given to another instructor?
21      A.  That is correct.
22      Q.  Tell me about, tell me why those C modules did
23  not remain with Bobbi Wade?
24      A.  Because she was going to be away on leave.
25  These were modularized courses.  C module was scheduled

37

1  to meet over a four-week period.  My recollection is
2  that for one of the C modules there were going to be a
3  total of ten class meetings.  Miss Wade was going to be
4  gone for at least four of them.  My recollection is that
5  for the other of the modularized courses there were
6  going to be a total of eight course meetings during the
7  short semester.  Miss Wade was going to be gone for
8  three of them.
9          In my professional judgment, I felt that
10  having the students miss between 37.5 and 40 percent of
11  the class meetings or having to reschedule that number
12  of class meetings in a very tight semester was not in
13  the students' best interests.
14      Q.  So you gave them -- so was it your duty to
15  decide who taught that module, those Module C's?
16      A.  In this instance, yes.
17      Q.  And did you think that you had the authority
18  to decide who taught the Module C's?
19      A.  Yes.  Subject to the approval of the
20  president.  The Personnel Action Form would ultimately
21  be signed by the president.
22      Q.  Was there a Personnel Action Form generated
23  for those modules?
24      A.  I don't recall specifically, but I assume
25  there was.

10 (Pages 34 to 37)

Wade vs. Ilisagvik                           5-10-2006                           John Tuthill, Ph.D.

---

46

1  added days as well, correct?
2      A.  Yes, but it would have had exactly the same
3  schedule issue.  These were students who in many cases
4  were taking other Ilisagvik courses or who had work
5  responsibilities.  They had built their personal lives,
6  their work responsibilities around the Ilisagvik
7  schedule that had been published and announced the
8  summer before.  To change that, to say to them, in order
9  for you to get credit in this course which you signed up
10  for in good faith in August, you're going to have to
11  change your schedule now and give up additional hours
12  and additional days, is not something that students can
13  always do.
14      Q.  How many students were in the English class;
15  do you know?
16      A.  I would guess approximately 15, but I'm not
17  absolutely sure.
18      Q.  Did you go and talk to the class and see what
19  their preference was?
20      A.  I did not.
21      Q.  How many students were in the math class?
22      A.  Approximately 15, I would guess.
23      Q.  And did you go and talk to those students to
24  see what their preference was?
25      A.  I did not.

---

47

1      Q.  What did you do to decide that you would
2  replace the instructor rather than change the schedule?
3      A.  I had been receiving notices for several weeks
4  from the college retention officer, Sonya Abu, who was
5  reporting the feelings of a number of students in the
6  Business English and the Business Math course.  She was
7  reporting to me that the students were perplexed and
8  confused by scheduling changes which they were being
9  informed of by the instructor.  That they did not like
10  the scheduling changes, that they wanted to know what
11  was going to happen and when it was going to happen.
12  That was one of the main reasons why I made the
13  determination that continuing to follow the original
14  schedule was the best plan.
15      Q.  Out of the 30 students, 15 in English and 15
16  in math, how many of them had complained?
17      A.  I don't know.  What I had was summaries from
18  Sonya Abu, who told me that a number of students, it was
19  students, plural, from Miss Wade's classes had come to
20  her and reported this, that, or the other issue or
21  concern or complaint.
22      Q.  How many of them complained about the changing
23  class schedule?
24      A.  I will say the same thing.  I cannot give you
25  the precise number.  What I know is that Ms. Abu

---

48

1  reported to me multiple student concerns, issues,
2  complaints, some of which were centered on the
3  scheduling and scheduling changes of Miss Wade's
4  classes.
5      Q.  As you were deciding whether or not to retain
6  Miss Wade, who did you talk to?
7      A.  I'm going to ask you to clarify what you mean
8  by "talk to" there.  I gathered information from as many
9  sources as I could.  If you want to know that list, I
10  can, you know --
11      Q.  Okay, let's start with that list.
12      A.  Okay.
13      Q.  Gathered information from --
14      A.  Now, these are not necessarily people with
15  whom I talked specifically about renewal of Miss Wade's
16  contract.  These are people from whom I'm gathering
17  information.
18      Q.  Okay.
19      A.  A number of students in Miss Wade's class, a
20  number of students who were currently taking her class,
21  and a number of students who had taken her courses in
22  the past.
23      Q.  And who would that be?
24      A.  Now, a FERPA question.  Am I allowed to give
25  you names of individual students?

---

49

1          MS. DUCEY:  Can I just interject?  We
2  have a confidentiality agreement, and so, yes, you may
3  give names, and pursuant to the agreement I think we're
4  not going to disclose those in open court, so you can
5  speak freely.
6      A.  Okay.  I will give you a list of the names
7  that come to mind.  This is not a complete list.  It's
8  been a while since I talked to these people.
9          I talked to Mariette Mealor.  I talked to
10  Jamie Elbert.  I talked to Diana Kennedy.  I talked to
11  Sonya Abu.  I know that there are other students that I
12  talked to besides Mariette Mealor, though I can't tell
13  you names specifically.  They were not students who I
14  knew terribly well.
15          Beyond that I talked about issues with Dr. Pat
16  O'Rourke.  I talked about issues with the President
17  MacLean.  There were issues that I talked about with
18  Aimee Valenti; to a lesser extent Tim Carlson.  I'm sure
19  there are others, but that's what comes to mind.
20      Q.  (By Ms. Johnson)  What did you talk to
21  President MacLean about?
22      A.  I recall one specific conversation with
23  President MacLean sometime in the latter half of January
24  in which we were talking about faculty contract
25  renewals, and she asked me if there were any contracts

---

13 (Pages 46 to 49)

Wade vs. Ilisagvik                          5-10-2006                          John Tuthill, Ph.D.

---

**50**

1  that I could foresee not renewing. I told her that
2  there were two contract issues that I was grappling
3  with, where I had not yet reached a determination. She
4  asked me who those individuals were and what the issues
5  were, and I told her.
6      Q.  Who were those people?
7      A.  One was Miss Wade. One was Courtneay
8  Bartholomew.
9      Q.  And other than informing President MacLean of
10 who you were contemplating not renewing, what else did
11 you talk to her about?
12     A.  She wanted to know what the issues were in
13 both instances and I told her.
14     Q.  What did you tell her about Bobbi Wade?
15     A.  That there was an issue in teaching
16 competence, that there was an issue in academic
17 qualifications.
18     Q.  Anything else?
19     A.  Those are the ones I recall.
20     Q.  And what were the issues with Courtneay
21 Bartholomew?
22     A.  Teaching competence. I suppose the fairest
23 way of saying it with Courtneay was teaching attitude.
24 To a lesser extent, the intelligibility of the spoken
25 English. That's all.

