Wade vs. Ilisagvik                                    5-10-2006                                    John Tuthill, Ph.D.

118

1  beginning of the semester that she could receive a grade
2  of deferred.
3      Q.  And was that information that Miss Valenti
4  needed in order to teach the class?
5      A.  No.  It was information Miss Valenti needed in
6  order to give grades for the class.
7      Q.  Was it information that you had instructed
8  Miss Wade to provide?
9      A.  I don't recall that I had instructed.  I don't
10 recall that at that point I was aware of that particular
11 issue.  Though ultimately I had to intervene with almost
12 all of the grades in Business English and Business Math.
13     Q.  So she attempted to give Aimee Valenti
14 information before it actually came to your attention
15 that --
16     A.  That's my recollection.  That may not be
17 correct, but that's what I think.
18     Q.  And Aimee was one of the two -- Aimee Valenti
19 was one of the two teachers who was hired to teach the
20 Module C courses when Ms. Wade went on leave?
21     A.  That is correct.
22     Q.  Was it Miss Wade's -- from your information in
23 talking to Miss Wade, did Ms. Wade believe that she was
24 going to come back and receive the Module C units back
25 to teach?

119

1      A.  No.  That is not my understanding at all.  I
2  had told her before she left that I had assigned the
3  courses to Miss Valenti and Mr. Carlson.  I had told her
4  why:  That I did not think it was in the best interests
5  of the students to delay the start of a four-week
6  semester by two weeks; that I did not believe it was in
7  the interests of the students, once they began Module C
8  with a certain instructor, to change instructors in mid-
9  stream.
10     Q.  When did you tell her that?
11     A.  In a telephone conversation prior to the
12 beginning of instruction in Module C.  It would have
13 been at some point before Miss Wade left on her leave in
14 November of 2003.
15     Q.  And do you recall if Miss Wade protested at
16 that time?
17     A.  No, she didn't protest.  She said okay.
18     Q.  When had the -- had a contract for Module C
19 been signed by Miss Wade before she left for her leave?
20     A.  To the best of my recollection, there was
21 never a contract for Module C for Miss Wade.
22     Q.  Were there contracts for Modules A and B?
23     A.  There may have been.  I do not recall
24 specifically.
25     Q.  Did you have Aimee Valenti sign a specific

120

1  contract for Module C?
2      A.  I believe so, yes.
3      Q.  What about Tim Carlson?
4      A.  I believe so.
5      Q.  Do you want to take another break?
6      A.  No hurry.
7          MS. JOHNSON:  Are we on 70?
8          COURT REPORTER:  Yes.
9          MS. JOHNSON:  Let's mark this 70.
10         (Exhibit No. 70 was marked
11          for identification.)
12     Q.  (By Ms. Johnson)  This is a Request for Leave
13 and it looks like it's for Tim Carlson.  Do you agree
14 with that?
15     A.  Yes, I do.
16     Q.  And is that your signature on the bottom under
17 Department Supervisor Approval?
18     A.  Yes, it is.
19     Q.  So on November 17th, at least, you were aware
20 that Tim Carlson was going to be absent the week of
21 Thanksgiving; is that correct?
22     A.  I don't believe it was the whole week.  I
23 don't have a calendar handy, but I want to say it was
24 for Tuesday and Wednesday rather than the whole week,
25 but I could be wrong.

121

1      Q.  If you look up towards the top, does it says
2  three days on the edge there?
3      A.  It says three days, 24th, 25th, 26th.  I just
4  don't know what days of the week those were.
5      Q.  Does the college normally have instruction on
6  Thanksgiving?
7      A.  No.  It might have instruction on Friday.  I
8  simply don't remember.
9      Q.  But if these were three days, 24, 25, and 26,
10 is it logical to you that that was Monday, Tuesday,
11 Wednesday?
12     A.  Not necessarily.  I will certainly agree that
13 I approved leave of three days.
14     Q.  And in the little comment box it says "I will
15 be calling in on Tuesday and Wednesday"?
16     A.  Uh-huh.
17     Q.  Is that correct?
18     A.  That's correct.
19     Q.  And he said he would be calling in for 055 and
20 060.  Do you know what those are?
21     A.  Those were two of his developmental math
22 courses.  He taught those classes in the Polar Bear
23 Building.  There was a teleconference connection there.
24 And his plan was to have the students assemble in the
25 class and he would telephone them, and he would be on

31  (Pages 118 to 121)

Wade vs. Ilisagvik                     5-10-2006                     John Tuthill, Ph.D.

---

130

1   requested?
2       A.  The changes I requested in the --
3       Q.  In his course work?  In his Blackboard?  I'm
4   sorry, did you suggest changes to be made in his
5   Blackboard courses?
6       A.  Yes.  In the middle of January, at roughly the
7   same time I was sending the Blackboard-related e-mail to
8   Miss Wade, I sent a similar Blackboard-related e-mail to
9   Mr. Bartholomew, and he made all of the changes that I
10  requested.
11          Let me say also that he immediately
12  acknowledged the receipt of the e-mail, told me that he
13  would work on it.  I got no reply from Miss Wade on that
14  issue.
15      Q.  Did you call Miss Wade down to talk to her
16  about the Blackboard issues in person?
17      A.  No.  I sent her the e-mail.
18      Q.  So if she complied but didn't state that she
19  got the information from you, would that have been
20  sufficient?
21      A.  Well, sufficient in what way?  I knew that she
22  was complying with two of the three issues, but only
23  because on a daily basis I was going to her Blackboard
24  courses to see if she had made the changes.  Ultimately
25  she did.  There was no acknowledgement to me.  There was

---

131

1   no, okay, John, I'm working on it.  There was no, well,
2   this is a terrible idea, I can't do it and here's why.
3   There was no feedback at all.
4       Q.  Was that a problem for you, that there was no
5   feedback?
6       A.  No, it wasn't something that I was deeply
7   worked up about.  But it was not something that was
8   terribly responsive either.
9           MS. JOHNSON:  Is this 71?
10          COURT REPORTER:  71, yes.
11          MS. JOHNSON:  Marking Exhibit 71.
12          (Exhibit No. 71 was marked
13           for identification.)
14      Q.  (By Ms. Johnson)  We've been talking about
15  Courtneay Bartholomew.  This appears to be an e-mail
16  from you to him talking about communication.  Do you
17  recall sending this?
18      A.  No, but it looks like something I would have
19  sent.
20      Q.  In the first paragraph you're asking him to
21  submit an IT program assessment, and in the last
22  sentence you state that, now, more than six weeks later,
23  we still have not received these important documents.
24      A.  Uh-huh.
25      Q.  Was that true when you wrote it?

---

132

1       A.  I don't usually lie.  I assume it was true.
2       Q.  Okay.  Do you recall whether he complied with
3   submitting these two documents that you asked?
4       A.  I don't remember a program assessment at all.
5   I remember that we did finally get the transcripts,
6   though much after this.
7       Q.  Did he acknowledge this e-mail to you?
8       A.  Oh, I have no idea.
9       Q.  In the next paragraph you state asked
10  repeatedly in the first line, asked repeatedly in the
11  second line, and in the third line we have asked you,
12  and after each of those you state no response, no
13  response, no response.
14      A.  Yeah.
15      Q.  Did you receive the information that you were
16  looking for in that paragraph?
17      A.  In paragraph two?
18      Q.  Yes.  Input in the spring '05 course catalog.
19  Did you receive that from him?
20      A.  I don't know.
21      Q.  What about the textbook selections for spring
22  '05?
23      A.  I can't tell you that either.  The course
24  schedule and the textbook selections would have gone to
25  Diana Kennedy rather than me.

---

133

1       Q.  How did you know that you hadn't received
2   them?
3       A.  She told me.  She said, John, I still don't
4   have anything from Courtneay, write him.
5       Q.  Do you recall her telling you that again after
6   November 10th?
7       A.  No, but there's no reason I would.
8       Q.  Okay.  And would she have advised you that she
9   did receive them?
10      A.  Yeah.
11      Q.  And what about the online student
12  evaluations?  Do you know whether he did the online
13  student evaluations?
14      A.  I don't remember that they were missing when I
15  reviewed the faculty evaluations the next January, so I
16  think he did, but I do not have absolute certainty
17  there.  Again, the evaluations would have gone to Diana
18  Kennedy rather than to me, and I would have reviewed
19  them at the beginning of the next term.
20      Q.  Was that important information that you
21  required from each faculty member?
22      A.  Yes.
23      Q.  Do you have any idea why he did not provide
24  this information to you?
25      A.  No.

---

34 (Pages 130 to 133)

Case 3:05-cv-00086-TMB    Document 86-3    Filed 06/14/2007    Page 3 of 20

Wade vs. Ilisagvik                          5-10-2006                          John Tuthill, Ph.D.

## 142

1  Module B is scheduled to end and we ought to have done
2  withdrawals for students in B who didn't get credit for
3  A.
4     A.  That sounds like a pretty big problem.
5     Q.  And he didn't have grades for A in yet and
6  Module B was almost finished.
7     A.  And that's what I was asking him about on
8  February the 23rd.  So now it's a week later and I still
9  don't have it.  Okay.
10    Q.  So this is part of the same problem that you
11  were talking about?
12    A.  Yes.
13    Q.  And he is promising you that the grades will
14  be in Wednesday, and it looks like you're talking to him
15  on a Monday?
16    A.  Oh, it's worse than that.  He's telling me now
17  that the final for A is tonight, when the week before he
18  had told me that the final was on Monday.
19    Q.  And Monday that week, you were talking to him
20  on Monday, so possibly --
21    A.  I'm not sure.
22    Q.  It could have been a couple days after you
23  talked to him?
24    A.  I will certainly agree that Tim is late and
25  this is becoming, it's --

## 143

1     Q.  It was becoming a problem, right?
2     A.  Yeah.
3     Q.  And in the same -- stay on page 2 for a
4  second.  In the next paragraph he says we will probably
5  run five weeks for B module.  On the next page?
6     A.  Where?
7     Q.  On the next page.  After he said the grades
8  will be in by Wednesday morning, he says we will
9  probably run five weeks for Module B.
10    A.  Yeah.
11    Q.  These were normally four-week modules, weren't
12  they?
13    A.  Not necessarily.  A normal academic semester
14  is 16 weeks.  It's supposed to be approximately 45 class
15  meetings for a Monday/Wednesday/Friday class.  If you're
16  modularising it, it's perfectly possible that you're
17  having a series of five-week semesters or four-and-a-
18  half-week semesters.  I can't tell you the exact
19  schedule for this course.
20    Q.  But it's clear that Module A has run beyond
21  when you thought it was going to run?
22    A.  Module A has run too long, and it looks like
23  Module B is not going to make up any time, and it looks
24  like Module C is going to get short shrift.
25    Q.  Shortened.  Did he submit the paperwork

## 144

1  necessary to amend the course schedule?
2     A.  Not to my recollection.  He and I did talk
3  about it.  We talked specifically about what to do with
4  Module C.  Did he change the official schedule for the
5  course?  Not to my recollection.
6     Q.  Was that a problem for you, that he didn't
7  submit the proper paperwork?
8     A.  Not particularly.
9     Q.  Why not?
10    A.  Because I knew what was going on.  I wasn't
11  getting student complaints.
12        MS. JOHNSON:  I'm going to mark 74,
13  please.
14        (Exhibit No. 74 was marked
15        for identification.)
16    Q.  This has some extra pages in it but it's how I
17  received it so I've left it that way.
18        Have you reviewed this string of e-mails
19  lately?
20    A.  No.
21    Q.  Do you want to leaf through it for a minute?
22    A.  This seems to be two copies of the same thing;
23  is that correct?
24    Q.  There are some extra pages.  Turn to page
25  26215, the second version of it in there.

