Page 1

```
 1                IN THE UNITED DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA
 3   BOBBI WADE,                        )
                                        )
 4                  Plaintiff,          )
                                        )
 5   vs.                                )
                                        )
 6   ILISAGVIK COLLEGE; NORTH SLOPE,    )
     BOROUGH; JOHN TUTHILL,             )
 7   individually; and PAMELA TAYLOR,   )
     individually,                      ) Case No. 3:05-cv-086-TMB
 8                  Defendants.         )
                                        )
 9   _____)

              VIDEOTAPED DEPOSITION OF PAM TAYLOR
10                       May 4, 2006
11   APPEARANCES:
12       FOR THE PLAINTIFF:        MS. LINDA J. JOHNSON
                                   Clapp Peterson & Stowers
13                                 711 H Street, Suite 620
                                   Anchorage, Alaska 99501
14                                 (907) 272-9272
15       FOR THE DEFENDANT
         NORTH SLOPE BOROUGH:      MR. PETER C. GAMACHE
16                                 Attorney at Law
                                   405 West 36th Avenue
17                                    Suite 201
                                   Anchorage, Alaska 99503
18                                 (907) 563-6969
19       FOR THE DEFENDANTS
         ILISAGVIK COLLEGE,
20       PAMELA TAYLOR and
         JOHN TUTHILL:             MS. CYNTHIA L. DUCEY
21                                 Delaney, Wiles, Hayes, Gerety,
                                      Ellis & Young, Inc.
22                                 1007 West Third Avenue
                                      Suite 400
23                                 Anchorage, Alaska 99501
                                   (907) 279-3581
24
         ALSO PRESENT:             MS. BOBBI WADE
25
```

Page 6

| | | |
|---|---|---|
| 1 | | discovery. I need you to answer audibly. A lot of |
| 2 | | people have a tendency to nod or say, uh-huh, and she's |
| 3 | | going to be transcribing this later, so Marci and I |
| 4 | | would both like you to..... |
| 5 | A | Sure. |
| 6 | Q | .....answer out loud. |
| 7 | A | Will do. |
| 8 | Q | Okay. How long have you lived in Barrow? |
| 9 | A | Almost eight years. |
| 10 | Q | And you're employed by Ilisagvik College? |
| 11 | A | Yes. |
| 12 | Q | And when did you get a job with Ilisagvik? |
| 13 | A | In November of 1998. |
| 14 | Q | And was that about the time that you moved to Barrow? |
| 15 | A | Yes. Uh-huh. |
| 16 | Q | You moved up here specifically for the job? |
| 17 | A | Uh-huh. Yes. I'm trying to say, yes, instead of uh- |
| 18 | | huh. |
| 19 | Q | Okay. |
| 20 | A | I understand. It can be confusing. |
| 21 | Q | It will be -- it will come to you more naturally as we |
| 22 | | go along. |
| 23 | A | Yeah, I'm sure. |
| 24 | Q | Tell us -- I'm looking for your education. |
| 25 | A | Uh-huh. |

Page 7

| | | |
|---|---|---|
| 1 | Q | So did you graduate from high school? |
| 2 | A | Yes. |
| 3 | Q | Where did you graduate? |
| 4 | A | Where? |
| 5 | Q | Yes. |
| 6 | A | Modesto, California. |
| 7 | Q | Okay. And did you go to college? |
| 8 | A | Yes. |
| 9 | Q | Where did you go to college? |
| 10 | A | I went to Modesto Junior College. |
| 11 | Q | What? I'm sorry, say again. |
| 12 | A | Modesto Junior College. |
| 13 | Q | Modesto. |
| 14 | A | And then University of San Francisco. |
| 15 | Q | And did you graduate from Modesto Junior College? |
| 16 | A | Yes. |
| 17 | Q | With an AA? |
| 18 | A | Yes. |
| 19 | Q | What was your AA in? |
| 20 | A | General transfer, I suppose. It's -- it's been so many |
| 21 | | years, I've -- it would just be a general transfer, AA. |
| 22 | | I'm sure that's what it was. |
| 23 | Q | Okay. |
| 24 | A | Yeah. |
| 25 | Q | You didn't specialize in..... |

Page 8

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | .....any particular..... |
| 3 | A | No. We didn't have that option at that time. |
| 4 | Q | Okay. University of San Francisco, you graduated? |
| 5 | A | Yes, I did. |
| 6 | Q | With a bachelor's of..... |
| 7 | A | Bachelor's in organizational behavior. |
| 8 | Q | What is organizational behavior? |
| 9 | A | It's essentially human resources and it's -- used to be |
| 10 | | called industrial psychology 40 years ago. It's |
| 11 | | changed names many, many times. Gone from personnel to |
| 12 | | human resources all those years. |
| 13 | Q | Okay. And other than University of San Francisco, do |
| 14 | | you have any other degrees? |
| 15 | A | Yes, I have another degree from the University of San |
| 16 | | Francisco, a master's in human resources and |
| 17 | | organizational development. |
| 18 | Q | Okay. And what year did you get -- oh, |
| 19 | | organizational..... |
| 20 | A | Development, right. |
| 21 | Q | .....development this time instead of behavior? |
| 22 | A | Uh-huh. Right. |
| 23 | Q | And what year did you get a master's? |
| 24 | A | In 1995. |
| 25 | Q | And when -- do you know what year was your bachelor's? |

Page 9

| | | |
|---|---|---|
| 1 | A | 1992. |
| 2 | Q | All right. And can you tell me, are there any other |
| 3 | | degrees, I should ask? |
| 4 | A | No. |
| 5 | Q | Okay. |
| 6 | A | That's enough for now, I hope. |
| 7 | Q | Have you taken any classes towards a doctorate? |
| 8 | A | No. I -- in my profession, it would probably not be |
| 9 | | helpful unless I was planning to teach. It's just |
| 10 | | something that most people don't bother with, although, |
| 11 | | it does exist, certainly. |
| 12 | Q | Okay. So job experience, your -- let's go |
| 13 | | backwards..... |
| 14 | A | Uh-huh. |
| 15 | Q | .....from Ilisagvik. You said you started working here |
| 16 | | November of '98? |
| 17 | A | Uh-huh. Yes. |
| 18 | Q | And where did you work before Ilisagvik? |
| 19 | A | I worked in Silicon Valley in San Jose, California. In |
| 20 | | Freemont, we had a series of different layoffs at that |
| 21 | | time, so we had -- I worked at UMAX Corporation. I |
| 22 | | worked at Cisco Systems. I worked -- before that I |
| 23 | | worked as human resource office manager at a pool |
| 24 | | company. I don't remember the name of the pool |
| 25 | | company. This is years ago. It's -- probably by that |

**Page 10**

1  time, it's 1990 -- about 1989.
2  Q  The pool company was about.....
3  A  '88, probably '88, 1988. Yes.
4  Q  Okay.
5  A  And at that point -- before that I had -- I worked in a
6     dental laboratory.
7  Q  So you had dental.....
8  A  Dental laboratory. Yes, I was a dental laboratory
9     technician in my former life.....
10 Q  Okay.
11 A  .....many years ago. Came naturally with my father
12    being a dentist, so.....
13 Q  Those are your major jobs in the.....
14 A  Yeah. Then I've also taught as adjunct faculty for
15    University of San Francisco. I taught both
16    undergraduate and graduate school in the college for
17    professional studies. I do consulting work throughout
18    different times throughout -- the time of -- from 1992
19    on -- primarily since 1995, as I was working on my
20    master's. I also worked -- taught guitar, taught
21    music. Yeah. I mean, it -- whatever it took to get
22    through school, you know, how that is.
23 Q  Sure. Let's go back to -- you said, Umax Corp.?
24 A  Uh-huh.
25 Q  Were you in the human resources field?

**Page 11**

1  A  Yes.
2  Q  And what was your job?
3  A  HR manager.
4  Q  And how long were you there?
5  A  It was about a year-and-a-half when they closed down
6     the -- the -- that portion of the -- of the
7     corporation. It used to be a PC, a Mac clone
8     corporation and it was no longer the Mac -- Apple
9     closed down its licensing on Mac clone, so that the
10    whole operation had to close. So I wrote my own layoff
11    letter along with everybody else's. That was a sad day
12    for everybody.
13 Q  What year was that?
14 A  I think that was about 1990 -- 1998.
15 Q  Did you come from that job to Ilisagvik?
16 A  Yes.
17 Q  Okay. And Cisco Systems, what year was that?
18 A  I was there from 1991, or I think it was 1991 until
19    1996.
20 Q  And what did you do there?
21 A  HR, human resources doing everything for -- anything
22    and everything from relocation, recruiting,
23    orientations, acquisitions.
24 Q  Okay. Did you have a title? HR.....
25 A  HR administrator at that point.

**Page 12**

1  Q  Okay.
2  A  Yes.
3  Q  Were you working for a manager or a director or
4     were.....
5  A  I was working with a HR manager and director, yes.
6  Q  Okay. So you were subordinate to them?
7  A  Yes, indeed I was.
8  Q  Okay. And it was at UMAX -- was that the first time
9     that you were the manager, an HR manager?
10 A  Yes, and I -- well, that was -- no, it was -- there was
11    another time. I'm trying to think of -- yes, I think
12    it was. Yes. Yes, I'm just trying to think of dates.
13    It's been awhile.
14 Q  Was there anything before 1991 where you worked in
15    human resources?
16 A  Not human resources with the formal title of HR, but,
17    again, at the pool company in -- in Modesto, I worked
18    as a -- at a construction company. After that, as a
19    office manager handling payroll, human resources
20    issues, and -- as I was working on my HR studies. So
21    that was really the beginnings of -- about
22    18 -- 1990 -- about 1989, 1988, I'd say was when it
23    began.
24 Q  Okay. So you worked at the construction company and
25    the pool company and.....

