Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA
 3
 4   BOBBI J. WADE,
 5           Plaintiff,
 6      vs.
 7   ILISAGVIK COLLEGE, NORTH SLOPE
     BOROUGH, JOHN TUTHILL, individually,
 8   and PAMELA TAYLOR, individually,
 9           Defendants.
10   ─────────────────────────────────────
     Case No. A05-086 CV (TMB)              COPY
11
12
13
14
15              DEPOSITION OF DEBRA ENGLISH
16                 Taken April 24, 2007
                Commencing at 9:15 a.m.
17
             Volume I - Pages 1 - 402, inclusive
18
19
20              Taken by the Defendants
                          at
21                 Delaney Wiles, Inc.
           1007 West 3rd Avenue, Suite 400
22                 Anchorage, AK 99501
23
24
        Reported by: Valerie Martinez
25
```

Page 18

1  decision.
2  Q  And was that a decision where you thought
3  liquidated damages were appropriate?
4  A  I said I didn't read the decision. I just know
5  that they lost and it was a large dollar amount.
6  Q  What is the standard for imposing liquidated
7  damages under FMLA?
8  A  I've never been involved in that.
9  Q  So you don't know?
10 A  I don't know.
11 Q  Do you know what constitutes good faith compliance
12 under FMLA?
13 A  It's following the law. Insuring that you're
14 following the letter of the law.
15 Q  So any time the letter of the law isn't followed,
16 that's bad faith in your opinion?
17 A  If you're not following the law, you're not
18 following law.
19 Q  Do you see that there's a difference between a
20 simple mistake and bad faith under FMLA?
21 A  Yes, there is a difference.
22 Q  What is the difference?
23 A  A mistake is you didn't know or you -- basically,
24 it's a mistake. Bad faith is you knew the law and you
25 didn't apply the law.

Page 19

1  Q  Does a mistake include an attempt to ascertain the
2  law but some confusion about the law? Is that included
3  in your opinion within the rubric of mistake?
4  A  Can you repeat that question?
5  Q  Is it possible for one to be mistaken about the law
6  while one is trying to comply?
7  A  That's reasonable.
8  Q  And that wouldn't constitute bad faith; would it?
9  A  No.
10 Q  It wouldn't constitute intentional discrimination
11 either; would it?
12 A  I --
13     MR. VAN FLEIN: I am just going to object.
14 You are asking for a legal conclusion. It's up to the
15 trier of fact to determine what bad faith is going to
16 be, what good faith is going to be. It's not a question
17 within a scope of her expertise.
18     MS. DUCEY: I would love it if you would
19 comply with the rules on objections and state your
20 objection in a succinct fashion instead of a speech so
21 we don't have to waste time.
22     THE WITNESS: If it's a simple mistake --
23     MR. VAN FLEIN: Hold on. There's no question
24 pending.
25     MS. DUCEY: I didn't get an answer. Do you

Page 20

1  need it repeated?
2     THE WITNESS: Yeah.
3     MS. DUCEY: Could you repeat it, please?
4     (Last question read back.)
5  BY MS. DUCEY:
6  Q  So if one is attempting to comply with the law but
7  one makes a mistake in carrying that out, does that
8  constitute bad faith?
9  A  One mistake, no.
10 Q  What if one is confused about an area of the law
11 but one is trying to comply? Does that constitute bad
12 faith?
13 A  Not necessarily.
14 Q  And you don't know what the judicial definition of
15 bad faith is in a FMLA context; do you?
16 A  In the legal term, no.
17 Q  How much time have you personally spent in your
18 employment history receiving and evaluating leave
19 requests to determine if they qualify for FMLA?
20 A  I'm unable to give you that number.
21 Q  Have you spent any time actually doing that work?
22 A  I have -- my disability manager would do that. If
23 there's a problem or a question with a supervisor, I
24 would get involved and I might ask, Well, do you have
25 the medical certification? Here's the medical cert, it

Page 21

1  says "X". I would give advice based on my knowledge of
2  the law and application of the law.
3  Q  But you've actually had no time actually being the
4  person who receives the leave requests, evaluates them,
5  and makes either a final or a preliminary determination
6  about whether they qualified for FMLA; correct?
7  A  That's rather narrow. I've been actively involved
8  in cases at -- that have arisen out of FMLA. And so I
9  would be advising supervisors, You need to give this
10 employee notice. You need to request a certification.
11 This employee is entitled under the law to more than
12 what you've given. This is FMLA leave. This is a FMLA
13 situation. This is just an employee who is ill but it
14 doesn't qualify.
15 Q  But it's never been one of your job duties to
16 receive those leave requests and you, yourself, make
17 that determination?
18 A  That's at a lower level. If it's appealed or
19 there's questions, then it's bumped up the chain.
20 Q  What does "FMLA qualifying" mean?
21 A  Eligibility. It means whether or not a person has
22 worked there long enough to be able -- you have to work
23 a certain amount of time and able to -- in order to
24 apply for FMLA, you have to have a serious medical
25 condition for yourself or for a family member. So

### Page 38

1  were called Personnel Memorandums and they would number
2  them. It would be, like, Family and Medical Leave,
3  Personnel Memorandum Acts, and it would give policy
4  guidance to HR and to supervisors for what to do.
5      Generally, they would call us on the phone and
6  we would ask the questions, we would -- if we needed to
7  review our resources, we would do that. If we just
8  needed to give them the Certification of Health Care
9  Provider, we would do that. So a lot of it was verbal.
10 There was hard material and a lot verbal.
11 Q  Are you aware of a personnel memorandum when you
12 worked for the State that set out when and under what
13 circumstances an employee seeking leave should be given
14 notification of FMLA rights?
15 A  I would have to look at it. That was back in the
16 '90s.
17 Q  Those personnel memorandums, correct me if I am
18 wrong, came up as a result of questions and problems
19 that arose in managing HR; is that right?
20 A  Anytime you have a new law passed, especially when
21 the regulations are in the formative stages, you need to
22 give employees guidance. And there were questions, and
23 this provided guidance so that we were all operating and
24 implementing the law in the same manner.
25 Q  And until that guidance is given, an employee who

### Page 39

1  is responsible for these sorts of legal determinations
2  could make a mistake; right?
3  A  Well, I would assume they would seek legal
4  assistance if they were unsure.
5  Q  But it's possible even in good faith, even after
6  consulting a lawyer, they could make a mistake?
7  A  No one is perfect.
8  Q  And you would agree that's not bad faith; correct?
9  A  That alone, no.
10 Q  So I would be looking for a personnel memorandum
11 that came from who at the State?
12 A  The director of personnel put out the assistance,
13 the personnel memorandum.
14 Q  How about at the City? What would that document be
15 titled?
16 A  I would look in the policies and procedures of the
17 City. It talks about family and medical leave. Also
18 the training. And the tracking of family and medical
19 leave was under the records and benefits and payroll
20 section, so they may have additional information that
21 they gave supervisors.
22 Q  Do you know if they do?
23 A  I never needed to get it, so, no, I can't tell you.
24 Q  So, I got -- Mary, who I haven't introduced yet,
25 got this yesterday and it says, Muni of Anchorage

### Page 40

1  Personnel Rules. And is this different than what you're
2  referring to --
3  A  Yes.
4  Q  -- or is it the same document?
5  A  No. Those are the personnel rules that govern
6  the -- it's kind of the law for non-rep employees?
7  Q  So what you are referring to is something that is
8  actually different?
9  A  It's a policy and procedures manual. I know you
10 have one in your -- I have one in the packet for the
11 college. But it's a policy and procedures manual.
12 Q  So it would simply be entitled Municipality of
13 Anchorage Policy and Procedure Manual?
14 A  Yes.
15 Q  And then the training programs that you described
16 at the Muni involved training an employee on when and
17 under what circumstances --
18 A  Supervisors and managers.
19 Q  Supervisors and managers training. That's what
20 it's called?
21 A  No. It trains -- we have -- it's a week-long
22 supervisors and managers training session. Managers
23 went, supervisors went, executives went, and I believe
24 they also extended it to leaves.
25     It was to train the supervisors so when they get

### Page 41

1  the request for the employer -- the employee says, I
2  have a medical situation, I need to, you know, go get
3  this treatment, or I'm having a child, that the
4  supervisor, the leave, the manager, the exec knew how to
5  handle it.
6  Q  And were there written materials for that?
7  A  Yes. There's an entire training manual for it.
8  And that was one. There is several components in this
9  training program. There's a workers' comp component.
10 Q  Sure. Of course.
11 A  So, there's materials.
12 Q  And who would have those written materials now?
13 A  The training is coordinated through the Employee
14 Relations Division.
15 Q  Do you recall who gave that training when you
16 worked there?
