IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| BOBBI WADE, | |
|---|---|
| Plaintiff, | |
| v. | |
| ILISAGVIK COLLEGE; NORTH SLOPE BOROUGH; JOHN TUTHILL, individually; and PAMELA TAYLOR, individually, | |
| Defendants. | Case No. A05-086 CV (JWS) |

## TRANSCRIPT OF GRIEVANCE HEARING

### June 24, 2004

#### Appearances

| | |
|---|---|
| **Hearing Officer** | **Patrick O'Rourke** |
| **Employee** | **Bobbi Wade** |
| **Counsel for Employee** | **Ted Stepovich (telephonic)** |
| **Employer** | **John Tuthill, Ilisagvik College** |
| **Counsel for Employer** | **Cheryl McKay** |





DATE -8-06 EX. 1
WITNESS McKay
METRO COURT REPORTING
(907) 276-3876

Page 1

**Mr. O'Rourke:** ........Charged as the hearing officer for what I believe is step three in the grievance of Bobbie Wade against Ilisagvik College. Present with us today is Bobbi Wade, John Tuthhill and Cheryl McKay representing John Tuthill and Ilisagvik College. And we have on the speaker phone.........who?

**Mr. Stepovich:** Ted Stepovich, S-t-e-p-o-v-i-c-h

**MR. O'ROURKE:** Thank you. I will be recording these proceedings here and these will be available to either party's if they have a need for them at a later time. I do have an agenda that I'd like to hand out but before I do, does anyone have any comments that they would like to make?

**Ms. Wade:** Well I would like to make a comment. Um, this meeting is supposed to be a meeting of my appeal, of my grievance, and your response to that grievance. In review of the grievance and this is step three of the grievance procedure. We've already been through step two which included John T.

**MR. O'ROURKE:** Yes, as I understand it your grievance was denied at step two and that you appealed it to step three.

**Ms. Wade:** Yes.

**MR. O'ROURKE:** And that you submitted your written materials and the administration has submitted written materials, both of which I have read, and this is the purpose of this meeting today is to hear the oral presentation of the grievance. Following that I will render a decision, in writing, within ten days of this hearing

**Ms. McKay:** I'd like to add just one thing, this is Cheryl McKay, step two was decided by John Vanhosan based only on the written materials and there is some question as to whether Ms. Wade declined to participate in an oral presentation at that time because of the issue of tape recording or not. Then the document that I have reviewed show that Ms. Wade appealed that to step three and the appeal is untimely and then she requested reconsideration from President McLain who granted the discretionary appeal for this step three in the interest of fairness decided to make this an impersonal testimony altogether.

**Mr. Stepovich:** This is Ted Stepovich. In speaking with Ms. Wade regarding this matter we did not anticipate evidence to be taken at this hearing. It was her understanding that this was going to be a meeting to talk about the decision that Mr. O'Rourke had come to concerning the prior information.

**MR. O'ROURKE:** I had not come to any decision based on the prior information. As I said, I have read the materials but according to the college's grievance procedure, the hearing is to hear the oral discussion of those materials and to allow me the opportunity to ask questions of the individual parties. So, I do want to make one clarification as I read it in the record. There seems to be some dispute as to what happened at the step two hearing. John Vanhoosen, who was the hearing officer for that particular one, apparently chose not to go ahead on the basis that Ms. Wade wanted to record the proceedings.

**Ms. Wade:** That's correct

**MR. O'ROURKE:** So, that's what advances it to this point.

**Ms. McKay:** I would also add that President McLain's letter of April 8th set forth what would occur at this step three meeting and that would include that each side would have approximately 20 minutes to make their presentation and introduce any additional argument or evidence. And that's in her letter of April 8th. And then the rest of it is the same as what the hearing officer just said; that he would have the opportunity to ask questions of either party.

**MR. O'ROURKE:** In any event, let me first of all clarify the agenda as I have presented it to parties here for Mr. Stepovich who presently doesn't have access to seeing it. (chuckling) We're in to what I would call the introductory remarks, right now I guess, which was then going to be followed by a presentation by Bobbi Wade and/or Mr. Stepovich at her choosing. I've suggested 20-30 minutes, then a presentation by the College Administration, Dr. John Tuthhill and/or Cheryl McKay, 20-30 minutes. After each I might have questions before proceeding on to the next and I might have questions at the end. Then, allowing 5-10 minutes for summary by both parties and then adjournment. So, that's how I intend to proceed.

**Ms. Wade:** Okay I have no prior notice that that would be.......

**MR. O'ROURKE:** Well I think that the nature of the College grievance policy at step three would suggest that the parties were going to meet and provide a presentation. This is the last internal step to the College.

**(unknown):** Yes.

**MR. O'ROURKE:** And so...in any event, for my introductory comments, I would like to make the following: First of all, I want to note, for the record, that I have worked with both parties to this grievance over the course of their years at Ilisagvik College and that I am not an employee of the College but an independent contractor. So, I guess, I now wish to ask each party to indicate whether or not they think my working relationship with either of them would cause me to be unable to render a fair and impartial decision to this grievance based upon the written materials submitted and the oral presentations submitted at this meeting.

**Ms. Wade:** I do.

**MR. O'ROURKE:** You think I will be unable to?

**Ms. Wade:** I think you will be able to give a fair and impartial...

**MR. O'ROURKE:** Okay, thank you.

**Ms. McKay:** And we have no objection to your participation as hearing officer.

**MR. O'ROURKE:** (Laughing)...Less than an endorsement

**Ms. McKay:** We have absolute faith in your ability to make a fair and impartial judgment

**Mr. Stepovich:** Hi, this is Ted Stepovich. I need an opportunity to speak with Ms. Wade.

**MR. O'ROURKE:** Fine, I'd be happy to pull the proceedings and the rest of us will step out of the room and let the two of you talk. Is that acceptable?

**Mr. Stepovich:** That will work.

**MR. O'ROURKE:** Thank you. One moment.

(Break)

**MR. O'ROURKE:** This is Pat O'Rourke again and we're back on the record. I was in the process of going over my introductory comments. Does anyone have any desired changes to the agenda?

**Ms. McKay:** No it's fine.

**MR. O'ROURKE:** Do you feel….

**Mr. Stepovich:** ...Um.

**MR. O'ROURKE:** Yes sir?

**Mr. Stepovich:** This is Ted Stepovich. As I understand it the next on the agenda as you've stated would be the next first statement and questioning...

**MR. O'ROURKE:** Yes.

**Mr. Stepovich:** ...that you would be doing the questioning or if you had any questions you would ask them after the statement.

**MR. O'ROURKE:** That's correct

**Mr. Stepovich:** Okay. Well I spoke with Ms. Wade and she has indicated that you stand on her statement as a written agreement that she is willing to answer questions that you may have regarding that (grievance/agreement).

