# ILISAGVIK COLLEGE
## Faculty Grievance Hearing
### June 24, 2004  1:30 p.m.

Hearing Officer:    Dr. Patrick J. O'Rourke
Faculty Grievant:    Bobbi J. Wade
Actions(s) Grieved:    Nonrenewal of Contract for 2004-2005

## INDEX OF EXHIBITS
## SUBMITTED BY ILSAGVIK COLLEGE ADMINISTRATION

| DOCUMENT NUMBER | DESCRIPTION OF DOCUMENT |
|---|---|
| 1 | Prehearing Brief of Ilisagvik College Administration (June 21, 2004) |
|  | **GRIEVANCE DOCUMENTS** |
| 2 | Memorandum of Grievance, Bobbi J. Wade (February 28, 2004) |
| 3 | Step 2 Written Response from John Van Hoesen (March 12, 2004) |
| 4 | Response to the Grievance of Ms. Bobbi Wade by John Tuthill, Dean of Instruction (March 2, 2004) |
|  | **RELEVANT EMPLOYMENT HISTORY AND CONTRACTS** |
| 5 | Letter from Dean Tuthill to Bobbi Wade re: nonrenewal of contract (January 30, 2004) |
| 6 | Faculty Appointment Letter for 2003-2004 |
| 7 | Faculty Position Description:  Assistant Professor |
| 8 | Employment Offer Letter and Professional Employment Contract (2002-2003) |
| 9 | Letter from President MacLean to Bobbi Wade re: expiration of faculty contracts (February 8, 2002) |
| 10 | Employment Offer Letter and Professional Employment Contract (2001-2002) |
| 11 | Letter of Agreement for Employment (2000-2001) |
| 12 | Letter of Application and Resume of Bobbi J. Wade |
| 13 | Receipt & Acknowledgment of Employee Handbook by Bobbi Wade (1/02/02) (09/21/01) (08/22/00) |
|  | **PROCEDURAL DOCUMENTS RELATED TO THIS GRIEVANCE** |
| 14 | Email and memo to Bobbi Wade from John Van Hoesen re: tape recording of Step 2 meeting (March 5, 2004) and response from Ms. Wade |
| 15 | Email (April 1, 2004) and letter from Human Resources Director to Bobbi Wade re: untimeliness of appeal |
| 16 | Letter from Bobbi Wade to President MacLean requesting discretionary |

| | review of appeal (March 30, 2004) |
|---|---|
| 17 | Letter from President MacLean to Bobbi Wade accepting discretionary appeal and scheduling Step 3 meeting for April 16, 2004 (April 8, 2004) |
| 18 | Email from Human Resources Director to Bobbi Wade confirming rescheduling of Step 3 meeting to May 10, 2004 (April 29, 2004) |
| 19 | Email from Hearing Officer to Bobbi Wade and Dean Tuthill requesting rescheduling of Step 3 meeting to June 24 (April 29, 2004) |
| 20 | Email from Hearing Officer to parties confirming Step 3 meeting on June 24, 2004 (April 30, 2004) |
| | APPLICABLE COLLEGE PROCEDURES AND LAWS |
| 21 | Board of Trustees Policy 7.05 re: faculty contracts |
| 22 | Employee Handbook (9/7/01) re: faculty contracts |
| 23 | Employee Handbook section 27.5 (05/14/04) re: faculty employment contracts |
| 24 | Grievance Procedure (9/7/01) |
| 25 | Employee Handbook section 25 (05-14-04) re: Employee Complaints -- Grievances |
| 26 | Age Discrimination in Employment Act (29 USC 623) |
| 27 | Regulations of the Equal Employment Opportunity Commission (EEOC) re: age discrimination 29 CFR § 1625.7 |
| 28 | Ilisagvik College Spring 2004 Age Detail Report for Adjunct and Regular Faculty (names redacted) |
| 29 | DOCUMENTS RELATED TO STUDENT COMPLAINTS |
| 30 | DOCUMENTS RELATED TO GRADE CHANGES |
| 31 | Bobbi Wade Student Success Rate |
| 32 | Email from Dean Tuthill to Bobbi Wade re: advising students not to take Aimee Valenti's classes (1/23/04) |
| 33 | DOCUMENTS RELATED TO DEFAMATION CLAIM |
| | p. 1-2  Email from Dean Tuthill to Bobbi Wade re: poor student success rate (1/15/04) |
| | p. 3-4  Email from Dean Tuthill to Bobbi Wade denying independent study request on behalf of granddaughter (1/20/04) |
| 34 | Dean Tuthill's notes in preparation for issuing notice of nonretention and meeting with President MacLean |
| 35 | Letter to Bobbi Wade from President MacLean re: offer of employment as ABE Instructor (6/21/04) |

**EXHIBIT AB**
**PAGE 002**

ILISAGVIK COLLEGE

BEFORE HEARING OFFICER DR. PATRICK J. O'ROURKE

In re:                                    )
                                          )
        BOBBI J. WADE                     )        Faculty Grievance
                                          )        Step 3: Informal Hearing
Nonrenewal of Contract                    )
_____ )

## PREHEARING BRIEF
## OF ILISAGVIK COLLEGE ADMINISTRATION

The administration of Ilisagvik College is responsible for hiring faculty to carry out the educational mission of Ilisagvik College (sometimes referred to herein as "the College"). Thus, it is the responsibility of the administration to determine whether or not to rehire or retain faculty.

In this case, College administration decided not to rehire Bobbi J. Wade, a nontenured assistant professor, for the 2004-2005 academic year. It is the Hearing Officer's responsibility to determine whether or not to affirm the decision to nonretain Ms. Wade. This Prehearing Brief will outline the legal context within which the Hearing Officer must make this decision.

### DISCUSSION

Ilisagvik College faculty are not tenured, have no contract renewal rights and have no expectation of continued employment. The relationship between nontenured faculty and the College is created by contract and governed by

Prehearing Summary of Argument
of Ilisagvik College Administration



**EXHIBIT AB**
**PAGE 003**
Page 1 of 4

20159
Wade v. Ilisagvik College

principles of contract law.[1]    Faculty are employed pursuant to the terms of a written contract for a specified term of employment.  The employment contract may be renewed from year to year at the College's discretion.  The fact that the College has renewed a faculty member's contract in past years does not create a legitimate expectation of retention.[2]

Ms. Wade alleges that her nonretention requires "good cause".  That is not the case.  There are no state law requirements of "cause" or "reason" before a decision can be made to renew employment of nontenured faculty.[3]  Nonretention takes effect at the expiration of the faculty member's contract.  Nonretention is, therefore, no more than the expiration of an employment contract and the decision by the employer (the College) not to rehire the faculty member for the next school year.  Nonretention of a nontenured professor is not equivalent in any sense to a dismissal or termination of employment.

