Date: 5-4-06  Exhibit: 39
Witness: Taylor
Marci L. Lynch, Court Reporter
Liz D'Amour & Associates, Inc.
(907) 452-3678

Memo to:      Dr. Edna MacLean
cc:           Pam Taylor

Memo from:    John Tuthill

Date:         December 12, 2003

Subject:      Detailed Response to Bobbi Wade's "Formal Grievance"

The "Formal Grievance" document makes several specific allegations against me in my role as Dean of Instruction of the College. I take these allegations very seriously. Here is my response to each of them. In each case, I have left Bobbi's original in bold print, and my response follows in regular type.

The "Formal Grievance" states:

"When I reported for work on August 18, my schedule was such that it was almost beyond reason. I had 31 new advisees, plus the 30 that I was already advising, making a total of 61 altogether. I had six classes beginning at the same time, because of the scheduling, with a total of 87 students. More were added on later. This is almost unheard of, because faculty members usually stagger the classes in order for the teaching load not to be a burden to the instructor. Then, too, the Blackboard classes had to be designed before the students could begin the courses. This is very time consuming and requires a lot of concentration and has to be done before the classes begin.

This problem could have been eased when one of my classes was cancelled. But, again, I was not consulted and the class was cancelled leaving the same schedule with all classes being taught at the same time. If I had been included in the decision, I could have rearranged the schedule to shift the class load to a little more balanced situation. Again, no consideration at all was given to me, or the load I was carrying. <u>Also, it was in violation of my contract, which states that if a class is cancelled, it will be in consultation with the instructor prior to cancellation.</u>"

I made the decision to cancel BUS 112 on September 3, 2003, at the very end of the late registration period. The class had an enrollment of four. I checked the program sheets for all four of the registered students, and discovered that none of them had to have the course that semester. I cancelled the course specifically to give Bobbi Wade some relief from her very heavy teaching load. The allegation that I cancelled the class without consultation with Bobbi Wade is untrue. Before the course was cancelled, Diana Kennedy telephoned Bobbi to tell her what we planned. Diana reported to me that Bobbi completely supported the course cancellation at that time, saying that it would be a help to her to have one less class ~~to have~~ to prepare.

The "Formal Grievance" continues:

"I requested leave to take care of a medical problem. I had Module C of both Bus Math and Bus English to complete, because both courses are three credit hours of study, but I had scheduled each of them in three phases, Modules A, B, and C. I made a schedule for myself to teach Module C of both Bus Math and Bus English upon my return from leave (11 days), which the students in both classes agreed was satisfactory with them. The change in dates would have not been confusing to the students nor damaging to my classes. It would have been a smooth inclusion. Dean Tuthill totally ignored my schedule, which left my students in a state of confusion, because he hired other instructors in my absence to teach the third phase of the two classes that I was in the process of teaching. Again, this was done with no consultation with me. Also, he knew that my leave request was only for 11 days, which three class meeting would be held in my absence with the original schedule. Why was I not allowed the privilege of getting someone to substitute in my absence, and resume teaching the classes upon my return if he wanted to keep the original, and not adhere to my revised one? Others have taken leave. Did the Dean replace them while they were gone by hiring instructors to take their place, or did they make arrangements for their duties to be taken care of while they were gone, and then resume the duties when they returned, as is the usual procedure."

When Bobbi Wade initially requested the medical leave [from November 17/18], she suggested that we delay the start of BUS 105C and BUS 109C to December 1/2, so that she could teach the courses on a more intensive schedule upon her return from leave. This schedule change would have meant BUS 105C compressed into a total of six class meetings; BUS 109C into a total of five. In consultation with Sonya Abu, I made the determination that such an intensive schedule was not in the best interests of the students, so I looked for other alternatives. [who had been working with several of the students in these classes]

I did not believe I could appropriately use a temporary instructor in Bobbi's absence, and then ask her to finish the course herself upon her return. Her medical leave necessitated her missing four of the total of ten class meetings scheduled for BUS 105C, and three of the total of eight class meetings scheduled for BUS 109C. I thought it would be disruptive to the students to change instructors half way through a very short term.

I identified two very capable and experienced instructors – Tim Carlson for BUS 105C and Aimee Valenti for BUS 109C – who agreed to handle the courses for us, and we processed their contracts.

The allegation that I acted without consulting Bobbi Wade is untrue. I talked to her over the telephone at least twice concerning plans for BUS 105C and BUS 109C, and she was duly notified that I had found suitable adjuncts to take care of the classes.

