Case 3:05-cv-00086-TMB   Document 91-7   Filed 06/14/2007   Page 1 of 5

BOBBI WADE vs. ILASAAVIK COLLEGE, et al          VIDEOTAPE DEPOSITION OF DR. EDNA MacLEAN
CASE NO. 3:05-cv-086-TMB                                          NOVEMBER 30, 2006

Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                     FOR THE DISTRICT OF ALASKA
 3   BOBBI WADE,                    )
                                    )
 4              Plaintiff,          )
          vs.                       )
 5                                  )
     ILISAGVIK COLLEGE; NORTH SLOPE )
 6   BOROUGH; JOHN TUTHILL,         )
     individually; and PAMELA TAYLOR,)
 7   individually,                  )
                                    )  Case No. 3:05-cv-086-TMB
 8              Defendants.         )
                                    )
 9
              VIDEOTAPED DEPOSITION OF EDNA B. MacLEAN, M.D.
10                         November 30, 2006
11   APPEARANCES:
12          FOR THE PLAINTIFF:      MS. LINDA J. JOHNSON
                                    Clapp, Peterson, Van Flein,
13                                  Tiemessen & Thorsness, LLC
                                    Attorneys at Law
14                                  711 H Street, Suite 620
                                    Anchorage, Alaska 99501
15                                  (907) 272-9631
16          FOR THE DEFENDANTS:     MR. PETER C. GAMACHE
                                    Attorney at Law
17                                  405 W. 36th Avenue, Suite 201
                                    Anchorage, Alaska 99503
18                                  (907) 563-6969
19                                  MS. CYNTHIA L. DUCEY
                                    Delaney Wiles, Inc.
20                                  Attorneys at Law
                                    1007 W. 3rd Avenue, Suite 400
21                                  Anchorage, Alaska 99501
                                    (907) 279-3581
22
                                    MR.  JONATHAN CLEMENT
23                                  Delaney Wiles, Inc.
                                    Attorneys at Law
24                                  1007 W. 3rd Avenue, Suite 400
                                    Anchorage, Alaska 99501
25                                  (907) 279-3581
```

Case 3:05-cv-00086-TMB   Document 91-7   Filed 06/14/2007   Page 2 of 5

BOBBI WADE vs. ILASAAVIK COLLEGE, et al    VIDEOTAPE DEPOSITION OF DR. EDNA MacLEAN
CASE NO. 3:05-cv-086-TMB                    NOVEMBER 30, 2006

Page 54

```
 1       her.....
 2   A   No.
 3   Q   .....medical leave?
 4   A   Unh-unh (negative). No.
 5   Q   Do you know of anybody else at the college who has
 6       taken Family Medical Leave Act protected leave?
 7   A   Not -- no, although there were a couple of pregnant
 8       women that might have taken it.....
 9   Q   That would.....
10   A   .....when they had their babies.
11   Q   That would be your guess, or do you know that?
12   A   Pardon me?
13   Q   Is that a guess, or do you know that?
14   A   I know that. There was a person in the registrar's
15       office. She had twins.
16   Q   She needed it.
17   A   Yes.
18   Q   Were you aware that Jay St. Vincent took leave for
19       medical reasons in November 2003?
20   A   No.
21   Q   So the process that was approaching your office, can
22       you explain what that was?
23   A   Are you referring to the Bobbi Wade.....
24   Q   Yes.
25   A   .....grievance process?
```

Page 55

