Cynthia L. Ducey
Delaney Wiles, Inc.
1007 West 3rd Avenue, Suite 400
Anchorage, Alaska 99501
(907) 279-3581
Fax  (907) 277-1331
cld@delaneywiles.com
Attorney for defendants Ilisagvik College,
John Tuthill and Pamela Taylor

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| BOBBI J. WADE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 3:05-cv-00086 (TMB) |
| v. ) | |
| ) | |
| ILISAGVIK COLLEGE, NORTH SLOPE ) | |
| BOROUGH, JOHN TUTHILL, individually ) | |
| and PAMELA TAYLOR, individually ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Defendants, Ilisagvik College, Dr. John Tuthill, and Pamela Taylor, ("Ilisagvik College" or "the College"), move for summary judgment seeking dismissal of this case in its entirety. In summary, the motion should be granted because 1) plaintiff cannot establish a prima facie case of FMLA interference since plaintiff obtained her leave within 48 hours of a newly diagnosed condition and after she complied with the college's lawful request for medical information; 2) plaintiff cannot establish a prima facie case of FMLA discrimination because she was not qualified for her job; 3) her § 1983 claim should be dismissed because she had no due process interest in employment; 4) Dr. Tuthill and Taylor should be dismissed since they were public officials and have qualified immunity; 5) the undisputed facts establish that plaintiff's alleged protected speech was for a personal personnel matter and thus is not protected speech; 6) there is

no basis to impose punitive damages; 7) Wade received the FMLA's benefits and was not prejudiced; and 8) Count I should be limited to compensatory damages only because the College acted in good faith and upon the advice of counsel. For all of these reasons the motion for summary judgment should be granted.

## FACTS

Ilisagvik College in Barrow is a two year community college offering post-secondary education aimed at matching workforce needs. *Ilisagvik College: About Us* (visited April 9, 2007)<http://webspace.ilisagvik.cc/index.php?option=com_content&task=view&id=19&Itemid=63>. The College was established by North Slope Borough Municipal Code 8.02.020 as a public, non-profit corporation. Exh. A, Board of Trustees Approved Policy Manual Excerpts (Manual), at 2. The mission of the College is to provide quality post-secondary academic, vocational and technical education. *Id.* at 3. The predominantly Eskimo student population is at risk due to their minority and challenges presented on the North Slope. Exh. B, Deposition of Sonya Abu (Abu), at 10, 12-13; Exh. C, Deposition of Bobbi Wade (Wade V. I), at 86.

Dr. John Tuthill was a Fulbright Scholar before his employment with the College. Exh. D, Deposition of John Tuthill (Tuthill), at 9. Dr. Tuthill was hired as Dean of Instruction in June 2003. *Id.,* at 11, 23, 298. Before he came, the College had only an acting Dean. Exh. C, Wade V. III, at 462. As Dean Dr. Tuthill's duties included supervising and evaluating all faculty and developing new programs according to Board policies and the College President. Exh. D, Tuthill, at 13. Dr. Tuthill obtained a bachelor's degree from the University of Michigan, a master's degree from Columbia University and a doctorate from the University of California at Berkeley. *Id.* at 296. Dr. Tuthill was the interim president at the College of the Marshall Islands when he left in 2002. *Id.* at 8.

Pamela Taylor was Director of Human Resources from 1998 until 2006. Exh. E, Deposition of Pamela Taylor (Taylor), at 6. She obtained a bachelor's degree in organizational behavior and a master's degree in human resources and organizational development from the

ELANEY WILES, INC.
007 WEST 3RD AVENUE
SUITE 400
NCHORAGE, ALASKA
(907) 279-3581

University of San Francisco. *Id.* at 8. Before her employment at Ilisagvik College, Taylor was a human resources manager/administrator for several Silicon Valley companies. *Id.* at 9, 11.

When plaintiff was hired by the College in 2000 she was a three time divorcee who had been unemployed for three months. Although she had a bachelor's degree in secondary education with a minor in English and a master's degree in art education from Troy State University in Troy, Alabama, she had never obtained a permanent teaching position anywhere. Exh. C, Wade V. I, at 55-56; Exh. F, Wade College Transcripts, at 1-5. She had applied no less than five times to the Anchorage School District to be a teacher but was never hired. Exh. C, Wade V. I, at 19, 20, 23, 26, 28, 29, 35, 37, 39. Additionally, she had applied but had not been hired by school districts in Palm Springs and New Haven, CT. *Id.* at 25. She applied for positions teaching English or Art at numerous colleges but could only obtain nonpermanent adjunct teaching contracts as an English teacher. *Id.* at 34, 38, 39, 40, 41. She had also sold insurance twice for brief time periods and worked as a hotel manager in Barrow, earning $10 per hour. *Id.* at 19, 20, 26, 30. Prior to teaching at Ilisagvik Wade had never taught a business course except for Business English. *Id.* at 60-61.

Wade had never applied for a position teaching Business because she questioned whether she was qualified to teach business. *Id.* at 46-48. In fact she had taken no business classes as a student. When she applied for a position at Ilisagvik, she applied for the Office Technology position. Taylor and the outgoing temporary business teacher, Lisa Asplin, offered her the business management position instead. *Id.* It is the Dean of Instruction's responsibility to ensure that faculty have the proper credentials to teach their classes. Exh. D, Tuthill, at 108. Despite this, Wade was hired without speaking to the Dean of Instruction or the College President. Exh. C, Wade V. I, at 47.

Dr. Tuthill became Dean in June 2003 after Wade was hired. Exh. C, Wade V. I., at 147-48. The College had recently become accredited by the Northwest Commission on Colleges and Universities ("NWCCU"). Exh. D, Tuthill, at 56, 58; Exh. G, NWCCU Website Documents, at 1. "Regional accreditation is a process of recognizing educational institutions for performance,

ELANEY WILES, INC.
007 WEST 3RD AVENUE
SUITE 400
NCHORAGE, ALASKA
(907) 279-3581

integrity, and quality." Exh. G, NWCCU Website Documents, at 3.  Under the accreditation standards, College faculty was required to be "professionally qualified." *Id.* at 4.

Once on the job, Dr. Tuthill reviewed the files of all faculty members. Exh. D, Tuthill, at 14-15.  No later than August 2003, before he met Wade, Dr. Tuthill knew Wade was not qualified to be an assistant professor of business management because she had no academic background in business, did not have an MBA and had taken no advanced business courses. Exh. D, Tuthill, at 54, 56; Exh. C, Wade V. I, at 52-58, 60.

Wade's teaching contract with the College was a limited term of one year. Exh. C, V. I, at 96; Exh. H, 2003-2004 Faculty Appointment Letter (2003 Contract), at 1.  According to Wade's contract, Board Policy and the Employee Handbook, faculty members were not tenured and had no expectation of continued employment beyond the one year contract. Exh. H, 2003 Contract, at 1; Exh. I, Ilisagvik College Employee Handbook Excerpts (Handbook), at 12; Exh. A, Manual, at 4, 5.  Wade's 2003 contract provided for teaching twelve credits of instruction a semester and three credit equivalents of service. Exh. H, 2003 Contract, at 1.  The faculty normally received $1,500 per credit for any credits of instruction above the twelve credit threshold. Exh. D, Tuthill, at 195.  Wade signed her 2003 contract before she left Barrow. Exh. C, Wade V. I, at 98-99.

