Linda J. Johnson
Clapp, Peterson, Van Flein,
Tiemessen & Thorsness, LLC
711 H Street, Suite 620
Anchorage, AK 99501-3454
(907) 272-9272
(907) 272-9586 fax
usdc-anch-ntc@cplawak.com
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

BOBBI WADE,

                Plaintiff,

v.

ILISAGVIK COLLEGE; NORTH SLOPE
BOROUGH; JOHN TUTHILL,
individually; and PAMELA TAYLOR,
individually,

                Defendants.      Case No. 3:05-cv-086-TMB

## NOTICE OF SUBMISSION OF EXHIBITS

    Plaintiff Bobbi Wade, by and through her attorneys Clapp, Peterson, Van Flein, Tiemessen & Thorsness, LLC, herein submits exhibits in support of her motion for partial summary judgment.

Notice of Submission of Exhibits
*Wade v. Ilisagvik*, Case No. 3:05-cv-086-TMB
Page 1 of 2

Clapp, Peterson, Van Flein,
Tiemessen & Thorsness, LLC
711 H Street, Suite 620
Anchorage, Alaska 99501-3454
(907) 272-9272 fax (907) 272-9586

DATED AT Anchorage, Alaska this 15th day of June, 2007.

CLAPP, PETERSON, VAN FLEIN,
TIEMESSEN & THORNSESS, LLC
Attorneys for Plaintiff


s/ Linda J. Johnson
CLAPP, PETERSON, VAN FLEIN,
TIEMESSEN & THORSNESS LLC
711 H Street, Suite 620
Anchorage, AK 99501-3454
Phone: (907) 272-9631
Fax: (907) 272-9586
Direct email: ljj@cplawak.com
Alaska Bar No. 8911070


Certificate of Service

I hereby certify that on June 15, 2007, a copy of the foregoing Notice of Submission of Exhibits was served electronically on Cynthia Ducey, Esq.

s/ Linda J. Johnson

Notice of Submission of Exhibits
*Wade v. Ilisagvik*, Case No. 3:05-cv-086-TMB
Page 2 of 2

Clapp, Peterson, Van Flein,
Tiemessen & Thorsness, LLC
711 H Street, Suite 620
Anchorage, Alaska 99501-3454
(907) 272-9272 fax (907) 272-9586

## WADE EXHIBIT LIST

1    Dr. Church note dated Thursday, Aug. 7, 2003
2.   Deposition of Bobbi Wade, Vol. I, II, III, IV  (6 pgs)
3    May 1, 2003 Ltr from Edna MacLean to Bobbi Wade (7 pgs)
4    Bobbi Wade's Request for Leave dated 10/2/03
5    E-mail leave request from Bobbi Wade dated 10/6/03
6    Note from Dr. Snyder Chart dated 10/6/03
7    Note from Dr. Snyder dated 10/6/03
8    Deposition of Pam Taylor (7 pgs)
9    Deposition of Cheryl  McKay (3 pgs)
10   E-mail from Bobbi Wade to John Tuthill dated 10/9/07 (2 pgs)
11   Dr. Snyder noted dated 11/5/03
12   Deposition of Michelle Snyder (6 pgs)
13   Bobbi Wade's Request for Leave dated 11/4/03
14   Deposition of John Tuthill (18 pgs)
15   Chart of Office visit to Dr. Church 11/12/03 (2 pgs)
16   Deposition of Joseph Delozier, MD (4 pgs)
17   E-mail from Pam Taylor to John Tuthill dated 10/9/07
18   E-mail (re leave request) from John Tuthill to Bobbi Wade dated 10/20/03
19   Memo to Edna MacLean from John Tuthill dated 12/12/03 (detailed response to Bobbi  Wade's formal grievance)(8 pgs)
20   Ilisagvik College Course Information Change Form dated 10/2/03
21   E-mail to Bobbi Wade from Pam Taylor dated 10/14/03
22   E-mail to Naomi Ruby from Sara Gamboa re: Bobbi Wade schedule dated 11/13/03 (4 pgs)
23   Response to Plaintiff's First Discovery Request to Ilisagvik, Req. for Admission No. 4  (2 pgs)
24   Memo to Bobbi Wade, John Tuthill, Pam Taylor from D. Kennedy dated 12/19/03
25   Grievance filed by Bobbi Wade dated 12/11/03 (6 pgs)
26   Ilisagvik College Personnel Action Form dated 6-30-04 (employment nonrenewal)
27   Ltr from John Tuthill to Bobbi Wade dated 1/30/04 (terminating  employment)
28   Issues concerning Bobbi Wade (no date)
29   Synopsis of Past Performance for Bobbi Wade (5 pgs)
30   Deposition of Edna MacLean, MD (3 pgs)
31   Deposition of Sonya ABU (3 pgs)
32   Pages from Ilisagvik Employee Handbook (2)
33   E-mail from John Tuthill to Bobbi Wade re: Blackboard Courses dated 1/15/04 (2 pgs)
34   Success Rate for Blackboard Courses (2 pgs)
35   E-mail from Sara Gamboa to Bobbi Wade dated 1-16-04
36   Ilisagvik College Tuition Scholarship/Waiver Application dated 1/8/02
37   Ilisagvik College Academic Petition Form/Study Forms  dated 1/14/04 (5 pgs)
38   Board of Trustees Policy  Manual 6.12 *Nepotism* (2 pgs)

# HERITAGE MEDICAL
## A S S O C I A T E S , P. C.

*ALLERGY*
  THOMAS G. PENNINGTON, M.D.

*CARDIOLOGY*
  JOHN BRIGHT CAGE, M.D.

*ENDOCRINOLOGY*
  JAMES ERWIN ANDERSON, JR., M.D.

*FAMILY PRACTICE*
  W. THOMAS PATTEN, M.D.

*GASTROENTEROLOGY*
  ROBERT C. DUNKERLEY, JR., M.D.
  DOUGLAS P. MITCHELL, M.D.
  HARRISON J. SHULL, JR., M.D.
  GEORGE D. WRIGHT, M.D.

*INTERNAL MEDICINE*
  JAMES ERWIN ANDERSON, JR., M.D.
  SUSAN M. BERKEBILE, M.D.
  MICHAEL D. CALLAWAY, M.D.
  THOMAS H. CALLAWAY, M.D.
  ROBERT A. CROWDER, JR., M.D.
  HENRY L. HARRELL, M.D.
  ART L. LEDFORD, JR., M.D.
  MAEL G. OLIVE, M.D.
  OMAS PATTEN, M.D.
  AS G. PENNINGTON, M.D.
  W. CLARK RAY, M.D.
  DONNA D. SCUDDER, M.D.
  PAUL R. STUMB, M.D.
  JOHN G. THOMPSON, JR., M.D.

