Case 3:05-cv-00086-TMB    Document 94-4    Filed 06/15/2007    Page 1 of 18

Wade vs. Ilisagvik                5-10-2006                John Tuthill, Ph.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

---

BOBBI WADE, )
)
        Plaintiff, )
)
  vs. ) No. 305-cv-086-TMB
)
ILISAGVIK COLLEGE; NORTH SLOPE )
BOROUGH; JOHN TUTHILL, )
individually; and PAMELA TAYLOR, )
individually, )
)
        Defendants. )
)

---

Videotaped Deposition Upon Oral Examination

of

JOHN TUTHILL, Ph.D.

---

8:04 a.m.

May 10, 2006

1601 Fifth Avenue, Suite 860

Seattle, Washington

Sharon K. Langford, CCR    1601 Fifth Avenue, Suite 860
Court Reporter               Seattle, WA 98101

*RECEIVED BY: Clapp, Peterson, Van Flein, Tiemessen & Thorsness, LLC. Date Rec'd/Initials: 5/24/06 NKK. Distribution: LJJ, PAW*

*EXHIBIT 14 PAGE 1 OF 18*

Case 3:05-cv-00086-TMB   Document 94-4   Filed 06/15/2007   Page 2 of 18

Wade vs. Ilisagvik                    5-10-2006                    John Tuthill, Ph.D.

Page 218

1   A. That's what personal leave means to me.
2   Q. In this Comments section it says personal with
3   a colon and then on this side it says sick leave.
4   A. Okay.
5   Q. Did you have an understanding that personal
6   leave incorporated sick leave with --
7   A. Yes, I did know that.
8   Q. And was it incumbent upon the employee to
9   designate their leave request as extended medical leave
10  in order to get medical leave?
11  A. No. However, the policy of the College, as I
12  was informed by Miss Taylor, the sick leave was for when
13  you had the flu. If you were traveling off-Slope to
14  have medical procedures done, that was supposed to be
15  the extended medical leave, because that had more
16  protection for the employee, I was advised, so that if
17  your sick leave, if your personal leave ran out, your
18  position would be held for you, would not be terminated
19  because you were taking care of your health, as was
20  entirely appropriate. My understanding was I was not
21  authorized to give a sick leave to somebody to travel
22  several thousand miles to have medical procedures done
23  off-Slope.
24  Q. Well, if an employee marked the wrong box,
25  would you hold that against them?

Page 219

1   A. No. I'd get it corrected, though. And I
2   would ask for the medical documentation, which is what I
3   had been asking for.
4   Q. So as of October 20th when you received a new
5   personal leave request from Miss Wade, you did not
6   connect her new request with her sick leave request from
7   a couple of weeks prior to that?
8   A. Not clearly, because on the 9th she had told
9   me, my medical problem is not a matter of life or death
10  so leaving everything until the holiday looks like the
11  most feasible thing right now. This looked to me like
12  Miss Wade attempting to advance the start of her holiday
13  week.
14      Faculty always want to leave early. And
15  that's something that really has to be discouraged
16  unless there's a bona fide medical reason, a documented
17  medical reason for the need.
18  Q. Let's look at Exhibit 30 and Exhibit 31.
19  These are two more leave requests from Bobbi Wade for
20  November, and one is dated -- Exhibit 30 is dated
21  November 3rd and Exhibit 31 is dated November 4th.
22      Do you recall, first of all, getting Exhibit
23  30?
24  A. No.
25  Q. Do you know, do you have any idea of why there

Page 220

1   were two requests for leave filled out?
2   A. Not directly. The leave request on the 4th,
3   if I do recall correctly, came attached to the type of
4   medical documentation we had been asking for. This was
5   the one I signed. This was the one that gave the
6   College the information needed to process the extended
7   medical leave.
8   Q. And Exhibit 31, what was your understanding of
9   the medical issue that needed attention?
10  A. I'd have to see the notice from the doctor to
11  tell you.
12  Q. All right. Look at Exhibit 32 and see if that
13  helps.
14      MS. DUCEY: Objection to foundation.
15  Q. (By Ms. Johnson) Have you seen Exhibit 32?
16  A. Yes, I have.
17  Q. When did you see it?
18  A. I assume, just a guess, that I saw it in
19  conjunction with this leave request.
20  Q. "This leave" being the second --
21  A. Which was the -- yeah, the --
22  Q. -- the Exhibit 31?
23  A. -- Exhibit 31. This was the document that
24  gave me the documentation I felt I needed in order to
25  sign, and Miss Taylor agreed.

Page 221

1   Q. And why was Exhibit 32 sufficient?
2   A. "The follow-up should occur in a somewhat
3   urgent time frame." "Medical conditions that cannot be
4   addressed here" tells me that it's something the North
5   Slope can't do. "Somewhat urgent," "urgent" tells me
6   that this is something to take seriously. "Urgent time
7   frame" tells me that this is something to take seriously
8   and to do promptly. "Somewhat" tells me that the
9   employee is, you know, not critical, but that's not my
10  issue.
11      This is telling me that there is, to my
12  reading, a serious medical issue that needs prompt care
13  that can't be dealt with locally. That's what I had
14  been asking for for a month. I got it. I signed the
15  leave.
16  Q. Did you have any conversations with Pam Taylor
17  about Exhibit 32?
18  A. About Exhibit 32? Yeah. We talked about it.
19  Q. What did you say?
20  A. We agreed that it was what we were looking
21  for.
22  Q. And the difference between Exhibit 32 and
23  Exhibit 34 is the adjectives used, the "somewhat urgent
24  time frame"?
25  A. Well, let me find 34.

EXHIBIT _14_
PAGE _2_ OF _18_

Case 3:05-cv-00086-TMB   Document 94-4   Filed 06/15/2007   Page 3 of 18

Wade vs. Ilisagvik   5-10-2006   John Tuthill, Ph.D.

**Page 34**

1  Q. Do you recall what those were about?
2  A. Mostly they were about teaching or about
3  scheduling or about issues that came up in the
4  workplace. Sometimes about the leave requests.
5  Q. And did you keep a copy of those e-mails?
6  A. I did.
7  Q. Did you specifically run them off of the
8  computer?
9  A. I don't think I did at this point. I had them
10 all saved in my college e-mail file. I believe I
11 printed copies of these when we went into the grievance
12 phase in the spring of 2004, but I don't believe I had
13 printed copies of them in January.
14 Q. So when you say correspondence, you weren't
15 looking at a correspondence file like we talked about
16 before?
17 A. No. I'm going through my e-mails.
18 Q. And while you were looking through the
19 application and resume, did you have to go down to the
20 human resources office in order to do that?
21 A. Yes.
22 Q. And the grade submission, tell me about the
23 grade submission and why that was evidence that you
24 looked at?
25 A. Over the Christmas vacation of 2003 I looked

**Page 35**

1  at the grade submissions of all of the faculty, looked
2  at the grades that they had given, looked with specific
3  interest at the number of students who had withdrawn
4  from the courses. That was an issue of interest and
5  concern. There were also issues in Miss Wade's case
6  where we received grades for two of her courses a month
7  late, which led to strongly adverse effects for the
8  continuity of the course.
9  Q. You say they were strongly adverse?
10 A. It's not the grades were strongly adverse.
11 This was a modularized course, two modularized courses
12 that had an A component for four weeks, a B component
13 for four weeks, a C component for four weeks. Because
14 Miss Wade was late in submission of the B component
15 grades by a month, it meant that the students had
16 already been promoted into C even when it turned out
17 they had not mastered the material in B, so they
18 shouldn't have been registered in the C module at all.
19 It was a mess that I had to spend considerable time
20 straightening out.
21 Q. And why was this a problem for the College?
22 A. Why was it a problem for the College?
23 Q. Uh-huh.
24 A. Because we were giving inappropriate grades in
25 the C modules to students who were in the course because

**Page 36**

1  we had not followed our own procedures. The procedure
2  was if a student had failed to complete Module B, the
3  student should be administratively withdrawn at the
4  outset of Module C, not allowed to register. Instead,
5  because we didn't have the grades in a timely manner,
6  the students had been allowed to register for Module C,
7  and in many instances they were given a grade of F when
8  the appropriate grade for them would have been a W.
9  Q. W being?
10 A. Withdrawn.
11 Q. Withdrawn. Bobbi Wade taught the first two
12 modules of that, of those two classes; is that correct?
13 A. That is correct.
14 Q. She taught A and B in Business 105 and she
15 taught A and B in Business 109?
16 A. That is correct.
17 Q. And the C modules were given, in 105 was given
18 to a different instructor; is that correct?
19 A. That is correct.
20 Q. And 109 was given to another instructor?
21 A. That is correct.
22 Q. Tell me about, tell me why those C modules did
23 not remain with Bobbi Wade?
24 A. Because she was going to be away on leave.
25 These were modularized courses. C module was scheduled

**Page 37**

1  to meet over a four-week period. My recollection is
2  that for one of the C modules there were going to be a
3  total of ten class meetings. Miss Wade was going to be
4  gone for at least four of them. My recollection is that
5  for the other of the modularized courses there were
6  going to be a total of eight course meetings during the
7  short semester. Miss Wade was going to be gone for
8  three of them.
9      In my professional judgment, I felt that
10 having the students miss between 37.5 and 40 percent of
11 the class meetings or having to reschedule that number
12 of class meetings in a very tight semester was not in
13 the students' best interests.
14 Q. So you gave them -- so was it your duty to
15 decide who taught that module, those Module C's?
16 A. In this instance, yes.
17 Q. And did you think that you had the authority
18 to decide who taught the Module C's?
19 A. Yes. Subject to the approval of the
20 president. The Personnel Action Form would ultimately
21 be signed by the president.
22 Q. Was there a Personnel Action Form generated
23 for those modules?
24 A. I don't recall specifically, but I assume
25 there was.

