## Bobbi Wade

| | |
|---|---|
| **From:** | Pam Taylor |
| **Sent:** | Monday, December 15, 2003 5:22 PM |
| **To:** | Bobbi Wade |
| **Subject:** | 12/15/03 Meeting Summary and Next Step |

Hi Bobbi,
Thank you for taking time out of your busy schedule to meet with me this morning about the written complaint you delivered to me last Thursday, December 11. This follow-up message from today's meeting will summarize the specifics of our discussion and will also outline our mutually agreed upon next step that we'll be taking together as we all work toward a prompt, respectful resolution of this situation.

Status of Written Complaint [dated 12/11/03]
As per the Grievance qualification criteria outlined in the Employee Handbook [pp. 46-47], your written complaint does not qualify as a Grievance because it failed to:
a.) Specify which College policies have allegedly been violated
b.) Specify any requested remedy[ies]

Although I explained to you this morning why a Grievance situation does not currently exist , your concerns are certainly taken seriously, and will be handled expeditiously and respectfully.

Next Step Towards Resolution
As per our mutual agreement this morning, I've arranged a meeting with John Tuthill, you, Diana Kennedy, and myself [as facilitator]. Please note that our meeting is confirmed for next Friday, December 19 at 2 pm in the Tutoring Center.

Please let me know if you have any questions, Bobbi, and I will be happy to assist you as appropriate.
Pam


Pamela Taylor - Director of Human Resources
Ilisagvik College
P.O. Box 749
Barrow, Alaska 99723
[907] 852-3936 FAX


Date: 5-4-06  Exhibit: 40
Witness: Taylor
Marci L. Lynch, Court Reporter
Liz D'Amour & Associates, Inc.
(907) 452-3678

EXHIBIT ___/___
PAGE ___/___ OF ___/___

**100203**

Page 1 of 1

**John Tuthill**

| | |
|---|---|
| **From:** | John Tuthill |
| **Sent:** | Thursday, October 09, 2003 12:39 PM |
| **To:** | Bobbi Wade |
| **Subject:** | Medical leave request |

Bobbi --

If you are planning to take the medical leave later this month, I need a written notification from a licensed physician, preferably by fax and as soon as possible, to the effect that your medical treatment cannot wait until the December break, when you could have the treatment without conflict with your regular teaching duties. As soon as I have received such a notification, I can begin to process the request for a medical leave.

– John
Dean of Instruction
Ilisagvik College

EXHIBIT
25

EXHIBIT _2_
PAGE _1_ OF _1_

21559
Wade v. Ilisagvik College

## John Tuthill

**From:**    Bobbi Wade
**Sent:**    Monday, October 06, 2003 9:55 AM
**To:**      John Tuthill
**Subject:** RE: Plan

Yes, Business English 109B and Business Math 105B will begin this week.

I have appointments in Tennessee with my doctors, and I also have a letter from my doctor in Tennessee stating that I will need to return as soon as possible for medical treatment. Under these circumstances, I don't feel that it is necessary to consult with doctors here. There are no doctors here that can be seen without long-standing appointments, and this is an immediate situation. Thanks,

Bobbi Wade

> -----Original Message-----
> **From:** John Tuthill
> **Sent:** Friday, October 03, 2003 3:57 PM
> **To:** Bobbi Wade
> **Subject:** Plan
>
> Bobbi –
>
> Here's my understanding of where we stand after all of our conversations this week.
>
> My understanding is that you will begin teaching Business English "B" and Business Math "B" next week, as originally scheduled, and that you will notify the students in advance, so they will know to come.
>
> My understanding further is that you will consult with your physicians here and in Tennessee to determine if they feel that you require immediate medical treatment, and that, depending on what they say, you may prepare a medical leave request so that you can receive any required treatment during the semester.
>
> If my understanding is incorrect, please tell me your understanding as soon as you can.
>
> Thanks.
>
> – John

