**Faculty Appointment Letter for 2003-2004**

May 1, 2003

Ms. Bobbi J. Wade
Ilisaġvik College
P. O. Box 749
Barrow, Alaska 99723

Dear Ms. Wade:

On behalf of Ilisaġvik College, I am pleased to offer you employment for the next fiscal year (2003 -
2004). The following terms and conditions apply to your appointment.

| | |
|---|---|
| Title: | Assistant Professor |
| Nature of Proposed Duties: | Provide instruction and college service in your field of expertise equivalent to 30 credit hours of teaching and 7 credit hours of College service over the course of the Fall, Spring and Summer terms. Typically, this will be the equivalent of 12 credit hours of teaching and 3 credit hours of College service in the Fall and Spring respectively, and 6 credit hours of teaching and 1 credit hour of College service in the Summer. To accommodate individual program needs, variations in the division of this workload among the semesters may be made by the Dean of Instruction with the concurrence of the President. Faculty are expected to assist with the recruitment, retention and mentoring of students and to participate in the various committee structures established to encourage faculty participation in the guidance of the institution. |
| Term: | July 1, 2003 through June 30, 2004. Following summer leave, you will be expected to report for work on Monday, August 18, 2003. It is understood by both the College and yourself that teaching positions at Ilisagvik College are untenured and one may not acquire tenured status by reason of this appointment. |
| Annual Salary: | $75,477.00, payable in equal bi-weekly installments based on 260 days of service per contract year. This is a professional, exempt position and as such does not carry any entitlement to overtime pay or additional compensation for any work performed on weekends, holidays, outside of normal working hours, or days in excess of 260 days of service per year. |

EXHIBIT // PAGE / OF //

EXHIBIT
12

The terms and conditions of your employment with Iḷisaġvik College are in accordance with this letter of appointment including Attachment A, the Iḷisaġvik College Employee Handbook and the Policy and

Regulations of the Board of Trustees as they exist today and as they may be duly amended from time to time. Of course, all employees are also expected to abide by state and federal law.

This letter of employment with its references encompassed herein constitutes the full and complete contract agreement between yourself and Iḷisaġvik College. Any other oral agreement between the parties shall be null and void. This contract shall be modified only in writing.

If you accept the above conditions of your employment with Iḷisaġvik College, please sign where indicated below and return the original to my office within twenty (20) days. Please retain a copy for your records. I am looking forward to your contributions this coming year.

Sincerely,

*Edna A. MacLean*

Edna Ahgeak MacLean, President

Iḷisaġvik College

I accept the above terms, conditions and provisions of the employment offered in this appointment and its attachment A.

_Bobbi J. Wade_
Signature

_5/5/03_
Date

Cc: Office of Human Resources



EXHIBIT __11__
PAGE _2_ OF _7_

20370                                    2
Wade v. Ilisagvik College

**Attachment A**

**Iḷisaġvik College Faculty Appointments**
**2003 - 2004**

Iḷisaġvik College recognizes its faculty as integral to the fulfillment of its mission to provide quality education and training to students. Toward this end, faculty are expected to be involved in academic and student life at Iḷisaġvik College by serving as a resource for students both inside and outside of the classroom.

*__Academic Year__* - The College's academic year consists of two full semesters (fall and spring) and one summer session (from May through the end of June). Specific dates and a College calendar are published by College administration. If deemed necessary and appropriate by the Dean of Instruction in consultation with the faculty member, certain programs may be scheduled at other times during the calendar year to better meet the needs of students. If such modifications occur, an addendum to this contract shall be made in writing.

*__Teaching__* - The teaching component of the workload is satisfied by teaching an assigned number of credit-hour courses, or by delivering a program of non-traditional or client-based programs. Equivalent assignments may be granted in one (1) credit increments, not to exceed three (3) credits per semester unless waived in writing by the Dean of Instruction. Equivalent assignments may include individual or independent course studies or client-based programs, individual lab instruction and other instructional functions. Faculty are expected to be available to students outside of classroom hours, and shall post and maintain at least 10 office hours per week at times scheduled for the convenience of the students.

Distance Delivery Course Preparation - The following may be applied towards faculty workload, upon approval by the Dean of Instruction, with involvement of the instructor:
- A faculty member who teaches a pre-written course (i.e. a "Canned" course) will receive the equivalent of one credit hour per three credit hours at a one to three ratio.
- A faculty member who develops and teaches a plan for an on-line course (i.e. a "From Scratch" course) will receive the equivalent of three credit hours per three credit hours at a one to one ratio.

*__College Service__* - As part of their professional duties, faculty are expected engage in college service. Such service activities may be assigned by the department head or the Dean following consultation with the faculty member and shall assist the College to fulfill its mission and goals. Activities include, but are not limited to: student advising, recruiting, participating in College committees, curriculum development, distance delivery technology, program coordination and supervision, grant and proposal development and reporting, accreditation support, committee or project leadership, community service, special projects or scholarly activity.

*__Additional Workload__* - Workloads are reviewed on a case-by-case basis by the Department Head and the Dean of Instruction in consultation with the instructor. Necessary work assignments in excess of normal workload may be eligible for additional compensation, pursuant to the terms of a written agreement between Iḷisaġvik College and the instructor. Such determinations shall be made by the Dean of Instruction subject to the approval of the President.

EXHIBIT __11__
PAGE __3__ OF __7__

*Class Cancellation* - Instructors are encouraged to recruit students to enroll in their classes. A minimum enrollment of five (5) students is required per class, unless as otherwise determined by the Dean of Instruction.  If a class does not meet the minimum enrollment, the Dean of Instruction shall, with the involvement of the instructor and Department Head, determine whether the class will be cancelled or under what circumstances the class will be taught. Should an assigned class be cancelled, instructors shall complete alternate faculty activities through curriculum development, online course development, or other special faculty projects as assigned by the Dean of Instruction. Instructors shall not receive additional compensation for a cancelled class that would be part of that instructor's excess credit load.

*Class Coverage* - Faculty needing class coverage must inform the Department Head one week prior to the class needing coverage. The faculty member will work with the Department Head to arrange coverage for the class. The class coverage agreement must be agreed upon between the faculty member and the Department Head and approved by the Dean of Instruction.

*Student Recruitment, Retention, and Mentoring.* - Faculty are encouraged to help part time students to identify their personal potential and career goals and to assist them to pursue program-active status.  Faculty are also encouraged to accompany the recruiter on village recruitment tours.  Faculty will participate in a half-day training session on mentoring students and class completion procedures involving referrals to other college resources.

*Professional Development* - Faculty  are expected to remain current in their fields and to participate in professional growth activities including, but not limited to, course work, professional association activities, vocational internships or scholarly activities in the instructor's discipline. Professional development shall be supported by the College based upon availability of funds, with written approval of the Dean of Instruction, and in accordance with Board of Trustees Policies.

