1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF ALASKA

3   BOBBI WADE,                    )
                                   )
4              Plaintiff,          )
          vs.                      )
5                                  )
    ILISAGVIK COLLEGE; NORTH SLOPE )
6   BOROUGH; JOHN TUTHILL,         )
    individually; and PAMELA TAYLOR,)
7   individually,                  )
                                   )   Case No. 3:05-cv-086-TMB
8              Defendants.         )
    _____)

9

10    <u>VIDEOTAPED DEPOSITION OF EDNA B. MacLEAN, M.D.</u>
                    November 30, 2006

11  APPEARANCES:

12          FOR THE PLAINTIFF:     **MS. LINDA J. JOHNSON**
                                   Clapp, Peterson, Van Flein,
13                                 Tiemessen & Thorsness, LLC
                                   Attorneys at Law
14                                 711 H Street, Suite 620
                                   Anchorage, Alaska 99501
15                                 (907) 272-9631

16          FOR THE DEFENDANTS:    **MR. PETER C. GAMACHE**
                                   Attorney at Law
17                                 405 W. 36th Avenue, Suite 201
                                   Anchorage, Alaska 99503
18                                 (907) 563-6969

19                                 **MS. CYNTHIA L. DUCEY**
                                   Delaney Wiles, Inc.
20                                 Attorneys at Law
                                   1007 W. 3rd Avenue, Suite 400
21                                 Anchorage, Alaska 99501
                                   (907) 279-3581

22

23                                 **MR.  JONATHAN CLEMENT**
                                   Delaney Wiles, Inc.
24                                 Attorneys at Law
                                   1007 W. 3rd Avenue, Suite 400
25                                 Anchorage, Alaska 99501
                                   (907) 279-3581

EXHIBIT _17_

*M E T R O   C O U R T   R E P O R T I N G*  PAGE _1_ OF _13_

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876



1　Q　When did that occur?

2　A　Gosh, I don't remember.  Some time in February or

3　　　March.

4　Q　What did he tell you at that time?

5　A　That a grievance process was coming to me.

6　Q　And you said he explained some of the basis.  Is that

7　　　right?  Did he.....

8　A　That he had -- that he had been trying to deal with it,

9　　　he and Pam, and then it had finally reached me.

10　Q　What did it have to do with Bobbi Wade's medical leave?

11　　　What did he tell you about that?

12　A　No.

13　Q　He didn't tell you that it had to do with her medical

14　　　leave?

15　A　I don't remember.

16　Q　Did he tell you what the grievance was about?

17　A　No, but I had a vague idea of -- this was right after

18　　　the -- the faculty contracts, so I left that up to him

19　　　to make recommendations to me.

20　Q　When he presented you with all the paperwork, did you

21　　　read through all of it?

22　A　Yes.

23　Q　And after you read through it.....

24　A　And it was -- and then I asked -- I think I asked Pat

25　　　O'Rourke to be the disinterested person but also

*METRO COURT REPORTING*

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

EXHIBIT 17
PAGE 2 OF 13

| | | |
|---|---|---|
| 1 | | knowledgeable about the college. |
| 2 | Q | So did you have other -- well let me ask you.  When |
| 3 | | John Tuthill brought you paperwork, did he also bring |
| 4 | | you Exhibit number 50? |
| 5 | A | Not in February, no, but it -- but I remember seeing |
| 6 | | this as well.  I forget the exact time line. |
| 7 | Q | Did you read through Exhibit 50 when you got it? |
| 8 | A | Yes. |
| 9 | Q | Did you get it before you appointed the hearing |
| 10 | | officer? |
| 11 | A | I don't remember that -- the time line for that. |
| 12 | Q | Okay.  I'm going to leave those out there with you. |
| 13 | | Did you ever receive Exhibit number 52, which is -- and |
| 14 | | actually I'd like you to read that, if you would, |
| 15 | | please. |
| 16 | A | (Pause - reading document)   Hmmm. |
| 17 | Q | Did you ever get that document? |
| 18 | A | I remember reading it. |
| 19 | Q | Do you remember when? |
| 20 | A | No. |
| 21 | Q | Did it concern you that -- that no actual meeting with |
| 22 | | Bobbi Wade had been -- had taken place during the step |
| 23 | | two process? |
| 24 | | MS. DUCEY:  Objection, vague. |
| 25 | | MS. JOHNSON:  Unless she instructs you not to |

*METRO COURT REPORTING*

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

EXHIBIT __17__
PAGE __3__ OF __13__

1   answer, go ahead.

2   A      Pardon me?

3           MS. JOHNSON:  I said unless she instructs you

4   not to answer, go ahead.

5   A      Okay.

6           MS. DUCEY:  If you understand -- if you

7   understand the question, you can answer it.

8   A      No.

9   Q      (By Ms. Johnson)  When you read this document, did you

10        ask anybody if the -- if John Van Heusen had ever

11        actually held a meeting with Bobbi Wade?

12   A      Did it concern me?

13   Q      Did you ask anybody if it really happened, that he held

14        a meeting?

15   A      I don't remember asking him if it really happened.

16   Q      Did it concern you that he refused to meet with her

17        because she wanted to tape it?

18   A      No, not at the time.

19   Q      Is there any policy against taping -- any written

20        policy against taping a step two meeting?

