Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                    FOR THE DISTRICT OF ALASKA
 3
 4   BOBBI WADE,
 5           Plaintiff,
 6       vs.
 7   ILISAGVIK COLLEGE, NORTH SLOPE
     BOROUGH, JOHN TUTHILL, Individually,
 8   and PAMELA TAYLOR, Individually,
 9              Defendants.
                                                 /
10   Case No. A05-086 CV (TMB)
11
12              *  *  *  *  *  *  *  *  *  *
13
                    DEPOSITION OF BOBBI WADE
14                         Volume 1
                    Pages 1 - 283 (inclusive)
15
                          May 1, 2006
16                        9:19 a.m.
17
        Taken by the Defendants, Ilisagvik College,
18           John Tuthill and Pamela Taylor
                             at
19   Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc.
            1007 West 3rd Avenue, Suite 400
20                Anchorage, Alaska 99501
21
22
23
     Reported by:
24   Caren S. Carlson, RPR
25
```

COPY

EXHIBIT C
Page 1 of 2

Page 214

1 welfare. They do not accept change readily, especially
2 from one instructor to another.
3    Q. Uh-huh.
4    A. I was trying to set up something here where I
5 could go on my sick leave, it wasn't medical leave, and
6 still take care of my students at the same time.
7    Q. Ms. Wade, if you didn't have these medical
8 appointments, you never would have changed the course
9 meeting times or dates, would you?
10    A. No.
11    Q. Okay. And did you tell Courtney Bartholomew
12 that the real reason that you needed to change these
13 course dates and times was because of your medical
14 appointments?
15    A. Did I tell him?
16    Q. Yes.
17    A. I don't remember what I told Courtney --
18    Q. Okay. You certainly didn't --
19    A. -- but I told him the truth, whatever it was.
20    Q. You didn't give him written notification that
21 you had medical needs --
22    A. Not Courtney.
23    Q. -- that required changing it?
24    A. No, not Courtney.
25    Q. Okay. And you didn't ask for a substitute

Page 215

1 teacher; right?
2    A. That was the dean's responsibility to hire me a
3 substitute teacher. I asked him if he could -- I could
4 not get a substitute and he said that there were no
5 substitutes available.
6    Q. Uh-huh. You asked him that before or after you
7 submitted this form?
8    A. When he refused to accommodate me in this
9 situation, I did ask him about getting a substitute. In
10 fact, I mentioned that in my grievance. Why couldn't he
11 have gotten me a substitute?
12    Q. Uh-huh. Okay. So he did get a substitute,
13 didn't he?
14    MS. JOHNSON: Objection --
15    A. No, he didn't.
16    MS. JOHNSON: -- form of the question.
17    Q. Well, you may not have liked the substitute, but
18 he did get substitute teachers in?
19    MS. JOHNSON: Objection, form of the question,
20 argumentative.
21    Q. Isn't that true?
22    A. No.
23    Q. Okay. When did you tell him that you wanted a
24 substitute teacher? On what date?
25    A. I don't remember.

Page 216

1    Q. And what else was being discussed at that time?
2    A. I don't recall.
3    Q. And what documents did you present to him at
4 that time?
5    A. I don't recall.
6    Q. Where did the meeting occur?
7    A. It wasn't a meeting.
8    Q. Where did you have this communication with him?
9    A. In his office. It was always in his office. He
10 never came over to my building.
11    Q. And was anyone else present?
12    A. No.
13    Q. Before the break you had told me that you had
14 been in to see Pam. She had told you that you didn't
15 have hours accrued and that you had left her office. And
16 then you told me you had another conversation with Dr.
17 Tuthill where he asked if you could take the leave at
18 Christmas and you said you could do that. Right?
19    A. I didn't say I could do that. I said if that
20 was possible.
21    Q. Okay.
22    A. A possibility, because it's very difficult to
23 get doctor's appointments, especially with specialists.
24    Q. All right. So how did you leave it, then? Did
25 you agree to wait until Christmas and try and reschedule

Page 217

1 your appointments?
2    A. At that time I did.
3    Q. So what efforts did you make to reschedule for
4 Christmas?
5    A. I called Dr. Gold's office and the only time
6 they could see me was on December the 2nd. They could
7 not even -- they had no openings around the Christmas
8 holidays.
9    Q. And when did you call him?
10    A. I don't know, but the appointment was on
11 December the 2nd, so it was prior to December the 2nd.
12    Q. Okay. And did you ask him for January?
13    A. No. I wouldn't be there in January.
14    Q. You might be there on January 3rd.
15    A. I doubt that I was. I --
16    Q. So it would be more convenient -- it would be
17 more convenient, wouldn't it, to stay one or two days
18 over on your Christmas --
19    A. Doctor --
20    Q. May I finish my question? It would be more
21 convenient to stay one or two days over on your Christmas
22 break rather than to take ten days off in the middle of
23 the semester; isn't that true?
24    A. It might have been true.
25    Q. And would have been less disruptive of classes,

Page 284

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF ALASKA
 3
 4   BOBBI WADE,
 5           Plaintiff,
 6      vs.
 7   ILISAGVIK COLLEGE, NORTH SLOPE
     BOROUGH, JOHN TUTHILL, Individually,
 8   and PAMELA TAYLOR, Individually,
 9           Defendants.
     _____/
10   Case No. A05-086 CV (TMB)
11
12              *  *  *  *  *  *  *  *  *  *
13
14              VIDEOTAPED DEPOSITION OF BOBBI WADE
                              Volume 2
                   Pages 284 - 432 (inclusive)
15
                          May 5, 2006
16                         2:04 p.m.
17
18      Taken by the Defendants, Ilisagvik College,
                John Tuthill and Pamela Taylor
19                            at
        Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc.
20           1007 West 3rd Avenue, Suite 400
                   Anchorage, Alaska 99501
21
22
23
24   Reported by:
     Caren S. Carlson, RPR
25
```

