IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

---

| | |
|---|---|
| BOBBI WADE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 305-cv-086-TMB |
| | ) |
| ILISAGVIK COLLEGE; NORTH SLOPE BOROUGH; JOHN TUTHILL, individually; and PAMELA TAYLOR, individually, | ) |
| | ) |
| Defendants. | ) |

---

Videotaped Deposition Upon Oral Examination

of

JOHN TUTHILL, Ph.D.

---

8:04 a.m.

May 10, 2006

1601 Fifth Avenue, Suite 860

Seattle, Washington

Sharon K. Langford, CCR          1601 Fifth Avenue, Suite 860
Court Reporter                   Seattle, WA 98101

EXHIBIT P
Page 1 of 3

Case 3:05-cv-00086-TMB   Document 102-4   Filed 08/03/2007   Page 2 of 3

Wade vs. Ilisagvik                     5-10-2006                      John Tuthill, Ph.D.

94

1  the e-mail January 15th; is that correct?
2  A. Let me double-check the e-mail.
3     That's correct.
4  Q. So in that length of time, you believed that
5  Bobbi was resistant to changing her style of Blackboard?
6  A. Yes.
7  Q. And what was it that in that length of time
8  made you believe that she was resistant to changing her
9  style of Blackboard teaching?
10 A. When I wrote this, I wrote "she is doing some
11 of what I directed; most she is not." Now, I was
12 talking about three issues. "Most" implies that there
13 were two that she had not responded to. Subsequently
14 she responded to two. There was one that she did not.
15    The one issue that she did not respond to was
16 the public forum for questions and answers and
17 discussions on the Blackboard platform. She maintained
18 the policy on the syllabus of insisting that if the
19 students needed to contact her with an issue or a
20 question, it should be by telephone or by personal
21 e-mail.
22 Q. So if you look back at Exhibit 66, you said in
23 the first paragraph that that was a direct order, and
24 she did comply with that direct order, correct?
25 A. That is true.

95

1  Q. And in the second paragraph you said that was
2  a direct order, and she complied with that as well?
3  A. That is also true.
4  Q. So in the third paragraph, which you said was
5  not a direct order --
6  A. No, I said it was a strong, urging
7  recommendation.
8  Q. Correct.
9  A. And she did not comply. That is true.
10 Q. But it was not a direct order, was it?
11 A. That was not a direct order. Well, the direct
12 order was to please reconsider. The direct order was
13 not, you got to do it.
14 Q. Right. So it was not a direct order to
15 change?
16 A. It was not.
17 Q. It was a direct order to think about changing?
18 A. True.
19 Q. And if she met with Sonya Abu and Rob Carrillo
20 and talked to them about that issue and still did not
21 change the way that she offered her classes, would that
22 have been in compliance with what you directed her to
23 do?
24 A. Well, I don't know. I'm not aware of the
25 meeting. I'm not aware of the topic of the meeting.

96

1  I'm not aware of the issues that were discussed. If it
2  was an issue that she was thinking about, I'm pleased to
3  hear that, but I had no evidence of that.
4  Q. If she had done that, would she have complied
5  with your urging?
6     MS. DUCEY: Objection; asked and
7  answered.
8  Q. (By Ms. Johnson) If she did do it. She gets
9  to object whenever she wants. As long as she doesn't
10 direct you not to answer, you need to answer.
11    MS. DUCEY: My objection was that that
12 has been asked and answered. But you can answer the
13 question nonetheless.
14 A. Repeat the question, please?
15 Q. (By Ms. Johnson) If she had met with them and
16 talked to them about that and considered it, would that
17 have met your strong urging?
18 A. Not necessarily.
19 Q. Why?
20 A. Well, it depends on the result of the
21 conversation. If, for example, they had had the meeting
22 and Sonya and Rob had said, well, this is a really great
23 idea, we think you should do it, here are all the
24 reasons why, and Miss Wade said, no, that's too much
25 trouble, I'm not going to do it, no.

