Page 1

1                        IN THE UNITED DISTRICT COURT
2                        FOR THE DISTRICT OF ALASKA
3    BOBBI WADE,                              )
                                             )
4                    Plaintiff,              )
                                             )
5    vs.                                      )
                                             )
6    ILISAGVIK COLLEGE; NORTH SLOPE,          )
     BOROUGH; JOHN TUTHILL,                   )
7    individually; and PAMELA TAYLOR,         )
     individually,                           ) Case No. 3:05-cv-086-TMB
8                    Defendants.             )
                                             )
9

                        VIDEOTAPED DEPOSITION OF PAM TAYLOR
10                               May 4, 2006
11   APPEARANCES:
12            FOR THE PLAINTIFF:          MS. LINDA J. JOHNSON
                                          Clapp Peterson & Stowers
13                                        711 H Street, Suite 620
                                          Anchorage, Alaska 99501
14                                        (907) 272-9272
15            FOR THE DEFENDANT
              NORTH SLOPE BOROUGH:        MR. PETER C. GAMACHE
16                                        Attorney at Law
                                          405 West 36th Avenue
17                                           Suite 201
                                          Anchorage, Alaska 99503
18                                        (907)  563-6969
19            FOR THE DEFENDANTS
              ILISAGVIK COLLEGE,
20            PAMELA TAYLOR and
              JOHN TUTHILL:               MS. CYNTHIA L. DUCEY
21                                        Delaney, Wiles, Hayes, Gerety,
                                             Ellis & Young, Inc.
22                                        1007 West Third Avenue
                                             Suite 400
23                                        Anchorage, Alaska 99501
                                          (907)  279-3581
24
              ALSO PRESENT:               MS. BOBBI WADE
25

EXHIBIT E
Page 1 of 5
49e0613c-0d57-4b98-9fb6-7969e42607ce

May 4, 2006                     Bobbi Wade v. Ilisagvik College, et al.                     3:05-cv-086-TMB
                                          Pamela Taylor

Page 58

1  A  Because that could have been more than -- well, a
2     single appointment, who knows.
3  Q  Okay. But she said she needed to take leave because
4     she had medical appointments. Is that right?
5  A  No, she didn't say that.
6  Q  What did she say?
7  A  She said she's going to take leave and while she was
8     gone, she'd have some appointments.
9  Q  Okay. Do you recall if Bobbi Wade had ever taken
10    extended medical leave before?
11 A  No, I don't recall. I don't recall that.
12 Q  How does one get the leave under family medical leave
13    on this form? See down here.....
14 A  Uh-huh. Uh-huh.
15 Q  .....where it says family medical leave?
16 A  Uh-huh.
17 Q  When would that be granted to somebody?
18 A  When someone indicates they have a serious medical
19    condition that needs attention.
20 Q  And what kind of -- what -- in your mind, what is a
21    serious medical condition?
22 A  I don't have that -- that expertise to tell you what
23    that would be and this -- question of the ages.
24 Q  Well, if you don't know what it is, how would you know
25    when to apply family medical leave?

Page 59

1  A  I would expect the doctor to be giving us something
2     in -- in writing to say it was a serious medical
3     condition.
4  Q  Okay. And what would you be looking for in a doctor's
5     note?
6  A  Please excuse John Smith to attend to treatment for a
7     serious medical condition or a doctor's
8     certification -- certification of a medical health care
9     provider, which I would have given to someone had --
10    they said they had a serious medical condition. And
11    then the doctor would fill that out. Upon receipt of
12    that, then we would certainly also began the authority
13    process.
14 Q  Okay. So if somebody -- at -- what would somebody have
15    to tell you for you to give them some sort of
16    paperwork?
17 A  What kind of paperwork?
18 Q  Well, I -- that -- let me back up. Do you have Family
19    Medical Leave Act paperwork that you give out?
20 A  Yes.
21 Q  What kind of paperwork do you use?
22 A  It's a -- it's a -- first of all, it's the form. For
23    example, I say please have your physician or nurse
24    care -- nurse practitioner or someone fill this out,
25    bring it back to me, so that I can review it. We can

