Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF ALASKA
 3
 4   BOBBI J. WADE,
 5        Plaintiff,
 6     vs.
 7   ILISAGVIK COLLEGE, NORTH SLOPE
     BOROUGH, JOHN TUTHILL, individually,
 8   and PAMELA TAYLOR, individually,
 9        Defendants.
10
     Case No. A05-086 CV (TMB)          COPY
11
12
13
14
15              DEPOSITION OF DEBRA ENGLISH
16                  Taken April 24, 2007
                  Commencing at 9:15 a.m.
17
              Volume I - Pages 1 - 402, inclusive
18
19
20              Taken by the Defendants
                          at
21                 Delaney Wiles, Inc.
           1007 West 3rd Avenue, Suite 400
22                 Anchorage, AK 99501
23
24
     Reported by:  Valerie Martinez
25
```

EXHIBIT A

Page 74

1  protection, which would start your -- the employer's
2  responsibility to implement (c).
3  Q  All right. I didn't get an answer to my question,
4  which was: If the employee does not say I need FMLA
5  leave, at that point the employer has a duty to inquire
6  but no duty to give notice of FMLA rights; is that
7  right?
8  A  They don't. They need to make a determination or
9  they can just conditionally approve it based on the
10 receipt of the certification from the physician that
11 will make a final -- give them all the information in
12 one document to make a final determination.
13 Q  So they can but they are not required to give that
14 FMLA notification?
15 A  They're required to inquire further. If an
16 employee comes up and says, I need FMLA leave -- believe
17 me, no employee is going to come up and do that unless
18 they have walked that path before.
19    They're not going to say, I need FMLA leave.
20 They just don't do it. They don't know the laws.
21 That's not their arena. If they have had FMLA leave
22 before and they knew about the protection, there is a
23 greater likelihood -- there is some likelihood that they
24 will say, I need FMLA leave.
25 Q  Now, if the employee doesn't give the information

Page 75

1  that the employer requests when the employer makes a
2  reasonable inquiry, does the employer have the
3  obligation then to give notice of FMLA rights?
4  A  The employer has to inquire enough so that they can
5  make a determination. The Department of Labor --
6  Q  What if the employee refuses to cooperate, refuses
7  to give that information?
8  A  Well, if the employer has not -- determined it's
9  not FMLA, then that's a choice that they've made.
10 Q  But what if the employer doesn't know that the
11 employee is not cooperating and refusing to give the
12 information sought? Does the employer have any further
13 obligation?
14 A  If the employee refuses to provide all the
15 information contained in the Certification of Health,
16 they can deny -- they can say, You don't qualify. You
17 haven't provided me "X".
18 Q  What if the employer asks not for all of that
19 information but some additional information to determine
20 whether it's FMLA qualifying and the employee refuses to
21 provide that?
22 A  It would depend on what they refused to provide.
23 Like if they say, Are you having a hysterectomy? And
24 the employee says, I don't have to tell you that. That
25 is correct. They do not have to tell you that.

Page 76

1  Q  So, let's look back to (b)(1) of 301, and would you
2  agree with me that this contains all of the things that
3  have to be included in the FMLA notification of rights?
4  A  Yes.
5  Q  And what are the consequences for failure of an
6  employer to give that notification?
7  A  What are the consequences to the employer?
8  Q  Right. Yes.
9  A  Well, that they have not complied with the law. If
10 they don't give this notice but they give the employee
11 all of the protections --
12 Q  Right.
13 A  -- I don't think there is a problem.
14 Q  So if the employee gets the leave, there is no
15 problem?
16 A  If they get the leave and they get all their
17 protections -- that means they're allowed to take the
18 leave -- when they return to their same or equivalent
19 position, if they get the protections without having
20 the, you know, notice -- the law requires a notice, but
21 I -- if they provide the protections, I think if an
22 employee came after them in a suit, they wouldn't have a
23 leg to stand on. They may not have given them the
24 notice, but -- excuse me -- let me refresh.
25    The employer has to invoke FMLA. It's not the

Page 77

1  employee's responsibility. So in order for the leave to
2  count toward the bucket of FMLA hours you are entitled
3  to, they have to invoke it. If the employer doesn't,
4  then they've lost their ability to capture that and
5  count it against the employee subsequently.
6  Q  So the regulation actually states specifically what
7  the consequences are for failure to give the notice.
8  Let me ask you first: Are you familiar with that
9  provision?
10 A  What --
11 Q  Don't bother to look at it. I want to know first
12 if you are familiar with that provision.
13 A  If they don't -- if the employer doesn't designate
14 it as FMLA --
15 Q  No, no. If the employer does not give the written
16 notification that is set out in 29CFR825.301(b)(1) --
17 correct me if I am wrong -- you are not familiar with
18 the specific provision that discusses the consequences
19 of that failure?
20 A  No, because I haven't dealt with that.
21 Q  Would it also be correct to say that you did not
22 evaluate that in your report?
23 A  I didn't.
24 Q  So then could you look at (f), please?
25    And let me read it into the record. It says:

Case No. A05-086 CV (TMB)                                    Debra English

Page 202

1  the dispute; is that correct?
2  A   Yes.
3  Q   And internal resolution contemplates that these are
4  going to be insiders that are attempting to resolve the
5  dispute; correct?
6  A   At the early stages. But oftentimes organizations
7  will use an outside person at the end of the process.
8  Q   But unless the contract requires that, they're not
9  obligated to do that; are they?
10 A   Nope. They have control over the process.
11 Q   They have control. And there is an advantage to
12 try and attempt an informal resolution to the -- through
13 a grievance; correct?
14 A   Yes.
15 Q   It costs a lot less money; right?
16 A   Yes.
17 Q   People's hackles don't get up; right?
18 A   Well, their hackles don't get up.
19 Q   Sometimes, but oftentimes if you go into a more
20 formal process, like arbitration or litigation, not only
21 is everybody mad, everybody is really mad; right?
22 A   Yes.
23 Q   And there is no opportunity for a face-to-face that
24 might result in resolving the dispute; correct?
25 A   When?

Page 203

1  Q   There's no opportunity if you're not in the
2  grievance procedure, if you're outside that internal
3  resolution procedure, for having a face-to-face with the
4  employee and try and resolve it; right?
5  A   No, I disagree. You can sit down with an employee
6  at any time and try to resolve issues.
7  Q   Once you're in arbitration --
8  A   No.
9  Q   -- and everybody is represented by lawyers?
10 A   Then you're sitting down -- at court cases, you can
11 sit down and resolve things outside before there is a
12 final decision.
13 Q   You may be, yeah.
14 A   At arbitration, you can call a halt and go outside
15 and cut a deal. Prior to that --
16 Q   Of course.
17 A   -- at any time you can cut a deal prior to going --
18 Q   Of course. But if you're at the informal
19 resolution stage where insiders are trying to resolve
20 this without attorney involvement, that provides the
21 most direct means of trying to get the grievance
22 resolved; right?
