IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

---

BOBBI WADE,　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　vs.　　　　　　　　　　　　　　　) No. 305-cv-086-TMB
　　　　　　　　　　　　　　　　　　　)
ILISAGVIK COLLEGE; NORTH SLOPE　　　 )
BOROUGH; JOHN TUTHILL,　　　　　　　 )
individually; and PAMELA TAYLOR,　　 )
individually,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　Defendants.　　　　　　　)
　　　　　　　　　　　　　　　　　　　)

RECEIVED BY:
Clapp, Peterson, Van Flein,
Tiemessen & Thorsness, LLC
Date Rec'd/Initials: 5/24/06
400.85
Distribution:

---

Videotaped Deposition Upon Oral Examination

of

JOHN TUTHILL, Ph.D.

---

8:04 a.m.

May 10, 2006

1601 Fifth Avenue, Suite 860

Seattle, Washington


Sharon K. Langford, CCR    1601 Fifth Avenue, Suite 860
Court Reporter             Seattle, WA 98101

EXHIBIT 4A
PAGE 1 OF 5

Case 3:05-cv-00086-TMB    Document 109-5    Filed 08/17/2007    Page 2 of 5

Wade vs. Ilisagvik               5-10-2006                    John Tuthill, Ph.D.

**46**

added days as well, correct?
   A.  Yes, but it would have had exactly the same schedule issue. These were students who in many cases were taking other Ilisagvik courses or who had work responsibilities. They had built their personal lives, their work responsibilities around the Ilisagvik schedule that had been published and announced the summer before. To change that, to say to them, in order for you to get credit in this course which you signed up for in good faith in August, you're going to have to change your schedule now and give up additional hours and additional days, is not something that students can always do.
   Q.  **How many students were in the English class; do you know?**
   A.  I would guess approximately 15, but I'm not absolutely sure.
   Q.  **Did you go and talk to the class and see what their preference was?**
   A.  I did not.
   Q.  **How many students were in the math class?**
   A.  Approximately 15, I would guess.
   Q.  **And did you go and talk to those students to see what their preference was?**
   A.  I did not.

**47**

   Q.  **What did you do to decide that you would replace the instructor rather than change the schedule?**
   A.  I had been receiving notices for several weeks from the college retention officer, Sonya Abu, who was reporting the feelings of a number of students in the Business English and the Business Math course. She was reporting to me that the students were perplexed and confused by scheduling changes which they were being informed of by the instructor. That they did not like the scheduling changes, that they wanted to know what was going to happen and when it was going to happen. That was one of the main reasons why I made the determination that continuing to follow the original schedule was the best plan.
   Q.  **Out of the 30 students, 15 in English and 15 in math, how many of them had complained?**
   A.  I don't know. What I had was summaries from Sonya Abu, who told me that a number of students, it was students, plural, from Miss Wade's classes had come to her and reported this, that, or the other issue or concern or complaint.
   Q.  **How many of them complained about the changing class schedule?**
   A.  I will say the same thing. I cannot give you the precise number. What I know is that Ms. Abu

**48**

reported to me multiple student concerns, issues, complaints, some of which were centered on the scheduling and scheduling changes of Miss Wade's classes.
   Q.  **As you were deciding whether or not to retain Miss Wade, who did you talk to?**
   A.  I'm going to ask you to clarify what you mean by "talk to" there. I gathered information from as many sources as I could. If you want to know that list, I can, you know --
   Q.  **Okay, let's start with that list.**
   A.  Okay.
   Q.  **Gathered information from --**
   A.  Now, these are not necessarily people with whom I talked specifically about renewal of Miss Wade's contract. These are people from whom I'm gathering information.
   Q.  **Okay.**
   A.  A number of students in Miss Wade's class, a number of students who were currently taking her class, and a number of students who had taken her courses in the past.
   Q.  **And who would that be?**
   A.  Now, a FERPA question. Am I allowed to give you names of individual students?

