Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF ALASKA
 3
 4   BOBBI WADE,
 5            Plaintiff,
 6       vs.                                      COPY
 7   ILISAGVIK COLLEGE, NORTH SLOPE
     BOROUGH, JOHN TUTHILL, Individually,
 8   and PAMELA TAYLOR, Individually,
 9            Defendants.
                                              /
10   Case No. A05-086 CV (TMB)
11
12             *   *   *   *   *   *   *   *   *   *
13
                     DEPOSITION OF BOBBI WADE
14                           Volume 1
                     Pages 1 - 283 (inclusive)
15
                          May 1, 2006
16                         9:19 a.m.
17
         Taken by the Defendants, Ilisagvik College,
18              John Tuthill and Pamela Taylor
                              at
19   Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc.
              1007 West 3rd Avenue, Suite 400
20                   Anchorage, Alaska 99501
21
22
23
     Reported by:
24   Caren S. Carlson, RPR
25
```

EXHIBIT C
Page 1 of 8

Page 170

1  Dr. Church had recommended and an appointment that I had
2  scheduled with Dr. Gold.
3     Q. When did you schedule the appointment with Dr.
4  Gold?
5     A. I don't recall.
6     Q. Was it before you left for Barrow?
7     A. No.
8     Q. Was it before you changed the schedule?
9     A. I tried to schedule the -- the same appointment
10 with Dr. Gold that I had with the other two doctors in
11 the same time frame of the request for leave that I was
12 submitting.
13    Q. Uh-huh.
14    A. I believe it was ten days.
15    Q. And what else did you plan to do in the ten
16 days?
17    A. Nothing. That was my only reason for going back
18 to Nashville.
19    Q. Okay.
20    A. But you have to consider it's kind of hard to
21 get the plane reservations when you're flying on frequent
22 mile flyers [sic].
23    Q. Well, I guess that sort of begs the question,
24 Ms. Wade. Why didn't you just tell the doctors, "You
25 need to do this at a time convenient with me -- for me so

Page 171

1  schedule them out but schedule them at a time when I have
2  time to make plane reservations and we can do these
3  appointments in a few days"?
4        MS. JOHNSON: Objection, form of the question.
5     A. I don't understand what you have just said.
6  Please rephrase and simplify your question.
7     Q. Okay. Ms. Wade, why didn't you tell the
8  doctors, "I can't come on less than a week's notice and I
9  can't come if there's ten days in between these
10 appointments"?
11    A. Tell which doctors?
12    Q. All three. Tell them, "I'm going from Barrow.
13 This is an expensive trip. I need to make plans for this
14 trip. I need to get a good flight, a good fare. I need
15 you to schedule me" --
16    A. Because I don't think those doctors --
17    Q. Can I finish my question? "I need you to
18 schedule me for a time when I can get a good fare. I
19 needs X amount of days to get a good fare. I need to
20 advise the dean of instruction and then I need not to be
21 gone for ten days. If this is something that if I wait
22 two more weeks, you can schedule me in three consecutive
23 days."
24        MS. JOHNSON: Objection, form of the question.
25    Q. Why didn't you do that?

Page 172

1     A. Because you can't manipulate doctors, especially
2  specialists. They see you at their time, not my time.
3     Q. Did you try? Did you make the request?
4     A. I tried to schedule the appointments --
5     Q. That's not what I asked.
6     A. -- within a ten-day time frame. I didn't do
7  what you're suggesting because that would have been
8  impossible.
9     Q. Did you make the request of the doctor's office?
10    A. No.
11    Q. Okay.
12    A. I was lucky to even get an appointment.
13    Q. And when you made the appointment with Dr. Gold,
14 did you immediately inform Dr. Tuthill that you had made
15 an appointment and planned to be gone?
16    A. I informed Dr. Tuthill when I made time to go
17 over to his office. It was very difficult for me to find
18 time -- to find a time that I could talk with him because
19 he was new on the job and he was very busy also. And I
20 went over to his office and I don't recall if I requested
21 to see him or not. I might have or I might not have.
22    Q. So the answer to the question is, no, you did
23 not immediately inform him you had an appointment with
24 Dr. Gold; correct?
25    A. Correct.

Page 173

1     Q. Is there anything that prevented you from
2  sending an e-mail?
3     A. No.
4     Q. Is there anything that prevented you from
5  advising Pam Taylor that you had all of these
6  appointments and nobody knew you were planning to leave?
7     A. The appointments weren't made until they got my
8  leave request on October the 2nd and until I talked with
9  Dr. Tuthill.
10    Q. Well, I thought I understood you to say that you
