IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

---

BOBBI WADE, )
            )
    Plaintiff, )
            )
  vs.       ) No. 305-cv-086-TMB
            )
ILISAGVIK COLLEGE; NORTH SLOPE )
BOROUGH; JOHN TUTHILL, )
individually; and PAMELA TAYLOR, )
individually, )
            )
    Defendants. )
            )

---

Videotaped Deposition Upon Oral Examination

of

JOHN TUTHILL, Ph.D.

---

8:04 a.m.

May 10, 2006

1601 Fifth Avenue, Suite 860

Seattle, Washington


Sharon K. Langford, CCR     1601 Fifth Avenue, Suite 860
Court Reporter              Seattle, WA 98101


EXHIBIT D
Page 1 of 3

Case 3:05-cv-00086-TMB   Document 111-4   Filed 08/17/2007   Page 2 of 3

Wade vs. Ilisagvik                        5-10-2006                        John Tuthill, Ph.D.

**18**

1    Q. Yeah, how many were not related to Bobbi Wade?
2    A. In Barrow?
3    Q. In the United States.
4    A. In the United States.
5    Q. Yeah, in the United States you've worked as a
6    dean only at Ilisagvik; is that correct?
7    A. That's correct.
8    Q. So you said you had on-the-job training and
9    you had applied -- learned and applied your knowledge on
10   the job; is that correct?
11   A. Okay, yes.
12   Q. And so your on-the-job training and your
13   application, would that all have been at Ilisagvik
14   College?
15   A. No.
16   Q. Where else would you have applied American
17   employment law?
18   A. At the University of Guam.
19   Q. The University of Guam? And --
20   A. Let me also add to that, the College of the
21   Marshall Islands is operating in an independent nation,
22   but it is held to American accreditation standards, and
23   as a result of that is expected to operate along the
24   same commonly accepted rules as American institutions,
25   including applying American employment law.

**19**

1    Q. So the Marshall Islands, although it's its own
2    separate country, uses American employment law?
3    A. No, the College of the Marshall Islands is
4    accredited by the Western Association of Schools and
5    Colleges, which has as one of its mandates that
6    accredited institutions will follow American employment
7    law: EEOC laws, for example. We are not bound to that
8    by the law of the Republic of the Marshall Islands. We
9    are bound to that by our accreditation standards.
10   Q. And you said the University of Guam, but I
11   thought at the University of Guam that you were a
12   professor.
13   A. I was a professor. I was also for a time the
14   chair of the faculty division of humanistic studies, in
15   which capacity I was responsible for supervising roughly
16   20 full-time faculty and a larger number of adjuncts.
17   Q. And as part of your supervisory duties you
18   applied American employment law; is that correct?
19   A. Certainly.
20   Q. What sorts of -- what sorts of -- would it be
21   the same thing: medical leave, contract disputes?
22   A. There were contract disputes associated with
23   my position as the faculty chair. I don't recall
24   medical leave issues coming up that year. It's possible
25   they did, but I don't recall. I do know of contract

**20**

1    disputes.
2    Q. All right. And specifically, have you ever
3    applied the Family Medical Leave Act?
4    A. Define "applied."
5    Q. Well, have you ever -- have you ever
6    decided or -- let's back up.
7        When you were in Guam did you have the help of
8    a human resources professional?
9    A. Yes.
10   Q. And did that human resources professional ever
11   tell you that Family Medical Leave Act would apply to
12   any of the medical issues that came up?
13   A. No. I've already said I don't recall that
14   medical leave issues came up --
15   Q. In Guam.
16   A. -- during the period when I was division chair
17   in Guam.
18   Q. Then how about at the Marshall Islands? Did
19   you have the help of an HR professional?
20   A. Yes, we did.
21   Q. And did you ever -- did you ever face an issue
22   of whether Family Medical Leave Act would apply or not
23   while you were in the Marshall Islands?
24   A. We had medical leave issues. We awarded
25   medical leave, I believe in conformance with FMLA

**21**

1    legislation, by granting medical leave to employees who
2    had documented that there was a medical issue that
3    needed to be dealt with in a timely manner and could
4    only be dealt with off-island. We assisted those people
5    in their exit from the Marshall Islands and held their
6    position for them when they returned.
7        Was that explicitly and specifically aimed at
8    FMLA legislation? I don't know. That was the policy at
9    the institution. That is what I was advised by the
10   personnel office, and that was the policy that I
11   enforced.
12   Q. So what do you understand that the FMLA
13   requires?
14   A. My understanding is the FMLA requires that a
15   college, in this instance, grant a medical leave to
16   employees who are eligible because of a documented
17   medical issue which needs timely treatment, and in these
18   instances treatment which is not available locally, so
19   that the employee must physically leave in order to get
20   the treatment.
21       My understanding is the FMLA legislation
22   requires the institution to grant this leave and to
23   bring the individual back to their position at the
24   institution when the leave is over, after they have
25   documented release from a licensed physician saying that

Case 3:05-cv-00086-TMB    Document 111-4    Filed 08/17/2007    Page 3 of 3

Wade vs. Ilisagvik                      5-10-2006                      John Tuthill, Ph.D.

