```
                                                              Page 1
 1          IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF ALASKA
 3
 4   BOBBI J. WADE,
 5          Plaintiff,
 6      vs.
 7   ILISAGVIK COLLEGE, NORTH SLOPE
     BOROUGH, JOHN TUTHILL, individually,
 8   and PAMELA TAYLOR, individually,
 9          Defendants.
     _____
10
     Case No. A05-086 CV (TMB)              COPY
11
12
13
14
15          DEPOSITION OF DEBRA ENGLISH
16              Taken April 24, 2007
               Commencing at 9:15 a.m.
17
          Volume I - Pages 1 - 402, inclusive
18
19
20            Taken by the Defendants
                        at
21               Delaney Wiles, Inc.
          1007 West 3rd Avenue, Suite 400
22                Anchorage, AK 99501
23
24
     Reported by: Valerie Martinez
25
```

EXHIBIT A
Page 1 of 11

Case No. A05-086 CV (TMB)                                                                                    Debra English

## Page 2

```
 1  APPEARANCES
 2  For Plaintiff:
 3      THOMAS VAN FLEIN
        Clapp, Peterson, Van Flein,
 4      Tiemessen & Thorsness, LLC
        711 H Street, Suite 620
 5      Anchorage, AK 99501
        (907) 272-9631
 6
 7  For Defendants:
 8      CYNTHIA L. DUCEY
        Delaney Wiles, Inc.
 9      1007 West 3rd Avenue, Suite 400
        Anchorage, AK 99501
10      (907) 279-3581
11
12
13  Present:
14      Mary Hodsdon
15
16
17  Taken by:
18      Valerie Martinez
19
20
21  BE IT KNOWN that the aforementioned deposition was taken
22  at the time and place duly noted on the title page,
23  before Valerie Martinez, Notary Public within and for
24  the State of Alaska.
25
```

## Page 3

```
 1           PROCEEDINGS
 2                DEBRA ENGLISH,
 3  called as a witness herein, being first duly sworn to
 4  state the truth, the whole truth and nothing but the
 5  truth by the Notary, testified under oath as follows:
 6                EXAMINATION
 7  BY MS. DUCEY:
 8  Q   Ms. English, can you state your name for the record
 9  and spell your last name and tell us your business
10  address?
11  A   Debra English, E-n-g-l-i-s-h. My home address is
12  9787 Middlerock Road -- all one word -- Anchorage,
13  99507.
14  Q   And are you currently employed?
15  A   Yes, I am.
16  Q   And where are you employed?
17  A   I am employed by ACS, the Alaska Communications
18  Systems.
19  Q   And what is your job title there?
20  A   Director of workforce development.
21  Q   And how long have you had that position?
22  A   I was hired in March of this year.
23  Q   And what are your job duties?
24  A   I am responsible for the recruitment. I have a
25  staff -- I have a total staff of seven -- wait, nine
```

## Page 4

```
 1  people.
 2       The recruitment section has two staff;
 3  individual and organizational effectiveness, which is
 4  training and succession of planning has three staff; the
 5  employee relations section has two staff; and I am in
 6  the process of hiring a labor relations manager, and
 7  that position will also have one to two staff.
 8  Q   What does employee relations deal with?
 9  A   That deals with employee investigations;
10  discipline; performance management; any issues relating
11  to employees; responding to human rights complaints,
12  EEOC complaints; dealing with workers' compensation
13  claims; family and medical leave. Anything in the
14  employee arena.
15  Q   And then what would the labor relations manager do?
16  A   The labor relations manager will be responsible for
17  contract negotiation; making modifications to the
18  contract; as we proceed, changing -- facilitating an
19  open relationship so we can change business needs and
20  deal with the contract provisions that affect the
21  employees.
22  Q   And who do you report to?
23  A   Lynn Erwin. She is the vice president of human
24  resources. And it's E-r-w-i-n.
25  Q   Before you worked for ACS, where did you work?
```

## Page 5

```
 1  A   I worked at Denali Family Services.
 2  Q   And why did you leave them?
 3  A   Lynn convinced me to come work for her. And Denali
 4  was a nonprofit. It doesn't have union employees, and I
 5  missed involvement with the union.
 6  Q   That was something that you had done quite a bit of
 7  at the Muni?
 8  A   Yes.
 9  Q   You worked for the Muni for how many years?
10  A   From March of '97 through June 30th of '03.
11  Q   And your title there was -- at the end, was it
12  manager -- human resources director -- no, labor
13  relations manager; right?
14  A   I was the director of HR, and also I had -- I was
15  responsible for all the contracts, so it was kind of a
16  combined position.
17  Q   Are there any nonunion employees at the Muni?
18  A   Oh, yes.
19  Q   And are there any non-management nonunion employees
20  or are all the non-supervisory employees covered by a
21  contract?
22  A   No.
23  Q   How many non-contractual employees does the Muni
24  have?
25  A   All of the department heads are executives
```

Case No. A05-086 CV (TMB)   Debra English

Page 62

1  Q  I want to show you one of the CFRs. It's
2  29CFR825.302, and let me ask you if you are familiar
3  with that reg?
4  A  I have seen the text before about the 30 days
5  notice, as soon as practicable. So it's contained, just
6  a different format.
7  Q  Is this a document that's in Exhibits 123 through
8  128?
9  A  This is Westlaw.
10 Q  You don't have a copy of this regulation?
11 A  I have this text. 825.302, I probably have it in
12 here (indicating), it's just not in the same format --
13 Q  I see.
14 A  -- because you printed it from Westlaw. But I do
15 know the provision.
16 Q  So, let me just see if you agree with me about the
17 employee's affirmative obligations. They must give the
18 employer 30 days advance notice if leave is foreseeable;
19 is that correct?
20 A  Or as soon as practicable if 30 days is not.
21 Q  And they must provide, at minimum, verbal notice
22 sufficient to make the employer aware that the employee
23 meets FMLA-qualifying leave and the anticipating timing
24 and duration of the leave; correct?
25 A  Yes.

