IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

--ooOoo--


BOBBI WADE,                          )

        Plaintiff,              )

vs.                                  )

ILISAGVIK COLLEGE; NORTH SLOPE       ) No. 3:05-cv-086-TMB

BOROUGH; JOHN TUTHILL,               )

individually; and PAMELA TAYLOR,     )

individually,                        )

        Defendants.             )

_____)

--ooOoo--

DEPOSITION OF BETH BRASCUGLI HIRSCH, MBA, SPHR

MONDAY, MAY 7, 2007

SACRAMENTO, CALIFORNIA

--ooOoo--

REPORTED BY:  LEE B. POOLE, CSR NO. 3311


# CENTRAL CALIFORNIA REPORTERS, INC.

### Certified Shorthand and Video Reporters

505 W. Whittier Avenue • Tracy, California 95376
251 West Jackson Street • Sonora, California 95370

*Redding to Visalia - Coast to Foothills*

## (800) 347-2185

BAY AREA • CENTRAL VALLEY • SIERRA FOOTHILLS

EXHIBIT AX
Page ___ of 11

1    Q    We might be.

2    A    Okay.

3    Q    October 6th, 2003.

4    A    Do you have a Bates number?

5    Q    Hold on.

6         MS. DUCEY:  Which E-mail are you referring to,

7    October 6th?

8         MR. VAN FLEIN:  Yes.

9         MS. DUCEY:  An E-mail.  Let me see if I can find

10   it faster.

11        MR. VAN FLEIN:  You're doing a search for it?

12        MS. DUCEY:  Yes.

13        MR. VAN FLEIN:  I believe it's Exhibit 24.

14        MS. DUCEY:  Yes, it is Exhibit 24.

15        Yeah.  That was where I was.  Yes, it is Exhibit

16   24.

17   BY MR. VAN FLEIN:

18    Q    Okay.  And ma'am, do you have it by Bates number

19   or by exhibit?

20    A    I've got them both ways.  So I've got 20824; is

21   that what we're talking about?

22    Q    20824, correct.

23    A    I've got it in front of me.

24    Q    Okay.  So you've seen this E-mail?

25    A    Yes, I have.

EXHIBIT $\bigwedge$ $\bigvee$    29

Page 2 of 11

1    Q    All right.  And what is your understanding of this

2    E-mail?

3    A    It looks to me like Mr. Tuthill is trying to

4    confirm whether Miss Wade needs an immediate medical

5    leave for a serious health condition or not.  That's how

6    I would describe it; I doubt that that's how he thought

7    about it, but that's how I would describe it.

8    Q    That's his words, right, "immediate medical

9    treatment"?

10   A    Yeah.

11   Q    And can you show me in the Family Medical Leave

12   Act, or any regulation under it, where that term is used,

13   "immediate medical treatment"?

14   A    It's not.

15   Q    Okay.  So to the extent Mr. Tuthill was operating

16   under the assumption that something required immediate

17   medical treatment, would you agree with me that he was

18   under a misunderstanding of what was required?

19   A    Well, I don't know if he had understanding of the

20   FMLA, but I believe that what he was trying to do was

21   determine the need for the leave.  And I do believe that

22   that's -- the intent of the FMLA is to have employers

23   determine the need for a leave.

24   Q    Okay.  But not necessarily an immediate leave,

25   right?

EXHIBIT $\frac{AX}{3}$

Page 3 of 11

30

1    A    That's certainly not used in the statute.

2    Q    And it's not used in practice, is it?

3    A    Oh yes, used in practice.  It's wordsmithing.  So

4  "immediate" is a term that one manager uses.  "As soon as

5  possible" may be a term that another manager uses.  The

6  doctor may say "urgent."  All of those have a lot of

7  different definitions.  The real key is, "When do you

8  need to go?  So let's find that out."  And how you do

9  that is the challenge.

