# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| BOBBI WADE,<br><br>     Plaintiff,<br><br>  vs.<br><br>ILISAGVIK COLLEGE; NORTH SLOPE BOROUGH; JOHN TUTHILL, individually; and PAMELA TAYLOR, individually,<br><br>     Defendants. | 3-05-cv-086-TMB<br><br>**ORDER REGARDING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY and DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## I.  MOTIONS PRESENTED

Plaintiff Bobbi Wade ("Wade") filed this action against Defendants Ilisagvik College, North Slope Borough, John Tuthill, and Pamela Taylor (collectively, "Defendants"), alleging violations of federal constitutional and statutory law and state statutory and common law. Defendants have filed a motion for summary judgment on the remaining claims in this case.[1] Their motion is supported by a  memorandum and numerous affidavits and depositions. Plaintiff has filed a motion for partial summary judgment on her Family and Medical Leave Act ("FMLA") claims, which is also supported by a memorandum, numerous affidavits,

---

[1] Docket 85.

depositions and other evidence.[2] Both motions have been fully briefed by the parties, and the Court heard oral argument on Plaintiff's motion on January 10, 2008.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Bobbi Wade worked as an associate professor of business management at Ilisagvik College ("the College") from September 2000 until June 2004 under consecutive, one-year contracts. The College had no tenure system and, according to the College's employee handbook, faculty members could not obtain tenure under the standard one-year contracts. Wade's 2003 contract called for her to teach twelve credits of instruction each semester and perform three credit equivalents of service, but the contract did not specify the particular courses that would make up the 12 credits. In addition, she was to receive $1,500 per credit for any additional courses she taught above her contractual obligation to teach twelve credits, per College policy. During the fall of 2003, Wade taught the first two "modules" of Business English and Business Math, along with other courses, and had expected to teach the third module before taking FMLA-approved leave in November 2003.

In late September, Wade made a verbal request for leave from her teaching duties to John Tuthill, the College's dean of instruction and Wade's direct supervisor. On October 2, 2003, Wade then submitted a written request for leave, using a form provided by the College. On that form, she checked a box marked "personal" for the type of leave; other choices included "extended medical leave" or "family medical leave." Wade requested that the leave

_____

[2] Docket 94.

2

period run from October 20 to October 31. According to Wade, the written leave request was

prompted by a call from the office of her Tennessee physician, Dr. Cecilia Church, informing

Wade about medical appointments scheduled on her behalf. The appointments were follow-

ups to an August 6, 2003 appointment with Dr. Church. According to a chart note, Wade saw

Dr. Church for problems related to her bladder, right hip, thyroid, and high blood pressure.[3]

In connection with that visit, Wade obtained a note, dated August 7, from Dr. Church stating:

> Bobbi Wade is a patient followed in our clinic. I am aware that it is necessary
> for her to travel to Alaska for her job, but I have requested that she return as
> soon as possible for further medical work up with possible surgical treatment.[4]

In response to Wade's leave request, and conversations that followed, Tuthill wrote an email

to Wade on October 3 stating:

> Bobbi –
>
> Here's my understanding of where we stand after all of our conversations this
> week.
>
> My understanding is that you will begin teaching business English "B" and
> Business Math "B" next week, as originally scheduled, and that you will notify
> the students in advance, so they will know to come.

---

[3] Docket 102, Ex. 7. The parties offer conflicting accounts of the reasons Wade saw Dr. Church in August 2003. According to chart notes submitted by the Defendants, Wade was seen for problems related to her bladder, right hip, thyroid, and high blood pressure. Docket 102, Ex. 7. Wade testified during her deposition that she was seen for problems related to her stomach, left foot, high blood pressure, and a skin patch on her left shoulder. Docket 85, Ex. 4 at 119 and Ex. 5 at 143.

[4] Docket 87, Ex. X.

> My understanding further is that you will consult with your physicians here and in Tennessee to determine if they feel that you require immediate medical treatment, and that, depending on what they say, you may prepare a medical leave request so that you can receive any required treatment during the semester.
>
> If my understanding is incorrect, please tell me your understanding as soon as you can.[5]

Wade responded to Tuthill in an October 6 email, stating:

> Yes, Business English 109B and Business Math 105B will begin this week.
>
> I have appointments in Tennessee with my doctors, and I also have a letter from my doctor in Tennessee stating that I will need to return as soon as possible for medical treatment. Under these circumstances, I don't feel that it is necessary to consult with doctors here. There are no doctors here that can be seen without long-standing appointments, and this is an immediate situation. Thanks.

Nonetheless, Wade visited the clinic in Barrow on October 6, the same day as her email. The record shows that she consulted Dr. Michelle Snyder about a mole on her chest that had become itchy and irritated, a request for medication refills, and complaints of pain in her right hip. During this visit, Dr. Snyder gave Wade a noted stating: "I agree and recommend she see a specialist for multiple medical problems."[6] At her deposition, Dr. Snyder described the note as a "standard form" used as "kind of a work excuse."[7] She also testified that she

---

[5] Docket 88, Ex. CC.

[6] Docket 88, Ex. DD at 16.

[7] *Id.*

4

could not remember whether she had seen the note written earlier by Dr. Church, or what "multiple medical problems" her note referred to.[8]

On October 8, 2003, Tuthill and Pamela Taylor, the College's Director of Human Resources from 1998 to 2006, spoke by phone with the College's outside counsel, Cheryl McKay, about Wade's October 2, 2003 leave request. Tuthill's "general impression" from the conversation was that the College "should and would issue a medical leave to Miss Wade as soon as we had appropriate documentation that there was a medical need for treatment in a timely manner that could only be provided off-Slope."

On October 9, Tuthill emailed Wade stating:

> If you are planning to take the medical leave later this month, I need a written notification from a licensed physician, preferably by fax and as soon as possible, to the effect that your medical treatment cannot wait until the December break, when you could have the treatment without conflict with your regular teaching duties. As soon as I have received such notification, I can begin to process the request for a medical leave.[9]

Wade responded by email the same day, writing:

> John, I turned that request in to Pam day before yesterday. I attached a statement from my doctor in TN, and then I went to the Dr. here in Barrow on Monday evening and she reinforced the opinion by a written note, which I feel is sufficient for obtaining leave. But, since I can't change the schedule of the Modules B for Business Math and Business English, I really don't want to leave my students at this point. They are good classes and I don't want to upset them in any way. My medical problem needs attention as soon as possible, but

---

[8] *Id.*

[9] Docket 88, Ex. GG.

5

it [sic] not a matter of life or death. So, leaving everything until the holidays looks like the most feasible thing right now.[10]

On October 24, Wade returned to see Dr. Snyder at the Barrow clinic. During that visit, Dr. Snyder removed three moles from Wade's chest and sent tissue samples to a lab in Anchorage. On or about October 30, 2003, one of the samples was diagnosed as in situ squamous cell carcinoma and, at some point after that date, Wade was told of the diagnosis.[11]

Wade then submitted another leave request on November 3 seeking time off for "sick leave" from November 18-26, but did not provide any supporting documentation. On the College's leave form, she checked a box marked "Personal" for the type of leave requested. Tuthill denied this request on the ground that it would have required Wade to miss the last five days of instruction and "unduly interfere[] with the delivery of the college's program of instruction."

On November 4, Wade submitted another request for leave from November 18-26. The following day she gave Taylor a note from Dr. Snyder stating:

To Whom It May Concern,

I am writing on behalf of Bobbi Wade, a patient of mine. Ms. Wade needs follow up for some medical conditions that cannot be addressed here. The follow up should occur in a somewhat urgent time frame.
Thank you for understanding.[12]

---

[10] *Id.*

[11] Docket 88, Ex. DD at 37-38; Docket 85, Ex. C at 265-66.