---

**51**

1      Q.  Did President MacLean make any comments to you
2  about Bobbi Wade's competence?
3      A.  No. She listened with interest and responded
4  with something noncommittal such as okay.
5      Q.  What about Bobbi Wade's qualifications?
6      A.  She said nothing specific there.
7      Q.  Did she make any specific comments about Bobbi
8  Wade herself?
9      A.  Not that I recall.
10     Q.  Was that all that you talked about to the
11 president about Bobbi Wade?
12     A.  To my recollection, yes.
13     Q.  And before you made the retention decision did
14 you have any other meetings with the president?
15         MS. DUCEY:  Objection; vague.
16     Q.  (By Ms. Johnson) About the retention.
17     A.  No. I recall the one conversation with the
18 president about the contract issue.
19     Q.  In looking at Exhibit 47, Edna MacLean appears
20 to have signed on the line of the president on the same
21 day that you signed; is that correct?
22     A.  That is correct.
23     Q.  Did you take this form to the president in
24 order to have it signed?
25     A.  Not that I recall.

---

**52**

1      Q.  You didn't have any conversations at the time
2  that this form was signed with the president?
3      A.  Not that I recall.
4      Q.  Did you talk to any board members about the
5  retention issues?
6      A.  No.
7      Q.  You said you talked to Patrick O'Rourke about
8  issues with Miss Wade.
9      A.  That is true.
10     Q.  What did you talk to him about?
11     A.  Dr. O'Rourke and I had -- had talked regularly
12 for months, every time he came to the college. He was a
13 consultant for the college and I relied on his
14 background and expertise. We talked in general about
15 teaching issues and faculty teaching issues throughout
16 the fall semester of 2003.
17         Specifically, in January of 2004 I was talking
18 to him about renewed contracts and told him that there
19 was a possibility that I would recommend that Miss
20 Wade's contract not be renewed, and he responded.
21     Q.  What did he say?
22     A.  He said that he hoped I could find a way to
23 renew her.
24     Q.  Why did he say that?
25     A.  He did not say.

---

**53**

1      Q.  Did you explain to Patrick O'Rourke what the
2  issues were?
3      A.  Yes, I did.
4      Q.  What did you tell him?
5      A.  I told him that there were issues of teaching
6  competence and that there were issues of instructional
7  qualifications, which concerned me very much.
8      Q.  Did he make any comment on the competence
9  issue?
10     A.  No, not specifically.
11     Q.  Not specifically. What do you -- that sounds
12 like a qualification. Was there some sort of comment?
13     A.  We had talked on again, off again throughout
14 the fall semester about Miss Wade and other instructors
15 and where they would be best placed in terms of
16 instruction, how we could best use them. Dr. O'Rourke
17 had advised me, for example, that he did not think it
18 was appropriate for Miss Wade to teach in the College
19 Skills Academy program. He thought that that was not
20 the best target audience for Miss Wade's teaching.
21     Q.  And did he explain why?
22     A.  No.
23     Q.  What is the College Skills Academy?
24     A.  The Skills Academy was a program for workers
25 employed by the North Slope Borough. It was a program

---

14 (Pages 50 to 53)

Wade vs. Ilisagvik                                5-10-2006                              John Tuthill, Ph.D.

---

54

1   designed to provide them with upgraded computer skills
2   and upgraded business skills to make them more effective
3   in the jobs that they were doing. So it was an audience
4   of students who were primarily older, all of them full-
5   time employed, and I suppose a comparatively more
6   demanding, more aggressive group of students.
7       Q.  Were these students that intended to get a
8   degree?
9       A.  Not necessarily. It was hoped by the College
10  that some of them would be attracted by the instruction
11  they had received and would subsequently enroll in
12  degree programs, but that was not the primary intention
13  of the program.
14      Q.  Was this something that the North Slope
15  Borough paid to send its employees to?
16      A.  Yes.
17      Q.  Did you agree with Dr. O'Rourke's assessment
18  that the College Skills Academy was not suitable for
19  Bobbi Wade?
20      A.  I followed his advice. He gave me that advice
21  in August, before I had met Miss Wade. This was a
22  program that was designed to be implemented as early as
23  the next month. I followed his suggestion.
24      Q.  Who did you place in the College Skills
25  Academy?

---

55

1       A.  Primarily the instructor for the Skills
2   Academy classes, or at least the coordinator of the
3   whole program was Dr. Chris Lapp, who the college hired
4   that summer.
5       Q.  To specifically fulfill those duties?
6       A.  Yes, and to teach other business courses as
7   well, but the primary focus of his activity was to
8   coordinate and do some of the instruction in the Skills
9   Academy class. He didn't teach the IT classes, for
10  example, but he taught some of the business classes.
11      Q.  If Bobbi Wade had been placed into the Skills
12  Academy, would it have been a full-time job for her?
13      A.  Oh, I don't think so.
14      Q.  Could she have just taught specific classes
15  for the Skills Academy?
16      A.  That could have been done, though, remember,
17  in the course load that she had, she was already more
18  than booked up. She was teaching a substantial overload
19  just with her regular Ilisagvik College classes.
20      Q.  So when Dr. O'Rourke told you that he didn't
21  think she was suited for the College Skills Academy, he
22  didn't express a reason for that?
23      A.  Not specifically. He simply said that he
24  didn't think that was the best audience for her.
25      Q.  Did he say what was the best audience?

---

56

1       A.  No. The implication was that Miss Wade would
2   be better suited for the traditional classes that she
3   had always been instructing.
4       Q.  Okay. So other than making that comment to
5   you, did Dr. O'Rourke make any other comments about Miss
6   Wade's competence or her qualifications?
7       A.  We talked about her qualifications.
8       Q.  And what did you say?
9       A.  We were both aware of the fact that her
10  education was in English, that her graduate degree was
11  in educational administration, and that these degrees
12  were not directly connected to much of the content area
13  of what she was teaching at the College.
14      Q.  And what sort of comments did Dr. O'Rourke
15  make about that?
16      A.  None. We just observed the fact.
17      Q.  At some point this became a problem for you;
18  is that correct?
19      A.  It was an issue for me. It was an issue for
20  me in determining whether or not I wanted to recommend
21  the renewal of the contract.
22      Q.  Why was it an issue?
23      A.  It was an issue because the accreditation
24  standard by the Northwest Accrediting Commission states
25  that an accredited college will have appropriately

---

57

1   qualified instructors. I had an instructor in the
2   business program who was teaching classes in accounting
3   and economics and finance and business management and
4   marketing who had very limited or no academic background
5   in these areas. That was not appropriate
6   qualifications, so I was in violation of an
7   accreditation standard.
8       Q.  Well, when they say appropriately qualified,
9   is there a definition for that?
10      A.  There's no explicit definition in the
11  accreditation standard. There is a general consensus, I
12  would say, that at the community college level it is
13  appropriate for an instructor to have a master's degree
14  in the field in which they are teaching or a closely
15  related field.
16      Q.  And what was Miss Wade's master's degree?
17      A.  Her master's I believe was in educational
18  administration.
19      Q.  And did you discuss the accreditation issue
20  and Miss Wade's master's degree with Dr. O'Rourke?
21      A.  It may have been something that was raised.
22  It wasn't something we needed to talk a lot about
23  because he and I were both very well aware of the
24  accreditation requirements.
25      Q.  Was it Dr. O'Rourke's opinion that Miss Wade

---

15 (Pages 54 to 57)

EXHIBIT ____D

Page ___11___ of __40

Wade vs. Ilisagvik                                5-10-2006                                John Tuthill, Ph.D.