## 145

1     A.  Okay.
2     Q.  And at the top it says page 1 of 2 and it's
3  from Jay St. Vincent on December 10th.  She's talking
4  about faculty recommendations for change in leave.  Do
5  you remember that being an issue?
6     A.  Yes.
7     Q.  Why was it an issue?
8     A.  It was an issue because I made it an issue.
9  We had an institutional policy that said faculty was
10  entitled to ten days of personal leave during
11  instructional time over the course of the academic year,
12  which they could be awarded if in the judgment of the
13  dean of instruction it did not unduly interfere with the
14  delivery of instruction.
15       Never in my experience had I been at an
16  institution that seemed to be offering two weeks of
17  vacation time, paid vacation time to college faculty in
18  the middle of an academic year.  The faculty get four
19  weeks, roughly, off at Christmas, they get a couple of
20  months off in the summer.
21       It is very common for them to have a personal
22  day or two or three over the course of the academic
23  year, but I had received comments and complaints from
24  regents, from the administration, from fellow faculty
25  members, of faculty in previous years who had

37  (Pages 142 to 145)

Wade vs. Ilisagvik                         5-10-2006                         John Tuthill, Ph.D.

146

1  disappeared on vacation in the middle of the semester.
2  Deans had permitted it. And there was the legend of the
3  faculty member who had gone off in the middle of the
4  semester on a two-week Caribbean cruise and come back,
5  and that did not sound right.
6          I wanted to come up with a policy that did not
7  put me in the position of having to say no, no, no, to
8  personal leave requests, because most personal leave
9  requests of any lengthy duration I would think
10 unreasonably interfere with instruction; to come up with
11 something that would be fair to the faculty, recognizing
12 that Barrow is isolated, recognizing that Barrow is
13 harsh, that sometimes things come up so you have to go
14 away, while still protecting the integrity of our
15 instructional process. That was a very serious issue,
16 where I wanted to meet with the faculty and try to
17 arrive at some sort of consensus.
18     Q. Did you talk to Edna MacLean about a change in
19 leave before you proposed it to faculty?
20     A. I told her that it was an issue I was going to
21 discuss with the faculty. Did I tell her my specific
22 ideas? Not to my recollection. I'm not sure I talked
23 to the faculty at first about my specific ideas. My
24 preferred method would be to get the faculty to talk
25 about the issue, come up with their recommendation and

147

1  work from that.
2      Q. In order to get a recommendation from them,
3  what did you tell them that you were looking for?
4      A. Something that would allow some flexibility to
5  them for special occasions that came up, while still
6  protecting the academic integrity of our instructional
7  process. I told them that from my point of view, two
8  weeks of personal leave over the course of an academic
9  year for faculty was unprecedented and inappropriate.
10     Q. So is it your testimony that -- you said
11 almost any personal leave would interfere with
12 instruction; is that correct?
13     A. That's not quite what I said.
14     Q. Okay.
15     A. Tim Carlson's personal leave of three days
16 before Thanksgiving, with a plan for making sure the
17 students are receiving activity and instruction during
18 that time, is something that I would be willing to grant
19 occasionally. Not to everybody every year. A two-week
20 vacation to go on a Caribbean cruise in the middle of
21 instruction time in the semester is something that I am
22 quite sure I would always say no to.
23     Q. What did personal leave -- what could a
24 faculty member take personal leave for? Do you know?
25     A. Personal leave, if I recall correctly, at

148

1  Ilisagvik College -- now I may be wrong here, but my
2  recollection is that it was sick leave or it was
3  vacation time.
4      Q. You're welcome to look at the request that I
5  have put in front of you, if you think that will help.
6  It's Exhibit 70, Tim Carlson's request. And in the
7  middle there are certain things that, it looks like a
8  definition. Would you consider that a definition in the
9  middle?
10         MS. DUCEY: Objection to speculation
11 unless he knows.
12     A. Well, if Tim Carlson was sick, that would be
13 reported after the fact on a form like this and he would
14 check personal leave. It was common, though not 100
15 percent practice, for someone to circle Sick Leave and
16 then write in Comments below, sick.
17     Q. (By Ms. Johnson) Or flu or --
18     A. Yeah.
19     Q. -- something like that? So sick leave, how
20 long -- when you talk about sick leave, how long of a
21 sick leave would qualify someone for personal leave?
22     A. Well, my recollection -- again, I don't have
23 the employee handbook in front of me -- is that the
24 faculty at the start of each academic year are given ten
25 personal leave days. If they are ill for ten days and

149

1  take ten personal leave days for sick leave, that's the
2  end of the personal leave until the next year.
3          If they are not ill but choose to ask for a
4  personal release day, as Miss Wade did initially in
5  October, as Miss St. Vincent did initially in October
6  and November, I forget the date, as Tim Carlson did in
7  November, if they choose to take the personal leave days
8  for non-illness related reasons, then it's my
9  responsibility as dean to evaluate whether this is undue
10 disruption of instruction. And what I told the faculty
11 was in most cases I'm going to think that it is. Your
12 job during the academic year is to be here, teaching.
13     Q. If you know that it's for medical leave, if
14 they tell you it's for medical leave, then what was your
15 responsibility?
16     A. If I know that it is for medical leave, in the
17 instance of Miss Wade and Miss St. Vincent, my
18 instructions from the HR director, my understanding from
19 the college attorney, was that awarding this leave was
20 fine upon the presentation of appropriate documentation
21 from a licensed physician that there was a serious
22 health issue that needed treatment in a timely manner,
23 and where the treatment was only available off-Slope.
24 In those instances my information was we were to award
25 the leave.

38 (Pages 146 to 149)

Wade vs. Ilisagvik                     5-10-2006                    John Tuthill, Ph.D.

166

1    A.  Well, I haven't read enough to see.
2        Okay.  It is my advice to her about what
3    documentation we need in order to process the medical
4    leave request.
5    Q.  Did you ever receive a medical note from her?
6    Is this --
7    A.  I did.
8    Q.  Is this the medical note in Exhibit 65?
9    A.  Exhibit which?
10   Q.  I'm sorry, 75?  The next one.  It's attached
11   to the request for leave?
12       MS. DUCEY:  Have you given us 75?
13       MS. JOHNSON:  (Indicating.)
14       MR. GAMACHE:  75.
15       MS. DUCEY:  Oh, you've got it.
16   A.  I believe so.
17   Q.  (By Ms. Johnson)  And look at the next page in
18   75.  What does that look like to you?
19   A.  That looks like a doctor's notification that
20   an employee will be able to return to work on 12/2.
21   Q.  Do you recall receiving information regarding
22   the specific appointment dates?
23   A.  No.
24   Q.  Is that something that you required?
25   A.  Not anything I required.  It may be something

167

1    personnel wanted, but I would not ask for that.
2    Q.  The note that's attached to Exhibit 75, did
3    that give you enough information to know that the
4    medical condition required treatment away from Barrow?
5    A.  Yes.  "Procedures unavailable here."
6    Q.  And it says it needs to be off-Slope, meaning
7    off the North Slope?
8    A.  Yes.
9    Q.  And that to you means out of Barrow; is that
10   correct?
11   A.  Yes.
12   Q.  And the next sentence simply says "These
13   procedures need to be done in a timely manner."  Was
14   that sufficient for you to know that it had to be
15   done -- well, I guess I should ask you.  What does that
16   mean to you, "timely manner"?
17   A.  It meant that it should be done now rather
18   than waiting until the Christmas break.
19   Q.  Did you ask Miss St. Vincent if this matter
20   could be postponed until Christmas break?
21   A.  No.
22   Q.  You did not ask her that?
23   A.  No.
24   Q.  Why not?
25   A.  Because she told me in her e-mail to me in

168

1    Exhibit 75, 74, St. Vincent to Tuthill, Friday, November
2    7th, 10:45 a.m., "My doctor's appointment yesterday with
3    Dr. Hales here has me seeking off-Slope reference for a
4    lump that needs diagnosis and possible surgery."  I'm
5    not going to ask somebody who has a lump that needs
6    diagnosis and possible surgery if it can wait until
7    Christmas.
8    Q.  But you had asked for the information on, back
9    on the page 26221, you had stated that, in the middle of
10   the last paragraph, "I will gladly grant such a leave,
11   provided the college has written notification from a
12   licensed physician indicating that you require such
13   medical care and that it cannot wait until December."
14   A.  That is correct.
15   Q.  Her doctor didn't tell you that it couldn't
16   wait until December, did he?
17   A.  Her doctor told me, if I can find it again,
18   "these procedures need to be done in a timely manner,"
19   which I took to be analogous to Miss Wade's doctor
20   telling me that Miss Wade's procedure needed to be
21   handled in a somewhat urgent time frame.
22       MS. JOHNSON:  Let's mark 76.
23       (Exhibit No. 76 was marked
24       for identification.)
25   Q.  And I believe in answer to an interrogatory

169

1    earlier in this litigation that it was confirmed that
2    you wrote this document; is that right?
3    A.  I did write this document.
4    Q.  And were you asked if you wrote this document?
5    A.  Oh, I don't remember.
6    Q.  Okay.  But you recall writing this?
7    A.  Oh, very well.
8    Q.  And when did you write it?
9    A.  Christmas vacation, quote-unquote, unvacation,
10   2003.
11   Q.  And what was the purpose of this document?
12   A.  The purpose of this was to sort out a total
13   collapse in the grading system for Business English and
14   Business Math.  I had a situation in which there had
15   apparently been no control exercised over students
16   moving from Module A to Module B to Module C.
17       By the time the grades got turned in, I had
18   students who had failed Module A and were allowed to
19   register in Module B and failed it, which should not
20   have happened.  In one instance I think I had a student
21   who failed Module A or withdrew and then took Module B
22   and then passed it, which shouldn't have to happen at
23   all.  I had students who had withdrawn from one module
24   and then were allowed to take the next.
25       It was a violation of College policy for a

43 (Pages 166 to 169)

Case 3:05-cv-00086-TMB    Document 86-3    Filed 06/14/2007    Page 6 of 20

Wade vs. Ilisagvik                   5-10-2006                John Tuthill, Ph.D.