**Page 13**

1  A  Prior to going to Silicon Valley, yes.
2  Q  Okay. And those were both prior to your bachelor's
3     degree?
4  A  Right. Indeed.
5  Q  Okay. Was there anything else where you worked
6     specifically in.....
7  A  No.
8  Q  .....human resources?
9  A  No. I wouldn't -- I wouldn't say anything since then.
10 Q  Okay.
11 A  At any time before then, certainly not, because I was
12    busy doing laboratory work.
13 Q  You said you did some consulting work between '92 and
14    '95. Who were you consulting with?
15 A  Well, actually, I've done it recently. I did it about
16    a year ago as well. I -- one of the dentists in town
17    at -- I helped her with some consulting work here more
18    than once over the years. In the last nearly eight
19    years, I've helped her many times. Prior to that, I
20    worked with churches and organizations individually
21    helping -- people would often call me from different
22    places, different parts of -- even here in town, people
23    call me saying, what would you do here; how would you
24    handle this. So a lot of on-the-side informal, many
25    times, consulting help. It wasn't -- I didn't have a

**Page 38**

1    positions.
2 Q  Okay. Do you apply any sort of government standards
3    when you're looking for an employee or an instructor?
4 A  Maybe if you could define government standards for me.
5    I don't know what that means.
6 Q  Okay. Well, I'm thinking of -- is there anything about
7    prior experience or minimum qualifications that is sort
8    of an over-arching standard for your hires?
9 A  I -- I don't understand the question. I don't mean to
10   be difficult or.....
11 Q Okay. No. That's all right.
12 A I don't understand the question.
13 Q When you -- let me go on to something else. When
14   you're looking at a prior employee, do they get any
15   sort of -- I hate to say the word points, but do they
16   get any sort of points or added weight if they have
17   worked in Barrow before?
18 A If they worked in Barrow before, no. The first pass --
19   the first important thing, the most important thing,
20   always, is basic requirements.
21 Q Okay.
22 A Not prefers -- that would be considered a preferred
23   skill or ability.
24 Q That's the word you're looking for, right?
25 A Yeah. That is not the first thing at all.

**Page 39**

1 Q  Okay. So the most important skill would be
2    qualifications, is that what you said?
3 A  Yes. The basic qualifications.
4 Q  Okay.
5 A  Do they have a degree; you know, do they have teaching
6    experience; those kinds of things would be considered
7    examples -- examples of any type of basic requirements.
8 Q  Is there any particular rule back in the year 2000 that
9    someone needed to have a specific degree in the
10   specific subject that they were going to be teaching?
11 A  I don't recall. I don't recall.
12 Q  Who would set that kind of a policy if there was one?
13 A  The dean of instruction.
14 Q  Preferred qualifications, how do those weigh in when
15   you're looking at a candidate?
16      MS. DUCEY: Objection; foundation.
17 A  I'd have to -- it depends on the position. It -- it
18   varies. It just -- it would be very difficult to say
19   either this happens or this happens. It's not that
20   black and white. It would be very dependent on the
21   position, the requirements needed, the applicant pool,
22   the quality of the applicant pool, the number of
23   applicants. You often don't get very many applications
24   for faculty. We get more faculty -- we get more non-
25   faculty positions and applicants than we do faculty,

**Page 40**

1    so.....
2 Q  Okay. Do you give anyone any preference for having
3    taught at Ilisagvik College in the past, do you know?
4 A  Not necessarily. It depends. It depends, again, on
5    how it's posted. I don't recall how that was posted.
6 Q  Do you recall the -- after Bobbi Wade had been hired in
7    the year 2000, do you recall when she first came up
8    here and was a new instructor?
9 A  Absolutely. Yes.
10 Q Okay. Did she go through an orientation with you?
11 A Yes, she did.
12 Q And what -- do you have a specific recollection of what
13   you did during that orientation?
14 A Not that specific orientation, of course, but all our
15   orientations have been pretty consistent.
16 Q And what would you normally have done for -- in
17   orientation in the year 2000?
18 A I would have made sure they had their offer letter
19   signed.....
20 Q Offer letter?
21 A Okay. Yeah, yeah. Oh, and their contract. In this
22   case a faculty member have their contract signed, made
23   sure that was taken care of, made sure the INS
24   paperwork was in order and then given them the basic
25   forms to fill out related to emergency information

**Page 41**

1    contact sheet, EEO form, health questionnaire, drug
2    test done, then we go through the -- take a break. By
3    that time, they're ready for it and then go on into the
4    benefits discussion and opportunities for health
5    coverage, life insurance. Back then, we had basic life
6    insurance, health coverage, PERS notification process,
7    beneficiary discussion, handbook discussion.
8 Q  Okay.
9 A  There we are. Can't forget the handbook. And then --
10   then there's a form that they would sign off on the
11   handbook and then go from there. Yeah.
12 Q Okay. When you're going over the handbook, do you
13   specifically point out any policies?
14 A Yes, indeed.
15 Q What policies is your normal practice?
16 A We talk about -- we talk about how -- I make sure they
17   understand how they were hired, that they should be
18   proud of the fact that they're there, because they, you
19   know, worked hard to get there. We talk about how our
20   posting process is; how we handle -- what exit
21   interview means, what that means when a person leaves;
22   what rights they have, if there are COBRA rights and
23   other things when they leave. We talk about the
24   process to fill out leave requests for payroll
25   reimbursements, advances; for safety discussion part of

### Page 42

1  our handbook, safety plan; you know, everything in
2  between. We talk about how leave accrues for that --
3  in this case for faculty, what -- what might have
4  accrued. It doesn't have an accrual for faculty on
5  personal leave, but there are certain amounts of leave
6  given in the contract from year to year. And what
7  else? Many things.
8  Q  Do you go over specific rights such as the sexual and
9     racial harassment?
10 A  Yes, indeed. Yes. We talk about the harassment policy
11    as one of the things I check off on. Harassment
12    policy; safety policy, I mentioned that. Yes, we.....
13 Q  Okay. Do you specifically go through the Family
14    Medical Leave Act when -- in orientation?
15 A  We talk about family medical leave; we talk about
16    medical leave from the extended medical leave bank and
17    how that accrues; we talk about different types of
18    unpaid leave, like subsistence leave; we talk about
19    military leave, jury duty leave. I talk about how
20    we've added pieces to our benefits plan, so that they
21    have health coverage for off slope care, things like
22    that.
23 Q  Okay. That's a lot for me to follow up on, of course.
24    Tell me how leave accrues for a faculty member.
25 A  It doesn't.

### Page 43

1  Q  Okay. You said that already.
2  A  Yeah.
3  Q  Tell me how does an instructor get a -- leave. Just --
4     wait, go back. In the year 2000, was the leave that a
5     faculty could take, personal leave that a faculty.....
6  A  Uh-huh.
7  Q  .....member could take different than it would have
8     been than say, in the year 2003?
9        MS. DUCEY: Objection; foundation.
10 A  It would depend on the contract terms. I don't have a
11    recollection of different years of contracts, but
12    there's always leave defined, how many days leave is
13    defined in that contract year in that person's
14    contract. That's all I can remember at this point.
15 Q  So if they have a defined number of days, at what point
16    can they start drawing on those defined days?
17 A  At any point.
18 Q  Could they -- if they needed to take leave the second
19    day of work, could they do that?
20 A  If the supervisor approved it, yes.
21 Q  Sure.
22 A  Yes. You're talking about faculty now?
23 Q  I'm just talking about the leave.....
24 A  You're talking faculty?
25 Q  .....availability. Yes.

### Page 44

1  A  Yes, indeed.
2  Q  But the leave availability would be there?
3  A  Right. Different for non-faculty.
4  Q  Okay. So on the first day of work, is all the leave
5     that the faculty is entitled to available to that
6     faculty member?
7  A  Yes.
8  Q  Okay. And that's because it doesn't accrue. Is that
9     right?
10 A  Exactly. It's just a set amount of time for that
11    contract year available to be used at their -- their
12    determination along with the supervisor's approval.
13 Q  Okay. You talked about extended medical leave. What
14    is extended medical leave?
15 A  It's separate from the personal leave in that it is an
16    amount of six days per calendar year that has an
17    accrual value. That is the one piece of leave that
18    does accrue.
19 Q  Okay.
20 A  For faculty as well as non-faculty.
21 Q  And has that changed over time?
22 A  No, that's been consistent.
23 Q  So how does that accrue?
24 A  It's just a set amount of six days per calendar year
25    and it submits -- you're asking somebody who is

### Page 45

1  number -- numbers-challenged here. Don't -- I don't
2  know how they figure that out, but I don't -- I don't
3  know. But it's just equivalent to six days and you
4  don't lose it from year to year. It keeps growing.
5  Q  Oh, I see.
6  A  Yes.
7  Q  So on the first day of work, would a faculty member
8     have all six days?
9  A  No. They have -- I do know that.
10 Q  Okay.
11 A  I believe they only have maybe one-tenth of six days.
12    I don't know for that first day.
13 Q  And what can a facility member take -- what sort of
14    circumstances can a faculty member take extended
15    medical?
16 A  If they're under a doctor's care, let's say, for four
17    more days locally, or if they have to be taken out of
18    town, which is more often the case for even basic care,
19    especially back then. It's gotten a little better
20    here, but not then. We would count that -- we would
21    protect their personal leave bank and then count that
22    only as extended medical, so that they didn't have to
23    lose their personal leave to get health care taken care
24    of.
25 Q  Okay. Is there anything specific that a faculty member

Page 46

1  would have to do to be able to claim extended medical
2  leave?
3  A  Yes.
4  Q  What would that be?
5  A  That would be to supply a doctor's note, noting
6     appointment dates so that those dates of appointments
7     could be counted as dates of pers- -- of extended
8     medical leave as opposed to just general personal leave
9     for that whole time they're gone.
10 Q  So if somebody had to travel, say to Anchorage, they
11    took a plane trip down, they were there for two days
12    and they came home on the fourth day. So they were
13    gone for four days.....
14 A  Uh-huh.
15 Q  .....out of the week and they only saw the doctor one
16    of the two days they were in Anchorage, how would you
17    give them -- how would you allocate extended medical
18    leave for that purpose?
19 A  That one of their appointment date -- if there's
20    something in writing that we receive from them to show
21    that appointment date from the doctor's letterhead,
22    that would be considered that extended medical leave
23    date.
24 Q  Okay. What about.....
25 A  Now, if they had to be medivaced out of here, let's