17 A  I know that my disability management -- we had
18 different people for different sections. On the legal
19 section, Theresa Hillhouse would come in and give that.
20 Q  So let me ask about FMLA. Who gave that?
21 A  I know that Candice Munford, now called Candice
22 Sherwood (ph), she would give the family and medical
23 leave portion. And my staff rotated through that. So
24 it would have been Will Askren, Candice -- I can't
25 remember who else I had working. A number of people

Page 42

1  that worked in that area.
2  Q  Are those folks lawyers or are they part of your
3  staff?
4  A  They were part of my staff at the time.
5  Q  Do you know if they are still there?
6  A  Will Askren is still there. Candice Sherwood works
7  for risk management.
8  Q  Could you spell Will's last name for me?
9  A  A-s-k-r-e-n.
10 Q  Thank you. You brought a bunch of things in
11 response to our deposition notice; didn't you?
12 A  I brought material that I reviewed.
13     MS. DUCEY: Stacks and stacks.
14     I want those marked as exhibits. What we
15 normally do when somebody is asked to bring documents,
16 is the court reporter takes charge of them. She copies
17 them. She'll get you back the originals, but we retain
18 a set as an exhibit.
19     THE WITNESS: Okay.
20     MS. DUCEY: Is that all right?
21     THE WITNESS: That's fine. Can I take a
22 restroom break?
23     MS. DUCEY: You bet.
24     (Off the record.)
25     (Exhibits 123 through 129 marked.)

Page 43

1  BY MS. DUCEY:
2  Q  So, 128 and 129, are those documents that you
3  created yourself?
4  A  Yes.
5  Q  And why did you create those documents?
6  A  Because there was such a volume of paper and it's
7  easier for me to organize it with a time line and
8  identify: What's the leave issues; what's the
9  performance issues; what's the grievance issues; what's
10 the code issues.
11 Q  Now, in Exhibits 123 through 127, which are the
12 four notebooks, are those all documents that you
13 received from Ms. Johnson's office?
14 A  Yes.
15 Q  Are there any documents in there that you did not
16 receive from Ms. Johnson's office?
17 A  No.
18 Q  So when --
19 A  Well, there's my report; there's my bill; there's
20 my resume; and I think that's all that I -- oh, the
21 papers I gave to you about the Department of Labor. I
22 just pulled that up online. I have the Certification of
23 Health Care Provider, which I also pulled up online.
24 And I believe that's all that didn't come -- but, you
25 know, I think that's all.

Page 44

1  Q  The Certification of Health Care Provider, can you
2  put your hands on that?
3  A  Sure. Do you want me to pull it out?
4  Q  Yes. Thank you.
5     So just so that we know what we're talking
6  about, this is the U.S. Department of Labor
7  Certification of Health Care Provider Family Medical
8  Leave Act of 1993 and it was in Exhibit 125.
9     And let me just hand it back to you,
10 Ms. English. And tell me, is there anywhere on that
11 document that states when the employer either should or
12 is required to give that notice to an employee?
13 A  To give notice or to give the form?
14 Q  Either one.
15 A  Those are two different things. The law does not
16 require the employer to give this form. The employer
17 can grant the leave, grant FMLA leave, without the form.
18 It's their choice. That's one answer.
19 Q  So let me ask you the other question: Is there
20 anywhere on that form that says when notification of
21 FMLA rights has to be given or under what circumstances?
22 A  On this form? No.
23 Q  The employer can choose not to give that
24 notification; right?
25 A  They can choose not to give this form.

Page 45

1  Q  And they can choose not to give the notification --
2  right -- and just grant the leave --
3  A  Yes.
4  Q  -- and mark everything --
5  A  Yes. They can grant the leave without giving the
6  notification. They do have to -- if they grant the
7  leave, they do have to tell the employee their
8  responsibilities under the Act. If they grant the
9  leave.
10 Q  You can put that back. Thank you.
11    In your practice, are there certain professional
12 standards you rely on?
13 A  Yes.
14 Q  And what are those standards?
15 A  You represent your employer to the best of your
16 ability to ensure that you are protecting them, you are
17 applying the laws correctly, you are following the
18 processes and procedures.
19    In regard to FMLA, the practice in all the
20 organizations that I have worked for is that you provide
21 the employee -- if an employee comes to you and says, I
22 have a medical -- actually, overall standards?
23 Q  You maybe misunderstood what I was trying to
24 convey. Is there an outside standard that you rely on
25 in your employment in the HR field in order to

Page 98

1    So when she was sending new documents, sometimes
2    she would e-mail them and I would print them off,
3    sometimes they would courier them or mail them.
4    Q    Did you conduct any evaluation in this case about
5    what Ms. Wade did to comply with her affirmative duties
6    under 29CFR825.302?
7    A    Is that the...
8    Q    I think you still have that one, actually.
9    A    This is the employer's obligations?
10   Q    Yes.
11   A    And you are asking me the employee's obligations?
12   Q    Well, I think we established that there are
13   affirmative obligations of the employee in this
14   regulation.
15   A    In --
16        MR. VAN FLEIN: Objection. I don't think it
17   was established at all.
18        THE WITNESS: On October 3rd, there is a
19   disagreement.
20   BY MS. DUCEY:
21   Q    Well, is the answer "yes"?
22   A    State the question.
23   Q    Did you conduct an evaluation of whether Ms. Wade
24   complied with her affirmative obligations under
25   29CFR825.302?

Page 99

1    A    Yes.
2    Q    And what evaluation did that consist of?
3    A    She provided them the note from Dr. Church. It was
4    stale.
5    Q    "Stale" means what to you?
6    A    It means it was dated August 7th and she submitted
7    it sometime in December -- end of December or the 1st of
8    October. There's a disagreement between Wade, Tuthill,
9    and Taylor.
10   Q    At minimum, she had that notice for 47 days after
11   she received it -- right --
12   A    Yes.
13   Q    -- and she did nothing?
14   A    And I would consider that stale.
15   Q    And if you were the employer, you wouldn't accept
16   that note; would you?
17   A    No. I would ask for a new certification.
18   Q    And so just so that we're on track about that --
19   and what else did you do to determine if she had
20   complied with her affirmative obligations?
21   A    She notifies the employee she needs to take leave.
22   There's a disagreement whether -- from Tuthill's
23   testimony whether it was a leave for personal reasons or
24   for medical reasons.
25        On October 3rd, Tuthill writes back, e-mails

Page 100

1    Wade saying, confer again with your doctor in Tennessee
2    and the doctors here to see if you need to take leave.
3    That tells me that he saw the note from the Tennessee
4    doctor and he's directing her on the 3rd -- he's
5    recognizing that it's outdated and he is directing her
6    to go get a new doctor's note.
7    Q    That says what?
8    A    Let me find the e-mail.
9         "My understanding further is that you will
10        consult with your physicians here and in
11        Tennessee to determine if they feel that you
12        require immediate medical treatment, and that
13        depending on what they say, you may prepare a
14        medical leave request so that you may receive
15        any required treatment during this semester."
16   Q    And it's Exhibit 20. Exhibit 20 is the August 7th
17   note from Church; right?
18   A    Yes.
19   Q    And the employer was reasonable in disregarding
20   Ms. Church's statement -- Dr. Church's statement that
21   she return as soon as possible given the fact that that
22   notice was stale; correct?
23   A    I wouldn't disregard it. I would just say it's
24   stale. The facts are still there but it's stale.
25   Q    So you need to do something to show that there is

Page 101

1    still some as-soon-as-possible component to this;
2    correct?
3    A    Yes.
4    Q    And when Dr. Tuthill sent the October 3rd e-mail,
5    it asks specifically that she address whether the leave
6    needed to be taken now, during this semester; right?
7    A    Yes. And based on that, the employer is on notice
8    that it is not a vacation, that there is a need for
9    medical treatment. They have the Tennessee note that is
10   stale and they are directing her to get a new note that
11   either affirms or denies the need for the treatment.
12   Q    And let's be clear about that. He wanted
13   affirmance from a medical provider that immediate
14   medical treatment was required; is that correct? And
15   that was absolutely reasonable for him to do that;
16   wasn't it?
17   A    Yes. What he should have done was given the
18   Certification of Health Care Provider that had all the
19   questions that he needed answered in order to determine
20   if it was immediate.
21   Q    But if he didn't care about that and all he wanted
22   to know --
23   A    But he did care about that.
24   Q    If all he wanted to know was whether the need was
25   immediate or not, then he didn't need to give that

Page 118

1  wanted the second opinion, and her e-mail that says, I
2  don't think I have to give it to you, to me, it's like,
3  you're wrong there. And then it says, but I went to the
4  doctor.
5  Q   Did you consider the employee's motive in refusing
6  to give that information?