**MR. O'ROURKE:** So she's waiving her right to make an oral presentation at this meeting?

**Ms. Wade:** Yes

**Mr. Stepovich:** Well...

**Ms. Wade:** Oh, excuse me...

**Mr. Stepovich:** Yes, as she states there.

**MR. O'ROURKE:** Okay.

EXHIBIT YY
Page 4 of 27

**Mr. Stepovich:** I think that she should…Ms. Wade, I think that you should explain in…there needs to be a brief explanation as to the position that she sees this matter as being in given the notification she has and I think she should put that on the record. Bobbi, do you agree with that?

**Ms. Wade:** Yes

**Mr. Stepovich:** Okay, so that's all I have to add.

**MR. O'ROURKE:** Let me finish my introductory comments first and then I'll give Ms. Wade an opportunity to do so. In any event, my role as hearing officer will be to determine whether or not any policies, rules, regulations and laws have been abridged based on the facts presented. Burden of proof then rests with the grievant to demonstrate violations to her rights and with the institution to demonstrate that its actions were in accordance with those policies, rules, regulations, and law. My intention is to allow the grievant to present her case without interruption and same thing with the administration. I do want to add that I'm not here to mediate this dispute and I presume that efforts have occurred at the informal level to already resolve it…..and nor am I a court. So, I do want to reiterate that this is the, um….nor am I an arbitrator (chuckle). I am a hearing officer and will attempt on the basis of the facts presented, both here and in the written statements, to render a fair and impartial judgment. With that, I guess, I'm ready to proceed if the other parties are.

**Ms. McKay:** Are we still in introductory statements or…

**MR. O'ROURKE:** Sure.

**Ms. McKay:** … introductory comments? (Chuckle)

**MR. O'ROURKE:** Sure.

**Ms. McKay:** …um, I don't know if you wanted Ms. Wade to go first or not. Did you say you wanted to…..

**MR. O'ROURKE:** Oh, I'm sorry, she was going to do a survey, a presentation of her case I think.

**Ms. Wade:** Okay, first of all, this meeting…

**MR. O'ROURKE:** Wait, excuse me. Did you have something introductory or not?

**Ms. McKay:** I do have an introductory statement to make not related to the merits of the grievance at all. I just wanted…this is Cheryl McKay (inaudible) sorry (inaudible) on speaker phone…I just wanted to stress that this is an informal hearing that is provided to Ms. Wade as a matter of Ilisagvik College policy. It is not a due process hearing and it is not a statutory hearing. So, you know, evidence rules do not apply except at the hearing officer's discretion and we have not been informed that and evidence rules would be in affect. And that this is an informal opportunity to just present each side or flush out each of the documents as much as possible. Relating to the documents, my request is that when the formal record of the hearing is prepared by the college-I noted that 7 of Ms. Wade's documents contain student identifying information including, social security numbers and grades for those students. So, I would ask that when the final record of this is

EXHIBIT  Y Y
Page  5  of  27

prepared by the college that those names and student identifying information be redacted. That information has been redacted from the college administration's documents and, Ted, if you would like me to provide you with a copy of the administration's exhibits, I'd be happy to do so.

**MR. O'ROURKE:** Mr. Stepovich?

**Mr. Stepovich:** That would be necessary, yes.

**Ms. McKay:** I'm sorry, that was yes?

**Mr. Stepovich:** Yes.

**Ms. McKay:** Okay, thanks. When I get back to Anchorage I will forward a copy to your office.

**Mr. Stepovich:** Thank you.

**MR. O'ROURKE:** Do you have any objections to the names and social security numbers of the students being redacted?

**Ms. Wade:** Of students, no.

**Ms. McKay:** And I just had one addition, final, I just want to say for the record that I was unaware that Ms. Wade was represented by counsel at this meeting. Otherwise, I would have forwarded those documents to you ahead of time.

**Mr. Stepovich:** Well, this is just for the record too, Ms. Wade asked me to come in. There couldn't have been any way that you would have known of me coming in until today.

**Ms. McKay:** Okay, thank you.

**MR. O'ROURKE:** Okay, with that, then, Bobbi I turn it over to you to make any statements that you'd care to.

**Ms. Wade:** Well, first of all, this meeting is not what I thought it would be and I have not prepared a presentation. I have already presented my grievance in a written document and that's where it (inaudible).

**MR. O'ROURKE:** That's it?

**Ms. Wade:** That's it.

**MR. O'ROURKE:** I'd be happy to allow the administration opportunity to present its statement.

(Intercom interruption.)

**Ms. McKay:** Okay, that was not my statement. (Chuckle) My name is Cheryl McKay, I represent the Administration of Ilisagvik College and Dr. Tuthhill is also here. I have also reviewed



Page 6

Ms. Wade's documents of her grievance and essentially Ms. Wade had an employment contract for 2003-2004, the academic year, as an Assistant Professor and the Administration chose not to renew her contract for 2004,-2005. That contract had a termination date. It was a one year contract and non-retention is not a dismissal from employment. It is not a termination of employment. It's not a deprivation of any contract or property rights, it's simply the expiration of an employment contract and the decision of the employer not to offer a contract for the subsequent year. Ilisagvik College faculty are not tenured. The policies state that there's no expectation of continued employment and even if a contract has been renewed in previous years that does not create any vested contract rights to a continuing contract for future years. Now, Ms. Wade has claimed that the non-renewal of her contract is because of unlawful age discrimination and that the decision not to renew her contract was retaliatory for her complaints made against other instructors and, to some extent, to Dean Tuthhill and that it is (inaudible) towards her. The Administration is presenting a grievance for non-retaining Ms. Wade and that those reasons do not satisfy the criteria. The Administration has compiled a set of documents, um, 35 documents, that are grouped in several areas that discuss Dean Tuthhill's reasons for recommending Ms. Wade was not retained. Those reasons are contained in the Administration's Exhibit 34. (inaudible) in several areas. The first is a large amount of student complaints received in the fall and spring of 2003 and 2004 that led to the administration's conclusion that Ms. Wade was ineffective in the classroom. Exhibit 29 emails, documenting student complaints and the Dean's efforts to remedy these problems that involved shifting class schedules and compressing the time that was scheduled for classes and assignments that was short of the time that was provided in the registration schedule and the published class schedule. Those emails showed that the students were complaining that Ms. Wade was not available to advise them. In the interest of the limited time here I will highlight documents received by Dean Tuthhill from Sonya Abu, who is the Student Retention Officer for Ilisagvik College that she received between the time period between October and December of 2003.