A nontenured professor does not have a constitutional right to a due process hearing.[4]  College policy provides a nontenured professor with the right to an informal hearing.  In this case, College administration and Ms. Wade agreed to

---

[1] See Zuelsdorf v. University of Alaska, Fairbanks, 704 P.2d 932, 934-35 (Alaska 1990).

[2] See Chijide v. Manilaq Ass'n, 972 P.2d 167, 172 (Alaska 1999).

[3] Compare AS 14.20.175(a) (providing that a teacher in the public school system who has not obtained tenure rights is subject to nonretention for any cause which the employer determines to be adequate).  In Shatting v. Dillingham City School District, the Alaska Supreme Court held that this statute "grants to a school board virtually unlimited discretion in deciding whether to deny continued employment to non-tenured teachers." 617 P.2d 9, 12 (Alaska 1980).  In comparison, nontenured faculty at Ilisagvik College are not subject to even the statutory minimum "any cause" standard for nontenured public school teachers.

[4] See Board of Regents v. Roth, 408 U.S. 564 (1972) (holding that a mere expectation of a benefit is not sufficient to create an interest protected by procedural due process).

Prehearing Summary of Argument
of Ilisagvik College Administration

Exhibit 1

Page 2 of 4

**EXHIBIT AB
PAGE 004**

20160
Wade v. Ilisagvik College

waive the normal grievance procedure and hold an informal hearing at Step 3, the final step of Ms. Wade's grievance.

During this informal nonretention hearing, College administration will explain its reasons for recommending that the assistant professor not be rehired for the next academic year. The College is not saying, and need not say, that Ms. Wade is not capable of ever becoming an exceptional faculty member. That is because a nontenured faculty member does not have a right to more than a one-year contract which, in this case, expires at the end of the 2003-2004 academic year.

Ms. Wade also alleges that her nonretention constitutes unlawful age discrimination, is in retaliation for complaints made by her against other instructors and the Dean of Instruction, and is defamatory. College administration will produce evidence that its reasons for not rehiring Ms. Wade are nondiscriminatory, not retaliatory and not defamatory. There is no suggestion that the College, in declining to rehire Ms. Wade, imposed on her a stigma or other reputational injury that foreclosed her freedom to take advantage of other employment opportunities.[5]

Ms. Wade bears the ultimate burden of persuasion to demonstrate that the College's reasons for nonrenewal are pretextual; that is, that the College's

---

[5] *See id.* at 573-74.

Prehearing Summary of Argument
of Ilisagvik College Administration



Exhibit ____1____
Page ___3___ of __4__

proffered reasons are not the true reasons for her nonretention and that she has been the victim of intentional discrimination.[6]

The Hearing Officer must decide whether nonrenewal of the assistant professor's contract was made in violation of any statutory right. If it is not, the Hearing Officer must affirm the nonretention.

DATED this 21st day of June, 2004, at Anchorage, Alaska.

LANDYE BENNETT BLUMSTEIN LLP
Counsel for Ilisagvik College Administration

By: _____
       Cheryl L. McKay

20162
Wade v. Ilisagvik College

---

[6] *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-6 (1981).

Prehearing Summary of Argument
of Ilisagvik College Administration


Exhibit ___1___
Page ___4___ of ___4___

Page 4 of 4

**EXHIBIT AB**
**PAGE 006**

Submitted by Bobbi J. Wade
Grievance document received on
February 29, 2004
By

*Received on March 1, 2004*
*since Feb 29 was a Sunday; therefore*
*Employee was advised to deliver on March 1*
*with assurance that it would be accepted on a*
*timely basis if delivered*
*by Feb March 1*
*(based on 2/29*
*phone discussion)*

Pamela Taylor, Director of Human Resouce
Ilisagvik College

*Date: 3/1/04*

20163
Wade  v. Ilisagvik College

Exhibit ___2___
Page __1__ of __5__
EXHIBIT  AB
PAGE  007

# MEMORANDUM

Date:     February 28, 2004

To:     Pamela Taylor, Director of Human Resource
        Board of Trustees of Ilisagvik College

From:     Bobbi J. Wade, Assistant Professor of Business Management

Subject: Grievance

On January 28, 2004, a Personnel Action Form was signed by four people; John Tuthill, Pamela Taylor, John Van Hoesen, and Edna A. MacLean, indicating a non renewal of my contract for the year 2004/2005. Then, on January 30, 2004, I was given a letter by John Tuthill in the presence of Pam Taylor advising me of the above action. There was no reason or cause given in the letter for this action, and I was advised by Pam Taylor that no reason or cause has to be given according to the approved Board of Trustee' policy (Exhibit I). This action is justified if the "no cause" procedure is done for a good reason. But, this action was not taken because of a good cause. The termination of my affiliation with Ilisagvik College by non-renewal of contract for the year 2004/2005 was based upon "Wrongful Cause." The "No Cause" clause of the contract itself was used as a tool by John Tuthill to terminate my employment with Ilisagvik College, because with renewed contract, I would have been vested with PERS within a nine months period of time. Also, the notice of non renewal of contract was an act of Malfeasance and of Retaliation to me, which are listed in the numbered violations below. They are all violations of the Employees Equal Opportunity Commission (EEOC), Age Discrimination in Employment Act of 1967(ADEA), and the Older Workers Benefit Protection Act of 1990 (OWBPA) an amendment to the ADEA.

Violation #1: Age Discrimination:
- In November, 2003, two young people (Amiee Valenti, Business English 109, and Tim Carlson, Business Math 105) were hired to replace me by teaching two classes that I had been previously scheduled to teach. This was done entirely against my wishes, and it was also restricting my position as Lead Instructor for the Business Management programs (Exhibit 2).
- Also, a younger faculty member (Christopher Low) has been hired recently who has begun and will replace me in my position It was also established in the last Board of Trustees' meeting that the approved 2004/2005 budget has included a faculty member to be hired in the Business Management Department. I can surmise that the funds are coming from my non renewal of contract in order to hire another faculty member in the Business Management program. This action of the Budget Committee and the Board of Trustees' was confirmed in an email from

Exhibit     2
Page     2     of     5
EXHIBIT AB
PAGE 008

John Tuthill on January 27, 2004, the day just prior to the signing of my non renewal notice on January 28, 2004 (**Exhibit 3**).