2

21838
Wade v. Ilisagvik College
AJ
Page 2 of 8

The "Formal Grievance" states:

"Then, too, the Business 109C teacher the Dean hired (Amiee Valante) to take over the class is an outside adjunct who has totally aborted my class syllabus, textbook, and teaching plans. The students were in a state of confusion upon my return and are being told that the teaching materials that have been previously used are wrong and they will no longer be used—that she is totally rewriting the course, and she is using a syllabus for Business 100. <u>This is an insult to my reputation as an instructor and defamation to my character.</u> It has always been my understanding that an adjunct will teach a course under the direction and plans of the Lead instructor of the department, and will use the teaching materials that are provided. All adjuncts have adhered to this policy until now. Now, it seems that this particular adjunct has taken over with all authority in my program and classes with no regards to my position. Plus, making remarks to the class that is <u>demeaning to me and my status as a full time faculty member with four years of service.</u> Up until now, I have always had the privilege of screening and hiring the adjuncts for my programs---all of a sudden that privilege has been taken away from me without due process."

While I certainly appreciate the assistance of the full-time faculty in identifying and screening potential adjuncts, I do not believe it is the policy of Ilisagvik College to give to the faculty the responsibility for "hiring" those adjuncts. In this particular case, Bobbi Wade was preparing to go on an emergency medical leave and offered no assistance in identifying potential adjuncts for the course, so I took the responsibility of handling it myself.

When Aimee Valenti agreed to take on the BUS 109C course, she went to see Bobbi Wade to request information about how the course was set up and what she should do. Bobbi was in class and refused to meet with her, rather rudely, in Aimee's estimation, and did not offer a later meeting time. Bobbi did give course material to Diana before she left, and Diana forwarded the material to Aimee subsequently. Aimee discussed her teaching plans with me as the course progressed. She found that the students had done very little actual writing in BUS 109A and 109B. She felt, and I agreed, that it was important that BUS 109C give them actual writing experience, and she has taught the course accordingly, with my full approval and consent.

The "Formal Grievance" states:

"<u>The adjunct instructor that has been teaching Bus 109 has for the past 3.5 years has been replaced without cause or provocation,</u> which is a very unethical procedure and damaging to the reputation of the college, because she is a very upstanding citizen of the community. "

I do not understand what this means. No "adjunct instructor" was replaced in this instance. The originally-scheduled instructor was Bobbi Wade herself; because of her medical leave, she was replaced with Aimee Valenti, who had taught successfully for us in the past. We are using an adjunct instructor for an evening section of BUS 109C –

3

21839
Wade v. Ilisagvik College

EXHIBIT 3 of 8

Marie Ellen Keeter, but she was not asked to do the day-time section because she has a full-time job during the day and was therefore unavailable.

The "Formal Grievance" states:

"Also, the Bus Math 105 adjunct instructor was taken off the spring roster and replaced without notification. He, too, has been teaching Bus Math for the past two years, and is also a fine citizen of the community. "

The draft Spring 2004 Schedule from the Business Department listed Noli Alcantara as the instructor for BUS 105. I replaced this adjunct instructor with our full-time mathematics instructor, Tim Carlson, in order to give Tim a full 12-credit teaching load for the spring semester. No disrespect was intended to Noli Alcantara, but it seemed to me that it made more sense to use our full-time instructor, at no additional cost to the institution, rather than paying an adjunct to teach the course in the Spring Semester.

Before I made this change, I sent Courtneay Bartholomew, the department head, a memo asking if the change was acceptable to the Business Department faculty, and he responded positively.

The "Formal Grievance" states:

"Another upstanding citizen and leader in the community, was taken off the fall schedule without notice. This is not an ethical way to work with people of the community, and I am strongly opposed to it."

The one Business Department adjunct I removed from the Fall 2003 Schedule had presented academic credentials that I had, and have, good reason to believe were fraudulent. I explained the reasoning for my decision to Bobbi Wade at the beginning of the Fall 2003 Semester, when the decision was made, and explained to her what additional information I needed to receive before I would be willing to hire that particular instructor. No such additional material has since been forthcoming.

The "Formal Grievance" states:

"In late September, 2003, I applied for personal leave because I needed to go back to my family doctor for continuation of tests that I had begun in July while on summer break. I took my leave request in to Dean Tuthill and talked with him about rearranging my schedule as not to interfere with my teaching duties. I had the classes rescheduled on the proper change form and had talked with my students. Every student in the class agreed it was a better schedule than the old one. Dean Tuthill seemed agreeable and to think it was a workable schedule, but said he would need to look into it. I also presented him with a copy of a document from my doctor verifying that I needed the immediate follow-up.