```
 1   Q   Yeah.
 2   A   You want me to explain the process?
 3   Q   Yes.
 4   A   I guess we had -- the process would be, first of all,
 5       to see if we could resolve the issue without going into
 6       the process.
 7   Q   How would you do that?
 8   A   Oh, some meetings probably with the complaint -- the
 9       person who is making the complaint and maybe whatever
10       problem they had would be discussed and see if we
11       couldn't resolve it administratively, and then is there
12       was no.....
13   Q   Who would meet with that person, administratively?
14   A   I don't recall.
15   Q   Was it you?
16   A   No. No, it was not me.
17   Q   Then what happened af- -- if you couldn't resolve it?
18   A   Then it started on the process of the person had to
19       file papers, and there were certain set days that we
20       had or limits that we had to comply with, and it would
21       move up the process.
22   Q   Where would you find that -- was there a policy on
23       this?
24   A   Uh-huh (affirmative). Yes, there is.
25   Q   Where would you find that?
```

Page 56

```
 1   A   Probably in the employee handbook.
 2   Q   Did you ever read the section of the employee handbook
 3       that.....
 4   A   Yes, uh-huh (affirmative). I don't recall exact steps,
 5       but I remember I read through all of those papers
 6       during the first -- whenever they were done and in the
 7       process of developing them.
 8   Q   So when -- would it be -- would you call that a
 9       grievance process?
10   A   Uh-huh (affirmative). Yes.
11   Q   Did -- you said that you read through the paperwork
12       when the grievance process was being drafted. Is that
13       correct?
14   A   The process was being drafted, yes. Not just me but
15       others. There was a lot of input to be fair to
16       everyone.
17   Q   And who was responsible for either setting policy or
18       revising policies?
19   A   The board of trustees.
20   Q   Okay. Who would draft a policy?
21   A   The cabinet with -- with help from the HR.
22   Q   When you say the cabinet, there was more than one
23       person, so is there a specific person who would.....
24   A   The deans, remember?
25   Q   The deans?
```

Page 57