The Employee Handbook permitted several types of leave, including personal leave, sick leave, extended medical leave, and family medical leave. Exh. I, Handbook, at 3-8.  Extended medical leave was used when the employee was out of Barrow for 3 days or more for medical reasons. *Id.* at 7-8; Exh. E, Taylor, at 43-49.  Taylor provided Wade with a new employee orientation and explained the leave policies. Exh. E, Taylor, at 40-43; Exh. C, Wade V. I, at 66-67.  Wade signed an acknowledgment of receipt of the handbook and all updates and had used leave previously. Exh. J, Acknowledgments of Receipt Dated 8/22/00, 9/21/01, 1/10/02; Exh. C, Wade V. I, at 69, 76, 77, 79-80.  When an employee wanted foreseeable medical leave they were required to complete a written leave request form at least 30 days in advance of the requested date, and include the reason for the leave, its duration and return date. Exh. I, Handbook, at 6.  If

:LANEY WILES, INC.
:07 WEST 3ʀᴅ AVENUE
SUITE 400
ᴄHORAGE, ALASKA
(907) 279-3581

Memorandum in Support of Motion for Summary Judgment
*Wade v. Ilisagvik, et al.*, Case No. 3:05-cv-00086-TMB                    Page 4 of 50

the leave was for the employee's own serious health condition, medical certification of the serious health condition was required. *Id.* If the certification did not show sufficient disability to preclude the employee from the performance of duties, the Medical Leave could be canceled. *Id.*

According to Wade, "It takes a will of steel to live in Barrow." Exh. C, Wade V. IV, at 1011. Barrow has an extreme climate and is off the road system. The temperature dips below zero for eight months of the year. *BBC – Weather Centre – World Weather - Average Conditions – Barrow* (visited May 30, 2007) <http://www.bbc.co.uk/weather/world/city _guides/results.shtml?tt=TT001540>; *CMDL Annual Report 24: 1.5.2. Barrow Station Climatology* (visited May 30, 2007)<http://www.esrl.noaa.gov/gmd/publications /annrpt24/brw152.htm>. Thus, it is not surprising that Wade attempted to spend blocks of time during the teaching semester out of Barrow. Exh. C, Wade V. II, at 317, 318, 418. For instance in the 2002-2003 academic year Wade spent 15 days out of Barrow. Exh. K, Request For Leave Dated 6/24/02; Exh. L, Request For Leave Dated 6/13/02; Exh. M, Request For Leave Dated 5/2/03; Exh. N, Wade E-mail Dated 3/19/02; Exh. O, Wade E-mail Dated 11/7/02. Wade had a history of using personal leave combined with sick leave. Thus, she would leave Barrow and attend to personal matters while also scheduling medical visits. Exh. O, Wade E-mail Dated 11/7/02; Exh. C, Wade V. I, at 111-117.

Personal leave had been used so often by faculty during the teaching semester that Dr. Tuthill received complaints, including the "legend" of a faculty member who took a two week cruise during the teaching semester. Exh. D, Tuthill, at 145-47. Although the leave may have been approved in the past, two weeks' paid vacation during the semester to faculty in addition to the roughly four weeks' leave at Christmas and summers off was unprecedented. *Id.* Dr. Tuthill wanted a leave policy that would permit a day or two of leave when necessary, but would not interfere with the delivery of teaching. *Id.* at 147. Before Dr. Tuthill arrived the Board changed the personal leave policy. *Compare* Exh. P, April 17, 2002 Employment Offer (2002 Contract), and Exh. H, 2003 Contract. In the 2002 contract, Wade could take up to 12 days of paid leave and use up to 6 days for personal paid time off in lieu of sick leave. Exh. P, 2002 Contract, at 3;

ELANEY WILES, INC.
307 WEST 3RD AVENUE
SUITE 400
ANCHORAGE, ALASKA
(907) 279-3581

Memorandum in Support of Motion for Summary Judgment
*Wade v. Ilisagvik, et al.*, Case No. 3:05-cv-00086-TMB                    Page 5 of 50

Exh. C, Wade V. I, at 101.    However in 2003, Wade was permitted up to twelve days' leave when taking it "did not unduly interfere with the delivery of the College's program of instruction," and she received advance approval from the Dean of Instruction. Exh. C, Wade V. I., at 101; Exh. H, 2003 Contract, at 4. Wade was aware of the rules. Exh. C, Wade V. I, at 102.

At the same time Dr. Tuthill became Dean Sonya Abu was hired into the new position of Student Retention Officer.   Her duties were to assist the student population, who were at risk of not completing school.  She had an advisory role in helping students sign up for classes and overcoming obstacles they faced throughout the process. Exh. B, Abu, at 9-10.  Abu worked with instructors to bridge the gap between students and faculty.  *Id.* at 11.  Abu knew from training she received that the student population was at risk since they were predominately Inupiat Eskimos, and due to the general challenges of the North Slope. Eskimos had differences in communication, body language, culture and teaching methodology.  *Id.* at 13-14.  Inupiats tend not to make eye contact and speak more slowly, while Caucasians speak more quickly and look people in the eye.  *Id.*  Further, Inupiat teaching is verbal and hands-on, while in academia it is textbook oriented.  *Id.* at 12-13, 16.  Abu built trust with the students and they began to bring concerns about faculty to her, mainly through spokespersons.  *Id.* at 19.  Issues about Wade surfaced immediately, as well as two other teachers, Jay St. Vincent and Courtney Bartholomew. *Id.* at 21-23.  When Abu received concerns about faculty she documented them and reported them to her supervisor, Beverly Grinage.  Grinage told her to notify Dr. Tuthill, which she did with three e-mails. *Id.* at 23, 25-27, 32, 39-41, 47-53.

The largest number of concerns Abu received were about Wade.  *Id.* at 21.  Students complained that Wade talked down to them and they felt humiliated.  *Id.* at 28.  Abu observed Wade's interaction with a student at orientation and saw her "cut off" the student in an abrupt manner.  *Id.* at 22.  Students complained that Wade did not respond to their e-mails. Exh. C, Wade V. II, at 383.  They were upset when Wade accused students of stealing her answer key to a test, resulting in Wade's refusal to grade a test.  *Id.* at 393; Exh. B, Abu, at 31-32.  Instead of testing out of the class for credit, students had to take the entire class.  She also refused to teach a

LANEY WILES, INC.
07 WEST 3RD AVENUE
SUITE 400
CHORAGE, ALASKA
(907) 279-3581

class, accusing the students of stealing the teacher's text.    Exh. Q, Abu E-mails and Memorandums, at 40.    Wade announced she wanted to cancel one of the scheduled days' meeting time for Business English and change the length of the class.    Exh. B, Abu, at 33. Students complained that Wade did not teach Business Math students how to calculate the lowest common denominator.    Exh. Q, Abu E-mails and Memorandums, at 40.

Wade admitted she had no formal policy regarding late homework, and that her acceptance of late homework depended on the particular student's circumstances, which Abu saw as discriminatory.    Exh. C, Wade V. II, at 355-56.    The Business English class was difficult because Wade was teaching it randomly out of the book, instead of teaching it chronologically. Exh. B, Abu, at 34. Wade assigned homework for the entire semester that would be due only at the end of the semester, giving students no opportunity to obtain feedback about their work before the final.    *Id.* at 51, 60-61.    Wade canceled a Thursday meeting time for Business English on short notice, which meant not all students learned of the cancellation.    *Id.* at 32.    The students felt classroom attendance did not matter since Wade had canceled classes and told them to go to a tutor.    *Id.* at 51-52.    Students were also concerned that Wade's granddaughter, Amy (Underwood) Conyer, was allowed to take classes while living in Tennessee.    *Id.* at 83.

Some of the student concerns involved Blackboard classes, which were taught online only, and completed at the students' individual pace during the semester.    After Dr. Tuthill learned of concerns about Bartholomew and Wade regarding Blackboard classes, he reviewed their courses online and determined that Wade's classes used only the vendor prepared class, without any customization and there was no method for students to interact with the instructor or other students.    Exh. D, Tuthill, at 61-62.

During the semester Dr. Tuthill learned additional information about Wade's granddaughter that caused him increasing concern.    Amy received tuition waivers of over $2,000 from Ilisagvik because Wade claimed Amy as a dependent; however she admitted Amy was not her dependent.    Exh. R, Dr. Tuthill 1/20/04 E-mail, at 2.    Wade completed and signed the tuition waiver form, which was for students to complete.    Exh. C, Wade V. IV, at 974-76, 978; Exh. S,

ELANEY WILES, INC.
007 WEST 3RD AVENUE
SUITE 400
NCHORAGE, ALASKA
(907) 279-3581

Tuition Waiver Application, at 1. Dr. Tuthill learned that Wade taught Amy all of her last 23 credits at the College. Exh. R, Dr. Tuthill E-mail, at 2; Exh. C, Wade V. IV, at 969-70.  Amy lived in Barrow only one semester and when she returned to her home in Tennessee, she was enrolled at Middle Tennessee State University ("MTSU"), but continued to simultaneously take classes at Ilisagvik only from her grandmother. Exh. C, Wade V. IV, at 790, 793-94, 970-73. Dr. Tuthill learned plaintiff had promised Amy a grade of deferred ("DF") at the beginning of two classes and attempted to change Amy's grade to DF in one class even though another instructor was teaching it. *Id.* at 780-83; Exh. D, Tuthill, at 186-87. Amy enrolled in Business Math, a course taught in person, but apparently attended only one session by phone. Exh. T, Deposition of Amy Conyer (Conyer), at 66-68. For the classes Wade taught Amy, her overall GPA was 3.62. *Id.* at 123; Exh. U, Conyer Ilisagvik College Transcript.[1]

Wade was required to provide the College with a written leave request at least 30 days in advance of the requested leave date for foreseeable medical leave. Exh. I, Handbook, at 6; Exh. C, Wade V. I, at 72-73. If leave was unforeseeable, the employee was expected to request leave as soon as reasonably possible. Exh. I, Handbook, at 6; Exh. C, Wade V. I, at 73. The handbook and the leave form required the employee to furnish medical certification of the serious health condition. Exh. I, Handbook, at 6; Exh. C, Wade V. I, at 73.