*NEUROLOGY*
  CURTIS J. HAGENAU, M.D.

*BELLEVUE OFFICE*
  7640 HIGHWAY 70 SOUTH
  NASHVILLE, TENNESSEE 37221
  (615) 662-1021

  *INTERNAL MEDICINE*
  P. ROBERT CHAPMAN, M.D.
  MARK T. STUBBLEFIELD, M.D.

*GREEN HILLS OFFICE*
  2325 CRESTMOOR ROAD
  NASHVILLE, TENNESSEE 37215

  *INTERNAL MEDICINE*
  (615) 284-2222
  ELIZABETH L. CATO, M.D.
  JAMES R. CATO, M.D.
  J(    ). JONES, M.D.
  l    . PHARRIS, M.D.

*PEDIATRICS*
  (615) 284-2260
  LAWRENCE A. KLINSKY, M.D.
  ROBERT E. MALLARD, M.D.

8/7/03

Re: Bobbi Wade
     SSN 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

To Whom It May Concern:

Bobbi Wade is a patient followed in our clinic. I am aware that it is necessary for her to travel to Alaska for her job, but I have requested that she return as soon as possible for further medical workup with possible surgical treatment.

Sincerely,

*Celia V. Church*

Celia V. Church, MD

EXHIBIT _____/_____

PAGE ___/___ OF ___/___

21382
Wade v. Ilisagvik College

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ALASKA

3

4    BOBBI WADE,

5              Plaintiff,

6        vs.

7    ILISAGVIK COLLEGE, NORTH SLOPE

     BOROUGH, JOHN TUTHILL, Individually,

8    and PAMELA TAYLOR, Individually,

9              Defendants.

     _____/

10   Case No. A05-086 CV (TMB)

11

12            *   *   *   *   *   *   *   *   *   *

13

              DEPOSITION OF BOBBI WADE

14                    Volume 1

              Pages 1 - 283 (inclusive)

15

                  May 1, 2006

16                 9:19 a.m.

17

     Taken by the Defendants, Ilisagvik College,

18        John Tuthill and Pamela Taylor

                      at

19   Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc.

          1007 West 3rd Avenue, Suite 400

20            Anchorage, Alaska 99501

21

22

23

     Reported by:

24   Caren S. Carlson, RPR

25

EXHIBIT 2

PAGE 1 OF 6

Page 118

1   A. It was like a urinary tract infection.
2   Q. Uh-huh. And did she treat it in late July?
3   A. I don't recall what she did about that and what
4   I took.
5   Q. Anything else that she saw you for?
6   A. Yes.
7   Q. What else?
8   A. High blood pressure.
9   Q. You had that over the summer?
10  A. Yes.
11  Q. And that was a continuing problem for you,
12  wasn't it?
13  A. Yes. But it continued to rise and get higher.
14  Q. And how did she treat that?
15  A. By medication.
16  Q. What medication did you take?
17  A. Lisinopril.
18  Q. When did you begin taking Lisinopril for the
19  first time?
20  A. I don't recall.
21  Q. You took it before you saw Dr. Church, didn't
22  you?
23  A. I don't recall. The doctor in Barrow might have
24  prescribed it.
25  Q. Well, you actually took it for many years,

Page 119

1   didn't you, Ms. Wade?
2   A. Not for many years, no.
3   Q. Did you see any other medical providers in the
4   summer of '03?
5   A. No.
6   Q. Okay. So when you saw Dr. Church in the summer
7   of '03, did she give you any reason that you might have
8   to return to see her?
9   A. Yes, she did.
10  Q. What did she say?
11  A. She wanted to do further tests as to what was
12  causing my high blood pressure and at the time I was
13  having stomach problems. She wanted to do tests there.
14  Q. Uh-huh.
15  A. And I had a -- I had begun to have a problem
16  with my left foot and I needed -- it was really painful
17  and I needed to get that -- find out what was causing
18  that. And I had a spot on my left shoulder that was
19  becoming real concerned about because it was beginning to
20  itch and burn and really drawing my attention and I was
21  afraid.
22  Q. And so what did she tell you she wanted you to
23  do?
24  A. She wanted me to come back for tests -- she
25  wanted me to have tests then --

Page 120

1   Q. Uh-huh.
2   A. -- and I told her I couldn't.
3   Q. Why not?
4   A. Because I wouldn't have time to have all the
5   medical testing done and get back to work on time and I
6   had to get back to work on time.
7   Q. Uh-huh. What time were you supposed to be back?
8   A. I believe it was August the 15th, but I wasn't
9   pos-- I'm not positive about that date because each
10  year it was a different date.
11  Q. Uh-huh.
12  A. But it was approximately during that time.
13  Q. Did you try and schedule some of those tests
14  before you had to go back?
15  A. No. There wasn't -- there wasn't time.
16  Q. Why not?
17  A. I don't recall.
18  Q. Who did you try and schedule them with?
19  A. I didn't try to schedule the tests.
20  Q. So you made no effort at all to schedule the
21  tests?
22  A. No. Dr. Church scheduled the tests, not me.
23  Q. Well, did you ask Dr. Church to make an effort
24  to schedule the tests, some of them, before you had to go
25  back?

Page 121

1   A. No.
2   Q. Why not?
3   A. Because there wasn't time.
4   Q. Why wasn't there time?
5   MS. JOHNSON: Objection as to form.
6   A. I don't recall.
7   Q. There was time to do nothing between the time
8   you saw Dr. Church until the time you got back?
9   MS. JOHNSON: Objection, form of the question.
10  A. I don't -- I don't recall.
11  Q. Not a single time?
12  A. I don't know. I don't recall what my activities
13  were at that time.
14  Q. Uh-huh. But what could be more important than
15  your health?
16  MS. JOHNSON: Objection, form.
17  A. There was nothing.
18  Q. Okay. You weren't working that summer, were
19  you?
20  A. No.
21  Q. Okay. And was there -- were there any other
22  things that had a higher priority than your health in
23  late July, early August?
24  A. No. No.
25  Q. Did you ask Dr. Church to see if she could

31 (Pages 118 to 121)