EXHIBIT 14
PAGE 3 OF 18

Case 3:05-cv-00086-TMB   Document 94-4   Filed 06/15/2007   Page 4 of 18

Wade vs. Ilisagvik                5-10-2006                  John Tuthill, Ph.D.

Page 186

1 not telling Aimee Valenti that you had authorized a
2 credit by examination for this student. Did you blame
3 Bobbi Wade for not getting this information to Aimee
4 Valenti?
5    A. No, I reported a fact, that the information
6 had not gone from Miss Wade to Aimee Valenti. This was
7 an issue in which there was fault on both sides. My
8 understanding is that Miss Wade attempted to deliver
9 this information to Miss Valenti while Miss Valenti was
10 giving a class. In December, when Miss Valenti -- or
11 November when Miss Valenti had gone to Miss Wade to ask
12 for information while Miss Wade was giving a class, Miss
13 Wade had not been receptive. Interrupting a teacher
14 when they're teaching is usually not a very good thing
15 to do.
16       The important point for me, the point that I'm
17 attempting to make here, is that the communication lines
18 did not work. The information was not going from the
19 person who had it to the person who needed it. And
20 that's a problem.
21    Q. In the bottom carry-over paragraph, Miss Wade
22 promised a grade of DF to students in other instructors'
23 courses?
24    A. That is in effect true.
25    Q. And "in effect," what do you mean by "in

Page 187

1 effect true"?
2    A. Well, what Miss Wade reported was that she
3 told Miss Underwood, for example, that if she got busy
4 at the end of the term, she would be eligible to get a
5 grade of DF in Module C. When Miss Wade imparted that
6 information to Miss Underwood, Miss Wade had every
7 reason to anticipate that she would be the instructor of
8 Module C. That was the plan at that time.
9       However, the plan changed. Module C for
10 Business English was assigned to Miss Valenti, so the
11 effect of this was that Miss Wade had promised to a
12 student in a class, for which the instructor of record
13 was now Miss Valenti, a grade, and that's an extremely
14 awkward situation.
15    Q. But for her leave she would have been teaching
16 Module C. Do you agree with that?
17    A. In all probability, yes.
18    Q. Now, Miss Wade was teaching three courses that
19 were online courses, and each of those courses was a
20 three-hour course; is that correct?
21    A. That's my recollection from the September the
22 3rd load report that I see.
23    Q. Would you review Exhibit 19 and tell me if you
24 know whether this is an accurate depiction of Bobbi
25 Wade's fall classes?

Page 188

1    A. No. I can guarantee you I can't say that. It
2 was a complicated schedule. It was a complicated
3 semester. The Principles of Economics course was
4 canceled, for example. It is possible that additional
5 classes were added to Miss Wade's schedule. I don't
6 remember that detail.
7    Q. Do you recall a class being added towards the
8 end of the year?
9    A. No. I recall, because I have seen the
10 document recently, correspondence between Miss Wade and
11 me regarding the need to find an instructor for a
12 record, a filing and record keeping course. The
13 information I have does not make clear whether in the
14 end Miss Wade decided to take that course or not. And I
15 just don't remember.
16    Q. Do you recall how many credits that course
17 was?
18    A. Two.
19    Q. So if Miss Wade had three online courses that
20 were three hours each and a filing and record keeping
21 course of two hours each --
22    A. One.
23    Q. It was one hour?
24    A. No, it was two hours but it was one filing and
25 record keeping. So there's no "each."

Page 189

1    Q. Thank you. My mouth got away from my brain.
2       So she had a total of nine hours for those
3 four courses?
4    A. No. If she had three three-credit --
5    Q. Eleven hours.
6    A. Yes.
7    Q. She had eleven hours?
8    A. For those four courses. If in fact she taught
9 the filing and record keeping. I'm not 100 percent sure
10 that happened. I don't remember.
11    Q. Okay. And the standard course load for a
12 teacher pursuant to their regular contract is how many
13 hours?
14    A. The general rule of thumb was 12, 12 and six;
15 12 in the fall, 12 in the spring, six in the short
16 summer semester. There were exceptions to that. For
17 example, in the trades program it was common for the
18 faculty to do a 15 and 15, because having a short
19 program for the month of May in the trades didn't seem
20 to make as much sense.
21    Q. So Exhibit 12 is the contract for Miss Wade
22 for 2003-2004. Does that specifically say that she
23 would carry 12 hours?
24    A. No. It says typically. This will be the
25 equivalent of 12 credit hours of teaching and three

48 (Pages 186 to 189)

Case 3:05-cv-00086-TMB   Document 94-4   Filed 06/15/2007   Page 5 of 18

Wade vs. Ilisagvik   5-10-2006   John Tuthill, Ph.D.

Page 90

1 talked about. It was something that we talked about
2 with faculty candidates when we interviewed and asked
3 them, you know, how will you deal with an issue if all
4 of a sudden a whale comes in and there's no one in your
5 class for a week. And we were looking for people who
6 were patient, flexible, while at the same time dedicated
7 to maintaining the instructional integrity of the
8 course.
9    Q. Would you advise faculty members to give
10 students who had lifestyle issues more time to complete
11 a course?
12   A. In general, yes.
13   Q. How much time?
14   A. Depends on the circumstances. At the most, I
15 can imagine a student who had a culturally related
16 interruption of their studies to be given a grade of
17 incomplete, and a grade of incomplete would typically
18 allow the student till the end of the next academic
19 semester to complete the course requirements. And I
20 would expect the faculty member to work with that
21 student during that time to complete the course
22 requirements.
23   Q. How common was an incomplete at Ilisagvik?
24   A. A number of students got incompletes. I would
25 not say that it was a huge number, but it was a number.

Page 91

1 I would say that the completion rate of the
2 students who got the incompletes was probably very low.
3 Most students, when they get the incomplete, tend to put
4 it off and think, well, I have until the end of the
5 semester, and when the end of the semester comes they've
6 forgotten what they were doing the semester before and
7 the work never gets done. That was my general
8 impression. I don't have data to confirm it, though.
9    Q. Did a faculty member have authority to grant a
10 student an incomplete?
11   A. My recollection is the faculty member could
12 give the incomplete. It may have required a
13 countersignature from the dean. But it's something that
14 if it did, I would have routinely signed off on.
15   Q. Did you encourage face-to-face interaction
16 between your faculty members and the students who were
17 in the villages?
18   A. Face-to-face?
19   Q. Yes.
20   A. Whenever I could. I was perfectly delighted
21 when the faculty would travel to the villages or meet
22 with the village students when they came to Barrow. Not
23 enough of that happened, but obviously having a personal
24 connection is a very good thing.
25   Q. So if a faculty member requested to go to a

Page 92

1 village, you would have approved it?
2    A. Well, it depends on the circumstances and the
3 costs and the time away from their regular instruction,
4 but it would certainly be something that I would
5 encourage in principle.
6    Q. Were you aware that shortly after you sent
7 Bobbi Wade Exhibit 66, that she scheduled a meeting
8 with -- between herself, Sonya Abu, and Rob Carrillo?
9    A. I don't believe so.
10   Q. You were not aware of that?
11   A. Not to my recollection.
12   Q. Did Sonya -- did you talk to Sonya about the
13 Blackboard courses in late January of 2004?
14   A. In late January? Probably not. I don't
15 recall that I talked about the content of this memo with
16 Sonya, though it certainly is possible. She would have
17 had a business interest, a professional interest in this
18 issue, since supporting Blackboard students was an issue
19 for her as well as for Rob.
20   Q. We're going to look at Exhibit 46 which has
21 already been marked. You don't have it yet. Let me
22 find it for you.
23       Have you ever seen this document before?
24   A. Yes. I wrote it.
25   Q. You wrote this? When did you write this?