EXHIBIT __5__
PAGE __/__ OF __/__

20824
Wade v. Ilisagvik College

EXHIBIT __5__
PAGE __/__ OF __/__

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF ALASKA
 3

 4    BOBBI WADE,
 5             Plaintiff,
 6        vs.
 7    ILISAGVIK COLLEGE, NORTH SLOPE
      BOROUGH, JOHN TUTHILL, Individually,
 8    and PAMELA TAYLOR, Individually,
 9             Defendants.
      _____/
10    Case No. A05-086 CV (TMB)
11
12              *   *   *   *   *   *   *   *   *   *
13
                DEPOSITION OF BOBBI WADE
14                      Volume 1
                Pages 1 - 283 (inclusive)
15
                       May 1, 2006
16                     9:19 a.m.
17
          Taken by the Defendants, Ilisagvik College,
18            John Tuthill and Pamela Taylor
                           at
19    Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc.
             1007 West 3rd Avenue, Suite 400
20               Anchorage, Alaska 99501
21
22
23
      Reported by:
24    Caren S. Carlson, RPR
25
```

EXHIBIT 4
PAGE 1 OF 2

Page 258

1　　MS. DUCEY: Well, if you want to cross-examine
2　her --
3　　MS. JOHNSON: It's not -- it was not a coach.
4　　MS. DUCEY: All right.
5　　MS. JOHNSON: Do you want to look at your own?
6　　THE WITNESS: Yes, I do.
7　　MS. JOHNSON: That's fine. Look at Number 21.
8　She objected to --
9　　A. I know what's on there and I know that sick
10　leave is listed under personal leave.
11　　Q. (By Ms. Ducey) Uh-huh. All right. And you
12　said that you "had no response advising of the status of
13　the request. Could you please update me." Right?
14　　A. Yes.
15　　Q. Okay. And she wrote you back the same day;
16　right?
17　　A. Yes.
18　　Q. And she said, "It's my understanding from John,
19　you and he had directly communicated last week regarding
20　your leave request and you decided to wait until the
21　semester's classes were completed before going off slope.
22　As the supervisor's signature is always necessary before
23　leave request can be forwarded to H.R., please continue
24　to contact John -- to first contact John directly should
25　your situation change." Correct?

Page 259

1　　A. Yes.
2　　Q. Okay. And you had withdrawn the request for
3　leave; right?
4　　A. I had not withdrawn it. I --
5　　Q. Maybe I misunderstood. Exhibit 24 -- I'm sorry,
6　Exhibit 26. "My medical problem needs attention as soon
7　as possible, but it's not a matter of life and death so
8　leaving everything until the holiday looks like the most
9　feasible thing right now." --
10　　A. Okay.
11　　Q. -- Right?
12　　A. That was agreeing to wait, but it was not
13　withdrawing my request. That's --
14　　Q. Well --
15　　A. -- that's two different things.
16　　Q. -- could you look at 26 again? And what is the
17　subject of this e-mail?
18　　A. From whom, John or --
19　　Q. From John Tuthill.
20　　A. From me to John Tuthill. "I turned that request
21　in to Pam. I don't" --
22　　Q. What is the subject line of the e-mail --
23　　A. I really don't --
24　　Q. -- is what my question was?
25　　A. The subject of the e-mail is my taking leave.

Page 260

1　　Q. What -- what does it say, ma'am?
2　　A. It says, "John, I turned that request in."
3　　Q. Could you please identify the subject of the
4　e-mail?
5　　MS. JOHNSON: I --
6　　Q. The subject line says "Re"?
7　　A. "Medical leave request."
8　　Q. And in that e-mail you said, "leaving everything
9　until the holidays looks like the most feasible thing
10　right now," referenced your medical leave request;
11　correct?
12　　A. Yes. Which to me was the same thing as sick
13　leave.
14　　Q. So you withdraw it as of --
15　　A. That's not a withdrawal.
16　　Q. Well, what is it, ma'am?
17　　A. I never said I was withdrawing my request.
18　　Q. Well, maybe it's --
19　　A. I was just going along with his idea and
20　agreeing that it -- it would be better for me to wait
21　until the Christmas holidays because he would not let me
22　change my class schedule.
23　　Q. So you agreed to delay it?
24　　A. I agreed to delay it, yes.
25　　Q. All right. So, then, the medical leave request

Page 261

1　that was dated October 2nd, and asked for leave beginning
2　October 6th, didn't need to be acted on, did it? It was
3　moot.
4　　A. But I wanted a -- an official -- a written
5　notice that my request was turned down.
6　　Q. Why?
7　　A. Because I've always wanted a written response to
8　my requests.
9　　Q. But it was moot, wasn't it?
10　　A. It apparently -- apparently so. I just wanted
11　to know what Pam -- the decision Pam had made.
12　　Q. Okay. Did you explain that even though you had
13　withdrawn your request --
14　　A. John and I talked about my waiting until
15　December to see the doctor.
16　　Q. Okay. You can see why Pam might be confused
17　though; right?
18　　A. Yes, I can see.
19　　Q. She's been told that you've agreed to wait until
20　Christmas and the request is moot and now you're asking
21　for action on it; right?
22　　A. I wanted to know what her status was.
23　　Q. So to clear up the confusion, she said, "Why
24　don't you ask your supervisor if there's been some
25　misunderstanding first before I wade into this?"

66 (Pages 258 to 261)

EXHIBIT　4

PAGE　2　OF　2

Page 284

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ALASKA

3                                    RECEIVED BY:
                                  Clapp, Peterson, Van Flein,
4    BOBBI WADE,                  Tiemessen & Thorsness, LLC

5          Plaintiff,         Date Rec'd/Initials: HD IIA 6/9/06
                                                    400-85
6        vs.                   Distribution:_____

7    ILISAGVIK COLLEGE, NORTH SLOPE                 COPY
     BOROUGH, JOHN TUTHILL, Individually,
8    and PAMELA TAYLOR, Individually,

9          Defendants.
     _____/

10   Case No. A05-086 CV (TMB)

11

12          *   *   *   *   *   *   *   *   *   *

13

          VIDEOTAPED DEPOSITION OF BOBBI WADE
14                      Volume 2
              Pages 284 - 432 (inclusive)
15

                      May 5, 2006
16                     2:04 p.m.

17

18     Taken by the Defendants, Ilisagvik College,
           John Tuthill and Pamela Taylor
19                        at
     Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc.
20       1007 West 3rd Avenue, Suite 400
              Anchorage, Alaska 99501

21

22

23

24   Reported by:
     Caren S. Carlson, RPR

                                    EXHIBIT  5
25                                  PAGE  1  OF  2

Page 297

1    A. Again that --
2    Q. -- was -- was this withdrawn?
3    A. I don't know.
4    Q. He never -- he never said that, "Look, if you
5  get me the written notification, you can have your
6  leave"?  He never said, "Hey, that's off, too, so don't
7  bother doing that"; did he?
8    A. I don't remember if he did.  I know he verbally
9  told me a lot of things that are not -- that is not in
10  these e-mails and --
11    Q. Okay.
12    A. -- there was a lot of verbal discussion and so
13  forth.
14    Q. But you don't remember --
15    A. And, again, I was -- I was puzzled as to why he
16  would send me that e-mail, so I responded to him in the
17  best way that I knew how.
18      MS. DUCEY:  When Linda gives you back the paper.
19    Q. Okay.  But you don't remember him ever telling
20  you that "By the way, if you get that written
21  notification, it's tough luck, because I'm not going to
22  honor it"?
23    A. No.
24    Q. So that agreement was still good; right?
25    A. Which one are you referring to?

Page 298

1    Q. The agreement that he had with you that, "If you
2  get written notification by a doctor that your medical
3  treatment can't wait, I'll process your request for
4  medical leave as soon as I get that."
5    A. Ms. Ducey, I had already taken on another class
6  by that time to teach and I had reached the point where
7  I -- at that time I could not take leave at that time.
8    Q. Okay.  But he never told you that his agreement
9  to give you leave as soon as you presented written
10  notification was no longer valid; right?
11    A. No, he never told me that.
12    Q. Okay.  So as of 10/24, when you told the doctor
13  that sick leave was denied, that wasn't accurate; was it?
14    A. I was referring to that first sick leave when he
15  verbally told me he would not sign it.
16    Q. Right.  But on 10/24 that was already -- you --
17  you were past that, you --
18    A. I did not know what he meant there and I did not
19  know his reasoning for sending me that e-mail.
20    Q. Well, did you ask him?
21    A. No, I didn't.
22    Q. Okay.  He never told you that he didn't mean
23  what he said in the e-mail; right?
24    A. And also I was talking to Pam at that time.
25      MS. DUCEY:  Excuse me.  That's not an exhibit,

Page 299

1  Jonathan.  Just put it back in the file.
2    A. And she was telling me what I should do and
3  shouldn't do about getting proof that I needed to take
4  medical leave.
5    Q. Okay.  And he told you -- she told you
6  repeatedly that the dean is the one that approves it;
7  right?
8    A. She didn't tell me that at -- at the time
9  verbally.
10    Q. Uh-huh.  But you knew that; right?  You knew you
11  had to get the dean's approval; correct?
12    A. His signature, yes.
13    Q. Yes.  On 10/24 when you told the doctor sick
14  leave was denied, there had been no request for sick
15  leave denied -- that was denied that negated the October
16  9th e-mail; correct?
17    A. I don't know, because I had been denied on
18  October the 24th.  I was denied when I went -- handed
19  him -- when I talked to him the first time and I went
20  back in his office around the 1st or 2nd or 3rd of
21  October.
22    Q. Right.
23    A. And he very strongly told me, "I will not sign
24  your sick leave."  That was what I was referring to.
25    Q. And then time went on and October 9th came after

Page 300

1  October 2nd; right?
2    A. Yes.
3    Q. And on October 9th he sent you this e-mail --
4    A. Yes --
5    Q. -- that said --
6    A. -- and I --
7    Q. -- that said all you have to do is get written
8  notification, okay; right?
9    A. Right.
10    Q. And then you withdrew your request for leave;
11  right?  Said --
12    A. I did not withdraw anything.  I took on another
13  class to teach and I couldn't leave at that time.
14    Q. Okay.
15      MS. JOHNSON:  I -- I object to this line of
16  questioning.  We did all this last Monday and --
17      MS. DUCEY:  No, we didn't do this.
18      MS. JOHNSON:  -- unless you have a new line of
19  questioning, this really is just going over old ground.
20      MS. DUCEY:  No, we didn't do this.
21    Q. (By Ms. Ducey)  And then you said, "Leaving
22  everything until the holidays looks like the most
23  feasible thing as of October 9th"; right?
24    A. Yes.
25      MS. JOHNSON:  Objection, asked and answered.

**EXHIBIT** 5
**PAGE** 2 **OF** 2

Message

## Pam Taylor

| | |
|---|---|
| **From:** | Pam Taylor |
| **Sent:** | Tuesday, October 14, 2003 12:04 PM |
| **To:** | Bobbi Wade |
| **Subject:** | RE: Medical |

Hi Bobbi,
It was my understanding from John that you and he had directly communicated last week regarding your Leave
Request and that you had decided to wait until this semester's classes were completed before going off-Slope. As
the supervisor's signature is always necessary before Leave Requests can be forwarded to HR, please continue
to first contact John directly should your situation change.
Thanks!
Pam

-----Original Message-----
**From:** Bobbi Wade
**Sent:** Tuesday, October 14, 2003 10:39 AM
**To:** Pam Taylor
**Subject:** Medical

Hello, Pam:
    On October 2, 2003 I submitted a request form to you for Medical Leave. As of to date, I have had no
response advising me of the status of the request. Could you please update me as to the status of the
request? Thanks,

Bobbi Wade

EXHIBIT
27
PENGAD-Bayonne, N. J.

EXHIBIT_____6_____
PAGE _/_ OF _/_

**John Tuthill**

| | |
|---|---|
| **From:** | John Tuthill |
| **Sent:** | Monday, October 20, 2003 2:20 PM |
| **To:** | Bobbi Wade |
| **Subject:** | Leave request |

Bobbi –

I can't approve your request for a Personal Leave from the morning of Thursday, December 11 through the afternoon of Friday, December 19.  Such a leave would mean that you missed the last five days of instruction, and that, to my mind, "unduly interferes with the delivery of the College's program of instruction."  Please continue to meet with your classes until the end of the semester, in accordance with our regular academic schedule.

John Tuthill
Dean of Instruction
Ilisagvik College



EXHIBIT
PENGAD-Bayonne, N. J.
29

EXHIBIT 7
PAGE / OF /

21560
Wade v. Ilisagvik College

## bobbi wade

**From:**  John Tuthill
**Sent:**  Thursday, October 09, 2003 3:38 PM
**To:**  Bobbi Wade
**Subject:** RE: Teaching duties

Bobbi –

No, I am not asking you or assigning you to teach "OT 104, Filing and Record Management," though so far we have not been able to identify another qualified instructor.

You will get an "Added Duty" contract just as soon as the College's current policy on compensation for Blackboard courses is clear to me. I hope that will be next week, in which case we could process your contract right away and you would get your check on Friday, October 24.

Here's the problem I've got with the "Added Duty" contracts. There are at least three different understandings of the College's current policy on compensation for Blackboard courses:

One interpretation is that teaching a three credit Blackboard "packaged" course is compensated at the rate of one credit. That interpretation seems to be supported by the "Attachment" to each faculty member's current contract. If this interpretation proves to be our current official policy, then you are currently teaching a total of nine credits for this semester, and you would not be eligible for an "Added Duty" contract. This is not what I want, and not what I hope is going to happen, but I am not going to be certain until I have more complete information.

Another interpretation is that instructors are compensated for three credits for developing a three-credit "original" Blackboard course for the first time, and an additional three credits for subsequently teaching it; and one credit for developing a three-credit "packaged" Blackboard course for the first time, and three credits for subsequently teaching it. If that interpretation proves to be our current official policy, then you should currently be compensated for a total of fifteen credits. You would be eligible for an "Added Duty" contract for teaching three additional credits as an overload. You would not receive added compensation for your Blackboard courses, because you have taught them before.

Yet another interpretation is that instructors teaching a three-credit Blackboard course, whether packaged or not, are compensated at the rate of four credits each time, because of the effort that goes into developing and teaching a Blackboard course each time. If that interpretation proves to be our current official policy, then you should currently be compensated for a total of eighteen credits. You would be eligible for an "Added Duty" contract for teaching six additional credits as an overload.

I expect a resolution of this question next week, and that "Added Duty" contracts will then be promptly forthcoming, as needed.

As for OT 104 – Filing and Record Management: if you want to take it on, you are more than welcome. That would help, and, assuming either of the latter two interpretations of our current official policies wins out, you would receive compensation for two additional teaching credits, or $3000.