*Benefits.* - Faculty are eligible for benefits provided by the College, according to the policies and procedures set forth in the Employee Handbook. Current benefits include retirement contributions, health, dental, vision and life insurance, and the following paid leaves:

*Personal and Sick Leave* - Twelve days of personal leave per (contract) year are allowed when taking it does not unduly interfere with the delivery of the College's program of instruction. Leave must be approved in advance by the faculty member's department head and Dean of Instruction except in the event of an emergency situation. Personal leave has no cash value and may not be accrued from year to year.

*Winter Holiday Leave* – You are eligible to receive ten (10) days of paid time off, which includes two (2) paid holidays and eight (8) days of paid time off, during the Winter Holiday period scheduled from December 22, 2003 through January 5, 2004.  Paid Winter Holiday leave does not have cash value, does not accrue, and is forfeited if not used during the term of your contract.

*Leave Without Pay* - Unexcused time off, or time off where no paid leave is available, shall be taken as leave without pay and deducted at the instructor's per diem salary rate, subject to the policies and procedures contained in the Employee Handbook.

EXHIBIT  //
PAGE  4  OF  7

***Drug Testing and Substance Abuse*** - You understand and agree to comply with the College's drug testing and substance abuse policy. Failure to take or pass the drug screening as provided in the policy may result in termination of employment.

***Other Employment*** - You shall devote full time to your duties as a faculty member with the College and shall not accept any other employment or fee during the term of this Agreement without first obtaining the written consent of the Dean of Instruction and the President.

***Point of Hire*** - The point of hire for this contract is Barrow, Alaska and you specifically waive all rights to return transportation as outlined in AS 23.10.375-.400.

***Payroll Deductions*** - You authorize the College to make regular deductions from the Employee's paycheck for mandatory contributions to the State of Alaska Public Employees Retirement System (PERS) and as otherwise authorized or required by law and the terms of this contract or Employee Handbook.

***Termination.*** This Agreement may be terminated on mutual consent, or by the College for cause in accordance with Trustees Policy and the Employee Handbook.

***Liquidated Damages.*** It is expressly understood and agreed that you will receive full salary and benefits beginning July 1, 2003 and that you have no duty to report or job duties until August 15, 2003 (unless otherwise specified in an Addendum to this contract). If you resign effective prior to December 31, 2003, you shall be liable to the College as liquidated damages the amount of your salary for the time period of July 1 through August 15, 2003. If you resign effective January 1, 2004 through the expiration of this contract, or otherwise terminates this contract without consent of the College, you shall be liable for liquidated damages in the amount of $2,500. You agree that the liquidated damages set forth herein may be withheld from any amounts due and owing to you from the College, or otherwise collected in accordance with law.

***Final Paycheck.*** The College may withhold the your final paycheck pending submission of summaries, student grades, statistics, documents, College property, or pending resolution of salary or compensation disputes. You waive the right to receive final payment within three (3) business days following termination or expiration of this Agreement as provided by AS 23.05.140. The College shall issue final payment within five (5) business days after verified submission or resolution of the foregoing.

***Effective Date.*** This contract shall become effective only after it is signed by the President of the College, signed by faculty member, and returned to the College. This Agreement must be signed by Employee and returned to the College within twenty (20) calendar days of receipt or the Agreement is void.

***Interpretation and Venue.*** This contract shall be interpreted according to the laws of the State of Alaska and shall not be construed against the drafter hereof. Venue for any action brought under this contract shall be Barrow, Alaska. In the event any provision of this contract is found by a court of competent jurisdiction to be invalid, such provision shall be stricken but the remainder of the contract shall remain in full force and effect.

EXHIBIT ___//___
PAGE __5__ OF __7__

ILISAĠVIK COLLEGE
FACULTY POSITION DESCRIPTION

*Bobbi J. Wade*

| Title: Assistant Professor/Instructor of Business Management | Number [HR use only]: |
|---|---|
| Department: Business Management and Information Technology [BMIT] | Date [HR use only]: 6/22/00 |
| Purpose of Position: Under the direction of the BMIT Director, teaches courses within the BMIT Division. | Approved [HR use only]: 6/22/00 |

## ESSENTIAL FUNCTIONS:

Develops and teaches courses within the Business Management and Information Technology Division.

Serves as student advisor, as required.

Evaluates student performance and submits appropriate grades and reports, as required.

Participates in professional development, as appropriate.

Completes reports and presentations, and attends meetings and special events, as required.

Monitors the degree and certificate programs within the division and makes timely changes, as appropriate.

Travels to outlying villages or off-Slope for professional training may be required.

Performs College-level instruction in the appropriate discipline in Barrow and the outlying villages, as required.

Prepares and maintains updated instructional materials, course outlines, and curriculum.

Maintains office hours, as required

Participates in the development of and contributes to the quality of College-level curriculum in the area of study.

Actively participates in College and community service including serving on communities and task forces, participating in College activities, curriculum planning, professional development, and assisting in the budgeting of assigned programs. Contributes toward the attainment of the goals and mission of the College.

Complies with College policies, procedures and administrative directives, as well as state, federal, and local laws, regulations, and ordinances.

Performs other duties as assigned.

## EDUCATION/SPECIAL SKILLS/TRAINING [Required]:

Bachelor's degree in appropriate field for Instructor level.

Master's degree in Business Management, Information Technology, or related field for Assistant Professor level.

Working knowledge and a minimum of 2 years teaching experience beyond formal education in the appropriate field.

Management or entrepreneurial experience.

EXHIBIT __11__
PAGE __6__ OF __7__

20374
Wade v. Ilisagvik College

Ability to work independently.

Ability to complete and pass a pre-employment drug screen.

## EDUCATION/SPECIAL SKILLS/TRAINING [Preferred]:

Teaching experience at the College level.

Experience in curriculum development.

Experience with distance delivery.

Demonstrated knowledge in one or more of the following areas: post-secondary educational systems, North Slope Borough [NSB] institutions and organizations; Iñupiat culture, language, values, and traditions; ability to interpret and represent NSB community values, customs, and beliefs for the College, and the ability to interpret and represent College actions and Western institution to the NSB community.

Valid driver's license.

## PHYSICAL REQUIREMENTS:

The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

> While performing the duties of this job, the employee is required to sit, stand, walk, use hands to finger, handle or feel objects, tools, controls, and reach with hands and arms. The employee is frequently required to stoop, kneel, crouch, or crawl and talk and hear. The employee may occasionally be required to drive a vehicle, climb or balance.

> The employee must be able to lift and/or move up to 40 pounds. Specific vision abilities required by this job include close vision, distance vision, color vision, peripheral vision, depth perception, and the ability to adjust focus.

## ENVIRONMENTAL CONDITIONS:

The environmental conditions described here are representative of those an employee encounters while performing the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

> The employee is regularly required to work indoors with a usually moderate noise level in the work environment.