21   A      I don't remember.  I don't recall.

22   Q      It didn't concern you at the time?

23   A      No.

24   Q      Why not?

25   A      Because I was not involved yet.

EXHIBIT 17
PAGE 4 OF 13

| | | |
|---|---|---|
| 1 | Q | Were you worried about Bobbi Wade's rights? |
| 2 | A | Not at the time. |
| 3 | Q | Did you become worried later? |
| 4 | A | No. |
| 5 | Q | Did you ever receive Exhibit Number 57? |
| 6 | A | Yes, but I don't recall what's in there.  I remember |
| 7 | | the form. |
| 8 | Q | Do you want to read it? |
| 9 | A | I don't have my reading glasses.  (Pause - reading |
| 10 | | document)  Hmmm. |
| 11 | Q | So do you -- does that refresh your recollection of |
| 12 | | what Bobbi was complaining about? |
| 13 | A | About her grievance process? |
| 14 | Q | Uh-huh (affirmative). |
| 15 | A | I remember there was some -- Pam had to leave town, but |
| 16 | | I don't recall that as being an impediment to the |
| 17 | | process. |
| 18 | Q | Do you recall hearing that Pam had refused to accept |
| 19 | | the next paperwork from Bobbi because it was late? |
| 20 | A | No, I don't recall that. |
| 21 | Q | Do you recall this letter coming to you and asking you |
| 22 | | to..... |
| 23 | A | I remember that comment in the letter, but I don't |
| 24 | | remember it actually happening, but -- |
| 25 | Q | Did you talk to Pam about whether or not she had |

**METRO COURT REPORTING**

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

EXHIBIT 17
PAGE 5 OF 13

1    refused to accept paperwork?

2  A  No, I did not, because I did not believe that Pam would

3    do that.

4  Q  Did -- do you recall Exhibit 58?  Do you recall sending

5    that document to Bobbi Wade?

6  A  (Pause - reading document)  I think this was a good

7    response, yeah.

8  Q  When you received Exhibit 57, which was the letter from

9    Bobbi Wade, did you talk to Bobbi directly about her

10    letter?

11  A  No.

12  Q  Did you ask anybody to do any investigation for you?

13  A  No.  Not that I recall, but this was -- we, the

14    college, wanted to be there, so we opened it up again,

15    as I recall.

16  Q  Why did you open it up again?

17  A  Because I think the days might have exceeded -- the

18    number of days might have exceeded themselves, but --

19  Q  You thought the days were exceeded but --

20  A  But to be fair to the process, to Bobbi, then this was

21    the good way to resolve that.

22  Q  So you didn't mind that you were waiving your right to

23    enforce a deadline?

24  A  No, I saw it as a way to resolve the issue, to be

25    fair.....

**METRO COURT REPORTING**

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

EXHIBIT 17
PAGE 6 OF 13

1  Q    And did you know.....

2  A    .....in the process since Pam had to leave.

3  Q    At the time when you wrote that letter, did you know

4       what the grievance was about?

5  A    I had some idea, yes.

6  Q    And can you tell me what you thought the grievance was

7       about?

8  A    About the faculty contracts.

9  Q    What about them?

10 A    That her contract was not renewed, but I don't know if

11      her's was the only one not renewed.  I don't recall

12      though.  It was a -- we had a time frame for those

13      contracts as well.

14 Q    In that letter, you discuss going forward with step

15      three.  Is that correct?

16 A    If that's what it says, yes.

17 Q    What did you believe step three to be?

18 A    It's a meeting with Bobbi.  Once again, each step, I

19      think, was to try to resolve the issue in

20      administration -- administratively or in-house.

21 Q    What specifically happened during the step three?  Do

22      you recall?

23 A    I don't remember.

24 Q    Does this document help you.....

25 A    I wasn't at the meeting.

*METRO COURT REPORTING*

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

EXHIBIT 17

PAGE 7 OF 13

1  Q    Why?

2  A    Because if the policy -- if a grievance started prior

3       to the new policy then and she was well on her way in

4       that process, we would have kept it in that process.

5       That would be my thinking.

6  Q    And you would just keep it with the old process for

7       what reason?

8  A    To be fair to Bobbi, because she started the process

9       under the old policy, and it wouldn't be fair to change

10      it in the middle of her process and have her.....

11 Q    What if the new policy gave her more rights?

12 A    I don't know.  That's a hypothetical right now.  I

13      don't know.

14 Q    You don't know that that's true?

15 A    No.

16 Q    Okay.  If -- would you consider giving her the benefit

17      of more rights?

18 A    I think I would stick to the old process to be fair to

19      maybe others that would come up, you know, and --

20 Q    Other grievances, you mean?

21 A    Other grievances, yeah.  That you start with a process,

22      you stick to the process.  You don't change the rules

23      in the middle of the game.

24 Q    I don't remember if I asked you, who chose Patrick

25      O'Rourke as the hearing officer for the -- Bobbi Wade's

*METRO COURT REPORTING*

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

EXHIBIT 17
PAGE 8 OF 13

1  A    During accreditation process, the Commission on Schools

2       and Colleges send up their own representatives to

3       monitor that and --

4  Q    Did you ask Patrick O'Rourke to specifically go in and

5       evaluate the faculty that was currently.....

6  A    No.

7  Q    .....providing instruction?

8  A    No, that would be the task of the dean of instruction.

9  Q    When the -- I'm sorry, who did you say send up a

10      representative?

11 A    Pardon me?

12 Q    You said somebody sent up a representative.

13 A    Northwest Commission on Colleges and Universities.

14      That's accreditation institution.

15 Q    Did the Northwest Commission on Colleges and

16      Universities ever express any concern about any of the

17      faculty members that you had working for you at the

18      time?