COPY

RECEIVED JUN 9 2006 DELANEY WILES, INC.

Midnight Sun Court Reporters
(907) 258-7100

EXHIBIT 3 of 9

Case No. A05-086 CV (TMB)                                                                 Bobbi Wade

Page 309

1   call.
2      Q. The date of the telephone call isn't recorded
3   anywhere; is it?
4      A. No.
5      Q. Okay. So that's what I want to know. When in
6   relation to receiving the note from Dr. Snyder did you
7   get the phone call?
8         MS. JOHNSON: Objection, asked and answered.
9      A. Just prior to getting the note from her.
10     Q. Was it the day before?
11        MS. JOHNSON: Asked and answered.
12     A. It could have been. I don't recall unless I see
13  a document with dates on it.
14     Q. It doesn't have -- there is no document with
15  dates.
16     A. Okay.
17     Q. So it's your testimony that you can't give me
18  any idea?
19        MS. JOHNSON: Objection to form.
20     A. How far apart it was?
21     Q. Right. That's all I want to know.
22     A. It -- it could have been the same day. It could
23  have been the next day, but I knew that I would have to
24  have a note from her to give to Dr. Tuthill in order to
25  be able to get sick leave to go have the moles procedure.

Page 310

1   She informed me over the phone that I would need a moles
2   procedure.
3      Q. Uh-huh.
4      A. And I might have told her over the phone that I
5   would need a note from her.
6      Q. And what did you tell her you needed in the
7   note?
8      A. To certify that I needed the moles procedure,
9   that it couldn't be done in the state of Alaska because
10  there was not a certified doctor that can make such a
11  test --
12     Q. Uh-huh. And what else did you tell her in --
13     A. -- in the state of Alaska. That's all I recall
14  telling her.
15     Q. Okay. You eventually saw who to get the moles
16  procedure?
17     A. When I arrived in Tennessee, I saw Dr. Church
18  and then I couldn't get an appointment to see the doctor
19  I had originally wanted to see, Dr. Gold.
20     Q. Uh-huh.
21     A. And she and -- Dr. Church informed me that he
22  was not a certified doctor that could do the moles
23  procedure.
24     Q. Right. The question was, who did the moles
25  procedure?