97

1     If she had had the meeting and discussed the
2  issues and had considered it and had a good, thoughtful
3  reason for why it was not being done, would that have
4  met the technical request? Yes, it would be
5  reconsidering. Would I be disappointed if she wasn't
6  doing what I had urged her to do? Yes, I would be.
7  Q. In looking at Exhibit 46, let's start with the
8  bottom of the page, number five. What was the poor
9  professional judgment that you were talking about?
10 A. She was intervening on behalf of her
11 granddaughter, who was a student in her classes while
12 residing in Nashville, Tennessee, or thereabouts. She
13 was giving the appearance of special consideration and
14 special favors or inappropriate advising for her
15 granddaughter.
16    She was claiming her granddaughter as a
17 dependent for tuition benefit purposes. She was asking
18 the College to make special accommodations for a
19 non-resident student in a way that really suggested a
20 conflict of interest.
21 Q. How did she intervene for her granddaughter?
22 A. Well, there were some specific cases that came
23 up in the late fall of 2003 and in January of 2004. One
24 issue that came up in the fall of 2003 was that her
25 granddaughter was registered in both the Business

25 (Pages 94 to 97)

MOBURG & ASSOCIATES          1601 Fifth Avenue, Suite 860              Seattle, WA 98101
Court Reporters                    206-622-3110           EXHIBIT  D    Fax 206-343-2272
                                                          Page 2 of 3

Case 3:05-cv-00086-TMB   Document 102-4   Filed 08/03/2007   Page 3 of 3

Wade vs. Ilisagvik                 5-10-2006                 John Tuthill, Ph.D.

### Page 158

A. Well, now, I won't say correct. I'm not sure how she actually phrased the next leave request.

Q. Okay. Let me mark an exhibit and then you can maybe help me more. This should be Exhibit 75.

(Exhibit No. 75 was marked for identification.)

Q. Exhibit 75 appears to be dated and requested after the e-mail that she sent you that we're talking about in Exhibit 74; is that right?

A. Yes.

Q. And the e-mail is dated November 7th, and that's when she tells you things have changed. On November 7th?

A. She tells me November 7th things have changed. She gives me the leave request on the 13th.

Q. Was there a prior leave request that she filled out before Exhibit 75?

A. Yes.

Q. Did you keep a copy of it? Did you receive it?

A. I think I did.

Q. Did you keep a copy of it?

A. I don't know.

Q. If a leave request is not finalized, what happens to the leave request at Ilisagvik?

### Page 159

A. Normally, I would expect it would be filed. On the other hand, filing was not our strong suit that semester.

Q. Was there a specific reason that semester that filing was not a strong suit?

A. Uh-huh. Her name was Diana Kennedy, who was very talented in many ways, one of which was not filing.

Q. Okay. So where would you have expected it to have been filed? In a medical file, a personnel file, a separate file? Is there --

A. I would expect it to be filed in Miss St. Vincent's file folder in the dean's office.

Q. In the dean's office?

A. That's what I would expect, but I could be entirely wrong.

Q. Would you have given it to Diana Kennedy and told her to file it?

A. Yes.

Q. You didn't do your own filing?

A. Oh, no. I was worse at it than Diana.

Q. Okay. So she gave you an original leave and you believe that original leave was for personal leave; is that correct?

A. That is what I think, yes.

Q. And your e-mail on the next page seems to

### Page 160

discuss personal leave; would you agree with that?

A. It appears so. I don't specifically say it was a personal leave request, but that is my recollection.

Q. And then she tells you things have changed.

A. Okay.

Q. And she tells you she had had a doctor's appointment in Barrow and that she has a lump that needed diagnosis and possible surgery.

A. Yes. And she says this is far more about her body than I have a right to know.

Q. Well, but that is what she told you. Did that in your mind equate to a need for medical leave?

A. It equated in my mind to a need for me to give her the same information, the same offer that we gave to Miss Wade: That if this was a serious medical condition that needed to be addressed in a timely manner and that could only be addressed off-Slope, that she was eligible to apply for the medical leave.

Q. When you say timely manner, what does that mean to you?

A. If something could wait until the Christmas holiday without injury to the employee/patient, then it doesn't need treatment in a timely manner. If there is something that is growing, if there is something that is

### Page 161

making life difficult for the employee, if there is something that is a situation that is ongoing and accelerating, then it needs to be dealt with now.

Q. What kind of documentation did you require to know whether something was timely?

A. I needed documentation from a licensed physician to the effect that there was a serious medical issue that needed to be taken care of now, sooner rather than later, urgently, in a timely manner. Some expression to indicate that this was not something that should wait until the next scheduled break.

Q. So some expression of need, some expression of -- some adjective that lets you know that it has to be what, immediate or -- you say timely.

A. Well, Jay's note says these procedures need to be done in a timely manner. That was acceptable to me. It was acceptable to the personnel office. Miss Wade's medical leave request, the medical documentation said in a somewhat urgent framework or something like that. Somewhat urgent was satisfactory to me.

More importantly, it was satisfactory to the personnel office. They were the ones who were setting the requirements, not me. My goal was to relay the information so the employee could get the leave that they wanted.