Page 60

1     get the -- the employer's response. It's a formal
2     letter that I then send it -- then issue to the
3     employee, noting out the terms of the -- the leave.
4  Q  Okay. So you give them a form. Is the form that you
5     use one that has been approved by the Department of
6     Labor?
7  A  Yes, it's the family -- it's the emergency -- it's
8     the -- it's the medical certification provider
9     form.....
10 Q  Okay.
11 A  .....filled out by the medical provider. Excuse me.
12 Q  And where did you obtain a form like that?
13 A  Off the Department of Labor website.
14 Q  Okay. So did you.....
15 A  As also a copy of it through our attorney.
16 Q  Through your attorney?
17 A  Uh-huh.
18 Q  Okay. Did you personally go to the website and run off
19    the form on a computer?
20 A  Yes. Numbers of years ago, more than once.
21 Q  Okay.
22 A  Yeah.
23 Q  Do you go to the computer on an as-needed basis or do
24    you have a.....
25 A  No. From the file.

Page 61

1  Q  You have a file. Okay.
2  A  Yeah, yeah. That would be -- I only have one person in
3     my department now. I'm not going to do that too many
4     times.
5  Q  Okay. So you give out a form. And you also give out a
6     formal letter, you said?
7  A  As a result of the doctor's note or.....
8  Q  After you receive it.....
9  A  Some sort of certification from it -- from a licensed
10    medical expert.
11 Q  So first you do the form, then you get the doctor's
12    note back?
13 A  No. Not necessarily. If I just get a doctor's note
14    saying this is a serious medical condition that she
15    will be or he will be ex- -- out of work for many
16    months or whatever, I mean, certainly. He doesn't have
17    to give us a necessarily a diagnosis. That's private
18    information. I don't expect that.
19 Q  Okay.
20 A  But I do expect something from the physician saying
21    this person is under serious medical care or has had
22    surgery or something or is expecting a baby or
23    something to do that. And then also if that doesn't
24    come either -- either direction and the only -- the
25    other option is that -- that certification form that's

16 (Pages 58 to 61)

EXHIBIT E
Page 2 of 5        49e0616c-0d57-4b98-9fb6-7969e42607ce

Page 62

1    filled out by the physician that we hope to get back.
2    That's the ideal.  Because it gives more information;
3    it gives anticipated duration of absence, all kinds of
4    things a physician fills out.  It helps us a lot in
5    the -- in the employer's letter of response.
6  Q    I think I'm not understanding.  When is it that you
7    give the form out?  Who do you give that to?
8  A    I would give it to the employee if I knew that there
9    was some reason to.
10  Q    Okay.  And if -- so if an employee came to you and they
11    said, I need to go off slope; I'm going to get some
12    medical appointments done, would that trigger you
13    giving them the form?
14  A    No.  Not at all.
15  Q    Why not?
16  A    Because that's pretty common practice for us to go off
17    slope to get our teeth filled, to get our eyes checked.
18    Those are not serious medical conditions by any sense
19    of the word.  And that's a pretty common practice is to
20    combine personal time away with medical appointments or
21    dental appointments or eye appointments.
22  Q    Okay.
23  A    It's a very common practice up here.
24  Q    So what do you expect the employee to say in order --
25    if they have to go off slope, what do you expect them

Page 63

1    to say to you that would trigger you to say, oh, family
2    medical leave?
3  A    I have a serious medical condition I'm concerned about;
4    I'm worried about something, X; I might be pregnant; I
5    have -- those are the kinds of things.  I mean, those
6    would be standard triggers and unless I hear something
7    like that, I'm not going to just jump to conclusions
8    and -- and hand an FMLA form every time, because very
9    rarely do we need those.  The occasion for FMLA is rare
10    compared to the occasion for going off slope to get
11    your teeth cleaned or not even teeth cleaned, but teeth
12    filled.  I, myself, went one time to get a bone graft
13    put in my maxillary arch.  That wasn't a serious
14    medical condition, but I had to go off slope to get it.
15  Q    Okay.  If you saw something like exhibit 20, if this
16    was handed to you, would this be enough for you to say,
17    here's the form for FMLA?
18  A    Not necessarily.
19  Q    Why not?
20  A    Again, it doesn't tell me -- had I seen it, it's
21    conjecture.  I mean, I don't know what I would have
22    done.
23  Q    Okay.
24  A    I mean it depends.  I -- I don't want to have to look
25    at hypotheticals because we're trying to talk about