23 A   Yes.
24 Q   And in your experience -- I looked at a couple of
25 the Muni's CBAs. Do they all have three steps in the

Page 204

1  grievance process?
2  A   Yes.
3  Q   And the personnel handbook for the Muni also has a
4  three-step grievance process; correct?
5  A   Actually, it's code. It's Municipal code.
6  Q   Right. It has a three-step grievance process;
7  right?
8  A   With an outside hearing officer, yes.
9  Q   Well, it's after the third step is resolved that
10 there's a right to arbitration; right? It's really
11 almost a fourth step.
12 A   It's when the parties have not reached resolution
13 that it can go to a hearing officer.
14 Q   Right. Yeah, I looked at this yesterday and it
15 says -- it's 330101 -- right -- is the grievance
16 procedure? Step 1 is informal discussion with the
17 agency head; right?
18 A   Yep.
19 Q   Step 2 is decision by the agency head, which says
20 upon receipt of a written grievance an agency head
21 shall, within five working days, respond in writing;
22 correct?
23 A   Yes.
24 Q   And then upon receipt of the response, the employee
25 has five days to appeal the decision in writing to the

Page 205

1  mayor; correct?
2  A   Yes.
3  Q   And then Step 3 is a decision by the mayor;
4  correct?
5  A   Yes.
6  Q   Within five working days of receipt, the mayor or
7  his designee shall review the matter or respond in
8  writing to the grievance. And then upon receipt of the
9  decision, the next step -- if it's carried to the next
10 step -- will be the employee has five working days to
11 submit a written request to arbitration, to the
12 director; right?
13 A   Yes.
14 Q   So arbitration is actually -- I don't know if you
15 want to call it Step 4. The next step in the
16 proceeding; right?
17 A   It's the last step.
18 Q   An arbitration is a proceeding that's formal; isn't
19 it?
20 A   Yes, it is.
21 Q   And arbitration under the personnel rules requires
22 that a hearing officer be appointed outside the agency;
23 right?
24 A   Yes.
25 Q   And it has other provisions, too, for an

52 (Pages 202 to 205)

Page 206

1  arbitration hearing; correct?
2  A  Yes.
3  Q  But until it gets to arbitration, the grievance is
4  handled all by insiders; isn't it?
5  A  Yes.
6  Q  And that's legal; isn't it?
7  A  That's customary.
8  Q  It's not only legal, it's contractual; isn't it?
9  A  That's by code by law.
10 Q  Now, the mayor can designate someone to resolve
11 this Step 3 grievance; right?
12 A  Yes.
13 Q  And in your experience, who typically does the
14 mayor designate as his Step 3 designee?
15 A  When I was there, it was me.
16 Q  And you're an insider; right?
17 A  Yes.
18 Q  You might have knowledge of all the parties; right?
19 A  Yes, I do.
20 Q  And you have knowledge of all the personalities;
21 right?
22 A  Yes.
23 Q  You are paid money by the Muni; right?
24 A  Yes.
25 Q  But from the Muni's point of view, it's absolutely

Page 207

1  legal for you, who is an employee of the Muni and being
2  paid by them, a public servant, to decide these Step 3
3  matters; right?
4  A  To respond at the Step 3, yes.
5  Q  And when you worked for the State, was it pretty
6  similar except that maybe it was a different person
7  besides the mayor?
8  A  No. It went up to labor relations to Department of
9  Administration, which was the step before arbitration so
10 they can overrule actions by the departments.
11 Q  But the first three steps in the State grievance
12 procedure were also done by insiders; weren't they?
13 A  Yes.
14 Q  People that were public servants; right?
15 A  Yes.
16 Q  Paid by the employer; correct?
17 A  Correct.
18 Q  And making these substantive determinations about
19 grievances; right?
20 A  Yes.
21 Q  Nothing illegal about that; right?
22 A  No.
23 Q  Nothing unfair; is there?
24 A  No.
25 Q  It's the employer's prerogative to have a grievance

Page 208

1  procedure or not; isn't it?
2  A  Yes.
3  Q  It's the employer's prerogative to determine what
4  the terms of that grievance procedure is; correct?
5  A  If it's nongovernment and noncontractual, yes.
6  Q  And it's the employer's prerogative to decide if
7  and under what circumstances any of those rights will be
8  enlarged; right?
9  A  Yes.
10 Q  So let's talk about Ms. Wade's contract, and you
11 can refer to the contract if you'd like. But also
12 probably Exhibit 7, which is the personnel rules.
13 A  Is that the manual?
14 Q  Right. The employee handbook. And my page numbers
15 on the bottom got cut off, but the document number for
16 the grievance procedure is 20584.
17 A  I have it.
18 Q  So the grievance procedure that Ilisagvik has is
19 not dissimilar to the grievance procedures you have been
20 involved with; is it?
21 A  No.
22 Q  It has a three-step procedure; right?
23 A  Yes.
24 Q  And those three steps are all performed by
25 insiders; right?

Page 209

1  A  Yes.
2  Q  They are all people who are servants of the
3  employer; right?
4  A  Yes.
5  Q  They are getting paid money by the employer; right?
6  A  Yes.
7  Q  And they probably know all the parties; right?
8  A  Yes.
9  Q  And they may know all the history, too?
10 A  They may.
11 Q  And there is nothing illegal about that; is there?
12 A  No.
13 Q  There is nothing unfair about that; is there?
14 A  No.
15 Q  And is there any violation of federal statute in
16 having an insider decide a Step 3 appeal?
17 A  No.
18 Q  And that would include if the employer determines
19 if they are going to enlarge the Step 3 rights by having
20 a hearing; right?
21 A  No.
22 Q  Nothing illegal about that; right?
23 A  No.
24 Q  And the employer has really all of the bargaining
25 power to decide the parameters of the Step 3 hearing;

Page 210

1  don't they?
2  A  Yes.
3  Q  In your experience in processing grievances, did
4  you ever -- did the City or the State give the employee
5  the right to tape-record a Step 2 grievance meeting?
6  A  Yes, the union. Most of them are represented by
7  union.
8  Q  If that's not in the contract, the employer does
9  not have to afford the employee the right to tape-record
10 a Step 2 hearing; do they?
11 A  This wasn't in the contract. We just required that
12 we had to be provided with a transcript.
13 Q  If a contract doesn't permit or allow
14 tape-recording of a Step 2 grievance hearing, it is the
15 employer's prerogative to prohibit that; correct?
16 A  If the policy doesn't allow it, yes.
17 Q  And there might be policy reasons why taping a Step
18 2 grievance meeting would be counterproductive; wouldn't
19 you agree?
20 A  In my expertise, I don't know why an employer would
21 not want to do it unless they don't want to be on the
22 record.