**49**

       MS. DUCEY: Can I just interject? We have a confidentiality agreement, and so, yes, you may give names, and pursuant to the agreement I think we're not going to disclose those in open court, so you can speak freely.
   A.  Okay. I will give you a list of the names that come to mind. This is not a complete list. It's been a while since I talked to these people.
       I talked to Mariette Mealor. I talked to Jamie Elbert. I talked to Diana Kennedy. I talked to Sonya Abu. I know that there are other students that I talked to besides Mariette Mealor, though I can't tell you names specifically. They were not students who I knew terribly well.
       Beyond that I talked about issues with Dr. Pat O'Rourke. I talked about issues with the President MacLean. There were issues that I talked about with Aimee Valenti; to a lesser extent Tim Carlson. I'm sure there are others, but that's what comes to mind.
   Q.  **(By Ms. Johnson) What did you talk to President MacLean about?**
   A.  I recall one specific conversation with President MacLean sometime in the latter half of January in which we were talking about faculty contract renewals, and she asked me if there were any contracts

13 (Pages 46 to 49)

Case 3:05-cv-00086-TMB    Document 109-5    Filed 08/17/2007    Page 3 of 5

Wade vs. Ilisagvik                5-10-2006                John Tuthill, Ph.D.

302

```
 1         CERTIFICATE
 2   STATE OF WASHINGTON )
                          ) SS.
 3   COUNTY OF SNOHOMISH  )
 4
 5         I, the undersigned Notary Public in and
 6   for the State of Washington, do hereby certify:
 7         That the annexed and foregoing deposition
 8   of each witness named herein was taken stenographically
 9   before me and reduced to typewriting under my direction;
10         I further certify that the deposition was
11   submitted to each said witness for examination, reading
12   and signature after the same was transcribed, unless
13   indicated in the record that the parties and each
14   witness waive the signing;
15         I further certify that I am not a
16   relative or employee or attorney or counsel of any of
17   the parties to said action, or a relative or employee of
18   any such attorney or counsel, and that I am not
19   financially interested in the said action or the outcome
20   thereof;
21         I further certify that each witness
22   before examination was by me duly sworn to testify the
23   truth, the whole truth and nothing but the truth;
24         I further certify that the deposition, as
25   transcribed, is a full, true and correct transcript of
```

```
 1   MOBURG & ASSOCIATES
     COURT REPORTERS
 2   1601 FIFTH AVENUE, SUITE 860
     SEATTLE, WA 98101
 3   206-622-3110  FAX 206-343-2272
     _____
 4   PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
     SHOWING PAGE, LINE, AND REASON, IF ANY. SIGN THIS SHEET
 5   AND SIGN THE ACCOMPANYING SIGNATURE PAGE (AFFIDAVIT).

 6   PAGE   LINE      CORRECTION AND REASON
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22              _____
                JOHN TUTHILL, Ph.D.
23              Date taken: 5/10/06
     SEE WA. REPORTS 34, RULE 30(E)
24     USCA 28, RULE 30(E)
25   REPORTER: SHARON K. LANGFORD, CCR
```

303

```
 1   the testimony, including questions and answers, and all
 2   objections, motions, and exceptions of counsel made and
 3   taken at the time of the foregoing examination;
 4         IN WITNESS WHEREOF, I have hereunto set
 5   my hand and affixed my official seal this _____ day of
 6   _____, 2006.
 7
 8
 9
10
11
12
13         _____
14         SHARON K. LANGFORD, CCR
           Notary Public in and for
15         the State of Washington,
           residing at Edmonds.
16         My Commission Expires 1-27-08.
           CCR No. 2241
17
18
19
20
21
22
23
24
25
```

MOBURG & ASSOCIATES
Court Reporters
1601 FIFTH AVE, SUITE 860
SEATTLE, WA 98101
(206) 622-3110 FAX (206)343-2272

Date: May 22, 2006

To: Cynthia L. Ducey
    Attorney at Law
    1007 W. 3rd, Suite 400
    Anchorage, AK 99501-1990

In Re: Wade v. Ilisagvik College, et al.

Deposition of: JOHN TUTHILL, Ph.D.
Date of Deposition: May 10, 2006

Enclosed is your copy of the deposition transcript of the above-named deponent, plus a correction sheet and signature page. Please have the deponent review the transcript and sign the correction sheet and the signature page. The signed correction sheet and signature page should then be forwarded to
    Moburg & Associates
    1601 Fifth Avenue, Suite 860
    Seattle, WA 98101
within 30 days of the date of this letter.

Sincerely,


_____
SHARON K. LANGFORD, CCR

cc: Linda J. Johnson
    Peter C. Gamache

77 (Pages 302 to 305)

Case 3:05-cv-00086-TMB   Document 109-5   Filed 08/17/2007   Page 4 of 5

Wade vs. Ilisagvik                  5-10-2006                    John Tuthill, Ph.D.