11 did nothing to move leave forward until these doctors
12 called you to tell you, "Hey, we got appointments for you
13 on the 1st and 3rd"?
14    A. The doctors didn't call me. A doctor's office
15 doesn't do that, especially a specialist's. These
16 doctors are very busy, they're very hard to see and it's
17 very difficult to get an appointment with them.
18    Q. Uh-huh. Well, how was it that you learned you
19 had appointments on October 1st and 3rd?
20    A. I called Dr. Church's office to find out.
21    Q. And she told you --
22    A. And her receptionist told me. No, the doctor
23 doesn't tell me anything about appointments. The
24 receptionist does.
25    Q. So let's just rephrase the question.

Page 166

1  Q. Where would you jot it down?
2  A. Maybe in a -- a booklet where I kept notes or
3  something. I -- I don't recall.
4  Q. Did you keep such a booklet?
5  A. I kept many booklets of notes.
6  Q. Uh-huh. Did you keep a booklet that kept
7  appointment times?
8  A. I don't recall --
9  Q. Okay.
10 A. -- if I did or not.
11 Q. Did you keep a calendar?
12 A. The calendar I kept in my office was destroyed.
13 I had many dates on that and -- and it was -- I tore the
14 pages off and threw them away.
15 Q. Why?
16 A. As the calendar -- as the days went by.
17 Q. Uh-huh.
18 A. Because it was a desk calendar.
19 Q. Uh-huh. Did you keep any other calendar?
20 A. Not a calendar. I -- I kept a financial
21 calendar.
22 Q. Uh-huh. And did you keep medical appointments
23 on the financial calendar?
24 A. Maybe some I did and some I didn't.
25 Q. Okay. And where is the financial calendar?

Page 167

1  A. It's at -- I have it in -- at my house.
2  Q. Okay. Did you keep any other type of calendar?
3  A. No.
4  Q. So the only place that you -- you would have
5  recorded this appointment; right?
6  A. I would have written it down somewhere.
7  Q. All right. So one possibility is that it was on
8  your desk calendar; right?
9  A. Yes.
10 Q. And another possibility is that it was on your
11 financial calendar?
12 A. Yes.
13 Q. Another possibility is that you just wrote it on
14 a piece of paper?
15 A. Right.
16 Q. And where would you have put that --
17 A. In a notebook.
18 Q. -- notebook paper?
19 A. I probably -- it probably has been thrown away
20 because I kept pads like you're using there to constantly
21 make notes on.
22 Q. Uh-huh. And when did you throw it away?
23 A. I have no idea because I had to move and leave
24 Barrow. I had to pack everything up and then when I
25 arrived in Tennessee, I had to put everything in storage

Page 168

1  and everything has been in a storage room. And it's very
2  difficult to keep up with notes and notebooks and -- and
3  things when --
4  Q. All right. You said that you changed the module
5  in your classes so that you could go and do these
6  appointments later in October; right?
7  A. Yes.
8  Q. All right. Did you change the schedule before
9  or after the doctor's office called you?
10 A. I made -- I don't -- I don't remember that. I
11 don't recall.
12 Q. Did you change the appointments schedule as --
13 let me restate that. Did you submit your first leave
14 request before or after the doctor's office called you to
15 advise you there were appointments scheduled?
16 A. When they advised me of the appointment
17 schedules in early October on -- around the 2nd and 3rd,
18 I knew that it would be impossible for me to keep those
19 appointments. So I called the doctors myself and
20 rescheduled the appointments --
21 Q. Okay.
22 A. -- later on in the month and then I went to Dr.
23 Tuthill and talked with him --
24 Q. Okay.
25 A. -- about taking the leave.

Page 169

1  Q. And were the appointments on the same day?
2  A. No.
3  Q. How many days apart were they?
4  A. I have -- I don't remember.
5  Q. Well, did you consult with the doctor's office
6  to tell them that you really needed appointments on the
7  same day to minimize the disruption to the school?
8  A. No. You have to see a specialist. It's very
9  difficult to get an appointment with a specialist and you
10 have to see them when they have an appointment -- an
11 opening for you. You can't coincide appointments with
12 other doctors.
13 Q. Okay. Well, are we talking about weeks apart?
14 A. No, we're --
15 Q. Are we talking --
16 A. -- talking about several days apart.
17 Q. Several days apart?
18 A. Uh-huh.
19 Q. So perhaps you needed as many as two or three
20 days to go down and do these appointments and come back
21 and if there was a weekend --
22 A. I needed several days to get down there --
23 Q. Uh-huh.
24 A. -- go see the doctors and at the same time I had
25 an appointment with three different doctors; the two that

Page 174

1   A. Okay.
2   Q. Once you learned from Dr. Church's office that
3   you had appointments scheduled the 1st and 3rd, why was