**290**

1  Q. Did you have any input into this employment
2  offer?
3  A. Yes. This was my idea.
4  Q. And you said this was your idea. How did you
5  come up with this?
6  A. One of the things that happened at Ilisagvik
7  in the spring of 2004 was a cut in our appropriation
8  from the Borough, which necessitated budget cutbacks at
9  the institution. The decisions about what programs to
10  cut were made collectively in a series of budget
11  committee meetings and then were ratified by the
12  president.
13      One of the areas that the College was forced
14  to cut for budgetary reasons was adult basic education.
15  Adult basic education was funded in part from an
16  external grant to which the College had been
17  contributing a two-to-one match. For every one dollar
18  of grant the College chipped in two. And that matching
19  was reduced to one-to-one.
20      And I was tasked in the spring of 2004 with
21  figuring out how to preserve instruction in the ABE/GED
22  program while cutting their budget by a third. It was a
23  very lean budget already. There was barely adequate
24  funding for mandatory travel, for paper and printing
25  supplies and things of that nature. Overwhelmingly, the

**291**

1  salary was -- the budget went to salary.
2      As a result, I had a series of meetings with
3  the ABE/GED staff late in the spring of 2004. They knew
4  that the budget cuts were coming; they knew that I was
5  responsible for figuring out what to do. The two
6  ABE/GED instructors, in my opinion, reached the wrong
7  conclusions and felt that their jobs were at risk and
8  they resigned. Voluntarily. Their contracts were not
9  terminated. Those chose to resign. That left me in
10  June of 2004 with two vacant instructional positions in
11  the ABE/GED program.
12      One of the cornerstone purposes of ABE/GED was
13  to offer pre-college credit level instruction in a sort
14  of informal and computer-assisted basis to community
15  members who came in for instruction. Instruction in
16  English. I was well aware that Miss Wade had a degree
17  in English, as well as the background in educational
18  administration. And I felt that this was an area where
19  she could make a real contribution to the instruction of
20  the College. This was an area where she had the right
21  educational background as opposed to the business
22  program.
23      The previous instructors had been paid at the
24  rate of $50,000 a year salary. I was aware that that
25  was substantially less than the salary that Miss Wade

**292**

1  had been making. I wanted to increase that salary level
2  as much as I conceivably could within the limits of an
3  enormously tight budget. I got it up to 55. That was
4  the best I could do. It was literally spending upwards
5  of 90 percent of the budget on salary. And offered the
6  position to Miss Wade.
7  Q. Was there any consideration to the fact that
8  you were very close to the date of the administrative
9  hearing?
10  A. I can honestly say that there was none on my
11  part. This was something that I had been thinking about
12  doing for some time. I was not in an administrative
13  position to make it happen earlier. I needed to
14  complete the reorganization plan for this program first,
15  and that was a time-consuming process.
16      Did I do this because I felt under a gun from
17  Miss Wade in the grievance process? Absolutely,
18  positively not. I did this because this was an area in
19  which I thought she could be of genuine service to the
20  College.
21  Q. Edna MacLean signed this. Did you have a
22  conversation with Edna MacLean about this offer?
23  A. Sure.
24  Q. And what did Edna say about the offer?
25  A. Okay.

**293**

1  Q. Is that the extent of your conversation?
2  A. Pretty much. I said, this is what I'd like to
3  do. I think Bobbi has a real contribution to make in
4  the ABE/GED program. Edna might have said, do you think
5  she'd take it? And I might have said, I hope so but I
6  don't know.
7      But it would not have been an extended
8  conversation and it certainly was not part of any
9  tactical planning to deal with the grievance. It just
10  was not about that at all.
11  Q. Did you talk to Pam Taylor about it?
12  A. Yeah.
13  Q. What did she have to say about it?
14  A. Probably the same thing. Hey, that's a neat
15  idea, I think Bobbi could be valuable there. Do you
16  think she'll take it.
17  Q. Did you get anybody else's advice before you
18  made the offer on whether Bobbi was an acceptable
19  candidate for the job?
20  A. Well, I wouldn't ask anybody else's advice as
21  to whether Bobbi was an acceptable candidate, no.
22  That's within my purview as the Dean of Instruction.
23  Q. At the beginning of September, 2003, you asked
24  each of the faculty members to come in on an individual
25  basis and sit down with you and talk to you about their