Page 63

1  Q  And the employer is permitted to inquire further;
2  is that correct?
3  A  Actually, it's more strongly worded. It says, "the
4  employer should" in order to determine that that is a
5  FMLA situation.
6  Q  But that is one of the employer's rights; right?
7  A  That's their obligation, yes.
8  Q  To say to the employee, I don't have enough
9  information. I need more information in order to
10 determine whether your leave is -- should be approved
11 whether there is some statute involved; right?
12 A  And that's why we -- yes, to your answer. And
13 that's why we use the certification that the Feds
14 provide.
15 Q  And in the case of a medical condition, the
16 employer has the right to inquire further to determine
17 if the leave is because of a serious health condition;
18 right?
19 A  Yes.
20 Q  And they may or may not request certification;
21 right?
22 A  Yes.
23 Q  It's their choice?
24 A  Yes.
25 Q  Now, the employer can also require the employee to

Page 64

1  comply with the employer's usual and customary notice
2  and procedural requirements for requesting leave;
3  correct?
4  A  As long as it's not more stringent --
5  Q  Yes.
6  A  -- than the family and medical leave.
7  Q  Assuming it's not, though, the employee has that
8  affirmative obligation to comply; correct?
9  A  Yes. But it also goes back to the 30 days or as
10 soon as practicable.
11 Q  When planning medical treatment, the employee has
12 the affirmative obligation to consult with the employer;
13 correct?
14 A  Yes.
15 Q  And make a reasonable effort to schedule leave so
16 as not to unduly disrupt the employer's operation;
17 correct?
18 A  If that comports within the need for the leave as
19 determined by the doctor.
20 Q  Subject to the approval of the health care
21 provider; right?
22 A  Yes.
23 Q  And employees are ordinarily expected to consult
24 with their employers prior to scheduling treatment in
25 order to work out a treatment schedule which best suits

Page 65

1  the needs of the employer and the employee; correct?
2  A  Depending on the health care providers. If it's
3  surgery and I have broken my leg, I can't schedule it 30
4  days down. It needs to happen right away. So, in that
5  situation, that is the as soon as practicable.
6  Q  But if you know 30 days out --
7  A  If it's optional -- okay, if I want to get a nose
8  job. I broke my nose skiing. It wasn't an optional
9  choice. I had a seven-day window in which to get my
10 surgery or they have to break it again. That was not
11 optional.
12    If I don't like my nose and I'm going to have it
13 reconstructed and get it different, then that's an
14 optional. I can do that any time. And absolutely in
15 that regard I should be working with my employer and I
16 shouldn't affect their business operations just because
17 I choose to get a new nose.
18 Q  Right. Or schedule planned treatment in advance.
19 One should work with the employer first before ever
20 scheduling those treatments; right?
21 A  But you have to look at the need and the type of
22 treatment.
23 Q  Now, do you know anything about an academic
24 institution's balancing of student needs versus
25 educational staff needs?

**Page 66**

1  A  Do I...
2  Q  Let me restate that. Are you qualified to state
3  how important it is to not disrupt an academic semester
4  for the students?
5  A  No.
6  Q  And do you know how academia would go about making
7  that determination?
8  A  No.
9  Q  Does it make sense to you, though, that if a class
10 schedule is posted in the course -- the schedule of
11 classes and if classes have begun and students have
12 enrolled in a class, that academia would have a pretty
13 strong interest in trying to keep -- stay that course?
14 A  Yes.
15 Q  Because otherwise students who have other
16 commitments may not be able to finish the course; right?
17 A  I would assume that academia would put a substitute
18 in there to cover the class if the person -- if the
19 instructor couldn't teach.
20 Q  Rather than change the schedule after it's been
21 published and students have enrolled; right?
22 A  That's more difficult.
23 Q  So you'd agree with me that changing a course
24 schedule and changing days and times of classes after
25 the schedule has been published and students have

**Page 67**

1  enrolled would be disruptive of the operations of an
2  educational institution; right?
3  A  It would be disruptive.
4  Q  And so the institution would have a strong interest
5  in trying to insure that that disruption did not occur;
6  right?
7  A  Yes.
8  Q  Now, perhaps I have asked this but I want to ask it
9  one more time. Back to FMLA, is there a statute or a
10 regulation that you can point me to that states
11 specifically when notification of FMLA rights must be
12 given or should be given?
13 A  I don't think there's -- what the intent of the law
14 is -- and I will -- during my break I will look for
15 this. But in the HR world, relying on all the resources
16 that we have for FMLA, if an employee comes to a
17 supervisor and asks for medical leave, then what advice
18 we have given to our supervisors is, you need to ask, Is
19 this a potential family and medical leave situation?
20     And we tell the supervisors, you give them the
21 information, you give them the material, you have them
22 fill out the certification so that we can make the right
23 determination, we can start the process, we can give
24 them their rights, and we can make them aware of their
25 obligations.