10    Q    And would you agree with me that either way,

11  whether it needs to be done now, like a doctor may say,

12  "If we don't get you into surgery now you could have a

13  stroke" --

14    A    Right.

15    Q    -- that would be very immediate, right?

16    A    Correct.

17    Q    In fact, an employee might want to just leave work

18  if that was the case --

19    A    Absolutely.

20    Q    -- and deal with the consequences later?

21    A    I would think so, yes.

22    Q    Okay.  So that's a real immediate need?

23    A    Yeah.

24    Q    And then there's other ones where the doctor may

25  say, "Well, we've got to get you into surgery in the next

EXHIBIT A X                31
Page 4 of 11

1    A    Because it's in the middle of nowhere.

2    Q    Okay.  Do you agree that Mr. Tuthill in his

3  October 9th, 2003 E-mail, which is Exhibit 26, was asking

4  Bobbi Wade in essence to wait, quote, "until the December

5  break" to have her treatment?

6    A    No, that's not the way I read it.

7    Q    Okay.  How do you read that?

8    A    I read it that he wants to confirm that she can't

9  wait.  He wants a confirmation that she needs to have it

10  happen now.  That's the way that I read it, because it

11  specifically says "cannot wait until."

12    Q    And under what regulation or guideline or law was

13  Mr. Tuthill entitled to ask Miss Wade to wait, to even

14  consider waiting until December, until over 60 days

15  later?

16    A    Well, I can't quote which regulation it is.  But

17  the intent of the FMLA is, if it's not an immediate need

18  that you work together to schedule it around the

19  organization's and the employee's needs.  So it's a joint

20  discussion.  And I believe that's what was trying to

21  happen here, is that they were trying to make sure that

22  her needs were being met and that the student's needs

23  were being met.  So it was the beginning of that attempt.

24    Q    And more accurately, though, if it's not an

25  immediate need, but a foreseeable need, right, that's the



EXHIBIT

Page 5 of 11

65

1   was intended for the employee that needed to leave they

2   suffer no work repercussions at all for taking their

3   leave, correct?

4      A   Correct.

5      Q   And if you don't get added classes and more

6   money, isn't that a repercussion?

7      A   Well, actually the FMLA says the job that you had,

8   and her job was the contract.

9         The added duty stuff is -- I would liken it to the

10  bonuses for production or something that's specific to an

11  opportunity because you're there.  That you would get

12  with -- you work so many hours per week and you get a

13  production bonus, but if you don't work that specific

14  number of hours you're not eligible.  And I think the

15  FMLA has said that, yes, in that case you're not going to

16  get the bonus.  So it's a very specific nuance to this

17  law.

18         And is there a really clear answer, Thomas?  I'm

19  not sure there is a really clear answer in this

20  situation.  I have not seen this specific situation

21  before.

22         So when I analyzed it, I went back to the contract

23  to say, okay, this is what the contract for employment is

24  explicitly, and that's what I used to come to my

25  conclusion, is the contract itself, and what the initial



EXHIBIT 4K

Page 6 of 11

74

1  contract said she could have.

2       Clearly there were other opportunities all the

3  time for many different things that she may or may not

4  have taken advantage of throughout the year.

5       So that was the way that I came to that

6  conclusion, was just looking at the intent of the initial

7  contract she signed.  And my opinion is that, in terms of

8  the initial contract she signed, there was opportunity

9  for her to teach all the classes that she needed to teach

10 to get the $74,000 salary, and get all the benefits of

11 employment that she had when she left.

12   Q   Upon whom did congress place the burden for

13 educating about leave and processing leave requests?

14       MS. DUCEY:  Objection; no foundation.

15       THE WITNESS:  The employer is responsible for

16 informing the employee of the procedures and the access

17 and the parameters for taking leave of any kind.

18 BY MR. VAN FLEIN:

19   Q   Okay.  With that in mind, do you see anything the

20 college should have done differently in handling Bobbi

21 Wade's requests here?

22   A   Is there anything the college should have done

23 differently in handling Bobbi Wade's requests?

24   Q   Yes.

25   A   Which one?



EXHIBIT _AX_

Page __ of 11

75

1   don't have it with you?

2     A    No, I wasn't provided it.

3     Q    Okay.  Take a moment to look at Exhibit 28.

4     A    It looks familiar.  Well, I actually -- I think

5   that this was done very appropriately.  I mean, he spells

6   out all the confusion, and just sort of thinks it through

7   with her and wonders how she can teach the classes, some

8   of the classes, if she's not going to be there.  And the

9   way that he states it is, "But I don't see how we can do

10  that."  So in this instance it appears to me he's trying

11  to work this through with her.  So I actually like the

12  way that that E-mail is written.