[12] Docket 88, Ex. DD at 44.

Tuthill approved Wade's leave request on November 5, after receiving the note from Dr. Snyder. At the time, Wade was in the midst of teaching the second modules of Business English and Business Math, but had not begun teaching or signed a contract for the third, and final, modules of each course. After approving her leave request, Tuthill rejected Wade's proposed plan for rescheduling the third-module classes around her leave. He then hired two adjunct instructors, Aimee Valenti and Tim Carlson, to teach the third modules of Business English and Business Math. During her leave, Wade traveled to Tennessee where she saw Dr. Church and a plastic surgeon, Dr. Joseph DeLozier, who excised cells from the malignant lesion. She returned to her job at the College on December 1.

In early December, Wade gave Taylor a memo entitled "Formal Grievance," that included complaints about the hiring of Valenti and Carlson to teach the third modules of Business English and Business Math. She also complained about Tuthill's refusal to approve the rescheduling of those classes, his refusal to approve her earlier leave requests, and the College's failure to pay her for "two added-duty" contracts in connection with courses she had already taught. Wade met with Tuthill and Taylor about the grievance in December, but the College took no action on it.

The College's policy manual required administrators to give faculty members who had been teaching at least three years written notice by February 1 if their contracts were not

going to be renewed for the following year.[13] In late January, Tuthill recommended that the College not renew Wade's contract based on what he described as performance issues and inadequate academic and professional credentials. College President Edna McLean approved Tuthill's recommendation and on January 30, 2004, Tuthill gave Wade written notice that her contract would not be renewed.

On February 29, Wade filed a second grievance with the College. On March 12, a College hearing officer found Wade's second grievance to be without merit. Wade appealed and a hearing was held before a second hearing officer on June 24, 2004, at which Wade was represented by counsel. On July 6, 2004, the hearing officer concluded that the College had committed no violations.

On April 22, 2005, Wade filed a complaint against the Defendants in U.S. District Court for the District of Alaska, alleging nine causes of action: 1) violation of the FMLA; 2) violation of her due process rights pursuant to 42 U.S.C. § 1983; 3) violation of the covenant of good faith and fair dealing; 4) violation of the federal Age Discrimination in Employment Act of 1967 and the Older Workers Benefit Protection Act of 1990; 5) violation of the Alaska Human Rights Act, AS 18.80.220, due to age discrimination; 6) violation of public policy in connection with the Defendants' alleged retaliation against Wade for exercising her FMLA rights; 7) violation of the Alaska Whistleblower Act, AS 39.90.100 et seq.; 8) intentional interference with contract; and 9) intentional infliction of emotional and

---

[13] Docket 85, Ex. A at 5.

mental distress. Since then, all of the claims have been dismissed except for the FMLA claims, the due process claim, and the Alaska Whistleblower Act claim.[14] These claims are the subject of the motions currently before the Court.

### III.  DISCUSSION

**A. Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted when there is no genuine dispute about material facts and when the moving party is entitled to judgment as a matter of law. The moving party has the burden of showing that material facts are not genuinely disputed.[15]   To meet this burden, the moving party must point out the lack of evidence supporting the nonmoving party's claim, but need not produce evidence negating that claim.[16]

Once the moving party meets its burden, the nonmoving party must demonstrate that a genuine issue of material fact exists by presenting evidence indicating that certain facts are

---

[14]     On September 19, 2005, U.S. District Court Judge John W. Sedwick, who previously presided over this case, dismissed Wade's claims for intentional interference with the contract, breach of the implied covenant of good faith and fair dealing, and violation of public policy based on the forum selection clause in Wade's employment contract. Docket 19. And in March 2007, this Court accepted a stipulation by the parties to the dismissal with prejudice of the North Slope Borough as a defendant in the case, and to the dismissal of Wade's claims for age discrimination, pursuant to 29 U.S.C. § 621 and AS 18.80.220, and Wade's claim for intentional infliction of emotional and mental distress. Docket Nos. 78 and 80.

[15] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[16] *Id.* at 325.

so disputed that a fact-finder must resolve the dispute at trial.[17]   The court must view this evidence in the light most favorable to the nonmoving party, must not assess its credibility, and must draw all justifiable inferences from it in favor of the nonmoving party.[18]

### B. The FMLA

The FMLA provides job security and leave entitlements to employees who must take absences from work because of their own illnesses, or to care for new babies or family members with serious illnesses.[19]   The FMLA entitles qualifying employees to take unpaid leave for up to twelve weeks each year provided they have worked for the covered employer for twelve months.[20] The Act also guarantees that an employee who takes FMLA-protected leave has the right to be reinstated to his or her original position or to a position equivalent in benefits, pay, and conditions of employment upon return from leave.[21] In tandem with these rights, the FMLA explicitly prohibits employers from interfering with employees' rights under the Act. Under the FMLA, it is illegal for any employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the

---

[17] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

[18] *Id.* at 255; *Soldano v. United States*, 453 F.3d 1140, 1143 (9th Cir. 2006) (citation omitted).

[19] *Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 248-49 (1986).

[20] 29 U.S.C. § 2612(a).

[21] 29 U.S.C. § 2614(a).

Act]."[22] Separately, the FMLA prohibits employers from taking action against an employee who protests or otherwise opposes employer actions that violate the Act. An employer may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]."[23]

In *Bachelder v. America West Airlines, Inc.*, the Ninth Circuit distinguished between the FMLA's anti-interference and anti-discrimination provisions.[24]     The court noted that "the issue is one of interference with the exercise of FMLA rights . . . not retaliation or discrimination."[25] The court further noted that the "plain meaning" of the anti-retaliation or anti-discrimination provisions does "not cover visiting negative consequences on an employee simply because he has used FMLA leave,"[26] instead such an action would be covered by the "interference" provision under § 2615(a)(1).[27]

---

[22]  29 U.S.C. § 2615(a)(1).

[23] 29 U.S.C. § 2615(a)(2); *see also* 29 C.F.R. § 825.220(e).

[24] *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001).

[25] *Id.* (citing 29 U.S.C. § 2615(a)(1)).

[26] Under authorization from Congress, the Department of Labor ("DOL") has issued implementing regulations for the FMLA. 29 U.S.C. §2654. Any violation of the FMLA  or the DOL regulations constitutes an "interference" with an employee's rights under the FMLA. The DOL regulations further interpret "interference" to include "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."29 C.F.R. § 825.220(b).

[27] *Bachelder,* 259 F.3d at 1124.

**C. Wade's October Leave Requests**

To prevail on an interference claim, a plaintiff must establish that: (1) she is an eligible employee, as defined in 29 U.S.C. § 2611(2); (2) the employer is covered by the FMLA, as defined in 29 U.S.C. § 2611(4); (3) she was entitled to take leave as defined in 29 U.S.C. § 2612(a)(1); (4) she gave notice of her intention to take leave, as defined in 29 U.S.C. § 2612(e)(1) and 29 C.F.R. §§ 825.302-.303; and (5) defendants denied her the benefits to which she was entitled under the FMLA.[28]

Wade argues that the Defendants interfered with her FMLA rights pursuant to § 2615(a)(1) by refusing to approve her October 2, 2003 leave request[29] and failing to inform her of her FMLA rights. She also contends that the Defendants acted unlawfully by seeking proof that her leave could not wait until the College's December break. Defendants counter that Wade's interference claim fails

---

[28]*Mak v. Asante,* 2007 WL 1887748 *7 (D.Or. 2007); *Price v. Multnomah County,* 132 F.Supp.2d 1290, 1297 (D.Or. 2001).