58

1   was not suitably or appropriately qualified for
2   accreditation purposes?
3       A.  I don't think he said that explicitly. He did
4   say that he was well aware that she did not have a
5   degree in business. Did he say specifically that this
6   is a violation of the accreditation standard? No.
7       Q.  Who would you rely upon for advice as to what
8   was an appropriately qualified instructor for
9   accreditation purposes?
10      A.  Me.
11      Q.  Just you?
12      A.  Uh-huh.
13      Q.  You made that decision?
14      A.  Yes.
15      Q.  How were you aware of what was appropriate and
16  what wasn't?
17      A.  I have been doing this for many years. We had
18  exactly the same accreditation issues at the College of
19  the Marshall Islands, at the University of Guam. There
20  is nothing new about this. What was new at Ilisagvik
21  was it had only very recently become a fully accredited
22  institution, and that meant that it needed to make
23  certain that it upheld the standards if it wanted to
24  retain its accreditation.
25      Q.  There were many different types of

59

1   instructors --
2       A.  That is true.
3       Q.  -- at Ilisagvik College, correct?
4       A.  Yes.
5       Q.  There were hands-on instructors who taught
6   more trade skills than actual classroom --
7       A.  That is correct.
8       Q.  -- instruction, right?
9       A.  Uh-huh.
10      Q.  And what did you expect out of your people who
11  were more trade-oriented?
12      A.  Well, let me go through a list, if I may.
13  Fannie Akpik is a good example. She was a native
14  Alaskan. She was responsible for teaching traditional
15  arts and crafts and skills. She did an Inupiat dance
16  course. She did sinew sewing classes.
17          She didn't have a master's degree. Nobody
18  gives a master's degree in that and I didn't expect
19  that. She had a level of cultural expertise, a level of
20  practical knowledge and skill which compensated for the
21  lack of a formal degree program in the type of activity
22  courses that she was teaching.
23          We had instructors in a carpentry program, in
24  an electrical program, in a plumbing program, and a
25  truck driving program. They didn't have master's

60

1   degrees. Nobody's going to go get a master's degree in
2   plumbing. It doesn't work that way. But they had
3   professional credentials. They had journeyman
4   certifications. They had years of trade experience and
5   years of teaching experience. And that made them, by
6   accreditation standards, too, in my judgment,
7   appropriately qualified instructors.
8          Miss Wade's issue was a little bit different,
9   because she was teaching in the business program the
10  academic-oriented courses. She was teaching
11  accounting. She was teaching marketing. She was
12  teaching finance. She was teaching economics. Those
13  were courses for students who were asking for academic
14  degrees, not so much just vocational certificates.
15  Those were courses which a student from Ilisagvik might
16  very well want to transfer to another degree program at
17  the University of Alaska or someplace else later on in
18  their educational career.
19          I needed to make sure that those courses were
20  done at the appropriate academic level to make sure that
21  the students would get transfer credit when they moved
22  to another institution, to make sure not just the
23  transfer credit but that those students would also have
24  the skills, the outcomes that they needed to survive at
25  the next level when they did go to UAF and took the

61

1   classes for which the Ilisagvik classes had been
2   prerequisites.
3       Q.  Were you aware of whether Bobbi Wade had
4   experience in the fields that she taught rather than an
5   academic degree?
6       A.  I was not aware of great depth of practical
7   experience in fields such as marketing or finance or
8   economics or business management. I was aware that she
9   had taught these courses for Ilisagvik in the recent
10  past.
11      Q.  And what did you do to determine whether her
12  actual teaching ability was appropriate?
13      A.  I reviewed the courses that she was teaching.
14  She was teaching in fall semester of 2003 the
15  academically oriented business classes online, on
16  Blackboard. I went into her Blackboard Web site and
17  reviewed the courses.
18      Q.  How many of her courses?
19      A.  There were three.
20      Q.  So you looked at all three of the Blackboard
21  courses?
22      A.  Yes, I did.
23      Q.  And when you looked at them what were you
24  looking for?
25      A.  Looking to see what they were. Looking to see

16 (Pages 58 to 61)

25

Wade vs. Ilisagvik                          5-10-2006                          John Tuthill, Ph.D.

**62**

1   how much of the instructor was present in these courses,
2   how much activity there was by the students, the type of
3   assignments the students were being asked to do.
4        Q.  And what was your observation?
5        A.  My observation was that there was very little
6   of the instructor in the Blackboard course. They were
7   packaged courses which had been bought from a vendor, so
8   that the instructional material by and large was
9   supplied from an outside source. Miss Wade was not
10  engaging the students in the Blackboard platform.
11       She had in her rules on the Blackboard courses
12  that if the students had a question or a problem, they
13  should telephone her privately and individually or they
14  should e-mail her at her private e-mail, but not to use
15  the Blackboard platform for those purposes so that it
16  would be common knowledge and shared who was contacting
17  who. So there wasn't really a whole lot of interaction
18  I could see there. There wasn't a whole lot of
19  instruction I could see there.
20       Q.  Who else taught Blackboard courses that
21  semester?
22       A.  That semester I know Courtneay Bartholomew
23  did. I know Jay St. Vincent taught Blackboard courses,
24  though I don't recall specifically that she had any that
25  semester.

**63**

1        Q.  Did you go in and look at Courtneay
2   Bartholomew's classes on the Blackboard?
3        A.  Yes, I did.
4        Q.  And did you find anything different on his
5   courses?
6        A.  Yes.
7        Q.  What did you find different?
8        A.  There was a great deal of interaction between
9   the students and the instructor. So he was interfacing
10  with the students using the public platform on
11  Blackboard in a way that Miss Wade was not. On the
12  other hand, I also found that his Blackboard courses
13  were hopelessly confusing. I had a hard time navigating
14  them and trying to figure out what was what, which
15  helped me understand why the students were telling me
16  the same thing.
17       Q.  Was he using pre-packaged courses?
18       A.  I don't believe so.
19       Q.  Anybody other than Bartholomew that you can
20  remember who taught Blackboard courses in the fall?
21       A.  Not that I specifically recall.
22       MS. DUCEY:  Whenever it's appropriate if
23  we could take five.
24       MS. JOHNSON:  Sure. Why don't we do that
25  now.