174

1    Barring that, at the very least I say, when
2  she turned the grades in on December the 5th, she
3  submitted the grades to the registrar's office, the two
4  instructors for the Module C, Mr. Carlson and Miss
5  Valenti, did not know that the grades had been turned
6  in, they were not aware that they needed to check on the
7  grades in Module B and identify who was still in their
8  class who perhaps should not have been. There was no
9  notification. There was no cooperation in this
10  process.
11    Q. Notification by who?
12    A. By Miss Wade.
13    Q. Notification of what, I guess?
14    A. That she was turning the grades in on December
15  the 5th and this information would be of value to the
16  other instructors. She didn't tell me.
17    Q. And no cooperation, what do you mean by that?
18    A. She was not sharing information with
19  colleagues whom she knew needed it.
20    Q. Well, she went to Aimee Valenti's class one
21  day, correct, and was turned away?
22    A. I believe that was after the fact. I believe
23  that one was on the issue of the deferred grade for
24  Module C for Miss Underwood. We're talking now about
25  something that happened very shortly after Miss Wade's

175

1  return when she's submitting grades for Module B, which
2  she knew very well were important for identifying who
3  should be registered in Module C. But she did so
4  without sharing the information with her colleagues.
5    Q. Did the registrar share that information?
6    A. Eventually. I can't tell you exactly when. I
7  don't think I got it the 5th. I don't think I was aware
8  of the problem probably for possibly as long as another
9  two weeks. I think this issue came to my attention when
10  I started doing investigation surrounding the grade of
11  deferred for Miss Underwood in Module C and the credit
12  by examination for Miss Mariette Mealor. I think that
13  got me looking into all of the grades and then I
14  realized the depth of the problem.
15    Q. When you say "the depth of the problem," what
16  do you mean by that?
17    A. Okay. On 21602, I have one, two, three, four,
18  five, six, seven, eight, nine, ten, eleven, 12, 13, 14,
19  15, 16, 17, 18, 19 students whose grades are going to
20  need to be changed, and this thing goes on for several
21  more pages. In essence, the majority of the students
22  registered in Module C needed to have their grades
23  changed. A large number of students in Module B needed
24  to have their grades changed.
25    Q. Why did the students in Module B need their

176

1  grades changed?
2    A. Why?
3    Q. Yes.
4    A. Because in some instances Miss Wade had
5  allowed students to continue taking Module B who had not
6  completed Module A. Those are the students listed on
7  the top of 21603.
8    Q. And when should she have -- what should she
9  have done?
10    A. She should have completed the grade sheet for
11  105A and 109A. She should have then identified those
12  students who had failed the class or withdrawn from the
13  class and she should have administratively withdrawn
14  them at the beginning of the second module from B
15  module.
16    Q. Where is -- when were the grades for A due?
17  Module A due?
18    A. I don't have the calendar in front of me.
19  They would have been due shortly after the final exam
20  period for Module A, which would normally be sometime
21  the latter part of September, early part of October, but
22  that's just a guess.
23    Q. Was there a specific policy that covered when
24  grades were due for module classes?
25    A. Yeah. The grades should be due, I would

177

1  guess, something in the order of 48 hours after the
2  final exam deadline.
3    Q. What policy would that be found in?
4    A. I don't know. It would be an interesting
5  thing to look for. I don't think it was in the faculty
6  handbook. The registrar's office at the beginning of
7  the semester would send out notices to the faculty in
8  the modularized courses. Diana Perkett did tell me that
9  she had done that. That may be it.
10    Q. What sort of a notice did Perkett send out?
11    A. A notice saying this is the schedule for the
12  modularized courses and this is when the grades are due.
13    Q. Did you see that notice?
14    A. Not that I recall, though I wouldn't normally.
15    Q. Did you ask Perkett if she had sent out that
16  notice?
17    A. Yes.
18    Q. Is that how you know about it?
19    A. Yes.
20    Q. Did you go back and review whether that notice
21  was sent out when you were looking at these module
22  courses?
23    A. No.
24    Q. Where would I find a copy of that notice
25  today?

45 (Pages 174 to 177)

EXHIBIT ___D___
Page 26 of 46

Ilisagvik                                5-10-2006                              John Tuthill, Ph.D

178

A.  Today?

Q.  If I was to ask at the College --

A.  I would start with Diana Perkett, the registrar.

Q.  You would think that it would be kept in the registrar's office?

A.  Yeah.  I expect she'd have a template on her computer.

Let me say as well that Miss Wade had taught 105 and 109 repeatedly in the past on the modularized basis.  She knew the rules.

Q.  Well, if in the past she had not gotten her grades in until the end of the semester for all three modules and no one had told her otherwise --

A.  Then she would have had to go through the same exercise I have here, or the College was giving inappropriate grades to students who should have been dropped.  I certainly hope that's not the case.

Q.  How many other modularized courses were given the fall of 2003-2004?

A.  I don't have a list.  I couldn't tell you. Besides the modularized courses there were also several short courses that were one credit and were not delivered through the whole semester.  It was a very complicated schedule, but I could not tell you the exact

179

1  number.

2      Q.  Here's what's been marked Exhibit 18.  Is

3  there -- and it's the academic calendar for fall 2003,

4  spring 2004.

5      A.  That is correct.

6      Q.  Is there a date on this document which would

7  indicate when grades are due for a modular course?

8      A.  There is not.

9      Q.  But there is a date for -- pardon me while I

10  look at your copy -- faculty-initiated withdrawal; is

11  that correct?

12      A.  That is correct.  Those are for semester-long

13  courses.

14      Q.  And only semester-long courses?

15      A.  Yes.  The policy was that you take the

16  percentage of the semester -- now, this is going to be

17  complicated to explain.  If the date for administrative

18  withdrawal is, say, 60 percent through the semester for

19  a 16-week semester, then the date for administrative

20  withdrawal of a four-week course is going to be 60

21  percent of the way through the four-week course.  You

22  take the same ratio as best you can and apply it to the

23  short course.

24      Q.  And what policy are you referring to?

25      A.  The policy of the College.

180

1      Q.  Is it written down?

2      A.  Yes.  I've seen it.

3      Q.  And is it stated the way that you just

4  described it?

5      A.  No.  It probably states it more clearly than I

6  did.

7      Q.  Does it talk specifically about modular

8  courses or short courses?

9      A.  Yes.

10      Q.  Not just about semester-long courses?

11      A.  Yes.  Absolutely.

12      Q.  And what sort of a document would I look for

13  to look for that policy?

14      A.  I'd start with the registrar's office again.

15      Q.  Did the registrar's office issue policies?

16      A.  No.  I think the policy -- the policy was

17  there when I got there, so the policy was not something

18  that I implemented.  I did not ask specifically where

19  the policy came from because it struck me as reasonable

20  and appropriate.  Normally a policy such as that would

21  emerge from the college curriculum committee with

22  approval from the dean.

23      Q.  Did you see this policy in writing?

24      A.  Yeah.

25      Q.  And where did you see it?

181

1      A.  I don't remember.  That's why I suggest you

2  start with the registrar's office.  I know that I have

3  read it.  I don't think it would be in the employee

4  handbook.  I don't think it would really belong in an

5  employee handbook.  I can't tell you any more, other

6  than saying that I've read it and that I suspect if I

7  needed to find it I'd start with the registrar's office.

8      Q.  While you were there did you issue any

9  policies about grades?

10      A.  Policies about grades?

11      Q.  Uh-huh.  Did you initiate a policy on grades?

12      A.  None that we already didn't have.

13      Q.  Did you issue any new policies about the

14  manner in how instruction was to be implemented?

15      A.  The manner in how instruction?  In general?

16      Q.  (Nods.)

17      A.  No.  I made specific recommendations and in

18  some cases directives to Miss Wade and Mr. Bartholomew,

19  for example.  I did the usual mentoring and counseling

20  for a number of the faculty members.  Did I give any

21  overall directives on general teaching strategies?  No.

22      Q.  Or any overall directive on when grades were

23  due?

24      A.  No.  The registrar's office gave the

25  information on when grades were due and that was not

MOBURG & ASSOCIATES                1601 Fifth Avenue, Suite 860                          Seattle, WA 98101
Court Reporters                           206-622-3110                                        Fax 206-343-2272

Wade vs. Ilisagvik                         5-10-2006                         John Tuthill, Ph.D.

186

1   not telling Aimee Valenti that you had authorized a
2   credit by examination for this student. Did you blame
3   Bobbi Wade for not getting this information to Aimee
4   Valenti?
5       A. No, I reported a fact, that the information
6   had not gone from Miss Wade to Aimee Valenti. This was
7   an issue in which there was fault on both sides. My
8   understanding is that Miss Wade attempted to deliver
9   this information to Miss Valenti while Miss Valenti was
10  giving a class. In December, when Miss Valenti -- or
11  November when Miss Valenti had gone to Miss Wade to ask
12  for information while Miss Wade was giving a class, Miss
13  Wade had not been receptive. Interrupting a teacher
14  when they're teaching is usually not a very good thing
15  to do.
16      The important point for me, the point that I'm
17  attempting to make here, is that the communication lines
18  did not work. The information was not going from the
19  person who had it to the person who needed it. And
20  that's a problem.
21      Q. In the bottom carry-over paragraph, Miss Wade
22  promised a grade of DF to students in other instructors'
23  courses?
24      A. That is in effect true.
25      Q. And "in effect," what do you mean by "in

187

1   effect true"?
2       A. Well, what Miss Wade reported was that she
3   told Miss Underwood, for example, that if she got busy
4   at the end of the term, she would be eligible to get a
5   grade of DF in Module C. When Miss Wade imparted that
6   information to Miss Underwood, Miss Wade had every
7   reason to anticipate that she would be the instructor of
8   Module C. That was the plan at that time.
9       However, the plan changed. Module C for
10  Business English was assigned to Miss Valenti, so the
11  effect of this was that Miss Wade had promised to a
12  student in a class, for which the instructor of record
13  was now Miss Valenti, a grade, and that's an extremely
14  awkward situation.
15      Q. But for her leave she would have been teaching
16  Module C. Do you agree with that?
17      A. In all probability, yes.
18      Q. Now, Miss Wade was teaching three courses that
19  were online courses, and each of those courses was a
20  three-hour course; is that correct?
21      A. That's my recollection from the September the
22  3rd load report that I see.
23      Q. Would you review Exhibit 19 and tell me if you
24  know whether this is an accurate depiction of Bobbi
25  Wade's fall classes?