Page 47

1     say, we would consider that from day one, their
2     absence.
3  Q  Okay. So in my example, the flight days would not be
4     extended medical days?
5  A  If that care -- that's -- let me think. Yes, it could
6     have been. Yes, it could have been. Those would have
7     been considered extended medical because as long as we
8     have that doctor's note, I believe that -- showing that
9     the referral note out is necessary, because it wasn't
10    care that was available here, we could do that. Yes.
11 Q  Okay. So if the Barrow Clinic said, we can't serve
12    this person here; they must go to Anchorage. Then the
13    travel days would also be included?
14 A  Yes. I see where you -- you ask -- I apologize. I
15    didn't get that clearer.
16 Q  No, I'm just trying to.....
17 A  Yeah, yeah. Indeed.
18 Q  Okay. So that would be correct?
19 A  Yes.
20 Q  But the second day that they stayed without a medical
21    appointment you would not -- you would still not
22    consider that extended medical care?
23 A  That would be correct. You're trying to establish the
24    time they're gone is under medical care and those dates
25    that they're under medical care or having medical

Page 48

1     appointments would be the dates that we would count as
2     extended medical. Yes.
3  Q  And so all necessary days that they're absent would be
4     covered?
5  A  Yes. If -- say if the doctor said, she's under my
6     care; he's under my care for -- from date to date, we
7     would consider that extended medical.
8  Q  Okay. And you said that kicks in approximately four
9     days when someone is -- needs doctor's care for four
10    more days?
11 A  For locally.
12 Q  Oh, locally.
13 A  Locally.
14 Q  I see. Before four days locally, what would you call
15    it?
16 A  Uh-huh. Personal leave.
17 Q  And what does someone do in order to get personal
18    leave?
19 A  They turn in a leave request, ideally, ahead of time,
20    unless it's subsequent to an emergency or something.
21    And the supervisor would then review it based on the
22    timing of the request. For somewhat general personal
23    leave now, correct?
24 Q  Yes.
25 A  Yeah.

Page 49

1  Q  So the supervisor reviews it?
2  A  And then would -- he or she would approve it or not,
3     depending on the needs of the college at that time and
4     the timing of the re- -- the absence.
5  Q  Okay. And do you have anything called sick leave?
6  A  No. Not really. It's -- it's often interchanged with
7     the word extended medical leave.
8  Q  So in order to get -- so -- I'm sorry. If someone was
9     ill for a couple of days, you would charge that to
10    their personal leave bank?
11 A  Uh-huh. Indeed. Let's say they're home with a cold or
12    something like that.
13 Q  Correct.
14 A  That's number 3.
15 Q  Okay. Exhibit number 20.
16       MS. JOHNSON: I'm announcing it for everybody
17    else.
18 A  That's okay.
19 Q  Have you ever seen this document before?
20 A  Yes.
21 Q  And when was the first time you saw this document?
22 A  I saw this document sometime in the spring semester of
23    2004.
24 Q  In 2004, the next year?
25 A  2004.

Page 54

1  Q   You don't remember ever not approving an extended
2      medical leave request?
3  A   Not offhand, no. Not at the moment, I don't recall
4      ever saying -- disapproving, you mean, saying no to it?
5  Q   Correct.
6  A   Yeah. No, I have not -- not remembered that at all,
7      not recalled something like that happening.
8  Q   Okay. Is there anything else besides an appointment
9      date and perhaps a doctor's note that would be required
10     for extended medical leave, in your opinion?
11         MS. DUCEY: Objection to foundation.
12 A   In my opinion, again, it would depend on many factors
13     including the -- the supervisor's needs, the timing of
14     the request, the urgency of the request, whether it was
15     urgent -- whether the dates were there, if it could be
16     worked with, adjusted, again.
17 Q   Well, on a regular basis, how often do people ask for
18     more than four days of leave to get medical attention?
19 A   It's not uncommon, because where we -- of where we
20     live.
21 Q   Sure.
22 A   Certainly, that's really a big factor is -- is the
23     location of our -- of our community, being such a
24     remote place.
25 Q   And what -- can you tell me if you have ever asked

Page 55

1      someone to postpone their extended medical leave
2      request for the needs of the college?
3  A   Again, if it depends on the nature of the request, if
4      it's possible. We say, is it something that can be
5      waited on. We have in the past and at times, we've
6      asked them point blank, say, can -- can this be
7      adjusted to fit the needs of the -- of the students or
8      the business at hand, if it's at all possible. And
9      they'll yes or no.
10 Q   And do you take the employee's word for that?
11 A   At that point, we might ask them for more information.
12 Q   Okay.
13 A   It depends, again, on the nature of the situation.
14 Q   Okay. Look at exhibit 21. Have you ever seen this
15     document before?
16 A   Yes.
17 Q   And when did you see exhibit 21?
18 A   On or about the early part of October.
19 Q   And where were you when you first saw this, do you
20     recall?
21 A   In my office.
22 Q   And how did it come to your attention?
23 A   Bobbi brought it to my attention -- brought it to me.
24 Q   Okay. Do you recall whether it was on the 2nd or the
25     3rd of October?

Page 56

1  A   No, I don't recall.
2  Q   Do you recall if it was -- did you say it was in early
3      October?
4  A   Yes, I would -- be on or about early October as I see
5      that date there as well. It strikes a -- a memory on
6      that.
7  Q   Okay. And did it look just like this when you saw it
8      the first time?
9  A   Yes.
10 Q   It had the verification of hours on it?
11 A   Yes.
12 Q   Okay. And do you remember a conversation with Bobbi
13     about this document?
14 A   Yes.
15 Q   Okay. Can you tell me about that conversation?
16 A   She brought it to me and I said, well, this is a
17     personal leave. Go ahead and have your supervisor sign
18     it and as you see on the -- I don't sign off on
19     personal leave, so take it to John and discuss it with
20     him, because it's really not in my venue to determine
21     that personal leave.
22 Q   Okay. Did you she tell you whether she'd already
23     talked to John Tuthill about this?
24 A   I don't recall.
25 Q   Did you -- so is it your testimony that you -- she did

Page 57

1      not present exhibit 20 at the same time she presented
2      you exhibit 21?
3  A   That is my testimony, yes. Correct.
4  Q   Okay. And did you know what the leave was for when she
5      came into your office?
6  A   No.
7  Q   She didn't tell you that she needed medical leave?
8  A   She said she was going to have some medical
9      appointments at the time -- same time she was on leave.
10 Q   Did she tell you what kind of medical appointments they
11     were?
12 A   No.
13 Q   And did you -- you noted that the leave was for 10
14     days. Is that correct?
15 A   Yes.
16 Q   And did you, at that time, talk to her about extended
17     medical leave?
18 A   No, I would not have known to, because we -- all this
19     was on the -- the -- the personal thing that was where
20     the -- it was noted as personal.
21 Q   Okay. Well, she -- so she would have had to ask you
22     for extended medical leave for you to bring it up?
23 A   She would have had to give me more information than
24     simply saying she had appointments.
25 Q   Okay.

15 (Pages 54 to 57)

330 Wendell Street, Suite A        LIZ D'AMOUR & ASSOCIATES, INC.        Fairbanks, Alaska 99701
                                   907.452.3678  EXHIBIT E
                                   Page 2 of 18
49e0613c-0d57-4b98-9fb6-7969e42607ce

Page 130

1  just had it on my e-mail. I won't remember it's out
2  there. I print -- I tend to print these kinds of
3  things out, so I can keep track of them. With this
4  hard copy, I see -- I'm horrible for wasting paper,
5  but.....
6  Q   The bottom part of the e-mail is from Bobbi Wade and
7      she's asking about the form she filled out for medical
8      leave.
9  A   Uh-huh.
10 Q   What form did you think she was talking about?
11 A   Well, I -- I thought she was referring to her personal
12     leave form on October 2nd, the one that she mentioned
13     to me and she was going to be having some medical
14     appointments while she was out.
15 Q   And she asked you for an update on the status.
16 A   Uh-huh.
17 Q   Okay. And when you saw that, did you think that you
18     had already given her an update on the status?
19 A   No. I thought John had given her an update on the
20     status by his previous communications to her earlier,
21     which is what I referred to in my answer to her.
22 Q   Okay. Did you -- do you recall having any
23     conversations with her between -- about the August 2nd
24     or 3rd time frame and October 14th about her leave?
25 A   Could you restate this question? I'm sorry. I didn't

Page 131

1  quite catch that.
2  Q   Okay.
3  A   I'm sorry. I must be getting tired or hungry or --
4      where's the food here?
5  Q   At the.....
6  A   I was thinking it's lunch time. I apo- -- apologize.
7  Q   I'm trying to see at this point -- and I'll just tell
8      you where I'm going with this. I'm trying to figure
9      out how many times you talked with Bobbi Wade
10     personally in early October.
11 A   I recall that time when she turned it in. Yeah.
12 Q   Okay. And then in this e-mail, exhibit 35, you talk
13     about the documents Bobbi handed to me the other day.
14     When was that?
15 A   Yeah. I don't recall.
16 Q   Was that the same time frame as.....
17 A   No. I would say the other day. Maybe it was. I don't
18     know. It could have been a weeks difference, who
19     knows. I don't know.
20 Q   So do you think that you had another conversation with
21     her after October 2nd or 3rd when she gave you this?
22 A   Possibly, because she didn't give me anything on
23     October 2nd other than the personal leave request.
24 Q   Okay. So it's possible that you had a second
25     conversation with her here?