7  A   Well, the motive, basically from my perspective, if
8  they refuse to do it and the employer requires them to
9  do it to get the leave, then the employer can deny it.
10 Q   Well, circle back to abusive leave. Did you
11 consider, ma'am, that when she refused to give this
12 information, the reason she might be refusing is because
13 she knew there was no immediate need for treatment?
14 A   No.
15 Q   Why not?
16 A   I had never factored in that this employee is
17 abusing leave. There was no record that told me that,
18 there was no e-mails, there was no discipline, there was
19 nothing in the record that tells me, you know, I have
20 this set of facts. Nothing from any of the documents
21 that said she had been abusing leave and that had
22 confronted her with abusing leave.
23 Q   Exhibit 26 is the e-mail from Dr. Tuthill to
24 Ms. Wade and her response. I think you have that right
25 in front of you.

Page 119

1  A   Which one are you talking about? The date?
2  Q   Exhibit 26.
3  A   Exhibit 26, okay.
4  Q   This (indicating) is the one you have?
5  A   Yes.
6  Q   In the e-mail that Ms. Wade sent back to
7  Dr. Tuthill, she withdrew her request for leave;
8  correct?
9  A   Yes.
10 Q   And that's how you would read it; right?
11 A   I read it that she didn't want to -- she felt she
12 had the need. She felt she provided two doctors' notes
13 that supported that leave, but that she didn't want to
14 disrupt her students and so she was going to wait until
15 the holidays.
16 Q   So she withdrew her request and it was reasonable
17 for the employer to construe it that way; correct?
18 A   Yes.
19 Q   As of October 9th -- did you review the medical
20 records to determine if indeed there was a serious
21 health condition?
22 A   And by "medical records" you mean what?
23 Q   Ms. Wade's.
24 A   Ms. Wade's medical records?
25 Q   Yes.

Page 120

1  A   I didn't review any Certification of Health Care
2  Provider that told me whether or not she had a serious
3  medical condition.
4  Q   Did you review her medical records to determine if
5  the records would establish that she had a serious
6  health condition as of October 9th?
7  A   The only medical chart that I have is the 10/24
8  when she went back in to see Dr. Snyder.
9  Q   Is there any evidence in the chart note dated 10/24
10 that she had a serious health condition as defined under
11 FMLA?
12 A   This doesn't give me all the facts that would make
13 me reach that conclusion. Again, that -- if a serious
14 health condition is an issue, have the doctor complete
15 the form and identify which of the factors of a serious
16 health condition is covered in regard to that patient.
17 I am not qualified to look at a doctor's chart and make
18 that determination.
19 Q   You have no opinion about whether she had a serious
20 health condition as of October 9th?
21 A   Based on the two doctors' notes?
22 Q   Uh-huh.
23 A   I have knowledge that -- opinion that she had a
24 medical condition that may have qualified as a serious
25 health condition, but without the information from the

Page 121

1  physician stating what the issues were, what the
2  treatment was, whether she could work, whether she
3  couldn't work, that's not a determination.
4      You don't make a determination based on the
5  medical chart notes. You make it based on the
6  information that either you request or, I'm used to
7  using, that certification because it's filed out by the
8  doctor.
9  Q   Based on the information that Ms. Tuthill [sic] had
10 provided to the college, was there any evidence that she
11 indeed had a serious health condition on October 9th?
12 A   The information that she provided said she needed
13 medical treatment. I am unable to determine at that
14 point if it was a serious medical condition.
15 Q   As of October 9th, did you make any determination
16 about whether her leave could wait until the semester
17 ended?
18 A   No.
19 Q   And did you see any evidence in the record that was
20 not stale that demonstrated she could not wait until the
21 semester ended to take her leave?
22 A   Again, in regard to that note from the doctor --
23 from Dr. Snyder, I assumed that when it said, I agree
24 and recommend that she seek outside treatment, that she
25 was agreeing with the first. And based on that, I would

Page 126

1  before the leave is to begin of the employee's intent to
2  take leave except that if the date of treatment requires
3  the leave to begin in less than 30 days, the employee
4  shall provide such notice as is practicable. So, that's
5  the 30-day notice.
6  BY MS. DUCEY:
7  Q   But that doesn't speak to the issue of whether the
8  employer has a --
9  A   No.
10 Q   You would agree that on August 7th, 2003, Ms.
11 Wade's leave was foreseeable by her; wouldn't you?
12 A   Yes.
13 Q   And so she was required to give 30 days notice;
14 right?
15 A   Yes.
16 Q   Which she did not; did she?
17 A   No.
18 Q   Is there any evidence that on October 2nd her leave
19 could not have waited 30 days?
20 A   No.
21 Q   Did she provide a reasonable explanation in your
22 opinion for why she sat on the August 7th note until it
23 became stale?
24 A   In her testimony -- and I don't recall the pages of
25 the deposition or maybe I do -- it said that -- okay. I

Page 127

1  don't have it here. But I recall reading in her
2  deposition that she stated that she felt it was
3  important to come to -- the reason she didn't stay and
4  get the treatment before reporting to work is that she
5  wanted to get her -- develop her classes, get her
6  schedule organized, get the curriculum out, and get that
7  posted.
8      And that -- there was a belief that somebody
9  else couldn't set that up because that was what she was
10 hired to do and she was hired to teach it, but that she
11 could schedule her leave after she got the classes set
12 up and the classes up and running, that it would be less
13 disruptive for her students to do it that way.
14 Q   But notifying her supervisor, her employer, was
15 there a legitimate explanation for failing just to put
16 them on notice that, hey, here's what's coming down the
17 pike?
18 A   No.
19 Q   And did you find any evidence that she complied
20 with her obligation under 302(e) to try and schedule
21 leave in a manner not to disrupt operations that summer
22 while she was in Tennessee and had all of that time?
23 A   Again, that's between her doctor and herself. And
24 I don't know all the other factors that played in at the
25 time.

Page 128

1  Q   You read her deposition, though; didn't you?
2  A   Yes.
3  Q   And did you see any credible evidence that she made
4  any attempt to comply with her obligations under 302(e)?
5  A   I don't remember any.
6  Q   You didn't note any in your report; did you?
7  A   No.
8  Q   And did you see any evidence in September or
9  October that she made any effort to schedule her leave
10 in a manner not to disrupt the operations of the
11 employer?
12 A   She didn't make any notice to schedule the leave.
13 Q   And she also -- there's no evidence that she
14 attempted to contact health care providers to see if she
15 could take the leave later; right?
16 A   I don't believe there was any contact.
17 Q   There's no evidence in any of the documents that
18 you saw that she ever, specifically after August 7th,
19 went to any medical provider and said, here is
20 Dr. Tuthill's e-mail. It says:
21     "My understanding is you'll consult with your
22     physicians here in Tennessee to determine if
23     they feel you require immediate medical
24     treatment and depending on what they say, you
25     may prepare a leave request so that you can

Page 129

1      receive any required treatment during the
2      semester."
3      Right? No evidence that she did that?
4  A   No.
5  Q   Wouldn't be burdensome; would it?
6  A   I can't speak for that.
7  Q   In your opinion as an experienced human --
8  A   No.
9  Q   And it wouldn't be unduly intrusive either; would
10 it?
11 A   No.
12 Q   But she failed to do that; right?
13 A   She didn't. I have no documents that said she did
14 that.
15 Q   Any evidence that she made any attempt to contact
16 her physicians and say, gee, you know, could this wait
17 until Thanksgiving weekend back in August? Gee,
18 Dr. Church, I won't be back until Thanksgiving. Let's
19 set these appointments up now so that they'll be in
20 place when I come back at Thanksgiving. Any evidence of
21 that?
22 A   No.
23 Q   Wouldn't be unduly burdensome; would it?
24 A   No.
25 Q   Wouldn't be intrusive; would it?

Page 130

1  A  No.
2  Q  So on October 9th when she withdrew her request for
3  leave, at that point, does the statute state that the
4  employer has any additional obligation once she has
5  withdrawn her request for leave?
6     MR. VAN FLEIN: I am just going to object that
7  it mischaracterizes the e-mails of withdrawal of leave
8  request.
9  BY MS. DUCEY:
10 Q  We did establish that; right?
11 A  She said she didn't want to disrupt her students.
12 She said she felt that she had justification for the
13 leave and that it needed to happen, but she set her
14 needs aside for her students. That's what it says.
15 Q  So she withdrew her request; right?
16 A  It doesn't mean that -- the need didn't disappear.
17 She withdrew the request for that leave, but not that
18 the need didn't exist. The need still existed.
19 Q  And she agreed in her deposition she withdrew her
20 request; didn't she?