**MR. O'ROURKE:** Did you reference the exhibit number?

**Ms. McKay:** Ah, yep. That is the, ah, pages 7-9 and 10-11 of Exhibit 29. Those two memorandums from Sonya Abu summarize the individual complaints that are also contained in the documents. The October 29th memorandum centers on the arbitrary nature of the cancellation of classes. The students complained that Ms. Wade cancelled the class because she believed someone stole her book and (inaudible) other class cancellations without notice, that her interactions with students were causing the students to complain, that students who asked for extra help were refused in the classes, that the classes were organized in a way that made it very difficult to follow what the assignments were expected of them, and that several students were interested in what the consequences for turning in late homework were. Ms. Abu contacted Ms. Wade asking what the consequences for turning in late homework were and Ms. Wade's response was she asked to know who that student was and wouldn't answer what the homework question was until she knew who that student was. Ms. Abu took a look into this and reported back to Dean Tuthhill that there were no guidelines in place in the class syllabi or other materials provided to students that explained what the consequences for late homework turn in were in and that that decision of whether she would accept late homework or not depended on many factors, including who that student was. Now, Ms. Abu was very concerned about this as the Student Retention Officer because that position is meant to be a resource for students who need help in these classes and to prevent the discouragement of these students that leads to their dropping out. Confidentially is a very important part of that process. Students who feel that there identity is going to be compromised to there instructor have reason to fear that their grades might be impacted or they might be subject to retaliation for some reason. That is why that Student Retention Officer position is there, to work as a resource for these students and



resolve potential problems and complaints without the identity of the students being compromised. The following week, November 5, Sonya Abu again sent another memorandum to Dean of instructions compiling a number of complaints, that's pages 10-13 of Exhibit 29. Again students were contacting Sonya Abu about the homework issue and asking why homework would not be accepted after December 8th when the published class schedule that the instruction would continue and the semester ended on December 17th. They felt they were being penalized for missing those addition days. Students were complaining that they were not getting feedback on how they were progressing in course work, that the homework was compiled in such great lumps of time. In one particular class the homework was not due until the final exam day. So, the students had no way of knowing how they were progressing in the course work or what they could expect on their final exam. The Student Retention Officer's concerns, in this regard, is that provided her no leverage for encouraging class attendance by students when assignments aren't due until the final day of semester and that not providing feedback on course work does not provide a safety net to catch these students who don't understand the materials before the final exam. These concerns were presented to Dean Tuthhill, compiled them and (inaudible) contacting Ms. Wade to find out the answers to these questions when in December the grade fiasco surfaced, and that is contained in Exhibit 30. Dean Tuthhill provided a summary of this problem that all occurred over the end of the Fall Semester over the Holiday break. During mid-December it started coming to Dean Tuthhill's attention that students (telephone ringing)…um, this concerns the business… (Telephone ringing)….. (inaudible)

**Ms. Wade:** No, that's his phone.

**MR. O'ROURKE:** Are you online? (Telephone ringing)

**Mr. Stepovich:** Hello

**MR. O'ROURKE / Ms. McKay together**: Are you online?

**Mr. Stepovich:** I'm still here………

**MR. O'ROURKE:**…excuse me……

**Mr. Stepovich:** Hello?

**Ms. McKay:** I'm here. Sorry, I just broke my concentration. So, the grade fiasco involves Business Math and Business English, Business Math 105 and Business English 109. Those courses are taught in compressed sessions, of modules of compressed sessions, and Ms. Wade taught modules A and B for both of those classes. Different instructors taught modules C and D.

**Tuthhill:** 'C'

**Ms. McKay:** Oh, pardon me. I stand corrected, module C. And the intent of those classes is that the student passes a lower level of these modules before advancing to the more advanced modules B and C. The reason is to ensure these students understand the lower level course work before they progress to the higher, more advanced courses. Now, it came to everyone's attention through these that Ms. Wade turned the grades in to module B late, halfway through the module C course work had begun, so neither the students nor the faculty could know that these students were not eligible to enroll in the more advance classes because they had not satisfactorily completed the lower level course work. Now this occurred halfway through the module C lessons and there was a

real issue of fairness there that students who had already been enrolled in module C and had progressed halfway through the course work we're now finding out they were ineligible for that class. And halfway through this module would now be ineligible to complete that course work. The grades showed that 14 of these students were affected, 10 students in business math and 9 students in business English. So, as a result of all this research the Administration was forced to change failing grades for the B module classes to a W and to change the incomplete grades and the DF grades, the differed grades in which the student would be allowed to complete the course work at a later time. If those students had received a passing grade in the higher level course, in Module C, they were allowed to receive credit for that course even they had not......even though they lacked the prerequisites, even though they had not fulfilled the prerequisite to complete module B. So, this cause a huge problem between the Registrar's office and the Dean of Instruction's office and the same problem occurred for module A students who had not completed the course work for module A but were allowed to progress into module B, and that affected 2 students in business math A and 3 students in business English A. The Dean concluded that Ms. Wade should have administratively withdrawn those students at the beginning of the module B term but she had not. Also related in this email from...this email memorandum from Dean Tuthhill to Ms. Wade is that she had promised differed grades to 2 students (inaudible) advisor to business students who were enrolled in other instructor's classes was also contained.........in exhibit 30. 2 students were advised at the beginning of the fall semester that they could receive a differed grade, a grade of DF, at the end of that semester, even though they were enrolled in the other instructor's classes, they were not enrolled in Ms. Wade's classes. So, she was essentially promising these 2 students that even though they were enrolled in other instructor's classes they could receive a differed grade at the end of that semester. The Administration decided it was not fair to penalize these students so changed their deficient grades to an "I", to an Incomplete, and allowed them to make up the work. In researching this question Dean Tuthhill asked Ms. Wade to provide the names of students who had requested these differed grades. Ms. Wade provided the names of 2 of these students from business math and omitted 2 other student names, and 3 names for business English. Overall, the Dean of Instruction concluded that this grade fiasco was an exercise of very poor professional judgment on Ms. Wade's part, caused a great deal of problems for the Administration to change these grade systems, cause the Administration to waive any of its academic policies with regard to completing this work and it was very unfair to these students who received bad advice in the first place. Now, with regard to the students' third reason for non-retaining Ms. Wade is a very poor student success rate, Exhibit 31 of the Administration's documents. Ms. Wade's student success rate............the student success rate measures the percentage of students who successfully receive credit for course work, what percentage of the students enrolled in the class actually complete the course and receive credit for it. Ms. Wade's success rate range from a high of 73% in the Spring of 2002 to a low of 23% for the black board courses taught by Ms. Wade in the Fall of 2003. Now, 23% success rate is an alarming number. It means, you know, close to 75% of those students did not complete the course work and received failing or incomplete grades. Ms. Wade in her grievance points out that there are many reasons for students not to succeed. And there are many reasons for students not to succeed. One of those reasons is ineffective course teaching and there's a correlation between the student complaints received earlier and those success rates, receiving no feedback on the completed homework, compressed schedule, placing greater demands on students being able to complete that course work, the scheduling of the homework, and not being available for advising on these matters. Dean Tuthhill prepared a summary of reasons why he was recommending non-retention to President McLain and his summary of reasons in preparation for that meeting is contained in Exhibits 33 and 34. So, these all contribute to poor professional judgment on Ms. Wade's part. But, Dean Tuthill's determining factor, weighing all of these considerations, has to deal with the academic credentials of this institution and the academic credentials of its faculty. Now, recently the Ilisagvik College

attained its accreditation and is now accountable to be a crediting body of The Northwest Association. The Dean of instruction is trying to build a strong academic business program here at the college and these accreditation standards set the bar much higher. Exhibit 12 demonstrates that Ms. Wade's credentials include a Master of Science in secondary education from Troy State University and some doctorate level classes at Middle Tennessee State University. This is from your personnel file, Ms. Wade. I am unaware if you've completed any course work beyond there that's not reflected in your personnel file. So, I stand corrected if you have.