- At the end of my present contract, I will have four years and three months in service with PERS. Consequently, with renewal of my contract beginning July 1, 2004, I would have been vested for retirement within nine months. By non renewal of my upcoming contract, it will eliminate a secured retirement for me, thus, eliminating any responsibility of the College to contribute to my retirement. **Also, by replacing me with a younger person, it will reduce the costs that are and would have been paid to me had I been given a contract for the year 2004/2005.**

**Violation #2: A vindictive and malfeasance act of Retaliation by John Tuthill, Dean of Instruction.**

- In early December, 2003, I submitted a previous complaint against an adjunct instructor, Amiee Valenti, who was slandering my name around the college (**Exhibit 4**). John upheld her in hiring her to teach English classes which included Business English 109 for the Spring Semester, 2004 (**Exhibit 5**). I was strongly opposed to her working in the Administrative Assistant program, because she was confusing and upsetting some of the students, interfering in my duty as an advisor, and still slandering my name (**Exhibit 6**). Early in January, 2004, I again went to the Human Resource Director, Pam Taylor, and informed her of Amiee Valenti's behavior, and I also told her that I was ready to file another grievance. Pam told me that I was just being paranoid and to, "Give John time, he is working on it," indicating to me that he was working out a solution to my problem with Amiee Valenti. It was a hoax, because Pam was stalling for time until January 30 when John could hand to me a non renewal of contract notice. <u>This was his only solution: to use the "No Cause" clause in my contract to terminate me by using his position as Dean to do so.</u>

- **Also, using his position as Dean, John Tuthill set up an ESL class for his wife, Lyudmyla Tuthill, at Ilisagvik's expense (Exhibit 7). ESL classes have been taught at the ABE/GED Center for several years, and the Center also has the special ESL teaching materials. John Tuthill tried to use his position as Dean to confiscate these materials (Crossroads Café') for Valenti to use in the class he had gotten set up under the name of Ilisagvik College, But, he could not according to rules of the ABE/GED grant (Exhibit 8). Why was an ESL class set up for Ms. Valenti? Because she had already been terminated from the ABE/GED Center by the Director, Barbara Struble (Exhibit 9), and to use Ms. Valenti's services, he had to by-pass that method.** <u>**My complaints against Amiee Valenti was causing personal problems for John Tuthill to use Ms. Valenti in giving his wife ESL lessons: consequently, another reason to terminate me by a non renewal of contract notice.**</u>

**EXHIBIT AB**
**PAGE 009**

Exhibit    2
Page  3  of  5

- Another incident that is an unethical procedure that I fear will go against our Accreditation Standards involves another instructor, Jay St. Vincent. There are four English 100/810 classes. There is English 100A/810= 1 Cr., English 100B/810=1 Cr., English 100C/810=1 Cr, all with several students, which are legitimate classes, but there is another class scheduled for English 100/810=3 Credits, with one student who does not need the class (Carlon A. Whiskey). Carlon's registration for the class was done illegally, because I did not sign her registration as her advisor or even knew about it, Jay St. Vincent signed her registration knowing that it was not her duty to do so. Why? And what is the purpose of the class? Is it possible to have two entirely differently scheduled classes with different students—all under the same class code? And why try to avoid my knowledge in setting up the class? The whole class is a hoax set up by Amiee Valenti, Jay St. Vincent, and I believe with the knowledge of John Tuthill (Exhibit 10). All in all, Amiee Valenti is scheduled as an adjunct to teach 14 hours of credit, which is a cost of $14,000. to the college for one semester. I believe that 7.5 hours is supposed to be the limit of an adjunct by the BOT policy. Why should she teach Bus Engl 109 when she is already overloaded with other classes (Exhibit 11).
- <u>What does all the above matters have to do with my grievance?</u> Because my complaints and knowledge against Amiee Valenti were interfering with John Tuthill's plans for her services. Again, he used his position as Dean in negotiating a non renewal of contract in retaliation to me (and to get me out of the way) because I was interfering in his plans for using the college and Amiee Valenti's services for his purposes and personal gain.

**Violation #3: Debasement and Defamation to use as justification for non renewal of contract**

- Dean Tuthill needed justification for my non renewal of contract other than "Age Discrimination." So, since his arrival as Dean of Ilisagvik College, I have received several demeaning emails from him indicating incompetence. Two of the most outstanding ones were sent just prior to the notice of non renewal of contract. The first was reprimanding me for student withdrawals from the courses that I taught during the Fall Semester, 2003 (there are many causes for a student not to succeed), and the second in which he accused me of favoritism of my granddaughter, Amy Underwood, who is a Program Active student at Ilisagvik College. Amy could have graduated at the end of the Spring Semester, 2004, but with John's denial of the classes she needs, prohibited her from doing so. (Exhibit 12).
- John Tuthill, again, used his position as Dean for debasement purposes to me as an instructor, and to obtain information about a student as tools of justification for giving me a "Non Renewal of

EXHIBIT AB
PAGE 010

Exhibit 2
Page 4 of 5

Contract" notice. Also, I believe he used the position of his wife, Lyudmyla Tuthill, as well, who is a newly hired employee in the Registrar's office (nepotism) to research the material for him concerning Amy Underwood; <u>thus, the confidential record of Amy Underwood was obtained for the purpose of defaming me just prior to a non renewal of contract notice given to me on January 30, 2004.</u>

I have served Ilisagvik College for four years beyond the call of duty named by my contract, and by following rules and guidelines, teaching overloads because of lack of funds for another instructor, working hard on committees to get the college accredited, advising an overload of students, caring and tutoring and adhering to students' needs, developing and building the Business Management programs, participating and teaching distance education courses online, among numerous other things. I have gotten good reviews at the end of each year (Exhibit 13). Now, with my fifth year renewal of contract approaching (vesting year), why am I not being rehired?

## Redress Sought

I have worked very loyally for four years with Ilisagvik College, and substantiated myself with the Personal Employee Retirement System (PERS). Now, <u>because of the above violations,</u> I have been, and continue to be under a lot of stress, which is causing severe health problems. The stress is mainly due from being ostracized, embarrassed, and demeaned in my workplace, and it is very difficult to work under these conditions. Thus, should my contract be renewed, the stressful situation would remain the same here at the onsite facility, and due to my age, it would be highly improbable that I could find another job. Consequently, non renewal of contract just shy of retirement, leaves me with a great loss and in a critical retirement situation. Consequently, the redress I propose is:

1. That I am allowed to finish the present contract at an off-site location, and relieved of all duties that require my presence at the onsite facility.
2. That Diana Kennedy immediately be assigned as my monitor/supervisor with no interference from the Dean of Instruction, John Tuthill, until I retire.
3. That my contract be renewed with no duty assignments, at an off-site location, with full benefits and pay until I reach fulfillment of the PERS requirements for retirement.
4. That Ilisagvik College pays my attorney's fees in full until he is dismissed by me concerning this matter.
5. That Ilisagvik College purchase a one way Alaska Airlines plan ticket for me from Barrow to Anchorage.

Signed _Bobbi J. Wade_        Date: _2/29/04_

EXHIBIT AB
PAGE 011

20167
Wade v. Ilisagvik College

Exhibit 2
Page 5 of 5



## Ilisagvik College
### Grievance Submitted by Bobbi Wade
### Response at Informal Step #2 Review

Date:           March 12, 2004

To:             Bobbi Wade, Assistant Professor
                John Tuthill, Dean of Instruction
                Pamela Taylor, Director of Human Resources

Prepared by:    John Van Hoesen
                Chief Financial Officer, Ilisagvik College

Re:             Step 2 Written Response

Step 2 Review of the grievance filed by Bobbi Wade on February 29, 2004, was assigned to me by the President of Ilisagvik College. In accordance with prescribed grievance procedures described in the College's Employee Handbook, I scheduled an informal meeting of the parties to the grievance on March 5, 2004, at 1:00 pm in the College Tutoring Center. The purpose of the meeting was to give the parties to the grievance an opportunity to resolve it through informal discussion of the complaints made by Bobbi Wade.