In a couple of days, I went back into his office to inquire about my leave, he told me in a very abrupt attitude that he would not approve the change in the class schedule and, consequently, would not approve my leave, because it would interfere with my teaching schedule. The rescheduling of my classes was a very logical one and there was no reason it would not have worked. Yet, he would not allow me to use the rearranged schedule that would allow me to take the necessary leave time, and at the same time, keep the students content. Some of the students even decided to take a break while I was away, and we would all meet back to continue with the classes upon the specified date that I would return."

I rejected a total of at least three personal leave requests from Bobbi Wade during the course of the semester, on the grounds that her absence from instruction for an extended period of time would, in my estimation, "unduly interfere with the deliverance of instruction." My decision was based in part on concerns expressed to me and/or to Sonya Abu by students in her courses.

The "Formal Grievance" states:

"I was very disturbed by his lack of cooperation with me to work out a pressing problem, because I really needed the medical attention. I went to Pam Taylor and she advised me to fill out a request for medical leave along with verification from my doctor, which I did. But, this didn't satisfy Pam. She wanted more documentation from the doctor. Rather than try to obtain more documentation, I decided that I would go to the doctor here in Barrow and try to get by until the Christmas holidays, which was Dean Tuthills' suggestion. I told him that I would take his suggestion and wait until the Christmas holidays, and, in the meantime, took another 2 credit course to teach because there was no one to teach it. This was related that to Dean Tuthill in an email. By that, I thought he would approve time in December adjoining the holiday break for my seeing the doctor.

But, he denied that also, because I then applied for leave in December, and worked out an arrangement to have the classes completed by the time I took the leave days. But Dean Tuthill denied the request without even consulting with me about the arrangements I had worked out for my classes. He said I would have to stay on the job until Dec. 19. That, of course, would leave no time to see a doctor since most offices are closed the week of Christmas. "

I did reject Bobbi Wade's personal leave request that would have had her leave Barrow a week before the end of the semester. She told me that she had already changed the meeting schedule of her courses so that they would end early. I had received no course schedule change from Bobbi, and no change of her course meeting schedule had been approved by my office. In the absence of an approved schedule change, courses have to be met on the days and times originally scheduled, and students cannot be required to submit their work early.

The "Formal Grievance" states:

"But, again, due to tests results from the local medical clinic, I submitted another leave request to Dean Tuthill on Nov. 3, and he did not respond at all. He did not even give me the courtesy of replying. Then, I got a phone call from the doctor in Barrow informing me that I must see a specialist immediately, because the type of treatment I needed (a Mose Procedure) could not be done in Barrow, and could not be done in Anchorage. Only when I reached the point that was critical did he sign a leave request, and this was done when Pam Taylor informed him that he had no choice."

I did approve Bobbi Wade's medical leave request as soon as she had presented me with the required medical documentation. The allegation that I approved the leave request only "when Pam Taylor informed" me that I "had no choice" is untrue. I approved the medical leave request as soon as I had the required medical documentation – the medical documentation that I had been asking Bobbi to provide for the ~~past~~ previous month.

The "Formal Grievance" states:

Again, his denial of my leave request was in violation of my contract, because there was a reasonable plan to take care of my classes in my absence, and consequently, it would NOT have hindered my duties nor been in violation of my contract. It seemed he was trying to enforce his stated opinion of faculty leave time which was designated in a contract that was written and signed several months prior to his hire date."

The C~~o~~llege [personal] policy gives to the Dean of Instruction the responsibility of deciding when a faculty leave does, or does not, "unduly interfere with the delivery of instruction." No instructor has final authority to determine what is "a reasonable plan to take care of" classes.

The "Formal Grievance" states:

"For all the extra-duty units that were added to my schedule, I finally received the signed contracts from the Dean of Instruction. I signed the contracts and fulfilled the teaching and Blackboard designing duties that were required in the contracts. Dean Tuthill has voided two of the contracts for extra-duty pay without consultation with me. The teaching duties that were described in the contracts have been fulfilled. In other words, he has broken two extra-duty contract that had been fulfilled prior to his voiding them.