```
 1   A   The dean of instruction, the student services, the
 2       faculty rep on the cabinet and the budget person and
 3       myself.
 4   Q   Was there a single individual who would do the
 5       drafting?
 6   A   Probably HR.....
 7   Q   And.....
 8   A   .....director.
 9   Q   Would the policy then be submitted to the cabinet?
10   A   Yes.
11   Q   Would the cabinet then review and comment on the
12       policy?
13   A   Uh-huh (affirmative). Yes.
14   Q   Did any -- do you recall specifically yourself making
15       any revisions to the grievance policy that came before
16       you?
17   A   No.
18   Q   Do you recall how many times the grievance policy was
19       presented to you for revision or for change?
20   A   I don't recall how many times it was presented to me.
21   Q   Do you recall it being presented to you?
22   A   Yes, to the cabinet.
23   Q   So when the -- when Bobbi Wade's grievance process
24       began, did you reread the policy at that point?
25   A   No, I did not.
```

Case 3:05-cv-00086-TMB   Document 91-7   Filed 06/14/2007   Page 3 of 5

BOBBI WADE vs. ILASAAVIK COLLEGE, et al
CASE NO. 3:05-cv-086-TMB

VIDEOTAPE DEPOSITION OF DR. EDNA MacLEAN
NOVEMBER 30, 2006

Page 66

1 Q  Were you worried about Bobbi Wade's rights?
2 A  Not at the time.
3 Q  Did you become worried later?
4 A  No.
5 Q  Did you ever receive Exhibit Number 57?
6 A  Yes, but I don't recall what's in there. I remember
7    the form.
8 Q  Do you want to read it?
9 A  I don't have my reading glasses. (Pause - reading
10   document) Hmmm.
11 Q  So do you -- does that refresh your recollection of
12   what Bobbi was complaining about?
13 A  About her grievance process?
14 Q  Uh-huh (affirmative).
15 A  I remember there was some -- Pam had to leave town, but
16   I don't recall that as being an impediment to the
17   process.
18 Q  Do you recall hearing that Pam had refused to accept
19   the next paperwork from Bobbi because it was late?
20 A  No, I don't recall that.
21 Q  Do you recall this letter coming to you and asking you
22   to.....
23 A  I remember that comment in the letter, but I don't
24   remember it actually happening, but --
25 Q  Did you talk to Pam about whether or not she had

Page 67

1    refused to accept paperwork?
2 A  No, I did not, because I did not believe that Pam would
3    do that.
4 Q  Did -- do you recall Exhibit 58? Do you recall sending
5    that document to Bobbi Wade?
6 A  (Pause - reading document) I think this was a good
7    response, yeah.
8 Q  When you received Exhibit 57, which was the letter from
9    Bobbi Wade, did you talk to Bobbi directly about her
10   letter?
11 A  No.
12 Q  Did you ask anybody to do any investigation for you?
13 A  No. Not that I recall, but this was -- we, the
14   college, wanted to be there, so we opened it up again,
15   as I recall.
16 Q  Why did you open it up again?
17 A  Because I think the days might have exceeded -- the
18   number of days might have exceeded themselves, but --
19 Q  You thought the days were exceeded but --
20 A  But to be fair to the process, to Bobbi, then this was
21   the good way to resolve that.
22 Q  So you didn't mind that you were waiving your right to
23   enforce a deadline?
24 A  No, I saw it as a way to resolve the issue, to be
25   fair.....

Page 68

1 Q  And did you know.....
2 A  .....in the process since Pam had to leave.
3 Q  At the time when you wrote that letter, did you know
4    what the grievance was about?
5 A  I had some idea, yes.
6 Q  And can you tell me what you thought the grievance was
7    about?
8 A  About the faculty contracts.
9 Q  What about them?
10 A  That her contract was not renewed, but I don't know if
11   her's was the only one not renewed. I don't recall
12   though. It was a -- we had a time frame for those
13   contracts as well.
14 Q  In that letter, you discuss going forward with step
15   three. Is that correct?
16 A  If that's what it says, yes.
17 Q  What did you believe step three to be?
18 A  It's a meeting with Bobbi. Once again, each step, I
19   think, was to try to resolve the issue in
20   administration -- administratively or in-house.
21 Q  What specifically happened during the step three? Do
22   you recall?
23 A  I don't remember.
24 Q  Does this document help you.....
25 A  I wasn't at the meeting.

Page 69

1 Q  .....remember?
2 A  Unh-unh (negative). I wasn't at the meeting.
3 Q  Did you write this letter yourself?
4 A  Yes, with some assistance.
5 Q  Who did you get assistance from?
6 A  Probably.....
7       MS. DUCEY: I'll tell you that there's an
8    attorney/client privilege.....
9 A  Okay.
10      MS. DUCEY: .....and if your answer would
11   impinge on that, you should not answer the question.
12 A  Okay.
13 Q  (By Ms. Johnson) Who did you get assistance from?
14 A  I will not answer that question.
15      MS. DUCEY: So we're asserting attorney/client
16   privilege.