Although Wade was in Tennessee in the summer of 2003 she delayed scheduling an appointment with her doctor, Cecilia Church, until August 6, about two weeks before her work duties resumed. Exh. C, Wade V. I, at 110, 117, 134-139. Wade knew in June 2002 of an itchy, burning lesion on her chest. Exh. W, Samuel Simmonds Hospital Chart Note Dated 6/26/02. At that time, she requested a referral to a dermatologist, but did nothing about it while in Tennessee. Exh. C, Wade V. I, at 110, 117, 139. On August 6 when she saw Church she intended to return to Tennessee during the Fall semester for routine medical tests that were not of any particular

---

ELANEY WILES, INC.
007 WEST 3ᴿᴰ AVENUE
SUITE 400
NCHORAGE, ALASKA
(907) 279-3581

[1] By contrast, Amy's cumulative GPA at MTSU, including remedial courses, was 0.587, and she was on academic probation and then given three successive one-year suspensions by MTSU. Exh. V, Conyer MTSU Transcript. *Id.* Conyer received 1 A, 2 C's, 1 D, and 14 F's in her courses at MTSU over four semesters. *Id.* Conyer did not earn a degree from MTSU or Ilisagvik College. Exh. T, Conyer, at 8.

urgency and to see a specialist for elective surgery. *Id.* at 119, 122, 142. Dr. Church wanted her to have routine tests done for the spot on her shoulder, but Wade made no effort to schedule the test before she left. *Id.* at 119-20. None of her symptoms required attention prior to the end of the teaching semester. *Id.* at 141-44, 160. Nevertheless, Wade obtained a note from Dr. Church on August 6, which stated Wade should "return as soon as possible for further medical workup with possible surgical treatment." Exh. X, Dr. Church's Note Dated 8/7/03.

Wade failed to confer with Church to determine whether the tests could wait until the end of the semester or how the tests could be scheduled to minimize disruption for her students. Exh. C, Wade V. I, at 127-28, 141-45. Instead, she went back to Barrow and failed to advise anyone at the College that she intended to leave her teaching duties during the semester. *Id.* at 146.

When Wade returned to Barrow, the course schedule had already been published. *Id.* at 150-51. This included two courses, Business English and Business Math. *Id.* at 153. These classes consisted of three short modules denoted: Modules A, B, and C. Each module was an intense one month class, with a final grade at the end of each module. A student could not take the next module unless they had passed the preceding module. *Id.* at 153-54. Students relied on the published dates and times of courses to arrange their schedules. Exh. B, Abu, at 33. Instead of conferring with Dr. Tuthill and her doctors to determine the best time to schedule leave so as to minimize disruption to her teaching duties, and without permission from Dr. Tuthill, Wade announced to her Business English and Business Math Module B students in early October that she intended to change the class meeting dates for both Module C courses, as well as the class meeting times. *Id.* at 73-75; Exh. D, Tuthill, at 239-40; Exh. C, Wade V. I, at 210. Predictably, students complained to Sonya Abu. Additionally she completed a class course schedule change for Module C of both Business English and Business Math, and had another instructor, Courtney Bartholomew, approve them before presenting them to Dr. Tuthill. Exh. C, Wade V. I, at 205-210; Exh. Y, BUS 105B Course Information Change Form; Exh. Z, BUS 109B Course Information Change Form. The course schedule changes required a reason to be given and Wade wrote "to accommodate the students' needs", even though she knew the change was simply to

LANEY WILES, INC.
07 WEST 3RD AVENUE
SUITE 400
CHORAGE, ALASKA
(907) 279-3581

accommodate her desire for leave.  Exh. C, Wade V. I, at 207-08; Exh. Y, BUS 105B Change Form; Exh. Z, BUS 109B Change Form.

Wade presented her proposal to change the Module C meeting dates and times to Dr. Tuthill sometime during the last week of September 2003.  Exh. C, Wade V. I, at 162.  She may or may not have presented the note from Dr. Church, as well as a leave request.[2]  However, by the last week in September, the doctor's note was at least 47 days old, and by all accounts stale. Exh. AA, Deposition of Debra English (English), at 99.  Nothing prevented Wade from presenting the note to the College sooner and the College had the right to request new medical documentation of her need for leave before the end of the semester.  *Id.* at 133.

Wade told Dr. Tuthill that the purpose of the leave was medical leave, although she advised Pam Taylor, consistent with her past practice, that the leave was combined personal leave and medical leave.[3]  Exh. E, Taylor, at 56; Exh. C, Wade V. I, at 162.  On October 2, Wade completed a leave request form and checked "personal" leave rather than sick leave, extended medical leave or family medical leave.  Exh. BB, Wade Leave Request Dated 10/2/03.  The form sought personal leave 18 days later for a period of 11 days.  *Id.*  Wade did not give 30 days' notice to her employer for her foreseeable leave request.  *Id.*; Exh. C, Wade V. I, at 194-96. Wade completed the form after she received a call from Dr. Church's office advising that they had scheduled appointments for the second week of October.  Exh. C, Wade V. I, at 163.  She told them that she could not come then, but made no attempt to schedule the appointments so as to minimize disruption to teaching.  *Id.* at 165.

Dr. Tuthill sent Wade an e-mail on October 3, as follows:

My understanding is that you will begin teaching Business English "B" and Business Math "B" next week, as originally scheduled, and that you will notify the students in advance, so they will know to come.

---

[2] Determination of these issues is not necessary for resolution of the motion for summary judgment.  The defendants assume for purposes of this motion only that she did in fact present these documents.
[3] Resolution of this disparity is not necessary for determination of summary judgment.

ELANEY WILES, INC.
007 WEST 3RD AVENUE
SUITE 400
NCHORAGE, ALASKA
(907) 279-3581

Memorandum in Support of Motion for Summary Judgment
*Wade v. Ilisagvik, et al.*, Case No. 3:05-cv-00086-TMB                    Page 10 of 50

> My understanding further is that you will consult with your physicians here and in Tennessee to determine if they feel that you require immediate medical treatment, and that, depending on what they say, you may prepare a medical leave request so that you can receive any required treatment during the semester.
>
> If my understanding is incorrect, please tell me your understanding as soon as you can.

Exh. CC, Dr. Tuthill 10/3/03 E-mail; Exh. C, Wade V. I, at 235.

Wade visited the hospital clinic in Barrow on October 6 but failed to obtain a note addressing Dr. Tuthill's request to have a doctor determine if medical treatment was required before the end of the semester. Wade reported to Dr. Michelle Snyder that the same chest lesion she failed to seek treatment for the year before was irritated, and right hip pain. Exh. DD, Deposition of Michelle Snyder (Snyder), at 10-11; Exh. EE, Hospital Chart Note Dated 10/6/03. The hospital chart note does not indicate whether Wade presented Dr. Church's note to Snyder, and Wade has no recollection. Exh. EE, Chart Note. Dr. Snyder gave Wade a form note stating, "I agree and recommend she see a specialist for multiple medical problems;" however Dr. Snyder does not recall what she agreed with, or whether she saw the note. Exh. DD, Snyder, at 16-17. None of Wade's problems required medical attention before the end of the semester. *Id.* at 17; Exh. C, Wade V. I, at 141-45.