EXHIBIT  2
PAGE  2  OF  4

case No. A05-086 Civil

Bobbi Wade

Page 142

1    A. -- what I was given. I -- I don't recall what I
2  was given.
3    Q. So you may have gone back to Barrow untreated
4  for a urinary tract infection?
5    A. No, I didn't go back to Barrow untreated for a
6  urinary fact -- tract infection. If I had an infection,
7  she gave me medication.
8    Q. Okay. So that --
9    A. But I don't recall if she did or not.
10   Q. All right. So the urinary tract infection
11 presumably wasn't an issue anymore because she treated
12 you for it?
13   A. Yes, there -- there are other issues --
14   Q. Okay. What was it?
15   A. -- that causes the infection.
16   Q. What other issues were there?
17   A. I have a tilted bladder.
18   Q. Uh-huh. Okay.
19   A. And I have been told that it will -- needs --
20 needs to be tacked up and I asked her about it.
21   Q. Okay. And was that an emergency?
22   A. No, it wasn't an emergency.
23   Q. Okay. That would have been elective surgery if
24 it occurred; right?
25   A. Yes.

Page 143

1    Q. Okay. Could have been scheduled at the
2  convenience of the college; right?
3    A. "At the convenience of the college," what do you
4  mean by that?
5    Q. It could have been scheduled at a time that was
6  convenient for the delivery of services to the students;
7  correct?
8    A. It could have, yes.
9    Q. Okay. Okay. Was there anything else that you
10 saw Dr. Church for?
11   A. At that time I was having real severe stomach
12 problems with nauseation [sic], upset stomach, diarrhea
13 and food made me sick.
14   Q. Okay.
15   A. Every time I ate, I became sick.
16   Q. And you reported that to Dr. Church in August
17 '03?
18   A. I talked with her about it.
19   Q. Okay.
20   A. And she suggested that I have the tests made --
21   Q. Uh-huh.
22   A. -- for my stomach.
23   Q. What tests did you need to have done?
24   A. Gallbladder test. It's the test that's
25 called -- I don't recall if it's called an MRI, but it's

Page 144

1  a test that tests you for several different things.
2    Q. Uh-huh. Okay. So she assessed you for nausea,
3  upset stomach and diarrhea and vomiting in August '03;
4  correct?
5    A. She didn't assess me. I don't know what you
6  mean by "assess."
7    Q. You -- you reported symptoms to her; correct?
8    A. Yes.
9    Q. Okay. And those symptoms included nausea, upset
10 stomach --
11   A. Yes.
12   Q. -- diarrhea and vomiting?
13   A. And she would not give me any medication until I
14 had tests made.
15   Q. Okay. And for how long have you been having
16 those symptoms prior to seeing her?
17   A. Not long.
18   Q. Uh-huh. How long?
19   A. I don't know. I don't remember.
20   Q. During the course of the summer?
21   A. No, not the whole course of the summer --
22   Q. But part of the summer?
23   A. -- but just prior to going to her.
24   Q. Okay. And how soon before you saw her did you
25 call to schedule an appointment?

Page 145

1    A. To see her?
2    Q. Uh-huh.
3    A. Probably just a few days. I don't recall when I
4  called to see her.
5    Q. Okay. When you were there during the summer
6  and -- and doing the things that you would normally do
7  during the summer, did you give any thought or concern to
8  the scheduling needs of the college in terms of classes
9  in relation to your medical needs?
10   A. Yes, I did.
11   Q. And what consideration did you give to the
12 college? That summer is what I want to know.
13   A. That summer?
14   Q. Yes.
15   A. Prior to seeing Dr. Church?
16   Q. Yes.
17   A. Or after seeing her or during seeing her?
18   Q. Prior to seeing her. You're on the Alcan,
19 you're headed down the road to Murfreesboro and you know
20 you're going to be there for the summer, did you give any
21 consideration during the course of the summer to the
22 college's scheduling needs in relation to your medical
23 needs?
24   A. Not at that time, no.
25   Q. Okay.

37 (Pages 142 to 145)

Midnight Sun Court Reporters *** (907) 258-7100

EXHIBIT   2

PAGE  3  OF  6

Page 162

1  time to see a dermatologist?
2  A.  No, because I told her I wanted to make the
3  appointment with a dermatologist that my family members
4  had seen that I trusted.  I preferred to see Dr. Gold and
5  I didn't want her to make an appointment with some other
6  doctor.
7  Q.  Okay.  So when was the first time you gave
8  anyone any -- at the college any reason to believe that
9  you needed to go back for medical treatment?
10  A.  It was towards the end of September when I got
11  my classes, everything all scheduled and running, and the
12  courses designed on the Blackboard, which was very
13  time-consuming, that I worked day and night and weekends
14  on to get done.  And when I got everything in order, that
15  my classes were situated in good order and I rescheduled
16  the B section of the English and Math as not to interrupt
17  my students, then I went to him and I talked to him about
18  my condition and that my doctor had requested that we
19  come back -- that I come back and have tests made.
20  Q.  Uh-huh.
21  A.  And he seemed agreeable at that time.  He said
22  he didn't see any reason why I couldn't have it -- do
23  that.
24  Q.  Okay.  When was it that you told him?
25  A.  It was toward the end of September.  I don't

Page 163

1  remember the exact date.
2  Q.  And why do you remember it was September?
3  A.  Because I had gotten notice from Dr. Church's
4  office that she had scheduled appointments for me on
5  around the first part of October.
6  Q.  Uh-huh.  When in October?
7  A.  I don't recall.  I think one was the 2nd and the
8  other was the 3rd.  So I called the doctor's offices, Dr.
9  Smith and Dr. Concepcion, and I called their offices and
10  told them that I couldn't possibly make it that early
11  because of my job duties and to reschedule them later
12  into the month.
13  Q.  When did you have this conversation with their
14  office?
15  A.  It was just prior to the -- date of those
16  appointments that she had set.  I don't remember the
17  exact date.
18  Q.  How many days prior?
19  A.  I have no idea how many days.  I saw it -- the
20  dean the latter part of September and those dates were
21  due on the 2nd and 3rd and so it was all with -- within
22  just a few days there.
23  Q.  Well, the doctor's office knew that you were in
24  Barrow, didn't they?
25  A.  Yes, they did.