Page 93

1    A. I do not remember exactly when I wrote this.
2 Let's see, from the context it was written in the latter
3 half of January.
4    Q. What makes you think that it was written in
5 late January?
6    A. Because of issue three. "At the beginning of
7 the semester, I gave her a series of specific directions
8 for what she needed to do differently in order to
9 support our students better. She is doing some of what
10 I directed; most she is not."
11       Now, I sent that e-mail, if I recall
12 correctly, on January the 15th, so this was written
13 sometime afterwards, because I had been to the
14 Blackboard courses to see what had been changed and what
15 had not.
16   Q. Did you write this document before you signed
17 the non-renewal?
18   A. Yes. My recollection is that this document
19 was part of my decision-making process. I typed up my
20 own notes and my own thoughts about what the issues were
21 concerning Miss Wade. My recollection is that I wrote
22 this as notes to myself rather than for dissemination
23 outside my office.
24   Q. So we established that you signed the
25 non-renewal on the 28th of January, and that you wrote

Page 54

1 designed to provide them with upgraded computer skills
2 and upgraded business skills to make them more effective
3 in the jobs that they were doing. So it was an audience
4 of students who were primarily older, all of them full-
5 time employed, and I suppose a comparatively more
6 demanding, more aggressive group of students.
7  Q. Were these students that intended to get a
8 degree?
9  A. Not necessarily. It was hoped by the College
10 that some of them would be attracted by the instruction
11 they had received and would subsequently enroll in
12 degree programs, but that was not the primary intention
13 of the program.
14  Q. Was this something that the North Slope
15 Borough paid to send its employees to?
16  A. Yes.
17  Q. Did you agree with Dr. O'Rourke's assessment
18 that the College Skills Academy was not suitable for
19 Bobbi Wade?
20  A. I followed his advice. He gave me that advice
21 in August, before I had met Miss Wade. This was a
22 program that was designed to be implemented as early as
23 the next month. I followed his suggestion.
24  Q. Who did you place in the College Skills
25 Academy?

Page 55

1  A. Primarily the instructor for the Skills
2 Academy classes, or at least the coordinator of the
3 whole program was Dr. Chris Lapp, who the college hired
4 that summer.
5  Q. To specifically fulfill those duties?
6  A. Yes, and to teach other business courses as
7 well, but the primary focus of his activity was to
8 coordinate and do some of the instruction in the Skills
9 Academy class. He didn't teach the IT classes, for
10 example, but he taught some of the business classes.
11  Q. If Bobbi Wade had been placed into the Skills
12 Academy, would it have been a full-time job for her?
13  A. Oh, I don't think so.
14  Q. Could she have just taught specific classes
15 for the Skills Academy?
16  A. That could have been done, though, remember,
17 in the course load that she had, she was already more
18 than booked up. She was teaching a substantial overload
19 just with her regular Ilisagvik College classes.
20  Q. So when Dr. O'Rourke told you that he didn't
21 think she was suited for the College Skills Academy, he
22 didn't express a reason for that?
23  A. Not specifically. He simply said that he
24 didn't think that was the best audience for her.
25  Q. Did he say what was the best audience?

Page 56

1  A. No. The implication was that Miss Wade would
2 be better suited for the traditional classes that she
3 had always been instructing.
4  Q. Okay. So other than making that comment to
5 you, did Dr. O'Rourke make any other comments about Miss
6 Wade's competence or her qualifications?
7  A. We talked about her qualifications.
8  Q. And what did you say?
9  A. We were both aware of the fact that her
10 education was in English, that her graduate degree was
11 in educational administration, and that these degrees
12 were not directly connected to much of the content area
13 of what she was teaching at the College.
14  Q. And what sort of comments did Dr. O'Rourke
15 make about that?
16  A. None. We just observed the fact.
17  Q. At some point this became a problem for you;
18 is that correct?
19  A. It was an issue for me. It was an issue for
20 me in determining whether or not I wanted to recommend
21 the renewal of the contract.
22  Q. Why was it an issue?
23  A. It was an issue because the accreditation
24 standard by the Northwest Accrediting Commission states
25 that an accredited college will have appropriately

Page 57

1 qualified instructors. I had an instructor in the
2 business program who was teaching classes in accounting
3 and economics and finance and business management and
4 marketing who had very limited or no academic background
5 in these areas. That was not appropriate
6 qualifications, so I was in violation of an
7 accreditation standard.
8  Q. Well, when they say appropriately qualified,
9 is there a definition for that?
10  A. There's no explicit definition in the
11 accreditation standard. There is a general consensus, I
12 would say, that at the community college level it is
13 appropriate for an instructor to have a master's degree
14 in the field in which they are teaching or a closely
15 related field.
16  Q. And what was Miss Wade's master's degree?
17  A. Her master's I believe was in educational
18 administration.
19  Q. And did you discuss the accreditation issue
20 and Miss Wade's master's degree with Dr. O'Rourke?
21  A. It may have been something that was raised.
22 It wasn't something we needed to talk a lot about
23 because he and I were both very well aware of the
24 accreditation requirements.
25  Q. Was it Dr. O'Rourke's opinion that Miss Wade

Case 3:05-cv-00086-TMB   Document 94-4   Filed 06/15/2007   Page 7 of 18

Wade vs. Ilisagvik                   5-10-2006                  John Tuthill, Ph.D.

Page 58

1  was not suitably or appropriately qualified for
2  accreditation purposes?
3      A.  I don't think he said that explicitly. He did
4  say that he was well aware that she did not have a
5  degree in business. Did he say specifically that this
6  is a violation of the accreditation standard? No.
7      Q.  Who would you rely upon for advice as to what
8  was an appropriately qualified instructor for
9  accreditation purposes?
10     A.  Me.
11     Q.  Just you?
12     A.  Uh-huh.
13     Q.  You made that decision?
14     A.  Yes.
15     Q.  How were you aware of what was appropriate and
16 what wasn't?
17     A.  I have been doing this for many years. We had
18 exactly the same accreditation issues at the College of
19 the Marshall Islands, at the University of Guam. There
20 is nothing new about this. What was new at Ilisagvik
21 was it had only very recently become a fully accredited
22 institution, and that meant that it needed to make
23 certain that it upheld the standards if it wanted to
24 retain its accreditation.
25     Q.  There were many different types of

Page 59

1  instructors --
2      A.  That is true.
3      Q.  -- at Ilisagvik College, correct?
4      A.  Yes.
5      Q.  There were hands-on instructors who taught
6  more trade skills than actual classroom --
7      A.  That is correct.
8      Q.  -- instruction, right?
9      A.  Uh-huh.
10     Q.  And what did you expect out of your people who
11 were more trade-oriented?
12     A.  Well, let me go through a list, if I may.
13 Fannie Akpik is a good example. She was a native
14 Alaskan. She was responsible for teaching traditional
15 arts and crafts and skills. She did an Inupiat dance
16 course. She did sinew sewing classes.
17         She didn't have a master's degree. Nobody
18 gives a master's degree in that and I didn't expect
19 that. She had a level of cultural expertise, a level of
20 practical knowledge and skill which compensated for the
21 lack of a formal degree program in the type of activity
22 courses that she was teaching.
23         We had instructors in a carpentry program, in
24 an electrical program, in a plumbing program, and a
25 truck driving program. They didn't have master's

Page 60

1  degrees. Nobody's going to go get a master's degree in
2  plumbing. It doesn't work that way. But they had
3  professional credentials. They had journeyman
4  certifications. They had years of trade experience and
5  years of teaching experience. And that made them, by
6  accreditation standards, too, in my judgment,
7  appropriately qualified instructors.
8          Miss Wade's issue was a little bit different,
9  because she was teaching in the business program the
10 academic-oriented courses. She was teaching
11 accounting. She was teaching marketing. She was
12 teaching finance. She was teaching economics. Those
13 were courses for students who were asking for academic
14 degrees, not so much just vocational certificates.
15 Those were courses which a student from Ilisagvik might
16 very well want to transfer to another degree program at
17 the University of Alaska or someplace else later on in
18 their educational career.
19         I needed to make sure that those courses were
20 done at the appropriate academic level to make sure that
21 the students would get transfer credit when they moved
22 to another institution, to make sure not just the
23 transfer credit but that those students would also have
24 the skills, the outcomes that they needed to survive at
25 the next level when they did go to UAF and took the

Page 61

1  classes for which the Ilisagvik classes had been
2  prerequisites.
3      Q.  Were you aware of whether Bobbi Wade had
4  experience in the fields that she taught rather than an
5  academic degree?
6      A.  I was not aware of great depth of practical
7  experience in fields such as marketing or finance or
8  economics or business management. I was aware that she
9  had taught these courses for Ilisagvik in the recent
10 past.
11     Q.  And what did you do to determine whether her
12 actual teaching ability was appropriate?
13     A.  I reviewed the courses that she was teaching.
14 She was teaching in fall semester of 2003 the
15 academically oriented business classes online, on
16 Blackboard. I went into her Blackboard Web site and
17 reviewed the courses.
18     Q.  How many of her courses?
19     A.  There were three.
20     Q.  So you looked at all three of the Blackboard
21 courses?
22     A.  Yes, I did.
23     Q.  And when you looked at them what were you
24 looking for?
25     A.  Looking to see what they were. Looking to see

16 (Pages 58 to 61)

MOBURG & ASSOCIATES         1601 Fifth Avenue, Suite 860         ttle, WA 98101
Court Reporters                       206-622-3110          EXHIBIT ___14___   Fax 206-343-2272
                                                            PAGE __7__ OF __18__

Case 3:05-cv-00086-TMB   Document 94-4   Filed 06/15/2007   Page 8 of 18

Wade vs. Ilisagvik  5-10-2006  John Tuthill, Ph.D.