But I don't see how we can do that if you are expecting to go on medical leave later this month. If that is likely to happen, then I need to find a substitute instructor for your Business English and Business Math classes, and an alternate instructor for OT 104.

I hope this answers your questions.

-- John

-----Original Message-----

11/21/2005

EXHIBIT
PENGAD-Bayonne, N.J.
28

EXHIBIT  8
PAGE  1  OF  1

100267

Case 3:05-cv-00086-TMB    Document 100-2    Filed 08/03/2007    Page 11 of 30

Wade vs. Ilisagvik                5-10-2006                John Tuthill, Ph.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒

|                                              |     |
| -------------------------------------------- | --- |
| BOBBI WADE,                                  | )   |
|                                              | )   |
|              Plaintiff,                      | )   |
|                                              | )   |
|     vs.                                      | )   No. 305-cv-086-TMB |
|                                              | )   |
| ILISAGVIK COLLEGE; NORTH SLOPE               | )   |
| BOROUGH; JOHN TUTHILL,                       | )   |
| individually; and PAMELA TAYLOR,             | )   |
| individually,                                | )   |
|                                              | )   |
|              Defendants.                     | )   |
|                                              | )   |

‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒


Videotaped Deposition Upon Oral Examination

of

JOHN TUTHILL, Ph.D.


‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒

RECEIVED BY:
Clapp, Peterson, Van Flein,
Tiemessen & Thorsness, LLC
Date Rec'd/Initials: 5/24/06 NKK

Distribution: LJJ, PAW

8:04 a.m.

May 10, 2006

1601 Fifth Avenue, Suite 860

Seattle, Washington


Sharon K. Langford, CCR        1601 Fifth Avenue, Suite 860
Court Reporter                 Seattle, WA 98101

EXHIBIT  9

PAGE  1  OF  16

Case 3:05-cv-00086-TMB    Document 100-2    Filed 08/03/2007    Page 12 of 30

Wade vs. Ilisagvik                    5-10-2006                    John Tuthill, Ph.D.

Page 34

1    Q.  Do you recall what those were about?
2    A.  Mostly they were about teaching or about
3  scheduling or about issues that came up in the
4  workplace.  Sometimes about the leave requests.
5    Q.  And did you keep a copy of those e-mails?
6    A.  I did.
7    Q.  Did you specifically run them off of the
8  computer?
9    A.  I don't think I did at this point.  I had them
10  all saved in my college e-mail file.  I believe I
11  printed copies of these when we went into the grievance
12  phase in the spring of 2004, but I don't believe I had
13  printed copies of them in January.
14    Q.  So when you say correspondence, you weren't
15  looking at a correspondence file like we talked about
16  before?
17    A.  No.  I'm going through my e-mails.
18    Q.  And while you were looking through the
19  application and resume, did you go down to the
20  human resources office in order to do that?
21    A.  Yes.
22    Q.  And the grade submission, tell me about the
23  grade submission and why that was evidence that you
24  looked at?
25    A.  Over the Christmas vacation of 2003 I looked

Page 35

1  at the grade submissions of all of the faculty, looked
2  at the grades that they had given, looked with specific
3  interest at the number of students who had withdrawn
4  from the courses.  That was an issue of interest and
5  concern.  There were also issues in Miss Wade's case
6  where we received grades for two of her courses a month
7  late, which led to strongly adverse effects for the
8  continuity of the course.
9    Q.  You say they were strongly adverse?
10    A.  It's not the grades were strongly adverse.
11  This was a modularized course, two modularized courses
12  that had an A component for four weeks, a B component
13  for four weeks, a C component for four weeks.  Because
14  Miss Wade was late in submission of the B component
15  grades by a month, it meant that the students had
16  already been promoted into C even when it turned out
17  they had not mastered the material in B, so they
18  shouldn't have been registered in the C module at all.
19  It was a mess that I had to spend considerable time
20  straightening out.
21    Q.  And why was this a problem for the College?
22    A.  Why was it a problem for the College?
23    Q.  Uh-huh.
24    A.  Because we were giving inappropriate grades in
25  the C modules to students who were in the course because

Page 36

1  we had not followed our own procedures.  The procedure
2  was if a student had failed to complete Module B, the
3  student should be administratively withdrawn at the
4  outset of Module C, not allowed to register.  Instead,
5  because we didn't have the grades in a timely manner,
6  the students had been allowed to register for Module C,
7  and in many instances they were given a grade of F when
8  the appropriate grade for them would have been a W.
9    Q.  W being?
10    A.  Withdrawn.
11    Q.  Withdrawn.  Bobbi Wade taught the first two
12  modules of that, of those two classes; is that correct?
13    A.  That is correct.
14    Q.  She taught A and B in Business 105 and she
15  taught A and B in Business 109?
16    A.  That is correct.
17    Q.  And the C modules were given, in 105 was given
18  to a different instructor; is that correct?
19    A.  That is correct.
20    Q.  And 109 was given to another instructor?
21    A.  That is correct.
22    Q.  Tell me about, tell me why those C modules did
23  not remain with Bobbi Wade?
24    A.  Because she was going to be away on leave.
25  These were modularized courses.  C module was scheduled

Page 37

1  to meet over a four-week period.  My recollection is
2  that for one of the C modules there were going to be a
3  total of ten class meetings.  Miss Wade was going to be
4  gone for at least four of them.  My recollection is that
5  for the other of the modularized courses there were
6  going to be a total of eight course meetings during the
7  short semester.  Miss Wade was going to be gone for
8  three of them.
9        In my professional judgment, I felt that
10  having the students miss between 37.5 and 40 percent of
11  the class meetings or having to reschedule that number
12  of class meetings in a very tight semester was not in
13  the students' best interests.
14    Q.  So you gave them -- so was it your duty to
15  decide who taught that module, those Module C's?
16    A.  In this instance, yes.
17    Q.  And did you think that you had the authority
18  to decide who taught the Module C's?
19    A.  Yes.  Subject to the approval of the
20  president.  The Personnel Action Form would ultimately
21  be signed by the president.
22    Q.  Was there a Personnel Action Form generated
23  for those modules?
24    A.  I don't recall specifically, but I assume
25  there was.

**EXHIBIT** 9
PAGE 2 OF 16

10 (Pages 34 to 37)

Wade vs. Ilisagvik                           5-10-2006                          John Tuthill, Ph.D.

**Page 50**

1  that I could foresee not renewing. I told her that
2  there were two contract issues that I was grappling
3  with, where I had not yet reached a determination. She
4  asked me who those individuals were and what the issues
5  were, and I told her.
6     Q.  Who were those people?
7     A.  One was Miss Wade. One was Courtneay
8  Bartholomew.
9     Q.  And other than informing President MacLean of
10  who you were contemplating not renewing, what else did
11  you talk to her about?
12     A.  She wanted to know what the issues were in
13  both instances and I told her.
14     Q.  What did you tell her about Bobbi Wade?
15     A.  That there was an issue in teaching
16  competence, that there was an issue in academic
17  qualifications.
18     Q.  Anything else?
19     A.  Those are the ones I recall.
20     Q.  And what were the issues with Courtneay
21  Bartholomew?
22     A.  Teaching competence. I suppose the fairest
23  way of saying it with Courtneay was teaching attitude.
24  To a lesser extent, the intelligibility of the spoken
25  English. That's all.

**Page 51**

1     Q.  Did President MacLean make any comments to you
2  about Bobbi Wade's competence?
3     A.  No. She listened with interest and responded
4  with something noncommittal such as okay.
5     Q.  What about Bobbi Wade's qualifications?
6     A.  She said nothing specific there.
7     Q.  Did she make any specific comments about Bobbi
8  Wade herself?
9     A.  Not that I recall.
10     Q.  Was that all that you talked about to the
11  president about Bobbi Wade?
12     A.  To my recollection, yes.
13     Q.  And before you made the retention decision did
14  you have any other meetings with the president?
15        MS. DUCEY: Objection; vague.
16     Q.  (By Ms. Johnson) About the retention.
17     A.  No. I recall the one conversation with the
18  president about the contract issue.
19     Q.  In looking at Exhibit 47, Edna MacLean appears
20  to have signed on the line of the president on the same
21  day that you signed; is that correct?
22     A.  That is correct.
23     Q.  Did you take this form to the president in
24  order to have it signed?
25     A.  Not that I recall.

**Page 52**

1     Q.  You didn't have any conversations at the time
2  that this form was signed with the president?
3     A.  Not that I recall.
4     Q.  Did you talk to any board members about the
5  retention issues?
6     A.  No.
7     Q.  You said you talked to Patrick O'Rourke about
8  issues with Miss Wade.
9     A.  That is true.
10     Q.  What did you talk to him about?
11     A.  Dr. O'Rourke and I had -- had talked regularly
12  for months, every time he came to the college. He was a
13  consultant for the college and I relied on his
14  background and expertise. We talked in general about
15  teaching issues and faculty teaching issues throughout
16  the fall semester of 2003.
17        Specifically, in January of 2004 I was talking
18  to him about renewed contracts and told him that there
19  was a possibility that I would recommend that Miss
20  Wade's contract not be renewed, and he responded.
21     Q.  What did he say?
22     A.  He said that he hoped I could find a way to
23  renew her.
24     Q.  Why did he say that?
25     A.  He did not say.

**Page 53**

1     Q.  Did you explain to Patrick O'Rourke what the
2  issues were?
3     A.  Yes, I did.
4     Q.  What did you tell him?
5     A.  I told him that there were issues of teaching
6  competence and that there were issues of instructional
7  qualifications, which concerned me very much.
8     Q.  Did he make any comment on the competence
9  issue?
10     A.  No, not specifically.
11     Q.  Not specifically. What do you -- that sounds
12  like a qualification. Was there some sort of comment?
13     A.  We had talked on again, off again throughout
14  the fall semester about Miss Wade and other instructors
15  and where they would be best placed in terms of
16  instruction, how we could best use them. Dr. O'Rourke
17  had advised me, for example, that he did not think it
18  was appropriate for Miss Wade to teach in the College
19  Skills Academy program. He thought that that was not
20  the best target audience for Miss Wade's teaching.
21     Q.  And did he explain why?
22     A.  No.
23     Q.  What is the College Skills Academy?
24     A.  The Skills Academy was a program for workers
25  employed by the North Slope Borough. It was a program

14 (Pages 50 to 53)

Page 102

1      MS. DUCEY: Objection; vague.
2      Q. (By Ms. Johnson) Maybe it is vague. There
3  was nothing in writing that stated that each time a
4  student signed up for a new class, that they had to go
5  back in to get a new tuition waiver; is that right?
6      A. Not that I recall. My recollection is the
7  tuition waiver forms stayed on file.
8      MS. JOHNSON: Let's mark this 69.
9      (Exhibit No. 69 was marked
10      for identification.)
11      Q. Is this an e-mail you recall receiving from
12  Ms. Gamboa?
13      A. Yes.
14      Q. And where did Ms. Gamboa work at the College?
15      A. She was the chief accounting officer.
16      Q. And she told you there's never been a clear
17  definition of dependent, which is what you just said,
18  correct?
19      A. I did not say there was not a clear
20  definition. She did.
21      Q. Did you believe that there was a clear
22  definition?
23      A. Let's say that I understood that there was not
24  a definite definition consistently applied as a policy
25  at the institution.

Page 103

1      Q. So is it your testimony that Ms. Wade's
2  granddaughter did or did not fit into the application of
3  the definition of dependent?
4      A. Well, I don't think that was my call to
5  judge. Miss Wade had applied for the tuition waiver for
6  her granddaughter, I believe at a time in which her
7  granddaughter was resident in Barrow with her
8  grandmother. The tuition waiver had been authorized,
9  and it continued to be used by Miss Wade and her
10  granddaughter even after the granddaughter subsequently
11  moved back to Tennessee. I mean those are, as far as I
12  know, facts. My judgment had nothing to do with it.
13      Q. But in your estimation, in Exhibit 46, the use
14  of that waiver was -- presented an appearance of a
15  conflict of interest?
16      A. Oh, of course. Yes.
17      Q. Why?
18      A. Because Miss Wade is receiving a tuition
19  benefit, paying no tuition to register her
20  granddaughter, to take courses with her grandmother
21  consistently, while the granddaughter is living in
22  Tennessee, going out of her way to take community
23  college courses with her grandmother in Barrow, Alaska,
24  I assume specifically because they were free and because
25  they were offered by her grandmother, instead of taking

Page 104

1  advantage of the opportunities available at her local
2  community college.
3      Q. Did you think it was reasonable for Miss Wade
4  to encourage her granddaughter to pursue her education
5  at Ilisagvik?
6      A. No.
7      Q. Why not?
8      A. I think it would have been healthier for the
9  granddaughter to pursue her education in Tennessee. I
10  do not think it was healthy for the granddaughter to be
11  taking courses over and over and over again with the
12  grandmother.
13      Q. Healthy meaning?
14      A. Well, for one thing, it's not advantageous to
15  the student to take the lion's share of their credits
16  with a single instructor. One of the important values,
17  one of the important outcomes of any college education
18  is diversity, diversity of instruction styles, diversity
19  in dealing with the faculty and the fellow students that
20  you're encountering as you go along your educational
21  career.
22      For a grandmother -- for a granddaughter to be
23  dependent on a grandmother for the lion's share of her
24  higher education, and to go out of her way to do that
25  when there were other alternatives, no, I don't think

Page 105

1  that's in the best educational interests of the student.
2      Q. Most of your educational offerings at
3  Ilisagvik College did not have a deep faculty to draw
4  from, did they?
5      A. That's true.
6      Q. In most instances most of your departments had