Ilisaġvik College
P.O. Box 749 • Barrow, Alaska 99723
☎ (907) 852-3333  Fax (907) 852-2729

# ILISAĠVIK COLLEGE

# REQUEST FOR LEAVE

Name: _Bobbi J. Wade_

Department: _Bus Mgt._                Date of Request: _11/4/03_

Number of Days or Hours ___11___   Begin: _Nov 12 8:30_ AM/PM   End: _Nov. 26 5:00_ AM/PM
                                         Month Day Hour            Month Day Hour

Type of Leave Requested: ☒ Personal (PT)  ☐ Public Service     ☐ Subsistence
                         ☐ Military        ☐ Family Medical Leave  ☒ Extended Medical Leave
                         ☐ Jury Duty       ☐ Leave Without Pay

Personal:

12 Personal Days

11 - ×
7 - 5 =
82 - 50 -

Sick Leave, Vacation, Subpoenaed Witness (Requires copy of subpoena)
of 10 days per calendar year: Unpaid Leave
of 15 days per calendar year (Requires copy of jury summons and that court
ided compensation be given to Ilisaġvik College.): Paid Leave
of 16.5 days per calendar year (Requires copy of orders): Paid Leave
of 12 weeks per calendar year (Requires copy of Doctor's verification): Unpaid Leave
y of Doctor's verification: Paid Leave
f 10 days per calendar year (Requires minimum 3 days prior approval. If honorarium
ed, Personal Leave must be taken or honorarium turned over to Ilisaġvik College.)
pe of leave not described above (Requires explanation below)

Con. _leave designated — once required Medical documentation (ie appt schedule(s) and Work Release) obtained, Leave will be adjusted to reflect appropriate Extended Medical Leave dates (PT)_

Employee Signature: _Bobbi J. Wade_                Date: _11/4/03_

Payroll Verification of Hours Available: _____   Date: _____

Department Supervisor Approval: _____           Date: _11/6/03_

Human Resources Approval: _Carmela Dayn_                   Date: _11/10/03_
(Not Required for Personal Leaves)

EXHIBIT _12_
PAGE _1_ OF _1_

21362
Wade v. Ilisagvik College

EXHIBIT 31

* * * All Signatures Must be Obtained Prior to Leave Date. * * *

White - Human Resources      Canary - Payroll      Pink - Employee      Golden - Department

9/14/99

IN THE UNITED STATE DISTRICT COURT

FOR THE DISTRICT OF ALASKA

BOBBI J. WADE,                           )
                                         )
              Plaintiff,                 )
                                         )        Case No. A05-086 CV (JWS)
v.                                       )
                                         )
ILISAGVIK COLLEGE, NORTH SLOPE           )
BOROUGH, JOHN TUTHILL, individually      )
and PAMELA TAYLOR, individually          )
                                         )
              Defendants.                )
                                         )

**RESPONSE TO PLAINTIFF'S FIRST DISCOVERY REQUEST**
**TO DEFENDANT ILISAGVIK COLLEGE**

Defendant, Ilisagvik College, by and through counsel, Delaney, Wiles, herein responds to

plaintiff's first discovery request to Ilisagvik College as follows:


**INTERROGATORIES**

**INTERROGATORY NO. 1:** Please state the number of full-time and part-time

employees at Ilisagvik during the 2003-2004 school year.

**RESPONSE:** Objection, not relevant nor reasonably calculated to lead to discoverable

information. Without waiving the foregoing, 124 full-time employees and 116 part-time

employees.


**INTERROGATORY NO. 2:** Please describe the services that Dr. Patrick J. O'Rourke

provided to Ilisagvik College for the last five years, including, but not limited to, consulting

DELANEY, WILES,
HAYES, GERETY,
LLIS & YOUNG, INC.
SUITE 400
007 WEST 3RD AVENUE
NCHORAGE, ALASKA
(907) 279-3581

1

EXHIBIT 23
PAGE 1 OF 2

EXHIBIT 13
PAGE 1 OF 2

**RESPONSE:** Objection to vague and ambiguous discovery requests regarding complaint. It is admitted that plaintiff submitted document number 21386-21391A. The remaining allegations are denied.

**REQUEST FOR ADMISSION NO. 3:** Please admit that Ms. Wade references being seen for a "Mose Treatment" in her December 11, 2003 complaint.

**RESPONSE:** It is admitted that the document speaks for itself and mentions "Mose Procedure" at page 5 without any explanation. The remaining allegations in request for admission 3 are denied.

**REQUEST FOR ADMISSION NO. 4:** Please admit that two classes assigned to Ms. Wade to teach during the fall semester 2003 were transferred to other teachers during her leave in November 2003.

**RESPONSE:** It is admitted that two of the classes Ms. Wade taught were module classes of only four weeks duration. For the period of time Ms. Wade was absent due to leave she would miss 40% of the classes, a situation that had never occurred before. Accordingly, because 40% of the class meetings would be missed by her, these two classes only were reassigned. Her classes in Business 100, Business 105, Business 154 and Business 233, as well as any other additional classes she picked up before the end of the semester in 2003 were not reassigned. The remaining allegations are denied.

ELANEY, WILES,
IAYES, GERETY,
JS & YOUNG, INC.
SUITE 400
37 WEST 3rd AVENUE
CHORAGE, ALASKA
(907) 279-3581

19

EXHIBIT___23___
PAGE___2___OF___2___

EXHIBIT___13___
PAGE___2___OF___2___



# Memorandum

**Date:** December 19, 2003

**To:** Bobbi Wade, John Tuthill, and Pam Taylor

**From:** Diana Kennedy

**RE:** Meeting to address Bobbi's complaints

Pam explained how the meeting would be conducted and that everything said would be confidential.

Bobbi began by questioning why two of her added duty contracts were broken after the duties were fulfilled.

John said the contracts were not pay because the 12 credit teaching load had not been met because Bobbi had to take medical leave. The added duties had to be adjusted by two credits.

Bobbi asked why she couldn't have just been paid in the Fall and her schedule adjusted for Spring, or postpone the start of the two classes until she returned on December 1st.

John said he didn't think it was in the best interest of the students to postpone the start of the two classes. He found two willing and capable instructor to teach the classes at the scheduled times.

Bobbi said it was in the worst interest of the students to hire adjunct instructors for these classes.

Pam said these were two different issues.

Bobbi feels she has been discriminated against by John because she is over 40. She feels this is the case because she feels she is not being consulted when important decisions are being made concerning the Business programs, for example canceling courses. Another example is that two adjuncts were hired that were younger than 40 to teach the two class mentioned above.

John reminded Bobbi that the schedule for the fall semester had obligated her to teach an unreasonable number of credits and the decision to cancel the class was done to help ease the burden and that Diana had called and told her that the class was going to be canceled.