19 A    Not specific -- not specific individuals, but that our

20      personnel needed to match the programs, academic

21      content.

22 Q    Okay.  And.....

23 A    Because they check through the resumes of faculty to

24      make sure that they're -- what they trained for and

25      what their academic professionalism is on matched the

*METRO COURT REPORTING*

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876


EXHIBIT 17
PAGE 9 OF 13

| | | |
|---|---|---|
| 1 | | program requirements, and I think they also had -- but |
| 2 | | I'm not certain, but an institution needed to have an |
| 3 | | assurance that -- for academic integrity that their |
| 4 | | professors were trained to do particular teaching |
| 5 | | content. |
| 6 | Q | When did they do that? |
| 7 | A | During accreditation process. |
| 8 | Q | Do you remember what year? |
| 9 | A | They came up several times.  They would do it in -- |
| 10 | | what we would do for the accred- -- the accreditation |
| 11 | | team from the Northwest Commission on Colleges was to |
| 12 | | put all of our policies, our programs, our syllabi, |
| 13 | | anything that had to do with the governance of the |
| 14 | | college, both academically, fiscally and otherwise, |
| 15 | | into one room, and they spent several days pour- -- |
| 16 | | looking through every document, and then when they |
| 17 | | didn't have a document, then we had to find it in the |
| 18 | | college files and bring it to them, but that's how they |
| 19 | | looked at all of the -- the resumes of our faculty and |
| 20 | | administration. |
| 21 | Q | And when they looked at the resumes, was Bobbi Wade's |
| 22 | | one of the resumes? |
| 23 | A | It would have been, yes, but they never did single out |
| 24 | | any faculty.  What they would do is, I guess, determine |
| 25 | | the content expertise to make sure that that matched |

*METRO COURT REPORTING*

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

EXHIBIT 17
PAGE 10 OF 13

1      the college's programs, and programs changed too.

2    Q    Did they give you any instructions, or did they express

3         any desire that any of your faculty should change?

4    A    No, not there.

5    Q    Did they express any concern about the qualifications

6         of your faculty?

7    A    No.

8              MS. DUCEY:  Objection, asked and answered.

9    A    Pardon me?

10   Q    (By Ms. Johnson)  I mean broadly to all of the faculty.

11        They never said any particular faculty member was

12        deficient?

13   A    No.

14   Q    Did they say that the college, in general, needed to

15        establish a certain standard for quality of faculty

16        that it didn't have already?

17   A    They already -- they have standards that they apply to

18        every institution, and one of that -- one of the

19        standards focus on faculty and their professional

20        training.

21   Q    Did they give you a copy of the standards that they

22        applied?

23   A    Oh, yes.  They sent up several copies, and I made sure

24        those were distributed to every -- all throughout the

25        college and some out to the community as well.  So not

*METRO COURT REPORTING*

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

EXHIBIT __17__
PAGE __11__ OF __13__

1       focus on?

2   Q   Would you check and see if you've signed that document?

3   A   Yes, my name is there on the letter of offering.   I

4       guess this is the offer letter.   Yeah.

5   Q   Would there be a form letter that goes out with -- I'm

6       sorry.   Did you establish first a form contract and

7       then plug in specifics for each faculty member?

8   A   You mean separate?

9   Q   Did you have one form contract in the 2003/2004 that

10      you would then put specific information in for each

11      faculty member?

12  A   Probably the salary and their names, yeah.

13  Q   But do you think the faculty contracts were -- had the

14      basic terms identical?

15  A   Basic terms in terms of -- they did not have the same

16      salary offers.....

17  Q   Was there any differences.....

18  A   .....or -- or.....

19  Q   .....between them other than that?

20  A   Pardon me?

21  Q   Were there any differences between faculty contracts

22      other than salary and position?

23  A   I would think not.

24  Q   On page two, at the top, it says the terms and

25      conditions of your employment.   Do you understand what

### METRO COURT REPORTING

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

EXHIBIT 17
PAGE 12 OF 13

1       the terms and conditions meant?

2  A    Probably referring to the length of the contract, the

3       number of faculty days and things of that nature.

4       Salary, number of hours they had to teach.

5  Q    Then in -- in the third paragraph, the first sentence

6       says this letter of employment, with its references

7       encompassed herein.  What references is it referring

8       to?

9  A    Probably anything that had to do with policies

10      pertaining to personnel that we didn't need to repeat

11      in here because they already existed in some other

12      form.  That's what I would say.

13 Q    (Pause - reviewing documents)  Looking at Exhibit 65,

14      you're welcome to read that.

15 A    Okay.  (Pause - reading document)  Hmmm.

16 Q    Do you recall that document?

17 A    I remember doing a merit increase.  Not just for her,

18      but for others as well, but I don't remember this

19      particular one.

20 Q    The first line says that faculty has received a merit

21      increase.

22 A    Uh-huh (affirmative).

23 Q    Does that indicate that all of the faculty received a

24      merit increase?