Page 311

1      A. Dr. DeLozier.
2      Q. Okay. And when did he do it?
3      A. In a few days. She had to make an appointment
4   with him and it was in several -- it was in two or three
5   days. It wasn't immediately like that day or the next
6   day. Again, I would have to look at the document to know
7   the exact date.
8      Q. Was the procedure done in his office?
9      A. Yeah, I think so. I don't recall.
10     Q. Okay. And did you have the procedure done the
11  same day of your first visit?
12     A. I had the procedure done the same day of my
13  first visit to him --
14     Q. Uh-huh.
15     A. -- yes.
16     Q. Okay. And was it done with a local anesthetic?
17     A. Yes.
18     Q. All right. And did they shave off pieces, look
19  at them under the microscope after they had shaved pieces
20  until they were satisfied that it was completely gone?
21     A. I don't know what they did.
22     Q. Okay. And how long were you in the office that
23  day?
24     A. I was in there for, I would say, from two to
25  three hours.

Page 312

1      Q. Okay. And how long did the actual procedure
2   take?
3      A. I would say probably 30 minutes.
4      Q. Okay. Did you have a stitch?
5      A. Yes.
6      Q. Just one?
7      A. No, I -- I had several stitches.
8      Q. Okay.
9      A. I don't recall how many.
10     Q. What did Dr. DeLozier tell you you should do in
11  terms of caring for it after it was shaved?
12     A. He put a patch on it and I don't recall him
13  telling me anything as far as care.
14     Q. Okay. Did he tell you that any of your
15  activities were not to be done?
16     A. I don't remember what he told me without
17  referring to my chart to see what he --
18     Q. Okay.
19     A. -- was written down there.
20     Q. Did he tell you you couldn't work?
21     A. No, he didn't tell me I couldn't work.
22     Q. Okay. Did he tell you that you needed any
23  follow-up?
24     A. I don't recall that he did.
25     Q. Uh-huh. And did you have follow-up with him?

8 (Pages 309 to 312)