Page 64

1    what we know happened or didn't happen.
2  Q    Right.  But we have a note and I just wondered.....
3  A    Yeah.
4  Q    .....if this was presented to you, would it be your
5    practice to give somebody an FMLA form?
6  A    Again, it would have to be dependent on -- on a lot of
7    factors.  And I -- I don't want to even have to say
8    what I would have and not have done.
9  Q    Okay.
10  A    This is looking back.
11  Q    You would agree that the employee would not have to ask
12    you for family medical leave.  Is that correct?
13  A    Yes.  That would be expecting them to be a lawyer by
14    doing so.
15  Q    Do you ask follow-up questions when somebody says they
16    need to go off slope and get medical treatment?
17  A    Not necessarily.  And I don't.  I try to honor their
18    privacy.
19        MS. JOHNSON:  Would you ask her to mark that
20    exhibit 33?
21            (Deposition Exhibit 33 marked)
22  Q    I'll give you your copy in a minute.
23  A    Oh, okay.  I figured that would.....
24        MS. DUCEY:  You can look at that if you want.
25  A    Okay.  There we go.  I've got the one with the sticker.

Page 65

1    Okay.
2  Q    That's right.  You get the official copy.
3  A    I get the special one.
4  Q    Did you have a chance to read that?
5  A    Oh, yeah.
6  Q    Okay.  Do you recall getting this particular.....
7  A    Yes, I actually do.  Uh-huh.
8  Q    Okay.
9  A    I do.
10  Q    And do you recall getting it October 1st?
11  A    Not offhand, but I'm sure -- I -- I try to read my --
12    my e-mail within the day or two of getting them.  I get
13    a lot, so I can't say when I read it, but I do recall
14    getting this.  Certainly, if it came on 10/1, I -- I
15    certainly got it soon after I read it -- soon after.
16  Q    I haven't seen a response to this.  Do you call
17    responding to this, like, you know, turning an e-mail
18    around and sending a written response back?
19  A    Not always.  No.  I'm pretty informal.  Again, I'm --
20    Bobbi is a friend -- at the time, cer- -- I probably
21    called her back.  I remember talking to her about it,
22    but not -- not e-mailing her.  I don't have an e-mail
23    record of it either.
24  Q    You do have a recollection of talking to her about it?
25  A    Yes, I do.

17 (Pages 62 to 65)

EXHIBIT E
Page 3 of 5
49e0613c-0d57-4b98-9fb6-7969e42607ce

Page 66

1 Q   And what do you recall saying to her?
2 A   I said, there's no specific guidelines for faculty that
3     would cover leave anyway.  It's in the over-arching
4     employee handbook would be the one that is applying.
5 Q   Okay.
6 A   And I referred her to that handbook.  I said, take a
7     look at that.  It's -- this, you know -- it's -- it's
8     in the general handbook is our policy on all faculty
9     and non-faculty leave.  And, of course, how are -- how
10    much leave you have available from your contract.
11 Q  Okay.  So you told her that there was no faculty
12    handbook.  Is that correct?
13 A  No.  I said, the leave would not be affected by any
14    faculty handbook, because I don't -- the instruction
15    office handles the faculty handbook from year to year.
16    The -- every aspect of our leave is covered in -- in
17    the over-arching general employee handbook, which it
18    covers -- it applies to all faculty and non-faculty,
19    all those policies.
20 Q  Okay.  Do you recall if there is a specific faculty
21    handbook?
22 A  There was years ago.  Don't -- there hasn't been for
23    some time and afraid there hasn't been even in those
24    days, there wasn't one.  It was hit and miss with the
25    instruction department.