23 Q  Has it ever come to your attention that tape
24 recording proceedings sometimes heightens the anxiety or
25 the emotions of the parties involved?

Page 211

1  A  You know, in arbitrations, they are always taped.
2  It's just part of the process, and once you start down
3  that process, you know, it takes a life of its own.
4  Q  At an arbitration, it's an expectation in advance;
5  isn't it?
6  A  Some take notes, some tape-record.
7  Q  Now, in Ms. Wade's case, she showed up for a Step 2
8  grievance meeting with John Van Hoesen and Ms. Taylor in
9  December '03; correct?
10 A  Yes.
11 Q  And she attempted to surreptitiously record the
12 proceedings; correct?
13 A  I thought she put the tape recorder on the table
14 and asked -- and said she was going to tape it.
15 Q  Yeah, I think there was evidence in the records
16 that that's after they realized she was taping it. But
17 whether it was surreptitious or not, it was within the
18 employer's prerogative to tell her, no, you are not
19 going to tape a Step 2 grievance meeting; correct?
20 A  Both parties have to agree to it. If they don't,
21 it doesn't get taped.
22 Q  And that's not evidence of bad faith to say, I
23 don't want you taping this meeting; is it?
24 A  No.
25 Q  So you would agree that the college's refusal to

Page 212

1  let her tape-record that meeting was not illegal;
2  correct?
3  A  It's not illegal.
4  Q  Was not unfair to her; correct?
5  A  Well, it was their policy. I'm not going to say
6  that it was unfair or fair, it was their policy and they
7  had the authority.
8  Q  Is it fair for them to stand on their policy
9  rights?
10 A  Yes.
11 Q  Their contract rights? Okay.
12    So telling her that she couldn't tape-record the
13 proceeding was not an unfair procedure?
14 A  It followed their policy.
15 Q  And it certainly comported with the process that
16 was due her under Step 2 of the grievance procedure;
17 correct?
18 A  The nontaping?
19 Q  Prohibiting her from taping was not a violation of
20 the process that was due her under Step 2?
21 A  No.
22 Q  And they did meet with her; right?
23 A  It's my understanding that it was cancelled because
24 she wanted to tape. They said no. She asked for their
25 decision not to allow her to tape in writing, and they

Page 213

1  wouldn't give it to her. And the meeting was then
2  cancelled.
3  Q  Was there any requirement that they put in writing
4  that they didn't want the proceedings tape-recorded?
5  A  No.
6  Q  So that didn't violate any of her procedural rights
7  under Step 2; correct?
8  A  There is no violation, but it was a reasonable
9  request.
10 Q  Well, it was reasonable but it was not a violation
11 of her procedural rights to deny it; was it?
12 A  No. Cancelling the meeting, though, doesn't meet
13 with their policy. They said that they're -- in the
14 grievance policy, there's a Step 2 meeting. So when
15 they failed to have that meeting, they weren't following
16 that policy.
17    MR. VAN FLEIN: I have an objection or at
18 least a question on clarification -- and this is one
19 that I am at a disadvantage, not having been to the
20 prior depositions with you. The policy of not allowing
21 the tape-recording, I guess I don't have a copy of that.
22 What exhibit?
23    MS. DUCEY: We're referring to the grievance
24 procedure in Exhibit 7.
25    THE WITNESS: It's not in it. It's just a

Page 214

1  policy at the college.
2      MR. VAN FLEIN: It's not a written policy?
3      THE WITNESS: No.
4      MR. VAN FLEIN: So I haven't missed a
5  document?
6      THE WITNESS: I wasn't aware that it was
7  written. It was just a standard policy they didn't
8  tape. It's standard practice in human resources in
9  meetings like that, that both the parties have to agree.
10 And if they don't agree, then it's not taped.
11     MR. VAN FLEIN: I misunderstood earlier. I
12 thought you were talking about a policy that was part of
13 this and I didn't see it. So, I'm not missing an
14 exhibit is what I'm asking.
15 BY MS. DUCEY:
16 Q  Ms. English, when the college stood on its rights
17 under the grievance procedure, the Step 2, and said,
18 well, we want to meet with you but you're not going to
19 tape-record that, and we're going to cancel the meeting
20 and you need to decide what you want to do, and she
21 refused to reschedule, that wasn't a violation of her
22 procedural rights; was it?
23 A  If they had the Step 2 meeting scheduled and they
24 met and they told her you're not going to tape it, she
25 turns the tape off -- if she refused to turn the tape

Page 215

1  off, cancel the meeting, but she turned the tape off,
2  proceed with the meeting.
3  Q  Well, they had some informal conference where they
4  tried to decide what they were supposed to do under that
5  circumstance; right?
6  A  Yes, but they have to have a Step -- the process
7  says she gets a Step 2 meeting. So, that's their
8  process. They set aside their process. I understand
9  not taping it, you know, but turn off the tape recorder,
10 proceed with the meeting.
11 Q  Where is the evidence that she turned the tape
12 recorder off and was willing to meet with them that day?
13 A  The evidence was -- the letter from Van Hoesen said
14 the meeting was cancelled. She didn't control the
15 meeting. She didn't cancel the meeting.
16 Q  Right. So what I am wondering is, where is the
17 evidence that establishes that she turned the tape
18 recorder off while they were all there and said, I am
19 willing to proceed?
20 A  I'm not sure there is evidence to that. I know
21 that Van Hoesen wrote back to her and she disagreed with
22 his assertion of what happened.
23     It's an e-mail dated March 5th.
24     "In response to your memo, the action in the
25 meeting room is not described as accurate, but I

Page 216

1  will agree to what you have said as acceptable
2  in the last paragraph. I did not refuse to meet
3  without the meeting being tape-recorded."
4      So there is a difference between the parties.
5  Q  Right. Mr. Van Hoesen's recollection of events is
6  different?
7  A  Yes. She said:
8  "I agreed to meet without the tape recorder if
9  you would sign a statement that you refused me
10 the right to use a tape recorder. You said,
11 yes, I will type it up right now. You went out
12 the door. I expected the meeting to proceed and
13 it was cancelled."
14     That's her recollection.
15 Q  And in Exhibit 53B, we have John Van Hoesen's March
16 5th recollection of the events; correct?
17 A  Yes.
18 Q  And he says:
19 "Upon entering the room, I asked if you would be
20 having an attorney present at the meeting. You
21 said, no. I asked if you would be
22 tape-recording the meeting. You said, yes. I
23 responded I wouldn't agree to the meeting being
24 tape-recorded and said if you insisted on
25 tape-recording the meeting, we would not hold

Page 217

1  the meeting. You responded, your attorney said
2  you had a right to tape-record the meeting and
3  your right extended to not disclosing to anyone
4  at the meeting that you were tape-recording it."