                                                                    262

1  December 19?
2     A.  Exhibit 34?
3     Q.  I'm sorry, I'm reading upside down; 43.
4     A.  43. No, but that would make sense. So we had
5  the complaint meeting and this was given to me at the
6  meeting?
7     Q.  That's what I'm asking you.
8     A.  Could be.
9     Q.  Okay. Why was this meeting taking place, this
10 December 19th meeting?
11    A.  If I recall on this one, this meeting took
12 place because Pam Taylor understood that Ms. Wade was
13 frustrated and angry and upset, and she understood that
14 there were administrative positions that had been taken
15 that displeased Miss Wade, and Miss Taylor felt that it
16 would be helpful to get the parties together in a room
17 to talk about it.
18    Q.  So what happened?
19    A.  We got to the room and we talked about it. We
20 left. My recollection is no one felt better.
21    Q.  In the third paragraph it states that "John
22 said the contracts were not pay" -- I assume that's a
23 typo -- "because the 12 credit teaching load had not
24 been met because Bobbi had to take medical leave."
25    A.  The notes were taken by a Diana Kennedy. She

                                                                    263

1  would have sat there, scratching out the notes in
2  longhand. That is not exactly the way that I would like
3  to have said that. But I think the suggestion here is
4  that Miss Wade was not paid for the two C modules that
5  she did not teach, so her added duties had to be
6  adjusted by two credits. So she was paid for six credit
7  equivalents of added duties instead of for eight, is
8  what this suggests.
9        MS. JOHNSON: Let's take a break.
10       VIDEOGRAPHER: We are going off the
11 record. The time is approximately 3:53 p.m.
12       (Recess taken.)
13       VIDEOGRAPHER: We are back on the
14 record. The time is approximately 4:02 p.m.
15    Q.  (By Ms. Johnson) Do you recall the phrase
16 "grade fiasco"?
17    A.  Grade fiasco?
18    Q.  Uh-huh.
19    A.  No, but it sounds like something I could have
20 said.
21    Q.  If that phrase was used during the
22 administrative hearing, who would have coined that
23 phrase?
24    A.  Oh, I suspect me. Now, I won't necessarily
25 claim credit. I won't swear that I said it, but it

                                                                    264

1  sounds like something I could have said.
2     Q.  Does it sound like something you could have
3  thought?
4     A.  That it was a grade fiasco with --
5     Q.  Yes.
6     A.  -- the Business English and the Business
7  Math? Absolutely.
8        Where did you see that?
9     Q.  Oh, I'm sure that your attorney can show you
10 that.
11       MS. DUCEY: You're not allowed to ask
12 questions.
13       THE WITNESS: I know.
14       MS. DUCEY: An irresistable temptation.
15    Q.  (By Ms. Johnson) There was eventually a
16 grievance which was accepted and was processed as a
17 grievance?
18    A.  That is correct.
19    Q.  And about February was the time frame for
20 that. There was a response from you to the grievance;
21 do you recall that?
22    A.  Yes.
23    Q.  A written response?
24    A.  Yes.
25    Q.  And it went to what's called a Step 2 hearing?

                                                                    265

1     A.  Yes.
2     Q.  And at the Step 2 hearing it was assigned to
3  John Van Hoesen; is that correct?
4     A.  That is correct. Hoesen.
5     Q.  Hoesen, thank you.
6        And you said you were present during a meeting
7  with John Van Hoesen and Bobbi Wade?
8     A.  Sort of.
9     Q.  Sort of present?
10    A.  Well, this sort of meeting. This was
11 something that sort of happened. My recollection is
12 that I was not in the room initially, that Mr. Van
13 Hoesen and Miss Wade in the presence of, I'm not sure
14 whom because I wasn't there, had a discussion about Miss
15 Wade's intent to tape record the meeting, and Mr. Van
16 Hoesen's refusal to permit the meeting to be tape
17 recorded.
18       I remember at some point in this I was called
19 from wherever it was I was waiting and told to come.
20 And I believe I was told when I got there that we
21 weren't going to have the meeting, and then I went away
22 again. It was confusing and I don't pretend to have all
23 the details on that, because I don't think I was there
24 the whole time.
25    Q.  Pam Taylor said she was consulted on whether

                                              67 (Pages 262 to 265)

Case 3:05-cv-00086-TMB   Document 109-5   Filed 08/17/2007   Page 5 of 5

Wade vs. Ilisagvik          5-10-2006                    John Tuthill, Ph.D.