4   it that you didn't tell Pam Taylor that immediately?
5   A. Because I didn't intend to keep those
6   appointments.
7   Q. So you rescheduled appointments with the
8   urologist and did that -- did the urinary problem at that
9   point prevent you from fulfill -- fulfilling your job
10  duties?
11  A. No.
12  Q. And did the orthopedic problem with your foot
13  prevent you from performing your job duties?
14  A. No.
15  Q. So when you went to see Dr. Tuthill, do you know
16  what day of the week that was?
17  A. No.
18  Q. Do you know what date it was?
19  A. No.
20  Q. Do you know when it was in relation to your
21  first leave request?
22  A. It was just a few days prior, but it was still
23  in the month of September.
24  Q. Okay. And that was the first time that you
25  advised him that you needed to take leave; correct?

Page 175

1   A. Yes.
2   MS. JOHNSON: Objection.
3   Q. And what did you tell him?
4   A. I told him about Dr. Church requesting that I
5   come back for tests and that I was having medical
6   problems that needed attention and that I had written a
7   plan to reschedule Module B of Business English and
8   Business Math and those were the only two courses that
9   would have been left unattended because the other three
10  courses that I was teaching at that time were scheduled
11  online on the Blackboard and I could teach those from
12  anywhere that I could get to a computer. Those were
13  online courses. And also I could keep in touch with my
14  students by e-mail so it was only Business English and
15  Business Math that was in question.
16  Q. What did he say?
17  A. He looked at my schedule. He listened to me.
18  And he seemed to agree that it would work.
19  Q. What do you mean "he seemed to agree"?
20  A. He told me he thought that it would be all right
21  and that he didn't see any problem with it. And then
22  when I got up to leave, I said, "Well, I'll make out a
23  leave request and get -- you know, get it started." He
24  says, "I will talk to Pam Taylor about it."
25  Q. Okay.

Page 176

1   A. I made out my leave request. I took it to
2   Angie, who was the payroll clerk, which was the first
3   step to verify that I had the time that I was asking for.
4   Q. Uh-huh.
5   A. Angie verified it.
6   Q. Let me back you up for a second. Did you show
7   him the -- the proposed course information change?
8   A. Yes, I did
9   Q. Okay. And did you have it signed by anyone
10  before you showed it to him?
11  A. No, it didn't require a signature.
12  Q. Are you sure about that?
13  A. No, I'm not sure. I would have to look at the
14  document to refresh my memory of -- of what it required.
15  Q. Okay. You don't remember having anyone else
16  sign it?
17  A. I don't remember, no.
18  Q. Okay. So then you went to Angie and you asked
19  her whether you had leave; right?
20  A. Yes.
21  Q. Okay. And what did she tell you?
22  A. She signed the request leave that I had the
23  leave, the required leave to take ten days.
24  Q. Okay. Did he tell you -- did Dr. Tuthill tell
25  you that your leave request was approved or did he say

Page 177

1   that it seemed all right and he would consider it
2   after --
3   A. He did not tell me it was approved. He just --
4   he was just in agreement that it was a workable idea.
5   Q. Did you give him anything else at the time
6   besides the --
7   A. When I -- when I took the leave request, I also
8   took the document here from Dr. Church and I took the
9   proposed change of the module B of Business English and
10  Business Math.
11  Q. Uh-huh. So you gave him the document that we've
12  marked --
13  A. He kind of looked at --
14  Q. -- Number 20.
15  A. Yes, and handed them back to me. He did not
16  keep them.
17  Q. Did he tell you to do anything with them?
18  A. No. I told him that I would -- I didn't show
19  Dr. Tuthill the documents when I went in to talk with
20  him.
21  Q. Okay.
22  A. I didn't show him anything.
23  Q. Okay. You did not show him Exhibit 20?
24  A. No.
25  Q. Okay.

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA
 3
 4    BOBBI J. WADE,
 5         Plaintiff,
 6       vs.
 7    ILISAGVIK COLLEGE, NORTH SLOPE
      BOROUGH, JOHN TUTHILL, individually,
 8    and PAMELA TAYLOR, individually,
 9
              Defendants.
10    _____
11    Case No. A05-086 CV (TMB)
12
13                                            COPY
14
15
16         VIDEOTAPED DEPOSITION OF BOBBI J. WADE
17                 Taken December 7, 2006
                   Commencing at 8:23 a.m.
18
           Volume IV - Pages 690 - 1015, inclusive
19
20
21                 Taken by the Defendants
                             at
22                   Delaney Wiles, Inc.
             1007 West 3rd Avenue, Suite 400
23                   Anchorage, AK 99501
24
25    Reported by:  Valerie Martinez
```