**Page 68**

1  Even if we don't think it is FMLA, the best
2  course of action is to give them the certification and
3  get the information and make an informed decision based
4  not only what the employee is saying but primarily based
5  on what the doctor says the employee needs.
6  Q  So subject to you finding some specific statutory
7  or regulatory reference, you would agree with me that
8  there is nowhere in FMLA that states when that
9  notification must or should be given; correct?
10 A  In there, it says when the employer has an idea
11 that the leave that is requested is for a medical,
12 they're supposed to inquire further. And I will look --
13 if you want me to look now, I will look now.
14 Q  This is a specific question not about further
15 inquiry. But what I am wondering is where in the
16 statute or the reg it states specifically that
17 notification of employee rights must be given at "X"
18 time or when certain events are triggered? Do you know
19 of such a reference?
20 A  You're asking for a date? If I come in and ask for
21 sick leave today, do I give them the medical leave form?
22 Is that what you're asking?
23 Q  Or some conditions that are satisfied that trigger
24 the employer's obligation.
25 A  No, the law says the employer needs to inquire. If

**Page 69**

1  an employee comes and says, I want to go on a vacation,
2  I'm going to make a yes or no answer.
3      If they say, I'm sick, I should inquire -- if
4  they say, I'm sick and I need to be out three days or I
5  need treatment or I need to go in the hospital or I'm
6  being referred out of state for treatment, then that
7  tells me I have a potential FMLA. I hand them the form,
8  I hand them the policies, and I tell them, Get me this
9  form. When the form is completed by your physician,
10 bring it back to me and I'll make that determination.
11 Q  You would agree that other employers deal with the
12 notification issue differently; wouldn't you?
13 A  Than I do?
14 Q  Yes.
15 A  I don't know that.
16 Q  You have no idea what other employers do?
17 A  No. I know that the State has an actual
18 conditional form that when employees say that, they hand
19 them a form and say, Your leave is approved
20 conditionally. It may be FMLA if this happens, this
21 happens, this happens.
22     They're trying to protect themselves as well as
23 provide the employer information. I come from the same
24 perspective. I want to be in the forefront. I want to
25 know if it's medical leave today. I don't want to know,

Case No. A05-086 CV (TMB)                                                                                          Debra English

Page 74
1  protection, which would start your -- the employer's
2  responsibility to implement (c).
3  Q  All right. I didn't get an answer to my question,
4  which was: If the employee does not say I need FMLA
5  leave, at that point the employer has a duty to inquire
6  but no duty to give notice of FMLA rights; is that
7  right?
8  A  They don't. They need to make a determination or
9  they can just conditionally approve it based on the
10 receipt of the certification from the physician that
11 will make a final -- give them all the information in
12 one document to make a final determination.
13 Q  So they can but they are not required to give that
14 FMLA notification?
15 A  They're required to inquire further. If an
16 employee comes up and says, I need FMLA leave -- believe
17 me, no employee is going to come up and do that unless
18 they have walked that path before.
19      They're not going to say, I need FMLA leave.
20 They just don't do it. They don't know the laws.
21 That's not their arena. If they have had FMLA leave
22 before and they knew about the protection, there is a
23 greater likelihood -- there is some likelihood that they
24 will say, I need FMLA leave.
25 Q  Now, if the employee doesn't give the information

Page 75
1  that the employer requests when the employer makes a
2  reasonable inquiry, does the employer have the
3  obligation then to give notice of FMLA rights?
4  A  The employer has to inquire enough so that they can
5  make a determination. The Department of Labor --
6  Q  What if the employee refuses to cooperate, refuses
7  to give that information?
8  A  Well, if the employer has not -- determined it's
9  not FMLA, then that's a choice that they've made.
10 Q  But what if the employer doesn't know that the
11 employee is not cooperating and refusing to give the
12 information sought? Does the employer have any further
13 obligation?
14 A  If the employee refuses to provide all the
15 information contained in the Certification of Health,
16 they can deny -- they can say, You don't qualify. You
17 haven't provided me "X".
18 Q  What if the employer asks not for all of that
19 information but some additional information to determine
20 whether it's FMLA qualifying and the employee refuses to
21 provide that?
22 A  It would depend on what they refused to provide.
23 Like if they say, Are you having a hysterectomy? And
24 the employee says, I don't have to tell you that. That
25 is correct. They do not have to tell you that.