13    Q    Okay.  So you approve --

14    A    It doesn't appear to be a directed E-mail, if you

15  don't do this I'm going to do that.  It's more of, these

16  are the issues we're up against, how do we deal with it?

17  If you're not going to be here, you know, what are we

18  going to do?  So I think that would be it.

19    Q    Okay.  Did you have a chance to look at Deborah

20  English's report at all?

21    A    No.  Well, wait a minute.  Tell me what the --

22  tell me what the Bates number is.  Is that this last

23  stuff that you sent me?  No.

24    Q    I actually don't know.

25    A    I'm sure I got that.  That's the original one that

EXHIBIT _____

Page ____ of ____

89

1   begun, and they had another teacher in the class, and

2   there were five -- very few days left of the class when

3   she returned, so they let the other teacher complete the

4   teaching of those classes.

5       Q   For the college to have met the letter of the law,

6   it would have been obligated to put her back in those two

7   classes that she was scheduled to teach, correct?

8       A   It's a difficult question, it's a difficult

9   question.  And as we talked about before, when I looked

10  to determine an answer for it, what I looked to was her

11  contract, and did they meet the letter of the law in

12  terms of her contract?  And so my response to that is, in

13  terms of her contract they reinstated her, so she was --

14  they were in compliance with her written contract.  So

15  that was my opinion about it.

16      Q   Okay.

17      A   That these two classes were outside of the

18  agreed-upon contract.  They were things that she chose

19  to do; they weren't contracted to do.  The classes are

20  not scheduled in the contract; they are scheduled in

21  terms of number of credits per year, not any specific

22  class at any specific time.  So they met the letter of

23  the contract; that's my opinion about it.

24      Q   Do you think the college should have given her two

25  other credit classes to teach if they couldn't put her

EXHIBIT AX
Page 9 of 11

159

1    Q    And so in your mind you see the added contract

2    duties as a separate standalone --

3    A    I think so, yes.  And it was something that I

4    spent a lot of time looking at, because it's not --

5    I've not had experience with this particular specific

6    situation, and it's not a bright line.  So for me the

7    contract is what dictated my opinion.

8         Did the contract that she signed get met?  And

9    yes, I believe that it did.  And so the extra courses

10   that were available to her were above and beyond what the

11   initial contract said, or what the contract was actually

12   for, the minimum, the minimum requirement.

13   Q    Okay.  I'm not sure I completely understand what

14   you're saying.

15        Let's take it out of the context of this college

16   and put it in the context of a different situation.

17   A    Well, that's the tough part.  What's the different

18   situation?

19   Q    You know, my understanding of the situation, in

20   the fall of 2003 Bobbi Wade was scheduled to teach 12

21   credit hours, ten of which you're saying was in a primary

22   contract, and two of which were an additional contract.

23   A    No.  Actually what I said is that the whole

24   contract is not -- did not schedule her time by semester.

25   It says to get paid this amount you need to do this many



 1   credit hours per year.  And so when you're looking at a
 2   concrete piece of time, FMLA is an unpaid leave.  There's
 3   no obligation for any kind of pay with FMLA.  So when
 4   she's not there and she's not able to -- let's look at it
 5   a different way.  If she's not there and she's not able
 6   to teach, she doesn't get paid.  If she wasn't there, she
 7   wasn't able to teach, she didn't get paid.

 8         And these contracts for teaching are not split
 9   between teachers.  It's to teach this class.  And she
10   wasn't there to teach this class to make that money.
11   So if we tried to compare it to a salaried employee who
12   was not there for two weeks, they're not getting paid for
13   two weeks; they get zero dollars.

14         I really did attempt to try and find a similar
15   situation.  So if you've got a hypothetical for me that
16   will help us clarify this, I'd be more than happy to
17   consider it, 'cause I couldn't come up with one myself.
18     Q    Let's say we have an employee who works on a
19   contract basis with a company and some core duties, okay?
20     A    Okay.
21     Q    And if the employee wants to do extra, they can
22   sign up for additional duties.
23     A    Right.
24     Q    Okay.  And they do so.  All right.  Are you with
25   me so far?



163