[29] Wade asserts that she also made a leave request via email dated October 20, 2003. However, Wade's only evidence of this request is an email from Tuthill to Wade, dated October 20, 2003, which stated in relevant part:

> Bobbi –
>
> I can't approve your request for a Personal Leave from the morning of Thursday, December 11 through the afternoon of Friday, December 19. Such a leave would mean that you missed the last five days of instruction, and that, to my mind, "unduly interferes with the delivery of the college's program of instruction."

Docket 94, Ex. 4 at 8.

Without additional evidence, this email is insufficient to establish that Wade gave Defendants adequate notice that her request for leave, made on or about October 20, 2003, might be covered by the FMLA. Thus, the Court does not consider this request in its analysis of Wade's FMLA claims.

because she has not established that she had a serious medical condition in connection with her October 2, 2003 leave request or that she gave proper notice of her need for FMLA-protected leave. Defendants also assert that the denial of leave was justified because Wade's request failed to give 30 days advance notice, and because she failed to make a reasonable effort, in consultation with Defendants, to schedule her leave so as not to unduly disrupt the employer's operations. Defendants further contend that even if Wade was entitled to leave in connection with her October 2 request, she withdrew or agreed to delay the leave in an October 9 email to Tuthill, thus relieving the Defendants of any FMLA-related duties. Wade counters that Defendants never properly requested medical certification that she had a serious health condition and, thus, cannot rely on the lack of one as a basis for the denial of leave. She also denies that her October 9 email to Tuthill was a withdrawal or agreement to delay her leave request.

### 1. Notice

As a preliminary matter, the Court finds that Wade gave the Defendants adequate notice of a probable basis for FMLA leave. In requesting leave, the employee must provide "at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave."[30] The Ninth Circuit has held that "[t]he employee need not experessly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed [for a qualifying reason]."[31] Here, Wade's presentation of the August 7 note from Dr. Church requesting that Wade "return as soon as possible for further medical workup with

---

[30] 29 C.F.R. § 825.302(c).

[31] *Bachelder*, 259 F.3d at 1130.

possible surgical treatment," should have put the Defendants on notice that Wade's request might fall within the scope of the FMLA. Wade's October 6 email to Tuthill stating that she needed to see doctors in Tennessee for an "immediate situation" provided additional notice, as did the October 6 note from Dr. Snyder recommending that Wade see a specialist for "multiple medical problems."

## 2. Medical Certification

Once an employee has given adequate notice of the reason for an impending absence, the burden shifts to the employer to determine whether a leave request is likely to be covered by the FMLA. The employer may inquire further, if necessary, to determine if the leave is being sought for a serious medical condition and to obtain the necessary details.[32] Where the leave is premised on a serious medical condition, the employer may request medical certification to support the need for such leave.[33] DOL regulations require employers to make written requests for medical certification "at the time the employee gives notice of the need for leave or within two business days thereafter, or, in the case of unforeseen leave, within two business days after the leave commences."[34] In addition, the employer must give the employee notice of the consequences of failing to provide an adequate certification, and give the employee an opportunity to correct any certification the employer finds to be incomplete.[35] Finally, the regulations provide that if an employer fails to give proper

---

[32] *Id.*

[33] *Id.* at 1131; 29 C.F.R. § 825.305(d).

[34] 29 C.F.R. § 825.305(c).

[35] 29 C.F.R. § 825.305(d).

notice related to the request for certification, the employer "may not take action against an employee for failure to comply with any provision required to be set forth in the notice."[36]

Defendants assert that Tuthill properly requested certification in an October 9 email to Wade, which stated:

> If you are planning to take the medical leave later this month, I need a written notification from a licensed physician, preferably by fax and as soon as possible, to the effect that your medical treatment cannot wait until the December break, when you could have the treatment without conflict with your regular teaching duties. As soon as I have received such notification, I can begin to process the request for a medical leave.[37]

Tuthill's use of "notification" rather than "certification," Defendants argue, is a "distinciton without a difference." They also contend that the notice requirements were met because information about the FMLA was posted on a bulletin board and the College's leave request form stated that a doctor's verification is required for medical leave.

These arguments are not persuasive. Given the specificity of the notice requirements related to medical certification, there is, at best, a factual dispute as to whether Tuthill's email can be construed as a request for a certification, as the term is defined by the Act and DOL regulations. More importantly, the Defendants' failure to give Wade notice of the consequences of not providing an adequate certification precludes them from justifying the denial of her October 2, 2003 leave based on a lack of documentation regarding a serious medical condition. Even assuming that Wade was aware of the College's requirement for a doctor's verification in connection with medical leave,

---

[36] 29 C.F.R. § 825.301(f).

[37] Docket 88, Ex. GG.

there is no evidence that she had notice of the consequences of failing to provide a certification or her right to cure a certification deemed deficient.

### 3. Thirty Days' Notice Requirement

Defendants have, however, raised a legitimate reason for their refusal to approve Wade's October 2, 2003 leave request: Wade's failure to give 30 days advance notice of her need for foreseeable leave. DOL regulations state that an employer may delay the taking of FMLA leave "until at least 30 days after the date the employee provides notice to the employer of the need for FMLA leave"[38] if the employee fails to give 30 days notice for foreseeable leave "with no reasonable excuse for the delay."[39] One caveat is that the employer may only delay the start of leave if it is clear the employee knew of the 30-day advance notice requirement.[40] This "actual notice" requirement is satisfied where an employer has posted the "required notice" at the employee's worksite.[41] In addition, the need for leave "must have been clearly foreseeable to the employee 30 days in advance of the leave."[42]

While the Ninth Circuit has not squarely addressed the issue of whether an employee's failure to give 30 days notice for foreseeable leave provides a valid basis for the denial of the leave request, several other circuits have concluded that it does. In *Aubuchon v. Knauf Fiberglass*, *GMBH*, the

---

[38] 29 C.F.R. § 825.304(c).

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

Seventh Circuit stated: "It is important to note that if the required notice, whether 30 days or 'as soon as practicable,' is not given, the employer can deny leave . . . "[43] As the *Aubuchon* court explained:

> Conditioning the right to take FMLA leave on the employee's giving the required notice to his employer is the quid pro quo for the employer's partial surrender of control over his work force. Employers do not like to give their employees unscheduled leave even if it is without pay, because it means shifting workers around to fill the temporary vacancy and then shifting them around again when the absentee returns. The requirement of notice reduces the burden on the employer.[44]

Similarly, in *Bailey v. Amsted Industries Inc.*, the Eighth Circuit affirmed a district court's conclusion that an employer had not violated the FMLA by discharging an employee where the employee had presented "no evidence that he gave 30 days or 'such notice as is practicable' to [the employer] about his foreseeable absences . . . and therefore [the employee] has not satisfied the notice requirements of 29 U.S.C. § 2612(e)(2)."[45]

These decisions reflect the effort by Congress to achieve in the FMLA a balance between the needs of employers and employees. As the Ninth Circuit recognized in *Bachelder*, "Congress, in enacting the FMLA, also took employers' legitimate prerogatives into account . . . "[46] The FMLA expressly states that its purpose is:

---

[43] *Aubuchon v. Knauf Fiberglass, GMBH*, 359 F.3d 950, 951 (7th Cir. 2004).

[44] *Id.* at 951-52.

[45] *Bailey v. Amsted Industries Inc.*, 172 F.3d 1041, 1046 (8th Cir. 1999); *see also Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir. 1998) (affirming dismissal of former employee's FMLA claim where there was no evidence the employee had provided notice in compliance with 29 U.S.C. §2612(e)(2) of the need for leave or a qualifying reason).

[46] *Bachelder,* 259 F.3d at 1119-20.