**64**

1        VIDEOGRAPHER:  We are now going off the
2   record. The time is approximately 9:27 a.m.
3        (Recess taken.)
4        VIDEOGRAPHER:  We are back on the
5   record. The time is approximately 9:38 a.m.
6        Q.  (By Ms. Johnson)  We were talking about
7   Blackboard courses and distance delivery. How familiar
8   were you when you came to Ilisagvik College with the
9   Blackboard platform?
10       A.  That was entirely new to me.
11       Q.  And did you set about learning it?
12       A.  I did.
13       Q.  When did you do that?
14       A.  I went through the same Blackboard orientation
15  program as all of the returning and new faculty in
16  August of 2003. I also spoke at length individually
17  with Rob Carrillo, who was the College employee charged
18  with assisting students in the use of the technology
19  program associated with the Blackboard platform. Rob
20  gave me access to the instructional Blackboard courses
21  and files and told me how to go through and see what was
22  what on them.
23       Q.  And was it important to the College that the
24  Blackboard be used?
25       A.  Yes. It was vitally important to the College.

**65**

1        Q.  Why?
2        A.  Because the College was charged not just with
3   the mission of serving students in Barrow, but also all
4   of the outlying villages on the North Slope, village
5   students who could not necessarily give up homes and
6   families and careers in order to come to Barrow and
7   pursue their studies. So that Blackboard was one of
8   very few options they had for getting college level
9   instruction.
10       There was an overall goal of trying to do
11  everything we could figure out how to do to sustain the
12  lifestyle of the traditional villages. Providing a
13  higher education to people who were still able to reside
14  there was something the College felt very strongly it
15  needed to promote.
16       Q.  And did you accept and try to work with that
17  goal?
18       A.  Yes.
19       MS. DUCEY:  Objection; compound question.
20       Q.  (By Ms. Johnson)  Did you encourage faculty
21  members to learn Blackboard?
22       A.  Yes.
23       Q.  What did you do to encourage them to learn it?
24       A.  Most specifically, in the fall of 2003 we had
25  a two-day faculty orientation program in which all of

17 (Pages 62 to 65)

74

1    could not require the students to complete their work
2    until the end of the scheduled term.
3        **Q. So you believe that there were e-mails to that**
4    **effect?**
5        A. I believe there was at least one e-mail to
6    that effect.
7        **Q. And what about using, in the third paragraph,**
8    **using the Blackboard chat room or discussion board? Had**
9    **you talked to Bobbi Wade about her reluctance to use**
10   **that?**
11       A. No, I had not talked to Miss Wade about that
12   specifically. That was echoing a recommendation that
13   had been made by the College technical support person,
14   Rob Carrillo. Rob and I had talked at length over the
15   Christmas holidays about what seemed to be working in
16   Blackboard, and he had made the point that having more
17   obvious and public interface between student and
18   instructor was a good thing.
19        We both recognized that if one student asks a
20   question, there may be another dozen who have the same
21   question but are embarrassed or afraid to ask or just
22   don't get around to it. But having everybody able to
23   see what questions and problems other students are
24   struggling with can make them feel like they're part of
25   a group instead of out there floundering alone.

75

1        **Q. How does a chat room work? Does everyone have**
2    **to be online at the same time?**
3        A. I'm not necessarily talking about a chat
4    room. There were various components of Blackboard.
5    There were some instructors who had a synchronous chat,
6    where the students were told, okay, come to the chat
7    room at 5:00 on Thursday and let's all talk about
8    science for an hour. That is something that could be
9    done. That was something that was very difficult to
10   schedule. If you have students coming from the North
11   Slope Borough villages, they couldn't always be
12   guaranteed computer access at the same time as everyone
13   else.
14        But there was also a feature in Blackboard
15   that let the students pose a question to the instructor
16   by e-mail on the platform, so that other students could
17   see the question. And that would allow the instructor
18   to answer the student question on the platform so the
19   student would be able to see the answer. There were
20   discussion groups that did not have to be done
21   synchronously.
22       **Q. So this feature where they pose the question**
23   **and the teacher answered, is that done live time or does**
24   **that remain on the Blackboard?**
25       A. Oh, it remains on the Blackboard. And it

76

1    doesn't have to be a question and answer. It could be
2    anything. It could be an observation. Hey, today's
3    lesson was really neat. I didn't care so much what. I
4    simply felt that building a learning community with the
5    students and the instructor was a way of helping to
6    break down the anonymity associated with studying
7    online, with a computer.
8        **Q. When did you learn about that feature? First,**
9    **what was the feature called?**
10       A. Oh, I have no idea what it was called.
11       **Q. When did you learn about it?**
12       A. When I started exploring Blackboard early in
13   the fall of 2003. That was one of the things I would
14   look at. I would look at the comments that were coming
15   from the students and the answers that were coming from
16   the instructors.
17       **Q. When did you first decide that this was a**
18   **feature that you wanted your faculty to use?**
19       A. In the Christmas of '03. Up until the
20   Christmas of '03 I had had the impression that
21   Blackboard was something that the faculty already knew
22   about, that the faculty had some experience using and
23   that we were good at. I was astonished at the low
24   student success rate with the Blackboard courses, and
25   that told me that this was not a technology that we had

77

1    mastered yet and where we needed to change some things
2    if our students were going to learn and meet their
3    educational goals.
4        **Q. Had you gone back and looked at student**
5    **success rates on the Blackboard for past semesters?**
6        A. I don't recall that I did that. I may have
7    but I don't remember that.
8        **Q. In the first paragraph of Exhibit 66 you cited**
9    **numbers.**
10       A. Yes.
11       **Q. Where did you get these percentages from?**
12       A. I generated them myself. I took, for each
13   course, each instructor, each delivery platform, the
14   total number of students who had registered for the
15   course, and then figured the percentage of those
16   students who at the end of the semester had received
17   credit for the course. I defined student success for
18   this purposes, for this purpose, as receiving credit at
19   the end of the semester for the course.
20       **Q. Credit meaning a letter grade?**
21       A. No, it could be a pass/no pass course where
22   you get P, and that's fine. My definition was that the
23   student has registered for the course because at the end
24   they want credit. So if they get something that assigns
25   them credit, for my purposes they have succeeded. They

MOBURG & ASSOCIATES                1601 Fifth Avenue, Suite 860                        Seattle, WA 98101
Court Reporters                              206-622-3110                                    Fax 206-343-2272

EXHIBIT _____ D

Page _14_ of _40_

Wade vs. Ilisagvik                          5-10-2006                          John Tuthill, Ph.D.