188

1       A. No. I can guarantee you I can't say that. It
2   was a complicated schedule. It was a complicated
3   semester. The Principles of Economics course was
4   canceled, for example. It is possible that additional
5   classes were added to Miss Wade's schedule. I don't
6   remember that detail.
7       Q. Do you recall a class being added towards the
8   end of the year?
9       A. No. I recall, because I have seen the
10  document recently, correspondence between Miss Wade and
11  me regarding the need to find an instructor for a
12  record, a filing and record keeping course. The
13  information I have does not make clear whether in the
14  end Miss Wade decided to take that course or not. And I
15  just don't remember.
16      Q. Do you recall how many credits that course
17  was?
18      A. Two.
19      Q. So if Miss Wade had three online courses that
20  were three hours each and a filing and record keeping
21  course of two hours each --
22      A. One.
23      Q. It was one hour?
24      A. No, it was two hours but it was one filing and
25  record keeping. So there's no "each."

189

1       Q. Thank you. My mouth got away from my brain.
2       So she had a total of nine hours for those
3   four courses?
4       A. No. If she had three three-credit --
5       Q. Eleven hours.
6       A. Yes.
7       Q. She had eleven hours?
8       A. For those four courses. If in fact she taught
9   the filing and record keeping. I'm not 100 percent sure
10  that happened. I don't remember.
11      Q. Okay. And the standard course load for a
12  teacher pursuant to their regular contract is how many
13  hours?
14      A. The general rule of thumb was 12, 12 and six;
15  12 in the fall, 12 in the spring, six in the short
16  summer semester. There were exceptions to that. For
17  example, in the trades program it was common for the
18  faculty to do a 15 and 15, because having a short
19  program for the month of May in the trades didn't seem
20  to make as much sense.
21      Q. So Exhibit 12 is the contract for Miss Wade
22  for 2003-2004. Does that specifically say that she
23  would carry 12 hours?
24      A. No. It says typically. This will be the
25  equivalent of 12 credit hours of teaching and three

48 (Pages 186 to 189)

194

1   semester pointing out what their teaching and other
2   duties are, they would routinely say if they were
3   developing a pre-packaged Blackboard course, they would
4   add to the teaching load one additional credit in
5   compensation for the course development.
6        And I would take a look at that and go to
7   Diana Kennedy and say, why are they doing that, and
8   she'd say, well, it's kind of the policy or they think
9   it is. And then we'd look at this thing trying to make
10  sense out of it.
11      Q. So Diana confirmed that in the past that had
12  been the practice?
13      A. Oh, no, I wouldn't say that at all. This was
14  a new statement that was added by the previous dean of
15  instruction as an attachment to faculty contracts. I
16  was informed that he had added this without any
17  authorization from anyone else, but it was a contract
18  addendum, the contract was signed, so I was told that
19  this was gospel.
20      Q. Who told you it was gospel?
21      A. The personnel manager, the college attorney.
22      Q. The personnel manager being?
23      A. Miss Taylor.
24      Q. And so getting back to Miss Wade's fall
25  semester, you recall her being paid for developing a

195

1   course or two? Do you recall that?
2       A. My recollection is that she was paid $4,500
3   for developing three Blackboard courses.
4       Q. Do you recall what those courses were?
5       A. The three on the schedule, Intro to Business,
6   Intro to Organization Management, Financial Management.
7   I don't know that for a fact, but that's the assumption
8   I'd make.
9       Q. And was she in fact paid for those?
10      A. I believe so.
11      Q. And the Module A's versus the Module B's, if
12  there were individual extra duty contracts signed for
13  those, how much would she have been paid for Module A in
14  English, Business English?
15      A. In Module A?
16      Q. Correct.
17      A. It would be one credit, which would be $1,500.
18      Q. Would that be the same for Module A math?
19      A. Sure.
20      Q. They were one-credit courses?
21      A. Yes.
22      Q. Was each module one credit?
23      A. Yes.
24      Q. So for a total of three credits?
25      A. For A, B, and C?

196

1       Q. (Nods.)
2       A. Okay.
3       Q. Is that right?
4       A. Yeah.
5       Q. One credit each? And if you took the entire
6   module, a student would receive three credits for the
7   whole --
8       A. If you took all three modules, the student
9   would get -- if you passed all three modules, the
10  student would get three credits.
11      Q. Okay. So do you recall whether Miss Wade was
12  paid separately for the A modules in Business English
13  and Business Math?
14          MS. DUCEY: Objection; vague.
15      Q. (By Ms. Johnson) Under an extra duty
16  contract?
17      A. Do I recall that? No. My recollection is
18  that she was paid twice, once in November, once in
19  December, in the amount of $4,500 each. That's my
20  recollection. For added duty contracts. What
21  specifically each contract was for, I can't tell you. I
22  am pretty sure that 4500 of that was the preparation
23  work for the three Blackboard courses. Do I recall
24  seeing the added duty contract that specifies that? No,
25  I don't.

197

1       Q. So let's assume she was paid $4,500 for added
2   duty contracts during this semester.
3       A. 4500 as a total during the semester?
4       Q. Yes.
5       A. Why would we assume that?
6       Q. For added duty contracts?
7       A. But she got paid 4500 twice.
8       Q. Well, the first one you said was for creating
9   three classes; is that right?
10      A. My understanding is that one of them, one of
11  the $4,500 payments, was for developing three Blackboard
12  courses.
13      Q. Okay. Do you recall if she had extra
14  duty contracts -- added duty contracts for any of those
15  Blackboard courses?
16      A. I don't recall added duty contracts at all.
17      Q. You don't recall any added duty contracts with
18  Miss Wade?
19      A. No. Now, I'm quite sure she had them because
20  I'm quite sure she got paid. Added duty contracts would
21  have been generated by Diana Kennedy, the assistant to
22  the dean. Diana would have taken them off to the
23  faculty; the faculty would have signed them. They would
24  then come to me. I would sign them and then they would
25  go off from there. But added duty contracts were not

MOBURG & ASSOCIATES                1601 Fifth Avenue, Suite 860                           Seattle, WA 98101
Court Reporters                              206-622-3110                                              Fax 206-343-2272

Wade vs. Ilisagvik                           5-10-2006                        John Tuthill, Ph.D.

---

206

1    "teleconference," so to you that indicates that you
2    talked to her on the phone?
3        A.   We certainly talked on the phone, yes.  That
4    was the normal procedure.
5        Q.   Why was Diana Kennedy in that teleconference?
6        A.   I have no idea.
7        Q.   Did you ask her to be in there?
8        A.   Not that I recall.
9        Q.   Would she have taken notes for you?
10       A.   Possibly.
11       Q.   Did you use her in that regard?
12       A.   Not commonly, but it is possible.
13       Q.   At the top of Exhibit 24.
14       A.   Top of Exhibit 24, uh-huh.
15       Q.   There is an e-mail from Bobbi to you dated
16   Monday, October 6th; is that right?
17       A.   Yes.
18       Q.   And this is an answer to your four paragraph
19   e-mail in which you state your understandings and you
20   tell her to get -- to consult with her physicians and
21   prepare a medical leave request.
22       A.   Yes.  Supported by appropriate documentation.
23       Q.   Where does it say supported by documentation?
24       A.   We said it orally if we didn't say it in
25   writing.

---

207

1        Q.   Okay, because it doesn't actually say that in
2    writing here, does it?
3        A.   Not in my memo to her, no.
4        Q.   But in her memo back to you she says: I have
5    a letter from my doctor in Tennessee stating I will need
6    to return as soon as possible for medical treatment.
7            Do you recall getting that information from
8    her?
9        A.   Yes, I do.
10       Q.   And did you ask her for a copy of the letter
11   from her doctor?
12       A.   Not that I recall, though I did subsequently
13   get it.  But I have clearly not gotten it yet by the
14   time she wrote this one.
15       Q.   Is that what that means to you?
16       A.   Yes.
17       Q.   And she's telling you this is an immediate
18   situation.  Did you follow up and talk to her about
19   this?
20       A.   At some point she gave me the document.  Miss
21   Taylor and I would have responded to the document that
22   this really is not giving us the information that we
23   need, and then Miss Wade would have responded.
24       Q.   Do you specifically recall calling her into
25   your office or calling her up after you received this

---

208

1    e-mail and saying, what is so immediate about your
2    situation?
3        A.   Do I specifically recall doing that?  No.  But
4    that normally would have been done by the HR office, not
5    the dean.
6        Q.   Would you have asked Pam Taylor to do that?
7        A.   Yes.
8        Q.   Did you ask Pam Taylor to do that?
9        A.   I don't remember specifically.
10       Q.   Were your conversations with Pam Taylor
11   written or oral?
12       A.   Generally, they were oral.  Sometimes they
13   were written, but more commonly they were oral.
14       Q.   So if you wanted a follow-up on what -- why
15   this was so immediate, if you hadn't seen this doctor's
16   note yet and she's telling you this is an immediate
17   situation and you wanted somebody to follow up, do you
18   recall going down to Pam Taylor's office or calling her
19   up and saying, check this out for me?
20       A.   Do I recall saying check this out for me?
21   No.  Do I remember any number of conversation with Miss
22   Taylor saying that we need to get this information and
23   make this clear to the employee?  Yes.
24       Q.   And did Miss Taylor ever indicate to you that
25   she followed up with Bobbi Wade?

---

209

1        A.   Information continued to be forthcoming from
2    Miss Wade.
3        Q.   What kind of information?
4        A.   Well, at some point we got this Exhibit 20.
5    At some point there was a further piece of medical
6    documentation from Barrow.
7        Q.   Okay.  Let me show you what's previously been
8    marked as 34.  Is that the document that you're thinking
9    of?
10       A.   Yes.
11       Q.   Do you recall when you saw this document?
12       A.   I don't recall exactly when I got it.
13       Q.   Was it -- well, let me give you another
14   document, 26.  At the top of 26 it states: I attached a
15   statement from my doctor in Tennessee and then I went to
16   the doctor here in Barrow on Monday.
17           And this appears to be written October 9th.
18   Does that help you remember when you might have seen
19   Exhibit 20 and Exhibit 34?
20       A.   It suggests that I could have received them at
21   that time.  Do I remember specifically receiving them
22   then?  No.
23           So on Thursday the 9th, in my e-mail to Miss
24   Wade, this is the day after the conversation with Cheryl
25   McKay, and now I'm saying: I need a written

---

MOBURG & ASSOCIATES                1601 Fifth Avenue, Suite 860                    Seattle, WA 98101
Court Reporters                         206-622-3110                              Fax 206-343-2272

Wade vs. Ilisagvik                                5-10-2006                              John Tuthill, Ph.D.