Page 132

1  A   Possibly, yeah. I mean, Bobbi and I were pretty
2      informal with each other, had a pretty open door policy
3      with each other.
4  Q   Do you have a specific recollection of her coming back
5      to your office?
6  A   No, I don't. It's been too many years.
7  Q   Do you recall talking to her on the phone?
8  A   More than once, obviously, but it could have been a
9      number of different things she was -- sometimes we have
10     lunch together; sometimes we talk on the phone. I
11     don't recall specific dates or what we talked about
12     oftentimes.
13 Q   Okay. Specifically about this leave, do you recall in
14     early October talking to her on the phone?
15 A   Not offhand, no.
16 Q   Okay. In exhibit 27, you refer her back to John
17     Tuthill. Is that correct?
18 A   Yes, because we were still talking about personal leave
19     at that time still. She refers to it as medical leave
20     erroneously on her October -- on her e-mail to me,
21     because it was a med- -- it was a personal leave noted
22     October 2nd and we were still under the assumption that
23     she was still work -- I was under the assumption,
24     rather, not we, that she was still working trying to
25     work out the details with John and -- in terms of

Page 133

1  timing.
2  Q   So.....
3  A   And based on her e-mail back to him, she, herself, said
4      she -- well, she can't wait until the holidays, so
5      that's why I referenced that as well.
6  Q   So on October 14th, you didn't consider that she was
7      asking for medical leave at this point?
8  A   No. Because we still hadn't -- at this point, we were
9      still thinking of personal leave.
10 Q   Even though you had talked to Cheryl McKay about family
11     medical leave, you still.....
12 A   If -- yes. If we can asked, because she did mention
13     the word medical appointments to us -- I mean, to me on
14     October 2nd. And if you recall, she had turned in, on
15     the 10th -- on the 6th of October, another leave
16     request which really started me really thinking about
17     this. This is what precipitated my -- my concerns and
18     we -- and my recommendation to John to call Cheryl.
19 Q   Okay.
20 A   Not to be personal leave of October 2nd.
21 Q   So there was a second leave request filled out on the
22     6th?
23 A   No. I'm referring to the note that was handed to me on
24     or about the 6th.
25 Q   Okay.

**Page 134**

| | | |
|---|---|---|
| 1 | A | Which is this one, exhibit number 34. |
| 2 | Q | So did you take this as a second request, this note? |
| 3 | A | A second request, yes. |
| 4 | Q | Okay. So you took this as a new request? |
| 5 | A | As a possible new request with some more medical |
| 6 | | information on it than we had before. We had no |
| 7 | | medical information; we just had a personal request on |
| 8 | | October 2nd. |
| 9 | Q | With this exhibit 34, would you have thought that the |
| 10 | | request for leave was possibly a medical leave, though? |
| 11 | | MS. DUCEY: Objection to speculation. |
| 12 | A | No. I don't know. I didn't want to speculate. I |
| 13 | | didn't even want to think about what it could be. I |
| 14 | | was looking at -- at the facts at hand. It said |
| 15 | | personal leave with a -- with a verbal comment to me |
| 16 | | that she was going to have medical appointments while |
| 17 | | she was gone, again, common practice here on the slope. |
| 18 | | Typical, for most of us to use that way. |
| 19 | Q | Okay. I'm sorry. I'm..... |
| 20 | A | Don't be apologizing. |
| 21 | Q | I'm not trying -- I'm trying to put this together. |
| 22 | | If -- did the -- did exhibit 34 amend exhibit 21? |
| 23 | A | No. |
| 24 | Q | No. You thought this was a..... |
| 25 | A | Personal leave. |

**Page 135**

| | | |
|---|---|---|
| 1 | Q | .....personal leave and..... |
| 2 | A | This..... |
| 3 | Q | .....exhibit 34 was possibly..... |
| 4 | A | This gave me more..... |
| 5 | Q | .....a new leave request? |
| 6 | A | .....or new information that may add value to her need |
| 7 | | to leave sooner than later for leave, whatever kind of |
| 8 | | leave it was. |
| 9 | Q | Were you still applying -- were you applying exhibit 34 |
| 10 | | to the leave request under exhibit 21? |
| 11 | A | Possibly connected, but my ma- -- my main concern was |
| 12 | | now we have something here that we -- we have to look |
| 13 | | at more urgently in terms of timing is getting close. |
| 14 | | It's getting -- the -- another week had passed or |
| 15 | | something to that effect and she's making good faith |
| 16 | | effort to try to, you know, get some time off. Still |
| 17 | | hadn't had def- -- definition, results back yet on a |
| 18 | | doctor's note saying this could or couldn't wait until |
| 19 | | the holidays with any dates, appointment dates. The |
| 20 | | main -- main issues that we were looking for, some |
| 21 | | medical -- professional medical determination on |
| 22 | | whether or not this had to be rescheduled later or done |
| 23 | | now, so that John, (a), could then schedule his cla- -- |
| 24 | | the course work if he needed to do it, find -- have |
| 25 | | time to find somebody. There's a lot of pieces |

**Page 136**

| | | |
|---|---|---|
| 1 | | connected to that and not just -- the most important |
| 2 | | thing of taking care of her health. |
| 3 | Q | Do you require someone to submit a copy of an |
| 4 | | appointment before you will allow them to leave on |
| 5 | | extended medical? |
| 6 | A | Yeah. We will let them go on personal leave. We will |
| 7 | | call it personal leave if we have to and we can back |
| 8 | | into it after the fact and give it extended medical |
| 9 | | status once I get that note, but not often. I mean, if |
| 10 | | it's, you know -- the issue is about whether or not she |
| 11 | | could go on personal wasn't related to me; it was |
| 12 | | related to her and John's discussion. The timing of |
| 13 | | that personal leave request was something that she and |
| 14 | | John were working out the details on, which was why I |
| 15 | | referred her back to John here on this e-mail as well. |
| 16 | | So I keep referring and say leave request go through |
| 17 | | the signature process and it would go through first to |
| 18 | | the supervisor for consideration of any kind of leave |
| 19 | | request first. |
| 20 | Q | Okay. Exhibit 29, another e-mail. And it looks like |
| 21 | | it was written by John Tuthill. Would you agree with |
| 22 | | that? |
| 23 | A | I would, yes. With another date at the bottom. I |
| 24 | | learned something new. This is -- I never noticed it. |
| 25 | Q | Go ahead and read through it. |

**Page 137**

| | | |
|---|---|---|
| 1 | A | Uh-huh. I did. |
| 2 | Q | Okay. You are a fast reader. You're faster than I am. |
| 3 | A | I actually am really. It's a talent I have that I |
| 4 | | don't tell many people about because then they give me |
| 5 | | everything to read. |
| 6 | Q | In the late October time frame, did you receive a new |
| 7 | | request -- a new filled out request form for the -- in |
| 8 | | your office? |
| 9 | A | Possibly, maybe not. Generally, personal leaves that |
| 10 | | are not finalized by the instru- -- by the |
| 11 | | instructor -- by the supervisor don't get to me because |
| 12 | | I don't sign them, again. I usually often don't see |
| 13 | | them until towards the very end of the process after |
| 14 | | it's submitted approved by the supervisors, so I don't |
| 15 | | know if I ever got this leave request that she had |
| 16 | | asked for. She -- if she didn't put it on a leave |
| 17 | | request form, I don't know, you know. |
| 18 | Q | Okay. So a leave request form doesn't come to your |
| 19 | | office first and then you distribute it? |
| 20 | A | No, no. It goes from the employee -- ideally, they |
| 21 | | take it to the payroll to see how much time they have |
| 22 | | available on whatever leave status bank they're using |
| 23 | | and then it goes -- the employee would take it to the |
| 24 | | supervisor for -- for approval. |
| 25 | Q | If somebody brought you a leave request form before |

Page 142

1  the differences.
2  A  Yeah, these are different.
3  Q  Was -- exhibit 30, do you recall receiving that
4     document?
5  A  No, I don't.
6  Q  Do you recall talking to Bobbi about a leave request in
7     early November?
8  A  Yes, I do recall that one, but not this one.
9  Q  Okay. So you recall exhibit 31?
10 A  Yes, I do.
11 Q  And is your handwriting on exhibit 31?
12 A  Yes, it is.
13 Q  And where is it?
14 A  Comments -- comments section.
15 Q  In the comments section. Tell me where the.....
16 A  That would be this part here that's covered.
17 Q  Turn it all the way around, so the videotape gets it.
18 A  This part right here. It's the part of the receipt
19    from payroll.....
20 Q  Oh, I see. It's covered up, so.....
21 A  .....calculations, slightly covered apparently.
22 Q  Underneath there it says the word, comment.
23 A  Yeah. The word comment, c-o-m right there.
24 Q  Okay. And above that in the same box, it has a circle
25    around the word personal.....

Page 143

1  A  Uh-huh.
2  Q  .....and there's p-t beside it.
3  A  That would be my writing and my initials.
4  Q  That's you. I don't know what it says underneath this.
5     Do you recall what it actually says?
6  A  Yes, I do, because I -- I -- I remember that. I said,
7     personal leave is designated. Once required medical
8     documentation, appointments, schedules, work releases,
9     et cetera is obtained, leave then can be adjusted then
10    to reflect appropriate extended medical leave dates.
11 Q  Okay.
12 A  And the calculations are from payroll. This -- this
13    writing here is from payroll.
14 Q  I see. Is that something that's been added to this
15    document?
16 A  Apparently, it's -- I think it looks like a -- it's a
17    actual cal- -- calculator tape.
18 Q  Okay. So it's not a sticky note?
19 A  No, it would not be a sticky note. It would be
20    probably a.....
21 Q  How would it be stuck on here?
22 A  I don't know how payroll would have stuck it on. I --
23    maybe they -- they stapled it; maybe they didn't. I
24    don't know. Taped it, could be. I don't know. This
25    looks like it may have come from the yellow copy,

Page 144

1  because this is usually on their yellow copy. The
2  payroll's yellow copy that.....
3  Q  Oh, I see.
4  A  That personal leave date calculation is something they
5     usually attach to the -- to the yellow copy, not to the
6     original copy because they have to keep it for their
7     files.
8  Q  So do you recall that's whatever it is being on your
9     copy in the personnel file?
10 A  No, I don't recall. I don't recall. I -- I don't
11    think it -- I don't know. It wouldn't be the normal
12    practice for it to be stuck on the normal file.
13 Q  Okay. Sorry. Keep it out.
14 A  Oh, I'm sorry.
15 Q  You -- did you sign that on the bottom?
16 A  Yes, I did.
17 Q  And it's dated -- can you read that?
18 A  11/6 it looks like.
19 Q  Okay. Why would you have signed this leave request?
20 A  Because of the doctor's note that we got, I believe at
21    this point.....
22 Q  Okay. So let me give you.....
23 A  .....as extended medical, I'm not sure where that was,
24    if that was the case or not.
25 Q  Did you get a new doctor's note?