21 A  Yes.
22 Q  So after she withdraws her request for leave,
23 between that time and the time she reasserts it and
24 provides the thing that Dr. Tuthill has been asking for
25 all along, immediacy, does the employer have any

Page 131

1  additional obligation?
2  A  And you're referring to?
3  Q  Well, between October 9th and -- I'll withdraw
4  that, and let's restate the question.
5     Ms. Wade eventually provided a nonstale note
6  that still didn't address the issue, but did have
7  "urgent" in it; right?
8  A  This is the one after Dr. Snyder got the results
9  back from the areas that she tested --
10 Q  That she had been seen for in 2002 and did nothing
11 about. So finally on November 5th, 2003, there is --
12 it's Exhibit 32. There's a note from Dr. Snyder that
13 talks about -- addresses the time frame; correct?
14 A  What's the date?
15 Q  November 5th, 2003.
16 A  Yes. Wade needs follow-up in a somewhat urgent
17 time frame provided -- it was sent to Tuthill and
18 Taylor. But subsequent to that, she submitted other
19 leave requests requesting time off for treatment.
20 Q  And she never did what Dr. Tuthill asked her -- the
21 simple thing -- which was, get me something from a
22 medical provider that says your leave can't wait; right?
23 A  No, she didn't.
24 Q  She presented something that at least discussed the
25 time frame; correct?

Page 132

1  A  From Snyder. Hers does say --
2  Q  But not until November 5th; right?
3  A  No, because Wade still believes, based on her
4  e-mails, the August note and the Snyder note supported
5  her leave request.
6  Q  But it was her affirmative obligation to
7  demonstrate that.
8  A  The two parties did not agree.
9  Q  So she has withdrawn her leave request. And
10 between October 9th and November 5th, she provided no
11 affirmative evidence as required by 825.302(e) that her
12 leave either had to be scheduled or that she could
13 schedule it in a manner not to disrupt classroom
14 instruction; right?
15 A  Right.
16 Q  And does the statute place upon the employer in a
17 situation like this where the employee has withdrawn
18 their leave requests, they haven't done what the
19 employer asks, between that time and the time that the
20 employee comes up with the note that Dr. Snyder gave on
21 November 5th, does any statue under FMLA state that the
22 employer in this circumstance has some obligation to do
23 something more once the employee withdraws their request
24 and does not provide the documentation that the employer
25 says is necessary to approve the leave?

Page 133

1  A  The statute doesn't address that.
2  Q  So it was reasonable for the employer to wait until
3  they received that; right?
4  A  It was reasonable for the employer to assist Wade
5  in understanding --
6  Q  Couldn't you answer --
7  A  -- what they want.
8  Q  -- the question I asked? It was reasonable under
9  the statute for the employer to wait until and unless
10 the employee gave them the information they required?
11 A  That was an option, yes.
12    MS. DUCEY: So, do you want to take a little
13 break since we've been going for a little while?
14    MR. VAN FLEIN: How long do you intend to have
15 her for today?
16    MS. DUCEY: Without looking at my notes, it's
17 hard to say. Probably at least an hour more or perhaps
18 more. But I'm going to try and be as efficient as
19 possible, and if we take a short break, I can look at my
20 notes and see where I am.
21    MR. VAN FLEIN: Let's take a half hour.
22    MS. DUCEY: That's fine, yeah. It's 12:30
23 right now.
24    MR. VAN FLEIN: Do you want to come back at
25 1:00?

Page 166

1  back to a clause that you haven't even established is
2  either/or.
3       MR. VAN FLEIN: This is improper. You are
4  just arguing with this witness.
5       MS. DUCEY: She's the witness that --
6       MR. VAN FLEIN: I ask you to just go back to a
7  regular question/answer format.
8       MS. DUCEY: We are.
9       MR. VAN FLEIN: Enough arguing with her.
10      MS. DUCEY: We are.
11      MR. VAN FLEIN: If you don't like her answer,
12 that's fine.
13      MS. DUCEY: I know. She's on the ropes.
14 She's on the ropes. She can't really explain why she's
15 given -- she's changing her testimony after lunch with
16 Linda. She is, but that's all right. And you know it
17 as well as I do. You know the game that is being played
18 here.
19      MR. VAN FLEIN: I think she is answering your
20 question, you just don't like her answer. But if you
21 don't like it --
22      MS. DUCEY: She has not answered my question.
23      MR. VAN FLEIN: -- I don't think it helps by
24 asking it again and again. I would just prefer you ask
25 it and go on to another question.

Page 167

1  BY MS. DUCEY:
2  Q   Where does it say under the contract that the
3  employer's precluded -- when she asked for sick leave,
4  to ask the employee, please demonstrate to us that you
5  must take this leave now as opposed to the end of the
6  semester?
7  A   What contract are you referring to?
8  Q   Her own contract. Ms. Wade's contract. Where does
9  it say that?
10 A   The contract that you referenced shows they could
11 take ten days of sick leave or personal leave with the
12 concurrence.
13 Q   If it does not unduly interrupt the operations of
14 the college; right?
15 A   Right.
16 Q   It's a clear condition precedent; isn't it?
17 A   It's sick leave. I see sick leave and family
18 medical leave is not necessarily the same in all
19 situations.
20 Q   I want to just talk about the contract because you
21 want to separate them. So let's talk about the
22 contract. Where in the contract does it say the
23 employer may not ask the employee, why you got to go
24 now?
25 A   It doesn't address that in the employment contract.

Page 168

1  Q   It doesn't prohibit the employer from asking that;
2  does it?
3  A   Nor does the law.
4  Q   In fact, it permits the employer to deny the leave
5  if it in fact unduly disrupts; right?
6  A   Under that contract, it does.
7  Q   Is it your testimony that you didn't discuss your
8  testimony at all at lunch with Ms. Johnson?
9  A   I asked to look up a section where the employer was
10 responsible for being proactive in getting more
11 information from the employee was reasonable.
12 Q   So you in fact did discuss your testimony at lunch?
13 A   No. I just asked -- I told you previously that I
14 had that. I had seen it and I couldn't find it.
15 Q   What constitutes a discussion in your mind? You
16 said you didn't discuss your testimony at all. You
17 asked a question. Was it of Ms. Johnson?
18 A   Yes, because I thought that she had given me the
19 code provision. I had seen it.
20 Q   And did she answer your question at lunch?
21 A   She said that she thought she had given it to me.
22 Q   And did you discuss any other statutory or
23 regulatory sections?
24 A   I don't believe so.
25 Q   Did she show you any documents?

Page 169

1  A   No.
2  Q   On November 3rd, assuming Ms. Wade withdrew her
3  request for leave, did the employer have any obligation
4  to grant this leave on the 3rd?
5  A   She withdrew it on?
6  Q   The 9th of October.
7  A   The 9th, okay. The 6th of October.
8  Q   We're talking about Exhibit 30, which is her
9  November 3rd, '03 leave request.
10 A   Okay. She withdrew it on the 9th. What's the
11 Exhibit?
12 Q   30.
13 A   Okay. And your question?
14 Q   Was the employer required to grant this leave on
15 November 3rd?
16 A   Yes.
17 Q   Why?
18 A   They were on notice of a need for leave on October
19 3rd.
20 Q   Well, they didn't know why; right?
21 A   Well, she provided two medical certifications.
22 Q   Is there any evidence that she said, this is for
23 the same reason?
24 A   For treatment, tests, and evaluation by family
25 doctor.

Page 174

1  A   The law only requires --
2  Q   She did not do that; did she?
3  A   She didn't do it, but the law only requires her to
4  give 30 days notice of foreseeable leave.
5  Q   But if your interpretation is wrong and you have
6  not been able to point me to anyplace where it says to
7  the contrary, then the employer had no obligation on
8  October 9th to give her leave within 30 days; right?
9  A   If my interpretation is wrong.
10 Q   And if your interpretation is wrong, the employer
11 had no obligation on the 3rd to grant her leave;
12 correct?
13 A   If my interpretation is wrong, and I don't believe
14 it is.
15 Q   And you can't point me to anyplace in the statute
16 that says that those two are mutually exclusive. That
17 once you have 30 days notice, you get to take it.
18     Now, why is it on the 3rd that they've got to
19 grant the leave that same day, less than 24 hours? They
20 don't; do they?
21 A   No.
22 Q   Right. They have a couple days; right?
23 A   Yes.
24 Q   A reasonable amount of time; right?
25 A   Yes.

Page 175

1  Q   We don't know if Pam Taylor was working that day.
2  If she wasn't, she wouldn't have to sign it that day;
3  right?
4  A   Right.
5  Q   We don't know if Dean Tuthill was in town that day;
6  right?
7  A   I don't know.
8  Q   So, does the statute say what a reasonable amount
9  of time is to act on a request?