**Ms. Wade:** I (inaudible)

**Ms. McKay:** Okay. But, based on the information that had been presented to the Administration regarding the level of academic achievement, this is not the caliber of background that this Institution is entitled to strive for. This Dean is entitled to set the standards to fulfill the accreditation of standards. One of these professors that is mentioned in Ms. Wade's memorandum of grievance is Christopher Lowell. He is mentioned in the grievance document as a younger faculty member who had been hired to replace Ms. Wade, as she claims. Exhibit 4 in Dean Tuthhill's response at level 2 denies that Professor Lowell has been hired as a replacement. Professor Lowell's 61 years of age and has a PhD from UCLA...............

## (continued, Tape 1, Side 2)

**MR. O'ROURKE:** Listening to Cheryl McKay make the Administration's presentation.

**Ms. McKay:** And we were discussing one of the reasons supporting Dean Tuthhill's determination not to renew Ms. Wade's contract based on the standards that the Administration is setting for these instructors, with Professor Lowe, having his PhD from UCLA and other professors in these academic programs. The History professor, for example, has a PhD in History and the Science professor has a PhD in Natural Sciences from Yale. Ms. Wade does not have a academic background in these business.......core business academic classes that she's teaching except in relation to........not in relation to her Master's or her Doctorate classes. The Administrations determination that this type of academic background is insufficient is reasonable. The Administration is entitled to set the bar higher. Now, those are the Administration's reasons supporting the non-retention. Ms. Wade has raised the issue that these reasons are not the real reasons for her non-retention, that they are pretextural and that the real reasons are age discrimination retaliation and discrimination. So, I am obliged to rebut those (inaudible) Ms. Wade has the burden of persuasion ultimately on that point but we will present evidence that...Ms. Wade claims that an instructor named Amy Valenti has been hired to replace....this is not the case, Ms.Valenti is a temporary adjunct professor whose contract has expired and she does not work for Ilisagvik College currently. Ms. Valenti was the target of a grievance filed by Ms. Wade in December 2003 claiming that Ms. Valenti defamed her in comments to students and others. That grievance was not processed through the grievance procedure but was.......the parties agreed to an informal resolution and several meetings were held on that.........those documents reflect that. But, there's not causation link between that complaint, the December 2003 complaint against Amy Valenti and the Dean's action to not renew the contract. The Administration's exhibit 32 contains an E-mail from Dean Tuthhill to Ms. Wade after the Dean received a complaint from a student who had attempted to register for Business 109, one of Ms. Valenti's classes, and he told the Dean that Ms. Wade had been advising students not to enroll in Ms. Valenti's classes. That component of Ms. Wade grievance relates entirely to the interaction between Ms. Wade and Ms. Valenti and is not a reflection of the Administration's determination at all. Ms. Wade claims that this action is

defamatory toward her and, for the record, a defamatory claim involves a false statement which is published through a third person whether spoken or written….that has a……..

(Intercom Interruption)

**Ms. McKay:** Excuse…. (Chuckle)…….So, whether a false statement is negligently passed on to a third person that causes harm or injury to Ms. Wade's reputation. Ms. Wade claims that two E-mails against her are defamatory and I have included copies of those two E-mails from Dean Tuthhill to Bobbi Wade at the Administration's Exhibit 33. So, I've included those E-mails in our exhibits so we can see what we're talking about. The first E-mail that Ms. Wade describes is a January 15th E-mail addressing the poor student success rates from the Fall Semester. Ms. Wade claims that this is defamatory against her or somehow a reprimand. The second E-mail is from January 20th regarding his denial……Dean Tuthill's denial of Ms. Wade's request to teach an independent study course. Both of these E-mails were directed only to Ms. Wade. They were not copied to anybody else. There's no allegations that these E-mails were copied to anyone else. They are not titled as reprimands. There are no disciplinary sanctions imposed in these correspondence and they are not contained in her personnel file. They're just simply not defamatory at all. The remaining claim is that the purpose for this non-retention is based solely because of Ms. Wade's age. The Age Discrimination Employment Act and related statutes and regulations of the EEOC prohibit any action that's based on or because of a person's age and there's no evidence here that this decision is because of Ms. Wade's age. An employer can make a decision and can differentiate between employees or make decisions that affect employees so long as it's based on reasonable factors other than a person's age. We've already presented evidence the this determination was based on reasonable factors other than Ms. Wade's age and Exhibit 28 of the Administration's exhibits is a document that compiles the regular (inaudible) faculty for the Spring Semester. The faculty is not identified, their names have been redacted, but that information is available confidentially if it's necessary. But what it shows is that the ages of the regular faculty range from 28 to 70 and that 12 of the 14 regular faculty employed by the Ilisagvik College are over the age of 40, the age that is protected by the Age Discrimination Laws. That's 80%.......86% of the Administration's faculty are over age 40 and of those…..10 of those……..10 of those 14 faculty are over the age 50.

> **MR. O'ROURKE:** 10 of the 12?

> **Ms. McKay:** 10 of the 14.

> **MR. O'ROURKE:** 15…14 (clearing throat)

**Ms. McKay:** Now Ms. Wade has also claimed that because she is not receiving a contract for next year that she will not vest in the Public Employee's Retirement System, in PERS, and that the only reason that the Administration has decided not to renew her contract is to prevent her from vesting in PERS. This is also simply not true. Dean Tuthhill had previously discussed with Ms. Wade the possibility of her serving in the Adult Basic Education Program as an instructor and that position has been offered to her at Exhibit 34. Now, that position also would enable Ms. Wade to continue to participate in the PERS System and vest at the conclusion of her next year of service. So, there's absolutely no evidence that this decision to non-retain her was because of the Institution's reluctance to allow her to participate in PERS. And that's the conclusion of our primary presentation and I'll reserve remaining remarks for our summary.



**MR. O'ROURKE:** Thank you.  (inaudible) not question and answer but did you want to respond to any of that at all?

**Ms. Wade:** No.  Not at this time.

**MR. O'ROURKE:** Okay…..

**Ms. Wade:** I have responses to make but not at this time…….

**Mr. Stepovich:** I needed to ask a question…..

**MR. O'ROURKE:** Yes…please…..

**Mr. Stepovich:** Bobbi, did you receive copies of the exhibits prior to today?

**Ms. Wade:** Of these exhibits that she's reading?

**Mr. Stepovich:** Yeah.

**Ms. Wade:** No.

**Mr. Stepovich:** Okay. . .

**Ms. McKay:** Ted, I handed Ms. Wade a copy of our exhibits when we entered the room today for the hearing.  There was no pre-hearing exchange of documents.

**Mr. Stepovich:** Okay.  That's…..I just was curious about that……I didn't know one way or another.

**Ms. McKay:** Yeah, we had not arranged previous procedures that would allow for the exchange back and forth of documents.