Upon my arrival at the meeting room, I asked Bobbi Wade if she would be tape recording the meeting, and she said yes. I said I would not agree to the meeting being tape recorded. Bobbi Wade insisted that it was her right to tape record the meeting, and that her right to tape record it extended to not disclosing to anyone else at the meeting that she was tape recording it. I again said that I would not agree to the meeting being tape recorded, and explained to her that I would prepare my written response to her grievance based on her written complaint and supporting materials. This decision was documented in a memo from me to Bobbi Wade on the afternoon of March 5, 2004, and is attached here as Exhibit A. Accordingly, the scheduled Step 2 meeting did not take place.

Bobbi Wade's grievance arises out of John Tuthill's non-renewal of her faculty appointment for the academic year 2004/2005. Following is my written response to the nature of the grievance, and each of the three complaints listed in her grievance. This response is based on my review of her five-page grievance document, the thirteen exhibits attached to it, and supporting documentation. I also sought a response from John Tuthill, Dean of Instruction, and discussed that response with him.

**Nature of Grievance: Non-Renewal of Faculty Contract**
Bobbi Wade grieves the nonrenewal of her employment contract, claiming that the nonrenewal was for "wrongful cause." In doing so, she compares the nonrenewal of her contract to a "for-cause" termination. That is not the case. Bobbi Wade is employed by Ilisagvik College according to the terms of a one-year employment contract. Board of Trustees Policy 7.05 provides that faculty contracts may be renewed from year to year, in the College's sole discretion. In addition, Policy 7.05, and the College's Employee Handbook state that "Faculty are not tenured and have no expectation of continued employment."

Exhibit      3
Page   1   of  4

EXHIBIT AB
PAGE 012

The College has determined that Ms. Wade will not be offered an employment contract for the 2004/2005 academic year. The "for-cause" standard for termination of employment is not required for contract nonrenewal. Ms. Wade's employment contract expires on June 30, 2004. Ms. Wade's employment has not been terminated - her current employment contract with the College remains in full force and effect through its expiration, and Ms. Wade will receive all of the salary and benefits to which she is entitled under her current contract.

### Violation #1-Age Discrimination:
Bobbi Wade claims age discrimination based on the following facts alleged by Ms. Wade:
- The College hired three younger faculty members (Valenti, Carlson, and Low), whom Bobbi Wade says were hired to replace her.
- Valenti and Carlson were hired against Bobbi Wade's wishes, and restricted her position as Lead Instructor for the Business Management programs.
- Non-renewal of Bobbi Wade's appointment was also done for two economic reasons: to release funds to hire another faculty member and to reduce the College's cost of providing retirement benefits to its employees.

Bobbi Wade's claim of age discrimination is based only on her observation that the faculty members hired were younger. She provides no evidence that John Tuthill used their ages as a basis of his hiring decision. While Bobbi Wade may have believed or felt that she was being discriminated against on the basis of her age, she does not provide any evidence, in the form of John Tuthill's comments, actions, or otherwise, that he was discriminating against her because of her age. She completely discounts that other factors, such as their education, knowledge, and skills, were taken into account when making the decision to hire these individuals.

Bobbi Wade claims that faculty members hired in the Business Management program must meet with her approval as Lead Instructor. The position of Lead Instructor does not exist, and any use of the title or references to Lead Instructor is strictly informal and does not infer any rights or responsibilities accruing to the title. This term is not used in any current contractual relationships that Bobbi Wade has with the College. John Tuthill has the right and responsibility to hire whomever he determines to be most qualified for the position. The Dean of Instruction is not required to consult with Bobbi Wade or any other faculty member with regard to hiring decisions.

Bobbi Wade claims that she will face economic hardship from the non-renewal of her contract, but fails to provide any direct evidence that supports her claim that John Tuthill was discriminating against her for these reasons. Her comments are her feelings and her opinions from her perspective, not from anything John Tuthill said or did.

### Violation #2-Vindictive and Malfeasance Act of Retaliation by John Tuthill:
Bobbi Wade describes four incidents which she claims were revengeful acts of misconduct against her by John Tuthill, Dean of Instruction:
- John Tuthill hired adjunct instructor Valenti, against the wishes of Bobbi Wade.
- John Tuthill set up ESL classes and tried to use his position as Dean to confiscate ABE class materials.
- Student Carlon Whiskey's registration was done illegally because Bobbi Wade did not know about it.
- John Tuthill used his position as Dean to non-renew her contract because Bobbi Wade's complaints against Valenti and knowledge of her were interfering with his plans to use Valenti's services.



Exhibit 3
Page 3 of 4

EXHIBIT AB
PAGE 013

Bobbi Wade's claim of vindictive and malfeasance acts by John Tuthill is without merit. John Tuthill, as Dean of Instruction, has the right and responsibility to hire instructors, to set up classes, to verify student registrations, and to renew or non-renew faculty contracts. While Bobbi Wade may have believed and felt that John Tuthill had an obligation to consult with her, he, in fact, did not have such an obligation.

**Violation #3-Debasement and Defamation:**
Bobbi Wade claims that her contract was not renewed because of the following:
  John Tuthill reprimanded her for student withdrawals.
  John Tuthill accused her of favoritism toward her granddaughter.
  John Tuthill used his position as Dean to obtain information about a student.
What Bobbi Wade claims is a reprimand for excessive student withdrawals is not a reprimand, but his suggestions of things she should do to help improve the retention rate of her students and the effectiveness of her teaching.

As Dean of Instruction, it is John Tuthill's responsibility to detect and evaluate situations where favoritism, both actual and perceived, or other improprieties may be given by an instructor to a relative student. I find nothing inappropriate about his observations or decisions concerning Bobbi Wade's instruction of her out-of-state granddaughter. In addition, it is John Tuthill's right and responsibility as Dean of Instruction to seek out any information available from the Registrar's Office about the appropriateness of the academic relationship between an instructor and a relative student.

**Conclusion:**
After careful review of the facts, circumstances, and all of the information submitted by Bobbi Wade, I find all of her complaints without merit for the reasons I have stated above. I find that Bobbi Wade is defamation or character committed by mitt ation of employment upon extation of her current believe John Tuthill acted professionally and in the best interests of the College. I deny all redress sought by Bobbi Wade, including relocation to an off-site location, release from all duty assignments, reassignment to Diana Kennedy as her supervisor, reimbursement of her attorney's fees, and purchase of an airline ticket from Barrow to Anchorage.