He contends that he took away two units of pay, because I am not teaching Module C of both Bus Math and Bus English. Those were my teaching duties, not contract units. Then, too, I would not have lost those teaching duties if the he had not taken them away from me without just cause. But, because he took away those two classes, he contends that I lack two units fulfilling the twelve hours required per semester.

6

21842
Wade v. Ilisagvik College

EXHIBIT AJ
Page 6 of 8

We have been told several times that if we don't fulfill the hours in one semester, we can make them up in another as long as we fulfill the required teaching units as prescribed by the end of the contract. I could have easily made up the two hours in the spring or summer semesters, and not had the two contracts broken. <u>Again, no meeting with me to discuss the situation, just blatant unethical procedure and a violation of two signed and fulfilled contracts.</u>"

Bobbi Wade's "extra duty" contract, offering her compensation for eight additional credits ~~of compensation~~ for the Fall 2003 Semester, was based on the assumption that she would teach the full 12-credit instructional load that had originally been scheduled for her, in addition to the overload. When I assigned other instructors to teach BUS 105C and BUS 109C, that reduced her total teaching load from 20 credits to 18 credits, and her overload pay was correspondingly reduced. That is the normal operating procedure at this institution. It is true that I could have paid her for eight credits of overload compensation this semester and then required that she teach two additional credits next semester to make up for the two-credit reduction in her base teaching load this semester. I did not feel that was appropriate. Since Bibbi had been complaining about her heavy teaching load all semester, I wanted to do everything possible to keep her teaching load at the standard level of 12 credits for next semester. The allegation that I broke her contract is not true. ~~She did not fulfill her contract~~ When her medical leave required our hiring other instructors to teach two courses which had been assigned to Bobbi, We made the necessary adjustments; that is all.

The "Formal Grievance" states:

"I have worked very hard to build the Business Management programs at Ilisagvik College and have been given the academic freedom to do so up until the beginning of the fall semester, 2003. I have been told repeatedly, "You are the head of the business programs. You are the Lead Instructor." I have hired and mentored adjunct instructors, and they have fully cooperated with my leadership---until now. I have made schedule after schedule to accommodate students, tutored, advised, counseled, previewed and ordered textbooks and teaching materials for both my classes and adjunct classes; visited and accommodated village students to keep them interested and active. I have written programs, prepared courses, and written lesson plans to accommodate the demands of the work force people, and to meet the needs of the students who are older and need review courses in the basics---because I have lived in this environment long enough that I understand the needs. It doesn't happen overnight, it takes years of time to understand the culture and the lifestyle of the students and the community, and one does not begin by using unethical tactics on the people in the community who have lived and worked here for several years.

"I feel as if my classes are being taken away or rearranged without my knowledge or consultation in an unethical manner. Why? Why am I being demeaned as Lead Instructor of the Business Management programs after soon-to-be four years in this position? I feel I deserve an explanation. "

I cannot speak to Bobbi Wade's performance in the past. I can say that she has had a very difficult semester in Fall 2003, and her performance and behavior has not inspired my confidence. The Fall 2003 Schedule for Business and Office Technology courses has been problematic throughout the term. In some instances, courses were scheduled at times in which the adjunct instructors were not available; in other instances, courses were scheduled with no instructors identified or available. The schedule was not Bobbi's fault, but she also did not provide sufficient leadership to her programs to resolve those problems. During the semester, I have received numerous complaints about her teaching from students: that she is unresponsive, unhelpful, unavailable, insufficiently challenging. Much of Bobbi's energy this semester seems to have gone into her repeated requests for personal leave, and not instruction. I am deeply concerned that the education of her students has been severely impacted for the worse. I note, for example, that at the end of this semester, she has administratively withdrawn a total of 11 out of 15 students in her BUS 100 course; 10 out of 20 students in her BUS 154 course; 4 out of 9 students in her BUS 233 course. These administrative withdrawals were submitted to the Registrar's Office two and a half weeks after the November 17 deadline. This action, and related anecdotal evidence I have been hearing throughout the semester, suggests to me that her instructional courses have been largely ineffective this semester, I suspect because she has been distracted by personal issues. My attempts to discuss instructional concerns with Bobbi this semester have repeatedly been rebuffed. Whenever she has been informed of student complaints, her concern has always been to identify the specific student making the complaint – "Who said that?" – not to address the problem.

Under the circumstances, I have not been able to rely on Bobbi Wade during my tenure thus far as Dean of Instruction, notwithstanding any contributions that she may have made to Ilisagvik College in the past.

21844
Wade v. Ilisagvik College