17 Q  (By Ms. Johnson) Okay. Did you talk to Pam Taylor
18   about this grievance process?
19 A  She's the one who informed me of the process. That
20   this was moving forward up to me.
21 Q  Okay. But specifically when.....
22 A  And John Tuthill.
23 Q  .....you went to write this letter, did you go and talk
24   to Pam Taylor and ask her about what would happen next?
25 A  Yes.

Case 3:05-cv-00086-TMB   Document 91-7   Filed 06/14/2007   Page 4 of 5

BOBBI WADE vs. ILASAAVIK COLLEGE, et al  VIDEOTAPE DEPOSITION OF DR. EDNA MacLEAN
CASE NO. 3:05-cv-086-TMB                                     NOVEMBER 30, 2006

Page 82

Q   Why?
A   Because if the policy -- if a grievance started prior to the new policy then and she was well on her way in that process, we would have kept it in that process. That would be my thinking.
Q   And you would just keep it with the old process for what reason?
A   To be fair to Bobbi, because she started the process under the old policy, and it wouldn't be fair to change it in the middle of her process and have her.....
Q   What if the new policy gave her more rights?
A   I don't know. That's a hypothetical right now. I don't know.
Q   You don't know that that's true?
A   No.
Q   Okay. If -- would you consider giving her the benefit of more rights?
A   I think I would stick to the old process to be fair to maybe others that would come up, you know, and --
Q   Other grievances, you mean?
A   Other grievances, yeah. That you start with a process, you stick to the process. You don't change the rules in the middle of the game.
Q   I don't remember if I asked you, who chose Patrick O'Rourke as the hearing officer for the -- Bobbi Wade's

Page 83

grievance hearing?
A   I did. I probably -- yeah.
Q   Why did you choose him?
A   Because I saw him as a person who was knowledgeable about the college and never took sides with anybody. He always gave you what was up front, and he still does.
Q   Did it concern you that he had made a great deal of money each year from the col-.....
A   A what?
Q   A great deal of money each year from the college?
A   No. I -- he worked for it.
Q   But he was paid as a hearing officer. Who paid him for his services?
A   The time that he spent? Probably the college, because he was under contract.
Q   Did he do this as part of his contract, or did.....
A   I don't recall whether he put that in the billing.
Q   Do you re- -- specifically recall.....
A   Yes. Uh-huh (affirmative).
Q   .....a new contract with him for that service?
A   No, I don't recall a new contract with him for this specific task.
    COURT REPORTER: Excuse me. There's a little bit of overtalking, and it's real important to completely wait

Page 84

for her to.....
A   Okay.
    COURT REPORTER: .....ans- -- ask the question and then pause for a second and then answer.
A   Okay.
Q   (By Ms. Johnson) I'm sorry. I'll try to remember that to. What were his qualifications as a hearing officer?
A   He was -- he was with the college, and we were trying to keep the process informal but within -- contained within the college, and he's dealt with an educational institution for many years, and I knew him to be impartial, both on the administration side, and if anything else, he was always partial to the faculty. Then -- and he knew the ins and outs of the college, and I knew Bobbi -- I don't know whether she trusted him, but everybody in the college knew him to be a trustworthy person with -- full of integrity.
Q   Do you know if he had ever performed any other hearing on behalf of the college?
A   No, I don't.
Q   Do you know if he had ever been a hearing officer for any other college?
A   No.
Q   Did you talk to Patrick O'Rourke about the hearing before the hearing?

Page 85

A   I told him that this was a grievance process that had reached my office, and I preferred to have a third -- another person do it and see if we can come to some agreement.
Q   Did you tell him what you expected him to do during the hearing?
A   No. No, I did not.
Q   Did you tell him what the grievance was about?
A   Yes.
Q   And what did you tell him?
A   That this was a grievance by Bobbi Wade concerning the faculty contract and --
Q   Did you tell him why she had grieved?
A   Pardon me?
Q   Did you tell him the issue about the contract, why she had grieved?
A   Yes, I believe so, after I read the information.
Q   And what did you tell him about that?
A   I don't remember the exact words. It was just the contents of all the paperwork.
Q   Well it wasn't.....
    (Indiscernible - simultaneous speech)
Q   More specifically, I mean, it wasn't just a -- there was an issue with her contract, correct?
A   Yes. Uh-huh (affirmative). I guess her contract was

Case 3:05-cv-00086-TMB   Document 91-7   Filed 06/14/2007   Page 5 of 5

BOBBI WADE vs. ILASAAVIK COLLEGE, et al   VIDEOTAPE DEPOSITION OF DR. EDNA MacLEAN
CASE NO. 3:05-cv-086-TMB   NOVEMBER 30, 2006

Page 86