Dr. Tuthill and Pam Taylor called the College's outside counsel, Cheryl McKay, the first week of October to determine their rights and duties regarding Wade's leave request. Exh. D, Tuthill, at 25; Exh. FF, Landye Bennett Blumstein Invoice, at 2. McKay advised them the College should grant Wade's leave request as soon as she provided the College with documentation that there was a timely, medical need for treatment that could only be provided off-Slope. Exh. D, Tuthill, at 25-26. On October 9, Dr. Tuthill wrote to Wade:

> If you are planning to take the medical leave later this month, I need a written notification from a licensed physician, preferably by fax and as soon as possible, to the effect that your medical treatment cannot wait until the December break, when you could have the treatment without conflict with your regular teaching duties. *As soon as I have received such a notification, I can begin to process the request for a medical leave.*

ΞLANEY WILES, INC.
)07 WEST 3ʀᴅ AVENUE
SUITE 400
ɴCHORAGE, ALASKA
(907) 279-3581

Memorandum in Support of Motion for Summary Judgment
*Wade v. Ilisagvik, et al.*, Case No. 3:05-cv-00086-TMB                    Page 11 of 50

Exh. GG, Dr. Tuthill E-mail Dated 10/9/03 (emphasis added); Exh. C, Wade, V. I, at 249. Instead of complying with Dr. Tuthill's request to provide written notice from her physician, Wade told him she would not provide the information and either withdrew her October 2, 2003, leave request on October 9, 2003, or at minimum, agreed to delay it until December. Exh. C, Wade, V. I, at 250, 252-53, 260; Exh. GG, Wade E-mail Dated 10/9/03. A reasonable employer would have considered the October 9th e-mail as a withdrawal of her leave request. Exh. AA, English, at 119, 130. Wade did not ask her doctors if they believed she needed immediate treatment. Exh. C, Wade V. II, at 290. As of October 9, she had no medical condition requiring treatment before the end of the semester. *Id.*, Wade V. I, at 252-53.

On October 14, Wade e-mailed Pam Taylor asking about the status of her leave request. *Id.* at 256-58. Taylor replied, stating she understood the leave request was withdrawn but to follow up with Dr. Tuthill since he approved leave requests. *Id.* at 258-59; Exh. E, Taylor, at 130; Exh. HH, E-mails Between Wade and Taylor Dated 10/14/03. Yet Wade did not follow up. Exh. C, Wade V. II, at 291.

Although Wade cannot recall if a new leave request was submitted to the College between October 2 and October 20, and there is no record of such a request, Dr. Tuthill sent her an e-mail dated October 20, regarding a personal leave request for December leave. Exh. C, Wade, V. I, at 265-66; Exh. D, Tuthill, at 214-18; Exh. E, Taylor, at 136-37. Dr. Tuthill denied the request since Wade continued to refuse to provide medical certification demonstrating need for treatment prior to the end of the semester, and since it was during the teaching semester. *See* Exh. II, Dr. Tuthill E-mail Dated 10/20/03; Exh. C, Wade V. I, at 265-66.

Wade returned to see Dr. Snyder on October 24, 2003 and had the right chest lesion excised. She also reported seven other symptoms, which did not require medical attention outside of Barrow before the end of the semester, and did not incapacitate her. Exh. DD, Snyder, at 22-26. The shaved tissue was sent to pathology and diagnosed sometime on or about October 31, 2003 as an in situ squamous cell carcinoma. *Id.* at 33.

ELANEY WILES, INC.
007 WEST 3RD AVENUE
SUITE 400
NCHORAGE, ALASKA
(907) 279-3581

An in situ cancer is one that is still on top of the skin and has not spread or metastasized, and is the second least serious type of skin cancer. *Id.* at 34, 56. Until Dr. Snyder received the pathology results of the shave on October 31, there was no medical reason for Wade to travel outside of Barrow to see a doctor before the end of the semester. *Id.* at 37-38, 46. Wade was advised to have the area re-excised. Exh. C, Wade V. I, at 227. Because Wade told Dr. Snyder that her leave had been unqualifiedly denied, Dr. Snyder wrote "urgent" on the note. Exh. DD, Snyder, at 44, 72. Dr. Snyder was intentionally vague about the time frame in the note. *Id.* at 44. Urgent to Dr. Snyder meant that it should occur within the next four weeks, i.e., before the end of the semester. *Id.* at 72-73.

Wade submitted a new personal leave request on November 3 for 15 days later but still failed to submit a doctor's certification of a serious health condition. Exh. JJ, Request For Leave Dated 11/3/03; Exh. C, Wade, V. I, at 267-69. The next day Wade submitted another leave request and increased the number of days sought from 6 days to 11 days but did not submit medical certification. Exh. KK, Request For Leave Dated 11/4/03. On November 5, Wade finally presented Pam Taylor a doctor's note, dated November 5, from Dr. Snyder, who wrote, "Ms. Wade needs follow up for some medical conditions that cannot be addressed here. The follow up should occur in a somewhat urgent time frame." Exh. LL, Dr. Snyder 11/5/03 Note; Exh. C, Wade, V. I, at 276-77. Dr. Tuthill approved the November 4 leave request the next day, November 5, when he received the note from Dr. Snyder. Exh. C, Wade V. I, at 232, 277-78.

Wade's November 4th leave request was designated personal leave subject to change when Wade returned and presented her appointment schedule. Exh. E, Taylor, at 143; Exh. KK, November 4th Request. Wade provided a return to work slip and faxed a partial appointment schedule but never provided any additional information about a serious health condition. Exh. E, Taylor, at 157-59. Nevertheless Wade received paid leave.

When Wade's leave request was approved on November 5, Modules B of Business English and Business Math had not ended and Wade was teaching them; however, she had not signed a contract to teach Module C. Business English Module C began on November 6, and

BLANEY WILES, INC.
007 WEST 3RD AVENUE
SUITE 400
ANCHORAGE, ALASKA
(907) 279-3581

Business Math Module C began on approximately November 15. Exh. C, Wade, V. II, at 330-31; Exh. MM, Business English Syllabus, at 1.

After Wade's request for leave was approved, and after consultation with Sonya Abu, and Wade, Dr. Tuthill determined that Wade's suggested schedule would not be in the best interests of the students. Exh. D, Tuthill, at 36-37, 247-48. Accordingly, he hired Aimee Valenti to teach Business English C and Tim Carlson for Business Math when these courses began. Before Wade's leave began Abu observed a yelling match between Valenti and Wade after Wade refused to give Valenti the syllabus and teaching materials. Exh. B, Abu, at 91-92; Exh. C, Wade, V. III, at 630; Exh. D, Tuthill, at 116-17, 240-41. Wade continued to be uncooperative with Valenti. Wade never provided her teaching materials to Valenti, and Valenti was required to use her own materials for Business English Module C. Exh. C, Wade V. IV, at 808. Wade demanded that Valenti not be retained as an adjunct instructor. Exh. D, Tuthill, at 110.

Wade made no attempt to schedule leave in a manner not disruptive to the school. She did not attempt to have the follow up in Alaska or Seattle. Exh. C, Wade, V. I, at 221. Instead, she saw her family doctor in Tennessee and then went to a plastic surgeon, Dr. Joseph DeLozier, who re-excised the treated area in a procedure that took 15 minutes to do and about 30 minutes for the lab to verify Dr. Snyder had excised all problem cells. Exh. NN, Deposition of Dr. Joseph DeLozier (DeLozier), at 5-12. She also consulted with him about a lesion on the left side of her face. Exh. OO, DeLozier Chart Note.

Wade returned a few days later to have stitches removed. Exh. C, Wade V. II, at 313. She did not ask Dr. DeLozier about having her stitches removed in Barrow or inquire if the stitches could be removed sooner. *Id.* She did not tell Dr. DeLozier or Dr. Church the College needed her back or make any effort to minimize disruption to classes. Wade corresponded with her students and kept up with her online courses while in Tennessee. *Id.* at 317. She was capable of working and flying back to Barrow two days after the procedure, and although she had a note from Dr. DeLozier stating she was fully capable of returning to work on the 26th, she delayed her return until after the Thanksgiving holidays and obtained an inexplicable note from

ELANEY WILES, INC.
007 WEST 3RD AVENUE
SUITE 400
ANCHORAGE, ALASKA
(907) 279-3581

Dr. Church stating that she was released for work on December 2. Wade could have safely waited until the Christmas holidays to have her lesion reexcised. Exh. NN, DeLozier, at 17.