Page 164

1  Q.  So they wouldn't have scheduled an appointment
2  for the next day, would they?
3  A.  No.  I didn't say they scheduled it for the next
4  day.  I don't know when she scheduled the appointments.
5  Q.  Well, didn't they give you some lead time?
6  A.  I don't recall if they did or not.
7  Q.  And didn't they call and ask you if that date
8  would be convenient to schedule a test since they knew
9  you were in Barrow?
10  A.  I don't recall if they did or not.  I don't -- I
11  don't recall.  I was very busy in my work at that time.
12  Q.  Uh-huh.
13  A.  I had an awfully heavy load work schedule.
14  Q.  And what tests were scheduled for October 1st
15  and 3rd?
16  A.  There were no tests scheduled.
17  Q.  Well, what was scheduled for the 1st and 3rd?
18  A.  To see the specialists.
19  Q.  What specialists?
20  A.  Dr. Smith and Dr. Concepcion.  I've already
21  answered that question.
22  Q.  Well, you haven't told me what kind of
23  specialists they are.
24  A.  I previously did, yes.  Dr. Concepcion is a
25  urinary tract, bladder, so forth.

Page 165

1  Q.  Uh-huh.  And how about Dr. Concepcion?
2  A.  That's who she was.
3  Q.  Okay.  How about Dr. Smith?
4  A.  He's an orthopedic doctor.
5  Q.  And why were you seeing an orthopedist?
6  A.  Because of the -- my foot problem.
7  Q.  Okay.  And what was the purpose of seeing a
8  urologist?
9  A.  Because of my urinary tract problem.
10  Q.  Okay.  So when you called the offices back and
11  said that you couldn't make those appointments, did you
12  tell the staff that --
13  A.  I didn't call Dr. Church's office.  I called Dr.
14  Smith and Dr. Concepcion's office and changed the
15  appointments after I made out my leave request.
16  Q.  Okay.  And for what date did you make the
17  appointments changed to?
18  A.  They were later in October.  I don't remember
19  the appointments' dates.  I would have to review to
20  refresh my memory.
21  Q.  And what would you review?  What would you
22  review?
23  A.  I would go back and -- and review appointments.
24  Q.  Uh-huh.  Where?
25  A.  Maybe I jotted it down somewhere.

42 (Pages 162 to 165)

EXHIBIT 2
PAGE 4 OF 6

Page 274

1 the 26th; correct?
2    A. Yes.
3    Q. And looks like the leave designated is extended
4 medical leave, although "personal" was marked and it's
5 got "PT" by it; right?
6    A. Yes.
7    Q. Do you see the little circle? Do you remember
8 what leave you checked?
9    A. I don't think I checked anything because
10 according to Pam and John, I had been checking the wrong
11 things --
12    Q. Okay.
13    A. -- so Pam says, "Don't check anything. I'll
14 check it."
15    Q. All right. And why did you change the number of
16 days from six to eleven in 24 hours?
17    A. I don't know. I don't remember.
18    Q. Okay. Why did you resubmit a leave request the
19 next day?
20    A. I think it was due to Pam's request that I do
21 so.
22    Q. Do you remember how that request was made to
23 you?
24    A. No, I don't.
25    Q. Do you remember what she asked?

Page 275

1    A. No, I don't.
2    Q. Okay.
3    A. But she was pre- -- very precise in what she
4 wanted and I was trying to adhere to her wishes.
5    Q. Okay. Do you remember if your schedule changed?
6    A. My scheduling what?
7    Q. While you were in Tennessee.
8    A. No, I don't remember.
9    Q. Okay. And it looks like I got the wrong copy
10 with a little yellow sticky on it, but it says, "Leave
11 designated once. Required medical documentation, i.e.,
12 appointment schedules and work release obtained. Leave
13 will be adjusted to reflect appropriate extended medical
14 leave dates." Right?
15    A. Pam wrote that on there. I had no knowledge of
16 when she put that on there. She might have written it
17 after I left. I don't know.
18    Q. Okay. But your leave was approved; right?
19    A. At this time it was, yes.
20    Q. Do you remember if you submitted anything with
21 it?
22    A. No, I don't remember, but I do remember that I
23 gave Pam all the appropriate doctors -- documents
24 concerning my leave and appointments and whatever.
25    Q. What were those documents that you gave her?

Page 276

1    A. I don't remember. They were documents from my
2 doctor in Tennessee.
3    Q. Dr. Church?
4    A. They were documents where Dr. Church had made
5 appointments for me.
6    Q. Okay. So you believe you submitted those with
7 Exhibit 31?
8    A. I think I did, but I'm not sure.
9    Q. Did you submit anything else with Exhibit 31?
10    A. I don't remember.
11        (Exhibit No. 32 marked.)
12    Q. Okay. Can you take a look at Exhibit 31 and
13 tell me if you can identify what that is?
14    A. 31 or 32?
15     MR. CLEMENT: 32.
16     MS. DUCEY: Thanks.
17    Q. (By Ms. Ducey) 32.
18    A. Okay.
19    Q. Can you identify what 32 is?
20    A. Yes.
21    Q. What is Exhibit 32?
22    A. It's a note from my doctor, Dr. Snyder, at the
23 Barrow Medical Clinic.
24    Q. What's the date of that note?
25    A. It's November the 5th.

Page 277

1    Q. Could you have turned that in prior to November
2 3rd or on November 3rd?
3    A. Could I have turned it in?
4    Q. Yes.
5    A. No, because it's got November the 5th on it.
6    Q. All right. Is it reasonable to infer that
7 you did not turn it in with the leave request dated
8 November 3rd, which is Exhibit 30?
9    A. It's possible that I didn't because Dr. Snyder
10 called me and told me about the malignancy and that I had
11 to take the time to go back over to her office to get
12 this note.
13    Q. Okay. But it's dated the 5th; right?
14    A. It's dated the 5th and that's the day I went
15 back over and got it and maybe after I turned this
16 request for leave in, I might have then gotten all --
17 together all the proper documents that Pam needed.
18    Q. Okay. And it's from Dr. Snyder and she says,
19 "I'm writing on behalf of Bobbi Wade, a patient of mine.
20 Ms. Wade needs follow-up for some medical conditions that
21 cannot be addressed here. The follow-ups are to occur in
22 a somewhat urgent time frame. Thank you for your
23 understanding." Right?
24    A. Yes.
25    Q. And that day John Tuthill approved your leave;

EXHIBIT 2
PAGE 5 OF 6

Page 278

1  right?
2      A.  Yes.
3      Q.  And the next day Ms. Taylor signed off on it;
4  right?
5      A.  Yes.
6      Q.  And this was the medical certification that was
7  being requested that you could not wait until the end of
8  the semester to take your leave; correct?
9      A.  How could she have written this when she did not
10 know at that time that I had a malignancy?
11     Q.  Precisely the point.
12     A.  Because I couldn't supply him with this because
13 we did not know of the malignancy, but I knew of the
14 urgency of my shoulder.
15     Q.  Right.  So until Dr. Snyder got the report back,
16 there was not a medical reason why you needed to travel
17 to Tennessee before the end of the semester; correct?
18     MS. JOHNSON:  Objection, form.
19     A.  I don't know if there was a reason or not.
20     Q.  Well, I've been asking you extensively for hours
21 this afternoon.  Was --
22     MS. JOHNSON:  And it's asked and answered.
23     Q.  Was there a doctor who told you that you could
24 not wait until December --
25     A.  No.