Page 234

1  A. My recollection is that "a" through "e"
2  consisted of my list of issues of concern underlying the
3  decision not to retain Miss Wade. But I would insist
4  for the record that most of these alone, many of these
5  in combination, would not have been sufficient cause in
6  my estimation not to renew.
7     The basic cause for my decision not to renew
8  Miss Wade was a combination of very serious performance
9  issues, coupled with a basic lack of qualifications for
10 the position that she held, and my awareness that no
11 matter how much we worked on the performance issues, if
12 indeed she would be willing to work with me on the
13 performance issues and I had no indication that she
14 would, that that would not affect the fundamental fact
15 that she was not qualified for this instructional
16 position.
17  Q. Well, let's break that down a little bit. You
18 looked at -- when you first came in to your position you
19 looked at the student evaluation file for Miss Wade?
20  A. That is correct.
21  Q. And at some point did you say that you went in
22 and you looked at her personnel file and you saw her
23 resume and you looked at all those --
24  A. That is also correct.
25  Q. Did you look at the evaluation that had been

Page 235

1  done by a prior dean?
2  A. Yes, I did.
3  Q. And there was one for the spring of '03; is
4  that correct?
5  A. That is correct.
6  Q. And that evaluation was not a bad evaluation?
7  A. It was not a bad evaluation.
8  Q. So based on performance issues in the past,
9  other than the fall of '03, did you have any other
10 indication other than the fall of of '03 that Miss Wade
11 would not be able to perform well in the future?
12  A. I saw evidence of performance issues in
13 earlier semesters in her file. And --
14  Q. And what --
15  A. -- don't forget that on top of the performance
16 issue, we had in my estimation the lack of
17 qualifications for the position.
18  Q. Okay, well, I just want to focus on the
19 performance issues. What evidence of performance issues
20 did you see?
21  A. One suggestion of at the least performance
22 questions was some notices in student evaluations that
23 some students in previous semesters had felt that Miss
24 Wade's courses were too easy, insufficiently
25 challenging, suggesting that this could be an instructor

Page 236

1  who was not teaching to college credit level.
2     There were documents in file, and I want to
3  say dating to the spring of 2003 but I'm not absolutely
4  sure, where there was a disagreement or a
5  misunderstanding or an issue between Miss Wade and a
6  student. That was a troubling series of documents. The
7  student had a concern or a problem about something, and
8  Miss Wade's reaction seemed from the documents to be to
9  go on the attack, to accuse the student of questioning
10 Miss Wade's integrity, to accuse the student of being
11 inappropriate and out of line.
12    It was not the reaction that you would expect
13 from a professional instructor, suggesting that this was
14 an individual whose working relations with students
15 might be problematic, particularly when the students
16 were not easy, sometimes confrontational as students
17 could be. That was also in the file.
18    I received oral reports that were not in the
19 file in the summer before the fall semester began.
20  Q. From who?
21  A. Jamie Elbert particularly, though I think it
22 was -- no, let's just say Jamie Elbert, who said that
23 Miss Wade's classes were not challenging, that in fact
24 you didn't have to work at them at all, that you could
25 just coast along doing practically nothing until the two

Page 237

1  weeks before the semester was over, and then do all the
2  Blackboard material and turn it in and get your grade.
3  That was of concern to me.
4     The evaluations from the students, the written
5  evaluations in file, the evaluations from the deans in
6  previous years, were by and large favorable. That is
7  true. So I did not enter into the fall '03 semester
8  expecting problems, though in fact some of the things
9  that I had suggested in those files proved to be issues
10 of concern.
11  Q. Now, Exhibit 46 that you've looked at before
12 and have in your stack --
13  A. 46. 46.
14  Q. -- this was actually used as an exhibit at the
15 administrative hearing; is that correct?
16  A. I don't remember that at all. My memory is
17 that I wrote this as a note to myself.
18  Q. Did you make up the exhibits for the hearing
19 yourself?
20  A. I don't remember.
21  Q. Did you speak on the record to the hearing
22 officer during the hearing?
23  A. The hearing with Dr. O'Rourke?
24  Q. Yes.
25  A. Yes.

60 (Pages 234 to 237)

MOBURG & ASSOCIATES   1601 Fifth Avenue, Suite 860  EXHIBIT ____   Seattle, WA 98101
Court Reporters          206-622-3110   PAGE __8__ OF __18__   )6-343-2272

Case 3:05-cv-00086-TMB   Document 94-4   Filed 06/15/2007   Page 9 of 18

Wade vs. Ilisagvik                 5-10-2006                           John Tuthill, Ph.D.

Page 126

1  MS. JOHNSON: Do you want to break?
2  MR. GAMACHE: Yeah.
3  MS. JOHNSON: Take a break.
4  VIDEOGRAPHER: We're going off the
5  record. The time is approximately 11:12 a.m.
6  (Recess taken.)
7  VIDEOGRAPHER: We are back on the record.
8  The time is approximately 11:23 a.m.
9  Q. (By Ms. Johnson) During the fall of 2003 did
10 you receive complaints from students about any
11 instructor other than Bobbi Wade?
12 A. Yes.
13 Q. Who?
14 A. I received complaints from students about
15 Courtneay Bartholomew. I received complaints from
16 students about Jay St. Vincent. I received complaints
17 from students about Tony Kaliss.
18 Q. What were students complaining about with
19 Courtneay Bartholomew?
20 A. That they didn't understand him or that he was
21 rude or that the instructions in his Blackboard courses
22 were not appropriate to the course.
23 Q. And what about Jay St. Vincent?
24 A. That she was demanding, that she was mean,
25 that her courses were too hard, that no matter how hard

Page 127

1  the student tried they still got red ink all over their
2  essays.
3  Q. And what about, you said Tony Kaliss?
4  A. Tony Kaliss.
5  Q. What did they complain about Tony Kaliss?
6  A. That he was pompous, dogmatic, self-righteous,
7  deadly dull.
8  Q. Were those complaints that you took seriously?
9  A. I certainly listen. I'll listen to any
10 student complaint.
11 Q. Did you investigate any of those complaints?
12 A. Sure.
13 Q. What did you find out about Courtneay
14 Bartholomew?
15 A. That his English was very difficult to
16 understand. That his Blackboard courses were in many
17 cases set up inappropriately. He had grafted his
18 traditional delivery syllabus on to the Blackboard site
19 so that the Blackboard students were being advised that
20 they couldn't chew gum in class and they couldn't bring
21 their infant children to class because it was disruptive
22 to everyone else, this in a Blackboard course that had
23 no class. And that at times he was quite curt to
24 students and not supportive, in the Blackboard
25 instruction particularly.

Page 128

1  Q. What did you do about your findings?
2  A. Talked to Courtneay.
3  Q. And what did you say?
4  A. We talked some about the student perception.
5  We talked some about his interests, the direction in
6  which he wanted his career to go. We reached, I think,
7  the mutual conclusion that Courtneay was more effective
8  in the specialized IT courses for students who were
9  really professional and motivated and talented; that he
10 was less effective in the bread and butter, general
11 education, intro to computer type course. He didn't
12 really have the patience with those students. And we
13 agreed that we would attempt to schedule him to teach
14 those courses in which he was more appropriate.
15 Q. Did you bring somebody in to teach the lower
16 level courses for him?
17 A. We already had people who came in as adjuncts.
18 Did we recruit another full-time person? No, we would
19 have loved to but didn't have the budget for it at that
20 time.
21 Q. So you were using an adjunct to teach the
22 basic course?
23 A. In some instances Courtneay taught the basic
24 courses, too. We just agreed that we were going to
25 attempt to move, insofar as we could, in the direction

Page 129

1  of having him concentrate on the professionally oriented
2  courses and have other instructors do the entry level
3  courses.
4  Q. Did he teach face-to-face courses as well?
5  A. Yes.
6  Q. What did you instruct him about his, was it an
7  accent problem? Was that the problem?
8  A. There was an accent problem, and there really
9  wasn't a whole lot you could do with that. You could
10 counsel him to speak slower. You could ask him "what"
11 repeatedly until he got the picture and slowed down.
12 But that was just simply a way that Courtneay came, and
13 it was something that the College was either going to
14 have to deal with or choose to find another instructor.
15 I chose to deal with it.
16 Q. Did you have him take any sort of course or
17 accent reduction course, anything like that?
18 A. No. I didn't see, and still don't see, the
19 value of an accent reduction course for an individual
20 such as Courtneay. He's got the accent that he grew up
21 with, that he's been speaking with for the past 50
22 years. I don't know that a four-week course, reading
23 how now brown cow into a telephone, is going to make a
24 substantive difference.
25 Q. And did Courtneay make the changes that you

33 (Pages 126 to 129)

Page 226

1 policy or FMLA or whatever was not my issue. My issue
2 was what the employee needed to do to get the help they
3 needed, and what they needed subsequently in order to
4 come back.
5    Q. (By Ms. Johnson) Did anybody raise a question
6 about whether it was appropriate to give Ms. Wade the
7 Module C classes after she returned from medical leave?
8    A. No.
9    Q. Pam Taylor never had any discussions with you
10 about that?
11    A. Not to my recollection.
12    Q. And did you consult Cheryl McKay about that?
13    A. I don't recall that I did. I may have, but I
14 do not recall.
15    Q. You said you thought you had more than one
16 conversation with Cheryl McKay?
17    A. Oh, over the semester I had multiple
18 conversations.
19    Q. Okay, specifically about Miss Wade and her
20 medical leave, how many conversations?
21    A. Oh, I couldn't tell you. I mean I know of one
22 from the documentation. I suspect there were two
23 others.
24    Q. And did she -- do you recall her giving you
25 any specific advice on how to treat Miss Wade when she