7  a single primary full-time faculty member with some
8  adjunct members; is that correct?
9      A. It certainly was the case in business.
10      Q. The issue -- back on page, or Exhibit 46, the
11  first issue is the accreditation standards require the
12  institution to employ professionally qualified faculty,
13  and you state that Bobbi does not have a solid academic
14  background in the academic business courses she
15  teaches. What was she missing?
16      A. Advanced courses in finance, in marketing, in
17  economics, in accounting, in business management, in
18  organizational behavior.
19      Q. I'm sorry, you said those very quickly.
20  Finance, organizational behavior?
21      A. Marketing, economics, business management.
22      MR. GAMACHE: You also said accounting.
23      A. Accounting.
24      Q. (By Ms. Johnson) Finance and accounting, is
25  that separate or are they the same?

27 (Pages 102 to 105)

EXHIBIT  9
PAGE  4  OF  14

Wade vs. Ilisagvik                           5-10-2006                         John Tuthill, Ph.D.

Page 94

1   the e-mail January 15th; is that correct?
2       A.   Let me double-check the e-mail.
3       That's correct.
4       Q.   So in that length of time, you believed that
5   Bobbi was resistant to changing her style of Blackboard?
6       A.   Yes.
7       Q.   And what was it that in that length of time
8   made you believe that she was resistant to changing her
9   style of Blackboard teaching?
10      A.   When I wrote this, I wrote "she is doing some
11  of what I directed; most she is not." Now, I was
12  talking about three issues. "Most" implies that there
13  were two that she had not responded to. Subsequently
14  she responded to two. There was one that she did not.
15          The one issue that she did not respond to was
16  the public forum for questions and answers and
17  discussions on the Blackboard platform. She maintained
18  the policy on the syllabus of insisting that if the
19  students needed to contact her with an issue or a
20  question, it should be by telephone or by personal
21  e-mail.
22      Q.   So if you look back at Exhibit 66, you said in
23  the first paragraph that that was a direct order, and
24  she did comply with that direct order, correct?
25      A.   That is true.

Page 95

1       Q.   And in the second paragraph you said that was
2   a direct order, and she complied with that as well?
3       A.   That is also true.
4       Q.   So in the third paragraph, which you said was
5   not a direct order --
6       A.   No, I said it was a strong, urging
7   recommendation.
8       Q.   Correct.
9       A.   And she did not comply. That is true.
10      Q.   But it was not a direct order, was it?
11      A.   That was not a direct order. Well, the direct
12  order was to please reconsider. The direct order was
13  not, you got to do it.
14      Q.   Right. So it was not a direct order to
15  change?
16      A.   It was not.
17      Q.   It was a direct order to think about changing?
18      A.   True.
19      Q.   And if she met with Sonya Abu and Rob Carrillo
20  and talked to them about that issue and still did not
21  change the way that she offered her classes, would that
22  have been in compliance with what you directed her to
23  do?
24      A.   Well, I don't know. I'm not aware of the
25  meeting. I'm not aware of the topic of the meeting.

Page 96

1   I'm not aware of the issues that were discussed. If it
2   was an issue that she was thinking about, I'm pleased to
3   hear that, but I had no evidence of that.
4       Q.   If she had done that, would she have complied
5   with your urging?
6           MS. DUCEY:  Objection; asked and
7   answered.
8       Q.   (By Ms. Johnson) If she did do it. She gets
9   to object whenever she wants. As long as she doesn't
10  direct you not to answer, you need to answer.
11          MS. DUCEY:  My objection was that that
12  has been asked and answered. But you can answer the
13  question nonetheless.
14      A.   Repeat the question, please?
15      Q.   (By Ms. Johnson) If she had met with them and
16  talked to them about that and considered it, would that
17  have met your strong urging?
18      A.   Not necessarily.
19      Q.   Why?
20      A.   Well, it depends on the result of the
21  conversation. If, for example, they had had the meeting
22  and Sonya and Rob had said, well, this is a really great
23  idea, we think you should do it, here are all the
24  reasons why, and Miss Wade said, no, that's too much
25  trouble, I'm not going to do it, no.

Page 97

1           If she had had the meeting and discussed the
2   issues and had considered it and had a good, thoughtful
3   reason for why it was not being done, would that have
4   met the technical request? Yes, it would be
5   reconsidering. Would I be disappointed if she wasn't
6   doing what I had urged her to do? Yes, I would be.
7       Q.   In looking at Exhibit 46, let's start with the
8   bottom of the page, number five. What was the poor
9   professional judgment that you were talking about?
10      A.   She was intervening on behalf of her
11  granddaughter, who was a student in her classes while
12  residing in Nashville, Tennessee, or thereabouts. She
13  was giving the appearance of special consideration and
14  special favors or inappropriate advising for her
15  granddaughter.
16          She was claiming her granddaughter as a
17  dependent for tuition benefit purposes. She was asking
18  the College to make special accommodations for a
19  non-resident student in a way that really suggested a
20  conflict of interest.
21      Q.   How did she intervene for her granddaughter?
22      A.   Well, there were some specific cases that came
23  up in the late fall of 2003 and in January of 2004. One
24  issue that came up in the fall of 2003 was that her
25  granddaughter was registered in both the Business

MOBURG & ASSOCIATES                1601 Fifth Avenue, Suite 860        Seattle, WA 98101
Court Reporters                            206-622-3110                         Fax 206-343-2272

EXHIBIT _____9_____
PAGE _5_ OF _11_

Case 3:05-cv-00086-TMB    Document 100-2    Filed 08/03/2007    Page 16 of 30

Wade vs. Ilisagvik                          5-10-2006                          John Tuthill, Ph.D.

Page 70

1  about and say that this is a model of best practices for
2  all the institution to follow? No. Everybody was
3  learning. The students were learning, the faculty was
4  learning. Everybody was struggling with the platform.
5  There were some that were more successful than others.
6      Q.  Can you recall which ones you thought were
7  more successful?
8      A.  I honestly can't.
9      Q.  Do you recall what instructors offered those
10 courses that were more successful?
11     A.  I can't specifically say this was true in the
12 fall, but in the long run during my tenure at Ilisagvik
13 College, the more successful Blackboard courses that I
14 recall were given by Lana Mcneil and by Jay St. Vincent.
15     Q.  Do you recall that in the fall of 2003 Jay
16 St. Vincent began teaching a Blackboard course that all
17 of the students for some reason withdrew from that
18 course?
19     A.  I do not recall that.
20     Q.  The next three paragraphs -- each one of them
21 starts with a number, first, second, and third -- are
22 advice from you to Bobbi Wade; is that correct? Would
23 that be a correct characterization?
24     A.  Advice, recommendations. Number one seems to
25 be a bit stronger than a recommendation. Please revise

Page 71

1  your courses. That sounds to me like a general order.
2      Q.  Where do you see that?
3      A.  Oh, let's see. Five or six lines from the
4  bottom.
5      Q.  Can you read the first part of the --
6      A.  "Please revise your courses so that you have a
7  separate due date for each chapter assignment."
8          MS. DUCEY:  Seven from the bottom. If
9  you include "help."
10     Q.  (By Ms. Johnson) Please revise your courses,
11 okay. So do you consider that a direct order?
12     A.  I consider it a gentle but direct order.
13         Paragraph number two is more direct and less
14 gentle. "You cannot require the students to finish
15 their courses in advance of the scheduled course
16 completion date. You must give them all of the time
17 allowed by the academic schedule to finish their
18 course."
19     Q.  Would you call that a direct order?
20     A.  I would call that a direct order.
21     Q.  What about in the third paragraph? Is there a
22 direct order?
23     A.  The third one is not a direct order. It is a
24 please reconsider. It is a fairly strong urging to
25 change the teaching tactic.

Page 72

1      Q.  The first paragraph, prior to writing this
2  down, had you talked to Miss Wade personally about
3  revising her courses?
4      A.  No, I had not.
5      Q.  When did you first decide that courses needed
6  to be revised?
7      A.  This was an issue that I had been working on
8  throughout the Christmas holiday when the majority of
9  the faculty was not present in Barrow. I was
10 identifying the very poor level of student success rate
11 in most of the Blackboard courses. I was comparing that
12 to the structure of the Blackboard courses where the
13 students had a higher success rate. I was thinking
14 about my own educational experience, and I have 18 years
15 in the classroom, what worked for me and what did not.
16         One of the things I concluded in reviewing
17 Miss Wade's courses was that it was against the
18 interests of the student, therefore against the
19 interests of the College, to have all of the assignments
20 clumped together a month at a time. It meant, as I
21 believe I told her, that by the time we got information
22 that a student might be having trouble with the course,
23 it was almost too late to intervene in a helpful
24 manner. A month would have passed and the student would
25 be failing in three different chapter assignments

Page 73

1  instead of just one.
2          In my experience, it was advantageous to the
3  student and therefore to the College to have at least
4  one assessed assignment fairly early on in the
5  semester. So the instructor can gauge -- could
6  engage -- no, could gauge what students were physically
7  there, what students were responding, what students were
8  active with the course, what students might need an
9  extra nudge, what students were not turning the work in
10 on time, what students didn't seem to be absorbing the
11 material. If we got that information early, then our
12 student support services could do something with it.
13     Q.  And this was the first time that you had
14 articulated -- this being Exhibit 66. This is the first
15 time that you articulated these thoughts to Bobbi Wade
16 in particular?
17     A.  That is correct.
18     Q.  Paragraph two, had you -- prior to writing
19 this e-mail, had you sat down with Bobbi Wade and talked
20 about the due dates and the completion dates for the
21 course?
22     A.  I do not recall specific conversations about
23 that in the previous semester. I do believe that I
24 recall instances in which I wrote to her that her
25 classes were scheduled to end too early and that we

19 (Pages 70 to 73)

EXHIBIT___9___
PAGE__4__OF__16__

Case 3:05-cv-00086-TMB    Document 100-2    Filed 08/03/2007    Page 17 of 30

Wade vs. Ilisagvik                    5-10-2006                    John Tuthill, Ph.D.

Page 82

1  upon?
2      A.  From the grade sheets.
3      Q.  And you got the grade sheets from where?
4      A.  The registrar's office.
5          VIDEOGRAPHER:  We've got about five
6  minutes left on the tape.
7          MS. JOHNSON:  Do you want to change?
8          VIDEOGRAPHER:  In about five minutes.  If
9  you want to stop now that's fine.
10         MS. JOHNSON:  No, that's okay.
11     Let's mark this as 67.
12         (Exhibit No. 67 was marked
13         for identification.)
14     Q.  (By Ms. Johnson)  Can you tell from this
15  document which classes Miss Wade taught?
16     A.  From this document, no.  I recall that Miss
17  Wade was teaching Business 100.  I would suspect that
18  she was teaching Business 154, Intro to Organization
19  Management.  I would suspect that she was teaching
20  Business 233, Financial Management.
21     Q.  But there's no way to identify her -- which
22  professor taught these courses?
23     A.  Not from this form, no.
24     Q.  Is this one of the documents that you used to
25  look at when you were making up your percentages?

Page 83

1      A.  No.  For my perspective this type of document
2  is completely useless.
3      Q.  Why?
4      A.  Because it gives you a false perspective on
5  what's happening.  This tells you that there is a
6  retention rate of 90.65 percent in fall semester '03
7  Blackboard courses.  If you will take the number of
8  students who registered for Blackboard courses,
9  anticipating learning something and geting credit, and
10  compare it to the number who got credit at the end of
11  the term, the number is not 90.65.  Not even close.
12     Q.  Do you have any idea who would have generated
13  this document?
14     A.  I suspect that this was the sort thing
15  generated by the registrar's office.
16     Q.  And have you reviewed any documents in this
17  format in the past?
18     A.  Oh, I'm sure I have.
19     Q.  So on the top where it says Credits, Adds, and
20  Drops, what do those refer to?
21     A.  I couldn't tell you.  It means in Intro to
22  Business somebody is recording that 15 students added
23  the course.  That may very well be that 15 students
24  actually registered for it.  And it suggests that no
25  student formally withdrew from the course.

Page 84

1      Q.  So when you looked at a document, specifically
2  what was the -- tell me exactly what kind of a document
3  you were looking at.  I take it this is the not kind of
4  document you were looking at?
5      A.  No, this is not the document I was looking at
6  at all.
7      Q.  What did you look at?
8      A.  I looked at the instructor's grade report that
9  was turned in to the registrar's office, which gives a
10  complete list of every student registered for the course
11  who receives a grade.  That grade might be an A or a B
12  or a C or a D or an F.  It might be a W for withdrawal.
13  It might be a DF for deferred.  It might be an I for
14  incomplete.
15     I would take the total list of students who
16  had received a grade for the course and divide the total
17  by the number of students who received credit, and that
18  would be my success rate.  I did not call it a retention
19  rate.  I called it a success rate.
20     Q.  Okay.  And...
21         VIDEOGRAPHER:  We've got about two
22  minutes left.
23         MS. JOHNSON:  Why don't you go ahead and
24  change it.
25         VIDEOGRAPHER:  This is the end of tape

Page 85

1  number two in the continuing deposition of John
2  Tuthill.  This deposition will continue on tape number
3  two.  The time is approximately 10:08 a.m.  We are now
4  going off the record.
5          (Discussion held off the record.)
6          (Exhibit No. 68 was marked
7          for identification.)
8          VIDEOGRAPHER:  We are back on the
9  record.  This is the beginning of tape number two in the
10  continuing deposition of John Tuthill.  The time is
11  approximately 10:11 a.m.
12         MS. DUCEY:  Just so the record is clear,