20343
Wade v. Ilisagvik College

Date: **5-4-06** Exhibit: **44**
Witness: **Taylor**
Marci L. Lynch, Court Reporter
Liz D'Amour & Associates, Inc.
(907) 452-3678

EXHIBIT **14**
PAGE **1** OF **2**



# Memorandum

John said his decision to hire the two adjuncts had nothing to do with age. They were available to teach the classes at the scheduled times and were qualified.

Bobbi asked why James Smith was removed from the schedule and Aimee was added without consulting her.

John said this was done when she was on medical leave and he had consulted Courtneay as the Department Chair.

Bobbi said she wanted to find someone else because she didn't want Aimee teaching any of her Business courses. Bobbi heard Aimee say insulting things about her to the students. Bobbi said she wrote Aimee a memo offering to help her but Aimee got upset and said that she would take her directions from the Dean.

John said that Aimee told him she had gone to Bobbi before she left for medical leave and asked for guidance. Bobbi was in class and told Aimee to leave.

Bobbi said the students were in the middle of the final test and told Aimee that she couldn't talk to her at that time but didn't tell her to leave.

John agreed that it wasn't good timing.

Bobbi said Aimee was teaching over the students' heads. Bobbi knows her students capabilities and does a lot of tutoring on the side.

20344

Wade v. Ilisagvik College

EXHIBIT 14

PAGE 2 OF 2

1                IN THE UNITED DISTRICT COURT

2              FOR THE DISTRICT OF ALASKA

3   BOBBI WADE,                        )
                                       )          **RECEIVED BY:**
4              Plaintiff,              )       Clapp, Peterson, Van Flein,
                                       )       Tiemessen & Thorsness, LLC
5   vs.                                )    Date Rec'd/Initials: 6|8|06
                                       )                         ano-86
6   ILISAGVIK COLLEGE; NORTH SLOPE,    )    Distribution:
    BOROUGH; JOHN TUTHILL,             )
7   individually; and PAMELA TAYLOR,   )
    individually,                      )    Case No. 3:05-cv-086-TMB
8              Defendants.             )
    _____)

9

10             VIDEOTAPED DEPOSITION OF PAM TAYLOR
                        May 4, 2006

11  APPEARANCES:

12         FOR THE PLAINTIFF:      MS. LINDA J. JOHNSON
                                   Clapp Peterson & Stowers
13                                 711 H Street, Suite 620
                                   Anchorage, Alaska 99501
14                                 (907) 272-9272

15         FOR THE DEFENDANT
           NORTH SLOPE BOROUGH:    MR. PETER C. GAMACHE
16                                 Attorney at Law
                                   405 West 36th Avenue
17                                   Suite 201
                                   Anchorage, Alaska 99503
18                                 (907)  563-6969

19         FOR THE DEFENDANTS
           ILISAGVIK COLLEGE,
20         PAMELA TAYLOR and
           JOHN TUTHILL:           MS. CYNTHIA L. DUCEY
21                                 Delaney, Wiles, Hayes, Gerety,
                                     Ellis & Young, Inc.
22                                 1007 West Third Avenue
                                     Suite 400
23                                 Anchorage, Alaska 99501
                                   (907)  279-3581
24
           ALSO PRESENT:           MS. BOBBI WADE
25
                         * * * *

        *LIZ D'AMOUR & ASSOCIATES, INC.*        EXHIBIT  13
                330 Wendell Street, Suite A
                  Fairbanks, Alaska 99701       PAGE  1  OF  18
                     (907) 452-3678

1       connected to that and not just -- the most important

2       thing of taking care of her health.

3  Q    Do you require someone to submit a copy of an

4       appointment before you will allow them to leave on

5       extended medical?

6  A    Yeah.  We will let them go on personal leave.  We will

7       call it personal leave if we have to and we can back

8       into it after the fact and give it extended medical

9       status once I get that note, but not often.  I mean, if

10      it's, you know -- the issue is about whether or not she

11      could go on personal wasn't related to me; it was

12      related to her and John's discussion.  The timing of

13      that personal leave request was something that she and

14      John were working out the details on, which was why I

15      referred her back to John here on this e-mail as well.

16      So I keep referring and say leave request go through

17      the signature process and it would go through first to

18      the supervisor for consideration of any kind of leave

19      request first.

20  Q    Okay.  Exhibit 29, another e-mail.  And it looks like

21      it was written by John Tuthill.  Would you agree with

22      that?

23  A    I would, yes.  With another date at the bottom.  I

24      learned something new.  This is -- I never noticed it.

25  Q    Go ahead and read through it.

**LIZ D'AMOUR & ASSOCIATES, INC.**
*330 Wendell Street, Suite A*
*Fairbanks, Alaska 99701*
*(907) 452-3678*

EXHIBIT  15
PAGE  2  OF  18

1          doctor's certification as such, some kind of a doctor's

2          note that would say that.

3    Q     At this time when she took the November leave, did you

4          give her a form and tell her to have a doctor fill it

5          out?

6    A     No.  Because, again, I did not have an indication there

7          was a serious medical condition.

8    Q     Okay.

9                MS. JOHNSON:  And ask that this document be

10   marked 37.

11                         (Deposition Exhibit 37 marked)

12                MS. DUCEY:  Are you on 36, Linda?  My.....

13                MS. JOHNSON:  I'm marking 37.

14                MS. DUCEY:  Was that -- did you -- I'm sorry.

15   A     This is -- last one 36?

16                MS. DUCEY:  I'm behind.  Never mind.  You're

17   absolutely right and I'm one behind.

18   A     Almost fell.

19   Q     This is 37.

20                MR. GAMACHE:  37.

21   Q     Okay.  Did you ever receive this document?

22   A     I don't recall seeing this document.

23   Q     Is this document anywhere in Bobbi Wade's medical file?

24   A     I don't recall.

25   Q     What -- and you would not have placed this in her

*LIZ D'AMOUR & ASSOCIATES, INC.*
*330 Wendell Street, Suite A*
*Fairbanks, Alaska 99701*
*(907) 452-3678*

EXHIBIT  15
PAGE  3  OF  18

1         opinion?

2    A    Personal leave?

3    Q    Personal leave.

4    A    I don't.....

5    Q    Have you read this?  Do you need to read it?

6    A    No, I've read it.

7    Q    Okay.

8    A    I'm a fast reader.

9    Q    Okay.

10   A    A paragraph doesn't take long.

11            MS. DUCEY:  Objection to speculation and

12   foundation.

13   A    I don't know -- I don't know how I would answer that

14        only because of circumstances would have to be looked

15        at as -- I would not be the one determining personal

16        leave anyway.

17   Q    Who determine -- oh, you said the supervisor.

18   A    Supervisor.  Uh-huh.

19   Q    Okay.  How about -- who determines extended medical

20        leave?

21   A    The supervisor and I would work together and I would

22        sign off on that -- that particular leave.  I don't

23        sign off on personal leaves.