25 A    Uh-huh (affirmative).

EXHIBIT _17_
PAGE _13_ OF _13_

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

**CERTIFIED COPY**

BOBBI J. WADE                )        Case No.
                            )
            Plaintiff.       )        A05-086 CV (TMB)
                            )
v.                          )        Video Deposition of:
                            )
                            )        SONYA ABU
ILISAGVIK COLLEGE, et al.    )
                            )
            Defendants.      )
_____)

-o-

August 28, 2006, 8:09 a.m., MST

STOKES EXECUTIVE SUITES

7190 South State Street

Salt Lake City, Utah 84047

Reported by Carlton Way, CSR/RPR

in and for the State of Utah

ATKINSON-BAKER, INC.
COURT REPORTERS
WWW.DEPO.COM
(800) 288-3376

FILE NO. A006DD1

RECEIVED BY:
Clapp, Peterson, Van Flein,
Tiemessen & Thorsness, LLC
Date Rec'd/Initials: 12/8/06
                    400.85
Distribution: Cpy Ppd to PAW
              FYI: Tpp

EXHIBIT 18
PAGE 1 OF 5

1

1      Q.      Uh-huh, she told you --

2      A.      -- to work closely with Dean Tuthill.

3      Q.      And how would you describe Dr. Tuthill to

4   work with?

5      A.      He was pleasant to work with.  He would

6   come down to my office and verbally follow up on

7   things and check up with me on student concerns that I

8   had e-mailed to him.

9      Q.      If you observed, Ms. Abu, what was the

10   faculty's and staff's reaction to Dr. Tuthill when he

11   first came in the Fall of 2003?

12              MS. JOHNSON:  Objection; compound.

13              THE WITNESS:  I remember hearing some

14   concerns that he was an outsider and questioned why

15   people who were already at the College and been there

16   so long weren't advanced to that position; and then

17   other people who said that he brought good experience

18   and they thought that he was appropriate for the

19   position and were pleased with the work that he was

20   doing.

21              MS. DUCEY:  Once you got into the position

22   of Student Retention Officer, were there any issues

23   that developed as you assumed your new duties?

24      A.      Since it was a new position, the faculty

25   had never had someone to work with.  And so, at first,

EXHIBIT _18_

PAGE _2_ OF _5_

18

1    I didn't hear very much from instructors on any

2    concerns that they had with students.  And students

3    were reluctant to talk to me because I was also an

4    outsider, I was new.  So it took me a while to develop

5    a relationship of trust with them.

6            Initially, I developed a relationship of

7    trust with the student, and they are the ones who

8    started bringing their concerns to me first.  And then

9    instructors started using me, as well, sending their

10   concerns about students to me.

11           And that was more of a follow-up, I was

12   sending information out and requesting their responses

13   about students.

14       Q.    Okay.  And did students then express

15   concerns to you?

16       A.    Yes.

17       Q.    What sort of concerns were expressed to

18   you?

19       A.    Mainly there was a spokesperson for the

20   group because there were a lot of the student who were

21   still very shy about coming up to me and there were

22   concerns about confidentiality.

23           So there was one main student who came to

24   me, and she lived in the dorms and so was more

25   familiar with me.

EXHIBIT 18
PAGE 3 OF 5

19

1    She brought up concerns about class

2  schedules being changed such as classes being

3  cancelled at the last minute, which was a huge concern

4  because transportation was a big problem for students.

5  The College is not in town.  And, you know, the cost

6  of paying for the bus or a taxi to get to the College

7  and then have to go back if the class is canceled is

8  frustrating; as well as the time factor.  So that was

9  a situation.

10    Students were concerned about teachers not

11  being available to answer their questions or if

12  teachers were even there; not answering students

13  questions and just referring them to a tutor.

14    Students felt that the teacher wasn't

15  doing all that they should be as an instructor to

16  fulfill that responsibility.

17    Feeling humiliated in the classroom

18  setting; just feeling talked down to by instructors.

19  Those were some of the concerns.

20    Q.    Okay.

21    A.    Feeling like things weren't being

22  explained fully, that time wasn't being taken, that it

23  was assumed students should know the concepts already.

24  They would argue that is why we are here, is to be

25  taught the concepts.

EXHIBIT *18*

PAGE *4* OF *5*

20

1              Things like that.

2      Q.      Okay.  Who was the spokesperson that you

3  mentioned?

4      A.      Crystal Gross.

5      Q.      And who did students express these

6  concerns about?

7      A.      Predominantly Bobbi Wade, Jay St. Vincent,

8  Courtneay Bartholomew; student concerns is that he was

9  difficult to understand.

10      Q.      Was there one of -- and was Jay

11  St. Vincent a faculty member?

12      A.      Yes.

13      Q.      As well as Courtneay Bartholomew?

14      A.      Yes.

15      Q.      Was there one instructor that there were

16  more than more concerns expressed about than others?

17      A.      Yes.

18      Q.      Who was that?

19      A.      Bobbi Wade.

20      Q.      Okay.

21              You came to meet Bobbi Wade, is that

22  right?

23      A.      Yes.

24      Q.      How did you come to meet her?

25      A.      I met all of the faculty at the initial

EXHIBIT _18_
PAGE _5_ OF _5_
21

**Bobbi Wade**

| From: | John Tuthill |
|---|---|
| Sent: | Thursday, January 15, 2004 9:41 AM |
| To: | Bobbi Wade |
| Subject: | Blackboard Courses |



Bobbi –

I am concerned that this past Fall Semester we had a very poor student success rate in almost all of the Blackboard courses we offered at Ilisagvik College. Only 26% of our total number of students registered for Blackboard courses received credit for their course at the end of the semester. The success rate for students in your three Blackboard courses was even lower: 23%.

I realize that Blackboard is a challenging delivery platform for many of our students, but I also know that in many cases it is the only way we have to get the courses to the students, and we have to look for ways to help the students be more successful in their learning.