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF ALASKA
 3
 4   BOBBI J. WADE,
 5          Plaintiff,
 6     vs.
 7   ILISAGVIK COLLEGE, NORTH SLOPE
     BOROUGH, JOHN TUTHILL, individually,
 8   and PAMELA TAYLOR, individually,
 9
              Defendants.
10   _____
11   Case No. A05-086 CV (TMB)
12                                         COPY
13
14
15
16        VIDEOTAPED DEPOSITION OF BOBBI J. WADE
17               Taken December 6, 2006
                 Commencing at 9:21 a.m.
18
          Volume III - Pages 433 - 689, inclusive
19
20
21             Taken by the Defendants
                          at
                   Delaney Wiles, Inc.
22
            1007 West 3rd Avenue, Suite 400
23                 Anchorage, AK 99501
24
25   Reported by:  Valerie Martinez
```

Page 450

1  part of your contract that's not contained in that
2  document there that we marked as --
3        THE WITNESS: Not that I recall.
4  BY MS. DUCEY:
5  Q  When you were at -- you can put that aside. Thank
6  you, Ms. Wade. In all the years that you have been in
7  the education field, have you come to learn that there
8  is a chain of command or authority within educational
9  institutions?
10 A  Yes, ma'am.
11 Q  And at the top of the chain, sometimes there's a
12 president or a superintendent of schools or the
13 chancellor of the academic institution; correct?
14 A  Yes, ma'am.
15 Q  And then from there, there is a chain of authority
16 that flows downward with the least senior instructors
17 being at the bottom; right?
18 A  Uh-huh.
19 Q  And within that chain of command, have you in the
20 past had knowledge that there are deans involved, for
21 instance, deans of instruction?
22 A  Yes, ma'am.
23 Q  And did you know that before you came to Ilisagvik?
24 A  Yes, ma'am.
25 Q  And before you came to Ilisagvik, did you ever

Page 451

1  have, in your chain of command, a dean of instruction?
2  A  Did I ever have a dean of instruction?
3  Q  With any other employment that you had, was there
4  ever a dean of instruction within your chain of command?
5        MS. JOHNSON: Objection. Vague.
6        THE WITNESS: I assume there were but I never
7  had any direct contact with the dean.
8  BY MS. DUCEY:
9  Q  You weren't a direct report to them?
10 A  No. It was the chair of the department.
11 Q  And with respect to the chair of the department in
12 other jobs that you had, did the chair have authority to
13 give you directives or instructions?
14 A  Yes, ma'am.
15 Q  And did you have to follow those?
16 A  Yes, ma'am.
17 Q  Even if you disagreed with them?
18 A  Yes, ma'am.
19 Q  Is that the way it is now with your current
20 employment that the person that you report to has the
21 authority to give you instructions or directives?
22 A  Yes, ma'am. I look to her for directives.
23 Q  When you worked at Ilisagvik, how many deans of
24 instruction did you work under?
25 A  Three.

Page 452

1  Q  And we know Dr. Tuthill was one; correct?
2  A  Yes.
3  Q  And who were the other two?
4  A  The first one who was dean when I was there was
5  Frank Willingham -- Dr. Frank Willingham, and he was
6  there for two years.
7  Q  Then who was the second one?
8  A  Bruce Meyers.
9  Q  And did you understand that Mr. Meyers and
10 Mr. Willingham had authority to give you instructions or
11 directives?
12 A  Yes, I did. And Dr. Pat O'Rourke was an inter --
13 Q  He was acting for a while?
14 A  Yeah, he was acting at different intervals. And I
15 worked directly with Dr. O'Rourke.
16 Q  Did you ever disagree with anything that Mr. Meyers
17 or Mr. Willingham told you to do?
18 A  No, ma'am.
19 Q  But if you had, would you have been required to
20 follow those instructions?
21       MS. JOHNSON: Objection. Form.
22       THE WITNESS: Yes, ma'am.
23 BY MS. DUCEY:
24 Q  When Dr. Tuthill came and became dean, did you
25 understand that if he gave you an instruction or a

Page 453

1  directive, that you were required to follow it also?
2  A  Yes, I did.
3  Q  Even if you disagreed with it?
4  A  Yes, ma'am.
5  Q  And in that regard, if you had a different opinion
6  about what should have occurred than Dr. Tuthill's,
7  whose opinion controlled what you needed to do?
8        MS. JOHNSON: Objection. Form, calls for
9  speculation.
10 BY MS. DUCEY:
11 Q  As you understood the chain of command, if you
12 disagreed -- if you had a different opinion than Dr.
13 Tuthill about a course of action to take, whose opinion
14 controlled?
15 A  Dr. Tuthill's did.