Page 67

1 Q   Okay.
2 A   I don't guarantee it was in even one then, because I
3     agree, she -- there -- Bobbi was looking for a faculty
4     handbook and I don't think there was one existing at
5     that time.
6 Q   Okay.  So you told her to look at the general handbook.
7     Did you point out any specific -- I'm sorry.  Maybe I
8     wasn't paying enough attention when you talked -- did
9     you point out a specific policy to her?
10 A  No, because it was a vague question and/or medical
11    leave -- and personal leave.  I just said that the --
12    the leaves are discussed in that handbook.  And I --
13    knowing me, I often called Bobbi because she worked in
14    the hut across the way.  It was a long walk to go back
15    and forth and I liked talking with her, you know, on
16    the phone.
17 Q  Let's see.  Exhibit number 8, do you recall having
18    employees sign for their leaves and tell them that you
19    would give them their updates at a later time?
20 A  No, I don't recall that.
21 Q  Was that a common practice for you at that time?
22 A  It wouldn't have been.
23 Q  It wouldn't have been?
24 A  No.  To do what again?
25 Q  To have them sign a form like this and then tell

Page 68

1     them -- not have anything available at the time and
2     then tell them that you would give it to them later?
3 A   Give what to them later?
4 Q   The update that they were signing for.
5 A   No.
6 Q   You don't recall doing that?
7 A   Never.
8 Q   Did you do it with anybody?
9 A   Not that I recall.  I mean, this would have come from
10    the handbook.
11 Q  What do you mean?
12 A  This was part of the handbook.  This has always been a
13    part of the handbook -- is a separate piece that comes
14    out and you sign off on it.
15 Q  So is it your practice to only give people this
16    document if you also give them the leaflet that updates
17    them?  Is that what you're saying?
18 A  There wouldn't be a leaf- -- there would be an entire
19    handbook attached to this.
20 Q  Oh, I see.  So this only comes with a whole copy of the
21    handbook?
22 A  Yes.
23 Q  I see.
24 A  This was the 2001 handbook that was updated.
25 Q  Okay.  So if there are more than one of these, does

Page 69

1     that mean that in somebody's personnel file, does that
2     mean that you've given them whole copies.....
3 A   Yes.
4 Q   .....every time they've signed this?
5 A   Yes.
6 Q   It was never your practice to give inserts, say, you
7     know, here's a new section 5?
8 A   We did only one time and that was in February of 2002
9     when we had a very slight change, rather than --
10    because I asked our attorney, our counsel for
11    information on that and she said to go ahead and just
12    do update on the simple pages -- the few pages that
13    were updated, rather than do the whole handbook
14    distribution again.
15 Q  Correct.
16 A  And that 2002 is a separate form acknowledging that
17    revision update of 2002.  This is not to be confused
18    with this form, which is the 2001 handbook.
19 Q  Who does the handbook updates for the college or would
20    you do that?
21 A  I work with the attorney on that and the cabinet
22    approves it.  We have -- the cabinet.
23 Q  Who -- the cab- -- who's the cabinet?
24 A  The president.  At the time, it was the president and
25    the deans and I believe we had an executive vice

May 4, 2006                    Bobbi Wade v. Ilisagvik College, et al.                    3:05-cv-086-TMB
                                        Pamela Taylor

Page 126

1  correctly and carefully, it says, the documents Bobbi
2  handed to me the other day are the same documents I
3  handed to you yesterday.  I'm not saying in that
4  sentence or even now, at any point now, that this is a
5  Tennessee document.
6  Q   Would you have said that if she didn't.....
7  A   Not.....
8  Q   .....if she didn't give you a doctor -- a document from
9  Tennessee?
10 A   Not necessarily.  I -- who knows what I would have
11 said.  I -- I mean, a ten- -- I'm not defining that the
12 document is a Tennessee document then, nor am I
13 recollecting it to be specifically Tennessee now.
14 Q   Okay.  So if she stated that she gave you this doctor's
15 note from Tennessee dated 8/7/03, it's exhibit 20.....
16 A   Uh-huh.
17 Q   .....is she -- said that she gave it to you at least as
18 of October 9th, would you still dispute that you
19 received this document in '03?
20 A   I'm saying that I got -- I did not see that document in
21 '03.
22 Q   Okay.  The next paragraph says the phrase, the more
23 things change, the more they seem to -- they.....
24 A   The more they remain the same.
25 Q   Boy, I can't say that.  The more things change, the