5      Would you agree with that, that she could
6  surreptitiously tape-record the meeting?
7  A  No.
8  Q  Right.
9  "I again said that I would not agree to the
10 meeting being tape-recorded and left the room to
11 inform the other participants no meeting would
12 be held. I returned a few minutes later with
13 Pam Taylor to reconfirm to you that no meeting
14 would be held and said I would prepare my
15 response to the grievance based on the material
16 I had already received. You requested I confirm
17 to you in writing that the college declined you
18 to tape-record and would no [sic] agree to allow
19 you to tape-record the meeting. The purpose of
20 the college's grievance procedure is to resolve
21 the issues" and so on.
22     So his recollection is that it was a blanket
23 refusal; correct?
24 A  Well, it's a little dicey. I mean, he is recalling
25 that she said that she wanted it in writing, that he

Page 218

1  couldn't -- that she couldn't tape it and that they
2  refused to let her to tape it. So his recollection is
3  different than hers.
4  Q   And how long does the employer have to wait to
5  decide whether the employee will withdraw the right to
6  tape-record the meeting? I mean, do we allow -- in your
7  opinion, must the employer allow the employee to go back
8  and forth, well, I'm going to tape-record; well, it
9  might be secret; well, now it's not; well, now I'll
10 meet?
11 A   No, it's just you're not going to tape-record. But
12 I would also say -- and if they request they wanted
13 something in writing saying I refuse to tape-record it,
14 I would give it to them.
15 Q   But it's not a violation of her procedural rights
16 to refuse to do that; is it?
17 A   To refuse to allow her to tape?
18 Q   Say in writing that I said you couldn't
19 tape-record.
20 A   No.
21 Q   So with respect to the Step 2 of the grievance
22 procedure, there is a dispute in the facts; correct?
23 A   Yes.
24 Q   But you have taken Ms. Wade's side?
25 A   Yes.

Page 219

1  Q   And why did you do that?
2  A   Because two of his statements confirm exactly what
3  she said, that she tried to tape it. She asked -- he
4  told her she couldn't tape it and she asked for it in
5  writing, and then he -- he controlled the meeting.
6      She doesn't cancel the meeting. She didn't have
7  control of the meeting to cancel the meeting. The only
8  one that can cancel the meeting is the one that called
9  it. It's the employer's process. They control the
10 process. They scheduled the meeting.
11 Q   That doesn't explain why you accepted her version
12 of the facts simply because they agreed on some points.
13 A   I think that they were surprised that she was going
14 to tape the meeting. And if she did do it
15 surreptitiously, that's wrong. And I don't think that
16 they were prepared with how to deal with her.
17 Q   That still doesn't explain why you accepted
18 Ms. Wade's version of the facts simply because they
19 agreed on some points of what occurred at the meeting.
20 A   I think she's credible. I think they were
21 uncomfortable when she brought the tape recorder in and
22 she demanded that they put it in writing that they
23 wouldn't allow her to tape. I think that made them
24 uncomfortable.
25 Q   Have you been involved in investigations in your

Page 220

1  employment history involving serious allegations such as
2  sexual harassment or other claims that might lead to
3  disciplinary action including termination?
4  A   Yes.
5  Q   And what is the standard operating procedure in
6  conducting an investigation when you have two essential
7  witnesses who have different versions of facts?
8  A   You get written statements.
9  Q   And what is the accepted human resource or employer
10 response when one witness says it happened this way, and
11 the other witness says, no, it happened this way, and
12 there is no documentary evidence or disinterested
13 witness to confirm one side or the other?
14 A   You look for collaborating witness testimony or
15 collaborating evidence on both sides.
16 Q   And when there is none, the appropriate conclusion
17 to the investigation is -- correct me if I am wrong --
18 there was insufficient evidence to confirm this
19 complaint; correct?
20 A   Yes.
21 Q   Why didn't you take that -- use that conclusion
22 here?
23 A   Because in order for her -- this is her day in
24 court. Why would she cancel? Not court per se, but
25 this is her day to explain why they shouldn't have taken

Page 221

1  these actions. Why would she cancel it? Why would she
2  say, I don't want to meet? She said she wanted to meet.
3  Q   Are you suggesting that an employee never has a
4  motive to not tell the truth?
5  A   No.
6  Q   So then why, when you had two statements that were
7  inconsistent with each other by two witnesses and you
8  had no supporting documentation that would confirm or
9  deny one witness's version of events or the others and
10 no disinterested third-party witness who could confirm
11 or corroborate one party's claim or another, why would
12 you then conclude in favor of the plaintiff?
13 A   Because she had every hope that she could turn this
14 around. That she could turn some or all of these
15 actions around. To cancel her opportunity to attempt to
16 do that, that's what she is seeking. She is seeking to
17 correct the redress, the problems that she has. She
18 wouldn't -- she doesn't have any motive to cancel that.
19 That's her window of opportunity.
20 Q   So, correct me if I am wrong, there was no
21 disinterested third-party witness to corroborate one way
22 or another; right?
23 A   Right.
24 Q   There was Pam Taylor and Diana Kennedy, though, and
25 they confirmed Mr. Van Hoesen's version of events;

### Page 222

1  correct?
2  A  Yes.
3  Q  And did you find any reason to believe that either
4  of them were not credible?
5  A  I have to accept their statements that they have
6  here, but they disagree with this.
7  Q  So there was no reason to believe that Ms. Kennedy
8  was not a credible witness; correct?
9  A  No.
10 Q  And there was no reason to believe that Ms. Taylor
11 was not a credible witness; correct?
12 A  Ms. Taylor was involved in the whole thing.
13 Q  Was there reason to believe that she was not
14 credible on that point?
15 A  No.
16 Q  When you have been involved in retaliation claims,
17 Ms. English, have you ever conducted an investigation?
18 A  Retaliation is generally not the primary basis.
19 Q  When you have been involved in any sort of
20 complaints that included a claim of retaliation, have
21 you ever been involved in investigating those?
22 A  Yes.
23 Q  And have you been involved in making a
24 determination of the facts?
25 A  Generally, yeah, I make a -- if I am doing the

### Page 223

1  investigation, I make a recommendation and another level
2  in the organization would make a final decision.
3  Q  And have you received any training in how to
4  conduct an investigation into employee's claims against
5  the employer such as retaliation or harassment?
6  A  Yes.
7  Q  And where have you received that training?
8  A  American -- AAA, American Arbitration Association.
9  Also -- I can see the book -- but it's how to
10 investigate discrimination complaints, and I -- it was
11 probably about seven, eight, years ago. A number of
12 classes.
13     MS. DUCEY:  Give me just a minute. I have to
14 send a note out that I am not going to make a meeting.