**198**

1  something that I generated.
2  Q. But you did sign?
3  A. I did sign them.
4  Q. And was your signature required in order for
5  the instructor to teach an added duty course?
6  A. No, because these were generally signed after
7  the instruction was over. My signature was required
8  before anybody got paid for it.
9  Q. Let's look at Exhibit 20. It's been
10 previously marked. Have you seen this document before?
11 A. Yes, I have.
12 Q. When did you see it first?
13 A. Sometime in the latter part of October or
14 beginning of November of 2003.
15 Q. You don't recall seeing this in early October?
16 A. No. I do not.
17 Q. Do you recall Miss Wade coming to your office
18 in late September, the last week of September and
19 handing you a copy of this?
20 A. No. I do not.
21 Q. Look at Exhibit 21. Do you recall this leave
22 request?
23 A. Yes.
24 Q. When did you see it first?
25 A. I could not tell you the date. I would assume

**199**

1  it was on or soon after October the 2nd.
2  Q. And do you recall where you were when you saw
3  it?
4  A. My recollection is it was waiting for me on my
5  desk when I came back to my office from someplace else
6  in the building. Though that could be wrong. That's
7  what I remember.
8  Q. Did you have a conversation with Bobbi Wade
9  about this document?
10 A. I believe that I did have conversations with
11 Miss Wade about this document.
12 Q. When would have the first conversation been?
13 A. I would assume fairly soon after the receipt
14 of this document.
15 Q. And how would you have contacted her?
16 A. She would either come by or I would telephone
17 her.
18 Q. Do you remember which happened first?
19 A. No, I have no idea.
20 Q. And do you know why Miss Wade wanted this
21 leave in October?
22 A. My understanding when I received this leave
23 request is that it was for a personal leave for a
24 vacation.
25 Q. At the time that she gave you this leave, your

**200**

1  testimony is that you did not see Exhibit 20 at the same
2  time?
3  A. That is correct.
4  Q. When Miss Wade came to talk to you, did she
5  show you what's been previously marked as Exhibit 22 and
6  Exhibit 23?
7  A. No.
8  Q. Have you ever seen these before?
9  A. The first time I recall seeing these is
10 yesterday. I do not believe I saw these in fall
11 semester 2003.
12 Q. Do you recall talking to Miss Wade about her
13 leave request in October and talking to her about what
14 she would do with her classes while she was gone?
15 A. I recall getting a report, I believe on
16 October the 3rd, from Sonya Abu, the retention officer,
17 indicating that she had received multiple student
18 complaints from students in Miss Wade's 105 and 109
19 classes, saying that they had come to class and seen a
20 note on the blackboard saying that class was canceled
21 for the month of October and the classes would begin
22 again on a doubled-up schedule in November. Those
23 students were puzzled and frustrated and angry about
24 this.
25     I know from my e-mail correspondence that

**201**

1  there were conversations with Miss Wade and with Pam
2  Taylor and with Cheryl McKay revolving around medical
3  issues associated with Miss Wade's personal leave
4  request. I do not remember those conversations. I have
5  an e-mail to Miss Wade, I believe the Friday following
6  this leave request, in which I say that it's my
7  understanding that she will begin the instruction of
8  Module B, according to the schedule, beginning the next
9  week, can she confirm that, and she did.
10 Q. Okay. Is that what's reflected on the bottom
11 of Exhibit 24?
12 A. Yes. Now, this indicates -- my e-mail to her
13 on the 3rd indicates "all of our conversations this
14 week," that there had been ongoing conversations with
15 Miss Wade about this. I do not remember those
16 specifically.
17 Q. In the largest paragraph, the third one, it
18 says: You will consult with your physicians here and in
19 Tennessee to determine if they feel you require
20 immediate medical treatment.
21 A. That was the information I was getting from
22 Pam Taylor, the HR director. That if this was a leave
23 for medical reasons, that it shouldn't be a personal
24 leave, it should be a medical leave, and that in order
25 to process the medical leave request, the college needed

51 (Pages 198 to 201)