Page 831

1  BY MS. DUCEY:
2  Q  How does that show she was malicious?
3     MS. JOHNSON: Objection to the term malicious.
4     THE WITNESS: I don't know how that shows that
5  she's malicious. It would take some thought.
6  BY MS. DUCEY:
7  Q  Anything else?
8     MS. JOHNSON: Same objection.
9     THE WITNESS: I can't recall anything else at
10 this time.
11 BY MS. DUCEY:
12 Q  What is the factual basis to conclude that,
13 assuming that mistakes were made, they were other than
14 unintentional as opposed to malicious?
15    MS. JOHNSON: Calls for a legal conclusion.
16 Go ahead.
17    THE WITNESS: I can't recall any at this time.
18 BY MS. DUCEY:
19 Q  By the time you left Ilisagvik, you didn't like Pam
20 Taylor much either, did you?
21 A  I've always liked Pam. I still like her.
22 Q  Why do you like her?
23 A  Because she was a friend of mine for three years,
24 three and a half years.
25 Q  Why did you sue her then?

Page 832

1  A  Because she committed acts against me that
2  interfered with the rest of my life, caused me a
3  hardship for the rest of my life, and she should not
4  have done that.
5  Q  Isn't that inconsistent with being a friend?
6  A  No, it's not. You do what you have to do to
7  protect yourself but you do it in a legal way.
8  Q  Well, aren't her actions inconsistent with being a
9  friend?
10 A  No.
11 Q  Why aren't they?
12 A  They were not inconsistent. She was a friend prior
13 to the fall of 2003, or I thought she was. I would put
14 it that way.
15 Q  What is the factual basis to support a conclusion
16 that John Tuthill's behavior toward you was malicious?
17    MS. JOHNSON: Asks for a legal conclusion.
18    THE WITNESS: The basis? The factual basis?
19 The fact that I applied for and finally got medical
20 leave, that I complained against Aimee Valenti, that I
21 submitted a complaint on December the 11th.
22 BY MS. DUCEY:
23 Q  Anything else?
24 A  I can't think of anything else right off.
25 Q  You didn't like Aimee Valenti, did you?

Page 833

1  A  I didn't know Aimee Valenti.
2  Q  But once you got to know her, you certainly didn't
3  like her.
4  A  I didn't get to know her.
5  Q  You didn't like the way she behaved.
6  A  I didn't like the way she acted, no.
7  Q  And you resented the fact that she was teaching the
8  class you thought you were going to teach; right?
9     MS. JOHNSON: Objection. Form of the
10 question.
11    THE WITNESS: I don't recall resenting the
12 fact, no.
13 BY MS. DUCEY:
14 Q  Were you concerned that she might take over the
15 department?
16 A  No.
17 Q  Not at all?
18 A  No.
19 Q  How was John Tuthill going to use her for his
20 personal gain, then?
21 A  He was -- she was going to -- he was going to set
22 her up with ESL classes to teach his wife English, the
23 English language.
24 Q  Well, how did that involve you?
25 A  Because it involved one of my students and the fact

Page 834

1  that I complained about Aimee Valenti disrupted his
2  plans. He couldn't go through with what he was planning
3  on doing.
4  Q  Which was?
5     MS. JOHNSON: Objection. Asked and answered.
6     THE WITNESS: Setting up the ESL classes for
7  her to teach and giving her classes in my program, and I
8  could not work with Aimee Valenti because she refused to
9  talk to me. You can't work with an adjunct who refuses
10 to talk to you.
11 BY MS. DUCEY:
12 Q  What was the student you referred to -- who was the
13 student? That involved one of the students, what
14 student are you referring to?
15 A  One of the students for what?
16 Q  With respect to the ESL class, you said it involved
17 one of the students. Who was that student?
18 A  It was the student that we were just talking about
19 a little while ago that Jay St. Vincent signed her
20 registration. All of that was connected.
21 Q  How was it connected?
22 A  He set up those classes for Aimee with only one
23 student in there when the student didn't even need the
24 course. She had already taken the course.
25 Q  What course was it?