Page 76
1  Q  So, let's look back to (b)(1) of 301, and would you
2  agree with me that this contains all of the things that
3  have to be included in the FMLA notification of rights?
4  A  Yes.
5  Q  And what are the consequences for failure of an
6  employer to give that notification?
7  A  What are the consequences to the employer?
8  Q  Right. Yes.
9  A  Well, that they have not complied with the law. If
10 they don't give this notice but they give the employee
11 all of the protections --
12 Q  Right.
13 A  -- I don't think there is a problem.
14 Q  So if the employee gets the leave, there is no
15 problem?
16 A  If they get the leave and they get all their
17 protections -- that means they're allowed to take the
18 leave -- when they return to their same or equivalent
19 position, if they get the protections without having
20 the, you know, notice -- the law requires a notice, but
21 I -- if they provide the protections, I think if an
22 employee came after them in a suit, they wouldn't have a
23 leg to stand on. They may not have given them the
24 notice, but -- excuse me -- let me refresh.
25      The employer has to invoke FMLA. It's not the

Page 77
1  employee's responsibility. So in order for the leave to
2  count toward the bucket of FMLA hours you are entitled
3  to, they have to invoke it. If the employer doesn't,
4  then they've lost their ability to capture that and
5  count it against the employee subsequently.
6  Q  So the regulation actually states specifically what
7  the consequences are for failure to give the notice.
8  Let me ask you first: Are you familiar with that
9  provision?
10 A  What --
11 Q  Don't bother to look at it. I want to know first
12 if you are familiar with that provision.
13 A  If they don't -- if the employer doesn't designate
14 it as FMLA --
15 Q  No, no. If the employer does not give the written
16 notification that is set out in 29CFR825.301(b)(1) --
17 correct me if I am wrong -- you are not familiar with
18 the specific provision that discusses the consequences
19 of that failure?
20 A  No, because I haven't dealt with that.
21 Q  Would it also be correct to say that you did not
22 evaluate that in your report?
23 A  I didn't.
24 Q  So then could you look at (f), please?
25      And let me read it into the record. It says

20 (Pages 74 to 77)

Page 78

1  "If an employer failures to provide notice in
2  accordance with the provisions of this section,
3  the employer may not take action against an
4  employee for failure to comply with any
5  provisions required to be set forth in the
6  notice."
7       Correct?
8  A   Yes.
9  Q   Could you look back at (b) -- are you familiar with
10 that; does that refresh your recollection?
11 A   Yes.
12 Q   Could we look back at (b)(1)? And what I want to
13 know is, in the requirements for notice that are
14 contained in (b)(1), is there a requirement that the
15 employer give notification, that the employee must
16 consult with the employer and make a reasonable effort
17 to schedule the leave so as not to disrupt unduly the
18 employer's operations?
19 A   That's not in (b)(1).
20 Q   So the failure to give FMLA notification -- written
21 notification, does not preclude the employer from
22 standing on their right to try and schedule the leave in
23 a manner that's not disruptive; is that true?
24 A   That's true.
25 Q   Did you review Ms. Wade's contract for the

Page 79

1  2003/2004 year?
2  A   Yes.
3       MS. DUCEY: Let's see how fast I can find it
4  in this mess. I think it's Exhibit 11.
5       (Off the record.)
6  BY MS. DUCEY:
7  Q   So we're looking at Exhibit 12 and I am going to
8  hand it to you, Ms. English. This has been identified
9  as her appointment letter for '03/'04. Have you seen
10 this document?
11 A   Yes.
12 Q   And are you familiar with the provision that
13 requires her to schedule leave in a manner not to
14 disrupt operations?
15 A   Yes.
16 Q   And that's at -- attachment A, it's page 4; right?
17 Under personal and sick leave; do you see that?
18 A   Yes.
19 Q   And it says:
20     "Twelve days of personal leave per contract year
21     are allowed when taking it does not unduly
22     interfere with the delivery of the college's
23     program of instruction."
24 A   Yes.
25 Q   (Reading.)

Page 80

1  "Leave must be approved in advance by the
2  faculty member's department head and the Dean of
3  Instruction except in the event of an emergency
4  situation."
5       Correct?
6  A   Yes.
7  Q   So just to make specific, what I think I understood
8  you to say before, you're not qualified to give any
9  opinion about whether changing class schedules or times
10 would unduly interfere with delivery of a program of
11 instruction; correct?
12 A   No, I'm not qualified.
13 Q   So in addition to the statutory duty that we talked
14 about in the Code of Federal Regulations, Ms. Wade had a
15 contract duty to try and schedule leave so as not to
16 unduly disrupt operations; correct?
17      MR. VAN FLEIN: I am going to object. It
18 misstates the contract. It absolutely misstates the
19 contract.
20      THE WITNESS: She had an obligation to
21 schedule personal leave and sick leave.
22 BY MS. DUCEY:
23 Q   And the college could deny personal and sick leave
24 if it did unduly interfere; correct?
25      MR. VAN FLEIN: Objection. Misstates the law.