17

(1) to balance the demands of the workplace with the needs of families, to promise the stability and economic security of families, and to promote national interests in preserving family integrity;

(2) to entitle employees to take reasonable leave for medical reasons . . .

(3) to accomplish the purposes described in paragraphs (1) and (2) in a manner that accommodates the legitimate interests of employers.[47]

In the instant case, it is undisputed that Wade failed to give 30 days notice for her October 2, 2003 leave request.[48] Specifically, her request sought leave beginning October 20 – only 18 days later. Nor has Wade presented any evidence that her leave was unforeseeable. The record shows that Wade relied on the August 7 note from Dr. Church in seeking leave, indicating that she knew of her need for treatment more than 30 days before she submitted her written request. In addition, the October 6 notes from Dr. Snyder gave no hint of a changed or emerging health condition, that would suggest the need for leave was unforeseeable.

Wade argues instead that Defendants improperly denied, rather than delayed, her leave request. "If the medical leave was considered foreseeable," she asserts, "Defendants should have, but did not, tell Ms. Wade that she could obtain leave in 30 days." Wade cites no authority for the proposition that the Defendants "should have told" Wade she needed to give 30 days notice, beyond the "actual notice" requirement of the 30-day advance notice rule. Here, the evidence shows that the "actual notice" requirement was satisfied by the College handbook's discussion of requirements for invoking FMLA-protected leave and Wade has not disputed this point. In particular, the handbook's

---

[47] 29 U.S.C. §2601(b).

[48] The record offers some indication that Wade made a verbal request for leave in late September, but it is not clear if she sought to have the leave begin on a specific date. Because Wade noes not argue that the verbal request complied with the 30-day notice requirement, the Court does not consider it as a basis for her interference claim.

18

"Leave Without Pay" section lists requirements for the use of FMLA leave, including that the employee give the College a "written request for the Leave at least 30 days in advance of the requested Leave date." Given the detailed nature of the DOL regulations as to notice provisions, the Court declines to impose requirements beyond the "actual notice" set forth in 29 C.F.R. § 825.304(c).

Viewing the evidence in the light most favorable to Wade, the Court finds that the Defendants were justified in denying Wade's foreseeable leave request for at least 30 days. The Court thus grants  summary judgment for the Defendants on Wade's denial-of-leave claim with respect to her October 2, 2003 leave request and dismisses this basis of Wade's interference claim.[49]

### D. Reinstatement

As a separate basis for her interference claim, Wade argues that the Defendants failed to properly reinstate her to her faculty position after she returned from medical leave. Specifically, she asserts that Defendants violated 29 U.S.C. § 2614(a)(1) by hiring adjunct instructors to teach the third modules of Business English and Business Math and not restoring her to teach those courses or equivalent ones after her return. As a result of this, Wade alleges, the College paid her $3,000 less for the fall semester than she would have been paid had she not taken leave.

---

[49] Since we resolve Wade's denial-of-leave claim on the lack of 30 day' notice, the Court need not address Wade's claims that the Defendants allegedly violated her FMLA rights by failing to inform her of her general rights under the FMLA in connection with her October 2, 2003 leave request and by seeking confirmation that her leave could not wait until the December break. Likewise, the Court need not consider the Defendants' contentions that Wade has not established the existence of a serious medical condition and that her October 9, 2003 email to Tuthill constituted a withdrawal of her earlier leave request.

Defendants deny that the failure to reinstate Wade as the instructor of the third modules of Business English and Business Math was an adverse employment action on the ground that Wade never signed "added duty" contracts for those courses. As the Defendants see it, "[t]he FMLA does not require an employee to be reinstated into a class that she has not started teaching prior to when the leave began, and was not scheduled to be taught until after the leave began." They also assert that Tuthill and the College, generally, had the right to reassign instructors. In reply, Wade argues that she was not required to sign contracts for the Business English and Business Math courses because they were part of her regular "base load" of 12 teaching credits and were not "extra duty" assignments.

The FMLA entitles employees who have returned from family medical leave to be reinstated to the position they held before leave or to an "equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."[50] In other words, the taking of leave must not result in the loss of any employment benefit that had accrued prior to the date on which leave began.[51] DOL regulations define an "equivalent position" as:

> one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.[52]

The employee's right to reinstatement applies even if the employer has found a replacement for the employee during her leave. The DOL regulations state that "[a]n employee is entitled to . . .

---

[50] 29 U.S.C. § 2614(a)(1).

[51] 29 U.S.C. § 2614(a)(3).

[52] 29 C.F.R. § 825.215(a).

20

reinstatement even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence."[53]

Wade has introduced substantial evidence that she was assigned to teach the third modules of Business English and Business Math, and that she expected to do so before taking leave in November. For example, she points to Tuthill's deposition testimony that: "Miss Wade had every reason to anticipate that she would be the instructor of [Business English] Module C. That was the plan at the time." When asked, "But for [Wade's] leave she would have been teaching Module C. Do you agree with that?" Tuthill responded: "In all probability yes." The record also supports Wade's assertion that the College withheld payments for two "added duty" courses she had already taught and, instead, applied those teaching credits to "cover" the courses assigned to other instructors – the third modules of Business English and Business Math. Notes taken by a College employee, Diana Kennedy, during a meeting between Wade, Tuthill and Taylor further support Wade's claim. In a summary of the meeting, Kennedy wrote: "John [Tuthill] said the contracts were not pay [sic] because the 12 credit teaching load had not been met because [Wade] had to take medical leave. The added duties had to be adjusted by two credits."

Regardless of whether the third modules of Business English and Business Math were considered part of Wade's 12-credit base load under her annual contract, or additional "added duty" courses, the record shows that both College officials and Wade considered them to be part of her "position" prior to her request for leave in November 2003. The record further shows that Wade suffered a tangible loss – at least $3,000 – due to the College's failure to properly reinstate her. The

---

[53] 29 C.F.R. § 825.214(a).

Defendants' argument regarding unsigned contracts is irrelevant; the FMLA and DOL regulations make no such distinction. They simply require that an employee be reinstated to an "equivalent position." Accordingly, the Court finds that when viewing the evidence in the light most favorable to the Defendants, Wade is entitled to summary judgment on her reinstatement claim. The Court also rejects Defendants' request to limit damages under this claim to $2,000, the amount of the two "added duty" contracts for which Wade was not paid. Wade is entitled to an evidentiary hearing on additional damages, including any loss to her retirement account.

### E. Mischaracterization of Leave Requests

Both parties seek summary judgment on Wade's claim that the Defendants interfered with her FMLA rights by mischaracterizing her leave requests as "personal" instead of "medical" or FMLA-protected. She argues that this failure led supervisors to view her requests as discretionary rather than protected by statute, as shown by Tuthill's references to the College's standard procedures for evaluating leave requests by faculty members. The erroneous application of those standards, Wade alleges, led to the denial of her leave requests and to the Defendants' failure to properly reinstate her upon her return from leave in December.

As a preliminary matter, Wade's mischaracterization claim is moot as to her October 2003 request for leave. As explained above, Defendants are entitled to summary judgment on this request because of Wade's failure to provide 30 days advance notice. The mischaracterization claim is also moot as to Wade's purported October 20, 2003 request because, as explained above, Wade has not provided enough information for the court to evaluate this request; nor has she expressly argued that

Defendants mischaracterized such a request. Thus, the Court's analysis focuses solely on Wade's return to work following her FMLA-protected leave in November 2003.