78

1    have met their goal.
2        Q.  And do you recall the total number of students
3    who had registered for Blackboard courses?
4        A.  Oh, no.  I prepared those statistics.  I broke
5    the statistics down in any way that I could think of.  I
6    broke it down by course, I broke it down by delivery
7    platform, I broke it down by instructor, I broke it down
8    by program, and tried to look for any trends and
9    patterns I could find.
10       Q.  What trends and patterns did you find?
11       A.  I found that Blackboard courses consistently
12   had a lower success rate than traditional courses.  I
13   found that students seemed to be doing better in courses
14   which were activity-oriented as opposed to academic in
15   orientation.  The plumbers did better than the
16   mathematicians.  I found that overall Miss Wade and
17   Mr. Bartholomew had particularly notable low rates of
18   student success.
19       Q.  Do you remember who else taught besides Wade
20   and Bartholomew that semester?
21       A.  Taught what?
22       Q.  Taught Blackboard.
23       A.  I don't recall specifically.  I've mentioned,
24   for example, that I know that while I was at Blackboard,
25   Jay St. Vincent and Lana Mcneil reported considerable

79

1    success with Blackboard courses.  I do not recall
2    specifically that that was the fall of '03.  I do
3    believe I remember that there was at least one
4    Blackboard course that had a higher success rate than
5    did Mr. Bartholomew's and Miss Wade's, but I do not
6    remember what it is.
7        If you're about to pull out my data I'll be
8    grateful.
9        Q.  I'll have to look through it.  I think I have
10   it.
11       Did any of Courtneay Bartholomew's courses
12   have a lower success rate than the 23 percent that you
13   assigned to Bobbi Wade?
14       A.  I believe the 23 percent for Miss Wade is the
15   aggregate for her nine credits of Blackboard courses
16   combined.  I won't swear to that, but that's my
17   recollection.  My recollection is that Mr. Bartholomew's
18   aggregate student success rate was marginally higher.  I
19   want to say 26.  But I have not looked at that data in
20   years so I may not remember completely accurately.
21       Q.  How did you -- in what format did you
22   calculate these numbers?  Did you do it on a computer or
23   did you do it in writing?
24       A.  I had printed sheets, the grade reports.  I
25   had photocopies of the grade reports from the

80

1    instructors which listed all of the students in the
2    class who received a grade, including the ones who had
3    received a W, who had dropped out over the course of the
4    semester.
5        I would physically count the number of
6    students in each course.  I would write down on a yellow
7    tablet the name of the instructor, the discipline of the
8    course, the total number of students.  I would then
9    physically count the total number of students who at the
10   end of the semester had received credit, and I would
11   figure the percentage.
12       Q.  What did you do with those notes?  Do you
13   recall?
14       A.  Yeah; I kept them.
15       Q.  Where are they?
16       A.  Oh, I couldn't tell you now.  I produced from
17   this my own report for my own purposes that was typed
18   and saved in my computer.  The actual yellow pad notes,
19   my recollection is that I kept and I made an effort when
20   I left Blackboard -- not Blackboard, left Ilisagvik
21   College, to make sure that my notes and files were all
22   preserved there.  What happened to them, I can't say.
23       Q.  So you left them at the College?
24       A.  That is my recollection.  Do I remember
25   specifically as I was packing my bags saying, oh my God,

81

1    where are these notes?  No.  I do not remember shredding
2    them.
3        Q.  You said you produced a report.  Did you put
4    it in a report or a memo format?
5        A.  No.  What I recall is that I produced this for
6    myself.  I expect that I shared the information with Rob
7    Carrillo, who I had been talking to about these issues.
8    It was fundamental to his job.  It was something that he
9    was very concerned with as well.
10       I shared the data with the faculty.  I told
11   the faculty across the board that our success with
12   Blackboard courses was not good enough and that
13   Blackboard was not going away and we needed to find a
14   better way of dealing with it.
15       I wrote the specific memo on January the 15th
16   to Miss Wade with recommendations and orders for what I
17   wanted her to do differently.  I wrote a very similar
18   letter with very similar recommendations and orders to
19   Mr. Bartholomew telling him what I wanted him to do.
20   Those were the two instructors who I think had critical
21   issues to face with their Blackboard delivery.
22       Q.  Did you give a copy of your report to, say,
23   the president?
24       A.  I don't think so.
25       Q.  And where did you get the data that you relied

21 (Pages 78 to 81)

Wade vs. Ilisagvik                          5-10-2006                          John Tuthill, Ph.D.

90

1    talked about. It was something that we talked about
2    with faculty candidates when we interviewed and asked
3    them, you know, how will you deal with an issue if all
4    of a sudden a whale comes in and there's no one in your
5    class for a week. And we were looking for people who
6    were patient, flexible, while at the same time dedicated
7    to maintaining the instructional integrity of the
8    course.
9        Q.  Would you advise faculty members to give
10   students who had lifestyle issues more time to complete
11   a course?
12       A.  In general, yes.
13       Q.  How much time?
14       A.  Depends on the circumstances. At the most, I
15   can imagine a student who had a culturally related
16   interruption of their studies to be given a grade of
17   incomplete, and a grade of incomplete would typically
18   allow the student till the end of the next academic
19   semester to complete the course requirements. And I
20   would expect the faculty member to work with that
21   student during that time to complete the course
22   requirements.
23       Q.  How common was an incomplete at Ilisagvik?
24       A.  A number of students got incompletes. I would
25   not say that it was a huge number, but it was a number.

91

1        I would say that the completion rate of the
2    students who got the incompletes was probably very low.
3    Most students, when they get the incomplete, tend to put
4    it off and think, well, I have until the end of the
5    semester, and when the end of the semester comes they've
6    forgotten what they were doing the semester before and
7    the work never gets done. That was my general
8    impression. I don't have data to confirm it, though.
9        Q.  Did a faculty member have authority to grant a
10   student an incomplete?
11       A.  My recollection is the faculty member could
12   give the incomplete. It may have required a
13   countersignature from the dean. But it's something that
14   if it did, I would have routinely signed off on.
15       Q.  Did you encourage face-to-face interaction
16   between your faculty members and the students who were
17   in the villages?
18       A.  Face-to-face?
19       Q.  Yes.
20       A.  Whenever I could. I was perfectly delighted
21   when the faculty would travel to the villages or meet
22   with the village students when they came to Barrow. Not
23   enough of that happened, but obviously having a personal
24   connection is a very good thing.
25       Q.  So if a faculty member requested to go to a

92

1    village, you would have approved it?
2        A.  Well, it depends on the circumstances and the
3    costs and the time away from their regular instruction,
4    but it would certainly be something that I would
5    encourage in principle.
6        Q.  Were you aware that shortly after you sent
7    Bobbi Wade Exhibit 66, that she scheduled a meeting
8    with -- between herself, Sonya Abu, and Rob Carrillo?
9        A.  I don't believe so.
10       Q.  You were not aware of that?
11       A.  Not to my recollection.
12       Q.  Did Sonya -- did you talk to Sonya about the
13   Blackboard courses in late January of 2004?
14       A.  In late January? Probably not. I don't
15   recall that I talked about the content of this memo with
16   Sonya, though it certainly is possible. She would have
17   had a business interest, a professional interest in this
18   issue, since supporting Blackboard students was an issue
19   for her as well as for Rob.
20       Q.  We're going to look at Exhibit 46 which has
21   already been marked. You don't have it yet. Let me
22   find it for you.
23           Have you ever seen this document before?
24       A.  Yes. I wrote it.
25       Q.  You wrote this? When did you write this?