---

210

1   notification from a licensed physician, preferably by
2   fax and as soon as possible, to the effect that your
3   medical treatment cannot wait until the Christmas
4   break. As soon as I have received such notification I
5   can begin to process the request for a medical leave.
6       Q.  So look at Exhibit 34.
7       A.  Uh-huh.
8       Q.  And is Exhibit 34 sufficient to receive
9   medical leave?
10      A.  In my opinion, no.
11      Q.  Why not?
12      A.  It was also not sufficient in the opinion of
13  Miss Taylor, and I believe Cheryl McKay agreed.
14          Well, the first problem with this, a
15  handwritten note, "I agree." I agree to what? I agree
16  with what? It's not clear to me what this individual is
17  saying. "I agree and recommend that she see a
18  specialist for multiple medical problems." Now, this
19  does not tell me that the multiple medical problems are
20  of sufficient seriousness and time constraints that this
21  needs to be done before Christmas. It's possible, but
22  it's possible not. And this does not tell me that this
23  is a level of medical care that can't be provided in
24  Barrow.
25      Q.  Well, what does the word "specialist" mean to

---

211

1   you on there?
2       A.  It means a specialist. It means someone who
3   specializes in some specific area of medicine.
4       Q.  And how many specialists are there in Barrow?
5       A.  I have no idea.
6       Q.  Did you --
7       A.  I have never been to the Barrow hospital.
8       Q.  Did you ask Pam Taylor whether a specialist
9   was available in Barrow?
10      A.  No. We didn't know what kind of specialist.
11      Q.  If Pam Taylor stated that there were no
12  specialists in Barrow, would that have been sufficient
13  for you to understand that this meant off-Slope
14  treatment was necessary?
15      A.  Yeah, if I had been told that, well, the
16  specialist in this area or there are no specialists
17  here, that would confirm off-Slope. It would still not
18  confirm the need for the immediate treatment, and it
19  would still leave me hanging with this puzzling "I
20  agree" that doesn't tell me anything.
21          What we were asking for by that time, what we
22  were asking for in my October the 9th e-mail was not
23  very difficult. Written notification from a licensed
24  physician, as soon as possible -- we wanted to have this
25  happen -- to the effect that your medical treatment

---

212

1   cannot wait until December break. And this was not
2   that.
3       Q.  If you remember Jay St. Vincent's request, you
4   told Jay St. Vincent the same thing, that you wanted to
5   know from her doctor whether the treatment could wait
6   until the December break. Jay St. Vincent's doctor did
7   not state specifically that the treatment could or could
8   not wait until December.
9       A.  That is true. Nor did Miss Wade's physician,
10  ultimately, in the documentation that we accepted to
11  process the medical leave. Miss Wade's physician in the
12  document that we signed off on used the phrase "somewhat
13  urgent time frame." I believe Miss St. Vincent's
14  physician had used the phrase "timely manner."
15      Q.  Timely.
16      A.  Were either of these exactly what we were
17  looking for? No. But they were close enough.
18      Q.  Okay. So the fact that there's no adjective
19  in this handwritten statement about time to look at
20  multiple medical problems is what was insufficient for
21  you; is that right?
22      A.  That was part of what seemed insufficient to
23  me. There was the issue of what was being agreed to.
24  It could have been much clearer if that had been spelled
25  out. It would have been valuable to have some sort of

---

213

1   written assurance that the medical problems were serious
2   in nature.
3       Q.  Did you have any conversations with Miss Wade
4   about Exhibit 34?
5       A.  Exhibit 34.
6       Q.  The one you're looking at.
7       A.  I do not recall specifically. I'm quite sure
8   we did, that Miss Taylor and I both did at some point.
9   Do I recall the conversation? No.
10      Q.  So you don't recall telling her, or calling
11  her up and saying, Bobbi, this second doctor's note is
12  insufficient. You still need to go back, you need to
13  get me something else.
14      A.  I'm pretty sure that that was said
15  subsequently. Though the immediate thing that's
16  happening in Exhibit 26 on Thursday, October the 9th, is
17  Miss Wade is withdrawing her leave request. Now, when
18  she decides, when she states, "My medical problem needs
19  attention as soon as possible, but it's not a matter of
20  life or death. So, leaving everything until the holiday
21  seems like the most feasible thing right now. Thanks,"
22  then all of this goes in the file.
23      Q.  Well, if you back up just a little bit, she
24  said since I can't change the schedule, I really don't
25  want to leave my students at this point.

---

54 (Pages 210 to 213)

EXHIBIT D
Page 31 - 40

Wade vs. Ilisagvik                                  5-10-2006                              John Tuthill, Ph.D.

---

214

1     A.  And I do appreciate that.
2     Q.  And she says "I can't change the schedule."
3  Why couldn't she change the schedule?  Did you know what
4  she was talking about?
5     A.  By that time I did.  I knew that she had
6  proposed to the students, she had told the students that
7  105 and 109 would be canceled for the month of October
8  and would be taught on a different schedule in
9  November.  No, that was completely unacceptable.
10     Q.  And had you told her that was unacceptable by
11  this point?
12     A.  Well, since she says "I can't change the
13  schedule," I would think I did.
14     Q.  So do you recall having a conversation where
15  you told her this is not going to be an acceptable
16  change?
17     A.  Yeah.  Now, that does not necessarily mean
18  that she can't have the medical leave.  If she had had
19  the medical leave I would have found someone else to
20  teach the course.
21     Q.  Did you tell her that?
22     A.  Not that I recall.
23     Q.  Let's look at Exhibit 29.  You don't have it
24  yet.  This is another e-mail from you to Bobbi Wade
25  dated October 20th.  Do you recall a second leave

---

215

1  request for December?
2     A.  Yes.
3     Q.  And when was that made?
4     A.  I don't know.
5     Q.  Was it approximately October 20th time frame?
6     A.  I would guess so, yes.
7     Q.  Was it on an actual form, an actual Request
8  For Leave form?
9     A.  I think so.
10     Q.  Do you recall what happened to that form?
11     A.  I do not.
12     Q.  How did you get a copy of the form?
13     A.  I have no idea.
14     Q.  Would you have given --
15     A.  Things generally appeared on my desk.
16     Q.  Would you have given it to Diana Kennedy to
17  file?
18     A.  The form?
19     Q.  Yes.
20     A.  More than likely.
21     Q.  So if it's not in Bobbi Wade's files, do you
22  believe the breakdown would have been in the filing
23  system?
24        MS. DUCEY:  Objection to speculation.
25     A.  And I honestly can't answer it.  It could have

---

216

1  been filed someplace else.  I have no way to know.
2     Q.  (By Ms. Johnson)  And you stated in this form
3  that you could not approve the leave request; is that
4  right?
5     A.  Yes.
6     Q.  And did you know that this was still a request
7  for medical leave?
8     A.  This is a request for a personal leave.  This
9  is a request for a personal leave which is being
10  submitted without any of the medical documentation that
11  we had asked for.
12        It had been made perfectly apparent to Miss
13  Wade that as soon as we had the medical documentation we
14  had asked for, written notification from a licensed
15  physician to the effect that your medical treatment
16  cannot wait until the December break, and you could have
17  the treatment without conflict with your regular
18  teaching duties, that the leave would be granted.
19        This was not.  This was a request to shorten
20  the semester by a week.  To miss the last week of the
21  semester, which is panic time for the students, when
22  they need all the time and the support that they can
23  get, to take what was clearly labeled as a personal
24  leave, is not something I am going to approve.
25     Q.  Did you talk to Miss Wade about the reason

---

217

1  that she wanted the leave in December?
2     A.  It was a personal leave request.  All I can
3  say here is that I replied as you read.  I can't
4  approve --
5     Q.  But my question is, did you actually talk to
6  her about this leave request, face-to-face?
7     A.  Not that I recall.  It's possible that I did.
8  But this suggests that I got a personal leave request
9  without medical documentation, without any notification
10  that this was having anything to do with medical issues.
11     Q.  Why does this indicate that it was not medical
12  leave?
13     A.  It's just what I say:  "I can't approve your
14  request for a personal leave."  If it was something
15  where she had said this is a personal leave because I
16  really need to see the doctor, I would have gone back to
17  repeating what we had said before:  The medical leave is
18  something that we can approve.  We can approve this
19  right now.  As soon as we have the notification from a
20  licensed physician that this is a serious medical issue
21  that needs to be dealt with promptly.
22     Q.  Okay.  So, in your opinion, if Miss Wade
23  checked personal leave on a Request For Leave form and
24  turned it in to you, that that was a request for
25  personal leave?

---

MOBURG & ASSOCIATES                    1601 Fifth Avenue, Suite 860                              Seattle, WA 98101
Court Reporters                                206-622-3110                                            Fax 206-343-2272

218

1    A.   That's what personal leave means to me.
2    Q.   In this Comments section it says personal with
3  a colon and then on this side it says sick leave.
4    A.   Okay.
5    Q.   Did you have an understanding that personal
6  leave incorporated sick leave with --
7    A.   Yes, I did know that.
8    Q.   And was it incumbent upon the employee to
9  designate their leave request as extended medical leave
10  in order to get medical leave?
11    A.   No.  However, the policy of the College, as I
12  was informed by Miss Taylor, the sick leave was for when
13  you had the flu.  If you were traveling off-Slope to
14  have medical procedures done, that was supposed to be
15  the extended medical leave, because that had more
16  protection for the employee, I was advised, so that if
17  your sick leave, if your personal leave ran out, your
18  position would be held for you, would not be terminated
19  because you were taking care of your health, as was
20  entirely appropriate.  My understanding was I was not
21  authorized to give a sick leave to somebody to travel
22  several thousand miles to have medical procedures done
23  off-Slope.
24    Q.   Well, if an employee marked the wrong box,
25  would you hold that against them?

219

1    A.   No.  I'd get it corrected, though.  And I
2  would ask for the medical documentation, which is what I
3  had been asking for.
4    Q.   So as of October 20th when you received a new
5  personal leave request from Miss Wade, you did not
6  connect her new request with her sick leave request from
7  a couple of weeks prior to that?
8    A.   Not clearly, because on the 9th she had told
9  me, my medical problem is not a matter of life or death
10  so leaving everything until the holiday looks like the
11  most feasible thing right now.  This looked to me like
12  Miss Wade attempting to advance the start of her holiday
13  week.
14      Faculty always want to leave early.  And
15  that's something that really has to be discouraged
16  unless there's a bona fide medical reason, a documented
17  medical reason for the need.
18    Q.   Let's look at Exhibit 30 and Exhibit 31.
19  These are two more leave requests from Bobbi Wade for
20  November, and one is dated -- Exhibit 30 is dated
21  November 3rd and Exhibit 31 is dated November 4th.
22      Do you recall, first of all, getting Exhibit
23  30?
24    A.   No.
25    Q.   Do you know, do you have any idea of why there

220

1  were two requests for leave filled out?
2    A.   Not directly.  The leave request on the 4th,
3  if I do recall correctly, came attached to the type of
4  medical documentation we had been asking for.  This was
5  the one I signed.  This was the one that gave the
6  College the information needed to process the extended
7  medical leave.
8    Q.   And Exhibit 31, what was your understanding of
9  the medical issue that needed attention?
10    A.   I'd have to see the notice from the doctor to
11  tell you.
12    Q.   All right.  Look at Exhibit 32 and see if that
13  helps.
14      MS. DUCEY:  Objection to foundation.
15    Q.   (By Ms. Johnson)  Have you seen Exhibit 32?
16    A.   Yes, I have.
17    Q.   When did you see it?
18    A.   I assume, just a guess, that I saw it in
19  conjunction with this leave request.
20    Q.   "This leave" being the second --
21    A.   Which was the -- yeah, the --
22    Q.   -- the Exhibit 31?
23    A.   -- Exhibit 31.  This was the document that
24  gave me the documentation I felt I needed in order to
25  sign, and Miss Taylor agreed.