Page 145

1  A  I don't recall.
2  Q  Let me give you exhibit 32.
3  A  I'm getting confused here as far as dates here and --
4     and I'm losing track of my -- my papers here.
5  Q  Do you recall seeing exhibit 32?
6  A  Yes, I do. That would be Dr. Schneider here in town.
7     I recall that name.
8  Q  And when did you receive exhibit 32?
9  A  I don't know, but obviously that -- that did give us
10    some reason to sign it here.
11 Q  Do you think.....
12 A  That was probably connected.....
13 Q  .....that this is the witness copy?
14 A  Okay. I'm -- it's from me to -- yeah. These probably
15    were connected on that -- on the reason why I would
16    have said, hey, let's -- let's -- I told John, let's --
17    you know, let's get this going here.
18 Q  Do you think that it was the -- it's the -- is it the
19    date of the document that makes you think that?
20 A  No. I'm just thinking the dates may -- may match or
21    not, but I'm just thinking, I signed it here because I
22    still count it as personal leave because I still don't
23    have appointment dates and still didn't have anything
24    we were looking for there. And that's why John had
25    signed it saying that's okay to go at this ti- -- this

330 Wendell Street, Suite A — LIZ D'AMOUR & ASSOCIATES, INC. — 907.452.3678 — Fairbanks, Alaska 99701

EXHIBIT E
Page 10 of 18

Page 154

1  A  Yes. Yes.
2  Q  And you had said that when you received the appointment
3     schedule, you will adjust it to reflect appropriate
4     extended medical leave?
5  A  That's what I said on the comments section.
6  Q  Does that lead you to believe that perhaps when you
7     circled personal, that you were doing so because you
8     were changing it to extended medical?
9  A  No. It could have been because I was changing it from
10    extended medical, whoever -- whoever checked that to
11    personal.
12 Q  Okay.
13 A  Because it had -- we still didn't have appointment
14    dates at that early stage.
15 Q  Okay. Did you ever receive appointment dates?
16 A  I don't recall. At the moment, I don't know if I did
17    or not.
18 Q  All right. Do you.....
19 A  Perhaps.
20 Q  Do you recall whether.....
21 A  Excuse me.
22 Q  Do you ever recall whether Bobbi's leave was designated
23    as extended medical?
24 A  No. I don't recall. That would have been noted on the
25    subsequent time sheet. I would hope that would have

Page 155

1     been adjusted from the instruction office.
2  Q  I'm not sure I understand that. What does that mean?
3  A  The time sheets are -- are signed off by the dean of
4     instruction, so if he adjusted it from the perspective,
5     it would have been noted on the time sheet so that
6     payroll would know to recode that earlier, personally,
7     than to the appropriate amount of extended medical
8     time.
9  Q  So I could look it up in the personnel -- or the
10    payroll information?
11 A  You could. Yeah. That would be a -- if it was done in
12    payroll records, it would show up there.
13 Q  Okay. I don't think that I brought what I was going to
14    bring. Okay. So at this point, you don't recall if it
15    ever became extended medical?
16 A  Not to my knowledge, at this point. I don't know. I
17    don't recall.
18 Q  Did you ever designate it as family medical leave?
19 A  No.
20 Q  Why not?
21 A  Because, once again, we were still waiting notification
22    of a serious medical condition.
23 Q  And what more did you need to decide whether it was
24    serious medical.....
25 A  As I've stated numerous times, we were waiting for a

Page 156

1     doctor's certification as such, some kind of a doctor's
2     note that would say that.
3  Q  At this time when she took the November leave, did you
4     give her a form and tell her to have a doctor fill it
5     out?
6  A  No. Because, again, I did not have an indication there
7     was a serious medical condition.
8  Q  Okay.
9        MS. JOHNSON: And ask that this document be
10    marked 37.
11       (Deposition Exhibit 37 marked)
12       MS. DUCEY: Are you on 36, Linda? My.....
13       MS. JOHNSON: I'm marking 37.
14       MS. DUCEY: Was that -- did you -- I'm sorry.
15 A  This is -- last one 36?
16       MS. DUCEY: I'm behind. Never mind. You're
17    absolutely right and I'm one behind.
18 A  Almost fell.
19 Q  This is 37.
20       MR. GAMACHE: 37.
21 Q  Okay. Did you ever receive this document?
22 A  I don't recall seeing this document.
23 Q  Is this document anywhere in Bobbi Wade's medical file?
24 A  I don't recall.
25 Q  What -- and you would not have placed this in her

Page 157

1     personnel file, correct?
2  A  If I had received it, I would not have put it in her
3     personnel file that I can recall. Unless it got
4     attached to something by accident, I've never done
5     that.
6  Q  Okay. Is this sufficient notification of a doctor's
7     appointment? You said you were looking for a copy of a
8     doctor's appointment. Would this exhibit 37 be
9     sufficient?
10 A  For what?
11 Q  For notice of a doctor's appointment.
12 A  Would it have been sufficient for what purpose?
13 Q  Well, to get extended leave.
14 A  It could be, yes. Again, it depends on -- yes, it
15    could be. Certainly, had I seen that.
16 Q  So you don't recall seeing it?
17 A  No, I do not.
18 Q  Do you recall receiving a fax from a doctor showing
19    that a medical appointment had been scheduled?
20 A  I remember seeing some medical appointments. I don't
21    know if it came by fax or not. I don't recall.
22 Q  Okay. Where -- was it a medical appointment that
23    related to Bobbi Wade's leave request in November?
24 A  I don't recall. I don't -- I don't recall if we had a
25    fax on that or not.

**Page 158**

1  Q   Okay. What records in payroll would I look at to
2      determine whether Bobbi Wade's leave was designated as
3      extended medical leave?
4  A   You have to contact payroll to look at, I would expect
5      the time sheets, I would think.
6  Q   Okay. So I should ask for time sheets?
7  A   I would, yeah. I -- I think that's the record they
8      would use, not knowing their system.
9  Q   Okay. On page 2 of exhibit 37, do you require an
10     employee to give you a release to return to work if
11     they've been on personal leave?
12 A   No.
13 Q   When would you require a release?
14 A   A release if they are on extended medical, under a
15     doctor's care.
16 Q   And is that a requirement for anyone who would go on
17     extended medical leave?
18 A   Yes, if they're on -- under doctor's care -- active
19     care, then it would be for protection for their
20     Workers' Comp rights and other things, certainly.
21 Q   It -- was there any dispute with Bobbi Wade upon her
22     return from her leave over whether she needed to give
23     you a release from a doctor?
24 A   I don't recall. If that was our policy, I would have
25     expected that to be followed up. I can't imagine a

**Page 159**

1      dispute, but I don't know.
2  Q   And do you recall receiving a return to work release
3      from a doctor for Bobbi Wade?
4  A   Not at any one particular time, but, yes, we do -- did
5      receive some release to work note somewhere along the
6      line.
7  Q   For this particular leave, you would -- do you
8      specifically recall that?
9  A   I don't recall that. I recall getting some release to
10     work, but whether I got it at the time or later, I
11     don't recall.
12 Q   Okay. I guess when you say you rec- -- you remember
13     receiving the release, would it have been in
14     conjunction with any other leave or was it in
15     conjunction with this leave?
16 A   It could have been with other leaves, I don't recall.
17 Q   Okay. I'm just trying to be more specific.
18 A   Yeah. I understand and I wish I could be more specific
19     for you. I don't recall the time frame and how --
20     which leave was addressed at which notes, if any.
21 Q   Do you recall John Tuthill discussing that issue with
22     you?
23 A   No, I don't. Not offhand.
24 Q   Who would determine whether Bobbi Wade had presented a
25     sufficient release or return to work release?