10 A   As soon as practicable.
11 Q   And they granted the request on the 5th; right?
12 A   Yes.
13 Q   And that was as soon as practical; wasn't it?
14 A   That was their determination, yes.
15 Q   In your opinion, was 48 hours later within the
16 reasonable time frame of as soon as practical?
17 A   Yes.
18 Q   It was; wasn't it?
19 A   Yes.
20 Q   This leave request on the 3rd, if your
21 interpretation is incorrect, is foreseeable leave
22 requesting it less than 30 days later; right?
23 A   State that again.
24 Q   If your interpretation of the statute is incorrect,
25 this request for leave is foreseeable leave, which seeks

Page 176

1  leave less than 30 days after it is sought; right?
2  A   Yes.
3  Q   Exhibit 31 is the leave request dated the 4th;
4  right?
5  A   Mine doesn't have -- it doesn't say 31 on it. It
6  says 200452 on the bottom.
7  Q   What I am referring to is a leave request dated
8  11/4/03 and signed by Ms. Wade.
9       MR. VAN FLEIN: Do you have Exhibit 31? It
10 should have a tag that says 31.
11      MS. DUCEY: Here we are.
12 BY MS. DUCEY:
13 Q   Exhibit 31 is her leave request dated 11/4; right?
14 A   Yes.
15 Q   And it's marked personal leave; right?
16 A   And extended medical leave.
17 Q   But we don't know who marked that; right?
18 A   You asked me if it was marked. It's marked
19 personal leave and extended medical leave.
20 Q   And it is foreseeable leave; correct?
21 A   I don't know that.
22 Q   You don't know whether this is foreseeable leave or
23 not?
24 A   I don't know if this is based on the doctor's
25 report or...

Page 177

1  Q   Does it say?
2  A   No.
3  Q   Just like Exhibit 30 doesn't say what it's based
4  on; does it?
5  A   I'm basing this one back to the other one.
6  Q   But it doesn't say what it's based on; does it?
7  A   No.
8  Q   Why did Ms. Wade submit these two leave requests,
9  one of the 3rd and one on the 4th?
10 A   Well, it looks like she's changed dates.
11 Q   Do you know why?
12 A   No.
13 Q   Did you interview her?
14 A   Did I interview her?
15 Q   Yes.
16 A   No.
17 Q   Do you know why she changed the dates?
18 A   I answered that.
19 Q   Well, I asked you why the dates that the leave
20 request was signed. Do you know why she changed the
21 days she was seeking leave?
22 A   No.
23 Q   They increased; didn't they?
24 A   Yes.
25 Q   Do you know why?

Page 182

1  in Anchorage and said, hey, do you do a Mohs procedure
2  because I need one; is there?
3  A  Dr. Snyder told her they weren't done in Alaska.
4  Q  Well, Dr. Snyder doesn't remember saying that;
5  right?  But nevertheless, the record is completely
6  devoid of any effort of Ms. Wade to call someplace in
7  Seattle; right?  People go to Seattle all the time;
8  don't they?
9  A  Most doctors refer patients.
10 Q  People elect to pick up the phone and call a doctor
11 in Seattle.  You're certainly aware of that; aren't you?
12 A  If I have ever needed a doctor, I get a referral.
13 Q  But not everybody does that; do they?
14 A  I don't know what everybody does.
15 Q  Well, she made no attempt to ask Dr. Snyder for a
16 referral to Seattle; did she?
17 A  I don't know that.
18 Q  Is there any evidence in the record she did that?
19 A  I don't know.
20 Q  Did you look?
21 A  I didn't get the doctor's report.  I got the note
22 that said she needs to be referred.  I got the doctor's
23 note when -- on the one where Snyder said her leave was
24 cancelled.
25 Q  You read Ms. Wade's deposition; didn't you?

Page 183

1  A  Yes, several.
2  Q  She said she did nothing; didn't she?
3  A  I would have to go back and refresh myself.
4  Q  Did you include that in your report?
5  A  Include what?
6  Q  Did you include an evaluation of whether Ms. Wade
7  made any attempt to schedule her leave in a manner that
8  wouldn't unduly disrupt the employer operation by
9  seeking treatment someplace besides 4,000 miles away?
10 A  No.  She wanted treatment by her family doctor.
11 Q  So you would agree that she made no attempt to
12 schedule the leave in a manner that would be least
13 disruptive to the employer because she wanted to go
14 4,000 miles away; correct?
15 A  I would state that she wanted to go see her doctor
16 in Tennessee.
17 Q  And that was the most disruptive to employer
18 operations; wasn't it?
19 A  I don't know that.
20 Q  Well, would you agree with me that 11 days plus
21 Thanksgiving vacation -- so, virtually, the entire
22 Module C course that we -- that you also opined about
23 would be the most disruptive?
24 A  That is, if she is gone for the entire course, that
25 would be difficult to cover.

Page 184

1  Q  Or 40 percent of the course?  That would be most
2  disruptive; wouldn't it?
3  A  That would be disruptive.
4  Q  And if she could come down to Anchorage and in a
5  day go back, that would be minimally disruptive;
6  wouldn't it?
7  A  Yes.
8  Q  Schedule the leave, come down, have it re-excised,
9  get back on a plane to Barrow.  Least disruptive; right?
10 A  A choice the employee makes on the doctor she
11 wants, but it would be least disruptive.
12 Q  Was the employer required on November 4th to grant
13 this leave that day?
14 A  No.
15 Q  Did it cause you any concern that the number of
16 days went up from six days to eleven in a one-day
17 period?
18 A  I wondered if that was regarding scheduling, but
19 there wasn't any information for me.
20 Q  Did you ask for any information so that you could
21 make a determination of why the leave went from six days
22 to eleven?
23 A  No.
24 Q  It did tag in with Thanksgiving, though; didn't it?
25 A  It ended -- yes.  She returned after the

Page 185

1  Thanksgiving holiday.
2  Q  On November 5th at 8:57, Exhibit 32 was faxed and
3  finally provided some medical information that
4  Dr. Tuthill had sought since October 2nd, and the leave
5  was approved that day; right?
6  A  The letter?
7  Q  Yeah.  The leave was approved the same day?
8  A  Yes.
9  Q  And Ms. Wade didn't have to come back and say, gee,
10 I don't understand what you're asking me; did she?
11 A  No.
12 Q  She knew because she was able to provide this note;
13 correct?
14 A  Correct.
15 Q  So, there couldn't have been any misunderstanding
16 back in October 9th about what she needed to do; could
17 there?
18 A  I don't have an answer for that.  This one is
19 clear, "occur in a somewhat urgent time frame."
20 Q  Ma'am, is there anything in the record to indicate
21 that she had to get some special explanation from
22 somebody about what they wanted in order to comply with
23 Dr. Tuthill's request, please let us know?
24 A  She felt she met it.  He didn't feel she did in the
25 previous ones.  This one, he felt she met and she felt

Page 190

1  The first on the 3rd, and the second on the 4th, the
2  most generous leave request; correct?
3  A  Yes.
4  Q  Is that evidence of bad faith or good faith?
5  A  It's good faith.
6  Q  So, as soon as she provided that note that talked
7  about the temporal component, the time element, he in
8  good faith gave her the most generous leave request;
9  correct?
10 A  Which was the last one, yes.
11 Q  Is that evidence that supports a claim of
12 retaliation?
13 A  No.
14 Q  Or discrimination?
15 A  No.
16 Q  Or interference with an employee's FMLA rights?
17 A  By approving leave?
18 Q  The most generous leave request within 48 hour --
19 within 24 hours of receiving the information you had
20 been seeking since October?
21 A  He denied all the previous ones. He approved the
22 last one.
23 Q  Is that fact, the fact that he gave her the most
24 generous leave request within 24 hours of getting the
25 information he asked for, evidence of discrimination?

Page 191

1  A  No.
2  Q  What damages did Ms. Wade suffer from not
3  designating her leave ultimately as FMLA leave?
4  A  It's an employer's obligation to designate the
5  leave as FMLA.
6  Q  That's not what I asked you, ma'am. What damages
7  did she suffer? Damages as a result of not designating
8  her leave as FMLA?
9  A  And I'm stating that it's not her responsibility --
10 I will answer your question, but I don't want to be
11 misquoted. It's not the employee's responsibility to
12 invoke FMLA. It's the employer's.
13    In regard to the damages --
14 Q  Ma'am, that's not what I'm asking. Let's assume,
15 for purposes of argument, the employer did everything
16 wrong. Everything. It's all bad faith. What damages
17 did Ms. Wade suffer? Damages as a result of the failure
18 to designate her leave as FMLA?
19 A  They didn't reinstate her to the same or equivalent
20 position when she returned from her family medical
21 leave.
22 Q  Let's pick that apart a little. I am going to come
23 back to that.