**MR. O'ROURKE:** I received Ms. Wade's documents by my arrival here on Monday and received the Administration's today, just before lunch so it was my reading material for lunch. (Chuckle) But I have read…….

**Ms. McKay:** You're welcome (laughing)

**MR. O'ROURKE:** ……both sets of materials.  I did have a couple of questions that, I guess, based on both the written documents and the testimony that's been provided so far……..first of all Bobbi, were you aware of the reasons proffered here, this afternoon, for your non-retention…

**Ms. Wade:** No….

**MR. O'ROURKE:** …..for your non-renewal……

**Ms. Wade:** No, I was not.

**MR. O'ROURKE:** Oh, non-retention.  So, have they been offered to you before?

**Ms. Wade:** No.

**MR. O'ROURKE:** Okay. Um, could you tell me why they weren't…..

**Ms. McKay:** I can respond to that. I'm gonna analogize this to a non-retention of a……in the public school system…..

**MR. O'ROURKE:** Okay.

**Ms. McKay:** ….because that is a statutory proceeding and the Alaska statute says a public school teacher can be non-retained for any reason that is determined by the employer. That's a statutory right. There is no corresponding provision…..that…..and the statutes provide that the employer must provide the public school teacher with a statement of cause and a bill of particulars outlining what those reasons are. There's no corresponding provision under Ilisagvik College policy. The policies simply state that the contract is subject to expiration. The policies require the college to give notice to the faculty member by a certain date. That date was met here. The policies do not require the Administration to set out a bill of particulars or statement of reason at that time.

**MR. O'ROURKE:** Bobbi, was your contract for the period July 1, 2003 through June 30, 2004?

**Ms. Wade:** Yes it was.

**MR. O'ROURKE:** Were you aware that the contracts were one year contracts?

**Ms. Wade:** Yes.

**MR. O'ROURKE:** Do you allege that there was any abridgement in Ilisagvik policies in not offering you a new contract, and if so, which policies would you refer me to?

**Ms. Wade:** I would have to (inaudible) policies.

**MR. O'ROURKE:** 'Because I didn't read anything in your documents that suggested an abridgment of policies. I might have missed it.

**Ms. Wade:** I don't recall any, no.

**MR. O'ROURKE:** Okay. Given the fact that, I think the number was 10 of 14 faculty over the age of 40……..excuse me, 12, over the age of 40 and 10 over the age of 50, could you elaborate at all on why you feel then, you were being discriminated……

**Ms. Wade:** Because….

**MR. O'ROURKE:** …..against on the basis of age…..on the age issue

**Ms. Wade:** Because with another contract………had I fulfilled that contract I would have been vested and it would……..Ilisagvik would have had to (inaudible) to my entire (inaudible). . .



(Intercom interruption)

**MR. O'ROURKE:** Is it your intention to refill the position that Ms. Wade will take it?

**Tuthhill:** Yes.

**MR. O'ROURKE:** And would you pay benefits into the retirement system for that position?

**Mr. Mr. Tuthill:** Yes.

**Ms. Wade:** At the board meeting it was stressed that expenses to Ilisagvik had gone up over the last year due to retirements and age (inaudible) of (inaudible).

**MR. O'ROURKE:** And you're referring to a board meeting held........

**Ms. Wade:** It was on......in January.

**MR. O'ROURKE:** In January?

**Ms. Wade:** Yes. It was pointed out by one of the board members that expenses in benefits had gone up and it was due to retirements and age.

**MR. O'ROURKE:** Just to......point of clarification on my end because I attended a board meeting last two days, (chuckle) as you are aware...

**Ms. Wade:** Hm-hm

**MR. O'ROURKE:** ......and it was indicated that the cost of the retirement benefit that the college pays into the public employee retirement system for the state had double from, I forget, something like 5 point 'x' percent to 10 point some odd percent.

**Ms. Wade:** Hm-hm

**MR. O'ROURKE:** But I'm.......but you would be paying that on the new hire, in any event. Is that what I'm hearing you say?

**Mr. Tuthill:** Yes, that's correct.

**MR. O'ROURKE:** So, how would that save the institution money?

**Ms. Wade:** I don't know. It would have to be investigated.

**MR. O'ROURKE:** K

**Ms. McKay:** I'd also point.....actually my question (giggling) is that the cost of the retirement benefits just for the college that is doubled or is that the cost of retirement benefits for any employer participating in PERS?

**MR. O'ROURKE:** My understanding it's.....PERS is......



**Ms. McKay:** …'cause it's not……

**MR. O'ROURKE:** …major adjustment to the…. …

**Ms. McKay:** ….particular to the…..

**MR. O'ROURKE:** ….right.

**Ms. McKay:** …..so, it's a global change in the PERS system not particular to the college?

**MR. O'ROURKE:** As I understand it. Excuse me……just in terms of trying to capture the reasons for the non-retention, what I kind of have as a…..major reasons are a high number of student complaints, insufficient educational background for the courses being taught………….sorry I thought you said there were three. I'm trying to lump things, I realize.

**Ms. McKay:** I actually have five. If you wanted (inaudible) lumps (chuckle)

**MR. O'ROURKE:** (chuckle) Sure, would you give me the other three then.

**Ms. McKay:** I will lump for you. And I'd actually clarify the high number of student complaints is one of them. The failure to turn in grades in a timely manner which caused the grading fiasco at the end of the Fall Semester was the second major area. The third major area is the deficient student success rates in the classes taught, down to 23% in the Fall of 2003, which reflects the poor professional judgment in those areas. And I would (inaudible) your insufficient……you had turned your insufficient background for the courses being taught. It's actually the academic credentials don't meet the standard that is being set by the Administration to fulfill the accreditation standards. We're not resting on whatever academic courses Ms. Wade is taking (inaudible).

**MR. O'ROURKE:** High number of student complaints, academic credentials, failure to turn in grades that led to the grade fiasco, high number of incompletes and the (inaudible).

**Ms. McKay:** And the poor professional judgment in advising the students not to take Ms. Valenti's classes and requesting approval for the independent study class to be taught by her grand……..uh, to be taken by her granddaughter that are all contained in the written material.

**MR. O'ROURKE:** K. Bobbi, could you explain to me efforts that you took previously to resolve this with your supervisor?

**Ms. Wade:** It began in December and then it began again in January and I went to the Human Resource Director and she told me that I was being paranoid.

**MR. O'ROURKE:** But she wasn't your supervisor.

**Ms. Wade:** No, she wasn't my supervisor but, it was her place to set up the meeting with my supervisor because I was instructed that any complaints I had would come straight to her.

**MR. O'ROURKE:** Could you have set up a meeting directly with the Dean?

**Ms. Wade:** Uh, I probably could have but I'm the type of person who likes to do things by the way it's in the regulations.

**MR. O'ROURKE:** Dr. Tuthhill does….do you require that complaints go through the Human Resource Director before reaching you?

**Tuthhill:** No I do not.

**Ms. Wade:** In fact I went to her several times, in January, trying to get her to set up a meeting that this could be resolved.