If Ms. Wade is not satisfied with this response, she may submit an appeal according to the procedure contained in Step 3 of the College's Grievance Procedure. Please note that the administrator to hear any Step 3 appeal will be designated by the President, and that any appeal may be addressed to Pamela Taylor, Director of Human Resources.

## ACKNOWLEDGMENT OF RECEIPT
My signature below indicates only that I received this document on the date written.

_Bobbi G. Wade_                    _3/15/04_

20170
Wade v. Ilisagvik College

Exhibit 3
Page 3 of 4

**EXHIBIT AB**
**PAGE 014**

STEP 2 MEETING RESPONSE: Exhibit A

# Ilisagvik College

March 5, 2004, 3:30pm

Memo To:     Bobbi Wade, Assistant Professor of Business Management

From:        John Van Hoesen, Chief Financial Officer

Re:          Informal Step 2 Meeting
             1:00pm at Tutoring Center

This memo serves to confirm our conversation this afternoon regarding procedures for the Step 2 meeting of your grievance, which was assigned to me by the President of the College and scheduled for 1:00pm today in the College Tutoring Center.

Upon entering the room, I asked if you would be having an attorney present at the meeting. You said no. I then asked you if you would be tape recording the meeting, and you said yes. I responded that I would not agree to the meeting being tape recorded, and said that if you insisted on tape recording the meeting that we would not hold the meeting. You responded that your attorney said you had a right to tape record the meeting, and that your right extended to not disclosing to anyone at the meeting that you were tape recording it. I again said that I would not agree to the meeting being tape recorded, and left the room to inform the other participants that no meeting would be held.

I returned a few minutes later with Pamela Taylor, Director of Human Resources, to re-confirm to you that no meeting would be held, and said that I would prepare my response to the grievance based on the material that I had already received. You requested that I confirm to you, in writing, that the College declined to tape record this meeting, and would no agree to allow you to tape record the meeting.

The purpose of the college's grievance process is to resolve issues on the most informal level. The informal nature of the supervisor-level meeting requires an atmosphere that encourages the persons involved to speak freely. In our experience, tape recording has a chilling effect on communications and hinders the informal resolution process.

The College understands your refusal to participate in the Step 2 meeting, unless tape recorded by you, to be a waiver of your right to a Step 2 level meeting. Accordingly, I will issue a written response to your grievance based on your written complaint and supporting materials. Please contact me with any questions.

20171
Wade v. Ilisagvik College

Exhibit 3
Page 4 of 4

EXHIBIT AB
PAGE 015

Response to the Grievance of Ms. Bobbi Wade

**From:**   John Tuthill
Dean of Instruction
Ilisagvik College

**Date:**   March 2, 2004

## Response to *"Violation #1: Age Discrimination"*

In November 2003, I hired Tim Carlson to teach BUS 105C and Aimee Valenti to teach BUSC 109C because the originally-scheduled instructor, Bobbi Wade was going to be absent for at least the first two weeks of instruction due to her medical leave. When Bobbi Wade initially requested the medical leave, she suggested that we delay the start of BUS 105C and BUS 109C from November 17/18 to December 1/2, so that she could teach the courses on a more intensive schedule upon her return from leave. This schedule change would have compressed BUS 105C into a total of six class meetings; BUS 109C into a total of five. I made the determination that such an intensive schedule was not in the best interests of the students, so I looked for other alternatives, identifying and recruiting two adjunct instructors who had the requisite content knowledge and teaching experience. The ages of these instructors had absolutely nothing to do with my decision.

Ms. Wade argues that the hiring of these two adjunct instructors was "restricting my position as Lead Instructor for the Business Management programs." She presents "Exhibit 2" a memorandum by Stan Scott, Acting Dean, dated February 10, 2002, indicating that she "is the lead faculty for Business Management programs. She will work with the Admin. Assistant for Academics and with the Director of Academics for scheduling and teaching assignments and for the hiring of Adjunct faculty…." The expression "work with" does not imply that Ms. Wade had or has sole responsibility or authority for scheduling, teaching assignments, and the hiring of adjuncts. This document is superseded by her present contract (Response Exhibit A), signed by Ms. Wade on May 5, 2003, which says nothing about any assignment as "Lead Instructor," nor anything about any responsibilities regarding scheduling, teaching assignments, or the hiring of adjunct faculty.

Chris Low was hired in August 2003 to fill an additional full-time position in the Business/IT program. His position was new, and an addition to our full-time faculty. Contrary to Ms. Wade's contention, Dr. Low in no way "has begun and will replace" Ms. Wade in her position. He has, in fact, taught courses in an entirely new program, the North Slope Borough Skills Academy, and additional College courses that Ms. Wade had not requested to teach in her proposed schedules. Ms. Wade contends that the hiring of Dr. Low is evidence of age discrimination against her. She does not point out that Dr. Low is himself hardly a "younger faculty member." He is 61 years of age.

Exhibit ___4___
Page ___1___ of ___15___

*Response to the Grievance of Ms. Bobbi Wade, page 2….*

In its January 2004 meeting, the College Board of Trustees approved the hiring of an additional, new, full-time member of the Business Program faculty. The new position is separate from Ms. Wade's position and has separate funding. This new position has nothing to do with the decision not to renew Ms. Wade.

The decision not to renew Ms. Wade's contract was in no way based on the costs associated with extending her contract or her vesting in a pension plan, nor is it certain that the College will save money by recruiting a new instructor to fill her position.

Ms. Wade presents no evidence or pattern of age discrimination against her in the actions I have undertaken as Dean of Instruction.

**Response to *Violation #2: "A Vindictive and malfeasance act of Retaliation by John Tuthill, Dean of Instruction."***

The College hired Aimee Valenti to teach a total of 11 credits of instruction in Spring Semester 2004, including BUS 109. Ms. Wade had recommended another instructor to teach BUS 109, but in my estimation Ms. Valenti had superior credentials to teach that course, specifically a master's degree in English and prior experience teaching the course. While adjunct instructors do not usually teach more than 7.5 credits of instruction in a given semester, there is precedent and College policy to support occasionally increasing their instructional load beyond that amount. The decision to retain Ms. Valenti in Spring Semester 2004 was taken before and independently of the decision not to renew Ms. Wade's contract.

Ms. Valenti is also teaching an ESL course, at my request. I did ask the Director of the ABE Center for permission to use special ESL teaching materials for that course. I never attempted to "confiscate" these materials, as my correspondence on the issue in Ms. Wade's "Exhibit 8" makes clear. At the direction of the President of Ilisagvik College, I ordered new copies of the ESL teaching materials for use in this course when I was advised by the State of Alaska ABE Director that the College could not use materials purchased with ABE funds for non-ABE programs and courses. This issue has absolutely nothing to do with my decision not to renew Ms. Wade.