```
           not renewed.
 2    Q    Okay.  And you knew that when you talked to Dr.
 3         O'Rourke?
 4    A    I knew that in February, because the issue of some
 5         faculty contracts I think happened around the end of
 6         January.
 7    Q    And you were aware her's had not been renewed?
 8    A    Right, and I thought that was the process of her
 9         grievance -- I mean, the reason for her grievance.
10    Q    Did you tell O'Rourke why her contract had not been
11         renewed?
12    A    I don't recall telling him that because I -- he needed
13         to read the information himself and then go to a
14         hearing with an open mind, I thought.
15    Q    Did you tell him about the medical leave issues that
16         John Tuthill had told you?
17    A    No, I did not.  I don't remember telling O'Rourke
18         anything about the medical leave.
19    Q    Did you discuss Bobbi Wade with Mr. O'Rourke, telling
20         him or asking him about Bobbi Wade?
21    A    No, I don't.
22    Q    Did you ask him about her qualifications?
23    A    No, I did not.
24    Q    Do you understand what due process is?
25    A    I think so.
```

Page 87

```
 1    Q    What do you think it is?
 2    A    That there is -- in the college, you mean?  For the
 3         college grievance process?
 4    Q    Yes.
 5    A    That we followed procedure according to what's laid out
 6         in the policy and --
 7    Q    Did you understand when you wrote this letter -- in
 8         this third paragraph is says this is not a due process
 9         hearing.
10    A    Uh-huh (affirmative).
11    Q    What would be a due process hearing?
12         MS. DUCEY:  Objection, insofar as it calls for
13    a legal conclusion she's not qualified to give.
14    Q    (By Ms. Johnson)  What do you think a due process
15         hearing is?
16    A    I don't know.
17    Q    Why -- where did you get this information that the
18         hearing -- that this step three grievance meeting would
19         not be a due process hearing?
20         MS. DUCEY:  Objection to attorney/client
21    privilege.  You can answer if it -- if you know other than
22    communications with a lawyer.
23    A    I don't know what the due process hearing is.  I mean,
24         the definition for that would be right there.
25    Q    (By Ms. Johnson)  And you don't know when it would be
```

Page 88

```
 1         applied -- when a due process hearing would be
 2         required?
 3    A    Probably if there's a lawsuit.
 4    Q    Okay.
 5    A    I don't know.
 6    Q    All right.  And you understood when you wrote this that
 7         there would be -- that Bobbi Wade would not be allowed
 8         to call witnesses.  Is that correct?
 9    A    Right.
10    Q    And that she would not be allowed to cross examine
11         anyone during the hearing?
12    A    I think both parties -- right.
13    Q    Correct.
14    A    Yeah.
15    Q    Okay.  Including Bobbi Wade?
16    A    She's a party, yeah.
17    Q    Did you know whether or not Bobbi Wade had been
18         informed of the reasons why her contract had not been
19         renewed when you wrote this letter?
20    A    Would you repeat that?
21    Q    Do you know whether Bobbi Wade had been informed of the
22         reasons why her contract had not been renewed when you
23         wrote this letter?
24    A    I assumed that Tuthill told her.
25    Q    But did you have any specific knowledge.....
```

Page 89

```
 1    A    No, I did not have specific knowledge of why she -- if
 2         Tuthill told her or not.
 3    Q    Do you know how -- do you know whether Patrick O'Rourke
 4         ever worked with Bobbi Wade?
 5    A    I don't know.
 6    Q    Did he work with her.....
 7    A    He worked with the faculty, but with committees of
 8         faculties.
 9    Q    Did he -- do you recall him working with her on
10         accreditation issues?
11    A    Probably not an individual, but on a committee basis.
12    Q    Okay, let me.....
13    A    She was a member of some committee for accreditation.
14         We had so many committees for accreditation.
15    Q    Let me see if I have more than one of these.  (Pause -
16         locating documents)  Good grief.  Too much paperwork in
17         this case.
18    A    Not good.
19    Q    (Pause - locating documents)  Well do you want to read
20         this one?  I can go and make a copy if you would
21         prefer.
22    A    (Pause - reading document)  Okay.
23         MS. JOHNSON:  Are we on 78 in our.....
24         MR. GAMACHE:  That's my recollection.
25         MS. JOHNSON:  The next one would be 78?
```