While Wade was on leave, additional problems regarding her teaching came to the attention of Dr. Tuthill. As mentioned above, she had notified the students of a change of the class meeting dates and times, and announced this to the students contrary to the published schedule in the schedule of classes. *See* above at p. 9. Over the Christmas break in 2003, Dr. Tuthill became aware that there were many problems involving the grades given in Wade's Fall 2003 Business English and Business Math courses. Exh. D, Tuthill, at 34-35. He later referred to it as a "total collapse in the grading system for Business English and Business Math." *Id.* at 169. Specifically, Wade failed to turn in her students' grades to the registrar in a reasonable time. *Id.* at 35. Because the courses were modular courses, they had an A component for four weeks, a B component for four weeks, and a C component for four weeks. *Id.*; Exh. C, Wade, V. I, at 153-54. Wade had taught modular courses repeatedly in the past and was aware of the procedural grade requirements. Exh. D, Tuthill, at 178. Additionally she knew the students must learn foundational material in Module A before learning more complex materials in Module B. Exh. C, Wade, V. I, at 211-12. It was important for the instructor teaching Module courses to complete grading of all tests and turn in the grades to the registrar. A student was not permitted to enroll in the subsequent Module if they had not passed the preceding Module. Exh. C, Wade, V. I, at 153-54. Wade waited until the second week of December to turn grades in. Thus, students were enrolled in Module C of Business English and Math who were not entitled to take the class because they had not successfully completed Module B. Exh. D, Tuthill, at 175-76; Exh. PP, Dr. Tuthill Grade Problems Memorandum, at 1-3.

When Wade returned to Barrow in early December she filed a grievance because of anger at Valenti and Dr. Tuthill for taking her control away. Exh. QQ, December 11, 2003 Grievance. The College's employee grievance procedure is described in the Handbook. Exh. I, Handbook, at 10-11. Wade's grievance asserted that one of her classes was canceled without consulting her and complained that she was not allowed to teach Module C for Business English and Business

Math. Exh. QQ, December 11, 2003 Grievance, at 2-3. Wade complained that Dr. Tuthill would not approve the rescheduling of her classes. *Id.* at 4. She also asserted that Dr. Tuthill improperly denied her leave requests, and that the College breached two added duty contracts she had signed. *Id.* at 4-5. In December Wade met with Dr. Tuthill and Taylor regarding the grievance. The College's position did not change and Wade took no further action until February 29, 2004, when she filed a second grievance. Exh. C, Wade V. IV, at 751, 753.

On January 15, 2004, Dr. Tuthill told Wade he was concerned about the success rate in Wade's Blackboard courses. Exh. R, Dr. Tuthill E-mail Dated 1/15/04, at 1. Only 23 percent of the students in Wade's three Blackboard courses received credit for their course at the end of the fall semester. *Id.* Dr. Tuthill suggested Wade: (1) have a separate due date for each chapter assignment; (2) give her students all the time allowed by the academic schedule to finish their course; and (3) have regular Blackboard discussions in her Blackboard classes. *Id.*

In the meantime, the College was required by February 1 to give notice if it did not intend to renew Wade's contract. *See* Exh. A, Manual, at 5. In January 2004, Dr. Tuthill informed Dr. MacLean that he had not reached a decision about the renewal of the contracts of Bobbi Wade and Courtneay Bartholomew. Exh. D, Tuthill, at 49-50. Dr. Tuthill wrote a memorandum to himself at this time regarding Wade. *Id.* at 93; Exh. RR, Dr. Tuthill Memorandum Regarding Wade. Dr. Tuthill's concerns about Wade included that she did not have a solid academic background in the business courses she taught at the College. Dr. Tuthill had numerous complaints from students through Abu and Wade had a low student success rate. Wade was resistant to changing her style of teaching. Wade showed poor professional judgment by teaching independent study courses to her granddaughter. Exh. RR, Dr. Tuthill Memorandum Regarding Wade. Dr. Tuthill defined "student success" as students who had registered for a course and received credit for the course at the end of the semester. Exh. D, Tuthill, at 77. Wade's Blackboard students had a notably low student success rate of only 23%. *Id.* at 78-79.

At about the same time in January that Dr. Tuthill sent Wade an e-mail about Blackboard, Dr. Tuthill sent a similar e-mail to Bartholomew about Blackboard. *Id.* at 130. While Wade did

ELANEY WILES, INC.
007 WEST 3RD AVENUE
SUITE 400
NCHORAGE, ALASKA
(907) 279-3581

not acknowledge receipt of the e-mail or provide Dr. Tuthill any feedback, Bartholomew immediately acknowledged receipt of it and said he would work on the issues enumerated by Dr. Tuthill. *Id.* at 130-31. Bartholomew made all of Dr. Tuthill's requested changes. *Id.* at 130.

Dr. Tuthill realized that even if Wade worked on her specific performance issues, ultimately she was not qualified to teach business courses at the college level. *Id.* at 230. Wade had training in educational administration, not business. *Id.* at 231. In late January after reviewing Wade's file and gathering evidence from as many sources as possible, Dr. Tuthill made the initial recommendation to not renew Wade's contract. *Id.* at 31-33. He based his recommendation upon the "combination of very serious performance issues, coupled with a basic lack of qualifications for the position she held." *Id.* at 234. President McLean approved his recommendation. On January 30, Dr. Tuthill gave written notice to Wade that her contract would not be renewed. Exh. SS, Dr. Tuthill 1/30/04 Letter.

On February 29, Wade filed a second grievance, which although late, was accepted. Exh. TT, Wade Grievance Dated 2/29/04 and Attached Exhibits (2004 Grievance and Exhibits). Dr. MacLean asked Van Hoesen to handle the Step 2 process. Exh. E, Taylor, at 212. Van Hoesen and Wade met and Wade demanded the meeting be recorded. Exh. UU, Step 2 Meeting Response Exhibit A. The College refused after consultation with their lawyer, Cheryl McKay and Pam Taylor since it was not College policy to tape grievance meetings and the grievance procedure did not provide right to tape record. *Id.*; Exh. E, Taylor, at 226-27.

On March 12, Van Hoesen issued his written response to Wade's grievance, based on the written materials submitted and found Wade's complaints to be without merit. Exh. VV, Step 2 Written Response. Wade had five working days to appeal Van Hoesen's decision. Exh. I, Handbook, at 11; Exh. E, Taylor, at 238; Exh. WW, Taylor 4/2/04 E-mail, at 2. Wade's appeal of Step 2 was untimely but the College waived timeliness and accepted Wade's appeal. Exh. XX, April 8, 2004 Letter from Dr. MacLean. The College designated Dr. Patrick O'Rourke as the Step 3 hearing officer. *Id.* at 1.

:LANEY WILES, INC.
007 WEST 3RD AVENUE
SUITE 400
NCHORAGE, ALASKA
(907) 279-3581

Dr. O'Rourke was a former chancellor of the University of Alaska Fairbanks and was a consultant in securing accreditation for the college. Exh. E, Taylor, at 253-54, 265. He and Wade had known each other for years and she accepted him as a fair hearing officer. *Id.* at 264; Exh. C, Wade V. III, at 468; Exh. YY, Step 3 Grievance Hearing Transcript (Transcript), at 3. Although not required by the grievance procedure, Dr. O'Rourke scheduled a hearing on June 24, 2004. Exh. ZZ, Step 3 Grievance Hearing and Decision (Decision), at 1. Wade was represented by attorney Ted Stepovich. Exh. YY, Transcript, at 1-2. Cheryl McKay was counsel for the College and Dr. Tuthill represented the College. *Id.* Both parties submitted written materials in advance of the Step 3 hearing. Exh. YY, Transcript, at 2; Exh. AB, Ilisagvik College Step 3 Hearing Exhibits; Exh. TT, 2004 Grievance and Exhibits. The College provided Wade an extra opportunity to submit additional written materials, evidence and/or an oral presentation after the hearing but Wade did not avail herself of these offers. Exh. AC, Notice of Errata, at 2. On July 6, 2004, Dr. O'Rourke issued his Step 3 decision, finding no violations by the College and affirming Wade's non-renewal. Exh. ZZ, Decision, at 4-7.

Wade was offered an alternative position at the college, Adult Basic Education Instructor, teaching English, which would have permitted her to vest in PERS in less than one year and would pay $55,000 base salary plus allow her to teach additional classes but she refused and filed an EEOC complaint alleging age discrimination, which was summarily dismissed. Exh. AD, EEOC Notice of Dismissal, at 1. This lawsuit followed.

## ARGUMENT

### I.    Summary Judgment Standard.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[a] party against whom a claim, . . . is asserted . . . may . . . move . . . for a summary judgment . . . upon all or any part thereof." Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). Courts must draw reasonable inferences of fact in favor of the non-movant. *Raad v. Fairbanks North Star Borough*, 323 F.3d 1185, 1193-94 (9th Cir. 2003).