Page 279

1      Q.  -- for medical treatment?
2      A.  No, no one told me that I could not wait until
3  December.
4      Q.  Okay.  All right.
5      A.  She doesn't even state I could not wait in this
6  note.
7      Q.  Well, it's a note dated November 5th that you
8  presented on the 5th that says "urgent"; right?
9      A.  All it says is "urgent."
10     Q.  Didn't wait 47 days to present that urgent note;
11 right?
12     MS. JOHNSON:  Objection, argumentative.
13     MS. DUCEY:  I think that I -- I'm about to
14 change subjects and I'm -- probably a good time to stop
15 for the day.
16     THE VIDEOGRAPHER:  Going off record now?
17     MS. DUCEY:  Yeah.
18     THE VIDEOGRAPHER:  This concludes Volume 1 of
19 the deposition of Bobbi Wade.  The time is 5:11.
20     (Proceedings adjourned at 5:11 p.m.)
21
22
23
24
25

Page 280

1          WITNESS CERTIFICATE
2      I, the undersigned, Bobbi Wade, do hereby certify
3  that I have read the foregoing deposition and that, to
4  the best of my knowledge, said deposition is true and
5  accurate with the exception of the following corrections
6  listed below:
7
8  PAGE/LINE    CORRECTION AND REASON FOR CORRECTION
9
10
11
12
13
14
15
16  _____
17  _____
18  _____
19  _____
20  _____
21
22  _____    _____
    Date              Bobbi Wade
23
    (Use additional paper to note corrections as needed,
24  signing and dating each page.)
25

Page 281

1          REPORTER'S CERTIFICATE.
2
3      I, CAREN S. CARLSON, Registered Professional
4  Reporter and Notary Public in and for the State of
5  Alaska, do hereby certify:
6      That the witness in the foregoing proceedings
7  was duly sworn; that the proceedings were then taken
8  before me at the time and place herein set forth; that
9  the testimony and proceedings were reported
10 stenographically by me and later transcribed under my
11 direction by computer transcription; that the foregoing
12 is a true record of the testimony and proceedings taken
13 at that time; that the witness requested signature; and
14 that I am not a party to nor have I any interest in the
15 outcome of the action herein contained.
16     IN WITNESS WHEREOF, I have hereunto subscribed
17 my hand and affixed my seal this 11th day of May, 2006.
18
19
20
21
22     CAREN S. CARLSON
       Registered Professional Reporter
       Notary Public for Alaska
23     My Commission Expires: 05-30-09
24
25

71 (Pages 278 to 281)

EXHIBIT ___
PAGE ___ OF ___



### Faculty Appointment Letter for 2003-2004

May 1, 2003

Ms. Bobbi J. Wade
Ilisaġvik College
P. O. Box 749
Barrow, Alaska 99723

Dear Ms. Wade:

On behalf of Ilisaġvik College, I am pleased to offer you employment for the next fiscal year (2003 - 2004). The following terms and conditions apply to your appointment.

| | |
|---|---|
| **Title:** | Assistant Professor |
| **Nature of Proposed Duties:** | Provide instruction and college service in your field of expertise equivalent to 30 credit hours of teaching and 7 credit hours of College service over the course of the Fall, Spring and Summer terms. Typically, this will be the equivalent of 12 credit hours of teaching and 3 credit hours of College service in the Fall and Spring respectively, and 6 credit hours of teaching and 1 credit hour of College service in the Summer. To accommodate individual program needs, variations in the division of this workload among the semesters may be made by the Dean of Instruction with the concurrence of the President. Faculty are expected to assist with the recruitment, retention and mentoring of students and to participate in the various committee structures established to encourage faculty participation in the guidance of the institution. |
| **Term:** | July 1, 2003 through June 30, 2004. Following summer leave, you will be expected to report for work on Monday, August 18, 2003. It is understood by both the College and yourself that teaching positions at Ilisagvik College are untenured and one may not acquire tenured status by reason of this appointment. |
| **Annual Salary:** | $75,477.00, payable in equal bi-weekly installments based on 260 days of service per contract year. This is a professional, exempt position and as such does not carry any entitlement to overtime pay or additional compensation for any work performed on weekends, holidays, outside of normal working hours, or days in excess of 260 days of service per year. |



P.O. BOX 749   BARROW, ALASKA 99723   907-852-3333   FAX 907-852-2729
*SERVING THE RESIDENTS OF THE NORTH SLOPE*

EXHIBIT 3
PAGE 1 OF 7

20369
Wade v. Ilisagvik College

The terms and conditions of your employment with Iḷisaġvik College are in accordance with this letter of appointment including Attachment A, the Iḷisaġvik College Employee Handbook and the Policy and

Regulations of the Board of Trustees as they exist today and as they may be duly amended from time to time. Of course, all employees are also expected to abide by state and federal law.

This letter of employment with its references encompassed herein constitutes the full and complete contract agreement between yourself and Iḷisaġvik College. Any other oral agreement between the parties shall be null and void. This contract shall be modified only in writing.

If you accept the above conditions of your employment with Iḷisaġvik College, please sign where indicated below and return the original to my office within twenty (20) days. Please retain a copy for your records. I am looking forward to your contributions this coming year.

Sincerely,

*Edna A. MacLean*

Edna Ahgeak MacLean, President

Iḷisaġvik College

I accept the above terms, conditions and provisions of the employment offered in this appointment and its attachment A.

*Bobbi J. Wade*        *5/5/03*
Signature             Date

Cc: Office of Human Resources



EXHIBIT 3
PAGE 2 OF 7

**Attachment A**

**Iḷisaġvik College Faculty Appointments**
**2003 - 2004**

Iḷisaġvik College recognizes its faculty as integral to the fulfillment of its mission to provide quality education and training to students. Toward this end, faculty are expected to be involved in academic and student life at Iḷisaġvik College by serving as a resource for students both inside and outside of the classroom.