Page 227

1 came back from leave?
2    A. I do not recall that.
3    Q. Do you recall any issues with Miss Wade's
4 documentation when she returned from medical leave?
5    A. I don't recall the documentation when she
6 returned, so, no, I don't recall any issues with it.
7    Q. Is that documentation brought to you when
8 somebody comes back from medical leave?
9    A. Well, this was the first medical leave, in my
10 recollection, that we had at Ilisagvik that semester.
11 So I can't say what the definite procedure was. My
12 suspicion is that it would go to personnel rather than
13 to me.
14    Q. And would personnel have notified you if the
15 documents were insufficient?
16    A. I would think so.
17    Q. I want you to look at Exhibit No. 60. Bobbi
18 Wade filed a grievance in February which culminated in
19 an administrative hearing. Do you recall that?
20    A. Yes.
21    Q. And were you present for the administrative
22 hearing?
23    A. That was the hearing presided over by
24 Dr. O'Rourke?
25    Q. You were present at a hearing that he presided

Page 228

1 over?
2    A. Well, there was one level hearing that was to
3 be presided over by John Van Hoesen and then one by
4 Dr. O'Rourke. I was present at both.
5    Q. Do you recall reading this decision from
6 Dr. O'Rourke?
7    A. Yes.
8    Q. Did you read it at the time that he made the
9 decision?
10    A. Well, I read it subsequent to it, after he had
11 it distributed to the parties.
12    Q. So you read it sometime in the summer of 2004?
13    A. I don't recall the dates at all. Let's see.
14 He's reviewing things in June 24, so, yes, it would have
15 been in the summer of 2004.
16    Q. Turn to page 3. And paragraph labeled 13
17 states, "The Administration proffered the following
18 reasons for Miss Wade's non retention." Do you know who
19 the administration is that he's referring to?
20    A. Me.
21    Q. And the following reasons are labeled "a,"
22 "b," "c," "d," and "e." Do you recall that these were
23 the reasons that were presented at the hearing?
24    A. Not exactly. I think the question that I was
25 responding to here were what were the performance

Page 229

1 issues, what were the issues of concern pertaining to
2 Miss Wade. These were all issues of concern.
3    Q. So --
4    A. These were not -- many of these, in and of
5 themselves, would not have been sufficient reason in my
6 estimation not to renew Miss Wade.
7    Q. Each individually was not sufficient?
8    A. No, I didn't say that. E, for example,
9 "failure to submit timely grades" was a performance
10 problem. It was something that I was concerned about,
11 but there were performance issues with other faculty
12 members I was concerned about and I recommended their
13 contracts be renewed.
14       The poor professional judgment, the deferred
15 grades, I could add here the, in my opinion, poor
16 evaluation of -- poor advisement of students who were
17 being urged to withdraw from classes taught by people
18 Miss Wade didn't like, those were performance issues
19 that were of concern to me, but alone that would not
20 have led to a non-renewal.
21    Q. What did lead to the non-renewal? I thought
22 you said it was qualification and --
23    A. In the end, for me -- understand that from my
24 point of view, there had been an almost complete
25 breakdown in Miss Wade's instruction in the fall

58 (Pages 226 to 229)

MOBURG & ASSOCIATES          1601 Fifth Avenue, Suite 860   EXHIBIT 14   Seattle, WA 98101
Court Reporters                     206-622-3110            PAGE 10 OF 18   06-343-2272

Page 230

1  semester of 2003. Most of the students registered in
2  her courses did not achieve their objective. There was
3  evidence of poor advisement.
4      There was evidence of, it seemed to me, a
5  complete misunderstanding of the whole process of the
6  modularized courses, which was puzzling because she had
7  taught them repeatedly. You can't cancel those classes
8  for a month and then pick them up. You can't run B and
9  C modules concurrently when B is the prerequisite for C,
10 and yet those were things that Miss Wade had asked for.
11     I had multiple student complaints from a
12 variety of sources that Miss Wade was disinterested,
13 unhelpful, judgmental, rude. They felt intimidated,
14 they felt humiliated, they felt confused. I have
15 reports of Miss Wade in essence telling students that
16 they should already know how to do that and she wasn't
17 going to waste her time helping them. I had a meltdown
18 of instruction.
19     And I realized that no matter how hard the
20 administration worked or how hard Miss Wade worked on
21 those specific performance issues, the bottom line, when
22 push came to shove, was that this was an instructor who
23 did not meet the minimal acceptable qualifications for
24 the job. This was not someone who should have been an
25 assistant professor of business at an accredited

Page 231

1  college. She simply lacked the education. And she
2  would continue to lack the education no matter what
3  happened.
4      Q. So the bottom line for you was what?
5      A. The determining factor for me, what made Miss
6  Wade's case different for me than all the other ones
7  where I had a performance issue, I felt that the
8  performance issue with Miss Wade in the fall semester
9  was more severe than anyone else's, but I also felt she
10 was the faculty member who simply did not have the
11 educational qualifications needed for the position that
12 she held at Ilisagvik College.
13     She had training in English, she had training
14 in educational administration, not in business. She was
15 teaching classes in marketing, in accounting, business
16 management, finance, economics, where, in my evaluation
17 of her transcript, she lacked the academic foundation to
18 be teaching.
19     Q. So did you tell those reasons specifically to
20 Patrick O'Rourke during the administrative hearing?
21     A. Yes. "Insufficient academic background for
22 the area in which she teaches."
23     Q. That was one of the five areas?
24     A. That was one of the five issues, though I will
25 say again, that for me was the one that I couldn't

Page 232

1  figure out how to get around.
2      Q. But the other things that you listed here also
3  factored into your decision?
4      A. Those were issues. Those were areas of
5  concern. Some of very grave concern, others of concern
6  but not quite so grave.
7      Q. They were --
8      A. There were certainly a multitude of
9  performance issues, coupled with the insufficient
10 academic background.
11     Q. They were of sufficient concern to you to
12 mention them to the administrative hearing officer?
13     A. I was asked by the administrative hearing
14 officer what my concerns were with Miss Wade. I
15 answered the question --
16     Q. And in fact --
17     A. -- completely and honestly.
18         MS. DUCEY: Before you ask that next
19 question, I never got -- somehow I might have misplaced
20 my Exhibit 60. So you've been asking all these
21 questions and I don't -- it's not your fault. I just
22 don't have my copy and I'm wondering --
23         MS. JOHNSON: I don't have an extra copy.
24         MR. GAMACHE: I thought I saw an extra
25 one.

Page 233

1          MS. JOHNSON: Get out of my copies.
2          MS. DUCEY: Well, I'm wondering maybe
3  if --
4          MS. JOHNSON: You're welcome to take a
5  break and look at it if you want.
6          MS. DUCEY: Can we take five and I can
7  get another copy? Probably speed up the process. Just
8  walk out and get another one.
9          VIDEOGRAPHER: We're now going off the
10 record. The time is approximately 2:51 p.m.
11         (Recess taken.)
12         VIDEOGRAPHER: We are back on the
13 record. This is the beginning of tape number four in
14 the continuing deposition of John Tuthill. The time is
15 approximately 3:01 p.m.
16     Q. (By Ms. Johnson) So we were talking about the
17 presentation to the hearing officer who was
18 Dr. O'Rourke, and the reasons for non-retaining Miss
19 Wade, and "a" through "e" were presented -- you agree
20 that "a" through "e" were presented to the hearing
21 officer as the reasons for not retaining Miss Wade for
22 another year?
23     A. No, I don't agree.
24     Q. Okay. What is your recollection of what
25 happened?

Case 3:05-cv-00086-TMB   Document 94-4   Filed 06/15/2007   Page 12 of 18

Wade vs. Ilisagvik | 5-10-2006 | John Tuthill, Ph.D.

Page 82

1 upon?
2  A. From the grade sheets.
3  Q. And you got the grade sheets from where?
4  A. The registrar's office.
5      VIDEOGRAPHER: We've got about five
6 minutes left on the tape.
7      MS. JOHNSON: Do you want to change?
8      VIDEOGRAPHER: In about five minutes. If
9 you want to stop now that's fine.
10     MS. JOHNSON: No, that's okay.
11     Let's mark this as 67.
12       (Exhibit No. 67 was marked
13        for identification.)
14  Q. (By Ms. Johnson) Can you tell from this
15 document which classes Miss Wade taught?
16  A. From this document, no. I recall that Miss
17 Wade was teaching Business 100. I would suspect that
18 she was teaching Business 154, Intro to Organization
19 Management. I would suspect that she was teaching
20 Business 233, Financial Management.
21  Q. But there's no way to identify her -- which
22 professor taught these courses?
23  A. Not from this form, no.
24  Q. Is this one of the documents that you used to
25 look at when you were making up your percentages?