13  Dr. Tuthill has identified with respect to Exhibit 66
14  only the e-mail from himself to Miss Wade.
15     Q.  (By Ms. Johnson)  In the top of page 66 when
16  you talked about 26 percent and 23 percent, what was the
17  statistical difference in those two?  How many students
18  are we talking about?
19     A.  I don't know.
20     Q.  Have you ever taken a statistics class?
21     A.  I have not.
22     Q.  In your mind, when you looked at this, did you
23  think that the difference in 3 percent was statistically
24  significant?
25     A.  No, indeed.  I would say that I felt both of

MOBURG & ASSOCIATES          1601 Fifth Avenue, Suite 860          Seattle, WA 98101
Court Reporters                      206-622-3110                        Fax 206-343-2272

EXHIBIT  9
PAGE  1  OF  16

Wade vs. Ilisagvik                           5-10-2006                           John Tuthill, Ph.D.

Page 86

1    these sets of figures gave me reason to believe that
2    there was considerable improvement that needed to be
3    made in the delivery of those courses. Am I going to
4    say that 23 is notably worse than 26? No.
5        Q. I'm handing you what's been marked as Exhibit
6    68. Is the attachment to the e-mail something that you
7    are -- something that you have read prior to today?
8        A. Not that I recall.
9        Q. Were you aware that there was a subcommittee
10   report on distance delivery back in the year 2002?
11       A. Not that I recall.
12       Q. Do you recall when the College began offering
13   distance delivery courses?
14       A. No. It was certainly before my arrival.
15       Q. So you wouldn't know who was on the
16   subcommittee that generated this report?
17       A. No.
18       Q. If you turn to the page that's marked at the
19   bottom 23415?
20       A. Okay.
21       Q. And I'm looking at the paragraph marked
22   three.
23       A. Uh-huh.
24       Q. It talks about success in distant learning
25   courses, and first it motivates -- first it states that

Page 87

1    it needs students who are highly motivated with good
2    organizational skills. Would you agree with that?
3        A. Yes, I would.
4        Q. In the next paragraph, paragraph marked four,
5    it states that it is critical that all students receive
6    equivalent instruction. Do you agree with that?
7        A. Depends on what they mean. Let me read the
8    next sentence.
9        Q. Okay.
10       A. In general I'd say that sounds reasonable.
11       Q. Okay. So what does equivalent instruction
12   mean to you?
13       A. That you attempt, insofar as is possible, to
14   provide the same level of instruction, the same level of
15   instructional support to all students at whatever
16   location.
17       Q. You defined it as attempt. Is it acceptable
18   to you that some students receive instruction that other
19   students are not able to receive?
20       A. Is it acceptable? No. Is it sometimes
21   inevitable? Yes. There are times in which the phone
22   connection to Point Hope breaks down. You either cancel
23   the class for everybody or Point Hope misses out that
24   particular class and you try to get Point Hope caught up
25   the next time. Sometimes, inevitably, that happened.

Page 88

1        Q. Is it acceptable to cancel the class for
2    everyone?
3        A. Oh, I don't think it would be the first
4    choice.
5        Q. What would be your first choice?
6        A. To continue the instruction as best you could
7    with the folks you did have online and get Point Hope
8    caught up in your next meeting.
9        Q. This document says it is critical that all
10   students receive equivalent instruction. Is that
11   something that you agree with?
12       A. I would say that it is very important, but
13   again, I would say that there are probably instances in
14   which it is technically impossible.
15       Q. This also says that courses offered through
16   Blackboard should not have class meetings for Barrow
17   students only. Do you agree with that?
18       A. Yes.
19       Q. And the sixth paragraph talks about students
20   in the villages who for lifestyle reasons may not
21   conform to a traditional academic calendar. Were you
22   aware that that occurred in the vicinity of Barrow?
23       A. Yes.
24       Q. And do you understand what those lifestyle
25   issues were?

Page 89

1        A. Yes, I understand some of them.
2        Q. What were those?
3        A. When a whale comes you go out and get it.
4        Q. So whaling?
5        A. If you have class that week, the class can
6    wait, the whale can't.
7        Q. What else?
8        A. Same with caribou.
9        Q. Caribou? So subsistence? Hunting and
10   subsistence?
11       A. Sure.
12       Q. Anything else?
13       A. Those are the ones that come to mind. I know
14   that there are traditional holidays and festivities that
15   are important. I know that there are family issues as
16   well. That's typical in many native communities that
17   I've worked with. If somebody needs to take care of the
18   little sister and mom says it's your job, that takes
19   priority over going to class and weighed far stronger
20   than it does in a traditional American classroom
21   setting.
22       Q. Was there a policy at Ilisagvik that told
23   faculty members how to deal with those kind of lifestyle
24   issues that came up with their students?
25       A. Not as I recall. It was something that we

23 (Pages 86 to 89)

EXHIBIT  9
PAGE  8  OF  16

Wade vs. Ilisagvik                5-10-2006                    John Tuthill, Ph.D.

Page 126

1    MS. JOHNSON:  Do you want to break?
2    MR. GAMACHE:  Yeah.
3    MS. JOHNSON:  Take a break.
4    VIDEOGRAPHER:  We're going off the
5  record.  The time is approximately 11:12 a.m.
6        (Recess taken.)
7    VIDEOGRAPHER:  We are back on the record.
8  The time is approximately 11:23 a.m.
9    Q.  (By Ms. Johnson)  During the fall of 2003 did
10  you receive complaints from students about any
11  instructor other than Bobbi Wade?
12    A.  Yes.
13    Q.  Who?
14    A.  I received complaints from students about
15  Courtney Bartholomew.  I received complaints from
16  students about Jay St. Vincent.  I received complaints
17  from students about Tony Kaliss.
18    Q.  What were students complaining about with
19  Courtney Bartholomew?
20    A.  That they didn't understand him or that he was
21  rude or that the instructions in his Blackboard courses
22  were not appropriate to the course.
23    Q.  And what about Jay St. Vincent?
24    A.  That she was demanding, that she was mean,
25  that her courses were too hard, that no matter how hard

Page 127

1  the student tried they still got red ink all over their
2  essays.
3    Q.  And what about, you said Tony Kaliss?
4    A.  Tony Kaliss.
5    Q.  What did they complain about Tony Kaliss?
6    A.  That he was pompous, dogmatic, self-righteous,
7  deadly dull.
8    Q.  Were those complaints that you took seriously?
9    A.  I certainly listen.  I'll listen to any
10  student complaint.
11    Q.  Did you investigate any of those complaints?
12    A.  Sure.
13    Q.  What did you find out about Courtney
14  Bartholomew?
15    A.  That his English was very difficult to
16  understand.  That his Blackboard courses were in many
17  cases set up inappropriately.  He had grafted his
18  traditional delivery syllabus on to the Blackboard site
19  so that the Blackboard students were being advised that
20  they couldn't chew gum in class and they couldn't bring
21  their infant children to class because it was disruptive
22  to everyone else, this in a Blackboard course that had
23  no class.  And that at times he was quite curt to
24  students and not supportive, in the Blackboard
25  instruction particularly.

Page 128

1    Q.  What did you do about your findings?
2    A.  Talked to Courtneay.
3    Q.  And what did you say?
4    A.  We talked some about the student perception.
5  We talked some about his interests, the direction in
6  which he wanted his career to go.  We reached, I think,
7  the mutual conclusion that Courtneay was more effective
8  in the specialized IT courses for students who were
9  really professional and motivated and talented; that he
10  was less effective in the bread and butter, general
11  education, intro to computer type course.  He didn't
12  really have the patience with those students.  And we
13  agreed that we would attempt to schedule him to teach
14  those courses in which he was more appropriate.
15    Q.  Did you bring somebody in to teach the lower
16  level courses for him?
17    A.  We already had people who came in as adjuncts.
18  Did we recruit another full-time person?  No, we would
19  have loved to but didn't have the budget for it at that
20  time.
21    Q.  So you were using an adjunct to teach the
22  basic course?
23    A.  In some instances Courtneay taught the basic
24  courses, too.  We just agreed that we were going to
25  attempt to move, insofar as we could, in the direction

Page 129

1  of having him concentrate on the professionally oriented
2  courses and have other instructors do the entry level
3  courses.
4    Q.  Did he teach face-to-face courses as well?
5    A.  Yes.
6    Q.  What did you instruct him about his, was it an
7  accent problem?  Was that the problem?
8    A.  There was an accent problem, and there really
9  wasn't a whole lot you could do with that.  You could
10  counsel him to speak slower.  You could ask him "what"
11  repeatedly until he got the picture and slowed down.
12  But that was just simply a way that Courtneay came, and
13  it was something that the College was either going to
14  have to deal with or choose to find another instructor.
15  I chose to deal with it.
16    Q.  Did you have him take any sort of course or
17  accent reduction course, anything like that?
18    A.  No.  I didn't see, and still don't see, the
19  value of an accent reduction course for an individual
20  such as Courtneay.  He's got the accent that he grew up
21  with, that he's been speaking with for the past 50
22  years.  I don't know that a four-week course, reading
23  how now brown cow into a telephone, is going to make a
24  substantive difference.
25    Q.  And did Courtneay make the changes that you

33 (Pages 126 to 129)

MOBURG & ASSOCIATES          1601 Fifth Avenue, Suite 860          Seattle, WA 98101
Court Reporters                  206-622-3110                    Fax 206-343-2272

EXHIBIT  9
PAGE  9  OF  16

Case 3:05-cv-00086-TMB    Document 100-2    Filed 08/03/2007    Page 20 of 30

Wade vs. Ilisagvik                    5-10-2006                    John Tuthill, Ph.D.

Page 186

1  not telling Aimee Valenti that you had authorized a
2  credit by examination for this student. Did you blame
3  Bobbi Wade for not getting this information to Aimee
4  Valenti?
5      A.  No, I reported a fact, that the information
6  had not gone from Miss Wade to Aimee Valenti. This was
7  an issue in which there was fault on both sides. My
8  understanding is that Miss Wade attempted to deliver
9  this information to Miss Valenti while Miss Valenti was
10 giving a class. In December, when Miss Valenti -- or
11 November when Miss Valenti had gone to Miss Wade to ask
12 for information while Miss Wade was giving a class, Miss
13 Wade had not been receptive. Interrupting a teacher
14 when they're teaching is usually not a very good thing
15 to do.
16     The important point for me, the point that I'm
17 attempting to make here, is that the communication lines
18 did not work. The information was not going from the
19 person who had it to the person who needed it. And
20 that's a problem.
21     Q.  In the bottom carry-over paragraph, Miss Wade
22 promised a grade of DF to students in other instructors'
23 courses?
24     A.  That is in effect true.
25     Q.  And "in effect," what do you mean by "in

Page 187

1  effect true"?
2      A.  Well, what Miss Wade reported was that she
3  told Miss Underwood, for example, that if she got busy
4  at the end of the term, she would be eligible to get a
5  grade of DF in Module C. When Miss Wade imparted that
6  information to Miss Underwood, Miss Wade had every
7  reason to anticipate that she would be the instructor of
8  Module C. That was the plan at that time.
9      However, the plan changed. Module C for
10 Business English was assigned to Miss Valenti, so the
11 effect of this was that Miss Wade had promised to a
12 student in a class, for which the instructor of record
13 was now Miss Valenti, a grade, and that's an extremely
14 awkward situation.
15     Q.  But for her leave she would have been teaching
16 Module C. Do you agree with that?
17     A.  In all probability, yes.
18     Q.  Now, Miss Wade was teaching three courses that
19 were online courses, and each of those courses was a
20 three-hour course; is that correct?
21     A.  That's my recollection from the September the
22 3rd load report that I see.
23     Q.  Would you review Exhibit 19 and tell me if you
24 know whether this is an accurate depiction of Bobbi
25 Wade's fall classes?

Page 188

1      A.  No. I can guarantee you I can't say that. It
2  was a complicated schedule. It was a complicated
3  semester. The Principles of Economics course was
4  canceled, for example. It is possible that additional
5  classes were added to Miss Wade's schedule. I don't
6  remember that detail.
7      Q.  Do you recall a class being added towards the
8  end of the year?
9      A.  No. I recall, because I have seen the
10 document recently, correspondence between Miss Wade and
11 me regarding the need to find an instructor for a
12 record, a filing and record keeping course. The
13 information I have does not make clear whether in the
14 end Miss Wade decided to take that course or not. And I
15 just don't remember.
16     Q.  Do you recall how many credits that course
17 was?
18     A.  Two.
19     Q.  So if Miss Wade had three online courses that
20 were three hours each and a filing and record keeping
21 course of two hours each --
22     A.  One.
23     Q.  It was one hour?
24     A.  No, it was two hours but it was one filing and
25 record keeping. So there's no "each."

Page 189

1      Q.  Thank you. My mouth got away from my brain.
2      So she had a total of nine hours for those
3  four courses?
4      A.  No. If she had three three-credit --
5      Q.  Eleven hours.
6      A.  Yes.
7      Q.  She had eleven hours?
8      A.  For those four courses. If in fact she taught
9  the filing and record keeping. I'm not 100 percent sure
10 that happened. I don't remember.
11     Q.  Okay. And the standard course load for a
12 teacher pursuant to their regular contract is how many
13 hours?
14     A.  The general rule of thumb was 12, 12 and six;
15 12 in the fall, 12 in the spring, six in the short
16 summer semester. There were exceptions to that. For
17 example, in the trades program it was common for the
18 faculty to do a 15 and 15, because having a short
19 program for the month of May in the trades didn't seem
20 to make as much sense.
21     Q.  So Exhibit 12 is the contract for Miss Wade
22 for 2003-2004. Does that specifically say that she
23 would carry 12 hours?
24     A.  No. It says typically. This will be the
25 equivalent of 12 credit hours of teaching and three

MOBURG & ASSOCIATES          1601 Fifth Avenue, Suite 860          Seattle, WA 98101