24   Q    Okay.  So if you were presented this, would this

25        document -- just looking at it by itself, would this be

*LIZ D'AMOUR & ASSOCIATES, INC.*
*330 Wendell Street, Suite A*
*Fairbanks, Alaska 99701*
*(907) 452-3678*

EXHIBIT ___15___
PAGE _4_ OF _18_

 1           sufficient to obtain extended medical leave?

 2  A        It doesn't have.....

 3                   MS. DUCEY:  Objection to foundation and

 4  speculation.

 5  A        .....enough information for me to -- to know.  Again,

 6           it would be dependent on the situation.

 7  Q        What else besides this note would you need?

 8  A        I would need appointment dates at least to start

 9           something.....

10  Q        Okay.

11  A        .....on -- on the extended medical.

12  Q        And between this and the appointment dates, would that

13           be sufficient for you to sign a leave request?

14                   MS. DUCEY:  Objection to foundation.

15  A        I -- I don't -- again, don't have -- it would have to

16           be in conjunction with the needs of the college, the

17           time and the timing.

18  Q        Even for extended medical leave, you would require it

19           to be in conjunction with the needs of the college?

20  A        Not always.  At times.  It depends on -- on the nature

21           of the -- of the -- the situation and the specifics.

22  Q        Have you ever disproved an extended medical leave

23           request?

24                   MS. DUCEY:  Objection to foundation.

25  A        I don't recall that happening.

*LIZ D'AMOUR & ASSOCIATES, INC.*
*330 Wendell Street, Suite A*
*Fairbanks, Alaska 99701*
*(907) 452-3678*

EXHIBIT 15
PAGE 3 OF 18

1   A   No, I don't recall.

2   Q   Do you recall if it was -- did you say it was in early

3       October?

4   A   Yes, I would -- be on or about early October as I see

5       that date there as well.  It strikes a -- a memory on

6       that.

7   Q   Okay.  And did it look just like this when you saw it

8       the first time?

9   A   Yes.

10  Q   It had the verification of hours on it?

11  A   Yes.

12  Q   Okay.  And do you remember a conversation with Bobbi

13      about this document?

14  A   Yes.

15  Q   Okay.  Can you tell me about that conversation?

16  A   She brought it to me and I said, well, this is a

17      personal leave.  Go ahead and have your supervisor sign

18      it and as you see on the -- I don't sign off on

19      personal leave, so take it to John and discuss it with

20      him, because it's really not in my venue to determine

21      that personal leave.

22  Q   Okay.  Did you she tell you whether she'd already

23      talked to John Tuthill about this?

24  A   I don't recall.

25  Q   Did you -- so is it your testimony that you -- she did

EXHIBIT  15
PAGE  6  OF  18

1          not present exhibit 20 at the same time she presented

2          you exhibit 21?

3  A      That is my testimony, yes.  Correct.

4  Q      Okay.  And did you know what the leave was for when she

5          came into your office?

6  A      No.

7  Q      She didn't tell you that she needed medical leave?

8  A      She said she was going to have some medical

9          appointments at the time -- same time she was on leave.

10  Q      Did she tell you what kind of medical appointments they

11          were?

12  A      No.

13  Q      And did you -- you noted that the leave was for 10

14          days.  Is that correct?

15  A      Yes.

16  Q      And did you, at that time, talk to her about extended

17          medical leave?

18  A      No, I would not have known to, because we -- all this

19          was on the -- the -- the personal thing that was where

20          the -- it was noted as personal.

21  Q      Okay.  Well, she -- so she would have had to ask you

22          for extended medical leave for you to bring it up?

23  A      She would have had to give me more information than

24          simply saying she had appointments.

25  Q      Okay.

EXHIBIT _15_
PAGE _7_ OF _18_

**LIZ D'AMOUR & ASSOCIATES, INC.**

*330 Wendell Street, Suite A*
*Fairbanks, Alaska 99701*
*(907) 452-3678*

1  A    Because that could have been more than -- well, a
2       single appointment, who knows.
3  Q    Okay.  But she said she needed to take leave because
4       she had medical appointments.  Is that right?
5  A    No, she didn't say that.
6  Q    What did she say?
7  A    She said she's going to take leave and while she was
8       gone, she'd have some appointments.
9  Q    Okay.  Do you recall if Bobbi Wade had ever taken
10      extended medical leave before?
11 A    No, I don't recall.  I don't recall that.
12 Q    How does one get the leave under family medical leave
13      on this form?  See down here.....
14 A    Uh-huh.  Uh-huh.
15 Q    .....where it says family medical leave?
16 A    Uh-huh.
17 Q    When would that be granted to somebody?
18 A    When someone indicates they have a serious medical
19      condition that needs attention.
20 Q    And what kind of -- what -- in your mind, what is a
21      serious medical condition?
22 A    I don't have that -- that expertise to tell you what
23      that would be and this -- question of the ages.
24 Q    Well, if you don't know what it is, how would you know
25      when to apply family medical leave?

EXHIBIT _15_
*LIZ D'AMOUR & ASSOCIATES, INC.* PAGE_8_ OF_18_
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

```
 1            that mean that in somebody's personnel file, does that
 2            mean that you've given them whole copies.....
 3   A        Yes.
 4   Q        .....every time they've signed this?
 5   A        Yes.
 6   Q        It was never your practice to give inserts, say, you
 7            know, here's a new section 5?
 8   A        We did only one time and that was in February of 2002
 9            when we had a very slight change, rather than --
10            because I asked our attorney, our counsel for
11            information on that and she said to go ahead and just
12            do update on the simple pages -- the few pages that
13            were updated, rather than do the whole handbook
14            distribution again.
15   Q        Correct.
16   A        And that 2002 is a separate form acknowledging that
17            revision update of 2002.  This is not to be confused
18            with this form, which is the 2001 handbook.
19   Q        Who does the handbook updates for the college or would
20            you do that?
21   A        I work with the attorney on that and the cabinet
22            approves it.  We have -- the cabinet.
23   Q        Who -- the cab- -- who's the cabinet?
24   A        The president.  At the time, it was the president and
25            the deans and I believe we had an executive vice
```

EXHIBIT _15_
PAGE _9_ OF _18_

1      president then, as well.  And the cabinet would have
2      reviewed the final changes in draft and then reviewed
3      it and approved it based on counsel's approval.
4  Q   So in 2001, do you recall if there was an entire new
5      handbook produced?
6  A   Yes.  There was.
7  Q   And that would have gone through the process that you
8      just described?
9  A   Indeed.
10 Q   Who would do the initial work on it?  Would that be
11     you?
12 A   I would -- yeah.  The basic clerical aspects of it,
13     certainly.  Working with -- making sure we had things
14     from the old handbook transferred over and the policy
15     would be developed by the cabinet.
16 Q   And in 2001, did you still have an assistant?
17 A   I believe so, yes.
18 Q   And would your assistant have helped you with
19     distributing the new policy manuals?
20 A   Not necessarily.  I tended to do that myself because I
21     wanted to be able to answer any questions and just
22     explain.  I liked the chance to get out and about and
23     try to -- to meet the folks and be with them and have a
24     friendly face to their -- to their questions.
25 Q   Okay.  Would you call a meeting of, say a whole