In reviewing the three Blackboard courses you delivered last semester (BUS 100, BUS 154, and BUS 233), and the two that appear to be "up and running" so far this semester (BUS 112 and BUS 260) I find three areas in which changes could be made that would benefit our students.

First, in all of these courses, you have lumped together many different assignments that are all due on the same date. For example, in BUS 112, all assignments for Chapters 1, 2, and 3 are due one month into the semester, on February 16. All assignments for Chapters 4, 5, and 9 are due a month later, on March 19. All assignments for Chapters 10, 11, 16, and 25 are due a month after that, on April 16. Clumping all of these assignments together in this way encourages students to wait until the last minute before they begin to get to work. It also means that we cannot tell which students are getting into trouble until so late in the semester that it may be too late to help them. You tell the students that if they have not participated in Phase One of your Blackboard courses, you will withdraw them. That's fine, but if you don't require work from them prior to the very end of Phase One, we have no advanced warning as to which students might be in trouble, and so there's nothing you, or Rob, or Sonya can do to help them. Please revise your courses so that you have a separate due date for each chapter assignment, with a new assignment due every couple of weeks throughout the semester. They should be able to keep up better that way, and if they don't, we'll know it earlier and can take appropriate preventative action. And please get the students to begin submitting work to you for your assessment before the end of this month. If at that point you find some students not participating, or turning in sub-standard work, please notify Rob and Sonya of the names of the students and their problems, so they can get on it and see what they can do to help.

Second, you have apparently ended all three of these courses too early. BUS 112, BUS 234, BUS 241, and BUS 260 are all scheduled to run until April 26, the last day of classes in the Spring Semester 2004. Your syllabus for BUS 112 and BUS 260 indicate that students must complete their final assignments on April 16, ten days before the close of the semester. Unless you have authorization from the Dean of Instruction's office for a change of schedule, you need to follow the academic schedule in all of your instruction, including the Blackboard courses. You cannot require the students to finish their courses in advance of the scheduled course completion date. You must give them all of the time allowed by the academic schedule to finish their course.

Third, you are under-utilizing several Blackboard features that could make your courses more "user friendly" to your students. It looks to me like you communicate with your students mostly one-on-one, whether in person, or by telephone, or by non-Blackboard e-mail. Such communication is great, but if one student asks a question or has a problem, it's often the case that several others are struggling with the same thing. In your syllabus, you emphasize that you will NOT use the Blackboard Chat Room or Discussion Board. Please reconsider! It would help to have regular Blackboard discussions in each of your classes, and possibly to arrange for some activities in which your students can use Blackboard to work together in small groups. The students need to feel that they are part of a group, that they're not alone as they work their way through these courses, and having the chance to interact with one another and with you, as a group, could help keep them going.

EXHIBIT _19_

PAGE _/_ OF _3_

20123

Wade v. Ilisagvik College

-----Original Message-----
**From:** John Tuthill
**Sent:** Tuesday, January 20, 2004 6:46 PM
**To:** Bobbi Wade
**Subject:** Registration for Amy Underwood

Bobbi —

Under ordinary circumstances, I am happy to approve requests for Individual Study, but I cannot approve your request for Amy Underwood to take Time Management and Record Keeping for Business as independent studies. The last 23 credits Ms. Underwood has received from Ilisagvik have been with you as the instructor. For a student to receive so much instruction from her grandmother is troubling enough. It's even more troubling to note that for much of this time Ms. Underwood has been living in Tennessee, and you have been claiming her as a dependent for purposes of Ilisagvik College tuition waiver. Thus far, the College has waived over $2000 in tuition for her.

I have no problem with Ms. Underwood continuing her education at Ilisagvik College, even while she resides in Tennessee, but she should do it via regularly scheduled distance education courses in which she is part of a class. For you to spend your instructional time providing one-on-one courses to your grand-daughter in Tennessee falls well outside the parameters of the mission of Ilisagvik College.

I am likewise uncomfortable with the idea of her "testing out" of IT-110. If she receives credit for a comparable course at an accredited institution in Tennessee, we can transfer that credit to her degree program here, but we must avoid any appearance of favoritism or other improprieties by giving special treatment to your grand-daughter.

-- John


Dean of Instruction
Ilisagvik College

EXHIBIT 19
PAGE 2 OF 3

20124
Wade v. Ilisagvik College

# Exhibit #13

EXHIBIT _19_

PAGE _3_ OF _3_

20125

Wade  v. Ilisagvik College

*Issues Concerning Bobbi Wade*

1) Our accreditation standards require that "the institution employs professionally qualified faculty...." Bobbi's academic preparation is primarily in English and educational administration. She does not have a solid academic background in the academic business courses she teaches at our college.

2) Bobbi's teaching performance has been very disappointing this academic year. I have received numerous complaints from students who have found her unhelpful, and sometimes even insulting. The rate of student success in her Blackboard courses was especially low: only 10 of the 44 students enrolled in Bobbi's Blackboard courses received credit for their work last semester (a total of 23%). 25 of Bobbi's 44 Blackboard students (57%) received a grade of "W."

3) Bobbi has been resistant to changing her style of teaching on Blackboard. At the beginning of the semester, I gave her a series of specific directions for what she needed to do differently in order to support our students better. She is doing some of what I directed; most she is not.