16 Q  Would you look now at -- it should be Number 95.
17 Can you identify what that is?
18 A  It looks like a faculty position description.
19 Q  You can take as much time as you need, but tell me
20 if that was the job description that applied to your
21 position as assistant professor of business management
22 at Ilisagvik.
23       MS. JOHNSON: I object. I think we went over
24 those with Exhibit 12 back in the very first deposition
25 that we did. It was attached to 12.

Page 486

1  Church, and I believe I took my records with me. I
2  don't recall how the records got there, but she had the
3  records from Barrow. And I told her that the doctor had
4  told me in Barrow that I needed a Mohs procedure, and I
5  was depending on her to recommend someone who could do
6  that.
7  Q   You said when we talked last time that you were
8  aware that there was a dermatologist that sometimes came
9  to Barrow; is that true?
10 A   Occasionally they did.
11 Q   Did they come to the hospital?
12 A   I have no idea.
13 Q   How did you know that they occasionally came?
14 A   It was just common knowledge that different people
15 come up there at different times.
16 Q   Did you make any attempt to have the dermatologist
17 that came up occasionally look at that patch on your
18 shoulder?
19 A   No, I didn't.
20 Q   Is there a reason you did not?
21 A   It's very difficult to see those people. They
22 usually are there when I am -- during work hours.
23 Q   Did you make any attempt to schedule --
24 A   No.
25 Q   -- with the dermatologist? Do you have reason to

Page 487

1  believe that you couldn't have taken time off to see the
2  dermatologist in Barrow if you could have gotten an
3  appointment?
4  A   At what time?
5  Q   In the fall of '03.
6     MS. JOHNSON: Foundation as to when the person
7  was there.
8     THE WITNESS: I don't know why. It never
9  occurred to me because the facilities in Barrow are very
10 limited and it's a poor choice to have to go for medical
11 treatment.
12 BY MS. DUCEY:
13 Q   But just to have a dermatologist look at the patch,
14 is there any reason why you didn't try and to see if you
15 could get an appointment with the person who came up
16 just to see if they could look at the patch?
17    MS. JOHNSON: Objection. Foundation to when
18 he was there during that time frame.
19    MS. DUCEY: You can answer.
20    THE WITNESS: It never occurred to me.
21 BY MS. DUCEY:
22 Q   With respect to the medical leave that you took,
23 Ms. Wade, did you ever provide anything in writing from
24 the doctors that you saw that verified that you had a
25 serious health condition?

Page 488

1     MS. JOHNSON: I'm sorry -- I didn't get that.
2     THE WITNESS: I don't understand exactly what
3  your question is.
4  BY MS. DUCEY:
5  Q   Did you ever provide Ilisagvik with something in
6  writing from the doctor that said, she has a serious
7  health condition?
8  A   The notes.
9     MS. JOHNSON: Objection to the foundation and
10 legal conclusion.
11 BY MS. DUCEY:
12 Q   Can you look in the notes and tell me where it says
13 Ms. Wade has a serious health condition?
14 A   The notes I have does not say that.
15 Q   And did any of the things from the doctors that you
16 provided Ilisagvik discuss the facts that support a
17 conclusion that you had a serious health condition?
18    MS. JOHNSON: Objection. Asks for a legal
19 conclusion, also foundation.
20    THE WITNESS: I can't answer that.
21 BY MS. DUCEY:
22 Q   Did any of the notes that you provided discuss what
23 was going on with you that showed why you needed to
24 leave?
25 A   No.

Page 489

1  Q   Did any of the notes that you provided from the
2  doctors say the date that the condition started, your
3  medical condition?
4  A   No.
5  Q   Did any of the notes that you provided state what
6  the probable duration of your medical condition would
7  be?
8  A   No.
9  Q   Did any of the notes that you provided state
10 whether you were incapacitated?
11 A   No.
12 Q   Did any of the notes that you provided state
13 whether additional treatment would be required?
14 A   No.
15 Q   Or an estimate of the number of additional
16 treatments?
17 A   No.
18 Q   Did any of the notes say whether you were unable to
19 perform work of any kind?
20 A   No.
21 Q   After the semester was finished in December 2003
22 and the new semester began, you went back to Nashville;
23 right?
24 A   For the Christmas break, yes.
25 Q   So then you came back to Barrow, but then you left