Page 127

1  more they remain the same.  What did that mean?
2  A   It means that we were still waiting for medical
3  appointment dates.  We still had -- with all the
4  changes and discussions, we still had not gotten what
5  we were asking for.  That was my -- my meaning in that
6  statement.
7  Q   Is that all you were waiting for at this point, is
8  medical appointment dates?
9  A   Well, at that point, we were waiting for appointment
10 dates; we were still waiting for notification from the
11 doctor that this could not wait and that -- and then in
12 an e-mail that Bobbi sent, it just -- she herself was
13 saying, well, this should be sufficient.  She made the
14 decision.  We were still waiting for the doctor's note
15 saying this needed to be done now, not later or not --
16 we didn't got any of that still.  That's what I was
17 saying, the more things change, the more they remain
18 the same.  What we were asking for still had not been
19 given to us.
20 Q   Okay.  And you still -- so you still wanted appointment
21 dates and you wanted a note from the doctor that said,
22 this can't wait until Christmas?
23 A   Or it could wait, one or the other, yeah.  Some
24 determination of the -- from the phys- -- from the
25 physician's point of view, from the educated opinion,

Page 128

1  whether or not this could wait until business needs
2  could be met until the holidays.
3  Q   Did you ever talk to John Tuthill about whether a
4  substitute teacher could be provided to Bobbi Wade to
5  cover her while she was on medical leave?
6  A   Well, it is our standard practice for our -- in our
7  process to hire adjunct faculty, not really called
8  substitutes, but someone to fill in if an employee/
9  faculty member is gone for any serious length of time.
10 Q   And when you say serious length of time.....
11 A   Well, length of time, I should say.  Serious is a poor
12 choice of word, but, yeah, length -- a lengthy time.
13 More than one -- one or two -- you know, one course.  I
14 mean, one or two absence dates or something that's
15 saying this -- this is weeks at a time or days and days
16 at a time.
17 Q   So.....
18 A   It would be a standard practice.  And he did ask me,
19 well, you know, it looks like I'm going to have to --
20 he didn't ask me.  He says, I -- it looks like I may
21 have to think about hiring someone to fill in for
22 Bobbi's classes if she has to go.  I said, well, that's
23 a possibility.
24 Q   When did you have that discussion with John Tuthill?
25 A   Earlier.  Right around this time.  Yeah.

Page 129

1  Q   In the October time frame?
2  A   Yeah, exactly.  I said, it depends on what the doctor's
3  office says, John.  What -- we have to go by what
4  that -- what that says.  He says, I understand,
5  certainly.
6  Q   So you advised him that if the doctor said that she
7  needed to go that he should.....
8  A   Oh, absolutely.  Absolutely.  I did tell him that and
9  he says, there's no question in my mind either.  We'll
10 definitely take care of her health.  It's the first
11 priority.....
12 Q   Okay.
13 A   .....in his mind, ultimately was.
14 Q   I want you to look at exhibit 27.
15 A   Thank you.  I have my own sticker again, now.  Okay.
16 A   Do you remember getting this e-mail?
17 A   Yes.  I do.  I certainly do.
18 Q   Okay.  And, again, I would ask you does this -- does
19 the indications on the page look like you printed this
20 off?
21 A   Yes.  It does, doesn't it.  I -- I never noticed that
22 really.  It's funny.
23 Q   And you would have kept this in your pending file as
24 well?
25 A   Yes, still.  Just keeping -- I'm very visual, so I -- I

33 (Pages 126 to 129)