15 BY MS. DUCEY:
16 Q  And did you have written materials?
17 A  Yes.
18 Q  Do you still have those written materials?
19 A  I probably do somewhere. I believe I had a book
20 that they provided, but I have moved and so I am not
21 sure that I know where it is. I also -- most of the
22 training materials that I received when I was employed,
23 I would leave them with the employer.
24 Q  Did you just have one training on retaliation?
25 A  You asked for investigation training that involved

### Page 224

1  retaliation. Probably a couple.
2  Q  Who else besides AAA?
3  A  The other one, I can't remember. I just can tell
4  you it was a gray booklet about this thick (indicating)
5  and I don't recall what organization presented the
6  training. I think it was like a three-day training
7  class.
8  Q  And do you still have that?
9  A  I probably have it somewhere, but I'm not sure
10 where it is.
11 Q  In your investigation, what were you told you
12 should do in order to conduct a thorough investigation
13 that's fair to both sides on an issue involving
14 retaliation?
15 A  You need to interview the individuals. You need to
16 find out if there was -- if they have any additional
17 witnesses that may have witnessed an act or actions.
18 You look at documents and records that they provide.
19 You ask questions to find out if there is any other
20 information that they can provide.
21 Q  Anything else?
22 A  Take their written statements. I'm not sure if I
23 said that, but take their written statements and ask for
24 as many facts and dates and places and what the actions
25 were, and then investigate to see if there was anything

### Page 225

1  that supported their allegations.
2  Q  And what does your training tell you in terms of an
3  evaluation of these documents? What are you supposed to
4  do with all this stuff that you've compiled?
5  A  You're supposed to evaluate it. You're supposed to
6  weigh it. You're supposed to -- you look at the facts
7  to see if they're corroborated. So if somebody says,
8  this employer did -- this supervisor did "X" to me and
9  retaliated in this manner by doing these five things,
10 then you have to look at what those actions are, what is
11 the reason, if they did occur, if they didn't occur. If
12 they did occur, what are the reasons that they did
13 occur. Did the employer have any reasons to do them
14 other than what the employee is alleging?
15 Q  And do your trainings tell you that there should be
16 corroboration for a claim of retaliation?
17 A  Yes.
18 Q  And that corroboration should be in what form?
19 A  It comes in a variety. Whether it's witnesses to
20 the act, whether it's documents that -- whether it's a
21 pattern that there's an action that the employee -- the
22 employee is a whistleblower and then all of a sudden,
23 that employee is being treated differently. You look at
24 those facts.
25 Q  Do you only look at the time element in terms of

Page 226

1  when an action occurred and when the employee perhaps
2  asserted a right?
3  A   I'm not understanding your question.
4  Q   Is the single factor only that, you know, within
5  two weeks of the employee asserting their workers' comp
6  rights they were terminated? Is that it? That's the
7  beginning and end? If you've got a close in time
8  element, that's enough to show retaliation?
9  A   No. You would look and see if that employee has
10 got a report.
11 Q   There has to be something more than simply a
12 temporal element between an adverse employment action
13 and the assertion of a right; correct?
14 A   Yes.
15      MR. VAN FLEIN: Objection. That's not what
16 the law provides. That misstates the factors
17 completely. There is a shifting of the burden.
18      MS. DUCEY: Yeah, it doesn't at all. We don't
19 need you to give a speech.
20      MR. VAN FLEIN: Well, you're misstating the
21 law.
22      MS. DUCEY: You can be quiet because she is an
23 expert. Your objection is, mischaracterizes the law,
24 period.
25      MR. VAN FLEIN: Absolutely it mischaracterizes

Page 227

1  the law.
2       MS. DUCEY: And it doesn't.
3       MR. VAN FLEIN: It does.
4       MS. DUCEY: Be quiet.
5       MR. VAN FLEIN: She's not a lawyer --
6       MS. DUCEY: Be quiet.
7       MR. VAN FLEIN: -- and you're telling her this
8  is --
9       MS. DUCEY: She is giving legal opinions.
10      MR. VAN FLEIN: I sure hope not.
11      THE WITNESS: If the employee claims that the
12 supervisor did "X", then you go to the supervisor. The
13 burden shifts to the supervisor, saying, the reason I
14 made this determination was because of all of these
15 factors.
16      Then it shifts back to the employee to say,
17 there was business reasons, there were performance
18 reasons for this action, tell me why you're saying that
19 it's retaliation or discrimination. And then if that
20 individual says, well, I am African American and Sally,
21 who is Caucasian, she has the same performance work or
22 the same bad attendance as I have, but there's no
23 discipline. She didn't get fired. And that's what the
24 issue was with me and he fired me and it's
25 discrimination and it's retaliation.

Page 228

1  Q   Would that be enough or would you have to conduct
2  further investigation to determine --
3  A   Well, I would look into Sally to see. If they say,
4  I am being treated this way and Sally is being treated
5  this way, then you look at that.
6  Q   And if Sally was being treated a different way
7  because of circumstances that are unique to Sally's
8  case --
9  A   Then that's part of the investigation process.
10 Q   -- you would conclude no retaliation; right?
11 A   Well, you would conclude that there was a business
12 reason to do this or not to do this.
13 Q   But it's not enough for the witness who is claiming
14 retaliation to say that there was an adverse action
15 taken against me within a short period of time after I
16 asserted some rights under a statute; correct?
17 A   An employee can make that claim.
18 Q   Yes, but you would have to find more than simply
19 that time element in order to sustain a claim of
20 retaliation; isn't that true?
21      MR. VAN FLEIN: You mean she, personally, or
22 the law, because the law disagrees entirely?
23      THE WITNESS: Can I take a restroom break?
24      MS. DUCEY: Not until you answer the question.
25

Page 229

1  BY MS. DUCEY:
2  Q   You would have to find more than a time element
3  when you conduct an investigation in order to sustain a
4  charge of retaliation; isn't that true?
5  A   I would have to show that the reasons the employer
6  had for taking the action were not based on an illegal
7  action like they're African American or they're a
8  whistleblower. I would have to find that fact.
9  Q   And time isn't enough? A closeness in time is not
10 enough by itself; correct? In your mind.
11      MR. VAN FLEIN: I am just going to object.
12      THE WITNESS: It could be --
13      MR. VAN FLEIN: The law is the law on this and
14 it is well established. It really doesn't matter what
15 her opinion is.
16      THE WITNESS: If a person was fired because
17 they are over 40, and if that was the basis for it,
18 that's -- and I found that that was the basis for it,
19 the time element is not at issue. It's that there was
20 an illegal reason for firing that employee.
21 BY MS. DUCEY:
22 Q   But if the employee comes in and says, you know
23 what, I reported a safety violation and three days later
24 I was demoted. That is some evidence, but it is not
25 conclusive evidence of retaliation; isn't that true?

Page 230

1  A   Not unless the employer agrees with that assessment
2  or I find that out in the investigation.
3  Q   So you have to have more evidence than simply that
4  time element?