Case No. A05-086-CV (TMB)                                      Bobbi J. Wade

Page 851

1   THE REPORTER: It's 109.
2   MS. DUCEY: 109. Now, Jonathan tells me we
3   haven't marked this, which actually could be right.
4   BY MS. DUCEY:
5   Q   Could you identify what that is?
6   A   Yes, I can.
7   Q   What is that?
8   A   It's the letter that John Tuthill gave to me
9   telling me that my contract would not be renewed.
10  Q   And I think you testified yesterday that you got
11  that in a meeting with Pam and John Tuthill?
12  A   Yes, I did.
13  Q   Did you have any follow-up conversation with either
14  John Tuthill or Pam Taylor after that meeting about why
15  your contract was not renewed?
16  A   I did with Pam.
17  Q   And what did she say?
18  A   She said she did not have to give me a reason.
19  Q   When did you have that follow-up?
20  A   Immediately after I got this letter, when we walked
21  down the hall to her office.
22  Q   Tell me as best as you recall what was said in that
23  conversation.
24  A   I don't recall what was said in the conversation
25  except I recall asking Pam to give me a reason for my

Page 852

1   contract to not be renewed and she says, I do not have
2   to give you a reason because of the no-cause clause in
3   your contract.
4   Q   Do you remember anything else being said at that
5   time?
6   A   That's all I remember being said.
7   Q   Did you have any other conversations with either
8   Pam or John about the reasons your contract was not
9   renewed?
10  A   I don't recall.
11  Q   How about with Edna MacLean?
12  A   No, I had no conversations with Edna.
13  Q   And what action did you take after you received
14  this notice -- let me restate it. What action did you
15  take in response to receiving this notice, if any?
16  A   What action did I take?
17  Q   Uh-huh.
18  A   I began working on my -- on the grievance that I
19  was to turn in.
20  Q   Did you also ask for a copy of your personal file?
21  A   I think I did.
22  Q   That was in February '04?
23  A   Yes.
24  Q   And did the college offer you another job?
25  A   Yes, they did.

Page 853

1   Q   Can you look at Number 59 and tell me if you can
2   identify what that is?
3   A   It's a job offer.
4   Q   That's an offer dated June 21st, '04; right?
5   A   Yes.
6   Q   And it's for the position of Adult Basic Education
7   Instructor; correct?
8   A   Yes.
9   Q   And the salary was $55,000 a year; correct?
10  A   Yes.
11  Q   And you were eligible for participation in PERS
12  with that job; correct?
13  A   Correct.
14  Q   And you would have had all your other benefits that
15  you had had as an assistant professor; is that right?
16  A   The benefits as far as the health insurance?
17  Q   Yes.
18  A   Yes.
19  Q   When I say benefits, I mean those monetary benefits
20  such as PERS and health insurance and everything else.
21  A   Yes.
22  Q   So it would have been identical in terms of
23  benefits; correct?
24  A   It should have been. I don't know what the
25  benefits would be. The leave would be different.

Page 854

1   Q   How did you receive that offer?
2   A   This offer?
3   Q   Yes.
4   A   It was handed to me by John Tuthill.
5   Q   And when did he give you that?
6   A   I was called over to his office and he gave it to
7   me in his office.
8   Q   Was anyone else present?
9   A   I don't recall anyone else being present. Pam
10  might have been present --
11  Q   And what did he --
12  A   -- but I don't think she was.
13  Q   What did he say when he gave it to you?
14  A   He just told me that he had an offer that he wanted
15  to submit to me, and I looked at it and I told him that
16  I would take some time to consider it and I would let
17  him know and that I appreciated the offer.
18  Q   Okay. And did he say anything else?
19  A   I don't recall anything else he said.
20  Q   Did you say anything else?
21  A   I don't recall anything else I said.
22  Q   Did you take the offer?
23  A   No, I didn't.
24  Q   Why not?
25  A   One thing, the pay cut was too tremendous to still