Page 81

1  BY MS. DUCEY:
2  Q   Is that right under her contract?
3       MR. VAN FLEIN: Same objection.
4       THE WITNESS: I don't consider sick leave the
5  same as medical leave. So in distinguishing sick leave,
6  I'm hung over, I'm sick, yeah, that's covered under that
7  provision.
8  BY MS. DUCEY:
9  Q   Well, this isn't much different than the CFR we
10 just talked about; right?
11 A   Sick leave doesn't require a medical certification.
12 It doesn't require an employee to give the employer her
13 rights. Sick leave is, I'm sick but my leave does not
14 qualify under the federal law as family and medical
15 leave.
16 Q   That may be your personal opinion, but is there
17 anywhere in the personnel handbook that defines sick
18 leave as not comprising the subset of family medical
19 leave, extended leave?
20 A   It may cover within that, but from my perspective,
21 sick leave is -- it is you may be sick, but that leave
22 may not qualify under the family and medical leave
23 protections.
24 Q   But this is a term that is defined in the contract,
25 so if it's different than what your understanding is,

Page 82

1  then the contract term would prevail; right?
2       MR. VAN FLEIN: Objection. You're still
3  misstating the contract. This is only part of the
4  contract.
5  BY MS. DUCEY:
6  Q  If the contract defines sick leave as including all
7  sorts of leave that are required based on nonpersonal or
8  nonvacation reasons, then the contract definition is
9  what's going to control; right?
10 A  No. I would disagree. If it's family and medical
11 leave, which may be a component of sick leave but it may
12 not be a component of sick leave, the employee cannot
13 schedule emergency surgery. They can't schedule
14 treatment. They can't schedule a birth.
15 Q  You are not being responsive to my question. It is
16 the contract language that controls -- right -- not your
17 personal opinion about what constitutes sick leave?
18 A  Federal law controls family and medical leave. If
19 this is sick leave, but not sick leave as a component of
20 family and medical leave, it's two different things.
21 Q  But the contract can define sick leave as including
22 FMLA and other types of nonpersonal leave; correct?
23 A  It can include it and it can not include it.
24 Q  So if it includes it, then FMLA leave is comprised
25 within this contract term; right?

Page 83

1  A  I guess we are going to agree to disagree.
2  Q  Well, can you tell me where in the federal statutes
3  or regulations the definition of sick leave would --
4  well, first of all, is there a definition of sick leave
5  in the --
6  A  No.
7  Q  So can you also point me to any statute or
8  regulation that states that FMLA's definition of sick
9  leave, which is nonexistent --
10 A  Right.
11 Q  -- controls over the contract definition?
12 A  No.
13 Q  Does this provision in your opinion narrow an
14 employee's rights?
15 A  Not necessarily.
16 Q  It's really not any less of a burden than the CFR
17 we just talked about which requires the employee to try
18 and schedule leave in a manner not to disrupt
19 operations; right?
20 A  No. I would disagree.
21 Q  And how is it different?
22 A  Family and medical leave is a serious medical
23 condition. Sick leave doesn't have a definition.
24 There's no definition in the law of a serious --
25 Q  We're still -- we're not communicating.

Page 84

1       MR. VAN FLEIN: You have to let her finish her
2  answer.
3       MS. DUCEY: But when it's nonresponsive, I
4  don't.
5       MR. VAN FLEIN: Yes, you do.
6  BY MS. DUCEY:
7  Q  What I am trying to establish is that the statutory
8  obligation of an employee -- the affirmative duty of an
9  employee to schedule leave in a manner not to disrupt
10 the employer's operations is not a whole lot different
11 than what it says right here, which is that, yeah, leave
12 can be taken as long it doesn't unduly interfere; right?
13 A  And I would disagree with you.
14 Q  Of course there will be situations where the
15 employee establishes that they need to take that leave;
16 right?
17 A  I would disagree that sick leave and a serious
18 health condition are bundled one and the same. You
19 don't --
20 Q  Can you show me anyplace in the contract where it
21 requires a definition to the contrary?
22 A  I don't know that I can.
23 Q  And can you show me anywhere in the statutes or in
24 the regulations that requires a definition to the
25 contrary?

Page 85

1  A  There is no definition of sick leave. There is a
2  definition of a serious health condition.
3  Q  All I want to talk about is the employee's
4  affirmative duty to schedule leave in a manner not to
5  unduly disrupt operations.
6  A  And I would say if it's sick leave and not family
7  and medical leave, they have a right to --
8  Q  I want you to ignore personal and sick leave. Just
9  ignore it for purposes of discussion. Here's my point:
10 The regulatory affirmative duty of the employee to
11 schedule leave in a manner not to unduly disrupt
12 operations is not a whole lot different from the
13 statement that, yeah, you can take leave if it doesn't
14 unduly interfere with the delivery of the college's
15 program of instruction.
16 A  And I would say if you have a serious medical
17 condition, you may be forced to take leave and it may
18 disrupt the college.
19 Q  Right. And that can be approved by the dean;
20 right? It says so right there.
21 A  Okay.
22 Q  But the requirement --
23 A  That says if an emergency.
24 Q  The requirement to confer and collaborate with your
25 employer prior to even scheduling that leave is an

Page 86

1  obligation that can be inferred from that contract term
2  as well as the regulation; isn't it?
3  A   Give me the provision back or read it to me.
4  Q   (Reading.)
5       "Twelve days of personal leave per year
6       (contract) are allowed when taking it does not
7       unduly interfere with the delivery of the
8       college's program of instruction."
9       Right? And what that implies is just what the
10  reg says. Show us that we are not -- scheduling this
11  leave is not going to unduly disrupt our operations.
12  A   That's if it's foreseeable. The regulations say if
13  leave is foreseeable, 30 days, or as soon as
14  practicable.
15      Thirty days may disrupt the course schedules, as
16  I understand, and I have been in college. We have all
17  taken courses. It's a semester system or it's a quater
18  system. That's not 30 days, that's three months.
19  Q   There are sometimes situations that even are not
20  foreseeable --
21  A   Yes.
22  Q   -- that still can be scheduled in a manner not to
23  disrupt operations; correct?
24  A   Yes.
25  Q   So the issue isn't whether it's foreseeable or