With respect to Wade's November 2003 leave, Defendants respond that Wade has not established that she was prejudiced by the College's failure to designate her leave as FMLA-protected. In support of this, they cite the United States Supreme Court's decision in *Ragsdale v. Wolverine World Wide, Inc.*, in which the Court struck down a DOL regulation, 29 C.F.R. § 825.700(a), that prohibited an employer from counting paid or unpaid leave against an employee's 12-week FMLA allotment if the employer did not designate it as covered by the FMLA.[54] Defendants also argue that they are entitled to summary judgment on this claim because it is "undisputed" that Wade continued to receive health insurance during her leave and was later reinstated to the classes she had been assigned to teach.

Wade does not specify how or when the alleged mischaracterizations of her leave occurred, though she does provide a record cite to a copy of her November 4, 2003 leave request on which "Personal" is circled for the type of leave requested and the letters "PT" – which presumably stand for Pamela Taylor – are written and circled next to this.[55]  Defendants note that the same form indicates the College was ready to convert Wade's "personal" leave to one for "extended medical" leave once Wade submitted "required documentation."[56]

---

[54] *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 90-91 (2002).

[55] *See* Docket 94**,** Ex. 13.

[56] *Id.*

Wade argues that if the Defendants accurately characterized Wade's November 2003 leave requests as FMLA-protected she would have been aware of her "FMLA status," and, with this awareness, "she could have researched her rights both before and after her leave and been able to articulate her needs more forcefully."[57] While Wade has not established a causal connection between the mischaracterization and the Defendants' failure to properly reinstate Wade, an inference can be drawn, when the evidence is viewed in the light most favorable to Wade, that the proper labeling of Wade's November leave as FMLA-protected might have altered the Defendants' treatment of Wade following her return to work and her own ability to assert her rights under the FMLA. Thus, Wade has raised a genuine issue of material fact, precluding the Defendants' motion for summary judgment on this claim.

### F. FMLA Notice Requirements

Both Wade and the Defendants also seek summary judgment on her claim that the Defendants violated the FMLA by failing to notify Wade of her rights under the Act.[58] As with the mischaracterization claim, Wade's notice claim is moot with respect to her October 2, 2003 request for leave for the reasons explained above. Thus, the Court analyzes this claim only with regard to her November 2003 requests for leave, use of FMLA-protected leave, and her return to work in December 2003.

---

[57] Docket 99, Pl.'s Resp. to Def.'s Mot. for Summ. J. at 13.

[58] *See* Pl.'s Compl. at ¶ 41.

It is undisputed that Defendants failed to give Wade the general FMLA-rights notice required under 29 C.F.R. § 825.301(b)[59] and (c).[60] As Wade accurately points out, the notice requirement under 29 C.F.R. § 825.301(b) is in addition to any notice posted on a bulletin board or appearing in a handbook, as indicated by the word "also" in § 825.301(b). Wade further asserts that the lack of notice harmed her ability to assert her rights and challenge the College's failure to properly reinstate her following her return from leave. She argues that she was "unable to articulate in her grievance exactly why Defendants' actions were illegal, which resulted in Defendants being angry with her for not simply accepting their wrongful actions." Defendants respond that they provided adequate notice and, alternatively, that they should not be held liable for a "technical violation" of the FMLA because Wade received the intended benefits of the Act and has not established prejudice.

---

[59] 29 C.F.R. § 825.301(b)(1) provides in relevant part:

The employer shall also provide the employee with written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations. The written notice must be provided to the employee in a language in which the employee is literate . . . Such specific notice must include, as appropriate:
. . . .
(vii) the employee's right to restoration to the same or an equivalent job upon return from leave . . .

[60] 29 C.F.R. § 825.301(c) provides in relevant part:

Except as provided in this subparagraph, the written notice required by paragraph (b) (and by subparagraph (a)(2) where applicable) must be provided to the employee no less often than the first time in each six-month period that an employee gives notice of the need for FMLA leave (if FMLA leave is taken during the six-month period). The notice shall be given within a reasonable time after notice of the need for leave is given by the employee – within one or two business days if feasible . . .

Wade already has established, as discussed above, that the Defendants failed to fully reinstate her following her return from leave and penalized her for taking leave by refusing to pay her for the completion of two extra-duty contracts. And while she has presented no evidence of the Defendants' purported anger, Wade has raised a triable issue of fact as to whether the Defendants' failure to notify her of her right to reinstatement contributed to the harm she suffered by the Defendants' refusal to assign her to the same or equivalent classes upon her return. The Court thus denies both parties' motions for summary judgment on this claim.

### G. Wade's December 11 Grievance

Wade's complaint also asserts that Defendants interfered with her FMLA rights by "refusing to accept a written complaint regarding the violation of her FMLA rights." Defendants now seek summary judgment on this claim. Wade has not briefed the issue in her response to the Defendants' motion or her own partial motion for summary judgment. According to Wade's complaint, she submitted a memo entitled "Formal Grievance" on December 11, 2003 that accused the Defendants of failing to properly reinstate her to her position. Her complaint alleges that Taylor rejected the document because it was not in a "proper form." Defendants contend that Wade's claim should be dismissed because she has offered no evidence in support if it, and because the College retained a copy of Wade's memo. We agree. Because Wade has failed to raise a factual issue, or make any arguments in support of her claim, Defendants are entitled to summary judgment on this cause of action.

**H. The Non-Renewal of Wade's Contract**

Wade asserts that the Defendants retaliated and discriminated against her by weighing her use of FMLA-protected leave as a negative factor in the decision not to renew her contract. Although Wade frames her claim as one of discrimination and retaliation, she is actually making an interference claim under 29 U.S.C. § 2615(a)(1) and a separate discrimination claim under 29 U.S.C. § 2615(a)(2) related to the grievances she filed against the Defendants.[61]

The Ninth Circuit has held that "where an employee is subjected to 'negative consequences . . . simply because he has used FMLA leave,' the employer has interfered with the employee's FMLA rights under 29 C.F.R. § 825.220(a)(1)."[62] Under that provision, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.[63] The interference – discrimination distinction is important because the Ninth Circuit has expressly declined to apply the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*[64] to interference claims based on termination; the court has not addressed whether the analysis applies to discrimination claims brought under § 2615(a)(2). To prevail, at trial, on a claim that an employer interfered with her rights by terminating her in violation of the FMLA, an

---

[61] *See Bachelder*, 259 F.3d at 1124.

[62] *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir. 2003) (quoting *Bachelder*, 259 F.3d at 1124) (emphasis added).

[63] *Bachelder*, 259 F.3d at 1122 (citing 29 C.F.R. § 825.220(c)).

[64] 411 U.S. 792 (1973).

employee must show by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her.[65]

In an attempt to establish a link between her leave and the non-renewal of her contract, Wade points to the closeness in time between her engagement in protected activities and the College's decision on her contract. In particular, she points to three protected activities: her use of FMLA-protected leave, her return to work after leave, and her filing of a grievance against Tuthill and the College.

Wade's arguments are unpersuasive. First, her grievance is relevant to her discrimination claim, which is analyzed below, and not to the interference claim. Second, her argument that the temporal proximity between her medical leave and return from leave to Tuthill's notice of non-renewal fails to establish that either her leave, or her return from leave, were factors in the non-renewal decision. The mere fact that two months elapsed between her return from leave and the contract non-renewal does not, on its own, suggest that Tuthill based his non-renewal recommendation, even in part, on Wade's use of FMLA-protected leave. In sum, Wade has not provided enough evidence for a reasonable jury to conclude that the non-renewal of her contract was based on her use of FMLA-protected leave.

Because of this, the Court grants summary judgment for the Defendant on this issue and dismisses Wade's claim of interference based on the non-renewal of her contract.

---

[65] *Xin Liu*, 347 F.3d at 1135-36.