93

1        A.  I do not remember exactly when I wrote this.
2    Let's see, from the context it was written in the latter
3    half of January.
4        Q.  What makes you think that it was written in
5    late January?
6        A.  Because of issue three. "At the beginning of
7    the semester, I gave her a series of specific directions
8    for what she needed to do differently in order to
9    support our students better. She is doing some of what
10   I directed; most she is not."
11           Now, I sent that e-mail, if I recall
12   correctly, on January the 15th, so this was written
13   sometime afterwards, because I had been to the
14   Blackboard courses to see what had been changed and what
15   had not.
16       Q.  Did you write this document before you signed
17   the non-renewal?
18       A.  Yes. My recollection is that this document
19   was part of my decision-making process. I typed up my
20   own notes and my own thoughts about what the issues were
21   concerning Miss Wade. My recollection is that I wrote
22   this as notes to myself rather than for dissemination
23   outside my office.
24       Q.  So we established that you signed the
25   non-renewal on the 28th of January, and that you wrote

24 (Pages 90 to 93)

Wade vs. Ilisagvik                                    5-10-2006                                    John Tuthill, Ph.D.

102

1        MS. DUCEY: Objection; vague.
2        Q. (By Ms. Johnson) Maybe it is vague. There
3    was nothing in writing that stated that each time a
4    student signed up for a new class, that they had to go
5    back in to get a new tuition waiver; is that right?
6        A. Not that I recall. My recollection is the
7    tuition waiver forms stayed on file.
8        MS. JOHNSON: Let's mark this 69.
9        (Exhibit No. 69 was marked
10       for identification.)
11       Q. Is this an e-mail you recall receiving from
12   Ms. Gamboa?
13       A. Yes.
14       Q. And where did Ms. Gamboa work at the College?
15       A. She was the chief accounting officer.
16       Q. And she told you there's never been a clear
17   definition of dependent, which is what you just said,
18   correct?
19       A. I did not say there was not a clear
20   definition. She did.
21       Q. Did you believe that there was a clear
22   definition?
23       A. Let's say that I understood that there was not
24   a definite definition consistently applied as a policy
25   at the institution.

104

1    advantage of the opportunities available at her local
2    community college.
3        Q. Did you think it was reasonable for Miss Wade
4    to encourage her granddaughter to pursue her education
5    at Ilisagvik?
6        A. No.
7        Q. Why not?
8        A. I think it would have been healthier for the
9    granddaughter to pursue her education in Tennessee. I
10   do not think it was healthy for the granddaughter to be
11   taking courses over and over and over again with the
12   grandmother.
13       Q. Healthy meaning?
14       A. Well, for one thing, it's not advantageous to
15   the student to take the lion's share of their credits
16   with a single instructor. One of the important values,
17   one of the important outcomes of any college education
18   is diversity, diversity of instruction styles, diversity
19   in dealing with the faculty and the fellow students that
20   you're encountering as you go along your educational
21   career.
22       For a grandmother -- for a granddaughter to be
23   dependent on a grandmother for the lion's share of her
24   higher education, and to go out of her way to do that
25   when there were other alternatives, no, I don't think

103

1        Q. So is it your testimony that Ms. Wade's
2    granddaughter did or did not fit into the application of
3    the definition of dependent?
4        A. Well, I don't think that was my call to
5    judge. Miss Wade had applied for the tuition waiver for
6    her granddaughter, I believe at a time in which her
7    granddaughter was resident in Barrow with her
8    grandmother. The tuition waiver had been authorized,
9    and it continued to be used by Miss Wade and her
10   granddaughter even after the granddaughter subsequently
11   moved back to Tennessee. I mean those are, as far as I
12   know, facts. My judgment had nothing to do with it.
13       Q. But in your estimation, in Exhibit 46, the use
14   of that waiver was -- presented an appearance of a
15   conflict of interest?
16       A. Oh, of course. Yes.
17       Q. Why?
18       A. Because Miss Wade is receiving a tuition
19   benefit, paying no tuition to register her
20   granddaughter, to take courses with her grandmother
21   consistently, while the granddaughter is living in
22   Tennessee, going out of her way to take community
23   college courses with her grandmother in Barrow, Alaska,
24   I assume specifically because they were free and because
25   they were offered by her grandmother, instead of taking

105

1    that's in the best educational interests of the student.
2        Q. Most of your educational offerings at
3    Ilisagvik College did not have a deep faculty to draw
4    from, did they?
5        A. That's true.
6        Q. In most instances most of your departments had
7    a single primary full-time faculty member with some
8    adjunct members; is that correct?
9        A. It certainly was the case in business.
10       Q. The issue -- back on page, or Exhibit 46, the
11   first issue is the accreditation standards require the
12   institution to employ professionally qualified faculty,
13   and you state that Bobbi does not have a solid academic
14   background in the academic business courses she
15   teaches. What was she missing?
16       A. Advanced courses in finance, in marketing, in
17   economics, in accounting, in business management, in
18   organizational behavior.
19       Q. I'm sorry, you said those very quickly.
20   Finance, organizational behavior?
21       A. Marketing, economics, business management.
22       MR. GAMACHE: You also said accounting.
23       A. Accounting.
24       Q. (By Ms. Johnson) Finance and accounting, is
25   that separate or are they the same?

27 (Pages 102 to 105)

Wade vs. Ilisagvik                                    5-10-2006                                    John Tuthill, Ph.D.