221

1    Q.   And why was Exhibit 32 sufficient?
2    A.   "The follow-up should occur in a somewhat
3  urgent time frame."  "Medical conditions that cannot be
4  addressed here" tells me that it's something the North
5  Slope can't do.  "Somewhat urgent," "urgent" tells me
6  that this is something to take seriously.  "Urgent time
7  frame" tells me that this is something to take seriously
8  and to do promptly.  "Somewhat" tells me that the
9  employee is, you know, not critical, but that's not my
10  issue.
11      This is telling me that there is, to my
12  reading, a serious medical issue that needs prompt care
13  that can't be dealt with locally.  That's what I had
14  been asking for for a month.  I got it.  I signed the
15  leave.
16    Q.   Did you have any conversations with Pam Taylor
17  about Exhibit 32?
18    A.   About Exhibit 32?  Yeah.  We talked about it.
19    Q.   What did you say?
20    A.   We agreed that it was what we were looking
21  for.
22    Q.   And the difference between Exhibit 32 and
23  Exhibit 34 is the adjectives used, the "somewhat urgent
24  time frame"?
25    A.   Well, let me find 34.

MOBURG & ASSOCIATES                1601 Fifth Avenue, Suite 860                    Seattle, WA 98101
Court Reporters                              206-622-3110                                       Fax 206-343-2272

Wade vs. Ilisagvik                                   5-10-2006                                   John Tuthill, Ph.D.

230

1   semester of 2003. Most of the students registered in
2   her courses did not achieve their objective. There was
3   evidence of poor advisement.
4           There was evidence of, it seemed to me, a
5   complete misunderstanding of the whole process of the
6   modularized courses, which was puzzling because she had
7   taught them repeatedly. You can't cancel those classes
8   for a month and then pick them up. You can't run B and
9   C modules concurrently when B is the prerequisite for C,
10  and yet those were things that Miss Wade had asked for.
11          I had multiple student complaints from a
12  variety of sources that Miss Wade was disinterested,
13  unhelpful, judgmental, rude. They felt intimidated,
14  they felt humiliated, they felt confused. I have
15  reports of Miss Wade in essence telling students that
16  they should already know how to do that and she wasn't
17  going to waste her time helping them. I had a meltdown
18  of instruction.
19          And I realized that no matter how hard the
20  administration worked or how hard Miss Wade worked on
21  those specific performance issues, the bottom line, when
22  push came to shove, was that this was an instructor who
23  did not meet the minimal acceptable qualifications for
24  the job. This was not someone who should have been an
25  assistant professor of business at an accredited

231

1   college. She simply lacked the education. And she
2   would continue to lack the education no matter what
3   happened.
4       Q.  So the bottom line for you was what?
5       A.  The determining factor for me, what made Miss
6   Wade's case different for me than all the other ones
7   where I had a performance issue, I felt that the
8   performance issue with Miss Wade in the fall semester
9   was more severe than anyone else's, but I also felt she
10  was the faculty member who simply did not have the
11  educational qualifications needed for the position that
12  she held at Ilisagvik College.
13          She had training in English, she had training
14  in educational administration, not in business. She was
15  teaching classes in marketing, in accounting, business
16  management, finance, economics, where, in my evaluation
17  of her transcript, she lacked the academic foundation to
18  be teaching.
19      Q.  So did you tell those reasons specifically to
20  Patrick O'Rourke during the administrative hearing?
21      A.  Yes. "Insufficient academic background for
22  the area in which she teaches."
23      Q.  That was one of the five areas?
24      A.  That was one of the five issues, though I will
25  say again, that for me was the one that I couldn't

232

1   figure out how to get around.
2       Q.  But the other things that you listed here also
3   factored into your decision?
4       A.  Those were issues. Those were areas of
5   concern. Some of very grave concern, others of concern
6   but not quite so grave.
7       Q.  They were --
8       A.  There were certainly a multitude of
9   performance issues, coupled with the insufficient
10  academic background.
11      Q.  They were of sufficient concern to you to
12  mention them to the administrative hearing officer?
13      A.  I was asked by the administrative hearing
14  officer what my concerns were with Miss Wade. I
15  answered the question --
16      Q.  And in fact --
17      A.  -- completely and honestly.
18          MS. DUCEY:  Before you ask that next
19  question, I never got -- somehow I might have misplaced
20  my Exhibit 60. So you've been asking all these
21  questions and I don't -- it's not your fault. I just
22  don't have my copy and I'm wondering --
23          MS. JOHNSON:  I don't have an extra copy.
24          MR. GAMACHE:  I thought I saw an extra
25  one.

233

1           MS. JOHNSON:  Get out of my copies.
2           MS. DUCEY:  Well, I'm wondering maybe
3   if --
4           MS. JOHNSON:  You're welcome to take a
5   break and look at it if you want.
6           MS. DUCEY:  Can we take five and I can
7   get another copy? Probably speed up the process. Just
8   walk out and get another one.
9           VIDEOGRAPHER:  We're now going off the
10  record. The time is approximately 2:51 p.m.
11          (Recess taken.)
12          VIDEOGRAPHER:  We are back on the
13  record. This is the beginning of tape number four in
14  the continuing deposition of John Tuthill. The time is
15  approximately 3:01 p.m.
16      Q.  (By Ms. Johnson) So we were talking about the
17  presentation to the hearing officer who was
18  Dr. O'Rourke, and the reasons for non-retaining Miss
19  Wade, and "a" through "e" were presented -- you agree
20  that "a" through "e" were presented to the hearing
21  officer as the reasons for not retaining Miss Wade for
22  another year?
23      A.  No, I don't agree.
24      Q.  Okay. What is your recollection of what
25  happened?

MOBURG & ASSOCIATES                1601 Fifth Avenue, Suite 860                Seattle, WA 98101
Court Reporters                            206-622-3110                                Fax 206-343-2272

Wade vs. Ilisagvik                          5-10-2006                          John Tuthill, Ph.D.

234

1      A.  My recollection is that "a" through "e"
2   consisted of my list of issues of concern underlying the
3   decision not to retain Miss Wade. But I would insist
4   for the record that most of these alone, many of these
5   in combination, would not have been sufficient cause in
6   my estimation not to renew.
7        The basic cause for my decision not to renew
8   Miss Wade was a combination of very serious performance
9   issues, coupled with a basic lack of qualifications for
10  the position that she held, and my awareness that no
11  matter how much we worked on the performance issues, if
12  indeed she would be willing to work with me on the
13  performance issues and I had no indication that she
14  would, that that would not affect the fundamental fact
15  that she was not qualified for this instructional
16  position.
17      Q.  Well, let's break that down a little bit.  You
18  looked at -- when you first came in to your position you
19  looked at the student evaluation file for Miss Wade?
20      A.  That is correct.
21      Q.  And at some point did you say that you went in
22  and you looked at her personnel file and you saw her
23  resume and you looked at all those --
24      A.  That is also correct.
25      Q.  Did you look at the evaluation that had been

235

1   done by a prior dean?
2      A.  Yes, I did.
3      Q.  And there was one for the spring of '03; is
4   that correct?
5      A.  That is correct.
6      Q.  And that evaluation was not a bad evaluation?
7      A.  It was not a bad evaluation.
8      Q.  So based on performance issues in the past,
9   other than the fall of '03, did you have any other
10  indication other than the fall of of '03 that Miss Wade
11  would not be able to perform well in the future?
12      A.  I saw evidence of performance issues in
13  earlier semesters in her file. And --
14      Q.  And what --
15      A.  -- don't forget that on top of the performance
16  issue, we had in my estimation the lack of
17  qualifications for the position.
18      Q.  Okay, well, I just want to focus on the
19  performance issues. What evidence of performance issues
20  did you see?
21      A.  One suggestion of at the least performance
22  questions was some notices in student evaluations that
23  some students in previous semesters had felt that Miss
24  Wade's courses were too easy, insufficiently
25  challenging, suggesting that this could be an instructor

236

1   who was not teaching to college credit level.
2        There were documents in file, and I want to
3   say dating to the spring of 2003 but I'm not absolutely
4   sure, where there was a disagreement or a
5   misunderstanding or an issue between Miss Wade and a
6   student. That was a troubling series of documents. The
7   student had a concern or a problem about something, and
8   Miss Wade's reaction seemed from the documents to be to
9   go on the attack, to accuse the student of questioning
10  Miss Wade's integrity, to accuse the student of being
11  inappropriate and out of line.
12        It was not the reaction that you would expect
13  from a professional instructor, suggesting that this was
14  an individual whose working relations with students
15  might be problematic, particularly when the students
16  were not easy, sometimes confrontational as students
17  could be. That was also in the file.
18        I received oral reports that were not in the
19  file in the summer before the fall semester began.
20      Q.  From who?
21      A.  Jamie Elbert particularly, though I think it
22  was -- no, let's just say Jamie Elbert, who said that
23  Miss Wade's classes were not challenging, that in fact
24  you didn't have to work at them at all, that you could
25  just coast along doing practically nothing until the two

237

1   weeks before the semester was over, and then do all the
2   Blackboard material and turn it in and get your grade.
3   That was of concern to me.
4        The evaluations from the students, the written
5   evaluations in file, the evaluations from the deans in
6   previous years, were by and large favorable. That is
7   true. So I did not enter into the fall '03 semester
8   expecting problems, though in fact some of the things
9   that I had suggested in those files proved to be issues
10  of concern.
11      Q.  Now, Exhibit 46 that you've looked at before
12  and have in your stack --
13      A.  46. 46.
14      Q.  -- this was actually used as an exhibit at the
15  administrative hearing; is that correct?
16      A.  I don't remember that at all. My memory is
17  that I wrote this as a note to myself.
18      Q.  Did you make up the exhibits for the hearing
19  yourself?
20      A.  I don't remember.
21      Q.  Did you speak on the record to the hearing
22  officer during the hearing?
23      A.  The hearing with Dr. O'Rourke?
24      Q.  Yes.
25      A.  Yes.