**Page 160**

1  A   Well, sufficient wouldn't be the correct adjective to
2      use. I would say to -- whether it existed or not would
3      be often brought to the doc -- from the doctor's note
4      from the employee to the supervisor. And the
5      supervisor would then forward it on to -- to HR
6      office.....
7  Q   If it was brought.....
8  A   .....for the medical file.
9  Q   If it was brought directly to you, would you direct the
10     employee to take it to their supervisor first?
11 A   I would say, yes, take a copy to them. Make sure they
12     have a copy of it so that they -- unless it has a
13     diagnosis on it or something, certainly not, but if
14     it's just a simple return to work with any
15     modifications of work ability, anything that might be
16     attached to that, it would go -- a copy to the
17     supervisors, so they were aware of it as well.
18 Q   And would that be something that you would perform for
19     the employee? Would you forward that.....
20 A   Not necessarily. Not necessarily. No, sometimes it
21     depends and they can find -- if we can find the
22     supervisor immediately or he's there or she's there, or
23     if they're going to go on down to the office and just
24     hand it down to the supervisor while they're passing by
25     on their way out the door, that kind of thing. There's

**Page 161**

1      not a specific protocol for that. As long as they get
2      a copy within that same day they come back to work is
3      the most important.
4  Q   If someone has been designated as being on extended
5      medical leave and they leave the north slope.....
6  A   Uh-huh.
7  Q   .....are they -- does the college have any policy on
8      whether or not they can work while they are away on
9      leave?
10 A   That would depend on whether the doctor had allowed
11     such work to be done in writing.
12 Q   Okay.
13 A   I mean, if a person is on leave, medical leave, unable
14     to work, we expect them to take time to recover or do
15     whatever they need to do to take care of their health
16     and not be doing work, too, unless the doctor says they
17     can do so.
18 Q   Okay.
19 A   Multi-tasking, whatever it might be, within the
20     computer, whatever.
21 Q   If you -- are you aware of whether people have worked
22     while they were on extended medical leave?
23 A   Not offhand, because this is something I tend to want
24     to discourage. But I don't recall at the -- at the
25     moment, any one person that I remember having that --

41 (Pages 158 to 161)

330 Wendell Street, Suite A        LIZ D'AMOUR & ASSOCIATES, INC.        Fairbanks, Alaska 99701
                                          907.452.3678
                                                                EXHIBIT  E
                                                                Page 12 of 18
                                                                49e0613c-0d57-4b98-9fb6-7969e42607ce

Page 210

1  Q    So for you the citation of the age discrimination act
2       was sufficient to you?
3  A    It was certainly a -- certainly a good start.
4       Certainly, and any concerns for her contract -- you
5       know, contract violations, that would be another
6       example of a concern and, you know, following the
7       procedure.
8  Q    Right. Did you perform any investigation of her
9       grievance?
10 A    I did not, no. It's not in my role to perform those
11      investigations in a grievance process.
12 Q    What did you do with this grievance once you received
13      it?
14 A    I notified John of it; I notified my supervisor at the
15      time, Mr. Van Hoesen; and I notified Edna, president of
16      the college just in case they had not received a copy,
17      because I didn't see anyone else copied on this. And I
18      made copies for each and aler- -- alerted them to this
19      grievance and said, the clock is now ticking forward.
20      And I said to Dr. MacLean and Dr. Tuthill and
21      Mr. Van Hoesen -- all, I said, my next step is to
22      perform the next process of this, the next steps of
23      this grievance process and make sure that the step II
24      meeting is -- is set soon. We have five -- I have five
25      working days to get this taken care of. Clear your

Page 211

1       calendars, make sure you don't miss this date, whatever
2       date we had come to.
3  Q    So your advice was on the process?
4  A    Yes, once again.
5  Q    Did you.....
6  A    Not on the content.
7  Q    Okay. Did you -- were you asked for any
8       information -- well, let me step back. Do you know who
9       did perform the investigation on this?
10 A    Yes, I do.
11 Q    Who was that?
12 A    It was Mr. Van Hoesen.
13 Q    On.....
14 A    He was assigned by Dr. MacLean to be the -- the next
15      level -- step -- the grievance -- the president is not
16      part of the grievance process, so Edna asked John to
17      work with -- John Tuthill to work with John Van Hoesen.
18 Q    Okay. At this point, are you aware whether the
19      president asked John Tuthill to respond to these
20      allegations?
21 A    No. I'm not aware that she did. I know that John
22      Van Hoesen did.....
23 Q    Okay. You.....
24 A    .....asked him.
25 Q    Oh, John Van Hoesen asked him to respond?

Page 212

1  A    Yes. Because he was the one that was assigned by
2       Dr. MacLean. Get the two Johns correct here.
3  Q    Okay.
4  A    John Van Hoesen was asked by Dr. MacLean to -- to
5       handle the next level meeting and investigate this.
6       Investigate, meaning to let the grievance -- handle the
7       grievance according to process.
8  Q    Okay. So.....
9  A    And the steps.
10 Q    How were you aware that she asked Mr. Van Hoesen to do
11      that?
12 A    She told me.
13 Q    Okay. And at what -- how did she tell you that?
14 A    Just when I said, Edna, you're the president. You're
15      aware there's a grievance now. How do you want to
16      proceed and to her -- to whom do you want to assign
17      this? She says, let's have Van Hoe- -- she always
18      called him Van Hoesen. Let's have Van Hoesen do it.
19      So I said, okay. So I let John know that he'd been
20      requi- -- requested by his boss, the president,
21      to -- to be the next level supervisor on this case.
22      And I alerted John Tuthill the same news. That all was
23      in the same day.
24 Q    Was there any discussion with the president about why
25      she chose Mr. Van Hoesen specifically?

Page 213

1  A    Because he was the only one left at the high -- higher
2       level. There was no -- we have a very small chain of
3       command at the college. We're not a large institution
4       and the president steps back away from grievances,
5       but -- but the next level supervisors, usually de-
6       -- the dean level handle those. And, in this case,
7       the only other dean left was John Van Hoesen, who was
8       our CFO at the time, dean level position and -- and one
9       of the members of the cabinet.
10 Q    Would it -- did she think that it was appropriate for
11      John Tuthill to handle it himself?
12 A    Well, he couldn't have handled it himself,
13      because -- well, he could have, I guess, but we'd
14      already had the step taken care of at the immediate
15      level of trying to work it out with the December
16      19th -- that hadn't gone anywhere. She knew that.
17      Dr. MacLean did, so then she requested that we get to
18      the next step II aspect, because according to the
19      grievance process, honor the grievance process and the
20      step II meeting would be with the immediate supervisor
21      and if necessary, the in -- the -- the -- if the
22      circumstances warrant, the meeting can include the
23      grievance second level supervisor. In this case, that
24      would have been assigned to John Van Hoesen.
25 Q    Okay.

                                                                            54 (Pages 210 to 213)

330 Wendell Street, Suite A              LIZ D'AMOUR & ASSOCIATES, INC.                      Fairbanks, Alaska 99701
                                                   907.452.3678
                                                                                    Page 13 of 18
                                                                        49e0613c-0d57-4b98-9fb6-7969e42607ce

Page 226

| | | |
|---|---|---|
| 1 | | were called into the meeting. Do you recall being |
| 2 | | called into that meeting? |
| 3 | A | I remember -- yes, I remember John coming to me and |
| 4 | | asking me what to do with her request for taping. And |
| 5 | | I said, this is a -- this is, again, something that |
| 6 | | needs to be run by counsel. So he then called Cheryl |
| 7 | | McKay. I said, I can't give you an expla- -- I can't |
| 8 | | give a determination on that, John. |
| 9 | Q | Okay. So you..... |
| 10 | A | Again..... |
| 11 | Q | You gave him no advice..... |
| 12 | A | No. |
| 13 | Q | .....on whether it was appropriate? |
| 14 | A | I did not. I didn't think it was appropriate. Again, |
| 15 | | the grievance was still active. I wanted Cheryl's |
| 16 | | input on this, not mine. |
| 17 | Q | And do you recall what the final word was? |
| 18 | A | The answer was..... |
| 19 | Q | Could it be taped? |
| 20 | A | No. Could not according to Cheryl. |
| 21 | Q | Why not? |
| 22 | A | That's what John said, I don't know. John said that |
| 23 | | Cheryl said it can't be taped. |
| 24 | Q | Did you listen to the advice? Did you listen to |
| 25 | | the..... |

Page 227

| | | |
|---|---|---|
| 1 | A | No, it was a one-sided conversation. He called her |
| 2 | | from my office. I did not hear what she said, that I |
| 3 | | can recall. |
| 4 | Q | And you don't recall why she gave him that advice? |
| 5 | A | I was not told why. |
| 6 | Q | She just said, not allowed to tape? |
| 7 | A | I don't know what she said to him. |
| 8 | Q | Okay. |
| 9 | A | But the end result was that she had told him |
| 10 | | this -- the answer was, no, it cannot be taped. And |
| 11 | | then he wanted me to go with her -- with him, rather, |
| 12 | | back to the room to let -- to stand there so he could |
| 13 | | tell Bobbi that. |
| 14 | Q | Okay. Do you know in -- from a process point of view, |
| 15 | | if other grievance meetings had ever been taped before, |
| 16 | | step I or step II? |
| 17 | A | No, they'd never been taped. It's not the policy of |
| 18 | | the college to tape them. |
| 19 | Q | Okay. It's -- is there anything in your policy that |
| 20 | | specifically prohibits it in the grievance procedure? |
| 21 | A | I don't think so, no. I don't recall seeing that. |
| 22 | | It's just the common practice of the college. In my |
| 23 | | knowledge, I don't ever recall -- of course, I'm not at |
| 24 | | these meetings. Unless I -- it's been taped and I |
| 25 | | wasn't told about it later, I would have no knowledge |

Page 228

| | | |
|---|---|---|
| 1 | | of it. |
| 2 | Q | But you're the one who is responsible for moving the |
| 3 | | process forward, correct? |
| 4 | A | Indeed. Yes. And making sure the papers are collected |
| 5 | | at the end and in a safe place. |
| 6 | Q | But the overall process..... |
| 7 | A | Oh, yeah. |
| 8 | Q | .....making sure one -- step I, step II..... |
| 9 | A | Indeed. |
| 10 | Q | If there was a tape recording made, would you get a |
| 11 | | copy of it? |
| 12 | A | I would hope so. And I'd hope that it was agreed to by |
| 13 | | all parties. |
| 14 | Q | Okay. If -- at the end of the conversation that he had |
| 15 | | with your counsel in your office, did he hang up and |
| 16 | | say anything to you about the grievance procedure |
| 17 | | itself? |
| 18 | A | He just simply said Cheryl said, no. |
| 19 | Q | Okay. What about moving forward with his |
| 20 | | investigation? How did he intend to do that? |
| 21 | A | He didn't share with me details on that. |
| 22 | Q | Did you give him any advice on how to move forward with |
| 23 | | his investigation? |
| 24 | A | You mean, at this moment or this meeting? |
| 25 | Q | Yes. |