24    Let's talk about she's alleged a FMLA
25 interference claim. What does that mean to you?

Page 192

1  A  She requested leave on October 3rd. She asked for
2  leave that would be potentially covered under family and
3  medical leave. She was denied that. She submitted
4  multiple requests. She submitted a total of two
5  doctors' statements, one which was dated, one which
6  reaffirmed the dated one of the need.
7  Q  I wish you would answer my question. What
8  damages -- monetary damages did Ms. Wade suffer as a
9  result of failure to designate her leave immediately, as
10 you claim, FMLA leave?
11 A  Her treatment was later. If they had approved it
12 on October 3rd, she would have taken it November 3rd
13 rather than November 12th.
14 Q  Do you know if it cost her any money at all?
15 A  For what?
16 Q  Ma'am, she is looking for money damages. That's
17 what the statute requires. That's what the statute
18 permits. What money damages did she suffer as a result?
19 Are you aware of any?
20 A  On that end, no.
21 Q  So as far as you know, it's zero?
22 A  For prior to her reinstatement? I don't know of
23 any damages.
24 Q  On the retaliation claim, what money damages did
25 she sustain?

Page 193

1  A  Prior to her reinstatement?
2  Q  At any time, what monetary damages did she sustain
3  as a result of the alleged retaliation?
4  A  She wasn't reinstated to the same position that she
5  had. The same or equivalent. She lost her wages.
6  Q  And when you say that she wasn't reinstated, you're
7  talking about she wasn't given those Business C Module
8  classes to teach?
9  A  No. She wasn't reinstated to the same or
10 equivalent position. When she left, she had twelve
11 credits on her regular contract and she had three added
12 duty. Those added duty, they took away. And the added
13 duty contract added additional pay in addition to her
14 standard pay.
15 Q  So those three credits were worth $1500 a semester;
16 is that right?
17 A  I believe that's what it was.
18 Q  So we're talking about $4500. Anything else she
19 suffered in terms of monetary damages as a result of the
20 failure to reinstate her?
21 A  No, that's the reinstatement part.
22 Q  What money damages did she sustain as a result of
23 the retaliation?
24 A  Are you saying in regard to when they didn't renew
25 her contract?

Page 194

1  Q  Yes.
2  A  Well, her nonrenewal -- her pay ceased. She didn't
3  have a job. She no longer was contributing to her PERS.
4  She didn't have health insurance. I am sure there is a
5  variety of other things, but I am not the person that
6  dealt with those issues.
7  Q  You said in your report -- correct me if I am
8  wrong -- that on the reinstatement claim, simply paying
9  her the $4500, the difference in her pay, would have
10 satisfied the employer's obligation; is that true?
11 A  If they couldn't give her the classes back.
12 Q  That would have satisfied the employer obligation;
13 correct?
14 A  Yeah. If they couldn't give her her classes back
15 or they couldn't reassign her to other classes that
16 would make up the same caseload, they could give her the
17 pay. And then while her class load may be less, the pay
18 that she had when she started in the pay that she had
19 when she returned would have been equivalent.
20 Q  Now, one of those classes was below the
21 enrollment that would have warranted continuing with the
22 class; correct?
23 A  The ones that they -- the added-duty contract, she
24 had actually performed those. What they were -- she had
25 actually taught those classes. As I understand it, what

Page 195

1  they took away was the classes that were in the twelve
2  standard credits.
3  Q  On what did you make the determination?
4  A  That was a little difficult. That was, the classes
5  were a little difficult to sort out, so -- but she said
6  she had already taught the added-duty classes that were
7  listed in the added-duty contract and that what they
8  took away was the core classes that she was supposed to
9  teach, the twelve. When you're hired in, you have to
10 teach 12 credits. And then if you're given more, you're
11 paid added duty.
12 Q  That was her claim. What documentation was there
13 to support that claim?
14 A  It says, "Bobbi taught two credits less than normal
15 schedule, twelve credits." So the twelve credits were
16 the standard credits.
17 Q  Why don't you just pull out those documents you are
18 referring to.
19 A  So what they struck here was Business English
20 Module A, which she had taught. And Filing and
21 Recordkeeping, which she had taught.
22    (Cell phone ringing.)
23    THE WITNESS: I'm sorry -- I will turn that
24 off.
25

Page 196

1  BY MS. DUCEY:
2  Q  But you said that Module C were part of her normal
3  teaching duties; correct? Part of her normal twelve
4  hours?
5  A  No. I said she has twelve classes -- twelve
6  credits and then she had added-duty contracts. And the
7  way I understood it was she had -- she had already
8  taught the added-duty classes. And what they reduced --
9     (Cell phone ringing.)
10    THE WITNESS: I'm sorry -- I thought I turned
11 it off. What they reduced was the standard classes.
12 BY MS. DUCEY:
13 Q  So your understanding is that Module C of Business
14 Math and Business English were part of her standard
15 teaching load; correct?
16 A  Yes.
17 Q  But she got her regular salary; didn't she?
18 A  She got her regular salary, but they had overpaid.
19 They said that when they took the two credits away
20 because she was on leave, that she had been overpaid
21 because she really didn't have twelve credits now. She
22 only had ten credits.
23 Q  And where does it say that on this document?
24 A  Where they scratched out -- and this was my --
25 because I did -- this was not the very easy part. They

Page 197

1  scratched out the payment for this Business English,
2  Module A, Filing and Recordkeeping.
3     So those where classes that she had actually
4  taught, and they -- when they put her back, they took
5  away the Module C classes and didn't pay her for those.
6  Q  So, was Business Math Module C a regular teaching
7  class or was it added duties in your opinion?
8  A  That was from -- in my opinion, that was the
9  regular duties.
10 Q  Same question for Business English C. That was a
11 regular duty; is that right?
12 A  Yes.
13 Q  Dr. Tuthill made efforts to insure that what the
14 college was doing with respect to Ms. Wade's leave were
15 legally correct; didn't he?
16 A  He did contact counsel.
17 Q  He consulted with an outside attorney and that was
18 reasonable; wasn't it?
19 A  Yes.
20 Q  It was evidence of his good faith; wasn't it?
21 A  It was evidence of his attempt to understand the
22 law.
23 Q  Well, isn't that evidence of good faith?
24 A  Yes.
25 Q  Isn't that evidence that you are trying to comply

Page 198

1  with the law?
2  A  Yes.
3  Q  When you've consulted an attorney, have you ever
4  been accused of bad faith?
5  A  Possibly.
6  Q  But you would disagree with that; right?
7  A  Yes.
8  Q  And he was entitled to rely on Ms. McKay's advice;
9  wasn't he?
10 A  Yes.
11 Q  There was no evidence of bad faith in doing that;
12 is there?
13 A  No.
14 Q  In fact, that's evidence of good faith; isn't it?
15 A  Yes.
16 Q  And when you've disagreed with your counsel and not
17 followed their advice, in your opinion, is that evidence
18 of bad faith?
19 A  No.
20 Q  And he followed up with Ms. Wade after he consulted
21 with Ms. McKay and sent her the October 9th request for
22 medical verification; correct?
23 A  I think he sent it to her on October 3rd after he
24 had spoken with McKay.
25 Q  And then he sent another request on the 9th;

Page 199

1  correct?
2  A  Yes.
3  Q  And he didn't want her leave delayed; did he?
4  A  He didn't want her taking leave.
5  Q  Well, he didn't want her leave delayed as long as
6  she established that it was necessary before the end of
7  the semester because on October 9th he asked for the
8  medical verification, the notification, as soon as
9  possible and by fax; correct?
10 A  Yes.
11 Q  Is that evidence of bad faith?
12 A  It's evidence that he is trying to gain enough
13 information to determine if it's medical leave.
14 Q  Is the college to blame if the attorney gives
15 incomplete or inaccurate advice?
16 A  I don't know how to answer that.
17 Q  Well, you said that the college was entitled to
18 rely on the attorney's advice; right?
19 A  They are the ones making the decisions. You get
20 your advice from your attorneys, but you're ultimately
21 responsible for your actions.
22 Q  Well, if the attorney gives incomplete or incorrect
23 advice, does that show evidence of good faith on the
24 part of the college or bad faith?
25 A  It shows that maybe you don't have a very good

Page 200

1  attorney.
2  Q  Well, is that evidence of bad faith?
3  A  No.
4  Q  Does it support a finding of intentional
5  retaliation if the college consults with outside counsel
6  to try and determine what their obligations are under
7  the law and attempts within their means to carry out
8  that advice?
9  A  And if it's wrong?  Is that what you're saying?
10 Q  Is that evidence of intentional retaliation?
11 A  No.
12 Q  When you gave -- strike that.  In all of your
13 employment history, you've dealt with a lot of
14 collective bargaining agreements; correct?