**MR. O'ROURKE:** Could you tell me why you didn't try to set up a meeting yourself, just, I mean, you said you were the kind of person who…not quite sure.

**Ms. Wade:** Because she told me herself that any complaints I had would come to her.

**Ms. McKay:** I……..actually….I'm a little confused as to what we're talking about here. You asked what efforts……..

**MR. O'ROURKE:** Had been made to informally resolve the grievance.

**Ms. McKay:** The grievance wasn't filed until the end of Jan…….until after the notice of retention was filed so, so I think we're……..are we talking about the deficient performance issues as opposed to the non-retention (inaudible)?

**Ms. Wade:** A complaint was filed in December………and there was a hearing set up.

**MR. O'ROURKE:** But I am talking ah………I am talking about this grievance……

**Ms. McKay:** Okay.

**MR. O'ROURKE:** …which was…

**Ms. Wade:** This one?

**MR. O'ROURKE:** Yes…..

**Ms. McKay:** So this……

**Ms. Wade:** ………filed (inaudible)….

**MR. O'ROURKE:** …which was the one (inaudible)

**Ms. McKay:** So the notice of our retention was given on January 30th, I believe….let me check to make sure……….

**Ms. Wade:** Yes

**Ms. McKay:** ……..that's correct……

**MR. O'ROURKE:** Yes, I believe.....

**Ms. Wade:** Yes, hm-hm.

**Ms. McKay:** Okay.........okay, so we're talking about efforts after January 30th to resolve........

**MR. O'ROURKE:** Right...

**Ms. McKay:** .......the non.......the question of the (inaudible)

**MR. O'ROURKE:** Right.

**Ms. McKay:** Okay, thank you.

**MR. O'ROURKE:** There were no meetings?

**Ms. Wade:** No, none other than what the Human Resource director set up and then when we came to the meetings I was all prepared for the meeting and the CFO was directed to......directed to be the mediator of the meeting and he refused to conduct the meeting because I had a tape recorder......and I told him that if he would put it in writing that he refused me the right to use a tape recorder we would go ahead with the meeting and he could (inaudible) . . . and Dean Tuthill didn't show up at all.

**MR. O'ROURKE:** Did Dr. Tuthhill ever say anything to you about your age?

**Ms. Wade:** No.  But Pam Taylor did.

**MR. O'ROURKE:** Was she the one who carried out the non-retention?

**Ms. Wade:** No.

**MR. O'ROURKE:** In the case of Amy Underwood who I believe is your daughter?

**Ms. Wade:** She's my granddaughter.....yes

**MR. O'ROURKE:** Granddaughter, excuse me, I'm sorry.  You indicated in that you felt the Dean was, I forget what your term was...unfair or retaliatory in terms of denying your request for the independent study.........

**Ms. Wade:** Yes.......

**MR. O'ROURKE:** ......course for her, is that correct?

**Ms. Wade:** Yes.

**MR. O'ROURKE:** And were you asking for compensation for that?

**Ms. Wade:** No.  It's just (inaudible) . . .

**MR. O'ROURKE:** Do you confirm...

**Ms. Wade:** . . . I was there...

**MR. O'ROURKE:** .......that there was no compensation for her to be involved in the independent study?

**Mr. Tuthill:** Yes.

**Ms. McKay:** I think.....I'd just like to clarify.  We're talking about no addition compensation? ............

**MR. O'ROURKE:** No additional compensation....

**Ms. McKay:** .......as opposed to just regular salary

**MR. O'ROURKE:** .......that is correct

**Ms. McKay:** Okay

**Ms. Wade:** We do not receive a salary for an independent study.......and I was directing them......every semester I direct independent studies for students.

**MR. O'ROURKE:** One of the exhibits shows that your granddaughter had taken 27 credits of independent study with you.  Is that correct?

**Ms. Wade:** No.  It's not independent study.  That's in the program....

**MR. O'ROURKE:** Okay

**Ms. Wade:** ... She was a program active student in the program.

**MR. O'ROURKE:** But she's taken 27 credits with you?

**Ms. Wade:** 27?  No, I don't think so.

**MR. O'ROURKE:** Okay.  Do you have any idea how many?.........

**Ms. Wade:** And I have other students who have taken that many courses with me...

**MR. O'ROURKE:** Okay.

**Ms. Wade:** .......because I'm the only instructor that teaches those courses.

**MR. O'ROURKE:** Okay..........Could you elaborate at all on why you think you've been retaliated against?-Not the age thing, but I mean, you alleged a number of things in your grievance.  One was age discrimination.  One was......

**Ms. Wade:** No.  At this time I choose not to.

**MR. O'ROURKE:**  Okay, I just wanted to make sure that you got plenty of opportunity to elaborate on your grievance.....

**Ms. Wade:** Yes

**MR. O'ROURKE:** ........in any way that you would choose here....

**Ms. Wade:**  I've stated everything that I care to state in my grievance.

**MR. O'ROURKE:**  And you have nothing further to add to that?

**Ms. Wade:** No.  Not at this time.

**MR. O'ROURKE:** This is...........I do want to remind both parties....

**Ms. Wade:**  Um, hm

**MR. O'ROURKE:** .........this is the last time (laugh)......for anything to be stated internally.

**Ms. Wade:** Yes.

**Ms. McKay:**  Yes, I understand.

**MR. O'ROURKE:** Ah, and............

**Mr. Stepovich:** One..........This is Ted Stepovich.

**MR. O'ROURKE:** Yes?

**Mr. Stepovich:** One concern I have in regards to Bobbi addressing these issues is the fact that there are a number of documents that have been presented to the hearing office which are asked to be considered as evidence in this matter and they're being presented to Bobbi today for the first time and it puts her at a disadvantage, in that, obviously she has not had an opportunity to go through these exhibits and there may be issues in there when she gets an opportunity to go through that she'd want to address.  At this point there's....

**MR. O'ROURKE:** I........

**Mr. Stepovich:** .........no way to tell.

**MR. O'ROURKE:** I acknowledge that.  Although having read the Administration's documents about an hour before the meeting I would say that there's some representation of them are fairly accurate to what is contained in the written file, and so both you and Ms. Wade had the opportunity to sit through that as well and if there were any litigating circumstances that anyone wanted to address regarding those issues I would be happy to hear them.

EXHIBIT
Page ___ of ___

Page 19

**Ms. McKay:** Um, I would, I would just clarify that the vast majority of these 35 documents are either from Ms. Wade's personnel file, which she has a copy of, they are E-mails directly between Ms. Wade and the Dean of Instruction. There are, or are, copies of internal college policies which she also has a copy of. The documents that have been not shared with her were the confidential student reports from the retention officer, the compilation of faculty ages, which was prepared for this hearing, and a copy of Dean Tuthhill's notes that he prepared in preparation for his meeting with President McLain summarizing those reasons. There may be odd, other documents in there that are directly from students but I'd submit that the majority of the documents have already been seen in one form or another.