**EXHIBIT AB**
**PAGE 017**

20173
Wade v. Ilisagvik College

Exhibit ____4____
Page __2__ of __15__

*Response to the Grievance of Ms. Bobbi Wade, page 3....*

Ms. Wade complains that Ms. Valenti "was slandering my name around the college." As evidence, she presents her "Exhibit 4" and "Exhibit 6." "Exhibit 4" contains allegations by Ms. Wade concerning Ms. Valenti in a document dated 11 December 2003. Ms. Wade's allegations are just that – allegations; they are not evidence of "slander" on the part of Ms. Valenti. "Exhibit 6" consists of copies of e-mails concerning student registrations in BUS 109 and ENGL 100 in Spring Semester 2004. I see no evidence of any "slander" on the part of Ms. Valenti in these messages. The 2003-2004 Ilisagvik College Course Catalog, page 74 (Response Exhibit B) lists the prerequisites for BUS 109 as "placement test, or completion of English 070, permission of instructor." Ms. Valenti, as the course instructor, has the right to use her professional judgment to waive course prerequisites, or not to waive course prerequisites, for any student seeking to take BUS 109.

I know of no "hoax" set up by Aimee Valenti, Jay St. Vincent, and myself regarding Carlon Whiskey's registration in English 100. I do not know who signed Ms. Whiskey's registration form, though it was certainly not "illegal." As Ms. Wade herself points out in an e-mail dated February 10, 2004 (Response Exhibit C): "I have approximately 60+ active advisees, which is well beyond the capacity of one person to serve properly. Consequently, a host of people help to register the students namely, Jaime, Brad, and others (which I appreciate very much)." It is also entirely appropriate for Ms. Whiskey to take English 100 as an important foundation to her future college study.

Ms. Wade surmises that the decision not to renew her contract was made to protect Ms. Valenti for my purposes and personal gain. She presents no evidence to that effect. In reality, my decision to retain the services of Ms. Valenti had nothing to do with my decision not to renew the contract of Ms. Wade. Ms. Valenti is in no way a substitute for or replacement of Ms. Wade. With the exception of BUS 109, the two instructors operate in different departments and programs.

**Response to *"Violation #3: Debasement and Defamation to use as justification for non renewal of contract."***

I did not "reprimand" Ms. Wade for student withdrawals from her courses in Fall Semester 2003 in my e-mail of January 15, 2004 (presented in Ms. Wade's "Exhibit 12") or at any other time. I pointed out a problem to her, and indicated actions that should be taken to address the problem.

EXHIBIT AB
PAGE 018

20174
Wade  v. Ilisagvik College

Exhibit 4
Page 3 of 15

*Response to the Grievance of Ms. Bobbi Wade, page 4….*

I did not "reprimand" Ms. Wade in my e-mail of January 20, 2004 (presented in Ms. Wade's "Exhibit 12") or at any other time regarding her request to teach individual study courses for her grand-daughter, Amy Underwood.  I also did not accuse her of favoritism toward her grand-daughter.  In my e-mail of January 20, 2004, I said only that "we must avoid any *appearance* of favoritism or other improprieties by giving special treatment" to students who are also close relatives of their instructor.

My request to the Registrar's Office for a copy of Ms. Underwood's transcripts was by no means a "debasement" of Ms. Wade or an invasion of Ms. Underwood's privacy.  I needed the information in order to evaluate the appropriateness of the request for individual study.

Ms. Wade presents no evidence of "debasement and defamation" against her in the actions I have undertaken as Dean of Instruction.

In all of my actions about which Ms. Wade complains, I have been attempting in good faith to follow institutional best practices and to provide high quality instruction to our students:

1)  I hired two adjunct instructors to teach BUS 105C and BUS 109C only because Ms. Wade herself needed to take a medical leave during instructional time in our academic semester;

2)  I recruited one new faculty member for the Business program and secured budget approval for a second;

3)  I hired an adjunct instructor to teach basic English courses at our institution this semester, including BUS 109, which Ms. Wade herself had asked not to teach;

4)  I advised an instructor (Ms. Wade) of teaching practices that could make her Blackboard courses more effective for our students; and

5)  I recommended a reasonable alternate plan for Ms. Wade's grand-daughter to complete her education at Ilisagvik College in a way that would avoid any appearance of favoritism.

None of these actions was unusual or inappropriate under the circumstances, and they do not support allegations of "age discrimination," "a vindictive and malfeasance act of retaliation," or "debasement and defamation."

Exhibit 4
Page 4 of 15

# Response Exhibit A

**EXHIBIT AB**
**PAGE 020**

20176
Wade v. Ilisagvik College

Exhibit 4
Page 5 of 15



### Faculty Appointment Letter for 2003-2004

May 1, 2003

Ms. Bobbi J. Wade
Iḷisaġvik College
P. O. Box 749
Barrow, Alaska 99723

Dear Ms. Wade:

On behalf of Iḷisaġvik College, I am pleased to offer you employment for the next fiscal year (2003 - 2004). The following terms and conditions apply to your appointment.

| | |
|---|---|
| Title: | Assistant Professor |
| Nature of Proposed Duties: | Provide instruction and college service in your field of expertise equivalent to 30 credit hours of teaching and 7 credit hours of College service over the course of the Fall, Spring and Summer terms. Typically, this will be the equivalent of 12 credit hours of teaching and 3 credit hours of College service in the Fall and Spring respectively, and 6 credit hours of teaching and 1 credit hour of College service in the Summer. To accommodate individual program needs, variations in the division of this workload among the semesters may be made by the Dean of Instruction with the concurrence of the President. Faculty are expected to assist with the recruitment, retention and mentoring of students and to participate in the various committee structures established to encourage faculty participation in the guidance of the institution. |
| Term: | July 1, 2003 through June 30, 2004. Following summer leave, you will be expected to report for work on Monday, August 18, 2003. It is understood by both the College and yourself that teaching positions at Ilisagvik College are untenured and one may not acquire tenured status by reason of this appointment. |
| Annual Salary: | $75,477.00, payable in equal bi-weekly installments based on 260 days of service per contract year. This is a professional, exempt position and as such does not carry any entitlement to overtime pay or additional compensation for any work performed on weekends, holidays, outside of normal working hours, or days in excess of 260 days of service per year. |

20177
Wade v. Ilisagvik College



P.O. Box 749   Barrow, Alaska 99723   907-852-3333   Fax 907-852-2729

SERVING THE RESIDENTS OF THE NORTH SLOPE

Exhibit 4
Page 16 of 15

**EXHIBIT AB**
**PAGE 021**

The terms and conditions of your employment with Iḷisaġvik College are in accordance with this letter of appointment including Attachment A, the Iḷisaġvik College Employee Handbook and the Policy and

Regulations of the Board of Trustees as they exist today and as they may be duly amended from time to time. Of course, all employees are also expected to abide by state and federal law.

This letter of employment with its references encompassed herein constitutes the full and complete contract agreement between yourself and Iḷisaġvik College. Any other oral agreement between the parties shall be null and void. This contract shall be modified only in writing.

If you accept the above conditions of your employment with Iḷisaġvik College, please sign where indicated below and return the original to my office within twenty (20) days. Please retain a copy for your records. I am looking forward to your contributions this coming year.