ELANEY WILES, INC.
007 WEST 3rd AVENUE
SUITE 400
NCHORAGE, ALASKA
(907) 279-3581

A dispute over a material fact exists if the evidence would allow a reasonable fact-finder to return a verdict for the non-moving party; however the issue must be material to the determination. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If, after adequate time for discovery, the nonmovant fails to establish a disputed fact on an element essential to their case, and on which they will bear the burden of proof at trial, summary judgment is appropriate, since a complete failure of proof concerning an essential element of the nonmovant's case necessarily renders all other facts immaterial. *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986). Mere conclusory allegations will not defeat an otherwise proper motion. *Provenz v. Miller*, 102 F.3d 1478, 1489-90 (9th Cir.1996).

## II.    The FMLA Claims Should Be Dismissed Since Wade Has Failed To State A Claim.

### A.    Wade Cannot Establish She Gave Proper Notice Of Intent To Take Leave.

#### 1.    FMLA Overview.

There are two types of FMLA claims: the interference claim and the discrimination claim. *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400-01 (6th Cir.2003). To prevail on an FMLA interference claim, an employee must establish: (1) she is an eligible employee, per 29 U.S.C. § 2611(2); (2) the employer is an employer per 29 U.S.C. § 2611(4); (3) she was entitled to take leave, per 29 U.S.C. 2612(a)(1); (4) she gave notice of her intention to take leave, per 29 U.S.C. § 2612(e)(1) and 29 C.F.R. §§ 825.302-.303; and (5) the employer denied her benefits under the FMLA. *Price v. Multnomah County*, 132 F.Supp.2d 1290, 1297 (D.Or.2001)(citation omitted). Because Wade cannot prove the fourth essential element of her claim, i.e., that she gave notice of her intention to take leave, the court should grant summary judgment and dismiss her FMLA interference claim.

Employees must give notice at least 30 days in advance of foreseeable leave for reasons covered by the Act, and as soon as practicable when absences are not foreseeable and when they will be absent under circumstances that indicate the FMLA might apply. *Bachelder v. American West Airlines*, 259 F.3d 1112, 1130 (9th Cir.2001)(citing 29 U.S.C. § 2612(e), 29 C.F.R. § 825.303(a)). Further, an employee must consult with the employer in scheduling the leave so as

ELANEY WILES, INC.
007 WEST 3RD AVENUE
SUITE 400
NCHORAGE, ALASKA
(907) 279-3581

Memorandum in Support of Motion for Summary Judgment
*Wade v. Ilisagvik, et al.*, Case No. 3:05-cv-00086-TMB                    Page 19 of 50

to minimize any disruption to the employer's operations. *Bauer v. Varity Dayton-Walther Corp.*, 118 F.3d 1109, 1113 n.5 (6th Cir.1997)(citing 29 U.S.C. § 2612(e); 29 C.F.R. § 825.302(a), (e)).

An employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave.[4]  29 C.F.R. § 825.302(c).  In the case of medical conditions, the employer may find it necessary to inquire further to determine if the leave is because of a serious health condition and may request medical certification to support the need for such leave.  *Id.* (citing 29 C.F.R. § 825.305).    Under the Americans with Disabilities Act, the employee must engage in an interactive process with the employer to ensure that the needs of both parties are met.  *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171 (10th Cir.1999)(citing 29 C.F.R. § 1630.2(o)(3)). Similarly, the FMLA regulations require an employee to participate in an interactive process with the employer and to "make a reasonable effort to schedule the leave so as not to disrupt unduly the employer's operations."  29 C.F.R. § 825.302(e).

"The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Mora v. Chem-Tronics, Inc.*, 16 F.Supp.2d 1192, 1209 (S.D.Cal.1998) (quoting *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir.1995)).  Employers are entitled to the type of notice that will inform them that the FMLA may apply.  *Phillips v. Quebecor World Rai Incorporated*, 450 F.3d 308, 311 (7th Cir.2006)(quoting *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir.2001)).

If the required notice is not given by the employee, the employer may deny leave even if the employee has a serious health condition.  *Phillips*, 450 F.3d at 311 (citing *Aubuchon v. Knauf Fiberglass, GmbH*, 359 F.3d 950, 951 (7th Cir.2004)).  "Conditioning the right to take FMLA leave on the employee's giving the required notice to his employer is the quid pro quo for the employer's partial surrender of control over his work force."  *Aubuchon*, 359 F.3d at 951-52.

---

[4] For purposes of this motion the College does not dispute that Wade's November 2003 leave was FMLA qualifying.

ELANEY WILES, INC.
007 WEST 3RD AVENUE
SUITE 400
NCHORAGE, ALASKA
(907) 279-3581

If an employee fails to give 30 days' notice when the need for FMLA leave is foreseeable with no reasonable excuse for the delay, the employer may delay FMLA leave until ***at least*** 30 days after the date the employee provides notice to the employer of the need for FMLA leave. 29 C.F.R. § 825.304(b)(emphasis added).  Thus, an employer properly delayed leave of its employee who knew many months in advance when his child would likely be born and failed to request leave until the child was born. *Gilliam v. United Parcel Service, Inc.*, 233 F.3d 969, 971 (7th Cir.2000) (citing 29 C.F.R. § 825.304(b)).

"When leave is foreseeable, an employee must provide her employer with medical certification at least thirty days prior to her scheduled absence." *Killian v. Yorozu Automotive Tennessee, Inc.*, 454 F.3d 549, 554 (6th Cir.2006) (citing 29 C.F.R. § 305(b)).  If an employee fails to provide medical certification, her employer may delay foreseeable FMLA leave until the required certification is provided. *Id.* at 555 (citing 29 C.F.R. §§ 825.311(a)); *see also* 29 C.F.R. § 825.312(b).  Sufficient medical certification must include: (1) the date the serious health condition commenced; (2) the probable duration of the condition; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition; and (4) for purposes of leave under § 2612(a)(1)(D), a statement that the employee is unable to perform the functions of the job.[5]  29 U.S.C. § 2613(b).  "[T]he Act allows an employer to request a contemporary diagnosis at the time it grants FMLA leave; a safeguard that balances the rights of employer and employee." *Municipality of Anchorage v. Gregg*, 101 P.3d 181, 188 (Alaska 2004)(citing 29 U.S.C. § 2613(a)).

Under the statute the only notice that can be required of an employer is the posting of an FMLA notice. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 88 (2002); *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 161 (2nd Cir.1999)(citing 29 U.S.C. § 2619(a)).  Upon return from FMLA leave an employee shall be restored to the position of employment held by the employee when leave commenced or to an equivalent position with

ELANEY WILES, INC.
007 WEST 3RD AVENUE
SUITE 400
ANCHORAGE, ALASKA
(907) 279-3581

---

[5] Although the College disputes whether Wade had a serious health condition, resolution of this issue is not necessary.

equivalent employment benefits, pay and other terms and conditions of employment.  29 U.S.C.

§ 2614(a)(1).  If these statutes and regulations are applied to the facts, there is no disputed fact

and Ilisagvik is entitled to summary judgment.

### 2.    The Late September/Early October Leave Request ("October 2[nd] Request").

#### a.    Wade Did Not Give 30 Days' Notice Of Foreseeable Leave Of Her October 2nd Request.

The undisputed facts show that FMLA worked precisely the way it should work and the

College complied with the law.  Wade's October 2 request was foreseeable on August 7, 2003.[6]

Exh. AA, English, at 126.  Wade knew she would request leave on August 6, 2003 when Dr.

Church advised her to have recommended medical tests and possible surgery.  Exh. C, Wade V.

I, at 119-20; Exh. X, Church Note; Exh. AE, Plaintiff's Responses to Defendants' Seventh

Discovery Requests, at 4.

It is also undisputed that Wade did not give notice to her employer of her need for leave

until 47 days later, sometime in the last week of September when she submitted a personal leave

request form on October 2, asking for leave to begin 18 days later, on October 20.  Exh. BB,

Wade 10/2/03 Leave Request; Exh. C, Wade V. I, at 189, 247.[7]  Wade should have provided

notice at least 30 days in advance of foreseeable leave.  29 C.F.R. § 825.302(a); *Bachelder*, 259

F.3d at 1130; *Bauer*, 118 F.3d at 1113 n.5; Exh. AA, English, at 62; Exh. C, Wade V. I, at 72-73;

Exh. I, Handbook, at 6.  As a matter of law, plaintiff breached her statutory and contractual

obligation to give 30 days' notice of foreseeable leave.  Thus, the College properly delayed her

leave for at least 30 days.  29 C.F.R. § 825.304(b); *Gilliam*, 233 F.3d at 971(employer had right

to delay employee's leave for 30 days pursuant to 29 C.F.R. § 825.304(b)).  To the extent that

----

[6] Foresee is defined as "to know beforehand."  WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 483 (9th ed. 1991).
[7] Wade's claim that she submitted a leave request to Dr. Tuthill or Taylor dated October 2 is inconsistent with her claim that this occurred in late September.  Exh. C, Wade V. I, at 184, 189, 191.  However, resolution of this issue is not necessary.