*Academic Year* - The College's academic year consists of two full semesters (fall and spring) and one summer session (from May through the end of June). Specific dates and a College calendar are published by College administration. If deemed necessary and appropriate by the Dean of Instruction in consultation with the faculty member, certain programs may be scheduled at other times during the calendar year to better meet the needs of students. If such modifications occur, an addendum to this contract shall be made in writing.

*Teaching* - The teaching component of the workload is satisfied by teaching an assigned number of credit-hour courses, or by delivering a program of non-traditional or client-based programs. Equivalent assignments may be granted in one (1) credit increments, not to exceed three (3) credits per semester unless waived in writing by the Dean of Instruction. Equivalent assignments may include individual or independent course studies or client-based programs, individual lab instruction and other instructional functions. Faculty are expected to be available to students outside of classroom hours, and shall post and maintain at least 10 office hours per week at times scheduled for the convenience of the students.

Distance Delivery Course Preparation - The following may be applied towards faculty workload, upon approval by the Dean of Instruction, with involvement of the instructor:

- A faculty member who teaches a pre-written course (i.e. a "Canned" course) will receive the equivalent of one credit hour per three credit hours at a one to three ratio.
- A faculty member who develops and teaches a plan for an on-line course (i.e. a "From Scratch" course) will receive the equivalent of three credit hours per three credit hours at a one to one ratio.

*College Service* - As part of their professional duties, faculty are expected engage in college service. Such service activities may be assigned by the department head or the Dean following consultation with the faculty member and shall assist the College to fulfill its mission and goals. Activities include, but are not limited to: student advising, recruiting, participating in College committees, curriculum development, distance delivery technology, program coordination and supervision, grant and proposal development and reporting, accreditation support, committee or project leadership, community service, special projects or scholarly activity.

*Additional Workload* - Workloads are reviewed on a case-by-case basis by the Department Head and the Dean of Instruction in consultation with the instructor. Necessary work assignments in excess of normal workload may be eligible for additional compensation, pursuant to the terms of a written agreement between Iḷisaġvik College and the instructor. Such determinations shall be made by the Dean of Instruction subject to the approval of the President.

EXHIBIT 3
PAGE 3 OF 7

***Class Cancellation*** - Instructors are encouraged to recruit students to enroll in their classes. A minimum enrollment of five (5) students is required per class, unless as otherwise determined by the Dean of Instruction. If a class does not meet the minimum enrollment, the Dean of Instruction shall, with the involvement of the instructor and Department Head, determine whether the class will be cancelled or under what circumstances the class will be taught. Should an assigned class be cancelled, instructors shall complete alternate faculty activities through curriculum development, online course development, or other special faculty projects as assigned by the Dean of Instruction. Instructors shall not receive additional compensation for a cancelled class that would be part of that instructor's excess credit load.

***Class Coverage*** - Faculty needing class coverage must inform the Department Head one week prior to the class needing coverage. The faculty member will work with the Department Head to arrange coverage for the class. The class coverage agreement must be agreed upon between the faculty member and the Department Head and approved by the Dean of Instruction.

***Student Recruitment, Retention, and Mentoring.*** - Faculty are encouraged to help part time students to identify their personal potential and career goals and to assist them to pursue program-active status. Faculty are also encouraged to accompany the recruiter on village recruitment tours. Faculty will participate in a half-day training session on mentoring students and class completion procedures involving referrals to other college resources.

***Professional Development*** - Faculty are expected to remain current in their fields and to participate in professional growth activities including, but not limited to, course work, professional association activities, vocational internships or scholarly activities in the instructor's discipline. Professional development shall be supported by the College based upon availability of funds, with written approval of the Dean of Instruction, and in accordance with Board of Trustees Policies.

***Benefits.*** - Faculty are eligible for benefits provided by the College, according to the policies and procedures set forth in the Employee Handbook. Current benefits include retirement contributions, health, dental, vision and life insurance, and the following paid leaves:

***Personal and Sick Leave*** - Twelve days of personal leave per (contract) year are allowed when taking it does not unduly interfere with the delivery of the College's program of instruction. Leave must be approved in advance by the faculty member's department head and Dean of Instruction except in the event of an emergency situation. Personal leave has no cash value and may not be accrued from year to year.

***Winter Holiday Leave*** – You are eligible to receive ten (10) days of paid time off, which includes two (2) paid holidays and eight (8) days of paid time off, during the Winter Holiday period scheduled from December 22, 2003 through January 5, 2004. Paid Winter Holiday leave does not have cash value, does not accrue, and is forfeited if not used during the term of your contract.

***Leave Without Pay*** - Unexcused time off, or time off where no paid leave is available, shall be taken as leave without pay and deducted at the instructor's per diem salary rate, subject to the policies and procedures contained in the Employee Handbook.

EXHIBIT __3__
PAGE __4__ OF __7__

**_Drug Testing and Substance Abuse_** - You understand and agree to comply with the College's drug testing and substance abuse policy. Failure to take or pass the drug screening as provided in the policy may result in termination of employment.

**_Other Employment_** - You shall devote full time to your duties as a faculty member with the College and shall not accept any other employment or fee during the term of this Agreement without first obtaining the written consent of the Dean of Instruction and the President.

**_Point of Hire_** - The point of hire for this contract is Barrow, Alaska and you specifically waive all rights to return transportation as outlined in AS 23.10.375-.400.

**_Payroll Deductions_** - You authorize the College to make regular deductions from the Employee's paycheck for mandatory contributions to the State of Alaska Public Employees Retirement System (PERS) and as otherwise authorized or required by law and the terms of this contract or Employee Handbook.

**_Termination._** This Agreement may be terminated on mutual consent, or by the College for cause in accordance with Trustees Policy and the Employee Handbook.

**_Liquidated Damages._** It is expressly understood and agreed that you will receive full salary and benefits beginning July 1, 2003 and that you have no duty to report or job duties until August 15, 2003 (unless otherwise specified in an Addendum to this contract). If you resign effective prior to December 31, 2003, you shall be liable to the College as liquidated damages the amount of your salary for the time period of July 1 through August 15, 2003. If you resign effective January 1, 2004 through the expiration of this contract, or otherwise terminates this contract without consent of the College, you shall be liable for liquidated damages in the amount of $2,500. You agree that the liquidated damages set forth herein may be withheld from any amounts due and owing to you from the College, or otherwise collected in accordance with law.