Page 83

1  A. No. For my perspective this type of document
2 is completely useless.
3  Q. Why?
4  A. Because it gives you a false perspective on
5 what's happening. This tells you that there is a
6 retention rate of 90.65 percent in fall semester '03
7 Blackboard courses. If you will take the number of
8 students who registered for Blackboard courses,
9 anticipating learning something and geting credit, and
10 compare it to the number who got credit at the end of
11 the term, the number is not 90.65. Not even close.
12  Q. Do you have any idea who would have generated
13 this document?
14  A. I suspect that this was the sort thing
15 generated by the registrar's office.
16  Q. And have you reviewed any documents in this
17 format in the past?
18  A. Oh, I'm sure I have.
19  Q. So on the top where it says Credits, Adds, and
20 Drops, what do those refer to?
21  A. I couldn't tell you. It means in Intro to
22 Business somebody is recording that 15 students added
23 the course. That may very well be that 15 students
24 actually registered for it. And it suggests that no
25 student formally withdrew from the course.

Page 84

1  Q. So when you looked at a document, specifically
2 what was the -- tell me exactly what kind of a document
3 you were looking at. I take it this is the not kind of
4 document you were looking at?
5  A. No, this is not the document I was looking at
6 at all.
7  Q. What did you look at?
8  A. I looked at the instructor's grade report that
9 was turned in to the registrar's office, which gives a
10 complete list of every student registered for the course
11 who receives a grade. That grade might be an A or a B
12 or a C or a D or an F. It might be a W for withdrawal.
13 It might be a DF for deferred. It might be an I for
14 incomplete.
15     I would take the total list of students who
16 had received a grade for the course and divide the total
17 by the number of students who received credit, and that
18 would be my success rate. I did not call it a retention
19 rate. I called it a success rate.
20  Q. Okay. And...
21     VIDEOGRAPHER: We've got about two
22 minutes left.
23     MS. JOHNSON: Why don't you go ahead and
24 change it.
25     VIDEOGRAPHER: This is the end of tape

Page 85

1 number two in the continuing deposition of John
2 Tuthill. This deposition will continue on tape number
3 two. The time is approximately 10:08 a.m. We are now
4 going off the record.
5       (Discussion held off the record.)
6        (Exhibit No. 68 was marked
7         for identification.)
8      VIDEOGRAPHER: We are back on the
9 record. This is the beginning of tape number two in the
10 continuing deposition of John Tuthill. The time is
11 approximately 10:11 a.m.
12     MS. DUCEY: Just so the record is clear,
13 Dr. Tuthill has identified with respect to Exhibit 66
14 only the e-mail from himself to Miss Wade.
15  Q. (By Ms. Johnson) In the top of page 66 when
16 you talked about 26 percent and 23 percent, what was the
17 statistical difference in those two? How many students
18 are we talking about?
19  A. I don't know.
20  Q. Have you ever taken a statistics class?
21  A. I have not.
22  Q. In your mind, when you looked at this, did you
23 think that the difference in 3 percent was statistically
24 significant?
25  A. No, indeed. I would say that I felt both of

Page 86

1  these sets of figures gave me reason to believe that
2  there was considerable improvement that needed to be
3  made in the delivery of those courses. Am I going to
4  say that 23 is notably worse than 26? No.
5      Q. I'm handing you what's been marked as Exhibit
6  68. Is the attachment to the e-mail something that you
7  are -- something that you have read prior to today?
8      A. Not that I recall.
9      Q. Were you aware that there was a subcommittee
10 report on distance delivery back in the year 2002?
11     A. Not that I recall.
12     Q. Do you recall when the College began offering
13 distance delivery courses?
14     A. No. It was certainly before my arrival.
15     Q. So you wouldn't know who was on the
16 subcommittee that generated this report?
17     A. No.
18     Q. If you turn to the page that's marked at the
19 bottom 23415?
20     A. Okay.
21     Q. And I'm looking at the paragraph marked
22 three.
23     A. Uh-huh.
24     Q. It talks about success in distant learning
25 courses, and first it motivates -- first it states that

Page 87

1  it needs students who are highly motivated with good
2  organizational skills. Would you agree with that?
3      A. Yes, I would.
4      Q. In the next paragraph, paragraph marked four,
5  it states that it is critical that all students receive
6  equivalent instruction. Do you agree with that?
7      A. Depends on what they mean. Let me read the
8  next sentence.
9      Q. Okay.
10     A. In general I'd say that sounds reasonable.
11     Q. Okay. So what does equivalent instruction
12 mean to you?
13     A. That you attempt, insofar as is possible, to
14 provide the same level of instruction, the same level of
15 instructional support to all students at whatever
16 location.
17     Q. You defined it as attempt. Is it acceptable
18 to you that some students receive instruction that other
19 students are not able to receive?
20     A. Is it acceptable? No. Is it sometimes
21 inevitable? Yes. There are times in which the phone
22 connection to Point Hope breaks down. You either cancel
23 the class for everybody or Point Hope misses out that
24 particular class and you try to get Point Hope caught up
25 the next time. Sometimes, inevitably, that happened.

Page 88

1      Q. Is it acceptable to cancel the class for
2  everyone?
3      A. Oh, I don't think it would be the first
4  choice.
5      Q. What would be your first choice?
6      A. To continue the instruction as best you could
7  with the folks you did have online and get Point Hope
8  caught up in your next meeting.
9      Q. This document says it is critical that all
10 students receive equivalent instruction. Is that
11 something that you agree with?
12     A. I would say that it is very important, but
13 again, I would say that there are probably instances in
14 which it is technically impossible.
15     Q. This also says that courses offered through
16 Blackboard should not have class meetings for Barrow
17 students only. Do you agree with that?
18     A. Yes.
19     Q. And the sixth paragraph talks about students
20 in the villages who for lifestyle reasons may not
21 conform to a traditional academic calendar. Were you
22 aware that that occurred in the vicinity of Barrow?
23     A. Yes.
24     Q. And do you understand what those lifestyle
25 issues were?

Page 89

1      A. Yes, I understand some of them.
2      Q. What were those?
3      A. When a whale comes you go out and get it.
4      Q. So whaling?
5      A. If you have class that week, the class can
6  wait, the whale can't.
7      Q. What else?
8      A. Same with caribou.
9      Q. Caribou? So subsistence? Hunting and
10 subsistence?
11     A. Sure.
12     Q. Anything else?
13     A. Those are the ones that come to mind. I know
14 that there are traditional holidays and festivities that
15 are important. I know that there are family issues as
16 well. That's typical in many native communities that
17 I've worked with. If somebody needs to take care of the
18 little sister and mom says it's your job, that takes
19 priority over going to class and weighed far stronger
20 than it does in a traditional American classroom
21 setting.
22     Q. Was there a policy at Ilisagvik that told
23 faculty members how to deal with those kind of lifestyle
24 issues that came up with their students?
25     A. Not as I recall. It was something that we

23 (Pages 86 to 89)

MOBURG & ASSOCIATES          1601 Fifth Avenue, Suite 860      EXHIBIT 14    Seattle, WA 98101
Court Reporters                    206-622-3110            PAGE 13 OF 18        43-2272

Case 3:05-cv-00086-TMB    Document 94-4    Filed 06/15/2007    Page 14 of 18

Wade vs. Ilisagvik                    5-10-2006                    John Tuthill, Ph.D.

Page 94

1  the e-mail January 15th; is that correct?
2     A.  Let me double-check the e-mail.
3         That's correct.
4     Q.  So in that length of time, you believed that
5  Bobbi was resistant to changing her style of Blackboard?
6     A.  Yes.
7     Q.  And what was it that in that length of time
8  made you believe that she was resistant to changing her
9  style of Blackboard teaching?
10    A.  When I wrote this, I wrote "she is doing some
11 of what I directed; most she is not." Now, I was
12 talking about three issues. "Most" implies that there
13 were two that she had not responded to. Subsequently
14 she responded to two. There was one that she did not.
15        The one issue that she did not respond to was
16 the public forum for questions and answers and
17 discussions on the Blackboard platform. She maintained
18 the policy on the syllabus of insisting that if the
19 students needed to contact her with an issue or a
20 question, it should be by telephone or by personal
21 e-mail.
22    Q.  So if you look back at Exhibit 66, you said in
23 the first paragraph that that was a direct order, and
24 she did comply with that direct order, correct?
25    A.  That is true.

Page 95

1     Q.  And in the second paragraph you said that was
2  a direct order, and she complied with that as well?
3     A.  That is also true.
4     Q.  So in the third paragraph, which you said was
5  not a direct order --
6     A.  No, I said it was a strong, urging
7  recommendation.
8     Q.  Correct.
9     A.  And she did not comply. That is true.
10    Q.  But it was not a direct order, was it?
11    A.  That was not a direct order. Well, the direct
12 order was to please reconsider. The direct order was
13 not, you got to do it.
14    Q.  Right. So it was not a direct order to
15 change?
16    A.  It was not.
17    Q.  It was a direct order to think about changing?
18    A.  True.
19    Q.  And if she met with Sonya Abu and Rob Carrillo
20 and talked to them about that issue and still did not
21 change the way that she offered her classes, would that
22 have been in compliance with what you directed her to
23 do?
24    A.  Well, I don't know. I'm not aware of the
25 meeting. I'm not aware of the topic of the meeting.