Court Reporters                      206-622-3110                      Fax 206-343-2272

EXHIBIT    9
PAGE  10  OF  14

Case 3:05-cv-00086-TMB    Document 100-2    Filed 08/03/2007    Page 21 of 30

Wade vs. Ilisagvik                5-10-2006                John Tuthill, Ph.D.

Page 222

1  Okay, 34 starts out with a meaningless
2  statement, "I agree." I agree to what? This doesn't
3  tell me anything. I "recommend that she see a
4  specialist for multiple medical problems." There is no
5  urgency here. There is no time frame here. There is no
6  specific indication that this is something serious.
7  Maybe this is, you know, an orthopedic surgical
8  procedure for a bunged-up knee. That's something that
9  you need to do sometime, but it doesn't have to be done
10 now. I can't tell from looking at this if that's the
11 case.
12 Exhibit 32 tells me medical conditions cannot
13 be dealt with locally. "Somewhat urgent time frame."
14 "Urgent" gets my attention. This is something that
15 needs to be taken care of, that needs to be taken care
16 of promptly. No argument.
17 Q. And when you signed off on Exhibit 31, had you
18 talked to Cheryl McKay specifically about the Family
19 Medical Leave Act?
20 A. Yes.
21 Q. And what did Cheryl tell you about the Family
22 Medical Leave Act?
23 A. I do not know. When Cheryl and Pam started
24 talking specifics about different kinds of leaves and
25 the FMLA act, in all honesty, I tune out. It's over my

Page 223

1  head. The issue where I fixate as the Dean of
2  Instruction is to know what to tell the member of my
3  staff I need to have in order to process the paperwork
4  to allow the leave to happen. I would get enough out of
5  the conversation to know that for Miss Wade to be able
6  to take the leave that she had been asking for, for the
7  reasons that she wanted it, I needed something like
8  document number 32. That's what I got out of the
9  conversations.
10 Q. Did you know when you signed this leave
11 request that the issue Miss Wade was going to be having
12 a doctor look at was a patch of skin that had been
13 tested positive for cancer?
14 A. I don't recall that I knew that. It is
15 possible that Miss Wade told me. I remember that she
16 used the word "patch," though I don't know that I ever
17 knew specifically what, and I'm not sure that I ever
18 knew specifically what the problem with it was.
19 Q. You don't recall hearing the word "cancer"?
20 A. I don't recall. It is possible I heard
21 it. I don't recall.
22 I said to Miss St. Vincent -- you've already
23 read that I think, and I suspect I said to Miss Wade as
24 well -- the precise nature of the medical issue was only
25 my business because I had to have the assurance that it

Page 224

1  was something serious enough to justify the disruption
2  of the teaching. I didn't need to know the precise
3  details. It would have been fine with me if the precise
4  details had been given to Miss Taylor and not to me.
5  Q. Do you know if Miss Taylor told you whether
6  this was a skin cancer issue?
7  A. I would be quite sure she did not.
8  Q. Were you -- did you ever have any
9  conversations with Pam Taylor after you signed this
10 document about whether or not Bobbi's leave was
11 protected by the Family Medical Leave Act?
12 A. I don't think so. From my point of view, once
13 we had the thing signed, Bobbi finally knew that she
14 could go and take care of the issue, I was relieved and
15 that was the end of it.
16 Q. Were you concerned about, when Bobbi returned
17 from this leave, any Family Medical Leave Act issues?
18 MS. DUCEY: Objection to foundation.
19 A. I can say there that I had been advised by
20 Ms. Taylor that before Miss Wade returned to work we
21 would need a medical discharge. We would need something
22 from a licensed physician under whose care she had been
23 saying that she was now authorized to return to work,
24 and stipulating any conditions that might be necessary
25 and the time frame for those conditions when she did

Page 225

1  resume work.
2  Q. (By Ms. Johnson) Under the Family Medical
3  Leave Act, what is your understanding of reinstatement?
4  MS. DUCEY: Objection to foundation.
5  A. (No response.)
6  Q. (By Ms. Johnson) Do you have any
7  understanding of it?
8  MS. DUCEY: Let me also say that you
9  should not repeat any conversations you and I have had.
10 That's attorney-client privilege.
11 THE WITNESS: That?
12 MS. DUCEY: You should not disclose any
13 conversations you and I had.
14 A. Okay. I have said before, in the
15 conversations with the attorney and with Miss Taylor
16 about medical leave, family medical leave, extended
17 medical leave, my concern was not to know the details,
18 the differences between the various categories. My
19 concern was to get the information that I needed to give
20 to the College employee of what it would take in order
21 to get the College employee approval of the leave
22 request, and then what it would take for the College
23 employee to be able to resume normal work.
24 Whether that was family medical leave or
25 extended medical leave or College policy or federal

57 (Pages 222 to 225)

EXHIBIT _____9_____

PAGE __//__ OF __/6__

Case 3:05-cv-00086-TMB    Document 100-2    Filed 08/03/2007    Page 22 of 30

Wade vs. Ilisagvik                                          5-10-2006                                          John Tuthill, Ph.D.

Page 226

1  policy or FMLA or whatever was not my issue.  My issue
2  was what the employee needed to do to get the help they
3  needed, and what they needed subsequently in order to
4  come back.
5       Q.  (By Ms. Johnson)  Did anybody raise a question
6  about whether it was appropriate to give Ms. Wade the
7  Module C classes after she returned from medical leave?
8       A.  No.
9       Q.  Pam Taylor never had any discussions with you
10  about that?
11      A.  Not to my recollection.
12      Q.  And did you consult Cheryl McKay about that?
13      A.  I don't recall that I did.  I may have, but I
14  do not recall.
15      Q.  You said you thought you had more than one
16  conversation with Cheryl McKay?
17      A.  Oh, over the semester I had multiple
18  conversations.
19      Q.  Okay, specifically about Miss Wade and her
20  medical leave, how many conversations?
21      A.  Oh, I couldn't tell you.  I mean I know of one
22  from the documentation.  I suspect there were two
23  others.
24      Q.  And did she -- do you recall her giving you
25  any specific advice on how to treat Miss Wade when she

Page 227

1  came back from leave?
2       A.  I do not recall that.
3       Q.  Do you recall any issues with Miss Wade's
4  documentation when she returned from medical leave?
5       A.  I don't recall the documentation when she
6  returned, so no, I don't recall any issues with it.
7       Q.  Is that documentation brought to you when
8  somebody comes back from medical leave?
9       A.  Well, this was the first medical leave, in my
10  recollection, that we had at Ilisagvik that semester.
11  So I can't say what the definite procedure was.  My
12  suspicion is that it would go to personnel rather than
13  to me.
14      Q.  And would personnel have notified you if the
15  documents were insufficient?
16      A.  I would think so.
17      Q.  I want you to look at Exhibit No. 60.  Bobbi
18  Wade filed a grievance in February which culminated in
19  an administrative hearing.  Do you recall that?
20      A.  Yes.
21      Q.  And were you present for the administrative
22  hearing?
23      A.  That was the hearing presided over by
24  Dr. O'Rourke?
25      Q.  You were present at a hearing that he presided

Page 228

1  over?
2       A.  Well, there was one level hearing that was to
3  be presided over by John Van Hoesen and then one by
4  Dr. O'Rourke.  I was present at both.
5       Q.  Do you recall reading this decision from
6  Dr. O'Rourke?
7       A.  Yes.
8       Q.  Did you read it at the time that he made the
9  decision?
10      A.  Well, I read it subsequent to it, after he had
11  it distributed to the parties.
12      Q.  So you read it sometime in the summer of 2004?
13      A.  I don't recall the dates at all.  Let's see.
14  He's reviewing things in June 24, so, yes, it would have
15  been in the summer of 2004.
16      Q.  Turn to page 3.  And paragraph labeled 13
17  states, "The Administration proffered the following
18  reasons for Miss Wade's non retention."  Do you know who
19  the administration is that he's referring to?
20      A.  Me.
21      Q.  And the following reasons are labeled "a,"
22  "b," "c," "d," and "e."  Do you recall that these were
23  the reasons that were presented at the hearing?
24      A.  Not exactly.  I think the question that I was
25  responding to here were what were the performance

Page 229

1  issues, what were the issues of concern pertaining to
2  Miss Wade.  These were all issues of concern.
3       Q.  So --
4       A.  These were not -- many of these, in and of
5  themselves, would not have been sufficient reason in my
6  estimation not to renew Miss Wade.
7       Q.  Each individually was not sufficient?
8       A.  No, I didn't say that.  E, for example,
9  "failure to submit timely grades" was a performance
10  problem.  It was something that I was concerned about,
11  but there were performance issues with other faculty
12  members I was concerned about and I recommended their
13  contracts be renewed.
14          The poor professional judgment, the deferred
15  grades, I could add here the, in my opinion, poor
16  evaluation of -- poor advisement of students who were
17  being urged to withdraw from classes taught by people
18  Miss Wade didn't like, those were performance issues
19  that were of concern to me, but alone that would not
20  have led to a non-renewal.
21      Q.  What did lead to the non-renewal?  I thought
22  you said it was qualification and --
23      A.  In the end, for me -- understand that from my
24  point of view, there had been an almost complete
25  breakdown in Miss Wade's instruction in the fall

MOBURG & ASSOCIATES              1601 Fifth Avenue, Suite 860    Seattle, WA 98101
Court Reporters                          206-622-3110                      Fax 206-343-2272

EXHIBIT     9

PAGE   12   OF   16

Case 3:05-cv-00086-TMB     Document 100-2     Filed 08/03/2007     Page 23 of 30

Wade vs. Ilisagvik                        5-10-2006                        John Tuthill, Ph.D.

Page 230

1  semester of 2003. Most of the students registered in
2  her courses did not achieve their objective. There was
3  evidence of poor advisement.
4         There was evidence of, it seemed to me, a
5  complete misunderstanding of the whole process of the
6  modularized courses, which was puzzling because she had
7  taught them repeatedly. You can't cancel those classes
8  for a month and then pick them up. You can't run B and
9  C modules concurrently when B is the prerequisite for C,
10 and yet those were things that Miss Wade had asked for.
11        I had multiple student complaints from a
12 variety of sources that Miss Wade was disinterested,
13 unhelpful, judgmental, rude. They felt intimidated,
14 they felt humiliated, they felt confused. I have
15 reports of Miss Wade in essence telling students that
16 they should already know how to do that and she wasn't
17 going to waste her time helping them. I had a meltdown
18 of instruction.
19        And I realized that no matter how hard the
20 administration worked or how hard Miss Wade worked on
21 those specific performance issues, the bottom line, when
22 push came to shove, was that this was an instructor who
23 did not meet the minimal acceptable qualifications for
24 the job. This was not someone who should have been an
25 assistant professor of business at an accredited

Page 231

1  college. She simply lacked the education. And she
2  would continue to lack the education no matter what
3  happened.
4     Q.  So the bottom line for you was what?
5     A.  The determining factor for me, what made Miss
6  Wade's case different for me than all the other ones
7  where I had a performance issue, I felt that the
8  performance issue with Miss Wade in the fall semester
9  was more severe than anyone else's, but I also felt she
10 was the faculty member who simply did not have the
11 educational qualifications needed for the position that
12 she held at Ilisagvik College.
13        She had training in English, she had training
14 in educational administration, not in business. She was
15 teaching classes in marketing, in accounting, business
16 management, finance, economics, where, in my evaluation
17 of her transcript, she lacked the academic foundation to
18 be teaching.
19    Q.  So did you tell those reasons specifically to
20 Patrick O'Rourke during the administrative hearing?
21    A.  Yes. "Insufficient academic background for
22 the area in which she teaches."
23    Q.  That was one of the five areas?
24    A.  That was one of the five issues, though I will
25 say again, that for me was the one that I couldn't

Page 232

1  figure out how to get around.
2     Q.  But the other things that you listed here also
3  factored into your decision?
4     A.  Those were issues. Those were areas of
5  concern. Some of very grave concern, others of concern
6  but not quite so grave.
7     Q.  They were --
8     A.  There were certainly a multitude of
9  performance issues, coupled with the insufficient
10 academic background.
11    Q.  They were of sufficient concern to you to
12 mention them to the administrative hearing officer?
13    A.  I was asked by the administrative hearing
14 officer what my concerns were with Miss Wade. I
15 answered the question --
16    Q.  And in fact --
17    A.  -- completely and honestly.
18        MS. DUCEY:  Before you ask that next
19 question, I never got -- somehow I might have misplaced
20 my Exhibit 60. So you've been asking all these
21 questions and I don't -- it's not your fault. I just
22 don't have my copy and I'm wondering --
23        MS. JOHNSON:  I don't have an extra copy.
24        MR. GAMACHE:  I thought I saw an extra
25 one.

Page 233

1        MS. JOHNSON:  Get out of my copies.
2        MS. DUCEY:  Well, I'm wondering maybe
3  if --
4        MS. JOHNSON:  You're welcome to take a
5  break and look at it if you want.
6        MS. DUCEY:  Can we take five and I can
7  get another copy? Probably speed up the process. Just
8  walk out and get another one.
9        VIDEOGRAPHER:  We're now going off the
10 record. The time is approximately 2:51 p.m.
11        (Recess taken.)
12        VIDEOGRAPHER:  We are back on the
13 record. This is the beginning of tape number four in
14 the continuing deposition of John Tuthill. The time is
15 approximately 3:01 p.m.
16    Q.  (By Ms. Johnson) So we were talking about the
17 presentation to the hearing officer who was
18 Dr. O'Rourke, and the reasons for non-retaining Miss
19 Wade, and "a" through "e" were presented -- you agree
20 that "a" through "e" were presented to the hearing
21 officer as the reasons for not retaining Miss Wade for
22 another year?
23    A.  No, I don't agree.
24    Q.  Okay. What is your recollection of what
25 happened?

59 (Pages 230 to 233)

MOBURG & ASSOCIATES          1601 Fifth Avenue, Suite 860     EXHIBIT     9     Seattle, WA 98101
Court Reporters                      206-622-3110              PAGE  13  OF  16  Fax 206-343-2272