**LIZ D'AMOUR & ASSOCIATES, INC.**
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678


EXHIBIT _15_
PAGE _10_ OF _18_

```
 1   A   If you can help -- I can help you again, let me know.
 2   Q   We have to write our own on.  Have you ever seen this
 3       document before?
 4   A   Yes, I have.
 5   Q   And when did you see this?
 6   A   Around October 6th.  Can't tell you exact dates.
 7       Numbers and I are not the best friends.
 8   Q   And what -- when did you have occasion to first see
 9       this?
10   A   I don't understand when.....
11   Q   Did Bobbi bring this to you herself?
12   A   I don't recall how I first saw it.  I don't recall.
13       Maybe, maybe not.  I don't know.
14   Q   Do you recall where you were when you saw it?
15   A   No.  Could have been in John's office; it could have
16       been in my office.  I don't know.  I really don't
17       recall.  But I do remember seeing it around that time.
18   Q   About early October?
19   A   Yes.  Right in -- in that time frame.
20   Q   Okay.
21   A   At some point.
22   Q   And when you saw this, did you go back and review
23       exhibit 21, the request for leave?
24   A   No.  Not really.  I was looking at this on its own
25       merit.  Still looking for appointment dates.
```

**LIZ D'AMOUR & ASSOCIATES, INC.**
*330 Wendell Street, Suite A*
*Fairbanks, Alaska 99701*
*(907) 452-3678*

EXHIBIT  15
PAGE  11  OF  18

1    Q    Okay.  Did you have a conversation with Bobbi about

2         this document?

3    A    I don't recall.

4    Q    Okay.  Is this document -- would this document have

5         been sufficient if she had turned in an appointment

6         date to receive extended medical leave?

7    A    Possibly.  Again, if it's an appointment date, yes, we

8         were looking at -- we were seriously looking always for

9         appointment dates, so we could at least get this

10        started.

11   Q    Okay.  Did you have a conversation about John Tut- --

12        with John Tuthill about this document?

13   A    Yes.  And I think that's what -- I -- I -- it looks

14        like this may well have precipitated that -- that later

15        e-mail or something earlier.  I don't know, but we

16        did.....

17   Q    Exhibit.....

18   A    ..... talk about it.  Yes.

19   Q    Exhibit 24?

20   A    Yeah.  It could have been related to that.  I don't

21        know.

22   Q    The top part of this e-mail.....

23   A    Right.  Right.

24   Q    .....where it says.....

25   A    In -- in the bottom part, too.  Yeah.  I don't know.  I

*LIZ D'AMOUR & ASSOCIATES, INC.*
*330 Wendell Street, Suite A*
*Fairbanks, Alaska 99701*
*(907) 452-3678*

EXHIBIT _15_
PAGE _12_ OF _18_

1   was no intention to -- by John or -- or me, certainly

2   not Cheryl, to deny her rights in any way, shape, or

3   form.   The intention was to protect her rights by

4   getting advice from our counsel.

5 Q  Okay.  Did you have more than one conversation with

6   Cheryl during the time that Bobbi was asking, before

7   she went on leave?

8 A  About Bobbi, you mean?

9 Q  About Bobbi, Uh-huh.

10 A  Not that I reco- -- recollect.  I don't know.

11 Q  You just recall the one con- -- short conversation?

12 A  I just recall back the one that I initiated, because

13   I -- I -- I do remember that one.

14 Q  Okay.  And after she returned and she complained about

15   not being reinstated to two of her classes, did you

16   call Cheryl again?

17 A  No.  No, I did not.  I -- again, I wanted to see where

18   we were with the discussion, where it would go with

19   making sure that she and John could communicate and

20   find out, you know, where we were.  I mean, the lay of

21   the land, I wanted to see here -- I wanted to have both

22   sides have a chance to come to the table and talk it

23   through and get some of that -- get some clarification

24   that way.

25 Q  Okay.  Did you have any conversations with John Tuthill

EXHIBIT 15
PAGE 13 OF 18

| | | |
|---|---|---|
| 1 | | about -- after she returned about her reinstatement to |
| 2 | | these two classes? |
| 3 | A | No, I don't recall so, because he would have had -- if |
| 4 | | he -- he would have had the same words of -- of advice |
| 5 | | from Cheryl that I had that -- at that -- at that phone |
| 6 | | call and if she had said, indeed, she needs to be |
| 7 | | reinstated, he knew what the advice was.  So I didn't |
| 8 | | feel a need to follow up on that -- that particular |
| 9 | | conversation with Cheryl about Cheryl's conversation. |
| 10 | Q | Do you recall if Bobbi Wade was gone any -- just the |
| 11 | | amount of time she had requested in her request for |
| 12 | | leave in exhibit 31? |
| 13 | A | My memory is she came back a little later, if I recall, |
| 14 | | from the 26th. |
| 15 | Q | From the 26th? |
| 16 | A | Yeah. |
| 17 | Q | Do you recall when Thanksgiving was that year? |
| 18 | A | No, I don't recall. |
| 19 | Q | Is it possible that there was a Thanksgiving break in |
| 20 | | the weekend..... |
| 21 | A | Could be.  I don't know.  I -- I don't recall what |
| 22 | | the -- what the calendar was then. |
| 23 | Q | Do you recall -- do you have a specific recollection |
| 24 | | that she was gone -- absent more work days than she |
| 25 | | requested leave for? |

**LIZ D'AMOUR & ASSOCIATES, INC.**
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

EXHIBIT _15_
PAGE _14_ OF _18_

```
 1  A    No.  Again, I -- I don't recall being asked for advice
 2       because, frankly, I haven't been involved in a hearing.
 3       There's been no one that I recall getting to that level
 4       in some time -- any time.  And I -- it was all
 5       determined on -- there was nothing really -- any reason
 6       for me to give advice, because, again, I was just
 7       making sure the process kept going.  I don't recall
 8       anyone asking me for advice.  I remember they -- they
 9       might ask, gee, what's the next step and
10       how -- how -- how do -- how long will it take or -- and
11       I said, that would be up to the people present in the
12       hearing process with Dr. O'Rourke present.
13  Q    The grievance policy, and you're welcome to pull it out
14       and look at it if you need to, does not appear to.....
15  A    Which number is that?  I'm sorry, but I could be here
16       looking for that.  Go ahead.  I'm -- I -- I think I
17       know it, but if I don't, I'll.....
18  Q    If you want to look at it.  I just don't want to.....
19  A    No, I understand.
20  Q    .....you know, strike you with something that you can't
21       remember.
22  A    I might.
23  Q    The appeal -- the grievance process does not appear to
24       set out any procedures for the actual hearing itself.
25  A    I would -- I would agree just from basic recollection.
```

*LIZ D'AMOUR & ASSOCIATES, INC.*
*330 Wendell Street, Suite A*
*Fairbanks, Alaska 99701*
*(907) 452-3678*

EXHIBIT /5
PAGE /5 OF /8

1 Q Okay.

2 A I have to say you might be right there.

3 Q So.....

4 A Well, I'm not going to spend time looking through this

5  either.