4) Bobbi is resisting my efforts to administer those programs which she considers "hers." While complaining of her heavy teaching load, she has opposed my efforts to recruit new adjunct instructors to pick up some of the load. She is openly hostile to the adjunct instructor who is currently teaching BUS 109 (Business English), even to the point of advising students not to take this or any class under this instructor.

5) She is showing poor professional judgment in other ways, such as her recent petition to teach two independent study courses for her grand-daughter, who lives in Tennessee, and whom Bobbi claims as a dependent for College tuition-waiver purposes. (Over $2000 in Ilisagvik tuition has been waived for this student in the past two years.)

Exhibit __M__
Page __/__ of __/__

20049
Wade v. Ilisagvik College

EXHIBIT __20__
PAGE __/__ OF __/__

Date: __5-4-06__  Exhibit: __46__
Witness: __Taylor__
Marci L. Lynch, Court Reporter
Liz D'Amour & Associates, Inc.
(907) 452-3678

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

# CERTIFIED COPY

BOBBI J. WADE,                          )
                                        )
                    Plaintiff,          )
vs.                                     ) CASE NO.
                                        ) A05-086 CV (TMB)
ILISAGVIK COLLEGE, NORTH SLOPE          )
BOROUGH, JOHN TUTHILL, individually)
and PAMELA TAYLOR, individually,        )
                                        )
                    Defendants.         )
                                        )
_____)


THE VIDEO DEPOSITION OF

AMY CONYER

Taken on Behalf of the Defendants

August 30, 2006

Nashville, Tennessee

RECEIVED BY:
Clapp, Peterson, Van Flein,
Tiemessen & Thorsness, LLC
Date Rec'd/Initials: __11/28/06__
__400-85__

Distribution:_____


_____

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

FILE NO.: A006DC5

EXHIBIT _21_
PAGE _1_ OF _2_

1

1    to Jamie Albert?                                          12:30:48

2    A.      Equally.  For the most part, I would say she       12:30:50

3    was harder on me than anybody else.  I believe she        12:30:54

4    expected more out of me.                                  12:30:57

5    Q.      In what ways did her being harder on you kind      12:30:59

6    of manifest itself?                                       12:31:02

7    A.      Meaning that if -- well, I can use an example      12:31:03

8    of when I was taking English at MTSU and I would ask       12:31:07

9    her for advice on papers and she would tell me, no, I     12:31:11

10   need to rewrite that.  Situations like that.  If I       12:31:15

11   would turn something in, she was like, oh, no, you can    12:31:18

12   do better type of thing.                                 12:31:23

13   Q.      Was that something that happened when you were     12:31:26

14   up in Borough where she would reject work and tell you    12:31:29

15   to resubmit it?                                           12:31:32

16   A.      Not that I remember.  I asked for help on          12:31:33

17   papers.  I know I had a big final for my world history    12:31:36

18   and anthropology classes and I asked her to help me in    12:31:40

19   critiquing those papers, and there were some things she   12:31:45

20   asked me to rethink.  But she would never tell me         12:31:50

21   exactly what it was.  She just wanted me to learn         12:31:52

22   myself.                                                   12:31:55

23   Q.      Do you have any recollection of discussions        12:32:06

24   about you getting a DF grade?                             12:32:13

25   A.      No.                                               12:32:18

EXHIBIT 2/
PAGE 2 OF 2

115

Dear Employee:

**Welcome to Iḷisaġvik College!**

We're very happy to welcome you to Iḷisaġvik College. Thank you for joining us! We want you to know that you are a vital link in the operation of the College. The College expects that all employees will keep in mind that their primary job is related directly to the education and training of our students. When we all work together, our students will succeed.

This Handbook is designed to provide information about your employment with the College by describing policies that have been approved by the Board of Trustees. You will receive additional pages to insert as new policies and procedures are developed or revised that may affect your employment with the College.

If you have questions, your supervisor will provide answers. The Human Resources Office or the Business Office will also be happy to provide clarification whenever needed.

I hope your employment with our College will be pleasant and long lasting.

Sincerely,

Edna Ahgeak MacLean, Ph.D.
President

EXHIBIT 22
PAGE 1 OF 6

20535
Wade v. Ilisagvik College



# You're Part of Our Team...

The main objective of the College Team is to provide the best post-secondary academic, vocational, and technical education to the public in a learning environment that perpetuates and strengthens Iñupiat culture, language, values, and traditions.

## In order to fulfill this objective, the College will:

- Provide equipment, facilities, and competitive wages and fringe benefits

- Provide new employee job orientation and on-going staff development

- Provide a safe and pleasant work environment

## In order to fulfill this objective, employees will:

- Know their jobs and perform them to the best of their abilities

- Accept responsibility for their jobs and assume accountability for the results

- Work together as a team with all other staff members to assure the safest, most supportive, educational and work environment possible

EXHIBIT _22_

PAGE _2_ OF _6_

20542

Wade v. Ilisagvik College

# EMPLOYMENT POLICIES AND PROCEDURES

## Eligibility for Employment

Iḷisaġvik College shall comply with all state and federal laws governing eligibility for employment.

## Employee Classification

The following classifications do not affect an employee's status as an exempt (salaried) or non-exempt (hourly) employee. Employees in each classification shall be considered exempt or non-exempt as determined by their particular duties and federal and state law.

**Probationary Employee:** All new, rehired, transferred or promoted exempt and non-exempt non-faculty personnel in regular or rotation schedule, full-time or part-time positions are on probationary status during the first six (6) working months (180 working calendar days) of employment. Probationary status may be extended for cause upon the written recommendation of the employee's supervisor.