```
                                                          Page 690
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA
 3
 4     BOBBI J. WADE,
 5              Plaintiff,
 6        vs.
 7     ILISAGVIK COLLEGE, NORTH SLOPE
       BOROUGH, JOHN TUTHILL, individually,
 8     and PAMELA TAYLOR, individually,
 9
                Defendants.
10     _____
11     Case No. A05-086 CV (TMB)
12                                              COPY
13
14
15
16          VIDEOTAPED DEPOSITION OF BOBBI J. WADE
17                 Taken December 7, 2006
                   Commencing at 8:23 a.m.
18
            Volume IV - Pages 690 - 1015, inclusive
19
20
21                  Taken by the Defendants
                              at
                      Delaney Wiles, Inc.
22           1007 West 3rd Avenue, Suite 400
23                    Anchorage, AK 99501
24
25     Reported by:  Valerie Martinez
```

EXHIBIT C
Page 8 of 9

Page 831

```
1   BY MS. DUCEY:
2   Q   How does that show she was malicious?
3       MS. JOHNSON: Objection to the term malicious.
4       THE WITNESS: I don't know how that shows that
5   she's malicious. It would take some thought.
6   BY MS. DUCEY:
7   Q   Anything else?
8       MS. JOHNSON: Same objection.
9       THE WITNESS: I can't recall anything else at
10  this time.
11  BY MS. DUCEY:
12  Q   What is the factual basis to conclude that,
13  assuming that mistakes were made, they were other than
14  unintentional as opposed to malicious?
15      MS. JOHNSON: Calls for a legal conclusion.
16  Go ahead.
17      THE WITNESS: I can't recall any at this time.
18  BY MS. DUCEY:
19  Q   By the time you left Ilisagvik, you didn't like Pam
20  Taylor much either, did you?
21  A   I've always liked Pam. I still like her.
22  Q   Why do you like her?
23  A   Because she was a friend of mine for three years,
24  three and a half years.
25  Q   Why did you sue her then?
```

Page 832

```
1   A   Because she committed acts against me that
2   interfered with the rest of my life, caused me a
3   hardship for the rest of my life, and she should not
4   have done that.
5   Q   Isn't that inconsistent with being a friend?
6   A   No, it's not. You do what you have to do to
7   protect yourself but you do it in a legal way.
8   Q   Well, aren't her actions inconsistent with being a
9   friend?
10  A   No.
11  Q   Why aren't they?
12  A   They were not inconsistent. She was a friend prior
13  to the fall of 2003, or I thought she was. I would put
14  it that way.
15  Q   What is the factual basis to support a conclusion
16  that John Tuthill's behavior toward you was malicious?
17      MS. JOHNSON: Asks for a legal conclusion.
18      THE WITNESS: The basis? The factual basis?
19  The fact that I applied for and finally got medical
20  leave, that I complained against Aimee Valenti, that I
21  submitted a complaint on December the 11th.
22  BY MS. DUCEY:
23  Q   Anything else?
24  A   I can't think of anything else right off.
25  Q   You didn't like Aimee Valenti, did you?
```

Page 833

```
1   A   I didn't know Aimee Valenti.
2   Q   But once you got to know her, you certainly didn't
3   like her.
4   A   I didn't get to know her.
5   Q   You didn't like the way she behaved.
6   A   I didn't like the way she acted, no.
7   Q   And you resented the fact that she was teaching the
8   class you thought you were going to teach; right?
9       MS. JOHNSON: Objection. Form of the
10  question.
11      THE WITNESS: I don't recall resenting the
12  fact, no.
13  BY MS. DUCEY:
14  Q   Were you concerned that she might take over the
15  department?
16  A   No.
17  Q   Not at all?
18  A   No.
19  Q   How was John Tuthill going to use her for his
20  personal gain, then?
21  A   He was -- she was going to -- he was going to set
22  her up with ESL classes to teach his wife English, the
23  English language.
24  Q   Well, how did that involve you?
25  A   Because it involved one of my students and the fact
```

Page 834

```
1   that I complained about Aimee Valenti disrupted his
2   plans. He couldn't go through with what he was planning
3   on doing.
4   Q   Which was?
5       MS. JOHNSON: Objection. Asked and answered.
6       THE WITNESS: Setting up the ESL classes for
7   her to teach and giving her classes in my program, and I
8   could not work with Aimee Valenti because she refused to
9   talk to me. You can't work with an adjunct who refuses
10  to talk to you.
11  BY MS. DUCEY:
12  Q   What was the student you referred to -- who was the
13  student? That involved one of the students, what
14  student are you referring to?
15  A   One of the students for what?
16  Q   With respect to the ESL class, you said it involved
17  one of the students. Who was that student?
18  A   It was the student that we were just talking about
19  a little while ago that Jay St. Vincent signed her
20  registration. All of that was connected.
21  Q   How was it connected?
22  A   He set up those classes for Aimee with only one
23  student in there when the student didn't even need the
24  course. She had already taken the course.
25  Q   What course was it?
```

37 (Pages 831 to 834)