5  A   That's a component of it.
6       MS. DUCEY: Yeah, we can take a break.
7       (Off the record.)
8  BY MS. DUCEY:
9  Q   Can I go back to Exhibit 42 just for a minute?
10 A   Which one is that?
11 Q   It is the personnel manual.
12 A   The grievance?
13 Q   Uh-huh.
14 A   Okay.
15 Q   Is there anywhere in this grievance procedure that
16 requires a Step 3 hearing?
17 A   No.
18 Q   That's within management prerogatives; right?
19 A   Yes.
20 Q   And is there anywhere in this procedure or in
21 Ms. Wade's contract that requires if there is a hearing,
22 that the hearing be conducted by an outsider?
23 A   No.
24 Q   Is there anywhere in this grievance procedure that
25 requires that if a Step 3 hearing occurs, it be can

Page 231

1  conducted by somebody who is not paid by the employer?
2  A   No.
3  Q   And is there anyplace here in the grievance
4  procedure or in Ms. Wade's contract that requires that
5  if there is a Step 3 hearing, that there be any
6  particular rights -- procedural rights afforded to the
7  employee?
8  A   No.
9  Q   Such as the right to discovery? Anywhere there
10 where it's stated that that's a procedural requirement?
11 A   No.
12 Q   And anyplace there where it says that you have the
13 right to an attorney?
14 A   No.
15 Q   Anyplace where it gives the employee the right to
16 have counsel present?
17     MR. VAN FLEIN: Is that the same question?
18     MS. DUCEY: Well, you know, you have been
19 sitting here for all day, so at 3:30 sometimes people
20 ask a question twice.
21     MR. VAN FLEIN: I didn't know if it was a
22 trick question between counsel and attorney.
23     MS. DUCEY: We'll get farther without those
24 remarks.
25

Page 232

1  BY MS. DUCEY:
2  Q   Is there anyplace in Exhibit 42 or in Ms. Wade's
3  contract that gives her the right to cross-examine
4  witnesses?
5  A   No.
6  Q   Nevertheless, the college decided to enlarge her
7  rights and give her a hearing; correct?
8  A   Yes.
9  Q   And the hearing that was held with Dr. O'Rourke was
10 a Step 3 grievance hearing. Would you agree with that?
11 A   Yes.
12 Q   And there was no requirement for Dr. O'Rourke to be
13 an outsider; right?
14 A   No.
15 Q   Or someone not paid by the university; correct?
16 A   Correct.
17 Q   There was no right that she had under the contract
18 to any sort of additional due process; right?
19 A   Correct.
20 Q   And are you aware of any statutory rights, State
21 federal, or City, that would afford her those rights at
22 the Step 3 grievance hearing?
23 A   No.
24 Q   Why then did you conclude in your report that her
25 rights were violated at the Step 3 hearing by having an

Page 233

1  insider who was paid by the university to conduct that
2  hearing?
3  A   Because they had a hearing officer. They gave her
4  an opportunity for hearing officer, which is their
5  prerogative to broaden her rights. The hearing officer
6  stated that he was impartial and would render an
7  impartial decision. He was involved to such an extent
8  with Tuthill through the accreditation process, and
9  Tuthill had made -- they had had discussions about
10 Tuthill's decision, how he was contemplating not
11 renewing Wade.
12      And so, the hearing officer who's purporting to
13 be impartial has information that generally a hearing
14 officer wouldn't have, because usually a hearing officer
15 is not the one that is discussing -- the supervisor is
16 discussing nonemployment action with.
17 Q   That could be your understanding, but let's go back
18 to the contract. Where in the contract does it say that
19 if a Step 3 hearing is conducted, that there are certain
20 requirements for the officer that hears that Step 3
21 hearing?
22 A   If the process that they are listing in here is
23 supposed to be fair and equitable -- I mean, the intent
24 of a grievance process is for the employer to be able to
25 support why the action shouldn't be taken, to defend

Page 234

1  herself --
2  Q  Will you answer my question?
3  A  Well, I am.
4  Q  Where does it say --
5  A  The intent is it's fair and equitable, and if the
6  hearing officer --
7  Q  Where does it say that?
8  A  It is the policy of Ilisagvik College to insure
9  that employees are treated fairly and equitably on
10 matters affecting their employment. And this is in the
11 grievance procedure.
12     They crafted a grievance procedure to allow
13 employees to air complaints and grievances they had.
14 And it says that they will be treated fairly. To have
15 the hearing officer being in the discussion process with
16 a supervisor about nonrenewing or terminating Wade
17 doesn't -- it violates the intent of being fair for that
18 employee because that hearing officer was involved with
19 the supervisor in discussion.
20 Q  Well, ma'am, that's just the sort of things you
21 were involved with in Step 3 of the grievance procedure
22 when you reviewed Step 3 grievances as the mayor's
23 designee and made a determination on that as an insider
24 who had knowledge of these parties, who may have had
25 dealings with these parties; right?

Page 235

1  A  But I wasn't a hearing officer. I wasn't a hearing
2  officer. I was responding for the mayor. I wasn't a
3  hearing officer.
4  Q  You were making the determination on the appeal and
5  you were an insider being paid by the Municipality or
6  the State with knowledge of all of these characters,
7  including knowledge of their personnel records; right?
8  A  I wasn't the final step. The final step is the
9  hearing.
10 Q  Well, this wasn't the final step either; was it?
11 A  This was the final step. The hearing officer was
12 the final step.
13 Q  No, this was Step 3 of the grievance process;
14 correct? We established that.
15 A  That's the appeal. They are appealing the action.
16 Q  The next step is arbitration; isn't it? The next
17 step is arbitration with AAA; isn't it?
18 A  That's the final step. The final step in their
19 process was the hearing. Yes, in the Municipality's
20 procedures.
21 Q  I mean Ilisagvik's. The final step is arbitration;
22 isn't it, ma'am?
23 A  The executive vice president shall provide a final
24 written decision to the parties. That's the final
25 decision.

Page 236

1  Q  Yeah, just like step three of the Muni personnel
2  rules where you were the final determiner. Step 3 at
3  AMC330101:
4     "Within five working days of the written appeal
5     from the decision of the agency head, the mayor
6     or his designee shall review the matter and
7     respond in writing. Upon receipt of the
8     decision, the employer has five days to request
9     arbitration."
10    Just like Ilisagvik had a request for
11 arbitration; right? They did have an arbitration
12 clause; didn't they?
13 A  Ilisagvik?
14 Q  Yes.
15 A  Is it under a separate provision?
16 Q  Yeah, we will find it in a minute. Maybe at the
17 next break.
18    Assuming they had an arbitration provision, then
19 Step 3 was not the final determination; was it?
20 A  Well, I can't assume that if that's --
21 Q  Well, give me minute. You're the expert so I can
22 ask you a hypothetical question. Assuming there is an
23 arbitration provision, Step 3 wasn't the final step; was
24 it?