42 (Pages 851 to 854)

EXHIBIT C
Page 7 of 8

Page 1007

1  period the college had somehow found a reason to get rid
2  of you, that that might have improved your lawsuit?
3  A  It might have improved it. I don't know. I didn't
4  know at that time. I know that they expected me to
5  withdraw the grievance if I took this job.
6  Q  And why do you say that?
7  A  I don't think they would have given me another job
8  if I pursued the -- went through with the grievance
9  procedure and filed a lawsuit against them.
10 Q  Now --
11 A  One other reason --
12 Q  Go ahead.
13 A  -- because I didn't take this job is because there
14 was a job -- another job that I was qualified for on the
15 faculty that was open, it was posted, and I was not
16 offered that job. I would have taken that job.
17 Q  What job was that?
18 A  It was Developmental Studies, English instructor.
19 Q  And I never worked at the college, so I got to ask
20 this question: If a job opening was posted like that,
21 did you have to apply for it or how did that work?
22 A  Normally you would apply -- normally you would
23 apply for this job. I didn't apply for this job but it
24 was offered to me.
25 Q  In refusing this job offer, did you ask for that

Page 1008

1  other job that was open?
2  A  No, sir, I didn't because this was offered to me
3  and if Dr. Tuthill had reviewed my resume that
4  thoroughly, he should have known that I was qualified to
5  teach English on the junior college level.
6  Q  Now, I learned today for the first time that you
7  lived in the Senior Center there in Barrow and your rent
8  was about $800 a month?
9  A  Yes, sir.
10 Q  Now, to some people that might sound like a lot but
11 in Barrow that was a pretty good rent; wasn't it?
12 A  Yeah, it was good.
13 Q  If you had -- again, I am going to ask a
14 hypothetical question, probably objectionable, but this
15 job offer here was for $55,000 a year, which in Barrow
16 is not a lot of money; is it?
17 A  No.
18 Q  But had you ever had -- other than your Ilisagvik
19 College job, have you ever had another job that paid as
20 much as $55,000 a year?
21 A  I don't recall any other job that paid that much.
22 Teachers' pay is very poor everywhere.
23 Q  I used to be a teacher.
24 A  But had this job been elsewhere in the Lower 48, it
25 would have been a good salary.

Page 1009

1  Q  It would have been a very good salary.
2  A  But not in Barrow. I would not stay in Barrow for
3  55,000 a year.
4  Q  Now, you had no way of knowing this at the time in
5  June of 2004, but Dean Tuthill was not long for the
6  Ilisagvik College world; was he?
7  A  He didn't appear to be.
8  Q  He left not that much -- not that long after you
9  left; is that correct?
10 A  As I understand, he did. I don't know for sure
11 when he left.
12 Q  And I guess my question really is -- I think I have
13 some appreciation for your feelings and your position
14 for refusing this job offer in June of 2004, but
15 couldn't you have responded another way with the sense
16 that you were going to fight the college by outlasting
17 them and by accepting this position and doing a very
18 good job and earning your way back into an assistant
19 professorship? Wouldn't that have been --
20 A  I don't --
21     MS. JOHNSON: Objection. Foundation and
22 hypothetical.
23     THE WITNESS: I can't speculate on what might
24 have happened.
25

Page 1010

1  BY MR. GAMACHE:
2  Q  Right. But you didn't have those feelings at the
3  time that you wanted to get even --
4  A  No.
5  Q  -- by doing a good job?
6  A  No. I felt like -- that this was a setup and once
7  I signed this, that I would accept it because of that
8  probationary period, they could have done -- he could
9  have done anything he wanted to do with me. And he
10 thought the lawsuit -- my grievance procedure would be
11 stopped and that would be the end of me, totally.
12 Q  So the difference -- so if you were thinking at the
13 time that taking this job would be the end of you --
14 A  Yes.
15 Q  -- then the difference between taking it and not
16 taking it was, if you didn't take it, then you would
17 have your claims -- you would still have your claims
18 against the college?
19 A  I would still have something, yes.
20 Q  Okay.
21 A  Other than the fact that I wouldn't live in Barrow
22 on a 55,000-dollar salary.
23 Q  And I guess --
24 A  It takes a lot to live in Barrow.
25 Q  It does.