Page 87

1  unforeseeable. The issue is how emergency --
2  A   How emergent is it, how long is it, and what are
3  the business needs.
4  Q   Right.
5       So could you go back to your report now just for
6  a minute? Ms. Wade had a minimum of six weeks off every
7  summer; right?
8  A   I believe she left in May and came back in August.
9  Q   And during that time, she was completely relieved
10  of her teaching duties; correct?
11  A   Correct.
12  Q   And she was back in the place where she considered
13  home; right?
14  A   Yes.
15  Q   Where she could schedule all sorts of medical
16  appointments if she chose to do so; right?
17  A   Yes.
18  Q   Are you aware that Ms. Wade had seen a medical
19  provider and asked for a dermatology referral for the
20  patch on her chest the year before in 2002?
21  A   No.
22  Q   Would that surprise you to learn that?
23  A   I don't know. I wasn't aware of that fact.
24  Q   The chart note from Samuel Simmons Hospital dated
25  June 26, '02 says:

Page 88

1  "Called to come in. Would like to have thyroid
2  checked. Did not take meds this a.m.
3  Reevaluation of HTN and insomnia. Ambien
4  working well. Did not take any of her meds
5  today because she thought she would need TSH
6  checked but it was done on 4/02. She declines a
7  GYN exam scheduled for today. She needs to go
8  to work and organize things. Leaving in a few
9  days to Lower 48. Her 44-year-old son just
10  diagnosed with colon cancer. Also wants
11  dermatology referral due to a right chest lesion
12  that is itchy and burning."
13      So you weren't aware of that?
14  A   No.
15  Q   Did you see any evidence in the record that she
16  made an attempt between June 26 and August 7th, '03 to
17  try and deal with that red, patchy lesion on her chest?
18  A   I have no records from that, so no.
19  Q   Would you agree that she would have an affirmative
20  obligation under the regulations to try and schedule
21  that in a manner that wouldn't interfere with classroom
22  instruction?
23  A   At that time, she is not an employee. She is not
24  bound by the regulation. Was she an employee?
25  Q   Actually, she was an employee.

Page 89

1  A   Oh, okay. I thought that was during the summer you
2  were referring to.
3  Q   In the summer, it's leave. You're on leave for six
4  weeks.
5  A   In the summer? I thought your contract ended. I
6  didn't realize you were on leave.
7  Q   Well, it was renewed before she left.
8  A   But the start date was August?
9  Q   Uh-huh.
10  A   So they're a 12-month-around employee. I wasn't
11  aware of that.
12  Q   So what about between August '02 and August 7th,
13  '03? She had leave; right?
14  A   You're telling me she did.
15  Q   Do you know how much leave she took?
16  A   No.
17  Q   Are you aware that she was gone for several months
18  in the winter of '02?
19  A   No.
20  Q   And that the college paid her for the entire time
21  and didn't ask anything else of her except that she deal
22  with her delivery classes by Blackboard?
23  A   No.
24  Q   And you were not aware that she was taking care of
25  her son who had cancer during that time?

23 (Pages 86 to 89)

Case No. A05-086 CV (TMB)                                                                        Debra English

**Page 146**

1  until the end of the semester; is there?
2  A    That exact language that says you can't -- that
3  says you can't any more than what's in there. That's my
4  opinion is if it's a medical leave, that's all we can
5  ask.
6  Q    And this is only what is -- this only precludes
7  what is asked for on this certification form; correct?
8  A    And it says for medical leave --
9  Q    Is that correct?
10 A    That form and for medical leave situations.
11 Q    Where does it say that? Show me where it says
12 that.
13 A    (Reading.)
14    "Form WH-380, as revised, or another form
15    containing the same basic information may be
16    used by the employer; however, no additional
17    information may be required."
18 Q    If a medical certification of a serious health
19 condition is sought by the employer; right? But there
20 was no such certification sought by the employer; right?
21 A    If the employer is considering the leave as family
22 and medical leave regardless of whether they use a form
23 or not, they can request this information. They can't
24 request any more. They can't demand any more. They can
25 request.

**Page 147**

1  Q    Are you saying that if the employee does nothing
2  under 302(e) to schedule leave in a manner not to unduly
3  disrupt, they do absolutely nothing except present their
4  leave request and say, I want to go. You let me go.
5  The employer can't say to the employee, please
6  demonstrate that your leave can't wait until the end of
7  the semester?
8  A    This says that if it's foreseeable, they have to
9  give the employer 30 days notice.
10 Q    What does that have to do with what the employer
11 can ask?
12 A    Well, if it's foreseeable, at the most, they have
13 to schedule it -- they have to give the employer notice.
14 And so if she gave the employer notice on October 3rd
15 that she wanted to take leave the next week, the
16 employer can say, that is foreseeable. You knew you had
17 to take that leave. You can't take it for 30 days.
18 Q    Well, that's just one requirement that the employee
19 has to fulfill; right? That is one requirement --
20 A    No.
21 Q    That's the requirement under (a), foreseeable leave
22 has to be 30 days.
23 A    30 days.
24 Q    Another requirement of the employee is that they
25 must schedule leave in a manner so as not to unduly