28

**I. Wade's Discrimination and Retaliation Claim**

Wade also alleges that the College's non-renewal of her contract was based, in part, on the grievance she filed in December 2003.[66]  Defendants have cross-moved for summary judgment on this claim, arguing that Wade's claim fails because they have articulated legitimate, non-discriminatory reasons for the non-renewal of Wade's contract and Wade has not shown these reasons to be pretextual.

While the Ninth Circuit has not defined the test for a retaliation claim brought under 29 U.S.C. § 2615(a)(2),[67] both Plaintiff and the Defendants urge the Court to adopt the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green* as other circuits have done.  This approach makes sense. Under the *McDonnell Douglas* analysis, a plaintiff suing under the FMLA carries the burden of establishing a prima facie discrimination claim by showing that: (1) she exercised rights under the FMLA; (2) she suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.[68] If the plaintiff establishes these elements, then the burden shifts to the employer to articulate a legitimate,

---

[66] Wade's December grievance complained about the Defendants' refusal to approve her leave requests, the reassignment of teaching duties for the third modules of Business English and Business Math, and the College's failure to pay her for already completed extra-duty contracts. Docket 88, Ex. 17.

[67] *Bachelder*, 259 F.3d at 1125 n.11 ("Whether or not the *McDonnell Douglas* anti-discrimination approach is applicable in cases involving the "anti-retaliation" provisions of FMLA, is a matter we need not consider here.").

[68] *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 160-61 (1st Cir. 1998); *Potenza v. City of New York*, 365 F.3d 165, 168 (2nd Cir. 2004) *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001); *Richardson v. Monitronics Intern., Inc.*, 434 F.3d 327, 332 (5th Cir. 2005); *King v. Preferred Technical Group*, 166 F.3d 887, 892 (7th Cir. 1999); *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007).

nondiscriminatory reason for the adverse action that is sufficient to raise a genuine issue of fact as to whether it discriminated against the employee. If the employer does this, the plaintiff then bears the burden of establishing by a preponderance of the evidence that the employer's proffered explanation is a pretext for FMLA retaliation.[69] At all times, the employee retains the ultimate burden of persuasion under the burden-shifting approach for FMLA retaliatory discrimination claims.

The first two elements of Wade's prima facie discrimination claim are undisputed. She took FMLA-protected leave in November 2003 and filed a grievance against Tuthill in December 2003. She then suffered an adverse employment action as a result of the College's failure to properly reinstate her after her leave and the College's non-renewal of her contract. Wade suggests that Tuthill was angered by the grievance she filed in December 2003, and terminated her as punishment for this. She contends that evidence of a retaliatory intent can be found in notes taken by his assistant during a meeting between Tuthill and Wade on December 19, 2003, which indicated that the College did not pay Wade for two extra-duty teaching contracts due to her medical leave. While this evidence is relevant to Wade's reinstatement claim, the notes do not indicate that Tuthill was angered by Wade's grievance. Wade has thus failed to establish retaliatory intent, the third prong of a prima facie claim of retaliation. Yet even if Wade had been able to do so, her claim still fails because the Defendants have pointed to evidence in the record of legitimate, non-discriminatory motives that Wade has not shown to be pretextual.

---

[69] *Nichols*, 251 F.3d at 502; Richardson, 434 F.3d at 332-33.

According to a memorandum prepared by Tuthill, the reasons for the non-renewal of her contract included: student complaints about Wade's teaching; her tardiness in turning in grades for module courses; a decline in the "success rate" of students in her classes; deficiencies in Wade's academic credentials; and Wade's efforts to seek tuition waivers for her granddaughter in Tennessee and her approval of independent study courses for her granddaughter, which Wade then supervised.[70] In their opposition to Wade's motion, the Defendants offered evidence in support of these reasons. For example, Tuthill testified during his deposition that he considered Wade's academic qualifications to be a problem. He stated:

> It was an issue because the accreditation standard by the Northwest Accrediting Commission states that an accredited college will have appropriately qualified instructor. I had an instructor in the business program who was teaching classes in accounting and economics and finance and business management and marketing who had very limited or no academic background in these areas. That was not appropriate qualifications, so I was in violation of an accreditation standard.[71]

Wade contends the qualification issue is pretextual because Wade had the same professional qualifications when she was first hired by the College, and because the accreditation association did not flag her qualifications as a problem during its review of the College. That Wade taught for several years before Tuthill reviewed her credentials does not make Tuthill's complaint pretextual; rather, the timing of the scrutiny makes sense in light of Tuthill's arrival at the College during the summer of 2003. In addition, Tuthill's complaint is based on objective factors – the College's job

---

[70]Docket 88, Ex. RR.

[71] Docket 86, Ex. D at 56-57.

description for Wade's position and Wade's academic and teaching experience – rather than a subjective evaluation.[72]

Wade's objections to other reasons cited by the Defendants for the non-renewal of her contract also fail to show that the College's decision was pretextual. For example, Wade attempts to dismiss the student complaints about her that were documented and reported by Sonya Abu, the College's student retention officer. Wade asserts that the "vast majority" of the complaints came from one student. But as the Defendants note, Abu testified that one student acted as a spokesperson for others who were worried about confidentiality.

In sum, Wade has not met her burden of establishing an inference of retaliatory intent by the Defendants. Nor has she shown the Defendants' legitimate, non-discriminatory reasons for the non-renewal of her contract to be pretextual. Because of this, Defendants are entitled to summary judgment on Wade's retaliation claim based on the filing of her grievance asserting FMLA-protected rights.

### J.  Punitive Damages

Defendants seek an order that, as a matter of law, Wade is not entitled to punitive damages for violations of the FMLA, as sought in her complaint. As Wade acknowledges, the Ninth Circuit has stated that "[t]he FMLA only provides for compensatory damages and not punitive damages."[73]

---

[72] *See Xin Lu*, 347 F.3d at 1136 ("Where termination decisions rely on subjective evaluations, careful analysis of possible impermissible motivations is warranted because such evaluations are particularly 'susceptible of abuse and more likely to mask pretext'").

[73] *Xin Liu*, 347 F.3d at 1133 n.6; 29 U.S.C. § 2617(a).

In accord with this authority, Wade is not entitled to punitive damages in connection with her claims brought under the FMLA.

### K. Actual and Liquidated Damages

Defendants argue, in the alternative, that any damages for Wade's FMLA claims should be limited to actual damages. They assert that Tuthill, Taylor, and the College acted in good faith and had reasonable grounds for believing their actions did not violate the Act because Tuthill consulted the College's general counsel about Wade's leave request. Under 29 U.S.C. § 2617(a)(1)(A)(iii), an employer who violates the Act is liable for damages equal to the amount of any lost wages and other employment-related compensation, as well as any actual damages sustained as a result of the violation and interest thereon. The employer is also liable for liquidated damages equal to the amount of actual damages and interest, unless it can prove that it undertook in good faith the conduct that violated the Act and that it had "reasonable grounds" to believe that its conduct did not violate the Act.[74] Thus, the "good faith" exception has both a subjective and an objective element; the employer bears the burden of showing that it subjectively acted in good faith, and that its conduct was objectively reasonable.[75]

Wade responds that the Defendants failed to show good faith through their "repeated denials" of her leave requests and the Defendants' "insistence upon her obtaining proof that her medical leave could not wait until Christmas." Wade also attacks the Defendants' reliance on the conversations with the College's general counsel, Cheryl McKay. She argues that although McKay told Tuthill and

---

[74] 29 U.S.C. § 2617(a)(1)(A)(iii); *Bachelder*, 259 F.3d at 1130.

[75] *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 868 (8th Cir. 2006).