---

106

1      A.  Oh, they're separate courses.
2      **Q.  And when you say advanced courses, what are**
3  **you looking for?**
4      A.  Ideally, in a business instructor I'm looking
5  for an MBA, a Master's in Business Administration, who's
6  had a graduate level course in each of those fields.
7      **Q.  If they don't have an MBA but they have taken**
8  **advanced courses in each of these subject matters, would**
9  **that be sufficient?**
10     A.  In each of those subject matters?  And yet
11 they don't have a master's in business?
12     **Q.  Yeah.**
13     A.  It would not be ideal.  It might be sufficient
14 if there was no better qualified instructor available.
15     **Q.  And what if the person, if they were teaching**
16 **finance, they had taken advanced courses in finance, but**
17 **they didn't have an MBA overall in business management?**
18 **Would you hire them to teach a finance course?**
19     A.  It depends on what the course was in finance.
20 It depends on the institution.  It depends on the
21 circumstances of the individual.  If I'm doing an
22 adjunct contract, for example, for someone just to teach
23 finance, if they had had a good, solid academic
24 background in a business-oriented finance course, I
25 would consider it.  It would not be my first choice, but

---

107

1  I would consider it if there were no better alternative
2  available.
3      **Q.  What if the person had performed accounting**
4  **work and -- for several years in a regular job?  Would**
5  **they be qualified to teach accounting?**
6      A.  Not necessarily, no.
7      **Q.  Why not?**
8      A.  Because there are different levels of
9  accounting.  A college credit accounting course might
10 very well call upon a level of knowledge that a basic
11 data entry person or a basic bookkeeper, for example,
12 would not have.  There is a different level of
13 capability in an academic-oriented subject that could
14 lead to further education in that discipline.  That is
15 not something where I would just rely on field
16 experience without training if I had any choice at all.
17     **Q.  How complicated was the accounting course**
18 **given at Ilisagvik College?**
19     A.  I don't know.
20     **Q.  Did you ever go in and look at it?**
21     A.  No.  Well, yes, at the same time I was going
22 through all the other Blackboard courses.  If accounting
23 was a Blackboard course, though I don't specifically
24 recall that.
25     Am I qualified to go through and see the level

---

108

1  of challenge associated with an accounting course?  No,
2  I'm not an accountant.  But I --
3      **Q.  Would you say the same for the other courses**
4  **that you listed, organizational behavior, marketing,**
5  **economics?  Would you say the same thing, that you're**
6  **not qualified to tell me what is -- what level is being**
7  **taught?**
8      A.  No, that's not what I said.
9      **Q.  Okay.**
10     A.  What I told you is I'm not a business
11 instructor.
12     **Q.  Right.**
13     A.  I'm not an MBA.  I'm not in a position to
14 evaluate a specific accounting assignment or a specific
15 finance assignment and say, this is appropriate or this
16 is not appropriate, any more than I am a physics
17 assignment or a geology assignment.  It's my job as the
18 Dean of Instruction at an institution like Ilisagvik to
19 get myself a faculty working for the College whose
20 professional judgment and academic credentials I can
21 rely on so I don't have to attempt to be a specialist in
22 everything.
23     **Q.  Back on Exhibit 46, paragraph 4, you talk**
24 **about Bobbi resisting your efforts to administer**
25 **programs she considers hers.  What does that mean?**

---

109

1      A.  There were any number of instances in the fall
2  and early spring of 2003, 2004 in which Miss Wade
3  appeared to me to be doing things unilaterally, without
4  consultation with the administration, without any
5  recognition that these were areas where the
6  administration had some say.  Specifically, she had some
7  of her classes scheduled to end the week before the
8  semester ended, without having consulted with the
9  administration or filled out the change of schedule
10 request form.
11     Specifically, in early October of 2003 I was
12 informed that she had put a notice on the blackboard of
13 her course, her class, telling the students the classes
14 were canceled for the month of October and they would
15 resume on a different schedule in November.  And that
16 was done without consultation with me.  I did not know
17 about that until I began hearing student complaints.
18     In roughly mid-January there was an advisement
19 issue in which Miss Wade advised one of her advisees to
20 withdraw from the English class that he was teaching --
21 that he was taking, I believe he was in Business
22 English, and not to register for the developmental
23 English course that his Business English instructor was
24 recommending that he take, and instead to take no
25 English and wait until all the confusion had blown over,

---

28 (Pages 106 to 109)

Wade vs. Ilisagvik                              5-10-2006                              John Tuthill, Ph.D.

---

**110**

1  I believe was the way she phrased it.
2       She was encouraging students to withdraw from
3  courses that were the foundation of their future
4  educational growth, and she was ignoring the stated,
5  published College policy on what prerequisites were for
6  the English courses involved.
7       **Q.  Was there more than just that one student?**
8       A.  There is the one that comes to mind in
9  January.  I heard rumblings that there might be others,
10  but I don't have specific evidence of that.
11      **Q.  Did you investigate that?**
12      A.  I asked Miss Wade.  I said I've heard about
13  this.  There's no confusion.  This is the policy.  I did
14  not get a reply from her.
15      **Q.  You stated that she opposed your efforts to**
16  **recruit new adjunct professors to pick up her load.**
17  **What does that mean?**
18      A.  That means that she demanded that Aimee
19  Valenti not be retained as an adjunct instructor in
20  Business English.  She complained that she was being
21  denied her right to hire adjunct instructors in the
22  business department.
23      **Q.  Exhibit 15 has been previously marked.**
24      A.  Did you mean to give me 16 as well?
25      **Q.  No.  Thank you.**

---

**111**

1       MR. GAMACHE:  What number?
2       MS. JOHNSON:  Fifteen.
3       **Q.  (By Ms. Johnson)  Have you read that document**
4  **before?**
5       A.  Yes, I have.
6       **Q.  When did you read that?**
7       A.  Most recently, yesterday.  When I first read
8  it I'm not sure.
9       **Q.  Did you read it while Bobbi Wade was still**
10  **employed at Ilisagvik?**
11      A.  If I did not read this document, I read
12  another that was like unto it.
13      **Q.  Okay.  And did you understand from that**
14  **document that Stan Scott, back in the year 2002, if you**
15  **turn to page 2 of this document, at the very top, states**
16  **Bobbi Wade is the lead faculty for the business**
17  **management program.**
18      **Did you understand that he had written that**
19  **when Bobbi Wade was still employed?**
20      MS. DUCEY:  Objection to speculation.
21      A.  Shall I say that I understand it's on this
22  page?  I did not know Stan Scott.  I still do not know
23  who Stan Scott is, and it was not at all clear what he
24  meant in this statement.
25      **Q.  (By Ms. Johnson)  Do you recall reading -- you**