MOBURG & ASSOCIATES              1601 Fifth Avenue, Suite 860              Seattle, WA 98101
Court Reporters                       206-622-3110                         Fax 206-343-2272

EXHIBIT
Page 35 of 70

Wade vs. Ilisagvik                          5-10-2006                          John Tuthill, Ph.D.

238

1    Q.  And do you recall what you told him?
2    A.  Well, I think we were just talking about what
3  I told him here in his summary.  I was talking about
4  performance issues pertaining to Miss Wade, and talking
5  about the reason for the decision for me not to
6  recommend the renewal of her contract.
7    Q.  Did you at any time before the hearing discuss
8  with Bobbi Wade the reasons for not renewing her
9  contract?
10    A.  No.  I don't believe I did.
11    Q.  Did she ask you for the reasons?
12    A.  I don't think so.
13    Q.  Why would you not tell her the reasons?
14    A.  Because I was advised by Pam Taylor not to.
15    Q.  What did Pam Taylor say?
16    A.  That the College policy says that no reason
17  need be given for the non-renewal of a contract.  The
18  contract states that there is no expectation of renewal
19  on the part of the faculty member and that no reason
20  need be given.
21    Q.  Let's look at Exhibit 38.
22    A.  Do I already have that?
23    Q.  No.  This document has several people that
24  it's written to and you are one of them.  Do you recall
25  receiving this document in December of '03?

239

1    A.  Yes.
2    Q.  And you reviewed this document when you
3  received it?
4    A.  Yes.
5    Q.  Turn to page 100199.  And at the top, this
6  document states:  Why was I not allowed the privilege of
7  getting someone to substitute in my absence and resume
8  teaching classes upon my return if he wanted to keep the
9  original and not adhere to my revised one?
10    Do you recall responding to that comment from
11  Miss Wade?
12    A.  I expect that I prepared a written reply to
13  this statement, and I can imagine what I said.  Do I
14  specifically recall writing it?  No.
15    Q.  Do you recall, and you're welcome to look at
16  the page prior to that, 100198, do you recall Miss Wade
17  preparing a schedule so that she would be able to teach
18  Module C of both Business Math and Business English and
19  presenting that to you?
20    A.  I recall us talking about a proposed
21  schedule.  I don't recall seeing something written out,
22  though it is possible.  I know that we talked about the
23  possibility of canceling two weeks of the four-week
24  semester and doubling up the Module C's to meet for
25  twice as long.

240

1    Q.  And what do you recall about that discussion?
2    A.  That I said that I thought that was a poor
3  idea.  I didn't think that was in the interests of the
4  students.
5    Q.  Did Pam Taylor understand before Bobbi Wade
6  left that you intended to place Ms. Valenti into the
7  Business English class and place Tim Carlson into the
8  Business Math class?
9    A.  I think so.
10    Q.  Did you tell her that?
11    A.  She would have processed the paperwork to give
12  them the adjunct over their contracts.
13    Q.  Did she give you any advice about doing that?
14    A.  No.
15    Q.  Did she warn you about issues when you --
16    A.  No.
17    Q.  -- did that?
18    In the next paragraph on 100199, it talks
19  about Aimee Valenti.  It starts out "then, too."  Do you
20  see that paragraph?
21    A.  Yes.
22    Q.  And Miss Wade states that Miss Valenti aborted
23  the class syllabus textbook and teaching plans for
24  Business 109C.  Do you recall that happening?
25    A.  I wouldn't express it in exactly that way.

241

1  She certainly had different instructional standards and
2  techniques.
3    Q.  Well, did she use the pre-prepared syllabus
4  textbook and teaching plans?
5    A.  I don't think so.
6    Q.  Do you specifically recall talking to Aimee
7  Valenti about whether she would use Miss Wade's
8  material?
9    A.  I remember talking to her about her plans to
10  teach the course and what she would like to accomplish,
11  and I gave her my support.  The instructor of a class
12  should have the right to choose the textbook.
13    Q.  Even an adjunct professor?
14    A.  Absolutely.
15    Q.  So if an adjunct professor comes in and there
16  is a pre-prepared course, they're free to change that
17  course as they see fit?
18    A.  If I trust the adjunct, sure.
19    Q.  Okay, what does it take for you to trust the
20  adjunct?
21    A.  Good qualifications and track record teaching.
22    Q.  And how did you know Miss Valenti's track
23  record?
24    A.  She had taught for us before.  I had reviewed
25  her resume.  We had talked on several occasions about

61 (Pages 238 to 241)

Case 3:05-cv-00086-TMB    Document 86-3    Filed 06/14/2007    Page 17 of 20

Wade vs. Ilisagvik                                    5-10-2006                                    John Tuthill, Ph.D.

246

1    Q.  When you say it's supposed to specify redress,
2  where do you get that idea from?
3    A.  I'm sure it's in the employee handbook.
4    Q.  Did you review the grievance policy after you
5  got her grievance?
6    A.  Oh, I imagine so.
7    Q.  Does that mean you remember it or you don't
8  remember it?
9    A.  I certainly reviewed the grievance procedure
10  carefully in February when we got the official
11  grievance, if you will, from Miss Wade.  With those
12  sorts of issues you want to make very certain that you
13  follow the letter of the law and the timetable
14  associated.
15        There was not a whole lot of time frame here
16  if I got Miss Wade's formal grievance on the 11th and
17  replied on the 12th, so I cannot state categorically
18  that, yes, I studied the grievance procedure in that
19  day.  I may have.
20    Q.  Turn to the next page, page 2.
21    A.  You know, the fact that this seems to be my
22  mark-up copy makes me question whether it was
23  distributed at all.
24    Q.  Where would this have come from?
25    A.  It could have come from my files, which I

247

1  retained.  It could have been something that I made for
2  me and then didn't send out.  It looks like I edited
3  this subsequently and didn't produce a final copy.  So
4  let me say that I'm not 100 percent sure this went to
5  Dr. MacLean or to Pam Taylor.
6    Q.  Okay.
7    A.  I mean normally I wouldn't send something to
8  them and then mark it up subsequently myself.
9    Q.  Did you review this document before you came
10  in today?
11    A.  I didn't review it today.
12    Q.  Yesterday, day before, last week?
13    A.  I believe I looked at it briefly last night.
14    Q.  In the middle of this page it says that "I did
15  not believe I could appropriately use."  See that
16  paragraph?
17    A.  Uh-huh.
18    Q.  Just below the middle.  It says:  Her medical
19  leave necessitated her missing four of the total ten
20  class meetings scheduled for Business 105C, and three of
21  the total of eight class meetings scheduled for Business
22  109C.
23        Is that what made you remember so specifically
24  the number of classes that she would miss?
25    A.  Yeah.

248

1    Q.  Did you -- when you wrote this document, did
2  you have a schedule in front of you?
3    A.  Yeah, I had the schedule.  I had literally
4  counted out the days.
5        Let me add there that with this leave, not
6  only could I be quite sure with the leave dates that
7  Miss Wade would miss 37 and a half percent of the class
8  meetings of one of these courses and 40 percent of
9  another, but I also realized that going into an
10  uncertain series of medical procedures, we couldn't be
11  absolutely sure that she would be ready to return to
12  work immediately after the leave either.
13    Q.  Turn to page 5.  On the top of that page you
14  stated, "I rejected a total of at least three personal
15  leave requests from Bobbi Wade during the course of the
16  semester."  Do you recall rejecting at least three
17  personal leave requests?
18    A.  Well, let's see.  There was the leave request
19  dated October the 2nd we've talked about today.  There
20  was the leave request with the leave form that we
21  haven't found for the personal leave the last week of
22  the semester.  There was the strange personal leave
23  request that was dated November the 3rd that was
24  superceded by the one that was subsequently approved two
25  days later.

249

1    Q.  So you think those account for the phrase "at
2  least three personal leave requests"?
3    A.  That would be my estimation.
4    Q.  And it says you rejected them on the grounds
5  that the "absence from instruction for an extended
6  period of time would, in my estimation, 'unduly
7  interfere with the deliverance of instruction.'"
8    A.  That was the criteria that I had been given in
9  the contract addendum for the evaluation of personal
10  leave requests.  That I was authorized to grant personal
11  leave requests to faculty during the academic year for
12  up to a maximum of ten days, provided that the dean does
13  not find that the leave unduly interferes with the
14  deliverance of instruction.  And my estimation was that
15  these leaves would, as personal leaves.
16    Q.  You state in the last sentence, "My decision
17  was based in part on concerns expressed to me and/or to
18  Sonya Abu by students in her courses."
19    A.  That is true.  I had multiple student
20  complaints about what was going on in those courses.
21  The students felt under-served, under-supported, a bit
22  confused and bewildered by the schedule changes that had
23  been given to them and then rescinded.  They needed, in
24  my estimation, a consistent schedule and one instructor
25  to get them from the beginning to the end with the C

63  (Pages 246 to 249)

Wade vs. Ilisagvik                              5-10-2006                              John Tuthill, Ph.D.