Page 229

| | | |
|---|---|---|
| 1 | A | No, I did not. I just said, John, you call Cheryl. |
| 2 | Q | Okay. Did you know that he intended to respond to |
| 3 | | Bobbi Wade's grievance without holding a meeting with |
| 4 | | Bobbi Wade? |
| 5 | A | I don't understand your question. I'm sorry. |
| 6 | Q | Well, if you read through the one, two, third |
| 7 | | paragraph..... |
| 8 | A | Okay. |
| 9 | Q | .....he says, I returned a few minutes later with Pam |
| 10 | | Taylor to reconfirm that you -- and it's addressed to |
| 11 | | Bobbi Wade -- to you that no meeting would be held. Do |
| 12 | | you recall going back with him to the meeting where he |
| 13 | | told Bobbi Wade no meeting would be held? |
| 14 | A | I remember that because Bobbi had said before he left, |
| 15 | | come talk to me, that he -- that according to him, that |
| 16 | | Bobbi had said that -- that -- that she wanted a tape |
| 17 | | recording and that John had said if she persisted in |
| 18 | | saying that she wanted a tape recording, that he, John, |
| 19 | | would not have a meeting held. I remember him telling |
| 20 | | me that when he came -- when he came back. When he |
| 21 | | was..... |
| 22 | Q | Who..... |
| 23 | A | .....before -- okay. I'm sorry to..... |
| 24 | Q | Stop. Go back and do it again. |
| 25 | A | It's -- it's getting late in the day. I remember that |

Page 238

1  A   Exactly. I don't recall. No, I don't. I'm sorry.
2  Q   Okay. Do you recall on March 30th, rejecting the
3      appeal that Bobbi Wade filed?
4  A   With this letter, I certainly do.
5  Q   And you recall rejecting it because you deemed it to be
6      untimely?
7  A   Yes.
8  Q   Okay. When was the appeal due, in your estimation?
9  A   I don't -- I'd have to look a calendar dates.
10 Q   Okay. You're welcome to read all the way through the
11     document.
12 A   Yeah. On or before March 19th, it says.
13 Q   And if you wrote that at the time.....
14 A   Pardon me?
15 Q   If you wrote that at the time, that would have been
16     correct?
17 A   If I wrote that, that would have been correct.....
18 Q   Okay.
19 A   .....if that's what I wrote on April 1. It looks like
20     I wrote that, so, yes.
21 Q   Okay.
22 A   Based on my counting of the calendar at the time.
23 Q   And do you recall being on leave on March 19th?
24 A   I made a -- again, I don't recall.
25 Q   Okay. Let me give you a document.....

Page 239

1          MS. JOHNSON: We'll mark as exhibit 56.
2              (Deposition Exhibit 56 marked)
3          MS. JOHNSON: Thank you.
4  Q   Do you recall taking personal leave during.....
5  A   Yes, I do.
6  Q   .....the time frame of March 19th?
7  A   Yes, ma'am.
8  Q   Okay. And who approves your leave requests since
9      you're the HR director?
10 A   John Van Hoesen, my supervisor.
11 Q   And who would determine what sort of leave you're
12     entitled to?
13 A   Personal leave since my partner and I are not married,
14     it would be considered personal leave.
15 Q   I see. Okay. Who would determine, though -- if you
16     needed medical leave, who would make that determination
17     for you?
18 A   I don't know. That's a good question. That's not ever
19     come up. That's a very good question. I don't know.
20 Q   Okay.
21 A   I don't know who else is qualified to do that. That's
22     sort of like a brakeman's daughter has bad brakes in
23     the car. I don't know.
24 Q   So you agree with me that you were gone on March 19th
25     when this was due?

Page 240

1  A   Yes, I do. Yes, I do.
2  Q   Okay. And do you recall Bobbi Wade discussing that
3      with you before you left what -- that you were going to
4      be on leave and that you wouldn't be in your office
5      when her appeal was due?
6  A   I recall contacting her, discussing this with her and
7      said, that does not preclude the fact that the appeal
8      continues to go through on the time line and you can
9      get that to either the president or John Van Hoesen
10     while I'm gone.
11 Q   So you instructed her to go ahead and file it?
12 A   I told her that if I was gone during the -- that time
13     line, it would not stop the process. That she could
14     easily get that filed, because the grievance document
15     is still a document to the college. And anyone at
16     the -- at the -- John Van Hoesen could have accepted
17     that and John asked me to -- to make sure that
18     was -- let her know that.
19 Q   So you talked to John Van Hoesen about this?
20 A   Yes.
21 Q   And what did you tell him?
22 A   Well, I had to tell him I was going to be gone. I
23     said, I -- I'll be gone during the -- this time line
24     and I want you to make sure that this is -- we need to
25     make sure this is continuing forward. He says, yeah,

Page 241

1      let Bobbi know that -- that -- that won't change, you
2      know, that we're still -- the -- the process will
3      continue and I can take the -- the -- the le- -- the
4      appeal.
5  Q   So he agreed to take -- to accept the appeal himself?
6  A   If it -- if it had been on a timely basis, yes. My
7      absence did not impact the time line of that leave. I
8      mean, that time line of that appeal.
9          MS. JOHNSON: Let's mark 57.
10             (Deposition Exhibit 57 marked)
11 Q   Can you look at the original one instead of
12     your -- instead of the copy?
13 A   Uh-huh.
14         MS. JOHNSON: Oh, thank you.
15         MS. DUCEY: This was 57, right?
16         MS. JOHNSON: 57, correct.
17         MS. DUCEY: Thank you.
18 A   Well, we have a difference of opinion, apparently.
19 Q   Okay. You don't recall telling her that she could have
20     until you got back to file her appeal?
21 A   I don't recall that.
22 Q   Okay. You had granted her on the original
23     grievance -- on exhibit 49, you had granted her leave
24     to file it one day late, correct?
25 A   Because it was a non-work day. Again, it was based on

Page 250

1  don't recall that had Bobbi had sent anything to her.
2 Q  Okay. But she told you that she was going to consider
3     waiving the time line for the appeal?
4 A  She was looking at the whole time line and making a
5     decision.
6 Q  She.....
7 A  She didn't tell me details.
8 Q  She didn't tell you how she -- why this was.....
9 A  No, she didn't.....
10 Q  .....come up?
11 A  She just didn't say anything to me. She said, just
12     looking at the process now, what -- what the next steps
13     will be.
14 Q  Well, since the process is your bailiwick, so to speak,
15     were you curious about why she was looking at this?
16 A  With Dr. MacLean, I think anyone that knows her knows
17     that when she has her mind made up about something, she
18     just decides what she's going to do, she does it.
19 Q  So was it unusual for her to look at the process of an
20     appeal and make a decision about it?
21 A  No. She -- it was not unusual for her to respond to
22     anything given to her in writing by an employee. She
23     would be very careful -- just like John was careful to
24     make sure that people's rights were honored in the
25     process.

Page 251

1 Q  But explain.....
2 A  John Tuthill I'm referring to, for example, and John
3     Van Hoesen.
4 Q  So at this point, though, you didn't know why she was
5     looking at the process?
6 A  She said she was thinking of moving it forward to the
7     next step. She needed to make a decision on what she
8     wanted to do, because that's really -- ultimately
9     everything is at the behest of the president,
10     everything we do at the college.
11 Q  Okay. You knew, however, that you had told Bobbi Wade
12     that the grievance wasn't timely, correct?
13 A  The -- this -- the appeal wasn't.
14 Q  I'm sorry, yeah. The.....
15 A  Yes. The appeal. And that the step II decision not to
16     move forward on the -- on the meeting that John
17     Van Hoesen had. I thought she was talking about that.
18 Q  I see.
19 A  She, meaning the president.
20 Q  Okay. Patrick O'Rourke was designated as the hearing
21     officer. Do you have -- did you have any input into
22     the president choosing him as a hearing officer?
23 A  No. Not whatsoever.
24 Q  Had he ever been chosen as a hearing officer for an
25     appeal in the past?

Page 252

1 A  No, we hadn't had that situation occur before, really,
2     to that level, so this is -- usually was handled at
3     step II, most meeting -- most grievances, so we had not
4     had that need for him.
5 Q  You had never moved forward since you had been the HR
6     director, you were.....
7 A  Rarely have we had need of an appeal. I'm not saying
8     it has never happened, but it's not a common occurrence
9     that we would even get to a hearing officer stage.
10 Q  Do you recall prior to this hearing, how many hearings
11     you had been involved in that the college had been
12     involved in since you've been the HR director?
13 A  Hmm. Maybe one.
14 Q  Okay.
15 A  Maybe this would be it, Pat O'Rourke's hearing.
16 Q  You think this was the only one since you.....
17 A  I think so, yeah. I.....
18 Q  .....had come on board?
19 A  I believe as far as the appeal to that level, yes, to
20     that stage. Yes.
21 Q  Did you know that Patrick O'Rourke had been chosen as
22     the hearing officer?
23 A  Eventually, I did, yes, when I saw this letter,
24     obvious-.....
25 Q  Was -- before you saw this letter, did anybody tell you

Page 253

1     about it?
2 A  They said they would -- John Van Hoesen said -- told
3     me -- I believe it was John Van Hoesen. I believe it
4     was him that told me that Edna had decided to have
5     Dr. O'Rourke do the hearing.
6 Q  Okay. Did you talk with Mr. Van Hoesen about the
7     propriety of appointing Patrick O'Rourke?
8 A  No. It wasn't his appointment. It was the president's
9     appointment and the president can appointment anyone
10     she wants that she feels qualified to do so.
11 Q  Okay.
12 A  So I wasn't there to show her.
13 Q  Were you personally uncomfortable with the appointment?
14 A  No.
15 Q  Why not?
16 A  Because I know Dr. O'Rourke to be a very qualified
17     educator and administrator.
18 Q  Okay. Do you -- did you know anything about his
19     background? Did you know whether he had ever performed
20     hearing officer duties before?
21 A  I know that he was eminently qualified to handle such
22     a -- a job, yes.
23 Q  And what do you base that on?
24 A  He was the former chancellor of the
25     University -- University of Alaska Fairbanks for many

**Page 254**

1  years, now retired chancellor emeritus, in fact.
2  Q  And how did that make him qualified as a hearing
3     officer?
4  A  We have every -- every respect for his judgment
5     and -- and fairness.
6  Q  What qualifications are necessary for a good hearing
7     officer in an appeal?
8  A  I have no idea.
9  Q  Had you performed appeals in -- had you gone through
10    appeals in other job situations?
11 A  No, because the university academia level is a very
12    different atmosphere, very different set of processes
13    than -- than a corporate environment would ever be.
14 Q  Okay. So for example, when you were at UMAX
15    Corporation, did you handle grievances back then?
16 A  There was no grievances. They didn't have grievances
17    there. They just had complaints and resolutions,
18    meetings. It was very much different environment than
19    academia. Academia is much more formalized.
20 Q  What about Cisco Systems?
21 A  Same. Corporate.
22 Q  Okay. Did you work with any labor unions when you were
23    at UMAX?
24 A  No, we had no labor unions to work with.
25 Q  What about Cisco?