15 A  Correct.
16 Q  Almost all of them have grievance procedures;
17 right?
18 A  Yes.
19 Q  And the Muni personnel policy has a grievance
20 procedure; right?
21 A  Yes.
22 Q  And you understand that -- you would agree with me
23 that the rights that accrue to both sides in the
24 grievance procedure are stated in the contract; correct?
25 A  Yes.

Page 201

1  Q  And the employee doesn't normally have any greater
2  rights that are stated in the contract with respect to a
3  grievance; right?
4  A  They have rights outside the contract.
5  Q  Well, what rights are you referring to?
6  A  Human rights, EEOC.
7  Q  But in terms of the grievance process -- in terms
8  of that process itself that's articulated in the
9  contract document, their rights are limited to what is
10 set out in the contract; correct?
11 A  Yes.
12 Q  And the employer can choose to make those rights
13 greater; right?
14 A  Yes.
15 Q  But they don't have to; do they?
16 A  No.
17 Q  And the failure to enlarge an employee's rights
18 under the grievance procedure is not evidence of bad
19 faith; is it?
20 A  No.
21 Q  And it's not evidence of any illegality; is it?
22 A  No.
23 Q  In grievance procedures -- tell me if your
24 understanding is the same as mine.  The purpose of a
25 grievance procedure is to attempt to internally resolve

Page 234

1    herself --
2    Q    Will you answer my question?
3    A    Well, I am.
4    Q    Where does it say --
5    A    The intent is it's fair and equitable, and if the
6    hearing officer --
7    Q    Where does it say that?
8    A    It is the policy of Ilisagvik College to insure
9    that employees are treated fairly and equitably on
10   matters affecting their employment. And this is in the
11   grievance procedure.
12       They crafted a grievance procedure to allow
13   employees to air complaints and grievances they had.
14   And it says that they will be treated fairly. To have
15   the hearing officer being in the discussion process with
16   a supervisor about nonrenewing or terminating Wade
17   doesn't -- it violates the intent of being fair for that
18   employee because that hearing officer was involved with
19   the supervisor in discussion.
20   Q    Well, ma'am, that's just the sort of things you
21   were involved with in Step 3 of the grievance procedure
22   when you reviewed Step 3 grievances as the mayor's
23   designee and made a determination on that as an insider
24   who had knowledge of these parties, who may have had
25   dealings with these parties; right?

Page 235

1    A    But I wasn't a hearing officer. I wasn't a hearing
2    officer. I was responding for the mayor. I wasn't a
3    hearing officer.
4    Q    You were making the determination on the appeal and
5    you were an insider being paid by the Municipality or
6    the State with knowledge of all of these characters,
7    including knowledge of their personnel records; right?
8    A    I wasn't the final step. The final step is the
9    hearing.
10   Q    Well, this wasn't the final step either; was it?
11   A    This was the final step. The hearing officer was
12   the final step.
13   Q    No, this was Step 3 of the grievance process;
14   correct? We established that.
15   A    That's the appeal. They are appealing the action.
16   Q    The next step is arbitration; isn't it? The next
17   step is arbitration with AAA; isn't it?
18   A    That's the final step. The final step in their
19   process was the hearing. Yes, in the Municipality's
20   procedures.
21   Q    I mean Ilisagvik's. The final step is arbitration;
22   isn't it, ma'am?
23   A    The executive vice president shall provide a final
24   written decision to the parties. That's the final
25   decision.

Page 236

1    Q    Yeah, just like step three of the Muni personnel
2    rules where you were the final determiner. Step 3 at
3    AMC330101:
4        "Within five working days of the written appeal
5        from the decision of the agency head, the mayor
6        or his designee shall review the matter and
7        respond in writing. Upon receipt of the
8        decision, the employer has five days to request
9        arbitration."
10       Just like Ilisagvik had a request for
11   arbitration; right? They did have an arbitration
12   clause; didn't they?
13   A    Ilisagvik?
14   Q    Yes.
15   A    Is it under a separate provision?
16   Q    Yeah, we will find it in a minute. Maybe at the
17   next break.
18       Assuming they had an arbitration provision, then
19   Step 3 was not the final determination; was it?
20   A    Well, I can't assume that if that's --
21   Q    Well, give me minute. You're the expert so I can
22   ask you a hypothetical question. Assuming there is an
23   arbitration provision, Step 3 wasn't the final step; was
24   it?
25   A    Assuming there was an arbitration provision?

Page 237

1    Q    Yes.
2    A    I found it.
3    Q    What are you looking at?
4    A    It's 20547.
5    Q    Thank you. So arbitration was the final step;
6    wasn't it?
7    A    I would like to read this.
8    Q    Okay.
9    A    Yes, she had 90 days in which to file a request for
10   arbitration.
11   Q    So there was no requirement for the Step -- there
12   was no finality to the Step 3 hearing -- let me say that
13   again. There was no finality at Step 3; correct?
14   A    She had an opportunity to appeal it.
15   Q    So there was no --
16   A    But this says it's final. Generally, that
17   provision in most cases would be affixed as the final
18   step in the process, but it's set out in this employee
19   manual as a separate provision --
20   Q    But it doesn't render it invalid; does it?
21   A    -- and I missed that.
22   Q    So there was no requirement for the hearing officer
23   to be a neutral outsider -- was there -- at Step 3?
24   A    There's no requirement.
25   Q    And it wouldn't be unfair given the fact that there

Page 238

1  is one more level of review that now is formal
2  arbitration set into the process; right?
3  A   The employee had another opportunity.
4  Q   So there was no requirement for Dr. O'Rourke to be
5  an outsider that was disinterested; correct?
6  A   No.
7  Q   I forgot to ask you one question about the
8  retaliation investigation, which you may have already
9  covered. But, as I understand it, when you're looking
10 to try and conclude the retaliation claim and make a
11 determination, if you have no corroboration, no
12 disinterested third party who can corroborate one
13 person's version of events versus the others, the proper
14 determination of that claim of retaliation for you would
15 be insufficient evidence to make a determination;
16 correct?
17 A   If I can't find that the employer's intent was
18 based on an illegal action. If I don't make that
19 determination.
20 Q   So in your report at page, it looks like -- well,
21 it's not paginated. It looks like it's page 7. Maybe 7
22 doesn't deal with retaliation. Is page 7, where it says
23 cause of action, retaliating, terminating, and
24 discriminating? Is that your discussion of that
25 section?

Page 239

1  A   Yes.
2  Q   And did you conclude that there was retaliation?
3  A   Yes.
4  Q   Did you conclude that there was discrimination
5  against Ms. Wade?
6  A   There was an age discrimination complaint raised.
7  Q   And did you make an evaluation of age
8  discrimination?
9  A   Yeah, that it was not substantiated.
10 Q   There was no basis to that at all; was there?
11 A   No.
12 Q   But Ms. Wade was convinced that she was
13 discriminated against because of her age; correct?
14 A   Because younger people were hired and dealt with --
15 hired into positions. They were younger than Ms. Wade,
16 but they didn't fall within the parameters of the law.
17 Q   So her claim of age discrimination was not
18 credible; correct?
19 A   Was not substantiated.
20 Q   Did you determine it was not credible?
21 A   I determined it wasn't substantiated.
22 Q   What's the difference between not credible and not
23 substantiated?
24 A   Her belief is that if anybody -- what I determined
25 was that from her perspective if they hired somebody

Page 240

1  that was younger than her, that was discrimination.
2  Q   And that's not a credible claim; is it?
3  A   No. That isn't -- not a misunderstanding of the
4  law, but that's not the law.
5  Q   So in that sense, her claim of age discrimination
6  was not credible; correct?
7  A   It was wrong.
8  Q   You could not credit it?
9  A   I don't think she was lying. That was her belief.
10 It was wrong.
11 Q   Well, you don't think she was lying but did you
12 consider whether she had any ill will towards the
13 college?
14 A   Oh, I think she was unhappy.
15 Q   That's not what I asked. Ill will towards the
16 college?
17 A   I don't know.
18 Q   You didn't make that determination?
19 A   No.
20 Q   Then how do you know whether she was not credible
21 on her age discrimination? In other words, motivated by
22 ill will or bias or malice or not?
23 A   Well, she viewed herself in a protected class and
24 she is in a protected class.
25 Q   That wasn't my question, ma'am. How did you

Page 241

1  determine that she -- when she made these claims that
2  she wasn't acting with malice or ill will?
3  A   I didn't look at that because it was not
4  substantiated in that regard.
5  Q   Why did you not look at that issue, whether she had
6  some motive?
7  A   It was apparent she was not happy. Did she want
8  the employer to make her whole? Absolutely. That's
9  what she wanted.