**MR. O'ROURKE:** A question to the Administration. You indicated that, I think it was in exhibit, um..........well it's ah.....Exhibit 29, I believe, and possibly 30-Sonya Abu's....um.....concerns that were raised with Dean Tuthhill. Is that a correct classification?

**Ms. McKay:** Yes.

**MR. O'ROURKE:** Could you tell me how those came to be?-How was it that Sonya Abu.......

**Ms. McKay:** Do you want to.....

**Tuthhill:** Sure............

**Ms. McKay:** .........handle that issue.

**Tuthhill:** Throughout the semester I would drop in, informally, to Sonya's office from time to time, off and on for a weekly basis and simply ask, "How are things going?" "How are the students doing?" "Are there any problems that I should be aware of?" And in October she began to report increasing numbers of (inaudible) students in Ms. Wade's classes. I asked her to keep me informed and (inaudible) weekly reports.

**MR. O'ROURKE:** Did she provide you with information on problems in any other classes?

**Tuthhill:** Yes she did.

**MR. O'ROURKE:** Other faculty?

**Tuthhill:** Yes she did

**MR. O'ROURKE:** And did you invite that same....

**Tuthhill:** Yes I did

**MR. O'ROURKE:** .....from her? (clearing throat)............(long pause; pages rustling).....I then have no further questions, I think for either party and ... .I want to give you, (laughing) one last opportunity Bobbi to address anything that you heard here.

**Ms. Wade:** No, I don't have anything that I want to address at this time.

**MR. O'ROURKE:** Well, do you have a summary statement.....

**Ms. McKay:** I have a very.....

**MR. O'ROURKE:** .......that you'd like to make?

**Ms. McKay:** ........very, very brief summary statement that the Administration has set forth it's reason for recommending the non-retention and the burden have not been met here to show that those reason are false or a pretext or that the real reasons stem from age discrimination or retaliation or defamation. And the Administration is not saying that Ms. Wade is the worst faculty member ever or that she could not ever achieve, you know, a standard of excellence. The Administration has a great deal of sympathy over the retirement vesting issue and has made what the Administration feels is a fair offer that would enable Ms. Wade to continue to contribute to the PERS system to allow her to vest in that system but, in a position that would not impact the types of concerns that led to its decision not to retain her as an assistant professor in the business classes. The college is entitled to set the standard for its faculty and it's made the decision that it will strive for those higher standards. The bar's been set higher.....um......so we'd ask that the Hearing Office affirm the Administration's decision not to offer Ms. Wade a future contract for next year.

**MR. O'ROURKE:** Bobbi, do you have any statements that you'd like to make?

**Ms. Wade:** Yes. I stated in my redress...um....in the grievance.....ah.....I really expect to, the situation to be, redressed in a manner that would be acceptable to meet my experience, my qualifications and my professionalism.

**MR. O'ROURKE:** And is it true that an offer to teach in the ABE program had been extended?

**Ms. Wade:** It has been offered to me, yes.

**MR. O'ROURKE:** And do you feel that is an inadequate.....

**Ms. Wade:** Yes I do.

**MR. O'ROURKE:** ........redress?

**Ms. Wade:** Yes I do.

**MR. O'ROURKE:** Just to clarify your redress, if I understand it, you're asking for assignment outside of this area with no duties for the next year, is that correct?

**Ms. Wade:** I would......at the time I wrote that I was working in a very hostile environment. I was being ostracized............

**(continued, Tape 2, Side 1)**

**Ms. Wade:** ........an offer as far as the teaching (inaudible) are concerned, if it's reasonable, less than what I stated in the redress, but not to the extent of what I've been offered.

**MR. O'ROURKE:** Which is?

**Ms. Wade:** The instructor at the ABE department.

**MR. O'ROURKE:** So that is not an acceptable…

**Ms. Wade:** It is not…

**MR. O'ROURKE:** …..offer?

**Ms. Wade:** ……an acceptable offer, no.

**MR. O'ROURKE:** Have you notified the Administration of that?

**Ms. Wade:** No, but I have until the 28th or 29th…

**MR. O'ROURKE:** Okay

**Ms. Wade:** ……..to notify the Administration……and…….but as far as my attorney fees……ah…..and the other redress stipulations that I put in there, I don't remember now, I don't think there were any others.

**MR. O'ROURKE:** Oh, trip to Anchor………you know……

**Ms. Wade:** A plane ticket, yeah.

**MR. O'ROURKE:** A plane ticket out to Anchorage, your attorney's fees…….

**Ms. Wade:** That could be waived. My attorney's fees definitely not waived, they would have to be included in a redress. And something that would be acceptable to me, that would put me in the same status as I have been in for 31 years, that's a teacher and as a professor.

**MR. O'ROURKE:** Would you just for the oral record indicate what your Bachelor's degree is in and where it's from and what your Master's degree is and where it is from?

**Ms. Wade:** My Bachelor's degree is from Troy State University which is a big university in Alabama and it's in Art and English. My Master's degree is in Educational Leadership with a minor in English and a minor in Art. I have 25 hours of the Master's (inaudible) Educational Specialist degree. I have a Master's degree from the University of Alaska in Supervision and Administration. And I have held an Alaska's Principal's Certificate for 5 years, K through 12. I have been involved with (inaudible) of businesses. I have the experience, all of the credentials that I was hired on. I enrolled in a Educational Leadership program at Middleton C State University and when I accepted this job I had to abandon that because I could not do both. And there was a minor in English there. But, Educational Leadership covers a lot of territory (inaudible)

**MR. O'ROURKE:** So, is it…….are you saying you have two Master's degrees?

**Ms. Wade:** Yes.

**MR. O'ROURKE:** One is in secondary.......

**Ms. Wade:** Secondary Education and Educational Leadership..........

**MR. O'ROURKE:** Okay

**Ms. Wade:** ........and the second one is Supervision and Administration.....from the University of Alaska.

**MR. O'ROURKE:** Both kind of pertain to the K-12 system?

**Ms. Wade:** Yes.  K through 12.

**MR. O'ROURKE:** And then, back to your Bachelor's degree, is it a..........did you have a dual major, or did you major in one and minor in the other subject?

**Ms. Wade:** Hmm, well um, I majored um, I believe, in English with a Bachelor's degree and minored in Art.

**MR. O'ROURKE:** Okay.......Okay, thank you.......

**Ms. Wade:** But it's been since my second Master's in Educational Leadership that I progressed in the field of business and obtained a Master's degree from the University of Alaska.

**MR. O'ROURKE:**  But that was in Secondary Education?

**Ms. Wade:** It was in K through 12...

**MR. O'ROURKE:** K, 12 Education?

**Ms. Wade:**  Yeah.  Well my certificate was K through 12.

**MR. O'ROURKE:**  Okay.

**Ms. Wade:**  As far as the degree, I don't know how far that extends.  (inaudible) it extends into Junior College....

**MR. O'ROURKE:** Okay.

**Ms. Wade:** . . .  education.....in...I taught...

**MR. O'ROURKE:**  I'm sorry, I thought you said it was in......it's a Master's..........

**Ms. Wade:** But my Master's degree goes from K through..........

**MR. O'ROURKE:**  No, no, what is the actual degree?

**Ms. Wade:** .........Junior College.....it's in Supervision..........

**MR. O'ROURKE:** Because the University of Alaska system has nothing dealing with community colleges in its educational program.