Sincerely,

*Edna A. MacLean*

Edna Ahgeak MacLean, President
Iḷisaġvik College

I accept the above terms, conditions and provisions of the employment offered in this appointment and its attachment A.

*Bobbi Q. Wade*                    *5/5/03*
Signature                          Date

Cc: Office of Human Resources



20178
Wade v. Ilisagvik College
**EXHIBIT AB**
**PAGE 022**

Exhibit  4
Page  7  of  15

### Attachment A

### Iḷisaġvik College Faculty Appointments
### 2003 - 2004

Iḷisaġvik College recognizes its faculty as integral to the fulfillment of its mission to provide quality education and training to students. Toward this end, faculty are expected to be involved in academic and student life at Iḷisaġvik College by serving as a resource for students both inside and outside of the classroom.

*Academic Year* - The College's academic year consists of two full semesters (fall and spring) and one summer session (from May through the end of June). Specific dates and a College calendar are published by College administration. If deemed necessary and appropriate by the Dean of Instruction in consultation with the faculty member, certain programs may be scheduled at other times during the calendar year to better meet the needs of students. If such modifications occur, an addendum to this contract shall be made in writing.

*Teaching* - The teaching component of the workload is satisfied by teaching an assigned number of credit-hour courses, or by delivering a program of non-traditional or client-based programs. Equivalent assignments may be granted in one (1) credit increments, not to exceed three (3) credits per semester unless waived in writing by the Dean of Instruction. Equivalent assignments may include individual or independent course studies or client-based programs, individual lab instruction and other instructional functions. Faculty are expected to be available to students outside of classroom hours, and shall post and maintain at least 10 office hours per week at times scheduled for the convenience of the students.

Distance Delivery Course Preparation - The following may be applied towards faculty workload, upon approval by the Dean of Instruction, with involvement of the instructor:

- A faculty member who teaches a pre-written course (i.e. a "Canned" course) will receive the equivalent of one credit hour per three credit hours at a one to three ratio.
- A faculty member who develops and teaches a plan for an on-line course (i.e. a "From Scratch" course) will receive the equivalent of three credit hours per three credit hours at a one to one ratio.

*College Service* - As part of their professional duties, faculty are expected engage in college service. Such service activities may be assigned by the department head or the Dean following consultation with the faculty member and shall assist the College to fulfill its mission and goals. Activities include, but are not limited to: student advising, recruiting, participating in College committees, curriculum development, distance delivery technology, program coordination and supervision, grant and proposal development and reporting, accreditation support, committee or project leadership, community service, special projects or scholarly activity.

*Additional Workload* - Workloads are reviewed on a case-by-case basis by the Department Head and the Dean of Instruction in consultation with the instructor. Necessary work assignments in excess of normal workload may be eligible for additional compensation, pursuant to the terms of a written agreement between Iḷisaġvik College and the instructor. Such determinations shall be made by the Dean of Instruction subject to the approval of the President.

**EXHIBIT AB**
**PAGE 023**



*Class Cancellation* - Instructors are encouraged to recruit students to enroll in their classes. A minimum enrollment of five (5) students is required per class, unless as otherwise determined by the Dean of Instruction. If a class does not meet the minimum enrollment, the Dean of Instruction shall, with the involvement of the instructor and Department Head, determine whether the class will be cancelled or under what circumstances the class will be taught. Should an assigned class be cancelled, instructors shall complete alternate faculty activities through curriculum development, online course development, or other special faculty projects as assigned by the Dean of Instruction. Instructors shall not receive additional compensation for a cancelled class that would be part of that instructor's excess credit load.

*Class Coverage* - Faculty needing class coverage must inform the Department Head one week prior to the class needing coverage. The faculty member will work with the Department Head to arrange coverage for the class. The class coverage agreement must be agreed upon between the faculty member and the Department Head and approved by the Dean of Instruction.

*Student Recruitment, Retention, and Mentoring.* - Faculty are encouraged to help part time students to identify their personal potential and career goals and to assist them to pursue program-active status. Faculty are also encouraged to accompany the recruiter on village recruitment tours. Faculty will participate in a half-day training session on mentoring students and class completion procedures involving referrals to other college resources.

*Professional Development* - Faculty are expected to remain current in their fields and to participate in professional growth activities including, but not limited to, course work, professional association activities, vocational internships or scholarly activities in the instructor's discipline. Professional development shall be supported by the College based upon availability of funds, with written approval of the Dean of Instruction, and in accordance with Board of Trustees Policies.

*Benefits.* - Faculty are eligible for benefits provided by the College, according to the policies and procedures set forth in the Employee Handbook. Current benefits include retirement contributions, health, dental, vision and life insurance, and the following paid leaves:

*Personal and Sick Leave* - Twelve days of personal leave per (contract) year are allowed when taking it does not unduly interfere with the delivery of the College's program of instruction. Leave must be approved in advance by the faculty member's department head and Dean of Instruction except in the event of an emergency situation. Personal leave has no cash value and may not be accrued from year to year.

*Winter Holiday Leave* - You are eligible to receive ten (10) days of paid time off, which includes two (2) paid holidays and eight (8) days of paid time off, during the Winter Holiday period scheduled from December 22, 2003 through January 5, 2004. Paid Winter Holiday leave does not have cash value, does not accrue, and is forfeited if not used during the term of your contract.

*Leave Without Pay* - Unexcused time off, or time off where no paid leave is available, shall be taken as leave without pay and deducted at the instructor's per diem salary rate, subject to the policies and procedures contained in the Employee Handbook.

**EXHIBIT AB**
**PAGE 024**



*Drug Testing and Substance Abuse* - You understand and agree to comply with the College's drug testing and substance abuse policy. Failure to take or pass the drug screening as provided in the policy may result in termination of employment.

*Other Employment* - You shall devote full time to your duties as a faculty member with the College and shall not accept any other employment or fee during the term of this Agreement without first obtaining the written consent of the Dean of Instruction and the President.

*Point of Hire* - The point of hire for this contract is Barrow, Alaska and you specifically waive all rights to return transportation as outlined in AS 23.10.375-.400.

*Payroll Deductions* - You authorize the College to make regular deductions from the Employee's paycheck for mandatory contributions to the State of Alaska Public Employees Retirement System (PERS) and as otherwise authorized or required by law and the terms of this contract or Employee Handbook.

*Termination.* This Agreement may be terminated on mutual consent, or by the College for cause in accordance with Trustees Policy and the Employee Handbook.

*Liquidated Damages.* It is expressly understood and agreed that you will receive full salary and benefits beginning July 1, 2003 and that you have no duty to report or job duties until August 15, 2003 (unless otherwise specified in an Addendum to this contract). If you resign effective prior to December 31, 2003, you shall be liable to the College as liquidated damages the amount of your salary for the time period of July 1 through August 15, 2003. If you resign effective January 1, 2004 through the expiration of this contract, or otherwise terminates this contract without consent of the College, you shall be liable for liquidated damages in the amount of $2,500. You agree that the liquidated damages set forth herein may be withheld from any amounts due and owing to you from the College, or otherwise collected in accordance with law.