ELANEY WILES, INC.
007 WEST 3RD AVENUE
SUITE 400
NCHORAGE, ALASKA
(907) 279-3581

Memorandum in Support of Motion for Summary Judgment
*Wade v. Ilisagvik, et al.*, Case No. 3:05-cv-00086-TMB                    Page 22 of 50

Count I, FMLA interference, is based on not approving Wade's October 2nd request, the motion for summary judgment should be granted, since it is undisputed Wade cannot prove the fourth element of her prima facie case, i.e., that she gave proper notice of her intention to take leave to her employer. *Price*, 132 F.Supp.2d at 1297; *Celotex*, 477 U.S. at 322-23.

It is also undisputed that as of the October 2nd request, Wade provided no information that would lead an employer to conclude the leave might qualify for FMLA leave, since the only information she provided was a form marking personal leave coupled with a stale medical note and her statements that she intended to see medical providers while she was absent. Exh. BB, Wade 10/2/03 Leave Request; 29 C.F.R. § 825.302(c). Accordingly, the College could delay her request until this information was provided. *Killian*, 454 F.3d at 554 (citing 29 C.F.R. § 825.304(a)).

Moreover, other than completing the change course forms, she took no action to minimize disruption to the employer by inquiring of her medical provider if leave could be scheduled at a time when she did not have teaching duties or to determine if medical appointments in Tennessee could be scheduled so that the length of time was minimized. 29 C.F.R. § 825.302(e). The court thus should find Wade breached her duty under § 825.302(e) to work with her employer to schedule leave in a manner to minimize disruption. If the leave was not FMLA qualifying the College was within its rights to deny her leave request since it would unduly disrupt operations of the College. Exh. H, 2003 Contract, at 4.

**b.    The College Did Not Violate FMLA By Delaying The Leave Until Medical Certification was Received.**

As set out above, summary judgment should be granted on the October 2nd leave request for failure to give proper notice. In addition, summary judgment should be granted because the College properly delayed Wade's leave until she provided proper certification. It is undisputed that Wade was required to provide the College with timely medical certification at least 30 days prior to her scheduled absence, but failed to do so. *Killian*, 454 F.3d at 554 (citing 29 C.F.R. § 825.305(b)). On October 3, Dr. Tuthill requested that Wade provide medical certification that

ELANEY WILES, INC.
307 WEST 3rd AVENUE
SUITE 400
ANCHORAGE, ALASKA
(907) 279-3581

she required medical treatment during the semester.  Exh. C, Wade V. I, at 235; Exh. CC, 10/3/03 Dr. Tuthill E-mail.  Assuming *arguendo* that Wade provided the College with the August 6 Church note in late September, her own expert deemed the note stale in late September. Exh. AA, English, at 99, 126.  As a matter of law, the College had the right to delay Wade's foreseeable leave until she provided appropriate medical certification.  *Killian*, 454 F.3d at 555 (citing 29 C.F.R. § 825.311(a)); 29 C.F.R. § 825.312(b); Exh. AA, English, at 133.  As an alternative basis for summary judgment the court should find the undisputed facts show there was no interference with FMLA in delaying the October 2nd request for failure to provide medical certification and dismiss Count I.

### 3.    Wade Either Withdrew Or Agreed To Delay Leave on October 9 And The College Had No Further Duty Under The FMLA.

An employer is entitled to ask for information from the employee that establishes that leave will not be disruptive.  *Bauer*, 118 F.3d at 1113 n.5; 29 C.F.R. § 825.302(e).  Wade obtained a note from Dr. Snyder dated October 6, 2003 that states, "I agree and recommend that she see a specialist for multiple medical problems."  Exh. DD, Snyder, at 16; Exh. C, Wade V. I, at 249-50.  The note did not say what Dr. Snyder agreed with or address whether she needed to seek medical treatment outside of Barrow prior to the end of the semester.  Thus, it did not comply with Dr. Tuthill's October 3rd e-mail request.  Exh. CC, 10/3/03 Dr. Tuthill E-mail. However, to the extent Wade may have reasonably believed the note did in fact comply with Dr. Tuthill's October 3 request, it is undisputed that on October 9 Dr. Tuthill advised her he needed additional information.  Exh. D, Tuthill, at 209-10; Exh. GG, 10/9/03 Dr. Tuthill E-mail.

It is undisputed that Wade refused to cooperate further in the interactive process by stating, "and then I went to the doctor here in Barrow on Monday evening and she reinforced the opinion by a written note, which I feel is sufficient for obtaining leave."  Exh. C, Wade V. I, at 250; Exh. GG, 10/9/03 Wade E-mail.  If the employee refuses to cooperate, the employer can deny leave.  *Phillips*, 450 F.3d at 311; *Aubuchon*, 359 F.3d at 951.  Because Wade did not provide the requested medical certification, the College properly denied or delayed her request.

Memorandum in Support of Motion for Summary Judgment
*Wade v. Ilisagvik, et al.*, Case No. 3:05-cv-00086-TMB                          Page 24 of 50

Wade admitted on October 9 she withdrew her October 2 leave request. Exh. C, Wade V. I, at 252-53. Later she changed her testimony but admitted on October 9 she agreed to delay her leave until the Christmas holidays. *Id.* at 260. Because Wade agreed to either withdraw or delay her leave, the college had no further duty to act upon her prior leave request and it was reasonable for the College to construe her request as withdrawn. Exh. AA, English, at 119, 130. Wade also knew that there was no urgency regarding her medical condition at that time. Exh. C, Wade V. I, at 185.    An employer has no obligation to take further action once an employee withdraws their leave request and does not provide the documentation that the employer finds necessary to approve the leave. Exh. AA, English, at 132-33. It was reasonable for the College to wait until and unless Wade gave the College the information it sought. *Id.* at 133; 29 C.F.R. § 825.311(a); *Killian*, 454 F.3d at 555. Thus, to the extent Count I, FMLA interference, is based on events that occurred between October 2 and October 9, including Dr. Snyder's October 6 note, the motion for summary judgment should be granted.

### 4.    The October 20 "Request" For Personal Leave Did Not Comply With Ilisagvik's Request For Medical Certification.

Between October 9 and November 5, Wade did not provide any documentation to the College demonstrating she needed leave before December or that she could schedule it in a manner not disruptive to classroom instruction. Exh. AA, English, at 132.    Thus, it was reasonable for the College to wait until and unless Wade gave the College the information it sought. *Id.* at 133. Dr. Tuthill wrote an e-mail to Wade on October 20, 2003, in which he denies her request for personal leave from December 11-19, before the semester ended because it unduly interfered "with the delivery of the College's program of instruction." Exh. C, Wade V. I, at 265-66; Exh. II, 10/20/03 Dr. Tuthill E-mail. Wade has no recollection of making a verbal request and there was no leave request submitted. Exh. C, Wade V. I, at 266. Even if Wade argues that she attempted to minimize disruption to her employer, this argument fails since she has no proof she conferred with Dr. Tuthill and cannot establish she even tried to schedule the appointments only during the holiday break and then conferred with Tuthill.    Further, Wade

ELANEY WILES, INC.
007 WEST 3RD AVENUE
SUITE 400
NCHORAGE, ALASKA
(907) 279-3581

cannot prove that she contacted health care providers and arranged her medical appointments within the minimum number of days necessary.  29 C.F.R. § 825.302(e).

As of October 20, 2003, Wade had not submitted the requested medical certification sought by Dr. Tuthill on October 3 and October 9.  Exh. C, Wade V. I, at 266.  The College still had no information to conclude the December leave request was for a serious health condition and thus FMLA qualifying or that treatment was needed before the semester ended.  Thus, Dr. Tuthill could deny Wade's request for personal leave since it interfered with the delivery of the College's program of instruction and since Wade had not conferred with the College or attempted to schedule the leave in a manner not to disrupt operations.  29 C.F.R. § 825.302(e); Exh. AA, English, at 168. Wade also did not comply with her duty per § 825.302(e) to schedule her leave in a way to minimize disruption to the operations of her employer.  Exh. AA, English, at 128.  If Wade missed 40 percent of her course, that would be most disruptive to her employer. *Id.* at 184.  It would have been least disruptive if Wade had scheduled her leave in advance in the most efficient manner, in order to minimize days gone, gone to Anchorage or Seattle instead of Tennessee to have her skin lesion re-excised, and conferred with her doctors in advance of the procedure about a return to teaching as soon as possible.  *Id.* at 184.  Because it is undisputed that as October 20, 2003, Wade had not provided the requested medical certification the College lawfully denied her leave request.  *Phillips*, 450 F.3d at 311; *Aubuchon*, 359 F.3d at 951.  To the extent the October 20, 2003, e-mail comprises part of Wade's claim under Count I, for interference, the motion for summary judgment should be granted.