**_Final Paycheck._** The College may withhold the your final paycheck pending submission of summaries, student grades, statistics, documents, College property, or pending resolution of salary or compensation disputes. You waive the right to receive final payment within three (3) business days following termination or expiration of this Agreement as provided by AS 23.05.140. The College shall issue final payment within five (5) business days after verified submission or resolution of the foregoing.

**_Effective Date._** This contract shall become effective only after it is signed by the President of the College, signed by faculty member, and returned to the College. This Agreement must be signed by Employee and returned to the College within twenty (20) calendar days of receipt or the Agreement is void.

**_Interpretation and Venue._** This contract shall be interpreted according to the laws of the State of Alaska and shall not be construed against the drafter hereof. Venue for any action brought under this contract shall be Barrow, Alaska. In the event any provision of this contract is found by a court of competent jurisdiction to be invalid, such provision shall be stricken but the remainder of the contract shall remain in full force and effect.

EXHIBIT ___3___
PAGE ___5___ OF ___7___

ILISAĠVIK COLLEGE
FACULTY POSITION DESCRIPTION

*Bobbi J. Wade*

| Title: Assistant Professor/Instructor of Business Management | Number [HR use only]: |
| Department: Business Management and Information Technology [BMIT] | Date [HR use only]: 6/22/00 |
| Purpose of Position: Under the direction of the BMIT Director, teaches courses within the BMIT Division. | Approved [HR use only]: 6/22/00 |

## ESSENTIAL FUNCTIONS:

Develops and teaches courses within the Business Management and Information Technology Division.

Serves as student advisor, as required.

Evaluates student performance and submits appropriate grades and reports, as required.

Participates in professional development, as appropriate.

Completes reports and presentations, and attends meetings and special events, as required.

Monitors the degree and certificate programs within the division and makes timely changes, as appropriate.

Travels to outlying villages or off-Slope for professional training may be required.

Performs College-level instruction in the appropriate discipline in Barrow and the outlying villages, as required.

Prepares and maintains updated instructional materials, course outlines, and curriculum.

Maintains office hours, as required

Participates in the development of and contributes to the quality of College-level curriculum in the area of study.

Actively participates in College and community service including serving on communities and task forces, participating in College activities, curriculum planning, professional development, and assisting in the budgeting of assigned programs.  Contributes toward the attainment of the goals and mission of the College.

Complies with College policies, procedures and administrative directives, as well as state, federal, and local laws, regulations, and ordinances.

Performs other duties as assigned.

## EDUCATION/SPECIAL SKILLS/TRAINING [Required]:

Bachelor's degree in appropriate field for Instructor level.

Master's degree in Business Management, Information Technology, or related field for Assistant Professor level.

Working knowledge and a minimum of 2 years teaching experience beyond formal education in the appropriate field.

Management or entrepreneurial experience.

EXHIBIT ___3___

PAGE __16__ OF __7__

20374
Wade  v. Ilisagvik College

Ability to work independently.

Ability to complete and pass a pre-employment drug screen.

## EDUCATION/SPECIAL SKILLS/TRAINING [Preferred]:

Teaching experience at the College level.

Experience in curriculum development.

Experience with distance delivery.

Demonstrated knowledge in one or more of the following areas: post-secondary educational systems, North Slope Borough [NSB] institutions and organizations; Iñupiat culture, language, values, and traditions; ability to interpret and represent NSB community values, customs, and beliefs for the College, and the ability to interpret and represent College actions and Western institution to the NSB community.

Valid driver's license.

## PHYSICAL REQUIREMENTS:

The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

> While performing the duties of this job, the employee is required to sit, stand, walk, use hands to finger, handle or feel objects, tools, controls, and reach with hands and arms. The employee is frequently required to stoop, kneel, crouch, or crawl and talk and hear. The employee may occasionally be required to drive a vehicle, climb or balance.

> The employee must be able to lift and/or move up to 40 pounds. Specific vision abilities required by this job include close vision, distance vision, color vision, peripheral vision, depth perception, and the ability to adjust focus.

## ENVIRONMENTAL CONDITIONS:

The environmental conditions described here are representative of those an employee encounters while performing the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

> The employee is regularly required to work indoors with a usually moderate noise level in the work environment.

EXHIBIT ___3___

PAGE ___7___ OF ___7___

20375

Wade v. Ilisagvik College

Instr/AsstProf -BusMgmtJDF.doc 06/22/00



Ilisaġvik College
P.O. Box 749 • Barrow, Alaska 99723
☎ (907) 852-3333  Fax (907) 852-2729

# REQUEST FOR LEAVE

**Name:** *Bobbi J. Wade*

**Department:** *Business Mgt.*    **Date of Request:** *10/2/03*

**Number of Days or Hours** *10*    **Begin:** *Oct 20  8:30* AM PM    **End:** *Oct 31  5:00* AM PM

Month  Day  Hour                Month  Day  Hour

**Type of Leave Requested:** ☒ Personal  ☐ Public Service  ☐ Subsistence
☐ Military  ☐ Family Medical Leave  ☐ Extended Medical Leave
☐ Jury Duty  ☐ Leave Without Pay

| | |
|---|---|
| ...onal: | Sick Leave, Vacation, Subpoenaed Witness (Requires copy of subpoena) |
| ...sistence: | Maximum of 10 days per calendar year: Unpaid Leave |
| ...Duty: | Maximum of 15 days per calendar year (Requires copy of jury summons and that court provided compensation be given to Ilisaġvik College.): Paid Leave |
| Military: | Maximum of 16.5 days per calendar year (Requires copy of orders): Paid Leave |
| Family Medical Leave: | Maximum of 12 weeks per calendar year (Requires copy of Doctor's verification): Unpaid Leave |
| Extended Illness Leave: | Requires copy of Doctor's verification: Paid Leave |
| Public Service: | Maximum of 10 days per calendar year (Requires minimum 3 days prior approval. If honorarium received, Personal Leave must be taken or honorarium turned over to Ilisaġvik College.) |
| Other: | Any other type of leave not described above (Requires explanation below) |

**Comments:** _____

_____

_____

...mployee Signature: *Bobbi J. Wade*    **Date:** *10/2/03*

...yroll Verification of Hours Available: *AS OF 9/19/03  90.0  AS*    **Date:** *10/2/03*

...epartment Supervisor Approval: _____    **Date:** _____

...ar ...Resources Approval: _____    **Date:** _____
...(No...uired for Personal Leaves)

EXHIBIT 4
EXHIBIT 4
PAGE 1 OF 1

21381
Wade v. Ilisaġvik College

**\* \* \* All Signatures Must be Obtained Prior to Leave Date. \* \* \***

Distribution:    White - Human Resources    Canary - Payroll    Pink - Employee    Golden - Department    9/13/99

## John Tuthill

**From:**    Bobbi Wade
**Sent:**    Monday, October 06, 2003 9:55 AM
**To:**      John Tuthill
**Subject:**  RE: Plan

Yes, Business English 109B and Business Math 105B will begin this week.