Page 96

1  I'm not aware of the issues that were discussed. If it
2  was an issue that she was thinking about, I'm pleased to
3  hear that, but I had no evidence of that.
4     Q.  If she had done that, would she have complied
5  with your urging?
6         MS. DUCEY:  Objection; asked and
7  answered.
8     Q.  (By Ms. Johnson) If she did do it. She gets
9  to object whenever she wants. As long as she doesn't
10 direct you not to answer, you need to answer.
11        MS. DUCEY:  My objection was that that
12 has been asked and answered. But you can answer the
13 question nonetheless.
14    A.  Repeat the question, please?
15    Q.  (By Ms. Johnson) If she had met with them and
16 talked to them about that and considered it, would that
17 have met your strong urging?
18    A.  Not necessarily.
19    Q.  Why?
20    A.  Well, it depends on the result of the
21 conversation. If, for example, they had had the meeting
22 and Sonya and Rob had said, well, this is a really great
23 idea, we think you should do it, here are all the
24 reasons why, and Miss Wade said, no, that's too much
25 trouble, I'm not going to do it, no.

Page 97

1         If she had had the meeting and discussed the
2  issues and had considered it and had a good, thoughtful
3  reason for why it was not being done, would that have
4  met the technical request? Yes, it would be
5  reconsidering. Would I be disappointed if she wasn't
6  doing what I had urged her to do? Yes, I would be.
7     Q.  In looking at Exhibit 46, let's start with the
8  bottom of the page, number five. What was the poor
9  professional judgment that you were talking about?
10    A.  She was intervening on behalf of her
11 granddaughter, who was a student in her classes while
12 residing in Nashville, Tennessee, or thereabouts. She
13 was giving the appearance of special consideration and
14 special favors or inappropriate advising for her
15 granddaughter.
16        She was claiming her granddaughter as a
17 dependent for tuition benefit purposes. She was asking
18 the College to make special accommodations for a
19 non-resident student in a way that really suggested a
20 conflict of interest.
21    Q.  How did she intervene for her granddaughter?
22    A.  Well, there were some specific cases that came
23 up in the late fall of 2003 and in January of 2004. One
24 issue that came up in the fall of 2003 was that her
25 granddaughter was registered in both the Business

Page 114

1 authority to approve. The determination to hire Miss
2 Valenti was made prior to Miss Wade taking the medical
3 leave. The complaints about it, if I recall correctly,
4 I received after Miss Wade's return, by which time Miss
5 Valenti was already teaching the course. I was not
6 about to fire her because Miss Wade told me to.
7     I had reason to believe that Miss Valenti was
8 doing a good instructional job in the classroom. I had
9 reason to believe that she was upholding something
10 closer to college credit level standards than had been
11 done in that course in the past, and I wanted to support
12 that and wanted to continue that.
13    Q. Well, if Miss Wade had been told in this
14 document that she was the lead faculty, was there ever a
15 time that you're aware of that she was told she was not
16 the lead faculty?
17        MS. DUCEY: Objection to
18 mischaracterizing what this document says. And
19 foundation.
20    A. I will answer, if I may, that Miss Wade's
21 terms of work were specified in the contract under which
22 she was working in the academic year 2003 and 2004.
23    Q. (By Ms. Johnson) Sure, I understand that.
24    A. Which made no reference to any such position,
25 if there ever were one, of lead faculty member.

Page 115

1    Q. But if in the past she had been told she was
2 lead faculty and she had been treated as if she was lead
3 faculty, was there any time after you came on in which
4 you specifically told her you would no longer use her as
5 a lead faculty person?
6    A. I can't answer that question. I had no
7 evidence that she had ever been used as a lead faculty
8 member. I had no evidence about what that meant. The
9 HR director could not tell me what that meant. The
10 assistant to the dean, who was the second longest
11 serving employee at the college, who had been involved
12 in all of this, could not tell me what it meant. I had
13 a very strong impression, if I was not already told,
14 that it was not something that had ever been clearly
15 implemented.
16        Am I going to go tell Miss Wade and other
17 instructors that they're not lead faculty members? No.
18 I had no reason to believe that they thought they were.
19    Q. We touched on Miss Wade's objection to Aimee
20 Valenti. Did she express to you why she objected to
21 Aimee Valenti?
22    A. She told me that she found Miss Valenti to be
23 demeaning and insulting to Miss Wade and rude. I recall
24 comments of a personal nature like that rather than
25 comments of a professional nature.

Page 116

1    Q. Did you investigate whether Ms. Valenti had
2 been demeaning, insulting, and rude to Miss Wade?
3    A. I did.
4    Q. And what did you do to investigate?
5    A. I talked to Miss Valenti.
6    Q. What did she say?
7    A. My conclusion at the end of the conversation
8 is that she was indeed rude to Miss Wade and that Miss
9 Wade was rude to Miss Valenti.
10    Q. So you thought they were rude to each other?
11    A. I did.
12    Q. And did you give any instructions to Miss
13 Valenti?
14    A. Yes, I did.
15    Q. What did you tell her?
16    A. I told her to shut up and teach her course.
17 That's a quote.
18    Q. How had Miss Valenti been rude to Miss Wade?
19    A. I wasn't there. Miss Valenti had a young
20 person's very strong sense that she is in the right, and
21 an impatience with people who disagree or with people
22 who will not immediately see the wisdom of her ways. I
23 think she was short-tempered with Miss Wade.
24        I think Miss Wade was, in the specific
25 instance I'm recalling in January, from what I heard

Page 117

1 about it, attempting to give some information to Miss
2 Valenti. I think Miss Valenti flew off the handle and
3 told Miss Wade basically to go away, that Miss Valenti
4 didn't work for Miss Wade, she worked for Dr. Tuthill
5 and she wouldn't listen to anybody else. Do I think
6 that was appropriate? No.
7    Q. Do you know what information Miss Wade was
8 trying to give to her?
9    A. My recollection on that one, I guess it's not
10 January. I guess that specific instance is December.
11 That Miss Wade was attempting to give Miss Valenti
12 information about the grade of one student who had
13 gotten credit by examination for Business English. That
14 would have been Mariette Mealor. And information that
15 one or two students, Amy Underwood and possibly Ramona
16 Rock, had been promised a grade of deferred in Module
17 C.
18        Now, this was a little bit awkward, because
19 this was Miss Wade assigning grades in Module C for
20 which she was in fact at that time not the instructor of
21 record. But these were arrangements that she had made,
22 testing Mariette Mealor, entirely appropriately, earlier
23 in the semester that Miss Valenti did not know about,
24 and apparently promises that she had made to Amy
25 Underwood, I don't think so appropriately, at the

Case 3:05-cv-00086-TMB   Document 94-4   Filed 06/15/2007   Page 16 of 18

Wade vs. Ilisagvik | 5-10-2006 | John Tuthill, Ph.D.

Page 102

1  MS. DUCEY: Objection; vague.
2  Q. (By Ms. Johnson) Maybe it is vague. There
3  was nothing in writing that stated that each time a
4  student signed up for a new class, that they had to go
5  back in to get a new tuition waiver; is that right?
6  A. Not that I recall. My recollection is the
7  tuition waiver forms stayed on file.
8  MS. JOHNSON: Let's mark this 69.
9  (Exhibit No. 69 was marked
10      for identification.)
11  Q. Is this an e-mail you recall receiving from
12  Ms. Gamboa?
13  A. Yes.
14  Q. And where did Ms. Gamboa work at the College?
15  A. She was the chief accounting officer.
16  Q. And she told you there's never been a clear
17  definition of dependent, which is what you just said,
18  correct?
19  A. I did not say there was not a clear
20  definition. She did.
21  Q. Did you believe that there was a clear
22  definition?
23  A. Let's say that I understood that there was not
24  a definite definition consistently applied as a policy
25  at the institution.

Page 103

1  Q. So is it your testimony that Ms. Wade's
2  granddaughter did or did not fit into the application of
3  the definition of dependent?
4  A. Well, I don't think that was my call to
5  judge. Miss Wade had applied for the tuition waiver for
6  her granddaughter, I believe at a time in which her
7  granddaughter was resident in Barrow with her
8  grandmother. The tuition waiver had been authorized,
9  and it continued to be used by Miss Wade and her
10  granddaughter even after the granddaughter subsequently
11  moved back to Tennessee. I mean those are, as far as I
12  know, facts. My judgment had nothing to do with it.
13  Q. But in your estimation, in Exhibit 46, the use
14  of that waiver was -- presented an appearance of a
15  conflict of interest?
16  A. Oh, of course. Yes.
17  Q. Why?
18  A. Because Miss Wade is receiving a tuition
19  benefit, paying no tuition to register her
20  granddaughter, to take courses with her grandmother
21  consistently, while the granddaughter is living in
22  Tennessee, going out of her way to take community
23  college courses with her grandmother in Barrow, Alaska,
24  I assume specifically because they were free and because
25  they were offered by her grandmother, instead of taking