Wade vs. Ilisagvik       5-10-2006       John Tuthill, Ph.D.

Page 234

1     A. My recollection is that "a" through "e"
2 consisted of my list of issues of concern underlying the
3 decision not to retain Miss Wade. But I would insist
4 for the record that most of these alone, many of these
5 in combination, would not have been sufficient cause in
6 my estimation not to renew.
7     The basic cause for my decision not to renew
8 Miss Wade was a combination of very serious performance
9 issues, coupled with a basic lack of qualifications for
10 the position that she held, and my awareness that no
11 matter how much we worked on the performance issues, if
12 indeed she would be willing to work with me on the
13 performance issues and I had no indication that she
14 would, that that would not affect the fundamental fact
15 that she was not qualified for this instructional
16 position.
17     Q. Well, let's break that down a little bit. You
18 looked at -- when you first came in to your position you
19 looked at the student evaluation file for Miss Wade?
20     A. That is correct.
21     Q. And at some point did you say that you went in
22 and you looked at her personnel file and you saw her
23 resume and you looked at all those --
24     A. That is also correct.
25     Q. Did you look at the evaluation that had been

Page 235

1 done by a prior dean?
2     A. Yes, I did.
3     Q. And there was one for the spring of '03; is
4 that correct?
5     A. That is correct.
6     Q. And that evaluation was not a bad evaluation?
7     A. It was not a bad evaluation.
8     Q. So based on performance issues in the past,
9 other than the fall of '03, did you have any other
10 indication other than the fall of of '03 that Miss Wade
11 would not be able to perform well in the future?
12     A. I saw evidence of performance issues in
13 earlier semesters in her file. And --
14     Q. And what --
15     A. -- don't forget that on top of the performance
16 issue, we had in my estimation the lack of
17 qualifications for the position.
18     Q. Okay, well, I just want to focus on the
19 performance issues. What evidence of performance issues
20 did you see?
21     A. One suggestion of at the least performance
22 questions was some notices in student evaluations that
23 some students in previous semesters had felt that Miss
24 Wade's courses were too easy, insufficiently
25 challenging, suggesting that this could be an instructor

Page 236

1 who was not teaching to college credit level.
2     There were documents in file, and I want to
3 say dating to the spring of 2003 but I'm not absolutely
4 sure, where there was a disagreement or a
5 misunderstanding or an issue between Miss Wade and a
6 student. That was a troubling series of documents. The
7 student had a concern or a problem about something, and
8 Miss Wade's reaction seemed from the documents to be to
9 go on the attack, to accuse the student of questioning
10 Miss Wade's integrity, to accuse the student of being
11 inappropriate and out of line.
12     It was not the reaction that you would expect
13 from a professional instructor, suggesting that this was
14 an individual whose working relations with students
15 might be problematic, particularly when the students
16 were not easy, sometimes confrontational as students
17 could be. That was also in the file.
18     I received oral reports that were not in the
19 file in the summer before the fall semester began.
20     Q. From who?
21     A. Jamie Elbert particularly, though I think it
22 was -- no, let's just say Jamie Elbert, who said that
23 Miss Wade's classes were not challenging, that in fact
24 you didn't have to work at them at all, that you could
25 just coast along doing practically nothing until the two

Page 237

1 weeks before the semester was over, and then do all the
2 Blackboard material and turn it in and get your grade.
3 That was of concern to me.
4     The evaluations from the students, the written
5 evaluations in file, the evaluations from the deans in
6 previous years, were by and large favorable. That is
7 true. So I did not enter into the fall '03 semester
8 expecting problems, though in fact some of the things
9 that I had suggested in those files proved to be issues
10 of concern.
11     Q. Now, Exhibit 46 that you've looked at before
12 and have in your stack --
13     A. 46. 46.
14     Q. -- this was actually used as an exhibit at the
15 administrative hearing; is that correct?
16     A. I don't remember that at all. My memory is
17 that I wrote this as a note to myself.
18     Q. Did you make up the exhibits for the hearing
19 yourself?
20     A. I don't remember.
21     Q. Did you speak on the record to the hearing
22 officer during the hearing?
23     A. The hearing with Dr. O'Rourke?
24     Q. Yes.
25     A. Yes.

MOBURG & ASSOCIATES    1601 Fifth Avenue, Suite 860    Seattle, WA 98101
Court Reporters    206-622-3110    Fax 206-343-2272

EXHIBIT _____9_____

PAGE _14_ OF _16_

Wade vs. Ilisagvik                5-10-2006                John Tuthill, Ph.D.

---

Page 238

1    Q.   And do you recall what you told him?
2    A.   Well, I think we were just talking about what
3  I told him here in his summary. I was talking about
4  performance issues pertaining to Miss Wade, and talking
5  about the reason for the decision for me not to
6  recommend the renewal of her contract.
7    Q.   Did you at any time before the hearing discuss
8  with Bobbi Wade the reasons for not renewing her
9  contract?
10    A.   No. I don't believe I did.
11    Q.   Did she ask you for the reasons?
12    A.   I don't think so.
13    Q.   Why would you not tell her the reasons?
14    A.   Because I was advised by Pam Taylor not to.
15    Q.   What did Pam Taylor say?
16    A.   That the College policy says that no reason
17  need be given for the non-renewal of a contract. The
18  contract states that there is no expectation of renewal
19  on the part of the faculty member and that no reason
20  need be given.
21    Q.   Let's look at Exhibit 38.
22    A.   Do I already have that?
23    Q.   No. This document has several people that
24  it's written to and you are one of them. Do you recall
25  receiving this document in December of '03?

---

Page 239

1    A.   Yes.
2    Q.   And you reviewed this document when you
3  received it?
4    A.   Yes.
5    Q.   Turn to page 100199. And at the top, this
6  document states: Why was I not allowed the privilege of
7  getting someone to substitute in my absence and resume
8  teaching classes upon my return if he wanted to keep the
9  original and not adhere to my revised one?
10    Do you recall responding to that comment from
11  Miss Wade?
12    A.   I expect that I prepared a written reply to
13  this statement, and I can imagine what I said. Do I
14  specifically recall writing it? No.
15    Q.   Do you recall, and you're welcome to look at
16  the page prior to that, 100198, do you recall Miss Wade
17  preparing a schedule so that she would be able to teach
18  Module C of both Business Math and Business English and
19  presenting that to you?
20    A.   I recall us talking about a proposed
21  schedule. I don't recall seeing something written out,
22  though it is possible. I know that we talked about the
23  possibility of canceling two weeks of the four-week
24  semester and doubling up the Module C's to meet for
25  twice as long.

---

Page 240

1    Q.   And what do you recall about that discussion?
2    A.   That I said that I thought that was a poor
3  idea. I didn't think that was in the interests of the
4  students.
5    Q.   Did Pam Taylor understand before Bobbi Wade
6  left that you intended to place Ms. Valenti into the
7  Business English class and place Tim Carlson into the
8  Business Math class?
9    A.   I think so.
10    Q.   Did you tell her that?
11    A.   She would have processed the paperwork to give
12  them the adjunct over their contracts.
13    Q.   Did she give you any advice about doing that?
14    A.   No.
15    Q.   Did she warn you about issues when you --
16    A.   No.
17    Q.   -- did that?
18    In the next paragraph on 100199, it talks
19  about Aimee Valenti. It starts out "then, too." Do you
20  see that paragraph?
21    A.   Yes.
22    Q.   And Miss Wade states that Miss Valenti aborted
23  the class syllabus textbook and teaching plans for
24  Business 109C. Do you recall that happening?
25    A.   I wouldn't express it in exactly that way.

---

Page 241

1  She certainly had different instructional standards and
2  techniques.
3    Q.   Well, did she use the pre-prepared syllabus
4  textbook and teaching plans?
5    A.   I don't think so.
6    Q.   Do you specifically recall talking to Aimee
7  Valenti about whether she would use Miss Wade's
8  material?
9    A.   I remember talking to her about her plans to
10  teach the course and what she would like to accomplish,
11  and I gave her my support. The instructor of a class
12  should have the right to choose the textbook.
13    Q.   Even an adjunct professor?
14    A.   Absolutely.
15    Q.   So if an adjunct professor comes in and there
16  is a pre-prepared course, they're free to change that
17  course as they see fit?
18    A.   If I trust the adjunct, sure.
19    Q.   Okay, what does it take for you to trust the
20  adjunct?
21    A.   Good qualifications and track record teaching.
22    Q.   And how did you know Miss Valenti's track
23  record?
24    A.   She had taught for us before. I had reviewed
25  her resume. We had talked on several occasions about

---

61 (Pages 238 to 241)

EXHIBIT 9
PAGE 13 OF 14

Case 3:05-cv-00086-TMB    Document 100-2    Filed 08/03/2007    Page 26 of 30

Wade vs. Ilisagvik                                                      John Tuthill, Ph.D.
5-10-2006

Page 254

1    speculation.
2         A.   My answer is, I have absolutely no idea what
3    the business office would do with this. This one was in
4    the realm of the business office and payroll. Not me.
5         Q.   (By Ms. Johnson) Did you supervise the
6    business office and payroll?
7         A.   No, not at all.
8         Q.   Who did?
9         A.   Gary Gorse.
10        Q.   And who did he report to?
11        A.   Edna MacLean.
12        Q.   Turn to the last page, page 8. You go through
13   in the first quarter of the paragraph, third of the
14   paragraph, the various performance issues that we've
15   been talking about.
16        A.   Well, it looks like I'm talking about issues.
17   I mean the schedule is not Bobbi's fault, for example.
18   I can say she had a very difficult semester, so I'm
19   talking about some of the problems that emerged in the
20   fall semester 2003.
21        Q.   And about a third of the way down there's a
22   line that says, "Much of Bobbi's energy this semester
23   seems to have gone into her repeated requests for
24   personal leave, and not instruction." What made you
25   write that particular sentence?

Page 255

1         A.   When Bobbi wanted to talk to me, when Bobbi
2    wrote me, it was about leave requests, or it was about
3    frustration with Aimee Valenti.
4              There were instructional problems going on.
5    There were students who were struggling with these
6    courses. There were students who reported that she
7    didn't want to meet with them. There were students who
8    reported that she couldn't take the time to be with
9    them. That's why I said that.
10             The energy, the activity that I saw with Miss
11   Wade from October on was associated with leave requests,
12   or, at the end of the semester, anger with Miss Valenti,
13   or, in the next January the energy and activity was
14   special petitions for her granddaughter, rather than
15   addressing the educational issues which she was facing.
16        Q.   And so you then talk about issues with her
17   students and how many were administratively withdrawn
18   and when they were withdrawn?
19        A.   Yes.
20        Q.   And then you state, "This action, and related
21   anecdotal evidence I have been hearing throughout the
22   semester, suggests to me that her instructional courses
23   have been largely ineffective this semester, I suspect
24   because she has been distracted by personal issues."
25        A.   That was my suspicion.

Page 256

1         Q.   And what did you draw that suspicion from?
2         A.   That I was seeing from her no energy. Really,
3    I perceived no care and concern for teaching. She was
4    missing deadlines for submitting grades. She was
5    missing deadlines for withdrawing students. The
6    students were reporting that she was either angry or
7    insulting or non-responsive.
8              Not all of them, mind you, but nobody was
9    coming to me and saying, wow, these are great courses.
10   The issue that I heard, and it was from multiple
11   students in both courses, were invariably negative.
12        Q.   How many complimentary comments did you
13   receive from students about other instructors the first
14   semester?
15        A.   Oh, I didn't count them. In general, if
16   you're a dean you get the problems. It's not often a
17   student comes to you and plops down in your chair, says,
18   wow, I had the best class in my life and I want you to
19   know it. It did happen. It did happen occasionally.
20             With Jay St. Vincent the students would
21   grumble and complain, they'd say this woman is a witch,
22   she's entirely too hard, I can't get it right. But
23   every student would say that this was an instructor who
24   passionately cared about them and went the extra mile
25   and really, really, really worked.

Page 257

1              With Lana Mcneil I would hear, oh, she's so
2    sweet, she's so nice, she tries so hard, she's so
3    serious. I would hear good comments.
4         Q.   Those were the kind of comments that had been
5    in the spring 2003 student evaluations of Bobbi Wade,
6    weren't they? The good comments? I'm so glad I had
7    this instructor, she really taught me this --
8         A.   I don't recall that. I don't recall -- it may
9    be. What I recall is that the student evaluations were,
10   on the whole, positive without being wildly
11   enthusiastic. That's not a criticism. My recollection
12   is that the evaluations were solid. I do not recall
13   that they were truly breathtaking.
14        Q.   Were they any less breathtaking than any other
15   faculty's student evaluations?
16        A.   My recollection is that they were less
17   personalised than some of them, in the sense that what
18   can be most revealing in a student evaluation is not so
19   much the numbers the students write down or the box the
20   students check, but the little comments they write at
21   the bottom. I don't recall coming away from reading
22   Bobbi's comments with very strong feelings. I mean, not
23   negative, but I did not have the feeling this was an
24   instructor who had really captured and captivated the
25   students.

65 (Pages 254 to 257)

EXHIBIT  9

PAGE  16  OF  16

## Naomi Ruby

**From:** Sara Rahn Gamboa
**Sent:** Thursday, November 13, 2003 1:37 PM
**To:** Naomi Ruby
**Subject:** RE: Bobbi Wade

Before you process her check next week in payroll, I need to talk with Diana – she mentioned that two credits were not going to be paid and we would be paying her less than what we currently have on the contract.  Thanks,