6 Q Okay.  So -- but you agree that that's not in there?

7 A I agree that it seems reasonable off the top of my

8  head.  Yeah.

9 Q Okay.  So what polic- -- what procedures are followed

10  for a hearing, do you know?

11 A Well, it's sort of unchartered territory in some ways

12  perhaps, and that would have to be determined by the

13  president.

14 Q During the spring of '04, was the grievance policy

15  updated?

16 A That was part of the '01 handbook, which was updated in

17  '01.  That grievance policy is from the '01 time frame

18  and that was the one that would be -- extent.

19 Q I'm sorry.  That was the one that would be.....

20 A You're talking about the '01 handbook?  I'm sorry, is

21  there.....

22 Q No.  I'm talking about the spring of '04.  Was there an

23  upgrade.....

24 A Yes.  There was an updated handbook -- in '04 --

25  handbook.  Yes, indeed.  I think it was May -- May '04,

*LIZ D'AMOUR & ASSOCIATES, INC.*
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

EXHIBIT __15__
PAGE __16__ OF __18__

1           if I recall.

2    Q      Okay.

3    A      Yeah.  It was -- it took quite a long time to update

4           that handbook, I can guarantee it.  It was a lot of

5           work.

6    Q      And did you do that yourself?

7    A      No.  I did it, again, like I did the '01 clerically

8           based typing.  I knew my job was secure as long as I

9           kept the handbook open and never had to say it was

10          done, because it was like -- it was a long process and,

11          again, it was reviewed by cabinet -- drafts approved or

12          not approved by counsel.  Same process we use for the

13          '01.

14   Q      And do you recall when in May it was finalized?

15   A      No.  I don't recall in May, which -- I think it was May

16          and I don't recall when in May.

17   Q      I think you're right.  If the grievance procedure

18          changed in May '04, which grievance procedure would

19          have been applied to the -- Bobbi Wade's hearing?

20   A      The Bobbi Wade hearing, if I recall, was a continuation

21          of the original grievance.  That would have been the

22          '01 hearing process.

23   Q      Okay.  Is that what.....

24   A      If there was one.

25   Q      Were you asked whether to apply the '01 or the '04



EXHIBIT 15
PAGE 17 OF 18

1       policy?

2  A    No, because that grievance was still under the '01

3       policy.

4  Q    There was no question of which policy would apply?

5  A    No one -- no one asked me that, no.....

6  Q    But your.....

7  A    .....that I can recall.

8  Q    .....advice would have been the '01 policy applied?

9  A    If I'd been asked, I would have to look at it again,

10      but, yeah, I would think so because it was still part

11      of that '0- -- the '03 grievance.  I'm not sure.

12  Q    There's nothing in the.....

13  A    And since there's no real policy on the hearing

14      process, it was -- at some process, I would think.

15  Q    Okay.  If there was a pol- -- a process set out in the

16      May '04 update, would you have expected people to

17      follow the new process?

18  A    I -- I don't know.  I wouldn't -- I hadn't thought of

19      that.  I don't know.  I'd have to think about that.  I

20      wouldn't know.

21  Q    So it wasn't something that came up?

22  A    No.  It wasn't even something that came up at all.

23  Q    Okay.

24  A    No, ma'am.

25  Q    Did Bobbi Wade ask you before the hearing for the

EXHIBIT _15_
PAGE _18_ OF _18_

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

```
BOBBI WADE,                         )
                                    )
          Plaintiff,                )
                                    )
vs.                                 )
                                    )
ILISAGVIK COLLEGE, NORTH SLOPE      )
BOROUGH, JOHN TUTHILL,              )
individually; and                   )
PAMELA TAYLOR, individually,        )
                                    )
          Defendants.               )   Case No. A05-086 CV (JWS)
_____)
```

*HD 333*
*400-85*
FEB 2 2 2006
*Cpy to PAW*
*Jyp. Log*

### DEPOSITION OF CHERYL L. McKAY
**February 8, 2006**

APPEARANCES:

          FOR THE PLAINTIFF:        **MS. LINDA J. JOHNSON**
                                    Clapp, Peterson, Van Flein,
                                     Tiemessen & Thorsness, LLC
                                    Attorneys at Law
                                    711 H Street
                                    Suite 620
                                    Anchorage, Alaska  99501
                                    (907) 272-9272

          FOR THE DEFENDANTS
           ILISAGVIK COLLEGE,
           JOHN TUTHILL and
           PAMELA TAYLOR:           **MS. CYNTHIA L. DUCEY**
                                    Delaney, Wiles, Hayes,
                                     Gerety, Ellis & Young
                                    Attorneys at Law
                                    1007 West Third Avenue
                                    Suite 400
                                    Anchorage, Alaska 99501
                                    (907) 279-3581

EXHIBIT _14_
PAGE _1_ OF _8_

*M E T R O   C O U R T   R E P O R T I N G*
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*



1          she would not be teaching.

2     Q    Okay.

3     A    That she would be taking medical leave.

4     Q    But you don't recall somebody actually saying that to

5          you?

6     A    Saying, I'm sorry, saying what?

7     Q    That when she was not present, she would not be

8          teaching?

9     A    No.  The -- the phrasing and what we were discussing

10         is when Ms. Wade is not -- when Ms. Wade is on leave.

11    Q    And do you know -- was that the extent of your

12         conversation at that time, was the options of the ways

13         that they could cover her classes?

14    A    The options for covering her classes, what happens on

15         the return from leave, and I believe that's it.

16    Q    And you told them that she needed to be reinstated to

17         a similar -- the same or similar position, is that

18         correct?

19    A    It's the same or reasonably equivalent.

20    Q    Okay.  And are you aware of what happened when she did

21         return?

22    A    No.

23    Q    Did they call and advise you -- or ask your advice on

24         what to do when she returned?