**Regular Full-time Employee:** A non-faculty employee who works at least 37.5 hours in a regular workweek.

**Regular Part-time Employee:** A non-faculty employee who works at least 18.75 hours, but less than 37.5 hours in a regular workweek.

**Regular Faculty:** An employee who delivers full- or part-time academic or vocational instruction pursuant to an employment contract.

**Adjunct Faculty:** An employee who delivers no more than 7.5 credit hours of instruction per semester and is hired on an as-needed basis pursuant to an employment contract. Adjunct faculty are not entitled to College-provided employment benefits.

EXHIBIT _22_

PAGE _3_ OF _4_

# SALARY ADMINISTRATION
# AND PAYROLL

## <u>Salary Administration</u>
## <u>and Performance Reviews</u>

An Iḷisaġvik College employee's salary and performance shall be reviewed on an annual basis. The purpose of an evaluation is to monitor employee performance and progress, encourage exceptional job performance, and identify areas of improvement. Supervisors shall complete an evaluation of all Regular employees. Evaluations of Regular non-faculty employees will be completed at the end of their probationary period and on or about their hire date each year thereafter. Regular faculty evaluations will be completed annually prior to the end of their annual contract period.

Prior to the evaluation, the employee will be provided with a Self-Evaluation form (See Appendix B). The employee should complete this form and submit it to his/her supervisor prior to the salary and performance review. Evaluations shall be based on an employee's self-evaluation, his or her job description, and other job-related expectations, and shall be recorded on College-provided evaluation forms.  Employees may also request a performance evaluation to ascertain the appropriateness of their performance, progress and quality of work. Employees have the right to file a written response to the supervisor's evaluation, and to have the employee's response included in their personnel file.

Employees are not entitled to salary increases, except as determined by the College. Salary increases are dependent on better than satisfactory evaluations, supervisor recommendations, approval of their department Dean, Human Resources Director, the President, and the availability of funds. All wage and salary changes must be authorized in writing.

Evaluations shall be considered in employment retention, pay increase, promotion, lay-off, demotion, and disciplinary decisions.

## <u>Work Hours and Overtime</u>

EXHIBIT 22
PAGE 4 OF 6

The standard workweek for most non-faculty employees consists of 37.5 hours worked. Time reported on an hourly basis shall be reported to the nearest one-quarter hour. Pay will accrue from the date of reporting for duty, except as

20562

Wade v. Ilisaġvik College

# DISCIPLINE AND TERMINATION OF EMPLOYMENT

## Discipline

I̧lisaġvik College may discipline any of its employees for failure to comply with the Employee Handbook, I̧lisaġvik College Code of Ethics, other College rules, policies, directives, health, safety and welfare regulations, federal, state, or local law, insubordination, or any other grounds deemed appropriate in the College's discretion. I̧lisaġvik College strives to enhance, improve and correct the performance or behavior of its employees through performance management, including, but not limited to, suggestions, verbal warnings, written reprimands and/or performance improvement plans. Discipline will ordinarily be assessed only after giving the employee an opportunity to respond to the alleged violations. However, exceptional circumstances may require immediate disciplinary action. Under such circumstances, I̧lisaġvik College specifically reserves the right to discipline an employee without providing notice of the charge and an opportunity to respond.

The above-stated grounds for discipline are not an exclusive remedy and do not in any way limit or modify other remedies available to I̧lisaġvik College. The College reserves the right to terminate an employee at any time for cause.

## Suspension

I̧lisaġvik College may suspend an employee, with or without pay, for disciplinary reasons, pending investigation, or other purposes. The department Dean and Human Resources Director are authorized to place an employee on suspension, with approval of the President.

## Termination for Cause

Employees may be dismissed from employment for cause. When disciplinary efforts fail to achieve a satisfactory change in the employee's performance or behavior, the conduct cannot be remedied, or on those occasions where an infraction is of a particularly serious nature, the College may terminate the employment of an employee. The decision to terminate shall be made by the department Dean and the Human Resources Director, with the approval of the

EXHIBIT 22
PAGE 5 OF 6



20581
Wade v. Ilisagvik College

# FACULTY

Except as otherwise noted in this Handbook, or as specifically included in a written contract for employment, faculty are employees of Iḷisaġvik College and are subject to terms and provisions of this Employee Handbook. The following section contains provisions that are applicable only to Iḷisaġvik College faculty.

## Candidate Screening

The President (or designee) and Dean of Academic Affairs shall appoint members of the faculty to participate in the screening of candidates for Regular full-time faculty positions.

At its discretion, the Board of Trustees may solicit faculty input in the screening of candidates for President of the College.

## Placement in Rank by Discipline

All faculty are expected to possess a high level of academic, professional, and/or experiential preparation appropriate to their discipline and shall be appointed to an academic rank and status commensurate with their preparation and credentials (see "Placement in Rank by Discipline" Table - page 49).

Placement in rank will be guided by the following criteria:

In cases where the advanced degree in the discipline or a related discipline is deemed the most important criteria and where such an advanced degree is available, individuals will be placed according to the Academic track.

In cases where journeyman certification in the trade or comparable certificates is considered the most important criteria, placement will be made according to the Vocational/Technical track.

In Cultural Studies, advanced degrees are not currently available in the disciplines listed and frequently recognized expert status is the only way to recognize one's knowledge and abilities in this area.

Please note that, in all cases, continuing advanced education is built in to advancement in rank to encourage continuing education for all faculty.