25 A  Assuming there was an arbitration provision?

Page 237

1  Q  Yes.
2  A  I found it.
3  Q  What are you looking at?
4  A  It's 20547.
5  Q  Thank you. So arbitration was the final step;
6  wasn't it?
7  A  I would like to read this.
8  Q  Okay.
9  A  Yes, she had 90 days in which to file a request for
10 arbitration.
11 Q  So there was no requirement for the Step -- there
12 was no finality to the Step 3 hearing -- let me say that
13 again. There was no finality at Step 3; correct?
14 A  She had an opportunity to appeal it.
15 Q  So there was no --
16 A  But this says it's final. Generally, that
17 provision in most cases would be affixed as the final
18 step in the process, but it's set out in this employee
19 manual as a separate provision --
20 Q  But it doesn't render it invalid; does it?
21 A  -- and I missed that.
22 Q  So there was no requirement for the hearing officer
23 to be a neutral outsider -- was there -- at Step 3?
24 A  There's no requirement.
25 Q  And it wouldn't be unfair given the fact that there

**Page 242**

1  Q   Did you -- "yes" or "no" first. Did you make an
2  evaluation of Ms. Wade's credibility in this case?
3  A   Yes.
4  Q   And what investigation did you conduct in order to
5  make that evaluation?
6  A   I didn't conduct an investigation. I read her
7  deposition, I looked at the information, and she seemed
8  at times to not remember some things. But the fact
9  pattern that she kept requesting the leave, she thought
10 she had control of her classes.
11 Q   Did you go through her deposition testimony and
12 document the inherent inconsistencies?
13 A   No.
14 Q   That would have been important to understand
15 whether she was credible or not; wouldn't it be?
16 A   There were so many questions and they were asked so
17 many times.
18 Q   Well, you did give a legal opinion that --
19 A   I didn't give a legal opinion.
20 Q   You have given an expert opinion that she
21 apparently is credible in all respects, maybe misguided,
22 perhaps forgetful, but otherwise credible; correct?
23 A   Yes.
24 Q   That is your opinion?
25 A   Yes. She is misguided in some, she is forgetful in

**Page 243**

1  others, she was wrong about the age.
2  Q   So then having stated that opinion that she is
3  credible, why didn't you do the minimum, which is to go
4  through her testimony, determine the inconsistencies,
5  determine whether they're material or not, determine
6  what things she has given inconsistent testimony on,
7  determine whether there are documents that support her
8  despite the inconsistencies on material points?
9  A   I wasn't hired to do that.
10 Q   Then why did you make the determination she was
11 credible if you didn't conduct that investigation or
12 evaluation of the evidence?
13 A   I said -- because -- well, she didn't lie. I
14 didn't find where she lied. I found where she was
15 forgetful.
16 Q   Well, how did you make the determination that she
17 did not lie if you did not conduct a thorough evaluation
18 of her testimony and document the instances where she
19 told inconsistent stories and make a determination about
20 whether they were important to material facts or not and
21 decide whether there was corroboration for the things
22 that she said? You didn't do any of those things;
23 right?
24 A   I read the testimony. I looked at the
25 documentation.

**Page 244**

1  Q   But you didn't conduct that evaluation; did you?
2  A   Not that exhaustive. I didn't conduct an
3  investigation of her testimony.
4  Q   Because it was easier just to write the report for
5  your friend; right?
6  A   No, it's not my friend. I was hired to review the
7  case. And this wasn't easy to do because of the
8  voluminous documents in it.
9  Q   Did you make any determinations about the
10 credibility of any other witnesses or parties involved?
11 A   Looking at Tuthill's statement -- in his deposition
12 early on when he said that Wade came to him requesting
13 leave, he said, well, it could be -- her leave request
14 could have been personal, it could have been -- you
15 know, she wanted a vacation. And the very next -- on
16 the 3rd, he sends her an e-mail saying, I want you to
17 check with your doctor in Tennessee and your doctor here
18 about your need for medical leave.
19     If he's saying that on one hand it's a vacation
20 and on the next -- on the other hand, he's requesting
21 medical documentation. Why would he consider it
22 personal leave if he's asking for medical information?
23 Q   I thought we established earlier today that you
24 sometimes question the employee's motive in taking
25 leave; correct?

**Page 245**

1  A   Yes.
2  Q   And even when they get some medical provider to say
3  she's got a migraine and she can't get out of the
4  bathroom because she is throwing up, you question their
5  motives; right?
6  A   No, I question whether it was a serious health
7  condition under family and medical leave. I didn't
8  question whether they were sick. I questioned whether
9  that qualified to cover them under family and medical
10 leave.
11 Q   And you've questioned whether employees abuse their
12 leave; right?
13 A   Yes.
14 Q   So when the employee comes in on Tuesday, not
15 having come in on Monday, but says, boy, I was really
16 sick, you've questioned why they were home; right?
17 A   If there's a pattern, yes.
18 Q   Right. And in this case, you made no attempt to
19 determine the pattern of her absences from Barrow; did
20 you.
21 A   I wasn't asked to do that.
22 Q   But that would have been important to know in order
23 to determine whether Dr. Tuthill was credible in
24 wondering is there some other reason why she elects to
25 go 4,000 miles away for 12 days to take leave when she

Page 246

1  could have this done in Anchorage, Seattle, Barrow,
2  Los Angeles? That would have been important to know;
3  right?
4  A  If they asked for medical leave and they have a
5  doctor's slip, I might have asked, why do you have to go
6  12,000 miles away, but I still wouldn't say it's a
7  vacation.
8  Q  But in order to make the determination about
9  Dr. Tuthill's credibility, you would need to know, why
10 did he say that? Was it bad faith or did he have some
11 credible belief that there could be something else
12 operating here; right?
13 A  There was nothing in his testimony to tell me why.
14 Q  Well, did you ask for any additional documentation?
15 A  I was provided all of this documentation.
16 Q  There were lots of unknowns -- weren't there --
17 about why Dr. Tuthill would talk about -- strike that.
18    She marked it as personal leave -- correct --
19 and in the past did you know that she had a history of
20 combining medical and personal leave?
21 A  No.
22 Q  That was her pattern. And that's something that
23 you would want to know before you determine
24 Dr. Tuthill's motive; correct?
25 A  If the college had approved it, then it's not a --

Page 247

1  if they had approved her leave, then it's a nonissue.
2  Q  Well, in the past. That doesn't mean they have to
3  approve it in the future; right?
4  A  No, they don't have to approve it in the future,
5  but they can't go back and ding her for the past. You
6  go forward and say, from this date forward, we are only
7  going to approve medical leave for -- we're not going to
8  allow you to add on vacation to that. It's only going
9  to be for the time that your doctor needs to do whatever
10 treatment needs to be done.