**Page 148**

1  disrupt the employer's operations; correct?
2  A    But the 30 days -- they were asking her to schedule
3  it in 90 days, not 30 days.
4  Q    We're talking in circles.
5  A    We are.
6  Q    What I want to know is: Where do the regulations
7  or the statutes say that the employer may not ask --
8  they're not seeking medical certification of a serious
9  health condition. All they want to know is under (e).
10 Under (e), that's all they want to know.
11 A    They have to comply with --
12 Q    Can you --
13 A    -- (b). "As soon as practicable." 30 days. They
14 have to give 30 days notice.
15 Q    Do you seem to think that if they give 30 days
16 notice, they get to take leave whenever they want?
17 A    If it's medical leave and they -- they have to
18 consider -- they have to consider the business needs.
19 But if it's foreseeable, there's a 30-day window for the
20 employee and the employer to schedule that leave.
21 Q    Is (a) and (e), under 302, mutually exclusive?
22 A    No. They're all --
23 Q    Are they two separate obligations of the
24 employee's?
25 A    Yes.

**Page 149**

1  Q    Two separate obligations?
2  A    Yes.
3  Q    All right. So the employee must both give 30 days
4  notice; right?
5  A    And they can take a leave in 30 days.
6  Q    No. The employee must also schedule that leave in
7  the 30-day period in a manner not to disrupt operations;
8  is that true?
9      MR. VAN FLEIN: I object. It misstates the
10 regulation.
11     THE WITNESS: They have to consider, under
12 (e), the business -- okay -- so as not to disrupt --
13 BY MS. DUCEY:
14 Q    Who does? Who does?
15 A    Both the -- the employer needs to look at the
16 business needs and the employee needs to consider that.
17 Q    Where does it say the employer must look at their
18 business needs?
19 A    Well, I am sure the employer is not going to
20 approve leave --
21 Q    But the employer doesn't have that affirmative
22 obligation; do they?
23 A    The employee looks at it -- and she did in this
24 case, and she actually backed down on, like, the 9th.
25 And she said, I need this leave, but I don't want to

Case No. A05-086 CV (TMB)                                                    Debra English

**Page 338**

1  Q  Did you know that?
2  A  No.
3  Q  Was that one of the claims that Ms. Johnson told
4  you not to bother with because the judge dismissed it?
5  A  No.
6  Q  You didn't give any opinion on a breach of the
7  implied covenant of good faith; did you?
8  A  No.
9  Q  And it's not been refiled; right?
10 A  I haven't received documentation of that.
11 Q  So without any sort of claim of breach of the
12 implied covenant of good faith, all of those questions
13 about good faith don't really have much relevance to the
14 issue here; right?
15       MR. VAN FLEIN: Objection.
16       THE WITNESS: That sounds like a legal
17 question.
18       MR. VAN FLEIN: Hold on. Objection. There's
19 a difference between a claim for breach of the covenant
20 versus the ongoing obligation of an employee to act in
21 accord with it. There's a big difference.
22 BY MS. DUCEY:
23 Q  But Ms. Johnson didn't ask you to evaluate good
24 faith in the context of the contractual terms; did she?
25 A  I don't believe so.

**Page 339**

1  Q  And you didn't make any such findings in your
2  report; did you?
3  A  No.
4  Q  And none -- no issues of good faith with respect to
5  what the contract stated burbled up to the surface as
6  you were evaluating these issues and writing your
7  report; right?
8  A  No.
9  Q  You didn't self-identify -- right -- any issues of
10 good faith; right?
11 A  No.
12 Q  Except what you have specifically stated in the
13 report?
14 A  No.
15 Q  But in response to Mr. Van Flein's leading
16 questions, you were willing to say anything he wanted;
17 right?
18       MR. VAN FLEIN: Objection. Misstates the
19 questions and the answers. It's also argumentative.
20       THE WITNESS: No.
21 BY MS. DUCEY:
22 Q  Weren't you?
23 A  No.
24 Q  It was reasonable for Ilisagvik, as you testified
25 before, to construe the January 9th e-mail as a

**Page 340**

1  withdrawal of Ms. Wade's request for leave; wasn't it?
2  A  No. What I said was she put her medical needs
3  aside in favor of her students and the college.
4  Q  And as we established before, it was reasonable for
5  the employer to construe that e-mail as a withdrawal of
6  her request for leave. That's what you've testified to;
7  right?
8  A  They could construe it that way, yes.
9  Q  And that was reasonable; wasn't it?
10 A  But not that the need of the leave went away.
11 Q  But the request for leave was withdrawn; right?
12       MR. VAN FLEIN: That misstates it. You asked
13 her earlier -- you represented that Bobbi Wade said she
14 was withdrawing the request.
15       MS. DUCEY: Well, we'll get to that in just a
16 minute, believe me.
17       THE WITNESS: She said -- the e-mail said that
18 she would -- it wasn't a matter of life or death, and
19 she would try to wait until Christmas. I would have to
20 find the e-mail again.
21 BY MS. DUCEY:
22 Q  And just to be specific, you have previously
23 testified it was reasonable for the employer to construe
24 that as withdrawing her request; is that true?
25 A  If she postpones it until December, it's not