Taylor to reinstate Wade to a "reasonably equivalent" position, "they actively failed to abide by her advice," and, thus, their actions were not objectively reasonable. Wade also cites as evidence of a lack of good faith Taylor's alleged refusal to "process" her December grievance, the failure of Tuthill and Taylor to consult the FMLA or DOL regulations, and the College's non-renewal of her contract – which Wade characterizes as a "firing" – six weeks after her return from FMLA-protected leave.

Apart from the court's conclusion on Wade's reinstatement cause of action, Defendants have not met their burden of proving either the subjective or objective element of the good-faith exception. The Defendants' primary argument is that Tuthill's reliance on legal advice from McKay indicates a good faith attempt to comply with the law. In support of their motion, Defendants note that Tuthill had several conversations with McKay in the fall of 2003 regarding Wade's leave request. McKay testified that she spoke with Tuthill and Taylor during that time about Wade's request for leave. McKay also testified that she told them Wade needed to be restored to the "same or reasonably equivalent position" upon her return from FMLA-protected leave. Yet the evidence on summary judgment does not show that Defendants heeded this advice, because the third modules of Business Math and Business English were shifted to adjunct instructors and Wade was not assigned a "reasonably equivalent" course load upon return. Thus, even assuming that Tuthill and Taylor's consultation with McKay was evidence of subjective good faith, Defendants have not shown that their conduct was objectively reasonable with regard to the reinstatement claim. As to Wade's pre-leave interference claims, it is the employer's burden, as explained above, to determine whether a leave request is likely to be covered by the Act.[76] Here, the Defendants did not attempt to

---

[76] *Bachelder*, 259 F.3d at 1130.

properly determine if the FMLA applied to Wade's October 2003 requests for leave. In particular, they did not explicitly request a medical certification, the primary means provided by the statute and regulations for verifying the existence of a serious health condition. Accordingly, Defendants have failed, at the summary judgment stage, to establish that they acted in good faith.

### L. The FMLA Claims Against Tuthill and Taylor

As part of their summary judgment motion, Defendants argue that the FMLA claims against Tuthill and Taylor should be dismissed as a matter of law because they are public officials. In support of this, Defendants rely, primarily, on a Sixth Circuit case which held that the Act's text and structure do not support imposing liability on public agency employers.[77] Wade counters that both Tuthill and Taylor fall within the FMLA's definition of "employer" and that the "weight of case law," including dicta in a Ninth Circuit case, support imposing individual liability, including on public agency supervisors.

The Ninth Circuit has not squarely addressed this question. However,  as Wade notes, the court briefly addressed the issue in *Hibbs v. Nevada, Dep't of Human Resources*, stating:

> *While we agree with the other circuits that some supervisory employees can be sued as employers under the FMLA*, determining which supervisors qualify is not a straightforward matter, and it has not been briefed by the parties . . . [78]

The other circuits that have considered the question have split on the issue. The Sixth and Eleventh Circuits have held that a public official is not an employer for purposes of the FMLA when sued in

---

[77] *Mitchell v. Chapman*, 343 F.3d 811, 829 (6th Cir. 2003).

[78] *Hibbs v. Nevada, Dep't of Human Resources*, 273 F.3d 844, 872 (9th Cir. 2001) (emphasis added).

an individual capacity, while the Fifth and Eighth Circuits have reached the opposite conclusion.[79]

A number of district courts have also divided on the question, although it appears that a majority

have concluded that public employees may be held liable in their individual capacities.[80]

We agree with the approach of the circuits that have found liability may be imposed on

individual public agency employees. In particular, we find the Fifth Circuit's reasoning in *Modica*

*v. Taylor* to be persuasive. In *Modica*, the Fifth Circuit concluded that the FMLA's definition of

"employer" and the statute's express inclusion of public agencies as employers[81] subjects public

employees to potential liability under the Act.[82] Under 29 U.S.C. § 2611(4)(A)(ii)(I), the definition

of "employer" includes "any person who acts, directly or indirectly, in the interest of an employer

to any of the employees of such employer." Therefore, the *Modica* court reasoned, "if a public

employee 'acts, directly or indirectly, in the interest of an employer,' he satisfies the definition of

employer under the FMLA . . . "[83]

---

[79] *Compare Mitchell*, 343 F.3d at 832 and *Wascura v. Carver*, 169 F.3d 683, 687 (11th Cir. 1999) with *Modica v. Taylor,* 465 F.3d 174, 185-87 (5th Cir. 2006) and *Darby v. Bratch,* 287 F. 3d 673, 681 (8th Cir. 2002).

[80] *See Modica*, 465 F.3d at 184. *See, e.g., Morrow v. Putnam*, 142 F.Supp.2d 1271 (D.Nev. 2001).

[81] 29 U.S.C. § 2611(4)(A)(iii); see also 29 C.F.R. § 825.104(a) ("Employers covered by FMLA also include any person acting, directly or indirectly, in the interest of a covered employer to any of the employees of the employer, any successor in interest of a covered employer, and any public agency.").

[82] *Modica*, 465 F.3d at 184-86.

[83] *Id*. at 184.

36

In light of our adoption of the Fifth Circuit's approach to individual liability, this Court concludes that both Tuthill and Taylor may be held liable for violations of the FMLA. Both had sufficient supervisory authority over Wade to expose them to potential liability; Tuthill was Wade's direct supervisor and Taylor, as the human resources director, oversaw Wade's requests for leave. Accordingly, the Defendants' motion for summary judgment on this issue is denied.

**M. Wade's Due Process Claim**

The Defendants argue that Wade's § 1983 claim should be dismissed because she has failed to state a prima facie claim for violation of her due process rights. They assert that Wade's claim fails for the following legal and factual reasons: she had no constitutionally protected property interest in her employment with the College; she either waived her contractual right to arbitration or her due process rights were limited to the procedural rights provided by her one-year contract; she has not shown that she was injured by a longstanding practice or custom of the College; her FMLA claim cannot serve as the basis for her § 1983 claim; Tuthill and Taylor have qualified immunity from the § 1983 claim; and Wade is not entitled to punitive damages for the § 1983 claim.

Wade's § 1983 claim based on procedural due process requires the existence of a property right in her continued employment with the College.[84] In *Board of Regents of State Colleges v. Roth*, the United States Supreme Court explained the source of a property interest:

> Property interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an

---

[84] *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).; *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985).

independent source such as state law–rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.[85]

To show that she has a property right in continuing employment with the College, Wade must point to a sources or sources that provide a "legitimate claim of entitlement" to such a property interest.[86]

Wade asserts two bases for her property interest in continued employment: 1) her 2003-04 employment contract, which incorporated the College's employee handbook and the Board of Trustees' policies and regulations; and 2) a statement in the handbook that create a de facto tenure system. Neither argument is persuasive.

In support of her contract-based theory, Wade relies on language from four sections of the employee handbook that, she asserts, "promised that 'regular faculty' like Bobbi Wade would be retained from year to year." First, she points to a letter from College President Edna McLean stating, "I hope your employment with our College will be pleasant and long lasting." Second, she points to a section heading of the handbook that reads, "You're Part of Our Team . . ." Wade argues that these statements "comport with [her] understanding that the job was hers for as long as she wanted it."

Third, she relies on a section of the handbook addressing "Salary Administration and Performance Reviews." Within this section, Wade relies on the following statements: "Regular faculty evaluations will be completed annually prior to the end of their annual contract period," and "Evaluations shall be considered in employment retention, pay increase, promotion, lay-off, demotion, and disciplinary decisions." Wade interprets these statements to mean "if evaluations are

---

[85] *Board of Regents of State Colleges*, 408 U.S. at 577.