---

**112**

1  **said you recalled reading this document prior to**
2  **yesterday?**
3       A.  I had read reference to the concept of a lead
4  faculty member.  If it was not in this document it was
5  in another like it.
6       **Q.  And what was the concept of lead faculty?**
7       A.  Unclear.  The first thing I notice when I look
8  at this, when Miss Wade used the term "lead faculty" it
9  was with a capital L and a capital F, as if this were an
10  official Ilisagvik College title.  In this document it
11  is with a lower case L, a lower case F.  That suggests
12  to me that what it really is indicating is the fact that
13  at the time Ms. Wade was the only full-time faculty
14  member in the business department.
15      I do know that I talked to Diana Kennedy about
16  the issue of lead faculty.  I talked to the HR director
17  Pam Taylor about the issue of lead faculty.  Both of
18  them told me that this had been a suggestion, a
19  proposal, by someone whose name I forgot, that was not
20  current institutional policy.  I did go to the step of
21  reviewing Miss Wade's current contract, which had no
22  reference to a position of lead faculty member.
23      I note finally that in this particular
24  document it states that she will work with the
25  Administrative Assistant for Academics and with the

---

**113**

1  Director of Academics for scheduling and teaching
2  assignments and for the hiring of adjuncts.  It does not
3  say that Miss Wade or any faculty member makes the
4  schedules unilaterally or makes teaching assignments
5  unilaterally or hires adjunct faculty.
6       It was perfectly true that faculty were
7  encouraged to assist in identifying adjuncts.  It was
8  perfectly true that faculty were encouraged, urged,
9  implored, to give their scheduling recommendations.
10  That did not mean that the final authority rested with
11  them.
12      **Q.  Did you explore or investigate what the actual**
13  **practice between February of '02 and, say, July of '03,**
14  **what the actual practice had been in hiring adjuncts?**
15      A.  In hiring adjuncts?  No, I did not ask.  I
16  asked what the process was currently.
17      **Q.  Okay.  Did you ask -- when Miss Wade protested**
18  **that Miss Valenti had been hired without her**
19  **concurrence, did you talk to Miss Wade about what the**
20  **past practice had been, what she had done in the past to**
21  **make her believe that she had authority to approve or**
22  **disapprove?**
23      A.  No, I did not.
24      **Q.  Why not?**
25      A.  Because I did not believe she had the

---

29 (Pages 110 to 113)

Wade vs. Ilisagvik                                    5-10-2006                                    John Tuthill, Ph.D.

---

**114**

1  authority to approve. The determination to hire Miss
2  Valenti was made prior to Miss Wade taking the medical
3  leave. The complaints about it, if I recall correctly,
4  I received after Miss Wade's return, by which time Miss
5  Valenti was already teaching the course. I was not
6  about to fire her because Miss Wade told me to.
7       I had reason to believe that Miss Valenti was
8  doing a good instructional job in the classroom. I had
9  reason to believe that she was upholding something
10  closer to college credit level standards than had been
11  done in that course in the past, and I wanted to support
12  that and wanted to continue that.
13      **Q.  Well, if Miss Wade had been told in this**
14  **document that she was the lead faculty, was there ever a**
15  **time that you're aware of that she was told she was not**
16  **the lead faculty?**
17          MS. DUCEY: Objection to
18  mischaracterizing what this document says. And
19  foundation.
20      A.  I will answer, if I may, that Miss Wade's
21  terms of work were specified in the contract under which
22  she was working in the academic year 2003 and 2004.
23      **Q.  (By Ms. Johnson) Sure, I understand that.**
24      A.  Which made no reference to any such position,
25  if there ever were one, of lead faculty member.

---

**115**

1       **Q.  But if in the past she had been told she was**
2  **lead faculty and she had been treated as if she was lead**
3  **faculty, was there any time after you came on in which**
4  **you specifically told her you would no longer use her as**
5  **a lead faculty person?**
6       A.  I can't answer that question. I had no
7  evidence that she had ever been used as a lead faculty
8  member. I had no evidence about what that meant. The
9  HR director could not tell me what that meant. The
10  assistant to the dean, who was the second longest
11  serving employee at the college, who had been involved
12  in all of this, could not tell me what it meant. I had
13  a very strong impression, if I was not already told,
14  that it was not something that had ever been clearly
15  implemented.
16      Am I going to go tell Miss Wade and other
17  instructors that they're not lead faculty members? No.
18  I had no reason to believe that they thought they were.
19      **Q.  We touched on Miss Wade's objection to Aimee**
20  **Valenti. Did she express to you why she objected to**
21  **Aimee Valenti?**
22      A.  She told me that she found Miss Valenti to be
23  demeaning and insulting to Miss Wade and rude. I recall
24  comments of a personal nature like that rather than
25  comments of a professional nature.

---

**116**

1       **Q.  Did you investigate whether Ms. Valenti had**
2  **been demeaning, insulting, and rude to Miss Wade?**
3       A.  I did.
4       **Q.  And what did you do to investigate?**
5       A.  I talked to Miss Valenti.
6       **Q.  What did she say?**
7       A.  My conclusion at the end of the conversation
8  is that she was indeed rude to Miss Wade and that Miss
9  Wade was rude to Miss Valenti.
10      **Q.  So you thought they were rude to each other?**
11      A.  I did.
12      **Q.  And did you give any instructions to Miss**
13  **Valenti?**
14      A.  Yes, I did.
15      **Q.  What did you tell her?**
16      A.  I told her to shut up and teach her course.
17  That's a quote.
18      **Q.  How had Miss Valenti been rude to Miss Wade?**
19      A.  I wasn't there. Miss Valenti had a young
20  person's very strong sense that she is in the right, and
21  an impatience with people who disagree or with people
22  who will not immediately see the wisdom of her ways. I
23  think she was short-tempered with Miss Wade.
24      I think Miss Wade was, in the specific
25  instance I'm recalling in January, from what I heard

---

**117**

1  about it, attempting to give some information to Miss
2  Valenti. I think Miss Valenti flew off the handle and
3  told Miss Wade basically to go away, that Miss Valenti
4  didn't work for Miss Wade, she worked for Dr. Tuthill
5  and she wouldn't listen to anybody else. Do I think
6  that was appropriate? No.
7       **Q.  Do you know what information Miss Wade was**
8  **trying to give to her?**
9       A.  My recollection on that one, I guess it's not
10  January. I guess that specific instance is December.
11  That Miss Wade was attempting to give Miss Valenti
12  information about the grade of one student who had
13  gotten credit by examination for Business English. That
14  would have been Mariette Mealor. And information that
15  one or two students, Amy Underwood and possibly Ramona
16  Rock, had been promised a grade of deferred in Module
17  C.
18      Now, this was a little bit awkward, because
19  this was Miss Wade assigning grades in Module C for
20  which she was in fact at that time not the instructor of
21  record. But these were arrangements that she had made,
22  testing Mariette Mealor, entirely appropriately, earlier
23  in the semester that Miss Valenti did not know about,
24  and apparently promises that she had made to Amy
25  Underwood, I don't think so appropriately, at the

---

MOBURG & ASSOCIATES                1601 Fifth Avenue, Suite 860                    Seattle, WA 98101
Court Reporters                              206-622-3110          Page 20 of 40        Fax 206-343-2272