250

1  modules.
2      Q.  Do you recall that the time that Bobbi wanted
3  to take off in October was spanned across the time of
4  the Alaska Federation of Natives meeting?
5      A.  No.
6      Q.  Do you know what the AFN meeting is?
7      A.  Yeah, I'm aware of it.  On the other hand,
8  this was also my first semester in Alaska, so I was by
9  no means an expert in it.
10      Q.  Okay.  But you know what it is now?
11      A.  Yeah.
12      Q.  And while you were there, did you observe
13  students who wanted to go to the AFN meeting?
14      A.  Sure.
15      Q.  You do not discuss in this paragraph any sort
16  of rebuttal about her coming to you in late September
17  2003.  You quoted the paragraph on the page before, but
18  you did not state that it didn't happen.
19      A.  Well, I would not deny that she may have come
20  to me in late September of 2003.
21      Q.  And you also did not --
22      A.  She did not provide medical documentation
23  then.
24      Q.  You also did not -- you did not disagree
25  that -- you seemed to agree, you seemed agreeable and to

251

1  think it was a workable schedule but you would need to
2  look into it.
3          You didn't agree with that statement in here
4  either, did you?
5      A.  I didn't agree with that statement?
6      Q.  You didn't disagree with it?
7      A.  No, I didn't.  I chose to focus on what struck
8  me as most important at this time, and that was my
9  reasoning for not approving the personal leaves.
10      Q.  On the next page, this states that you
11  approved Bobbi Wade's medical leave as soon as you had
12  the required medical documentation.  By that I assume
13  that you were talking about the second statement from
14  the Barrow doctor?
15      A.  Yes.  The one that says this treatment needed
16  to be done in a somewhat urgent time frame.
17      Q.  In the next page, page 7, is a discussion of
18  the extra duty contracts and that she had been offered
19  compensation for eight additional credits for the fall
20  semester?
21      A.  Does it say that?
22      Q.  In your section?
23      A.  "Bobbi Wade's 'extra duty' contract, offering
24  her compensation for eight additional credits" was
25  based.  That suggests that there was a contract offering

252

1  her eight credits.  I do not recall that now.
2          Was based on the assumption that she would
3  teach the full 12-credit instructional load that she had
4  originally been scheduled for in addition to the
5  overload.  When I assigned other instructors to teach
6  Module C, that reduced her total teaching load from 20
7  credits to 18, and her overload pay was correspondingly
8  reduced.
9      Q.  So --
10      A.  That is the normal operating procedure at this
11  institution.  That was not my choice.  That was what the
12  business office did to process these things.
13      Q.  So she was not paid for those Module C's; is
14  that correct?
15      A.  She was not paid for the Module C.  Okay.
16      Q.  Would you agree with that?
17      A.  I hesitate because this was such a complicated
18  system.  The faculty had their base pay, which was
19  awarded for approximately 12 credits of instruction in a
20  normal semester and three credit equivalents of
21  service.  Anything above and beyond that was normally
22  compensated at the rate of $1,500 a credit.
23          As far as I recall, there was no clear process
24  in every case of determining which were the 12 base
25  credits, which were the added duty credits.  From a

253

1  purely technical point of view, it was irrelevant.  The
2  bottom line was going to come out the same, except in
3  this instance where we had the issue of the Module C's.
4          I don't know for a fact where the Module C's
5  were, if they were originally supposed to be in an added
6  duty contract or if they were originally part of the
7  base contract.  I don't know.
8      Q.  So if Module C's were supposed to be part of
9  the base contract and she wasn't paid for two credit
10  hours, then how would you have gone about figuring out
11  what she would not be paid for?
12      A.  Well, remember, too, typically all of this is
13  done after the fact, which makes it from a business
14  procedure all the more complicated.  What Diana Kennedy
15  would do with the added duty contracts, at some point
16  near the end of the semester, she would simply take the
17  faculty member's teaching load, she would add it up.
18  She would come up with a list of 12 credits, and then
19  she would assign the other credits to an added duty
20  contract.
21      Q.  If the added duty contracts had been entered
22  into prior to the time Bobbi Wade left, would you have
23  expected her to have been paid for the added duty
24  contracts as well as the normal base load?
25          MS. DUCEY:  Objection to vague and

64  (Pages 250 to 253)

Wade vs. Ilisagvik                    5-10-2006                    John Tuthill, Ph.D.

294

1  goals, their plans?
2    A.  That is correct.
3    Q.  You remember --
4    A.  Oh, very well.
5    Q.  -- issuing that?
6    A.  I remember what happened, too.
7    Q.  Okay, what happened?
8    A.  All hell broke loose with my schedule.  In the
9  fall of 2003, I was often sent out to meetings,
10  particularly in Anchorage, with work force development
11  groups, with -- oh, I don't remember all of these
12  groups.  I was, I was in the air and on the road.  So
13  when the faculty set up the schedules to meet with me,
14  more often than not I ended up breaking them.  Either I
15  was traveling or there was some emergency or some
16  critical project that was coming my way that I was told
17  I absolutely had to do, and I had to ask the faculty to
18  postpone.
19       Miss Wade's was one of the appointments that I
20  regretted having to postpone.  Hers is, to my
21  recollection, the only one that never took place.  I was
22  still having those initial orientation, let's go to --
23  let's-get-to-know-each-other meetings with the faculty,
24  oh, I think as late as March of 2004.  It took forever
25  to get it all done, just because of the crazy schedule.

295

1  And Miss Wade's didn't happen.
2       MS. DUCEY:  Linda, do you have an
3  estimate of time?
4       MS. JOHNSON:  About three or four
5  minutes?  Should we go off record?  I can just look
6  through my notes and make sure I have everything.  I
7  think we're done.
8       VIDEOGRAPHER:  We're now going off the
9  record.  The time is approximately 4:50 p.m.
10       (Discussion held off the record.)
11       VIDEOGRAPHER:  We are back on the
12  record.  The time is approximately 4:52 p.m.
13       MS. JOHNSON:  I don't have any other
14  questions.
15       MS. DUCEY:  No questions.
16
17       EXAMINATION
18  BY MR. GAMACHE:
19    Q.  Dr. Tuthill --
20       VIDEOGRAPHER:  Oh, I'm sorry, can I get
21  you to grab a microphone?
22       MR. GAMACHE:  I'll take one.
23       MS. JOHNSON:  She needs hers since you're
24  questioning her witness.
25       MR. GAMACHE:  Thanks.

296

1    Q.  (By Mr. Gamache)  Dr. Tuthill, I'm Peter
2  Gamache.  I'm here for the North Slope Borough, which is
3  a codefendant in the case.  I do have a few questions.
4       How old are you?
5    A.  Fifty-four.
6    Q.  And you grew up where?
7    A.  I was born in Virginia.  I grew up in
8  Michigan, Illinois, South Carolina, and Georgia.
9  Graduated high school in Georgia.
10    Q.  And how about Mrs. Tuthill?  Where was she
11  raised?
12    A.  She was raised in Ukraine.
13    Q.  What are your academic credentials?
14    A.  I have a doctorate in history from the
15  University of California at Berkeley, a master's in
16  history from Columbia University, a bachelor's in
17  Chinese studies from the University of Michigan, where I
18  was an honors graduate and a Phi Beta Kappa keyholder.
19    Q.  And you got your Ph.D. in what year?
20    A.  1972.  No, I'm sorry, 1982.
21    Q.  At Ilisagvik College, as Dean of Instruction,
22  how many faculty members did you supervise in a given
23  semester?
24    A.  I should remember offhand and I don't, because
25  it was years ago.  I could tell you right off the bat I

297

1  have 39 now in the Marshall Islands.  I think it was a
2  bit less than that at Ilisagvik.  I think we had
3  somewhere just shy of 20 full time and perhaps as many
4  adjuncts, but I may not remember correctly.
5    Q.  Now, as Dean of Instruction it sounds like you
6  were the principal -- I'll do it as a question.
7       Were you the principal decision-maker with
8  regard to Bobbi Wade's non-retention?
9    A.  I was the individual who was responsible for
10  Miss Wade's evaluation and for making the initial
11  recommendation.  My initial recommendation was supported
12  by the president.
13    Q.  Was your recommendation for non-retention in
14  any way affected by the medical leave which she took in
15  the fall of 2003?
16    A.  No.  Not at all.
17    Q.  And was your recommendation for non-retention
18  affected in any way by the grievance that she had
19  lodged?
20    A.  Not at all.
21    Q.  When I use the term the "North Slope Borough,"
22  I mean the mayor, the Assembly, or, and/or the
23  administration.  With that as a definition, did the
24  conduct of your duties as Dean of Instruction, were your
25  duties in any way directed by or controlled by the North

75 (Pages 294 to 297)

MOBURG & ASSOCIATES              1601 Fifth Avenue, Suite 860                Seattle, WA 98101
Court Reporters                        206-622-3110                          Fax 206-343-2272

Wade vs. Ilisagvik                5-10-2006                John Tuthill, Ph.D.

298

1  Slope Borough?
2      A.  They were not.  Ilisagvik College is a
3  community college.  If a community college is going to
4  thrive, it needs to be deeply rooted in the community.
5  It needs to listen to the community.  It needs to
6  respond to community needs.  In that sense there was a
7  connection between the North Slope Borough as the
8  leaders of the community and the College.
9          Was there a direct political control?  No.  In
10  fact, that would have been anathema to the accreditation
11  standards which calls for the college to be an
12  autonomous, self-governing entity directed by a board of
13  trustees.
14      Q.  And the College, as you mentioned, had
15  recently achieved accreditation; is that right?
16      A.  That is correct.  They were awarded
17  accreditation, I think they got the letter the same day
18  I came for my job interview at the end of June, 2003.
19      Q.  And the accrediting authority was what?
20      A.  Northwest Association of Schools and Colleges.
21      Q.  Now, we've learned in this case that the
22  substantial proportion of the College's funding came
23  from the North Slope Borough; is that right?
24      A.  That is correct.
25      Q.  Did the Borough use its position as the source

299

1  of funds to, in your experience, to seek to control
2  administrative decisions of the College?
3      A.  No.  There was the same awareness that any
4  public institution would have from the legislative
5  body.  I mean the University of Michigan and the state
6  legislature.  I mean the Assembly is watching and are,
7  is expecting responsiveness in the community college.
8  But beyond that, no.
9          Let's say that North Slope Borough gave the
10  institution plenty of rope with which to hang itself if
11  it chose to do so.
12      Q.  Did the North Slope Borough influence or
13  attempt to influence you in the matter of Bobbi Wade's
14  medical leave in the fall of 2003?
15      A.  Absolutely not.  There is no connection at
16  all.
17      Q.  Is there any connection between the North
18  Slope Borough and your role in Bobbi Wade's grievance
19  process with the college?
20      A.  No, there is not.
21      Q.  And what about with respect to the North Slope
22  Borough's influence or attempted influence over your
23  recommendation for her non-retention?
24      A.  There was none.
25      Q.  Was there ever any -- during your tenure, was

300

1  there ever any North Slope Borough influence or
2  attempted influence over administrative decisions of the
3  College?
4      A.  No.
5          MR. GAMACHE:  Thank you.  That's all I
6  had.
7          MS. DUCEY:  I have nothing.
8          VIDEOGRAPHER:  This is the end of
9  videotape number four and concludes the deposition of
10  John Tuthill.  The time is approximately 4:59 p.m.  Here
11  ends this deposition.
12          (Deposition concluded at 4:59 p.m.)
13          (Signature was reserved.)
14
15
16
17
18
19
20
21
22
23
24
25

301

1              A F F I D A V I T
2
3  STATE OF _____ )
                    ) SS.
4  COUNTY OF _____ )
5
6          I declare under penalty of perjury that
7  I have read my within deposition, and the same is true
8  and accurate, save and except for the changes and/or
9  corrections, if any, as indicated by me on the
10  Correction Sheet.
11
          Dated this _____ day of _____, 2006.
12
13
14
15
          _____
          JOHN TUTHILL, Ph.D.
16
17
18
19
20
21
22
23
24  SHARON K. LANGFORD, CCR
25  Court Reporter

MOBURG & ASSOCIATES        1601 Fifth Avenue, Suite 860        Seattle, WA 98101
Court Reporters                    206-622-3110                        Fax 206-343-2272

EXHIBIT ___
Page ___