**Page 255**

1  A  Same.
2  Q  Have you ever worked with any labor unions?
3  A  No.
4  Q  No labor experience at all?
5  A  Not directly with labor unions, no.
6  Q  Okay. When you say not directly, of course, that.....
7  A  I worked with labor -- I mean, in -- I don't know what
8     you mean by labor. I guess labor in general.
9  Q  Well, a union. A union.
10 A  Yeah. No, certainly not.
11 Q  No union experience?
12 A  I was in once as a dental technician. Does that count?
13 Q  No.
14 A  I remember what they didn't do for me. How's that?
15 Q  Okay. So I'm just trying to figure out what you're
16    drawing on from your experience.
17 A  Yeah, I -- I have to trust our president's expertise
18    and knowledge of Pat O'Rourke's qualifications. She
19    chose him. It's her decision as appropriate according
20    to our -- you know, the college's president makes the
21    final decision on all things.
22 Q  Okay. If you had a concern about him, what would you
23    do?
24 A  I would let Edna know.
25 Q  Did she have an open door policy like that?

**Page 256**

1  A  To the HR, she would listen to me. Open door for Edna
2     was problematic. At the term, I don't mean that as an
3     insult to Dr. MacLean. She just was a very busy woman
4     and I didn't report directly to her, but I would have
5     gone to her had I a concern with Dr. O'Rourke
6  Q  And you feel that she would have listened to you?
7  A  Yes. She always did. You know, she may not always
8     agree with me, but she.....
9  Q  Sure.
10 A  I was often just an advisor, which is my role, but it
11    was.....
12 Q  You thought you could provide advice to her without
13    getting fired?
14 A  Oh, yes. Oh, yes. Oh, yes. If -- if that was the
15    case, you -- there was a lot of advice I could have
16    gotten -- she may not have liked over the years and I'm
17    still here, so trust me. I wasn't always the most
18    popular, what I said, so.....
19       MS. JOHNSON: Let's go off the record for a
20 minute. I want to.....
21       COURT REPORTER: We're off record. Time on the
22 camera is 3:49.
23       (Off record)
24       (On record)
25       COURT REPORTER: We're back on record. Time

**Page 257**

1  on the camera is 4:01:34.
2  Q  At any point when Bobbi Wade was asking for medical
3     leave in October, did you doubt the actual validity of
4     her medical problems?
5  A  No. I wasn't told what they were.
6  Q  Did at any time you think that she was faking a medical
7     in -- illness?
8  A  No.
9        MS. DUCEY: Objection to speculation.
10 A  I wouldn't have thought that. I just take it at face
11    value, personal leave noted, asking for appointment
12    dates, so we can give it extended leave status if we
13    needed to.
14 Q  To your knowledge, had Bobbi Wade ever been designated
15    as taking family medical leave while she was working at
16    Ilisagvik College?
17 A  I don't recall.
18 Q  How -- what would help you to recall?
19 A  If there's a leave slip that I don't remember, that
20    would be fine. I mean, prior -- you're tell -- prior
21    to the November -- I mean.....
22 Q  Yes.
23 A  Okay. I don't recall. I don't know.
24 Q  So what would you need.....
25 A  I see a lot of leaves.

### Page 262

| | | |
|---|---|---|
| 1 | A | Again, it would depend on the type of employee. |
| 2 | | Depends on the type of circumstance. |
| 3 | Q | Is there a basic minimum for faculty for credit hours? |
| 4 | | Is there an expectation that a faculty member will have |
| 5 | | a certain number of credit hours that they teach? |
| 6 | | MS. DUCEY: Objection to foundation. |
| 7 | A | Again, it would depend on the calendar -- the contract |
| 8 | | year. Each contract year is a little different. |
| 9 | Q | Okay. |
| 10 | A | I -- I don't remember if that would be it from year to |
| 11 | | year. |
| 12 | Q | Would I look at the contract to det- -- make that |
| 13 | | determination? |
| 14 | A | That would help, yes. |
| 15 | Q | Okay. So for example, if there were 12 hours that were |
| 16 | | required for a full-time professor..... |
| 17 | A | Uh-huh. |
| 18 | Q | .....if somebody came back from family medical leave |
| 19 | | would you expect that they would be given back 12 |
| 20 | | credit hours to teach? |
| 21 | A | Or some other type of project to maintain their -- you |
| 22 | | know, to be -- go back to work with, certainly. Some |
| 23 | | other kind of activity could be given to them as well |
| 24 | | without loss of benefits. |
| 25 | Q | Okay. So long as they're employed back at the college, |

### Page 263

| | | |
|---|---|---|
| 1 | | it wouldn't matter what they were doing as long as they |
| 2 | | got the same..... |
| 3 | A | No, it would have to be something similar to faculty |
| 4 | | type of activities. They could be advising students. |
| 5 | | They could be doing a lot of things, but, yes, course |
| 6 | | hours could be one of those things. Again, it would |
| 7 | | depend on the instruction office's needs; how the |
| 8 | | students are adjusting to the different instructors. |
| 9 | | There's a lot of factors there that -- that really |
| 10 | | would have to require the educational expertise and |
| 11 | | fairness of John Tuthill to make that decision on this |
| 12 | | case. |
| 13 | Q | Before we went on break, we were almost to the hearing. |
| 14 | A | Oh, I'm sorry. |
| 15 | Q | And I'm trying -- no, no. It's not your fault. I'm |
| 16 | | trying to sort of..... |
| 17 | A | That's right. You -- you decided to go on -- off |
| 18 | | record. |
| 19 | Q | .....work through this linearly. So we got to the |
| 20 | | appeal; the appeal had been reinstated by Edna. |
| 21 | A | Yes, ma'am. |
| 22 | Q | And the appeal went forward; O'Rourke had been |
| 23 | | appointed as the hearing officer. What happened next? |
| 24 | A | Then the hearing took place. |
| 25 | Q | Okay. What sort of involvement did you have in the |

### Page 264

| | | |
|---|---|---|
| 1 | | preparation for the hearing? |
| 2 | A | I contacted Pat O'Rourke and said, Dr. MacLean has |
| 3 | | requested that you perform the functions of the hearing |
| 4 | | officer according to our process and our policy. He |
| 5 | | says, okay. And we -- and then I -- he says -- I said, |
| 6 | | if you can work directly with Edna to find out what |
| 7 | | time table we're looking at in your schedule |
| 8 | | with -- get this -- so this can be resolved soon. And |
| 9 | | he sho- -- he says, okay, I'll give Edna a call and |
| 10 | | we'll work the details out and then I'll let you know |
| 11 | | what I need for the hearing. That's what he said to |
| 12 | | me, meaning materials or -- I say -- he says, can you |
| 13 | | arrange a room when I give you the date. And I said, |
| 14 | | certainly, I've got the room arranged. He says, will |
| 15 | | you be able to -- if you can get a tape recorder and |
| 16 | | tapes for that. I said, certainly, I'll be glad to do |
| 17 | | that and that's the extent of my involvement on that. |
| 18 | Q | Okay. Did you inform him who the grievant was? |
| 19 | A | Yes. |
| 20 | Q | Did he tell you whether or not he knew Bobbi Wade? |
| 21 | A | Yes. He told -- he says -- yeah, I knew -- he didn't |
| 22 | | even have to tell me that. I know just from years of |
| 23 | | experience with him and with Bobbi, they knew each |
| 24 | | other. But I don't know if it even came up in the |
| 25 | | discussion. |

### Page 265

| | | |
|---|---|---|
| 1 | Q | Have you worked with Patrick O'Rourke in the past? |
| 2 | A | Yes. Uh-huh. |
| 3 | Q | What sort of issues have you worked with him on? |
| 4 | A | Well, I really haven't worked with issues for HR |
| 5 | | specific things. He's just been a very great help with |
| 6 | | accreditation process. He's our accreditation expert |
| 7 | | when we were becoming accredited. He helped us prepare |
| 8 | | for the self-study for the five-year study. He still |
| 9 | | serves function of projects, special projects |
| 10 | | that -- and serves at the president's request -- comes |
| 11 | | up occasionally still to help out. He's here right now |
| 12 | | helping us with our accreditation renewal. So he stays |
| 13 | | very busy, supposedly retired, but he doesn't think he |
| 14 | | is. |
| 15 | Q | And did you work on any of those specifically with him? |
| 16 | A | Not me, specif- -- specifically. He was already in |
| 17 | | place and working on those kinds of things when I came |
| 18 | | to the college. He's been at the college for many |
| 19 | | years. Proceeds me even. There aren't too many of us |
| 20 | | left that do that. |
| 21 | Q | How did you become familiar with him? |
| 22 | A | Just he and I both love coffee and he'd come by and |
| 23 | | have coffee and we talk. And we're both Irish and I |
| 24 | | tease him because he's a lapsed Catholic and he laughs |
| 25 | | at me and I laugh at him and, I don't know, we just |