10 Q   When you conduct any sort of an investigation into
11 discrimination, retaliation, whistleblowing, age or race
12 discrimination, do you have to make some sort of
13 judgment about the credibility of the witnesses?
14 A   Yes.
15 Q   And then why did you not do that in Ms. Wade's
16 case?
17 A   She didn't -- I don't believe she understood the
18 law. She viewed it as, I'm older, they're younger.
19 She's not an attorney. She obviously is not in the HR
20 field. I don't believe that that was -- it wasn't
21 substantiated. Once I determined that, which didn't
22 take very long, I didn't look any further at it.
23 Q   Well, did you make an evaluation of Ms. Wade's
24 credibility in this case?
25 A   I found that --

Page 294

1  It didn't change.
2  Q  What is the evidence that Dr. Tuthill intentionally
3  discriminated against Ms. Wade?
4  A  Those standards existed for however long they
5  existed. When he came in, it was dealing with her on
6  medical leave. She was not an easy employee. She
7  wouldn't do what he said. She pushed to invoke her
8  family and medical leave rights, forced him to allow her
9  to have leave. He failed to reinstate her. She grieved
10 that he should have reinstated her.
11 Q  Anything else?
12 A  I think those are the keys.
13 Q  Did you evaluate the question of Ms. Taylor's
14 credibility?
15 A  I think Ms. Taylor was doing the best she could.
16 Q  You didn't answer my question. Did you evaluate
17 the issue of whether she was credible?
18 A  She was credible. She just wasn't competent.
19 Q  And did you make a determination that she acted
20 with an illegal motive?
21 A  I don't believe she did. I think she was
22 incompetent.
23 Q  So it's your opinion that she neither intentionally
24 discriminated against Ms. Wade or intentionally
25 retaliated against Ms. Wade?

Page 295

1  A  She didn't make the decision to nonrenew Wade or to
2  terminate Wade. She didn't have the authority in that.
3  She wasn't in that chain of command.
4  Q  Is there anybody else that you determined
5  intentionally discriminated or retaliated against
6  Ms. Wade other than the two defendants in this case,
7  Tuthill and Taylor? I'm talking about people, not
8  entities.
9  A  No.
10 Q  In your report, what opinions were you asked to
11 provide by Ms. Johnson?
12 A  I was asked to look at the family and medical leave
13 issue, whether or not the employer restrained the
14 employee from invoking it, whether or not when they --
15 when she returned whether or not they violated her
16 rights under the Family and Medical Leave Act, look at
17 discrimination and retaliation based on the nonrenewal
18 of her employment.
19 Q  And were there any opinions that you were
20 specifically asked not to give?
21 A  Sorry -- and the age.
22 Q  Any that you were asked not to give?
23 A  Initially, there were a couple other filings at the
24 onset. And I can't remember what they were, but --
25 Q  You mean filings with OSHA or the EEOC?

Page 296

1  A  No, in the list of -- in the complaint.
2  Q  Did you ask Ms. Johnson if she wanted opinions
3  about anything that she said no to besides what you've
4  mentioned?
5  A  I'm not clear on your question.
6  Q  Did you, for instance, identify potential
7  additional issues that she might want you to evaluate
8  but she said no?
9  A  No.
10 Q  Did you make any changes to this report?
11 A  I do a draft report, and the documents -- I did
12 most of my work in July of '06. And then other
13 information came in and I may have made additional
14 changes based on reviewing those documents.
15 Q  And where are the draft reports now?
16 A  I don't -- I just work off one and I edit as I go
17 along. I don't save them as separate drafts.
18 Q  Did you communicate the initial drafts to
19 Ms. Johnson?
20 A  I verbalized it with her. I verbalized, you know,
21 what my opinions were.
22 Q  Did she ask you to maintain draft reports?
23 A  No.
24 Q  Did she tell you not to?
25 A  No.

Page 297

1  Q  Is there a reason why you did not reduce your
2  report to writing when it was in draft before you
3  discussed it with her?
4  A  That's just the way I do it.
5  Q  Did she ask you not to?
6  A  No.
7  Q  How did you communicate the report to her?
8  A  Verbally.
9  Q  Other than the materials here, have you looked at
10 any other materials in coming to your opinions?
11 A  No.
12 Q  Did you ask to see any other materials that you
13 were told you could not see?
14 A  No.
15 Q  Did you review any notes or written materials that
16 were created by Ms. Johnson such as notes of interviews
17 or memos?
18 A  No.
19 Q  Are there any opinions that you will give that is
20 not contained in your written report?
21 A  No.
22 Q  However minor, any opinions that you will give that
23 are not contained in your report?
24 A  I have no new information.
25 Q  Is there any further review you have been asked to

Page 358

1  give any more opinions. But when Mr. Van Flein asked
2  you if she had been scrutinized differently, you
3  willingly said yes without reviewing a single document;
4  is that true?
5  A   She was treated --
6  Q   That's not what I asked you. Is it true that you
7  gave that opinion?
8      MR. VAN FLEIN: Hold on. I am going to object
9  here. You're now telling the witness she can't answer
10 questions and that she gave some oath that she wouldn't
11 respond to questions, and that's misleading and it's
12 improper and it's still just arguing with this witness.
13     MS. DUCEY: I would just like her to answer
14 the question.
15     MR. VAN FLEIN: But you're arguing with her,
16 though.
17 BY MS. DUCEY:
18 Q   You spent 80 hours reviewing this, you filled out a
19 report that didn't have any finding or evaluation of
20 being scrutinized differently, but you agree when
21 Mr. Van Flein asked you, without reviewing a single
22 document, you said, yes, she was treated differently; is
23 that true?
24 A   Yes.
25 Q   It is?

Page 359

1  A   Tuthill's behavior changed when she filed family
2  and medical leave.
3  Q   If the prior leave that she took in 2002 and 2001
4  was not FMLA leave, it wasn't improper to consider it;
5  was it?
6  A   Yes, if it has been approved. If it had been
7  approved and it was past issue.
8  Q   But if it was not FMLA leave --
9  A   If it was --
10 Q   -- there was nothing improper about considering
11 that; correct?
12 A   If the college had approved that leave, they can't
13 look back and say, I'm going to ding you for this leave
14 that you took.
15 Q   Well, they can take action against an employee who
16 abuses leave; right?
17 A   If they notify the employee, you're abusing leave
18 and these are -- you asked for leave here for medical,
19 you used it for vacation. They can deal with that
20 issue.
21 Q   But where does it say that in the contract? Where
22 in the personnel handbook?
23 A   That's how you treat an employee.
24 Q   But there's no contract term that requires it;
25 right?

Page 360

1  A   That's a customary practice of treatment of
2  employees.
3  Q   And there's nothing in FMLA that prohibits that
4  consideration?
5  A   There's nothing in FMLA that requires that
6  consideration.
7  Q   Would you answer my question? There is nothing in
8  the Family and Medical Leave Act that precludes an
9  employer from considering the employee's use of non-FMLA
10 leave that could be considered abusive; correct?
11     MR. VAN FLEIN: Objection. Misstates the law.
12     THE WITNESS: There is nothing in the law that
13 talks about considering anything other than the leave
14 that's been requested and whether or not that leave
15 would be qualifying under the law.
16 BY MS. DUCEY:
17 Q   And if the leave was never requested as FMLA, never
18 designated as FMLA, never talked about as FMLA, was
19 given to the employee, but looking back, the employer
20 says, gee, I wonder if there was a problem with that
21 leave, I wonder if that employee was abusing leave, FMLA
22 doesn't prohibit that; do they?
23 A   Good practice prohibits an employer from going back
24 and second-guessing the actions that they took and
25 penalizing an employee for an action they took long ago.

Page 361

1  Q   Could you answer my question? FMLA does not
2  prohibit that; does it?
3  A   No.
4  Q   And where is it written -- where is the Bible of
5  human resources that says that an employer cannot
6  consider that? Where is it written so that anybody who
7  was looking for human resource material would know?
8      MR. VAN FLEIN: You mean other than the actual
9  nonretaliation provision by Congress? Isn't that Bible
10 enough?
11 BY MS. DUCEY:
12 Q   Could you answer my question? Where is it written
13 that it's a standard practice that any human resource
14 person would know simply from reading some manual that
15 tells everybody what they need to know about human
16 resource law?
17 A   There --
18 Q   There isn't one; is there?
19 A   There isn't a manual that specifically states that.
20 Q   Thank you.
21     Now, the discrimination and retaliation
22 allegations were in fact investigated thoroughly and
23 they were litigated through a hearing process; weren't
24 they?
25 A   The grievance procedure? Is that what you're

91 (Pages 358 to 361)

Midnight Sun Court Reporters (907) 258-7100