**Ms. Wade:** It's the degree that certifies a principal....

**MR. O'ROURKE:** Okay.

**Ms. Wade:** ......within Secondary Education.....

**MR. O'ROURKE:** Okay. I understand, thank you.

**Ms. Wade:** And I have all the related (inaudible)

**MR. O'ROURKE:** Okay.

**Ms. Wade:** I completed the program.

**MR. O'ROURKE:** Okay. (inaudible) for some reason I asked for some questions (chuckle) and I apologize to both parties so, in my questioning, did that raise anything that anyone else wanted to add, for purposes of this hearing?

**Ms. McKay:** Not at all, no.

**Ms. Wade:** Well a lot of this being brought to this meeting without my knowledge that this is the type of meeting that is was going to be and not having been presented the material prior to this, there's a lot of it that I can't respond to at this point. But that doesn't mean that there isn't a reason to respond to it. And at no time, have I met with anyone.........alone. Not with the attorney, not with Dr. O'Rourke, not with Dr. McLain,-not with anyone without the presence of John Tuthhill. And there has been times, sufficient times, that I know, that he has met with all concerned without my presence.

**MR. O'ROURKE:** You.....

**Ms. Wade:** So.......

**MR. O'ROURKE:** You made a hand gesture that included me......

**Ms. Wade:** Yeah.

**MR. O'ROURKE:** As I said at the beginning of this meeting, the nature of my work with this college has caused me to work with both of you..........

**Ms. Wade:** Yes.

**MR. O'ROURKE:** ah.......but it did not go to including any personnel matters with regard to you until I was appointed the Hearing Officer of this hearing......so......

**Ms. Wade:** Okay.

**MR. O'ROURKE:** ..........I have not met individually.....

**Ms. Wade:** hm, mm

**MR. O'ROURKE:** ...with either of you or Dr. Tuthhill (inaudible)

**Ms. Wade:** Hm, mm. Okay.

**Ms. McKay:** I'd also like to state that I've not met Bobbi Wade before today and I have not met with her in any capacity on this matter, exchanged any communications with her or with Dr. O'Rourke on the subject matter of this grievance. And, I also would, I need to respond to the notification issue as to what the procedure for this meeting would be and I would direct the Hearing Office to exhibit 17 which is the President's letter setting out the procedure for this hearing.

**Ms. Wade:** And again I would like to stress to Dr. O'Rourke, I do respect you and respect your judgment. I was one of the one's to get this college accredited (inaudible).

**MR. O'ROURKE:** Now, just to.....did want to clarify in the letter of April 8th, President McLain, in terms of stating the hearing, and she specifies the....I'm sorry, it's referring to?..........

**Ms. Wade:** Does anyone have a copy of this letter that she was supposedly to have sent?

**MR. O'ROURKE:** You were just given one (inaudible)...

**Ms. Wade:** It's in here?

**MR. O'ROURKE:** ..........yeah, exhibit 17, if you want to...........

**Ms. Wade:** Okay.

**MR. O'ROURKE:** ...see it.

**Ms. McKay:** And I'd clarify that this meeting was originally scheduled for April 16th and there are other documents in the exhibits that relate to the procedure of this meeting being rescheduled a number of times until we finally get to today.

**MR. O'ROURKE:** It does state in the letter the meeting will be closed jury. Each side will have approximately 20 to make their presentation and introduce any additional documentary argument or evidence........so, um, that's the basis that I approached it on and......ah.......

**Ms. Wade:** Okay.

**MR. O'ROURKE:** So, is there anything else anyone.........

**Mr. Stepovich:** Just for the record, I think it ought to be clear though.....Bobbi, have you seen that letter before today?

**Ms. Wade:** I have not seen it yet.

**MR. O'ROURKE:** Are you saying you have not rec...........You did not receive that letter........

**Ms. Wade:** I received a letter that was scanned on the E-mail and it was so small that I couldn't read it and it could not be printed. When I tried to print it off I got a blank page..........

**MR. O'ROURKE:** It isn't........

**Ms. Wade:** ...so, it's the same as not receiving it.

**MR. O'ROURKE:** It is marked as hand delivered, April 8th..........

**Ms. Wade:** No.

**MR. O'ROURKE:** .......2004. So, I..........

**Ms. Wade:** Hm, mm, no. I got........I had received no such letter. If it was hand delivered to me it wasn't put in my mail.

**Ms. McKay:** Could I, could I ask that...........I believe this is an important enough issue that we should ask Ms. Wade to look at the exhibit to see if it is tot..........

**Ms. Wade:** And where is (inaudible)?

**Ms. McKay:** It's at number 17.

**MR. O'ROURKE:** Number 17.

**Ms. Wade:** Number 17...(Turning pages)..........No, I have not gotten this letter at all.

**MR. O'ROURKE:** Now, this is the one that designated me the Hearing Officer as well.

**Ms. Wade:** No.

**MR. O'ROURKE:** How did you know I was the Hearing Officer?

**Ms. Wade:** Because you're sitting (inaudible).

**MR. O'ROURKE:** So, that was the first......

**Ms. Wade:** Yeah........that was........

**MR. O'ROURKE:** ..........communication you've had?

**Ms. Wade:** .......yes. And in my Grievance, in my redress, in my appeal, I requested that you be the one to read the material because I knew that you would be thorough.

**MR. O'ROURKE:** Okay.

**Ms. McKay:** And, just my final conclusion, there's a succession of E-mails between the parties rescheduling this meeting and discussing the procedures and those are........

**MR. O'ROURKE:** Okay.

**Ms. McKay:** ...fall in that issue of the procedural nature of the meeting.

**Ms. Wade:** I received E-mails concerning the time but that's all.

**MR. O'ROURKE:** Did both parties feel their, that time they choose to use here today. I'm going to bring the hearing to a close with the notation that I will render my decision to both parties, at the same time, within ten working days and........actually it's probably going to 5 pm, by 5 pm July 5th.

**Ms. McKay:** But before ten working days?

**MR. O'ROURKE:** That's before.....that is before ten working days.

**Ms. McKay:** Okay, thank you.

**MR. O'ROURKE:** That is actually ten calendar days but I hope it will be before that.

**Ms. McKay:** I understand, I understand.

**Ms. Wade:** Are you going to be here until that time?

**MR. O'ROURKE:** No, I will not. I will be here through tomorrow and then I'll be back in my (inaudible) office and will review the materials again, I guess, and listen to the tapes and proceed.

**Ms. Wade:** Okay.

**MR. O'ROURKE:** K?

**Ms. Wade:** Thank you.

**Ms. McKay:** Are we all set then?

**MR. O'ROURKE:** Thank you, going off record. Mr. Stepovich, is there anything you wish to add to the record before I close?

**Mr. Stepovich:** Um..........nothing further.

**MR. O'ROURKE:** Thank you.