*Final Paycheck.* The College may withhold the your final paycheck pending submission of summaries, student grades, statistics, documents, College property, or pending resolution of salary or compensation disputes. You waive the right to receive final payment within three (3) business days following termination or expiration of this Agreement as provided by AS 23.05.140. The College shall issue final payment within five (5) business days after verified submission or resolution of the foregoing.

*Effective Date.* This contract shall become effective only after it is signed by the President of the College, signed by faculty member, and returned to the College. This Agreement must be signed by Employee and returned to the College within twenty (20) calendar days of receipt or the Agreement is void.

*Interpretation and Venue.* This contract shall be interpreted according to the laws of the State of Alaska and shall not be construed against the drafter hereof. Venue for any action brought under this contract shall be Barrow, Alaska. In the event any provision of this contract is found by a court of competent jurisdiction to be invalid, such provision shall be stricken but the remainder of the contract shall remain in full force and effect.

# Response Exhibit B

EXHIBIT AB
PAGE 026

20182
Wade v. Ilisagvik College

Exhibit 4
Page 14 of 15

**BUSINESS MATH**

Review of basic math computati   kills as they apply to various areas of business   uding retail applications, statistics and graphics. Designed to provide the skills necessary to make better business decisions.

Module A – 1 credit
Review of whole numbers
Module B – 1 credit
Develop skills in fractions and percents
Develop skills in business and consumer math
Module C – 1 credit
Develop skills in interest and discount
*Prerequisite: Current enrollment or completion of MATH 055B or above, or permission of instructor.*

**BUS 106    SPRING    1 CREDIT**
**TIME MANAGEMENT**
The concept and principles of time management applied for gaining control over events that shape our working lives: desk control, handling interruptions, meetings, and procrastination. Tools include schedules, contracts, computerized personal information managers, personal digital assistants, and other types of electronic time management aids for increasing productivity.

**BUS 109    FALL, SPRING, SUMMER    1-3 CREDITS**
**BUSINESS ENGLISH**
Develops skills in English fundamentals with emphasis on language usage. Intensive study on grammar, punctuations, capitalization, spelling, word usage, and sentence structure. Also, develops skills in writing business documents with emphasis on letters, memos, resumes, reports and manuscripts, and other business documents.

Module A – 1 credit
Study on grammar skills
Module B – 1 credit
Study skills on the writing process
Module C – 1 credit
Study skills on writing business documents
*Prerequisite: Current enrollment requirement of placement test, or completion of English 070, permission of instructor.*

**BUS 110    FALL    3 CREDITS**
**PRINCIPLES OF ACCOUNTING I**
Accounting concepts and procedures for service businesses and for merchandising businesses owned by a single proprietor. Basic accounting principles including analyzing business transactions, T-accounts, journal entries, ledger accounts, posting and closing entries, accounts receivable and payable, payroll computations, and taxes. Includes record keeping, accounting requirements and the preparation of financial statements. Although tailored for the sole proprietor, this course will apply to all types of businesses.
*Prerequisite: MATH 058 or permission of the instructor.*

**BUS 111    SPRING    3 CREDITS**
**PRINCIPLES OF ACCOUNTING II**
Accounting concepts and procedures for businesses which are organized as partnerships or corporations and perform manufacturing operations. Accounting principles including notes payable and receivable, merchandise inventory, long-term bonds, statement analysis, corporate transactions, capital stock transactions, and property, plant and equipment. Activities emphasize financial transactions of partnerships and corporations, although the course will also apply to sole proprietorships.
*Prerequisite: BUS 110 or permission of the instructor.*

**BUS 112    FALL    3 CREDITS**
**PRINCIPLES OF ECONOMICS**
Introduction to basic economic concepts, including supply and demand, inflation, money and banking, interest rates, economic growth, price determination, equilibrium, consumerism, unemployment, and economic stability.
*Prerequisites: Completion or current enrollment in BUS 100 or permission of instructor.*

EXHIBIT AB
PAGE 027

Exhibit 4
Page 12 of 15

20183
Wade v. Ilisagvik College

Response Exhibit C

EXHIBIT AB
PAGE 028

20184
Wade v. Ilisagvik College

Exhibit    4
Page   13   of   15

# John Tuthill

| | |
|---|---|
| **From:** | Diana Kennedy |
| **Sent:** | Wednesday, February 18, 2004 5:16 PM |
| **To:** | John Tuthill |
| **Subject:** | FW: IT 110 Pre-requisites for all computer classes... |

Diana Kennedy
Assistant to the Dean of Instruction
Ilisagvik College
Phone 907-852-1811
Fax 907-852-1822
-----Original Message-----
**From:** Bobbi Wade
**Sent:** Wednesday, February 18, 2004 4:26 PM
**To:** Dawn Robinson; Diana Perkett
**Cc:** Diana Kennedy
**Subject:** RE: IT 110 Pre-requisites for all computer classes...

Hi Dawn:
  As Lead Instructor of Business and Management programs, and assigned advisor of most of these students, I would like to respond to your question also. Ordinarily, it is the duty of the person who signs the Registration form, and who also has access to the student's file. But this is not always the case; I have approximately 60+ active advisees, which is well beyond the capacity of one person to serve properly. Consequently, a host of people help to register the students namely, Jaime, Brad, and others (which I appreciate very much). And, not having access to the student's file folder, the student's record might not get checked for prerequisites. Then, too, if you will notice, the prerequisite for most I T courses state: "Or the permission of the instructor. So, it is really up to the instructor who teaches the IT course to allow the student to take a higher IT course without having had IT 110. The first thing I do when I get a new class list is to check it to see if all students are eligible, if not, we withdraw them from the class. When I say "we" I mean myself and the adjuncts who are and have been for the last four years working under my tutelege.
  So, who's to say if it is anyone's "job." It is everyone's job, and we have all been overwhelmed with heavy loads of work, and doing one's job in an appropriate manner of job description, at this point, is a fantasy. It will be nice when there is sufficient staff and the advisees can be divided into workable loads, but until that time, let's don't start pointing fingers to people who might have caused the failure of a student. We are all in this together, and it seems to me that everyone is doing the best they can, and doing a good job under the circumstances (Overloaded).We will just keep working at it until we get it right!! Thanks for understanding,

          -----Original Message-----
          **From:** Dawn Robinson
          **Sent:** Wed 2/18/2004 11:30 AM
          **To:** Diana Perkett
          **Cc:** Diana Kennedy; Bobbi Wade
          **Subject:** IT 110 Pre-requisites for all computer classes...

          Hi Diana,

I have been updating business management and administrative assistant program active students files and

**EXHIBIT AB**
**PAGE 029**

20185
Wade v. Ilisagvik College

3/2/2004