> ### 5.    The November 3 and 4 Leave Requests Were Approved Within A Lawfully Reasonable Time Under The FMLA.

It is undisputed that prior to October 30, no medical provider informed Wade that she had in situ squamous cell carcinoma.  Exh. AE, Plaintiff's Responses to Defendants' Seventh Discovery Requests, at 8.  Once Wade's in situ squamous cell carcinoma was diagnosed, her

ELANEY WILES, INC.
007 WEST 3RD AVENUE
SUITE 400
NCHORAGE. ALASKA
(907) 279-3581

need for leave was unforeseeable.[8]    Wade did not notify the College of her need for unforeseeable leave until at the earliest November 3, when she submitted a personal leave request for 6 days' leave from November 18-26, 2003, but failed to include a doctor's certification.    Exh. C, Wade V. I, at 267; Exh. JJ, 11/3/03 Leave Request.    The next day, November 4, Wade submitted another leave request, increasing the number of days from 6 to 11 days, plus Thanksgiving. Exh. KK, 11/4/03 Leave Request.  However, she still did not present medical certification of her need for leave until November 5, 2003. Exh. C, Wade V. I, at 276-77.  On November 5, Wade provided the College with a November 5 note from Dr. Snyder that states, "Ms. Wade needs follow up for some medical conditions that cannot be addressed here. The follow up should occur in a somewhat urgent time frame." *Id*. at 277-78; Exh. LL, 11/5/03 Snyder Note.  Thus, the College was entitled to delay her request until she submitted the medical certification Dr. Tuthill had been asking for as early as October 3, 2003.  Exh. CC, 10/3/03 Dr. Tuthill E-mail; 29 C.F.R. § 825.311(a); *Killian*, 454 F.3d at 555.  Likewise, Dr. Tuthill required Jay St. Vincent to provide medical certification in support of her request for leave.  Exh. AM, November 2003 E-mails Between St. Vincent and Dr. Tuthill.

Additionally as a matter of law, Dr. Snyder's note does not meet the criteria for medical certification set forth in 29 U.S.C. § 2613(b), because it did not identify a serious health condition, the probable duration and Wade's ability to perform her duties.  Exh. LL, 11/5/03 Snyder Note.  The College had the right to delay Wade's leave until she provided appropriate certification.  29 C.F.R. § 825.311(b); 29 C.F.R. § 825.312(b).  However, Dr. Tuthill approved Wade's November 4 leave request on the same day he received the note from Dr. Snyder, November 5.  Exh. C, Wade V. I, at 277-78.  It is undisputed that there was no delay in processing her leave request once she presented a recent doctor's note that addressed the immediacy of the need for leave. *Id.* at 232.

---

[8] Ilisagvik reserves the right to contest this construction of the facts if summary judgment is not granted.

ЕLANEY WILES, INC.
ᴏ07 WEST 3ʀᴅ AVENUE
SUITE 400
ᴧCHORAGE, ALASKA
(907) 279-3581

Memorandum in Support of Motion for Summary Judgment
*Wade v. Ilisagvik, et al.*, Case No. 3:05-cv-00086-TMB                    Page 27 of 50



Although the College had a duty to respond to Wade's requests for unforeseeable leave as soon as practicable, it was not unreasonable to delay acting upon the request for leave for 48 hours. Exh. AA, English, at 175; 29 C.F.R. § 825.301(c). Because the undisputed facts show that the College approved Wade's November 4 leave request within 48 hours of the request and the same day the doctor's note showing urgency was provided, the College did not interfere with Wade's leave. As a result Wade cannot prove the fourth essential element of her prima facie case, i.e., that she gave proper notice of her intention to take leave to her employer. *Price*, 132 F.Supp.2d at 1297; 29 U.S.C. § 2612(e). The court should grant summary judgment on Wade's FMLA interference claim, since there is no dispute about an essential element of the claim on which she will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

### B.    Wade's Claim Of Failure To Reinstate Must Be Dismissed.

As set out above, it is undisputed that plaintiff did not provide medical certification of her need for leave nor present evidence from a medical provider that her leave was FMLA qualifying. *See* pp. 23-26 above; 29 C.F.R. § 825.302(c); *Killian*, 454 F.3d at 554-55; Exh. AA, English, at 126, 132-133. Thus, the College could deny her FMLA leave. *Phillips*, 450 F.3d at 311; *Aubuchon*, 359 F.3d at 951. However, assuming *arguendo* her leave was FMLA qualifying, Wade's claim that she was not reinstated to her previous position should be dismissed. 29 U.S.C. § 2614(a)(1) states that upon return from FMLA leave, an employee shall be restored by the employer to the position of employment held by the employee when the leave commenced, or to an equivalent position with equivalent employment benefits and pay.

Wade took paid leave from November 12-26, 2003, and returned to work on December 1. Exh. C, Wade V. II, at 321; Exh. KK, 11/4/03 Leave Request. When Wade commenced her leave in November 2003, she was an assistant professor of business management. Exh. C, Wade V. I, at 41; Exh. H, Wade 2003 Contract. When she returned from leave, she was reinstated to her position of assistant professor of business management. Her base pay and other benefits, including insurance, remained the same. Exh. AF, Wade Earnings Statements for October to

ELANEY WILES, INC.
007 WEST 3RD AVENUE
SUITE 400
NCHORAGE, ALASKA
(907) 279-3581

December 2003.  In each earnings statement, she received $2,902.96 for her base salary.[9]  *Id.*
Thus her base pay remained the same as before she took leave.

At the beginning of the semester Wade was obligated to teach 12 credits, in addition to
"overload" credits.  Exh. D, Tuthill, at 252.  Faculty were paid their base pay for 12 credits of
instruction and three credit equivalents of service.  *Id.*  Any credits above the base teaching load
were normally compensated at the rate of $1,500 per credit.  *Id.*  Near the end of the semester,
the practice of the Business Office was to calculate the faculty member's teaching load, make a
list of 12 credits, and assign the other credits to an added duty contract.  *Id.*  Wade's course
schedule in the Fall 2003 semester shows that she taught 18 credits.  Exh. AG, Wade Fall 2003
Course Schedule, at 14.  This schedule does not include Business Math Module C or Business
English Module C because Wade did not teach those modules.  *Id.*

Wade claims she was not reinstated to the same position she held prior to her leave
because Business English Module C and Business Math Module C were not "given back" to her.
Exh. C, Wade V. II, at 336.  Instead Dr. Tuthill hired two other instructors to teach Module C of
both classes.  Exh. D, Tuthill, at 119.  The decision to hire Aimee Valenti was made before
Wade took her leave.  *Id.* at 114.  Wade never signed added duty contracts for Business English
Module C or Business Math Module C.  *Id.* at 119.  Rather, Valenti and Tim Carlson signed
added duty contracts for those modules.  Exh. AH, Valenti Adjunct Faculty Employment
Contract; Exh. AI, Carlson Added Duties Agreement.  Module C had not begun when her leave
was approved and Tuthill had advised Wade that if she took leave he did not see how she could
teach Module C.  Moreover, each module, i.e., Module A, Module B and Module C was a
discrete class with a final grade at the end of each module.  Exh. C, Wade V. I, at 153-54.

Wade did not teach the Module C classes which started after her leave began, and were
halfway completed by the time she returned from leave, and both courses were taught by adjunct
instructors.  Exh. C, Wade, V. II, at 330-31; Exh. MM, Business English Syllabus, at 1; Exh. D,

ELANEY WILES, INC.
007 WEST 3RD AVENUE
SUITE 400
NCHORAGE, ALASKA
(907) 279-3581

---

[9] The earnings statements dated November 21 and December 4 break Wade's base salary down into two categories:
"FACLEA" and "SALARY."  Nevertheless, when the two figures are added, they total $2,902.96.

Memorandum in Support of Motion for Summary Judgment
*Wade v. Ilisagvik, et al.*, Case No. 3:05-cv-00086-TMB                              Page 29 of 50