I have appointments in Tennessee with my doctors, and I also have a letter from my doctor in Tennessee stating that I will need to return as soon as possible for medical treatment. Under these circumstances, I don't feel that it is necessary to consult with doctors here. There are no doctors here that can be seen without long-standing appointments, and this is an immediate situation. Thanks,

Bobbi Wade

> -----Original Message-----
> **From:** John Tuthill
> **Sent:** Friday, October 03, 2003 3:57 PM
> **To:** Bobbi Wade
> **Subject:** Plan
>
> Bobbi –
>
> Here's my understanding of where we stand after all of our conversations this week.
>
> My understanding is that you will begin teaching Business English "B" and Business Math "B" next week, as originally scheduled, and that you will notify the students in advance, so they will know to come.
>
> My understanding further is that you will consult with your physicians here and in Tennessee to determine if they feel that you require immediate medical treatment, and that, depending on what they say, you may prepare a medical leave request so that you can receive any required treatment during the semester.
>
> If my understanding is incorrect, please tell me your understanding as soon as you can.
>
> Thanks.
>
> – John

EXHIBIT __5__

PAGE __/__ OF __/__

20824
Wade v. Ilisagvik College

IHS-803 (10/96)     P.L. 96-511 N.A.

# PCC AMBULATORY ENCOUNTER RECORD

Date 10-6-03

Arrival Time 1517 AM / PM

Clinic OPD

Appt. ___ Walk-in ✓  (80)

**PROBLEM LIST UPDATE** (Enter Problem Numbers from Health Summary)

| Remove | Move to Inactive | Move to Active |
|---|---|---|

PROVIDERS   AFFIL. | DIS. | INITIALS / CODE
8 | 01 | Clinc

PRIMARY PROVIDER

TEMP 96.8  PULSE 62  RESP 20  B/P 155/107

WT. 172  ☐ GM  ☑ KG / LB-OZ

**CHIEF COMPLAINT** Mole on Chest starting to get irritated, itches, + burns

**SUBJECTIVE / OBJECTIVE** Med Refill

CURRENT MEDICATIONS:
Synthroid
Lisinopril
Estraden
Ambien
Topamal
EDD Propranolol
Flonase

HT.  ☐ CM ☐ IN
HEAD  ☐ CM ☐ IN

suspicious dermatitis or irritated sub arbitis keratosis
Has ortho problems
® hip problems
radiation into leg.

VISION-UNCORRECTED  R | L
VISION-CORRECTED  R | L

Has been denied leave @ employment (college)
FP in ® Kentucky (home state) referred for eval.
Requesting note saying she should see specialist — agree w/ ortho referral.
Needs skin lesions removed.

| Injury? | ☐ Yes ☑ No | If yes, Date: | | ☐ ETOH Related | ☐ Empoy. Rel. |
|---|---|---|---|---|---|

Cause:  Place: ALLERGIES NSA
PHONE # 3632
BOX # 1399

OTHER TESTS / PROCEDURES ORDERED

(For additional Documentation, Use IHS 45-3 Continuation Sheet)

| | | ORDER | INITIALS |
|---|---|---|---|
| | ✓ | HCT. | |
| | | UA | |
| | | HCG | |
| | | BS-F/BS-R | |
| | | CBC | |
| | | Urine culture | |
| | | Throat culture | |
| | | Stool culture | |
| | | STS | |
| | | GC | |
| | | PAP | |
| | | Pelvic | |
| | | Breast | |
| | | Mammogram | |
| | | Rectal | |
| | | Chest X-ray | |
| | | EKG | |
| | | Soak | |
| | | Hep B # | |
| | | Hep A # | |
| | | OPV # | |
| | | DTP # | |
| | | DT sP # | |
| | | DT | |
| | | Td | |
| | | MMR # | |
| | | Varicella | |
| | | Influenza | |
| | | HIB TITER/ActHIB # | |
| | | Pedvax HIB # | |
| | | Pneumo Vax | |
| | | PPD ___ mm | |
| | ✓ | Type of Decision Making | |
| | | Straightforward | |
| | | Low Complexity | |
| | | Moderate Complexity | |
| | | High Complexity | |

**PURPOSE OF VISIT** (PRINT ONLY IN THIS SECTION; DO NOT ABBREVIATE)

| PROBLEM LIST A-AI-C | # | | Health Factors |
|---|---|---|---|
| | | Derm Skin lesion | 709.9 QH |
| | | ® hip pain | 719.45 |

| REPRODUCTIVE FACTORS | G | P | LC | SA | TA | LMP | | FP METHOD | DATE BEGUN |
|---|---|---|---|---|---|---|---|---|---|

PROBLEM LIST NOTES STORE NOTE FOR PROB. #     REMOVE NOTE #

STORE NOTE FOR PROB. #

MEDICATIONS     MEDICATIONS / TREATMENTS / PROCEDURES / PATIENT EDUCATION

Note saying agree & rec'd
nec should see specialist for
multiple med problems

HR #     SOM #     REVISIT/REFERRAL TO:     DATE     TIME

PURPOSE:

WADE, BOBBIE
MR# 15238  DOB 11-27-33  AGE 069
SSN 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  ACCT# 11133955
STAFF PHYSICIAN  DATE 10-06-03

INSTRUCTIONS: TO PATIENT:  ☐ SIGN RELEASE RECORDS
10/6/03

PROV. SIGNATURE

FACILITY     DATE

EXHIBIT 6
PAGE 1 OF 1

300016



# Samuel Simmonds Memorial Hospital

1296 Agvik Street  PO Box 29   Barrow, AK 99723   Phone: (907) 852-4611  Fax: (907) 852-6408

Date: _10/4/03_

**To Whom It May Concern:**

_Bobbie Wade_ _____ **was seen at this hospital today for outpatient treatment.** *I agree & recommend that she see a specialist for multiple medical problems.*

_M. Bushidd_ _____
**Physician Signature**

Revised 10/02

EXHIBIT __7__
PAGE __1__ OF __1__

**100022**