Page 104

1  advantage of the opportunities available at her local
2  community college.
3  Q. Did you think it was reasonable for Miss Wade
4  to encourage her granddaughter to pursue her education
5  at Ilisagvik?
6  A. No.
7  Q. Why not?
8  A. I think it would have been healthier for the
9  granddaughter to pursue her education in Tennessee. I
10  do not think it was healthy for the granddaughter to be
11  taking courses over and over and over again with the
12  grandmother.
13  Q. Healthy meaning?
14  A. Well, for one thing, it's not advantageous to
15  the student to take the lion's share of their credits
16  with a single instructor. One of the important values,
17  one of the important outcomes of any college education
18  is diversity, diversity of instruction styles, diversity
19  in dealing with the faculty and the fellow students that
20  you're encountering as you go along your educational
21  career.
22      For a grandmother -- for a granddaughter to be
23  dependent on a grandmother for the lion's share of her
24  higher education, and to go out of her way to do that
25  when there were other alternatives, no, I don't think

Page 105

1  that's in the best educational interests of the student.
2  Q. Most of your educational offerings at
3  Ilisagvik College did not have a deep faculty to draw
4  from, did they?
5  A. That's true.
6  Q. In most instances most of your departments had
7  a single primary full-time faculty member with some
8  adjunct members; is that correct?
9  A. It certainly was the case in business.
10  Q. The issue -- back on page, or Exhibit 46, the
11  first issue is the accreditation standards require the
12  institution to employ professionally qualified faculty,
13  and you state that Bobbi does not have a solid academic
14  background in the academic business courses she
15  teaches. What was she missing?
16  A. Advanced courses in finance, in marketing, in
17  economics, in accounting, in business management, in
18  organizational behavior.
19  Q. I'm sorry, you said those very quickly.
20  Finance, organizational behavior?
21  A. Marketing, economics, business management.
22  MR. GAMACHE: You also said accounting.
23  A. Accounting.
24  Q. (By Ms. Johnson) Finance and accounting, is
25  that separate or are they the same?

Page 266

1  or not the tape recording should occur. Were you
2  consulted on whether the tape recording should occur?
3      A. I don't think so.
4      Q. In your estimation, would a tape recording be
5  improper?
6          MS. DUCEY: Well, objection because it
7  calls for a conclusion this witness isn't qualified to
8  give.
9      A. I will say --
10         MS. DUCEY: Also foundation.
11     A. -- on a purely personal level it would not
12 bother me to have a tape recording.
13     Q. (By Ms. Johnson) And did this meeting, this
14 Step 2 meeting, ever reassemble and occur?
15     A. I don't think the meeting reoccurred. I think
16 what happened is that John Van Hoesen evaluated the
17 written statements from the party and reached his
18 judgment based on only that.
19     Q. Did you have any conversations with John Van
20 Hoesen about the grievance before he made his decision?
21     A. No.
22     Q. He didn't call you and ask you any questions?
23     A. No. We didn't talk about the grievance at
24 all.
25     Q. Did you and he have any conversations about

Page 267

1  this subject matter?
2      A. I think he told me that he didn't want the
3  thing tape recorded. But the substance of the grievance
4  I don't think we talked about.
5      Q. Did you know of any policy that prevented the
6  meeting from being tape recorded?
7      A. Did I know of any? No.
8      Q. Dr. O'Rourke was chosen as the administrative
9  hearing officer for Bobbi Wade's grievance.
10         MS. DUCEY: Well, objection to
11 mischaracterization.
12     Q. (By Ms. Johnson) Do you have any idea who
13 chose Mr. O'Rourke as the hearing officer?
14     A. My understanding is President MacLean chose
15 him.
16     Q. Did you have any input into that decision?
17     A. Oh, no. She would never discuss that with me.
18     Q. Why not?
19     A. I was a party to the grievance. It would be
20 inappropriate.
21     Q. Did you discuss the grievance with Edna
22 MacLean?
23     A. No.
24     Q. She didn't ask you any questions about it?
25     A. No.

Page 268

1      Q. Did she ever ask you to prepare any documents
2  for her to review?
3      A. I don't think so.
4      Q. Your wife was employed as a temporary employee
5  in the registrar's office; is that correct?
6      A. She was employed as a temporary employee for a
7  period, and then as a permanent employee for another
8  period.
9      Q. How long was she a temporary?
10     A. I believe she started her temporary contract
11 in November, and I suspect she was given a permanent
12 contract perhaps in February.
13     Q. November of what year?
14     A. '03.
15     Q. '03. And you think that by '04 she had
16 received a permanent --
17     A. Sometime in early '04. Sometime in the spring
18 semester.
19     Q. Okay, and how long did she stay as a permanent
20 employee?
21     A. She stayed until December of '04.
22     Q. Do you recall whether she was a probationary
23 employee at any part?
24     A. She was a probationary employee throughout.
25 She was probationary the whole time she was temporary,

Page 269

1  and her probationary clock restarted for another period
2  of 12 months when she became permanent. And she left
3  Ilisagvik College's employ before the year was out, so
4  she was always probationary.
5      Q. Before the probationary year was out; is that
6  what you mean?
7      A. Yes.
8      Q. When did she leave the College employ?
9      A. December of 2004. Probably at the very end of
10 the semester, the beginning of the Christmas break.
11     Q. When she was a temporary employee did she work
12 full time?
13     A. Yes.
14     Q. And who was her direct supervisor?
15     A. Diana Perkett.
16     Q. And who did Perkett -- who was Perkett's
17 supervisor?
18     A. Me.
19     Q. You?
20     A. Me.
21     Q. And did your wife apply for a waiver of the
22 nepotism clause before she was hired as a temporary?
23         MS. DUCEY: Objection to foundation.
24     A. My recollection is that President MacLean and
25 I discussed the nepotism issue and decided that it was

68 (Pages 266 to 269)

Page 270

1  not a problem as long as I was never acting as registrar
2  and in a direct supervisory position.
3      Q. (By Ms. Johnson) President MacLean was not
4  worried that you were her supervisor's supervisor?
5      A. President MacLean and I discussed the issue,
6  and she determined that it was appropriate so long as I
7  was never acting as registrar and in a direct
8  supervisory position.
9      Q. Are you aware of whether that was ever
10 formalized in a written document?
11     A. I don't remember. It is possible that it was,
12 but I can't say exactly.
13     Q. Why did your wife leave employment at the
14 College?
15     A. When did she leave?
16     Q. Why?
17     A. Because she was being pressured as a condition
18 of continuing employment to take an accent reduction
19 course, which she did not want to do and did not think
20 was appropriate.
21     Q. Who was pressuring her?
22     A. The president.
23     Q. And did you talk to the president about the
24 accent reduction course?
25     A. The president talked to me very briefly about

Page 271

1  it, but it was not a subject that I wanted to discuss
2  with the president. I did not think that was
3  appropriate.
4      Q. What did she say to you?
5      A. That she was ordering an accent reduction
6  program for my wife.
7      Q. Did she say why she was ordering it?
8      A. Not in that conversation. She had talked
9  about, in a cabinet meeting, an issue of student
10 complaints that had been forwarded to her by a member of
11 the College board of trustees pertaining to
12 Mrs. Tuthill's accent.
13     Q. What is a cabinet meeting?
14     A. What's a cabinet meeting? That's a meeting of
15 the staff that reports directly to the president.
16     Q. And other than yourself, who would be
17 involved?
18     A. Oh, let's see. The development officer would
19 be there, the business officer would be there, the
20 student services officer would be there. There would be
21 a faculty representative. Occasionally other guests who
22 were invited by the president. I may be forgetting
23 someone, but that sort of person. I would be there.
24     Q. Why was this issue mentioned during a cabinet
25 meeting?

Page 272

1      A. You'd have to ask the president that. She's
2  the one who raised it.
3      Q. Did she normally discuss personnel matters
4  during a cabinet meeting?
5      A. Sometimes.
6      Q. Did she discuss Bobbi Wade's grievances during
7  cabinet meetings?
8      A. Never.
9      Q. Did she ever discuss issues surrounding Bobbi
10 Wade's non-renewal of contract at a cabinet meeting?
11     A. Never.
12     Q. Can you give me an example of the type of
13 employment issue that would be raised at a cabinet
14 meeting?
15     A. I think we just did. The complaints from the
16 regent, from the trustees pertaining to Mrs. Tuthill's
17 accent. Oh, I recall a cabinet criticism of the work
18 performance of an employee in the work force investment
19 program.
20     Q. Work force investment or work force
21 development?
22     A. Work force development.
23     Q. Okay. Of the program itself or of a person?
24     A. A staff member in the program who --
25     Q. What staff member was that?

Page 273

1      A. Pardon me?
2      Q. What staff member was that?
3      A. Lisa Sparrow.
4      Q. How often did comments about employees come up
5  at cabinet meetings?
6      A. Oh, it wasn't a regular thing, but if there
7  was something that was really bothering the president,
8  it could come out. You know, we could go many weeks
9  with nothing, but if an issue came up, she was capable
10 of talking about it.
11     Q. Was there a specific agenda set for these
12 meetings?
13     A. Yes, there always was.
14     Q. Was there a written agenda?
15     A. Yes.
16     Q. And who created the written agenda?
17     A. The president's assistant.
18     Q. Who was that?
19     A. Claudia Mongalak (phonetic).
20     Q. And were these agendas, are these kept by the
21 College? Do you know?
22         MS. DUCEY: Objection to speculation.
23     A. I do not know.
24     Q. (By Ms. Johnson) Did you keep your copies?
25     A. Yes.

69 (Pages 270 to 273)