~~~~~~~~~~~~~~~~~
Sara Rahn-Gamboa
Accounting Supervisor
Ilisagvik College
PO Box 749, Barrow, AK  99723
Phone: 907.852.1829   Fax: 907.852.2652
E-mail: sara.rahn@ilisagvik.cc
        -----Original Message-----
        **From:** Naomi Ruby
        **Sent:** Thursday, November 13, 2003 1:33 PM
        **To:** Sara Rahn Gamboa
        **Subject:** FW: Bobbi Wade

        FYI

        Naomi Ruby
        Temp. HR / Accounting Clerk
        Ilisagvik College
        P.O. Box 749
        Barrow, AK  99723
        (907) 852-1837
        -----Original Message-----
        **From:** Mae Haimes
        **Sent:** Thursday, November 13, 2003 1:28 PM
        **To:** Naomi Ruby
        **Subject:** Bobbi Wade

        Hi Naomi!  Bobbi Wade had already turned in her final grades for OT 104, 801 – Filing and Records Management.  She should therefore be paid her contract for this course. Thanks!

        *Mae Lorenz Amistoso Haimes*
        *Program Assistant-Registrar & Admissions*
        *Ilisagvik College*
        *Phone:  907-852-1771*
        *Fax: 907-852-1784*

EXHIBIT __22__
PAGE __1__ OF __4__

**200112**

EXHIBIT __10__
PAGE __1__ OF __4__

**Ilisagvik College**
PO Box 749
Barrow, Alaska 99723

**BIWEEKLY EMPLOYEE EXEMPTION REPORT**

Employee ID:
Employee Name: Betty Wabb
Position: O 5001

Pay Period Ending: 11/14/03
SSN: 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
Hire Date: 8/01/2000
Default Dept: 101202

| Description | SAT 11/1 | SUN | MON | TUE | WED | THU | FRI | SAT | SUN | MON | TUE | WED 11/12 11/13 | THU 11/13 | FRI 11/14 | TOTAL | ACCOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prsnl Leave | | | | | | | | | | | | 7.5 | 7.5 | 7.5 | 22.5 | |
| Unpaid Leave | | | | | | | | | | | | | | | | |
| Family Lv Unpaid | | | | | | | | | | | | | | | | |
| Ext Med Leave | | | | | | | | | | | | | | | | |
| Jury Duty | | | | | | | | | | | | | | | | |
| Public Svc | | | | | | | | | | | | | | | | |
| Military | | | | | | | | | | | | | | | | |
| Subsistence Unpd | | | | | | | | | | | | | | | | |
| Faculty Sick Leave | | | | | | | | | | | | | | | | |
| TOTAL | | | | | | | | | | | | | | | 22.5 | |

Employee Signature _____

Supervisor Approval _____

EXHIBIT 22
PAGE 2 OF 4

200106

EXHIBIT 10
PAGE 2 OF 4

**Added Duties Contract**

## PURCHASING DEPARTMENT

**PHONE:** (907) 852-3333    **FAX:** (907) 852-2652

| REQUEST NO. | DATE | PAGE |
|---|---|---|
|  | 10/24/2003 | 1 of 1 |

# ADDED DUTIES CONTRACT REQUEST

**V E N D O R**

*Bobbi Wade*

**S H I P T O**

ILISAGVIK COLLEGE

104 2HRS
165
105

REQUESTED BY: *D Kennedy*
DEPARTMENT: *Instruction*
VENDOR CONTACT: *Bobbi*
VENDOR PHONE: *852-1731*
VENDOR FAX: *852-1828*

JUSTIFICATION:

| Term of Agreement | Course #<br>BUS 105 A,B & BUS 109 A & OT 104 |
|---|---|

**ACCOUNT CODE:** *10-001-1202-51101*

Fall 2003

| ITEM | QTY. | DESCRIPTION | Fixed Rate Compensation | EXTENDED PRICE |
|---|---|---|---|---|
| 1 | 1 | BUS 105 Business Math Module A | ~~1500~~ | ~~1500~~ |
|  | 1 | BUS 105 Business Math Module B | ~~1500~~ | ~~1500~~ |
| 2 | 1 | BUS109 Business English Module A | 1500 | |
| 3 | 2 | OT 104 Filing and Recordkeeping | 1500 | |
| 4 | 3 | Development of BlackBoard courses BUS 100, BUS 154 & BUS 233 | 1500 | 4500 |
|  |  | *Bobbi TAUGHT 2 CREDITS less than normal Schedule (12 Credits)* | | |
|  |  | *PAymENT Should be 2 credits less* | | 11/4/03 |

**Grand Total**
12000

| Director/Division Manager's approval (under $2,500) | Date |
|---|---|
| Dean's Approval (over $2,500) | Date<br>10-27-03 |
| Dean. / Administration & Finance Approval | Date<br>11/8/03 |

EXHIBIT 22
PAGE 3 OF 4

Purchase.xlt

EXHIBIT 10    200107
PAGE 3 OF 4

Added Duties Contract

| PURCHASING DEPARTMENT | REQUEST NO. | DATE | PAGE |
|---|---|---|---|
| PHONE: (907) 852-3333    FAX: (907) 852-2652 | | 10/24/2003 | 1 of 1 |

# ADDED DUTIES CONTRACT REQUEST

| V E N D O R | *Bobbi Wade* | S H I P T O | **ILISAGVIK COLLEGE** |
|---|---|---|---|

| | |
|---|---|
| REQUESTED BY: | *D Kennedy* |
| DEPARTMENT: | *Instruction* |
| VENDOR CONTACT: | *Bobbi* |
| VENDOR PHONE: | *852-1731* |
| VENDOR FAX: | *852-1828* |

JUSTIFICATION:

| Term of Agreement | Course # BUS 105 A,B & BUS 109 A & OT 104 |
|---|---|
| ACCOUNT CODE:  *10-001-1202-51101* | Fall 2003 |

| ITEM | QTY. | DESCRIPTION | Fixed Rate Compensation | EXTENDED PRICE |
|---|---|---|---|---|
| 1 | 1 | *BUS 105 Business Math Module A* | ~~1500~~ | 1500 |
| | 1 | *BUS 105 Business Math Module B* | ~~1500~~ | 1500 |
| 2 | 1 | *BUS109 Business English Module A* | 1500 | 1500 |
| 3 | 2 | *OT 104 Filing and Recordkeeping* | 1500 | 3000 |
| 4 | 3 | *Development of BlackBoard courses BUS 100, BUS 154 & BUS 233* | 1500 | 4500 |
| | | * Bobbi TAUGHT 2 CREDITS less than normal schedule (12 credits)  Payment should be 2 credits less | 11/4/03 | |
| | | | Grand Total | 12000 |

| | |
|---|---|
| Director/Division Manager's approval (under $2,500) | Date |
| Dean's Approval (over $2,500) | Date  10-27-03 |
| Dean Administration & Finance Approval | Date  11/0/03 |

EXHIBIT __22__
PAGE __4__ OF __4__

Purchase.xlt

EXHIBIT __10__
PAGE __4__ OF __4__

200111