25    A    No.

EXHIBIT _16_
PAGE _2_ OF _8_

*M E T R O   C O U R T   R E P O R T I N G*

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

```
 1   Q      Did you give any more advice on the specific Family
 2          Medical Leave Act issues in the year 2003?
 3   A      Not that I recall.
 4   Q      And how about 2004 on the Family Medical Leave Act
 5          issues, did you give any advice retroactive, you know,
 6          after reinstatement or anything like that?
 7   A      Oh, no, no.  Not that I recall, no.
 8   Q      So do you believe that this was the end of your advice
 9          on family medical leave?
10   A      With respect to Ms. Wade in the fall of '03, yeah, I
11          believe that -- I believe that's it.
12   Q      And did they call you again about her request in 2004
13          for medical leave?
14   A      I -- I -- now about the request for leave, I don't
15          believe so.
16   Q      Okay.  Did they ask you -- did Ilisagvik College ask
17          you for legal advice on a decision not to retain Ms.
18          Wade?
19   A      I am not going to answer that question.
20   Q      And why not?
21   A      On the basis of attorney-client privilege.
22   Q      Okay.
23              MS. JOHNSON:  And by being here today as a
24   fact witness, you have waived your attorney-client privilege
25   and the school has put you on its witness list as a fact
```

EXHIBIT __14__
PAGE _3_ OF _8_

1  A    That is correct.

2  Q    So you won't answer those questions?

3  A    I will not answer those questions based on attorney-

4       client privilege.

5  Q    Can you tell me what policy you relied upon to conduct

6       this hearing?  What Ilisagvik policy was used as a

7       basis for this hearing?

8  A    Ilisagvik has an internal grievance policy that any

9       employee is entitled to use when they feel that

10      they've been wronged by the mis-application of a

11      policy or of a contract right and it's an internal

12      policy that's a multi-step process.  And Ms. Wade

13      invoked her rights under that -- under that practice.

14  Q    Do you happen to recall the number of that policy?

15  A    I don't.

16  Q    Were you aware that the grievance policy was amended

17      in May of 2004?

18  A    Yes.

19  Q    And did you follow the pre-amendment policy or the

20      post-amendment policy?

21  A    I recall that this hearing was scheduled after the new

22      handbook had been adopted, so we used the most -- the

23      current procedures that were in place at the time of

24      the hearing, and those procedures -- at the time this

25      matter got up to what was considered step three, which

*METRO COURT REPORTING*
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*


EXHIBIT /6
PAGE 4 OF 8

1      identifying information.

2  Q    Okay.  What about the other things that you reference

3      in that paragraph?  You reference faculty ages and

4      Dean Tuthill's notes summarizing those reasons you

5      said?

6  A    I -- I think what this is get- -- I think it's --

7      there's two different questions here.  I -- I think

8      the question is whether Ms. Wade had been provided

9      with that information prior to the hearing and whether

10     -- whether or not, you know, in advance of the whole

11     hearing process.  The -- the documents that are

12     referenced in this paragraph on page 20 are contained

13     in the notebook of hearing exhibits.  So if she had

14     been provided a copy of the hearing exhibits, those

15     documents would have been included in that packet,

16     they would not have been removed from the exhibit

17     binder.

18  Q    Okay.  Let's turn to page 12 then and there's a

19     statement -- the second statement by Mr. Stepovich:

20     Bobbi, did you receive copies of the exhibits prior to

21     today?  She eventually answers no.  And then your

22     statement is:  Ted, I handed Ms. Wade a copy of our

23     exhibits when we entered the room today for the

24     hearing.  There was no pre-hearing exchange of

25     documents.

*M E T R O  C O U R T  R E P O R T I N G*
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

EXHIBIT 16
PAGE 5 OF 8

1   A      Uh-huh (affirmative).

2   Q      Does that refresh your memory that you did not provide

3          Ms. Wade a copy of your notebook prior to the hearing?

4   A      It -- it does.  And I -- and I do now that I'm looking

5          at this, I do recall handing her the -- the notebook

6          of exhibits in the room as I did with the hearing

7          officer as well.  My recollection is that Ms. Wade was

8          on medical leave just -- for a period of time just

9          prior to the hearing, and that we had had to

10         reschedule the hearing on at least one occasion that I

11         can recall, to accommodate that leave.  And that --

12         the procedures had been -- she had been notified of

13         the procedures that would be used at the hearing prior

14         -- prior to the step three meeting.

15  Q      Okay.  So if I told you that she had been on leave

16         from April 28th to May 17th but the hearing didn't

17         happen until June 24th, during that month that she was

18         back, you didn't -- did you attempt to give her these

19         documents before the hearing?

20  A      I don't believe so.

21  Q      Okay.  Is there any reason why you didn't do that?

22  A      The college's internal policies aren't a due -- it's

23         not a due process hearing so there's no automatic

24         right to due process protection such as cross

25         examination and presentation of evidence.  It's an

*METRO COURT REPORTING*
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

EXHIBIT 14
PAGE 6 OF 8

1    internal, informal hearing and the college determines

2    those procedures on a case-by-case basis.  So there's

3    -- it's not an automatic right to receive documents in

4    advance or any -- there's no time lines that have to

5    be met for exchange of -- it's not like civil

6    litigation where you have discovery rules.  There are

7    no discovery rules in the college's internal process.

8  Q    Who had the.....

9  A    And to my knowledge, she was not represented by

10   counsel.

11 Q    At the time you didn't know that?

12 A    That's correct.

13 Q    Okay.  Who had the burden of proof at the hearing?

14 A    Well, there's a burden of proof and a burden of

15   persuasion.  And since there were, you know,

16   allegations at the time, it was -- it's up to the

17   administration to demonstrate that the non-retention

18   was -- was supported -- was supported, was

19   inconsistent.  It would be the -- it would be the

20   employee's burden of persuasion to show that those

21   reasons would be pre-textural (ph).

22 Q    Okay.  And in order to meet her burden of persuasion,

23   would you agree that she would need to understand what

24   the reasons were for the termination?

25         MS. DUCEY:  Objection to foundation.  We're

EXHIBIT 16
PAGE 7 OF 8

1   not talking about termination.  It was a non-retention.

2   A       I -- I can't.....

3   Q       (By Ms. Johnson)  A non-retention, I apologize.

4   A       I'm sorry.  Could you re-state the question?

5   Q       You said that the employer, meaning Ilisagvik College,

6           had the burden to show that its non-retention was

7           supportable?

8   A       Was -- was supported, yes.

9   Q       Okay.  And you did not provide -- you -- neither you

10          nor the college provided Ms. Wade with the reasons for

11          her non-retention prior to the hearing, is that

12          correct?

13  A       I don't know the answer to that actually.  I did not

14          -- I did not provide Ms. Wade with a copy of the

15          exhibit binder prior to the time we arrived for the

16          informal hearing.

17  Q       Were you aware whether your client had provided Ms.

18          Wade with the reasons it had not retained her?

19              MS. DUCEY:  Objection to attorney-client

20  privilege.

21  A       I cannot answer that question; it's attorney-client

22          privileged information.

23  Q       (By Ms. Johnson)  Did you tell them to provide a

24          reason for her non-retention prior to the hearing?

25              MS. DUCEY:  Same objection.

*M E T R O   C O U R T   R E P O R T I N G*
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

EXHIBIT _16_
PAGE _8_ OF _8_