EXHIBIT 22
PAGE 6 OF 6
20586
Wade v. Ilisagvik College

05-086 CV (TMB)                                              Bobbi J. Wade

Page 433

1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF ALASKA

3

4     BOBBI J. WADE,

5             Plaintiff,

6        vs.

7     ILISAGVIK COLLEGE, NORTH SLOPE

      BOROUGH, JOHN TUTHILL, individually,

8     and PAMELA TAYLOR, individually,

9

         Defendants.

10    _____

11    Case No. A05-086 CV (TMB)

12                                        COPY

13

14

15

16           VIDEOTAPED DEPOSITION OF BOBBI J. WADE

17                  Taken December 6, 2006

                 Commencing at 9:21 a.m.

18

             Volume III - Pages 433 - 689, inclusive

19

20

21              Taken by the Defendants

                          at

22               Delaney Wiles, Inc.

             1007 West 3rd Avenue, Suite 400

23               Anchorage, AK 99501

24                                        EXHIBIT  23

25    Reported by:  Valerie Martinez       PAGE  1  OF  2

A05-086 CV (TMB)                                          Bobbi J. Wade

**Page 470**

1  This is the start of tape number two.
2       MS. DUCEY:  Let's see, here's the next one.
3       (Exhibit 97 marked.)
4       MS. DUCEY:  Ms. Wade, if you want to look at
5  that for a minute, you're more than welcome to, but I
6  was going to move on to another subject.
7       THE WITNESS:  I was looking at the terms and
8  conditions --
9       MS. DUCEY:  Sure.
10      THE WITNESS:  -- of my employment with
11  Ilisagvik College.  It says, they "are in accordance
12  with this letter of appointment including Attachment A,
13  the Ilisagvik College Employee Handbook and the Policy
14  and Regulations of the Board of Trustees as they exist
15  today and as they may be duly amended from time to
16  time."
17  BY MS. DUCEY:
18  Q   So those additional things form part of your
19  contract?
20  A   Yes.
21  Q   And we've already identified -- let's see, I think
22  that was Exhibit 7, as the personnel handbook; right?
23  A   Yes.
24  Q   I think we also actually identified the policy
25  manual, too, but if we didn't, I'll get that for you in

**Page 471**

1  a bit.  Anything else that came to mind during the
2  break?
3  A   No.
4  Q   All right.  So, I want to switch gears.  You can
5  just start making a pile right there.  That's fine.
6  A   Okay.
7  Q   All right.  So let me show you, again, Number 20
8  because I want to switch gears just for a couple
9  minutes.
10  A   Okay.
11  Q   And you previously identified that as a letter you
12  got from Dr. Church -- right -- dated August 7th?
13  A   Yes, ma'am.
14  Q   And I don't think I asked you this precise
15  question, which is, what serious health condition did
16  you have in the fall of 2003 that couldn't wait until
17  the end of the semester?
18      MS. JOHNSON:  We have gone over that and over
19  that and over that actually.  I object to going back to
20  this line of questioning.
21      MS. DUCEY:  You can answer.
22      THE WITNESS:  I had a spot on my shoulder that
23  I was very worried about that it was serious and it was
24  a threat.
25      MS. DUCEY:  All right.

**Page 472**

1       THE WITNESS:  And I was anxious to get it
2  tested.
3  BY MS. DUCEY:
4  Q   Since we have last talked about your employment at
5  Ilisagvik and you've -- I know you were there at Pam
6  Taylor's deposition; right?
7  A   Yes, ma'am.
8  Q   You didn't attend Dr. Tuthill's deposition; right?
9  A   Yes, I did.  I was in Seattle and in Barrow.  I was
10  in Seattle for Dr. Tuthill's deposition, yes.
11  Q   I don't know why I don't have a recollection of
12  that.  But if you knew my week this week --
13  A   Now, I'm supposed to think that way, not you.
14  Q   If you knew my week this week, you would know why I
15  can't pull that up.
16      You didn't come to Dr. MacLean's deposition;
17  right?
18  A   No, ma'am.
19  Q   So lots of times people remember things after they
20  have been prompted and even with the passage of time.
21  Is there anything, since we've talked, that you recall
22  now as being inaccurate in any way with respect to your
23  prior testimony?
24  A   As far as my testimony is concerned?
25  Q   Yes.

**Page 473**

1  A   No, ma'am.
2  Q   Or incomplete?
3  A   No, ma'am.
4  Q   We talked about the fact that you had conversations
5  with Dr. Tuthill either the last week of September '03
6  and the first week of October in '03.  Is there anything
7  about those conversations that you recall now that you
8  didn't tell me about before?
9  A   I don't recall anything that I didn't tell you
10  about before, you know.  I think I told you that I went
11  in to see him.
12  Q   So in particular, any details that you -- come to
13  mind now?
14  A   No, ma'am.
15  Q   So back to 34 for a minute.  You can go ahead and
16  look at that, Ms. Wade.
17  A   Oh, 34.
18  Q   Is there any statement on Exhibit 34 that you need
19  to take leave before the semester is out?
20  A   No.
21      MS. JOHNSON:  Objection.  Asked and answered.
22  BY MS. DUCEY:
23  Q   Is there any statement on Exhibit 34 that you
24  need to take leave as soon as possible?
25      MS. JOHNSON:  Objection.  Asked and answered

EXHIBIT 23 PAGE 2 OF 2

11 (Pages 470 to 473)

Midnight Sun Court Reporters (907) 258-7100