11 Q  Or they could simply say, we need you to try and
12 make an attempt to schedule your leave in a manner that
13 doesn't unduly disrupt operations; right?
14 A  They could do that, but it's more clear to say,
15 we're not going to let you tag on your vacations with
16 medical leave.
17 Q  So instead of just coming out front and being
18 confrontational with her, they could have said
19 reasonably, please let us know why your medical provider
20 thinks that this is something of immediate concern;
21 right?
22 A  I think it's clear, if their issue is that she's
23 combining -- using sick leave to extend a personal leave
24 vacation. They need to come out and say, we will
25 approve any required medical leave but we are not going

Page 248

1  to approve any personal leave attached to that.
2  Q  If, as you say, the employer --
3  A  Which they have the authority to do.
4  Q  If, as you say, the employer is not allowed to
5  inquire any further than what's in the certification,
6  they can't ask those questions; can they?
7  A  That's not a question. That's telling the
8  employee, we will approve medical leave for any required
9  medical leave, but we will not approve additional days
10 added on to it for personal.
11    That doesn't ask any medical questions. That
12 just says, there is a shift in how we are going to run
13 this organization. And while before, you may have had a
14 medical leave that took five days and we gave you ten
15 days so you could have a longer period of time, we are
16 not going to do that anymore. If you have a medical
17 absence and it's going to be for five days, that's what
18 we are going to approve.
19 Q  The employer could reasonably and within their
20 rights take an alternative approach than what you've
21 suggested; isn't that true?
22 A  If an employer --
23 Q  Is that's true?
24 A  They could take -- yes.
25 Q  And a reasonable alternative approach would be to

Page 249

1  ask the employee to get the doctor to verify, then we
2  don't have to even tell the employee we think that you
3  have dual motives in doing this. We can simply say,
4  let's let the doctor decide; right?
5  A  It's not answering the concern that they have that
6  she was linking medical with vacation.
7  Q  Well, it would give some information to the
8  employer about the reason for the leave; wouldn't it?
9  A  I don't think you're saying that the issue was that
10 she linked -- she expanded her leave, took her medical
11 leave and expanded it to get a longer period of time.
12 Asking a doctor, does she need leave soon, that's not
13 going to answer that question.
14 Q  But it would provide some information to the
15 employer about the need for leave and whether to inquire
16 further; wouldn't it?
17 A  They can always inquire further.
18 Q  And it would be reasonable to proceed that way?
19 A  I would inquire.
20 Q  And is there anything else upon which you base your
21 determination that Dr. Tuthill's statement about
22 vacation versus medical leave was not credible?
23 A  He also contacted counsel and asked on October 3rd.
24 And asked about if he could -- if he had to approve a
25 medical. They talked about, do they have to cancel her

Page 250

1  classes, do they have to approve the leave, what could
2  they do?
3  Q  So why does that show he --
4  A  If it was for a vacation, why would you call
5  counsel?
6  Q  Well, you're missing the point, which is that there
7  is lots of evidence in the record that this lady would
8  take leave and extend it for her personal business.
9  A  And they approved it.
10 Q  Before he was there. In other years before he
11 came, that happened. And he was entitled to come in and
12 say, well, I want to evaluate things differently; right?
13 A  So he won.
14 Q  He was entitled to do that; right?
15 A  He could come in and change things.
16 Q  And one way he could change it is simply to insist
17 that if you are going to take leave during classroom
18 teaching time in the semester, get me a doctor to say
19 that you need to do it before the end of the semester;
20 right?
21 A  As long as he did it for every employee, yes.
22 Q  Well, is there any evidence that he didn't require
23 that of other employees?
24 A  He had another employee. I believe it was either
25 Bartholomew or Carlson that asked for time off to go

Page 251

1  visit -- it was their granddaughter's birthday, and the
2  leave was denied.
3  Q  That was Edna St. Vincent -- Jay St. Vincent and
4  she was required to provide a doctor's note; right?
5  A  Well, you wouldn't need a doctor's note for your
6  granddaughter's birthday.
7  Q  Yeah, well, she begged and whined, and it was only
8  a day or two and he approved that day or two; didn't he?
9  A  I think he got -- she had to get a doctor's slip
10 and then he approved it.
11 Q  Right. So he applied pretty much -- even a more
12 harsh standard to her because he wanted to know why she
13 was going and how she could justify the granddaughter's
14 birthday trip, et cetera; right?
15 A  Well, I just knew that that was her original
16 request and the doctors -- she provided a doctor's note
17 and he approved it.
18 Q  Right. So he let her have the same consideration
19 perhaps that Ms. Wade did, but kept her to a higher
20 standard?
21 A  I don't know that it was a higher standard.
22 Q  So any other evidence?
23 A  Those are the two in the leave that I saw.
24 Q  Anything else upon which you base your
25 determination that Dr. Tuthill wasn't credible?

Page 252

1  A  His evaluation that Wade was not qualified to do
2  the work. She had been hired by the college since 2000,
3  and she had been performing that work. So one would
4  assume that after three years, you are more experienced
5  than you were when you started.
6  Q  Well, one could be more incompetent; right?
7  A  One would assume that if you were incompetent, you
8  wouldn't be hired back. So if she was incompetent in
9  2000, they wouldn't have renewed her for 2001.
10 Q  Did you make any determinations about the labor
11 pool in Barrow?
12 A  I think it's slim to none.
13 Q  Right. And what the turnover is in Barrow?
14 A  High.
15 Q  Did you make a determination under what
16 circumstances Ms. Wade was hired?
17 A  No.
18 Q  Did you know that she was hired by a part-time
19 employee that wasn't even in the department?
20 A  No.
21 Q  And Dr. Tuthill certainly had the right as the
22 administrator -- the new administrator to take a fresh
23 look at all the personnel files; didn't he?
24 A  Yes.
25 Q  And determine whether he felt they were qualified;

Page 253

1  right?
2  A  Yes.
3  Q  And it was within his rights to make determinations
4  that certain employees did not meet the minimum
5  qualifications; correct?
6  A  He could do that, yes.
7  Q  And so the past history wouldn't really show that
8  he was not credible if he came in and took a fresh look
9  and said, these people aren't qualified; right?
10 A  If they weren't qualified when they went through
11 the accreditation process, would that -- you know, I
12 would assume that the people that were coming in to
13 assess the quality of the education that's being taught
14 there, they would make that -- they would look at these
15 people's files.
16    They would determine, are these people qualified
17 to do the job? If they determine that Wade was one of
18 the ones that was not qualified, that's -- that would
19 be -- it's an outside source and the accreditation
20 requires this and Wade doesn't have it, yes, that would
21 be reasonable.
22 Q  You're making a lot of assumptions. Do you know
23 any of those facts to be true?
24 A  That the accreditation looked at --
25 Q  Uh-huh.