**Page 341**

1  withdrawing the request. It's postponing the time for
2  the leave.
3  Q  Did you testify, ma'am, that it was reasonable to
4  construe that as a withdrawal of her request for leave?
5  A  You said she withdrew it. I don't really -- I can
6  read it again.
7     "My medical problems need attention as soon as
8     possible but it's not a matter of life or death,
9     so leaving everything until the holiday looks
10    like the most feasible thing now."
11    So she pushed forward the leave into the
12 holidays.
13 Q  Here's my question: Did you testify when I asked
14 you that it was reasonable that you in fact construed
15 that October 9th e-mail as withdrawing her request for
16 leave? Was that your testimony not two hours ago?
17 A  I believe what I said was that she pushed it
18 forward. She put her leave behind that of the students
19 and the college. And it was off the books because she
20 was going to attempt to do it during Christmas.
21 Q  So you deny that that was your testimony?
22 A  I can see how they would judge that as, they don't
23 have a leave -- they don't have a request on their
24 plate.
25 Q  So it was reasonable for them to construe it that

Midnight Sun Court Reporters (907) 258-7100

**Page 342**

1  way, as a withdrawal of the request; correct?
2  A   And that she was going to do it during the
3  holidays.
4  Q   That's correct -- isn't it -- it was reasonable to
5  construe it that way?
6  A   It's reasonable.
7  Q   And you're aware that Bobbi flip-flopped all over
8  on that issue; aren't you?
9  A   On the leave?
10 Q   On whether that was a withdrawal. Page 300 wasn't
11 the end of that testimony; was it?
12 A   I'd have to pull Bobbi Wade's up and look through
13 it again. Do you have the site?
14 Q   Are you aware of that, ma'am?
15 A   I recall there were some issues that --
16 Q   -- she flip-flopped on.
17 A   She changed -- she went back and forth on. I don't
18 remember what the final one was.
19 Q   It's certainly possible that that was one of the
20 ones she flip-flopped on; wasn't it?
21     Well, for instance, on page 296 and 97 of her
22 deposition:
23     "QUESTION: Well, the October 9th e-mail that
24     said if you're planning to take medical leave, I
25     need written notification from a licensed

**Page 343**

1  physician, was this withdrawn?
2     "ANSWER: I don't know."
3     That's one evidence of her inability to give
4  consistent testimony. Do you see that?
5  A   I am trying to find the page. What page was it?
6  Q   It was 297.
7  A   Yes, I don't know.
8  Q   So we know she did at least one flop -- flip-flop;
9  right?
10 A   She said, I don't know. And then later on, she
11 said, I did not withdraw anything.
12 Q   But we could go on if you'd like. But
13 nevertheless, the employer could reasonably infer that
14 was a withdrawal; right?
15 A   They could.
16 Q   You said that she was qualified, because of the
17 cancer, for FMLA leave. FMLA leave requires that there
18 be a serious health condition; correct?
19 A   Yes.
20 Q   And you testified previously you had no opinion
21 about whether she had a serious health condition; isn't
22 that true?
23 A   Because they didn't provide the certification. The
24 doctor didn't --
25 Q   Well, ma'am, you testified that you, yourself, had

**Page 344**

1  no opinion about whether she --
2  A   Because there wasn't enough -- there wasn't
3  documentation from the doctor.
4  Q   And if the finding of a serious health condition is
5  a requirement for the leave to be FMLA qualifying --
6  A   Yes.
7  Q   -- how could you come to the determination that she
8  qualified as a result of the cancer treatment for FMLA
9  leave?
10 A   Cancer is considered a serious health condition.
11 Q   Not by itself. Not as a matter of law. Doesn't it
12 still require that you have treatment two or more times
13 by a provider --
14 A   Yes.
15 Q   -- that you have a period of incapacity of three
16 consecutive days; correct?
17 A   Yes. She was treated in Barrow, and then she was
18 treated by Dr. DeLozier and he didn't release her until
19 six or seven days after his treatment.
20 Q   But he said that she could perform all of her job
21 duties and go back to Barrow after two days.
22 A   If there was a Certification of Health Care
23 Provider at that time and he said that, that would be
24 different because there's no --
25 Q   Even more to the point, it was your testimony that

**Page 345**

1  you could not give an opinion about whether she had a
2  serious health condition because you didn't have
3  sufficient information; isn't that true?
4  A   And that they should have given her the form. My
5  practice is, you conditionally do it; you give them the
6  form; they get their treatment, whatever it is; and then
7  based on the certification by the doctor and all those
8  factors filled out, you can say, this doesn't meet the
9  definition --
10 Q   We're off point now.
11 A   -- or this does.
12 Q   We're off point --
13 A   You can't -- you can't --
14 Q   -- because it was your opinion that you could not
15 state whether she had a serious health condition, so if
16 that is a requirement for leave to be FMLA leave, then
17 how could you give the opinion that she in fact
18 qualified --
19 A   Under --
20 Q   -- for FMLA leave.
21 A   For cancer? Which one are you talking about?
22 Q   Well, I understand that cancer could be -- coulda,
23 woulda, shoulda. But your testimony was, I can't give
24 that opinion; right?
25 A   That was in the October -- where she needed