[86] *Id*. *See also Brown v. Independent Sch. Dist. No. I-06 of McCurtain Co., Okla.*, 974 F.2d 1237, 1239 (10th Cir. 1992).

positive, the employee will be retained." Fourth, Wade points to the statement, "Employees may be dismissed from employment for cause," under the handbook heading, "Termination for Cause."

Wade's contract-based argument fails for a number of reasons. Neither the language in the letter from McLean, nor the section heading entitled, "You're Part of Our Team . . . "can be construed as securing a property interest in re-employment with the College; nor has Wade cited any legal authority in support of this interpretation. Similarly, the statement, "Evaluations shall be considered in employment retention . . . " cannot be read as a binding promise that, as Wade suggests, if an employee receives positive evaluations that employee will be retained, through consecutive annual contracts, indefinitely. That the College promises to consider evaluations in retention decisions does not guarantee that such evaluations they will be given a particular weight; nor does it prohibit College officials from giving more weight to other factors in deciding whether to renew a faculty member's contract.

Finally, Wade's reliance on the "Termination for Cause" section of the handbook is misplaced. What is at issue here is not the termination of a valid contract, but rather the College's decision not to offer Wade a contract for the following academic year. Wade has pointed to no evidence that the College, through its handbook, policies, or practices, equated termination during the term of a contract with contract renewal.[87]   Thus, the handbook's statements regarding termination "for cause" have no bearing on the analysis of whether Wade had a property interest in re-employment arising from her 2003-04 contract.

---

[87] *See Cole v. Ruidoso Mun. Sch.*, 947 F.2d 903, 904 n.1 (10th Cir. 1991) (distinguishing "discharge" from "nonrenewal").

39

The fact that Alaska courts have held that an employee manual can modify an employment contract[88] is irrelevant to the instant case because none of the specific statements on which Wade relies created an objective expectation that her contract would be renewed. This is especially true given the explicit statements to the contrary in Wade's 2003-04 Faculty Appointment Letter[89] and the College handbook, which Wade does not address.

Wade's de facto tenure theory falls short as well. In support of this basis, she relies on *Perry v. Sindermann*, in which the United States Supreme Court held that the absence of an explicit contractual provision does not always foreclose the possibility that a faculty member has a property interest in re-employment.[90] In particular, the Court stated that: "A teacher . . . who has held his position for a number of years, might be able to show from the circumstances of this service – and from other relevant facts – that he has a legitimate claim of entitlement to job tenure" under an implied-contract theory. The Court also stated that:

> [T]here may be an unwritten 'common law' in a particular university that certain employees shall have the equivalent of tenure. This is particularly likely in a college or university . . . that has no explicit tenure system even for senior members of its faculty, but that nonetheless may have created such a system in practice.[91]

But the facts of *Perry* differ in a key respect from the case at bar. In that case, the Court found that the respondent had raised a factual issue as to whether language in a Faculty Guide and guidelines

---

[88] *See Jones v. Central Peninsula General Hospital*, 779 P.2d 783 (Alaska 1989).

[89] Wade's "Faculty Appointment Letter for 2003-2004" provides in relevant part: "It is understood by both the College and yourself that teaching positions at Ilisagvik College are untenured and one may not acquire tenured status by reason of this appointment."

[90] *Perry v. Sindermann,* 408 U.S. 593, 601-02 (1972).

[91] *Id.* at 602.

issued by state officials justified a legitimate claim to continued employment or tenure in the state college and university system.[92]    Specifically, the Court noted the existence of an "unusual provision" in the college's Faculty Guide which stated:

> The Administration of the college wishes the faculty member to feel that he has permanent tenure as long as his teaching services are satisfactory and as long as he displays a cooperative attitude toward his co-workers and his superior, and as long as he is happy in his work.[93]

By contrast, the basis for Wade's de facto tenure argument are the same statements quoted above from the College handbook that promise annual performance reviews for faculty and that "[e]valuations shall be considered in employment retention . . . " Unlike the language cited in *Perry*, these statements – for the reasons already stated – do not give rise to an expectation of tenure, particularly in light of the explicit statement in her contract that her position was untenured and that tenure could not be acquired.

In sum, Wade has not shown that she had a property interest in continued employment, or re-employment, with the College based on either her contract or a de facto tenure theory. Therefore, the Defendants were not obligated to provide Wade with a due process hearing in connection with the decision to not renew her employment contract. Given this, the Court grants summary judgment for the Defendants on Wade's § 1983 claim and dismisses her claim. As a result, the Court need not consider the alternative arguments on this issue, nor the Defendants' arguments regarding qualified immunity and punitive damages.

---

[92] *Perry*, 408 U.S. at 602.

[93] *Id*. at 600.

41

**N. Wade's Alaska Whistleblower Act Claim**

Defendants seek the dismissal of Wade's Alaska Whistleblower Act[94] claim on the grounds that the "protected activity" in which she engaged – filing a grievance against Tuthill for alleged violations of the FMLA – did not involve an issue of legitimate public concern, and because the College has established legitimate, non-discriminatory reasons for the non-renewal of her contract. Wade responds that her grievance was a matter of public concern because it reported alleged violations of federal law, and asserts that the Defendants' reasons for terminating her were pretextual.

To establish a prima facie claim for violation of the Alaska Whistleblower Act, a plaintiff must show that: (1) she has engaged in protected activity; and (2) the activity was a "substantial' or "motivating factor" in her termination.[95] An employer may rebut a prima facie case by showing that the employee would have been discharged even if she had not engaged in the protected activity. In turn, the employee may identify evidence that raises an inference that the reasons offered by the employer for the termination were pretextual.[96]

As an initial matter, we conclude that the substance of Wade's December grievance  was a matter of public concern. Specifically, Wade complained about the College's denial of her requests for leave and its failure to properly reinstate her upon her return from medical leave. However, Wade has not satisfied her burden of demonstrating that the filing of her grievance was a "substantial" or

---

[94] AS 39.900.100 *et seq*.

[95] *Lincoln v. Interior Reg'l Hous. Auth.*, 30 P.3d 582, 586 (Alaska 2001).

[96] *Id*. at 588.

"motivating factor" in her termination. Wade suggests that the passage of a "mere month" between the filing of her grievance establishes a link between her grievance and the non-renewal of her contract, but she offers no authority in support of this proposition.

Even assuming that Wade could establish a prima facie case, the Defendants have submitted evidence that her contract would not have been renewed regardless of the grievance. The Defendants' evidence, as discussed above, includes deficiencies in Wade's academic and professional credentials for her teaching position at the College and student complaints about her effectiveness and teaching style, as relayed by Sonya Abu.

Because Wade has failed to establish a prima facie case under the Whistleblower Act, and because Defendants have offered independent reasons for the non-renewal of her contract, the Court grants summary judgment to the Defendants on this issue and dismisses Wade's claim.


## IV.  CONCLUSION

For the reasons set out above, the **Defendants' Motion for Summary Judgment at Docket 85 is GRANTED in part and DENIED in part.** It is granted with respect to Wade's claims for 1) denial of her October 2, 2003 request for leave, 2) the non-renewal of her contract, 3) the handling of her December 2003 grievance or complaint, 4) retaliation and discrimination in connection with the exercise of her FMLA rights, 5) punitive damages, 6) violations of due process pursuant to § 1983, and 7) violation of the Alaska Whistleblower Act. Those claims are DISMISSED.

In addition, **Plaintiff's Motion for Summary Judgment at Docket 94 is GRANTED in part and DENIED in part.** It is granted with respect to her claim against the Defendants for failure to properly reinstate her after her return from FMLA-protected leave. It is denied with respect to the rest of her FMLA claims.

DATED this 28th day of March, 2008, at Anchorage, Alaska.


/s/ Timothy M. Burgess
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE